**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>     **Plaintiff,**<br><br>          **-against-**<br><br>**ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,**<br><br>     **Defendants,**<br><br>          **-and-**<br><br>**DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,**<br><br>     **Relief Defendants.** | **Civil Action No.:  5:21-cv-785-XR** |

**DEFENDANT ROBERT J. MUELLER'S BRIEF REGARDING USE OF FUNDS**

TO THE HONORABLE COURT:

     Pursuant to the Court's Order Freezing Certain Assets, Ordering an Accounting, and Preliminary Injunction of September 23, 2021 [Dkt. 7] (the "**Order**"), Defendant Robert J. Mueller ("**Mueller**") files this Brief Regarding Use of Funds and in support would respectfully show:

### I.     INTRODUCTION

     1.     The Securities and Exchange Commission (the "**SEC**") filed a Complaint [Dkt. 1] alleging that Mueller and the other Defendants violated the securities laws in various ways.  The

SEC has also sought to freeze (with limited exceptions noted in the Order) every penny received by Mueller during the approximately seven years that Mueller managed the investment funds and other entities that are the subject of this litigation.

2.     The scope of the SEC's proposed freeze is startling.  It would deprive Mueller of the ability to pay his child support, health insurance, rent, and other essentials of life mere weeks before Mueller's wife is due to give birth to their first child.  The proposed freeze would also prevent Mueller from retaining the counsel of his choice to defend against a criminal investigation regarding the same subject matter as the Complaint – an investigation that the SEC initiated by referring this matter to the Department of Justice.  In effect, the SEC is asking this Court for a knock-out blow: to deprive Mueller of the ability to pay for the immediate necessities of his family and defend against criminal charges, all before he has even filed an answer to the Complaint.

3.     The mere filing of a Complaint does not entitle the SEC to such sweeping relief. Indeed, Mueller intends to mount a vigorous defense to the allegations before him.  As detailed below, the SEC's allegations are not only unproven, the facts of this case (even as alleged) are complex and subject to numerous defenses.  Nonetheless, the parties have recognized the various legal and practical issues in litigating those facts at this stage – including the potential Fifth Amendment implications posed by the pending criminal investigation – and have agreed to narrow the issues before the Court.

4.     As reflected in the Order, the parties agreed to request that the Court freeze certain bank accounts, enjoin the dissipation of assets, and order an accounting of the Defendants' assets. The parties could not, however, agree on the full scope of the asset freeze and have deferred that issue to the Court under an abbreviated briefing schedule.  The Court need not resolve the merits of this case to address the scope of the freeze.  Rather, it need only consider certain records, along

with precedent that can guide the exercise of the Court's considerable discretion in setting the terms of an asset freeze.

5.      In particular, Mueller requests that the Court permit him to use up to $34,000 in his personal bank accounts to pay for child support, health insurance, and other critical living expenses up until the time at which his wife is expected to return to work after giving birth.  During that time, Mueller expects to seek alternative employment.  Mueller also requests that the Court permit certain funds currently held in trust by his counsel to be used to pay for defense against the criminal matter pending against Mueller.

## II.      BACKGROUND AND PROCEDURAL HISTORY

6.      Mueller has not filed an answer or other responsive pleading to the Complaint.  The following therefore merely summarizes the allegations in the Complaint, supplemented as noted by facts that are either undisputed or which Mueller expects to be presented later in this litigation. As expressly stated in the Joint Motion for an Asset Freeze, Accounting, and Preliminary Injunction [Dkt. 6] (the "**Joint Motion**") and recognized in the Court's Order, Mueller does not admit any allegations in the Complaint and expressly reserves the rights to answer, file a motion to stay this litigation, file dispositive motions, or otherwise contest the SEC's allegations.

7.      As alleged in the Complaint, Mueller is the founder and sole owner of the Deeproot family of companies, which includes Defendants Policy Services, Inc. and Deeproot Funds LLC (collectively, the "**Entity Defendants**") and Relief Defendants Deeproot Tech LLC, Deeproot Pinball LLC, Deeproot Studios LLC, Deeproot Sports & Entertainment LLC, and Deeproot Re 12621 Silicon Dr LLC (collectively, the "**Relief Defendant Entities**").  *See* Complaint ¶¶ 16-24.[1]

---

[1] Also named in the Complaint as Relief Defendants are Mueller, Jeffrey L. Mueller, and Belinda G. Breen, solely in their capacities as co-trustees of the MB Hale Ohana Revocable Trust.

