**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> -against- <br><br> **ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,** <br><br> **Defendants,** <br><br> -and- <br><br> **DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,** <br><br> **Relief Defendants.** | **Civil Action No.:  5:21-cv-785-XR** |

**PLAINTIFF'S RESPONSE TO DEFENDANT ROBERT J. MUELLER'S BRIEF
REGARDING USE OF FUNDS SUBJECT TO ASSET FREEZE**

Robert Mueller induced hundreds of people to invest more than $60 million into his "safe" investment funds, including scores of investors who put their life savings under his control.  He appears to have spent nearly every penny.  While his investors, many of whom worked their entire lives for the money they entrusted to Mueller, are scrambling to figure out how to pay their bills and survive, Mueller, who has yet to obtain gainful employment, asks the Court to let him squander $8,500 per month out of what little remains of the money with which he was entrusted so that his lifestyle can continue uninterrupted.  Mueller also asks the Court to let him use at least $87,000 of

investor funds for legal representation in a hypothetical criminal action that may *or may not* occur at some unknown point in the future.  The Securities and Exchange Commission ("SEC") opposes his request in its entirety.

## I.    BACKGROUND

As alleged in the Complaint, Robert Mueller used his companies, Defendants Policy Services Inc. and deeproot Funds LLC, to mislead approximately 300 people to invest more than $58 million in two investment funds managed by Mueller and deeproot Funds. *See* Declaration of Sachin Verma ¶ 5 (Ex. A); Dkt. 1 at ¶¶ 1, 41.[1] Despite promising to invest a majority of the funds' assets in life insurance policies,[2] Mueller appears to have spent roughly $11 million of the $60 million raised on such policies, and instead used the vast majority of the funds' assets like a piggy bank to fund his affiliated businesses (the Relief Defendants). *See* Ex. A ¶ 10, Dkt. 1 at ¶¶ 5-6, 30, 54-55. Mueller also made Ponzi-like payments to earlier investors using new investor money when his affiliated businesses failed to generate meaningful revenue, *see* Ex. A ¶¶ 15-16, Dkt. 1 at ¶¶ 7, 43-53, and used assets of the funds to pay personal expenses when the funds obtained new

---

[1] Since filing the Complaint, the SEC has learned that Mueller raised at least $7.2 million more after being served with SEC investigative subpoenas in October 2020, *see* Ex. A ¶ 6, without an apparent disclosure to investors of the SEC's investigation. Notably, this included more than $155,000 raised from investors after June 25, 2021, *see id.* ¶ 8, the date on which Mueller was notified by the SEC staff that they were going to recommend to the Commission that it file this securities fraud action against him and his companies. Again, Mueller took these funds without any apparent disclosure of this development to investors. And nearly all of this $7.2 million has been spent, *see id.* ¶ 14, indicating that even in the face of an SEC investigation Mueller has no compunction about rapidly depleting investor assets and will continue to do so unless restrained. The SEC reserves the right to amend the Complaint to reflect these newly-discovered facts.

[2] The private placement memoranda (PPMs) that Mueller attached to his brief demonstrate the promises made to investors to invest at least a "simple majority" of fund assets in life insurance policies.  *See* Dkt. 15-1 at Ex. A-2 p. 6 of 14 (for the deeproot 575 Fund, "We will invest in Life Insurance Policies . . . as the simple majority of our Fund Assets"), Ex. A-3 at pp. 6-7 of 14 (for the deeproot Growth Runs Deep (dGRD) Fund, "We will invest in Life Policies" and make capital acquisitions in affiliated companies, while "limiting the capital acquisition component . . . to thirty percent (30%) of the asset portfolio").

investors' deposits. *See* Ex. A ¶ 11. Notably, when specifically asked during the SEC's investigation about paying for personal expenses with the assets of his investment funds, Mueller asserted his Fifth Amendment right against self-incrimination. Dkt. 1 at ¶¶ 8-9, 64-71.

