**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>    **Plaintiff,**<br><br>        **-against-**<br><br>**ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,**<br><br>    **Defendants,**<br><br>        **-and-**<br><br>**DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,**<br><br>    **Relief Defendants.** | **Civil Action No.:  5:21-cv-785-XR** |

<u>**DEFENDANT ROBERT J. MUELLER'S REPLY BRIEF REGARDING USE OF FUNDS**</u>

TO THE HONORABLE COURT:

        Pursuant to the Court's Order Freezing Certain Assets, Ordering an Accounting, and Preliminary Injunction of September 23, 2021 [Dkt. 7] (the "<u>**Order**</u>"), Defendant Robert J. Mueller ("<u>**Mueller**</u>") files this Reply Brief Regarding Use of Funds and in support would respectfully show:

1

## I.     <u>INTRODUCTION</u>

1.      Plaintiff Securities and Exchange Commission (the "<u>SEC</u>") appears to believe that the parties are at the end of this case, rather than at its beginning.

2.      In its Response to Defendant Robert J. Mueller's Brief Regarding Use of Funds Subject to Asset Freeze [Dkt. 16] (the "<u>Response</u>"), the SEC asks this Court to deprive Mueller of his ability to pay his child support, feed and house his family, pay for health insurance and medical expenses related to the upcoming birth of his child, and defend himself against a criminal investigation instigated by the SEC.  Yet the basis for this draconian set of punishments is nothing more than a Complaint.  The Defendants have not yet filed an answer and currently dispute all of the SEC's allegations of wrongdoing.  No discovery has been conducted, no witnesses have testified, and the Court has not been asked to make any findings of fact.  The process through which the SEC must bear its burden of proof has only just begun.

3.      Even in the present set of briefs, the parties are not asking the Court to make any findings regarding the ultimate questions in this case.  Instead, the parties have agreed to forgo the evidentiary hearings that would normally accompany a request for an asset freeze, to suspend the operations of the entity Defendants and Relief Defendants, and to freeze their assets and some of Mueller's, pending a potential bankruptcy filing and supervision of the Court.  The only disagreement addressed by these briefs is the extent to which a small portion of these funds may be used to pay for Mueller's personal expenses and criminal defense.  That question is an exercise of the Court's equity powers, subject to considerable discretion.  The parties have entrusted the Court to balance the needs and interest of investors and Mueller (and his family), subject to constitutional and statutory limitations.

4.      Mueller's Brief Regarding Use of Funds [Dkt. 15] ("**Mueller's Brief**") emphasized the extent to which the facts relevant to the Court's decision are undisputed.  The SEC's Response is suffused with hyperbole and multiple misleading characterizations of the facts, several of which are discussed in detail below. But the Response also contains multiple critical concessions of fact and law.  For instance, the SEC does not dispute that the Court has the authority to allow Mueller to use some funds that could otherwise be frozen for personal expenses, as is routinely permitted by courts around the country.  The SEC merely demands that Mueller first complete an accounting, which the Court has already ordered and will be completed before the hearing in this matter. Similarly, the SEC does not appear to dispute that that the Court has the discretion to permit funds that are not traceable to any alleged fraud to be used for a criminal defense.  The parties merely disagree as to how the Court should exercise that discretion.

5.      Mueller is entitled to hold the SEC to its burden.  He is entitled to assert defenses, cross-examine witnesses, and challenge the legal foundations of the SEC's claims.  The SEC may not deprive Mueller of these rights merely by filing a Complaint.  Mueller instead asks that the Court focus on the narrow questions currently before it and exercise its considerable discretion to determine a fair and equitable asset freeze, including by permitting the use of limited funds for personal expenses and a criminal defense.

## II.      MUELLER'S USE OF FUNDS FOR PERSONAL EXPENSES

6.      The SEC's opposition to the use of funds in the Disputed Accounts for Mueller's personal expenses is premised on multiple assertions of fact that, at best, are incomplete and misleading.  Those assertions are also largely irrelevant to the question before the Court, which is whether Mueller should have the ability to house and feed his family as this litigation proceeds.

## A.  The funds in the Disputed Accounts are not "investor funds."

7.      The Response's claim that the funds in the Disputed Accounts are "investor funds" is highly misleading.  As the SEC admits in its brief, Mueller has informed the SEC that the funds were proceeds from the sale of Mueller's personal assets.[1]  In 2015, 2016, and 2018, Mueller purchased multiple pinball machines on credit cards.  The balance on those credit cards was later paid by one of the entity Defendants as part of the non-payroll compensation provided to Mueller. Mueller later sold several of those machines and placed those funds in the Disputed Accounts with the intention of using those funds to pay his living expenses.

