# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>            -against-<br><br>ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,<br><br>        Defendants,<br><br>            -and-<br><br>DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621 SILICON DR LLC,<br><br>        Relief Defendants. | Civil Action No.:  5:21-cv-785-XR |

## DECLARATION OF SACHIN VERMA

I, Sachin Verma, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Sachin Verma. I am over twenty-one years of age and have personal knowledge of the matters set forth herein. I submit this declaration in support of the Securities and Exchange Commission's ("Commission's") Motion for Summary Judgment.

2.      I am a Certified Public Accountant with over 20 years of experience. I am employed as an Assistant Chief Accountant in the Washington, D.C. office of the Commission. As part of my daily activities, I investigate securities law violations.

3.      All amounts referred to in this Declaration are approximate amounts and have been rounded to the nearest dollar.

## I.     Financial Records Reviewed

4.      This Declaration is based upon my personal review of financial records such as accounting records, bank statements, deposits, cancelled checks, wire transfers, signature cards, policy valuation documents, Robert Mueller's Sworn Accounting (SEC-RJM-E-0000016-727) ("Mueller's Sworn Accounting"), QuickBooks records,[1] and other documents for the accounts listed on Appendix A-1 that were produced to the Commission pursuant to subpoenas and document requests ("Financial Records"). My classification and summarization of Financial Records in this declaration may change based upon my review of records and any additional information that may be produced at a later date.

## II.     Total Investments in the Funds

5.      Based on the bank records and Mr. Mueller's Sworn Accounting, from September 24, 2015 to August 10, 2021, the total amount invested in the 575 and dGRD Funds was $66,350,037.  The investments were made by at least three hundred investors. The deeproot companies also maintained QuickBooks records, which show that the total amount invested in all funds (including the 575 and dGRD Funds) from September 24, 2015 to August 10, 2021 was $67,066,399.  For purpose of this declaration, I have based my calculations on the bank records totaling $66,350,037 invested in the 575 and dGRD investor funds.

6.      Based on the Financial Records, the first 575 Fund investment was made on or about September 24, 2015. The last 575 Fund investment was made on or about August 10, 2021. The first dGRD Fund investment was made on or about December 9, 2015. The last dGRD

---

[1] QuickBooks is an accounting software package used by businesses, including the deeproot companies to maintain accounting transactions and prepare financial statements.

Fund investment was made on or about June 9, 2020. Collectively, I will refer to the 575 Fund and the dGRD Fund in this declaration as the "Funds."

### III.     No Insurance Policies Were Purchased After April 26, 2017

7.      Based on the Financial Records, between September 24, 2015 and October 14, 2021, Policy Services Inc. ("Policy Services"), which I have been instructed is the entity that purchased and held the insurance policies, purchased a total of 6 life insurance policies with a face value of approximately $14,640,000.

8.      As of October 14, 2021, Policy Services owned an additional 13 policies with a face value of approximately $10,825,863, which were acquired prior to September 24, 2015, the date of the first investment in the 575 Fund.

9.      Based on the Financial Records, on more than one occasion, Policy Services purchased insurance policies using installment payments.

10.     Policy Services last purchased a new life insurance policy, ANDR62, on or about April 26, 2017.

11.     After April 26, 2017, the Funds received approximately $54,126,544 in new investments.[2]

12.     Policy Services also attempted to purchase a life insurance policy, BASH82, on or about May 17, 2017, but the policy was returned after Policy Services failed to make required installment payments.[3]

---

[2] The Complaint states that "Defendants purchased no new insurance policies for the Funds after September 2017." Policy Services made an installment payment for the BASH82 policy in September 2017. The last policy purchase occurred on April 26, 2017 as stated in paragraph 10.

[3] Based on Policy Services' QuickBooks records, between on or about May 17, 2017 and October 17, 2019, Policy Services made 14 installment payments, net of one credit, totaling $4,045,275 on the BASH82 policy.

## IV.     Policy Services Spent Approximately 18% of the Funds' Money Purchasing Life Insurance Policies

13.     Policy Services spent $11,162,577 to acquire new life insurance policies or pay premiums for life insurance policies between September 24, 2015 and October 14, 2021, which includes $4,045,275 Policy Services spent on its attempted acquisition of the BASH82 policy.  In addition, during this time frame, Policy Services spent an additional $880,261 to reacquire fractionalized shares in single life policies previously sold to other investors not part of the Funds (see Section VII below).  In total, Policy Services spent $12,042,838 to acquire new life insurance policies, acquire fractionalized shares in policies Policy Services previously purchased, and pay premiums.

14.     As a percentage, Policy Services spent 18.2% of the total amount of money invested in the Funds to acquire new life insurance policies, reacquire fractionalized shares in policies, or pay premiums for life insurance policies.

15.     As discussed in paragraph 22 below, I was instructed that the Funds could take 20% of investor deposits as a company advance for administrative expenses. If you first subtract 20% of investor deposits from the total invested, then Policy Services spent 22.7% of the remaining investor deposits to acquire new life insurance policies, acquire fractionalized shares, and pay premiums.

**V.     Use of Investor Funds to Pay Earlier Investors in the Funds and Investors in Other Funds**

16.     Based on the Financial Records, between November 24, 2015 and July 2, 2021, the Deeproot Accounts[4] made $4,079,633 in periodic payments (return on investment in the form of interest/dividend) and maturity payments (return of principal) to 575 Fund investors, which included roughly $177,249 paid to investors in November 2020 using the proceeds of a loan obtained by Mr. Mueller. During the same period, the Deeproot Accounts received $2,038,959 in income from various sources.[5] Therefore, at least $1,863,425 in new deposits from the Funds' investors were used to make periodic and maturity payments to earlier 575 Fund investors because there were no other sources of funds to pay the investors.

17.     Based on the Financial Records, between November 6, 2015 and June 24, 2021, the Deeproot Accounts made $5,086,570 in payments to investors in the deeproot 3-Year Bonus Reset Debenture Fund ("3-Year Debenture Fund") and the Bonus Growth 5-Year Debenture Fund ("5-Year Debenture Fund") (together, "Debenture Funds"). This amount does not include $880,621 that Policy Services spent to repurchase fractionalized shares of insurance policies. During the same period, the Deeproot Accounts received $1,327,886 in new investments.[6] Therefore, at least $3,758,684 in new deposits from the Funds' investors were used to pay

---

[4] When I refer to the "Deeproot Accounts" I am referring to one or more of the corporate bank accounts listed on Appendix A-1.

[5] The income received includes insurance proceeds, other income deposited in the deeproot Tech, deeproot Pinball, and deeproot Studios bank accounts, income identified as from "Finance IT," a deposit from Mass Mutual, a deposit from Dynamic Web Source, mobile deposits from unknown sources, and others.

[6] The deposits were received as investments in the Deeproot 3-Year Debenture Fund ($100,000) and the 5-Year Debenture Fund ($145,000) and $1,082,886 in investments that appear to be for the 575 or dGRD Funds, but I could not trace with certainty.

investors in the Debenture Funds at the time of the maturity of their investments because there were no other sources of funds to pay the investors.

18.     These calculations assume that any income from any of the deeproot companies was used to make periodic and maturity payments to 575 Fund investors. It also assumes that any proceeds received from matured insurance policies was used to pay investors. However, as discussed in paragraphs 26-31, because Policy Services sold fractionalized shares in policies, more than $587,405 of the $1,327,581 Policy Services received in insurance proceeds was used to pay other investors, not part of the Funds, who purchased fractionalized shares of policies.

19.     Based on the Financial Records, when the 575 Fund used new investor money to make payments to earlier investors, the payments were made without the money first being invested in life policy purchases or investments in other deeproot companies.

## VI.     The Transfers to the Affiliated Businesses and Total Operating Expenses (Including Payments to Muller) of the Funds Paid from the Deeproot Accounts Exceeded the Percentages Disclosed in the PPMs

20.     I was asked to review the Financial Records and determine what percentage of the Funds' investors' money were transferred to deeproot affiliated businesses, including deeproot Tech, deeproot Studios, deeproot Sports & Entertainment, deeproot RE 12621 Silicon Dr LLC, MB Hale Ohana Revocable Trust, Conrad Car Wash, and Food Development Corporation (the "Affiliated Businesses") and spent on operating expenses of the Affiliated Businesses, the Funds, Policy Services, or deeproot Funds LLC.

21.     Based on the Financial Records, including primarily bank account records, $50,126,341 was transferred[7] to the Affiliated Businesses or spent on operating costs. Specifically:

    a.   between March 29, 2017 and September 21, 2021, $14,162,564 was transferred from Deeproot Accounts to deeproot Tech;

    b.   between April 15, 2019 and September, 2021, $3,745,925 was transferred from Deeproot Accounts to deeproot Studios;

    c.   between January 19, 2016 and July 18, 2017, $160,447 was transferred from Deeproot Accounts to deeproot Sports & Entertainment LLC;

    d.   on January 8, 2021, $644,535 was transferred from deeproot Accounts to deeproot Re 12621 Silicon Dr LLC;

    e.   between November 15, 2016 and August 10, 2018, $329,054 was transferred from Deeproot Accounts to the MB Hale Ohana Revocable Trust;

    f.   between May 1, 2015 and September 9, 2021, $15,625,099 in payments that, based on the Financial Records, appear to be for the benefit of the Affiliated Businesses were transferred from the Deeproot Accounts;

    g.   between September 24, 2015 and September 21, 2021, $1,129,436 was transferred from the Deeproot Accounts to pay Mr. Mueller's salary;

---

[7] For purposes of this Declaration, I am using the term "transferred" to include direct transfers, but also the many instances in which funds from the Deeproot Accounts were used to pay the credit card and other expenses of the Affiliated Businesses. If requested, however, I am prepared to break out separately: (1) direct transfers from the Deeproot Accounts to the Affiliated Businesses; and (2) payments made on the Affiliated Businesses' behalf. I was instructed to include the categories of transfers listed in paragraphs 21(a)-(r) in my summary of operating expenses and transfers to the Affiliated Businesses.

h.  between January 1, 2016 to July 19, 2019, exclusive of salary payments, at least $1,343,141 from the Deeproot Accounts was used for Mr. Mueller's or his family's personal benefit (see paragraph 32 below);

i.  between September 24, 2015 and September 21, 2021, at least $1,863,425 was paid as periodic payments and maturity proceeds to 575 Fund investors (see paragraph 16 above);

j.  between November 11, 2015 and June 24, 2021, at least $5,086,570 was paid from the Deeproot Accounts to investors in the Debenture Funds as maturity payments when they became due (see paragraph 17 above);

k.  between September 24, 2015 and September 21, 2021, $6,215,319 was transferred from the Deeproot Accounts to finders for the Funds;

l.  between November 7, 2015 and April 26, 2017 at least $300,466 was paid from the Deeproot Accounts to a former business partner in Policy Services;

m.  between September 24, 2015 and February 12, 2021, $2,449,009 was transferred from the Deeproot Accounts to the Conard Car Wash;

n.  between September 25, 2015 and February 12, 2021, $385,000 was transferred from the Deeproot Accounts to the Food Development Corporation;

o.  between September 24, 2015 and February 12, 2021, $374,697 was transferred from the Deeproot Accounts for office furniture;

p.  between September 24, 2015 and February 12, 2021, $25,000 was transferred from the Deeproot Accounts to Tourbillon Partners;

q.  between February 2, 2018 and March 6, 2019, the Deeproot Accounts paid at least $99,907 to the deeproot Queue Fund; and

r.  between September 24, 2015 and October 14, 2021, the Deeproot Accounts received $245,000 as investments in the Debenture Funds, $2,321,567 as a part of the U.S. Department of Treasury's Paycheck Protection Program ("PPP"), $163,800 as part of the Small Business Administration's Economic Injury Disaster Loans program, and unidentifiable receipts totaling $1,082,886, all of which I have subtracted from the abovementioned payments.

22.     I was instructed that based on the PPMs (1) the Funds could take up to 20% of money from investors as a company advance for operating expenses; (2) the 575 Fund could invest up to 50% of investors' funds in Affiliated Businesses; and (3) the dGRD Fund could invest up to 30% of investors' funds in Affiliated Businesses.

23.     Based on these assumptions, the below table summarizes my calculations of the total company advance and investments in Affiliated Businesses allowed.

| Description | Reference | 575 Fund | dGRD | Total |
|---|---|---|---|---|
| Investor Funds | [1] | $53,735,824 | $12,614,213 | $66,350,037 |
| Maximum Allowed for Company Advances (20%) | [2] | $10,747,165 | $2,522,843 | $13,270,008 |
| Balance | [3=1-2] | $42,988,659 | $10,091,370 | $53,080,029 |
| Maximum Allowed Spend on Affiliated Businesses (50% 575, 30% dGRD) | [4] | $21,494,330 | $3,027,411 | $24,521,741 |
| Maximum Allowed Spend on Affiliated Businesses and Company Advance | [5=2+4] | $32,241,495 | $5,550,254 | $37,791,748 |

24.     Based on the Financial Records and the above assumptions, the Funds could spend a total of $37,791,748 on the company advance and on investments in Affiliated Businesses. The difference between this amount and the total invested in the Funds by investors, $66,350,037, is $28,558,289.

25.     The total of $50,126,341 spent from the Deeproot Accounts for operating expenses and on behalf of the Affiliated Businesses (paragraph 21, above), exceeds the $37,791,748 of the maximum amount the Funds' were allowed to spend for the company advance and as investments in the Affiliated Businesses (paragraph 24, above) by $12,334,593.

**VII.     Fractionalized Shares of Policies**

26.     Attached as Appendix A-2 is a table summarizing 139 Life Settlement Certificates, (SEC-PulmanR-E-0000022 to SEC-PulmanR-E-0000244) that document investments by individuals or entities in single life insurance policies. These are not investments in the 575, dGRD, or other deeproot funds.

27.     Based on the Life Settlement Certificates, Mr. Mueller's Sworn Accounting, and the deeproot Portal,[8] as summarized on the Attached Appendix A-2, of the policies owned by Policy Services, on October 14, 2021, fractionalized shares of 11 policies were held by 65 investors.

28.     The total face value of the 19 policies owned by Policy Services as of October 14, 2021, was $25,465,863 of which $6,499,230, or 25.52%, was held by investors in Life Settlement Certificates who purchased fractionalized shares in life policies. These are separate from any other investments the same individuals held in either the 575 or dGRD Funds.

---

[8] https://portal.dprtapp.com/

29.     Based on the Life Settlement Certificates and Financial Records, as summarized on the Attached Appendix A-3, between September 24, 2015 and August 21, 2021, two policies in which Policy Services had previously sold fractionalized shares matured.

30.     On or before October 1, 2014, Policy Services sold fractionalized shares of policy MILU82. When policy MILU82 matured, Policy Services received $506,603. Policy Services paid investors who had previously purchased fractionalized shares of MILU82 $492,184 of the total Policy Services received, leaving a difference of $14,446.

31.     On or before August 9, 2012, Policy Services sold fractionalized shares of policy HMIL48. When policy HMIL48 matured, Policy Services received $94,021. Policy Services paid investors who had previously purchased fractionalized shares of HMIL48 $95,211, more than Policy Services received.

## VIII.   Expenditures From the Deeproot Accounts for the Benefit of Robert Mueller

32.     From May 1, 2015 to April 7, 2021,[9] exclusive of salary payments, at least $1,343,141[10] from the Deeproot Accounts was used for Mr. Mueller's or his family's personal benefit, including, but not limited to, the following:

---

[9] From May 2015 to July 2019, Mr. Mueller and his former wife used American Express credit cards issued in the name of National Wealth Solutions LLC to make what appear to be purchases of a personal nature. The credit card bills were paid using a Policy Services' account at Wells Fargo (account number -3081).

[10] On October 6, 2021, I provided a sworn declaration that stated in paragraph 11, that from January 1, 2016 to July 19, 2019, "$1,537,666 from the Deeproot Accounts was used for Mr. Mueller's or his family's personal benefit." My October 6, 2021, declaration was based on my review and summary of account records at that time. Since October 6, 2021, I have had the opportunity to review additional records that reflect that a transfer of $194,525 that I originally understood was for the benefit of Mr. Mueller was to repay an investor in one of Mr. Mueller's earlier funds. I have adjusted my summary to reflect this change.

a.  payments totaling $87,057 made between February 1, 2016 and February 5, 2019 to St. Mary's Hall, a private school in San Antonio, Texas attended by Mr. Mueller's child;

b.  payments totaling $54,977 made between April 4, 2016 and March 4, 2019 to Disney Cruise Lines;

c.   payments totaling $11,486 made between February 27, 2017 and March 7, 2019, to Princess Cruises;

d.  payments totaling $23,100 made on January 12, 2017 and August 10, 2018 to Tabora Gallery LLC, an art gallery in Hawaii;

e.  payments totaling $70,298 made between December 22, 2017 and January 9, 2019 to physician Dr. Spencer Hardenbrook, MD;

f.  payment of $6,500 on December 12, 2017 to Rebecca Carrillo, an attorney who represented Mr. Mueller in his second divorce proceeding;

g.  payments totaling $9,050 made on December 15, 2018 and January 12, 2019 to James R. Van Winkle of Americus Diamond, a jeweler in San Antonio, Texas;

h.  $34,012 paid on March 8, 2019 to Lux Catering and Events in Salt Lake City, Utah for wedding catering;

i.  payments totaling $17,538 made between January 1, 2019 and March 3, 2019 to Michelle Leo Events in Salt Lake City, Utah for wedding planning; and

j.  payments totaling $85,500 made on April 14, 2016, October 13, 2016, and April 18, 2017 to Link2Gov Corp for personal income tax payments.

33.     I declare under penalty of perjury that the foregoing is true, correct, and made in good faith based upon my review of the Financial Records, as well as other documents or information produced to the Commission.  Executed on this 17th day of August 2023.


  /s/ Sachin Verma
Sachin Verma

**Appendix A-1**
**List of Bank Accounts and Credit Cards**

| ENTITY | Institution Name | Last 4 Digits of Account | Account Type | Signatory 1 | Date | Signatory 2 | Date |
|---|---|---|---|---|---|---|---|
| **Bank Accounts** | | | | | | | |
| Deeproot (aka Dprt) Funds LLC | Wells Fargo Bank N.A. | -2385 | Wells Fargo Simple Business Checking | Van L Gunnell | 6/24/2013 | Robert J Mueller | 6/24/2013 |
| Deeproot (aka Dprt) Funds LLC | Wells Fargo Bank N.A. | -2534 | Wells Fargo Simple Business Checking | Van L Gunnell | 6/24/2013 | Robert J Mueller | 6/24/2013 |
| Deeproot 575 Fund, LLC | Wells Fargo Bank N.A. | -8673 | Gold Business Service Package | Robert J Mueller | 1/23/2015 | | |
| Deeproot Growth Runs Deep Fund LLC | Wells Fargo Bank N.A. | -1354 | Wells Fargo Simple Business Checking | Robert J Mueller | 5/30/2014 | | |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -8461 | Gold Business Service Package | Glenn R Hagan | 6/1/2012 | Robert J Mueller | 6/1/2012 |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -8487 | Wells Fargo Simple Business Checking | Glenn R Hagan | 6/1/2012 | Robert J Mueller | 6/1/2012 |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -3081 | Gold Business Service Package | Glenn R Hagan | 9/21/2012 | Robert J Mueller | 9/21/2012 |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -3099 | Wells Fargo Simple Business Checking | Glenn R Hagan | 9/21/2012 | Robert J Mueller | 9/21/2012 |
| Deeproot Tech, LLC | Wells Fargo Bank N.A. | -6575 | Wells Fargo Simple Business Checking | Robert J Mueller | 3/13/2017 | | |
| Deeproot Studios LLC | Wells Fargo Bank N.A. | -6415 | Wells Fargo Business Choice Checking | Robert J Mueller | 2/21/2019 | | |
| Deeproot Pinball LLC | Wells Fargo Bank N.A. | -5571 | Wells Fargo Simple Business Checking | Robert J Mueller | 5/20/2015 | | |
| Deeproot Wealth Advisors LLC | Wells Fargo Bank N.A. | -1255 | Wells Fargo Simple Business Checking | Robert J Mueller | 4/11/2014 | Glenn R Hagan | 4/11/2014 |
| Dprt Advisory Services LLC | Wells Fargo Bank N.A. | -2526 | Gold Business Service Package | Aaron F Flores | 6/24/2013 | Robert J Mueller | 6/24/2013 |
| **Credit Cards** | | | | | | | |
| Deeproot Tech, LLC | American Express | -1003 | American Express Card | Robert J Mueller | | | |
| Policy Services, Inc. | American Express | -2003 | American Express Card | Robert J Mueller | | | |
| National Wealth Solutions LLC | American Express | -1001 | American Express Card | Robert J Mueller | | | |

**Appendix A-2**

**Fractionalized Shares of Policies Sold to Outside Investors**

| Policy | Policy Death Benefit | Outside Investor | Investment Closing Date | Outside Investment | Outside Investor Ownership % | Outside Investor Projected Return | Percent of Death Benefit available to 575 and dGRD Investors | Death Benefit Available to 575 and dGRD Investors |
|--------|---------|-------------|-----------|----------|--------|----------|----------|----------|
| JDE21L | $633,343 | Investor 53 | 7/16/2014 | $41,171 | 9.05% | $57,296 | | |
| | | Investor 44 | 4/18/2014 | $6,927 | 1.52% | $9,640 | | |
| | | Investor 1 | 11/19/2012 | N/A | | N/A | | |
| | | Investor 2 | 11/19/2012 | $110,000 | 24.17% | $153,083 | | |
| | | Investor 3 | 11/19/2012 | $10,000 | 2.20% | $13,917 | | |
| | | Investor 4 | 11/19/2012 | $220,000 | 48.34% | $306,167 | | |
| | $633,343 | | | $388,098 | 85.28% | $540,103 | 14.72% | $93,240 |
| | | | | | | | | |
| SUL429 | $300,000 | Investor 53 | 9/3/2014 | $38,710 | 19.14% | $57,419 | | |
| | | Investor 45 | 4/18/2014 | $13,318 | 6.59% | $19,755 | | |
| | | Investor 51 | 9/3/2014 | $20,000 | 9.89% | $29,667 | | |
| | | Investor 40 | 9/3/2014 | $25,000 | 12.36% | $37,083 | | |
| | | Investor 21 | 10/23/2013 | N/A | | N/A | | |
| | | Investor 23 | 10/23/2013 | N/A | | | | |
| | $300,000 | | | $97,028 | 47.98% | $143,925 | 52.02% | $156,075 |
| | | | | | | | | |
| SUL428 | $300,000 | Investor 1 | 5/27/2013 | N/A | 24.72% | N/A | | |
| | | Investor 14 | 5/27/2013 | $75,000 | 37.08% | $111,250 | | |
| | | Investor 15 | 5/27/2013 | N/A | | | | |
| | | Investor 16 | 5/27/2013 | $15,000 | 7.42% | $22,250 | | |
| | | Investor 17 | 5/27/2013 | $15,000 | 7.42% | $22,250 | | |
| | | Investor 18 | 5/27/2013 | $31,301 | 15.48% | $46,430 | | |
| | $300,000 | | | $136,301 | 92.12% | $202,180 | 7.88% | $97,820 |
| | | | | | | | | |
| UD33NL | $750,000 | Investor 53 | 7/16/2014 | $55,966 | 10.14% | $76,021 | | |
| | | Investor 51 | 5/28/2014 | $10,000 | 1.81% | $13,583 | | |
| | | Investor 19 | 4/2/2014 | $35,000 | 6.34% | $47,542 | | |
| | | Investor 8 | 3/25/2013 | N/A | | N/A | | |
| | | Investor 9 | 3/25/2013 | $11,472 | 2.08% | $15,583 | | |
| | | Investor 10 | 3/25/2013 | $24,000 | 4.35% | $32,600 | | |
| | | Investor 7 | 3/25/2013 | $91,894 | 16.46% | $124,822 | | |
| | | Investor 11 | 3/25/2013 | $25,000 | 4.53% | $33,958 | | |
| | | Investor 12 | 3/25/2013 | $23,485 | 4.25% | $31,900 | | |
| | | Investor 13 | 3/25/2013 | $4,849 | 0.88% | $6,587 | | |
| | | Investor 3 | 3/25/2013 | $10,000 | 1.81% | $13,583 | | |
| | | Investor 5 | 1/3/2013 | $50,000 | 9.06% | $67,917 | | |
| | $750,000 | | | $341,666 | 61.71% | $464,097 | 38.29% | $285,903 |
| | | | | | | | | |
| ANDE75 | $2,000,000 | Investor 53 | 7/16/2014 | $67,153 | 5.54% | $110,802 | | |
| | | Investor 46 | 4/18/2014 | $15,203 | 1.25% | $25,085 | | |
| | | Investor 51 | 9/3/2014 | $20,000 | 1.65% | $33,000 | | |
| | | Investor 56 | 10/6/2014 | $50,000 | 4.13% | $82,500 | | |
| | | Investor 19 | 8/6/2014 | $61,000 | 5.03% | $100,650 | | |
| | | Investor 55 | 10/1/2014 | $8,801 | 0.73% | $14,522 | | |
| | | Investor 6 | 1/7/2013 | $100,000 | 8.25% | $165,000 | | |
| | | Investor 26 | 9/17/2014 | $50,000 | 4.13% | $82,500 | | |
| | | Investor 47 | 4/2/2014 | $112,781 | 9.30% | $186,089 | | |
| | | Investor 29 | 4/2/2014 | $17,984 | 1.48% | $29,673 | | |
| | | Investor 7 | 1/7/2013 | $315,106 | 26.00% | $519,925 | | |
| | $2,000,000 | | | $818,029 | 67.49% | $1,349,747 | 32.51% | $650,253 |

| Policy | Policy Death Benefit | Outside Investor | Investment Closing Date | Outside Investment | Outside Investor Ownership % | Outside Investor Projected Return | Percent of Death Benefit available to 575 and dGRD Investors | Death Benefit Available to 575 and dGRD Investors |
|---|---|---|---|---|---|---|---|---|
| JKN22A | $2,500,000 | Investor 33 | 4/2/2014 | $29,859 | 1.81% | $45,286 | | |
| | | Investor 48 | 4/18/2014 | $13,318 | 0.81% | $20,199 | | |
| | | Investor 52 | 7/1/2014 | $36,264 | 2.20% | $55,000 | | |
| | | Investor 19 | 8/19/2013 | $25,000 | 1.52% | $37,917 | | |
| | | Investor 19 | 9/3/2014 | $25,000 | 1.52% | $37,917 | | |
| | | Investor 20 | 8/19/2013 | $35,251 | 2.14% | $53,465 | | |
| | | Investor 14 | 8/19/2013 | $25,000 | 1.52% | $37,917 | | |
| | | Investor 15 | 8/19/2013 | N/A | | N/A | | |
| | | Investor 21 | 8/19/2013 | N/A | | N/A | | |
| | | Investor 55 | 10/1/2014 | $8,801 | 0.53% | $13,348 | | |
| | | Investor 16 | 8/19/2013 | $35,000 | 2.12% | $53,083 | | |
| | | Investor 17 | 8/19/2013 | $35,000 | 2.12% | $53,083 | | |
| | | Investor 50 | 5/9/2014 | $31,858 | 1.93% | $48,317 | | |
| | | Investor 49 | 4/18/2014 | $38,817 | 2.35% | $58,872 | | |
| | | Investor 22 | 8/19/2013 | $85,900 | 5.21% | $130,282 | | |
| | | Investor 41 | 7/1/2014 | $33,604 | 2.04% | $50,967 | | |
| | | Investor 66 | 8/19/2013 | N/A | | N/A | | |
| | | Investor 57 | 6/2/2015 | N/A | | N/A | | |
| | | Investor 37 | 4/18/2014 | $22,161 | 1.34% | $33,611 | | |
| | | Investor 29 | 4/2/2014 | $15,000 | 0.91% | $22,750 | | |
| | | Investor 54 | 9/3/2014 | $25,000 | 1.52% | $37,917 | | |
| | | Investor 24 | 4/2/2014 | $25,000 | 1.52% | $37,917 | | |
| | | Investor 3 | 8/19/2013 | $24,600 | 1.49% | $37,310 | | |
| | | Investor 18 | 8/19/2013 | $55,000 | 3.34% | $83,417 | | |
| | $2,500,000 | | | $625,434 | 37.94% | $948,574 | 62.06% | $1,551,426 |
| | | | | | | | | |
| PER437 | $1,000,000 | Investor 25 | 1/22/2014 | $42,495 | 6.30% | $63,034 | | |
| | | Investor 33 | 4/2/2014 | $29,859 | 4.43% | $44,291 | | |
| | | Investor 51 | 12/11/2014 | $25,000 | 3.71% | $37,083 | | |
| | | Investor 52 | 12/11/2014 | $34,865 | 5.17% | $51,717 | | |
| | | Investor 19 | 1/22/2014 | $55,000 | 8.16% | $81,583 | | |
| | | Investor 21 | 1/22/2014 | N/A | | N/A | | |
| | | Investor 55 | 10/1/2014 | $8,801 | 1.31% | $13,055 | | |
| | | Investor 26 | 1/22/2014 | $51,125 | 7.58% | $75,835 | | |
| | | Investor 16 | 1/22/2014 | $10,000 | 1.48% | $14,833 | | |
| | | Investor 17 | 12/11/2014 | $20,400 | 3.03% | $30,260 | | |
| | | Investor 27 | 1/22/2014 | $97,000 | 14.39% | $143,883 | | |
| | | Investor 41 | 7/1/2014 | $20,000 | 2.97% | $29,667 | | |
| | | Investor 28 | 1/22/2014 | $10,550 | 1.56% | $15,650 | | |
| | | Investor 29 | 1/22/2014 | $17,016 | 2.52% | $25,241 | | |
| | | Investor 13 | 1/22/2014 | $78,263 | 11.61% | $116,090 | | |
| | | Investor 30 | 1/22/2014 | N/A | | N/A | | |
| | | Investor 54 | 9/3/2014 | $25,000 | 3.71% | $37,083 | | |
| | | Investor 31 | 1/22/2014 | $20,000 | 2.97% | $29,667 | | |
| | | Investor 32 | 1/22/2014 | $20,814 | 3.09% | $30,874 | | |
| | | Investor 43 | 1/27/2015 | $19,686 | 2.92% | $29,201 | | |
| | $1,000,000 | | | $585,875 | 86.91% | $869,049 | 13.09% | $130,951 |
| | | | | | | | | |
| SIE687 | $1,500,000 | Investor 58 | 6/2/2015 | $72,699 | 7.51% | $112,683 | | |
| | | Investor 59 | 6/2/2015 | $10,000 | 1.03% | $15,500 | | |
| | | Investor 17 | 6/2/2015 | $8,000 | 0.83% | $12,400 | | |
| | | Investor 60 | 6/2/2015 | N/A | | N/A | | |
| | | Investor 41 | 6/2/2015 | $20,000 | 2.07% | $31,000 | | |
| | | Investor 57 | 6/2/2015 | N/A | | N/A | | |
| | | Investor 36 | 6/2/2015 | $100,000 | 10.33% | $155,000 | | |
| | | Investor 65 | 11/16/2016 | N/A | | N/A | | |
| | $1,500,000 | | | $210,699 | 22% | $326,583 | 78.23% | $1,173,417 |

