# EXHIBIT 11

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 12, 2022.**

_____
**MICHAEL M. PARKER**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, | § | |
| LLC, ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | LEAD CASE |
| DEBTORS. | § | JOINTLY ADMINISTERED |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| POLICY SERVICES, INC. | § | BANKRUPTCY NO. 21-51513 |
| | § | |
| DEBTOR. | § | JOINTLY ADMINISTERED |

**ORDER AUTHORIZING AND APPROVING THE SALE
OF CERTAIN PERSONAL PROPERTY FREE AND CLEAR OF ALL INTERESTS
PURSUANT TO 11 U.S.C. §§ 363(b) and (f)**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Policy Services, Inc. (2864), Wizard Mode Media, LLC (3205), deeproot Pinball LLC (0320), deeproot Growth Runs Deep Fund, LLC (8046), deeproot 575 Fund, LLC (9404), deeproot 3 Year Bonus Income Debenture Fund, LLC (7731), deeproot Bonus Growth 5 Year Debenture Fund, LLC (9661), deeproot Tech LLC (9043), deeproot Funds LLC (9404), deeproot Studios LLC (6283), and deeproot Capital Management, LLC (2638).

On April 11, 2022 the Court conduced a hearing on the *Motion* of John Patrick Lowe, the Trustee ("**Trustee**") of the bankruptcy estate of in the case of In re Policy Services, Inc., Case No. 21-51513, ("**Policy Services**") which case is jointly administered with that of deeproot Capital Management, LLC and other related entities at Case No. 21-51523-mmp, *for an Order Authorizing and Approving the Sale of Certain Personal Property Free and Clear of Interests Pursuant to 11 U.S.C. §§ 363(b) and (f)* (the "**Sale Motion**") concerning personal property described as follows:

> Life Insurance Policies detailed on Exhibit "A-1" to the Sale Motion and attached hereto as Exhibit A, and incorporated by this reference (the "**In-Force Insurance Policies**");

> Life Insurance Policies detailed on Exhibit "A-2": to the Sale Motion and attached hereto as Exhibit B, and incorporated by this reference (the "**Lapsed Insurance Policies**"),

The "In-Force Insurance Policies" and the "Lapsed Insurance Policies" are referred to herein, collectively, as "**the Assets.**" The sale and conveyance of the Assets for which approval is sought is occasionally referred to herein as "the Sale." The Court has reviewed the Sale Motion and has heard the evidence in support of the relief requested therein at a hearing before the Court on April 11, 2022 (the "**Sale Hearing**"). The Court considered any objections to the Sale Motion, each of which are overruled, resolved, or withdrawn; and including the announcements and agreements stated on the record at the hearing, the Court has determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein. After due deliberation the Court finds that:

1.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this bankruptcy case and the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 105(a).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

2.     <u>Statutory Predicates</u>.  The statutory predicates for the relief sought in the Sale Motion are sections 105(a) and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 6004, 9007 and 9014, and the applicable Local Rules for the United States Bankruptcy Court for the Western District of Texas (the "**Local Rules**").

3.     <u>Final Order</u>.  This order approving the Sale Motion (the "**Order**") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and to any extent necessary under Bankruptcy Rules 9014, Rule 54(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7054, and any other applicable rule or law, the Court expressly finds that there is no just reason for the delay in the implementation of this Order, waives any stay, and expressly directs entry of the order as set forth herein.  This Order shall be effective and enforceable immediately upon entry.

4.     <u>Notice</u>.  As evidenced by the certificates of service filed with this Court, based upon the record of the case and representations of counsel at the Sale Hearing:  (i) in accordance with inter alia, Bankruptcy Rule 2002, due proper, timely, adequate and sufficient notice of the Sale Motion and the transactions contemplated by Sales Procedures Order (Docket No. 85) (the "**Sale**") has been provided; (ii) no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of this bankruptcy case; and (iv) no other or further notice of the Sale Motion, the Sale Hearing or the Sale is or shall be required. The disclosures made by the Trustee concerning the Sale Motion, the Sale, the Sale Hearing were reasonable, adequate, and complete.

5.     <u>Opportunity to Object</u>.  A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Sale Motion and the relief requested therein has been given to

all interested persons and entities, including, without limitation, the following: (i) all potential purchasers previously identified by the Trustee and any additional parties who have expressed an interest in potentially acquiring the In-Force Insurance Policies and the Lapsed Insurance Policies, including those parties that have submitted formal expressions of interest; (ii) all other potentially interested parties identified by the Trustee in his business judgment as a potential purchaser of the In-Force Insurance Policies and the Lapsed Insurance Policies; (iii) the Office of the United States Trustee; (iv) all applicable federal, state and local regulatory or taxing authorities; and (v) the debtors and all parties on the most current service list.

6. <u>Arm's-Length Sale</u>. The Sale was negotiated, proposed, and entered into by the Trustee of behalf of Policy Services, Inc. and TuYo Holdings, LLC, a Texas limited liability company ["**Turner-Yost Entity**"] for the purchase price of $1,078,389.36, and such additional consideration as provided in the Life Insurance Policy Purchase and Sale Agreement with respect to Lapsed Policies, without collusion, in good faith and from arm's-length bargaining positions. Neither the Trustee nor the Turner-Yost Entity, nor any of their respective representatives, have engaged in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. Specifically, neither the Turner-Yost Entity, nor any of its representatives have acted in a collusive manner with any person. The terms and conditions of the Sale and the transaction contemplated thereby (including without limitation the consideration provided in respect thereof) are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code.

7. <u>Good Faith Purchaser</u>. Turner-Yost Entity is purchasing the In-Force Insurance Policies and the Lapsed Insurance Policies in good faith and is a good faith purchaser of the Assets within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to

all of the protections afforded by that provision. Turner-Yost Entity and its representatives have proceeded in good faith and without collusion in all respects in connection with the Sale and Sale Hearing.

8.      <u>Sale in the Best Interests of the Trustee, the Debtors' Estates and Creditors</u>.  Good and sufficient reasons for approval of the Sale have been articulated, and the relief requested in the Sale Motion and granted herein is in the best interest of the Trustee, Policy Services, Inc., and the other Debtors, their estates, their creditors, and other parties in interest.

9.      <u>Business Justification</u>.  The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale outside of the ordinary course of business under section 363(f) of the Bankruptcy Code in that, among other things, the immediate approval by this Court of the Sale to Turner-Yost Entity is necessary and appropriate to maximize the value of the Debtors' estates.   Given all the circumstances of this bankruptcy case and the adequacy and fair value of the purchase price, the proposed Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

10.      <u>Free and Clear</u>.  Policy Services, Inc. is the sole and lawful owners of the In-Force Insurance Policies and the Lapsed Insurance Policies.  The conveyance of the In-Force Insurance Policies will be a legal, valid, and effective transfer of the Assets and vests or will vest Turner-Yost Entity  with all right, title, and interest of the Debtors to the Assets free and clear of all interests to the fullest extent permitted under 11 U.S.C. §363(f) including without limitation all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code and including without limitation successor liability claims), or other interests, of any kind or

nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, accruing, arising or relating thereto (collectively, the "Interests"[2]), at any time prior to the date of the Closing Date.

11.     Satisfaction of 363(f) Standards.  The Trustee may sell and transfer, and Turner Yost Entity may purchase, the In-Force Insurance Policies and the Lapsed Insurance Policies free and clear of any interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  The proposed sale of the In-Force Insurance Policies and the Lapsed Insurance Policies will be free and clear of all liens, claims, Interests, and encumbrances including any liabilities that arose prior to the Closing Date, with all such liens, claims, Interests, encumbrances and liabilities to transfer and attach to the sale proceeds with the same validity, priority, force and effect (if any) that such liens, claims, interests, encumbrances and liabilities had on the In-Force Insurance Policies and the Lapsed Insurance Policies immediately prior to the closing date.

12.     Not Executory Contracts.     The In-Force Insurance Policies and the Lapsed Insurance Policies, either individually or as a group, do not constitute "executory contracts" as that term is used in the context of 11 U.S.C. § 365. Without regard to their executory or non-executory nature, the Trustee, with Court approval, may transfer all right, title and interest of

---

[2] The term "Interests" as used in this Order includes, without limitations:  all encumbrances; obligations; debts; liabilities; demands; guaranties; options; rights; restrictions; contractual commitments, including but not limited to, any license obligations; rights of first refusal or interests; any of the foregoing that purport to give to any party any defense, a defense or right of setoff, or recoupment against or a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Inforce Insurance Policies and the Lapsed Insurance Policies, or any similar rights; any of the foregoing arising under any mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, the interest of any Debtor other than Policy Services, Inc., or any other person or entity, whether asserted as to the totality of the Inforce Insurance Policies and Lapsed Insurance Policies, or any portion thereof, including any fractional interest in any such policy or policies.

Policy Services, Inc., in and to the In-Force Insurance Policies and the Lapsed Insurance Policies pursuant to 11. U.S.C. §§363(b) and 363(f).

NOW, THEREFORE, IT IS ORDERED, ADJUDGMENT AND DECREED THAT:

1. <u>Sale Motion is Granted</u>.    The Sale Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein and on the record of the Sale Hearing, which is incorporated herein in its entirety, and the Sale as contemplated thereby is granted and approved. All findings of fact and conclusions of law of this Court stated on the record as part of the Court's ruling at the Sale Hearing are incorporated herein by reference and made a part hereof. The Trustee is authorized and directed to sell the In-Force Insurance Policies and the Lapsed Insurance Policies to Turner-Yost Entity for $1,078,389.36 and such additional consideration as is provided in the Life Insurance Policy Purchase and Sale Agreement with respect to the Lapsed Policies. The Turner-Yost entity shall fund the balance of the Purchase Price to Counsel for Trustee and the transaction shall close on or before five days from the entry of this Order but in no event later than May 3, 2022.

2. <u>Objections Overruled</u>.  Any objections to the entry of this Order or the relief granted herein or requested in the Sale Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. <u>Free and Clear</u>.  Except as expressly provided for in this Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, as of the Closing Date, the Trustee shall transfer, and Turner-Yost Entity shall take title to and possession of, the In-Force Insurance Policies and the Lapsed Insurance Policies free and clear of all Interests, with all such Interests attaching to the proceed of sale, subject to the terms of such Interests, with the same validity, force and effect,

and in the same order of priority, which such Interests now have against the In-Force Insurance Policies and the Lapsed Insurance Policies.

4.  <u>Valid Transfer</u>.  As of the Closing Date, the transaction shall effect a legal, valid, enforceable and effective sale and transfer of the In-Force Insurance Policies and the Lapsed Insurance Policies to Turner-Yost Entity and shall vest the Turner-Yost Entity with valid legal title free and clear of any Interests of any kind whatsoever.  The In-Force Insurance Policies and the Lapsed Insurance Policies are transferred to Turner-Yost Entity "as is, where is" with all faults.  All of the issuers of the In-Force Policies and the Lapsed Insurance Policies are hereby directed to effectuate the terms of this Order by recording in their books and records TuYo Holdings, LLC as the owner of each of the insurance policies described in <u>Exhibits "1" and "2"</u> attached hereto.

5.  <u>Direction to Release Interests</u>.  On the Closing Date, each of the Debtors, creditors or Interest holders is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the In-Force Insurance Policies and the Lapsed Insurance Policies, if any, as such Interests may have been recorded or may otherwise exist.

6.  <u>Good Faith</u>.  The transactions contemplated are undertaken by Turner Yost entity, its affiliates, agents, and representatives, without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization is duly stayed pending such appeal prior to the closing.  Turner-Yost Entity, which shall include its affiliates, agents and representative, is a good faith purchaser

of the Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

7.   Retention of Jurisdiction.   The Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things:

a.   interpret, implement, and enforce the terms and provisions of this Order, any related order, the Life Insurance Policy Purchase and Sale Agreement, and any other agreement executed in connection therewith;

b.   protect the Turner-Yost Entity, or any of the Assets, against any Interests in the Assets of any kind or nature whatsoever;

c.   resolve any disputes arising under or related to the Life Insurance Policy Purchase and Sale Agreement;

d.   resolve any disputes concerning the acknowledgement of the transfer and assignment to Turner-Yost Entity of the Assets on the books and records of any insurance company;

e.   adjudicate all issues concerning all Interests in and to the Assets, including the extent, validity, enforceability, priority and nature of all such Interests; and,

f.   adjudicate any and all issues or disputes related to the right, title and interest of Policy Services or any other Debtor in the Assets or the proceeds thereof.

8.   Assignment of Assets.   Upon the closing of the purchase of the assets by Turner-Yost entity, this Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Assets pursuant to the terms of the Life Insurance Policy Purchase and Sale Agreement.

9.  <u>Application of Sale Proceeds</u>.  Any and all valid and perfected Interests in the In-Force Insurance Policies and the Lapsed Insurance Policies shall attach to any proceeds in the order of priority, and with the same validity, force and effect (if any) that such liens, claims, Interests, encumbrances and liabilities had on the In-Force Insurance Policies and the Lapsed Insurance Policies immediately prior to the Closing Date.

10.  <u>Non-Material Modifications</u>.  The Purchase Agreement and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Trustee or the Debtors' estates in the business judgment of the Trustee.

11.  <u>General Authorization</u>.  The Trustee is further authorized and directed to perform such tasks and execute, acknowledge and deliver such instruments or documents as may be necessary to evidence and/or consummate the sale of the In-Force Insurance Policies and the Lapsed Insurance Policies pursuant to this Order. The Trustee is specifically authorized to execute and deliver any assignments or other evidence of the transfer of the Assets to Turner-Yost Entity as the authorized representative of Policy Services.

12.  <u>No Stay of Order</u>.  Notwithstanding the provisions of the Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in closing the transaction referenced herein, and the Trustee and Purchaser intend to close the Sale as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

13,    <u>Order Controls</u>.  To the extent that this Order is inconsistent with any prior order
or pleading with respect to the Sale Motion in this bankruptcy case, the terms of this Order shall
govern.

