# EXHIBIT 21



| | |
|---|---|
| **Mailing** | **Physical** |
| deeproot Funds | deeproot Funds |
| PO Box 691610 | 12621 Silicon Dr |
| San Antonio, TX 78269 | San Antonio, TX 78249 |

**EXHIBIT**

**74**

HO-14036

September 30, 2020

Dear 575P Investor,

In August, we sent a letter to you detailing our policy regarding the timing of 575P payments. Among the feedback we received concerning the letter was an unanswered question regarding 'what happens when a monthly payment is missed or late'. We are frustrated that so quickly after sending out the letter that this question has suddenly become very relevant. We will outline our policy regarding this question below and apprise you of what we will do moving forward.

In our previous letter, we pointed out that:

> "While COVID-19 has not negatively affected the assets of the company, it has caused some disruptions to cash flow. The financial world is an interwoven network of relationships. When the pandemic hit, it hit the entire network causing all companies to delay business activities due to staffing issues, forcible office or business closures, or other factors. Just as a company is waiting on something from another company, the company they are waiting on is waiting on yet another company, so on and so forth. This has substantially slowed requests for capital and movement of money, as well as increased conservation and delays in requests. While we try to keep adequate reserves for things like this, the prolonged nature of the pandemic (which could stretch into 2021) makes it difficult to time and account for payments..."

Shortly after sending that out we experienced those very cash flow delays in mid to late September that depleted our 575P payment reserves. The result was that some 575P investors received their payment in September and others did not. We apologize and are doing the best we can to deal with the current transfer and liquidation issues, many of which are outside of our control.

Getting your payments correct and timely to you is a business-critical endeavor. Despite many of the pandemic's effects disrupting cash flow, it is not your fault that this happened. So, we feel that instituting a reasonable, formal policy about late or delayed payments is the only fair way to deal with this issue. Moving forward, if we either miss or do not send a monthly payment prior to the last day of a month it is due, we will credit your account a goodwill amount equal $50 per full $500 of the payment missed, with a minimum credit of $100. Our goal is to make this goodwill amount substantially higher than normal interest penalties and to afford reasonable accommodation for the inconvenience. We will make these adjustments soon to those who we were unable to send payments out by today.

As before, we hope to have our transfer requests filled soon and to replenish reserves. We will continue to monitor the situation and continue to work on increasing cash flows and reserve amounts to minimize the impact of this. Thank you for trust and business. Please do not hesitate to contact us with any questions.

Yours Truly,

Robert J. Mueller
Principal – deeproot Family of Companies

---

**main** (888) 316-2935
**fax** (888) 316-2782

**email** contact@deeprootfunds.com
**web** www.deeprootfunds.com

**EXHIBIT**
**11**
02-16-2023

SEC-DEEPROOT-E-0008354

EXHIBIT 22

# Memo

**EXHIBIT**

**7**

HO-14036   05-24-2021

**deeproot Funds**

To:        Robert Mueller

From:      Scott Allen

CC:        Stephanie Lee

Date:      October 7, 2020

Re:        Resignation

---

Comments:   This memo should serve as an explanation of the business reasons for my resignation effecting October 7, 2020. I also want to provide suggestions for change and improvement for the company moving forward.

### Business Concerns:

You as the principal, owner, and sole manager of the funds and investment portfolio have full control and authority to make decisions and manage the collective whole as you see fit. There are many different opinions, philosophies, and strategies for operating businesses and making business decisions, and I have never expected to agree with you on everything. Hopefully, your chosen methods of operating, managing, and leading your organizations will prove to be successful, but I no longer trust or believe your methods and strategies will work and can see no indication or evidence to prove otherwise. Other general business concerns and differences of opinion are outlined in the suggestions below.

Missed investor payments – While I have no knowledge or reason to believe anything you are doing is fraudulent or illegal, your strategies and chosen methods to save, budget, plan, and manage investment capital has proven to be unsustainable and problematic. You have explained, reasoned, and reassured myself and others that you are operating as any other business would and are reliant on cashflows just the same; however, as evidenced with the recent missed 575-Periodic payments, it has become clear that your chosen strategies and methods up to this point have been relying entirely on incoming capital from new investors to be able to honor commitments to previous investors. While it may not be your design or intention...in functional operation it looks and feels like a Ponzi scheme, and I cannot and will not be part of it. **I am not making any accusations towards you or anyone else and do not know of anything that would confirm that scenario**...I am simply communicating my biggest concern. You have always been very clear that deeproot aims to be 100% ethical and operate legitimately, but I am uncomfortable with the circumstances that have resulted from your decisions and operating methods. Unfortunately, your explanations of "accounting methods" and attributing the missed payments to "cashflow" difficulties are not sufficient enough to resolve my personal concern.

### Suggestions for Improvement:

1. Planning and Budgeting – Budgeting and planning does not have to be complicated. Your chosen budgeting strategy and method is not working and is not sustainable. "The definition of insanity is doing the same thing(s) over and over again and expecting different results." You need to make some changes to get better results.
2. Hire a financial officer or controller to assist with point #1 and help you manage the complex financial situations of the Funds and other deeproot companies.
3. Planning and Decision-making – Before making commitments and hoping for a "Hail Mary" to get you there, you should already know whether something is realistic and possible. If it is not, you should not just commit anyway and hope to make it work later...you should develop

**EXHIBIT**

**18** 02-16-2023

SEC-AllenS-E-0000079

a plan to get there. "If you fail to plan, you plan to fail." The MACU building is a good example...you committed to it all on your own without stopping to see if the commitment was realistic and appropriate (which it was not). That is not the only example and you have shown a historical pattern of operating that way and unfortunately it has not worked.

4. Service & Relationships – You need to focus on building strong, healthy business relationships that are service oriented and more focused on you wanting to make their life easier instead of expecting them to live up to your demands. deeproot Funds as an investment offering should sell itself because everyone that has invested in and worked with deeproot knows there is not anyone better at delivering on their promises and going above and beyond. The model should be "Under promise and over deliver."

## Summary:

Please do not take this personal as it is meant to be constructive, business-specific feedback and an explanation for my resignation. I hope this feedback can be helpful in deeproot continuing to success in all endeavors. You possess an uncommon resolve and determination that allows you to do things many others would never attempt or think possible. deeproot has had success and as you have indicated plenty of times, there will likely be great success in the near future...any success deeproot and it's family of companies achieves will be built upon your strengths, abilities, and leadership. While there have been bumps in the road and a fair share of difficulties, I have learned a lot and experienced many good things while at deeproot for which I am grateful for the opportunity I was provided. Again, I wish you all the best.

2

SEC-AllenS-E-0000080

EXHIBIT 23

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
                         SAN ANTONIO DIVISION

SECURITIES AND EXCHANGE      *
COMMISSION,                  *
     Plaintiff,              *
                             *
     Against                 * Civil Action No:
                             * 5:1-cv-785-XR
ROBERT J. MUELLER,           *
DEEPROOT FUNDS LLC (A/K/A     *
DPRT FUNDS, LLC), AND        *
POLICY SERVICES, INC.,       *
     Defendants,             *
                             *
     And                     *
                             *
DEEPROOT TECH LLC, DEEPROOT  *
PINBALL LLC, DEEPROOT        *
STUDIOS LLC, DEEPROOT        *
SPORTS & ENTERTAINMENT LLC,  *
DEEPROOT RE 12621 SILICON    *
DR LLC, AND ROBERT J.        *
MUELLER, JEFFREY L.          *
MUELLER, AND BELINDA G.      *
BREEN, AS CO-TRUSTEES OF     *
THE MB HALE OHANA            *
REVOCABLE TRUST,             *
     Relief Defendants.      *


          ******************************************
          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
                        SCOTT ALLEN
                     FEBRUARY 16, 2023
          ******************************************

```
1          Q.  And how did you get to deeproot Funds?

2          A.  I received a phone call from Nate Spradlin, who

3    was a -- a friend and former colleague, we went to

4    school together and previously worked together as well,

5    letting me know there was an opening with the business

6    development team at deeproot.  So he had called me and

7    -- and wanted to know if I was interested.

8          Q.  All right.

9               And that was early 2018?

10         A.  Correct, I think February is when he reached

11   out.

12         Q.  All right.

13              So you were at deeproot from March 2018 to

14   October 2020; is that right?

15         A.  Correct.

16         Q.  Now, it says here that you raised 38 million;

17   is that right?

18         A.  Yes.

19         Q.  And is that you by yourself?

20         A.  That would have been Nate and I collectively as

21   a business development team.

22         Q.  Okay.

23              And when you -- it says you raised 38

24   million, is that in -- in investments into deeproot

25   companies?
```

```
 1          A.  Yes.
 2          Q.  And -- and which were the -- the companies that
 3     you raised investments for?
 4          A.  That would have been specifically into the
 5     deeproot 575 Fund and the deeproot Growth Runs Deep
 6     Fund, or dGRD.
 7          Q.  All right.
 8                   And so going forward, if I describe -- if I
 9     sub- -- yeah, if I use the term the "575 Fund," you
10     understand that to mean the deeproot 575 Fund?
11          A.  Yes.
12          Q.  And if I say "the dGRD Fund," you understand
13     that to be the deeproot dGRD, deeproot Growth Runs Deep
14     Fund?
15          A.  Yes.
16          Q.  Kind of a mouthful.  I take it you did not come
17     up with those names?
18          A.  I did not.
19          Q.  Those -- those product lines existed before you
20     got there?
21          A.  Correct.
22          Q.  All right.
23                   What was Mr. Spradlin's -- how did Mr.
24     Spradlin describe deeproot to you when he was recruiting
25     you for this job?
```

```
1          Q.   Who -- who is Andrew Cherones?

2          A.   I -- I don't recall.

3          Q.   Okay.

4               Do you recall --

5          A.   From the -- from the -- from the looks of this

6     e-mail, it looks like he was an investor in the 575

7     Fund.

8          Q.   Was your e-mail at the -- at the time you

9     worked at deeproot scott@deeprootfunds.com?

10         A.   Yes.

11         Q.   Okay.

12              Do you recall the phone call that led to

13    this e-mail?

14         A.   I do not recall the phone call.

15         Q.   Okay.

16              And let's see.  Further up, you forward --

17    it's fair to say you forwarded this e-mail chain to

18    Mr. Mueller?

19         A.   Yes.

20         Q.   With an extra -- with a little bit more of a

21    description about the conversation with Mr. Cherones; is

22    that fair?

23         A.   Yes.

24         Q.   All right.

25              Does this refresh your memory about this
```

1          I'm showing you what has been marked as

2    Exhibit -- what I'm marking as Exhibit 18, but was

3    previously marked through your interview as Exhibit 7.

4              (Exhibit Number 18 marked.)

5         Q.   Do you see this document?

6         A.   Yes.

7         Q.   What is this document?

8         A.   That would be the -- the memo I attached with

9    my resignation outlining a -- a more detailed list of my

10   concerns and suggestions moving forward that I felt

11   would help the -- would help deeproot, and hopefully

12   things would be better moving forward.

13        Q.   All right.

14             I'm gonna highlight the first sentence

15   there of the second paragraph.  Do you see that?

16        A.   Uh-huh.

17        Q.   Is that a yes?

18        A.   Yes, I see it.

19        Q.   And the reference is Missed investor payments,

20   correct?

21        A.   Yes.

22        Q.   It says, While I have no knowledge or reason to

23   believe that you were doing -- anything you were doing

24   is fraudulent or illegal.

25             Did I read that correctly?

```
 1        A.  Yes.
 2        Q.  And did you believe that at the time?
 3        A.  At the time that I wrote this?
 4        Q.  Yes.
 5        A.  Yes.  Well, I -- I had doubts that his
 6   explanations for the way he was doing things were
 7   legitimate, which is why I chose to leave, but I didn't
 8   have any knowledge or any -- any concrete basis.  That
 9   was -- that was my opinion or -- or my personal feeling
10   that I had come to.
11        Q.  All right.
12             MR. HULINGS:  Move to strike everything
13   after "yes."
14        Q.  So you referenced that there are missed 575
15   periodic payments.  I've got that highlighted.  Do you
16   see that?
17        A.  Yes.
18        Q.  And how many payments did -- how many months of
19   payments were missed at the time you wrote this, to the
20   extent that you remember?
21        A.  From what I can remember, I think it was one
22   month behind.
23        Q.  And what's that total amount that you know of,
24   if you know?
25        A.  Oh, I -- I -- I don't know.  It would have been
```

```
 1    thousands of dollars.
 2         Q.  Okay.  All right.
 3              I'm gonna highlight the next couple
 4    sentences down.
 5              While it may not be your design or
 6    intention, in the functional operation it looks and
 7    feels like a Ponzi scheme, and I cannot and will not be
 8    part of it.
 9              Do you see that?
10         A.  Yes.
11         Q.  All right.
12              Did -- at any point previous to providing
13    this memorandum, did you express the concern to
14    Mr. Mueller that the 575 Fund was, in functional
15    operation, looking and feeling like a Ponzi scheme?
16         A.  Not in any direct, explicit way.
17         Q.  Okay.
18              And the next sentence says, I'm not making
19    accusations toward you or anyone else and do not know of
20    anything that would confirm that scenario.
21              Do you see that?
22         A.  Yes.
23         Q.  Is that -- was that statement accurate at the
24    time you wrote it?
25         A.  Yes.
```

1    cash flows to operate, and based on how you -- how you

2    do the accounting or whichever accounting method that

3    you use, everything we're doing is aboveboard; it's just

4    a -- a very -- there's a -- there's a, you could say

5    unique way that we have to operate as a business to be

6    able to do what we do.  And so that -- that -- that

7    sufficed for a time for me to -- to continue working

8    there, until it -- until I -- I just no longer believed

9    that to be reliable.

10         **Q.  All right.**

11             **MR. HULINGS:**  So I'm going to move to

12    strike as nonresponsive.

13         **Q.  Let's -- let's kind of break this down a little**

14    **bit more.  You made -- you know, you put in your -- your**

15    **letter that in functional operation it looks and -- it,**

16    **meaning the 575 Fund, looks and feels like a Ponzi**

17    **scheme, correct?**

18         A.  Yes.

19         **Q.  All right.**

20             **So give me the complete factual basis for**

21    **that statement at the time.**

22         A.  He was not able to make the 575 periodic

23    payments.  There had not been enough investment capital

24    come in to account for those missed payments.

25         **Q.  Okay.**

1              **So --**

2      A.   Or -- or there was not enough incoming

3  investment capital that would have met the level that

4  needed to go out to those payments.

5      **Q.   All right.**

6           **And is that the complete factual basis for**

7  **your statement at the time?**

8      A.   That -- that was from -- that was from my

9  understanding.  I didn't know what other sources of

10  income were coming in from other -- from the other

11  affiliates, and so it -- it looked to me as if the only

12  way payments were being made were based on funding of

13  new investment dollars.

14      **Q.   Okay.  So have you ever heard the phrase "money**

15  **is fungible"?**

16      A.   Maybe not that specific phrase, but that sounds

17  like something I've heard.

