EXHIBIT 31

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION
 3                      - - -
 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
             Plaintiff,               )
 6                                    )
         -against-                    ) Civil Action No.
 7                                    ) 5:21-cv-785-XR
     ROBERT J. MUELLER, DEEPROOT      )
 8   FUNDS LLC (a/k/a dprt Funds,     )
     LLC, AND POLICY SERVICES INC.,   )
 9                                    )
             Defendants.              )
10                                    )
             -and-                    )
11                                    )
     DEEPROOT TECH LLC, DEEPROOT      )
12   PINBALL LLC, DEEPROOT STUDIOS LLC,)
     DEEPROOT SPORTS & ENTERTAINMENT  )
13   LLC, DEEPROOT RE 12621 SILICON   )
     DR LLC, AND ROBERT J. MUELLER,   )
14   JEFFREY L. MUELLER, AND BELINDA  )
     G. BREEN, AS CO-TRUSTEES OF THE  )
15   MB HALE OHANA REVOCABLE          )
     TRUST,                           )
16                                    )
             Relief Defendants.       )
17   _____)
18
19       VIDEOTAPED DEPOSITION OF DENNIS J. CONCILLA
20                  Wednesday, July 12, 2023
                    9:35 a.m.
21                  Carlile Patchen & Murphy
                    950 Goodale Boulevard
22                  Suite 200
                    Columbus, Ohio  43212
23
     REPORTED BY:
24   SUSAN L. COOTS, RPR
     REGISTERED PROFESSIONAL REPORTER
25   JOB No. 230712ARSI
```

1

10:02   1    of the document which is inaccurate.

      2    BY MS. WARDEN:

      3        Q     Who did you understand your client to be, sir?

      4        A     Policy Services.

10:02   5        Q     Okay.  And that's based upon what information?

      6        A     I met with Russ Hagan and Robert Mueller who,

      7    at the time, it was my understanding had formed Policy

      8    Services, and they had asked me to represent them with

      9    regards to certain transactions that they were

10:02 10    anticipating.

     11        Q     Okay.  So let me break that down.  Who -- who

     12    is the "they"?

     13        A     "They" is Robert Mueller and Russ Hagan.

     14        Q     Okay.  And they asked you to represent them

10:02 15    personally or Policy Services?

     16        A     I -- I undertook the assignment to be on

     17    behalf of Policy Services.

     18        Q     And at any point did you represent

     19    Robert Mueller personally?

10:03 20        MR. HULINGS:  So I'm going to object to the

     21    extent that that goes outside the scope -- that question

     22    goes outside the scope of the privilege waiver.  I think

     23    the -- we're okay with that question being asked through

     24    2018.  But any time after that, we object.

10:03 25    BY MS. WARDEN:

                                                                    31

10:03  1     Q    Up to December 2018, did you ever represent

      2  Mr. Mueller personally?

      3     A    No.  Except to the extent that he was the

      4  principal of a company that I was representing.  So as

10:03  5  an officer of the corporation, I considered my

      6  representation to be on behalf of Policy Services,

      7  Robert Mueller, Russ Hagan, when Russ Hagan was there.

      8         MS. SANSALONE:  Bless you.

      9  BY MS. WARDEN:

10:04 10     Q    Okay.  And did the scope of your

   11  representation of Policy Services, up through

   12  December 2018, change at any point?

   13     A    No.

   14         THE VIDEOGRAPHER:  Pardon me.

10:04 15         THE WITNESS:  Gesundheit.

   16  BY MS. WARDEN:

   17     Q    And do you recall Mr. Mueller ever asking you

   18  to represent him in his personal capacity?

   19         MR. HULINGS:  Objection to the extent that

10:04 20  that question goes to time period after December 2018.

   21     A    No.

   22     Q    When did you stop representing Policy

   23  Services?

   24     A    I -- I think it's hard to put a date on it.

10:04 25  I will tell you that by 2017, my relationship with

                                                  32

10:05   1   Policy Services was limited and I think we had some

2   contact in 2018.

3        Q    So did -- did you ever do a -- a disengagement

4   letter?

10:05   5        A    No.

6        Q    Okay.  But if you had to -- to date when your

7   representation of Policy Services ended, when would you

8   put that at?

9             MR. HULINGS:  So objection to the extent --

10:05  10   Instruction not to answer to the extent that that --

11   that question goes to any time period after

12   December 2018.

13             THE WITNESS:  The objection again.

14             MR. HULINGS:  So the privilege waiver goes

10:05  15   through 2018.  So to the extent that it involves

16   anything after 2018, we're objecting and instructing you

17   not to answer.

18             So you'll probably have to read the question

19   again.  But to the extent the question applies to the

10:06  20   time period before, you know, including and before

21   December 2018, that's what you can answer.

22   BY MS. WARDEN:

23        Q    In December 2018, were you representing Policy

24   Services?

10:06  25        A    There -- there were -- As you point out, there

33

10:07   1   best of his ability.

  2   BY MS. WARDEN:

  3       Q     -- by the end of December 2018, were you

  4   actively representing Policy Services?

10:07   5          MR. HULINGS:  Asked and answered.

  6       A     I've answered as best I can.  I -- I don't

  7   know what -- what level activity you're looking at.

  8   I do know there were communications in 2018.

  9       Q     With --

10:07 10       A     I --

  11       Q     -- Mr. Mueller?

  12       A     With Mr. Mueller.  I -- I know there -- Well,

  13   I -- that's -- that's all I can say.  There were

  14   communications.  I think there were some emails.

10:08 15   I certainly wasn't working day-to-day on -- on -- on

  16   projects that Mr. Mueller had asked me to work on.

  17       Q     During what time frame were you working

  18   day-to-day on projects that Mr. Mueller asked you to

  19   work on?

10:08 20       A     I think 2013 through 2016, '17.

  21       Q     Okay.  If you look at Exhibit 27, it's not

  22   signed by -- it's not signed by Mr. Mueller.  Did you

  23   ever ask Mr. Mueller to sign your engagement letter?

  24       A     I asked him in this letter.

10:08 25       Q     Yeah.  Okay.  Did Mr. Mueller ever sign

35

```
10:08   1   Exhibit 27?

        2        A    I -- I assume he did.

        3        Q    You assume he did?

        4        A    I -- it's -- You know, it's -- it's a billing

10:09   5   thing, so they won't set up a number unless there's an

        6   engagement letter signed somewhere.  But I can't speak

        7   to whether it was signed.  I will tell you it was the

        8   practice of the firm not to begin representation without

        9   a signed engagement letter.

10:09  10        Q    Okay.  So you assume that Mr. Mueller signed

       11   an engagement letter with Carlile Patchen at some time?

       12        A    I do.

       13        Q    And when did Andrew Federico begin

       14   representing Policy Services?

10:09  15        A    About the same time.

       16        Q    2013?

       17        A    Yes.

       18        Q    What -- Do you remember what month in 2013?

       19        A    Well, April.  Andy and I were a team, and...

10:09  20        Q    Sorry.  April 2013 --

       21        A    Yes.

       22        Q    -- when the engagement letter began?  Okay.

       23        A    Yes.

       24        Q    And what was Mr. Federico's position at

10:10  25   Carlile Patchen?
```

                                                                    36

10:10  1      A      He was Of Counsel at the time.

       2      Q      Okay.  Did that change at some point through

       3   your representation of Mr. Mueller?

       4      A      No.

10:10  5      Q      Mr. Federico was always Of Counsel?

       6      A      Correct.

       7      Q      Okay.  And are you aware of when Mr. Federico

       8   stopped representing Policy Services?

       9             MR. HULINGS:  So same objection and

10:10 10   instruction.  You can answer to the extent it applies to

      11   December of 2018 and before.

      12      A      Same answer.  I don't -- you know, we -- we

      13   stopped actively representing them sometime in 2018.

      14   And they certainly could have called to ask a question

10:10 15   or to make an inquiry, but we weren't drafting anything

      16   for them after that date.

      17      Q      Who was the lead lawyer on the -- on Policy

      18   Services?

      19      A      I was the lead lawyer.

10:11 20      Q      Any other attorneys at Carlile Patchen work on

      21   work for Policy Services?

      22      A      Not that I recall.

      23      Q      Okay.  And any paralegals that you remember?

      24      A      Yes.

10:11 25      Q      Who?

                                                            37

10:14  1  we're entitled to ask questions about the scope of the

       2  representation.

       3            MR. HULINGS:  And we're not going to change

       4  that on the fly in the middle of a deposition.  So if

10:14  5  you want to maintain it for the record --

       6            MS. WARDEN:  That's my objection.

       7            MR. HULINGS:  -- you want to take it to The

       8  Court, you can do that.

       9            But the objection and instruction stands.

10:14 10  BY MS. WARDEN:

      11     Q   I'm going to hand you, for the record, it's

      12  Tab 1, which I'm going to mark Exhibit 88.  88.

      13            I don't have one for you.

      14            MR. PRITIKIN:  That's fine.

10:14 15            (Deposition Exhibit 88 was marked for

      16            identification.)

      17  BY MS. WARDEN:

      18     Q   Take a minute to just briefly go through

      19  Exhibit 88, Mr. Concilla.

10:15 20     A   Okay.

      21     Q   Okay.  At some point did you work on an S-1

      22  offering for Policy Services?

      23     A   Yes.

      24     Q   Okay.  And when did that begin?

10:15 25     A   In -- in late 2014.  Well, maybe fall of 2014,

                                                              40

```
10:15    1   I would say.
         2        Q    Okay.  And explain to me what the S-1 offering
         3   is.
         4        A    Okay.  The -- the -- an -- an S-1 is a public
10:16    5   offering, meaning that it's not -- not limited, like a
         6   Reg D, to certain investors and certain members.  And --
         7   and so Russ and Bob -- Robert and Russ had -- had wanted
         8   to see if they could get a -- a public filing done on
         9   behalf of the deeproot companies.
10:16   10        Q    And when you refer to Bob, you mean
        11   Mr. Mueller, right?
        12        A    Yes.  Robert, yeah.
        13        Q    Okay.  So Russ and Bob sought your legal
        14   advice with respect to doing an S-1 for Policy Services?
10:16   15        A    Well, they had formed a company called
        16   deeproot, and -- and so it was a separate LLC from
        17   Policy Services.
        18        Q    Uh-huh.
        19        A    And so we undertook to create an S-1 filing on
10:17   20   their behalf.
        21        Q    On deeproot's behalf.
        22        A    On deeproot's behalf.
        23        Q    Okay.  At any point in time did you represent
        24   deeproot?
10:17   25        A    Yes.
```

41

10:17  1        Q    And when did that representation begin?

       2        A    Right about the time that they started talking

       3   about an S-1.  They were creating -- they had created

       4   this new LLC, and -- and that was the name they wanted

10:17  5   to use to create this fund.

       6        Q    Okay.  Do you have an engagement letter

       7   memorializing your representation of deeproot?

       8        A    I don't -- I don't believe we do.  I think we

       9   continued using -- operating under the engagement with

10:18 10   Policy Services.

      11        Q    Okay.  And is that kind of your standard

      12   practice?

      13        A    Then, yes.  Now, not so much.

      14        Q    Okay.  All right.  So the deep -- and that --

10:18 15   is it fair to say your representation of deeproot began

      16   roughly fall 2014?

      17        A    Yeah.  I don't -- I didn't form the company,

      18   so I'm not sure when they formed that company.

      19        Q    Okay.  And do you recall at what point your

10:18 20   representation of deeproot ended?

      21             MR. HULINGS:  Objection, for the record, and

      22   instruction to the extent the question concerns any time

      23   after December 2018.

      24        A    At the point in the -- in that 2018 time

10:18 25   frame, we were answering questions that were being asked

                                                                    42

```
10:21   1   Discussion, Opinion Letter, S-1 Fund Application, and
        2   Subscription Agreement."
        3          Mr. Concilla, how did you advise Policy
        4   Services regarding this draft S-1 for the dGRD Fund?
10:21   5   A    I -- Policy Services, if I remember the
        6   structure, was providing services to deeproot Growth
        7   Runs Deep Fund, and -- and their intent, again, was to
        8   file -- was to create a public filing, public
        9   registration; and so we advised them on what would be
10:22  10   required to do that.
       11          Q    What would be required under what?
       12          A    SEC law.
       13          Q    Okay.  To include federal laws?
       14          A    Yes.
10:22  15          Q    SEC rules and --
       16          A    Federal funding.
       17          Q    -- regulations and federal laws?
       18          A    Yes.
       19          Q    Okay.  And Mr. Mueller sent you these draft
10:22  20   documents.  So did he -- Do you recall whether he -- he
       21   drafted the first -- first set of these documents he
       22   attached to Exhibit 88?
       23          MR. HULINGS:  Objection.  Assumes facts not in
       24   evidence.  It's been established that these are draft.
10:23  25   I think the witness testified to the opposite.
```

45

```
10:23   1   BY MS. WARDEN:
        2        Q    Who -- who -- who drafted the documents in
        3   Exhibit 88, to your knowledge?
        4        A    Okay.  I -- It's a chicken and an egg thing.
10:23   5   I don't -- I don't remember exactly what the flow of
        6   paperwork was.
        7             What I remember is that they had a Texas
        8   attorney who had drafted something on their behalf.
        9   Andy and I reviewed it.  We weren't satisfied with it.
10:23  10   We recommended a number of changes.  I think we sent
       11   those recommendations to Robert, and -- and Robert
       12   produced this.
       13             If you -- if you look at the indexes -- Well,
       14   I'm looking at 001529.  You'll -- you'll notice at the
10:24  15   bottom there's a -- a -- a little document number.
       16        Q    Yeah.
       17        A    And I can tell from that that Andy drafted
       18   this and it was on our system --
       19        Q    Uh-huh.
10:24  20        A    -- at Carlile Patchen.  So how much of the
       21   rest of it was drafted on our system, I don't know.  But
       22   I think it was more or less a team effort, if you will.
       23        Q    Okay.  Let me just unpack that.  So the Texas
       24   attorney, do you remember that person's name?
10:24  25        A    No.
```

46

10:24 1    Q    Okay.  And is it your understanding this Texas

2    attorney drafted draft dGRD S-1 documents?

3    A    I don't -- I don't know that it was an S-1

4    document.  I -- I almost think it was a Reg D.  But

10:25 5    that's -- Again, I -- It's -- it's -- it's been

6    10 years.  I don't -- I don't remember.  But -- but

7    I don't -- I -- I -- I don't believe it was an S-1.

8    I think it was a Reg D.

9    Q    Okay.  And then to follow the chronology,

10:25 10   right, you, and/or Mr. Federico, provided edits to

11   the -- the draft Texas attorney's documents, correct?

12   A    Yes.

13   Q    Okay.  And then you provided those to

14   Mr. Mueller?

10:25 15   A    Yes.

16   Q    And then you believe what you're looking at in

17   Exhibit 88, the attachments to the January 8th, 2015,

18   email, are Mr. Mueller's revisions to those draft

19   documents?

10:25 20   A    I believe so.  I -- I believe so.  I don't --

21   Q    Okay.  What do you recall doing with these

22   documents after you received them on January 8th?

23   A    Well, I know we reviewed them.  I don't know

24   if this was the final iteration or whether there were

10:26 25   subsequent iterations.  But we then undertook to file it

47

```
10:28   1          A     I do not know.