8.      The Complaint alleges that Mueller solicited investments in two funds: the deeproot 575 Fund LLC (the "**575 Fund**"); and the deeproot Growth Runs Deep Fund LLC (the "**dGRD Fund**," and jointly with the 575 Fund, the "**Funds**").  *See id.* ¶¶ 25-27.  Mueller allegedly approved the drafting and dissemination of private placement memoranda ("**PPMs**"), along with other marketing materials.  *See id.* ¶ 28.

9.      The SEC further alleges that the PPMs described an investment strategy to purchase life insurance policies of people who had sold their policies for cash settlements while still alive. *See id.* ¶ 30.  The 575 Fund and/or dGRD Fund would be entitled to the death benefit of the purchased policies (i.e., the face value) upon "maturity" (i.e., the death of the insured).  *See id.* The PPMS also described certain regular payments that would be made to investors in the Funds. *See id.* ¶¶ 35-38.

10.     The SEC alleges that all versions of the PPMs for the 575 Fund and some versions of the PPMs for the dGRD Fund disclosed that the Funds could, at Mueller's sole discretion, make investments in certain affiliated businesses, including Deeproot Tech, LLC and Deeproot Pinball, LLC ("**Deeproot Pinball**").  *See id.* ¶ 31.

11.     The Complaint alleges that Mueller's management of the Defendant Entities and Relief Defendants violated the securities laws in three principal ways.

12.     First, the SEC alleges that Mueller made "Ponzi-like" payments in which payments to existing investors were made from new investor contributions to the fund.  *See id.* ¶¶ 43-53. The SEC also alleges that the PPMs did not provide reasonable notice to investors that investor funds would be used in this manner.  *See id.*  Notably, the SEC does not allege that the practice was a regular or significant use of investor funds, alleging that only $820,000 in new investor funds were used to pay previous investors (out of nearly $60 million raised).  *See id.* ¶¶ 41-53.

Mueller disputes the SEC's allegations, including its characterization of the payments as "Ponzi-like" and the allegation that the PPMs did not adequately disclose the payment of certain expenses.

13.     Second, the SEC alleges that Mueller improperly diverted the funds raised in the Funds to the affiliated entities, and to Deeproot Pinball in particular.  *See id.* ¶¶ 54-63.  The SEC does not appear to dispute that Deeproot Pinball was a real company, with a number of full-time employees, pinball parts and equipment with book values in the millions of dollars, intellectual property assets, and dozens of partially constructed pinball machines that were expected to retail for more than ten thousand dollars each.  The SEC also concedes – as it must – that the PPMs disclosed to investors that some portion of the funds would be invested in these affiliated entities, though they allege that more than the disclosed amount was invested in the entities.  *See id.* ¶ 31.  Finally, the SEC notes that a large portion of the investments raised since 2015 were used to purchase life insurance policies, though it alleges that no funds were used to purchase those policies since 2017.  *See id.* ¶ 54.

14.     Instead, the SEC alleges that Mueller, in effect, did not properly document the transfer of funds into Deeproot Pinball or the other affiliated entities.  The Complaint alleges that Mueller did not adequately document the purchase of equity interests in the entities by the funds, did not conduct sufficient analysis before spending funds on the affiliated entities, and otherwise expended funds in a manner that the SEC alleges would be unforeseeable to "reasonable" investors.  *See id.* ¶¶ 54-63.  Mueller disputes these allegations, including the contention that any failure to document a transaction appropriately amounted to a violation of the securities laws.

15.     Third, the SEC alleges that Mueller and the Entity Defendants misappropriated investor funds to Mueller's personal benefit.  *See id.* ¶¶ 64-71.  The Complaint identifies a handful of salacious examples of this alleged misappropriation, including the use of funds for medical bills,

jewelry, income tax payments, and a variety of personal expenses.  *See id.*  But the Complaint also alleges that the total compensation paid by all of the Defendant Entities and Relief Defendants to Mueller between 2015 and 2020 totaled $1.6 million in salary and $1.5 million in other expenditures.  *See id.* ¶¶ 65-66.  The total alleged salary payments and other payments thus averaged approximately $320,000 and $300,000, respectively, per year.  In an allegedly $60 million fund, these payments amounted to a little more than *5% of the alleged fund value*.