As part of the Joint Motion for an Asset Freeze, Accounting, and Preliminary Injunction (the "Joint Motion"), Mueller agreed that the SEC could make the requisite "proper showing" to put an asset freeze in place based on the allegations in the Complaint. Dkt. 6 at 8-9.  The agreed-upon asset freeze as to the majority of Mueller's and his companies' bank accounts likewise reflects "a reasonable likelihood that defendants misappropriated investor funds for personal use and benefit, commingled investor funds with defendants' funds, placed investor funds in unauthorized investment vehicles, and used investor funds for undisclosed purposes." *SEC v. Amerifirst Funding Inc.*, Civil Action No. 3:07-CV-1188-D, 2007 WL 2192632, *4 (N.D. Tex. July 31, 2007). As Mueller recognizes, the purpose of an order to "freeze defendants' assets [is] to preserve the status quo and prevent dissipation of ill-gotten gains so that they remain available to fund subsequent disgorgement orders and civil penalties." *Id.* at *3 (citing *SEC v. Brooks,* 1999 WL 493052, at *2 (N.D. Tex. July 12, 1999)); *SEC v. Harris*, Case No. 3:09-CV-1809-B, 2010 WL 11617972, at *3 (N.D. Tex. June 25, 2010) (freezing "cash assets, which are fungible, and as sufficient nexus has been shown that would allow disgorgement"); Dkt. 15 at 6-7 ¶ 18 (quoting *Amerifirst Funding* and *Harris*).

The Court's September 23, 2021 Order Freezing Assets, Ordering An Accounting, And Preliminary Injunction ("September 23 Order") froze twenty-four of Mueller's personal and corporate bank accounts that hold (with his attorneys' trust accounts) roughly $400,000 of investor money, including roughly $125,000 deposited by an investor as recently as mid-August 2021. Dkt.

7 at 3-4. Mueller now declares he has no accounts other than those listed in the Order.[3] The

September 23 Order, however, requires Mueller and each of the Defendants and Relief Defendants

to provide sworn accountings of all investor funds received by them, the subsequent disposition of

those funds, detail their holdings of any and all non-monetary assets, and identify all bank and

brokerage accounts held in their names or for their benefits. Dkt. 7 at 5-6. That has not yet occurred.

As the parties have agreed there is an appropriate basis for imposing an asset freeze, only

two issues remain before the Court. *First*, whether the Court will allow Mueller to use $8,500 per

month of other people's money to fund his lifestyle and pay unverified personal expenses. *Second*,

whether Mueller can use such money to fund his legal defense of both this action and a theoretical

criminal indictment. The Court should deny both requests.

## II.      MUELLER SHOULD NOT BE ALLOWED TO USE INVESTOR MONEY TO FUND HIS LIFESTYLE AND PAY PERSONAL EXPENSES

### A.      Including the Disputed Accounts in the Asset Freeze is Appropriate

As Mueller notes, "[the] primary reason for ancillary relief is to maintain the status quo

and to preserve assets for satisfaction of a future judgment." *Harris*, 2010 WL 11617972, at *3.[4]

Here, the potential disgorgement at this early stage of litigation could be more than $60 million, a

---

[3] Mueller is conspicuously precise when he states "there are no *bank* accounts *in my name* other than those listed in the Order," Dkt. 15-1 at ¶ 2 (emphasis added), but he makes no mention of bank accounts that exist for his benefit or upon which he might draw. This includes at least one account belonging to his wife that received $5,000 traceable to investor money, a newly-discovered fact that may necessitate amending the Complaint to add her as a relief defendant. Nor does he identify (or expressly disclaim) any investment or retirement accounts in his name or held by others for his direct or indirect benefit.  Mueller will of course have to disclose such other accounts as part of the Court-ordered accounting. Dkt. 7 at 6; *see, e.g.*, *SEC. v. Dobbins*, No. Civ.3:04–CV–0605–H, 2004, WL 957715, at *3 (N.D. Tex. April 14, 2004) (discussing disclosure of wife's work and separate property as a means to pay for living expenses).