8.      These funds are thus only "investor funds" if the Court were to accept the SEC's maximalist interpretation of the facts—and it should not.  As noted in Mueller's Brief, the Complaint concedes (or it is undisputed) that Mueller managed real companies, with assets worth millions of dollars, and (until recently) dozens of employees.  The PPMs also disclosed to investors that some funds would be used for administrative expenses, including compensation for Mueller. *See* Mueller's Brief Ex. A-2, Ex. A-3.  Whether that compensation was appropriate, properly disclosed, and/or properly accounted for will likely be central issues in this case.  But, at this stage of the litigation, the SEC has proven nothing.  All that is before the Court is that the CEO of a $60 million-plus investment fund received compensation, some of which he used to purchase pinball machines.

9.      In any event, the question of whether these funds are "investor funds" is irrelevant. The Court has the authority to freeze or unfreeze assets of a Defendant to help pay for a future judgment.  It does not need to trace any funds to investors or to any alleged fraud (except in relation to protection of 6th Amendment rights to counsel, as discussed below).  Indeed, the cases that

---

[1] Mueller also provided the SEC with documents to corroborate the purchase and sale of these pinball machines. These documents can be made available to the Court for in camera review or filed in redacted form if requested.

permit defendants to use frozen assets to pay for personal expenses do not attempt to determine whether the funds to be unfrozen are traceable to investors. *See, e.g.*, *S.E.C. v. Santillo*, 18-CV-5491 (JGK), 2018 WL 3392881, at *3-4 (S.D.N.Y. July 11, 2018); *S.E.C. v. North Star Finance, LLC*, Case No.: GJH-15-1339, 2017 WL 476602, at *1-2 (D. Md. Feb. 3, 2017); *S.E.C. v. Thibeault*, 80 F.Supp.3d 288, 294-95 (D. Mass. 2015); *S.E.C. v. Dowdell*, 175 F.Supp.2d 850, 855 (W.D. Va. 2001). The Response's characterization of the funds in the Undisputed Accounts thus appears to be little more than an attempt to shade this Court's opinion of Mueller and should be ignored.

### B. <u>The Response mischaracterizes the potential penalties and the assets at issue in this litigation.</u>

10.    The Response claims that the potential disgorgement could be more than $60 million, which is misleading in multiple ways. That figure assumes, of course, that the SEC can actually prove liability and demonstrate its entitlement to disgorgement. But it also assumes that virtually every penny received from investors was obtained through fraud. That contention is simply not tenable under the alleged and undisputed facts, which include some of those funds were used to purchased insurance policies and that the PPMs disclosed that a substantial portion of the funds raised would go to pinball and other affiliated businesses.

11.    The alleged facts also do not support a $60 million disgorgement award from Mueller personally. Disgorgement is an equitable remedy that is intended to return ill-gotten gains. *See Liu v. Securities and Exchange Comm'n*, 140 S.Ct. 1936, 1941 (2020). It is therefore ordinarily limited to the amounts received by a particular defendant, net of legitimate expenses. *Id.* at 1950-51. The Complaint concedes that Mueller's total compensation was a little more than $3 million. Complaint [Dkt. 1] ¶¶ 65-66. Even if a jury and the Court were to accept every one of the SEC's allegations as true—and Mueller expects to mount multiple defenses to these allegations—a

disgorgement remedy from Mueller would likely be limited to the approximately $3 million that he received, less legitimate expenses.

12.     Finally, the SEC notes that there is approximately $400,000 in cash left in all of the accounts, including those of the Relief Defendants and in Mueller's personal accounts.  But it fails to note that these entities still control ***other assets*** that, while less liquid, are still worth millions of dollars, including life insurance policies, partially completed pinball machines, manufacturing equipment, and pinball parts.  These liquidity problems were only exacerbated by the SEC's own actions, including the filing of the Complaint in the middle of Mueller's attempts (coordinated with the SEC) to identify a potential DIP-lender for a Chapter 11 bankruptcy.

### C.  The Response mischaracterizes Mueller's personal expenses.

13.     The Response also inaccurately characterizes Mueller's personal expenses.  The Response notes, for example, that Mueller pays rent to his father.  Response at 5.  But as the SEC has been informed, Mueller's stepfather purchased the home in which Mueller and his wife currently live at a time in which Mueller could not obtain a mortgage.  The amounts that Mueller currently pays in "rent" are payments to a bank in the amount of the mortgage payment.  The SEC does not even contend that the mortgage payment of $1,912.70 per month is unreasonable.  Even if Mueller and his wife (and, soon, child) were to vacate the house and rent an apartment, they could expect to pay a comparable amount in rent.