| Policy | Policy Death Benefit | Outside Investor | Investment Closing Date | Outside Investment | Outside Investor Ownership % | Outside Investor Projected Return | Percent of Death Benefit available to 575 and dGRD Investors | Death Benefit Available to 575 and dGRD Investors |
|---|---|---|---|---|---|---|---|---|
| GRR553 | $242,520 | Investor 15 | 10/23/2013 | N/A | 30.43% | N/A | | |
| | | Investor 27 | 4/18/2014 | $94,425 | 52.24% | $126,687 | | |
| | | Investor 23 | 10/23/2013 | N/A | | N/A | | |
| | | Investor 24 | 10/23/2013 | $10,000 | 5.53% | $13,417 | | |
| | $242,520 | | | $104,425 | 88.20% | $140,103 | 11.80% | $102,417 |
| | | | | | | | | |
| FEE548 | $500,000 | Investor 33 | 3/31/2014 | $65,281 | 19.26% | $96,290 | | |
| | | Investor 34 | 3/31/2014 | $75,000 | 22.13% | $110,625 | | |
| | | Investor 19 | 3/31/2014 | $35,000 | 10.33% | $51,625 | | |
| | | Investor 35 | 3/31/2014 | $10,000 | 2.95% | $14,750 | | |
| | | Investor 36 | 3/31/2014 | $103,535 | 30.54% | $152,715 | | |
| | | Investor 37 | 3/31/2014 | $18,167 | 5.36% | $26,796 | | |
| | | Investor 28 | 3/31/2014 | $10,000 | 2.95% | $14,750 | | |
| | | Investor 38 | 3/31/2014 | $18,000 | 5.31% | $26,550 | | |
| | $500,000 | | | $334,983 | 98.83% | $494,100 | 1.17% | $5,900 |
| | | | | | | | | |
| FEE287 | $500,000 | Investor 39 | 3/19/2014 | $16,000 | 4.72% | $23,600 | | |
| | | Investor 40 | 3/19/2014 | $10,000 | 2.95% | $14,750 | | |
| | | Investor 26 | 3/19/2014 | $50,000 | 14.75% | $73,750 | | |
| | | Investor 41 | 3/19/2014 | $20,000 | 5.90% | $29,500 | | |
| | | Investor 42 | 3/19/2014 | $25,000 | 7.38% | $36,875 | | |
| | | Investor 36 | 3/19/2014 | $96,465 | 28.46% | $142,285 | | |
| | | Investor 13 | 3/19/2014 | $100,000 | 29.50% | $147,500 | | |
| | | Investor 31 | 3/19/2014 | $15,518 | 4.58% | $22,890 | | |
| | | Investor 43 | 3/19/2014 | $6,000 | 1.77% | $8,850 | | |
| | $500,000 | | | $338,983 | 100.01% | $500,000 | -0.01% | $0 |
| | | | | | | | | |
| JMD135 | $500,000 | Investor 16 | 6/30/2015 | $13,000 | 4.26% | $21,291 | | |
| | | Investor 57 | 6/30/2015 | N/A | | N/A | | |
| | | Investor 61 | 6/30/2015 | $118,081 | 38.68% | $193,388 | | |
| | | Investor 62 | 6/30/2015 | $118,081 | 38.68% | $193,388 | | |
| | | Investor 63 | 6/30/2015 | $23,838 | 7.81% | $39,041 | | |
| | $500,000 | | | $273,000 | 89.43% | $447,108 | 10.57% | $52,892 |
| | | | | | | | | |
| MAR790 | $100,000 | Investor 57 | 6/2/2015 | N/A | | N/A | | |
| | | Investor 61 | 6/2/2015 | $13,272 | 19.80% | $19,797 | | |
| | | Investor 62 | 6/2/2015 | $13,272 | 19.80% | $19,797 | | |
| | | Investor 64 | 6/2/2015 | $22,838 | 34.07% | $34,067 | | |
| | $100,000 | | | $49,382 | 73.67% | $73,661 | 26.33% | $26,339 |

**Total For All Policies For Which Fractionalized Shares Were Sold**

| Policy | Policy Death Benefit | Total Outside Investments | Outside Investor Ownership % | Total Outside Investor Projected Return | Percent of Death Benefit available to 575 and dGRD Investors | Death Benefit Available to 575 and dGRD Investors |
|---|---|---|---|---|---|---|
| | $10,825,863 | $4,303,902 | 60.03% | $6,499,230 | 39.97% | $4,326,633 |

**Policies For Which No Fractionalized Shares Were Sold**

| Policy | Policy Death Benefit | | Death Benefit Available to 575 and dGRD Investors |
|---|---|---|---|
| FERN07 | $10,000,000 | | $10,000,000 |
| RID363 | $500,000 | | $500,000 |
| KFFN57 | $500,000 | | $500,000 |
| LW7116 | $1,100,000 | | $1,100,000 |
| HCS883 | $1,540,000 | | $1,540,000 |
| ANDR62 | $1,000,000 | | $1,000,000 |
| BASH82 | $0 | | $0 |
| | $14,640,000 | | $14,640,000 |

**Total For All Policies**

| Death Benefit for All Policies | Outside Investor Ownership % | Total Outside Investor Projected Return | Percent of Death Benefit available to 575 and dGRD Investors | Death Benefit Available to 575 and dGRD Investors |
|---|---|---|---|---|
| $25,465,863 | 25.52% | $6,499,230 | 74.48% | $18,966,633 |

Appendix A-3

**Maturity Distribution for Policies with Fracationalized Shares Sold to Prior Investors**

Example 1:

| Policy Name | Death Benefit | Acquisition | Date of Death | Date Deeproot Received Death Benefit | Death Benefit Deeproot Received |
|---|---|---|---|---|---|
| MILU82 | $500,000.00 | $329,670.33 | 4/30/2017 | 8/30/2017 | $506,630.14 |

Per Bank Records

| Date | Account Number | Account Name | Descripton | Amount Received/ (Paid) | Beneficiary | Projected Return |
|---|---|---|---|---|---|---|
| 8/30/2017 | xxxxxx8487 | Policy Services, Inc. | Insurance proceeds for MILU82 | $506,630.14 | | |
| 9/14/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($36,749.99) | Investor A | $36,999.99 |
| 9/14/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($30,083.33) | Investor B | $30,083.33 |
| 11/10/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($149,900.00) | Investor C | $150,150.00 |
| 11/20/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($82,667.00) | Investor D | $82,916.67 |
| 11/28/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($49,200.01) | Investor E | $49,450.01 |
| 12/4/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($71,033.33) | Investor F | $71,283.33 |
| 12/14/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($72,550.00) | Investor G | $75,833.33 |
| | | | Balance available for 575/dGRD investors | $14,446.48 | | |
| | | | | 2.85% | | |

Example 2:

| Policy Name | Death Benefit | Acquisition | Date of Death | Date Deeproot Received Death Benefit | Death Benefit Deeproot Received |
|---|---|---|---|---|---|
| HMIL48 | $96,021.00 | $70,690.31 | 7/7/2017 | 8/30/2017 | $96,021.00 |

Per Bank Records

| Date | Account Number | Account Name | Descripton | Amount Received/ (Paid) | Beneficiary | Projected Return |
|---|---|---|---|---|---|---|
| 8/30/2017 | xxxxxx8487 | Policy Services, Inc. | Insurance proceeds for HMIL48 | $94,021.00 | | |
| 9/13/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($7,579.53) | Investor H | $7,828.79 |
| 9/13/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($16,000.00) | Investor I | $16,298.47 |
| 9/13/2017 | xxxxxx8461 | Policy Services, Inc. | Paid to Investor (for their fractionalized share) | ($71,641.47) | Investor J | $71,884.73 |
| | | | Balance available for 575/dGRD investors | ($1,200.00) | | |
| | | | | -1.28% | | |

# EXHIBIT 2



EXHIBIT
6
HO-14036

DANDRIDGE
EXHIBIT
6
Victoria L. Valine, CSR, RMR, CRR
Stenographic Court Reporter
Texas CSR  No. 11743    9/22/2022



| **Mailing** | **Overnight/Physical** |
|---|---|
| PO Box 691610 | 12621 Silicon Dr |
| San Antonio, TX 78269-1610 | San Antonio, Texas 78249-3447 |

Toll Free (888) 316-2935

## CLASS C MEMBERSHIP SHARES

deeproot 575 Fund, LLC (the "Company", "us", "we", or "the575™") is a private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in deeproot affiliates; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

| | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,500.00 | $23,500.00 |
| | | | |
| Total Minimum[3] | $50,000.00 | $3,000.00 | $47,000.00 |
| Total Maximum | $75,000,000.00 | $4,500,000.00 | $70,500,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and may be paid out of the Investors principal.
[3] Proceeds will not be held in a separate account and will be immediately employed to purchase assets. Certain amounts may be retained for administration or management purposes.

### DATED FEBRUARY 26, 2018 --- LAST AMENDED JANUARY 1, 2021

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED
TO DEEPROOT IF YOU DO NOT INVEST.**

SEC-DEEPROOT-E-0211514

## NOTICES TO INVESTORS

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.   EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.  WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0211515

deeproot 575 Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## CLASS C SHARES OFFERING

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____

Name

Copy No.

iii

SEC-DEEPROOT-E-0211516

deeproot®

deeproot 575 Fund, LLC
("**the575™**")
$75,000,000
Class C Membership Shares

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot 575 Fund, LLC** (the "Company", "us", "we", "our", or "**the575™**") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company.

**the575™** is a fixed-rate, fixed-term investment fund. **the575™** provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot affiliates, which offers investors either a growth or income option in five year terms. The Operating Agreement of the Company is attached hereto as Appendix I.

The Company's principal business offices are located at 12621 Silicon Dr, San Antonio, Texas 78249-3447.

## I
## THE OFFERING

**Structure**

1.      The Company is initially offering up to $75,000,000, or 3,000 Class C Membership Shares ("Class C Shares") at a price of $25,000 per Class C Share, or a fraction thereof. The minimum investment per transaction is $50,000, or 2 Class C Shares. Fractional shares up to five decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class C Shares, without notice or permission, to accommodate renewals by existing Class C Shareholders.

2.      The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

3.      Any commissions or discounts paid (if any) with respect to the offering of the Class C Shares shall be at the expense of the Company. Advisory fees shall be at the expense of the Class C Shareholder.

**Offering Basics**

4.      **the575™** is an equity investment with a Mandatory Call five years, less one day ("subscription term"), from the Start Date. The Start Date is the date when all of the following conditions are satisfied: i) the Class C Shareholder's Application and Subscription Agreement is approved by the Company; ii) the Class C Shareholder makes the irrevocable Priority Return Election; and iii) all subscribed funds/monies ("Invested Capital" or "Principal" herein) are received by the Company, and are available for use.

5.      On or before the Start Date, a Class C Shareholder must make an irrevocable **_election_** as to how to receive the Priority Return. The "Priority Return" may either be: i) **deferred** (i.e. growth) – a simple fixed rate, lump-sum return of the Invested Capital; _or_ ii) **periodic** (i.e. income) – a fixed rate per annum of the Invested Capital paid in either monthly or quarterly payments. The irrevocable **_election_** defined in this paragraph will herein be referred to as the "Priority Return Election.". The fixed rates referenced _infra_ are on a Class C Shareholder basis for contemporaneous subscriptions of Principal as set forth in the following subparagraph (6).

6.      The **deferred** fixed rate return at maturity as a capital gain shall be 45% (or a simple equivalent of 9% per annum) for Principal under $500,000.00; and 55% (or a simple equivalent of 11% per annum) for

SEC-DEEPROOT-E-0211517

contemporaneous subscriptions of Principal $500,000.00 or over. The **periodic** fixed rate per annum shall be seven percent (7%) for Principal under $500,000.00; and nine percent (9%) for Principal under $500,000.00 or over. The fixed rate on deferred or periodic Priority Return Election may be negotiated at market rates for all institutional amount of Principal over $1.5 Million.

7.    The Company is permitted to issue a "Premature Call" before the full five year Mandatory Call term is satisfied. However, the Company must satisfy the full Priority Return due any prematurely called Class C Shareholder(s), as if the full five year term had been satisfied by a *normal* Mandatory Call. All calls are made in the sole discretion of the Company and are absolute, and without recourse. Any normal, or adverse, income tax implications arising from a Premature Call are the sole responsibility of the Class C Shareholder.

8.    **the575™** does not permit any Class C Shareholder to request any Invested Capital or Principal outside of a Mandatory or Premature Call. As such, Class C Shares (even in a periodic Priority Return Election) are not suitable for emergency, living expenses, other income requirements, or Required Minimum Distributions (RMDs).

9.    The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

10.    There are no costs, fees, or expenses that will be assessed against a Class C Shareholder's account, other than those disclosed in Articles VI or VII herein.

**Other Offering Details**

11.    Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

12.    Class C Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to this Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class C Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class C Shareholder.

13.    If a Class C Shareholder dies, such Class C Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class C Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class C Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

II
**SUITABILITY STANDARDS FOR INVESTORS**

Investment in the Class C Shares of the Company offered hereby involves a high degree of risk. The Class C Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class C Shares. The Class C Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

SEC-DEEPROOT-E-0211518

No Class C Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise. The Company will have the sole discretion regarding admittance of any investor into the Company.

## III
## RISK FACTORS

Participation in the Company requires a minimum investment of 2 Class C Shares ($50,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.    Lack of Operating History.
The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise.

B.    Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class C Shares.
Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class C Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.    Investment in the Class C Shares involves an enhanced degree of risk.
We will only be able to meet our obligations to the Class C Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

SEC-DEEPROOT-E-0211519

D.      It is possible Class C Shareholders may have to contribute additional money.

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class C Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class C Shareholders to advance additional principal if: i) the Class C Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class C Shareholders.

E.      Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers.  In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms.  Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company.  The Class C Shareholders will have limited right to participate in the management of the Company.

F.      Some Agreements, Including Those Involving Compensation, Not at Arms-Length.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class C Shareholders.  Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining.  However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds.  Those funds may, from time to time, purchase Class C Shares in the Company to hold as assets in those other funds.  Should dF purchase Class C Shares, they are subject to the same identical terms as any other Class C Shareholder.

G.      Lack of Liquidity.

The Class C Shareholders should be fully aware of the long-term nature of this investment.  There is no market for resale of Class C Shares, nor is one likely to develop.  The Shares are intended to be held indefinitely and are therefore, illiquid.  As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's).  There are a number of restrictions on the transferability of the Class C Shares offered hereunder.  In addition, Class C Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences.  Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement.  Accordingly, Class C Shareholders may not be able to liquidate this investment, even in the event of an emergency.  Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders.

H.      Not Suitable for Required Minimum Distributions.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class C Shareholder's elected periodic Priority Return might be greater than the annual RMD requirement.  RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires.  As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

I.      Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor.  While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

J.      Determination of Company's Profit and Loss.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital

SEC-DEEPROOT-E-0211520

is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

K.     Determination of Class C Shareholder's Share of Profit.
In all cases, a Class C Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, plus any unpaid elected Priority Return.

L.     No Guarantee of Fixed Returns.
Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class C Shareholders, our excess reserves would be expected to cover the deficit.  However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return.  As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

M.     Inadequate Valuations and Their Effect on the Accounting of the Company and Class C Shares.
Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio.  Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class C Shareholders will actually earn the amount owed upon each maturity.  However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

N.     Possible Classification as an Investment Company.
Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act").  Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies.  We intend to restrict investment in our securities to the maximum number of Class C Shareholders permitted under then-current federal law, in order to meet an exemption from registration under the Investment Company Act.  Since we do not intend to register as an investment company, Class C Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

O.     Some Information may not be Provided.
Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class C Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

P.     Federal Income Tax Risks.
WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING.  IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class C Shares.  The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment.  A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

Q.     Risk of Audit.
Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit.  While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

SEC-DEEPROOT-E-0211521

# IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Insurance Policies ("Life Policies", "Policies", "Contracts") as the simple majority of our Fund Assets. We anticipate that all Life Policies purchased by this Fund will be purchased as a turn-key package through an affiliate offering with the deeproot Growth Runs Deep Fund, LLC. As disclosed in that fund, the following disclosures would ultimately apply to any purchase made hereunder.

Life Policies are sales to third parties, of existing life insurance contracts held on insureds who are typically within 15 years of life expectancy, or 65 years of age or older. Policies are purchased at a discount; for more than their cash surrender value but less than the net death benefit to be paid under the policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. These policies are considered illiquid in that they are bought and sold in a secondary market through policy brokers and not on any exchange where settlement of a transaction is required in a timely manner.

The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes. Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity.

The Life Policies we buy should not be confused with (retail) life settlements or viaticals, both of which have negative connotations, substantial added risks, and are different than the institutional policies we source. A viatical is a policy that is bought to gamble on the potentially short life span of a terminally ill insured, usually under the age of 65. We do not buy viaticals. Retail life settlements refer to life policies that are bought and resold on the primary and secondary markets directly to investors (as opposed to being pooled in a fund). Since the investors tend to take on additional risk (such as premium and life expectancy risks), these policies tend to have attributes less favorable to our stricter underwriting guidelines.

<u>Types of Policies</u>
There are several types of insurance contracts that we might purchase. Some of these types of contracts might include whole life, universal life, or convertible term. Some of these types might have multiple subtypes. For example, universal life contracts can further be distinguished by indexed universal life, variable universal life, or fixed universal life. Each of these types of life policies have pros and cons. The Manager intend to use multiple types of contracts to diversify the portfolio.

Whole life insurance constitutes permanent cash-value life insurance policies that typically earn a fixed rate of internal interest above the cost of insurance. On the other hand, universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to cash value of the policy utilizing an investment-style under-lying mechanism. The investment-style crediting of a universal policy varies depending on if the allocation is fixed, indexed, or variable.

Whereas whole and universal life insurance policies are considered 'owned' policies; term life insurance are considered 'rented' or 'leased' policies. This is because term policies are only available for certain underwriting and age classes, only last for specific terms of time, and do not carry any cash value. Convertible Term policies are a variation in that you can 'lease to own'. In other words, the 'leased' term policy can be converted to an 'owned' whole or universal life policy under certain conditions.

<u>Target Life Settlement Portfolio Summary</u>
In sourcing life policies for a diversified portfolio, there are a number of attributes we look at before purchasing a contract. First and foremost is the reliability of the underwriting or life expectancy report. These reports are provided to us by our middle source provider, having been conducted by a well-known and reputable underwriter. In addition, we assess the following attributes and how the potential policy purchase would impact, and hopefully further diversify, the existing portfolio.

SEC-DEEPROOT-E-0211522

| | |
|---|---|
| Minimum Age of Insureds | 65 |
| Target Min Age for Male Insureds | 74 |
| Target Min Age for Female Insureds | 76 |
| Min Face-to-Acquisition Cost Ratio @ LE+1 | 0.70 |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Target Life Expectancy Range | 3 - 12 years |
| Target Life Expectancy | 4 - 6 years |
| Internal Life Expectancy/Premium Expense | Life Expectancy + 1 or higher |
| Carrier [AM Best] permissible ratings | B+, B++, A-, A, A+, A++ |
| <65 Age policies | < 5% of aggregate investments |
| Second to Die policies | < 5% of aggregate investments |

Sourcing

There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy.

In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies.

Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We rely on the medical/actuarial life expectancy assumptions provided to us by the third party medical actuarial firm to estimate the expected mortality of the insured. We will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year (ie. LE+1). It is management's experience that on average LE+1 is a responsible and conservative approach to estimating the life expectancy of the policies that we plan to purchase, due to the fact that LE is an actuarial based estimate for an insured's life expectancy.

The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies. Some of the insurance carriers our Manager have purchased policies in the past from, are: AIG, Transamerica, Met Life, VOYA, Lincoln Financial, Protective Life, AXA Financial, Midland National, etc.

The price we are willing to pay for a policy (the "Acquisition Cost") in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to not only exceed the costs necessary to pay premiums and the costs to cover our operating expenses, but also to return the liquidation amount to all investors.

Investment Allocation Policy

It is our policy to avoid conflicts of interest in allocation of funds to life policies. We segregate assets between classes of shares. Since life policies available for purchase are always in flux (being time and money dependent at any given time), we will only allocate capital from a specific Fund for purchase of the life policy for that Fund. This allocation policy prevents the Manager from favoring one Fund over another. If money is readily available from multiple Funds at the same time, the Manager may use discretion to choose appropriate policies for each Fund given the capital available with the then available policies at the time.

Risk Management

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles. Some risks apply to this asset, which are discussed as follows.

SEC-DEEPROOT-E-0211523

Risks - Sourcing

The United States is one of only a few financial markets in the world where quality life insurance can be obtained at low cost with a dynamic range of underwriting profiles. While historical trends indicate that most life policies are sold to overseas institutions and investors, domestic purchases have dwindled for various reasons. Sourcing is not amongst those reasons. Retention of our sourcing providers are a key element to our success. Our sourcing providers are able to tap the vibrant supply currently being sought after by foreign institutions and investors. While we do not expect any changes to the quality or quantity of life polices over the next decade, if this trend changes, we are prepared to adjust with other traditional or alternative capital appreciation assets.

Risks - Illiquidity

A life policy matures when the underwritten insured dies, an authenticated claim is filed with the insurance company, and the death benefits are paid. Until that time, the policy is practically illiquid. Future premium payments beyond normal reserves poses potential liquidity risks. Withdrawals of cash value will usually significantly alter the underlying accounting of policy, and even result in a potential lapse of the policy. As a result, it is our corporate policy to not withdraw cash value outright unless doing so will not affect the underlying accounting of the policy. We differentiate 'withdrawal' of cash from a life policy (for our retention or other use) from 'spending the cash down' for purposes of internal cash leverage to reduce premium outlay at the expense of the insurance carrier. In addition, by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'. While we reserve the right to resell a policy held by us in secondary market to one or more third parties, in return for fair market value (i.e. usually calculated as the face amount of the policy, less a discount for marketability and life expectancy), the inability to sell a policy that has become economically toxic could be an issue.

Risks - Unknown Maturities

There is no guaranteed method of predicting the death of an insured. The closest we can come to predicting a range of life expectancy is with a medical review, underwriting analysis, and governmental or industry mortality tables. While we intend to purchase life policies in the secondary market with life expectancy terms that average between four and six years, there could be maturities both sooner or later. Maturity directly affects two key aspects of our fund: the annualized return of the investment, and the pace of queue position advancement. Both of these aspects are equally important to fulfilling the expectations of investors.

Risks - Out of Control Premium Costs

Life policies usually require premiums to be paid periodically until maturity. The timely and accurate payment of premium is the most essential and critical component of holding a life policy portfolio. We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc. While some policies will require additional premium as billed, normally there is some semblance of reserves capable of funding the underwritten life expectancy of the insured, plus one year (LE+1). As a result, we do not anticipate having to dip into reserves or face exigencies until after such time as the insured has lived beyond LE+1. This significantly reduces the short and long term financial expenditures or costs of the Offering and increases internal liquidity.

Risks - Life Policy Forfeiture or Lapse

When premium is not timely paid, or not enough premium is paid, an insurance carrier might *lapse* the policy (i.e. terminate the policy for less than fair market value). This could happen due to oversight on our part, and/or by illicit behavior by carrier. In either circumstance, we might have to pay additional sums to reinstate the policy, or in the worst case scenario, litigate the matter. Litigation is extremely expensive and time consuming. Trends indicate that the risk of litigating a lapsed policy (whether occurring by our own fault, or that of the carrier) is only getting higher, as many carriers have adopted a 'come and take it' attitude. With that said, we do not anticipate that for most of our policies this will be an issue.

Risks - Carrier Rehabilitation or Liquidation

In the worst case scenario wherein a life insurance company enters rehabilitation by order of a state insurance official, files for bankruptcy, or is liquidated, we might not receive the full face value of the life policy. While one or more state guaranty funds might cover some or all of the losses, it is a historically-potential risk. While a risk, we do not anticipate that this will occur given the financial strength of the carriers our life policies are underwritten by. In addition, if this ever occurs it will likely only be with one or two carriers. A systemic failure of life insurance market

SEC-DEEPROOT-E-0211524

would arguably only occur in conjunction with a substantial or major economic disaster that would also affect every other industry and everyone, everywhere.

**Minority Allocations**

We minimize this risk by limiting the certain allocations of the funds in the 575 to less than fifty percent (50%) of the asset portfolio. We call these collectively the minority allocations.

The first minority allocation are capital acquisitions, being a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. The purpose of this investment type is: i) to provide short term liquidity; ii) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and iii) the safer diversification of underlying assets away from just life policies.

Currently, the following assets class may also be invested in using minority allocations. A subscribed investor maybe request disclosure information about any of these:

- Capital acquisition in tech (deeproot Tech, deeproot Studios, deeproot Pinball)
- Real Estate
- Small Businesses Car Wash
- Sports & Entertainment development, and venue and team management
- Factoring and financing of Construction Accounts Receivable

**Other Asset Classes**

The Company reserves the right to include other assets or asset classes, with reasonable notice to Class C Shareholders.

## V
## REPORTING

Class C Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class C Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access. For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class C Shareholders' prior requests. These include:

» notice of any default of more than 50% of asset value or investor Liquidation Amounts exceeding 25% of the Offering
» a statement of account at least once annually, or digital access to the same
» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
» notice of any adverse regulatory liltigation, proceeding or decision regarding us that directly and significantly affects the Class C Shareholders' rights or values

SEC-DEEPROOT-E-0211525

We also have a duty to release certain information only upon request by a Class C Shareholder. These include:

» a statement of account value at the time of request
» a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class C Shareholder. This information includes but is not limited to:

» copies of any confidential, privileged or proprietary information that does not directly involve any Class C Shareholder's interest
» any information concerning another Class C Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

# VI
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class C Shares will be used to begin purchasing assets identified above. The proceeds of sales of additional Class C Shares will be used as the sales are closed. The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
| --- | --- |
| Principal | $23,500.00 |
| Expenditures (~6%) | $ 1,500.00 |
| *Initial Compensation (if any)* | |

## Agent Compensation

If a Class C Shareholder is represented by a broker or other professional who may legally receive commissions or other compensation for referring, advising, or providing this Offering to Class C Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class C Shareholder.

There are some types of compensation that must be paid by the Class C Shareholder, such as advisory fees. In that case, the Class C Shareholder fully indemnifies Company from being responsible for those payments. In addition, we will not pay any selling commissions, but will pay Manager fees, in connection with the sale of Class C Shares to investors whose contracts for investment advisory and related brokerage services include a fixed or "wrap" fee feature. Investors may agree with their broker-dealers to reduce the amount of selling commissions payable with respect to the purchase of their preferred shares down to zero: (i) if the investor has engaged the services of a registered investment advisor, or RIA, or other financial advisor who will be paid compensation for investment advisory services or other financial or investment advice, or (ii) if the investor is investing through a bank trust account with respect to which the investor has delegated the decision-making authority for investments made through the account to a bank trust department. The net proceeds to us will not be affected by reducing commissions payable in connection with such sales. Neither our Manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the Class C Shares offered hereby.

## Company Advance

In lieu of a management fee, the Company shall receive an advance of no less than two percent (2%) and no more than ten percent (10%) of the Invested Capital of any Class C Shareholder. This is not a fee. Rather this is an advance out of Invested Capital. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent

SEC-DEEPROOT-E-0211526

(100%) of the Class C Shareholder's Principal shall be returned at the Pay Date.

## VII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers.  However, the sole current Manager is Robert J. Mueller, Esq.  All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | *As billed by the Custodian* |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | *As billed by the Custodian* |
| Wire Fee | *As billed by the Custodian* |
| Investor Advisory Fees | *See below \** |

*   For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class C Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class C Shareholder's Liquidation Amount at the Pay Date.