14.  The Court herein incorporates all rulings made on the record as part of this Order.

###

**Submitted by**:

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
**ATTORNEYS FOR JOHN PATRICK LOWE,**
**CHAPTER 7 TRUSTEE**

## EXHIBIT 1

## IN-FORCE INSURANCE POLICIES

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy | Acquisition Cost |
|---|---|---|---|---|---|---|
| **Protective Life Insurance Company (West Coast Life)** | ANDE75 | REDACTED | In-Force | REDACTED 575 | $2,000,000.00 | $1,212,121.21 |
| **Brighthouse Life Insurance Company** | JKN22A | REDACTED | In-Force | REDACTED 315 REDACTED | $2,500,000.00 | $1,648,351.65 |
| **John Hancock Life Insurance Company** | FEE287 | REDACTED | In-Force | REDACTED 287 | $500,000.00 | $338,983.05 |
| **John Hancock Life Insurance Company** | FEE548 | REDACTED | In-Force | REDACTED 548 | $500,000.00 | $338,983.05 |
| **Occidental Life Insurance Company NC** | MAR790 | REDACTED | In-Force | REDACTED 790 | $100,000.00 | $67,039.11 |
| **Transamerica Life Insurance Company** | JMD135 | REDACTED | In-Force | REDACTED 135 | $500,000.00 | $305,295.36 |
| **Brighthouse Life Insurance Company** | KFFN57 | REDACTED | In-Force | REDACTED 157 REDACTED | $500,000.00 | $254,104.00 |
| **Protective Life Insurance Company** | RID363 | REDACTED | In-Force | REDACTED 371 | $500,000.00 | $148,680.00 |

**Total Acquisition Cost:** **$4,313,557.43**

**Purchase Price (25%):** **$1,078,389.36**

# **EXHIBIT 2**

## **LAPSED INSURANCE POLICIES**

| Carrier | Policy ID | Last Name | Status | Policy Number | Face Amount of Policy |
|---|---|---|---|---|---|
| **Midland National Life** | GRR553 | REDACTED | Lapsed | REDACTED 553 | $242,520.00 |
| **ING Reliastar Life (VOYA)** | PER437 | REDACTED | Lapsed | REDACTED 378 | $1,000,000.00 |
| **SunLife Financial** | SUL428 | REDACTED | Lapsed | REDACTED 428 | $300,000.00 |
| **SunLife Financial** | SUL429 | REDACTED | Lapsed | REDACTED 429 | $300,000.00 |
| **US Life City NY** | UD33NL | REDACTED | Lapsed | REDACTED 0NL | $750,000.00 |
| **Protective Life Insurance Company** | LW7116 | REDACTED | Lapsed | REDACTED 116 | $1,100,000.00 |
| **American General Life** | JDE21L | REDACTED | Lapsed | REDACTED 21L | $633,342.81 |
| **Transamerica Life** | SIE687 | REDACTED | Lapsed | REDACTED 687 | $1,500,000.00 |
| **AXA Equitable Life** | FERN07 | REDACTED | Lapsed | REDACTED 607 | $10,000,000.00 |
| **Mass Mutual** | HCS883 | REDACTED | Lapsed | REDACTED 883 | $1,540,000.00 |
| **Principal** | ANDR62 | REDACTED | Lapsed | REDACTED 262 | $1,000,000.00 |
| **Transamerica Life** | BASH82 | REDACTED | Lapsed | | $9,000,000.00 |

# EXHIBIT 12

# Quick FAQ

## What type of investment is this?
the575™ is organized as a Limited Liability Company (LLC). The company has two classes of membership interests ("shares"). Class A Shares (retained by us) have standard voting rights and the ability to receive distributions of capital, subject to the preferential rights of the Class B Shares (investors). The Class B Shares have limited voting rights, and are subject to a mandatory call at a predetermined date (ie. 5 years), and amount ("Liquidation Amount").

## When will I know what my return is?
The Priority Return you receive will be based on the one-time, irrevocable Priority Return Election you make for the 5-year subscription term. The *deferred* Priority Return Election returns seven percent (7%) per annum of the Invested Capital. The *periodic* Priority Return Election returns pro rata monthly payments of an annualized five percent (5%) of the Invested Capital.

## What are some of the key terms?
The *Start Date* is the date when all of the following are satisfied: your Application is approved, your Priority Return Election is made, and all funds are received. The *deferred Liquidation Amount* is the sum of Principal + Cumulative Priority Returns + Bonus (if any). The *periodic Liquidation Amount* is the sum of Principal + Bonus (if any). The *Pay Date* is thirty days after the call date, in which Company must pay the Liquidation Amount.

## What does a call mean?
A call is a right reserved by the Company to terminate your investment. The Mandatory Call is preset to five years, less one day, for all subscriptions. The Company may issue a Premature Call, as long as the entire Liquidation Amount that would have been paid at a Mandatory Call, is honored and paid.

## Is my money protected?
Your principal is backed up by the assets of the Company in a contingent security agreement, based on the performance of the assets, subject to the liabilities of the Company. Class B Shares have preferential rights over all other shares. That does not guarantee that there will always be enough assets that can be disposed of to cover all sums owed to the Class B shareholders. Not FDIC insured.

## Contact us

deeproot Funds

🏠 8200 IH-10 West, Ste. 600
San Antonio, TX 78230
📠 (888) 316-2935
✉ contact@deeprootfunds.com
🖥 www.deeprootfunds.com

## Disclaimers

The deeproot 575 Fund, LLC ("the575™") is subject to regulatory and investor qualification requirements. Investment in the Class B Shares of the Company involves a high degree of risk. The Class B Shares are suitable only for those investors whose business and investment experience, either alone or together with their financial advisors, makes them capable of evaluating the merits or risks of their prospective investments in the Company and who can afford to bear the economic risk of their investment for an indefinite period, and have no need for liquidity. There are restrictions, risks, costs, and fees associated with this investment, all of which are discussed and enumerated in the **the575™** private placement memorandum ("PPM"). Void where prohibited. Not insured by FDIC. Not available in all States.

Rev. 2015-01A





the575™
FUND
Overview

SEC-DEEPROOT-E-0011222

# the575™

deeproot 575 Fund, LLC ("the575™") is a private equity investment offering, with a five year subscription term, and fixed growth or income returns, that features an innovative, proprietary allocation structure in 3 inherently collateralized asset classes:

- Life Insurance Policies
- Tech Capital Investments
- Cash or Cash Equivalents

# Assets

the575™ invests in a diversified portfolio of investments. Life policies must be from highly-rated carriers with insured ages 65+ and life expectancies between 3 & 12 years. Up to 45% of assets may be placed in private placement or capital acquisition sources to provide additional capital and liquidity for the the575™ Fund. Under a contingent security agreement, the portfolio of investments securitize and back up investor principal.



deeproot®
the575™
Portfolio Allocation



■ Life Policies 55 - 80%
■ Tech 5 - 45%
▦ Cash 5%

## Investor Suitability

ACCREDITED: An accredited investor has: i) a net worth (excluding primary residence) of at least $1 Million, or ii) net income for the last 2 years of at least $200,000 annually, and a reasonable expectation of that continuing.

OR

NON-ACCREDITED: A non-accredited investor has: i) sufficient liquid assets, exclusive of this investment, to cover standard of living expenses; & ii) sufficient knowledge and experience in financial matters to merit the risk associated with this investment.

## Fixed Rate, Fixed Term

**5** year term
% initial bonus (>$350k)
% renewal bonus opportunity

**7** % per annum
deferred return

OR

**5** % per annum
in monthly payments

Growth

Income

Your Choice!

© 2015+ deeproot Capital Management, LLC. All Rights Reserved.

deeproot™

Rev. 2015-01A

EXHIBIT 13

**Filed Under Seal**

EXHIBIT 14

CONFIDENTIAL

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   SECURITIES AND EXCHANGE          ) CONFIDENTIAL
     COMMISSION,                      )
 4                                    )
                  Plaintiff,          )
 5                                    )
        -against-                     ) Civil Action No.:
 6                                    ) 5:21-cv-785-XR
     ROBERT J. MUELLER, DEEPROOT      )
 7   FUNDS LLC (a/k/a dprt Funds,     )
     LLC), AND POLICY SERVICES INC.,  )
 8                                    )
                  Defendants,         )
 9                                    )
        -and-                         )
10                                    )
     DEEPROOT TECH LLC, DEEPROOT      )
11   PINBALL LLC, DEEPROOT STUDIOS LLC, )
     DEEPROOT SPORTS & ENTERTAINMENT  )
12   LLC, AND DEEPROOT RE 12621       )
     SILICON DR LLC, AND ROBERT J.    )
13   MUELLER, JEFFREY L. MUELLER, AND )
     BELINDA G. BREEN, AS CO-TRUSTEES )
14   OF THE MB HALE OHANA REVOCABLE TRUST,)
                                      )
15                Relief Defendants.  )
     _____)
16

17   ORAL AND VIDEOTAPED DEPOSITION OF ROBERT MUELLER, produced

18   as a witness at the instance of the Plaintiff and duly

19   sworn, was taken in the above styled and numbered cause on

20   Thursday, March 9, 2023, from 9:36 a.m. to 7:35 p.m.,

21   before Janalyn Elkins, CSR, in and for the State of Texas,

22   reported by computerized stenotype machine, at the offices

23   of Davis Santos, PC, 719 Flores Street, San Antonio,

24   Texas, pursuant to the Federal Rules of Civil Procedure

25   and any provisions stated on the record herein.
```

1

CONFIDENTIAL

10:39:27  1   hand to be able to answer these questions at the time I

10:39:29  2   signed and we provided it.

10:39:31  3        Q.  If you could -- I'm going to refer to you to

10:39:35  4   page 5 of the Document 28.  It's actually the Question

10:39:48  5   No. 5 and then the response.  It's page 5 on the page

10:39:53  6   number on the bottom.  I apologize.

10:39:58  7        A.  Did you want me to review it or?

10:40:08  8        Q.  Oh, so I was going to ask you -- so if you see

10:40:10  9   at the bottom of the response to Interrogatory No. 5,

10:40:14 10   you say, (Reading:)  In addition, Defendant further

10:40:16 11   responds the following individuals have draft, revise,

10:40:21 12   edit and/or provide revisions that were incorporated in

10:40:24 13   the PPM and 575 Funds.

10:40:26 14              Do you see that?

10:40:27 15        A.  I do see that.

10:40:28 16        Q.  Okay.  And there's a list of names there; is

10:40:29 17   that right?

10:40:29 18        A.  Yes.

10:40:30 19        Q.  Okay.  And then one of the names at the bottom

10:40:32 20   is a gentleman by the name of Gerald Wik at Centri

10:40:38 21   Business Consulting.

10:40:38 22              Do you see that?

10:40:39 23        A.  I see that.

10:40:40 24        Q.  Okay.  And you retained Mr. Wik in connection

10:40:43 25   with an S-1 that you were planing to file for something

                                                                    46

CONFIDENTIAL