18      **Q.   All right.**

19           **Do you agree with that statement?**

20      A.   Sure.

21      **Q.   Okay.**

22           **So if the source of payments to investors**

23  **has -- or if -- let me rephrase.**

24           **If the source of payments to investors is**

25  **funded by more than new investments, does that make the**

EXHIBIT 24

**Filed Under Seal**

EXHIBIT 25

**OPERATING AGREEMENT**

**OF**

**deeproot 575 Fund, LLC**
**(a Texas limited liability company)**

**September 1, 2015**

**As Amended and Effective February 26, 2018**

**THE MEMBERSHIP INTERESTS EVIDENCED BY SHARES OFFERED AND ISSUED PURSUANT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND RELATED SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), BUT ARE BEING SOLD PURSUANT TO AN EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER.   THE SHARES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO A REGISTRATION STATEMENT REGISTERING THE SHARES UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.  NO RESALES OR OTHER TRANSFERS OF THE SHARES MAY OCCUR WITHOUT THE PERMISSION OF THE COMPANY.**

SEC-DEEPROOT-E-0019790

# STATEMENT OF AGREEMENT ............................................................................................ 1

# ORGANIZATIONAL MATTERS ........................................................................................... 1

1. GENERAL .............................................................................................................................. 1
2. NAME .................................................................................................................................... 1
3. PURPOSES AND GENERAL POWERS ........................................................................................ 1
4. ORGANIZATIONAL FILINGS .................................................................................................... 1
   (a) Texas ............................................................................................................................ 1
   (b) Other States ................................................................................................................. 1
   (c) Cooperation .................................................................................................................. 1
5. NATURE OF ENTITY ............................................................................................................... 1
6. PRINCIPAL OFFICE AND PLACE OF BUSINESS .......................................................................... 2
7. AGENT FOR SERVICE OF PROCESS .......................................................................................... 2
8. TAX MATTERS MEMBER ........................................................................................................ 2
9. TERM .................................................................................................................................... 2

# FINANCIAL AND ACCOUNTING MATTERS ................................................................... 2

10. CAPITAL CONTRIBUTIONS ...................................................................................................... 2
    (a) Initial Members ............................................................................................................ 2
    (b) Investors ...................................................................................................................... 2
    (c) Limitations ................................................................................................................... 3
    (d) Credit to Capital Account ............................................................................................ 3
11. LOANS .................................................................................................................................. 3
12. FISCAL YEAR AND ACCOUNTING METHODS ............................................................................ 3
13. CAPITAL ACCOUNTS ............................................................................................................. 3
14. OWNERSHIP INTERESTS ......................................................................................................... 3
    (a) Shares .......................................................................................................................... 3
    (b) Class A Shares ............................................................................................................. 4
    (c) Class B Shares ............................................................................................................. 4
    (d) Computation of Profits and Losses .............................................................................. 4
    (e) Allocations ................................................................................................................... 4
    (f) . Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests. .... 4
    (g) Specific Items .............................................................................................................. 4
    (h) Unrealized Gain or Loss .............................................................................................. 5
    (i) Varying Interests .......................................................................................................... 5
15. SPECIAL CIRCUMSTANCES ALLOCATIONS .............................................................................. 5
    (a) General ........................................................................................................................ 5
    (b) Incorporation of Certain Rules .................................................................................... 5
    (c) Certain Fee Payments to Members ............................................................................... 5
    (d) Certain Imputed Interest .............................................................................................. 5
16. ELECTIONS ........................................................................................................................... 6
17. CURRENT DISTRIBUTIONS ..................................................................................................... 6
18. DISTRIBUTIONS UPON WINDING-UP ....................................................................................... 6
    (a) Creditors ...................................................................................................................... 6
    (b) Class B Members .......................................................... **Error! Bookmark not defined.**
    (c) Class B Members .......................................................... **Error! Bookmark not defined.**
    (d) Class A Members .......................................................................................................... 6
19. ACTIONS BY THE MEMBERS ................................................................................................... 6
    (a) General ........................................................................................................................ 6
    (b) Meetings ...................................................................................................................... 6
    (c) Written Action ............................................................................................................. 7
    (d) Actions Binding ........................................................................................................... 7
20. MANAGEMENT OF THE COMPANY .......................................................................................... 7
    (a) General ........................................................................................................................ 7
    (b) Initial Manager ............................................................................................................ 7

SEC-DEEPROOT-E-0019791

(c) Election of Managers .................................................................................... 7
(d) Resignation and Removal ............................................................................. 7
(e) Powers and Authority ................................................................................... 7
(f) Limitations ................................................................................................... 8
(g) Officers ........................................................................................................ 9
(h) Duties of the Managers ................................................................................ 9
(i) Other Activities ........................................................................................... 9
21. BANK ACCOUNTS ..................................................................................................... 9
22. RECORDS AND REPORTS ............................................................................................ 9
(a) Records ........................................................................................................ 9
(b) Annual Reports ............................................................................................ 9
(c) Inspections ................................................................................................... 9
(d) Other Information ...................................................................................... 10
23. COMPENSATION ..................................................................................................... 10
24. RELIANCE ON ACTS OF THE MANAGERS AND OFFICERS .......................................... 10
25. INDEMNIFICATION .................................................................................................. 10

**FUNDAMENTAL CHANGES** ................................................................................. **10**

26. WITHDRAWAL ........................................................................................................ 10
27. RESTRICTIONS ON TRANSFERS OF SHARES ............................................................. 10
(a) Requirements for Transfer ......................................................................... 10
(b) Effectiveness of Assignment ..................................................................... 11
(c) Requirements for Admission ..................................................................... 11
(d) Rights of Mere Assignees .......................................................................... 11
(e) Call Rights of the Company ....................................................................... 11
(f) General ....................................................................................................... 12
(g) Liquidation and Termination ..................................................................... 12
(h) Final Accounting ....................................................................................... 13
28. AMENDMENTS ....................................................................................................... 13
(a) By the Managers ........................................................................................ 13
(b) By Majority Consent .................................................................................. 13
(c) By Unanimous Consent .............................................................................. 13
(d) Other Amendments .................................................................................... 13
(e) Notice of Proposed Amendments .............................................................. 13

SEC-DEEPROOT-E-0019792

**MISCELLANEOUS** .................................................................................................................**13**

29.   NOTICES ..................................................................................................................14
30.   TIME PERIODS ..........................................................................................................14
31.   ENTIRE AGREEMENT ................................................................................................14
32.   SUCCESSORS IN INTEREST ........................................................................................14
33.   COUNTERPARTS AND FACSIMILES .............................................................................14
34.   SEVERABILITY .........................................................................................................14
35.   CAPTIONS ................................................................................................................14
36.   ADDITIONAL DOCUMENTS ........................................................................................14
37.   INDEMNIFICATION ....................................................................................................14
38.   NO THIRD PARTY BENEFIT ........................................................................................15
39.   GENDERS AND NUMBERS ..........................................................................................15
40.   NON-WAIVER ...........................................................................................................15
41.   COMPLIANCE WITH SECURITIES LAWS .......................................................................15
42.   SURVIVAL ................................................................................................................15
43.   VENUE .....................................................................................................................15
44.   APPLICABLE LAW .....................................................................................................15
45.   SCHEDULES AND EXHIBITS ........................................................................................15

**SCHEDULE 10(A)** ..............................................................................................................**17**

**SCHEDULE 10(B)** .............................................................................ERROR! BOOKMARK NOT DEFINED.

iii

SEC-DEEPROOT-E-0019793

deeproot 575 FUND, LLC
OPERATING AGREEMENT

This Operating Agreement (this "**Agreement**") originally entered into on September 1, 2015, and hereby amended, and restated in the entirety, on February 5, 2018, by and among deeproot Funds, LLC (collectively, the "**Initial Members**" and each an "**Initial Member**") and those Investors who have subscribed to become Class B Members or Class C Members of the Company (the "**Investors**"). As used herein, the term "**Member**" shall refer to each of the Initial Class A Members and to each Investor hereafter admitted to the Company as a Member, as provided in this Agreement.

## STATEMENT OF AGREEMENT

For good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Members agree as follows:

## ORGANIZATIONAL MATTERS

1.      General. The Members are entering into this Agreement for the purposes of forming and/or continuing a limited liability company (the "**Company**") under the laws of the State of Texas and of setting forth the rights and obligations of the Members of the Company.

2.      Name.    The name of the Company shall be "**deeproot 575 Fund, LLC**", "**the575™**," or such other name selected by the Members as may be required in order to be acceptable to the Secretary of State of Texas and of such other states, if any, in which the Company may do business.

3.      Purposes and General Powers. The purposes of the Company shall be to engage generally in the sale of Class B and Class C Membership Interests, which invests in a pool of life insurance policies and other assets, on behalf of the Investors, and to engage in any and all other activities incidental or related to any of the foregoing. Unless hereafter restricted by amendments to this Agreement or to the Company's Articles of Organization (the "**Articles**"), the Company shall have and may exercise all powers and rights which a limited liability company may legally exercise pursuant to the Texas Limited Liability Company Act (the "**Texas Act**").

4.      Organizational Filings.

(a)      Texas. The Members have caused (or promptly shall cause) the Articles to be filed with the Secretary of State of Texas pursuant to the Texas Act, and shall cause the Company to comply with all other applicable requirements of the Texas Act.

(b)      Other States. Prior to the Company's beginning to conduct business in any jurisdiction other than the State of Texas, if any, the Managers shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company authorized to do business in such jurisdiction.

(c)      Cooperation. At the request of any Member or Manager, each Member or Manager shall execute, acknowledge or verify and deliver all certificates and other instruments consistent with this Agreement which are necessary or appropriate to qualify, continue or terminate the qualification of the Company as a limited liability company in Texas and/or as a foreign limited liability company authorized to do business in jurisdictions other than Texas.

5.      Nature of Entity. It is the intention of the Members that the Company, as a limited liability company, shall not constitute or be treated as a partnership, limited partnership or joint venture for any purpose

- 1 -

SEC-DEEPROOT-E-0019794

other than for federal and state income tax purposes.  Except as otherwise specifically provided in this Agreement or required by applicable law, no Member or Manager shall be liable for any debts, obligations or liabilities of the Company, whether resulting from the judgment, decree or order of any court or otherwise.

6.    Principal Office and Place of Business.  The address, principal office and principal place of business of the Company shall be at 8200 W. Interstate 10, Ste. 600, San Antonio, TX 78230 or at such other place as the Managers may designate from time to time.

7.    Agent for Service of Process.  The Company's initial agent for service of process in Texas is Robert J. Mueller, Esq., and shall be such person as the Managers may designate from time to time by filing appropriate instruments with the Secretary of State of Texas pursuant to the Texas Act.

8.    Tax Matters Member.  The Managers may appoint Company's "**tax matters partner**" for purposes of §6231(a)(7) of the Internal Revenue Code of 1986 (the "**Code**"), otherwise §6231(a)(7)(B) shall apply until such time as his successor is duly appointed.  The Member so designated (the "**Tax Matters Member**") shall, at the expense of the Company, exercise the authority and carry out the responsibilities prescribed for a tax matters partner by §6223 et seq. of the Code in accordance with those provisions and the Treasury Regulations (the "**Regulations**") thereunder, including, without limitation, acting on behalf of the Company in administrative and judicial proceedings involving proposed adjustments to Company items and keeping all Members informed of such proposed adjustments.  Any other Member may, at its own expense, participate in such proceedings as permitted by those provisions of the Code and Regulations.  The Tax Matters Member shall advise all other Members in writing of any proposed settlement of such a proposed adjustment, of any requested extensions of any applicable statute of limitations and of any "**final partnership administrative adjustment**," as that term is used in the above-referenced provisions of the Code.  Unless approved by a majority in interest of all Members, the Tax Matters Member shall not cause the Company to agree to any such proposed settlement or extension or to pursue judicial review of any such final partnership administrative adjustment.  The Tax Matters Member shall have no liability to the Company or any Member for any action taken or not taken by it in good faith in accordance with this Section 8.

9.    Term.  The existence of the Company shall continue on a perpetual basis unless the Company is sooner terminated and liquidated and its affairs wound up pursuant to applicable provisions of the Texas Act and applicable provisions of this Agreement.

## FINANCIAL AND ACCOUNTING MATTERS

10.    Capital Contributions.

(a)    Initial Members.  The Company shall authorize and issue 1,500 Class A membership shares to the Initial Members.  The capital contribution and number of Class A Shares allocated to each Initial Member is set forth opposite such Member's name on Schedule 10(a) attached hereto.

(b)    Investors.  For each $25,000.00 contributed, in whole or part, to the capital of the Company by an Investor pursuant to Subscription Agreements accepted in whole or in part by the Company, the Company shall issue to such Investor either: (i) one (1) Class B Share(s), or a fraction thereof (as such Class is described in Section 14(c) hereof); or (ii) one (1) Class C Share(s), or a fraction thereof (as such Class is described in 14(c) hereof).  The Company is hereby authorized to issue to Investors up to 1,000 Class B Shares and 3,000 Class C Shares in exchange for contributions to the capital of the Company of up to $100,000,000 ($25,000,000 for Class B Shares, or $75,000,000 for Class C Shares) in the aggregate. The capital contribution and number of Class B Shares or Class C Shares allocated to each Investor shall be retained on the records of the Company. Any authorized but unissued shares shall be retained and owned by Company.

SEC-DEEPROOT-E-0019795

(c)     Limitations.   Except as otherwise specifically provided in this Agreement or required by applicable law, (i) no Member shall be required to make any further contribution to the capital of the Company to restore any loss of the Company, to discharge any liability of the Company, to eliminate any negative Capital Account (as defined below) or for any other purpose; (ii) no Member or Manager shall be personally liable for any liabilities of the Company; (iii) no contribution or other amount credited to the Capital Account of any Member shall earn interest at any time; (iv) no Member shall have the right to demand the return of any capital contribution or any other amount credited to the Capital Account of such Member; (v) no Member or Manager shall be personally liable for the return of all or any part of any capital contribution or any other amount credited to the Capital Account of any Member, it being expressly understood by each Member that any such return shall be made solely from the assets of the Company; and (vi) no Member shall have any right to demand or receive property other than cash in return for such Member's capital contribution or any other amount credited to the Capital Account of such Member, unless so requested in writing by such Member and approved in writing by the Managers, in their sole discretion.

(d)     Credit to Capital Account.   Contributions to the capital of the Company by a Member, as provided in this Agreement, shall be credited to the Capital Account of such Member as of the effective date of receipt by the Company.

11.     Loans.   A Member or Manager may (but, unless otherwise specifically provided herein, shall not be obligated to) loan funds to the Company for use in the business operations of the Company.  Any loan made to the Company by any Member or Manager shall be at a commercially reasonable interest rate and on other commercially reasonable terms as shall be determined by agreement of the lending person and the Managers, and such lending Member or Manager shall be treated as a general creditor of the Company with respect to such loan.

12.     Fiscal Year and Accounting Methods.   The fiscal year of the Company shall be from January 1st to December 31st.  The books of the Company shall be kept by the Managers in a manner consistent with the provisions of Sections 13, 15 and 16 and as otherwise determined to be appropriate based upon consultation with the Company's accountants.

13.     Capital Accounts.   A single capital account ("**Capital Account**") shall be maintained for each Member in accordance with the capital account accounting rules of §704(b) of the Code and the Regulations thereunder.  Each Member's beginning Capital Account shall be the amount of such Member's initial contribution to the capital of the Company made as provided in this Agreement.  Thereafter, a Member's Capital Account (a) shall be credited with and increased by (i) such Member's subsequent contributions of money, if any; (ii) the agreed net fair market value of property, if any, subsequently contributed by such Member; (iii) income and gain (including unrealized gain) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with rules of Regulation §1.704-1(b)(2)(iv); and (b) shall be debited with and reduced by (i) distributions of money to such Member; (ii) the net fair market value of property, if any, distributed to such Member; (iii) losses and deductions (including unrealized loss) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with the rules of Regulation §1.704-1(b)(2)(iv).  Notwithstanding the foregoing, nor any contrary provision in the Code and the Regulations, capital accounts for Investors shall be accounted for basis only of Invested Capital, as otherwise provided hereinafter.

14.     Ownership Interests.

(a)     Shares.   Ownership interests in the Company shall be denominated in "**Shares**". Fractional Shares, rounded to the nearest fifth decimal place, may be issued by the Company if necessary to reflect the agreed upon number of Shares to be issued in accordance with the terms of this Agreement.  A Member's "**Percentage Interest**", rounded to the nearest fifth decimal place, shall be determined by dividing the number of

SEC-DEEPROOT-E-0019796

Shares owned by such Member by the total number of Shares owned by all Members of the same class. The Company is authorized to issue 5,500 shares, segregated into three classes: 1,500 Class A Shares, 1,000 Class B Shares, and 3,000 Class C Shares, as described in subparagraphs (b) and (c) below. Each Share shall evidence, represent and constitute ownership of the Percentage Interest, the Capital Account balance and other rights attributable to that Share, all as set forth in this Agreement.

(b)      Class A Shares. "**Class A Shares**" as to any Member shall mean and refer to Shares issued to the Initial Members which entitle the holder to cast two votes for each Class A Share held by the Member on all matters reserved for the Members' approval, consent or consideration.

(c)      Investor Shares. "**Class B Shares**" or "**Class C Shares**" as to any Member shall mean and refer to Shares which entitle the holder to cast one vote for any matters reserved for the Members' approval, consent or consideration.

(d)      Computation of Profits and Losses. Profits and losses of the Company shall be computed in the same manner as used by the Company for federal income tax purposes, except that (i) for purposes of computing gain, loss, depreciation and other items, property of the Company shall be considered to have a book value equal to its fair market value as most recently determined pursuant to Section 14(d); (ii) income of the Company exempt from tax, and expenses of the Company not deductible or not properly chargeable to capital for tax purposes, under the Code shall be included in the computation; and (iii) unrealized gain or loss shall be taken into account as provided in Section 15(d).

(e)      Allocations. Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests.