        2          Q     Okay.  Do you recognize Exhibit 89?

        3          A     Yeah, I guess.

        4          Q     What is it?

10:28   5          A     It's -- it's the deeproot 575 Fund.  And this

        6    -- this -- this email was sent at the same time as

        7    the --

        8          Q     Uh-huh.

        9          A     -- as the first --

10:28  10          Q     Okay.

       11          A     -- one.

       12          Q     So it's an email from Mr. Mueller on

       13    January 28, 2015.  And it was to you and Mr. Federico,

       14    correct?

10:28  15          A     Yes.

       16          Q     For the record, this is Bates No.

       17    MUELLER-001554 through MUELLER-001664.

       18                Okay.  The subject line is deeproot 557 Fund,

       19    LLC.  And how -- how did you advise deeproot regarding

10:29  20    this draft S-1 for the 575 Fund?

       21          A     How did I advise them?

       22          Q     Uh-huh.

       23                MR. HULINGS:  I'm going to actually object.  A

       24    little late, but that's mitigation.

10:29  25          A     I don't -- I don't know what that means.
```

49

10:29   1    BY MS. WARDEN:

        2        Q     Did you provide legal advice --

        3        A     Yes.

        4        Q     -- on the draft --

10:29   5        A     Yes.

        6        Q     -- S-1 575 documents that you're looking at,

        7    Exhibit 89?

        8        A     Yes.

        9        Q     Okay.  And what legal advice did you provide?

10:29  10        A     I commented on the offering.  At -- again, at

       11    some point we made a filing.  I don't think we made two

       12    filings, though.  I think we only made one filing with

       13    the SEC because we were waiting for the comment period

       14    to run before we would have filed a second one.

10:29  15              So I don't know whether we filed 575 or we

       16    filed Growth Runs Deep.  Without reviewing them, I can't

       17    even really tell the differences between the two.

       18    I just know that they were different structures.

       19        Q     Could it be that the S-1 was never filed?

10:30  20        A     I -- I don't believe so, because I -- I mean,

       21    you would know better than I.  If you tell me it was

       22    never filed, I'll believe you.  But I remember having

       23    discussions with a -- a representative of the SEC on the

       24    filing.  I also know we had to EDGARize the filing which

10:30  25    was a computerized process --

                                                                    50

10:30  1        Q    Uh-huh.

       2        A    -- in order to submit it.

       3        Q    Uh-huh.

       4        A    So we went through that process.  Now, unless

10:30  5   I'm -- unless I'm forgetting the process, which is

       6   possible --

       7        Q    Uh-huh.

       8        A    -- I thought we filed an S-1 and -- and it

       9   kind of died on the vine.

10:30 10        Q    Okay.  And do you believe that S-1 that was

      11   filed was for both dGRD and 575?

      12        A    I don't -- I don't know.

      13        Q    Okay.  All right.  Did the Texas attorney

      14   provide the initial drafts of the S-1 for the 575 Fund?

10:31 15        A    No.  The -- You know, and it's -- again,

      16   I'm not sure which of these came first.  But -- but

      17   I know that there was a draft that I reviewed that I

      18   felt was inadequate and we made a lot of comments.  And,

      19   again, their intent was to create an S-1 that would be

10:31 20   marketable by broker/dealers, and so I -- I am almost

      21   certain that there was an SEC filing made on behalf of

      22   one of these funds.

      23        Q    And did Mr. Mueller provide the initial draft

      24   of the S-1 575 documents?

10:31 25        A    I -- I -- I don't -- I'm going to say no

                                                                  51

11:14   1        A    No.

        2        Q    Okay.  Do -- And if you look at the rest of

        3   the exhibit, so it's Pages 2 through 10, does it appear

        4   to be a draft dGRD PPM?

11:14   5        A    Yes.

        6        Q    Okay.  Do you know whether you drafted this

        7   PPM or Mr. Mueller?

        8             MR. HULINGS:  Objection.  Vague.  Compound.

        9   BY MS. WARDEN:

11:15  10        Q    Well, the email says Mr. Mueller turned it

       11   into a full PPM, right?

       12        A    Yes.  Yes.

       13        Q    Okay.  But do you remember whether -- Well,

       14   I think I said this before.

11:15  15             Do you remember him doing that before,

       16   drafting full PPMs and sending it to you?

       17        A    Yes.

       18             MR. HULINGS:  Objection.  Vague -- vague as to

       19   form.

11:15  20   BY MS. WARDEN:

       21        Q    Did Mr. Mueller ever draft the first version

       22   of the PPM and send it to you?

       23             MR. HULINGS:  Objection.  Vague as to "first

       24   version."

11:15  25        A    Yes.

                                                                    75

11:15  1         Q    Okay.  For both the dGRD and PPM -- and

       2  557 Funds?

       3              MR. HULINGS:  Same objections.

       4         A    Yes.

11:15  5         Q    And what is the equity approach that

       6  Mr. Mueller's referring to?

       7         A    You know, I don't -- I'm not sure I remember.

       8  I -- I -- I -- I -- I -- I think -- Well, I'd only be

       9  speculating.  I -- I don't recall really.

11:16 10         Q    Okay.  I'm going to hand you Tab 19 which I'll

      11  mark as Exhibit 91.

      12              (Deposition Exhibit 91 was marked for

      13              identification.)

      14  BY MS. WARDEN:

11:16 15         Q    Do you recognize this document?

      16         A    No.

      17         Q    Does it appear to be an August 12, 2015, email

      18  from you to Mr. Mueller?

      19         A    Yes.

11:16 20         Q    Okay.  You wrote, "In my mind, this is now

      21  ready."

      22              And it says there's attachment of a dGRD PPM,

      23  and that appears to be attached to this email

      24  MUELLER-2650 through 2667.

11:17 25              Do you see --

                                                              76

11:38  1       Q     And the dGRD PPM was not an SEC filing,

2    correct?

3       A     Correct.

4             MS. WARDEN:  Okay.  We can take a break.

11:38  5             THE VIDEOGRAPHER:   Okay.  And so we are going

6    off the record at 11:39 a.m.

7             (Recess taken.)

8             THE VIDEOGRAPHER:   We're back on the record at

9    12:03 p.m.

12:02 10   BY MS. WARDEN:

11       Q     Mr. Concilla, I had just a quick followup on

12   Exhibit 94, which is that Investor Presentation, if you

13   can pull that out.   MUELLER-002816 through 2851.

14             If you can turn to -- they're not numbered,

12:02 15   but it's MUELLER-2838.   It says Private Equity Fund at

16   the top.

17       A     Uh-huh.

18       Q     Are you there?  Okay.  Perfect.

19             And you previously testified that you provided

12:03 20   legal advice on this deeproot -- draft deeproot Investor

21   Presentation.

22       A     Yeah.

23       Q     Exhibit 94, correct?

24       A     Yes.

12:03 25       Q     Okay.  At the bottom of 2838, it says, "All

92

12:03  1   principal is securitized or backed up by the assets of

2   the Fund."

3          Do you see that?

4    A   Yes.

12:03  5    Q   If you learn that the Funds did not have any

6   assets, would that statement still be accurate?

7          MR. HULINGS:  Objection.  Hypothetical.  Calls

8   for facts not in evidence.  Calls for speculation.  And

9   it's vague.

12:03 10          But you can answer, if you can.

11    A   Yes.

12    Q   If you learn that the assets -- the Fund did

13   not have any assets, that statement would still be

14   accurate?

12:04 15    A   No, it would not be accurate.  It would not be

16   accurate.

17    Q   It would not be accurate?

18    A   Would not be accurate.

19    Q   Okay.

12:04 20          MR. HULINGS:  That happened a little quickly.

21   Just give me a second to --

22          THE WITNESS:  Okay.

23          MR. HULINGS:  -- interpose the objections.

24          All the same objections to the previous

12:04 25   question we'll assert to the question that was just

93

12:04  1  asked.

     2  BY MS. WARDEN:

     3      Q    And why would it not be accurate?

     4         MR. HULINGS:  Same objections.

12:04  5      A    Because this would be -- I'm sorry.  But

     6  you're saying if there were no assets, would this be

     7  accurate?  It -- of course not.  I mean, it -- it -- it

     8  really speaks for itself.  I mean, I -- Why would it not

     9  be accurate?

12:04 10      Q    Would it be a misrepresentation then?

    11         MR. HULINGS:  Objection.

    12      A    It would not be accurate.

    13      Q    Okay.

    14         MR. HULINGS:  So it would call -- Vague as to

12:04 15  "misrepresentation."  Calls for a legal conclusion.

    16  Calls for speculation.  Lack of foundation.  Vague.

    17  You can answer.

    18         THE WITNESS:  I did.

    19         MR. HULINGS:  Just got to preserve the

12:04 20  objections for --

    21         THE WITNESS:  Yeah, I -- No, I -- I

    22  understand.

    23  BY MS. WARDEN:

    24      Q    If you learned that the Funds, again, did not

12:05 25  have any assets, would you advise Mr. Mueller to amend

94

```
12:06    1              MS. WARDEN:  Oh, yeah.
         2    BY MS. WARDEN:
         3       Q    Did Mr. Mueller ever tell you that the 575 or
         4    dGRD Fund never held any assets?
12:06    5              MR. HULINGS:  So objection.  To the extent
         6    that that calls for testimony regarding a communication
         7    after December 2018, you're instructed not to answer
         8    anything that takes place after that date.  It's also
         9    pretty vague.
12:06   10              But you can answer.
        11       A    Okay.  This -- this -- this was accompanied by
        12    an email that was dated 2015, I believe.  So as of this
        13    date, no.
        14       Q    Okay.  Let's make sure we're accurate.  As of
12:06   15    -- the email is Exhibit 93?
        16       A    I believe so, yes.
        17       Q    Which is August --
        18              MS. SANSALONE:  Exhibit 93 is September 24th,
        19    2015.
12:07   20    BY MS. WARDEN:
        21       Q    So as of September 24th, 2015, is it fair to
        22    say Mr. Mueller never told you that the 575 Fund and
        23    dGRD Fund never held any assets?
        24              MR. HULINGS:  Objection.  Vague.
12:07   25       A    No.  He never told me that it didn't hold any
```

96

12:11   1          Q     Okay.  Is that a synonym for a Reg D?

        2          A     Yes.

        3          Q     And at the bottom, do you see it's dated

        4   September 1, 2015?

12:11   5          A     Yes.

        6          Q     Okay.  So I can represent to you that in

        7   Mr. Mueller's interrogatory responses, he indicated that

        8   Exhibit 36 that you're looking at --

        9          A     Yes.

12:11  10          Q     -- was operative between May 2015 and

       11   May 2018.  So were you representing Policy Services

       12   between -- at any point between May 2015 and May 2018?

       13          A     Periodically.

       14          Q     So is the --

12:11  15          A     Yes.

       16          Q     -- answer "Yes"?

       17          A     Yes.

       18          Q     Okay.

       19          A     From time to time.

12:11  20          Q     All right.  And do you recall advising Policy

       21   Services with respect to Exhibit 36?

       22                MR. HULINGS:  Objection.  Vague.

       23          A     Not -- not specifically.

       24          Q     Do you regard -- do you recall providing legal

12:12  25   advice with respect to the 575 PPMs?

                                                                    100

12:12  1    A    Yes.

2    Q    Okay.  And is Exhibit 36 one of the 575 PPMs

3  that you provided advice for?

4    A    I'm -- I'm unaware of there being more than

12:12  5  one 575 Fund.

6    Q    Okay.  All right.  So turning your attention

7  to Page 6.

8    A    Page -- Page 6 as in the numbering pages or in

9  the -- in the --

12:12 10    Q    Sorry.  That was my PDF Page 6.  So 14502.

11  Hold on.  So page 6 of 13 on the bottom.  So

12  SEC-DEEPROOT-E-0014505.

13    A    Yeah.  Got it.  Yes.

14    Q    Are you aware of more than one 575 Fund PPM?

12:13 15    A    I am -- I am not aware of more than one

16  575 PPM.

17    Q    Did Mr. Mueller ever tell you that there was

18  more than one 575 PPM?

19    A    I don't recall.

12:13 20    Q    Okay.  All right.  So if you look at the

21  bottom of Bates 14505, it -- Under the category, Life

22  Policies, it says, "We will invest in Life Policies, AKA

23  Life Settlements, which are sales to third parties of

24  existing life insurance contracts held on insureds who

12:13 25  are 65 years of age or older."

101

12:13  1          Do you see that?

       2      A    Yes.

       3      Q    Okay.  Did Mr. Mueller inform you that the

       4  575 Fund never invested in or owned any life policies?

12:14  5          MR. HULINGS:  Objection.  That assumes

       6  incorrect facts not in evidence.  Calls for -- So based

       7  on -- on -- on that, we object.  It's also vague.

       8  BY MS. WARDEN:

       9      Q    You can answer.

12:14 10      A    Oh, okay.  No, he did not.

      11      Q    Did Mr. Mueller seek legal advice from you

      12  regarding whether the 575 Fund never investing in or

      13  owning any life policies was adequately disclosed in

      14  Exhibit 36?

12:14 15          MR. HULINGS:  So objection, based -- based on

      16  assuming facts not in evidence.  Assuming false or

      17  inaccurate basis for the question.  It's also -- so that

      18  makes it vague and misleading.

      19          You can answer, if you can.

12:14 20      Q    Do -- do you need me to repeat the question?

      21          MS. SANSALONE:  Or you can read it right

      22  there.

      23      A    Not -- not that I recall specifically.

      24      Q    Did Mr. Mueller seek legal advice from you

12:15 25  regarding whether the 575 Fund never investing in or

                                                              102

12:17 1          A     Isn't that the same question?

2          Q     No.   One is grounded in Exhibit 36, and one is

3     saying at any time.

4                MR. HULINGS:  Asked and answered.

12:18 5          A     No.

6          Q     Okay.  Did Mr. Mueller inform you that the

7     life policies were owned and acquired by Policy

8     Services?

9                MR. HULINGS:  Objection.  Vague.

12:18 10               You can answer.

11         A     We saw a previous email where he says they

12    have interests in life settlements.  Policy Services has

13    interests in life settlements.  So to the extent that in

14    his email he told me they had interests in life

12:18 15    settlements, the answer would be yes.

16         Q     Did Mr. Mueller ever tell you that the life

17    policies purportedly held by the 575 and dGRD Fund were

18    owned by Policy Services?

19         A     No.

12:19 20         Q     Did Mr. Mueller seek legal advice from you

21    regarding whether Policy Services owning the life

22    policies was adequately disclosed in Exhibit 36?

23         A     No.

24         Q     Did Mr. Mueller seek legal advice from you

12:19 25    regarding whether Policy Services owning the life

                                                             105

12:19  1   policies was adequately disclosed in a 575 PPM at any

       2   time?

       3        A    I'm -- I'm sorry.  I don't understand the

       4   distinction in your question.  But the answer is no.

12:19  5   I mean, you -- It seems like the same question over and

       6   over.

       7        Q    I know.  So the first question is -- is asking

       8   whether he told you about whether a disclosure was

       9   adequate in Exhibit 36.  And then the second question is

12:19 10   whether he told you a disclosure was adequate at any

      11   time, like, in any subsequent PPM that you may or may

      12   not be aware.

      13             MR. HULINGS:  So to the extent there's a

      14   question there, it's vague and compound.  Maybe you want

12:20 15   to ask that one again.

      16        A    No.

      17        Q    Did you provide Mueller -- Mr. Mueller with

      18   legal advice regarding whether Policy Services owning

      19   the life policies was adequately disclosed in

12:20 20   Exhibit 36?

      21        A    No.

      22        Q    Did you provide Mr. Mueller with legal advice

      23   regarding whether Policy Services owning the life

      24   policies was adequately disclosed in a 575 PPM at any

12:20 25   time?

                                                              106