16.     As this litigation proceeds, in addition to reserving rights to challenge the totals alleged and their characterization, Mueller expects to show that such alleged totals are well within industry norms for the management of a fund of this size.  Mueller also expects to show that the direct payments were disclosed to the outside accountants for the Defendant Entities and the Relief Defendant Entities.  Finally, Mueller expects to show (as noted below) that the PPMs disclosed that Mueller would be provided compensation and that the funds may allocate various percentages of investor funds to administrative expenses.

17.     Mueller is not asking that the Court rule on the merits of any of the above arguments at this stage in the litigation.  The foregoing merely notes that the allegations in the Complaint are disputed.

### III.     THE DISPUTED ACCOUNTS

18.     The authority for a court to order asset freezes in SEC enforcement actions derives from a court's equitable powers to fashion the appropriate ancillary remedies necessary to grant full relief.  *See S.E.C. v. Manor Nursing Centers*, 458 F.2d 1082, 1103-04 (2d Cir. 1972); 15 U.S.C. § 78u(d)(5) ("[T]he Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.").  "[The] primary reason for ancillary relief is to maintain the status quo and to preserve assets for satisfaction of a future

judgment." *S.E.C. v. Harris*, Case No. 3:09-CV-1809-B, 2010 WL 11617972, at *3 (N.D. Tex. June 25, 2010).

19.     This Court has "broad equitable power in securities fraud cases to fashion appropriate ancillary remedies necessary to grant full relief." *S.E.C. v. AmeriFirst Funding, Inc.*, Civil Action No. 3:07-CV-1188-D, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007).  But in considering an asset freeze, the Court should also weigh "the disadvantages and possible deleterious effect of a freeze . . . against the considerations indicating the need for such relief." *Manor Nursing*, 458 F.2d at 1106.

20.     The parties' disagreement regarding the scope of the asset freeze presents an unusual procedural posture for the Court.  The parties agreed to avoid the preliminary hearing at which the Court would normally make the factual findings necessary to guide ancillary belief.  The parties are also not asking the Court to conduct such hearing in response to this briefing.  Instead, the parties ask the Court to use its broad equitable powers to define the scope of the asset freeze, in particular regarding the use of funds held or recently transferred from the Disputed Accounts. Mueller maintains that such a decision can be made based on the facts described below, which are believed to be undisputed or based on the records attached hereto.

### A. Mueller's Living Expenses.

21.     First, Mueller requests that the Court permit him to spend a limited amount of funds in his personal bank accounts to pay for reasonable living expenses.

22.     Courts exercising their discretion to fashion an asset freeze regularly permit defendants to use funds that would otherwise be frozen for reasonable living expenses.  In *S.E.C. v. Santillo*, for example, the district court noted that "[a]lthough the central purpose of an asset freeze is to preserve funds to satisfy a potential disgorgement order, courts routinely carve out

modest sums from asset freeze orders when necessary to meet the defendant's reasonable living expenses." 18-CV-5491 (JGK), 2018 WL 3392881, at *3-4 (S.D.N.Y. July 11, 2018). Similarly, in *S.E.C. v. North Star Finance, LLC*, the district court permitted a defendant to use funds that would otherwise be subject to an asset freeze for personal expenses for a period of 21 months. Case No.: GJH-15-1339, 2017 WL 476602, at *1-2 (D. Md. Feb. 3, 2017). Other courts are in accord. *See S.E.C. v. Thibeault*, 80 F.Supp.3d 288, 294-95 (D. Mass. 2015) (noting that SEC agreed to a "carve out" for reasonable living expenses and excluding such expenses from the asset freeze); *S.E.C. v. Dowdell*, 175 F.Supp.2d 850, 855 (W.D. Va. 2001) ("If the court has the authority to freeze personal assets temporarily, it logically has the corollary authority to release frozen personal assets, or lower the amount frozen." (internal quotation marks omitted)).

23.     A similar carve-out is appropriate in this case. As documented in the attached declaration, all of the bank accounts under Mueller's control (other than a juvenile account for his daughter) have either been frozen by the Order or are the Disputed Accounts addressed by this briefing. *See* Ex. A. Mueller seeks access to a limited portion of the funds in these accounts to pay for critical living expenses. These expenses include: (1) child support payments of $1,810.00 per month; (2) mortgage payments on the home in which Mueller and his wife live of $1,912.70 per month; (3) health insurance payments of $1,521.46 per month; (4) other insurance payments of approximately $400.00 per month; (5) credit card minimum payments of approximately $500.00 per month; and (6) other customary living expenses, including phone bills, groceries, electricity, and gas. *See id*.