[4] *Accord SEC v. Unifund SAL*, 910 F.2d.1028, 1041 (2d Cir. 1990); *Kohler v. McClellan*, 156 F.2d 908, 911 (5th Cir. 1946).

vastly larger sum than the approximately $400,000 in cash left in all of Mueller's accounts combined.[5] Even if the Court were to look solely at amounts Mueller misappropriated from investors to make extravagant purchases and pay personal expenses, which would be roughly $1.5 million,[6] that is still nearly four times larger than the available assets presently at issue before the Court. Accordingly, an asset freeze that preserves what little remains – *i.e.*, to preserve the *status quo* – for potential return to investors is appropriate. *See SEC v. Dobbins*, No. Civ.3:04–CV–0605–H, 2004 WL 957715, at *3 (N.D. Tex. April 14, 2004) ("The Court has a duty to ensure that Defendant's assets are available to make restitution to the alleged victims."); *SEC v. Current Financial Systems*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999)( holding that "[t]o ensure compensation to the victims in this case, the Court finds it reasonable to maintain the freeze order because plaintiff has demonstrated that the potential disgorgement it could receive in this case far exceeds the amount that is frozen in the account.").

### B.    Mueller Has Not Established the Need For a Carve Out

It is in this context that Mueller now asks the Court to let him spend $8,500 per month from the Disputed Accounts to cover personal expenses including child support payments ($1,810), rent payments which the SEC understands are made *to his father* ($1,912), health insurance ($1,521), "other insurance" (presumably for his luxury automobile, $400), "credit card minimum payments and/or interest payments" ($500), and (by mathematical deduction) roughly $2,500 for "*other customary living expenses* including phone bills, groceries, electricity, and gas." Dkt. 15 at ¶ 23

---

[5] This approximate amount is based on the information the SEC has obtained to date and could of course change in the course of discovery. This amount does not include any penalties the SEC is seeking in this action.

[6] *See* Ex. A ¶ 11. It bears noting, again, that when investigative testimony turned to Mueller's use of assets of his investment funds to fund these purchases and expenses, Mueller asserted his Fifth Amendment right against self-incrimination. Dkt. 1 at ¶¶ 9, 71.

(emphasis added); Dkt. 15-1 at 1-2 ¶ 5 (including "car payment" which the SEC understands is a Lexus).[7] Mueller's request to pay rent *to his father* and credit card minimums and interest, and spend a glaring $2,500 per month for food and utilities, from money with which he was entrusted and that could be used to recompense defrauded investors, many of whom have lost their entire retirement savings, is particularly galling. Incredibly, and in contrast to what was required in every case on which he relies, Mueller provides no evidentiary support for any of these professed expenses or a detailed explanation of how the bank records he attached to his declaration might reflect them. *See, e.g., Dobbins,* 2004 WL 957715, at *3 (requiring detailed information about defendant's expenses including $2,000 for "unspecified and unsupported" personal expenses).[8]

Moreover, before any determination of whether a carve out from an asset freeze for living expenses is appropriate, courts have routinely required a full accounting of the defendants' full financial condition and monies directly or indirectly available to them. *See e.g. SEC v. Dowdell,* 175 F. Supp. 2d 850, 854 (W.D. Va. 2001) ("Courts which have addressed requests for living expenses look for evidence of the defendant's overall assets or income…."); *Dobbins,* 2004 WL 957715, at *3; *SEC v. Duclaud Gonzalez de Castilla,* 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) (denying carve out for living expenses because defendants had not provided sufficient accounting

---

[7] Contrary to Mueller's characterization, the SEC did not agree that Mueller could spend $10,000 on personal expenses "in one month," thereby making his $8,500 per month request somehow more reasonable by comparison. Dkt. 15 at 9 ¶ 25. To be clear, the SEC only acquiesced to the $10,000 while the court otherwise considered Mueller's request – however long that may take – because Mueller made clear through counsel that he would otherwise spend the money while the Court considered a freeze order.

[8] Mueller states that his spouse "will not receive her *full* salary" while on maternity leave, Dkt. 1 at 8 ¶ 24 (emphasis added); Dkt. 15-1 at Ex. A ¶ 4 (same), but fails to disclose any information how much she will receive during that time that could pay some of the Mueller family's living expenses. *See, e.g., Dobbins,* 2004 WL 957715, at *3 (discussing disclosure of wife's work and separate property that could be used for living expenses); *SEC v. Dowdell,* 175 F. Supp. 2d 850, 854 (W.D. Va. 2001) (allowing or some use of frozen money for living expenses in part because defendant's spouse only made $100 per month).