14.     The same is true for the other expenses identified in Mueller's Brief.  The requested total of $8,500 a month is eminently reasonable, particularly given the increased medical and other expenses that Mueller and his wife will incur after the birth of their child.  Indeed, more than half of the requested total would go toward critical expenses that are difficult to change on short notice,

including child support, health insurance, and the mortgage.  These expenses do not go away just because the SEC filed a Complaint.

15.     The claim that Mueller has provided "no evidentiary support" for his expenses is also false.  *See* Response at 6.  Mueller submitted a declaration under oath attesting to these expenses and to the bank accounts he controls, which is as competent as any other evidence that could be provided.  *See* Mueller's Brief at Ex. A.  Mueller has also informally provided the SEC with his child support order and bank records, which show exactly what Mueller has been spending on living expenses.[2]

16.     Finally, the Response does not mention the significant time commitment that will be necessary for Mueller to take the entity Defendants and Relief Defendants into bankruptcy. There are at least 16 entities that may need to file, several of which own thousands of individual pinball parts, manufacturing equipment, and other pinball-related assets.  The entities' books are current only through December 2020, leaving a significant amount of accounting and/or bookkeeping to be completed before a filing.  The filing of the Complaint has made it much for difficult for these entities to secure lending to pay employees, leaving Mueller as the only person who has the knowledge and availability to do the work necessary for these bankruptcy filings.  Yet the SEC is not only demanding that Mueller do this work for free, it apparently expects him to do so without being able to house and feed his family.  These demands are simply not realistic.

D.  **The Court has the authority to permit the use of funds for living expenses.**

17.     Notably, the Response does not appear to dispute that the Court has the authority to permit Mueller to use funds that otherwise would be frozen for personal expenses.  *See* Response

---

[2] Mueller can provide those records to the Court for in camera review if necessary.

at 6-9.[3]  The SEC's primary objection to this use of funds instead appears to be that Mueller has not yet produced an accounting of his finances.  But Mueller has already agreed to provide ***exactly such an accounting*** and the Court has incorporated that agreement into its Order.  Per the briefing schedule agreed to with the SEC, that accounting is due on October 14.  It is expected to corroborate Mueller's declaration and establish that Mueller does not control any other funds to pay for his living expenses.  It will therefore be necessary for a limited amount of funds in the Disputed Accounts to be unfrozen to pay for Mueller's reasonable living expenses.

18.     The Court should therefore grant Mueller's request to use a limited amount of the funds in the Disputed Accounts to pay for limited living expenses for a limited time, subject to the supervision of the Court.

### III.    THE COURT SHOULD PERMIT THE USE OF FUNDS TRACEABLE TO MUELLER'S PAYROLL TO BE USED FOR HIS CRIMINAL DEFENSE

19.     For the most part, the parties do not dispute the legal framework through which the Court should evaluate the second question before it: whether to permit funds traceable to Mueller's salary to be used for his criminal defense.  The SEC does not dispute that Courts can (and frequently do) permit funds that are not directly traceable to fraud to be used to be used of criminal defense.  *See* Response at 11-12.  The parties also agree that the Sixth Amendment right to counsel does not formally adhere until a criminal defendant is charged.  *See* Mueller's Brief at 11 n.3.  The Response also does not identify any case law that would ***prevent*** the Court from using its discretion and equitable powers to permit such funds to be used before the filing of charges.

---

[3] The SEC's attempts to distinguish the cases cited by Mueller in support of the use of funds are entirely unpersuasive. *See* Response at 8-9.  Each of these cases involved different businesses and different sources of funds, but the sources of these funds were largely irrelevant to the courts' decisions.  *See Sanitillo*, 2018 WL 3392881, at *3-4; *North Star Fin.*, 2017 WL 476602, at *1-2; *Thibeault*, 80 F.Supp.3d at 294-95; *Dowdell*, 175 F.Supp.2d at 855.  Indeed, the SEC appears to concede that three of these cases involved the release of funds held in bank accounts, as is the case here. *See* Response at 9 (discussing *North Star*, *Thibeault*, and *Dowdell*).

20.     Even the Response's lead argument against the use of funds is not currently in dispute.  The SEC argues that Mueller has the burden to prove that any funds he wishes to use "***in any civil action***" are untainted and that there are sufficient other funds to pay for a disgorgement remedy.  Response at 10 (emphasis added).  But Mueller is not requesting that the funds in counsel's trust account be used for ***this civil action***.  Rather, he is asking the Court to permit these funds to be used ***in the parallel criminal action***.  The SEC's argument about use of funds in this action is thus pure red herring.