## VIII
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, the575**[TM]

There is only one director and executive officer of the Company: Robert J. Mueller.  He is an executive, attorney, and financial advisor with over fifteen years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated a semester early in December 2000, and was admitted to the Texas Bar in May 2001.

Robert is age 45 as of the date of this Prospectus, and has been the principal officer, director, or manager of Policy Services, Inc., and all of the deeproot® family of companies since 2012.  Prior to creating Policy Services, Inc, and the deeproot® family of companies in 2012, Robert practiced full time estate planning law, sold insurance products, and operated two companies in the insurance services industry, creating a book of business with over 750 clients.

Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities.  Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold.  He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises.  Robert also has backgrounds in accounting, valuation, information technology, graphic design, marketing, programming, and other technical areas.

Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the575 Fund. Robert is paid a salary from an affiliate for all services provided across all the entities.  Neither he, nor any other executive or personnel serving or employed may earn a commission on any Class C Shares sold.  Any marketing or travel expenses on behalf of the575 will be expensed by invoice.

SEC-DEEPROOT-E-0211527

**Security Ownership of Beneficial Owners**

| (1) Title of Class | (2) Name and Address of Beneficial Owner | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller<br>12621 Silicon Dr<br>San Antonio, TX 78249 | 100%<br>*By and through Parent Entities of the Company* | 100% |

**Security Ownership of Management**

| (1) Title of Class | (2) Name and Title of Manager | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller | 100%<br>*By and through Parent Entities of the Company* | 100% |

## IX
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class C Shares, a Class C Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of the dGRD Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars (or $23,500.00 if through an RIA) for each full Class C Share subscribed for, or fractional part thereof, or if an payable to the order of: **deeproot Funds**; or deeproot Fund's designated custodian.

Executed copies of the documents to be completed by the Class C Shareholders are being delivered with this Confidential PPM. EACH CLASS C SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class C Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Depending on the custodian: i) a certificate of ownership, in lieu of a share certificate, shall be issued to each Class C Shareholder in a closing packet, along with copies of the application and subscription agreement; or ii) a certificate will be held in street form with the custodian.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## X
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

SEC-DEEPROOT-E-0211528

Any Class C Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 12621 Silicon Dr, San Antonio, Texas 78249, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class C Shareholder.

## XI
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class C shares?**
deeproot 575 Fund, LLC ("**the575**™") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation. This was done for ease of organization, lower filing and maintenance costs, tax options, etc. In order for an LLC to mirror a For-Profit Corporation's issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares'). Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in **the575**™ are the equivalent to common stock in a For-Profit Corporation. They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class C's preferential rights.

**What are Class C shares?**
Class C Shares in **the575**™ are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory or Premature Call feature. While they do have limited voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Are Class C shares 'cumulative'?**
Yes. A cumulative Priority Return is the equivalent of cumulative preferred stock. That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class C Shareholders, before any other class' shareholders may receive net distributions.

**Are Class C shares 'participating'?**
No. Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return. In this Offering, the Company accepts the risk of participation interests or losses.

**What is my Priority Return and When will I receive it?**
The Priority Return you receive will be based on the Priority Return Election you make for the subscription term. Class C Shareholders with a periodic Priority Return Election will receive monthly or quarterly Priority Return payments equal to the monthly pro rata share of the fixed annualized return. Class C Shareholders with a deferred Priority Return Election will receive a lump sum capital gain on or about the Pay Date.

**What does it mean that the Company can 'call' my shares?**
A *call* is a right retained by the Company to buy-back Class C Shares. The Company's right to call is absolute and without recourse. Upon any call, all rights and privileges as to a Class C Shareholder's called position(s) will be terminated, and the Company will convey the Class C Shareholder's Liquidation Amount on the Pay Date. The Mandatory Call under the **the575**™ is pre-determined at five years, less one day, from the Start Date. A Premature Call can happen at any time before, and supersedes, the Mandatory Call.

**How do Class C Shareholders get notified when a 'call' occurs?**
For a Mandatory Call, the Company will notify you in writing shortly before the Mandatory Call to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any). For a Premature Call, the Company will notify you at least sixty days before the premature call date, to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).

**How can I get my Principal back?**
Unless renewed in full, or part, your Principal will be returned at the Pay Date. All requests for Invested Capital or Principal outside of a call (and subsequent Pay Date), will be rejected.

SEC-DEEPROOT-E-0211529

**Can I change my Priority Return election?**

No.  Once a Priority Return Election is chosen on or before the Start Date, it may not be changed or altered until a call occurs.

**Is my principal or liquidation amount protected?**

Each Class C Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company.  That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class C shareholders. Class C shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency.  The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**

Pursuant to the Operating Agreement, Class C shares have limited voting rights, or say, in the affairs of the Company.

## THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

*The area below the following line is intentionally left blank.*

SEC-DEEPROOT-E-0211530

# EXHIBIT 3





**EXHIBIT**
**5**
HO-14036

DANDRIDGE
**EXHIBIT**
**5**
Victoria L. Valine, CSR, RMR, CRR
Stenographic Court Reporter
Texas CSR  No. 11743     9/22/2022

| **Mailing** | **Overnight/Physical** |
|---|---|
| PO Box 691610 | 12621 Silicon Dr |
| San Antonio, TX 78269-1610 | San Antonio, Texas 78249-3447 |

Toll Free (888) 316-2935

## CLASS B MEMBERSHIP SHARES
### Version 2019

deeproot 575 Fund, LLC (the "Company", "us", "we", or "the575™") is a private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in deeproot affiliates; and cash or cash equivalents.  To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors."  Prospective investors will be asked to complete an Application and Subscription Agreement and provide photo identification.  We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506, Subsection (b).

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS.  See "Risk Factors."

|  | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,625.00 | $23,375.00 |
|  |  |  |  |
| Total Minimum[3] | $50,000.00 | $3,000.00 | $97,000.00 |
| Total Maximum | $75,000,000.00 | $4,875,000.00 | $70,125,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us.  However, we may engage third parties to help us sell Shares under this offering.  Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder.  Compensation to such persons, if any, will vary and may be paid out of the Investors principal, subject to reimbursement by Company as detailed herein.
[3] Proceeds will not be held in a separate account and will be immediately employed to purchase assets.  Certain amounts may be retained for administration or management purposes.

### DATED SEPTEMBER 16, 2019

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED
TO DEEPROOT IF YOU DO NOT INVEST.**

SEC-DEEPROOT-E-0164824

NOTICES TO INVESTORS

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.   EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.  WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0164825

deeproot 575 Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### CLASS B SHARES OFFERING

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____
Name

Copy No.

iii

SEC-DEEPROOT-E-0164826

deeproot*
**deeproot 575 Fund, LLC**
(**"the575™"**)
$75,000,000
Class B Membership Shares
Version 2019

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot 575 Fund, LLC** (the "Company", "us", "we", "our", or "**the575™**") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole shareholder and principal of the deeproot® family of companies is the current Manager of the Company.

**the575™** is a fixed-rate, fixed-term investment fund. **the575™** provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot affiliates, which offers investors either a growth or income option in five year terms. The Operating Agreement of the Company is attached hereto as Appendix I.

A modified version of this Offering of Class B Shares existed previously and has been closed to new investment. That Offering will continue in its current form and payout for all of those investors. The Class B Shareholders of this 2019 Version will substantially also invest in the same pooled assets materially supporting and backing up their investments.

The Company's principal business offices are located at 12621 Silicon Dr, San Antonio, Texas 78249-3447.

## I
## THE OFFERING

**Structure**

1.      The Company is initially offering up to $75,000,000, or 3,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof. The minimum investment per transaction is $50,000, or 2 Class B Shares. Fractional shares up to five decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2.      The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

3.      Any commissions or discounts paid (if any) to a Broker Dealer with respect to the offering of the Class B Shares shall be at the expense of the Company. See Agent Compensation under Section 6 for additional information.

**Offering Basics**

4.      **the575™** is an equity investment with a Mandatory Call five years, less one day ("subscription term"), from the Start Date. The Start Date is the date when all of the following conditions are satisfied: i) the Class B Shareholder's Application and Subscription Agreement is approved by the Company; ii) the Class B Shareholder makes the irrevocable Priority Return Election; and iii) all subscribed funds/monies ("Invested Capital" or "Principal" herein), for the singular transaction, are received by the Company, and are available for use.

SEC-DEEPROOT-E-0164827

5.        On or before the Start Date, a Class B Shareholder must make an irrevocable *election* as to how to receive the Priority Return.  The "Priority Return" may either be: i) **deferred** (i.e. growth) – a simple fixed rate, lump-sum return of the Invested Capital; <u>or</u> ii) **periodic** (i.e. income) – a fixed rate of either five percent (5%) of Invested Capital if less than $400,000.00, or seven percent (7%) per annum of Invested Capital $400,000.00 or higher, paid in either monthly or quarterly payments.  The irrevocable *election* defined in this paragraph will herein be referred to as the "Priority Return Election."

6.        On or about the thirtieth (30th) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount".  The Liquidation Amount shall be equal to the Invested Capital, plus one of the following:

(a)        if *deferred*, and the Invested Capital was less than $400,000.00, a lump sum capital gain of 35% of the Invested Capital.

(b)        if *deferred*, and the Invested Capital was $400,000.00 or greater, a lump sum capital gain of 45% of the Invested Capital.

(c)        if *periodic*, any unpaid priority returns.

7.        The Company is permitted to issue a "Premature Call" before the full five year Mandatory Call term is satisfied.  However, the Company must satisfy the full Priority Return due any prematurely called Class B Shareholder(s), as if the full five year term had been satisfied by a *normal* Mandatory Call. All calls are made in the sole discretion of the Company and are absolute, and without recourse.  Any normal, or adverse, income tax implications arising from a Premature Call are the sole responsibility of the Class B Shareholder.

8.        **the575**™ does not permit any Class B Shareholder to request any Invested Capital or Principal outside of a Mandatory or Premature Call.  As such, Class B Shares (even in a periodic Priority Return Election) are not suitable for emergency, living expenses, other income requirements, or Required Minimum Distributions (RMDs).

9.        The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

10.        There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VI or VII herein.

**Other Offering Details**

11.        Class A Shareholders retain all standard voting rights.  The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

12.        Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to this Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

13.        If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive.  The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return.  The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

II

SEC-DEEPROOT-E-0164828

## SUITABILITY STANDARDS FOR INVESTORS

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk.  The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment.  There will not be any public market for the Class B Shares.  The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency.  This is an offering made only to a limited number of investors for investment only.  Each investor will be required to execute the Subscription Agreement.  Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part.  Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters.  The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and autombiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment.  In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise.  The Company will have the sole discretion regarding admittance of any investor into the Company.

## III
## RISK FACTORS

Participation in the Company requires a minimum investment of 2 Class B Shares ($50,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT.  PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.      Lack of Operating History.

SEC-DEEPROOT-E-0164829

Even though the Company has been in operation since 2015, it still is subject to all the risks of a new business enterprise. The current version of this Offering will not necessarily have the benefit of a track record of success that the previous Offering enjoyed. However, many of the affiliates that money might be invested in may not have any operating history and thus be subject to the foreseeable risks of a startup.

B.      Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.
Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.      Investment in the Class B Shares involves an enhanced degree of risk.
We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D.      It is possible Class B Shareholders may have to contribute additional money.
As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

E.      Dependence on Managers.
The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

F.      Some Agreements, Including Those Involving Compensation, Not at Arms-Length.
As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder.

G.      Lack of Liquidity.
The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders.

H.      Not Suitable for Required Minimum Distributions.

SEC-DEEPROOT-E-0164830

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's elected periodic Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

    I.      <u>Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio</u>.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

    J.      <u>Determination of Company's Profit and Loss</u>.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

    K.      <u>Determination of Class B Shareholder's Share of Profit</u>.

In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, plus any unpaid elected Priority Return.

    L.      <u>No Guarantee of Fixed Returns</u>.

Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

    M.      <u>Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares</u>.

Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

    N.      <u>Possible Classification as an Investment Company</u>.

Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities to the maximum number of Class B Shareholders permitted under then-current federal law, in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

    O.      <u>Some Information may not be Provided</u>.

Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

    P.      <u>Federal Income Tax Risks</u>.

SEC-DEEPROOT-E-0164831

WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING. IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares. The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment. A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

Q.       Risk of Audit.

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit. While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

# IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Insurance Policies ("Life Policies", "Policies", "Contracts") as the simple majority of our Fund Assets. **We anticipate that all Life Policies purchased by this Fund will be purchased as a turn-key package through an affiliate offering with the deeproot Growth Runs Deep Fund, LLC.** As disclosed in that fund, the following disclosures would ultimately apply to any purchase made hereunder.

Life Policies are sales to third parties, of existing life insurance contracts held on insureds who are typically within 15 years of life expectancy, or 65 years of age or older. Policies are purchased at a discount; for more than their cash surrender value but less than the net death benefit to be paid under the policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. These policies are considered illiquid in that they are bought and sold in a secondary market through policy brokers and not on any exchange where settlement of a transaction is required in a timely manner.

The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes. Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity.

The Life Policies we buy should not be confused with (retail) life settlements or viaticals, both of which have negative connotations, substantial added risks, and are different than the institutional policies we source. A viatical is a policy that is bought to gamble on the potentially short life span of a terminally ill insured, usually under the age of 65. We do not buy viaticals. Retail life settlements refer to life policies that are bought and resold on the primary and secondary markets directly to investors (as opposed to being pooled in a fund). Since the investors tend to take on additional risk (such as premium and life expectancy risks), these policies tend to have attributes less favorable to our stricter underwriting guidelines.

Types of Policies

There are several types of insurance contracts that we might purchase. Some of these types of contracts might include whole life, universal life, or convertible term. Some of these types might have multiple subtypes. For example, universal life contracts can further be distinguished by indexed universal life, variable universal life, or fixed universal life. Each of these types of life policies have pros and cons. The Manager intend to use multiple types of contracts to diversify the portfolio.

Whole life insurance constitutes permanent cash-value life insurance policies that typically earn a fixed rate of internal interest above the cost of insurance. On the other hand, universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to cash value of the policy utilizing an

SEC-DEEPROOT-E-0164832

investment-style under-lying mechanism. The investment-style crediting of a universal policy varies depending on if the allocation is fixed, indexed, or variable.

Whereas whole and universal life insurance policies are considered 'owned' policies; term life insurance are considered 'rented' or 'leased' policies. This is because term policies are only available for certain underwriting and age classes, only last for specific terms of time, and do not carry any cash value. Convertible Term policies are a variation in that you can 'lease to own'. In other words, the 'leased' term policy can be converted to an 'owned' whole or universal life policy under certain conditions.

Target Life Settlement Portfolio Summary
In sourcing life policies for a diversified portfolio, there are a number of attributes we look at before purchasing a contract. First and foremost is the reliability of the underwriting or life expectancy report. These reports are provided to us by our middle source provider, having been conducted by a well-known and reputable underwriter. In addition, we assess the following attributes and how the potential policy purchase would impact, and hopefully further diversify, the existing portfolio.

| | |
|---|---|
| Minimum Age of Insureds | 65 |
| Target Min Age for Male Insureds | 72 |
| Target Min Age for Female Insureds | 73 |
| Target Min Avg Face-to-Acquisition Cost Ratio @ LE+1 | 0.70 |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Target Policy Life Expectancy Range | 3 - 12 years |
| Target Portfolio Life Expectancy | 4 - 6 years |
| Internal Life Expectancy/Premium Expense | Life Expectancy + 1 or higher |
| Carrier [AM Best] permissible ratings | B+, B++, A-, A, A+, A++ |
| <65 Age policies | < 5% of aggregate investments |
| Second to Die policies | < 5% of aggregate investments |

Sourcing
There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy.

In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies.

Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We rely on the medical/actuarial life expectancy assumptions provided to us by the third party medical actuarial firm to estimate the expected mortality of the insured. At a minimum, we will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year (ie. LE+1). It is management's experience that on average that (as each policy specs dictate) LE+1 to LE+3 is a responsible and conservative approach to estimating the life expectancy of the policies that we plan to purchase, due to the fact that LE is an actuarial based estimate for an insured's life expectancy.

The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies. Some of the insurance carriers our Manager have purchased policies in the past from, are: AIG, Transamerica, Met Life, VOYA, Lincoln Financial, Protective Life, AXA Financial, Midland National, etc.

The price we are willing to pay for a policy (the "Acquisition Cost") in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are

SEC-DEEPROOT-E-0164833

expected to not only exceed the costs necessary to pay premiums and the costs to cover our operating expenses, but also to return the liquidation amount to all investors.

Investment Allocation Policy
It is our policy to avoid conflicts of interest in allocation of funds to life policies. We segregate assets between classes of shares. Since life policies available for purchase are always in flux (being time and money dependent at any given time), we will only allocate capital from a specific Fund for purchase of the life policy for that Fund. This allocation policy prevents the Manager from favoring one Fund over another. If money is readily available from multiple Funds at the same time, the Manager may use discretion to choose appropriate policies for each Fund given the capital available with the then available policies at the time.

Risk Management
We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles. Some risks apply to this asset, which are discussed as follows.

Risks - Sourcing
The United States is one of only a few financial markets in the world where quality life insurance can be obtained at low cost with a dynamic range of underwriting profiles. While historical trends indicate that most life policies are sold to overseas institutions and investors, domestic purchases have dwindled for various reasons. Sourcing is not amongst those reasons. Retention of our sourcing providers are a key element to our success. Our sourcing providers are able to tap the vibrant supply currently being sought after by foreign institutions and investors. While we do not expect any changes to the quality or quantity of life polices over the next decade, if this trend changes, we are prepared to adjust with other traditional or alternative capital appreciation assets.

Risks - Illiquidity
A life policy matures when the underwritten insured dies, an authenticated claim is filed with the insurance company, and the death benefits are paid. Until that time, the policy is practically illiquid. While the wait-for-funds-before-Call design of the dGRD minimizes this risk, future premium payments beyond normal reserves poses potential liquidity risks. Withdrawals of cash value will usually significantly alter the underlying accounting of policy, and even result in a potential lapse of the policy. As a result, it is our corporate policy to not withdraw cash value outright unless doing so will not affect the underlying accounting of the policy. We differentiate 'withdrawal' of cash from a life policy (for our retention or other use) from 'spending the cash down' for purposes of internal cash leverage to reduce premium outlay at the expense of the insurance carrier. In addition, by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'. While we reserve the right to resell a policy held by us in secondary market to one or more third parties, in return for fair market value (i.e. usually calculated as the face amount of the policy, less a discount for marketability and life expectancy), the inability to sell a policy that has become economically toxic could be an issue.

Risks - Unknown Maturities
There is no guaranteed method of predicting the death of an insured. The closest we can come to predicting a range of life expectancy is with a medical review, underwriting analysis, and governmental or industry mortality tables. While we intend to purchase life policies in the secondary market with life expectancy terms that average between four and six years, there could be maturities both sooner or later. Maturity directly affects two key aspects of our fund: the annualized return of the investment, and the pace of queue position advancement. Both of these aspects are equally important to fulfilling the expectations of investors.

Risks - Out of Control Premium Costs
Life policies usually require premiums to be paid periodically until maturity. The timely and accurate payment of premium is the most essential and critical component of holding a life policy portfolio. We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc. While some policies will require additional premium as billed, normally there is some semblance of reserves capable of funding the underwritten life expectancy of the insured, plus one year (LE+1). As a result, we do not anticipate having to dip into reserves or face exigencies

SEC-DEEPROOT-E-0164834

until after such time as the insured has lived beyond LE+3. This significantly reduces the short and long term financial expenditures or costs of the Offering and increases internal liquidity.

Risks - Life Policy Forfeiture or Lapse

When premium is not timely paid, or not enough premium is paid, an insurance carrier might *lapse* the policy (i.e. terminate the policy for less than fair market value). This could happen due to oversight on our part, and/or by illicit behavior by carrier. In either circumstance, we might have to pay additional sums to reinstate the policy, or in the worst case scenario, litigate the matter. Litigation is extremely expensive and time consuming. Trends indicate that the risk of litigating a lapsed policy (whether occurring by our own fault, or that of the carrier) is only getting higher, as many carriers have adopted a 'come and take it' attitude. With that said, we do not anticipate that for most of our policies this will be an issue.

Risks - Carrier Rehabilitation or Liquidation

In the worst case scenario wherein a life insurance company enters rehabilitation by order of a state insurance official, files for bankruptcy, or is liquidated, we might not receive the full face value of the life policy. While one or more state guaranty funds might cover some or all of the losses, it is a historically-potential risk. While a risk, we do not anticipate that this will occur given the financial strength of the carriers our life policies are underwritten by. In addition, if this ever occurs it will likely only be with one or two carriers. A systemic failure of life insurance market would arguably only occur in conjunction with a substantial or major economic disaster that would also affect every other industry and everyone, everywhere.

**Capital Acquisition in deeproot Affiliates**

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to no more than fifty percent (50%) of the asset portfolio.

The purpose of this investment type is: i) to provide short term liquidity; ii) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and iii) the safer diversification of underlying assets away from just life policies.

Class B Shareholders are investing with the expectation of absolute reliance on the management team to successfully start, administer and execute these affiliates, in whatever form or structure may dictate. The enhanced risk of this reliance is minimized by limiting the portfolio exposure in affiliates, and the pro rata sub-project distribution with this portfolio exposure. The Class B Shareholders do not share in any equity, debt, risks, profits, or losses with these affiliates. The Class B Shareholders sole 'bargain' is the enhanced returns of this Offering in return for the minimized commiserate risk.

Currently, the Company will invest in the following enterprises of which disclosures are available upon request. The brief summary provided is only meant to provide clarity and does not limit or fully describe the operations that may be commenced. The Company reserves the right to alter the disclosure, or affiliates invested in, without notice or permission.

deeproot Tech

deeproot Tech is an enterprise that is comprised of engineers and scientists that develop, research & develop of tangible technology.

deeproot Pinball

deeproot Pinball is an enterprise which innovates, builds, and sells original and themed pinball machines.

deeproot Manufacturing

deeproot Manufacturing is an enterprise which contracts out to manufacture tangible goods or private label variations.

SEC-DEEPROOT-E-0164835

<u>deeproot Studios</u>

deeproot Studios is an enterprise in Utah that creates and develops art, animation, virtual reality, toys, and tangible games.

<u>deeproot Toys</u>

*See deeproot Studios.*

<u>deeproot Games</u>

*See deeproot Studios.*

<u>deeproot Sports & Entertainment</u>

deeproot Sports & Entertainment operates professional teams primarily in the soccer, football, and hockey sports, as well as operates entertainment venues.

**Other Asset Classes**

The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders.

# V
# REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access. For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

» notice of any default of any underlying asset
» notice of a failure to pay a Liquidation Amount to any Class B Shareholder
» a statement of account at least once annually, or digital access to the same
» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

We also have a duty to release certain information only upon request by a Class B Shareholder. These include:

» a statement of account value at the time of request
» a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:

» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest

| Confidential | deeproot 575 Fund, LLC | Class B Shares | September 16, 2019 | Page 10 of 15 |
|---|---|---|---|---|

SEC-DEEPROOT-E-0164836

» any information concerning another Class B Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VI
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above.  The proceeds of sales of additional Class B Shares will be used as the sales are closed.   The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
| --- | --- |
| Principal | $23,375.00 |
| Expenditures (~6%) *Initial Compensation (if any)* | $ 1,625.00 |

**Agent Compensation**

If a Class B Shareholder is represented by a broker or other professional who may legally receive commissions or other compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder.

There are some types of compensation that must be paid by the Class B Shareholder, such as advisory fees. In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments. In addition, we will not pay any selling commissions, but will pay Manager fees, in connection with the sale of Class B Shares to investors whose contracts for investment advisory and related brokerage services include a fixed or "wrap" fee feature. Investors may agree with their broker-dealers to reduce the amount of selling commissions payable with respect to the purchase of their preferred shares down to zero: (i) if the investor has engaged the services of a registered investment advisor, or RIA, or other financial advisor who will be paid compensation for investment advisory services or other financial or investment advice, or (ii) if the investor is investing through a bank trust account with respect to which the investor has delegated the decision-making authority for investments made through the account to a bank trust department. The net proceeds to us will not be affected by reducing commissions payable in connection with such sales. Neither our Manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the Class B Shares offered hereby.

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.  Despite an advance, <u>one hundred percent (100%)</u> of the Class B Shareholder's Principal shall be returned at the Pay Date.

## VII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers.  However, the sole current Manager is Robert J. Mueller, Esq.  All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

SEC-DEEPROOT-E-0164837

| | |
|---|---|
| NQ Account Set up Fee (Check) | $250.00 ^ |
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | Minimum $450 or *As billed by the Custodian* + |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | Minimum $50.00 or *As billed by the Custodian* |
| Wire Fee | Minimum $50.00 or *As billed by the Custodian* |
| Investor Advisory Fees | *See below* * |

^ Any initial investment amount for non-qualified queue positions that is not wired or in cashier's check form (i.e. personal check, money order, teller check) will incur a $250.00 fee for delays in processing due to bank holds.

+ For each annual year that a Class B Shareholder has and maintains at least $400,000.00 of Invested Capital in this Offering, Company shall cover that year's Annual IRA/Qualified Fee cost.

* For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

## VIII
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, the575™**

There is only one director and executive officer of the Company: Robert J. Mueller.  He is an executive, attorney, and financial advisor with over fifteen years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated a semester early in December 2000, and was admitted to the Texas Bar in May 2001.

Robert is age 44 as of the date of this Prospectus, and has been the principal officer, director, or manager of Policy Services, Inc., and all of the deeproot® family of companies since 2012 (see Pages 19 & 20 for entity information).  Prior to creating Policy Services, Inc, and the deeproot® family of companies in 2012, Robert practiced full time estate planning law, sold insurance products, and operated two companies in the insurance services industry, creating a book of business with over 750 clients.

Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities.  Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold.  He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises.  Robert also has backgrounds in accounting, valuation, information technology, graphic design, marketing, programming, and other technical areas.

Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the dGRD Fund. Robert is paid a salary from the Ultimate Parent for all services provided across all the entities.  Neither he, nor any other executive or personnel serving or employed from the Ultimate Parent downwards, may earn a commission on any Preferred Shares sold.  Any marketing or travel expenses on behalf of the dGRD Fund will be expensed by invoice.

It is not the Company's policy to permit an executive to hold any queue positions in his/her individual capacity.

SEC-DEEPROOT-E-0164838

It is the Company's policy to allow non-executive employees to hold queue positions, either as compensation, bonus, incentive, or retirement contributions; provided however that: i) cost and profit extend to a parent entity; and ii) such non-executive employees must follow the same rules as all other investors in being assigned queue positions at the back of the line, progress in the same sequential order, and receive a liquidation multiplier commiserate with the investment level.

### Security Ownership of Beneficial Owners

| (1) Title of Class | (2) Name and Address of Beneficial Owner | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller<br>12621 Silicon Dr<br>San Antonio, TX 78249 | 100%<br>*By and through Parent Entities of the Company* | 100% |

### Security Ownership of Management

| (1) Title of Class | (2) Name and Title of Manager | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller | 100%<br>*By and through Parent Entities of the Company* | 100% |

## IX
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of the dGRD Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, with a minimum of $50,000.00, payable to the order of: **deeproot Funds**; or deeproot Fund's designated custodian.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM. EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Depending on the custodian: i) a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement; or ii) a certificate will be held in street form with the custodian.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

SEC-DEEPROOT-E-0164839

# X
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 12621 Silicon Dr, San Antonio, Texas 78249, telephone: (888) 316-2935.  All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

# XI
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot 575 Fund, LLC ("**the575**™") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation.  This was done for ease of organization, lower filing and maintenance costs, tax options, etc.  In order for an LLC to mirror a For-Profit Corporation's issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares').  Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in **the575**™ are the equivalent to common stock in a For-Profit Corporation.  They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in **the575**™ are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory or Premature Call feature.  While they do have limited voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Are Class B shares 'cumulative'?**
Yes.  A cumulative Priority Return is the equivalent of cumulative preferred stock.  That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive net distributions.

**Are Class B shares 'participating'?**
No.  Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return.  In this Offering, the Company accepts the risk of participation interests or losses.

**What is my Priority Return and When will I receive it?**
The Priority Return you receive will be based on the Priority Return Election you make for the subscription term.  Class B Shareholders with a periodic Priority Return Election will receive monthly or quarterly Priority Return payments equal to the monthly pro rata share of the fixed annualized return.  Class B Shareholders with a deferred Priority Return Election will receive a lump sum capital gain on or about the Pay Date.

**What does it mean that the Company can 'call' my shares?**
A *call* is a right retained by the Company to buy-back Class B Shares.  The Company's right to call is absolute and without recourse.  Upon any call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the Class B Shareholder's Liquidation Amount on the Pay Date.  The Mandatory Call under the **the575**™ is pre-determined at five years, less one day, from the Start Date.  A Premature Call can happen at any time before, and supersedes, the Mandatory Call.

SEC-DEEPROOT-E-0164840

**How do Class B Shareholders get notified when a 'call' occurs?**
For a Mandatory Call, the Company will notify you in writing shortly before the Mandatory Call to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any). For a Premature Call, the Company will notify you at least sixty days before the premature call date, to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).

**How can I get my Principal back?**
Unless renewed in full, or part, your Principal will be returned at the Pay Date. All requests for Invested Capital or Principal outside of a call (and subsequent Pay Date), will be rejected.