```
10:40:47   1   called The Queue Fund; is that right?
10:40:48   2        A.  There were several -- if I recollect, there
10:40:51   3   were several goals for that representation for hiring
10:40:55   4   them as professionals for financial documents.
10:40:58   5        Q.  But it was in -- but one of those roles at
10:41:01   6   least was in connection with an S-1 that you were
10:41:04   7   considering filing for something called The Queue Fund;
10:41:08   8   is that correct?
10:41:08   9        A.  Yes, to the best of my recollection.
10:41:10  10        Q.  Okay.  And was Mr. Wik, as your understanding,
10:41:14  11   retained in any way in connection with the575 Fund LLC
10:41:19  12   or dGRD Fund LLC?
10:41:21  13              MR. HULINGS:  So objection; vague as to
10:41:23  14   "connection."
10:41:24  15              THE WITNESS:  I don't recollect
10:41:26  16   specifically if -- I don't recollect if there was an
10:41:29  17   engagement letter specifically or what the engagement
10:41:32  18   letter said.
10:41:33  19        Q.  (BY MR. NASSE)  Is your recollection -- do you
10:41:35  20   have any recollection of Mr. Wik providing edits or
10:41:38  21   comments on either the575 Fund PPM or the dGRD Fund PPM?
10:41:46  22        A.  Yes.
10:41:51  23        Q.  And when was that?  Do you have a specific
10:41:54  24   recollection?
10:41:55  25        A.  Well, we started with those documents --
```

47

CONFIDENTIAL

11:09:20 1      Q.  (BY MR. NASSE)  You can flip to the next page

11:09:26 2  on the organizational chart 2019.  So it's page Bates

11:09:37 3  numbered 1299.  Similar question, so in 2019 Policy

11:09:44 4  Services, Inc. was the only entity that held title or

11:09:47 5  ownership of life policies; is that right?

11:09:51 6                  MR. HULINGS:  Objection; vague.

11:09:53 7                  THE WITNESS:  To the best of my

11:09:55 8  recollection.

11:09:56 9      Q.  (BY MR. NASSE)  That's correct?

11:09:58 10      A.  Yes.

11:09:58 11      Q.  Okay.  None of the other entities --

11:10:05 12      A.  And I will caveat that as you've defined life

11:10:09 13  policies in your previous question.

11:10:11 14      Q.  Okay.  Tab 65.  We'll go ahead and mark as

11:10:38 15  Exhibit 30 -- you can keep that with you, but we're

11:10:40 16  going to bring in another exhibit.  So we'll mark this

11:10:42 17  as Exhibit 31.

11:10:44 18                  (Exhibit 31 was marked.)

11:11:13 19      Q.  (BY MR. NASSE)  What I'm marking as Exhibit 65

11:11:16 20  [sic], there's a cover letter, but on the second page is

11:11:18 21  a declaration from Robert Mueller dated 14th of

11:11:24 22  October 2021.  I can refer you to -- it's the second

11:11:38 23  page ending in Bates No. 16 and the following page

11:11:42 24  ending in Bates No. 17.

11:11:59 25      A.  I'm sorry.  Where would you like me to go?

61

| | | |
|---|---|---|
| 12:27:40 | 1 | Q.  (BY MR. NASSE)  Did you ever tell Mr. Concilla |
| 12:27:43 | 2 | that you were taking loans from any of the funds? |
| 12:27:49 | 3 | MR. HULINGS:  Objection.  Okay.  So the -- |
| 12:27:56 | 4 | is that question limited to pre-2019? |
| 12:28:01 | 5 | MR. NASSE:  Sure.  Yes. |
| 12:28:03 | 6 | MR. HULINGS:  All right.  You can answer as |
| 12:28:07 | 7 | long as it's before January 1, 2019. |
| 12:28:11 | 8 | THE WITNESS:  We had very frank and robust |
| 12:28:13 | 9 | discussions about almost everything we did with Dennis |
| 12:28:17 | 10 | and Andy.  They had an insight into almost everything |
| 12:28:20 | 11 | that we did.  I don't know what you mean by loans.  We |
| 12:28:24 | 12 | talk about payments here.  But yes, they knew that was |
| 12:28:27 | 13 | happening and it just confirmed it that I refreshed his |
| 12:28:31 | 14 | memory about it here. |
| 12:28:33 | 15 | Q.  (BY MR. NASSE)  That you understood that |
| 12:28:34 | 16 | payments were happening indirectly? |
| 12:28:37 | 17 | Okay.  Do you have any specific |
| 12:28:39 | 18 | recollection of discussing taking out loans from any of |
| 12:28:42 | 19 | the deeproot businesses? |
| 12:28:44 | 20 | MR. HULINGS:  Objection; vague and loans -- |
| 12:28:48 | 21 | vague as to loans from the deeproot businesses. |
| 12:28:52 | 22 | MR. NASSE:  Well, I'm happy to clarify. |
| 12:28:54 | 23 | MR. HULINGS:  Yeah.  Just clean the |
| 12:28:55 | 24 | question up a little bit, yeah. |
| 12:28:57 | 25 | Q.  (BY MR. NASSE)  Do you have any specific |

112

CONFIDENTIAL

| | | |
|---|---|---|
| 12:28:58 | 1 | recollection of any discussions with anyone from Carlile |
| 12:29:02 | 2 | Patchen regarding you receiving or taking loans from any |
| 12:29:08 | 3 | entity owned or controlled by Policy Services, Inc.? |
| 12:29:15 | 4 | MR. HULINGS:  Provided that the answer is |
| 12:29:17 | 5 | prior to 2019, you can answer. |
| 12:29:19 | 6 | THE WITNESS:  Again, we talked about almost |
| 12:29:22 | 7 | everything.  I don't remember of the specific word loans |
| 12:29:25 | 8 | or payments or compensation was used at the time.  Here |
| 12:29:30 | 9 | it says "payments."  Probably used different terms in |
| 12:29:34 | 10 | different conversations.  But they understood that Russ |
| 12:29:38 | 11 | and I received, however you want to call it, from the |
| 12:29:44 | 12 | fund for our services.  That's where he mentions, I |
| 12:29:48 | 13 | believe, here fund management, fees for fund management |
| 12:29:53 | 14 | as an executive. |
| 12:29:54 | 15 | Q.  (BY MR. NASSE)  My -- so sitting here today, |
| 12:29:57 | 16 | you have no specific recollection of discussing taking |
| 12:30:00 | 17 | loans from Policy Services, Inc. or any of the |
| 12:30:03 | 18 | subsidiaries or affiliates? |
| 12:30:05 | 19 | MR. HULINGS:  Objection; vague as to |
| 12:30:06 | 20 | "loans." |
| 12:30:07 | 21 | THE WITNESS:  Like I said, I'm sure we did. |
| 12:30:09 | 22 | I don't recall specifically because we had very robust |
| 12:30:13 | 23 | discussions verbal and written about a lot of things. |
| 12:30:16 | 24 | And here we had already been with them for some time and |
| 12:30:22 | 25 | been through several funds that we had set up.  We were |

113

CONFIDENTIAL

| | | |
|---|---|---|
| 12:30:24 | 1 | in the process of -- in this August here as we just |
| 12:30:28 | 2 | talked about earlier, process of getting the dGRD term |
| 12:30:32 | 3 | sheet into a compliant -- securities compliant fund. |
| 12:30:36 | 4 | So, yeah, it wouldn't surprise me at all if |
| 12:30:40 | 5 | discussions around, you want the term loans or loans or |
| 12:30:44 | 6 | anything else came up during those periods. |
| 12:30:47 | 7 | Q. (BY MR. NASSE) Yeah. And again, I mean, I |
| 12:30:48 | 8 | think you answered my -- I didn't ask you whether it |
| 12:30:50 | 9 | would surprise you. I asked if there's any specific |
| 12:30:53 | 10 | recollection of any discussion regarding loans previous |
| 12:30:55 | 11 | to 2015 for Policy Services or any of its affiliated |
| 12:30:59 | 12 | businesses? |
| 12:30:59 | 13 | MR. HULINGS: I believe it's been asked and |
| 12:31:01 | 14 | answered multiple times now. |
| 12:31:05 | 15 | THE WITNESS: I don't recall specifically. |
| 12:31:08 | 16 | But I recall that we had conversations where that |
| 12:31:11 | 17 | conversation could have come up as I've already |
| 12:31:13 | 18 | answered. |
| 12:31:13 | 19 | Q. (BY MR. NASSE) Okay. And did you recall |
| 12:31:16 | 20 | Carlile Patchen providing you any advice in terms of if |
| 12:31:19 | 21 | you were going to take loans, what would be required in |
| 12:31:21 | 22 | terms of disclosure or documentation? |
| 12:31:23 | 23 | MR. HULINGS: Objection; vague and |
| 12:31:26 | 24 | compound. |
| 12:31:27 | 25 | But you can answer provided that it's prior |

114

CONFIDENTIAL

```
01:55:29  1            MR. HULINGS:  Several times and you've
01:55:30  2   gotten an answer several times.
01:55:32  3            THE WITNESS:  Without going back through
01:55:34  4   emails, notes, tracked versions of this and stuff like
01:55:41  5   that, which I would need to do to recollect better on
01:55:44  6   this.
01:55:49  7       Q.  (BY MR. NASSE)  That you don't -- what's -- you
01:55:52  8   didn't finish the question -- the answer.
01:55:54  9       A.  Yeah, I would need to go back through those
01:55:57 10   documents.
01:55:57 11       Q.  So if we look at the next -- it's page ending
01:56:04 12   in Bates No. 4507, you see at the top of the page it
01:56:14 13   talks about a capital acquisition in DP, which I guess
01:56:21 14   is deeproot Pinball, would consist of the purchase of DP
01:56:24 15   class B shares that the company will hold as further
01:56:26 16   outlined below.
01:56:30 17            Do you see that?
01:56:30 18       A.  Yes.
01:56:30 19       Q.  Did deeproot 575 LLC ever hold class B
01:56:36 20   membership shares in deeproot Pinball?
01:56:38 21            MR. HULINGS:  Objection; it calls for a
01:56:40 22   legal conclusion.  It's also vague as to "hold."
01:56:43 23            You can answer.
01:56:44 24            MR. NASSE:  I'm using it as the term "hold"
01:56:47 25   is used in the document.
```

                                                                137

CONFIDENTIAL

| | | |
|---|---|---|
| 01:56:48 | 1 | MR. HULINGS:  You can still answer.  Same |
| 01:56:50 | 2 | objection. |
| 01:56:51 | 3 | THE WITNESS:  This regards privileged |
| 01:56:53 | 4 | information outside the scope.  Can we confer? |
| 01:56:56 | 5 | MR. HULINGS:  Okay.  Just a second.  We can |
| 01:56:59 | 6 | go off the record. |
| 01:57:01 | 7 | VIDEOGRAPHER:  We're off the record at |
| 01:57:03 | 8 | 1:57 p.m. |
| 01:57:05 | 9 | (Discussion off the record.) |
| 01:59:27 | 10 | VIDEOGRAPHER:  We are back on the record at |
| 01:59:34 | 11 | 1:59 p.m. |
| 01:59:37 | 12 | MR. NASSE:  Question's still pending. |
| 01:59:39 | 13 | MR. HULINGS:  Can you repeat the question |
| 01:59:40 | 14 | or read it off? |
| 01:59:57 | 15 | (Requested question was read.) |
| 01:59:58 | 16 | THE WITNESS:  I do not recall. |
| 02:00:00 | 17 | Q.  (BY MR. NASSE)  So as the manager of the fund, |
| 02:00:06 | 18 | you have no recollection as to whether deeproot 575 ever |
| 02:00:12 | 19 | held deeproot -- shares in deeproot Pinball? |
| 02:00:16 | 20 | MR. HULINGS:  So it asks for -- calls for a |
| 02:00:19 | 21 | legal conclusion, it's vague, and asked and answered. |
| 02:00:22 | 22 | THE WITNESS:  I don't recall.  I know we |
| 02:00:26 | 23 | documented it, paper and -- and through our portal.  I |
| 02:00:34 | 24 | don't recall specific advice that Dennis and Andy |
| 02:00:39 | 25 | recommended for this.  But I just don't recall. |

138

CONFIDENTIAL

02:00:42  1        Q.  (BY MR. NASSE)  Did you discuss with Carlile

02:00:46  2   Patchen whether if you -- 575 Fund did not buy any

02:00:52  3   class B shares whether that would have to be disclosed?

02:00:55  4                MR. HULINGS:  You can answer that.

02:00:59  5                THE WITNESS:  I don't recall that specific

02:01:01  6   conversation.

02:01:03  7        Q.  (BY MR. NASSE)  If we were to look for where we

02:01:09  8   could find out if deeproot 575 Fund ever purchased

02:01:12  9   class B shares in deeproot Pinball, where would we look,

02:01:16 10   where should we look?

02:01:17 11        A.  It would be in the client files, paper client

02:01:21 12   files or notes and documents that I had would be in our

02:01:27 13   online system.  And it would also be in the records that

02:01:34 14   we worked with Jerry Wik with Centri and Phil Forret, or

02:01:41 15   Forret, with Medio.  Because when they came in to do the

02:01:45 16   S-1, we reviewed these, again, and picked them apart as

02:01:50 17   we were creating the DRS itself, the language for the

02:01:55 18   DRS.

02:01:56 19        Q.  Do you recall whether deeproot Pinball ever

02:02:00 20   issued share certificates in connection with this

02:02:04 21   offering?

02:02:05 22                MR. HULINGS:  Objection; legal -- calls for

02:02:07 23   a legal conclusion, also vague.

02:02:10 24                THE WITNESS:  We didn't actually ever issue

02:02:13 25   actual certificates.  I believe there was a certificate

                                                              139

CONFIDENTIAL

02:02:16  1   of some sort that was provided to -- of the subscription

02:02:19  2   that was provided digitally and paper to investors for

02:02:24  3   investor positions.

02:02:26  4      Q.  (BY MR. NASSE)  Yeah.  I'm referring

02:02:27  5   specifically to this provision here in terms of 575's

02:02:32  6   capital acquisition as it's termed here of class B

02:02:36  7   membership shares in deeproot Pinball.

02:02:39  8      A.  I haven't looked at the deeproot Tech or

02:02:42  9   deeproot Pinball corporate book in a long time, so I

02:02:46 10   can't remember and I don't know what's in there.

02:02:49 11      Q.  If the -- if those records are not in the -- in

02:02:50 12   the corporate records, it's fair to say there were none?

02:02:53 13      A.  No, that would be very false.

02:02:56 14            MR. HULINGS:  Okay.  Hold on.  You've

02:02:58 15   already answered the question.  Remind you to give me a

02:03:02 16   second to make objections.

02:03:05 17      Q.  (BY MR. NASSE)  Where else would those

02:03:08 18   documents be?

02:03:10 19            MR. HULINGS:  Objection; vague as to "those

02:03:12 20   documents."

02:03:12 21      Q.  (BY MR. NASSE)  Documents that would document

02:03:14 22   any purchase of class B membership shares by 575 Fund,

02:03:20 23   so where would those documents be?

02:03:22 24            MR. HULINGS:  Objection; vague and calls

02:03:24 25   for legal conclusion.

                                                              140

CONFIDENTIAL

| | | |
|---|---|---|
| 02:03:25 | 1 | MR. NASSE:  Where the documents would be? |
| 02:03:26 | 2 | MR. HULINGS:  Description of the kind of |
| 02:03:28 | 3 | documents.  Does this document fit this legal |
| 02:03:31 | 4 | description you've outlined is a legal conclusion. |
| 02:03:34 | 5 | Q.  (BY MR. NASSE)  Any document that somehow |
| 02:03:36 | 6 | memorizes the capital acquisition of class B membership |
| 02:03:41 | 7 | shares. |
| 02:03:42 | 8 | A.  As I said before, they would have been in our |
| 02:03:44 | 9 | online system, digital form, digitally issued that way. |
| 02:03:48 | 10 | They would have been in paper form.  All the documents |
| 02:03:52 | 11 | and papers were left by instruction of counsel at the -- |
| 02:03:55 | 12 | MR. HULINGS:  Don't -- don't -- don't |
| 02:03:56 | 13 | reveal any instruction of counsel as to maintaining |
| 02:03:59 | 14 | those records. |
| 02:04:00 | 15 | THE WITNESS:  They were left at the |
| 02:04:02 | 16 | San Antonio facility when we were told -- well, they |
| 02:04:06 | 17 | were left at the San Antonio facility. |
| 02:04:08 | 18 | Q.  (BY MR. NASSE)  And when you refer to the |
| 02:04:09 | 19 | online platform, you're referring to, like, what's |
| 02:04:12 | 20 | sometimes referred to as the deeproot portal operated by |
| 02:04:16 | 21 | or maintained by Turner Logic? |
| 02:04:20 | 22 | A.  We had several kind of online systems that |
| 02:04:23 | 23 | Turner Logic designed and executed for us.  And it would |
| 02:04:29 | 24 | be, yeah, in those or through reports that we could |
| 02:04:35 | 25 | query that data with. |

141

CONFIDENTIAL

02:11:20  1  all our accounting with -- in a QuickBooks and had

02:11:25  2  professionals to help us with that.

02:11:27  3      Q.  (BY MR. NASSE)  So let's go through that.

02:11:29  4          Was there a written policy regarding how to

02:11:33  5  ensure you didn't exceed the 20 percent of the company

02:11:36  6  advance provision?

02:11:39  7          MR. HULINGS:  Vague as to "written policy."

02:11:42  8          THE WITNESS:  I don't believe that any of

02:11:44  9  our advisors and many that they are ever -- ever

02:11:49 10  specifically advised on that specific topic.

02:11:52 11      Q.  (BY MR. NASSE)  Yeah.  And maybe I didn't ask

02:11:53 12  you whether you had any advice.  I'm asking you, was

02:11:58 13  there a written policy governing the company advance

02:12:02 14  provision to ensure you didn't -- the Policy Services or

02:12:06 15  any of its affiliates didn't use over 20 percent?

02:12:08 16          MR. HULINGS:  Same objection.

02:12:10 17          THE WITNESS:  I don't recall specifically

02:12:11 18  and it was because we were never advised to do so by

02:12:14 19  financial advisors, by accountants, by attorneys, by

02:12:18 20  auditing anyone or even the SEC.

02:12:22 21      Q.  (BY MR. NASSE)  Yeah.  I don't recall -- strike

02:12:23 22  the SEC.

02:12:25 23      A.  It's a truthful answer --

02:12:26 24          MR. HULINGS:  Hold on.  Wait for a question

02:12:29 25  to be posed before you answer.

                                                              147

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

02:24:00  1     Q.  You said this discussion is in an email?

02:24:02  2     A.  It started with an email and the discussion was

02:24:04  3  as we went to the Pinball PPM --

02:24:07  4     Q.  Again, and my question is:  Is there discussion

02:24:10  5  of nominal administration expenses are used in that term

02:24:12  6  in an email?

02:24:13  7           MR. HULINGS:  Asked and answered.

02:24:15  8           THE WITNESS:  I can't recall if it's in an

02:24:17  9  email or if it was verbal.  But it happened many, many

02:24:23 10  times so I'm sure there's likely an email out there, I

02:24:25 11  just -- I don't know without going back and looking.

02:24:28 12     Q.  (BY MR. NASSE)  And in those discussions did

02:24:31 13  you ask Carlile Patchen whether the term "nominal

02:24:35 14  administration expenses" could cover priority return

02:24:39 15  payments to investors?

02:24:42 16     A.  My understanding in the advice I received is

02:24:48 17  that 575 payment -- 575 P payments due investors are

02:24:52 18  expenses of the fund and they would be included.

02:24:55 19     Q.  Okay.  So there -- so Carlile Patchen told you

02:24:59 20  that nominal administration expenses, that provision

02:25:02 21  could be used to pay prior to return payments to 575

02:25:07 22  Fund investors?

02:25:09 23     A.  Over the multiple times we did it in one form

02:25:12 24  or another, yes.

02:25:13 25     Q.  What do you mean by "one form or another"?

157

CONFIDENTIAL

02:28:50  1    that was attached to an email.  I just can't recall

02:28:54  2    without looking back.

02:28:55  3        Q.  Okay.  Did -- regardless of -- not even in the

02:29:27  4    context of nominal administrative expenses, did Carlile

02:29:31  5    Patchen ever advise you that it was permissible to pay

02:29:34  6    existing investors with new investor investments?

02:29:41  7        A.  Yes.

02:29:42  8        Q.  When did that occur?

02:29:44  9        A.  It occurred continuously throughout the

02:29:48 10    representation, including after the privilege waiver

02:29:51 11    date.

02:29:52 12            MR. HULINGS:  Let's not discuss anything

02:29:53 13    after the privilege waiver date.  You're instructed not

02:29:58 14    to answer anything about after the privilege waiver

02:30:01 15    date.

02:30:01 16        Q.  (BY MR. NASSE)  Not asking you anything about

02:30:03 17    after December 2019, when did you have conversation

02:30:08 18    where Carlile Patchen advised you that it was

02:30:10 19    permissible to pay existing investor with new investor

02:30:16 20    investments?

02:30:17 21        A.  We had many conversations about the reality of

02:30:20 22    being an issuer and complying with securities laws.  And

02:30:28 23    Dennis was very adamant during a lot of these

02:30:30 24    conversations including about this provision that money

02:30:32 25    was fungible, it's common sense as well.

                                                              161

CONFIDENTIAL

02:30:36  1          And a lot of our discussions, when it came

02:30:38  2  into, like, disclosure of this, what the process would

02:30:41  3  be, what the internal controls would be, were around

02:30:44  4  that concept that Dennis kept coming back to as one of

02:30:48  5  his -- his major themes.

02:30:50  6      Q.  And it was permissible?

02:30:51  7      A.  It's an expense of the fund.

02:30:54  8      Q.  Did you -- did you ever ask Mr. Concilla or

02:30:59  9  anyone at Carlile Patchen whether doing so would be

02:31:02 10  Ponzi scheme?

02:31:03 11          MR. HULINGS:  Objection; vague, and legal

02:31:05 12  conclusion as to "Ponzi scheme."

02:31:08 13          But you can answer.

02:31:09 14          THE WITNESS:  I believe there's an email.

02:31:10 15  We might have even reviewed -- that was disclosed, we

02:31:14 16  might have even reviewed it already where Dennis gave a

02:31:18 17  brief example of a Ponzi scheme.  So no, he did not

02:31:21 18  consider what we were doing or any of the disclosures or

02:31:27 19  our internal processes or controls a Ponzi scheme.

02:31:31 20      Q.  (BY MR. NASSE)  Okay.  We can go back.  I

02:31:32 21  believe he says -- he discusses what are the hallmarks

02:31:35 22  of a Ponzi scheme.  Does that sound right?

02:31:38 23      A.  I believe he discusses in context to that email

02:31:42 24  a -- one of the elements of a Ponzi scheme as I

02:31:47 25  understand it and as it related to that specific

162

CONFIDENTIAL

02:38:09   1           MR. HULINGS:  So objection, misstating

02:38:12   2    prior testimony, and that is vague and ambiguous.

02:38:15   3           But go ahead.

02:38:16   4           THE WITNESS:  Again, we did not hide

02:38:19   5    anything from Andy or Dennis.  We -- you can smile

02:38:25   6    and be very disrespectful --

02:38:26   7           MR. HULINGS:  Hey, hey, hey, hey.

02:38:28   8       Q.  (BY MR. NASSE)  You're not answering my

02:38:30   9    question, sir.

02:38:30  10       A.  I am answering --

02:38:30  11       Q.  I asked you a simple question.

02:38:31  12       A.  I am answering and I came here today to tell

02:38:34  13    the truth.

02:38:34  14           MR. HULINGS:  Stop, stop, stop, stop.

02:38:36  15       Q.  (BY MR. NASSE)  We can -- I asked a simple

02:38:38  16    question.  I'm happy to rephrase it.

02:38:40  17           The question was:  So you said you followed

02:38:42  18    their advice.  Is that a correct statement?  Did you

02:38:44  19    testify to that?

02:38:44  20       A.  If they advised something, we followed it.

02:38:47  21       Q.  And my question was:  That included following

02:38:49  22    their advice that it was -- that you -- in following

02:38:53  23    that advice you paid existing investors with new

02:38:56  24    investor funds?

02:38:57  25           MR. HULINGS:  So that is asked and

                                                            168

CONFIDENTIAL

| | | |
|---|---|---|
| 02:38:59 | 1 | answered.  It's vague and ambiguous.  It's |
| 02:39:02 | 2 | argumentative. |
| 02:39:02 | 3 | And to the -- again, the privilege waiver |
| 02:39:05 | 4 | does not exceed January 1, 2019, so to the extent the |
| 02:39:10 | 5 | answer involves communications after that, you are |
| 02:39:12 | 6 | instructed not to answer.  But you can answer as to the |
| 02:39:19 | 7 | question relating to prior to 2019. |
| 02:39:22 | 8 | THE WITNESS:  As I said before, Dennis -- |
| 02:39:24 | 9 | one of Dennis's major things was money was fungible. |
| 02:39:28 | 10 | Payments to investors are expenses of the funds.  That |
| 02:39:32 | 11 | is why they chose the language and proper disclosure |
| 02:39:35 | 12 | they did and we followed their advice. |
| 02:39:38 | 13 | Q.  (BY MR. NASSE)  And in following their |
| 02:39:40 | 14 | advice -- I mean, it's -- I mean, it's a nonresponsive |
| 02:39:44 | 15 | answer.  My question was very simple.  I understand what |
| 02:39:47 | 16 | you're saying their advice was.  You're saying you |
| 02:39:49 | 17 | followed their advice.  I'm asking:  Did that include |
| 02:39:53 | 18 | paying -- and I'll be more specific -- paying priority |
| 02:39:57 | 19 | return payments to existing 575 investors with |
| 02:40:04 | 20 | investments from new 575 investors? |
| 02:40:06 | 21 | MR. HULINGS:  So that's -- that is vague |
| 02:40:09 | 22 | and ambiguous, that is argumentative, and it has been |
| 02:40:13 | 23 | asked and answered. |
| 02:40:17 | 24 | You can answer again if you can follow the |
| 02:40:22 | 25 | question. |

169

CONFIDENTIAL