For the purposes of this Agreement, the following definitions shall apply:

(A)      "**Priority Return**" shall be defined by the Priority Return Election chosen by the Investor during a subscription term. For a **deferred** Priority Return Election, the Priority Return shall mean the cumulative deferred (and unpaid) returns calculated per annum by multiplying each respective Investor's Invested Capital by seven percent (7%); the deferred sum of which are paid at the Pay Date. For a **periodic** Priority Return Election, the Priority Return shall mean monthly payments calculated per annum by multiplying each respective Investor's Invested Capital by five percent (5%), and then dividing by twelve (12). Regardless of the Priority Return Election, priority returns shall be cumulative commencing on subscription (the "**Start Date**"), and any unpaid priority returns due on or about thirty (30) days (the "**Pay Date**"), after the mandatory Call, such Call being pre-determined as five years less one day after the Start Date, by the Company; and

(B)      "**Invested Capital**" shall mean an amount equal to the contributed capital made to the Company by a Class B Member or Class C Member under Section 10(b) hereof, less any return of capital previously distributed to such Investor.

(g)      Specific Items. Specific items of Company income, gain, loss and deduction shall be allocated to and among the Class A Members in proportion to the respective allocations of net profits and losses to and among such Members, except that each Class A Member's distributive share of depreciation, amortization and gain or loss with respect to any Company property, as computed for tax purposes, shall be determined so as to reflect the varying interests of the Members in unrealized gain or loss for prior periods, and otherwise to take into account the variation, if any, between the adjusted basis and book value of the property as required by §704(c) of the Code and the Regulations.

SEC-DEEPROOT-E-0019797

(h)     Unrealized Gain or Loss.  On each Adjustment Date (as hereinafter defined), the properties of the Company (including any property being distributed by the Company) shall be considered to have been sold on such date at fair market value (as determined by the Managers, using their reasonable business judgment).  The unrealized gain or loss attributable to such deemed sale shall be allocated to and among the Members in accordance with Section 15(b).  The amount of any distribution in kind shall be considered to be the fair market value of the distributed property, as so determined.  As used in this Agreement, "**Adjustment Date**" shall mean the date of the dissolution of the Company and each other date upon which there is (i) a distribution in kind of Company property; (ii) a contribution of money or other property (other than a de minimus amount) to the Company by a new or existing Member as consideration for an interest in the Company; or (iii) a distribution of money (other than a de minimus amount) by the Company to a withdrawing or continuing Member as consideration for an interest in the Company.

(i)     Varying Interests.  If additional Shares are issued, or if any Share is transferred during any fiscal year, the net profits and losses and credits allocated to the Members for such year shall be determined on a daily, monthly or other basis, as selected by the Managers using any method permitted under Code §706 and the Regulations thereunder.  The transferee of a Share shall succeed to the Capital Account attributable to the Share so transferred.

15.     Special Circumstances Allocations.

(a)     General.  The Code and Regulations impose a number of requirements that must be satisfied in connection with allocations made by the Company (including a requirement that, in order for an allocation of an item of income, gain, loss or deduction to be recognized for federal income tax purposes, the allocation must have substantial economic effect or otherwise must be in accordance with the Members' interests in the Company).  It is the intention of the Members that all allocations made under this Agreement shall comply with those requirements and shall be made in manners consistent with Code §§704(b) and 704(c) and Regulations §§1.704-1 and 1.704-2.  In addition to any other steps which may need to be taken to implement that intention, and in connection with certain other special circumstances which might arise, allocations shall be made under the provisions of this Section 16, to the extent applicable, before making any allocations under Section 15.

(b)     Incorporation of Certain Rules.  The "**qualified income offset**" rules, the "nonrecourse deduction" rules, the "partner nonrecourse deduction" rules, the "partner minimum gain" rules, the "partnership minimum gain" rules and the related "chargeback" rules of Regulations §§1.704-1 and 1.704-2 are incorporated in this Agreement by reference.  In addition, no loss or deduction shall be allocated to a Member if such allocation would cause or increase a deficit balance in such Member's Capital Account, adjusted as described in Regulations §1.704-1(b)(2)(ii)(d)(3) et seq.  Any special allocations of items pursuant to such rules or otherwise made to implement the intentions stated in Section 16(a) shall be taken into account in computing and making subsequent allocations to and among the Members so that the net amount of any items so allocated and the profits, losses and all other items allocated to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each Member under Section 15 if such special allocations had not occurred.

(c)     Certain Fee Payments to Members.  If and to the extent that any payments in the nature of fees made to a Member are finally determined by the Internal Revenue Service or otherwise to be distributions to a Member for federal income tax purposes (instead of being treated as fees), gross income shall be allocated to such Member in the amount of such distributions.

(d)     Certain Imputed Interest.  If and to the extent that the Company is entitled to a deduction for interest imputed under any provision of the Code on any loan or advance from a Member to the Company (whether such interest is currently deducted, capitalized or amortized), such deduction shall be allocated solely to such Member.

SEC-DEEPROOT-E-0019798

16.      Elections.  The Managers, in their discretion, may cause the Company to make any election required or permitted to be made by the Company under the Code and applicable Regulations, including, without limitation, an election pursuant to §754 of the Code to adjust the basis of the Company's assets for all transfers of Shares.

17.      Current Distributions.  Except as required by the Code and the Regulations thereunder, cash available for distribution shall be distributed with respect to a fiscal year at times determined by the Managers in the following order and priority as net profit, net loss and credit of the Company is allocated pursuant to Section 15(b) hereof.

18.      Distributions Upon Winding-Up.  Upon dissolution of the Company and the winding-up of the Company's affairs, the assets of the Company (after giving effect to the provisions of Section 15(d)) shall, subject to the requirements of applicable Texas law, be applied and distributed in the following order of priority:

(a)      Creditors.  To the payment of debts and liabilities of the Company to creditors of the Company (including those to Members other than liabilities to Members for distributions), including, without limitation, expenses of winding-up and the establishment of any reserves against liabilities and obligations of the Company which the liquidator, in the liquidators sole discretion, deems appropriate.

(b)      Investors.  To the Class B Members in accordance with, and in proportion to, their respective positive Capital Account balances. Then to Class C Members in accordance with, and in proportion to, their respective positive Capital Account balances.

(c)      Investors.  To the Class B Members, pro rata, in accordance with, and in proportion to, any unpaid Priority Returns. Then to the Class C Members, pro rata, in accordance with, and in proportion to, any unpaid Priority Returns.

(d)      Class A Members.  To the Class A Members in accordance with, and in proportion to, their respective positive Capital Account balances.

## OPERATIONS

19.      Actions by the Members.

(a)      General.  Whenever this Agreement requires the vote, consent, approval or other action by a specified fraction or percentage "in interest" of some or all of the Members, such requirement shall be satisfied if such vote, consent, approval or other action is provided or authorized by Members who own Class A shares which represent at least the specified fraction or percentage of the total shares owned by all Members entitled to participate in such decision.  Unless otherwise specifically provided, any proposed decision or action shall require approval by a majority in interest of the Class A Members, which Class A Members shall be entitled to vote on all matters reserved for their approval or consent.  Except as otherwise specifically provided in this Agreement or required by applicable law, no Member shall be disqualified from participating in the making of any such decision or the taking of any such action solely because such Member has an interest in the outcome thereof.

(b)      Meetings.  Unless hereafter required by the vote of a majority in interest of all Class A Members, there will be no regularly scheduled annual or other meetings of the Members.  However a meeting of the Members may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") to all of the Members given by the Managers or by seventy-five percent in interest of the Investors.  The Meeting Notice shall specify the subject matters to be considered at the meeting.  Unless the Managers or a majority in interest of the Members calling the meeting agree upon and state in the Meeting Notice a San Antonio, Texas location for the meeting, each meeting shall be by teleconference with arrangements which permit each Member participating in the teleconference to hear (and to be heard by) each of the other participating Members.  A majority

- 6 -

SEC-DEEPROOT-E-0019799

in interest of all Members (present in person or by written proxy) shall constitute a quorum for any meeting of the Members, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by unanimous consent of the Class A Members participating in the meeting.

(c)     Written Action.  Any action of the Class A Members set forth in writing and signed by the requisite percentage in interest of such Class A Members shall be effective whether or not a meeting of Members has been called and held for the purpose of considering such action.

(d)     Actions Binding.  Any action taken by the Class A Members at a meeting or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Managers to all of the Members.

20.     Management of the Company.

(a)     General.  In general, and except as otherwise provided herein or by applicable law, the persons elected annually by the Members as managers of the Company (the "**Managers**"), shall be responsible for the management of the Company.  No Member who is not a duly elected Manager, or officer of the Company shall have any responsibility, right or power to take part in the control of the Company's business or any authority or power to act or sign for or otherwise bind the Company or any other Member.

(b)     Initial Manager**.**  The initial Manager is ROBERT J. MUELLER, who shall serve as Manager until such time as his/her/their respective successors are duly elected by the Class A Members.

(c)     Election of Managers.  Class A Members shall, from time to time, determine the number of persons to be elected as the Managers of the Company and shall elect the number of Managers so decided upon.

(d)     Resignation and Removal.  A Manager may resign at any time, may be removed by a unanimous vote of Class A Members, or may be removed, for cause, by any other interested party, for conduct rising to clear and unambiguous criminal conduct, by a judge or court having subject matter and person jurisdiction over the Manager.

(e)     Powers and Authority.  Except as otherwise provided herein or by non-waivable provisions of applicable law, the powers and authority of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers (with the consent of a majority of the Managers being required for action by the Managers).  Unless hereafter required by the vote of a majority of the Managers, there will be no regularly scheduled annual or other meetings of the Managers.  However, a meeting of the Managers may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") given by any Manager to all of the other Managers.  The Meeting Notice shall specify the subject matters to be considered at the meeting.  Unless otherwise agreed upon in writing by a majority of the Managers specifying an agreed upon time and place for the meeting, each meeting shall be by teleconference with arrangements which permit each Manager participating in the teleconference to hear (and to be heard by) each of the other participating Managers.  A majority of all Managers (present in person or by written proxy) shall constitute a quorum for any meeting of the Managers, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by a majority of the Members participating in the meeting.  Any action of the Managers set forth in writing and signed by the requisite number of the Managers shall be effective whether or not a meeting of Managers has been called and held for the purpose of considering such action.  Any action taken by the Managers at a meeting

SEC-DEEPROOT-E-0019800

or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Mangers to all of the Members.  Subject to the foregoing, the powers and authority of the Managers shall include, without limitation, the power and authority to:

(i)   to enter into, make and perform contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and to make all decisions and waivers thereunder;

(ii)   to open and maintain bank and investment accounts and arrangements, to draw checks and other orders for the payment of money and to designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(iii)   to maintain the assets of the Company in good order;

(iv)   to collect sums due to the Company;

(v)   to the extent that funds of the Company are available therefore, to pay debts and obligations of the Company;

(vi)   to acquire, utilize for Company purposes and dispose of any asset of the Company;

(vii)   to borrow money or otherwise commit the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(viii)   to select, remove and change the authority and responsibility of lawyers, accountants and other advisers and consultants;

(ix)   to obtain insurance for the Company;

(x)   to make decisions concerning distributions by the Company of cash and other property as provided in Sections 18 and 19; and

(xi)   to adopt, amend or restate bylaws for the Company.

(xii)   to develop property in any way that the Members deem appropriate; and

(xiii)   to take any and all other action that is permitted by law and customary in or reasonably related to the conduct of the Company's business affairs.

(f)   Limitations.  Except with the consent and approval of a three-quarters majority in interest of all Members, the Managers shall not:

(i)   sell, lease, exchange or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust or trust indenture) all or substantially all of the Company's property and assets;

(ii)   require any Member to make additional capital contributions;

(iii)   amend or restate the Articles of the Company or, except as otherwise specifically permitted herein, this Agreement.

- 8 -

SEC-DEEPROOT-E-0019801

(g)    Officers.  From time to time, at the discretion of the Managers, the Managers may elect persons as officers of the Company, including, without limitation, a chief executive officer, a president, a secretary, a treasurer and such vice presidents, assistant secretaries and assistant treasurers as the Managers may deem desirable. Subject to the provisions of any employment or other agreements (approved by the Managers) between such officer and the Company, each officer so elected shall serve in that capacity at the pleasure of the Managers, and may be removed from such office by the Managers at any time for any reason, with or without cause.  The officers so elected by the Managers shall have such powers, duties and responsibilities as would be customary for officers of corporations with corresponding titles and as otherwise may reasonably be assigned to them, from time to time, by the Managers.

(h)    Duties of the Managers.  The Managers shall manage or cause to be managed the affairs of the Company in a prudent and businesslike manner, devoting such portion of his time and effort to Company affairs as may reasonably be required for the effective management of such affairs; provided, however, that it is expressly understood and agreed that the Managers shall not be required to devote their entire time or effort to the business of the Company and shall not be restricted in any manner from participating in any other business or activities.  The Managers also shall cause to be filed such certificates and shall do such other acts as may be required by law to qualify and maintain the Company as a limited liability company under the laws of the State of Texas and of any other jurisdiction in which the Company transacts business.

(i)    Other Activities.  No Member, Manager or other person related to or affiliated with any Member or Manager shall be prevented or restricted from engaging or participating in or conducting any other business or activity whatsoever (or have any accountability, liability or obligation whatsoever to the Company or any Member with respect thereto), even if such other business or activity competes with, or is enhanced by, the business and activities of the Company.

21.    Bank Accounts.  All cash receipts and other funds of the Company shall be deposited to one or more bank accounts in the name of the Company at one or more banks or other depositories selected by the Managers from time to time.  Checks and other withdrawals from such accounts may be signed by the Managers or by any one or more other persons who may be selected by the Managers from time to time.  All funds of the Company shall be used solely for Company purposes and shall not be commingled with funds of any Manager, Member or other person.

22.    Records and Reports.

(a)    Records.  The Managers shall keep or cause to be kept proper books of account in accordance with Section 11 and in such other manner as the Managers and the Company's accountants determine to be appropriate.  The Managers shall promptly enter or cause to be entered in the Company's books a full and accurate record of each transaction made by the Managers on behalf of the Company.  All books of account, with all other written records and other documents of the Company, shall be maintained at the principal office of the Company or at any other location in Texas that may be selected by the Managers from time to time, and shall be open to the reasonable inspection and copying by any Member or such Member's duly authorized representative, as provided in Section 23(c).

(b)    Annual Reports.  Upon request, the Managers shall cause to be prepared and delivered to a Member (i) financial statements of the Company for the preceding year, including an income statement, balance sheet, statement of cash flow and statement of changes in Members' equity, with a summary for such Member; and (ii) federal and other applicable income tax returns of the Company for the preceding year.  A Member's online access to such reports shall be deemed delivered.

(c)    Inspections.  Any Member shall have the right to inspect and copy, at such Member's own expense, any of the Company's records required to be maintained pursuant to the Act, at such

SEC-DEEPROOT-E-0019802

Member's reasonable request and during regular business hours; provided, however that the Managers may restrict or redact records, or parts thereof, that constitutes confidential, privileged, or proprietary information.

(d)   Other Information.  The Managers shall keep the Members informed generally of the transactions entered into by the Managers on behalf of the Company, only as such transactions may involve the Call of investment positions.

23.   Compensation.  A person serving as a Manager shall be entitled to receive compensation for services rendered to the Company as a Manager only if and as approved from time to time by a majority of the Managers.  A person serving as an officer shall be entitled to receive compensation for services rendered to the Company as an officer only if and as approved from time to time by the Managers.  All Managers and officers shall be entitled to reimbursement of reasonable expenses incurred by them on behalf of the Company.

24.   Reliance on Acts of the Managers and Officers.  No financial institution or any other person dealing with the Managers or officers of the Company shall be required to ascertain whether a Manager or officer is acting in accordance with this Agreement, but such financial institution or such other person shall be protected in relying solely upon the assurances of, and the execution and delivery of documents by, a Manager or officer.

25.   Indemnification.  Each Member, Manager and officer of the Company is hereby indemnified by the Company with respect to the matters described in, to the full extent permitted by and in accordance with the provisions of the Texas Act.  Notwithstanding the foregoing, the Company shall not indemnify (a) a Member with respect to any dispute among the Members or among the Company and any Members arising out of this Agreement or any other agreement among such Members and the Company, or (b) any Manager or officer with respect to any dispute between such Manager or officer and the Company arising out of any agreement between the Company and such Manager or officer.

## FUNDAMENTAL CHANGES

26.   Withdrawal.  The withdrawal of an Investor (as a Member) shall not cause the dissolution of the Company.  Accordingly, except as otherwise provided herein, no Investor shall have any right or power to voluntarily withdraw from the Company as a Member, or any right (under any provision of the Texas Act or otherwise) to receive any payment or compensation for such Member's Shares upon voluntary withdrawal from the Company, whether or not the withdrawal is in violation of this Agreement.