```
12:20    1        A    No.
         2        Q    Did Mr. Mueller inform you that Policy
         3   Services did not grant any ownership interest in the
         4   life policies to the 575 Fund?
12:20    5             MR. HULINGS:  So hold on.  That -- that's a
         6   different version of the question.  I'm objecting to
         7   facts -- assuming facts not in evidence.  The factual
         8   assertion is inaccurate.  And it's a vague question.
         9             You can answer.
12:20   10        A    No.
        11        Q    Did Mr. Mueller seek legal advice from you
        12   regarding whether the fact that Policy Services did not
        13   grant any ownership interest in the life policies of the
        14   575 Fund was adequately disclosed in Exhibit 36?
12:21   15             MR. HULINGS:  That's the same -- the same
        16   objections.  That's -- assumes facts not in evidence.
        17   It's based on a factual assertion that is false and is
        18   vague and misleading.
        19        A    No.
12:21   20        Q    Did Mr. Mueller seek legal advice from you
        21   regarding whether the fact that Policy Services did not
        22   grant any ownership interest in the life policies of the
        23   575 Fund was adequately disclosed in a 575 PPM at any
        24   time?
12:21   25             MR. HULINGS:  Same objections.  Asked and
```

107

12:21 1  answered.

2        A    No.  It's really -- Thank you.

3        Q    Did you provide Mr. Mueller with legal advice

4  regarding whether the fact that Policy Services did not

12:21 5  grant any ownership interest in the life policies of the

6  575 Fund was adequately disclosed in Exhibit 36?

7        MR. HULINGS:  Same objections.  And asked and

8  answered.

9        A    No.

12:21 10        Q    Did you provide Mr. Mueller with legal advice

11  regarding whether the fact that Policy Services did not

12  grant any ownership interest in the life policies of

13  the 575 Fund was adequately disclosed in a 575 PPM at

14  any time?

12:22 15        MR. HULINGS:  So asked and answered, which is

16  clear in the objections.  It's -- Make sure I preserve

17  them.  Assumes facts not in evidence.  Based on a false

18  factual predicate.  And vague and misleading.  In

19  addition to the asked and answered.

12:22 20        A    No.

21        Q    Did Mr. Mueller inform you that there was no

22  legal relationship between the 575 Fund and Policy

23  Services prior to 2020?

24        MR. HULINGS:  So same objections.  Assumes

12:22 25  facts not in evidence.  Based on a false factual

108

```
12:22    1   predicate.  Vague and misleading as to multiple terms in

         2   the question.

         3              You can answer, if you can.

         4       A    I -- I -- That there was no relationship

12:22    5   between -- Is the question did he inform me that there

         6   was no relationship between the two companies?

         7       Q    Between the 575 Fund and Policy Services prior

         8   to 2020.

         9       A    I thought there --

12:22   10              MR. HULINGS:  So same objections.  It's also

        11   argumentative at this point.

        12       A    No, he did not inform me they were not.

        13       Q    Did Mr. Mueller seek legal advice from you

        14   regarding whether the lack of a legal relationship

12:23   15   between the 575 Fund and Policy Services prior to 2020

        16   was adequately disclosed in Exhibit 36?

        17              MR. HULINGS:  Okay.  So, again, assumes facts

        18   not in evidence.  Based on a false factual predicate.

        19   It's vague and misleading.  It's asked and answered.

12:23   20   And argumentative.  Harassing at this point.

        21       A    What he said.

        22              MR. HULINGS:  You can answer, if you can.

        23       A    What he said.

        24       Q    So it --

12:23   25       A    I -- I mean --
```

                                                                      109

```
12:25    1        Q      Did you provide legal advice to Mr. Mueller
         2   regarding whether the lack of a legal relationship
         3   between the 575 Fund and Policy Services prior to
         4   2020 was adequately disclosed in a 575 PPM --
12:25    5              MR. HULINGS:  Same objection.
         6              MS. WARDEN:  I'm not done.
         7   BY MS. WARDEN:
         8        Q      -- at any time?
         9              MR. HULINGS:  Same objections.
12:25   10        A      I'm sorry.  I just don't understand the
        11   distinction that you seem to -- The answer is no, I
        12   guess.  But it is vague.  I mean, I -- I don't know.
        13   Did I ever have a conversation with him?
        14        Q      It's actually very specific.
12:26   15        A      Maybe on your side of the table.
        16        Q      After Exhibit 36 was finalized, did
        17   Mr. Mueller ever inform you that he wanted to amend the
        18   575 PPM?
        19        A      Not that I recall.
12:26   20        Q      And I think you said you're not aware of
        21   whether Exhibit 36 was amended, correct?
        22        A      I'm -- I'm not aware.
        23        Q      Okay.  And do you recall -- Okay.  Let me show
        24   you another exhibit.
12:27   25              Okay.  Handing -- I'm marking -- This is Tab
```

112

```
12:28    1   BY MS. WARDEN:
         2       Q    Did -- did you represent -- Your waiver
         3   applies -- Mr. Mueller's waiver applies to
         4   December 2018.  December 31, 2018, right?
12:28    5       A    Uh-huh.
         6       Q    So did you represent Policy Services in 2018?
         7       A    Yes.
         8       Q    Okay.  Mr. Mueller's interrogatory response
         9   represented that this PMM was in effect between May 2018
12:29   10   and November 2019.  So you already said that you did not
        11   advise Policy Services on this PPM, right; Exhibit 97?
        12       A    Yeah.
        13           MR. HULINGS:  So there's -- Let me object to
        14   that.  All of wind up to the question being
12:29   15   argumentative.  The question is just, Did you advise him
        16   on this PPM?  Is that the question?
        17   BY MS. WARDEN:
        18       Q    Did you advise Mr. Mueller on Exhibit 97?
        19       A    I don't believe so.
12:29   20       Q    Do you know who did?
        21       A    I don't.
        22       Q    Handing you what's been previously marked
        23   Exhibit 5.  Do you recognize this document,
        24   Mr. Concilla?
12:30   25       A    No.
```

114

```
12:30    1         Q    Okay.  It's dated September 16, 2019.  Were

         2    you representing Policy Services on that date?

         3         A    Not to my knowledge.

         4         Q    Did you advise Policy Services on exhibit --

12:30    5    on Exhibit 5?

         6              MR. HULINGS:  So that's a -- that's a little

         7    vague.  It's also technically within the -- outside the

         8    privilege waiver.  But I think -- and I also think it's

         9    been asked and answered:  Did you advise on this

12:30   10    document?

        11              But you can answer that question --

        12         A    No.

        13              MR. HULINGS:  -- I guess.

        14    BY MS. WARDEN:

12:30   15         Q    So let me reask it because it got muddy.

        16              Did you advise Policy Services on Exhibit 5?

        17         A    Not that I recall.

        18         Q    Did you advise Robert Mueller on Exhibit 5?

        19              MR. HULINGS:  Objection.  The same object --

12:31   20    same objections.

        21              You can answer that.

        22         A    No.

        23         Q    Did Carlile Patchen advise Policy Services on

        24    Exhibit 5?

12:31   25              MR. HULINGS:  I'm going to make sure I'm going
```

115

```
12:31   1   to object to that being vague and misleading.

        2           You can answer.

        3           MS. WARDEN:  I'll rephrase.

        4   BY MS. WARDEN:

12:31   5       Q   Did any attorneys at Carlile Patchen advise

        6   Policy Services on Exhibit 5?

        7           MR. HULINGS:  So I'm going to -- Same

        8   objections.  Vague and misleading.  If you want me to

        9   clarify the basis for the objection, I can.  But it's

12:31  10   vague and misleading.

       11       A   Not to my knowledge.

       12       Q   All right.  I'm handing you what's been

       13   previously marked Exhibit 6.  Mr. Concilla, do you

       14   recognize this document?

12:31  15       A   No.

       16       Q   Okay.  At the bottom, it says -- Do you see it

       17   says dated February 26.  Last amended January 1, 2021,

       18   correct?

       19       A   Yes.

12:32  20       Q   Okay.  Did you advise Policy Services on

       21   Exhibit 6?

       22       A   No.

       23           MR. HULINGS:  I mean, I'm going to object to

       24   that as vague and misleading, but the answer stands.

12:32  25   BY MS. WARDEN:
```

116

12:35   1        A     Yes.

        2        Q     Directing your attention to the first

        3   sentence.   "We will invest in Life Policies, AKA Life

        4   Settlements, which are sales to third parties of

12:35   5   existing life insurance contracts held on insureds who

        6   are 65 or older."

        7              Did Mr. Mueller inform you that the dGRD Fund

        8   never invested in or owned any life policies?

        9              MR. HULINGS:  So objection to assumes facts

12:35  10   not in evidence.   It's a false factual predicate.   Vague

       11   and misleading.

       12              You can answer.

       13        A     No.

       14        Q     Did Mr. Mueller seek legal advice from you

12:35  15   regarding whether the dGRD Fund never investing in or

       16   owning any life policies was adequately disclosed in

       17   Exhibit 38 (sic)?

       18              MR. HULINGS:  So for purposes of the next

       19   several -- what I anticipate to be the next several

12:35  20   questions, when I say "Same objections," I mean

       21   objections just asserted to the previous question.

       22        A     Not that I recall.

       23        Q     Well --

       24              MR. HULINGS:  And I assert the same objections

12:36  25   to the previous question for clarify.

                                                                   119

```
12:37   1        A    Not that I recall.

        2        Q    Did you provide Mr. Mueller with legal advice

        3   regarding whether the dGRD Fun never investing in or

        4   owning any life policies was adequately disclosed in a

12:37   5   dGRD PPM at any time?

        6             MR. HULINGS:  Same objections.

        7        A    Same answer.  Not that I recall.

        8        Q    Did Mr. Mueller inform you that the life

        9   policies were owned and acquired by Policy Services?

12:37  10             MR. HULINGS:  Objection.  Vague.

       11        A    I don't understand the question.  You -- you

       12   -- Just ask it again.

       13        Q    Yeah.  Did Mr. -- did Mr. Mueller ever tell

       14   you that the life policies that were purportedly held by

12:38  15   the 575 and dGRD Fund were owned by Policy Services?

       16        A    No.

       17             MR. HULINGS:  Hold on.

       18             THE WITNESS:  I'm sorry.

       19             MR. HULINGS:  Objection that that is vague and

12:38  20   misleading.  Assumes fact not in evidence.  False

       21   factual predicate.  Asked and answered multiple times.

       22   BY MS. WARDEN:

       23        Q    After Exhibit 98 was finalized, did

       24   Mr. Mueller ever inform you that he wanted to amend the

12:38  25   dGRD PPM?
```

                                                              121

```
12:38    1        A    Not that I recall.

         2        Q    And -- Okay.  Handing you what I'll mark

         3   Exhibit 99.

         4             (Deposition Exhibit 99 was marked for

12:39    5             identification.)

         6             MS. SANSALONE:  Thank you.

         7   BY MS. WARDEN:

         8        Q    This is Tab 32.  SEC-DEEPROOT-E-0164786

         9   through 0164803.  Mr. Concilla, do you recognize this

12:39   10   document?

        11        A    It's the same as the previous exhibit.

        12        Q    It's different.  It's -- it's a different

        13   exhibit.

        14             So I can represent to you that in

12:39   15   Mr. Mueller's interrogatory response, he indicated this

        16   dGRD PPM was operative between May 2018 through

        17   October 2019.

        18             MR. HULINGS:  So it assumes facts not in

        19   evidence.

12:40   20             Is there a question?

        21             MS. WARDEN:  Yeah.

        22   BY MS. WARDEN:

        23        Q    Did you advise Policy Services on Exhibit

        24   91 -- 99?

12:40   25        A    I -- I don't --
```

                                                                    122

```
12:45    1   BY MS. WARDEN:
         2        Q    Do you recognize this document, Mr. Concilla?
         3        A    No.
         4        Q    So I can represent to you that, in
12:45    5   Mr. Mueller's interrogatory responses, he indicated
         6   Exhibit 100 was operative between October 2019 through
         7   August 2021.  Did you advise Policy Services on
         8   Exhibit 100?
         9             MR. HULINGS:  So object to the statement prior
12:45   10   to the question.  Object to facts not in evidence.  And
        11   vague and misleading.
        12        A    No.
        13        Q    If you had advised on a PPM around
        14   October 2019, would you have expected there to be emails
12:46   15   between you and Mr. Mueller?
        16             MR. HULINGS:  Calls for speculation.  Lack of
        17   foundation.  Hypothetical.  Vague and ambiguous.
        18   Misleading.
        19             MS. SANSALONE:  I'll echo those same
12:46   20   objections.
        21        A    Yes.
        22             MS. WARDEN:  Do you want a break?
        23             THE WITNESS:  Is lunch here yet?  If lunch
        24   isn't here, then we should keep going, unless you
12:46   25   want --
```

126

```
12:49  1  a false hyp -- factual predicate.  Vague and misleading.
       2  Argumentative.
       3       A    I -- I -- Okay.  This is dated September 1st,
       4  2015, and then you gave me a date of 2017.  So --
12:49  5       Q    Uh-huh.
       6       A    -- I'm not sure.  I don't understand the
       7  question.
       8       Q    It's just a question of whether Muel --
       9  Mr. Mueller informed you, right, at any time, okay, that
12:49 10  neither the 575 Fund nor Policy Services purchased any
      11  new life insurance policies after April 2017?
      12            MR. HULINGS:  Same objections.
      13  BY MS. WARDEN:
      14       Q    So you represented Mr. Mueller post
12:50 15  April 2017, correct?
      16       A    Yes.
      17       Q    Okay.  Did Mr. Mueller ever tell you at any
      18  time that neither the 575 Fund, nor Policy Services,
      19  purchased any new life insurance policies after
12:50 20  April 2017?
      21            THE DEFENDANT:  Same objections.
      22       A    No.  But I don't -- but it -- you -- you asked
      23  me about this sentence, and that answer has nothing to
      24  do with this sentence.
12:50 25            "We minimize this risk by limiting the capital
```

129

```
12:56   1   record at 12:57 p.m.
        2            (Recess taken.)
        3            THE VIDEOGRAPHER:  Back on the record at
        4   1:00 p.m.
12:59   5   BY MS. WARDEN:
        6       Q    Mr. Concilla, can we turn back to Exhibit 36.
        7   It's the 575 PPM dated September 1, 2015, at the bottom.
        8       A    Okay.
        9       Q    Can you turn to Page 7 of 13.
12:59  10       A    Okay.
       11       Q    The last paragraph.  Capital Acquisition in
       12   deeproot Tech.  It says, "A capital acquisition is a
       13   purchase of an internal affiliated investment position
       14   in another enterprise, wherein such enterprise is
13:00  15   intended to enhance Company's reputability, safety, or
       16   financials through joint venture, partnership, or
       17   collaboration, or minimize pool risk, lower administrate
       18   -- administrative overhead or expenses, or to develop
       19   additional product lines."
13:00  20            Did Mr. Mueller inform you that the 575 Fund
       21   did not purchase anything from the deeproot affiliates?
       22            MR. HULINGS:  Okay.  So objection.  Assumes
       23   facts not in evidence.  False factual predicate.  Vague
       24   and misleading.  And argumentative.
13:00  25       A    No.
```

136

```
13:00    1        Q    Did Mr. Mueller seek legal advice from you

         2   regarding whether the 575 Fund's failure to purchase

         3   anything from the deeproot affiliates was adequately

         4   disclosed in Exhibit 36?