24.     The income from Mueller's wife employment can offset these expenses to a limited degree, but she is due to give birth to the couple's first child by the end of the month. *See id.* She will not receive her full salary during much of the time in which she will be at home on

family/medical leave, which is expected to last through February of 2022.  As a result, Mueller estimates that he will need approximately $34,000 to cover reasonable living expenses until his wife can return to work, approximately $8500 per month.  *See id.*  Mueller also intends to seek alternative employment during that time and will keep the Court informed of his progress.

25.     The requested amount is consistent with (indeed, less than) the amount that the SEC agreed to permit Mueller to spend on personal expenses between the time the Order was entered and the time in which briefing on this request is complete – $10,000 for an approximately one-month period.  *See* Joint Motion at 9; Order at 8.  Mueller merely asks that the Court permit a similar expenditure of funds for the next four months, without prejudice to returning to the Court if he is unable to find employment.  The SEC's proposed alternative – no funds after the initial $10,000 – would effectively put Mueller and his wife in dire financial straits at a very vulnerable time.  There is no reason for the Court to indulge that sort of cruelty.

### B.  The Ohana Trust.

26.     Second, Mueller requests that the Court permit him to use funds held in trust by his counsel for his criminal defense.

27.     In 2016, Mueller, his father, and his stepmother created the MB Hale Ohana Revocable Trust (the "**Ohana Trust**").  Both Mueller and his parents contributed funds into the Ohana Trust for the purchase of two condominiums in Hawaii, one of which is the primary residence for Mueller's parents.  One of those condominiums was eventually sold and Mueller's share of the proceeds, approximately $290,000.00, was placed into a bank account at First Hawaiian Bank (the "**Ohana Trust Account**").

28.     The Complaint alleges that in 2016 and 2018 Mueller wired to the Ohana Trust a total of $270,000 directly from the account of Defendant Policy Services, Inc.  *See id.* ¶ 68.  It

further alleges that Mueller paid for renovations on one of the properties with a check for $59,000 drawn on one of the Defendant Entities' accounts.  *See id.*  The SEC has indicated the funds in the Ohana Trust Account could be subject to disgorgement in this action.

29.     After providing notice to SEC, Mueller wired a total of $137,000 from the Ohana Trust Account to his attorney's trust account.  Mueller's counsel has wired $50,000 out of those funds to the Relief Defendants' restructuring counsel, who has been exploring a potential Chapter 11 bankruptcy.[2]  Mueller's counsel has retained $87,000 in trust, pending ruling of the Court on whether such funds can be used for Mueller's criminal defense.  *See* Joint Motion at 5 n.2. Mueller's counsel has repeatedly asked the SEC for its position regarding whether the funds currently held in counsel's trust account could be used for Mueller's criminal defense.  SEC counsel repeatedly responded that the SEC could not take a position on the use of such funds.

30.     There are good reasons for the Court to exercise its discretion and permit the funds to be used for criminal defense.  The Supreme Court has warned that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis v. United States*, 136 S.Ct. 1083, 1088 (2016).  District courts evaluating asset freezes in SEC enforcement actions have thus protected defendants' Sixth Amendment rights by permitting the use of funds that are not traceable to the alleged fraud for criminal defense, even though such funds could otherwise be frozen to provide for a potential disgorgement remedy.  In *SEC v. Stanford Intern. Bank, Ltd.*, Civil Action No. 3:09-CV-298-N, 2009 WL 8707814, at *2-3 (N.D. Tex. Oct. 9, 2009), for example, the district court permitted the use of company insurance policies to pay for an individual defendant's criminal defense, despite the fact that those policies could have been

---

[2] Courts routinely approve the use of funds that would otherwise be frozen to serve the interests of investors.  *See Santillo*, 2018 WL 3392881, at *3.  Counsel has been in regular consultation with the SEC regarding these efforts, which are intended to preserve value for investors.

used to make restitution to alleged victims.  Similarly, in *S.E.C. v. Thibeault*, 80 F.Supp.3d at 204-95, the district court carved-out from the asset freeze the funds needed for criminal defense, noting that the SEC "has the burden of demonstrating that such funds are traceable to fraud."  *See also S.E.C. v. FTC Capital Markets, Inc.*, No. 09 Civ. 4755(PGG), 2010 WL 2652405, at *8 (S.D.N.Y. June 30, 2010) ("Because the Commission has not shown that the funds Lopez seeks are traceable to fraud, it may not deny her advancement of fees for purposes of her criminal defense.").