their assets). The rationale for this requirement is self-evident: to ensure that, before investor funds are potentially invaded or dissipated, all of the defendant's other resources for living expenses are exhausted. *Dobbins*, 2004 WL 957715, at *3 ("the Court must consider whether the defendant possesses assets not subject to forfeiture that could supply living expenses."); *see e.g. SEC v. Coates*, 1994 WL 455558 (S.D.N.Y. 1994) (denying carve out for living expenses in part because the defendant failed to tell the court that the receiver was already paying monthly salaries to him and his family). Because Mueller has yet to satisfy this requirement with a full accounting of his assets, his request is not only brazenly unsubstantiated and excessive, it is also entirely premature.[9]

Lastly, although a showing of traceability is not required to impose an asset freeze or deny a carve out for expenses,[10] it is worth noting that the funds Mueller seeks to use for personal expenses here are derived from the very sort of illegal activity alleged in the Complaint. Namely, that Mueller misappropriated funds from investors to support his own personal lavish expenditures. Dkt. 1 at ¶¶ 8-9. 64-71. Based on representations from Mueller's counsel, all or nearly all of the funds Mueller is asking this Court to release from the PCB account are proceeds from the sale of vintage or collectible pinball machines, which Mueller purchased for his own personal use with company credit cards and then paid the resulting credit card bills with funds he withdrew from the deeproot funds or the Entity Defendants – funds the SEC has alleged came entirely from investor deposits. Mueller may ultimately dispute whether such activity was in fact improper, but given that these funds undisputedly flow directly from the very activity alleged in the Complaint, it would

---

[9] Pursuant to the September 23 Order, Defendants' sworn accounting is due by October 14, 2021. Dkt. 7 at 5.

[10] *See SEC v. Grossman,* 887 F. Supp. 649, 661(S.D.N.Y. 1995) (stating that "it is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity").

be entirely inequitable at this stage to allow Mueller to dissipate such assets to support his unverified personal expenses. The *status quo* should be preserved.

### C.     <u>Mueller Relies on Inapposite Authority</u>

In seeking a carve out for living expenses, Mueller relies on a number of SEC cases that are largely inapposite to the relief he seeks. Mueller first cites *SEC v. Manor Nursing Centers, Inc.*, Dkt. 15 at 7 ¶19, which discussed whether an asset freeze might "thwart the goal of compensating investors" by disrupting the corporate defendants' *on-going* business affairs – not an issue in this case. 458 F.2d 1082, 1106 (2d Cir 1972). By contrast, Mueller seeks a carve-out from frozen personal accounts for personal expenses and there is no argument or concern here that an asset freeze might endanger the on-going operations of his businesses to the detriment of investors. Dkt. 15, at 6. Here, quite the opposite is case, the asset freeze was imposed to *preserve* what little funds may be left for investors and to halt Mueller's diminution of investor assets. *See Harris*, 2010 WL 11617972, at *4 (discussing this distinction as it relates to *Manor Nursing)*. Moreover, the court in *Manor Nursing* otherwise *affirmed the asset freeze* that was put in place because "the [district] court could not be assured that [defendants] would not waste their assets prior to refunding public investors' money." *Manor Nursing Ctrs..*, 458 F.2d at 1106. Mueller then cites two Northern District of Texas decisions, *Amerifirst Funding* and *Harris*, Dkt. 15 at 6-7 ¶¶ 18-19, both of which appear to have frozen defendants' assets without any carve out for living expenses, with the *Harris* court expressly stating it was freezing cash assets because they are fungible. *Harris*, 2010 WL 11617972, at *3; *Amerifirst Funding*, 2007 WL 2192632 at *3.

Mueller rests his claim for using $8,500 per month from the PCB account to pay living expenses on several other SEC cases, yet those too do not support his requested relief. Dkt. 15 at 8-9 ¶24. In the first case, *SEC v. Santillo*, the Court allowed the defendant to pay living expenses