21.     Several key facts are also undisputed.  The SEC does not dispute that it instigated the criminal investigation by referring its Complaint to the United States Attorney's Office or that the investigation is ongoing.[4]  The Response also does not dispute that the funds at issue were transferred to the Ohana Trust Account from accounts in which Mueller's payroll was deposited. The SEC instead merely restates its position that every penny Mueller received from any of the entities is "the proceeds of fraud," a position that is both extreme and entirely unproven at this stage of the litigation.  Indeed, as noted above, the Complaint concedes that the entity Defendants and Relief Defendants are real companies, with millions of dollars in assets, and (formerly) with dozens of employees.  Moreover, the PPMs disclosed that a substantial portion of investor funds would go to pinball and other investments.  Thus, even if the SEC carries its burden and proves the alleged wrongdoing, it likely could not justify a claim that every penny spent by any of the Defendants or Relief Defendants was the product of fraud.

22.     Denying Mueller access to funds for a criminal defense would also be particularly damaging at this stage of the litigation.  The existence of a criminal case covering the same subject matter as this civil case makes a stay of this civil case increasingly likely, if not inevitable.  *See*

---

[4] The United States Attorney's Office recently sent Mueller a target letter, which can be made available to the Court for in camera review or filed under seal, if requested.

*Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1088-89 (5th Cir. 1979) (holding that district court abused its discretion by not staying civil case on same subject matter as pre-indictment criminal investigation); *S.E.C. v. AmeriFirst Funding, Inc.*, Civil Action No. 3:07-CV-1188-D, 2008 WL 866065, at *1-4 (N.D. Tex. Mar. 17, 2008) (granting motion to stay discovery over opposition from the SEC due to pre-indictment criminal investigation).  By requesting that the Court deny Mueller the ability to fund counsel in the criminal investigation, the SEC asks the Court to leave Mueller defenseless during the next, critical phase of this dispute.  As the Court is well aware, in white collar criminal cases, involvement of counsel prior to indictment can be as important to protecting a defendant's rights as counsel after indictment—particularly when the investigation has already resulted in a target letter.

23.     There is no reason for the Court to tie Mueller's hands in this manner.  The Court has the discretion to permit the limited use of these funds for a criminal defense, even before formal charges have been filed.  Permitting the limited use of such funds would help protect the rights addressed by the Sixth Amendment.  Mueller has also established that the funds at issue are traceable to Mueller's payroll and that the SEC's assertion that every penny paid to Mueller is the product of fraud is not tenable.[5]  Other funds of Mueller and the entities would also remain frozen, and the assets of the entities (the real value for investors) remain intact.  The Court should thus exercise its discretion to permit Mueller to use the funds in his counsel's trust account for his criminal defense.

---

[5] Mueller rejects the Response's attempt to place the burden to prove tracing on Mueller, as several courts have placed the burden on the SEC to show that the funds at issue are traceable to fraud.  *See Thibeault*, 80 F.Supp.3d at 204-95 (noting that the SEC "has the burden of demonstrating that such funds are traceable to fraud"); *S.E.C. v. FTC Capital Markets, Inc.*, No. 09 Civ. 4755(PGG), 2010 WL 2652405, at *8 (S.D.N.Y. June 30, 2010) ("Because the Commission has not shown that the funds Lopez seeks are traceable to fraud, it may not deny her advancement of fees for purposes of her criminal defense.").

**IV.    CONCLUSION**

24.    For the forgoing reasons and for the reasons stated in Mueller's Brief, Mueller requests that the Court permit him to use up to $34,000 in funds in the Disputed Account for personal expenses through February 2022, without prejudice to an additional request if necessary. Mueller further requests that the Court permit him to use $87,000 currently in his counsel's trust account for criminal defense.  Mueller further requests all other relief, at law or in equity, to which he may be entitled.

Dated:  October 13, 2021

                                                Respectfully submitted,

                                                **DAVIS & SANTOS, P.C.**

                                       By: *__/s/ H. Jay Hulings__*
                                                Jason M. Davis
                                                State Bar No. 00793592
                                                Email:  *jdavis@dslawpc.com*
                                                H. Jay Hulings
                                                State Bar No. 24104573
                                                Email:  *jhulings@dslawpc.com*
                                                719 S. Flores Street
                                                San Antonio, Texas 78204
                                                Tel: (210) 853-5882
                                                Fax: (210) 200-8395

                                                ***Counsel for Defendant Robert Mueller***

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2021, the foregoing document was served on counsel of record via the Court's ECF system.

*/s/ H. Jay Hulings*
H. Jay Hulings