**Can I change my Priority Return election?**
No. Once a Priority Return Election is chosen on or before the Start Date, it may not be changed or altered until a call occurs.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency. The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get a share of the profits from any of the Affiliates?**
No. The *bargain* of this Offering is an enhanced return for the commiserate risk of the Company bearing the main risk of success or failure in these new enterprises. Thus, the Class B Shareholder does not share in the gross risk, profits, losses, management, etc. of the affiliates.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares have limited voting rights, or say, in the affairs of the Company.

# THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

*The area below the following line is intentionally left blank.*

SEC-DEEPROOT-E-0164841

# EXHIBIT 4



| **Mailing** | **Overnight/Physical** |
|---|---|
| PO Box 691610 | 12621 Silicon Dr |
| San Antonio, TX 78269-1610 | San Antonio, TX 78249 |

Toll Free (888) 316-2935

**deeproot 575 Fund, LLC** (the "Company", "us", "we", or "**the575**™") is a new private equity investment offering that will invest in a number of asset classes including life settlements and ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in deeproot Tech; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement, a Form W-9 and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

| | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,750.00 | $23,250.00 |
| | | | |
| Total Minimum[3] | $100,000.00 | $7,000.00 | $93,000.00 |
| Total Maximum | $25,000,000.00 | $1,750,000.00 | $23,250,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and may be paid out of the Investors principal.
[3] All proceeds will be held in a separate account until we have received the minimum amount of $100,000 in order to start the enterprise. Thereafter, we will not place prospective investors' monies in escrow or a separate account. Certain amounts may be retained for administration or management purposes.

## DATED SEPTEMBER 1, 2015

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.**

i

SEC-DEEPROOT-E-0164808

<u>NOTICES TO INVESTORS</u>

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.  EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.  WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0164809

deeproot 575 Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### OFFERING DATED SEPTEMBER 1, 2015

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____
Name

Copy No.

iii

SEC-DEEPROOT-E-0164810

⬛ deeproot ®
### deeproot 575 Fund, LLC
("the575™")
$25,000,000
Class B Membership Shares

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot 575 Fund, LLC** (the "Company", "us," "we", "our," or "**the575™**") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member.  **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company.

**the575™** is a significant step forward in the evolution of deeproot®'s fixed-rate, fixed-term investment options. **the575™** provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot Tech, which offers investors either a growth or income option in five year terms.  The Operating Agreement of the Company is attached hereto as Appendix I.  The Company's principal business office is located at 12621 Silicon Dr, San Antonio, Texas 78249.  While ground-breaking, there is no assurance that the Company's business plan will be successful.

## I
## THE OFFERING

**Structure**

1.　　The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof.  The minimum investment per transaction is $25,000, or 1 Class B Share.  Fractional shares up to four decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2.　　Subscription payments will be held in an interest-bearing account until at least $100,000 of Class B Shares (4 Class B Shares) are sold.  Once the Company attains that level of sales, the Company will commence business by purchasing the first assets.  If subscriptions to purchase at least 4 Class B Shares have not been accepted by January 31, 2016, and by unanimous vote of all Class B Shareholders, all payments received will be returned *pro rata*, together with interest earned thereon (if any).  ** UPDATE: Subscriptions to purchase Class B Shares exceeded 4 shares by the end of calendar year 2015 and the Company commenced business.  **

3.　　The Company will have a board of Managers who will be responsible for the management of the Company.  Robert J. Mueller has been designated as the initial Manager.  Biographies of the management team are contained herein.

4.　　Any commissions or discounts paid (if any) with respect to the offering of the Class B Shares shall be at the expense of the Company.  Advisory fees shall be at the expense of the Class B Shareholder.

**Offering Details**

5.　　**the575™** is an equity investment with a Mandatory Call five years, less one day ("subscription term"), from the Start Date. The Start Date is the date when all of the following conditions are satisfied: i) the Class B Shareholder's Application and Subscription Agreement is approved by the Company; ii) the Class B Shareholder makes the irrevocable Priority Return Election; and iii) all subscribed funds/monies ("Invested Capital" or "Principal" herein) are received by the Company, and are available for use.

SEC-DEEPROOT-E-0164811

6.      On or before the Start Date, a Class B Shareholder must make an irrevocable *election* as to how to receive the Priority Return.  The "Priority Return" may either be: i) **deferred** (i.e. growth) – a simple fixed rate of seven percent (7%) per annum of the Invested Capital; the cumulative sum of deferred Priority Returns to be paid lump-sum on the Pay Date; or ii) **periodic** (i.e. income) – a fixed rate of five percent (5%) per annum of the Invested Capital, paid in monthly pro rata payments, commencing sixty days after the Start Date.  The irrevocable **election** defined in this paragraph will herein be referred to as the "Priority Return Election."

7.      On or about the thirtieth (30th) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount", being equal to: i) the Invested Capital; and ii) a bonus (if any), as defined *infra* in sub-paragraph 9.  *If the deferred Priority Return Election was chosen*, the Company will also pay any un-paid deferred cumulative Priority Returns.

8.      If permitted by the Company, a Class B Shareholder may elect to **renew** for another subscription term if a Class B Shareholder provides written notice to the Company, that must be received at least three business days before the Pay Date, of such's intent to renew.  The ability to renew is determined in the sole and absolute discretion of the Company.

»    If renewed: i) the renewed Start Date shall be reset to the prior Pay Date; ii) the renewed Mandatory Call will be reset to five years, less one day, from the prior Pay Date, and iii) the Class B Shareholder must elect a new Priority Return Election, in writing, for the renewed subscription term, on or before the renewed Start Date.

»    For any renewed subscription, "Invested Capital" or "Principal" shall thereinafter refer to sum of the: i) *reinvested* funds/monies from the prior Liquidation Amount; and ii) additionally contributed monies/funds (if any); all less any withdrawals or fees.

9.      The Company provides two **bonus** opportunities.  Any bonus credited by the Company will not be used in Priority Return calculations during the subscription term it is credited.

»    For the initial subscription term only: a bonus equal to five percent (5%) of the Invested Capital will be credited on the Start Date, and paid on the Pay Date, unless renewed in part or in full, for any subscription wherein Invested Capital equals or exceeds $350,000.00.

»    For all renewal subscription terms: If permitted by the Company at the time of renewal, and if the Class B Shareholder renews at least ninety percent (90%) of the prior subscription term's Liquidation Amount, then a bonus equal to five percent (5%) of the renewed Invested Capital will be credited on the renewed Start Date, and paid on the renewed Pay Date, unless renewed in part or in full again.

10.     The Company is permitted to issue a "Premature Call" before the full five year Mandatory Call term is satisfied.  However, the Company must satisfy the full Priority Return due any prematurely called Class B Shareholder(s), as if the full five year term had been satisfied by a *normal* Mandatory Call. All calls are made in the sole discretion of the Company and are absolute, and without recourse.  Any normal, or adverse, income tax implications arising from a Premature Call are the sole responsibility of the Class B Shareholder.

11.     **the575**™ does not permit any Class B Shareholder to request any Invested Capital or Principal outside of a Mandatory or Premature Call.  As such, Class B Shares (even in a periodic Priority Return Election) are not suitable for emergency, living expenses, other income requirements, or Required Minimum Distributions (RMDs).

12.     Any investment, renewal, or additional contribution of Invested Capital must meet the aggregate minimum investment amount of $25,000.

13.     The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

SEC-DEEPROOT-E-0164812

14.     There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VI or VII herein.

**Other Offering Details**

15.     Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

16.     Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to the Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

17.     Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in non-securitization of a majority of Class B Shareholder positions.

18.     If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

## II
## SUITABILITY STANDARDS FOR INVESTORS

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk. The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class B Shares. The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise. The Company will have the sole discretion regarding admittance of any investor into the Company.

SEC-DEEPROOT-E-0164813

## III
## RISK FACTORS

Participation in the Company requires a minimum investment of 1 Class B Share ($25,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT.  PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE.  THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.      Lack of Operating History.

The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings.  As such, the Company will be subject to all the risks of a new business enterprise.

B.      Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.

Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.      Investment in the Class B Shares involves an enhanced degree of risk.

We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio.  Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market.  There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D.      It is possible Class B Shareholders may have to contribute additional money.

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

E.      Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers.  In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms.  Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company.  The Class B Shareholders will have limited right to participate in the management of the Company.

SEC-DEEPROOT-E-0164814

F.     <u>Some Agreements, Including Those Involving Compensation, Not at Arms-Length</u>.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder.

G.     <u>Lack of Liquidity</u>.

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders.

H.     <u>Not Suitable for Required Minimum Distributions</u>.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's elected periodic Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

I.     <u>Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio</u>.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

J.     <u>Determination of Company's Profit and Loss</u>.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

K.     <u>Determination of Class B Shareholder's Share of Profit</u>.

In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, plus any unpaid elected Priority Return.

L.     <u>No Guarantee of Fixed Returns</u>.

Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

SEC-DEEPROOT-E-0164815

M.     Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares.

Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

N.     Possible Classification as an Investment Company.

Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

O.     Some Information may not be Provided.

Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

P.     Federal Income Tax Risks.

WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING. IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares. The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment. A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

Q.     Risk of Audit.

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit. While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

## IV
## UNDERLYING ASSETS

### Life Policies

We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older. Policies are purchased for more than their cash surrender value but less than the net death benefits to be paid under the policies. These Life Settlements may, but are unlikely to, include policies on the lives of terminally ill patients under the age of 65 as long as such's combined Face Value is less than five percent (5%) of the aggregate Face Value of the pool of life policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. Investments in these contracts involve certain risks, including liquidity risk, risk of excessive premium payments beyond the insured individual's life expectancy, credit risk of the insurance company, and inaccurate estimations of life expectancy of the insured individuals. These policies are considered illiquid in that they are bought and sold in a secondary market through life settlement agencies and not on any exchange

SEC-DEEPROOT-E-0164816

where settlement of a transaction is required in a timely manner. In the event of a bankruptcy of the insurance carrier for a policy, we may receive reduced or no benefits under the contract. Although unlikely, the Company may internally encounter losses on the investments if there is an inaccurate estimation of the life expectancies by having to pay higher-than-anticipated premium obligations.

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles.

### Target Life Settlement Portfolio Summary

| | |
|---|---|
| Minimum target age of insured individuals | 65 |
| % of Face Value <65 years of age | < 5% of aggregate investments |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Life Expectancy Range | 3 - 12 years |
| Internal Life Expectancy/Premium Reserves | Life Expectancy + 1 |
| Insurance carrier [AM Best] rating | B++ or higher |
| Second to Die policies | < 5% of aggregate investments |

In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year. The policies we will purchase are whole or universal life insurance policies issued by rated life insurance companies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement. If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the cash value of the policy. Universal life insurance is different from "term" life insurance in that "term" life insurance does not have a cash value associated with it. We may purchase convertible Term policies. Convertible term means that the term policy can be converted to a Universal Life policy under certain conditions.

The price we will be willing to pay for a policy in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to exceed the costs necessary to pay premiums, financing and servicing costs through the date of the insured's mortality. We rely on the medical/actuarial life expectancy assumptions provided to us by third-party medical actuary underwriters to estimate the expected mortality of the insured.

### Capital Acquisition in deeproot Tech

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio.

The purpose of this investment type is: i) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and ii) the safer diversifying of underlying assets away from just life policies.

SEC-DEEPROOT-E-0164817

Currently, deeproot Tech's sole project is deeproot Pinball, LLC ("dP") which is anticipated to be a multi-year project, starting in 2016 or 2017. Capital acquisition in **dP** would consist of the purchase of **dP** Class B Shares that Company will hold, as are further outlined below.

»   **dP** is offering up to $6,000,000 of Class B Membership Shares ("Class B Shares") at a price of $1,000 per Class B Share.

»   Per annum, **dP** Class B Shares will be entitled to a Priority Return equivalent to: i) six percent (6%); and ii) a pro rata share of twenty percent (20%), as a class, of any allocations of net profits. For purposes of calculations, per annum refers to the then designated fiscal year of the Company.

»   **dP** Class B Shares may be called at any time after December 31, 2016, at a call amount equal to the principal, plus: a cumulative ten percent (10%) per annum (or pro rata for partial years) return on the shares; less any Priority Return(s) previously distributed.

»   **dP** will have common management and control, and will retain all voting rights.

»   Pinball has been a staple for entertainment since the 1600's. Modern coin operated pinball grew from non-electric bagatelle machines during Prohibition. Modern solid-state pinball machines appeared in the mid-1970's and grew to a height in the 1990's with multiple manufacturers. By 2000, all but one manufacturer had left the business to focus on gambling, console & arcade games. Since 2000, demand for pinball machines has changed from a commercial to a home-use setting.

»   Today, thousands of used and new pinball machines are sold every year, making pinball a profitable vintage industry in the tens of millions of dollars annually. Since 2012 interest and demand for new pinball machine concepts and designs, as well as sales prices, are at all-time highs. While complicated machines to design and manufacture, pinball machines do not require advanced circuitry or programming that modern arcade or video games require. Most of the basic components (switches, lamps, solenoids, plastic, metal, and wood) are in ready supply and haven't changed much in decades. This provides a lower entry cost into the industry. And because of the profit margins, an enterprise doesn't have to sell a lot of machines to be profitable.

»   **dP's** approximate use of funds is as follows, and is subject to change at any time without notice:

| | | |
|---|---|---|
| Purchase of Equipment (est.) | $  602,015 | 10.03% |
| Purchase of Real Property / Improvements (est.) | $3,250,000 | 54.17% |
| Organizational, Legal and Accounting Fees (est.) | $  242,285 | 4.04% |
| R&D Overhead (est.) | $  925,300 | 15.42% |
| Inventory / Working Capital / Capital Reserve (est.) | $  980,400 | 16.34% |
| TOTAL | $6,000,000 | |

## Other Asset Classes

The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders.

V

**REPORTING**

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any

SEC-DEEPROOT-E-0164818

information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access.  For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

» notice of any default of any underlying asset
» notice of a failure to pay a Liquidation Amount to any Class B Shareholder
» a statement of account at least once annually, or digital access to the same
» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

We also have a duty to release certain information only upon request by a Class B Shareholder.   These include:

» a statement of account value at the time of request
» a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder.  This information includes but is not limited to:

» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest
» any information concerning another Class B Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VI
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above.  We have already sought out appropriate assets, and (if not already attained), will commence operations upon receipt of a minimum of $100,000 from Class B shareholders.  The proceeds of sales of additional Class B Shares will be used as the sales are closed.   The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
|---|---|
| Principal | $23,250.00 |
| Expenditures (~7%) | $ 1,750.00 |
| *Initial Compensation (if any)* | |

**Agent Compensation**

If a Class B Shareholder is represented by a representative, agent, advisor, broker, or other professional who may legally receive compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder.  There are some types of compensation that must be paid by the Class B Shareholder.  In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments, as provided in Article VII. A representative, agent, advisor, or broker may not earn compensation on principal invested by the same (i.e. as a Class B Shareholder).

SEC-DEEPROOT-E-0164819

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.  Despite an advance, <u>one hundred percent (100%)</u> of the Class B Shareholder's Principal shall be returned at the Pay Date.

**VII**
**ADMINISTRATION STRUCTURE & FEES**

The Company is managed by a Board of Managers.  However, the sole current Manager is Robert J. Mueller, Esq.  All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | *As billed by the Bank of Utah, or,* $400 in 2016, $450 in 2017, and $500 per year in 2018 - 2020. * |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | $50.00 |
| EFT Fee | $25.00 |
| Wire Fee | $50.00 |
| Investor Advisory Fees | *See below ** |

* For qualified positions: the Company will advance annual IRA custodian fees until all of any respective Class B Shareholder position(s) mature(s).  The Company shall deduct any or all advanced annual IRA fees from an investor's Liquidation Amount at the (or *each*) Pay Date, up to the lesser of: i) the actual advance; or ii) $500.00 per year.  After 2020, the contract between deeproot Funds and the Bank of Utah is up for renewal.  Any fees assessed thereafter will not be known until after such negotiation has taken place, and the Company notifies all Class B Shareholders with IRA accounts whether the annual fee will exceed $500.00 per year.

** For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

**VIII**
**PRINCIPALS & ADVISORS**

**Robert J. Mueller, Esq.**
**Manager, the575™**

Robert J. Mueller is an attorney and financial advisor with over twelve years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated in December 2000.

Robert has since concentrated his legal and financial practice in the area of estate planning, insurance products and investments.  He has personally drafted, delivered, and presented hundreds of simple and complex trust and financial estate plans for his clients.   Robert is a member of the State Bar of Texas, Estate Probate & Trust Law Section of the State Bar of Texas, Texas Young Lawyers Association, San Antonio Bar Association, and is insurance licensed in Texas.

Mr. Mueller is responsible for deeproot®'s product design, marketing, and strategic planning areas.

SEC-DEEPROOT-E-0164820

## IX
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1.  One completed and executed copy of **the575™** Application & Subscription Agreement, per registration type;
2.  A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, payable to the order of: **deeproot Funds**; or rollover or qualified transfer paperwork for the same.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM.

EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest.  Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company.  The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein.  Rather, a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## X
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 12621 Silicon Dr, San Antonio, Texas 78249, telephone: (888) 316-2935.  All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

## XI
## CONTINGENT SECURITY AGREEMENT

The Company agrees to immediately grant a security interest to Class B Shareholders in all assets it holds in the Company's investment portfolio (ie. underlying assets) upon a substantial default. A substantial default is defined as:

»  The inability of Company to pay a periodic Priority Return to any Class B shareholder, if still unpaid thirty (30) days after it is due;
»  The inability of Company to pay a liquidation amount to any Class B shareholder, if still unpaid sixty (60) days after it is due;
»  Enough losses from the underlying assets that would prevent the future repayment of each Class B Shareholder's principal amount;

SEC-DEEPROOT-E-0164821

> » Any officer or advisor convicted of a felony, that was committed in furtherance of performing such's duties under this Offering; or
> » A court or regulatory order that finds Company has committed a substantial default.

The Company will immediately perfect that security interest and provide immediate security information, including the security interest(s), upon a substantial default. Class B Shareholders must appoint a Trustee or other fiduciary who will receive, possess, hold, maintain, and dispose of any assets under the security interest.

The Company is only required to perfect a security interest in its entire investment portfolio upon the first occurrence of a substantial default, if it cannot cure within ninety (90) days of such default.

## XII
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot 575 Fund, LLC ("**the575**™") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation. This was done for ease of organization, lower filing and maintenance costs, tax options, etc. In order for an LLC to mirror a For-Profit Corporation's issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares'). Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in **the575**™ are the equivalent to common stock in a For-Profit Corporation. They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in **the575**™ are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory or Premature Call feature. While they do have limited voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Are Class B shares 'cumulative'?**
Yes. A cumulative Priority Return is the equivalent of cumulative preferred stock. That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive net distributions.

**Are Class B shares 'participating'?**
No. Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return. In this Offering, the Company accepts the risk of participation interests or losses.

**What is my Priority Return and When will I receive it?**
The Priority Return you receive will be based on the Priority Return Election you make for the subscription term. Class B Shareholders with a periodic Priority Return Election will receive monthly (starting sixty days after each's respective Start Date) Priority Return payments equal to the monthly pro rata share of the fixed annualized return. Class B Shareholders with a deferred Priority Return Election will receive the cumulative deferred Priority Returns on or about the Pay Date.

**What does it mean that the Company can 'call' my shares?**
A *call* is a right retained by the Company to buy-back Class B Shares. The Company's right to call is absolute and without recourse. Upon any call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the Class B Shareholder's Liquidation Amount on the Pay Date. The Mandatory Call under the **the575**™ is pre-determined at five years, less one day, from the Start Date. A Premature Call can happen at any time before, and supersedes, the Mandatory Call.

SEC-DEEPROOT-E-0164822

**How do Class B Shareholders get notified when a 'call' occurs?**
For a Mandatory Call, the Company will notify you in writing shortly before the Mandatory Call to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).  For a Premature Call, the Company will notify you at least sixty days before the premature call date, to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).

**How can I get my Principal back?**
Unless renewed in full, or part, your Principal will be returned at the Pay Date.  All requests for Invested Capital or Principal outside of a call (and subsequent Pay Date), will be rejected.

**Can I change my Priority Return election?**
Yes and no, depending on *when* you request a change.  Once a Priority Return Election is chosen on or before the Start Date, it may not be changed or altered until a call occurs.  If you invest sufficient additional amounts of principal to open a new investment position, or at a renewal, you can keep the same Priority Return Election, or change it, only for the additional or renewed Invested Capital.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company.  That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency.  The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares have limited voting rights, or say, in the affairs of the Company.


# THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

*The area below the following line is intentionally left blank.*

SEC-DEEPROOT-E-0164823

# EXHIBIT 5



| Mailing | Overnight/Physical |
|---|---|
| PO Box 691610 | 8200 IH-10 West, Ste. 600 |
| San Antonio, TX 78269-1610 | San Antonio, TX 78230 |

Toll Free (888) 316-2935

deeproot 575 Fund, LLC (the "Company", "us", "we", or "the575™") is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in deeproot Tech; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement, a Form W-9 and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

| | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,750.00 | $23,250.00 |
| | | | |
| Total Minimum[3] | $100,000.00 | $7,000.00 | $93,000.00 |
| Total Maximum | $25,000,000.00 | $1,750,000.00 | $23,250,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.

[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and may be paid out of the Investors principal.

[3] All proceeds will be held in a separate account until we have received the minimum amount of $100,000 in order to start the enterprise. Thereafter, we will not place prospective investors' monies in escrow or a separate account. Certain amounts may be retained for administration or management purposes.

DATED SEPTEMBER 1, 2015

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.**

i



SEC-DEEPROOT-E-0014497

<u>NOTICES TO INVESTORS</u>

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.   EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.  WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0014498

deeproot 575 Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## OFFERING DATED SEPTEMBER 1, 2015

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____

Name

Copy No.

iii

SEC-DEEPROOT-E-0014499

🜂 deeproot®
## deeproot 575 Fund, LLC
("**the575**™")
$25,000,000
Class B Membership Shares

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot 575 Fund, LLC** (the "Company", "us", "we", "our", or "**the575**™") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company.

**the575**™ is a significant step forward in the evolution of deeproot®'s fixed-rate, fixed-term investment options. **the575**™ provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot Tech, which offers investors either a growth or income option in five year terms. The Operating Agreement of the Company is attached hereto as Appendix I. The Company's principal business office is located at 8200 W Interstate 10, Suite 600, San Antonio, Texas 78230. While ground-breaking, there is no assurance that the Company's business plan will be successful.

## I
## THE OFFERING

**Structure**

1.      The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof. The minimum investment per transaction is $25,000, or 1 Class B Share. Fractional shares up to four decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2.      Subscription payments will be held in an interest-bearing account until at least $100,000 of Class B Shares (4 Class B Shares) are sold. Once the Company attains that level of sales, the Company will commence business by purchasing the first assets. If subscriptions to purchase at least 4 Class B Shares have not been accepted by January 31, 2016, and by unanimous vote of all Class B Shareholders, all payments received will be returned *pro rata*, together with interest earned thereon (if any). ** UPDATE: Subscriptions to purchase Class B Shares exceeded 4 shares by the end of calendar year 2015 and the Company commenced business. **

3.      The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

4.      Any commissions or discounts paid (if any) with respect to the offering of the Class B Shares shall be at the expense of the Company. Advisory fees shall be at the expense of the Class B Shareholder.

**Offering Details**

5.      **the575**™ is an equity investment with a Mandatory Call five years, less one day ("subscription term"), from the Start Date. The Start Date is the date when all of the following conditions are satisfied: i) the Class B Shareholder's Application and Subscription Agreement is approved by the Company; ii) the Class B Shareholder makes the irrevocable Priority Return Election; and iii) all subscribed funds/monies ("Invested Capital" or "Principal" herein) are received by the Company, and are available for use.

SEC-DEEPROOT-E-0014500

6.      On or before the Start Date, a Class B Shareholder must make an irrevocable *election* as to how to receive the Priority Return. The "Priority Return" may either be: i) **deferred** (i.e. growth) – a simple fixed rate of seven percent (7%) per annum of the Invested Capital; the cumulative sum of deferred Priority Returns to be paid lump-sum on the Pay Date; <u>or</u> ii) **periodic** (i.e. income) – a fixed rate of five percent (5%) per annum of the Invested Capital, paid in monthly pro rata payments, commencing sixty days after the Start Date. The irrevocable *election* defined in this paragraph will herein be referred to as the "Priority Return Election."

7.      On or about the thirtieth (30th) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount", being equal to: i) the Invested Capital; and ii) a bonus (if any), as defined *infra* in sub-paragraph 9. *If the deferred Priority Return Election was chosen*, the Company will also pay any un-paid deferred cumulative Priority Returns.

8.      If permitted by the Company, a Class B Shareholder may elect to *renew* for another subscription term if a Class B Shareholder provides written notice to the Company, that must be received at least three business days before the Pay Date, of such's intent to renew. The ability to renew is determined in the sole and absolute discretion of the Company.

»    If renewed: i) the renewed Start Date shall be reset to the prior Pay Date; ii) the renewed Mandatory Call will be reset to five years, less one day, from the prior Pay Date, and iii) the Class B Shareholder must elect a new Priority Return Election, in writing, for the renewed subscription term, <u>on or before</u> the renewed Start Date.

»    For any renewed subscription, "Invested Capital" or "Principal" shall thereinafter refer to sum of the: i) *reinvested* funds/monies from the prior Liquidation Amount; and ii) additionally contributed monies/funds (if any); all less any withdrawals or fees.

9.      The Company provides two **bonus** opportunities. Any bonus credited by the Company will not be used in Priority Return calculations during the subscription term it is credited.

»    For the <u>initial</u> subscription term only: a bonus equal to five percent (5%) of the Invested Capital will be credited on the Start Date, and paid on the Pay Date, unless renewed in part or in full, for any subscription wherein Invested Capital equals or exceeds $350,000.00.

»    For all <u>renewal</u> subscription terms: If permitted by the Company at the time of renewal, and if the Class B Shareholder renews at least ninety percent (90%) of the prior subscription term's Liquidation Amount, then a bonus equal to five percent (5%) of the renewed Invested Capital will be credited on the renewed Start Date, and paid on the renewed Pay Date, unless renewed in part or in full again.

10.     The Company is permitted to issue a "Premature Call" before the full five year Mandatory Call term is satisfied. However, the Company must satisfy the full Priority Return due any prematurely called Class B Shareholder(s), as if the full five year term had been satisfied by a *normal* Mandatory Call. All calls are made in the sole discretion of the Company and are absolute, and without recourse. Any normal, or adverse, income tax implications arising from a Premature Call are the sole responsibility of the Class B Shareholder.

11.     **the575**™ does not permit any Class B Shareholder to request any Invested Capital or Principal outside of a Mandatory or Premature Call. As such, Class B Shares (even in a periodic Priority Return Election) are not suitable for emergency, living expenses, other income requirements, or Required Minimum Distributions (RMDs).

12.     Any investment, renewal, or additional contribution of Invested Capital must meet the aggregate minimum investment amount of $25,000.

13.     The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

SEC-DEEPROOT-E-0014501

14.     There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VI or VII herein.

**Other Offering Details**

15.     Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

16.     Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to the Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

17.     Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in non-securitization of a majority of Class B Shareholder positions.

18.     If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

## II
## <u>SUITABILITY STANDARDS FOR INVESTORS</u>

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk. The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class B Shares. The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise. The Company will have the sole discretion regarding admittance of any investor into the Company.

SEC-DEEPROOT-E-0014502

## III
## RISK FACTORS

Participation in the Company requires a minimum investment of 1 Class B Share ($25,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.    Lack of Operating History.

The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise.

B.    Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.

Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.    Investment in the Class B Shares involves an enhanced degree of risk.

We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D.    It is possible Class B Shareholders may have to contribute additional money.

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

E.    Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

SEC-DEEPROOT-E-0014503

F.      <u>Some Agreements, Including Those Involving Compensation, Not at Arms-Length.</u>

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder.

G.      <u>Lack of Liquidity.</u>

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders.

H.      <u>Not Suitable for Required Minimum Distributions.</u>

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's elected periodic Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

I.      <u>Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio.</u>

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

J.      <u>Determination of Company's Profit and Loss.</u>

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

K.      <u>Determination of Class B Shareholder's Share of Profit.</u>

In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, plus any unpaid elected Priority Return.

L.      <u>No Guarantee of Fixed Returns.</u>

Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

SEC-DEEPROOT-E-0014504

M.     Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares.

Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

N.     Possible Classification as an Investment Company.

Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

O.     Some Information may not be Provided.

Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

P.     Federal Income Tax Risks.

WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING.  IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares.  The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment.  A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

Q.     Risk of Audit.

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit.  While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

## IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older.  Policies are purchased for more than their cash surrender value but less than the net death benefits to be paid under the policies.  These Life Settlements may, but are unlikely to, include policies on the lives of terminally ill patients under the age of 65 as long as such's combined Face Value is less than five percent (5%) of the aggregate Face Value of the pool of life policies.  When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. Investments in these contracts involve certain risks, including liquidity risk, risk of excessive premium payments beyond the insured individual's life expectancy, credit risk of the insurance company, and inaccurate estimations of life expectancy of the insured individuals. These policies are considered illiquid in that they are bought and sold in a secondary market through life settlement agencies and not on any exchange

SEC-DEEPROOT-E-0014505

where settlement of a transaction is required in a timely manner. In the event of a bankruptcy of the insurance carrier for a policy, we may receive reduced or no benefits under the contract. Although unlikely, the Company may internally encounter losses on the investments if there is an inaccurate estimation of the life expectancies by having to pay higher-than-anticipated premium obligations.