```
02:40:22   1            THE WITNESS:  One of Dennis's major themes
02:40:26   2   was the fungibility of money.  It's also common sense,
02:40:29   3   which I don't know why you can't get yourself.  Because
02:40:33   4   it was expenses, because we were -- it's disclosed
02:40:38   5   according to them, proper disclosure, and our processes
02:40:43   6   controls that Andy and Dennis helped form and knew well
02:40:46   7   of, we acted upon their advice.
02:40:51   8        Q.  (BY MR. NASSE)  And when you say -- you said
02:40:52   9   because it is -- it was expenses, what is the "it"
02:40:55  10   you're referring to?
02:40:57  11        A.  You were asking about the575 P payments as an
02:41:02  12   expense of the fund according to Dennis and Andy as
02:41:06  13   disclosed that they felt was good disclosure, those
02:41:10  14   expenses of the funds can be paid fungible money in the
02:41:14  15   fund, one dollar in is -- could be interchanged with a
02:41:17  16   dollar out, and that was proper according to their
02:41:20  17   advice and we took their advice.
02:41:23  18        Q.  Did you ever ask Carlile Patchen whether you
02:41:27  19   could disclose -- you should disclose in the PPM that
02:41:30  20   you were paying existing investors with new investor
02:41:34  21   funds?
02:41:34  22            MR. HULINGS:  So --
02:41:36  23            MR. NASSE:  I'm talking about in the
02:41:38  24   context before 2019.
02:41:40  25            MR. HULINGS:  Okay.  I'm going to object to
```

170

CONFIDENTIAL