27.   Restrictions on Transfers of Shares.

(a)   Requirements for Transfer.     Subject to any restrictions on transferability required by law (including the Securities Act of 1933, any state securities or "Blue Sky" law, and the rules promulgated thereunder), and subject to the provisions of Section 27(c), which shall have priority, each Member shall have the right to transfer (but not to substitute the assignee as a substitute Member in his or its place, except in accordance with Section 27(c) hereof), by a written instrument, the whole or any part of his or its Shares, provided that:  (i) the transferee is a citizen and resident of the United States, and otherwise not a tax-exempt entity under Section 168(h) of the Code; (ii) the transferor delivers to the Company and the Remaining Members an unqualified opinion of counsel designated by the Remaining Members that neither the transfer nor any offering in connection therewith violates any provision of any federal or state securities law; (iii) the transferee executes a statement that he or it is acquiring such Shares or such part thereof for his or its own account for investment and not with a view to distribution, fractionalization or resale thereof; and (iv) the Company receives a favorable opinion of the Company's legal counsel or such other counsel selected by the Remaining Members that such transfer would not result in the termination of the Company (within the meaning of Section 708(b) of the Code) or the termination of its status as a partnership under the Code; *provided, further*, that the Remaining Members may elect to waive the requirement of the opinions of counsel set forth in Sections 27(a)(ii) and (iv) above should each of them, in their

- 10 -

sole discretion, determine that the cost of time delays involved in procuring such opinions may impede the Company's ability to effect the contemplated transfer.

(b)   Effectiveness of Assignment.   No transfer shall be effective unless and until the requirements of Section 27(a) are satisfied.  The transfer by a Member of all or part of his or its Shares shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Section 27 have been met, and the Company has received from the transferor a transfer fee sufficient to cover all expenses of the Company connection with such transfer; *provided*, however, that the Remaining Members may elect to waive this fee in their sole discretion.  All distributions made thereafter in respect of the Shares of the transferor shall be made to the transferee of such transferor's Shares.

(c)   Requirements for Admission.   No transferee of the whole or a portion of a Member's Shares shall have the right to become a Member unless and until all of the following conditions are satisfied:

(i)   a duly executed and acknowledged written instrument of transfer approved by the Class A Members has been filed with the Company setting forth (A) the intention of the transferee to be admitted as a Member; (B) the notice address of the transferee; and (C) the percentage and Class of Shares transferred by the transferor to the transferee;

(ii)   the opinions of counsel described in Section 27(a) above are delivered to the Company and the Remaining Members, subject to the Remaining Members right to waive the delivery of these opinions in their sole discretion;

(iii)   the transferor and transferee execute and acknowledge, and cause such other persons to execute and acknowledge, such other instruments and provide such other evidence as the Class A Members may reasonably deem necessary or desirable to effect such admission, including without limitation:  (A) the written acceptance and adoption by the transferee of the provisions of this Agreement; (B) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under this Securities Act of 1933 and relevant state law; and (C) the transferee's completion, if applicable, of an acknowledgement of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(iv)   the admission is approved within the sole and absolute discretion by a majority of the Class A Members, unless and except all Class A Shares are being transferred, in which a super majority of two-thirds of Class B Members must approve the admission; and

(v)   a transfer fee has been paid to the Company by the transferor sufficient to cover all expenses in connection with the transfer and admission, including but not limited to attorney's fees for the legal opinions referred to in Sections 27(a) and (c), subject to the Remaining Members' right to waive the payment of this fee in their sole discretion.

(d)   Rights of Mere Assignees.      If a transferee of Shares is not admitted as a Member, he or it shall be entitled to receive the allocations and distributions attributable to receive the allocations and distributions attributable to the transferred Shares, but he or it shall not be entitled to inspect the Company's books and records, receive an accounting of the Company's financial affairs, exercise the voting rights of a Member, or otherwise take part in the Company's business or exercise the rights of a Member under this Operating Agreement.

(e)   Call Rights of the Company.

- 11 -

SEC-DEEPROOT-E-0019804

(i)     For Class B Members, under terms of a certain private placement memorandum dated September 1, 2015, the mandatory Call date for each subscription is set at five years, less one day, from the Start Date.  At any time prior to the mandatory Call date, the Company may mandate a premature Call of one or more Class B Shares, as long as Company pays a lump sum amount equaling the i) already accrued, but unpaid priority returns (if any); and ii) the cumulative priority returns that would have been due Investor, if the premature Call had not occurred, and the mandatory Call date applied.  In order to exercise this Call right, the Company shall provide a written call notice to each Class B Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class B Shares to be called.

(ii)     For Class C Members, under terms of a certain private placement memorandum dated February 5, 2018, the mandatory Call date for each subscription is set at five years, less one day, from the Start Date.  At any time prior to the mandatory Call date, the Company may mandate a premature Call of one or more Class C Shares, as long as Company pays a lump sum amount equaling the i) already accrued, but unpaid priority returns (if any); and ii) the cumulative priority returns that would have been due Investor, if the premature Call had not occurred, and the mandatory Call date applied.  In order to exercise this Call right, the Company shall provide a written call notice to each Class C Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class C Shares to be called.

(iii)     Upon each exercise by the Company of its call rights provided for herein, the Class B Members or Class C Members shall be required to sell to the Company all of the respective Shares of such Investors listed in the call notice.  The purchase price shall be equal to the Invested Capital related to the called Shares, plus any unpaid priority returns (if any).

(f)     General. The Company shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

(i)     the written agreement of a majority in interest of all Class A Members to dissolve the Company.

(ii)     at any time when there are no remaining Members of the Company.  (In any other situation where, following the withdrawal of any Member, there is at least one remaining Member, the Company shall not be dissolved, and the business and existence of the Company shall be continued by such remaining Member(s).

(iii)     the entry of a decree of judicial dissolution of the Company under the Texas Act.

(iv)     the sale or other disposition of all or substantially all of the assets of the Company.

(g)     Liquidation and Termination.  Upon dissolution of the Company, the Managers shall act as liquidator or may appoint one or more of the Managers to act as liquidator.  (If there are no Managers then serving, a majority in interest of the remaining Members shall select one or more persons to act as liquidator.)  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the liquidator to minimize any losses resulting from liquidation.  The liquidator, as promptly as possible after dissolution and again after final liquidation, shall cause a proper accounting to be made by a certified public accounting firm of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable, and

SEC-DEEPROOT-E-0019805

shall apply the proceeds of liquidation as provided in Section 19 and in accordance with the time requirements of §1.704-1(b)(2)(ii)(b)(2) of the Regulations. If, in the reasonable judgment of the liquidator, it will not be possible or prudent to complete the liquidation of the Company's assets and the distributions to the Members within that prescribed time period, the liquidator shall, on or before the last day of such period, distribute all remaining assets and liabilities of the Company to a trust, with the liquidator or such other person as the liquidator may appoint serving as the trustee thereof, for the purpose of complying with such timing requirements. The trustee of said trust shall, thereafter, proceed with the completion of the liquidation of said remaining assets in the manner described in this Section 29(b) and with the application of the proceeds therefrom in the manner described in Section 19, and the trust shall be terminated as promptly as possible after completing all such actions.

(h)     Final Accounting. Each of the Members shall be furnished with a statement prepared by the Company's accountants, which shall set forth the assets and liabilities of the Company as of the last day of the month which includes the date of dissolution and shall provide relevant information concerning the application and disposition of such assets and the proceeds thereof. Upon compliance by the liquidator with the foregoing provisions, the liquidator shall execute and cause to be filed Articles of Dissolution and any and all other documents necessary with respect to termination and cancellation of the Company under the Texas Act.

28.     Amendments

(a)     By the Managers. This Agreement may be amended by the Managers, without the consent or approval of the Members, if such amendment (i) is solely for the purpose of reflecting the admission of additional Members or substituted Members who have been admitted as additional or substituted Members of the Company in accordance with the terms of this Agreement; or (ii) is, in the opinion of counsel for the Company, necessary or appropriate to satisfy requirements of the Code or Regulations or of any federal or state securities laws or regulations. Any amendment made pursuant to Section 28(a)(ii) may be made effective as of the date of this Agreement.

(b)     By Majority Consent. Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a), the unanimous consent of all Class A Members, and the majority of Class B Members, are required to ratify any other amendments to this Agreement which would (i) permit any substantial changes to the offering documents, or (ii) permit substantial changes to the ownership or management of the Company.

(c)     By Unanimous Consent. Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a) & (b), the unanimous consent of all Members are required to ratify any other amendments to this Agreement which would (i) change the method of allocating profit and loss under Section 14 or 15 or of making distributions under Section 17 or 18, (ii) change any voting rights or required voting percentages otherwise set forth in this Agreement, (iii) expose any Members to personal liability for obligations of the Company, (iv) change the method of admitting additional Members shall require the written consent of all Members, (v) authorize the sale, lease, exchange or disposal of all or substantially all of the Company's property and assets, or (vi) ratifies any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Investor.

(d)     Other Amendments. Except as otherwise provided in this Section 28, amendments to this Agreement shall require the written consent of two-thirds in interest of all Class A Members.

(e)     Notice of Proposed Amendments. A copy of any amendment proposed to be made pursuant to this Section 28 shall be provided to each Member by the Managers at least 15 days prior to its proposed adoption date.

**MISCELLANEOUS**

- 13 -

SEC-DEEPROOT-E-0019806

29.     Notices.  Any notice, election or other written communication required or desired to be given hereunder shall be deemed given or made at such time as it (a) is delivered personally to the intended recipient, or (b) is delivered to Federal Express, UPS or any similar express delivery service, or is deposited in the United States mails, by registered or certified mail, return receipt requested, bearing proper postage, addressed to the intended recipient at the address set forth on the signature page(s) of this Agreement (in the case of any communication to a Member) or the address of the principal office of the Company (in the case of any communication to the Company).  Any Member or the Company may specify some other address for the receipt of such written communications by giving written notice of such change to the other Members.  Although a notice, election or other communication shall be deemed given or made when delivered to an express delivery service or deposited in the mails as provided above, any time period that is to begin running by reason of such communication shall not commence until such communication actually is received by the intended recipient.

30.     Time Periods.  In the case of any time period which, pursuant to the terms of this Agreement, begins to run upon receipt of any notice or the occurrence of any other act or event, the day after such receipt or occurrence shall constitute the first day of such period, and such period shall expire at midnight of the last day of such period.

31.     Entire Agreement.  Except as otherwise specifically indicated herein, this document contains the entire agreement of the parties and supersedes any and all prior understandings, agreements, representations and negotiations between them respecting the subject matters hereof.

32.     Successors in Interest.  Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the Company, the Members and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.

33.     Counterparts and Facsimiles.  This Agreement and any other documents related to this Agreement may be executed in several counterparts, and each executed counterpart shall be considered as an original of this Agreement or such other document, as the case may be.  A counterpart executed and transmitted by facsimile device by any person to the intended recipient thereof shall constitute and be accepted as an executed and delivered original of this Agreement or such other document, as the case may be.

34.     Severability.  In the event any provision of this Agreement or any application thereof is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the other provisions hereof and of any other application of the specific provision involved shall not be affected or impaired in any manner.

35.     Captions.  The captions at the beginnings of the sections and paragraphs of this Agreement are not part of the context of this Agreement, but are merely labels to assist in locating those sections and paragraphs, and shall be ignored in construing this Agreement.

36.     Additional Documents.  Each Member shall, and shall cause the Company to, execute, acknowledge or verify and deliver any and all documents from time to time reasonably requested by the Company or any other Member or Manager to carry out the purposes and intent of this Agreement.

37.     Indemnification.  If any Member violates any provision of this Agreement, then, in addition to being subject to all other remedies, liabilities and obligations imposed upon that Member for such violation under this Agreement or under any applicable law, that Member shall indemnify the Company and the other Members against any and all liabilities, losses, damages, claims, costs and expenses of any kind whatsoever relating to or arising directly or indirectly out of or by reason of any such violation (including, without limitation, consequential damages; legal fees and other costs and expenses of prosecuting or defending claims or

- 14 -

SEC-DEEPROOT-E-0019807

controversies, whether litigated or unlitigated; and interest on any such liabilities, losses, damages, claims, costs and expenses from the date paid at a floating rate equal to 2% plus the prime rate of interest as published in The Wall Street Journal from time to time).

38.     No Third Party Benefit.  Except as otherwise specifically provided herein, this Agreement is intended for the exclusive benefit of the Company and the Members and their respective successors and permitted assigns, and nothing contained in this Agreement shall be construed as creating any right or benefit in or to any third party.

39.     Genders and Numbers.   When permitted by the context, each pronoun used in this Agreement includes the same pronoun in other numbers or genders, and each noun used in this Agreement includes the same noun in other numbers.

40.     Non-Waiver.  No failure by the Company or any Member to insist upon strict compliance with any term of this Agreement or to exercise any option, enforce any right or seek any remedy upon any default of any other person shall affect, or constitute a waiver of, the Company's or such Member's right to insist upon such strict compliance, exercise that option, enforce that right or seek that remedy with respect to that default or any prior, contemporaneous or subsequent default; nor shall any custom or practice at variance with any provision of this Agreement affect, or constitute a waiver of, the Company's or any Member's right to demand strict compliance with all provisions of this Agreement.

41.     Compliance with Securities Laws.  In addition to the restrictions on Transfers of Shares under other provisions of this Agreement, no such Share may be sold or otherwise Transferred unless and until (a) such Share has been registered under all applicable federal and state securities laws pursuant to an effective registration statement which contemplates the proposed Transfer and complies with the then-applicable regulations, rules and administrative procedures and practices of any applicable federal and state securities commission or regulator, or (b) the Company has received (or, in its sole discretion, has waived its right to receive) a legal opinion of, or satisfactory to, its legal counsel that no such registration is required.

42.     Survival.  If any provision of this Agreement establishes, with respect to any Member or the Company, any rights and/or obligations which are to be in effect after the termination or expiration of this Agreement, such provision shall survive the termination or expiration of this Agreement and shall be binding upon all persons affected by such provision for such period of time as may reasonably be required in order to give full effect to the intended application of such provision.

43.     Venue.  The Company and the Members hereby designate the courts sitting in San Antonio, Texas, as the courts of proper and exclusive subject matter and personal jurisdiction and venue of and for any and all actions and proceedings relating to this Agreement; hereby irrevocably consent to such designation, jurisdiction and venue; hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any of said courts; and agree that service of process or notice in any such action or proceeding shall be effective if delivered or mailed in accordance with the notice provisions of this Agreement.

44.     Applicable Law.  The Company is being formed under the laws of the State of Texas, and all rights, duties and obligations of the Company and of the Members under this Agreement shall be determined in accordance with the laws of said State.

45.     Schedules and Exhibits.  All schedules, exhibits and other attachments (including all duly authorized substitutions and replacements therefore) referred to in, and attached to, this Agreement hereby are incorporated in this Agreement by reference.

SEC-DEEPROOT-E-0019808

IN WITNESS WHEREOF, this amended Agreement has been executed as of the date first set forth above, and unless further amended, shall be adopted and effective as of February 26, 2018.