13:01    5              MR. HULINGS:  Same -- same objections as

         6   asserted to the previous question.  And asked and

         7   answered.

         8              MS. SANSALONE:  Yeah.  I think this is where

         9   we get into where this is getting repetitive.  If the

13:01   10   prior answer is no --

        11              MS. WARDEN:  This is different.  We -- I --

        12   I have --

        13   BY MS. WARDEN:

        14        Q    My question is, Mr. Concilla, did Mr. Mueller

13:01   15   seek legal advice from you regarding whether the

        16   575 Fund's failure to purchase anything from the

        17   deeproot affiliates was adequately disclosed in

        18   Exhibit 36?

        19              MR. HULINGS:  Same objections as to the

13:01   20   previous -- as asserted to the previous question.  And

        21   asked and answered.

        22        A    No.

        23        Q    Okay.  Did Mr. Mueller inform you that he used

        24   575 funds to pay the deeproot affiliates' expenses?

13:01   25              MR. HULINGS:  So objection.  Assumes facts not
```

137

13:01  1    in evidence.  It is vague and misleading.  And ambiguous

       2    and argumentative.

       3              And -- and you can answer, if you can.

       4        A    No.

13:01  5        Q    Did Mr. --

       6        A    Not that I recall.

       7        Q    Did Mr. Mueller inform you that he used

       8    575 Funds to provide deeproot affiliates with

       9    interest-free loans?

13:02 10              MR. HULINGS:  Okay.  So let's -- running

      11    through the Rules of Evidence in my head so we can get

      12    them all.

      13              That assumes facts not in evidence.  It's a

      14    false factual predicate.  There is -- It is vague.

13:02 15    Misleading.  Argumentative.  Asked and answered.

      16        A    No.

      17              MS. WARDEN:  That's a brand new question.

      18    It's not asked and answered.

      19              MR. HULINGS:  Oh, that's right.  Well,

13:02 20    that's -- that's right.

      21              THE WITNESS:  Sort of.

      22              MR. HULINGS:  Yeah.

      23              THE WITNESS:  It's sort of a different

      24    question.  But only sort of.

13:02 25    BY MS. WARDEN:

                                                              138

13:02  1          Q     So you --

     2          A     My answer is no.

     3          Q     You answered.

     4                Okay.  And then did Mueller seek legal advice

13:02  5    from you regarding whether --

     6          A     I got -- not --

     7                MR. HULINGS:  Let me get the objection out.

     8    Go ahead.

     9                MS. SANSALONE:  So that's where this is

13:02 10    getting harassing.  So the answer to the prior question

    11    was no.  Go ahead.

    12    BY MS. WARDEN:

    13          Q     Did Mr. Mueller seek legal advice from you

    14    regarding whether his use of 575 funds to pay the

13:03 15    deeproot affiliates' expenses and to provide deeproot

    16    affiliates with interest-free loans was adequately

    17    disclosed in Exhibit 36?

    18                MR. HULINGS:  Same -- same objections as

    19    asserted to the previous question.  And asked and

13:03 20    answered.  And harassing.

    21                MS. SANSALONE:  Ditto.

    22          A     You don't care?  No.

    23          Q     No.  I was going to say you can answer the

    24    question.

13:03 25          A     Yeah.  But please, I mean, could we somehow --

                                                              139

13:07  1    through 0013236.

       2            MR. HULINGS:  So I'm going to object that this

       3    document is dated -- Well, the previous testimony

       4    established this is from 2020.  So by definition, it's

13:07  5    outside the scope of the privilege waiver.  But if

       6    you're going to ask were -- were there any

       7    communications about this document, I think you know the

       8    answer.  But we can do that.

       9    BY MS. WARDEN:

13:07 10       Q    Well, first, do you recognize this document,

      11    Mr. Concilla?

      12       A    No.

      13       Q    All right.  Did you have any communications

      14    with Mr. Mueller regarding Exhibit 25?

13:07 15       A    No.

      16       Q    I have a couple questions that's not about

      17    this exhibit, so you can --

      18       A    Good.

      19       Q    -- put it away.

13:08 20            Did Mr. Mueller ever inform you that he did

      21    not have a methodology or documented process to

      22    accurately value life insurance policies to report to

      23    575 and dGRD investors?

      24            MR. HULINGS:  Okay.  So assumes facts not in

13:08 25    evidence.  False factual predicate.  Argumentative.

                                                                    142

```
13:08   1    It's vague.  It's misleading.
        2            You can answer, if you can.
        3        A    I'm sorry.  I don't know that I can.  I mean,
        4    "...ever inform you that he did not have a methodology."
13:09   5            The answer is no.
        6        Q    Okay.  Did Mr. Mueller ever seek legal advice
        7    from you regarding how he should calculate the
        8    percentage ownership interest that the 575 Fund had in
        9    life policies?
13:09  10        A    No.  His objections.  No.
       11            MR. HULINGS:  Yes.  Yes.  Vague and ambiguous.
       12            THE WITNESS:  Yeah.
       13    BY MS. WARDEN:
       14        Q    Did Mr. Mueller ever show you a methodology of
13:09  15    how he was valuing the life insurance policies owned by
       16    the 575 and dGRD Funds?
       17            MR. HULINGS:  Vague and ambiguous.  And asked
       18    and answered.
       19        A    No.
13:10  20        Q    Did Mr. Mueller ever inform you that there
       21    were no internal finance controls at deeproot?
       22            MR. HULINGS:  So objection.  Assumes facts not
       23    in evidence.  False factual predicate.  Very
       24    argumentative.  Vague.  Misleading.
13:10  25            You can answer, if you can.
```

                                                        143

```
13:10   1        A    No.
        2        Q    And did Mr. Mueller ever seek legal advice
        3   from you regarding whether the lack of internal
        4   financial controls was adequately disclosed --
13:10   5             MR. HULINGS:  So that's --
        6   BY MS. WARDEN:
        7        Q    -- in the 575 PPM?
        8             MR. HULINGS:  So that's an extremely
        9   argumentative question, so start -- start there this
13:10  10   time.  Vague and ambiguous.  Assumes facts not in
       11   evidence.  And false factual predicate.  Asked and
       12   answered.
       13   BY MS. WARDEN:
       14        Q    Sorry.  Can you answer, sir?
13:10  15        A    No.
       16   BY MS. WARDEN:
       17        Q    Did Mr. Mueller ever show you documented
       18   internal financial controls of deeproot?
       19             MR. HULINGS:  Objection as to vague and
13:11  20   ambiguous.  Argumentative.
       21             THE WITNESS:  And I think asked and answered.
       22             MR. HULINGS:  Asked and answered.
       23        A    No.
       24        Q    Did Mr. Mueller ever inform you that there
13:11  25   were -- he employed -- Strike that.
```

144

```
13:11   1          Did Mr. Mueller ever inform you that there
        2   were no processes or procedures in place to ensure that
        3   the valuation of the 575 and dGRD assets were accurate?
        4          MR. HULINGS:  Okay.  So assumes facts not in
13:11   5   evidence.  False factual predicate.  It is
        6   argumentative.  It is vague.  It is misleading.  I think
        7   it's been asked and answered.
        8          MS. SANSALONE:  It's been asked and answered.
        9      A   No.
13:12  10      Q   And I assume -- Is it fair to say Mr. Mueller
       11   did not seek legal advice from you regarding whether the
       12   lack of processes or procedures in place to ensure the
       13   valuation of the funds were adequately disclosed?
       14          MR. HULINGS:  Same objections as asserted to
13:12  15   the previous question, including asked and answered.
       16          MS. SANSALONE:  And I'm going to say something
       17   else just to protect the record since you had asked for
       18   additional time the other day.
       19          This is -- I mean, this could have been done
13:12  20   so much more efficiently had these an -- these questions
       21   been asked in the right way and not repetitive.  So,
       22   I mean, there's no way we're going to be on seven hours
       23   at this point.  So whatever time he needs, we need to
       24   make sure it's accommodated because time is ticking.
13:12  25          MS. WARDEN:  Okay.  I'm going to object to the
```

145

13:18   1         MS. SANSALONE:  Let's -- let's move forward.

        2    BY MS. WARDEN:

        3         Q    Mr. Concilla, did Mr. Mueller inform you that

        4    he would pay his investors in earlier funds, not the

13:18   5    575 or dGRD Funds with 575 and dGRD investor funds?

        6         MR. HULINGS:  All right.  So vague and

        7    ambiguous and argumentative.  Assumes facts not in

        8    evidence.

        9         You can answer, if you can.

13:19  10         A    Money is fungible.  So wherever the money is

       11    coming from, or if it's going into an account, it could

       12    be used for whatever purpose.

       13         But did we have a specific discussion about

       14    what I think you're asking; paying old investors with

13:19  15    new investor money?  We did not.

       16         Q    Okay.  I'm going to reask it because it's --

       17    it's -- that was muddy to me.

       18         So did Mr. Mueller inform you that he would

       19    pay his inventors with earlier funds --

13:19  20         A    I've already --

       21         Q    -- with 575 and dGRD investor funds?

       22         MR. HULINGS:  Okay.  So same objections as

       23    asserted to the previous question.  And asked and

       24    answered.

13:19  25         A    I'm -- I'm confused.  You're saying his

                                                            152

13:19   1   investors in earlier funds?  Okay.  I thought these were

  2   the first.  I thought these were the only two funds, so

  3   I guess, no.  The answer is no.

  4        Q   Did Mr. Mueller ever seek legal advice --

13:20   5        A   No.

  6        Q   -- regarding that issue?

  7        A   No.

  8        MR. HULINGS:  Same objections as to the

  9   previous question.

13:20 10  BY MS. WARDEN:

11       Q   Okay.  Did Mr. Mueller inform you that he

12  would pay investors who owned fractionalized shares in

13  specific life settlement policies with 575 and

14  dGRD investor funds?

13:20 15       A   I don't understand the question.

16  Fractionalized shares.

17       MR. HULINGS:  I'm going to put a vague and

18  ambiguous --

19       THE WITNESS:  Yeah.

13:20 20       MR. HULINGS:  -- and argumentative objection

21  there.

22  BY MS. WARDEN:

23       Q   Did Mr. Mueller ever tell you that he would

24  pay 575 or dGRD investors -- Sorry.  That he would take

13:20 25  575 and dRG -- dGRD investor money and he would pay --

                                                                    153