31.     Here, although the criminal case has not yet been charged,[3] there is no question that it exists.  The SEC created the criminal case by referring its Complaint to the United States Attorneys' Office, which has confirmed the ongoing investigation to Mueller's counsel.[4]  The SEC has also repeatedly represented that it could not take a position on whether funds already transferred to counsel's trust account could be used for a criminal defense.  That non-position may be relevant to this brief, but it does not bind a potential future receiver from attempting to recoup those funds or directing them to other purposes.  To ensure that Mueller's right to counsel of his choice is preserved, it is critical that the Court clarify whether Mueller may use these funds for his criminal defense.

32.     The funds in counsel's trust account are also not directly traceable to the alleged fraud.  Indeed, to the extent that these funds can be traced, they can be traced to Mueller's **salary**, not to the direct payments on Mueller's behalf that are the focus of the Complaint.  Mueller received salary from Policy Services, Inc. through direct deposit into one of his USAA accounts, along with various other deposits.  Between January 2019 and May 2021, Mueller transferred a

---

[3] The Sixth Amendment right to counsel does not formally adhere until indictment.  *See Davis v. United States*, 512 U.S. 452, 457 (1994).  But the Court retains discretion under its broad equitable powers to protect the interest preserved by the Sixth Amendment by permitting limited funds that otherwise might be available to pay for a disgorgement remedy to be used for criminal defense.

[4] Mueller denies that there is any basis for a criminal investigation and intends to vigorously dispute any such allegations.

total of approximately $137,000 from his USAA account to the Ohana Trust.  Bank records documenting those transfers are attached hereto as Exhibit A-1.[5]

33.     There is a meaningful difference between funds paid through salary and direct payments made on Mueller's behalf.  The PPMs disclosed to investors that Mueller would receive some compensation.  As an example, a PPM from 2020 told investors that Mueller would receive a salary from one of the affiliated entities:

> Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the 575 Fund. Robert is paid a salary from an affiliate for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed may earn a commission on any Class C Shares sold.  Any marketing or travel expenses on behalf of the 575 will be expensed by invoice.

Ex. A-2 (emphasis added).   Other PPMs told investors that between 2% and 20% of their investments would be advanced to pay for "compensation" and other expenses:

> The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.  Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier.

Ex. A-3 (emphasis added).

34.     To hold that funds paid to Mueller through payroll are tainted would constitute a ruling that Mueller was not entitled to *any compensation* for his years of work managing the Defendant Entities and Relief Defendant Entities.  There is no basis for such a sweeping ruling at this stage of the litigation, particularly given that it is the SEC's burden to prove that the funds are tainted, the above-referenced disclosures in the PPMs, and the undisputed fact that Mueller was the sole manager of a fund with real assets – including insurance policies, manufacturing equipment, and pinball parts and machines with book values in the multiple millions of dollars.

---

[5] The records attached as Exhibit A-1 are redacted to avoid disclosure of personal and other irrelevant information. If requested, unredacted versions of the records can be made available to the Court for in camera review or filed under seal.

*See FTC Capital Markets*, 2010 WL 2652405, at *7-8 (rejecting SEC argument that funds provided to the defendant were tainted because "money is fungible" and all the relevant assets were controlled by the defendant).  A freeze of these funds may particularly suspect in this case, as the SEC is seeking the asset freeze mere weeks after initiating the criminal investigation.

35.     Mueller therefore requests that the Court exercise its discretion and permit the use of the $87,000 held in Mueller's trust account to be used for Mueller's criminal defense.

## IV.     CONCLUSION

36.     For the forgoing reasons, Mueller requests that the Court permit him to use up to $34,000 in funds in the Disputed Account for personal expenses through February 2022, without prejudice to an additional request if necessary.  Mueller further requests that the Court permit him to use $87,000 currently in his counsel's trust account for criminal defense.  Mueller further requests all other relief, at law or in equity, to which he may be entitled.

Dated:  September 29, 2021

Respectfully submitted,

**DAVIS & SANTOS, P.C.**

By: */s/ H. Jay Hulings*
    Jason M. Davis
    State Bar No. 00793592
    Email:  jdavis@dslawpc.com
    H. Jay Hulings
    State Bar No. 24104573
    Email:  jhulings@dslawpc.com
    719 S. Flores Street
    San Antonio, Texas 78204
    Tel: (210) 853-5882
    Fax: (210) 200-8395

    ***Counsel for Defendant Robert Mueller***

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2021, the foregoing document was served on counsel of record via the Court's ECF system.

*/s/ H. Jay Hulings*
H. Jay Hulings