out of "future commissions" that may be earned by his businesses after the entry of an asset freeze order, not out of money actually frozen by the order or that was derived from actions alleged in Complaint as is the case here. *SEC v. Santillo*, See 18-CV-5491 (JGK), 2018 WL 3392881, at *3-4 (S.D.N.Y. July 11, 2018).[11] The decision in *SEC v. North Star Finance Leasing, LLC*, No. GJH-15-1339, 2017 WL 476602 (D. Md. Feb. 3, 2017), is at best a cautionary tale that is particularly applicable here. While the court in *North Star Finance* allowed the defendant (who, like Mueller, was unemployed but promised the court he would seek employment) to use frozen assets to pay "necessary and reasonable living expenses," it also lamented that the defendant "nearly exhausted the funds frozen for defrauded investors . . . rendering the freeze meaningless." *Id*. at 1 (noting that "despite having come into the asset freeze reporting only $10,785.35 in assets, … $144,903.44 of the $328,546.46 in funds originally frozen . . . has been whittled away."). This is the very scenario the SEC seeks to avoid repeating here. In *SEC v. Thibeault*, 80 F. Supp. 3d 288 (D. Mass. 2015), where the SEC apparently agreed to a carve out of some indeterminate amount for "limited living expenses," the defendant was ordered to repatriate $8.5 million of investor money that he had sent overseas, *id*. at 294-95. By contrast, Mueller has spent nearly all of the more than $60 million he raised from investors and appears to have less than $400,000 in cash available to satisfy any potential judgment.  Finally, in *SEC v. Dowdell*, 175 F. Supp. 2d 850 (W.D. Va. 2001), the court, with some assent from the SEC, allowed defendants to use some frozen funds to pay living expenses only after seeing *detailed evidence* of such expenses and only after Dowdell disclosed that his wife only makes $100 per month.  *Id*. at 854.

---

[11] The *Santillo* court also reduced defendant's request for $12,535 per month down to $5,000 because (like Mueller) Santillo offered no documentation of his living expenses and included (like Mueller) expenses that "cannot be characterized as necessary living expenses." *Id.* at *4.

Because Mueller has squandered all but roughly $400,000 of the more than $60 million raised from investors, the SEC urges the court to "preserve the status quo" and deny Mueller's request to spend $8,500 per month from the Disputed Accounts in order to "prevent [further] dissipation of [Mueller's] ill-gotten gains so that they remain available to fund subsequent disgorgement orders and civil penalties." *Amerifirst Funding*, 2007 WL 2192632 at *3.

## IV.   THE COURT SHOULD REJECT MUELLER'S REQUEST TO USE INVESTOR MONEY TO PAY ATTORNEYS' FEES

Mueller indicates that his counsel in this matter received $137,000 from the Ohana Trust Account prior to it being frozen by the Sept. 23 Order (Dkt. 7 at 4 B.1), of which they hold $87,000 in a trust account after transferring $50,000 to the entity Defendants' and Relief Defendants' restructuring counsel.  Dkt. 15 at 10 ¶ 29.[12] Mueller seeks to use these funds to pay legal expenses. In doing so, however, Mueller attempts to ignore the applicable standard in a civil enforcement action. Courts have uniformly held, and all of the authority on which Mueller relies make clear, that "[t]o unfreeze assets to pay for attorneys' fees in any civil action, including an SEC civil enforcement action, '*the defendant* must establish [1] that the funds he seeks to release are untainted *and* [2] that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established.'" *Santillo*, 2018 WL 3392881, at *4 (emphasis added) (quoting *SEC v. Stein*, No. 07-cv-3125, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009)) (cleaned up); *Thibeault*, 80 F. Supp. 3d at 294 (citing *SEC v. FTC Capital Markets, Inc.*, No. 09 Civ. 4755(PGG), 2010 WL 2652405, at *8 (S.D.N.Y. June 30, 2010)). "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime."

---

[12] It is unclear how Mueller's counsel in this action is being compensated and begs the question whether the source of such funding holds more money for Mueller's benefit that should be reflected in the accounting ordered by the September 23 Order.

*Dobbins*, 2004 WL 957715, at *3 (quoting *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir.1993)). Mueller has not argued (nor could he) that the money at issue is untainted by the alleged fraud; indeed, his entire brief effectively concedes that the money flows entirely from the investors' deposits with his funds that underlies the SEC's allegations. As noted above, because potential disgorgement ranges anywhere from $1.5 million to $60 million, Mueller clearly cannot demonstrate that there are sufficient frozen assets to pay any reasonable theory of disgorgement. Accordingly, the Court should preclude him from using any money that might be subject to an asset freeze – including those in defense counsel's trust account – to pay defense counsel fees in this lawsuit. *Santillo*, 2018 WL 3392881, at *4 (citing cases).