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles.

**Target Life Settlement Portfolio Summary**

| | |
|---|---|
| Minimum target age of insured individuals | 65 |
| % of Face Value <65 years of age | < 5% of aggregate investments |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Life Expectancy Range | 3 - 12 years |
| Internal Life Expectancy/Premium Reserves | Life Expectancy + 1 |
| Insurance carrier [AM Best] rating | B++ or higher |
| Second to Die policies | < 5% of aggregate investments |

In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider.  The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year. The policies we will purchase are whole or universal life insurance policies issued by rated life insurance companies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement.  If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the cash value of the policy.  Universal life insurance is different from "term" life insurance in that "term" life insurance does not have a cash value associated with it.  We may purchase convertible Term policies.  Convertible term means that the term policy can be converted to a Universal Life policy under certain conditions.

The price we will be willing to pay for a policy in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to exceed the costs necessary to pay premiums, financing and servicing costs through the date of the insured's mortality. We rely on the medical/actuarial life expectancy assumptions provided to us by third-party medical actuary underwriters to estimate the expected mortality of the insured.

### Capital Acquisition in deeproot Tech

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses.  We minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio.

The purpose of this investment type is: i) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and ii) the safer diversifying of underlying assets away from just life policies.

SEC-DEEPROOT-E-0014506

Currently, deeproot Tech's sole project is deeproot Pinball, LLC ("dP") which is anticipated to be a multi-year project, starting in 2016 or 2017.  Capital acquisition in **dP** would consist of the purchase of **dP** Class B Shares that Company will hold, as are further outlined below.

» **dP** is offering up to $6,000,000 of Class B Membership Shares ("Class B Shares") at a price of $1,000 per Class B Share.

» Per annum, **dP** Class B Shares will be entitled to a Priority Return equivalent to: i) six percent (6%); and ii) a pro rata share of twenty percent (20%), as a class, of any allocations of net profits.  For purposes of calculations, per annum refers to the then designated fiscal year of the Company.

» **dP** Class B Shares may be called at any time after December 31, 2016, at a call amount equal to the principal, plus: a cumulative ten percent (10%) per annum (or pro rata for partial years) return on the shares; less any Priority Return(s) previously distributed.

» **dP** will have common management and control, and will retain all voting rights.

» Pinball has been a staple for entertainment since the 1600's. Modern coin operated pinball grew from non-electric bagatelle machines during Prohibition. Modern solid-state pinball machines appeared in the mid-1970's and grew to a height in the 1990's with multiple manufacturers.  By 2000, all but one manufacturer had left the business to focus on gambling, console & arcade games. Since 2000, demand for pinball machines has changed from a commercial to a home-use setting.

» Today, thousands of used and new pinball machines are sold every year, making pinball a profitable vintage industry in the tens of millions of dollars annually. Since 2012 interest and demand for new pinball machine concepts and designs, as well as sales prices, are at all-time highs. While complicated machines to design and manufacture, pinball machines do not require advanced circuitry or programming that modern arcade or video games require. Most of the basic components (switches, lamps, solenoids, plastic, metal, and wood) are in ready supply and haven't changed much in decades. This provides a lower entry cost into the industry. And because of the profit margins, an enterprise doesn't have to sell a lot of machines to be profitable.

» **dP's** approximate use of funds is as follows, and is subject to change at any time without notice:

| | | |
|---|---|---|
| Purchase of Equipment (est.) | $  602,015 | 10.03% |
| Purchase of Real Property / Improvements (est.) | $3,250,000 | 54.17% |
| Organizational, Legal and Accounting Fees (est.) | $  242,285 | 4.04% |
| R&D Overhead (est.) | $  925,300 | 15.42% |
| Inventory / Working Capital / Capital Reserve (est.) | $  980,400 | 16.34% |
| TOTAL | $6,000,000 | |

## Other Asset Classes

The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders.

## V
## REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s).  Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com.  For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any

SEC-DEEPROOT-E-0014507

information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access.  For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

- » notice of any default of any underlying asset
- » notice of a failure to pay a Liquidation Amount to any Class B Shareholder
- » a statement of account at least once annually, or digital access to the same
- » a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
- » notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
- » notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

We also have a duty to release certain information only upon request by a Class B Shareholder.  These include:

- » a statement of account value at the time of request
- » a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder.  This information includes but is not limited to:

- » copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest
- » any information concerning another Class B Shareholder's interest
- » specific positions, investments, assets, or transactions underlying in our portfolio
- » private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VI
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above.  We have already sought out appropriate assets, and (if not already attained), will commence operations upon receipt of a minimum of $100,000 from Class B shareholders.  The proceeds of sales of additional Class B Shares will be used as the sales are closed.   The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
| --- | --- |
| Principal | $23,250.00 |
| Expenditures (~7%) | $ 1,750.00 |
| *Initial Compensation (if any)* | |

**Agent Compensation**

If a Class B Shareholder is represented by a representative, agent, advisor, broker, or other professional who may legally receive compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder.  There are some types of compensation that must be paid by the Class B Shareholder.  In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments, as provided in Article VII. A representative, agent, advisor, or broker may not earn compensation on principal invested by the same (i.e. as a Class B Shareholder).

SEC-DEEPROOT-E-0014508

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date.

## VII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | *As billed by the Bank of Utah, or,* $400 in 2016, $450 in 2017, and $500 per year in 2018 - 2020. * |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | $50.00 |
| EFT Fee | $25.00 |
| Wire Fee | $50.00 |
| Investor Advisory Fees | *See below* ** |

* For qualified positions: the Company will advance annual IRA custodian fees until all of any respective Class B Shareholder position(s) mature(s). The Company shall deduct any or all advanced annual IRA fees from an investor's Liquidation Amount at the (or *each*) Pay Date, up to the lesser of: i) the actual advance; or ii) $500.00 per year. After 2020, the contract between deeproot Funds and the Bank of Utah is up for renewal. Any fees assessed thereafter will not be known until after such negotiation has taken place, and the Company notifies all Class B Shareholders with IRA accounts whether the annual fee will exceed $500.00 per year.

** For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

## VIII
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, the575™**

Robert J. Mueller is an attorney and financial advisor with over twelve years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated in December 2000.

Robert has since concentrated his legal and financial practice in the area of estate planning, insurance products and investments. He has personally drafted, delivered, and presented hundreds of simple and complex trust and financial estate plans for his clients. Robert is a member of the State Bar of Texas, Estate Probate & Trust Law Section of the State Bar of Texas, Texas Young Lawyers Association, San Antonio Bar Association, and is insurance licensed in Texas.

Mr. Mueller is responsible for deeproot®'s product design, marketing, and strategic planning areas.

SEC-DEEPROOT-E-0014509

## IX
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of **the575™** Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, payable to the order of: **deeproot Funds**; or rollover or qualified transfer paperwork for the same.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM.

EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Rather, a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## X
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 8200 W Interstate 10, Suite 600, San Antonio, Texas 78230, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

## XI
## CONTINGENT SECURITY AGREEMENT

The Company agrees to immediately grant a security interest to Class B Shareholders in all assets it holds in the Company's investment portfolio (ie. underlying assets) upon a substantial default. A substantial default is defined as:

» The inability of Company to pay a periodic Priority Return to any Class B shareholder, if still unpaid thirty (30) days after it is due;
» The inability of Company to pay a liquidation amount to any Class B shareholder, if still unpaid sixty (60) days after it is due;
» Enough losses from the underlying assets that would prevent the future repayment of each Class B Shareholder's principal amount;

SEC-DEEPROOT-E-0014510

» Any officer or advisor convicted of a felony, that was committed in furtherance of performing such's duties under this Offering; or

» A court or regulatory order that finds Company has committed a substantial default.

The Company will immediately perfect that security interest and provide immediate security information, including the security interest(s), upon a substantial default.   Class B Shareholders must appoint a Trustee or other fiduciary who will receive, possess, hold, maintain, and dispose of any assets under the security interest.

The Company is only required to perfect a security interest in its entire investment portfolio upon the first occurrence of a substantial default, if it cannot cure within ninety (90) days of such default.

## XII
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot 575 Fund, LLC ("**the575**™") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation.  This was done for ease of organization, lower filing and maintenance costs, tax options, etc.  In order for an LLC to mirror a For-Profit Corporation's issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares').  Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in **the575**™ are the equivalent to common stock in a For-Profit Corporation.  They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in **the575**™ are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory or Premature Call feature.  While they do have limited voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Are Class B shares 'cumulative'?**
Yes. A cumulative Priority Return is the equivalent of cumulative preferred stock.  That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive net distributions.

**Are Class B shares 'participating'?**
No.  Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return.  In this Offering, the Company accepts the risk of participation interests or losses.

**What is my Priority Return and When will I receive it?**
The Priority Return you receive will be based on the Priority Return Election you make for the subscription term.  Class B Shareholders with a periodic Priority Return Election will receive monthly (starting sixty days after each's respective Start Date) Priority Return payments equal to the monthly pro rata share of the fixed annualized return.  Class B Shareholders with a deferred Priority Return Election will receive the cumulative deferred Priority Returns on or about the Pay Date.

**What does it mean that the Company can 'call' my shares?**
A *call* is a right retained by the Company to buy-back Class B Shares.  The Company's right to call is absolute and without recourse.  Upon any call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the Class B Shareholder's Liquidation Amount on the Pay Date.  The Mandatory Call under the **the575**™ is pre-determined at five years, less one day, from the Start Date.  A Premature Call can happen at any time before, and supersedes, the Mandatory Call.

SEC-DEEPROOT-E-0014511

**How do Class B Shareholders get notified when a 'call' occurs?**
For a Mandatory Call, the Company will notify you in writing shortly before the Mandatory Call to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).  For a Premature Call, the Company will notify you at least sixty days before the premature call date, to provide you details about the Liquidation Amount, the Pay Date, and any renewal rights or benefits (if any).

**How can I get my Principal back?**
Unless renewed in full, or part, your Principal will be returned at the Pay Date.  All requests for Invested Capital or Principal outside of a call (and subsequent Pay Date), will be rejected.

**Can I change my Priority Return election?**
Yes and no, depending on *when* you request a change.  Once a Priority Return Election is chosen on or before the Start Date, it may not be changed or altered until a call occurs.  If you invest sufficient additional amounts of principal to open a new investment position, or at a renewal, you can keep the same Priority Return Election, or change it, only for the additional or renewed Invested Capital.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company.  That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency.  The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares have limited voting rights, or say, in the affairs of the Company.

## THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

*The area below the following line is intentionally left blank.*

SEC-DEEPROOT-E-0014512

EXHIBIT 6



|  | **Mailing** |  | **Overnight/Physical** |
|---|---|---|---|

**Mailing**
PO Box 691610
San Antonio, TX 78269-1610

**Overnight/Physical**
12621 Silicon Dr
San Antonio, Texas 78249-3447

Toll Free (888) 316-2935

## CLASS B MEMBERSHIP SHARES
### VERSION 2019

deeproot Growth Runs Deep Fund, LLC (the "Company", "us", "we", or "dGRD") is a private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506, Subsection (b).

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

|  | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $1,750.00 | $23,250.00 |
|  |  |  |  |
| Total Minimum[3] | $100,000.00 | $7,000.00 | $93,000.00 |
| Total Maximum | $75,000,000.00 | $5,250,000.00 | $69,750,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and will be paid out of the Investors principal, subject to reimbursement by Company as detailed herein.
[3] Proceeds will not be held in a separate account and will be immediately employed to purchase assets. Certain amounts may be retained for administration or management purposes.

### DATED SEPTEMBER 16, 2019

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED
TO DEEPROOT IF YOU DO NOT INVEST.**

i

DEPOSITION
EXHIBIT
100
PENGAD 800-631-6989
9·12·23

## NOTICES TO INVESTORS

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE.  ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.   EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.   WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0164763

deeproot Growth Runs Deep Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## CLASS B SHARES OFFERING

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____

Name

□□□□□□

Copy No.

iii

SEC-DEEPROOT-E-0164764

🅱 deeproot
**Growth Runs Deep Fund ("dGRD")**
$75,000,000
Class B Membership Shares
Version 2019

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot Growth Runs Deep Fund, LLC** (the "Company", "us, "we", "our", or "dGRD") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole shareholder and principal of the deeproot® family of companies is the current Manager of the Company.

The dGRD provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw'. The Operating Agreement of the Company is attached hereto as Appendix I.

A modified version of this Offering of Class B Shares existed previously and has been closed to new investment. That FIFO Queue/Fund will continue in its current form and payout for all of those investors. The Class B Shareholders of this 2019 Version will start in a new FIFO Queue with segregated, pooled assets materially supporting and backing up their investments.

The Company's principal business offices are located at 12621 Silicon Dr, San Antonio, Texas 78249-3447.

### I
### SUMMARY OF THE OFFERING

**Structure**

1.     The Company is initially offering up to $50,000,000, or 2,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share. The minimum investment per transaction is $100,000, or four (4) Class B Shares. Fractional shares up to five decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission.

2.     The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

3.     Any commissions or discounts paid (if any) to a Broker Dealer with respect to the offering of the Class B Shares shall be at the expense of the Company. See Agent Compensation under Section 6 for additional information.

**Offering Basics**

4.     The offering is made up of a chronological 'Queue' of segmented 1 share ($25,000) investment positions (the "position", or "positions"). A position may be fractional (ie. less than $25,000 or 1 share).

5.     Each investment position is assigned a predetermined rate (the "Liquidation Multiplier"). This is the equivalent of a lump-sum return. The Liquidation Multiplier is currently set at 1.525, or a 52.5% percentage equivalent for investment amounts less than $750,000.00. For investment amounts $750,000.00 or higher, the Liquidation Multiplier will increase by an additional 0.125 or 12.5% percentage equivalent to a fixed 1.65 or 65% percentage equivalent.

SEC-DEEPROOT-E-0164765

6.      The Class B Shares are subject to Mandatory Calls which are involuntary sales of stock back to the Company. As assets mature, the Company calls and pays off the positions based on their respective order in the FIFO Queue, as further described in this PPM.

7.      At a Mandatory Call a Class B Shareholder with called shares will receive a sum equal to the position(s)' initial principal, multiplied by the Liquidation Multiplier, which is paid no later than 30 days after the Call Date.  All calls are made in the sole discretion of the Company and are absolute, and without recourse.

8.      The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

9.      There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VII or VIII herein.

**Other Offering Details**

10.      Class A Shareholders retain all voting rights.  The Fund Advisor or Manager(s) retain sole discretion over due diligence, purchase, and maintenance of the assets.

11.      The Company has sold Class B Shares to Class B Shareholders in a separate series of shares and queue.  Any assets purchased by this Company for Class B Shareholders will be earmarked solely for Class B Shareholders.

12.      Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to this Offering; ii) substantial changes to the ownership or management of the Company; iii) the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder.

13.      If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive.  The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return.  The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

II
**SUITABILITY STANDARDS FOR INVESTORS**

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk.  The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment.  There will not be any public market for the Class B Shares.  The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency.  This is an offering made only to a limited number of investors for investment only.  Each investor will be required to execute the Subscription Agreement.  Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part.  Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

SEC-DEEPROOT-E-0164766

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters.  The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment.  In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise.  The Company will have the sole discretion regarding admittance of any investor into the Company.

### III
### RISK FACTORS

Participation in the Company requires a minimum investment of four (4) Class B Shares ($100,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT.  PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.      Lack of Operating History.
Even though the Company has been in operation since 2015, it still is subject to all the risks of a new business enterprise.  The current version of this Offering will not necessarily have the benefit of a track record of success that the previous Offering enjoyed.

B.      Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.
Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.      Investment in the Class B Shares involves an enhanced degree of risk.
We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

SEC-DEEPROOT-E-0164767

D.      Term, duration, or length of investment is unknown.

While the advantage of the FIFO Queue feature of the dGRD is to put Class B Shareholders on an equal footing and a better chance to achieve the average anticipated hold time of the investment, the Company cannot make any guarantee or guess as to the term, duration, or length of the investment.

E.      It is possible Class B Shareholders may have to contribute additional money.

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

F.      Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

G.      Some Agreements, Including Those Involving Compensation, Not at Arms-Length.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder, and take no preference in the FIFO Queue.

H.      Lack of Liquidity.

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders. Finally, when the Company decides to call one or more Class B Members' position(s), the specific Class B Shares to be called will be decided by such's order in the FIFO Queue. Queue jumping is not permitted.

I.      Not Suitable for Required Minimum Distributions.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs). RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

J.      Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

SEC-DEEPROOT-E-0164768

K.      Determination of Company's Profit and Loss.
Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

L.      Determination of Class B Shareholder's Share of Profit.
In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, multiplied by the percentage equivalent of such's position(s)' Liquidation Multiplier(s), that remains unpaid by Company.

M.      No Guarantee of Fixed or Annualized Returns.
Consistent and predictable growth is ideal in Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit.  However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return.  As the actual death of an insured, maturity of any life policy, or return of capital from a private placement are unknown at the time of investment, we cannot provide in advance a fixed or annualized rate of return.  Annualized return on investment calculations can only be made at a Mandatory Call.

N.      Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares.
Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio.  Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity.  However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

O.      Possible Classification as an Investment Company.
Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act").  Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies.  We intend to restrict investment in our securities to the maximum number of Class B Shareholders permitted under then-current federal law, in order to meet an exemption from registration under the Investment Company Act.  Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

P.      Some Information may not be Provided.
Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

Q.      Federal Income Tax Risks.
WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING.  IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice.  Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares.  The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment.  A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

R.      Risk of Audit.

SEC-DEEPROOT-E-0164769

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit.  While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

## IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Insurance Policies ("Life Policies", "Policies", "Contracts") as the majority of our Fund Assets. Life Policies are sales to third parties, of existing life insurance contracts held on insureds who are typically within 15 years of life expectancy, or 65 years of age or older.  Policies are purchased at a discount; for more than their cash surrender value but less than the net death benefit to be paid under the policies.  When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy.  These policies are considered illiquid in that they are bought and sold in a secondary market through policy brokers and not on any exchange where settlement of a transaction is required in a timely manner.

The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes.  Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity.

The Life Policies we buy should not be confused with (retail) life settlements or viaticals, both of which have negative connotations, substantial added risks, and are different than the institutional policies we source. A viatical is a policy that is bought to gamble on the potentially short life span of a terminally ill insured, usually under the age of 65.  We do not buy viaticals.  Retail life settlements refer to life policies that are bought and resold on the primary and secondary markets directly to investors (as opposed to being pooled in a fund).  Since the investors tend to take on additional risk (such as premium and life expectancy risks), these policies tend to have attributes less favorable to our stricter underwriting guidelines.

<u>Types of Policies</u>

There are several types of insurance contracts that we might purchase.  Some of these types of contracts might include whole life, universal life, or convertible term.  Some of these types might have multiple subtypes.  For example, universal life contracts can further be distinguished by indexed universal life, variable universal life, or fixed universal life.  Each of these types of life policies have pros and cons.  The Manager intend to use multiple types of contracts to diversify the portfolio.

Whole life insurance constitutes permanent cash-value life insurance policies that typically earn a fixed rate of internal interest above the cost of insurance.  On the other hand, universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to cash value of the policy utilizing an investment-style under-lying mechanism. The investment-style crediting of a universal policy varies depending on if the allocation is fixed, indexed, or variable.

Whereas whole and universal life insurance policies are considered 'owned' policies; term life insurance are considered 'rented' or 'leased' policies.  This is because term policies are only available for certain underwriting and age classes, only last for specific terms of time, and do not carry any cash value.  Convertible Term policies are a variation in that you can 'lease to own'.  In other words, the 'leased' term policy can be converted to an 'owned' whole or universal life policy under certain conditions.

<u>Target Life Settlement Portfolio Summary</u>

In sourcing life policies for a diversified portfolio, there are a number of attributes we look at before purchasing a contract.  First and foremost is the reliability of the underwriting or life expectancy report.  These reports are provided to us by our middle source provider, having been conducted by a well-known and reputable underwriter.  In addition,

SEC-DEEPROOT-E-0164770

we assess the following attributes and how the potential policy purchase would impact, and hopefully further diversify, the existing portfolio.

| | |
|---|---|
| Minimum Age of Insureds | 65 |
| Target Min Age for Male Insureds | 72 |
| Target Min Age for Female Insureds | 73 |
| Target Min Avg Face-to-Acquisition Cost Ratio @ LE+1 | 0.70 |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Target Policy Life Expectancy Range | 3 - 12 years |
| Target Portfolio Life Expectancy | 4 - 6 years |
| Internal Life Expectancy/Premium Expense | Life Expectancy + 1 or higher |
| Carrier [AM Best] permissible ratings | B+, B++, A-, A, A+, A++ |
| <65 Age policies | < 5% of aggregate investments |
| Second to Die policies | < 5% of aggregate investments |

Sourcing

There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy.

In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies.

Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We rely on the medical/actuarial life expectancy assumptions provided to us by the third party medical actuarial firm to estimate the expected mortality of the insured. At a minimum, we will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year (ie. LE+1). It is management's experience that on average that (as each policy specs dictate) LE+1 to LE+3 is a responsible and conservative approach to estimating the life expectancy of the policies that we plan to purchase, due to the fact that LE is an actuarial based estimate for an insured's life expectancy.

The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies. Some of the insurance carriers our Manager have purchased policies in the past from, are: AIG, Transamerica, Met Life, VOYA, Lincoln Financial, Protective Life, AXA Financial, Midland National, etc.

The price we are willing to pay for a policy (the "Acquisition Cost") in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to not only exceed the costs necessary to pay premiums and the costs to cover our operating expenses, but also to return the liquidation amount to all investors.

Investment Allocation Policy

It is our policy to avoid conflicts of interest in allocation of funds to life policies. We segregate assets between classes of shares. Since life policies available for purchase are always in flux (being time and money dependent at any given time), we will only allocate capital from a specific Fund for purchase of the life policy for that Fund. This allocation policy prevents the Manager from favoring one Fund over another. If money is readily available from multiple Funds at the same time, the Manager may use discretion to choose appropriate policies for each Fund given the capital available with the then available policies at the time.

Risk Management

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to

SEC-DEEPROOT-E-0164771

reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles. Some risks apply to this asset, which are discussed as follows.

Risks - Sourcing

The United States is one of only a few financial markets in the world where quality life insurance can be obtained at low cost with a dynamic range of underwriting profiles.  While historical trends indicate that most life policies are sold to overseas institutions and investors, domestic purchases have dwindled for various reasons. Sourcing is not amongst those reasons. Retention of our sourcing providers are a key element to our success. Our sourcing providers are able to tap the vibrant supply currently being sought after by foreign institutions and investors. While we do not expect any changes to the quality or quantity of life polices over the next decade, if this trend changes, we are prepared to adjust with other traditional or alternative capital appreciation assets.

Risks - Illiquidity

A life policy matures when the underwritten insured dies, an authenticated claim is filed with the insurance company, and the death benefits are paid. Until that time, the policy is practically illiquid. While the wait-for-funds-before-Call design of the dGRD minimizes this risk, future premium payments beyond normal reserves poses potential liquidity risks. Withdrawals of cash value will usually significantly alter the underlying accounting of policy, and even result in a potential lapse of the policy. As a result, it is our corporate policy to not withdraw cash value outright unless doing so will not affect the underlying accounting of the policy. We differentiate 'withdrawal' of cash from a life policy (for our retention or other use) from 'spending the cash down' for purposes of internal cash leverage to reduce premium outlay at the expense of the insurance carrier. In addition, by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'.  While we reserve the right to resell a policy held by us in secondary market to one or more third parties, in return for fair market value (i.e. usually calculated as the face amount of the policy, less a discount for marketability and life expectancy), the inability to sell a policy that has become economically toxic could be an issue.

Risks - Unknown Maturities

There is no guaranteed method of predicting the death of an insured. The closest we can come to predicting a range of life expectancy is with a medical review, underwriting analysis, and governmental or industry mortality tables. While we intend to purchase life policies in the secondary market with life expectancy terms that average between four and six years, there could be maturities both sooner or later. Maturity directly affects two key aspects of our fund: the annualized return of the investment, and the pace of queue position advancement. Both of these aspects are equally important to fulfilling the expectations of investors.

Risks - Out of Control Premium Costs

Life policies usually require premiums to be paid periodically until maturity. The timely and accurate payment of premium is the most essential and critical component of holding a life policy portfolio. We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc. While some policies will require additional premium as billed, normally there is some semblance of reserves capable of funding the underwritten life expectancy of the insured, plus one year (LE+1). As a result, we do not anticipate having to dip into reserves or face exigencies until after such time as the insured has lived beyond LE+3. This significantly reduces the short and long term financial expenditures or costs of the Offering and increases internal liquidity.

Risks - Life Policy Forfeiture or Lapse

When premium is not timely paid, or not enough premium is paid, an insurance carrier might *lapse* the policy (i.e. terminate the policy for less than fair market value). This could happen due to oversight on our part, and/or by illicit behavior by carrier.  In either circumstance, we might have to pay additional sums to reinstate the policy, or in the worst case scenario, litigate the matter.  Litigation is extremely expensive and time consuming.  Trends indicate that the risk of litigating a lapsed policy (whether occurring by our own fault, or that of the carrier) is only getting higher, as many carriers have adopted a 'come and take it' attitude. With that said, we do not anticipate that for most of our policies this will be an issue.

Risks - Carrier Rehabilitation or Liquidation

In the worst case scenario wherein a life insurance company enters rehabilitation by order of a state insurance official, files for bankruptcy, or is liquidated, we might not receive the full face value of the life policy. While one or more

SEC-DEEPROOT-E-0164772

state guaranty funds might cover some or all of the losses, it is a historically-potential risk. While a risk, we do not anticipate that this will occur given the financial strength of the carriers our life policies are underwritten by. In addition, if this ever occurs it will likely only be with one or two carriers. A systemic failure of life insurance market would arguably only occur in conjunction with a substantial or major economic disaster that would also affect every other industry and everyone, everywhere.

**V**
**TERMS OF THE OFFERING**

**The FIFO Queue**

Investments by Class B Shareholders are queued in one (1) share ($25,000.00) increments ("position"), or a part thereof if less, by the chronological order in which investments are initially received on a first-in, first-out ('FIFO') basis. Queue positions are numbered in sequential order based on a *timestamp* of when the i) Class B Shareholder's Application and Subscription Agreement was approved, and ii) the minimum qualifying principal was actually received. For example: Principal received at different times or dates may receive non-sequential positions in the FIFO Queue, if other shareholder(s) *timestamp(s)* intercede.

As assets mature and positions are called: i) Class B Shareholders are paid each's Liquidation Amount on or before the Pay Date, in order of Mandatory Calls on each's ordered position in the FIFO queue; and ii) the uncalled or remaining positions in the FIFO Queue *advance* in the same order to *fill* the called position(s), and are re-numbered respectively. As the position in the FIFO Queue is based on the 'investment' (or a part thereof), and not the 'Class B Shareholder', a single Class B Shareholder who has made multiple, separate, non-sequential investments of principal, will, as a result, hold multiple positions in the FIFO Queue. Queue jumping is not permitted, in any form.

**Mandatory Call**

A Class B Shareholder's position is subject to a Mandatory Call when all of the following events have occurred: i) an asset matures, or life policy matures due to the death of the insured(s); ii) the Company receives the maturity amount, or for life policies, the death benefit(s) or Face Value of the life policy from an insurance carrier; iii) the Class B Shareholder owns the next position in the FIFO queue; iv) enough net proceeds exist from the maturity, to pay the Liquidation Amount of the next Class B Shareholder's position in the FIFO queue; and v) the Company conveys written notification of a Mandatory Call, the Liquidation Amount, and the Pay Date to the Class B Shareholder. The "Call Date" is the date such written notification is conveyed. It is possible for a Class B Shareholder to have multiple sequential or non-sequential positions that *mature* on or about the same call date. A mandatory call is an involuntary sale of the shares back to the Company, and is decided in the sole and absolute discretion of the Company.

**Pay Date**

The Pay Date is 30 days following the Call Date. On or before the Pay Date, the Company will mail the Liquidation Amount to the Class B Shareholder by first class mail, unless the Class B Shareholder requests a premium service (*e.g.* overnight, Wire, etc.) in writing, which must be received by the Company at least three (3) business days before the Pay Date.



**Liquidation Multiplier**

The Liquidation Multiplier determines the future value of the Class B Shareholder's position at the Mandatory Call. It is pre-determined by the Company. Once set by the Company at investment, the Liquidation Multiplier for each position will not change until called. For investment amounts less than $750,000.00, the current Liquidation Multiplier

SEC-DEEPROOT-E-0164773

is set at 1.525, or a percentage equivalent of 52.5% of the invested queue position or principal. An extra 0.125 or 12.5% percentage equivalent shall be added to the Liquidation Multiplier if investment amount contemporaneously is $750,000 or higher.