```
07:31:54  1    document ending in Bates No. 1080, paragraph 23.
07:32:05  2         A.   Sorry.  20 --
07:32:10  3         Q.   23.
07:32:10  4         A.   Okay.
07:32:10  5         Q.   Do you see the paragraph "Compensation"?
07:32:12  6         A.   Yes.
07:32:13  7         Q.   Okay.  Was your -- you received compensation
07:32:18  8    from Policy Services, Inc.; is that correct?
07:32:20  9         A.   I received a salary from Policy Service.
07:32:23 10         Q.   Okay.  Was your compensation Policy Services,
07:32:26 11    Inc. pursuant to the paragraph 23 of Exhibit 42?
07:32:30 12              MR. HULINGS:  Objection; calls for a legal
07:32:37 13    conclusion, vague.
07:32:39 14              THE WITNESS:  I don't know how to answer
07:32:55 15    that question, other than I took compensation from -- or
07:33:01 16    salary from Policy Services, I took it from well before
07:33:05 17    the575 occurred.  I don't remember ever invoking or
07:33:12 18    using this provision.  It doesn't mean that it doesn't
07:33:18 19    apply, but I don't know.  I'd have to -- you know, I
07:33:22 20    don't remember specific advice from CPM on this.  But I
07:33:27 21    don't see how this applies to anything that I actually
07:33:30 22    did or actually happened.
07:33:31 23         Q.   (BY MR. NASSE)  Did you -- do you recall ever
07:33:35 24    receiving a written approval of your compensation?
07:33:41 25              MR. HULINGS:  Objection; vague as to
```

                                                              310

EXHIBIT 15

**Filed Under Seal**

# EXHIBIT 16

**EXHIBIT**

**67**

HO-14036

**To:**        'Gerald Wik'[gwik@centriconsulting.com]
**From:**      Robert J. Mueller
**Sent:**      2017-03-20T17:51:49-04:00
**Importance:**        Normal
**Subject:**   RE: Updated Files 3.20.2017
**Received:**          2017-03-20T17:51:00-04:00
deeproot S-1 Affiliate Fund Cash Flow Projections - Final - 3.2017.xlsx
deeproot brief fund summaries and narrative - 3.19.2017.pdf

I will 'paper' those internally.  Do you need them?

I updated the cash flow with a separate worksheet.  For the Tech, I assumed 40% of profits flowed
back to the fund.  This is conservative and gives a lot of room to increase it if we need to.  For the RE, I
used the PPM Pro Forma values.

I also updated the narrative with the allocations as you requested.  Though I didn't understand your
comments regarding 'Manager's ability to liquidate investments to pay investors or premiums'.  The
positive accumulated cash flow on the cash flow forecast is quite large.  Do you think we need to puff
it up any more?

Robert


========================================
Robert J. Mueller, Principal
deeproot® Family of Companies

 deeproot®

Phys: 8200 IH-10 West, Ste. 600 San Antonio, TX 78230
Mail: P.O. Box 691610, San Antonio, TX 78269

Office: (888) 316-2935
Mobile: (210) 602-8724
Facsimile: (888) 316-2782
http://www.deeprootfunds.com


This is a confidential communication and intended for the addressee(s) only.  If you are not an
addressee you are instructed to immediately destroy all digital or printed originals or copies of this
communication and notify deeproot® immediately.  Any dissemination or use (other than what is
reasonably contemplated by the communication) is strictly prohibited, and may be subject to civil
penalties.

**From:** Gerald Wik [mailto:gwik@centriconsulting.com]
**Sent:** Monday, March 20, 2017 3:31 PM
**To:** Robert J. Mueller <robert@deeprootfunds.com>
**Subject:** RE: Updated Files

Hi Robert,



Δ π EXHIBIT 57
Deponent Mueller
3-9-22
Date_____ Rptr._____
WWW.DEPOBOOKPRODUCTS.COM

You may want to paper those transactions, as that could become a tax issue, especially with real estate investments. The agreements should note interest rates on borrowed/invested money, how disbursements from the funds to the companies (and vise versa) are tracked, authorized, etc, then that supports when payments are coming back in to support cash flows. Also, consider updating the narratives for the max allocation/investment allowed into those alternative investments versus the other potentially liquid (i.e. could be sold) investments, as that also could affect future cash flows and the Manager's ability to liquidate investments to pay investors or premiums if necessary.


Thanks,
Jerry

**From:** Robert J. Mueller [mailto:robert@deeprootfunds.com]
**Sent:** Monday, March 20, 2017 4:10 PM
**To:** Gerald Wik <gwik@centriconsulting.com>
**Subject:** RE: Updated Files

I'll start working on them. But no, there is no formal documentation other than our discretion.


Robert


=====================================
Robert J. Mueller, Principal
deeproot® Family of Companies


deeproot


Phys: 8200 IH-10 West, Ste. 600 San Antonio, TX 78230
Mail: P.O. Box 691610, San Antonio, TX 78269

Office: (888) 316-2935
Mobile: (210) 602-8724
Facsimile: (888) 316-2782
http://www.deeprootfunds.com


**From:** Gerald Wik [mailto:gwik@centriconsulting.com]
**Sent:** Monday, March 20, 2017 3:02 PM
**To:** Robert J. Mueller <robert@deeprootfunds.com>
**Subject:** RE: Updated Files

I saw mention in the narrative (and our discussions) however, my question was more around the formal relationship. In short, if the funds have rights to cash flows: yes, include them. All expected inflows or outflows from the funds should be included. That said, are there debt or investment agreements in place between those businesses and the funds, whereby the terms of the cash flow, repayment schedules, profit allocations, etc, are documented?

Thanks,

Jerry

**From:** Robert J. Mueller [mailto:robert@deeprootfunds.com]
**Sent:** Monday, March 20, 2017 12:43 PM
**To:** Gerald Wik <gwik@centriconsulting.com>
**Subject:** RE: Updated Files

Technically under common control, yes.  We are using investor money from the funds to pay for the startup cost, as discussed in the narratives.  They are intended to diversify the portfolio so we are not so reliant on  life expectancies and renewals.

Robert

====================================
Robert J. Mueller, Principal
deeproot® Family of Companies

🮲 deeproot

Phys: 8200 IH-10 West, Ste. 600 San Antonio, TX 78230
Mail: P.O. Box 691610, San Antonio, TX 78269

Office: (888) 316-2935
Mobile: (210) 602-8724
Facsimile: (888) 316-2782
http://www.deeprootfunds.com

**From:** Gerald Wik [mailto:gwik@centriconsulting.com]
**Sent:** Monday, March 20, 2017 11:33 AM
**To:** Robert J. Mueller <robert@deeprootfunds.com>
**Subject:** Re: Updated Files

Hi Robert,

Are these businesses owned by the funds?

Gerald R Wik, CPA
Partner
Centri Business Consulting, LLC

Phone: (215) 344-1466
Email: gwik@CentriConsulting.com
Website: www.CentriConsulting.com

---

**From:** Robert J. Mueller <robert@deeprootfunds.com>
**Sent:** Monday, March 20, 2017 12:25:06 PM

**To:** Gerald Wik
**Subject:** RE: Updated Files

Gerald,

In talking with the guys this morning about the requests you have made, another issue was brought up.  Do we need to illustrate cash flows from the other three business units?  Car Wash and Comm RE will start this year; Tech in 2019; and Sports & Entertainment in 2018 or 2019 (still up in the air).  It will definitely make things look a lot better than relying solely on renewals for cashflow.

Or does all of this complicate matters even more?  Let me know and I will update the spreadsheet again with those forecasts.

Robert

======================================
Robert J. Mueller, Principal
deeproot® Family of Companies

deeproot

Phys: 8200 IH-10 West, Ste. 600 San Antonio, TX 78230
Mail: P.O. Box 691610, San Antonio, TX 78269

Office: (888) 316-2935
Mobile: (210) 602-8724
Facsimile: (888) 316-2782
http://www.deeprootfunds.com

**From:** Gerald Wik [mailto:gwik@centriconsulting.com]
**Sent:** Sunday, March 19, 2017 8:16 AM
**To:** Robert J. Mueller <robert@deeprootfunds.com>
**Subject:** Re: Updated Files

Thanks Robert.  I'll review early this week and let you know what questions I have.

Jerry

Gerald R Wik, CPA
Partner
Centri Business Consulting, LLC

Phone: (215) 344-1466
Email: gwik@CentriConsulting.com
Website: www.CentriConsulting.com

SEC-DEEPROOT-E-0210799

**From:** Robert J. Mueller <robert@deeprootfunds.com>
**Sent:** Saturday, March 18, 2017 6:45:45 PM
**To:** Gerald Wik
**Subject:** Updated Files

Gerald,

Please see attached an update Policy Valuation (found an error); and the updated cashflow.  In the updated cashflow:

- ❑ I added premium outlays
- ❑ I added (very speculative) dGRD queue position maturities (if we get $ then I added another line for the Pool showing that recapture)
- I added running total at bottom
- ❑ I updated some of the disclosures.

Robert

=====================================
Robert J. Mueller, Principal
deeproot® Family of Companies

deeproot

Phys: 8200 IH-10 West, Ste. 600 San Antonio, TX 78230
Mail: P.O. Box 691610, San Antonio, TX 78269

Office: (888) 316-2935
Mobile: (210) 602-8724
Facsimile: (888) 316-2782
http://www.deeprootfunds.com

SEC-DEEPROOT-E-0210800

EXHIBIT 17

**EXHIBIT**

**68**

HO-14036

# INVESTMENT ALLOCATION AGREEMENT

The undersigned, <u>deeproot Funds, LLC</u> (the "The Manager") being duly authorized, hereby contracts with <u>deeproot Tech, LLC</u> ("Investment Affiliate" or "enterprise"), being an affiliate company of common ownership and control with the Manager, in regards to receipts, disbursements, and management of allocated capital ("investment capital"), to and from the Funds referred to in Exhibit A (the "Fund" or "Funds") on the following terms and conditions, executed below, retroactive to the inception of the Investment Affiliate:

1.  **Authority**. Investment Affiliate will have the following power and authority with respect to the allocated investment capital from the Funds. It shall receive funds, commence, operate, manage, direct, and disburse approved Tech investments of and for the Funds on a discretionary basis without prior consultation with the Manager; subject, however, to such limitations and restrictions as the Manager may impose herein, or may hereinafter impose by notice in writing to the Investment Affiliate. This discretionary authority makes the Investment Affiliate the agent and attorney-in-fact with full power and authority in connection with the Funds: (a) to operate, in the ordinary course of business, one or more entities, and is empowered herein to retain, borrow, buy, sell, lease, exchange, convert, invest & reinvest, employ labor, execute transactions, trade, encumber, account for income and expenses, and perform or pursue any other reasonable activity or course of action Investment Affiliate may deem necessary to achieve the successful goals of the enterprise; (b) to periodically, or upon demand, prepare and submit to the Manager files, reports, financial or written statements, or answers to interrogatories regarding the operations and status of the enterprise; and (c) to disburse back to the Manager amounts of profits, income, or principal as agreed upon within this agreement.

2.  **Services of Investment Affiliate**. By execution of this Agreement, Investment Affiliate agrees to direct the investment capital pursuant to the terms provided under the Manager's authority or each respective Fund's PPM, carried out within the discretionary authority provided herein. Investment Affiliate will render to the Manager periodic written reports of the status of operations and investment capital of the Funds. It is agreed that the sole standard of care imposed upon the officers of the Investment Affiliate by this Agreement is to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. It is agreed that the Investment Affiliate, in the maintenance of its records, does not assume responsibility for the accuracy of information furnished by the Manager, the Funds, or any other party.

3.  **Transaction Procedure**. All transactions will be consummated by payments to, or delivery by, the Manager, of all cash due to or from the Funds. The Investment Affiliate shall not be responsible for any loss incurred by reason of any act or omission of the Manager or Fund(s). The Manager or Fund(s) shall not be responsible for any loss incurred by reason of any act or omission of the Investment Affiliate.

4.  **Reports to Investment Affiliate**. The Manager will provide the Investment Affiliate with such periodic reports concerning the status of the Funds, anticipated investment capital receipts payable to the Investment Affiliate, and with at least ninety (90) days written notice, of net income, profits, or principal that should be directed back to the Manager, or as the Investment Affiliate may reasonably request.

5.  **Confidential Relationship**. All information and advice furnished by either party to the other hereunder, including their respective agents and employees, shall be treated as confidential and

Δ π **EXHIBIT** 38

Deponent Mella

3-9-22

Date _____ Rptr. _____

WWW.DEPOBOOKPRODUCTS.COM

SEC-DEEPROOT-E-0213963

shall not be disclosed to third parties except as required by law or under each respective Fund's PPM.

6. **Management, Operations and Accounting Policies.** The Investment Affiliate shall execute and institute reasonable and customary management, operations, and accounting policies, that (a) adhere to the terms of this Agreement; and (b) maximize the safety, preservation, and return of investment capital back to the Manager.

7. **Split of Net Income.** Upon commencement of operations, the Investment Affiliate shall, at least once per quarter, disburse and return a minimum of forty percent (40%) of the estimated or actual net quarterly income, in arrears of the prior quarter, based on EBITDA, to the Manager. The compensation to Investment Affiliate for its services under this Agreement shall be calculated and paid by retention of sixty percent (60%) of the net quarterly income, over and above the amount due to Manager. On an annual basis, and after annual financial reports have been certified by the Investment Affiliate, the Parties shall reconcile the quarterly payments only if the Investment Affiliate reports that it under-paid the Manager. Any such catch-up payment must be made within thirty (30) days of the reconciliation thereof. Any changes to the split of net income of the enterprise must be agreed to in writing by the parties and made an amendment hereto, with the amendment thereof commencing the next respective quarter. All references to quarter or annual periods are to a calendar quarter or calendar year, respectively.

8. **Valuation.** In computing the fair market value of any investment of the Funds, the parties agree that the Investment Affiliate shall be valued in a manner determined in good faith by Investment Affiliate to reflect its fair market value, or by any third party valuation professional or firm Investment Affiliate deems appropriate.

9. **Investment Objectives.** It will be Investment Affiliate's responsibility to adhere to the written Investment Policy of the Funds, or any applicable investment disclosures thereto, as conveyed to the Investment Affiliate by the Manager, from time to time. Any pro forma accounting, estimates, or projections in the Investment Policy or disclosures are assumed to be speculative, and actual results from operations will be the only metric the Investment Affiliate is required to support or defend.

10. **Termination; Assignment.** This Agreement may be terminated at any time by either party's giving to the other written notice of such termination. Upon termination, the Investment Affiliate must return any deficient or past-due splits of net income (if any), and the cumulative capital investment(s) received, within a time reasonably ascertained from the then current operations of the Investment Affiliate. Upon repayment of all sums owed and due the Manager, the Investment Affiliate will be forever and irrevocably released from the terms of this agreement. No assignment, as that term is defined in the Investment Act of 1940, of the Agreement shall be made by Investment Affiliate without written consent of the Manager.

11. **Notices.** Unless otherwise specified herein or changed in writing, all notices, instructions, and advice with respect to any matters contemplated by this Agreement shall be deemed duly given when received in writing by Investment Affiliate at: 8200 W Interstate 10, Ste. 600, San Antonio, TX 78230, or when deposited by first class mail addressed to (or delivered by hand to) the Manager at: 8200 W Interstate 10, Ste. 600, San Antonio, TX 78230. Investment Affiliate may rely upon any notice from any person reasonably believed by it to be genuine and authorized.

12. **Representations by the Manager.** The Manager represents and confirms that the retention of

Investment Affiliate is authorized by the governing documents relating to the Funds and that terms hereof do not violate any obligations by which the Manager is bound, whether arising by contract, operation of law or otherwise, and if, the Manager is a corporation, trust or limited liability company, that (a) this Agreement has been duly authorized by appropriate action and when executed and delivered will be binding upon the Manager in accordance with its terms, and (b) the Manager will deliver to Investment Affiliate such evidence of such authority as Investment Affiliate may reasonably require, whether by way of a certified resolution or otherwise.

13.   **Entire Agreement; Governing Law**. This Agreement constitutes the entire agreement of the parties with respect to management of the Funds and can be amended only by a written document signed by the parties. It shall be governed by the laws of the State of Texas.

14.   **Attorney's Fees**. In the event of a dispute or litigation as to any terms or conditions of this Agreement, or if a party brings an action or proceeding to enforce or declare any rights herein created, or to bring about or declare the termination, cancellation, or rescission of this agreement, the prevailing party in such action or proceeding shall be entitled to receive from the other party fees and costs, including attorney's fees, as a Court of competent jurisdiction may deem just and proper.

15.   **Execution**. Agreed, signed and executed this 23nd day of March, 2017.


deeproot FUNDS, LLC                              deeproot TECH, LLC


By: Robert J. Mueller                            By: Robert J. Mueller
Its: Vice-President                              Its: Sole Manager

SEC-DEEPROOT-E-0213965

# EXHIBIT A

## FUNDS

deeproot Short Term Fixed Rate Debenture ('STFR-D')
deeproot 3 Year Bonus Income Debenture Fund ('INC-3')
deeproot 3 Year Bonus Reset Debenture Fund ('BRD-3')
deeproot Bonus Growth 5 Year Debenture Fund ('BGD-5')
deeproot 575 Fund ('the575')
deeproot Growth Runs Deep Fund ('dGRD')

SEC-DEEPROOT-E-0213966

# EXHIBIT 18

**EXHIBIT**
**62**
HO-14036



As of 4/1/2019

** FOR AGENT DUE DILIGENCE PURPOSES ONLY **
THIS INFORMATION MAY NOT BE USED FOR SOLICITATION PURPOSES,
AND MAY NOT BE SHOWN TO ANY THIRD PARTIES, INVESTORS, OR POTENTIAL INVESTORS
** CONFIDENTIAL AND MAY NOT BE COPIED, DUPLICATED, OR DISSEMINATED **



# ASSETS BACKING UP INVESTMENTS

**Life Policies**

The below policies represent the currently held and in force policies backing up investor principal. There is a total Face Value of $34.665MM. The weighted overall portfolio return averages at 178.21%. And there is a low Premium-to-Face ratio average of 8.949% (i.e. how much premium is expected to be paid through LE+1 as compared to Face). This does not include policies we are vetting or potentially purchased through escrow.

| Policy | Carrier | Face | Max Rtn | Cur Age | Premium Ratio |
|---|---|---|---|---|---|
| JDE21L | American General Life | $633,342.81 | 39.17% | 91 | 14.813% |
| SUL429 | SunLife Financial | $300,000.00 | 48.33% | 86 | 17.704% |
| SUL428 | SunLife Financial | $300,000.00 | 48.33% | 86 | 17.704% |
| UD33NL | US Life City NY | $750,000.00 | 35.83% | 78 | 0.000% |
| ANDE75 | Protective Life (WCL) | $2,000,000.00 | 65.00% | 84 | 2.500% |
| JKN22A | Metlife Investors | $2,500,000.00 | 51.67% | 81 | 16.627% |
| PER437 | ING Reliastar Life | $1,000,000.00 | 48.33% | 81 | 19.027% |
| SIE687 | Transamerica Life | $1,500,000.00 | 55.00% | 76 | 13.758% |
| GRR553 | Midland National Life | $242,520.00 | 34.17% | 86 | 12.750% |
| FEE548 | John Hancock Life | $500,000.00 | 47.50% | 79 | 14.740% |
| FEE287 | John Hancock Life | $500,000.00 | 47.50% | 79 | 14.519% |
| JMD135 | Transamerica Life | $500,000.00 | 63.78% | 68 | 9.700% |
| MAR790 | Occidental Life | $100,000.00 | 49.17% | 59 | 1.811% |
| MOR780 | Athene | $200,000.00 | 149.79% | 76 | 11.195% |
| FERN07 | AXA Equitable Life | $10,000,000.00 | 342.23% | 77 | 30.542% |
| RID363 | Protective Life (WCL) | $500,000.00 | 236.29% | 76 | 32.246% |
| KFFN57 | Brighthouse Life | $500,000.00 | 96.77% | 79 | 2.999% |
| LW7116 | Protective Life (WCL) | $1,100,000.00 | 661.62% | 75 | 29.575% |
| HCS883 | Mass Mutual | $1,540,000.00 | 76.61% | 77 | 10.715% |
| ANDR62 | Principal | $1,000,000.00 | 142.64% | 77 | 13.200% |
| BASH82 | Transamerica Life | $9,000,000.00 | 111.91% | 82 | 11.550% |
| **TOTAL/AVG:** | | **$34,665,862.81** | **178.21%** | | **8.949%** |

**deeproot Tech Assets**

deeproot Tech has hard assets (furniture, equipment, machinery, parts, inventory, computers) of around $2.8MM. The value of the intellectual property is intangible and cannot be determined until launch.

**Other Assets**

We have a promissory note on the car wash in the amount of $3.335MM, $4.626MM in closely held stock, and $1.747MM in accounts receivable.

EXHIBIT 19

 # POLICY SERVICES

101 Convention Center Dr. Las Vegas, NV 89109 • office (888) 505-3601 • fax (888) 505-2258 • email *contact@policy-services.net*

## LIFE SETTLEMENT CERTIFICATE

Owner:          **ELIZABETH A. ALLEN**

Client No.:     **TX120092**

State:          **TEXAS**

Tax Status:     **QUALIFIED (IRA)**          Custodian:     **PREFERRED TRUST CO**

Closing Date:   **JANUARY 22, 2014**

Case:           **PER437**                   Company:       **ING RELIASTAR LIFE**

| | |
|---|---|
| Death Benefit Amount: | **$1,000,000.00** |
| Your Acquisition Basis: | **$42,495.00** |
| Percentage Ownership: | **6.30%** |
| Maximum Return (%): | **48.33%** |
| Projected Return ($): | **$63,034.25** |
| Estimated Premium Start: | **N/A** |
| Estimated Premium Amount: | **N/A** |

Reserve Fixed Account

| | |
|---|---|
| Elected: | **YES** |
| Amount: | **$3,000.00** |
| Growth Rate: | **3.0%** |
| Qualified Election: | **YES** |

This certificate of ownership of a life settlement interest should be kept with all other paperwork issued to you at the closing of the policy purchase. All data and figures are based on the anticipated illustration provided to us by the life insurance company. In the event of a discrepancy between these data and figures and the actual policy, the actual policy will control. This certificate must be surrendered upon maturity of the policy as a condition precedent to payment of your portion of the death benefit proceeds.