**MANAGER:**

ROBERT J. MUELLER, Manager

**CLASS A MEMBER(S):**

deeproot Funds, LLC by ROBERT J. MUELLER, VP

**CLASS B & CLASS C MEMBER(S):**

*Authorization by subscription as held on the records of the company.*

- 16 -

SEC-DEEPROOT-E-0019809

**Schedule 10(a)**

| Member Name and Address | Capital Contribution | Class A Shares | Date Subscribed |
|---|---|---|---|
| deeproot Funds, LLC<br>8200 W. Interstate 10, Ste. 600 San Antonio, TX 78230 | $1,000.00 | 1,500 | 9/1/2015 |

SEC-DEEPROOT-E-0019810

EXHIBIT 26

**OPERATING AGREEMENT**

**OF**

**deeproot Growth Runs Deep Fund, LLC**
**(a Texas limited liability company)**

**August 3, 2015**

**As Amended and effective on February 26, 2018**

**THE MEMBERSHIP INTERESTS EVIDENCED BY SHARES OFFERED AND ISSUED PURSUANT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND RELATED SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), BUT ARE BEING SOLD PURSUANT TO AN EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER.   THE SHARES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO A REGISTRATION STATEMENT REGISTERING THE SHARES UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.  NO RESALES OR OTHER TRANSFERS OF THE SHARES MAY OCCUR WITHOUT THE PERMISSION OF THE COMPANY.**

SEC-DEEPROOT-E-0005760

STATEMENT OF AGREEMENT ........................................................................................................1

ORGANIZATIONAL MATTERS.....................................................................................................1

1.   GENERAL ..................................................................................................................................1
2.   NAME ........................................................................................................................................1
3.   PURPOSES AND GENERAL POWERS .........................................................................................1
4.   ORGANIZATIONAL FILINGS ......................................................................................................1
     (a)   Texas ...........................................................................................................................1
     (b)   Other States ................................................................................................................1
     (c)   Cooperation ................................................................................................................1
5.   NATURE OF ENTITY ..................................................................................................................1
6.   PRINCIPAL OFFICE AND PLACE OF BUSINESS .........................................................................2
7.   AGENT FOR SERVICE OF PROCESS ...........................................................................................2
8.   TAX MATTERS MEMBER ...........................................................................................................2
9.   TERM ........................................................................................................................................2

FINANCIAL AND ACCOUNTING MATTERS ..............................................................................2

10.  CAPITAL CONTRIBUTIONS ........................................................................................................2
     (a)   Initial Members ..........................................................................................................2
     (b)   Investors .....................................................................................................................2
     (c)   Limitations ..................................................................................................................3
     (d)   Credit to Capital Account ...........................................................................................3
11.  LOANS ......................................................................................................................................3
12.  FISCAL YEAR AND ACCOUNTING METHODS ............................................................................3
13.  CAPITAL ACCOUNTS .................................................................................................................3
14.  OWNERSHIP INTERESTS ............................................................................................................3
     (a)   Shares .........................................................................................................................3
     (b)   Class A Shares ............................................................................................................4
     (c)   Investor Shares ...........................................................................................................4
     (d)   Computation of Profits and Losses .............................................................................4
     (e)   Allocations ..................................................................................................................4
     (f)   Specific Items .............................................................................................................4
     (g)   Unrealized Gain or Loss .............................................................................................4
     (h)   Varying Interests ........................................................................................................5
15.  SPECIAL CIRCUMSTANCES ALLOCATIONS ..............................................................................5
     (a)   General .......................................................................................................................5
     (b)   Incorporation of Certain Rules ..................................................................................5
     (c)   Certain Fee Payments to Members .............................................................................5
     (d)   Certain Imputed Interest .............................................................................................5
16.  ELECTIONS ...............................................................................................................................5
17.  CURRENT DISTRIBUTIONS ........................................................................................................6
18.  DISTRIBUTIONS UPON WINDING-UP ........................................................................................6
     (a)   Creditors .....................................................................................................................6
     (b)   Investor Members .......................................................................................................6
     (c)   Class A Members ........................................................................................................6
19.  ACTIONS BY THE MEMBERS .....................................................................................................6
     (a)   General .......................................................................................................................6
     (b)   Meetings ......................................................................................................................6
     (c)   Written Action ............................................................................................................6
     (d)   Actions Binding ..........................................................................................................7
20.  MANAGEMENT OF THE COMPANY ...........................................................................................7
     (a)   General .......................................................................................................................7
     (b)   Initial Manager ..........................................................................................................7
     (c)   Election of Managers ..................................................................................................7
     (d)   Resignation and Removal............................................................................................7

i

    (e)    Powers and Authority ...........................................................................................7
    (f)    Limitations ...........................................................................................................8
    (g)    Officers ...............................................................................................................8
    (h)    Duties of the Managers .......................................................................................9
    (i)    Other Activities ..................................................................................................9
21.  BANK ACCOUNTS .............................................................................................................9
22.  RECORDS AND REPORTS ...................................................................................................9
    (a)    Records ................................................................................................................9
    (b)    Annual Reports.................................................................. **Error! Bookmark not defined.**
    (c)    Inspections .........................................................................................................9
    (d)    Other Information ...............................................................................................9
23.  COMPENSATION ...............................................................................................................9
24.  RELIANCE ON ACTS OF THE MANAGERS AND OFFICERS ..................................................10
25.  INDEMNIFICATION ..........................................................................................................10

FUNDAMENTAL CHANGES ........................................................................................ **10**

26.  WITHDRAWAL .................................................................................................................10
27.  RESTRICTIONS ON TRANSFERS OF SHARES .....................................................................10
    (a)    Requirements for Transfer ................................................................................10
    (b)    Effectiveness of Assignment .............................................................................10
    (c)    Requirements for Admission .............................................................................11
    (d)    Rights of Mere Assignees .................................................................................11
    (e)    Call Rights of the Company ..............................................................................11
    (f)    General ..............................................................................................................12
    (g)    Liquidation and Termination .............................................................................12
    (h)    Final Accounting ..............................................................................................12
28.  AMENDMENTS .................................................................................................................13
    (a)    By the Managers ...............................................................................................13
    (b)    By Unanimous Consent .....................................................................................13
    (c)    Other Amendments ...........................................................................................13
    (d)    Notice of Proposed Amendments ......................................................................13

MISCELLANEOUS ...................................................................................................... **13**

29.  NOTICES .........................................................................................................................13
30.  TIME PERIODS .................................................................................................................13
31.  ENTIRE AGREEMENT ........................................................................................................13
32.  SUCCESSORS IN INTEREST ...............................................................................................13
33.  COUNTERPARTS AND FACSIMILES ...................................................................................14
34.  SEVERABILITY .................................................................................................................14
35.  CAPTIONS ........................................................................................................................14
36.  ADDITIONAL DOCUMENTS ...............................................................................................14
37.  INDEMNIFICATION ..........................................................................................................14
38.  NO THIRD PARTY BENEFIT ..............................................................................................14
39.  GENDERS AND NUMBERS .................................................................................................14
40.  NON-WAIVER ..................................................................................................................14
41.  COMPLIANCE WITH SECURITIES LAWS ...........................................................................14
42.  SURVIVAL .......................................................................................................................15
43.  VENUE ............................................................................................................................15
44.  APPLICABLE LAW ...........................................................................................................15
45.  SCHEDULES AND EXHIBITS ..............................................................................................15

SCHEDULE 10(A) ......................................................................................................... **16**

SEC-DEEPROOT-E-0005762

deeproot GROWTH RUNS DEEP FUND, LLC
OPERATING AGREEMENT

This Operating Agreement (this "**Agreement**") originally entered into on August 3, 2015, and hereby amended, and restated in the entirety, on February 5, 2018, by and among deeproot Funds, LLC (collectively, the "**Initial Members**" and each an "**Initial Member**") and those Investors who have subscribed to become Class B Members or Class C Members of the Company (the "**Investors**").  As used herein, the term "**Member**" shall refer to each of the Initial Class A Members and to each Investor hereafter admitted to the Company as a Member, as provided in this Agreement.

## STATEMENT OF AGREEMENT

For good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Members agree as follows:

## ORGANIZATIONAL MATTERS

1.      General.  The Members are entering into this Agreement for the purposes of forming and/or continuing a limited liability company (the "**Company**") under the laws of the State of Texas and of setting forth the rights and obligations of the Members of the Company.

2.      Name.    The name of the Company shall be "**deeproot Growth Runs Deep Fund, LLC**", "**dGRD,**" or such other name selected by the Members as may be required in order to be acceptable to the Secretary of State of Texas and of such other states, if any, in which the Company may do business.

3.      Purposes and General Powers.  The purposes of the Company shall be to engage generally in the sale of Class B and Class C Membership Interests, to invest in a pool of life insurance policies on behalf of the Investors, and to engage in any and all other activities incidental or related to any of the foregoing.. Unless hereafter restricted by amendments to this Agreement or to the Company's Articles of Organization (the "**Articles**"), the Company shall have and may exercise all powers and rights which a limited liability company may legally exercise pursuant to the Texas Limited Liability Company Act (the "**Texas Act**").

4.      Organizational Filings.

(a)      Texas.  The Members have caused (or promptly shall cause) the Articles to be filed with the Secretary of State of Texas pursuant to the Texas Act, and shall cause the Company to comply with all other applicable requirements of the Texas Act.

(b)      Other States.  Prior to the Company's beginning to conduct business in any jurisdiction other than the State of Texas, if any, the Managers shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company authorized to do business in such jurisdiction.

(c)      Cooperation.  At the request of any Member or Manager, each Member or Manager shall execute, acknowledge or verify and deliver all certificates and other instruments consistent with this Agreement which are necessary or appropriate to qualify, continue or terminate the qualification of the Company as a limited liability company in Texas and/or as a foreign limited liability company authorized to do business in jurisdictions other than Texas.

5.      Nature of Entity.  It is the intention of the Members that the Company, as a limited liability company, shall not constitute or be treated as a partnership, limited partnership or joint venture for any purpose

- 1 -

SEC-DEEPROOT-E-0005763

other than for federal and state income tax purposes.  Except as otherwise specifically provided in this Agreement or required by applicable law, no Member or Manager shall be liable for any debts, obligations or liabilities of the Company, whether resulting from the judgment, decree or order of any court or otherwise.

6.      Principal Office and Place of Business.  The address, principal office and principal place of business of the Company shall be at 8200 W. Interstate 10, Ste. 600, San Antonio, TX 78230 or at such other place as the Managers may designate from time to time.

7.      Agent for Service of Process.  The Company's initial agent for service of process in Texas is Robert J. Mueller, Esq., and shall be such person as the Managers may designate from time to time by filing appropriate instruments with the Secretary of State of Texas pursuant to the Texas Act.

8.      Tax Matters Member.  The Managers may appoint Company's "**tax matters partner**" for purposes of §6231(a)(7) of the Internal Revenue Code of 1986 (the "**Code**"), otherwise §6231(a)(7)(B) shall apply until such time as his successor is duly appointed.  The Member so designated (the "**Tax Matters Member**") shall, at the expense of the Company, exercise the authority and carry out the responsibilities prescribed for a tax matters partner by §6223 et seq. of the Code in accordance with those provisions and the Treasury Regulations (the "**Regulations**") thereunder, including, without limitation, acting on behalf of the Company in administrative and judicial proceedings involving proposed adjustments to Company items and keeping all Members informed of such proposed adjustments.  Any other Member may, at its own expense, participate in such proceedings as permitted by those provisions of the Code and Regulations.  The Tax Matters Member shall advise all other Members in writing of any proposed settlement of such a proposed adjustment, of any requested extensions of any applicable statute of limitations and of any "**final partnership administrative adjustment**," as that term is used in the above-referenced provisions of the Code.  Unless approved by a majority in interest of all Members, the Tax Matters Member shall not cause the Company to agree to any such proposed settlement or extension or to pursue judicial review of any such final partnership administrative adjustment.  The Tax Matters Member shall have no liability to the Company or any Member for any action taken or not taken by it in good faith in accordance with this Section 8.

9.      Term.  The existence of the Company shall continue on a perpetual basis unless the Company is sooner terminated and liquidated and its affairs wound up pursuant to applicable provisions of the Texas Act and applicable provisions of this Agreement.

## **FINANCIAL AND ACCOUNTING MATTERS**

10.     Capital Contributions.

(a)      Initial Members.  The Company shall issue 200 Class A Shares in the aggregate to the Initial Members.  The capital contribution and number of Class A Shares allocated to each Initial Member is set forth opposite such Member's name on Schedule 10(a) attached hereto.

(b)      Investors.  For each $25,000.00 contributed, in whole or part, to the capital of the Company by an Investor pursuant to Subscription Agreements accepted in whole or in part by the Company, the Company shall issue to such Investor either: (i) one (1) Class B Share(s), or a fraction thereof (as such Class is described in Section 14(c) hereof); or (ii) one (1) Class C Share(s), or a fraction thereof (as such Class is described in 14(c) hereof).  The Company is hereby authorized to issue to Investors up to 1,000 Class B Shares and 3,000 Class C Shares in exchange for contributions to the capital of the Company of up to $100,000,000 ($25,000,000 for Class B Shares, or $75,000,000 for Class C Shares) in the aggregate. The capital contribution and number of Class B Shares or Class C Shares allocated to each Investor shall be retained on the records of the Company. Any authorized but unissued shares shall be retained and owned by Company.

SEC-DEEPROOT-E-0005764

(c)      Limitations.   Except as otherwise specifically provided in this Agreement or required by applicable law, (i) no Member shall be required to make any further contribution to the capital of the Company to restore any loss of the Company, to discharge any liability of the Company, to eliminate any negative Capital Account (as defined below) or for any other purpose; (ii) no Member or Manager shall be personally liable for any liabilities of the Company; (iii) no contribution or other amount credited to the Capital Account of any Member shall earn interest at any time; (iv) no Member shall have the right to demand the return of any capital contribution or any other amount credited to the Capital Account of such Member; (v) no Member or Manager shall be personally liable for the return of all or any part of any capital contribution or any other amount credited to the Capital Account of any Member, it being expressly understood by each Member that any such return shall be made solely from the assets of the Company; and (vi) no Member shall have any right to demand or receive property other than cash in return for such Member's capital contribution or any other amount credited to the Capital Account of such Member, unless so requested in writing by such Member and approved in writing by the Managers, in their sole discretion.

(d)      Credit to Capital Account.   Contributions to the capital of the Company by a Member, as provided in this Agreement, shall be credited to the Capital Account of such Member as of the effective date of receipt by the Company.

11.      Loans.   A Member or Manager may (but, unless otherwise specifically provided herein, shall not be obligated to) loan funds to the Company for use in the business operations of the Company.  Any loan made to the Company by any Member or Manager shall be at a commercially reasonable interest rate and on other commercially reasonable terms as shall be determined by agreement of the lending person and the Managers, and such lending Member or Manager shall be treated as a general creditor of the Company with respect to such loan.

12.      Fiscal Year and Accounting Methods.   The fiscal year of the Company shall be from January 1st to December 31st.  The books of the Company shall be kept by the Managers in a manner consistent with the provisions of Sections 13, 15 and 16 and as otherwise determined to be appropriate based upon consultation with the Company's accountants.

13.      Capital Accounts.   A single capital account ("**Capital Account**") shall be maintained for each Member in accordance with the capital account accounting rules of §704(b) of the Code and the Regulations thereunder.  Each Member's beginning Capital Account shall be the amount of such Member's initial contribution to the capital of the Company made as provided in this Agreement.  Thereafter, a Member's Capital Account (a) shall be credited with and increased by (i) such Member's subsequent contributions of money, if any; (ii) the agreed net fair market value of property, if any, subsequently contributed by such Member; (iii) income and gain (including unrealized gain) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with rules of Regulation §1.704-1(b)(2)(iv); and (b) shall be debited with and reduced by (i) distributions of money to such Member; (ii) the net fair market value of property, if any, distributed to such Member; (iii) losses and deductions (including unrealized loss) allocated to such Member as provided in this Agreement; and (iv) such other amounts as may be required in order for the Capital Accounts to be considered to be determined and maintained in accordance with the rules of Regulation §1.704-1(b)(2)(iv).  Notwithstanding the foregoing, nor any contrary provision in the Code and the Regulations, capital accounts for Investors shall be accounted for basis only of Invested Capital, as otherwise provided hereinafter.

14.      Ownership Interests.

(a)      Shares.   Ownership interests in the Company shall be denominated in "**Shares**".  Fractional Shares, rounded to the nearest fifth decimal place, may be issued by the Company if necessary to reflect the agreed upon number of Shares to be issued in accordance with the terms of this Agreement.  A Member's "**Percentage Interest**", rounded to the nearest fifth decimal place, shall be determined by dividing the number of

SEC-DEEPROOT-E-0005765

Shares owned by such Member by the total number of Shares owned by all Members of the same class.  The Company is authorized to issue 4,200 shares, segregated into three classes: 200 Class A Shares, 1,000 Class B Shares, and 3,000 Class C Shares, as described in subparagraphs (b) and (c) below.  Each Share shall evidence, represent and constitute ownership of the Percentage Interest, the Capital Account balance and other rights attributable to that Share, all as set forth in this Agreement.

(b)     Class A Shares.  "**Class A Shares**" as to any Member shall mean and refer to Shares issued to the Initial Members which entitle the holder to cast one vote for each Class A Share held by the Member on all matters reserved for the Members' approval, consent or consideration.

(c)     Investor Shares.  "**Class B Shares**" or "**Class C Shares**" as to any Member shall mean and refer to Shares which do not entitle the holder to cast any votes for any matters reserved for the Members' approval, consent or consideration.

(d)     Computation of Profits and Losses.  Profits and losses of the Company shall be computed in the same manner as used by the Company for federal income tax purposes, except that (i) for purposes of computing gain, loss, depreciation and other items, property of the Company shall be considered to have a book value equal to its fair market value as most recently determined pursuant to Section 14(d); (ii) income of the Company exempt from tax, and expenses of the Company not deductible or not properly chargeable to capital for tax purposes, under the Code shall be included in the computation; and (iii) unrealized gain or loss shall be taken into account as provided in Section 15(d).

(e)     Allocations.  Except as otherwise provided herein, net profits, net losses, and credits of the Company shall be allocated to and among each Class A Member in accordance with each's respective Percentage Interests.