```
13:20   1    take that money and pay people who owned shares of the
        2    life settlement policies owned by Policy Services?
        3              MR. HULINGS:  Okay.  So hold on.  There's a --
        4    there's a lack of foundation.  Calls for speculation.
13:20   5    It's argumentative.  It's vague and ambiguous.  It's
        6    misleading.  Assumes facts not -- not in evidence.
        7              You can answer, if you can.
        8        A    I don't think I can.  So if fractionalized who
        9    were not investors in the -- in -- in the two funds?
13:21  10              MR. NASSE:  Yes.
       11    BY MS. WARDEN:
       12        Q    Correct.
       13        A    So we're paying people outside of the funds
       14    with that money?
13:21  15              MR. HULINGS:  Same objections.
       16        A    Yeah.  No.
       17        Q    Okay.  And did Mr. Mueller ever seek legal
       18    advice regarding whether that was proper?
       19              MR. HULINGS:  Same objections as asserted to
13:21  20    the previous questions.  And it's asked and answered.
       21              MS. SANSALONE:  This -- this is the perfect
       22    example of the problem.
       23    BY MS. WARDEN:
       24        Q    Okay.  Let's do -- Handing you what's been
13:22  25    previously marked Exhibit 40, DEEPROOTFUNDS-005625.
```

                                                                  154

14:21  1        A    If they don't have these assets, then this is

       2   clearly misleading.

       3        Q    And also looking at Exhibit 40 again, if

       4   individuals outside of the funds owned portions of the

14:21  5   assets listed in this document, would that be a material

       6   omission?

       7        A    What --

       8             MR. HULINGS:  So hold on.

       9             THE WITNESS:  Yeah.

14:21 10             MR. HULINGS:  So it calls for speculation.

      11   Lack of foundation.  Assumes facts not in evidence.

      12   Vague and ambiguous.  And argumentative.

      13             I guess answer.

      14        A    Okay.  I think you got it all.

14:22 15             I don't know, looking at this document,

      16   whether what's listed as the face value is the total

      17   face value of the policy or only that portion of the

      18   policy that's allegedly owned by deeproot.  So if -- if

      19   this is the face value of the policy --

14:22 20        Q    Uh-huh.

      21        A    -- and deeproot owns something less than this

      22   amount of money, then yes, it's material and it's

      23   misleading.  Is that --

      24        Q    Okay.  If you can turn to Exhibit 36, please.

14:22 25        A    That's the one I just had.  Yeah.

                                                            160

14:22  1            MR. HULINGS:  Which one is 36?

    2            MS. WARDEN:  The 575 PPM.

    3            THE WITNESS:  The September 2015.

    4            MR. HULINGS:  Got it.

14:23  5            Yeah.  I think you do, but that's all

    6    right.  I have it.  So...

    7            MS. SANSALONE:  Okay.

    8            MR. NASSE:  Familiar with that one.

    9            THE WITNESS:  You've memorized it.

14:23 10            MR. HULINGS:  Familiar with that one.  Seen

   11    that one before.

   12            THE WITNESS:  You've memorized it.

   13    BY MS. WARDEN:

   14        Q    Okay.  And, Mr. Concilla, you -- you already

14:23 15    testified you -- you advised on exhibit -- You advised

   16    Policy Services on Exhibit 36, correct?

   17        A    Yeah.  Yeah.  And I -- and I feel like I have

   18    to clarify that answer.  I advised on a -- on a 575 PPM

   19    or -- in -- in September of 2015.  Whether it's this one

14:23 20    or not, I don't know.  I've seen a lot of PPMs that

   21    I've never seen before.

   22        Q    Okay.

   23        A    Okay.  So -- but, yes, I think.

   24        Q    Okay.  So if you can turn to Page 10 of 15

14:24 25    I think.

                                                          161

14:26  1  where I raised issues about what normal expenses would

2  be.  But I -- I -- I can't -- I can't give you a date or

3  a -- a specific conversation.

4      Q    Okay.  Do you recall what the context was what

14:26  5  Mr. Mueller was asking you?

6      A    I just don't recall.  I just remember that

7  there was a -- that there was an email exchange where

8  I was concerned about his -- his concept of what that

9  amounted to.

14:26 10      Q    Okay.  And was the concern that Mr. Mueller --

11  What was the concern that you had?

12      A    That it might not fit what I considered to be

13  a traditional definition of nominal expenses.

14      Q    Okay.  And do you recall what your advice to

14:27 15  Mr. Mueller was?

16      A    That -- that he -- that -- that he needed

17  to -- he -- they needed to be expenses that we could

18  consider to be nominal expenses, based on my

19  understanding of the term.

14:27 20      Q    Okay.  And you recall advising Mr. Mueller of

21  the types of things that are -- traditionally constitute

22  nominal administrative expenses?

23      A    You know, I -- as I sit here today, I can't

24  say I said what I just said.

14:27 25      Q    Uh-huh.

163

14:27  1        A     Xerox machines.  Lighting.  But that -- that

        2  is my concept of nominal expenses.

        3        Q     Okay.  Was it a normal part of your practice,

        4  when you're advising on PPMs, to explain what

14:28  5  constitutes a nominal administrative expense to your

        6  clients?

        7        A     Yes.

        8        Q     Did Mueller seek legal advice regarding what

        9  types of expenses he believed fell under the category of

14:28 10  nominal administration expenses?

       11             MR. HULINGS:  Asked and answered.  Vague and

       12  ambiguous.

       13        A     I -- I -- I feel like we had discussions, but

       14  I can't give you any specifics or relate it to a

14:28 15  particular -- Again, I think there's an email somewhere

       16  where I discuss it.

       17        Q     Okay.  Did Mr. Mueller inform you that the

       18  Company Advance was not being tracked to ensure that it

       19  was used for a business purpose?

14:29 20             MR. HULINGS:  Okay.  So argumentative.

       21  Assumes facts not in evidence.  False factual predicate.

       22  Vague and ambiguous.  Misleading.

       23        A     No.

       24        Q     So the Company Advance has this 20 percent

14:29 25  cap.  Did -- did you ever advise Mr. Mueller as to how

                                                              164

14:29  1  he should track the -- the way Company Advance funds are

       2  spent?

       3       A    I don't recall a specific discussion.

       4       Q    Did Mr. Mueller ever seek legal advice from

14:30  5  you regarding whether he should track the Company

       6  Advance?

       7            MR. HULINGS:  I think that's asked and

       8  answered.  Vague and ambiguous.

       9  BY MS. WARDEN:

14:30 10       Q    I think -- Sorry.  I did just ask that.  I'll

      11  strike that.

      12            Did Mr. Mueller ever show you how he was

      13  tracking expenses?  Show you.

      14            MR. HULINGS:  Vague and ambiguous and asked

14:30 15  and answered, but you can answer.

      16       A    No.

      17       Q    Did Mr. Mueller inform you that there were not

      18  protections and processes in place to ensure that

      19  100 percent of 575 investors' principal would be

14:30 20  returned as promised in the PPM, Exhibit 40?

      21            MR. HULINGS:  Vague and ambiguous.  And

      22  I'm sorry.  Could you repeat that question?

      23            MS. WARDEN:  Sure.

      24            MR. HULINGS:  I got lost in it.

14:31 25            MS. WARDEN:  Sure.

                                                              165

```
14:31   1   BY MS. WARDEN:
        2       Q    Did Mr. Mueller inform you that there were not
        3   protections and processes in place to ensure that
        4   100 percent of the 575 investors' principal would be
14:31   5   returned as promised in Exhibit 36?
        6            MR. HULINGS:  Okay.  So, yeah.  Assumes facts
        7   not in evidence.  It's argumentative.  False factual
        8   predicate.  Misleading.  Vague and ambiguous.  I already
        9   said argumentative, but I'll say it again.
14:31  10            You can answer.
       11       A    No.
       12       Q    Did Mr. Mueller inform you that the funds
       13   subject to the Company Advance were not segregated?
       14            MR. HULINGS:  Same objections as asserted to
14:32  15   the previous question.
       16       A    No.
       17       Q    And did Mr. Mueller seek legal advice
       18   regarding whether the funds subject to the Company
       19   Advance should be segregated?
14:32  20            MR. HULINGS:  Same objections.  And asked and
       21   answered.
       22       A    No.
       23       Q    Did Mr. Mueller inform you that the 575 and
       24   dGRD investor funds would be used to pay for operational
14:32  25   expenses?
```

166

14:32   1              MR. HULINGS:  Vague and ambiguous.  Assumes

2    facts not in evidence.  Argumentative.  Misleading.

3         A    Operational expenses could be nominal

4    expenses.

14:32   5         Q    Well, how -- how -- how would you define

6    operational expenses?

7         A    Again -- again, expenses that are associated

8    with day-to-day operations.  Did the electric bill get

9    paid?  Did the phone bill get paid?  Those are all

14:33  10   operational expenses.

11         Q    Did Mr. Mueller inform you that he would use

12   575 and dGRD investor funds to pay off credit card

13   purchases for personal expenses?

14              MR. HULINGS:  So vague and ambiguous.  Assumes

14:33  15   facts not in evidence.  Argumentative.  Misleading.

16              You can answer.

17         A    No.

18         Q    And just to follow up, are -- are investor

19   payments operational expenses?

14:33  20              MR. HULINGS:  Vague and ambiguous.

21   Argumentative.  Calls for a legal conclusion.

22         A    I think they could be.

23         Q    And did Mr. Mueller inform you that 575 and

24   dGRD investor funds would be used to pay for investor

14:34  25   payments?

                                                            167

14:58   1          Q     Did you have any conversations with

        2    Mr. Mueller about whether investors would have an

        3    ownership interest in the deeproot affiliates?

        4                MR. HULINGS:  Vague and ambiguous.

14:59   5          A     No.

        6          Q     Okay.  If you can turn to Exhibit 36 again.

        7    It's the 575 PPM.

        8          A     Yeah.

        9          Q     If you could turn to Pages 7 through 8.

14:59  10          A     Okay.

       11          Q     Okay.  At the top of Page 8 -- Sorry.  This is

       12    SEC-DEEPROOT-E-0014507.

       13                Do you see where it says, "deeproot Tech's

       14    sole project is deeproot Pinball, LLC, which is

15:00  15    anticipated to be a multi-year project starting in

       16    2016 or 2017.  Capital acquisition in dP would consist

       17    of the purchase of dP Class B Shares that Company will

       18    hold."

       19                Did Mr. Mueller inform you that the 575 or

15:00  20    dGRD Funds did not purchase any Class B Shares in

       21    deeproot Pinball, LLC?

       22                MR. HULINGS:  So objection.  Assumes facts not

       23    in evidence.  It's argumentative.  It's vague and

       24    ambiguous.  And misleading.

15:00  25                You can answer it, if you can.

                                                                 173

15:00  1        A    No.

       2        Q    Okay.  I'm showing you what's Tab 37 that I'll

       3   mark as Exhibit 101.

       4             (Deposition Exhibit 101 was marked for

15:01  5             identification.)

       6             MS. SANSALONE:  Thanks.

       7   BY MS. WARDEN:

       8        Q    Do you recognize this, Mr. Concilla?

       9        A    Yes.

15:01 10        Q    And what is it?

      11        A    It's my Declaration that I provided in this

      12   matter.

      13        Q    And if you look at the second page, is that

      14   your signature?

15:01 15        A    Yes.

      16        Q    Okay.  Why did you prepare this Declaration?

      17             MR. HULINGS:  Hold on.  Hold on.  Hold on.

      18             So communications between Mr. Mueller's

      19   counsel and his prior counsel are privileged.  This

15:01 20   document is not privileged.  But communications leading

      21   up to the execution of this document are privileged.  So

      22   we are objecting to the question and instructing the

      23   witness not to answer.

      24             MS. WARDEN:  The SEC opposes that instruction.

15:02 25   And I'm -- I'm asking for the -- for the facts that --

                                                              174

15:06  1   or law.

       2        Q    Okay.  Would payments of existing investors

       3   solely from new investor funds be proper?

       4             MR. HULINGS:  Objection.  Vague.  Ambiguous.

15:06  5   Calls for a legal conclusion.

       6        A    I just want to make sure I understand.

       7             MR. HULINGS:  Lack of foundation.  Calls for

       8   speculation.

       9             Give me more time and I'll think of more --

15:06 10   I'll think of more administrative rules.

      11             MS. SANSALONE:  Can you see the question?

      12             THE WITNESS:  I don't.  I don't.  It -- it

      13   goes --

      14             MS. WARDEN:  Here, I'll repeat it.

15:06 15             MS. SANSALONE:  Oh, no, no.  It's right here.

      16   It's probably easier for him to read it.

      17             Okay.  "Would payments of existing investors

      18   solely from new investors be proper?"

      19        A    No.

15:06 20        Q    And why not?

      21        A    Because it says "solely."

      22        Q    Yes.  So -- so why would payments to existing

      23   investors only from new investor funds be improper?

      24             MR. HULINGS:  Okay.  Hold on.

15:06 25             It calls for a legal conclusion.  Lack of

                                                                    179

```
15:06    1   foundation.  Calls for speculation.  Vague and
         2   ambiguous.
         3           You can answer.
         4      A    I believe that would -- that would be kind of
15:07    5   the hallmark of a Ponzi scheme where you're -- where
         6   you're not -- you're not investing the money in a way
         7   that's creating an investment return but, instead,
         8   you're using new money from new investors to pay old
         9   investors, so there is no enterprise.
15:07   10      Q    If revenue or funds from other sources is not
        11   sufficient to cover obligations or returns to existing
        12   investors, is it proper to use new investor funds to pay
        13   existing investors?
        14           MR. HULINGS:  So it calls for a legal
15:07   15   conclusion.  It's vague and ambiguous.  Argumentative.
        16      A    I believe it does not.  I -- I think I
        17   answered that properly.  I believe you could not do that
        18   under those circumstances, or that it would be improper,
        19   I guess, is -- in my mind.
15:08   20      Q    Did Mr. Mueller ever ask you that question?
        21           MR. HULINGS:  Vague and ambiguous.  And
        22   obviously instruct him not to answer if it -- if that
        23   conversation took place outside the waiver period.
        24      A    I don't think I can answer that question.
15:08   25      Q    Based upon attorney-client privilege --
```

180

15:08   1            MR. NASSE:  Within the waiver period.

        2   BY MS. WARDEN:

        3       Q    Within the waiver period, did you ever -- Did

        4   Mr. Mueller ever ask you the question that if revenue or

15:08   5   funds from other sources is not sufficient to cover

        6   obligations or returns to existing investors, is it

        7   proper to use new investor funds to pay existing

        8   investors?

        9            MR. HULINGS:  Vague and ambiguous.

15:09  10       A    No.

       11       Q    And then, Mr. Concilla, you didn't have access

       12   to deeproot's bank accounts at any time, correct?

       13       A    No.  But when the SEC subpoenaed that bank

       14   information, it came through this office.  So I had

15:09  15   that.

       16            MR. HULINGS:  During -- during the --

       17            MS. WARDEN:  Yeah, that's separate.

       18            MR. HULINGS:  -- investigation period.

       19            THE WITNESS:  Right.  Right.

15:09  20            MR. HULINGS:  So that, we'll, yeah, instruct

       21   you not to answer.

       22   BY MS. WARDEN:

       23       Q    Yeah.  I don't want to know --

       24            MR. HULINGS:  Unless you mean --

15:09  25   BY MS. WARDEN:

                                                              181