As to Mueller's plea that the Court should permit him to fund a criminal defense from money drawn from the Ohana Trust Account, Mueller is unable to cite to any authority that supports such a proposition. Indeed, Mueller effectively concedes that the request is, at best, premature. Dkt. 15 at 11 n. 3. Mueller states that the U.S. Attorney's Office in San Antonio recently began a criminal *investigation* after the SEC filed its complaint in this action but concedes, as he must, that no criminal case "has yet been charged." *Id.* at 11 ¶ 31.[13] Indeed, much of Mueller's authority makes clear that when "[n]o criminal proceeding has been initiated . . . he has no ripe Sixth Amendment right to counsel." *Santillo*, 2018 WL 3392881, at *5; *see also, e.g.*, *Thibeault*, 80 F. Supp. 3d at 294 (use allowed only for indicted parallel criminal proceeding); *FTC Capital Markets, Inc.*, 2010 WL 2652405, at *8 (use allowed after charging documents had been unsealed). In Mueller's case, not only is there no criminal indictment, there does not yet even appear to be a

---

[13] Mueller asserts that "the SEC created the [nonexistent] criminal case by referring its Complaint to the U.S. Attorney's Office," *id.*, yet the decision to begin a criminal investigation rests solely with attorneys in that office and not the SEC.  Clearly, the SEC has no ability or authority to "initiate" a criminal proceeding and the fact that the U.S. Attorney's Office *might* take action upon receiving the SEC's publicly-filed Complaint has no relevance to this proceeding.  Dkt. 15 at 13.

criminal subpoena or warrant issued against Mueller or his companies. Accordingly, the Court should deny his request to use assets that are subject to a freeze to pay criminal defense counsel.

Even if Mueller's request to use investor funds for criminal defense were not premature, "the use of frozen assets to pay attorney fees can be disallowed even in criminal cases," *Dobbins*, 2004 WL 957715, at *2. Notably, Mueller's own case law conflicts on whether the SEC or Mueller bears the burden of demonstrating that funds sought to be used for criminal defense are or are not traceable to the fraud. *Compare Thibeault*, 80 F. Supp. 3d at 295 (burden is on the SEC) *with Santillo*, 2018 WL 3392881, at *5 ("A defendant may seek to unfreeze assets to pay for attorneys' fees in any criminal action if the defendant can establish that the assets are not traceable to fraud.") (citing cases). The SEC disputes Mueller's characterization that the funds he seeks to use for criminal defense counsel "are . . . not directly traceable to the alleged fraud." Dkt. 11 at ¶ 32. As Mueller's case law explains, "'[f]unds are traceable to fraud when they are 'the proceeds of fraud.'" *Santillo*, 2018 WL 3392881, at *5 (quoting *FTC Capital Markets, Inc.*, 2010 WL 2652405, at *7).[14] Here, the SEC contends that every penny that Mueller has taken out of Policy Services' or deeproot Funds' bank accounts over the past six years came from investor deposits with his funds, thus every penny at issue is "the proceeds of fraud." *Id*. The SEC reserves all rights to object to any future request from Mueller to use frozen assets or money in counsel's trust account to pay for criminal defense counsel if and when that issue becomes ripe for the Court's consideration.

---

[14] In addition, as with living expenses, courts typically wait until the defendant has provided a sufficient and complete accounting before determining if a carve out for legal expenses is appropriate.  *See Dobbins*, 2004 WL 957715, at *2 (denying request for legal expense carve out because defendants had not yet made an accounting and thus the court could not "tell what other resources Defendants have for the payment of attorney fees.").

## CONCLUSION

For the foregoing reasons, Mueller's request to further dissipate funds that otherwise could (and should) be used to repay Defendants' victims should be denied.

Date: October 6, 2021          Respectfully submitted,

*/s/ Christian D. H.Schultz*
Christian D. H. Schultz
Assistant Chief Litigation Counsel
David Nasse
Trial Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4740 (Schultz)
(202) 551-4414 (Nasse)
schultzc@sec.gov
nassed@sec.gov

*Counsel for Plaintiff United States Securities and Exchange Commission*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 6th day of October, 2021, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, which will send copies to all counsel of record.

*/s/ Christian D. H. Schultz*
Christian D. H. Schultz

*Counsel for Plaintiff United States Securities*
*and Exchange Commission*