While the Liquidation Multiplier represents the total investment return, the realized **_annualized_** return can only be calculated after a Call has occurred. The following table illustrates a grid of hypothetical annualized simple returns for the Liquidation Multiplier, given a hypothetical Call in the respective number of years. This table is for illustration purposes only and is not a guarantee of any actual annualized returns.

| Initial Cumulative Principal | Hypothetical Annualized Simple Return (Per Year) at # of Years * | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| $100,000 - $749,999 | 52.5% | 26.25% | 17.5% | 13.13% | 10.5% | 8.75% | 7.5% | 6.56% | 5.83% | 5.25% |
| $750,000 + | 65.0% | 32.5% | 21.67% | 16.25% | 13.0% | 10.83% | 9.29% | 8.13% | 7.22% | 6.50% |

*\* Percentage equivalent returns as illustrated here are rounded here for simplicity. Actual percentage equivalents may vary.*

**Percentage Equivalent:**

The *percentage equivalent* is calculated by reducing the Liquidation Multiplier by '1', and then dividing by 100.

**Liquidation Amount**

Each respective Class B Shareholder will receive an amount equal to the initial principal in a matured position, multiplied by the Liquidation Multiplier set at the time of initial investment. This capital gain will be conveyed by the Pay Date to the Class B Shareholder.

**No Liquidity**

Outside of the Pay Date following a Mandatory Call, Class B Shareholders are not permitted to request amounts of principal or otherwise.

**Premiums**

The Company is responsible for paying all premiums for the life policies out of: i) an amount set aside at the purchase of each life policy that covers anticipated premium obligations through life expectancy plus one year; and ii) the Company's compensation, if any insured lives past the life expectancy plus one year guideline. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, the Company reserves the right to satisfy premiums out of future Class B Shareholder proceeds if: i) the Class B Shareholders are given reasonable notice; and ii) doing so is in the financial best interest of the Class B Shareholders.

**Voting rights**

Class B Shareholders do not receive voting rights, as to the ownership, management, or administration of the Company.

## VI
## REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deerootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any

SEC-DEEPROOT-E-0164774

information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access.  For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

>> notice of any default of any underlying asset
>> notice of a failure to pay a Liquidation Amount to any Class B Shareholder of this Offering
>> a statement of account at least once annually, or digital access to the same
>> a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
>> notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
>> notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

We also have a duty to release certain information only upon request by a Class B Shareholder.   These include:

>> a statement of account value at the time of request
>> a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder.  This information includes but is not limited to:

>> copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest
>> any information concerning another Class B Shareholder's interest
>> specific positions, investments, assets, or transactions underlying in our portfolio
>> private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VII
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above.  The proceeds of sales of additional Class B Shares will be used as the sales are closed.   The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
|---|---|
| Principal | $23,250.00 |
| Expenditures (~7%) | $ 1,750.00 |
| *Initial Compensation (if any)* | |

## Agent Compensation

If a Class B Shareholder is represented by a broker or other professional who may legally receive commissions or other compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder.

There are some types of compensation that must be paid by the Class B Shareholder, such as advisory fees. In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments. In

SEC-DEEPROOT-E-0164775

addition, we will not pay any selling commissions, but will pay Manager fees, in connection with the sale of Class B Shares to investors whose contracts for investment advisory and related brokerage services include a fixed or "wrap" fee feature. Investors may agree with their broker-dealers to reduce the amount of selling commissions payable with respect to the purchase of their preferred shares down to zero: (i) if the investor has engaged the services of a registered investment advisor, or RIA, or other financial advisor who will be paid compensation for investment advisory services or other financial or investment advice, or (ii) if the investor is investing through a bank trust account with respect to which the investor has delegated the decision-making authority for investments made through the account to a bank trust department. The net proceeds to us will not be affected by reducing commissions payable in connection with such sales. Neither our Manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the Class B Shares offered hereby.

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier.

**Company Compensation**

The Company shall receive compensation of the greater of: i) the difference between the percentage equivalent of the matured positions Liquidation Multipliers, and any policy maturity's maximum return (as calculated by face minus acquisition, divided by acquisition); ii) an amount equal to ten percent (10%) of any matured policy's gross maximum return before assigning to the liquidation of Class B Shareholder positions. The Company also shall receive any assets in the portfolio once all Class B Shareholder positions have been called.

## VIII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| NQ Account Set up Fee (Check) | $250.00 ^ |
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | Minimum $450 or *As billed by the Custodian* + |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | Minimum $50.00 or *As billed by the Custodian* |
| Wire Fee | Minimum $50.00 or *As billed by the Custodian* |
| Investor Advisory Fees | *See below* * |

^ Any initial investment amount for non-qualified queue positions that is not wired or in cashier's check form (i.e. personal check, money order, teller check) will incur a $250.00 fee for delays in processing due to bank holds.

+ For each annual year that a Class B Shareholder has and maintains at least sixteen (16) qualified/IRA queue positions, then Company shall cover any Annual IRA/Qualified Fee cost.

* For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

SEC-DEEPROOT-E-0164776

# IX
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, dGRD**

There is only one director and executive officer of the Company: Robert J. Mueller. He is an executive, attorney, and financial advisor with over fifteen years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated a semester early in December 2000, and was admitted to the Texas Bar in May 2001.

Robert is age 44 as of the date of this Prospectus, and has been the principal officer, director, or manager of Policy Services, Inc. ("Ultimate Parent"), and all of the deeproot® family of companies since 2012. Prior to creating Policy Services, Inc, and the deeproot® family of companies in 2012, Robert practiced full time estate planning law, sold insurance products, and operated two companies in the insurance services industry, creating a book of business with over 750 clients.

Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities. Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold. He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises. Robert also has backgrounds in accounting, valuation, information technology, graphic design, marketing, programming, and other technical areas.

Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the dGRD Fund. Robert is paid a salary from the Ultimate Parent for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed from the Ultimate Parent downwards, may earn a commission on any Preferred Shares sold. Any marketing or travel expenses on behalf of the dGRD Fund will be expensed by invoice.

It is not the Company's policy to permit an executive to hold any queue positions in his/her individual capacity.

It is the Company's policy to allow non-executive employees to hold queue positions, either as compensation, bonus, incentive, or retirement contributions; provided however that: i) cost and profit extend to a parent entity; and ii) such non-executive employees must follow the same rules as all other investors in being assigned queue positions at the back of the line, progress in the same sequential order, and receive a liquidation multiplier commiserate with the investment level.

### Security Ownership of Beneficial Owners

| (1) Title of Class | (2) Name and Address of Beneficial Owner | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller<br>12621 Silicon Dr<br>San Antonio, TX 78249 | 100%<br>*By and through Parent Entities of the Company* | 100% |

SEC-DEEPROOT-E-0164777

**Security Ownership of Management**

| (1) Title of Class | (2) Name and Title of Manager | (3) Amount and Nature of Beneficial Ownership | (4) Percent of class |
|---|---|---|---|
| Membership Interests / Shares | Robert J. Mueller | 100%<br>*By and through Parent Entities of the Company* | 100% |

## X
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of the dGRD Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, with a minimum of $100,000.00, payable to the order of: **deeproot Funds**; or deeproot Fund's designated custodian.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM. EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Depending on the custodian: i) a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement; or ii) a certificate will be held in street form with the custodian.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## XI
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 12621 Silicon Dr, San Antonio, Texas 78249, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

SEC-DEEPROOT-E-0164778

# XII
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot Growth Runs Deep Fund, LLC ("dGRD") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation. This was done for ease of organization, lower filing and maintenance costs, tax options, etc. In order for an LLC to mirror a For-Profit Corporations issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares'). Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in dGRD are the equivalent to common stock in a For-Profit Corporation. They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in dGRD are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory Call feature. While they do not have voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Am I able to find out my place in the FIFO Queue before investment?**
In short, No. Because your position(s) in the FIFO Queue is/are not assigned until your Application and Subscription Agreement has been approved, <u>and</u> we receive part or all of your principal (in $25,000 increments), any number/position we may provide will be a complete guess and will likely be wrong. It is normal for there to be delays in application deficiencies, or funding from qualified transfers, check holds, or other factors, which will directly affect the Company's ability to assign your position(s).

**Am I able to find out how many positions/investors are in front of me in the FIFO Queue, before investment?**
Due to the Company's commitment regarding the privacy and security of other shareholders, and because of the inherent *fairness* of the FIFO Queue design, the Company reserves the right to withhold how many positions or Class B Shareholders would come before you in the FIFO Queue, before you invest. In fact, as with the preceding question, the actual number will likely be different by the time your position(s) are eventually assigned.

**Do Class B shares receive a Priority Return?**
No, a Preferred or Priority Return for Class B shares is the equivalent of a preferred dividend for Preferred Stock. Traditionally, a Priority Return is paid on a periodic or annual basis (ie. Company's fiscal year) based on the profits or losses of the Company. In this Offering, the return is paid lump-sum (and not periodically or annually), at a predetermined rate, upon a Mandatory Call. This is the equivalent of a capital gain upon the sale of stock.

**Are Class B shares 'participating'?**
No. Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return. In this Offering, the Company accepts the risk of participation interests or losses.

**When will I know what my return is?**
All returns are predetermined by the Liquidation Multiplier assigned to each position created upon your investment.

**What does it mean that the Company can 'call' my shares?**
**What is a Mandatory Call?**
A *call* is a right granted to the Company to buy-back Class B Shares. The Company's right to call is absolute and without recourse. Upon a Mandatory Call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the respective liquidation amount(s). In this Offering, a call is made when the Company notifies a Class B Shareholder of a Mandatory Call ("Call Date"), and the Company will issue the liquidation amount on or about thirty (30) days thereafter ("Pay Date").

SEC-DEEPROOT-E-0164779

**What is the Company's criteria for how many positions are paid off at each asset maturity?**
Pursuant to the terms contained in this PPM, the actual net amount received from the maturity of an underlying asset is the chief determiner of how many positions will be called. Mandatory Calls will be made for the maximum number of positions in order of the FIFO Queue permitted herein. It is to the Company's financial advantage, as well as the best interests of the Class B Shareholders, that the <u>maximum</u> number of positions are paid off at each maturity.

**Do all Class B Shareholders get notified when an asset matures, or the FIFO Queue order changes?**
In short, Yes. However notification to positions/Shareholders that were not subject to a Mandatory Call will only be made by: i) a Class B Shareholder affirmatively calling us and requesting their current position number(s); ii) an email notification that will be sent out when the order of the FIFO Queue positions change; or iii) accessing your account information online with our secure website. Due to security and costs, we will not respond to such a request or convey notification by written correspondence.

**How can I get my invested principal back?**
There is no specific term period for this investment. While it is our intent to purchase assets with a target life expectancy of four to six years, we cannot guarantee any specific maturity date. Unless 'called', your investment will remain with the Company and may not be sold or assigned without permission or approval. The Company understands that each Class B Shareholder will have different expectations and need for the return of such Class B Shareholder's invested principal. The FIFO Queue was designed to ensure that the Company maintains a first-come, first serve fairness proposition for Class B Shareholders receiving their principal back in the shortest possible time. As such, the Company can make no guarantee that any Class B Shareholder will receive their invested principal back in the time period requested or expected.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency. The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares do not have a vote, or say, in the affairs of the Company.

# THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

SEC-DEEPROOT-E-0164780

# EXHIBIT 7



| Mailing | Overnight/Physical |
|---|---|
| PO Box 691610 | 12621 Silicon Dr |
| San Antonio, TX 78269-1610 | San Antonio, TX 78249 |

Toll Free (888) 316-2935

**deeproot Growth Runs Deep Fund, LLC** (the "Company", "us", "we", or "dGRD") is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in other deeproot® entities; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement, a Form W-9 and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

|  | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $2,000.00 | $23,000.00 |
|  |  |  |  |
| Total Minimum[3] | $100,000.00 | $8,000.00 | $92,000.00 |
| Total Maximum | $25,000,000.00 | $2,000,000.00 | $23,000,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and will be paid out of the Investors principal.
[3] All proceeds will be held in a separate account until we have received the minimum amount of $100,000 in order to start the enterprise. Thereafter, we will not place prospective investors' monies in escrow or a separate account. Certain amounts may be retained for administration or management purposes.

DATED AUGUST 3, 2015

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED
TO DEEPROOT IF YOU DO NOT INVEST.**

i



SEC-DEEPROOT-E-0164786

<u>NOTICES TO INVESTORS</u>

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.  EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.  WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0164787

deeproot Growth Runs Deep Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### OFFERING DATED AUGUST 3, 2015

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____

Name

☐☐☐☐☐☐

Copy No.

iii

SEC-DEEPROOT-E-0164788

## deeproot

### Growth Runs Deep Fund ("dGRD")
$25,000,000
Class B Membership Shares

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot Growth Runs Deep Fund, LLC** (the "Company", "us, "we", "our", or "dGRD") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company.

The dGRD is a significant step forward in the evolution of the life settlement transaction. The Fund provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw'. Other features include: renewal bonuses, above average pre-determined returns (38% to 60%), and no anticipated future premium obligations. The Operating Agreement of the Company is attached hereto as Appendix I. The Company's principal business office is located at 12621 Silicon Dr, San Antonio, Texas 78249. While ground-breaking, there is no assurance that the Company's business plan will be successful.

## I
## SUMMARY OF THE OFFERING

**Structure**

1.     The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share. The minimum investment per transaction is $25,000, or 1 Class B Share. Fractional shares up to four decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2.     Subscription payments will be held in an interest-bearing account until at least $100,000 of Class B Shares (4 Class B Shares) are sold. Once the Company attains that level of sales, the Company will commence business by purchasing the first assets. If subscriptions to purchase at least 4 Class B Shares have not been accepted by December 31, 2015, and by unanimous vote of all Class B Shareholders, all payments received will be returned *pro rata*, together with interest earned thereon (if any). ** UPDATE: Subscriptions to purchase Class B Shares exceeded 4 shares by 12/31/2015 and the Company commenced business. **

3.     The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

4.     Any commissions or discounts paid (if any) to a broker or finder, referring, representing or assisting a Class B Shareholder with respect to the offering of the Class B Shares, shall be paid at the expense of the Company.

**Offering Basics**

5.     The offering is made up of a chronological 'Queue' of segmented 1 share ($25,000) investment positions (the "position", or "positions"). A position may be fractional (ie. less than $25,000 or 1 share).

6.     Each investment position is assigned a predetermined rate (the "Liquidation Multiplier"). This is the equivalent of a lump-sum priority or preferred return ("Priority Return").

SEC-DEEPROOT-E-0164789

7.      The Class B Shares are subject to Mandatory Calls, and as assets mature, the Company calls and pays off the positions based on their respective order in the FIFO Queue, as further described in this PPM.

8.      Each Class B Shareholder has two options upon a Mandatory Call: i) to renew (ie. reinvest) the position(s) in return for an increased Liquidation Multiplier (ie. bonus); or ii) receive a sum equal to the position(s)' initial principal, multiplied by the Liquidation Multiplier, paid 30 days after the Call Date. All calls are made in the sole discretion of the Company and are absolute, and without recourse.

9.      The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

10.     There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VII or VIII herein.

**Other Offering Details**

11.     Class A Shareholders retain all voting rights. The Fund Advisor or Manager(s) retain sole discretion over due diligence, purchase, and maintenance of the assets.

12.     Class B Shareholders have a right to receive certain information, as further described herein; and retain a right to consent to any substantial changes to the Offering, or to the ownership or management of the Company.

13.     Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in non-securitization of a majority of Class B Shareholder positions.

14.     If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

## II
## SUITABILITY STANDARDS FOR INVESTORS

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk. The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class B Shares. The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3)

SEC-DEEPROOT-E-0164790

his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of a person other than the Company or its affiliates, who possesses such knowledge and expertise. The Company will have the sole discretion regarding admittance of any investor into the Company.

# III
# RISK FACTORS

Participation in the Company requires a minimum investment of 1 Class B Share ($25,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.    Lack of Operating History.
The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise.

B.    Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.
Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.    Investment in the Class B Shares involves an enhanced degree of risk.
We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D.    Term, duration, or length of investment is unknown.
While the advantage of the FIFO Queue feature of the dGRD is to put Class B Shareholders on an equal footing and a better chance to achieve the average anticipated hold time of the investment, the Company cannot make any guarantee or guess as to the term, duration, or length of the investment.

E.    It is possible Class B Shareholders may have to contribute additional money.

SEC-DEEPROOT-E-0164791

As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

F.    Dependence on Managers.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

G.    Some Agreements, Including Those Involving Compensation, Not at Arms-Length.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder, and take no preference in the FIFO Queue.

H.    Lack of Liquidity.

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders. Finally, when the Company decides to call one or more Class B Members' position(s), the specific Class B Shares to be called will be decided by such's order in the FIFO Queue. <u>Queue jumping is not permitted.</u>

I.    Not Suitable for Required Minimum Distributions.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

J.    Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

K.    Determination of Company's Profit and Loss.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital

SEC-DEEPROOT-E-0164792

is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

     L.     <u>Determination of Class B Shareholder's Share of Profit</u>.

In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, multiplied by the percentage equivalent of such's position(s)' Liquidation Multiplier(s), that remains unpaid by Company.

     M.     <u>No Guarantee of Fixed or Annualized Returns</u>.

Consistent and predictable growth is ideal in Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a private placement are unknown at the time of investment, we cannot provide in advance a fixed or annualized rate of return. Annualized return on investment calculations can only be made at a Mandatory Call.

     N.     <u>Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares</u>.

Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

     O.     <u>Possible Classification as an Investment Company</u>.

Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

     P.     <u>Some Information may not be Provided</u>.

Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

     Q.     <u>Federal Income Tax Risks</u>.

WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING. IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares. The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment. A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

     R.     <u>Risk of Audit</u>.

Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit. While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

SEC-DEEPROOT-E-0164793

## IV
## UNDERLYING ASSETS

**Life Policies**

We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older. Policies are purchased for more than their cash surrender value but less than the net death benefits to be paid under the policies. These Life Settlements may, but are unlikely to, include policies on the lives of terminally ill patients under the age of 65 as long as such's combined Face Value is less than five percent (5%) of the aggregate Face Value of the pool of life policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. Investments in these contracts involve certain risks, including liquidity risk, risk of excessive premium payments beyond the insured individual's life expectancy, credit risk of the insurance company, and inaccurate estimations of life expectancy of the insured individuals. These policies are considered illiquid in that they are bought and sold in a secondary market through life settlement agencies and not on any exchange where settlement of a transaction is required in a timely manner. In the event of a bankruptcy of the insurance carrier for a policy, we may receive reduced or no benefits under the contract. Although unlikely, the Company may internally encounter losses on the investments if there is an inaccurate estimation of the life expectancies by having to pay higher-than-anticipated premium obligations.

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles.

### Target Life Settlement Portfolio Summary

| | |
|---|---|
| Minimum target age of insured individuals | 65 |
| % of Face Value <65 years of age | < 5% of aggregate investments |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Life Expectancy Range | 3 - 12 years |
| Targeted Life Expectancy | 4 - 6 years |
| Internal Life Expectancy/Premium Reserves | Life Expectancy + 1 |
| Insurance carrier [AM Best] rating | B++ or higher |
| Second to Die policies | < 5% of aggregate investments |

In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year. The policies we will purchase are whole or universal life insurance policies issued by rated life insurance companies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement. If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the cash value of the policy. Universal life insurance is different from "term" life insurance in that "term" life insurance does not have a cash value associated with it. We may purchase convertible Term policies. Convertible term means that the term policy can be converted to a Universal Life policy under certain conditions.

The price we will be willing to pay for a policy in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to exceed the costs necessary to pay premiums, financing and servicing costs through the date of the insured's mortality. We rely

SEC-DEEPROOT-E-0164794

on the medical/actuarial life expectancy assumptions provided to us by third-party medical actuary underwriters to estimate the expected mortality of the insured.

**Capital Acquisition in deeproot Tech**

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to thirty percent (30%) of the asset portfolio.

The Company reserves the right to include other future assets or asset classes, with reasonable notice to Class B Shareholders.

**V**

**TERMS OF THE OFFERING**

**The FIFO Queue**

Investments by Class B Shareholders are queued in 1 share ($25,000.00) increments ("position"), or a part thereof if less, by the chronological order in which investments are initially received (or renewed) on a first-in, first-out ('FIFO') basis. Queue positions are numbered in sequential order based on a *timestamp* of when the i) Class B Shareholder's Application and Subscription Agreement was approved, and ii) the minimum qualifying principal was actually received. For example: Principal received at different times or dates may receive non-sequential positions in the FIFO Queue, if other shareholder(s) *timestamp(s)* intercede.

As assets mature and positions are called: i) Class B Shareholders are paid each's Liquidation Amount on the Pay Date, in order of Mandatory Calls on each's ordered position in the FIFO queue; and ii) the uncalled or remaining positions in the FIFO Queue *advance* in the same order to *fill* the called position(s), and are re-numbered respectively. As the position in the FIFO Queue is based on the 'investment' (or a part thereof), and not the 'Class B Shareholder', a single Class B Shareholder who has made multiple, separate, non-sequential investments of principal, will, as a result, hold multiple positions in the FIFO Queue. Queue jumping is not permitted, in any form.

*For Example*: See below a *magnified* subset of positions, as well as the sequential/non-sequential nature of the Queue.



Same Class B Shareholder
Non-Sequential Positions

**Mandatory Call**

A Class B Shareholder's position is subject to a Mandatory Call when all of the following events have occurred: i) an asset matures, or life policy matures due to the death of the insured(s); ii) the Company receives the maturity amount, or for life policies, the death benefit(s) or Face Value of the life policy from an insurance carrier; iii) the Class B Shareholder owns the next position in the FIFO queue; iv) enough net proceeds exist from the maturity, to pay the Liquidation Amount of the next Class B Shareholder's position in the FIFO queue; and v) the Company conveys written notification of a Mandatory Call, the Liquidation Amount, Pay Date, and a right to Renew to the Class

SEC-DEEPROOT-E-0164795

B Shareholder. The "Call Date" is the date such written notification is conveyed. It is possible for a Class B Shareholder to have multiple sequential or non-sequential positions that *mature* on or about the same call date.

**Pay Date**

The Pay Date is 30 days following the Call Date. On the Pay Date, the Company will mail the Liquidation Amount to the Class B Shareholder by first class mail, unless the Class B Shareholder requests a premium service (*e.g.* overnight, Wire, etc.), or renews, in writing, which must be received by the Company at least three (3) business days before the Pay Date.



**Renewals**

In lieu of accepting the Liquidation Amount for any matured position, a Class B Shareholder may reinvest (or "renew", "renewal", "renewed") part or all of the Liquidation Amount. If a renewal investment is elected, having been received by the Company in writing at least three business days <u>before</u> the Pay Date, of at least ninety percent (90%) of the Liquidation Amount, then the Class B Shareholder shall receive a bonus of 0.05 added to their Base Liquidation Multiplier on the renewed position. A renewal bonus (or renewal bonuses) is/are not cumulative. In all cases, a Class B Shareholder's renewed investment is placed at the end of the FIFO queue, as of the Pay Date.

*For example*: A policy comes due in which the first four positions mature and are paid. All remaining positions in the queue move forward. Class B Shareholder A, reinvests $100,000 and is placed at the end of the queue.



**Liquidation Multiplier**

The Liquidation Multiplier determines the future value of the Class B Shareholder's position at the Mandatory Call. It is based on the Class B Shareholder's <u>registration</u> type (ie. Individual, JTWROS, JT-in-Common, IRA, ROTH, Entity, Trust, etc.), and is pre-determined by the amount of aggregate/cumulative principal then invested in such Class B Shareholder's registration, at the time of investment. Non-sequential positions by the same Class B Shareholder registration can therefore have different Liquidation Multipliers. Once set by the Company at investment, the Liquidation Multiplier for each position will not change until called. The Base Liquidation Multiplier will increase by 0.05 for a qualifying renewal. The Liquidation Multiplier may never exceed 1.65 without prior written Company approval, signed by the Company's Manager(s) and the Company's Fund Advisor.

| Initial/Renewed Cumulative Principal | Base Liquidation Multiplier | Base Percentage Equivalent |
|---|---|---|
| **Under $100,000.00** | 1.38 | 38% |
| **$100,000.00 - $199,999.99** | 1.43 | 43% |
| **$200,000.00 - $399,999.99** | 1.46 | 46% |
| **$400,000.00 - $699,999.99** | 1.50 | 50% |
| **$700,000.00 - $999,999.99** | 1.55 | 55% |
| **$1,000,000.000 +** | 1.60 | 60% |

SEC-DEEPROOT-E-0164796

**Percentage Equivalent:**

The *percentage equivalent* is calculated by reducing the Liquidation Multiplier by '1', and then dividing by 100.

**Liquidation Amount**

Each respective Class B Shareholder will receive an amount equal to the initial (or renewed) principal in a matured position, multiplied by the Liquidation Multiplier set at the time of initial or renewed investment.

**No Liquidity**

Outside of the Pay Date following a Mandatory Call, Class B Shareholders are not permitted to request amounts of principal, Priority Return, or otherwise.

**Premiums**

The Company is responsible for paying all premiums for the life policies out of: i) an amount set aside at the purchase of each life policy that covers anticipated premium obligations through life expectancy plus one year; and ii) the Company's compensation, if any insured lives past the life expectancy plus one year guideline. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, the Company reserves the right to satisfy premiums out of future Class B Shareholder proceeds if: i) the Class B Shareholders are given reasonable notice; and ii) doing so is in the financial best interest of the Class B Shareholders.

**Voting rights**

Class B Shareholders do not receive voting rights, as to the ownership, management, or administration of the Company.

## VI
## REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access. For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

» notice of any default of any underlying asset
» notice of a failure to pay a Liquidation Amount to any Class B Shareholder
» a statement of account at least once annually, or digital access to the same
» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

SEC-DEEPROOT-E-0164797

We also have a duty to release certain information only upon request by a Class B Shareholder.   These include:

» a statement of account value at the time of request
» a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder.  This information includes but is not limited to:

» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest
» any information concerning another Class B Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VII
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above.  We have already sought out appropriate assets, and (if not already attained), will commence operations upon receipt of a minimum of $100,000 from Class B shareholders.  The proceeds of sales of additional Class B Shares will be used as the sales are closed.   The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
| --- | --- |
| Principal | $23,000.00 |
| Expenditures (~8%) | $ 2,000.00 |
| *Initial Compensation (if any)* | |

**Agent Compensation**

If a Class B Shareholder is represented by a representative, agent, advisor, broker, or other professional who may legally receive compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder.  There are some types of compensation that must be paid by the Class B Shareholder.  In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments, as provided in Article VIII. A representative, agent, advisor, or broker may not earn compensation on principal invested by the same (i.e. as a Class B Shareholder).

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.  Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier.

**Company Compensation**

The Company shall receive compensation of the greater of: i) the difference between the percentage equivalent of the matured positions Liquidation Multipliers, and any policy maturity's maximum return (as calculated by face minus acquisition, divided by acquisition); ii) an amount equal to ten percent (10%) of any matured policy's gross maximum return before assigning to the liquidation of Class B Shareholder positions.  The Company also shall receive any assets in the portfolio once all Class B Shareholder positions have been called.

SEC-DEEPROOT-E-0164798

## VIII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers.  However, the sole current Manager is Robert J. Mueller, Esq.  All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| Annual Account Fee | $0.00 |
| Annual IRA/Qualified Fee | *As billed by the Bank of Utah, or,* $400 in 2016, $450 in 2017, and $500 per year in 2018 - 2020. * |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | $50.00 |
| EFT Fee | $25.00 |
| Wire Fee | $50.00 |
| Investor Advisory Fees | *See below ** |

* For qualified positions: the Company will advance annual IRA custodian fees until all of any respective Class B Shareholder position(s) mature(s).  The Company shall deduct any or all advanced annual IRA fees from an investor's Liquidation Amount at the (or *each*) Pay Date, up to the lesser of: i) the actual advance; or ii) $500.00 per year.  After 2020, the contract between deeproot Funds and the Bank of Utah is up for renewal.  Any fees assessed thereafter will not be known until after such negotiation has taken place, and the Company notifies all Class B Shareholders with IRA accounts whether the annual fee will exceed $500.00 per year.

** For Investor Advisory Fees: If Company is billed for and pays any investment advisory fees from an advisor or advisory firm that represents the Class B Shareholder, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

## IX
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, dGRD**

Robert J. Mueller is an attorney and financial advisor with over twelve years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated in December 2000.

Robert has since concentrated his legal and financial practice in the area of estate planning, insurance products and investments. He has personally drafted, delivered, and presented hundreds of simple and complex trust and financial estate plans for his clients.   Robert is a member of the State Bar of Texas, Estate Probate & Trust Law Section of the State Bar of Texas, Texas Young Lawyers Association, San Antonio Bar Association, and is insurance licensed in Texas.

Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas. He is a tech enthusiast and builds/programs/designs for fun.

SEC-DEEPROOT-E-0164799

# X
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1. One completed and executed copy of the dGRD Application & Subscription Agreement, per registration type;
2. A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, payable to the order of: **deeproot Funds**; or rollover or qualified transfer paperwork for the same.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM. EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Rather a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

# XI
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 12621 Silicon Dr, San Antonio, Texas 78249, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

# XII
## CONTINGENT SECURITY AGREEMENT

The Company agrees to immediately grant a security interest to Class B Shareholders in all assets it holds in the Company's investment portfolio (ie. underlying assets) upon a substantial default. A substantial default is defined as:

» The inability of Company to pay a liquidation amount to any Class B shareholder, if still unpaid sixty (60) days after it is due;

» Enough losses from the underlying assets that would prevent the future repayment of each Class B Shareholder's principal amount;

» Any officer or advisor convicted of a felony, that was committed in furtherance of performing such's duties under this Offering; or

» A court or regulatory order that finds Company has committed a substantial default.