**SEC-PulmanR-E-0000022**

**To:**      **Elizabeth A. Allen**
            **407 Victory Ln**
            **Mansfield, TX 76063-3489**



**Date:**    **JANUARY 22, 2014**

**Re:**      **CLOSING OF LIFE SETTLEMENT TRANSACTION**

POLICY
SERVICES

Dear Elizabeth,

Congratulations!  We have received all paperwork and the closing of your life settlement purchase has been completed.  You have been assigned a client number of **TX120092**.  Please reference this client number on all future correspondence with us.

This letter serves as notice that we, as custodian of your life settlement policy interest, have received the proper endorsements from **ING ReliaStar Life** on the **PER437** case.  You acquired this policy in a **fractional** interest for the investment amount of **$42,495.00**, which results in an approximate **6.30%** ownership of the projected death benefit amount of **$1,000,000.00**.

Per the Policy Servicing Agreement, premium payments have been satisfied for at least life expectancy.  As Custodian, we will continue to make premium payments past life expectancy per the terms of that agreement.

Due to privacy laws & security of the insured, we are not permitted to provide many details about the policy or insured including: the full name or location of the insured, or policy specifics.  Be that as it may, we have enclosed copies of the Policy Servicing Agreement, policy endorsement(s) and life settlement report that your agent/rep should go over with you.  The enclosed Delivery Receipt should be signed & returned within thirty days the date of this closing letter.

Lastly, we do not send out paper statements.  However, you are welcome to print off a current statement at anytime by logging in to your account at **www.policy-services.net** with the account name of **eaallen** and an initial password of **Fh53Wu2**.  Note: We encourage you to change your password after your initial login.

If you have any questions or concerns, please do not hesitate to contact or email us.

Most Sincerely,

Customer Service
Policy Services, Inc.

---

101 Convention Center Dr., Suite 700                (888) 505-3601 **office** (888) 505-2258 **fax**
Las Vegas, NV 89109                         contact@policy-services.net **email**   www.policy-services.net **web**



## Life-Gift, Inc.
Unveiling The Inherent Value Of Life Insurance

# **Life Settlement Report**

### UNDERLYING POLICY DETAILS

| Case/Insured | P E R 4 3 7 | | Closing Date | January 22, 2014 |
|---|---|---|---|---|
| Death Benefit | $1,000,000.00 | | Age at Closing | 76 |
| Acquisition Cost | $674,157.30 | | Life Expectancy | 58   (months) |
| Maximum % Return | 48.33% | | Annual Premium* | $0.00 |

### CURRENT ACQUISITION DETAILS          Elizabeth A. Allen IRA

| Acquisition Amount | $42,495.00 | | Percentage Ownership | 6.30% |
|---|---|---|---|---|
| Projected Return* | $63,034.25 | | Years to Premium Due | 99 |
| Maximum % Return* | 48.33% | | Excess Annual Premium* | $0.00 |

### PROJECTED ANNUALIZED RETURNS (CAGR)

Projected annualized returns* based on hold period until maturity. Includes excess premium outlays (if any).

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| 48.33% | 21.79% | 14.05% | 10.36% | 8.21% | 6.79% | 5.79% | 5.05% | 4.48% | 4.02% |

* Approximate/Estimated

### PROJECTED ANNUALIZED RETURNS (CHART)



Created on Tuesday, January 21, 2014

© 2012+ Life Gift, Inc.

SEC-PulmanR-E-0000022

LIFE–GIFT, INC. 1005 Country Club Avenue, Cheyenne, WY 82001      **POLICY SERVICING AGREEMENT**

This policy servicing agreement is made this ___19___ day of __August_____, 20__13__ between _____ELIZABETH A. ALLEN_____ herein referred to as "Purchaser", **Life-Gift, Inc.** 1005 Country Club Avenue, Cheyenne, WY 82001, hereafter referred to as the "Agent", and **Policy Services, Inc.**, 101 Convention Center Dr., Ste. 700, Las Vegas, NV 89109 hereafter referred to as "Custodian". All of the above named individuals and entities are hereinafter referred to as the "Parties" under the laws of the State of Nevada. Purchaser has been assigned, or has an existing Client No. of: _____TX120092_____.

### ARTICLE I
### RECITALS

WHEREAS, Agent is a corporation involved in the business of identifying, and facilitating the purchase of at a discount percentage of face value, life insurance policies, and all related Death Benefit rights; and

WHEREAS, the Purchaser desires to purchase the Death Benefit rights in a life settlement policy; and

WHEREAS, Custodian is thereafter obligated to hold in custody and disburse Purchase Amount strictly in accordance with the terms and provisions of this Policy Servicing Agreement, and as set forth in the Policy Acquisition Application.

### ARTICLE II
### AGENT AND PURCHASER AGREEMENTS

Policy Services, Inc. shall serve as the Custodian hereunder. When Purchaser desires to purchase Death Benefit rights in a Life Settlement:

a.    Purchaser must execute (or have previously executed) a Policy Acquisition Application along with all required supplemental forms, and deliver the forms (if applicable), accompanied by this Policy Servicing Agreement and Purchase Amount to the Custodian.         $42,495.00 (After RFA)

b.    Purchaser hereby agrees to place $ ~~45,495~~ U.S. dollars for the purchase of the following life settlement and the payment of all costs related thereto (*leave below blank if unknown at time of execution*).

| CASE ID: | PER 437 | INSURANCE CO: | ING ReliaStar Life |
|---|---|---|---|
| | 6.30% | | 58 |
| PERC OWN: | _____ | ESTIMATED LIFE EXPECTANCY: | _____ months |

c.    All Purchase Amount proceeds must be payable to: Policy Services, Inc. (NQ) ; or to the *IRA Custodian* or Purchaser's *Tax Qualified Plan Trustee* (Q)

d.    **Purchaser(s) must initial each of the following, in full and complete understanding and accord of the Custodian's duties and power of attorney over your Purchase Amount:**

_____ Purchaser specifically authorizes Custodian to receive the Purchaser Amount for the following transactions:

1.    Purchasing a life settlement on behalf of the Purchaser pursuant to this Agreement, the Policy Acquisition Application and any other disclosures;
2.    Paying costs or premiums on behalf of the Purchaser; and
3.    Receiving Death Benefits at Policy Maturity and distributing payments to the Purchaser as stated herein.

_____ Purchaser hereby authorizes Custodian to transfer to Custodian money sufficient to pay all costs and premium associated with the purchase of Death Benefits rights through the indicated estimated life expectancy, as an unrefundable cost of the transaction.

_____ During the life expectancy period, Custodian shall pay into the above referenced policy's cash

PSA / Rev 13.01A                                                                                          Page 1 of 3

SEC-PulmanR-E-0000025

LIFE-GIFT, INC. 1005 Country Club Avenue, Cheyenne, WY 82001          **POLICY SERVICING AGREEMENT**

account held with the insurance carrier, any cost or premium requirement as may be due to keep the policy in force.

_____ Purchaser understands and acknowledges that in the event the insured's actual life exceeds the estimated life expectancy, then Custodian shall continue to make additional policy premium payments for the remainder of the insured's actual life, without further cost or obligation to Purchaser.

_____ Purchaser acknowledges that at Policy Maturity the Death Benefit rights shall be paid to the Purchaser (if non-qualified), or to the custodian of Purchaser's qualified plan (if qualified), less any applicable fees. If Purchaser(s) is not an entity, and Purchaser(s) has predeceased the Policy Maturity, then payment shall be made to Purchaser(s) designated beneficiary(ies); provided however if no beneficiary(ies) has/have been designated, then to the estate(s) of Purchaser(s).

### ARTICLE III
### FEES, COSTS, & EARLY WITHDRAWAL PENALTY

Purchaser acknowledges that Agent has not made any representation as to what minimum or specific face amount will be accepted by the insured in any life insured policy purchase, nor as to the specific fee(s) paid by Agent, Custodian or by any supporting entity including, but not limited to medical personnel, attorneys and consultants, and/or legal costs. Purchaser acknowledges that any costs or premium payments due during the insured's actual life are the sole responsibility of Custodian; that no premium payments or other funds are escrowed on behalf of Purchaser and are subsumed as a cost of the transaction. Upon Policy Maturity, the full amount of Purchaser's interest in and to the Death Benefit rights will be paid to Purchaser, Purchaser's entity or Purchaser's qualified account custodian, or (if applicable) to Purchaser's designated beneficiary(ies), less a nominal transaction fee.

Any request for a partial or full return of the Purchase Amount by Purchaser or Purchaser's beneficiary(ies) before Policy Maturity will be subject to a predetermined early withdrawal penalty assessed against the return of your Purchase Amount (and RFA if applicable) as outlined in the table below. Time will be calculated annually from contract anniversary to contract anniversary. By executing this Agreement, Purchaser (and Purchasers heirs, beneficiaries or assigns) expressly agrees that such penalty is a material term of this Agreement, is irrevocable and will result in the respective specified loss of the Purchase Amount upon refund.

| Early Withdrawal Penalty if Surrendered in... | | | | | | | | | |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|---------|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10+ |
| 12% | 12% | 10% | 10% | 8% | 8% | 8% | 6% | 6% | 4% |

### ARTICLE IV
### MISCELLANEOUS

With respect to the Custodian's duties and rights, the Parties agree as follows:

1. Custodian undertakes to perform only such duties as are expressly set forth herein.
2. The Parties covenant and agree that in performing any of its duties under this Agreement, Custodian shall not be liable for any loss or damages which may occur as a result of serving as Custodian hereunder, except for any loss of damages occasioned by its willful default or gross negligence.
3. Custodian may resign upon thirty (30) days written notice to Agent; provided that such resignation shall not become effective until such time as a successor Custodian acceptable to Agent has been selected.
4. This Agreement, combined with the Policy Acquisition Application and other supplemental forms, constitutes the entire agreement between the Parties hereto with respect to the transaction completed therein. This agreement may not be changed, waived or modified orally and may only be changed, waived or modified by agreement in writing signed by the parties.
5. This Agreement shall be binding and inure to the benefit of said respective parties, their respective licensees or representatives, successors, heirs, distributes and assigns.
6. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be original.

**LIFE-GIFT, INC.** 1005 Country Club Avenue, Cheyenne, WY 82001          **POLICY SERVICING AGREEMENT**

### ARTICLE V
### INDEMNITIES

PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS READ THIS AGREEMENT AND CLEARLY UNDERSTANDS THE MEANING, AND LEGAL CONSEQUENCES OF THE REPRESENTATIONS AND WARRANTIES MADE HEREIN AND PURCHASER HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL BEFORE SIGNING THIS AGREEMENT AND THEREFORE DOES HEREBY, FOR HIM[HER]SELF AND HIS[HER] HEIRS, ASSIGNS & REPRESENTATIVES INDEMNIFY AND HOLD HARMLESS AGENT AND AGENTS' PRINCIPALS , AGENTS REPRESENTATIVES, CONSULTANTS, EMPLOYEES, PURCHASER TAX QUALIFIED PLAN TRUSTEE, MANAGEMENT SERVICE AGENT, TRUSTEE AND OTHERS ASSOCIATED WITH WORKING IN COOPERATION WITH AGENT PURSUANT TO THE AUTHORIZATION CONTAINED HEREINFROM ANY AND ALL DAMAGES AND/OR LIABILITIES DUE TO OR ARISING FROM ANY ACTIVITY OR ACTING OUTSIDE THE CONTROL OF THE AGENT INCLUDING BUT NOT LIMITED TO THE FAILURE OF THE INSURED TO DIE WITHIN THE ACTUARIALLY AND MEDICALLY DETERMINABLE ESTIMATED LIFE EXPECTANCY.

### ARTICLE VI
### FIXED RESERVE ACCOUNT ELECTION

_Initials_   _Initials_    I (We) elect to set up a fixed reserve account for this life settlement purchase.  I (We) have received the official tri-fold and have read, understood, and acknowledge all of the details, aspects, benefits, restrictions and disclaimers therein.

Type of Funds:  ☑ Qualified  ☐ Non-Qualified        Initial Funding Amount:    $ _3000.00_
                                                                                _Min $3,000.00 / Max 50% of L.S._

_Initials_    If Qualified, I elect to receive the IRA fee offset and fee waiver benefits.  I specifically authorize my custodian to bill Policy Services, Inc. for fees until the benefits lapse.  I further understand that these benefits will lapse on the earlier to occur of the depletion of my account value or termination of the account at life settlement maturity.

In WITNESS WHEREOF, the parties hereto have agreed on this day, month and year.

_(signature)_   08/19/13
**Purchaser Signature**          **Date**                    **Purchaser Signature**                **Date**

ELIZABETH A. ALLEN
**Printed Name of Purchaser**                                **Printed Name of Purchaser**

**Title of Purchaser (if applicable)**                       **Title of Purchaser (if applicable)**

_(signature)_   08/19/13
**Witness or Advisor Signature (as to Form)**  **Date**        ▐▬▬▬▬▬▬▬▬▬▬
                                                             **REPORTING SSN OF PURCHASER**

                                 1/22/2014                                          1/22/2014
**Acceptance by Agent**              **Date**                   **Acceptance by Custodian**              **Date**

EXHIBIT 20

1

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:       )

4                            )   File No. HO-14036-A

5    DEEPROOT 575 FUND, LLC  )

6

7    WITNESS:  Robert Mueller

8    PAGES:    1 through 287

9    PLACE:    Securities and Exchange Commission

10             100 F Street NE

11             Washington, D.C.

12   DATE:     Wednesday, June 23, 2021

13

14        The above-entitled matter came on for hearing,

15   via WebEx, pursuant to notice, at 9:08 a.m.

16

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25                 (202)467-9200

28

1      Q    You've written and distributed private

2    placement memoranda.  Correct?

3      A    We have distributed it to investors prior

4    to subscription.  Correct.

5      Q    So when you distribute them you have some

6    sort of mechanism for keeping control of who's gotten

7    the PPM. Correct?

8      A    That answer is quite complicated but there

9    was a time where we put an identifier on there that

10   would match a PPM with an application and subscription

11   agreement.

12     Q    That's exactly the question I was asking a

13   few minutes ago.  Now, where do you keep a log of the

14   numbers you put on PPMs when you sent them out?

15          MR. PRITIKIN:  Objection.  That's assuming

16   there is a log but go ahead.

17     A    There -- there are some pages that Becca,

18   who is the clerk that takes care of that.  I do not know

19   if she keeps those logs.  I haven't seen those logs

20   since we stopped taking them.  So I'm not aware that

21   those logs even exist.

22     Q    But you haven't produced any old logs from

23   when you used this system.  Correct?

24     A    My struggle with answering this is my

25   understanding of the subpoenas that were originally done

63

1    would have been organized.  And some of them were

2    delisted or dormant for a while.  Some were not.  Some

3    are dormant now whereas they were not before.

4         Q    You've alluded to this.  But you've

5    formerly run some other investment funds.  Correct?

6         A    It's a very broad question.  I cannot

7    answer it.

8         Q    I'm happy to specify.  You mentioned the

9    Deeproot Short-Term Fixed Rate Debenture Fund LLC.

10   Correct?

11        A    Correct.

12        Q    There was also the Deeproot 3-Year Bonus

13   Income Debenture Fund LLC.

14        A    Yes.

15        Q    And there was the Deeproot 3-Year Bonus

16   Reset Debentures Fund LLC.

17        A    Yes.

18        Q    And the Deeproot Bonus Growth 5-Year

19   Debenture Fund LLC.

20        A    Yes.

21        Q    Are there any other investment funds that

22   you've run besides those and the current funds?

23        A    There -- I mean, I'm going to refer back to

24   the corporate org charts that I provided for relevant

25   lists in those time periods.

1      Q     What I'm asking, so the org chart that was

2  Exhibit 5 began at 2016.  And what I'm getting at is

3  that I believe these four funds I've named pre-dated --

4  largely pre-dated 2016.  Is that correct?

5      A     I do not remember.  They were organized

6  before then, but I don't remember exactly when a lot of

7  those placements happened and whether they happened

8  prior to 2016.

9      Q     These four funds, STFR, Short-Term Fixed

10 Rate Debenture Fund, 3-Year Bonus, 3-Year Bonus Reset

11 and the Bonus Growth 5-Year.  These four funds, are they

12 still active?

13     A     No.  None of them are taking new

14 subscriptions.

15     Q     Are they all wound up?

16     A     I don't know what wound up means.

17     Q     Well, have all the funds' investors been

18 paid back and the funds are now closed?

19     A     On some, but not others.

20     Q     Which ones are still open?

21     A     The Bonus Growth -- 5-Year Bonus Growth and

22 the 3-Year Bonus Reset.  I'm not sure on the Bonus

23 Reset.  And I know there was maybe one or two investors

24 left.  I don't know if those are in some -- have matured

25 or not.  But I know specifically that the 5-Year Bonus

65

1    Growth does have existing investors still.

2        Q    And so when you say existing investors,

3    these are investors who are still waiting for repayment

4    of their principal?

5        A    Correct.

6        Q    Are they still receiving some sort of

7    investment return?

8        A    For both of them, it's a deferred return at

9    maturity.  So  there are no periodic payments.

10       Q    Currently, you have the 575 Fund LLC and

11   the Deeproot Growth Runs Deep Fund LLC. Correct?

12       A    Correct.

13       Q    Are those the only two funds that you're

14   currently operating?

15       A    That we are taking subscriptions for.  That

16   is correct.

17       Q    And in terms of funds that have any

18   activity or any return of principal pending, it's just

19   the 575, the DGRD, and the one or two other funds we

20   just discussed -- older funds we just discussed.

21   Correct?

22       A    To the best of my recollection.  Yes.

23       Q    Can we agree to call the Deeproot Growth

24   Runs Deep Fund the DGRD Fund?

25       A    Yes.  That's how we normally abbreviate it.

1  reports.  I'd have to look at -- from those reports, to

2  determine where we were with at least the policy.  A

3  portion of the 575.  I'd have to sort of guesstimate

4  where expenses are currently and where they would go,

5  which would take some time and a lot of pulling together

6  with the assets of the 575.  And then I would try to

7  determine both percentages are against each other and

8  determine if we were still above 50 percent, close to

9  it, what we needed to do with that.

10        Q    How often, each year, do you engage in that

11  exercise?

12        A    Usually one to two times.  In past years

13  it's been more.  When we had a lot more investment in

14  the DGRD versus the 575.  Because we wanted to space

15  those, to not prejudice investors in the DGRD. But since

16  -- especially with COVID and the impact it had on our

17  business, and everyone's business last year, to the

18  present, in the last year, year and a half, it has not

19  happened more than about once or twice.

20        Q    Do you -- when you undertake this analysis,

21  do you document it?

22        A    No.  The documentation essentially for me

23  is just to do the transaction to do the purchase,

24  knowing when it would happen.

25        Q    Do you personally undertake that evaluation

1    the 575 Fund?  And the DGRD Fund?

2        A    Yes.

3        Q    Who determines the investment strategy of

4    the 575 Fund?

5        A    I do.

6        Q    Anyone else?

7        A    The design strategy would only be me.

8        Q    Who chooses the asset classes and the

9    actual assets in which the 575 Fund invests?

10       A    I make the final decision.

11       Q    You have the ultimate authority over these

12   investment decisions?

13       A    That is correct.

14       Q    Who purchases the actual assets in which

15   the 575 Fund invests?

16       A    I do as officer of the respective company.

17       Q    Other than attorneys, who has drafted the

18   language used in the 575 Fund PPM?

19       A    Myself.

20       Q    Only you?

21       A    No.  That actually brings me back to --

22   that's why I was looking at the different exhibits you

23   were handing in the dates.  Anything after the S-1 had

24   -- S-1 incorporating language, which would have been a

25   combination of attorneys, Centri Business Consulting,

153

1      Q    It was your choice to incorporate any

2    language that any of these other people may have

3    suggested.  Correct?

4      A    I think it was a very proper choice, in my

5    view, after the amount of time and effort and money that

6    was spent to properly vet some of these provisions.  I

7    think it was money well spent to use provisions that

8    have been vetted that well.

9      Q    But it was your choice as to what language

10   went into the PPM for the 575 Fund.  Correct?

11     A    Ultimately, yes.  The choice was mine.

12     Q    And that was true as to all versions of the

13   575 Fund PPM. Correct?

14     A    I would not say that that's -- it was

15   between me and counsel.

16     Q    And with respect to -- but other than

17   counsel, you had the final choice as to the language in

18   all versions of the 575 Fund PPM. Correct?

19     A    Correct.

20     Q    And counsel works for you.  Right?

21     A    I think that draws a legal conclusion.

22     Q    You're the one with the final authority

23   over the content of the 575 Fund PPM. Correct?

24     A    Sometimes.  Yes.

25     Q    On what occasions would you not be the one

155