For the purposes of this Agreement, the following definitions shall apply:

(A)     "**Priority Return**" shall mean a sum equivalent to a Class B or Class C Member's Invested Capital multiplied by a certain Liquidation Multiplier, as defined and assigned as per a certain private placement memorandum (respectively to each Class) of the offering; which shall be cumulative commencing on subscription (the "**Start Date**"), and due only upon a Call (as such 'Call' term is defined therein) by the Company; and

(B)     "**Invested Capital**" shall mean an amount equal to the contributed capital made to the Company by a Class B Member or Class C Member under Section 10(b) hereof, less any return of capital previously distributed to such Class B Member or Class C Member.

(f)     Specific Items.  Specific items of Company income, gain, loss and deduction shall be allocated to and among the Class A Members in proportion to the respective allocations of net profits and losses to and among such Members, except that each Class A Member's distributive share of depreciation, amortization and gain or loss with respect to any Company property, as computed for tax purposes, shall be determined so as to reflect the varying interests of the Members in unrealized gain or loss for prior periods, and otherwise to take into account the variation, if any, between the adjusted basis and book value of the property as required by §704(c) of the Code and the Regulations.

(g)     Unrealized Gain or Loss.  On each Adjustment Date (as hereinafter defined), the properties of the Company (including any property being distributed by the Company) shall be considered to have been sold on such date at fair market value (as determined by the Managers, using their reasonable business judgment).  The unrealized gain or loss attributable to such deemed sale shall be allocated to and among the Members in accordance with Section 15(b).  The amount of any distribution in kind shall be considered to be the

SEC-DEEPROOT-E-0005766

fair market value of the distributed property, as so determined.  As used in this Agreement, "**Adjustment Date**" shall mean the date of the dissolution of the Company and each other date upon which there is (i) a distribution in kind of Company property; (ii) a contribution of money or other property (other than a de minimus amount) to the Company by a new or existing Member as consideration for an interest in the Company; or (iii) a distribution of money (other than a de minimus amount) by the Company to a withdrawing or continuing Member as consideration for an interest in the Company.

      (h)    Varying Interests.  If additional Shares are issued, or if any Share is transferred during any fiscal year, the net profits and losses and credits allocated to the Members for such year shall be determined on a daily, monthly or other basis, as selected by the Managers using any method permitted under Code §706 and the Regulations thereunder.  The transferee of a Share shall succeed to the Capital Account attributable to the Share so transferred.

      15.    Special Circumstances Allocations.

      (a)    General.  The Code and Regulations impose a number of requirements that must be satisfied in connection with allocations made by the Company (including a requirement that, in order for an allocation of an item of income, gain, loss or deduction to be recognized for federal income tax purposes, the allocation must have substantial economic effect or otherwise must be in accordance with the Members' interests in the Company).  It is the intention of the Members that all allocations made under this Agreement shall comply with those requirements and shall be made in manners consistent with Code §§704(b) and 704(c) and Regulations §§1.704-1 and 1.704-2.  In addition to any other steps which may need to be taken to implement that intention, and in connection with certain other special circumstances which might arise, allocations shall be made under the provisions of this Section 16, to the extent applicable, before making any allocations under Section 15.

      (b)    Incorporation of Certain Rules.  The "**qualified income offset**" rules, the "nonrecourse deduction" rules, the "partner nonrecourse deduction" rules, the "partner minimum gain" rules, the "partnership minimum gain" rules and the related "chargeback" rules of Regulations §§1.704-1 and 1.704-2 are incorporated in this Agreement by reference.  In addition, no loss or deduction shall be allocated to a Member if such allocation would cause or increase a deficit balance in such Member's Capital Account, adjusted as described in Regulations §1.704-1(b)(2)(ii)(d)(3) et seq.  Any special allocations of items pursuant to such rules or otherwise made to implement the intentions stated in Section 16(a) shall be taken into account in computing and making subsequent allocations to and among the Members so that the net amount of any items so allocated and the profits, losses and all other items allocated to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each Member under Section 15 if such special allocations had not occurred.

      (c)    Certain Fee Payments to Members.  If and to the extent that any payments in the nature of fees made to a Member are finally determined by the Internal Revenue Service or otherwise to be distributions to a Member for federal income tax purposes (instead of being treated as fees), gross income shall be allocated to such Member in the amount of such distributions.

      (d)    Certain Imputed Interest.  If and to the extent that the Company is entitled to a deduction for interest imputed under any provision of the Code on any loan or advance from a Member to the Company (whether such interest is currently deducted, capitalized or amortized), such deduction shall be allocated solely to such Member.

      16.    Elections. The Managers, in their discretion, may cause the Company to make any election required or permitted to be made by the Company under the Code and applicable Regulations, including, without limitation, an election pursuant to §754 of the Code to adjust the basis of the Company's assets for all transfers of Shares.

SEC-DEEPROOT-E-0005767

17.     Current Distributions.  Except as required by the Code and the Regulations thereunder, cash available for distribution shall be distributed with respect to a fiscal year at times determined by the Managers in the following order and priority as net profit, net loss and credit of the Company is allocated pursuant to Section 15(b) hereof.

18.     Distributions Upon Winding-Up.  Upon dissolution of the Company and the winding-up of the Company's affairs, the assets of the Company (after giving effect to the provisions of Section 15(d)) shall, subject to the requirements of applicable Texas law, be applied and distributed in the following order of priority:

(a)     Creditors.  To the payment of debts and liabilities of the Company to creditors of the Company (including those to Members other than liabilities to Members for distributions), including, without limitation, expenses of winding-up and the establishment of any reserves against liabilities and obligations of the Company which the liquidator, in the liquidators sole discretion, deems appropriate.

(b)     Investor Members.  To the Class B Members in accordance with, and in proportion to, their respective positive Capital Account balances.  Then to the Class C Members in accordance with, and in proportion to, their respective positive Capital Account balances.

(c)     Class A Members.  To the Class A Members in accordance with, and in proportion to, their respective positive Capital Account balances.

## OPERATIONS

19.     Actions by the Members.

(a)     General.  Whenever this Agreement requires the vote, consent, approval or other action by a specified fraction or percentage "in interest" of some or all of the Members, such requirement shall be satisfied if such vote, consent, approval or other action is provided or authorized by Members who own Class A which represent at least the specified fraction or percentage of the total Class A owned by all Members entitled to participate in such decision.  Unless otherwise specifically provided, any proposed decision or action shall require approval by a majority in interest of the Class A Members, which Class A Members shall be entitled to vote on all matters reserved for their approval or consent.  Except as otherwise specifically provided in this Agreement or required by applicable law, no Member shall be disqualified from participating in the making of any such decision or the taking of any such action solely because such Member has an interest in the outcome thereof.

(b)     Meetings.  Unless hereafter required by the vote of a majority in interest of all Class A Members, there will be no regularly scheduled annual or other meetings of the Members.  However a meeting of the Members may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") to all of the Members given by the Managers or by seventy-five percent in interest of the Investors.  The Meeting Notice shall specify the subject matters to be considered at the meeting.  Unless the Managers or a majority in interest of the Members calling the meeting agree upon and state in the Meeting Notice a San Antonio, Texas location for the meeting, each meeting shall be by teleconference with arrangements which permit each Member participating in the teleconference to hear (and to be heard by) each of the other participating Members.  A majority in interest of all Members (present in person or by written proxy) shall constitute a quorum for any meeting of the Members, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by unanimous consent of the Class A Members participating in the meeting.

(c)     Written Action.  Any action of the Class A Members set forth in writing and signed by the requisite percentage in interest of such Class A Members shall be effective whether or not a meeting of Members has been called and held for the purpose of considering such action.

- 6 -

SEC-DEEPROOT-E-0005768

(d)   Actions Binding.  Any action taken by the Class A Members at a meeting or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Managers to all of the Members.

20.   Management of the Company.

(a)   General.  In general, and except as otherwise provided herein or by applicable law, the persons elected annually by the Members as managers of the Company (the "**Managers**"), shall be responsible for the management of the Company.  No Member who is not a duly elected Manager, or officer of the Company shall have any responsibility, right or power to take part in the control of the Company's business or any authority or power to act or sign for or otherwise bind the Company or any other Member.

(b)   Initial Manager**.**  The initial Manager is ROBERT J. MUELLER, who shall serve as Manager until such time as his/her/their respective successors are duly elected by the Class A Members.

(c)   Election of Managers.  Class A Members shall, from time to time, determine the number of persons to be elected as the Managers of the Company and shall elect the number of Managers so decided upon.

(d)   Resignation and Removal.  A Manager may resign at any time, may be removed by a unanimous vote of Class A Members, or may be removed, for cause, by any other interested party, for conduct rising to clear and unambiguous criminal conduct, by a judge or court having subject matter and person jurisdiction over the Manager.

(e)   Powers and Authority.  Except as otherwise provided herein or by non-waivable provisions of applicable law, the powers and authority of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers (with the consent of a majority of the Managers being required for action by the Managers).  Unless hereafter required by the vote of a majority of the Managers, there will be no regularly scheduled annual or other meetings of the Managers.  However, a meeting of the Managers may be called at any time upon at least ten days' written notice (the "**Meeting Notice**") given by any Manager to all of the other Managers.  The Meeting Notice shall specify the subject matters to be considered at the meeting.  Unless otherwise agreed upon in writing by a majority of the Managers specifying an agreed upon time and place for the meeting, each meeting shall be by teleconference with arrangements which permit each Manager participating in the teleconference to hear (and to be heard by) each of the other participating Managers.  A majority of all Managers (present in person or by written proxy) shall constitute a quorum for any meeting of the Managers, and action may be taken at such meeting only with respect to matters directly related to the subject matters specified in the Meeting Notice, unless otherwise agreed upon at such meeting by a majority of the Members participating in the meeting.  Any action of the Managers set forth in writing and signed by the requisite number of the Managers shall be effective whether or not a meeting of Managers has been called and held for the purpose of considering such action.  Any action taken by the Managers at a meeting or in writing, as described above, shall be binding and conclusive upon the Company and all Members and Managers, and a copy of the minutes of the meeting or of the written action in which such action was taken shall be certified to be true, accurate and complete by the Managers and shall promptly be provided by the Mangers to all of the Members.  Subject to the foregoing, the powers and authority of the Managers shall include, without limitation, the power and authority:

(i)   to enter into, make and perform contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and to make all decisions and waivers thereunder;

SEC-DEEPROOT-E-0005769

(ii)    to open and maintain bank and investment accounts and arrangements, to draw checks and other orders for the payment of money and to designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(iii)    to maintain the assets of the Company in good order;

(iv)    to collect sums due to the Company;

(v)    to the extent that funds of the Company are available therefore, to pay debts and obligations of the Company;

(vi)    to acquire, utilize for Company purposes and dispose of any asset of the Company;

(vii)    to borrow money or otherwise commit the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(viii)    to select, remove and change the authority and responsibility of lawyers, accountants and other advisers and consultants;

(ix)    to obtain insurance for the Company;

(x)    to make decisions concerning distributions by the Company of cash and other property as provided in Sections 18 and 19; and

(xi)    to adopt, amend or restate bylaws for the Company.

(xii)    to develop property in any way that the Members deem appropriate; and

(xiii)    to take any and all other action that is permitted by law and customary in or reasonably related to the conduct of the Company's business affairs.

(f)    Limitations.  Except with the consent and approval of a three-quarters majority in interest of all Members, the Managers shall not:

(i)    sell, lease, exchange or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust or trust indenture) all or substantially all of the Company's property and assets;

(ii)    require any Member to make additional capital contributions;

(iii)    amend or restate the Articles of the Company or, except as otherwise specifically permitted herein, this Agreement.

(g)    Officers.  From time to time, at the discretion of the Managers, the Managers may elect persons as officers of the Company, including, without limitation, a chief executive officer, a president, a secretary, a treasurer and such vice presidents, assistant secretaries and assistant treasurers as the Managers may deem desirable. Subject to the provisions of any employment or other agreements (approved by the Managers) between such officer and the Company, each officer so elected shall serve in that capacity at the pleasure of the Managers, and may be removed from such office by the Managers at any time for any reason, with or without cause.  The officers so elected by the Managers shall have such powers, duties and responsibilities as would be customary for officers of corporations with corresponding titles and as otherwise may reasonably be assigned to them, from time to time, by the Managers.

SEC-DEEPROOT-E-0005770

(h)   Duties of the Managers.  The Managers shall manage or cause to be managed the affairs of the Company in a prudent and businesslike manner, devoting such portion of his time and effort to Company affairs as may reasonably be required for the effective management of such affairs; provided, however, that it is expressly understood and agreed that the Managers shall not be required to devote their entire time or effort to the business of the Company and shall not be restricted in any manner from participating in any other business or activities.  The Managers also shall cause to be filed such certificates and shall do such other acts as may be required by law to qualify and maintain the Company as a limited liability company under the laws of the State of Texas and of any other jurisdiction in which the Company transacts business.

(i)   Other Activities.  No Member, Manager or other person related to or affiliated with any Member or Manager shall be prevented or restricted from engaging or participating in or conducting any other business or activity whatsoever (or have any accountability, liability or obligation whatsoever to the Company or any Member with respect thereto), even if such other business or activity competes with, or is enhanced by, the business and activities of the Company.

21.    Bank Accounts.  All cash receipts and other funds of the Company shall be deposited to one or more bank accounts in the name of the Company at one or more banks or other depositories selected by the Managers from time to time.  Checks and other withdrawals from such accounts may be signed by the Managers or by any one or more other persons who may be selected by the Managers from time to time.  All funds of the Company shall be used solely for Company purposes and shall not be commingled with funds of any Manager, Member or other person.

22.    Records and Reports.

(a)   Records.  The Managers shall keep or cause to be kept proper books of account in accordance with Section 11 and in such other manner as the Managers and the Company's accountants determine to be appropriate.  The Managers shall promptly enter or cause to be entered in the Company's books a full and accurate record of each transaction made by the Managers on behalf of the Company.  All books of account, with all other written records and other documents of the Company, shall be maintained at the principal office of the Company or at any other location in Texas that may be selected by the Managers from time to time, and shall be open to the reasonable inspection and copying by any Member or such Member's duly authorized representative, as provided in Section 23(c).

(b)   Annual Reports.  Upon request, the Managers shall cause to be prepared and delivered to a Member (i) financial statements of the Company for the preceding year, including an income statement, balance sheet, statement of cash flow and statement of changes in Members' equity, with a summary for such Member; and (ii) federal and other applicable income tax returns of the Company for the preceding year.  A Member's online access to such reports shall be deemed delivered.

(c)   Inspections.  Any Member shall have the right to inspect and copy, at such Member's own expense, any of the Company's records required to be maintained pursuant to the Act, at such Member's reasonable request and during regular business hours; provided, however that the Managers may restrict or redact records, or parts thereof, that constitutes confidential, privileged, or proprietary information.

(d)   Other Information.  The Managers shall keep the Members informed generally of the transactions entered into by the Managers on behalf of the Company, only as such transactions may involve the Call of investment positions.

23.    Compensation.  A person serving as a Manager shall be entitled to receive compensation for services rendered to the Company as a Manager only if and as approved from time to time by a majority of the Managers.  A person serving as an officer shall be entitled to receive compensation for services rendered to the

SEC-DEEPROOT-E-0005771

Company as an officer only if and as approved from time to time by the Managers. All Managers and officers shall be entitled to reimbursement of reasonable expenses incurred by them on behalf of the Company.

24. Reliance on Acts of the Managers and Officers. No financial institution or any other person dealing with the Managers or officers of the Company shall be required to ascertain whether a Manager or officer is acting in accordance with this Agreement, but such financial institution or such other person shall be protected in relying solely upon the assurances of, and the execution and delivery of documents by, a Manager or officer.

25. Indemnification. Each Member, Manager and officer of the Company is hereby indemnified by the Company with respect to the matters described in, to the full extent permitted by and in accordance with the provisions of the Texas Act. Notwithstanding the foregoing, the Company shall not indemnify (a) a Member with respect to any dispute among the Members or among the Company and any Members arising out of this Agreement or any other agreement among such Members and the Company, or (b) any Manager or officer with respect to any dispute between such Manager or officer and the Company arising out of any agreement between the Company and such Manager or officer.

## FUNDAMENTAL CHANGES

26. Withdrawal. The withdrawal of a Class B Member or Class C Member shall not cause the dissolution of the Company. Accordingly, except as otherwise provided herein, no Class B Member or Class C Member shall have any right or power to voluntarily withdraw from the Company as a Member, or any right (under any provision of the Texas Act or otherwise) to receive any payment or compensation for such Member's Shares upon voluntary withdrawal from the Company, whether or not the withdrawal is in violation of this Agreement.

27. **Restrictions on Transfers of Shares**.