```
17:53    1    Let me just find it.  Just a second.
         2         A    I can ask the question and then answer it.
         3              MS. SANSALONE:  Might have been more efficient
         4    all day if we'd done it that way.
17:53    5              THE WITNESS:  Might have been more efficient.
         6    Yeah.  Right.
         7    BY MR. HULINGS:
         8         Q    All right.  Let's look at Exhibit 36.
         9         A    Okay.
17:53   10              MS. SANSALONE:  Oh, right there on the top.
        11              THE WITNESS:  Yeah.  All right.
        12    BY MR. HULINGS:
        13         Q    Look at Page 6 of 13.
        14         A    Okay.
17:53   15         Q    Bottom of page says Life Policies.  Do you see
        16    that?
        17         A    Yeah.
        18         Q    It says, "We will invest in life policies."
        19         A    Yes.
17:54   20         Q    Does that say that the 575 Fund will purchase
        21    and maintain legal title to individual life insurance
        22    policies?
        23         A    It implies that.
        24         Q    Okay.  Does -- does that --
17:54   25         A    I'm sorry.
```

                                                                301

17:54 1  Q Does it -- does it prevent the 575 from --

2 from investing in another entity that then owned the --

3 the life insurance policies?

4   MS. WARDEN:  Objection.  Calls for

17:54 5 speculation.  Vague.

6  A It -- it -- it -- Again, as long as there is

7 a -- a possessory interest, as long as the 575 Fund has

8 some document which says you owe -- you own this, and

9 that's --

17:54 10  Q Okay.  So that sum document, does that

11 document have to be a formal written contract signed by

12 one entity and signed by the other entity?

13  A In my judgment, yes.

14  Q All right.  Is it -- would it be permissible

17:55 15 under this description of invest that there is some

16 other document that tracks -- which tracks the ownership

17 interests in particular funds?  Does it have to be a

18 contract?

19  A It does -- I don't believe it has to be a

17:55 20 contract, but it has to be enforceable.  But -- but,

21 remember, we have a fairly incestuous group of companies

22 here.

23  Q Uh-huh.

24  A So, in theory, you could have a spreadsheet

17:55 25 that -- that -- that does that, but it has to be

302

17:55   1   ultimately enforceable by the entity that's seeking to

        2   recover the --

        3        Q    Got it.  So -- but for purposes of tracking

        4   the investments --

17:55   5        A    Yes.

        6        Q    -- a spreadsheet would have been sufficient,

        7   if it's enforceable?

        8             MS. WARDEN:  Objection.

        9        A    If it's enforceable.

17:55  10             MS. WARDEN:  Speculative.

       11   BY MR. HULINGS:

       12        Q    Okay.  Well, what about a database?  Would

       13   that be -- could that --

       14        A    A database is a spreadsheet, by the way.

17:56  15             MS. WARDEN:  Same objection.

       16   BY MR. HULINGS:

       17        Q    Okay.  Well, kind of not, but that's okay.

       18        A    I'm an old programmer, by the way.

       19        Q    Do you know who Chris Turner is?

17:56  20        A    Yeah.

       21        Q    Do -- are you aware that Mr. Turner created

       22   the database for the deeproot companies?

       23        A    No, I am not -- I -- I -- no.

       24        Q    You never had that --

17:56  25        A    That's not the Chris Turner I'm thinking of.

                                                              303

EXHIBIT 32

**Filed Under Seal**

EXHIBIT 33

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION
 3                         -  -  -
 4    SECURITIES AND EXCHANGE            )
      COMMISSION,                        )
 5                                       )
                Plaintiff,               )
 6                                       )
            -against-                    )  Civil Action No.
 7                                       )  5:21-cv-785-XR
      ROBERT J. MUELLER, DEEPROOT        )
 8    FUNDS LLC (a/k/a dprt Funds,       )
      LLC, AND POLICY SERVICES INC.,     )
 9                                       )
                Defendants.              )
10                                       )
                -and-                    )
11                                       )
      DEEPROOT TECH LLC, DEEPROOT        )
12    PINBALL LLC, DEEPROOT STUDIOS LLC,)
      DEEPROOT SPORTS & ENTERTAINMENT    )
13    LLC, DEEPROOT RE 12621 SILICON     )
      DR LLC, AND ROBERT J. MUELLER,     )
14    JEFFREY L. MUELLER, AND BELINDA    )
      G. BREEN, AS CO-TRUSTEES OF THE    )
15    MB HALE OHANA REVOCABLE            )
      TRUST,                             )
16                                       )
                Relief Defendants.       )
17    _____)
18
19        VIDEOTAPED DEPOSITION OF ANDREW J. FEDERICO
20                     Thursday, July 13, 2023
                       9:34 a.m.
21                     Carlile Patchen & Murphy
                       950 Goodale Boulevard
22                     Suite 200
                       Columbus, Ohio  43212
23
      REPORTED BY:
24    SUSAN L. COOTS, RPR
      REGISTERED PROFESSIONAL REPORTER
25    JOB NO. 230713ARSI
```

1

```
10:36   1   off the record now at 10:37 a.m.
        2           (Recess taken.)
        3           THE VIDEOGRAPHER:  We're back on the record at
        4   10:51 a.m.
10:50   5   BY MS. WARDEN:
        6       Q    I'm handing you what's been previously marked
        7   Exhibit 36.  Take a minute to quickly review that, sir.
        8       A    Okay.
        9       Q    Do you recognize this document, Mr. Federico?
10:52  10       A    It appears to be my Private Placement
       11   Memorandum for deeproot 575 Fund, LLC.
       12       Q    Okay.  And do you see, at the bottom, it says,
       13   "Dated September 1, 2015"?
       14       A    Yes.
10:52  15       Q    Okay.  I can represent to you that
       16   Mr. Mueller's -- in Mr. Mueller's interrogatory
       17   responses, he indicated that this PPM, Exhibit 36, was
       18   operative between May 2015 and May 2018.  So were you
       19   representing Policy Services in May of 2015?
10:53  20       A    Yes.
       21       Q    And did you advise Policy Services on this
       22   PPM, Exhibit 36?
       23       A    Not that I recall.
       24       Q    You -- you did not advise Policy Services
10:53  25   on -- on a 575 PPM?
```

41

10:53  1      A    That's correct.

       2      Q    You provided no legal advice to Policy

       3  Services --

       4      A    I -- I don't -- I don't recall providing any

10:53  5  with regard to a PPM.  As I said earlier, the 575 Fund

       6  draft that I prepared was an S-1.

       7      Q    Okay.

       8      A    I did not prepare a -- a Private Placement

       9  Memorandum for 575 Fund.

10:53 10      Q    Did you provide redline edits to any PPM for

      11  575 or the dGRD Fund?

      12      A    I don't recall doing that, no.

      13      Q    Let me show you what I'm going to mark Exhibit

      14  111.

10:54 15           (Deposition Exhibit 111 was marked for

      16           identification.)

      17           MS. SANSALONE:  Bless you.

      18  BY MS. WARDEN:

      19      Q    Take a minute to review it, sir.  For the

10:55 20  record, sorry, this is Bates MUELLER-002472 through

      21  2490.

      22           MR. HULINGS:  Exhibit 111?

      23           MS. WARDEN:  Yeah.

      24      A    Okay.

10:56 25      Q    All right.  So if you -- Does this appear to

                                                              42

10:59    1           MS. WARDEN:  Yeah.

        2   BY MS. WARDEN:

        3     Q    I forgot to ask you.  What -- what things did

        4   you advise Policy Services on in the time frame that you

10:59    5   represented them, up through December 31, 2018?

        6           MR. HULINGS:  Objection.  Vague.  "Things."

        7   BY MS. WARDEN:

        8     Q    What types of matters did you advise Policy

        9   Services on?

10:59   10     A    Well, I think the first thing that we -- we

      11   looked at was forming a broker/dealer for them or buying

      12   a broker/dealer, also forming an investment advisory

      13   firm.

      14           We advised them on some of the PPMs.  The

11:00   15   first one was the STFR.  We revised that from what was

      16   provided to him before by an attorney in Texas.  We

      17   drafted S-1s for the 575 Fund and for the deeproot

      18   Growth Runs Deep Fund, and also for the Queue Fund.

      19           We did some PPMs for the -- or a PPM for the

11:00   20   five-year growth fund and the three-year growth fund.

      21     Q    Okay.  Did Mr. Concilla work on any matters

      22   for Policy Services that he didn't inform you about?  Is

      23   it possible that Mr. Concilla worked on matters for

      24   Policy Services that he did not inform you about?

11:01   25           MR. HULINGS:  Lack of foundation.  Calls for

                                                       45

11:01  1    speculation.

2          A    It's possible.

3          Q    Okay.  So if you turn to -- Sorry.  Going back

4     to page -- Exhibit 36, Page 6 of 13, do you see where it

11:01  5    says Underlying Assets and then Life Policies?

6          A    Yes.

7          Q    Okay.  Directing your attention to the

8     sentence, "We will invest in Life Policies, (AKA Life

9     Settlements) which are sales to third parties of

11:01 10    existing life insurance contracts held on insureds who

11    are 65 of age or older."

12              Do you see that?

13         A    Yes.

14         Q    Did Mr. Mueller inform you that the 575 Fund

11:01 15    never invested in or owned any life policies?

16              MR. HULINGS:  Okay.  So objection.  Lack of

17    foundation.  Calls for speculation.  Assumes facts not

18    in evidence.  It's an argumentative question.  False

19    factual predicate.  It's vague and ambiguous.  And

11:02 20    misleading.  And assuming we're going to have a series

21    of these, I will refer to that as "the previous

22    objections."

23         A    No.

24         Q    Did Mr. Mueller inform you that the life

11:02 25    policies were owned and acquired by Policy Services?

46

11:02  1          MR. HULINGS:  So previous -- same as the --
       2    same previous objections.
       3          A    He informed us that Policy Services owned some
       4    life policies.
11:02  5          Q    Okay.  But, Mr. Federico, my question is, did
       6    Mr. Mueller inform you that the life policies were owned
       7    and acquired by Policy Services?
       8          MR. HULINGS:  So same -- same objections.  And
       9    asked and answered.
11:02 10    BY MS. WARDEN:
      11          Q    Okay.  Let me rephrase.  Did Mr. Mueller
      12    inform you that the life policies purportedly held by
      13    the 575 Fund were owned and acquired by Policy Services?
      14          MR. HULINGS:  Same objections.  Asked and
11:03 15    answered.
      16          A    No.
      17          MR. NASSE:  Can we just take a quick break off
      18    the record?
      19          MS. SANSALONE:  Sure.
11:03 20          MR. HULINGS:  Sure.
      21          THE VIDEOGRAPHER:  Okay.  And we're going off
      22    the record at 11:04 a.m.
      23          (Recess taken.)
      24          THE VIDEOGRAPHER:  We're back on the record at
11:14 25    11:15 a.m.

                                                              47

11:21  1      A      With regard to the 575 Fund, I don't recall

2   ever having that conversation with him.

3      Q      Regarding the Company Advance provision in

4   Exhibit 36?

11:21  5      A      Yes.  With regard to the 575 Fund.

6      Q      Did you have any communications with

7   Mr. Mueller regarding what types of expenses qualify as

8   nominal administration expenses?

9           MR. HULINGS:  Same objections.

11:22 10      A      Yes.

11      Q      And when were those conversations?

12      A      They were sometime after 2015, I believe.

13      Q      And what did Mr. Mueller ask you?

14           MR. HULINGS:  Same objections.  But remind the

11:22 15   witness about the standing objection on the time period.

16      A      I don't think he asked us anything about it.

17   I -- When I saw that he put this into a draft, I think

18   of the Pinball offering circular, a PPM, I said I didn't

19   think that it was appropriate.

11:23 20      Q      Sorry.  Can you just repeat what you just

21   said.

22      A      As I said, I don't think that I talked to the

23   -- to him about the 575 Fund having this language in it.

24      Q      Uh-huh.

11:23 25      A      But with regard to the Pinball PPM --

53

11:23  1          Q     Oh.

       2          A     -- I did have a conversation with him that --

       3    or email communication with him that I didn't -- that he

       4    needed to specify what those nominal fees were and he

11:23  5    needed to justify them as being expenses of the -- of

       6    the Fund.

       7          Q     Okay.  Let me just unpack that.  You recall

       8    reading a company advance language in a draft deeproot

       9    Pinball PPM?

11:23 10          A     Yes.

      11          Q     Okay.  And that Company Advance language

      12    contained a reference to nominal administration

      13    expenses?

      14          A     Yes.

11:24 15          Q     Okay.  And you read that and you had a

      16    follow-up conversation with Mr. Mueller?

      17          A     I believe it was an email com --

      18    communication.

      19          Q     Okay.  And you advise -- you advised

11:24 20    Mr. Mueller that nominal administration expenses needs

      21    to include what?

      22          A     Needed to be justified and needed to be

      23    explained within the -- the PPM.

      24          Q     And what do you mean by "justified"?

11:24 25          A     Needed to be reasonable.

                                                                    54

```
11:26   1        Q    I'm going to show you what's been previously
        2   marked Exhibit 98.  Okay.  Just take a second to review
        3   that, sir.
        4            MS. SANSALONE:  I'm sorry.  What exhibit is
11:28   5   this?
        6            MS. WARDEN:  98.
        7        A    Okay.
        8        Q    Okay.  So do you recognize this document, sir?
        9        A    It appears to be a deeproot Growth Runs Deep
11:29  10   Fund, LLC, PPM dated August 3, 2015.
       11        Q    Yeah.  And sorry.  For the record, it's
       12   SEC-DEEPROOT-E-13 -- 13399 through 13416.
       13            So I can represent to you that Mr. Mueller
       14   represented in his interrogatory responses that this
11:29  15   PPM, Exhibit 98, was operative between August 2015
       16   through May 2018.
       17            Did you advise Policy Services in August 2015?
       18        A    Yes.
       19        Q    Okay.  Did you advise Policy Services on this
11:29  20   PPM, Exhibit 98?
       21        A    As I previously said, the -- the deeproot
       22   Growth Runs Deep Fund, LLC, document that I prepared was
       23   an S-1.  It was not a PPM.  So I may have looked at
       24   this, but I don't recall having seen it.
11:30  25            As I said, again, the one I prepared was a
```

56

11:30   1   registration statement to be filed with the SEC, not

        2   a -- not a PPM.

        3       Q    Do you recall whether Mr. Concilla provided

        4   legal advice regarding Exhibit 98?

11:30   5       A    I wouldn't know.

        6       Q    Okay.  Did you have any discussions with

        7   Mr. Concilla or the other guy, Mr. Stone?  Smith.

        8       A    Mr. Smith.

        9       Q    Regarding Exhibit 38.

11:30  10       A    No.

       11       Q    98.  Sorry.

       12       A    No.

       13       Q    Okay.  So based on that testimony, is it fair

       14   to say that you did not provide legal advice on any

11:31  15   investor disclosures or marketing materials that went to

       16   dGRD investors?

       17            MR. HULINGS:  Misstates prior testimony.

       18   But -- and vague and ambiguous.

       19            You can answer.

11:31  20       A    I don't recall having done that.  As I -- as I

       21   said, I prepared an S-1 for 575 Fund and dGRF.

       22       Q    Okay.  And is that the case for the entire

       23   period that you represented Mr. Mueller?

       24       A    Yes.

11:31  25       Q    So with -- with regard to the dGRD Fund, is it

                                                              57

```
11:55    1   in compliance with the Fund documents?
         2            MR. HULINGS:  Okay.  So that -- All right.  So
         3   assumes facts not in evidence.  It's argumentative.  And
         4   it has a false factual predicate.  It is vague and
11:55    5   ambiguous.
         6            You can answer, if you can.
         7       A    No.
         8       Q    And did Mr. Mueller ever inform you that the
         9   Company Advance was not being tracked to ensure it was
11:55   10   limited to the stated 20 percent?
        11            MR. HULINGS:  Same objections.
        12            Les -- Leslie, are you -- Yeah.  You there?
        13       A    No.
        14       Q    Did Mr. Mueller inform you that the funds
11:55   15   subject to the company advance were not segregated?
        16            MR. HULINGS:  Same objections.
        17       A    No.
        18       Q    Did Mr. Mueller inform you that he would use
        19   575 and dGRD investor funds to pay off credit card
11:55   20   purchases for personal expenses?
        21            MR. HULINGS:  Same objections.
        22       A    No.
        23       Q    Did Mr. Mueller ever inform you that he would
        24   use 575 and dGRD investor funds to initiate cash
11:56   25   transfers for personal expenses?
```

65

11:56  1                 MR. HULINGS:   Same objections.

 2       A     No.

 3       Q     Did you have any discussions with Mr. Mueller

 4   regarding how to represent to investors the value of the

11:56  5   575 or dGRD Funds?

 6                 MR. HULINGS:   Vague and ambiguous.

 7       A     No.

 8       Q     Did you have any discussions with Mr. Mueller

 9   regarding how to value the fund -- the 575 or

11:56 10   dGRD Funds' investments in deeproot affiliates?

11                 MR. HULINGS:   Objection.   Vague and ambiguous.

12       A     No.

13       Q     Did you have any discussions with Mr. Mueller

14   regarding how Mr. Mueller would track the -- the

11:56 15   percentage of investment of 575 or dGRD funds into

16   deeproot affiliates?