SEC-DEEPROOT-E-0164800

The Company will immediately perfect that security interest and provide immediate security information, including the security interest(s), upon a substantial default.   Class B Shareholders must appoint a Trustee or other fiduciary who will receive, possess, hold, maintain, and dispose of any assets under the security interest.

The Company is only required to perfect a security interest in its entire investment portfolio upon the first occurrence of a substantial default, if it cannot cure within ninety (90) days of such default.

## XIII
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot Growth Runs Deep Fund, LLC ("dGRD") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation.  This was done for ease of organization, lower filing and maintenance costs, tax options, etc. In order for an LLC to mirror a For-Profit Corporations issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares').  Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in dGRD are the equivalent to common stock in a For-Profit Corporation.  They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in dGRD are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory Call feature.  While they do not have voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Am I able to find out my place in the FIFO Queue before investment?**
In short, No.  Because your position(s) in the FIFO Queue is/are not assigned until your Application and Subscription Agreement has been approved, and we receive part or all of your principal (in $25,000 increments), any number/position we may provide will be a complete guess and will likely be wrong.  It is normal for there to be delays in application deficiencies, or funding from qualified transfers, check holds, or other factors, which will directly affect the Company's ability to assign your position(s).

**Am I able to find out how many positions/investors are in front of me in the FIFO Queue, before investment?**
Due to the Company's commitment regarding the privacy and security of other shareholders, and because of the inherent *fairness* of the FIFO Queue design, the Company reserves the right to withhold how many positions or Class B Shareholders would come before you in the FIFO Queue, before you invest.  In fact, as with the preceding question, the actual number will likely be different by the time your position(s) are eventually assigned.

**Do Class B shares receive a Priority Return?**
No, a Preferred or Priority Return for Class B shares is the equivalent of a preferred dividend for Preferred Stock. Traditionally, a Priority Return is paid on a periodic or annual basis (ie. Company's fiscal year) based on the profits or losses of the Company.  In this Offering, the return is paid lump-sum (and not periodically or annually), at a predetermined rate, upon a Mandatory Call.

**When will a Class B Shareholder receive a Priority Return?**
While a Preferred or Priority Return is traditionally paid periodically, the dGRD does not offer periodic payments. In this offering, a full or partial return is not paid until the Company issues a Mandatory Call of a Class B Shareholder's position(s) in the FIFO Queue.  As the Company (like you) waits for the maturity of underlying assets, it cannot provide a guarantee as to when a return will be paid.  An argument could be made that the trade-off for patience are the enhanced Liquidation Multipliers and potentially higher annualized ROI.

**What does 'cumulative' mean?**
A cumulative Priority Return is the equivalent of cumulative preferred stock.  That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive distributions. In this Offering, Class A Shareholders

SEC-DEEPROOT-E-0164801

are only entitled to an *advance* that must be repaid to Class B Shareholders, as well as earnings on the matured assets. Because Class B Shareholders receive a lump-sum Priority Return based on a matured asset being assigned to positions in FIFO Queue order, this Offering is cumulative.

**Are Class B shares 'participating'?**
No. Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return. In this Offering, the Company accepts the risk of participation interests or losses.

**When will I know what my return is?**
All returns are predetermined by the Liquidation Multiplier assigned to each position created upon your investment. Since the Liquidation Multiplier is based on the aggregate or cumulative principal of each unique Class B Shareholder registration, it is not only possible for you to have multiple, different Liquidation Multipliers, but also that your Liquidation Multiplier for a new or renewed position may increase or decrease with additional principal or calls.

**What does it mean that the Company can 'call' my shares?**
**What is a Mandatory Call?**
A *call* is a right granted to the Company to buy-back Class B Shares. The Company's right to call is absolute and without recourse. Upon a Mandatory Call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the respective liquidation amount(s). In this Offering, a call is made when the Company notifies a Class B Shareholder of a Mandatory Call ("Call Date"), and the Company will issue the liquidation amount on or about thirty (30) days thereafter ("Pay Date"), unless renewed.

**What is the Company's criteria for how many positions are paid off at each asset maturity?**
Pursuant to the terms contained in this PPM, the actual net amount received from the maturity of an underlying asset is the chief determiner of how many positions will be called. Mandatory Calls will be made for the maximum number of positions in order of the FIFO Queue permitted herein. It is to the Company's financial advantage, as well as the best interests of the Class B Shareholders, that the maximum number of positions are paid off at each maturity.

**Do all Class B Shareholders get notified when an asset matures, or the FIFO Queue order changes?**
In short, Yes. However notification to positions/Shareholders that were not subject to a Mandatory Call will only be made by: i) a Class B Shareholder affirmatively calling us and requesting their current position number(s); ii) an email notification that will be sent out when the order of the FIFO Queue positions change; or iii) accessing your account information online with our secure website. Due to security and costs, we will not respond to such a request or convey notification by written correspondence.

**How can I get my invested principal back?**
There is no specific term period for this investment. While it is our intent to purchase assets with a target life expectancy of four to six years, we cannot guarantee any specific maturity date. Unless 'called', your investment will remain with the Company and may not be sold or assigned without permission or approval. The Company understands that each Class B Shareholder will have different expectations and need for the return of such Class B Shareholder's invested principal. The FIFO Queue was designed to ensure that the Company maintains a first-come, first serve fairness proposition for Class B Shareholders receiving their principal back in the shortest possible time. As such, the Company can make no guarantee that any Class B Shareholder will receive their invested principal back in the time period requested or expected.

**What if I don't want my principal and/or liquidation amount back at a Mandatory Call?**
When a Mandatory Call is made, each Class B Shareholder has the right to renew part or all of the liquidation amount. You must provide the Company with written notice to renew at least three (3) business days before the Pay Date listed in your Mandatory Call notice. If you choose to renew at least 90% of your liquidation amount, then you will receive a bonus of 0.05 added to your renewed position(s)' Base Liquidation Multiplier. Renewal bonus(es) is/are not cumulative. Any renewed positions are treated as new investments, and are placed at the end of the FIFO Queue.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B

SEC-DEEPROOT-E-0164802

shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency. The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares do not have a vote, or say, in the affairs of the Company.

## THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

*The area below the following line is intentionally left blank.*

SEC-DEEPROOT-E-0164803

# EXHIBIT 8



**Mailing**
PO Box 691610
San Antonio, TX 78269-1610

**Overnight/Physical**
8200 IH-10 West, Ste. 600
San Antonio, TX 78230

Toll Free (888) 316-2935

deeproot Growth Runs Deep Fund, LLC (the "Company", "us", "we", or "dGRD") is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in other deeproot® entities; and cash or cash equivalents. To capitalize the Company, we are offering a series of preferred membership interests ("shares" or "Offering") designed to meet the needs of Investors.

The Shares will be offered only to persons whom we reasonably believe are Accredited Investors as defined in Securities and Exchange Commission ("SEC") Regulation D, 17 CFR 501(a), and to the maximum legally allowable non-accredited or non-institutional investors; all of whom are known as "prospective investors." Prospective investors will be asked to complete an Application and Subscription Agreement, a Form W-9 and provide photo identification. We intend to claim an issuer's exemption from the requirement to register this offering under SEC Regulation D, Rule 506.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING DOCUMENT OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THIS OFFERING INVOLVES A HIGH DEGREE OF RISK TO INVESTORS. See "Risk Factors."

|  | Principal Amount[1] | Underwriting discount and commissions[2] | Proceeds to issuer or other persons |
|---|---|---|---|
| Per unit Total | $25,000.00 | $2,000.00 | $23,000.00 |
|  |  |  |  |
| Total Minimum[3] | $100,000.00 | $8,000.00 | $92,000.00 |
| Total Maximum | $25,000,000.00 | $2,000,000.00 | $23,000,000.00 |

[1] This is the aggregate principal amount of the Offering offered through this offering document.
[2] This offering is made primarily by us. However, we may engage third parties to help us sell Shares under this offering. Any persons who may receive compensation will be registered as a broker, or an otherwise lawful finder. Compensation to such persons, if any, will vary and will be paid out of the Investors principal.
[3] All proceeds will be held in a separate account until we have received the minimum amount of $100,000 in order to start the enterprise. Thereafter, we will not place prospective investors' monies in escrow or a separate account. Certain amounts may be retained for administration or management purposes.

DATED AUGUST 3, 2015

**THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED
TO DEEPROOT IF YOU DO NOT INVEST.**

i



## NOTICES TO INVESTORS

THE LIMITED LIABILITY COMPANY SHARES HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY SECURITIES LAWS OF ANY STATE.  THE SHARES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTIONS FROM REGISTRATION ARE AVAILABLE.  NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AUTHORITY OR AGENCY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THERE IS NO PUBLIC MARKET FOR THE SHARES.

NO OFFERING LITERATURE, OTHER THAN THIS PRIVATE PLACEMENT MEMORANDUM, OR ADVERTISING, IN ANY FORM, WILL BE EMPLOYED IN THE OFFERING OF THESE SECURITIES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, AND, IF MADE, SUCH REPRESENTATIONS MUST NOT BE RELIED UPON.  THIS PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THESE SHARES AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM AS LEGAL OR TAX ADVICE.  EACH INVESTOR SHOULD SEEK HIS OWN LEGAL AND TAX ADVICE AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

THE OFFEREE, BY ACCEPTANCE OF THIS PRIVATE PLACEMENT MEMORANDUM, AGREES TO RETURN THIS DOCUMENT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT DECIDE TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THIS OFFERING IS PRELIMINARY AND MADE SUBJECT TO WITHDRAWAL, TERMINATION OR MATERIAL MODIFICATION BY THE COMPANY WITHOUT NOTICE.  WHETHER OR NOT WITHDRAWN OR TERMINATED, THE COMPANY RESERVES THE RIGHT TO OFFER SHARES IN THE FUTURE AT A PRICE LESS THAN, EQUAL TO OR GREATER THAN THE PRICE OF SHARES OFFERED HEREBY. THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

SEC-DEEPROOT-E-0013400

deeproot Growth Runs Deep Fund, LLC
(a Texas Limited Liability Company)

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### OFFERING DATED AUGUST 3, 2015

The information in this Private Placement Memorandum ("PPM") is furnished on a confidential basis exclusively for the use of the person named below, who, by accepting this PPM, **agrees to return it promptly to the Company**, upon request or if no investment occurs, and agrees not to reproduce or disclose to any persons (other than such person's legal, tax, accounting and other advisors) all or any part off this PPM without the express written permission of the Company.

_____

Name

☐☐☐☐☐☐    Copy No.

iii

SEC-DEEPROOT-E-0013401

🀫 deeproot®
**Growth Runs Deep Fund ("dGRD")**
$25,000,000
Class B Membership Shares

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**deeproot Growth Runs Deep Fund, LLC** (the "Company", "us, "we", "our", or "dGRD") is a Texas limited liability company of which deeproot Funds, LLC ("dF") is the sole member. **dF** owns all of the Class A Membership Shares ("Class A Shares") and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company.

The dGRD is a significant step forward in the evolution of the life settlement transaction. The Fund provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw'. Other features include: renewal bonuses, above average pre-determined returns (38% to 60%), and no anticipated future premium obligations. The Operating Agreement of the Company is attached hereto as Appendix I. The Company's principal business office is located at 8200 W Interstate 10, Suite 600, San Antonio, Texas 78230. While ground-breaking, there is no assurance that the Company's business plan will be successful.

**1**
## SUMMARY OF THE OFFERING

**Structure**

1.      The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share. The minimum investment per transaction is $25,000, or 1 Class B Share. Fractional shares up to four decimal places are permitted. The Company reserves the right to increase the outstanding, issued, and/or authorized amount of Class B Shares, without notice or permission, to accommodate renewals by existing Class B Shareholders.

2.      Subscription payments will be held in an interest-bearing account until at least $100,000 of Class B Shares (4 Class B Shares) are sold. Once the Company attains that level of sales, the Company will commence business by purchasing the first assets. If subscriptions to purchase at least 4 Class B Shares have not been accepted by December 31, 2015, and by unanimous vote of all Class B Shareholders, all payments received will be returned *pro rata*, together with interest earned thereon (if any).

3.      The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager. Biographies of the management team are contained herein.

4.      Any commissions or discounts paid (if any) with respect to the offering of the Class B Shares shall be at the expense of the Company.

**Offering Basics**

5.      The offering is made up of a chronological 'Queue' of segmented 1 share ($25,000) investment positions (the "position", or "positions"). A position may be fractional (ie. less than $25,000 or 1 share).

6.      Each investment position is assigned a predetermined rate (the "Liquidation Multiplier"). This is the equivalent of a lump-sum priority or preferred return ("Priority Return").

SEC-DEEPROOT-E-0013402

7.     The Class B Shares are subject to Mandatory Calls, and as assets mature, the Company calls and pays off the positions based on their respective order in the FIFO Queue, as further described in this PPM.

8.     Each Class B Shareholder has two options upon a Mandatory Call: i) to renew (ie. reinvest) the position(s) in return for an increased Liquidation Multiplier (ie. bonus); or ii) receive a sum equal to the position(s)' initial principal, multiplied by the Liquidation Multiplier, paid 30 days after the Call Date. All calls are made in the sole discretion of the Company and are absolute, and without recourse.

9.     The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature.

**Other Offering Details**

10.     Class A Shareholders retain all voting rights. The Fund Advisor or Manager(s) retain sole discretion over due diligence, purchase, and maintenance of the assets.

11.     Class B Shareholders have a right to receive certain information, as further described herein; and retain a right to consent to any substantial changes to the Offering, or to the ownership or management of the Company.

12.     Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in non-securitization of a majority of Class B Shareholder positions.

13.     If a Class B Shareholder dies, such Class B Shareholder's custodian(s), beneficiary(ies), legal representative(s), and/or assign(s) are subject to the same registration and terms upon which the Class B Shareholder would have been, had the Shareholder remained alive. The Company retains the sole and absolute right to require adequate documentation or authentication determinative of the legal right of the requesting custodian, beneficiary, legal representative, or assign to request or receive the deceased Class B Shareholder's principal and/or return. The Company also retains the absolute and sole discretion to reject any such request without a written order (to do so) issued by a court of proper jurisdiction.

## II
## SUITABILITY STANDARDS FOR INVESTORS

Investment in the Class B Shares of the Company offered hereby involves a high degree of risk. The Class B Shares offered hereby are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period and have no need for liquidity in this investment. There will not be any public market for the Class B Shares. The Class B Shares have not been registered with the Securities and Exchange Commission, nor with any state securities agency. This is an offering made only to a limited number of investors for investment only. Each investor will be required to execute the Subscription Agreement. Under the Subscription Agreement, each investor will be required to represent, among other things, that he is acquiring the units for his own account, for investment, and not with any intention of making a distribution or resale thereof, either in whole or in part. Furthermore, no resale or transfer will be permitted except in accordance with the provisions of the Federal Securities Act of 1933, as amended, the rules and regulations thereunder, the applicable state securities laws, and the terms of the Operating Agreement.

No Class B Shares will be sold to any person unless he executes and delivers to the Company a copy of the Subscription Agreement and accompanying documents, which contain representations regarding the prospective investor's net worth and certain other matters. The Company will not accept subscriptions from any prospective investor unless such investor certifies that (1) his net income before taxes for each of the two immediately preceding years was at least $200,000 and there is a reasonable expectation of reaching the same income level in the current year, or (2) his net worth (exclusive of primary residence, furnishings and automobiles) is at least $1,000,000, or (3) his financial position is otherwise suitable for the degree of risk associated with this investment. In addition, a prospective investor must have sufficient knowledge and experience in financial and business matters to enable such prospective investor to evaluate the merits and risks of an investment in the Company or must have the assistance of

SEC-DEEPROOT-E-0013403

a person other than the Company or its affiliates, who possesses such knowledge and expertise.  The Company will have the sole discretion regarding admittance of any investor into the Company.

## III
## RISK FACTORS

Participation in the Company requires a minimum investment of 1 Class B Share ($25,000), and the ability and willingness of the investor to accept substantial investment risks and lack of liquidity.

In addition to the factors set forth elsewhere in this PPM, prospective investors in the Company should carefully consider the following.

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX COUNSEL, ACCOUNTANT AND OTHER PERSONAL ADVISORS CONCERNING THE LEGAL, FINANCIAL AND TAX ASPECTS OF THIS INVESTMENT. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE ANY PART OF THE CONTENTS OF THIS SUMMARY AS LEGAL OR TAX ADVICE.

FURTHERMORE, INVESTORS CAN RECEIVE NO GUARANTEE WHATSOEVER THAT THEY WILL RECEIVE ANY RETURN ON THEIR CONTRIBUTIONS TO THE VENTURE. THE MANAGERS SHALL NOT HAVE ANY LIABILITY TO THE INVESTORS FOR ANY ACT OR OMISSION NOT AMOUNTING TO FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

A.     Lack of Operating History.
The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings.  As such, the Company will be subject to all the risks of a new business enterprise.

B.     Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.
Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

C.     Investment in the Class B Shares involves an enhanced degree of risk.
We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio.  Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market.  There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon.

D.     Term, duration, or length of investment is unknown.
While the advantage of the FIFO Queue feature of the dGRD is to put Class B Shareholders on an equal footing and a better chance to achieve the average anticipated hold time of the investment, the Company cannot make any guarantee or guess as to the term, duration, or length of the investment.

E.     It is possible Class B Shareholders may have to contribute additional money.
As more fully described below, when we acquire a life policy, we may be required to pay policy premiums. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, or other asset obligations, the Company reserves the right to request Class B Shareholders to advance additional principal if: i) the

SEC-DEEPROOT-E-0013404

Class B Shareholders are given reasonable notice; and ii) by doing so is in the financial best interest of the Class B Shareholders.

      F.     <u>Dependence on Managers</u>.

The success of the Company will depend, to a significant extent, on the quality of the management provided by the Managers. In the event Robert J. Mueller is incapacitated or dies, or is removed or resigns, there can be no assurance that a satisfactory replacement could be obtained or would be available on the same terms. Furthermore, the Managers will not be obligated, and are not expected, to devote full time and attention to the affairs of the Company. The Class B Shareholders will have limited right to participate in the management of the Company.

      G.     <u>Some Agreements, Including Those Involving Compensation, Not at Arms-Length</u>.

As described herein, we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining. However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return.

deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder, and take no preference in the FIFO Queue.

      H.     <u>Lack of Liquidity</u>.

The Class B Shareholders should be fully aware of the long-term nature of this investment. There is no market for resale of Class B Shares, nor is one likely to develop. The Shares are intended to be held indefinitely and are therefore, illiquid. As such, they are not suitable for emergency, living expenses, other income requirements, or required minimum distributions (RMD's). There are a number of restrictions on the transferability of the Class B Shares offered hereunder. In addition, Class B Shares may only be assigned subject to limitations imposed by federal and state securities laws and the necessity of avoiding adverse tax consequences. Additionally, an assignee may only become a substitute member with the consent of the Managers and upon satisfaction of the other conditions set forth in the Operating Agreement. Accordingly, Class B Shareholders may not be able to liquidate this investment, even in the event of an emergency. Additionally, the Company may decline to declare or distribute net maturity proceeds for reasons that may or may not be agreeable to Shareholders. Finally, when the Company decides to call one or more Class B Members' position(s), the specific Class B Shares to be called will be decided by such's order in the FIFO Queue. Queue jumping is not permitted.

      I.     <u>Not Suitable for Required Minimum Distributions</u>.

The Shares are not intended to satisfy Required Minimum Distributions (RMDs), even though a Class B Shareholder's Priority Return might be greater than the annual RMD requirement. RMD's generally are minimum amounts that a retirement plan account owner must withdraw annually starting with the year that he or she reaches 70 ½ years of age or, if later, the year in which he or she retires. As such, any RMD amount that would have been withdrawn from this Offering, must instead be withdrawn out of Shareholder's other qualified accounts.

      J.     <u>Our Ability or Inability to Employ High Quality Underwriting Standards and Adhere to them in Building the Portfolio</u>.

Our ability to find and obtain quality investments for our portfolio is a mission-critical endeavor. While we have current readily available sources of high quality investments, there is an inherent risk that such sources could be frustrated by external forces, yield lower quality investments, or dry up entirely.

      K.     <u>Determination of Company's Profit and Loss</u>.

Profit and loss shall be considered to have been earned over the period of the Company's fiscal year, except that profits and losses arising from the disposition of properties shall be taken into account as of the date thereof and except that if additional capital is contributed during the course of the Company's fiscal year, a separate determination of profit and loss shall be made as of the last day of the month preceding the month in which such additional capital is contributed, and the profit and loss of the Company for the period before such date shall be apportioned among the members in accordance with their respective interests on such date.

SEC-DEEPROOT-E-0013405

L.       Determination of Class B Shareholder's Share of Profit.
In all cases, a Class B Shareholder's maximum share, over the duration of fiscal years held, of any profit is limited to the principal invested, multiplied by the percentage equivalent of such's position(s)' Liquidation Multiplier(s), that remains unpaid by Company.

M.       No Guarantee of Fixed or Annualized Returns.
Consistent and predictable growth is ideal in Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit. However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return. As the actual death of an insured, maturity of any life policy, or return of capital from a private placement are unknown at the time of investment, we cannot provide in advance a fixed or annualized rate of return. Annualized return on investment calculations can only be made at a Mandatory Call.

N.       Inadequate Valuations and Their Effect on the Accounting of the Company and Class B Shares.
Low or inadequate valuations of our investment portfolio may lead to the appearance of an accounting deficit on a portion or all of the investment portfolio. Based upon the overwhelming intended allocation of investment funds to life policies and the fact that the face value of all life policies purchased for the portfolio will eventually be realized, we believe that Class B Shareholders will actually earn the amount owed upon each maturity. However, in the event of low valuations, the accounting of the investment portfolio may actually be less than when realized.

O.       Possible Classification as an Investment Company.
Because we will invest in items which may be deemed to be securities, we could be classified as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Classification as an investment company under the Investment Company Act would have a substantial adverse impact on our operations as it would require registration with the SEC and various state securities agencies. We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act. Since we do not intend to register as an investment company, Class B Shareholders will not have any of the protections that may be afforded by the Investment Company Act.

P.       Some Information may not be Provided.
Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

Q.       Federal Income Tax Risks.
WE HAVE NOT OBTAINED A LEGAL OPINION CONCERNING THE TAX IMPLICATIONS OF AN INVESTMENT IN THE OFFERING. IT IS EACH PROSPECTIVE INVESTOR'S RESPONSIBILITY TO OBTAIN AN INDEPENDENT TAX OPINION CONCERNING THE TAX STATUS OR IMPLICATIONS OF INVESTING IN THE OFFERING. Investors are presumed to have access to needed legal and tax advice. Prospective investors are expected to consult their own tax advisors as to their own tax situation prior to investment in the Class B Shares. The cost of such consultation could, depending on the amount thereof, materially increase the cost of purchasing an interest in this Offering and may decrease any anticipated yield on the investment. A number of changes in the tax laws have been made and/or are under consideration, and such professional consultation is essential.

R.       Risk of Audit.
Our federal tax returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items on our tax return in the event of either an audit or any litigation resulting from an audit. While an audit may decrease our ability to perform, such an audit should not affect the tax treatment afforded Investors with respect to the Offering.

SEC-DEEPROOT-E-0013406

IV
**UNDERLYING ASSETS**

**Life Policies**

We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older. Policies are purchased for more than their cash surrender value but less than the net death benefits to be paid under the policies. These Life Settlements may, but are unlikely to, include policies on the lives of terminally ill patients under the age of 65 as long as such's combined Face Value is less than five percent (5%) of the aggregate Face Value of the pool of life policies. When we acquire such a contract, we may be required to pay the policy premiums in return for the receipt of the net death benefit as the new owner and beneficiary under the policy. Investments in these contracts involve certain risks, including liquidity risk, risk of excessive premium payments beyond the insured individual's life expectancy, credit risk of the insurance company, and inaccurate estimations of life expectancy of the insured individuals. These policies are considered illiquid in that they are bought and sold in a secondary market through life settlement agencies and not on any exchange where settlement of a transaction is required in a timely manner. In the event of a bankruptcy of the insurance carrier for a policy, we may receive reduced or no benefits under the contract. Although unlikely, the Company may internally encounter losses on the investments if there is an inaccurate estimation of the life expectancies by having to pay higher-than-anticipated premium obligations.

We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles.

**Target Life Settlement Portfolio Summary**

| | |
|---|---|
| Minimum target age of insured individuals | 65 |
| % of Face Value <65 years of age | < 5% of aggregate investments |
| Policy Types | Whole, UL, IUL, VUL, Convertible Term |
| Life Expectancy Range | 3 - 12 years |
| Targeted Life Expectancy | 4 - 6 years |
| Internal Life Expectancy/Premium Reserves | Life Expectancy + 1 |
| Insurance carrier [AM Best] rating | B++ or higher |
| Second to Die policies | < 5% of aggregate investments |

In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. We will base our life expectancy estimates on the estimates provided by the actuarial firm plus one year. The policies we will purchase are whole or universal life insurance policies issued by rated life insurance companies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement. If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the cash value of the policy. Universal life insurance is different from "term" life insurance in that "term" life insurance does not have a cash value associated with it. We may purchase convertible Term policies. Convertible term means that the term policy can be converted to a Universal Life policy under certain conditions.

The price we will be willing to pay for a policy in the secondary market is primarily a function of: (1) the policy's face value; (2) the expected actuarial mortality of the insured; (3) the premiums expected to be paid over the life of the insured; and (4) market competition from other competitors. We seek to earn profits by purchasing policies at discounts to the face value of the insurance benefit. The discounts at which we purchase are expected to exceed the costs necessary to pay premiums, financing and servicing costs through the date of the insured's mortality. We rely

SEC-DEEPROOT-E-0013407

on the medical/actuarial life expectancy assumptions provided to us by third-party medical actuary underwriters to estimate the expected mortality of the insured.

**Capital Acquisition in deeproot Tech**

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to thirty percent (30%) of the asset portfolio.

The Company reserves the right to include other future assets or asset classes, with reasonable notice to Class B Shareholders.

**V**
**TERMS OF THE OFFERING**

**The FIFO Queue**

Investments by Class B Shareholders are queued in 1 share ($25,000.00) increments ("position"), or a part thereof if less, by the chronological order in which investments are initially received (or renewed) on a first-in, first-out ('FIFO') basis. Queue positions are numbered in sequential order based on a *timestamp* of when the i) Class B Shareholder's Application and Subscription Agreement was approved, and ii) the minimum qualifying principal was actually received. For example: Principal received at different times or dates may receive non-sequential positions in the FIFO Queue, if other shareholder(s) *timestamp(s)* intercede.

As assets mature and positions are called: i) Class B Shareholders are paid each's Liquidation Amount on the Pay Date, in order of Mandatory Calls on each's ordered position in the FIFO queue; and ii) the uncalled or remaining positions in the FIFO Queue *advance* in the same order to *fill* the called position(s), and are re-numbered respectively. As the position in the FIFO Queue is based on the 'investment' (or a part thereof), and not the 'Class B Shareholder', a single Class B Shareholder who has made multiple, separate, non-sequential investments of principal, will, as a result, hold multiple positions in the FIFO Queue. Queue jumping is not permitted, in any form.

*For Example*: See below a *magnified* subset of positions, as well as the sequential/non-sequential nature of the Queue.



Same Class B Shareholder
Non-Sequential Positions

**Mandatory Call**

A Class B Shareholder's position is subject to a Mandatory Call when all of the following events have occurred: i) an asset matures, or life policy matures due to the death of the insured(s); ii) the Company receives the maturity amount, or for life policies, the death benefit(s) or Face Value of the life policy from an insurance carrier; iii) the Class B Shareholder owns the next position in the FIFO queue; iv) enough net proceeds exist from the maturity, to pay the Liquidation Amount of the next Class B Shareholder's position in the FIFO queue; and v) the Company conveys written notification of a Mandatory Call, the Liquidation Amount, Pay Date, and a right to Renew to the Class

SEC-DEEPROOT-E-0013408

B Shareholder. The "Call Date" is the date such written notification is conveyed. It is possible for a Class B Shareholder to have multiple sequential or non-sequential positions that *mature* on or about the same call date.

**Pay Date**

The Pay Date is 30 days following the Call Date. On the Pay Date, the Company will mail the Liquidation Amount to the Class B Shareholder by first class mail, unless the Class B Shareholder requests a premium service (*e.g.* overnight, Wire, etc.), or renews, in writing, which must be received by the Company at least three (3) business days before the Pay Date.



**Renewals**

In lieu of accepting the Liquidation Amount for any matured position, a Class B Shareholder may reinvest (or "renew", "renewal", "renewed") part or all of the Liquidation Amount. If a renewal investment is elected, having been received by the Company in writing at least three business days <u>before</u> the Pay Date, of at least ninety percent (90%) of the Liquidation Amount, then the Class B Shareholder shall receive a bonus of 0.05 added to their Base Liquidation Multiplier on the renewed position. A renewal bonus (or renewal bonuses) is/are not cumulative. In all cases, a Class B Shareholder's renewed investment is placed at the end of the FIFO queue, as of the Pay Date.

*For example*: A policy comes due in which the first four positions mature and are paid. All remaining positions in the queue move forward. Class B Shareholder A, reinvests $100,000 and is placed at the end of the queue.