```
 1              (SEC Exhibit No. 39 was marked for

 2              identification.)

 3      A    Yes.

 4      Q    Do you recognize Exhibit 39?

 5      A    I do.

 6      Q    And what is Exhibit 39.

 7      A    It looks like the September 16, 2019 PPM

 8  for the Deeproot Growth Runs Deep Fund, or the DGRD.

 9      Q    And you were the person with ultimate

10  authority over the language that went into the PPM in

11  Exhibit 39.  Correct?

12      A    Yes.

13      Q    And you were the person with ultimate

14  authority over the language in all other DGRD Fund PPMs.

15  Correct?

16      A    Yes.

17      Q    Who has and exercises the authority to sell

18  an asset of the 575 Fund?

19      A    What do you mean by sale?

20      Q    Well, if you were to make decisions to

21  dispose of an asset of deeproot Tech or Pinball, if you

22  were to make a decision to sell a policy rather than to

23  hold it, a life insurance policy.  Who would be the

24  person with ultimate authority to make those decisions?

25      A    With counsel from numerous -- not just
```

1      Q     Well, how is the capital acquisition

2   documented or memorialized?

3      A     From which perspective?

4      Q     From the perspective of the 575 Fund or the

5   DGRD Fund having its investors' money go to a Deeproot

6   affiliate.

7      A     Correct.  But if you could help me, is it

8   from an accounting perspective or a legal perspective.

9      Q     From the perspective --

10     A     Because things are either one of those.

11     Q     From the perspective of documenting, what

12  interest, the 575 Fund, the DGRD Fund, gets in return

13  for the money.

14     A     So, from a documentation standpoint, the

15  way that I understand the accountants document that, is

16  through the bay [sic] transactions.  Up until COVID hit,

17  my understanding was that the intercompany tracked

18  transactions as they came into Deeproot Funds, to the

19  account, then to the Fund, and then to be placed.  And

20  since COVID, because it's been so complicated to

21  continue that, is that we've gone to more of a direct

22  route.

23     Q     Other than bank records, how is the

24  interest acquired by the 575 Fund or the DGRD Fund

25  memorialized or documented?

1        A    I mean, it's financial.  I mean, it's going

2    to be in the transactions.

3            BY MR. BAGNALL:

4        Q    So, Mr. Mueller, this is George Bagnall

5    again.  Can you hear me, sir?

6        A    Yes.

7        Q    Maybe it would help if we took a step back

8    and you could tell us more about how you operate your

9    businesses in this way.  So, after investor money comes

10   into the fund, either the 575 Fund or the DGRD Fund, who

11   makes the decision whether or not to invest some of that

12   money in any of the Deeproot affiliated businesses?

13       A    Ultimately, that decision is my decision.

14   And as I've said before, a few moments ago, the way that

15   operated -- we operated for the most part, I don't know

16   when we started that process, but I know that the

17   process was there for a long period of time and it

18   created all kinds of accounting nightmares, trying to

19   trace the intercompanies' transfers.  But that money

20   would come directly into the Deeproot Funds, sweep

21   account, bank account.  It would then be transferred

22   less the finder fee or advisory fee or commission to the

23   actual fund bank account.  And then from the fund bank

24   account, it would be transferred and placed directly

25   with Policy Services or with deeproot Tech, Deeproot

255

1    you want and then I'll read that section then.  I think

2    that would be easier in this case since like --

3         Q    Okay.  Do you recognize Exhibit 73?

4         A    Must have been an e-mail that we must have

5    received.  I don't remember the e-mail in question.

6         Q    Do you recognize the letter that's attached

7    to it?

8         A    Letter, I believe was the letter we sent

9    out to all 575 P investors. This is the letter I

10   referred to before, so.  Oh wait. Let me read this. I

11   apologize, 'cause there was an August letter that we

12   sent out.

13            Yea, I'm sorry. This is not that letter.

14   This was the letter we sent out in August -- the time

15   that 575 P would be paid because it was getting out of

16   control.

17        Q    Okay. You drafted this letter. Correct?

18        A    Yes.

19        Q    And this letter was transmitted to 575 Fund

20   investors. Right?

21        A    Correct.

22        Q    How was it transmitted to those investors?

23        A    We sent the letter through a third party

24   mailing service that mailed hard copies to all

25   investors.

288

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:        )

4                             )   File No. HO-14036-A

5    DEEPROOT 575 FUND, LLC   )

6

7    WITNESS:  Robert Mueller

8    PAGES:    288 through 387

9    PLACE:    Securities and Exchange Commission

10             100 F Street NE

11             Washington, D.C.

12   DATE:     Thursday, June 24, 2021

13

14        The above-entitled matter came on for hearing,

15   via WebEx, pursuant to notice, at 9:03 a.m.

16

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25                 (202)467-9200

 1   wait until the end as well.

 2          MR. PRITIKIN:  Nothing at this point.

 3      Q    Okay.  Thank you.  I have a few clean-up

 4   questions, Mr. Mueller.  Have you ever tried to become

 5   an associated person of a broker dealer?

 6      A    Depends what you mean by try.  I took some

 7   -- as I disclosed, I took some education to sit for

 8   Series 7 but it never went any further than that.

 9      Q    Did you take any other steps relating to

10   trying to become an associated person of a broker

11   dealer?

12      A    Not that I recall.

13      Q    And when was that that you did the training

14   for the Series 7?

15          MR. PRITIKIN:  Objection.  That

16   mischaracterizes his testimony.

17      Q    Correct me if I'm wrong, Mr. Mueller, but I

18   believe you did some education, some Series 7 prep and

19   when did you do that?

20      A    I don't recall.  It was -- if I had to

21   narrow it down to a timeline it was before the 575 and

22   the DGRD were put into place.

23      Q    What is the Food Development Corporation of

24   Texas?

25      A    FDC, as I call it. It is a company that

1    works with either NGOs, governments, or other

2    corporations typically in North Africa and we invested

3    equity prior to Deeproot.  I invested my own equity and

4    then through Policy Service in the early days before

5    Deeproot really got going, we added some additional

6    money and then we purchased some additional equity

7    shares.  I believe probably about two years ago.

8        Q    What have you received from that

9    investment?  What has the Deeproot family of companies

10   received from that investment in Food Development

11   Corporation of Texas?

12       A    So we have not received any distributions.

13   We have not received any dividends from that, from that

14   equity.

15       Q    Now, you mentioned -- I think you mentioned

16   that the investment happened before Deeproot got going

17   and then in recent years, for the sake brevity, Policy

18   Services Inc. has sent $385,000 between July 2016 and

19   April 2020 to FDC of Texas.  I'm wondering have you

20   received any sort of stock certificates or other

21   certificated investments in FDC?

22       A    There are other share certificates.  There

23   were agreements which confirmed those shares.

24       Q    What percentage of FDC does the Deeproot

25   family of companies own?

1       A    I don't recall the specific number but it

2   is just less than 50 percent from my best recollection.

3       Q    Have you ever provided any legal advice to

4   FDC?

5       A    I don't know if I've provided legal advice

6   to FDC as most of their dealings are with international

7   law which I'm not versed in.  I can't recall though.  It

8   might have happened that a question was asked or I was

9   asked to look over a document or something but I can't

10  recall specifics.

11      Q    Who owns the other 49 or 50 or 51 percent,

12  the remainder of the equity of FDC?

13      A    A gentleman named Frank Kartchner as far I

14  know.

15      Q    Thank you.  In addition to the loan we

16  discussed yesterday you've obtained other loans for the

17  Deeproot family of companies.  Correct?

18      A    Yes.  I did notice after in clarifying

19  yesterday's questions about that, I did recall after

20  getting back to my hotel room and doing some work that

21  there is a line of credit through Wells Fargo for Policy

22  Services.

23      Q    How much is that line of credit?

24      A    It's in the 30 -- $30,000 range.  I don't

25  remember the exact amount.

354