(a) Requirements for Transfer. Subject to any restrictions on transferability required by law (including the Securities Act of 1933, any state securities or "Blue Sky" law, and the rules promulgated thereunder), and subject to the provisions of Section 27(c), which shall have priority, each Member shall have the right to transfer (but not to substitute the assignee as a substitute Member in his or its place, except in accordance with Section 27(c) hereof), by a written instrument, the whole or any part of his or its Shares, provided that: (i) the transferee is a citizen and resident of the United States, and otherwise not a tax-exempt entity under Section 168(h) of the Code; (ii) the transferor delivers to the Company and the Remaining Members an unqualified opinion of counsel designated by the Remaining Members that neither the transfer nor any offering in connection therewith violates any provision of any federal or state securities law; (iii) the transferee executes a statement that he or it is acquiring such Shares or such part thereof for his or its own account for investment and not with a view to distribution, fractionalization or resale thereof; and (iv) the Company receives a favorable opinion of the Company's legal counsel or such other counsel selected by the Remaining Members that such transfer would not result in the termination of the Company (within the meaning of Section 708(b) of the Code) or the termination of its status as a partnership under the Code; *provided, further*, that the Remaining Members may elect to waive the requirement of the opinions of counsel set forth in Sections 27(a)(ii) and (iv) above should each of them, in their sole discretion, determine that the cost of time delays involved in procuring such opinions may impede the Company's ability to effect the contemplated transfer.

(b) Effectiveness of Assignment. No transfer shall be effective unless and until the requirements of Section 27(a) are satisfied. The transfer by a Member of all or part of his or its Shares shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Section 27 have been met, and the Company has received from the transferor a transfer fee sufficient to cover all expenses of the Company connection with such transfer; *provided*, however, that the Remaining Members may elect to waive this fee in their sole discretion. All distributions made thereafter in respect of the Shares of the transferor shall be made to the transferee of such transferor's Shares.

SEC-DEEPROOT-E-0005772

(c)     Requirements for Admission.     No transferee of the whole or a portion of a Member's Shares shall have the right to become a Member unless and until all of the following conditions are satisfied:

(i)     a duly executed and acknowledged written instrument of transfer approved by the Class A Members has been filed with the Company setting forth (A) the intention of the transferee to be admitted as a Member; (B) the notice address of the transferee; and (C) the percentage and Class of Shares transferred by the transferor to the transferee;

(ii)     the opinions of counsel described in Section 27(a) above are delivered to the Company and the Remaining Members, subject to the Remaining Members right to waive the delivery of these opinions in their sole discretion;

(iii)     the transferor and transferee execute and acknowledge, and cause such other persons to execute and acknowledge, such other instruments and provide such other evidence as the Class A Members may reasonably deem necessary or desirable to effect such admission, including without limitation: (A) the written acceptance and adoption by the transferee of the provisions of this Agreement; (B) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under this Securities Act of 1933 and relevant state law; and (C) the transferee's completion, if applicable, of an acknowledgement of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(iv)     the admission is approved within the sole and absolute discretion by a majority of the Class A Members, unless and except all Class A Shares are being transferred, in which a super majority of two-thirds of Investors must approve the admission; and

(v)     a transfer fee has been paid to the Company by the transferor sufficient to cover all expenses in connection with the transfer and admission, including but not limited to attorney's fees for the legal opinions referred to in Sections 27(a) and (c), subject to the Remaining Members' right to waive the payment of this fee in their sole discretion.

(d)     Rights of Mere Assignees.     If a transferee of Shares is not admitted as a Member, he or it shall be entitled to receive the allocations and distributions attributable to receive the allocations and distributions attributable to the transferred Shares, but he or it shall not be entitled to inspect the Company's books and records, receive an accounting of the Company's financial affairs, exercise the voting rights of a Member, or otherwise take part in the Company's business or exercise the rights of a Member under this Operating Agreement.

(e)     Call Rights of the Company.

(i)     At any time under terms of a certain private placement memorandum dated August 3, 2015, the Company may mandate a Call of one or more Class B Shares.  In order to exercise this Call right, the Company shall provide a written call notice to each Class B Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class B Shares to be called.

(ii)     At any time under terms of a certain private placement memorandum dated February 5, 2018, the Company may mandate a Call of one or more Class C Shares.  In order to exercise this Call right, the Company shall provide a written call notice to each Class C Member, specifying, at a minimum, the Pay Date, form of payment, amount of payment, and number of Class C Shares to be called.

- 11 -

SEC-DEEPROOT-E-0005773

(iii)    Upon each exercise by the Company of its call rights provided for herein, the Class B Members or Class C Members, subject to the Call, shall be required to sell to the Company all of the Class B or Class C Shares, respectively, of such Members listed in the call notice. The purchase price shall be equal to the Invested Capital related to the called Shares, plus a "call premium" equal to: [the percentage equivalent of the Share's pre-determined Liquidation Multiplier] multiplied by [the Invested Capital].

(f)    General. The Company shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

(i)    the written agreement of a majority in interest of all Class A Members to dissolve the Company.

(ii)    at any time when there are no remaining Members of the Company.  (In any other situation where, following the withdrawal of any Member, there is at least one remaining Member, the Company shall not be dissolved, and the business and existence of the Company shall be continued by such remaining Member(s).

(iii)    the entry of a decree of judicial dissolution of the Company under the Texas Act.

(iv)    the sale or other disposition of all or substantially all of the assets of the Company.

(g)    Liquidation and Termination.  Upon dissolution of the Company, the Managers shall act as liquidator or may appoint one or more of the Managers to act as liquidator.  (If there are no Managers then serving, a majority in interest of the remaining Members shall select one or more persons to act as liquidator.)  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the liquidator to minimize any losses resulting from liquidation.   The liquidator, as promptly as possible after dissolution and again after final liquidation, shall cause a proper accounting to be made by a certified public accounting firm of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable, and shall apply the proceeds of liquidation as provided in Section 19 and in accordance with the time requirements of §1.704-1(b)(2)(ii)(b)(2) of the Regulations.  If, in the reasonable judgment of the liquidator, it will not be possible or prudent to complete the liquidation of the Company's assets and the distributions to the Members within that prescribed time period, the liquidator shall, on or before the last day of such period, distribute all remaining assets and liabilities of the Company to a trust, with the liquidator or such other person as the liquidator may appoint serving as the trustee thereof, for the purpose of complying with such timing requirements.  The trustee of said trust shall, thereafter, proceed with the completion of the liquidation of said remaining assets in the manner described in this Section 29(b) and with the application of the proceeds therefrom in the manner described in Section 19, and the trust shall be terminated as promptly as possible after completing all such actions.

(h)    Final Accounting.  Each of the Members shall be furnished with a statement prepared by the Company's accountants, which shall set forth the assets and liabilities of the Company as of the last day of the month which includes the date of dissolution and shall provide relevant information concerning the application and disposition of such assets and the proceeds thereof.  Upon compliance by the liquidator with the foregoing provisions, the liquidator shall execute and cause to be filed Articles of Dissolution and any and all other documents necessary with respect to termination and cancellation of the Company under the Texas Act.

SEC-DEEPROOT-E-0005774

28.   Amendments.

(a)   By the Managers.  This Agreement may be amended by the Managers, without the consent or approval of the Members, if such amendment (i) is solely for the purpose of reflecting the admission of additional Members or substituted Members who have been admitted as additional or substituted Members of the Company in accordance with the terms of this Agreement; or (ii) is, in the opinion of counsel for the Company, necessary or appropriate to satisfy requirements of the Code or Regulations or of any federal or state securities laws or regulations.  Any amendment made pursuant to Section 28(a)(ii) may be made effective as of the date of this Agreement.

(b)   By Unanimous Consent.  Notwithstanding any other provisions of this Agreement except the provisions of Section 28(a), any other amendments to this Agreement which would (i) change the method of allocating profit and loss under Section 14 or 15 or of making distributions under Section 17 or 18, (ii) change any voting rights or required voting percentages otherwise set forth in this Agreement, (iii) expose any Members to personal liability for obligations of the Company, or (iv) change the method of admitting additional Members shall require the written consent of all Members.

(c)   Other Amendments.  Except as otherwise provided in this Section 28, amendments to this Agreement shall require the written consent of two-thirds in interest of all Class A Members.

(d)   Notice of Proposed Amendments.  A copy of any amendment proposed to be made pursuant to this Section 28 shall be provided to each Member by the Managers at least 15 days prior to its proposed adoption date.

## MISCELLANEOUS

29.   Notices.  Any notice, election or other written communication required or desired to be given hereunder shall be deemed given or made at such time as it (a) is delivered personally to the intended recipient, or (b) is delivered to Federal Express, UPS or any similar express delivery service, or is deposited in the United States mails, by registered or certified mail, return receipt requested, bearing proper postage, addressed to the intended recipient at the address set forth on the signature page(s) of this Agreement (in the case of any communication to a Member) or the address of the principal office of the Company (in the case of any communication to the Company).  Any Member or the Company may specify some other address for the receipt of such written communications by giving written notice of such change to the other Members.  Although a notice, election or other communication shall be deemed given or made when delivered to an express delivery service or deposited in the mails as provided above, any time period that is to begin running by reason of such communication shall not commence until such communication actually is received by the intended recipient.

30.   Time Periods.  In the case of any time period which, pursuant to the terms of this Agreement, begins to run upon receipt of any notice or the occurrence of any other act or event, the day after such receipt or occurrence shall constitute the first day of such period, and such period shall expire at midnight of the last day of such period.

31.   Entire Agreement.  Except as otherwise specifically indicated herein, this document contains the entire agreement of the parties and supersedes any and all prior understandings, agreements, representations and negotiations between them respecting the subject matters hereof.

32.   Successors in Interest.  Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the Company, the Members and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.

SEC-DEEPROOT-E-0005775

33.   Counterparts and Facsimiles.  This Agreement and any other documents related to this Agreement may be executed in several counterparts, and each executed counterpart shall be considered as an original of this Agreement or such other document, as the case may be.  A counterpart executed and transmitted by facsimile device by any person to the intended recipient thereof shall constitute and be accepted as an executed and delivered original of this Agreement or such other document, as the case may be.

34.   Severability.  In the event any provision of this Agreement or any application thereof is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the other provisions hereof and of any other application of the specific provision involved shall not be affected or impaired in any manner.

35.   Captions.  The captions at the beginnings of the sections and paragraphs of this Agreement are not part of the context of this Agreement, but are merely labels to assist in locating those sections and paragraphs, and shall be ignored in construing this Agreement.

36.   Additional Documents.  Each Member shall, and shall cause the Company to, execute, acknowledge or verify and deliver any and all documents from time to time reasonably requested by the Company or any other Member or Manager to carry out the purposes and intent of this Agreement.

37.   Indemnification.  If any Member violates any provision of this Agreement, then, in addition to being subject to all other remedies, liabilities and obligations imposed upon that Member for such violation under this Agreement or under any applicable law, that Member shall indemnify the Company and the other Members against any and all liabilities, losses, damages, claims, costs and expenses of any kind whatsoever relating to or arising directly or indirectly out of or by reason of any such violation (including, without limitation, consequential damages; legal fees and other costs and expenses of prosecuting or defending claims or controversies, whether litigated or unlitigated; and interest on any such liabilities, losses, damages, claims, costs and expenses from the date paid at a floating rate equal to 2% plus the prime rate of interest as published in The Wall Street Journal from time to time).

38.   No Third Party Benefit.  Except as otherwise specifically provided herein, this Agreement is intended for the exclusive benefit of the Company and the Members and their respective successors and permitted assigns, and nothing contained in this Agreement shall be construed as creating any right or benefit in or to any third party.

39.   Genders and Numbers.  When permitted by the context, each pronoun used in this Agreement includes the same pronoun in other numbers or genders, and each noun used in this Agreement includes the same noun in other numbers.

40.   Non-Waiver.  No failure by the Company or any Member to insist upon strict compliance with any term of this Agreement or to exercise any option, enforce any right or seek any remedy upon any default of any other person shall affect, or constitute a waiver of, the Company's or such Member's right to insist upon such strict compliance, exercise that option, enforce that right or seek that remedy with respect to that default or any prior, contemporaneous or subsequent default; nor shall any custom or practice at variance with any provision of this Agreement affect, or constitute a waiver of, the Company's or any Member's right to demand strict compliance with all provisions of this Agreement.

41.   Compliance with Securities Laws.  In addition to the restrictions on Transfers of Shares under other provisions of this Agreement, no such Share may be sold or otherwise Transferred unless and until (a) such Share has been registered under all applicable federal and state securities laws pursuant to an effective registration statement which contemplates the proposed Transfer and complies with the then-applicable regulations, rules and administrative procedures and practices of any applicable federal and state securities

SEC-DEEPROOT-E-0005776

commission or regulator, or (b) the Company has received (or, in its sole discretion, has waived its right to receive) a legal opinion of, or satisfactory to, its legal counsel that no such registration is required.

42.     Survival.  If any provision of this Agreement establishes, with respect to any Member or the Company, any rights and/or obligations which are to be in effect after the termination or expiration of this Agreement, such provision shall survive the termination or expiration of this Agreement and shall be binding upon all persons affected by such provision for such period of time as may reasonably be required in order to give full effect to the intended application of such provision.

43.     Venue.  The Company and the Members hereby designate the courts sitting in San Antonio, Texas, as the courts of proper and exclusive subject matter and personal jurisdiction and venue of and for any and all actions and proceedings relating to this Agreement; hereby irrevocably consent to such designation, jurisdiction and venue; hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any of said courts; and agree that service of process or notice in any such action or proceeding shall be effective if delivered or mailed in accordance with the notice provisions of this Agreement.

44.     Applicable Law.  The Company is being formed under the laws of the State of Texas, and all rights, duties and obligations of the Company and of the Members under this Agreement shall be determined in accordance with the laws of said State.

45.     Schedules and Exhibits.  All schedules, exhibits and other attachments (including all duly authorized substitutions and replacements therefore) referred to in, and attached to, this Agreement hereby are incorporated in this Agreement by reference.

IN WITNESS WHEREOF, this amended Agreement has been executed as of the date first set forth above, and unless further amended, shall be adopted and effective as of February 26, 2018.

**MANAGER:**

_____

ROBERT J. MUELLER, Manager


**CLASS A MEMBER(S):**

_____

deeproot Funds, LLC by ROBERT J. MUELLER, VP


**CLASS B & CLASS C MEMBER(S):**

*Authorization by subscription as held on the records of the company.*

SEC-DEEPROOT-E-0005777

**Schedule 10(a)**

| Member Name and Address | Capital Contribution | Class A Shares | Date Subscribed |
|---|---|---|---|
| deeproot Funds, LLC<br>8200 W. Interstate 10, Ste. 600 San Antonio, TX 78230 | $1,000.00 | 200 | 8/3/2015 |

SEC-DEEPROOT-E-0005778

EXHIBIT 27

**Filed Under Seal**

EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
**SAN ANTONIO DIVISION**

---

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

-AGAINST-

ROBERT J. MUELLER, DEEPROOT FUNDS LLC (A/K/A DPRT FUNDS, LLC), AND
POLICY SERVICES INC.,

DEFENDANTS,

-AND-

DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC,
DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621
SILICON DR LLC,

RELIEF DEFENDANTS.

---

SUPPLEMENTAL EXPERT REPORT OF
BILL POST
SENIOR MANAGING DIRECTOR
FTI CONSULTING

SUBMITTED APRIL 27, 2023

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

TABLE OF CONTENTS

**I.     SCOPE OF ASSIGNMENT AND INFORMATION RELIED UPON**......................1

**II.    SUPPLEMENTAL OPINIONS AND ANALYSIS**......................................................1

**EXHIBITS:**

Supplemental Exhibit 1:  Additional Documents Relied Upon

**I.      SCOPE OF ASSIGNMENT AND INFORMATION RELIED UPON**

1.  I submitted an expert report in this matter on March 17, 2023 (the "Post Initial Report").  Unless otherwise noted, this supplemental expert report incorporates by reference herein the opinions and information contained in the Post Initial Report.

2.  In the Post Initial Report, I reserved the right to update my report to the extent any additional information is produced by either party.  Since I issued the Post Initial Report, Nathan Spradlin, former Director of Business Development at deeproot Capital Management,[1] was deposed.  In his deposition, Mr. Spradlin was asked about reports prepared by an entity called FactRight for the deeproot 575 Fund, LLC (the "575 Fund") and the deeproot Growth Runs Deep Fund, LLC (the "dGRD Fund") (collectively, the "Funds").  I have reviewed Mr. Spradlin's testimony as well as the FactRight reports for the Funds from 2018 and 2019.  A complete listing of the documents I have reviewed since I issued the Post Initial Report is included in Supplemental Exhibit 1.

3.  My professional credentials and curriculum vitae were included as Exhibit 1 of the Post Initial Report and remain unchanged.