17                 MR. HULINGS:   Vague and ambiguous.

18       A     No.

19       Q     Did you have any conversations with

11:57 20   Mr. Mueller regarding what internal controls deeproot

21   had?

22       A     No.

23                 MR. HULINGS:   Vague and ambiguous.

24   BY MS. WARDEN:

11:57 25       Q     Did you have any discussions with Mr. Mueller

66

12:05  1      A    Just that -- just that:  That money is

       2  fungible.

       3      Q    All right.  So did you recall him saying that,

       4  because money is fungible, if the sources of funds to

12:05  5  deeproot are commingled in the same bank account, that

       6  that bank account can be used to pay -- to make payments

       7  to earlier investors?

       8           MS. WARDEN:  Objection.  Leading.  Assumes

       9  facts not in evidence.  Calls for speculation.

12:06 10  BY MR. HULINGS:

      11      Q    You can answer that.  You were in the room,

      12  right?

      13      A    I was in the room, yes.  I don't know that he

      14  said it that way.  But that's -- the -- the fact that

12:06 15  money was commingled, you couldn't tell whether it was

      16  new money or old money.

      17      Q    So in the situation in which money is

      18  commingled, and money from the commingled bank account

      19  is used to make payments to prior investors, do you

12:06 20  agree with Mr. Concilla that that is not a Ponzi scheme?

      21           MS. WARDEN:  Objection.  Calls for

      22  speculation.  And misleading.

      23      A    Let me read that again.

      24           As I said, in -- in -- with regard to a

12:07 25  different question that was asked, with regard to a

                                                                72

12:07  1   Ponzi scheme, it would depend on the circumstances.  And

       2   it wouldn't necessarily occur if money from one

       3   account -- a commingled account was -- was paid.

       4          But with regard to if you were taking money

12:07  5   from new investors and using that money only to -- to

       6   pay off old investors without acquiring anything in

       7   the -- in the meantime, that would be --

       8     Q    So you said "only."  So if some of the money

       9   from new investors is used to acquire new assets, would

12:08 10   that -- does that mean that payments to old investors

      11   would be permitted?

      12          MS. WARDEN:  Objection.  Calls for

      13   speculation.  And vague.

      14     Q    That's actually kind of a terrible question.

12:08 15   Let me ask -- You said the word "only."  So when you

      16   say -- What did you mean by "only"?

      17     A    The use of the funds that you raise from an

      18   investor are generally spelled out someplace.  All

      19   right.  And if one of the uses of those funds was

12:08 20   spelled out as acquiring an asset from a -- prior invest

      21   -- prior investor, then I would have no problem with

      22   that.

      23     Q    Okay.  So what if -- what if one of the uses

      24   identified in a PPM says -- indicates that the funds

12:09 25   would be used to provide a company advance?

                                                              73

13:14  1  speculation.  Asks for a legal conclusion.  Vague and

       2  ambiguous.

       3       A    I suppose it could.

       4       Q    Okay.  And so if -- if the 575 Fund had a

13:14  5  security interest in funds held by -- or life insurance

       6  policies held by other funds, and that security interest

       7  provided the source of payments to previous investors in

       8  the 575 Fund, would those payments be part of a Ponzi

       9  scheme?

13:14 10            MS. WARDEN:  Objection.  Calls for

      11  speculation.  Asks for a legal conclusion.  Vague and

      12  ambiguous.  Argumentative.

      13       Q    Since we're ask -- since we're discussing the

      14  legal advice provided by a client -- a lawyer to his

13:14 15  client, I think you can answer.

      16       A    Okay.  I would not have advised Mr. --

      17  Mr. Mueller to use new money to pay old investors in

      18  other funds or in this one.

      19       Q    Okay.  Did you -- You said you would not have.

13:15 20  Do you recall actually giving that advice --

      21       A    No.

      22       Q    -- during the relevant time period?

      23       A    No, because it -- it really never came up.

      24       Q    Okay.  So when -- If the 575 Fund purchased

13:15 25  interests in a previous fund and used those funds, the

                                                            113

EXHIBIT 34

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

        -against-

ROBERT J. MUELLER, DEEPROOT FUNDS
LLC (a/k/a dprt Funds, LLC), AND POLICY
SERVICES INC.,

     Defendants,

        -and-

DEEPROOT TECH LLC, DEEPROOT
PINBALL LLC, DEEPROOT STUDIOS LLC,
DEEPROOT SPORTS & ENTERTAINMENT
LLC, DEEPROOT RE 12621 SILICON DR LLC,
AND ROBERT J. MUELLER, JEFFREY L.
MUELLER, AND BELINDA G. BREEN, AS CO-
TRUSTEES OF THE MB HALE OHANA
REVOCABLE TRUST,

     Relief Defendants.

Civil Action No.: 5:21-cv-785-XR

## DECLARATION OF BRAD ALAN LEON

I, Brad Alan Leon, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am 69 years old and a resident of Asheville, North Carolina.

2.    I have been employed as a nurse anesthetist for approximately 45 years. For the last 19.5 years, I have been a nurse anesthetist with the United States Department of Veterans Affairs.

3.    This declaration is being made based on my personal knowledge and I would be competent to testify to the facts set forth in this declaration if I were called as a witness at trial.

4.      I do not consider myself a sophisticated investor.

5.      On or about June 2021, I invested $1,000,000 in the deeproot 575 Fund, LLC (the "575 Fund"). Under the terms of my investment agreement, I was supposed to receive an 11% annual return from the 575 Fund, to be paid to me as a lump sum at the end of five years. It was my understanding that the threshold amount to invest in order to receive this 11% annual return was $1,000,000. In addition, I was supposed to get my entire $1,000,000 investment returned to me by June 2026.

6.      I first learned about the 575 Fund during an April 2021 meeting with investment adviser Mark Zabinsky of the Henley Wealth Group in Charlotte, North Carolina. By way of background, Zabinsky reached out to my U.S. Department of Veterans Affairs email account in April 2021, offering to provide his investment advice with respect to my Thrift Savings Plan (TSP) account, which had a balance of approximately $1.4 million at the time. At the time, I believed that Zabinsky was approved by the federal government to work with federal employees. I responded to Zabinsky's email in April 2021, later spoke with him on the phone, and I invited him to meet me at my home in May 2021 to learn more about his services. During the May 2021 meeting with Zabinsky in my home, he told me that Robert Mueller had a fund (the 575 Fund) that invested in life insurance policies and he recommended that I invest in the fund as a way to guarantee a high rate of return for five years. Zabinsky told me that he had vetted Deeproot and that he had also personally invested in Deeproot. I recall that Zabinsky showed me a PowerPoint presentation about the 575 Fund during this meeting. Zabinsky explained that if I invested, I would receive an 11% annual return, to be paid as a lump sum in five years. Based on this information, I signed paperwork to invest $1,000,000 while Zabinsky was still in my home. It took approximately 30 days to get my funds out of my TSP account, so my $1,000,000 was

2

SEC-SEC-E-0002497

invested in the 575 Fund in June 2021. This represented approximately 70% of the balance in my TSP account, which was the product of 19.5 years of saving as a federal government employee.

7.     The promised 11% annual rate of return, along with representations from Zabinsky that the 575 Fund was not an aggressive investment, were important facts on which I based my decision to invest in the 575 Fund.

8.     After I signed the paperwork to invest $1,000,000 in the 575 Fund—but before my funds had transferred to Deeproot—I saw publicly filed complaints against Robert Mueller online. I raised my concerns about Robert Mueller with Zabinsky.

9.     As a result, Zabinsky arranged for me to have a three-way phone conversation with myself, Eric Dandridge, who was a Deeproot employee, and Zabinsky. In a 5-10 minute phone conversation, Dandridge told me that the complaints about Robert Mueller were just "one disgruntled individual" and that he was happy I was "on board" with the Deeproot family.

10.     No one from Deeproot informed me that Robert Mueller would receive any salary or compensation out of investor funds. No one from Deeproot mentioned anything about my investment going towards a pinball company.

11.     No one from Deeproot informed me that Mueller would use new investor funds to pay old investors. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

12.     No one from Deeproot informed me that Mueller would use investor funds for personal use, including to pay for his daughter's private school tuition, a condo in Hawaii, vacations for him and his family, his second wedding, his second divorce, his third wedding, and

3

SEC-SEC-E-0002498

jewelry for both witnesses. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

13.   In September 2021, Zabinsky sent me a text message informing me of the Securities and Exchange Commission's ("SEC") complaint against Robert Mueller. In a follow-up phone conversation with Zabinsky, he (Zabinsky) told me, "I think we have been scammed." Upon learning this information, I called Deeproot, but the phone number was disconnected. I also tried to access Deeproot's website, but the link did not work.

14.   As of the date of this declaration, I have not received my $1,000,000 principal back.

15.   As a result of Mueller's fraud scheme, my retirement plans have been significantly impacted and I will have to work many more years before I am able to retire.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 14 day of September, 2022 in Asheville, North Carolina.

Brad Alan Leon
Brad Alan Leon

4

SEC-SEC-E-0002499

EXHIBIT 35

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>          -against-<br><br>ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,<br><br>     Defendants,<br><br>          -and-<br><br>DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,<br><br>     Relief Defendants. | Civil Action No.:  5:21-cv-785-XR |

## DECLARATION OF JAMES DONNELLY

I, James Donnelly, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am 67 years old and a resident of Scottsdale, Arizona.

2.     I am a software engineer based in Tempe, Arizona.  I have worked in this field for approximately 42 years.

3.     This declaration is being made based on my personal knowledge and I would be competent to testify to the facts set forth in this declaration if I were called as a witness at trial.

SEC-SEC-E-0002984

4.      On or about May 2019, I made two separate investments in the deeproot 575 Fund, LLC (the "575 Fund") totaling approximately $199,000, which represented a significant portion of my retirement savings at the time.  Under the terms of my investment agreement, I was supposed to receive a 5% annual rate from one of my 575 Fund investments and 14% annual rate from the other 575 investment, which were both paid out in monthly distributions.  In addition, I was supposed to get my $199,000 investment returned to me by May 2024.

5.      I first learned about the 575 Fund during a meeting with my financial adviser, Jon Mark Richardson, at some point prior to my May 2019 investment.  During the meeting with Richardson, he told me that Robert Mueller had a fund (the 575 Fund) that invested in life insurance policies and he recommended that I invest in the fund.  Richardson explained that if I invested, I would receive a blended rate of 8%, and my principal would be returned in five years. Richardson provided me with information about the 575 Fund.  Before I invested, I also spoke to Robert Mueller on one occasion about the logistics of transferring funds into the investment. Based on this information, and my discussions with Richardson and Mueller, I made two separate investments totaling approximately $199,000 in the 575 Fund in May 2019.

6.      No one from Deeproot informed me that Robert Mueller would receive any salary or compensation out of investor funds.  This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

7.      No one from Deeproot verbally mentioned anything about my investment going towards a pinball company.  This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

2

SEC-SEC-E-0002985

8.      No one from Deeproot informed me that Mueller would use new investor funds to pay existing investors. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

9.      No one from Deeproot informed me that my 8% blended rate which was distributed monthly could be paid from other investors' investments. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

10.     No one from Deeproot informed me that Mueller would use investor funds for personal use, including to pay for his daughter's private school tuition, a condo in Hawaii, vacations for him and his family, his second wedding, his second divorce, his third wedding, and jewelry for both wives. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

11.     At some point after I invested, I stopped receiving my 8% blended rate monthly distributions.

12.     As of the date of this declaration, I have not received my approximately $199,000 investment back.

13.     As a result of Mueller's fraud scheme, my retirement plans have been significantly impacted.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

3

SEC-SEC-E-0002986

Executed on the _16_ day of October, 2022 in Scottsdale, Arizona.


James Donnelly

4

SEC-SEC-E-0002987

EXHIBIT 36

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>     -against-<br><br>ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,<br><br>     Defendants,<br><br>     -and-<br><br>DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,<br><br>     Relief Defendants. | Civil Action No.: 5:21-cv-785-XR |

## DECLARATION OF JOHN GRAY

I, John Gray, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am 66 years old and a resident of Little Rock, Arkansas.

2.    I was employed in the pharmaceutical business for over thirty years.

3.    This declaration is being made based on my personal knowledge and I would be competent to testify to the facts set forth in this declaration if I were called as a witness at trial.

4.    I do not consider myself a sophisticated investor.

5.      On or about September and October 2019, I made two separate investments in the deeproot 575 Fund, LLC (the "575 Fund"), which totaled $462,428.95. Under the terms of my investment agreement, I was supposed to receive a 7% monthly distribution from the 575 Fund, which was approximately $2,439.34 a month. The "call date" for my investment—which was the date on which my $462,428.95 investment was supposed to be returned to me—was September 9, 2024.

6.      These two investments in the 575 Fund—comprising almost $500,000—represented approximately one half of all of my funds that I had saved for retirement by 2019. I saved and invested these funds over the span of a forty year working career.

7.      I first learned about the 575 Fund during a May or June 2019 meeting with my financial adviser, Raphael Vallier, from INF Solutions LLC in Houston, Texas. During my conversation with Vallier, he told me (Gray) that he recommended that I (Gray) invest in the 575 Fund. More specifically, I recall that Vallier mentioned that Robert Mueller was a "Texas person," "a nice man," and that he had a fund (the 575 Fund) that invested in life insurance policies. Vallier explained that there were two options with the 575 Fund: (1) 7% return distributed annually, with the return of principal in 7 years; or (2) 7% return distributed monthly, with the return of principal in 5 years. I recall Vallier saying that the 5% option was "the safest" and that it "would help me through retirement." Vallier told me that he recommended the 575 Fund to other clients as well.

8.      During this May or June 2019 conversation with Vallier, Vallier suggested that my wife Twyla and I have a call with a Deeproot employee about the 575 Fund.

9.      Vallier, Twyla, and I spoke to a Deeproot employee in Vallier's office at a subsequent meeting, which was around June or July 2019. During this conversation, I recall a

2

SEC-SEC-E-0002960

Deeproot employee telling me that the 575 Fund would invest in life insurance policies. The Deeproot employee did not inform me that Mueller would receive any salary or compensation out of investor funds. The Deeproot employee did not mention anything about my investment going towards a pinball company. I recall receiving the Private Placement Memorandum (PPM) about the 575 Fund in Vallier's office at that time, and I recall reviewing it again at a later date. I also recall Vallier directing my attention to the clause "nominal administration expenses" on page 13 of the PPM. Vallier explained that it was a very low fee for the industry. I considered these pieces of information as significant parts of the total information I received about the 575 Fund.

10.     Based on the representations from the Deeproot employee and Vallier about the 575 Fund, as well as my review of the PPM for the 575 Fund, I decided to invest $462,428.95 in September and October 2019.