**Liquidation Multiplier**

The Liquidation Multiplier determines the future value of the Class B Shareholder's position at the Mandatory Call. It is based on the Class B Shareholder's <u>registration</u> type (ie. Individual, JTWROS, JT-in-Common, IRA, ROTH, Entity, Trust, etc.), and is pre-determined by the amount of aggregate/cumulative principal then invested in such Class B Shareholder's registration, at the time of investment. Non-sequential positions by the same Class B Shareholder registration can therefore have different Liquidation Multipliers. Once set by the Company at investment, the Liquidation Multiplier for each position will not change until called. The Base Liquidation Multiplier will increase by 0.05 for a qualifying renewal. The Liquidation Multiplier may never exceed 1.65 without prior written Company approval, signed by the Company's Manager(s) and the Company's Fund Advisor.

| Initial/Renewed Cumulative Principal | Base Liquidation Multiplier | Base Percentage Equivalent |
|---|---|---|
| **Under $100,000.00** | 1.38 | 38% |
| **$100,000.00 - $199,999.99** | 1.43 | 43% |
| **$200,000.00 - $399,999.99** | 1.46 | 46% |
| **$400,000.00 - $699,999.99** | 1.50 | 50% |
| **$700,000.00 - $999,999.99** | 1.55 | 55% |
| **$1,000,000.000 +** | 1.60 | 60% |

SEC-DEEPROOT-E-0013409

**Percentage Equivalent:**

The *percentage equivalent* is calculated by reducing the Liquidation Multiplier by '1', and then dividing by 100.

**Liquidation Amount**

Each respective Class B Shareholder will receive an amount equal to the initial (or renewed) principal in a matured position, multiplied by the Liquidation Multiplier set at the time of initial or renewed investment.

**No Liquidity**

Outside of the Pay Date following a Mandatory Call, Class B Shareholders are not permitted to request amounts of principal, Priority Return, or otherwise.

**Premiums**

The Company is responsible for paying all premiums for the life policies out of: i) an amount set aside at the purchase of each life policy that covers anticipated premium obligations through life expectancy plus one year; and ii) the Company's compensation, if any insured lives past the life expectancy plus one year guideline. While it is anticipated that Class B Shareholders will never have to satisfy a future premium obligation, the Company reserves the right to satisfy premiums out of future Class B Shareholder proceeds if: i) the Class B Shareholders are given reasonable notice; and ii) doing so is in the financial best interest of the Class B Shareholders.

**Voting rights**

Class B Shareholders do not receive voting rights, as to the ownership, management, or administration of the Company.

## VI
## REPORTING

Class B Shareholders have certain rights to receive ongoing information about the Company, the Company's financial status, and the Class B Shareholder's position(s). Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, some information may be exempt from reporting.

Secure online access is available at https://secure.deeprootfunds.com. For purposes of this Offering/PPM, all references to Company's duty (whether mandatory or permissive) to report, notify, convey, or deliver any information or document(s) shall be deemed to be reported, notified, conveyed, or delivered by online access to your secure account; whether or not you have requested such access. For shareholders that wish to have printed, postal mail notifications, you must contact us in writing.

We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:

- » notice of any default of any underlying asset
- » notice of a failure to pay a Liquidation Amount to any Class B Shareholder
- » a statement of account at least once annually, or digital access to the same
- » a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same
- » notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values
- » notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders

SEC-DEEPROOT-E-0013410

We also have a duty to release certain information only upon request by a Class B Shareholder.   These include:

» a statement of account value at the time of request
» a statement of Company's current financial condition at the time of request

We retain the right to not release certain information to any Class B Shareholder.  This information includes but is not limited to:

» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest
» any information concerning another Class B Shareholder's interest
» specific positions, investments, assets, or transactions underlying in our portfolio
» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators

## VII
## COSTS AND APPLICATION OF PROCEEDS

The proceeds from the sale of Class B Shares will be used to begin purchasing assets identified above.  We have already sought out appropriate assets, and (if not already attained), will commence operations upon receipt of a minimum of $100,000 from Class B shareholders.  The proceeds of sales of additional Class B Shares will be used as the sales are closed.   The following are the minimum amounts that will be utilized for the indicated purposes per $25,000 of principal received (or pro rata thereof), but may be less if no compensation is earned or paid.

| Cost of Services | Minimum Per $25,000 |
| --- | --- |
| Principal | $23,000.00 |
| Expenditures (~8%) | $ 2,000.00 |
| *Initial Compensation (if any)* | |

**Agent Compensation**

If a Class B Shareholder is represented by a representative, agent, advisor, broker, or other professional who may legally receive compensation for referring, advising, or providing this Offering to Class B Shareholder, then the Company may pay to the order of such professional an amount of compensation that has been disclosed to the Class B Shareholder. There are some types of compensation that must be paid by the Class B Shareholder.  In that case, the Class B Shareholder fully indemnifies Company from being responsible for those payments, as provided in Article VIII. A representative, agent, advisor, or broker may not earn compensation on principal invested by the same (i.e. as a Class B Shareholder).

**Company Advance**

The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.  Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier.

**Company Compensation**

The Company shall receive compensation of the greater of: i) the difference between the percentage equivalent of the matured positions Liquidation Multipliers, and any policy maturity's maximum return (as calculated by face minus acquisition, divided by acquisition); ii) an amount equal to ten percent (10%) of any matured policy's gross maximum return before assigning to the liquidation of Class B Shareholder positions.  The Company also shall receive any assets in the portfolio once all Class B Shareholder positions have been called.

SEC-DEEPROOT-E-0013411

## VIII
## ADMINISTRATION STRUCTURE & FEES

The Company is managed by a Board of Managers.  However, the sole current Manager is Robert J. Mueller, Esq.  All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice.

| | |
|---|---|
| Annual Account Fee | $0.00 |
| IRA Fee | $250.00 to $500.00 per year* |
| Call Notice and Payment | $0.00 |
| Check Fee | $0.00 |
| Overnight Fee | $50.00 |
| EFT Fee | $25.00 |
| Wire Fee | $50.00 |
| Advisory Fees | Unknown * |

* For qualified positions: the Company will advance annual IRA custodian fees until all of any respective Class B Shareholder position(s) mature(s).  The Company shall deduct any or all advanced annual IRA fees from an investor's Liquidation Amount at the (or *each*) Pay Date, up to the lesser of: i) the actual advance; or ii) $500.00 per year.

* For Advisory Fees: If Company is billed for and pays any advisory fees from an advisor or advisory firm that referred Class B Shareholder to Company or this Offering, then such advisory fees, plus three percent (3%) compounded interest, shall be deducted from the respective Class B Shareholder's Liquidation Amount at the Pay Date.

## IX
## PRINCIPALS & ADVISORS

**Robert J. Mueller, Esq.**
**Manager, dGRD**

Robert J. Mueller is an attorney and financial advisor with over twelve years of experience in the legal and financial industries. Robert earned a B.B.A. in Finance from the University of Texas at San Antonio, while concurrently learning about the financial markets with USAA Investment Management Company. After completing his undergraduate studies, Robert attended St. Mary's Law School in San Antonio, where he graduated in December 2000.

Robert has since concentrated his legal and financial practice in the area of estate planning, insurance products and investments. He has personally drafted, delivered, and presented hundreds of simple and complex trust and financial estate plans for his clients.  Robert is a member of the State Bar of Texas, Estate Probate & Trust Law Section of the State Bar of Texas, Texas Young Lawyers Association, San Antonio Bar Association, and is insurance licensed in Texas.

Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas. He is a tech enthusiast and builds/programs/designs for fun.

**Aaron F. Flores, Fund Advisor for dGRD**
**Manager, deeproot Advisory Services, LLC**

Aaron F. Flores is an investment professional with over nine years experience in financial advising, wealth management servicing, and securities trading at both USAA Investment Management Company and Citigroup. Aaron is a native Texan from Northwest Texas and earned degrees from Texas Tech University in Business and Spanish. He holds a FINRA Series 65 license and holds FINRA Series 7 and 63 licenses. Aaron also holds the Accredited Asset Management Specialist AAMS® and Chartered Retirement Planning Counselor CRPC® designations from the College for Financial Planning. He is currently one-third of the way through his work towards a CFA® designation.

SEC-DEEPROOT-E-0013412

**Advisory Agreement & Philosophy**

The investment advisory agreement between deeproot Advisory Services, deeproot Funds and us provides that we are the Advisor's client and have given the Advisor discretionary authority to invest our funds as it sees fit in accordance with our investment objectives. For those advisory services, the Advisor will earn investment management fees equal to one-quarter of one percent (0.25%) per annum of the assets under management ('AUM'). The investment management fees will payable on a periodic basis, of at least one payment each semiannual calendar period, based on the invoice of the Advisor.

## X
## SUBSCRIPTION PROCEDURE

In order to subscribe for Class B Shares, a Class B Shareholder must deliver to the Company, at its offices:

1.  One completed and executed copy of the dGRD Application & Subscription Agreement, per registration type;
2.  A bank or certified check, or Wire, in the amount of Twenty-Five Thousand Dollars ($25,000.00) for each full Class B Share subscribed for, or fractional part thereof, payable to the order of: **deeproot Funds**; or rollover or qualified transfer paperwork for the same.

Executed copies of the documents to be completed by the Class B Shareholders are being delivered with this Confidential PPM. EACH CLASS B SHAREHOLDER IS URGED TO READ THE SUBSCRIPTION AGREEMENT AND THE ACCOMPANYING DOCUMENTS IN THEIR ENTIRETY BEFORE EXECUTING THEM.

In the event the Company rejects or revokes acceptance of a subscription, funds delivered by the subscriber to the Company in connection with the subscription will be returned without interest. Each Class B Shareholder who is solely and affirmatively responsible for keeping their contact information (and bank information for EFT payments) current with the Company. The Company will not be responsible for any delayed, missing, or incorrect notices or payments due to Shareholder's inaction to affirmatively update such information.

Share certificates shall not be issued for any shares subscribed to herein. Rather a certificate of ownership, in lieu of a share certificate, shall be issued to each Class B Shareholder in a closing packet, along with copies of the application and subscription agreement.

deeproot Funds, LLC handles the administrative operations for the Company. Any subscription to this Offering constitutes a perpetual acknowledgment and consent to such.

## XI
## AVAILABLE INFORMATION

The statements in this PPM as to the contents of any contract or other document are of necessity brief descriptions thereof and are not necessarily complete; each such statement is qualified in its entirety by reference to such contract or document.

Any Class B Shareholder desiring additional information about the Company should contact deeproot Funds, LLC, 8200 W Interstate 10, Suite 600, San Antonio, Texas 78230, telephone: (888) 316-2935. All reasonable, permissible requests for books, records, and financial information regarding the Company shall be made available in reasonable amounts of time to the Class B Shareholder.

SEC-DEEPROOT-E-0013413

## XII
## CONTINGENT SECURITY AGREEMENT

The Company agrees to immediately grant a security interest to Class B Shareholders in all assets it holds in the Company's investment portfolio (ie. underlying assets) upon a substantial default. A substantial default is defined as:

» The inability of Company to pay a liquidation amount to any Class B shareholder, if still unpaid sixty (60) days after it is due;

» Enough losses from the underlying assets that would prevent the future repayment of each Class B Shareholder's principal amount;

» Any officer or advisor convicted of a felony, that was committed in furtherance of performing such's duties under this Offering; or

» A court or regulatory order that finds Company has committed a substantial default.

The Company will immediately perfect that security interest and provide immediate security information, including the security interest(s), upon a substantial default.   Class B Shareholders must appoint a Trustee or other fiduciary who will receive, possess, hold, maintain, and dispose of any assets under the security interest.

The Company is only required to perfect a security interest in its entire investment portfolio upon the first occurrence of a substantial default, if it cannot cure within ninety (90) days of such default.

## XIII
## FREQUENTLY ASKED QUESTIONS (FAQ)

**Why are there Class A and Class B shares?**
deeproot Growth Runs Deep Fund, LLC ("dGRD") is organized as a Limited Liability Company (LLC), and not as a For-Profit Corporation.  This was done for ease of organization, lower filing and maintenance costs, tax options, etc.  In order for an LLC to mirror a For-Profit Corporations issuance of Common and Preferred Stock, we use 'classes' of membership interests ('shares').  Each class is comprised of shareholders who enjoy the same rights and privileges.

**What are Class A shares?**
Class A Shares in dGRD are the equivalent to common stock in a For-Profit Corporation.  They have voting rights and the ability to receive dividends or distributions of capital from the business, subject to Class B's preferential rights.

**What are Class B shares?**
Class B Shares in dGRD are the equivalent to preferred stock in a For-Profit Corporation that includes a Mandatory Call feature.  While they do not have voting rights, they have preferential rights to receive dividends or distributions of capital from the Company, over any other class' shares.

**Am I able to find out my place in the FIFO Queue before investment?**
In short, No.  Because your position(s) in the FIFO Queue is/are not assigned until your Application and Subscription Agreement has been approved, <u>and</u> we receive part or all of your principal (in $25,000 increments), any number/position we may provide will be a complete guess and will likely be wrong.  It is normal for there to be delays in application deficiencies, or funding from qualified transfers, check holds, or other factors, which will directly affect the Company's ability to assign your position(s).

**Am I able to find out how many positions/investors are in front of me in the FIFO Queue, before investment?**
Due to the Company's commitment regarding the privacy and security of other shareholders, and because of the inherent *fairness* of the FIFO Queue design, the Company reserves the right to withhold how many positions or Class B Shareholders would come before you in the FIFO Queue, before you invest.  In fact, as with the preceding question, the actual number will likely be different by the time your position(s) are eventually assigned.

SEC-DEEPROOT-E-0013414

**Do Class B shares receive a Priority Return?**
No, a Preferred or Priority Return for Class B shares is the equivalent of a preferred dividend for Preferred Stock. Traditionally, a Priority Return is paid on a periodic or annual basis (ie. Company's fiscal year) based on the profits or losses of the Company.  In this Offering, the return is paid lump-sum (and not periodically or annually), at a predetermined rate, upon a Mandatory Call.

**When will a Class B Shareholder receive a Priority Return?**
While a Preferred or Priority Return is traditionally paid periodically, the dGRD does not offer periodic payments. In this offering, a full or partial return is not paid until the Company issues a Mandatory Call of a Class B Shareholder's position(s) in the FIFO Queue.  As the Company (like you) waits for the maturity of underlying assets, it cannot provide a guarantee as to when a return will be paid.  An argument could be made that the trade-off for patience are the enhanced Liquidation Multipliers and potentially higher annualized ROI.

**What does 'cumulative' mean?**
A cumulative Priority Return is the equivalent of cumulative preferred stock.  That is, if any Priority Return payments have been omitted in the past, all omitted Priority Return payments must first be paid out in-full to Class B Shareholders, before any other class' shareholders may receive distributions. In this Offering, Class A Shareholders are only entitled to an *advance* that must be repaid to Class B Shareholders, as well as earnings on the matured assets. Because Class B Shareholders receive a lump-sum Priority Return based on a matured asset being assigned to positions in FIFO Queue order, this Offering is cumulative.

**Are Class B shares 'participating'?**
No.  Participating preferred shareholders would be entitled to receive profits or incur losses outside of the preferred return.  In this Offering, the Company accepts the risk of participation interests or losses.

**When will I know what my return is?**
All returns are predetermined by the Liquidation Multiplier assigned to each position created upon your investment. Since the Liquidation Multiplier is based on the aggregate or cumulative principal of each unique Class B Shareholder registration, it is not only possible for you to have multiple, different Liquidation Multipliers, but also that your Liquidation Multiplier for a new or renewed position may increase or decrease with additional principal or calls.

**What does it mean that the Company can 'call' my shares?**
**What is a Mandatory Call?**
A *call* is a right granted to the Company to buy-back Class B Shares.  The Company's right to call is absolute and without recourse.  Upon a Mandatory Call, all rights and privileges as to a Class B Shareholder's called position(s) will be terminated, and the Company will convey the respective liquidation amount(s).  In this Offering, a call is made when the Company notifies a Class B Shareholder of a Mandatory Call ("Call Date"), and the Company will issue the liquidation amount on or about thirty (30) days thereafter ("Pay Date"), unless renewed.

**What is the Company's criteria for how many positions are paid off at each asset maturity?**
Pursuant to the terms contained in this PPM, the actual net amount received from the maturity of an underlying asset is the chief determiner of how many positions will be called.  Mandatory Calls will be made for the maximum number of positions in order of the FIFO Queue permitted herein.  It is to the Company's financial advantage, as well as the best interests of the Class B Shareholders, that the maximum number of positions are paid off at each maturity.

**Do all Class B Shareholders get notified when an asset matures, or the FIFO Queue order changes?**
In short, Yes. However notification to positions/Shareholders that were not subject to a Mandatory Call will only be made by: i) a Class B Shareholder affirmatively calling us and requesting their current position number(s); ii) an email notification that will be sent out when the order of the FIFO Queue positions change; or iii) accessing your account information online with our secure website. Due to security and costs, we will not respond to such a request or convey notification by written correspondence.

SEC-DEEPROOT-E-0013415

**How can I get my invested principal back?**
There is no specific term period for this investment. While it is our intent to purchase assets with a target life expectancy of four to six years, we cannot guarantee any specific maturity date. Unless 'called', your investment will remain with the Company and may not be sold or assigned without permission or approval. The Company understands that each Class B Shareholder will have different expectations and need for the return of such Class B Shareholder's invested principal. The FIFO Queue was designed to ensure that the Company maintains a first-come, first serve fairness proposition for Class B Shareholders receiving their principal back in the shortest possible time. As such, the Company can make no guarantee that any Class B Shareholder will receive their invested principal back in the time period requested or expected.

**What if I don't want my principal and/or liquidation amount back at a Mandatory Call?**
When a Mandatory Call is made, each Class B Shareholder has the right to renew part or all of the liquidation amount. You must provide the Company with written notice to renew at least three (3) business days <u>before</u> the Pay Date listed in your Mandatory Call notice. If you choose to renew at least 90% of your liquidation amount, then you will receive a bonus of 0.05 added to your renewed position(s)' Base Liquidation Multiplier. Renewal bonus(es) is/are not cumulative. Any renewed positions are treated as new investments, and are placed at the end of the FIFO Queue.

**Is my principal or liquidation amount protected?**
Each Class B Shareholder's principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency. The return is not backed up or guaranteed by the Company, and may only be payable, in whole or part, if enough assets exist at some future time, to pay them.

**Do I get to have a say in the Company?**
Pursuant to the Operating Agreement, Class B shares do not have a vote, or say, in the affairs of the Company.


# THIS PPM AND ENTIRE CONFIDENTIAL PACKET MUST BE RETURNED TO DEEPROOT IF YOU DO NOT INVEST.

---

*The area below the following line is intentionally left blank.*

---

SEC-DEEPROOT-E-0013416

EXHIBIT 9



**Jay Hulings**
jhulings@dslawpc.com

August 19, 2022

Mr. David Nasse                          *Via E-mail: nassed@sec.gov*
Ms. Kristen Warden                       *Via E-mail: WardenK@SEC.GOV*
U.S. Securities and Exchange Commission
100 E. Street, NE
Washington, DC 20549

Mr. Edward C. Snyder                     *Via E-mail: esnyder@casnlaw.com*
Castillo Snyder, P. C.
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205

     Re:    Cause No. 5:21-CA-00785, *Securities and Exchange Commission v. Robert J. Mueller, et al.*, pending in the Western District of Texas, San Antonio Division

Dear Counsel:

    We have enclosed *Defendant Robert J. Mueller's Objections and Responses to Plaintiff's First Set of Interrogatories* in connection with the above referenced matter.

    Additionally, please see below Defendant's production of documents Bates-labeled MUELLER 001045 through MUELLER 001088 in response to Plaintiff's discovery requests.

    Thank you for your attention. If you have any questions, please do not hesitate to contact our office.

                  Sincerely,

                  Jay Hulings

JH:ab
*Enclosure—as stated*



**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| -against- | |
| **ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,** | **Civil Action No.:  5:21-cv-785-XR** |
| **Defendants,** | |
| -and- | |
| **DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,** | |
| **Relief Defendants.** | |

**DEFENDANT ROBERT J. MUELLER'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Robert J. Mueller

("**Defendant**") serves these objections and responses to Plaintiff's First Set of Interrogatories.

Dated: August 19, 2022.

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By: _/s/ Jay Hulings_
    Jason M. Davis
    State Bar No. 00793592
    Email: jdavis@dslawpc.com
    H. Jay Hulings
    State Bar No. 24104573

Email: jhulings@dslawpc.com
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

*Attorneys for Defendant Robert J. Mueller*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was sent to the following counsel of record on August 19, 2022:

| David Nasse | | Regular Mail |
| Kristen Warden | | Certified Mail-RRR |
| U.S. SECURITIES & EXCHANGE COMMISSION | | Hand Delivery |
| 100 F Street NE | | Facsimile |
| Washington, DC 20549 | X | E-mail |
| Email: nassed@sec.gov | | |
| Email: wardenk@sec.gov | | |

*Attorney for Plaintiff*

| Edward C. Snyder | | Regular Mail |
| Castillo Snyder, P. C. | | Certified Mail-RRR |
| 700 N. St. Mary's, Suite 1560 | | Hand Delivery |
| San Antonio, Texas 78205 | | Facsimile |
| Email: esnyder@casnlaw.com | X | E-mail |

*Attorney for Relief Defendants*

/s/ Jay Hulings
H. Jay Hulings

2

## RESERVATION OF RIGHT TO AMEND OR SUPPLEMENT RESPONSES

Defendant Robert J. Mueller ("**Defendant**") has not fully completed his investigation of the facts relating to this case and has not completed his preparation for trial. The responses contained herein are based on the information presently available to and specifically known to Defendant. The following responses are given without prejudice to Defendant's right to disclose subsequently discovered facts or information. Defendant further reserves the right to amend or supplement these responses as additional facts and information are identified.

In addition, as agreed by Plaintiff, Defendant provides these objections and responses without waiving or prejudicing any assertion of Defendant's rights against self-incrimination pursuant to the Fifth Amendment to the United States Constitution.

## DEFENDANT ROBERT J. MUELLER'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

1.      Identify by Bates number and date all Private Placement Memoranda ("PPM") you contend were operative for the deeproot 575 Fund, LLC (the "575 Fund") during the relevant period.

### RESPONSE:

Defendant objects to this request on the ground that the term "operative" is undefined, vague, and ambiguous. Defendant further objects to the definition of the term "relevant period," which exceeds the relevant period identified in Plaintiff's Complaint.

Subject to and without waving these objections, Defendant responds that the following PPMs were used in solicitations to potential investors:

- SEC-DEEPROOT-E-0014497-512 was used from May 2015 to approximately May 2018;

- SEC-DEEPROOT-E-0164808-23 was used from approximately May 2018 to approximately November 2019;

- SEC-DEEPROOT-E-0164824-41 was used from approximately November 2019 to the end of the relevant period; and

- SEC-DEEPROOT-E-0211514-30 was used from approximately January 2021 to the end of the relevant period.

2.      Identify by Bates number and date all PPMs you contend were operative for the deeproot Growth Runs Deep Fund, LLC (the "dGRD Fund") during the relevant period.

**RESPONSE:**

Defendant objects to this request on the ground that the term "operative" is undefined, vague, and ambiguous. Defendant further objects to the definition of the term "relevant period," which exceeds the relevant period identified in Plaintiff's Complaint.

Subject to and without waving these objections, Defendant responds that the following PPMs were used in solicitations to potential investors:

- SEC-DEEPROOT-E-0013399-416 was used from approximately August 2015 to approximately May 2018;

- SEC-DEEPROOT-E-00164786-803 was used from approximately May 2018 to approximately October 2019; and

- SEC-DEEPROOT-E-0164762-80 was used from approximately October 2019 to the end of the relevant period;

3.      Identify by Bates number and date the Operating Agreement(s) you contend were operative for the 575 Fund during the relevant period.

**RESPONSE:**

Defendant objects to this request on the ground that the term "operative" is undefined, vague, and ambiguous. Defendant further objects to the definition of the term "relevant period," which exceeds the relevant period identified in Plaintiff's Complaint.

Subject to and without waving these objections, Defendant responds as follows:

- MUELLER 001067-88 from approximately September 2015 to approximately March 2018; and

- SEC-DEEPROOT-E-0019790 from approximately March 2018 to the end of the relevant period.

4.      Identify by Bates number and date the Operating Agreement(s) you contend were operative for the dGRD Fund during the relevant period.

**RESPONSE:**

Defendant objects to this request on the ground that the term "operative" is undefined, vague, and ambiguous. Defendant further objects to the definition of the term "relevant period," which exceeds the relevant period identified in Plaintiff's Complaint.

4

Subject to and without waving these objections, Defendant responds as follows:

- MUELLER 001045-66 from approximately May 2015 to approximately March 2018;

- SEC-DEEPROOT-E-0005760-78 from approximately March 2018 to the end of the relevant period.

5.      Identify by name, address and telephone number all persons who were involved in the drafting, creating, preparing, and/or editing of 575 Fund PPMs during the relevant period, and for each person identified state the basis and substance of their knowledge.

**RESPONSE:**

Defendant objects to this request on the grounds that the terms "basis and substance of their knowledge" are undefined, vague, and ambiguous.  Defendant further objects to this request on the grounds that the terms "involved in the drafting, creating, preparing, and/or editing" are vague and ambiguous, including because they could include clerical workers, copy services, and others who played only minor roles in the preparation of such documents. Defendant further objects to the definition of the term "relevant period," which exceeds the relevant period identified in Plaintiff's Complaint.  Defendant further objects that the request for information regarding the "basis and substance" of an individual's knowledge calls for information that is protected by the attorney-client privilege, work product privilege, or other applicable protection or privilege held by Defendant and/or a third party.

Subject to and without waving these objections, Defendant responds that during the relevant period Defendant and certain affiliated entities were represented by Dennis Concilla, Andrew Federico, and other attorneys at the firm of Carlile Patchen & Murphy LLP, 950 Goodale Blvd., Suite 200, Columbus, Ohio 43212, (614) 228-6135.

In addition, Defendant further responds that the following individuals helped draft, revise, edit, and/or provide revisions that were incorporated into the PPMs for the 575 Fund:

- Defendant;

- Cary Mueller, for whom Plaintiff is already in possession of contact information;

- Nathan Spradlin, for whom Plaintiff is already in possession of contact information;

- Scott Allen, for whom Plaintiff is already in possession of contact information;

- Gerald Wik, Centri Business Consulting, 530 Seventh Avenue, Suite 2201, New York, NY 10018, (516) 386-5556;

- Phil Forret and others at BDO USA, LLP, for which contact information is included in Defendant Robert J. Mueller's Initial Disclosures; and

- various persons at the Securities and Exchange Commission, who provided proposed revisions and comments on a proposed Form S-1 which were incorporated into PPMs.

Defendant further responds that various others may have reviewed the PPMs for the 575 Fund for various purposes, but Defendant does not recall that such persons provided any revisions or comments that were incorporated into the final versions of the PPMs.

6.      Identify by name, address and telephone number all persons who were involved in the drafting, creating, preparing, and/or editing of dGRD Fund PPMs during the relevant period, and for each person identified state the basis and substance of their knowledge.

**RESPONSE:**

Defendant objects to this request on the grounds that the terms "basis and substance of their knowledge" are undefined, vague, and ambiguous. Defendant further objects to this request on the grounds that the terms "involved in the drafting, creating, preparing, and/or editing" are vague and ambiguous, including because they could include clerical works and others who played only minor roles in the preparation of such documents. Defendant further objects to the definition of the term "relevant period," which exceeds the relevant period identified in Plaintiff's Complaint. Defendant further objects that the request for information regarding the "basis and substance" of an individual's knowledge calls for information that is protected by the attorney-client privilege, work product privilege, or other applicable protection or privilege held by Defendant and/or a third party.

Subject to and without waving these objections, Defendant responds that during the relevant period Defendant and certain affiliated entities were represented by Dennis Concilla, Andrew Federico, and other attorneys at the firm of Carlile Patchen & Murphy LLP, 950 Goodale Blvd., Suite 200, Columbus, Ohio 43212, (614) 228-6135.

In addition, Defendant further responds that the following individuals helped draft, revise, edit, and/or provide revisions that were incorporated into the PPMs for the 575 Fund:

- Defendant;

- Cary Mueller, for whom Plaintiff is already in possession of contact information;

- Nathan Spradlin, for whom Plaintiff is already in possession of contact information;

- Scott Allen, for whom Plaintiff is already in possession of contact information;

6

- Gerald Wik, Centri Business Consulting, 530 Seventh Avenue, Suite 2201, New York, NY 10018, (516) 386-5556;

- Phil Forret and others at BDO USA, LLP, for which contact information is included in Defendant Robert J. Mueller's Initial Disclosures; and

- various persons at the Securities and Exchange Commission, who provided proposed revisions and comments on a proposed Form S-1 which were incorporated into PPMs.

Defendant further responds that various others may have reviewed the PPMs for the 575 Fund for various purposes, but Defendant does not recall that such persons provided any revisions or comments that were incorporated into the final versions of the PPMs.

## **DECLARATION**

My name is Robert J. Mueller. I have read Defendant Robert J. Mueller's Objections and Responses to Plaintiffs' First Set of Interrogatories. Pursuant to Rule 33(b)(1)(A) of the Federal Rules of Civil Procedure, and pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual responses given therein are true and correct to the best of my knowledge, information, recollection, and belief.

Executed on August 19, 2022.

_____
Robert J. Mueller

EXHIBIT 10

**Filed Under Seal**