```
 1         A      I do.

 2         Q      What is Exhibit 85?

 3         A      It was a distribution for the purchase of a

 4    condo in Kauai.

 5         Q      Can you spell Kauai for the record?

 6         A      K-A-U-A-I.

 7         Q      And that's in Hawaii, obviously.  Right?

 8         A      It's a county in Hawaii that I'm aware of.

 9    Yes.

10         Q      On or about November 15, 2016 you wired

11    $135,000 from the bank account of Policy Services, Inc.

12    to Old Republic Title and Escrow in Hawaii.  Correct?

13         A      That is correct.

14         Q      What was the purpose -- you described this

15    a little bit.  But can you tell us what the purpose of

16    this expenditure was, more fully?

17         A      The purpose was to go toward the purchase

18    price of a condo in Kauai.

19         Q      This was approximately half of the purchase

20    price and closing costs for that condo.  Correct?

21         A      I don't recall.

22         Q      That condominium was titled in the name the

23    MB, as in Mike Bravo, the MB Hale Ohana Trust.  Correct?

24         A      That sounds correct.  Yes.

25         Q      And for the record, Poly Ohana is two
```

355

1    words, H-A-L-E O-H-A-N-A. Mr. Mueller, you, your father,

2    and your stepmother have been the three trustees of the

3    MB Hale Ohana Trust.  Correct?

4         A    I don't remember exactly who the trustees

5    are.  We're all grantors of the trust.

6         Q    And you're a beneficiary of this trust.

7    Correct?

8         A    We would all be as grantors.  Yes.

9         Q    You used $135,000 of investor funds towards

10   the purchase of a condominium in Hawaii.  Correct?

11        A    I would not characterize it like that.  I

12   do not believe that's a correct statement.

13        Q    This was a personal expense.  Correct?

14        A    I would not consider it a personal or a

15   business expense.

16        Q    If it's not a personal or a business

17   expense, then what is it?

18        A    It's a distribution.

19        Q    What documentation exists for this

20   distribution?  Other than payment records.  Other than

21   bank records or QuickBooks records and the like.

22        A    So, it was accounted for that year by

23   Charlotte, Ms. Acker as a distribution.  And it was

24   discussed with the accountants.  As I recall, anything

25   else beyond that, I do not recall.

```
 1       Q    And Mr. Van Winkle, an officer of Americus

 2   Diamond, and the reason why I mention his name is

 3   because the charge has variously shown as being to him

 4   or to Americus Diamond.  So let me ask a fresh question.

 5   On or about December 15th, 2018 you paid Americus

 6   Diamond $6,247.11 for jewellery.  Correct?

 7            MR. PRITIKIN:  Objection.

 8       A    I appears so, yes.

 9       Q    And again, you used the American Express

10   card of National Wealth Solutions.

11       A    I don't recall on that.  It says American

12   Express.

13       Q    Who was the jewellery for?

14       A    The best I can remember, around that time

15   period it was for my current wife, Kristi.

16       Q    And you married her approximately two

17   months after this purchase.  Correct?

18       A    I believe it was more than that, but it was

19   in early 2019 that we got married as talked about on the

20   record.

21       Q    And can you scroll to the description of

22   the jewellery you purchased?

23       A    Okay.

24       Q    And the description says it's a lady's

25   engagement ring.  Correct?
```

368

1       A    Yes.  That is in the description.  Lady's

2   engagement ring.

3       Q    In fact, on January 12th, on or about

4   January 12th of 2019 you charged another $2,802.59 to

5   Americus Diamond.  Correct?

6       A    I do not verify -- I'm sorry.  Do not

7   remember that.

8       Q    This over $9,000 in jewellery reflects

9   personal expenses.  Correct?

10      A    I don't know.

11      Q    These expenses were paid using Deeproot

12  company money.  Correct?

13      A    I refuse to answer.  I invoke my right to

14  protection under -- against self-incrimination  under

15  the Fifth Amendment.

16      Q    Sir, we are not authorized to compel you to

17  give evidence or testimony as to which you assert your

18  privilege against self-incrimination pursuant to the

19  Fifth Amendment of the United States -- to the United

20  States Constitution and we have no intention of doing

21  so.  We also do not have the authority to compel your

22  testimony by granting you immunity from prosecution.

23  Any question that we ask hereafter will be with the

24  understanding that if you wish to assert your privilege

25  against self-incrimination you need merely state that

1    for your second wife. Leah.  Correct?

2        A    I don't remember.

3        Q    Sir, I am now showing what has been marked

4    as Exhibit 92.  And Exhibit 92 bears the Bates number

5    SEC-Americus-E0000005 through 8.  America -- Exhibit 92

6    is another four page document.  It also says Americus

7    Diamond on the top center of the front page.  It also

8    has the address 12362 IH 10 West in San Antonio, Texas.

9            (Mueller Exhibit 92 was marked for

10   identification.)

11       Q    Sir, do you recognize Exhibit 92?

12       A    I'm looking through it.

13       Q    Please take your time.

14       A    It appears to be again a purchase for

15   jewellery, Americus Diamond, around the time that --

16   that I was engaged to Leah as you mentioned.

17       Q    And at the bottom of page 2, it

18   specifically gives the name of Ms. Leah Nelson.

19   Correct?  Near the description of the jewellery.  I'm

20   sorry.  I spoke over you.  I apologize.

21       A    I do see that.

22       Q    You do see where it says Leah Nelson in

23   Exhibit 92?

24       A    Yes.

25       Q    And on or about the next day, December

 1    15th, you charged another $2,976.88 on the National

 2    Wealth Solutions card at Americus Diamond.  Correct?

 3              MR. PRITIKIN:  Objection.

 4       A    I don't know.  That's not shown on this

 5    exhibit.

 6       Q    This exhibit shows that on December 14th,

 7    2015, you charged $5,351.88 using the American Express

 8    card of NWS at Americus Diamond.  Correct?

 9              MR. PRITIKIN:  Objection.

10       A    It appears to be that amount and it says

11    American Express on it.

12       Q    This jewellery was purchased using Deeproot

13    company money.  Correct?

14       A    I refuse to answer.  I invoke the right

15    against self-incrimination under the Fifth Amendment.

16       Q    Sir, I'm now showing you what's been marked

17    as Exhibit 93.

18              (Mueller Exhibit 93 was marked for

19    identification.)

20       Q    And sir, Exhibit 93 bears the Bates range

21    SEC-RFPA-AMEX-E-0002809 through 29 and it is another

22    American Express duplicate copy account statement of the

23    credit card of National Wealth Solutions ending in

24    4251001.  Sir, do you recognize Exhibit 93?

25       A    Appears to be a duplicate copy of an Amex

373

1       A    Are you asking me to looking or are you

2  just asking me the question?

3       Q    I'm just asking you the question, sir.

4       A    I don't know.

5       Q    All in all, you spent -- you charged

6  $7,795.37 in expenses at Wolf Weddings & Events.

7  Correct?

8            MR. PRITIKIN:  Objection.

9       A    I don't know.

10      Q    These expenses were for your wedding to

11  your second wife Leah in -- these expenses were for your

12  wedding to your second wife Leah.  Correct?

13           MR. PRITIKIN:  Objection.

14      A    Would appear to be around that time.

15      Q    And you married Ms. Leah Nelson in February

16  of 2016.  Correct?

17      A    To the best of my memory, yes.

18      Q    You paid these expenses for Wolf Weddings &

19  Events with Deeproot company money.  Correct?

20           MR. PRITIKIN:  Objection.

21      A    I refuse to answer.  I invoke my right to

22  -- against self-incrimination within the Fifth

23  Amendment.

24      Q    Sir, I'm now going to display what has been

25  marked as Exhibit 94.  Exhibit 94 bears the Bates range

1    2017 you also charged $2,507.33 to British Airways.

2    Correct?

3           MR. PRITIKIN:  Objection.

4       A    I do see that amount listed.

5       Q    And this American Express card statement

6    shows that you purchased airline flights to London in

7    the name of you and your child.  Correct?

8           MR. PRITIKIN:  Objection.

9       A    I don't know.

10      Q    Sir, did you travel to London on British

11   Airways or a British Airways affiliated carrier with

12   your daughter?

13      A    And I've travelled before with my daughter

14   on British Airways.  I don't recall this specific trip.

15      Q    Sir, between September 2016 and March of

16   2017, in fact, you used the American Express card in the

17   name of National Wealth Solutions to pay over $13,000 to

18   British Airways.  Correct?

19           MR. PRITIKIN:  Objection.

20      A    I don't know.

21      Q    But these were personal travel expenses

22   which were paid for using Deeproot company money.

23   Correct?

24      A    I refuse to answer.  I invoke my right

25   against self-incrimination under the Fifth Amendment.

378

1        A    I don't know.

2        Q    These expenditures to Disney Cruise Lines

3   were personal travel for you and your family.  Correct?

4        A    I don't know.

5        Q    This personal travel was paid for with

6   Deeproot company money.  Correct?

7             MR. PRITIKIN:  Objection.

8        A    I refuse to answer.  I invoke my right

9   against self-incrimination under the Fifth Amendment.

10       Q    Sir, between March of 2016 and March of

11  2019 you also used the Amex card of National Wealth

12  Solutions to pay over $15,000 to Princess Cruise Lines.

13  Correct?

14            MR. PRITIKIN:  Objection.

15       A    I don't know.

16       Q    This was personal travel.  Correct?

17       A    I don't know.

18       Q    These charges to Princess Cruise Lines were

19  paid for with Deeproot company money.  Correct?

20            MR. PRITIKIN:  Objection.

21       A    I refuse to answer.  I invoke the right --

22  sorry.  I invoke my right against self-incrimination

23  under the Fifth Amendment.

24       Q    Sir, on or about February 5th, 2018, you

25  charged 7,000 -- over $7,500 to cruises and more using

383

```
 1        Q    Sir, you used Deeproot company money to pay

 2   for your daughter's educational expenses.  Correct?

 3            MR. PRITIKIN:  Objection.

 4        A    Refuse to answer.  I invoke my right

 5   against self-incrimination under the Fifth Amendment.

 6        Q    Sir, you used Deeproot company money to pay

 7   for medical expenses.  Correct?

 8            MR. PRITIKIN:  Objection.

 9        A    I refuse to answer.  I invoke my right

10   against self-incrimination under the Fifth Amendment.

11        Q    Sir, you used Deeproot company money to pay

12   personal income tax bills.  Correct?

13            MR. PRITIKIN:  Objection.

14        A    I refuse to answer.  I invoke my right

15   against self-incrimination under the Fifth Amendment.

16        Q    Sir, you used Deeproot company money to pay

17   for the condominium in Hawaii.  Correct?

18            MR. PRITIKIN:  Objection.

19        A    I refuse to answer.  I invoke my right

20   against self-incrimination under the Fifth Amendment.

21        Q    Sir, you used Deeproot company money to pay

22   for the catering, photography, and wedding planning

23   expenses for your 2019 wedding.  Correct?

24            MR. PRITIKIN:  Objection.

25        A    I refuse to answer.  I invoke my right
```

384

1    against self-incrimination under the Fifth Amendment.

2        Q    Mr. Mueller, before we conclude your

3    testimony do you wish to clarify anything or add

4    anything to the statements you have made over the course

5    of your testimony whether yesterday or today?

6        A    Like for a chance to speak with my

7    attorneys before I answer that question.

8        Q    Sure.  We can go off the record.  How long

9    do you need?

10       A    A few minutes.  Five minutes.

11           MR. BOHR:  Five minutes.  Okay.  Let's go

12   off the record at 12:25.

13           (Whereupon a discussion was held off the

14   record.)

15           MR. BOHR:  We're back on the record at

16   12:30.

17           BY MR. BOHR:

18       Q    Mr. Mueller, do you understand you're still

19   under oath?

20       A    I do.

21       Q    And can you confirm that the SEC and you

22   had no substantive discussions while we were off the

23   record?

24       A    Yes.

25       Q    Thank you, sir.  Mr. Mueller, when we went