**II.     SUPPLEMENTAL OPINIONS AND ANALYSIS**

4.  My opinions as expressed in the Post Initial Report as well as the bases and reasoning thereof have not changed.  In fact, the recently-produced documents and the Spradlin deposition all provide additional support for my opinions.  To the extent that any additional related information to this matter continues to be produced, or if Plaintiffs submit any response or reports relating to my opinions and/or analyses, I continue to reserve my right to review and respond to such information.

---

[1] Deposition of Nathan Spradlin dated March 28, 2023 (rough), PDF p. 14.

*****

My report, with supporting exhibits, is contained herein, and presents my opinion and the bases and reasons thereof.  The exhibits are an integral part of this report and support the opinions contained herein. To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report.  This report was prepared solely for the above-captioned matter and should not be used for any other purpose without prior written authorization.

By:

Bill Post

Date:  April 27, 2023

Supplemental
Exhibit 1

**Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et. al.**               Supplemental Exhibit 1
**Additional Documents Relied Upon**

All documents cited in my report and Exhibits.

**Bates Stamped Documents**
>  SEC-FACTRIGHT-E-0000530
>  SEC-FACTRIGHT-E-0000558
>  SEC-FACTRIGHT-E-0000587
>  SEC-FACTRIGHT-E-0000616

**Depositions and Other Testimony**
>  Deposition of Nathan Spradlin dated March 28, 2023 (rough) and Exhibits 46, 47, and 55

EXHIBIT 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **-against-** | |
| **ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,** | **Civil Action No.: 5:21-cv-785-XR** |
| **Defendants,** | |
| **-and-** | |
| **DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,** | |
| **Relief Defendants.** | |

**DECLARATION OF SACHIN VERMA**

I, Sachin Verma, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Sachin Verma. I am over twenty-one years of age and have personal knowledge of the matters set forth herein. I submit this declaration is support of the Securities and Exchange Commission's ("Commission's") Response to Defendant Robert J. Mueller's Brief Regarding Use of Funds Subject to Asset Freeze.

2.     I am a Certified Public Accountant with over 20 years of experience. I am employed as an Assistant Chief Accountant in the Washington, D.C. office of the Commission. As part of my daily activities, I investigate securities law violations.

3.      All amounts referred to in this Declaration are approximate amounts and have been rounded to the nearest dollar.

## I.      **Financial Records Reviewed**

4.      This Declaration is based upon my personal review of financial records such as bank statements, deposits, cancelled checks, wire transfers, signature cards, and other documents for accounts listed on **Appendix A-1** that were produced to the Commission pursuant to subpoenas and document requests ("Financial Records").[1]  It is my understanding that the Defendants and Relief Defendants have not yet completed production of their bookkeeping, accounting, tax, or investor records in response to investigative subpoenas served prior to the filing of the Complaint. As a result, my classification and summarization of Financial Records in this Declaration may change based on additional information that may be produced at a later date.

## II.     **Deposits From Deeproot Investors**

5.      Between September 24, 2015 and February 2, 2021, approximately $58,789,759 of investor funds were deposited into one or more of the Defendants' corporate bank accounts listed on **Appendix A-1** ("Deeproot Accounts")

6.      Based on documentation provided to date, since October 29, 2020, the date the Defendants were served with an investigative subpoena from the Commission, investors have deposited or transferred at least $7,246,365 into Deeproot Accounts.

7.      Based on documentation provided to date, between May 24, 2021, after Mr. Mueller's counsel was informed that Mr. Mueller would be subpoenaed to testify before Commission Staff, and August 10, 2021, at least $3,780,193 of investor funds for either the 575 Fund or the DRGD Fund were deposited into the Deeproot Accounts.

---

[1] If requested I am prepared to provide, through the Commission's attorneys, copies of all the Financial Records used to prepare this Declaration.

8. Based on documents provided to date, investors deposited or transferred approximately $155,647 into Deeproot Accounts after June 25, 2021, that date on which Commission Staff advised Mueller's counsel that they were going to recommend to the Commission that it file this securities fraud enforcement action against Mueller and the entity Defendants and Relief Defendants.

## III. Life Insurance Policy Transactions

9. From October 30, 2015 to February 4, 2021, the Financial Records show approximately $10,623,288 in expenditures for the purchase or maintenance (premium payments) of life insurance policies.

## IV. Transfers from the Deeproot Accounts to Relief Defendants

10. From January 5, 2016 to February 12, 2021, Defendants transferred approximately $31,935,928 from the Deeproot Accounts to, or for the benefit of, bank, corporate, credit card, and other accounts owned or controlled by the Relief Defendants ("Relief Defendant Accounts").[2] Specifically:

a. between March 29, 2017 and February 12, 2021, $13,487,743 was transferred from Deeproot Accounts to Relief Defendant Deeproot Tech LLC;

b. between April 15, 2019 and February 12, 2021, $3,621,512 was transferred from Deeproot Accounts to Relief Defendant Deeproot Studios LLC;

c. between January 19, 2016 and July 18, 2017, $160,447 was transferred from Deeproot Accounts to Relief Defendant Deeproot Sports & Entertainment LLC;

---

[2] For purposes of this Declaration, I am using the term "transferred" to include direct transfers, but also the many instances in which the Defendants used funds from the Deeproot Accounts to pay the credit card and other expenses of the Relief Defendants. If requested, however, I am prepared to break out separately: (1) direct transfers from Deeproot Accounts to the Relief Defendants; and (2) payments made on the Relief Defendants' behalf.

d. on January 8, 2021, $644,535 was transferred from Deeproot Accounts to Relief Defendant Deeproot Re 12621 Silicon Dr LLC;

e. between November 15, 2016 and August 10, 2018, $329,054 was transferred from Deeproot Accounts to Relief Defendant MB Hale Ohana Revocable Trust; and

f. between May 1, 2015 and February 11, 2021, Mr. Mueller also used bank accounts in deeproot Funds' and PSI's names to make approximately $13,692,637 million in payments that, based on my review of the Financial Records, appear to be for the benefit of the Relief Defendants.

## V. Expenditures From the Deeproot Accounts For the Benefit of Robert J. Mueller

11. From January 1, 2016 to July 19, 2019,[3] exclusive of salary payments, at least $1,537,666 from the Deeproot Accounts was used for Mr. Mueller's or his family's personal benefit, including, but not limited to, the following:

a. payments totaling $87,057 made between February 1, 2016 and February 5, 2019 to St. Mary's Hall, a private school in San Antonio, Texas attended by Mr. Mueller's child;

b. payments totaling $54,977 made between April 4, 2016 and March 4, 2019 to Disney Cruise Lines;

c. payments totaling $11,486 made between February 27, 2017 and March 7, 2019, to Princess Cruises;

---

[3] During this time, Mr. Mueller and his former (second) wife used American Express credit cards issued in the name of National Wealth Solutions LLC – a dormant entity controlled by Mr. Mueller – to make purchases of a personal nature, and used a Policy Services' account at Wells Fargo (-3081) to pay the credit card bills.

    d.  payments totaling $23,100 made on January 12, 2017 and August 10, 2018 to Tabora Gallery LLC, an art gallery in Hawaii;

    e.  payments totaling $70,298 made between December 22, 2017 and January 9, 2019 to physician Dr. Spencer Hardenbrook, MD;

    f.  payment of $6,500 on December 12, 2017 to Rebecca Carrillo, an attorney who represented Mr. Mueller in his second divorce proceeding;

    g.  payments totaling $9,050 made on December 15, 2018 and January 12, 2019 to James R. Van Winkle of Americus Diamond, a jeweler in San Antonio, Texas;

    h.  $34,012 paid on March 8, 2019 to Lux Catering and Events in Salt Lake City, Utah for wedding catering;

    i.  payments totaling $17,538 made between January 1, 2019 and March 3, 2019 to Michelle Leo Events in Salt Lake City, Utah for wedding planning; and

    j.  payments totaling $85,500 made on April 14, 2016, October 13, 2016, and April 18, 2017 to Link2Gov Corp for personal income tax payments.

## VI.   <u>Recent Expenditures</u>

12.    As stated above, since October 29, 2020 information provided to date indicates that investors have invested at least $7,246,365.

13.    As of August 31, 2021 there was a total of $134,969 remaining in the Deeproot Accounts. Thus, between October 29, 2020 and August 31, 2021, expenditures totaling at least $7,111,396 (i.e., $7,246,365 minus the $134,969 that was frozen by the Court) have been made from the Deeproot Accounts, which included payments of $86,947 for life insurance policy premiums.

14.    Since October 29, 2020, out of at least $7,111,396 in expenditures, a total of $0 have been used to purchase new life insurance policies.

VII.    **Ponzi-like Payments to Earlier Investors**

15.    Based on my review of the Financial Records and applying a conservative interpretation of such Financial Records,[4] between September 24, 2015 and February 11, 2021, at least $836,218 in new investor deposits were used to make Ponzi-like payments to earlier deeproot investors. Separately, roughly $177,249 was paid to investors in November 2020 using the proceeds of a loan obtained by Mr. Mueller.

16.    Financial Records for the period February 12, 2021 through April 30, 2021 have not been produced in full to the SEC by Defendants or from their financial institutions. However, based on available records, and again using the same conservative approach, from May 1, 2021 through August 31, 2021, it appears that at least $151,668 in new investor deposits were used to make Ponzi-like payments to earlier deeproot investors.

VIII.   **Authority Over Accounts**

17.    Based on my review of the Financial Records, Robert J. Mueller was, or is, a signatory or primary account holder on the Deeproot Accounts and the Relief Defendant Accounts.


        I declare under penalty of perjury that the foregoing is true, correct, and made in good faith based upon my review of the Financial Records, as well as other documents or information produced the Commission. Executed on this 6th day of October 2021.

                                         /s/ Sachin Verma
                                        Sachin Verma

---

[4] This approach gave Defendants the benefit of the doubt with regard to any income received from any source during this period and crediting it towards the payment of investors without regard to expenses or other payments made during this same period.

**Appendix A-1**
**List of Deeproot Accounts**

| ENTITY | Institution Name | Last 4 Digits of Account | Account Type | Signatory 1 | Date Opened | Signatory 2 | Date |
|---|---|---|---|---|---|---|---|
| Deeproot (aka Dprt) Funds LLC | Wells Fargo Bank N.A. | -2385 | Wells Fargo Simple Business Checking | Van L Gunnell | 6/24/2013 | Robert J Mueller | 6/24/2013 |
| Deeproot (aka Dprt) Funds LLC | Wells Fargo Bank N.A. | -2534 | Wells Fargo Simple Business Checking | Van L Gunnell | 6/24/2013 | Robert J Mueller | 6/24/2013 |
| Deeproot 575 Fund, LLC | Wells Fargo Bank N.A. | -8673 | Gold Business Service Package | Robert J Mueller | 1/23/2015 | | |
| Deeproot Growth Runs Deep Fund LLC | Wells Fargo Bank N.A. | -1354 | Wells Fargo Simple Business Checking | Robert J Mueller | 5/30/2014 | | |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -8461 | Gold Business Service Package | Glenn R Hagan | 6/1/2012 | Robert J Mueller | 6/1/2012 |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -8487 | Wells Fargo Simple Business Checking | Glenn R Hagan | 6/1/2012 | Robert J Mueller | 6/1/2012 |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -3081 | Gold Business Service Package | Glenn R Hagan | 9/21/2012 | Robert J Mueller | 9/21/2012 |
| Policy Services, Inc. | Wells Fargo Bank N.A. | -3099 | Wells Fargo Simple Business Checking | Glenn R Hagan | 9/21/2012 | Robert J Mueller | 9/21/2012 |
| Deeproot Tech, LLC | Wells Fargo Bank N.A. | -6575 | Wells Fargo Simple Business Checking | Robert J Mueller | 3/13/2017 | | |
| Deeproot Studios LLC | Wells Fargo Bank N.A. | -6415 | Wells Fargo Business Choice Checking | Robert J Mueller | 2/21/2019 | | |
| Deeproot Pinball LLC | Wells Fargo Bank N.A. | -5571 | Wells Fargo Simple Business Checking | Robert J Mueller | 5/20/2015 | | |
| Deeproot Wealth Advisors LLC | Wells Fargo Bank N.A. | -1255 | Wells Fargo Simple Business Checking | Robert J Mueller | 4/11/2014 | Glenn R Hagan | 4/11/2014 |
| Dprt Advisory Services LLC | Wells Fargo Bank N.A. | -2526 | Gold Business Service Package | Aaron F Flores | 6/24/2013 | Robert J Mueller | 6/24/2013 |
| **Credit Card Accounts:** | | | | **Primary Account Holder** | | | |
| Deeproot Tech, LLC | American Express | -1003 | American Express Card | Robert J Mueller | | | |
| Policy Services, Inc. | American Express | -2003 | American Express Card | Robert J Mueller | | | |
| National Wealth Solutions LLC | American Express | -1001 | American Express Card | Robert J Mueller | | | |

EXHIBIT 30

**To:**       Policy Services, Inc.[contact@policy-services.net]
**Cc:**       G Russell Hagan[gr.hagan@gmail.com]
**From:**     Concilla, Dennis J.
**Sent:**     2013-04-22T12:23:03-04:00
**Importance:**      Normal
**Subject:**   01190212
**Received:**           2013-04-22T12:23:10-04:00
image005.gif
01190212.pdf

Please find engagement letter attached.



**Dennis J. Concilla** | Attorney | Carlile Patchen & Murphy LLP | 366 E. Broad Street |
Columbus, Ohio 43215
Direct: 614.628.0771 | Fax: 614.221.0216 | E-mail: DConcilla@cpmlaw.com | Biography | V-
Card
www.cpmlaw.com



**Voted 2012 Best Law Firm (under 50 lawyers) by Columbus C.E.O.'s readers' poll**

This message may be protected by the attorney-client privilege. If you believe that it has been sent to you in error, do not read, print or forward it. Please reply to the sender that you have received the message in error. Then delete it. Thank you
To comply with certain U.S. Treasury regulations, we notify you that any federal tax advice contained in this email, including attachments, is not a covered opinion as described in Circular 230 and therefore cannot be relied upon to avoid any tax penalties or to support the promotion or marketing of any federal tax transaction.





ATTORNEYS AT LAW

Writer's Direct Line: (614) 628-0771
Writer's E-Mail Address: dconcilla@cpmlaw.com

April 22, 2013

Email: Policy Services, Inc. <contact@policy-services.net>
Robert Mueller
Policy Services, Inc.
PO Box 690562
San Antonio, TX 78269-0562

Re:     Engagement

Dear Robert:

It was a pleasure to speak with you and Russ in regards to your efforts to create a marketable fund product. I also understand you have an interest in either acquiring or creating a broker dealer. As Andy and I indicated, we have substantial experience in the registration and compliance required for various types of investments and funds and the licensing and operations of broker dealers. We provide this letter to describe the basis on which our firm will provide legal services to you and be compensated for those services.

Like most providers of professional services, this firm bills on an hourly basis. Some aspects of serving you will certainly require a higher expertise than other aspects. It is our policy to assign and delegate responsibilities based upon the degree of experience and expertise required. My hourly billing rate for matters of the nature we have discussed is $415. If a different attorney assists me, that work will be billed at the rate of $175 to $375 an hour. From time to time, depending on what task is called for, it may be suitable to delegate work to a law clerk or paralegal, whose rates are between $125 and $170. The firm typically adjusts billable rates yearly, and we do not expect further adjustments this year.

Each month a statement for our services will be rendered to you and based on our current understanding, sent directly to you. Each monthly statement reflects services rendered through the end of the previous month and all out-of-pocket expenses incurred on your behalf. Such expenses include, but are not limited to, filing fees, long-distance telephone calls, telecopy charges, duplication, translation fees, delivery charges (messengers, courier services), computerized research, transportation, lodging and meals. The firm expects payment of its services upon receipt of the statement.

While we cannot guarantee the success of any given venture, we will strive to represent your interests professionally and efficiently. To that end, we will provide you with copies of

SEC-PulmanR-E-0000004

Robert Mueller
April 22, 2013
Page 2

correspondence and other relevant documents, and keep you apprised of developments in our representation of your interests.

Given the complex nature of this endeavor, we require a $10,000 retainer. This retainer will be held in our trust account and drawn upon by us as earned. Anything remaining at the end of our engagement will be returned to you. We do reserve the right to request retainer payments in the future as a condition of continued representation.

If you agree with the terms of the engagement, please sign where indicated below, keep a copy for your records, and return the signed letter along with your check to the address indicated. I am looking forward to working with you on this situation.

Very truly yours,

CARLILE PATCHEN & MURPHY LLP

Dennis J. Concilla

DJC/DJC/01190212.1
026335.000024

SEC-PulmanR-E-0000005