11.     Neither the Deeproot employee nor Vallier told me that Mueller would use new investor funds to pay existing investors. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

12.     Neither the Deeproot employee nor Vallier informed me that my 7% monthly payments could be paid from other investors' investments. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

13.     Neither the Deeproot employee nor Vallier told me that Mueller would use investor funds for personal use, including to pay for his daughter's private school tuition, a condo in Hawaii, vacations for him and his family, his second wedding, his second divorce, his third wedding, and jewelry for both witnesses. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

3

14.    I first learned that Mueller was being sued by the Securities and Exchange Commission ("SEC") in January 2021.  Around that time, I asked Vallier whether I would get my $462,428.95 investment back out, and he told me that we needed to wait to see what the outcome of the SEC's preliminary actions will be because he had other clients who were invested in the 575 Fund.

15.    As of the date of this declaration, I have neither received my $462,428.95 investment back nor my monthly 7% interest payments.

16.    As a result of Mueller's fraud scheme, my retirement plans have been impacted. My wife had to go back to work because I lost over half of my retirement funds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the ___9___ day of October, 2022 in Little Rock, Arkansas.

John Gray

4

EXHIBIT 37

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>      Plaintiff, <br><br>      -against- <br><br> ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC., <br><br>      Defendants, <br><br>      -and- <br><br> DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST, <br><br>      Relief Defendants. | Civil Action No.: 5:21-cv-785-XR |

## DECLARATION OF ROBERT KANE

I, Robert Kane, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am 84 years old and a resident of Tucson, Arizona.

2.     I am currently retired.  I last served as a Director of Information Systems for GATX.  I worked in the information technology field for over forty years.

3.     This declaration is being made based on my personal knowledge and I would be competent to testify to the facts set forth in this declaration if I were called as a witness at trial.

4.     I do not consider myself a sophisticated investor.

5.     In December 2017, I, as co-trustee of the Kane Revocable Trust, invested $150,000 in the deeproot Growth Runs Deep Fund, LLC (the "dGRD Fund"). I invested the principal for an undetermined time and was promised that I could receive a 1.50 liquidation multiplier upon the maturity of a life policy investment.

6.     In January 2018, I invested $200,000 in the deeproot 575 Fund, LLC (the "575 Fund"). Under the terms of my investment agreement, I was entitled to a 5% monthly distribution from the 575 Fund. On or about February 2023, I was also supposed to get my $200,000 investment returned to me.

7.     I first learned about the 575 and dGRD Funds during a June or July 2017 meeting with my investment adviser, Pam Hopman, in her office. During this meeting, she told me about two Deeproot funds that invested in life insurance policies and she recommended that I invest in the funds. Hopman told me that Deeproot was a safe investment and that either she and/or her family members invested in Deeproot. On a later date, Hopman provided me with a brochure about the 575 and dGRD Funds. Based on this information and the meeting with Hopman, I, as co-trustee of the Kane Revocable Trust, invested $150,000 in the dGRD Fund in December 2017 and I invested another $200,000 in the 575 Fund in January 2018. My combined $350,000 investment represented a significant portion of my retirement savings at the time.

8.     No one from Deeproot informed me that Robert Mueller would receive any salary or compensation out of investor funds. Hopman did not inform me that she was planning to receive a finder's fee from Deeproot. Hopman also did not tell me that she would receive a commission from me. This information would have been important to me in making a decision of whether or not to invest in the 575 and dGRD Funds.

2

9.      No one from Deeproot mentioned anything about my investment going towards a pinball company. This information would have been important to me in making a decision of whether or not to invest in the 575 and dGRD Funds.

10.     No one from Deeproot informed me that Mueller would use new investor funds to pay existing investors. It is my understanding that the returns on my investment came from the proceeds of life insurance policies. This information would have been important to me in making a decision of whether or not to invest in the 575 and dGRD Funds.

11.     No one from Deeproot informed me that my 5% monthly payments could be paid from other investors' investments. This information would have been important to me in making a decision of whether or not to invest in the 575 and dGRD Funds.

12.     No one from Deeproot informed me that Mueller would use investor funds for personal use, including to pay for his daughter's private school tuition, a condo in Hawaii, vacations for him and his family, his second wedding, his second divorce, his third wedding, and jewelry for both witnesses. This information would have been important to me in making a decision of whether or not to invest in the 575 and dGRD Funds.

13.     I received my last 5% monthly payment in August 2021. I reached out to Hopman around this time. When I asked her why I was no longer receiving my monthly payments from the 575 Fund, I recall Hopman telling me that there was a "major problem." On a subsequent phone call with Hopman, she told me that my entire investment in the 575 and dGRD Funds was gone.

14.     As of the date of this declaration, I have not received my $350,000 investment back.

3

SEC-SEC-E-0002908

15.     As a result of Mueller's fraud scheme, my retirement plans have been significantly impacted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the **23** day of September, 2022 in Tucson, Arizona.

Robert Kane

4

SEC-SEC-E-0002909

EXHIBIT 38

HO-14036_ARCHIVE-000000670

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      -against-

ROBERT J. MUELLER, DEEPROOT FUNDS
LLC (a/k/a dprt Funds, LLC), AND POLICY
SERVICES INC.,

      Defendants,

      -and-

DEEPROOT TECH LLC, DEEPROOT
PINBALL LLC, DEEPROOT STUDIOS LLC,
DEEPROOT SPORTS & ENTERTAINMENT
LLC, DEEPROOT RE 12621 SILICON DR LLC,
AND ROBERT J. MUELLER, JEFFREY L.
MUELLER, AND BELINDA G. BREEN, AS CO-
TRUSTEES OF THE MB HALE OHANA
REVOCABLE TRUST,

      Relief Defendants.

Civil Action No.: 5:21-cv-785-XR

## DECLARATION OF SANDRA S. THOMPSON

I, Sandra S. Thompson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am 63 years old and a resident of Tucson, Arizona.

2.     I am a PhD school psychologist for a public school district in Tucson, Arizona. I have been employed as a school psychologist by three public school districts and one private school in Tucson, Arizona since 1997.

3.     This declaration is being made based on my personal knowledge and I would be competent to testify to the facts set forth in this declaration if I were called as a witness at trial.

SEC-SEC-E-0002508

4.      I do not consider myself a sophisticated investor.

5.      On or about August or September 2016, I invested $100,000 in the deeproot 575 Fund, LLC (the "575 Fund"). Under the terms of my investment agreement, I was entitled to a 7% simple annual interest on my $100,000 investment from the 575 Fund. In October 2021, I was supposed to get my $100,000 investment returned to me, plus my 7% simple annual interest, for a total of $135,000.

6.      On or about October or November 2016, I invested another $149,750.30 in the 575 Fund. Under the terms of my investment agreement, I began receiving a 5% monthly distribution from the 575 Fund on or about October 2018. In addition, I was supposed to get $150,374.26 returned to me on December 2021. My combined total investment in the 575 Fund was $249,750.30, which represented a significant portion of my retirement savings at the time.

7.      I first learned about the 575 Fund during a July or August 2016 meeting with my investment adviser, Pam Hopman, in her office. During the July or August 2016 meeting with Hopman, she told me about a Deeproot fund that invested in life insurance policies and she recommended that I invest in the fund. I told Hopman that I could not afford to lose my $250,000 principal. Hopman told me that Deeproot was a safe investment, and that she had either personally invested in Deeproot or planned to invest in Deeproot. On this date, Hopman provided me with a folder of information about the 575 Fund, which also included the Private Placement Memorandum for the 575 Fund. Based on this information and the meeting with Hopman, I invested $100,000 in the 575 Fund in August or September 2016, and another $149,750.30 in October or November 2016.

2

SEC-SEC-E-0002509

8.     No one from Deeproot informed me that Robert Mueller would receive any salary or compensation out of investor funds. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

9.     No one from Deeproot mentioned anything about my investment going towards a pinball company. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

10.     No one from Deeproot informed me that Mueller would use new investor funds to pay existing investors. It is my understanding that the returns on my investment came from the proceeds of life insurance policies. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

11.     No one from Deeproot informed me that my 5% monthly payments could be paid from other investors' investments. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

12.     No one from Deeproot informed me that Mueller would use investor funds for personal use, including to pay for his daughter's private school tuition, a condo in Hawaii, vacations for him and his family, his second wedding, his second divorce, his third wedding, and jewelry for both witnesses. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund.

13.     I received my last 5% monthly payment in June 2021. Two months later, in August 2021, Hopman emailed me the Securities and Exchange Commission's ("SEC") complaint filed against Robert Mueller.

14.     As of the date of this declaration, I have not received my principal investment back, totaling $249,750.30.

3

SEC-SEC-E-0002510

15.     As a result of Mueller's fraud scheme, my retirement plans have been impacted and I will have to work more years before I am able to retire.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 15 day of September, 2022 in Tucson, Arizona.

Sandra S. Thompson

SEC-SEC-E-0002511

EXHIBIT 39



Jay Hulings
jhulings@dslawpc.com

December 16, 2022

Mr. David Nasse                           *Via E-mail:* nassed@sec.gov
Ms. Kristen Warden                        *Via E-mail:* WardenK@SEC.GOV
U.S. Securities and Exchange Commission
100 E. Street, NE
Washington, DC 20549

      Re:    Cause No. 5:21-CA-00785, *Securities and Exchange Commission v. Robert J. Mueller, et al.*, pending in the Western District of Texas, San Antonio Division

Dear Counsel:

On behalf of Robert J. Mueller, we confirm that Mr. Mueller waives the application of the attorney-client privilege and/or work product doctrine to communication between Mr. Mueller and attorneys at Carlile Patchen & Murphy, LLP ("**Carlile Patchen**") that took place before January 1, 2019, and which concerned the drafting of or revisions to Private Placement Memoranda and other materials that were presented or provided to potential investors in the "deeproot" entities.

This a limited waiver related to the assertion of an advice of counsel defense and does not include any communications other than those expressly identified above.  Mr. Mueller does **not** waive the application of the attorney-client privilege or work product doctrine to any communications with any attorneys other than those working at Carlile Patchen.  Further, Mr. Mueller does **not** waive the application of the attorney-client privilege or work product doctrine to any communications with Carlile Patchen regarding, concerning, and/or after the initiation of the investigation conducted by the Securities and Exchange Commission into Mr. Mueller and the deeproot entities.

Mr. Mueller retains and asserts any and all applicable privileges and protections, except as expressly described above.

Please let me know if you have any questions or concerns.

Regards,

Jay Hulings

JH:ab

EXHIBIT 40

## WAIVER OF ATTORNEY CLIENT PRIVILEGE AND CONFIDENTIALITY

I, **John Patrick Lowe**, currently serve as the Chapter 7 Bankruptcy Trustee for the following business entities:

- Policy Services, Inc. – SA-21-BK-51513 MMP;
- Wizard Mode Media, LLC – SA-21-BK-51514 MMP;
- Deeproot Pinball, LLC – SA-21-BK-51515 MMP;
- Deeproot Growth Runs Deep Fund, LLC – SA-21-BK-51516 MMP;
- Deeproot 575 Fund, LLC – SA-21-BK-51517 MMP;
- Deeproot 3 Year Bonus Income Fund, LLC – SA-21-BK-51518 MMP;
- Deeproot BonusGrowth 5 Year Debenture Fund, LLC – SA-21-BK-51519 MMP;
- Deeproot Tech, LLC – SA-21-BK-51520 MMP;
- Deeproot Funds, LLC – SA-21-BK-51521 MMP;
- Deeproot Studios, LLC – SA-21-BK-51522 MMP; and
- Deeproot Capital Management, LLC – SA-21-BK-51523 MMP.

Each of these eleven debtors (the "Debtors") filed for bankruptcy relief pursuant to Title 11 of the United States Code on December 9, 2021. Robert J. Mueller ("Mueller") acted on behalf of and as the authorized representative for each debtor when filing these bankruptcy petitions. Pursuant to the powers granted to me under Title 11 of the United States Code, as the Chapter 7 Trustee, I have assumed control of these Debtors. At this juncture, I have not taken the steps necessary to assume control over other entities which may be affiliated with or owned by the Debtors. In particular, I have not been appointed to or otherwise authorized to take control of deeproot Que, LLC.

I understand that on August 20, 2021, the Securities and Exchange Commission (the "Commission") filed a Complaint against Mueller and several of the Debtors in the action *SEC v. Mueller*, et al 21-cv-785-XR (W.D. TX) ("SEC Action"). I have been made aware that Mueller

has invoked an "advice of counsel" defense both personally and as the authorized representative of the Debtors, in connection with the SEC Action.

I understand from my counsel that the law firm of Carlile Patchen Murphy, LLP, located in Columbus, Ohio, through its members provided legal representation to some of the Debtors. Based upon my counsel's review of documents, I have been informed that the individual members of Carlile Patchen Murphy, LLP, who provided legal counsel to some of the Debtors are Dennis Concilla and Andrew Federico.

As the Chapter 7 Trustee, I am being represented by counsel, and have been fully advised as to this matter. As evidenced by my signature below, and witnessed by my attorneys, I do hereby waive all aspects of the attorney-client privilege between the Debtors and the law firm of Carlile Patchen Murphy, LLP,  and its individual members which may have existed up until the time of the bankruptcy filing.

I understand that Dennis Concilla and Andrew Federico with Carlile Patchen Murphy, LLP have a duty of confidentiality to me as the Chapter 7 Trustee. The confidentiality rule applies not only to matters communicated by the Debtors or Mueller as the authorized representative of the Debtors to Dennis Concilla and Andrew Federico with Carlile Patchen Murphy, LLP in confidence, but also to all information communicated to them by or other employees or representatives of the Debtors. I consent to the disclosure of confidential information to the counsel representing the Commission in the SEC Action and/or other Commission employees.

This attorney-client privilege waiver is intended  to apply to: all information relating to Dennis Concilla's and Andrew Federico's of Carlile Patchen Murphy, LLP representation of the Debtors; all communications between Dennis Concilla or Andrew Federico of Carlile Patchen Murphy, LLP and Mueller as the authorized representative of the Debtors; all communications

between Dennis Concilla or Andrew Federico of Carlile Patchen Murphy, LLP and others relating to their representation of the Debtors; all acts undertaken by Dennis Concilla and Andrew Federico with Carlile Patchen Murphy, LLP or others acting on their behalf taken in connection with representing the Debtors; any and all documents generated through their representation of the Debtors, including all documents, notes, and memoranda, and correspondence, reflecting contact with others, and any and all fee information; and all confidential information relating to Dennis Concilla and Andrew Federico with Carlile Patchen Murphy, LLP representing the Debtors. I specifically consent to Dennis Concilla and Andrew Federico with Carlile Patchen Murphy, LLP releasing and revealing any and all information related to their representation of the Debtors to counsel for the Commission and/or other Commission employees.

_____
DATED

_____
**John Patrick Lowe**, Chapter 7 Trustee for the Estates of the Debtors

WITNESSED BY:

_____
Randall A. Pulman
Pulman, Cappuccio & Pullen, LLP
Attorneys at Law
2161 N.W. Military Highway, Suite 400
San Antonio, Texas 78213