MOTION TO SEAL

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>          -against-<br><br>ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,<br><br>     Defendants,<br><br>          -and-<br><br>DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621 SILICON DR LLC,<br><br>     Relief Defendants. | Civil Action No.: 5:21-cv-785-XR |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR
SUMMARY JUDGMENT AS TO LIABILITY ON ALL COUNTS AGAINST
DEFENDANT ROBERT J. MUELLER AND ON MUELLER'S
ADVICE OF COUNSEL DEFENSE**

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF UNDISPUTED FACTS ........................................................ 3

   A.  Mueller's Creation of the Funds ............................................................... 3

   B.  The Marketing Documents Included False Statements and Misrepresentations............. 4

      1.  Marketing Materials Falsely Stated the Funds Would Own Life Insurance Policies... 5

      2.  Marketing Documents Failed to Disclose that Mueller Previously Sold Off Fractional Shares of the Insurance Policies ............................................. 6

      3.  Marketing Documents Falsely Stated the Funds Would Invest at Least 50% of Assets in Life Insurance Policies................................................... 7

      4.  The PPMs Falsely Stated the Funds Purchased Shares or other Interests in the Affiliated Companies ......................................................... 9

      5.  The PPMs Falsely Understated the Amount the Funds Would Invest in the Affiliated Companies and Spend on Operating Expenses.................................. 11

      6.  Marketing Documents Failed to Disclose that Mueller Used the "Company Advance" to Make Ponzi-Like Payments ........................................ 11

   C.  Mueller Breached the Fiduciary Duties He Owed to his Advisory Clients Because He Failed to Place the Funds' Interests Ahead of His Own ................ 13

   D.  The deeproot Entities' Attorneys Did Not Provide Legal Advice to Mueller Regarding the Alleged Misstatements, Omissions, Ponzi-like Payments, or Breaches of Duties ............. 15

   E.  Mueller's Misrepresentations, Omissions, and Breaches of His Duties Were Material to Investors' Investment Decisions................................ 18

III.  LEGAL STANDARD................................................................................... 19

IV.  ARGUMENT .............................................................................................. 20

   A.  The Court Should Grant Summary Judgment for the SEC as to Counts 1 Through 4... 20

   B.  Mueller Made Material Misrepresentations and Omissions and Employed a Fraudulent Scheme ................................................................. 22

      1.  Mueller's Misrepresentations and Omissions Violated Section 10(b), Rule 10b-5(b), and Section 17(a)(2).................................................. 22

      2.  Mueller Engaged in Deceptive, Manipulative, and Fraudulent Conduct that Operated as a Fraud in Violation of Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3) ........................................... 27

      3.  Mueller Acted with the Required Mental State ........................................ 27

      4.  Mueller's Conduct Was "In Connection With the Purchase or Sale" and "In the Offer or Sale" of Securities ......................................... 29

      5.  Mueller Also Obtained Money or Property .............................................. 29

6.      Mueller Offered and Sold Securities Using the Means and Instrumentalities of Interstate Commerce ........................................................................................... 30

C.    The Court Should Grant Summary Judgment as to Counts Five and Six ...................... 30

D.    Mueller's Actions and Omissions Also Violated Advisers Act Sections 206(1), (2), and (4) and Rule 206(4)-8 Thereunder .......................................................................... 31

1.      Mueller Acted With At Least Extreme Recklessness In Violation Section 206(1).... 31

2.      Mueller Also Acted Negligently In Violation of Sections 206(2) and (4) ................ 32

E.    Mueller Is Unable to Demonstrate that He Relied on the Advice of Counsel .............. 32

1.      Mueller Did Not Seek, and His Lawyers Did Not Provide, Legal Advice Relating to the Alleged Misrepresentations to Investors ......................................................... 32

2.      Mueller Cannot Demonstrate that He Made Complete Disclosure of Relevant Facts to Counsel ........................................................................................................... 33

F.    Remedies To Be Determined At A Later Date ................................................. 35

V.   CONCLUSION ........................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC,* 446 U.S. 680 (1980)...................................................................... 20, 21, 29

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................ 19

*Broad v. Rockwell Int'l Corp.,* 642 F.2d 929 (5th Cir. 1981)....................................... 22

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................... 19

*Celtic Marine Corp. v. James C. Justice Cos. Inc.* 760 F.3d 477 (5th Cir. 2014) ....... 19

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976)..................................................... 22

*Forsyth v. Barr,* 19 F.3d 1527 (5th Cir. 1994)............................................................. 20

*Goldstein v. SEC,* 451 F.3d 873 (D.C. Cir. 2006)........................................................ 31

*In re deeproot Capital Management, LLC*, 21-51523-mmp (Bankr. W.D. Tex. Apr. 13, 2022) 4, 5

*In re Vivendi, S.A. Secur. Litig.*, 838 F.3d 223 (2d Cir. 2016)..................................... 24

*Lorenzo v. SEC,* 139 S. Ct. 1094 (2019) ............................................................... 21, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............. 19, 20

*Roland v. Green,* 675 F.3d 503 (5th Cir. 2012) ........................................................... 29

*SEC v. Ahmed,* 308 F. Supp. 3d 628 (D. Conn. 2018)................................................. 32

*SEC v. Alliance Leasing Corp.*, No. 98-cv-1810, 2000 WL 35612001 (S.D. Cal. Mar. 20, 2000) ................................................................................................................................ 27

*SEC v. Blackburn,* 15 F. 4th 676 (5th Cir. 2021) ........................................................ 26

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)............................. 31

*SEC v. Farias,* 2022 WL 3031082 (W.D. Tex. Aug. 1, 2022) .................................... 21

*SEC v. Fehn,* 97 F.3d 1276 (9th Cir. 1996) ................................................................. 21

*SEC v. Gann,* 565 F.3d 932 (5th Cir. 2009)................................................................. 20

*SEC v. Haarman,* No. 21-CV-235, 2022 WL 2782648 (W.D. Tex. Jan. 25, 2022) ..... 32

*SEC v. Helms,* Civ. No. A-13-CV-01036 (ML), 2015 WL 5010298 (W.D. Tex. Aug. 21, 2015)21

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) .......................................................... 23

*SEC v. Hopper,* 2006 WL 778640 (S.D. Tex. Mar. 24, 2006)...................................... 21

*SEC v. Huff,* 758 F. Supp. 2d 1288 (S.D. Fla. 2010) *aff'd*, 455 F. App'x 882 (11th Cir. 2012) .. 34

*SEC v. Johnson*, 174 F. App'x 111 (3d Cir. 2006) ....................................................... 34

*SEC v. Milles,* 2022 WL 206808 (W.D. Tex. Jan. 24, 2022)....................................... 26

*SEC v. Recile*, 10 F.3d 1093 (5th Cir. 1993)......................................................... 25, 27

*SEC v. Roor*, 2004 WL 1933578 (S.D.N.Y. 2004)....................................................... 25

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019)......................................................... 27

*SEC v. Seghers,* 298 F. App'x 319 (5th Cir. 2008)........................................... 20, 29, 31

*SEC v. Sethi,* 910 F.3d 198 (5th Cir. 2018)............................................................ 21, 26

*SEC v. Silea,* 2022 WL 269105 (E.D. Tex. Jan. 27, 2022) ......................................... 21

*SEC v. Smart*, 2011 WL 2297659 (D. Utah 2011)....................................................... 25

*SEC v. Snyder*, 292 Fed. App'x 391 (5th Cir. 2008) ............................................... 32, 33

*SEC v. Spence & Green Chem. Co.,* 612 F.2d 896 (5th Cir. 1980) .............................. 21

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ....................................................... 31

*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) ................................................. 30

*SEC v. Thompson*, 238 F. Supp. 3d 575 (S.D.N.Y. 2017) ........................................... 24

*SEC v. World Tree Fin.,* 43 F. 4th 448 (5th Cir. 2022)................................................ 27

*Steadman v. SEC,* 603 F.2d 1126 (5th Cir.1979)......................................................... 31

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ........................................ 21, 24
*Turner v. Baylor Richardson Med. Ctr.,* 475 F.3d 337 (5th Cir. 2007)........................................ 20
*United States v. Peterson*, 101 F.3d 375 (5th Cir. 1996) ........................................ 32

**Statutes**

15 U.S.C. § 77q(a)(1)-(3) ........................................................................................ passim
15 U.S.C. § 80b-2(a)(11) ........................................................................................ 31, 32
15 U.S.C. § 80b-6(1)-(2), (4) ........................................................................................ 29, 31, 32
15 U.S.C. §78j(b) ........................................................................................ 20, 22, 31

**Rules**

FRCP 56(c)(1) ........................................................................................ 3

**Regulations**

17 C.F.R. § 240.10b-5(a)-(c) ........................................................................................ 21, 22, 31
17 C.F.R. § 275.206(4)-8(a)(2) ........................................................................................ 32
17 C.F.R. 275.206(4)-8 ........................................................................................ 31

## I.       INTRODUCTION

Robert Mueller and his investment advisory firm, deeproot Funds LLC ("deeproot"), fraudulently induced more than 300 people, many of whom used a significant portion of their retirement savings, to invest over $66 million in what they thought were investments in private funds largely backed by life insurance policies.  In reality, Mueller used investor money as a piggy bank to fund and keep afloat his other businesses.  He also misappropriated investor money for personal expenses including, for example, child's school tuition, vacations, a divorce, two weddings, jewelry, and a condominium in Kauai, Hawaii.  Further, Mueller used new investor funds to make Ponzi-like payments to existing investors, in part, to hide his fraud.  In the end, Mueller's deeproot 575 Fund, LLC ("575 Fund") and the deeproot Growth Runs Deep Fund, LLC ("DGRD Fund") (together, the "Funds") owned nothing—no life insurance policies or shares in Mueller's other businesses—and investors in the Funds lost all or virtually all their money.

Mueller carried out this fraudulent scheme by marketing the Funds with Private Placement Memorandum ("PPMs"), and other marketing materials with numerous affirmative misstatements and material omissions.  *First*, Mueller falsely stated that the Funds would own the insurance policies, but the Funds had no enforceable ownership interest in the few policies Mueller controlled.  *Second*, Mueller failed to disclose and misrepresented what the Funds' investors could receive from the insurance policies because he had previously sold interests in at least half the policies that were allegedly part of the Funds' asset portfolio.  *Third*, even if Mueller's spending could be considered an investment—which it was not—Mueller promised to use the majority of the Funds' assets to invest in life insurance policies.  In reality, Mueller spent only about 18% of the $66 million raised on such policies, using the rest of the money to fund his own businesses and misappropriating over $1.3 million for personal expenses.  *Fourth*, despite claiming the Funds

would "invest" in certain business, the Funds received nothing in exchange for the investors' money Mueller funneled into his businesses. *Fifth*, Mueller falsely claimed these "investments" would not exceed either 30% or 50% of the Funds' assets, depending on the fund, and falsely claimed he would limit operating expenses to 20%. Instead, Mueller ignored these limits and spent the overwhelming majority of the Funds' assets on things other than life insurance policies and lacked any reasonable process for keeping track of such expenses. *Lastly*, Mueller failed to disclose that he used new investors' money to make Ponzi-like payments to existing investors in the Funds as well as investors in other funds that Mueller had previously created.

As an investment advisor, Mueller breached his fiduciary duties to the Funds' through the foregoing misrepresentations and omissions, by failing to document his alleged rationale for siphoning the Funds' assets to his businesses, keeping adequate books and records, creating and following internal controls, and by taking a salary and other payments without a written agreement.

Mueller's lies and omissions were material, as the unrebutted declarations from five separate investors demonstrate. Because there is no genuine dispute as to any of these facts, Plaintiff Securities and Exchange Commission ("SEC") moves the Court for summary judgment as to liability on all counts, and on Mueller's reliance on counsel defense. Notably, Mueller does not dispute: (1) that the life policies were not owned by the Funds; (2) that he sold fractionalized interests in the life policies to investors outside of the Funds; (3) that he spent investor funds on himself or his businesses; or (4) that he paid investor returns with new investor funds. Rather, Mueller—an attorney himself—claims that lawyers he consulted said his actions were appropriate. Contrary to Mueller's claims, based on the testimony of the same lawyers, Mueller never disclosed his misrepresentations and omissions to them and there is no evidence that Mueller sought or obtained additional or other legal advice relating to his fraudulent misrepresentations or omissions.

II.    **STATEMENT OF UNDISPUTED FACTS**[1]

A.    **Mueller's Creation of the Funds**

Mueller, through deeproot, formed the Funds which he began marketing in September 2015.[2] Mueller, as an unregistered investment adviser, served as the director and executive officer of the Funds.[3] The Operating Agreement described Mueller as "responsible for the management of the [575 Fund]." 575 Fund Operating Agreement, Sept. 1, 2015 ("Ex. 24") at 001079. The PPMs described Mueller as "the architect and implementer of all" actions and decisions of the Funds, Entity Defendants, and Relief Defendants, including personally managing "administrative functions," "client care," "processing of investor" and "paperwork[.]" Ex. 2 at 211527. As such, Mueller was ultimately responsible for the PPMs and marketing materials given to investors. *See id.*; Mueller Invest. Tr., Jun. 23, 2021 ("Ex. 20") at 153:9-19; 155:13-16. Between September 2015 and the filing of the Complaint, the Funds received over $66 million from over 300 investors. Decl. of Verma, Aug. 16, 2023 ¶ 5 ("Ex. 1"). The Funds were designed as investments offering securities. *See, e.g.*, Ex. 3 at 164824-25. As its name was meant to imply, the 575 Fund offered a 5-year investment horizon but allowed investors to choose to receive their return form monthly periodic interest payments at 5% simple interest on their investment or defer their return and receive a lump sum at 7%. *Id.* at 164827-28. In contrast, the dGRD Fund provided a

---

[1] Consistent with FRCP 56(c)(1), all facts asserted herein are supported by exhibits attached to Plaintiff's Appendix and Declaration in Support ("Pl's Decl.").

[2] *See*, 575 PPM, Jan. 1, 2021 ("Ex. 2") at 211517; 575 PPM, Sept. 16, 2019 ("Ex. 3") at 164827; 575 PPM, Sept. 1, 2015 ("Ex. 4") at 164811; 575 PPM, Sept. 1, 2015 ("Ex. 5") at 14500; dGRD PPM, Sept. 16, 2019 ("Ex. 6") at 164765; dGRD PPM, August 3, 2015 ("Ex. 7") at 164789; dGRD PPM, August 3, 2015 ("Ex. 8") at 13402 (collectively, Exs. 2-8 the "PPMs").

[3] Ex. 2 at 211527 ("There is only one director and executive officer of the [575 Fund]: Robert J. Mueller"); Ex. 6 at 164777 (same); Section II.c, *infra*.

predetermined return when life policies matured paid to dGRD Fund investors in the order in which they invested.  Ex. 6 at 164765-66.

The PPMs disclosed the Funds' plans to invest in "Life Policies" or "life settlement[s]," the right to be paid the death benefit from a life insurance policy on a third-party.[4]  The PPMs also indicated that the Funds would make investments in other affiliated entities, including in various versions of the PPMs, identifying several entities named as relief defendants in the Complaint.[5]

## B.   The Marketing Documents Included False Statements and Misrepresentations

During the six years that Mueller marketed the Funds, the 575 Fund used four separate PPMs and the dGRD Fund used three.[6]  The Funds' PPMs and other marketing materials, which were all drafted or approved by Mueller, contained five types of misstatements about the makeup and allocation of the assets purportedly held by the Funds.

---

[4] Ex. 2 at 211522; Ex. 3 at 164832; Ex. 4 at 164816; Ex. 5 at 14505; Ex. 6 at 164770; Ex. 7 at 164794; Ex. 8 at 13407.

[5] Dkt. 1, Complaint, August 20, 2021. The Complaint names six relief defendants, deeproot Tech LLC ("deeproot Tech"), deeproot Pinball LLC ("deeproot Pinball"), deeproot Studios LLC ("deeproot Studios"), deeproot Sports & Entertainment LLC ("deeproot S&E"), deeproot RE 12621 Silicon Dr LLC ("deeproot RE"), and The MB Hale Ohana Revocable Trust ("Ohana Trust"), collectively, the ("Relief Defendants") and two entity defendants deeproot Funds and Policy Services Inc. ("PSI") (collectively, "deeproot Entities").  The Entity Defendants as well as deeproot Studios, deeproot Tech, and deeproot Pinball (collectively, the "Debtor Defendants"), filed a voluntary petition for bankruptcy on December 9, 2021. *In re deeproot Capital Management, LLC*, 21-51523-mmp, Dkt. 103 5 (Bankr. W.D. Tex. Apr. 13, 2022), Dkt. 1.  The Debtor Defendants by and through the bankruptcy trustee settled with the SEC, dkt. 81, the Clerk of the Court entered a default judgment against deeproot S&E and deeproot RE, dkt. 58, and the SEC dismissed its claims against the remaining relief defendant Ohana Trust, dkt. 74, leaving Mueller as the only remaining defendant in the case.

[6] *See* Def.'s Objs. and Resps. First Interrogs. ("Ex. 9") (Response 1 identifying Exs. 2-5 as PPMs for 575 investors and Response 2 identifying Exs. 6-8 as PPMs used for dGRD investors).

### 1.  Falsely Stated the Funds Would Own Life Insurance Policies

The Funds' PPMs falsely stated that the Funds would purchase and own the Life Policies in which they invested.  For example, the dGRD PPM used after October 2019 stated:  "[w]e will invest in Life Insurance Policies," "when we acquire such a contract," and "[t]he Life Policies we buy."[7]  The other six versions of the Funds' PPMs used the same or similar language with the two most recent versions of the 575 PPM explaining that the 575 Fund's investments in Life Policies would be made through the dGRD Fund.  *See* Ex. 2 at 211522; Ex. 3 at 164832; Ex. 4 at 164816; Ex. 5 at 14506; Ex. 7 at 164794; Ex. 8 at 13407.  Similarly, the other marketing materials, including the 575 Fund Overview and the deeproot Investor Presentation, stated that the Funds would invest in Life Policies and there were "underlying assets backed by multiple layers."  *See, e.g.*, 575 Quick FAQ at 11223 ("Ex. 12"); deeproot Investor Presentation at 2836 ("Ex. 13").  In reality, PSI—solely owned and controlled by Mueller—purchased and owned the Life Policies, not the Funds.[8] The Funds never held any ownership or other interest in a single life insurance policy.  Ex. 11.  As such PSI, at Mueller's direction, could and did (as set forth below) whatever it wanted with the Life Policies without regard for the Funds.  None of the PPMs or marketing materials informed investors that PSI, not the Funds, would own and control the Life Policies.  *See* Exs. 2-8.

Ownership of the Life Policies was important.  Investors were told they were receiving a "securitized investment in a pool of life settlement policies" that would back their investments.

---

[7] Ex. 6 at 164770.  PPMs describe Policy Services, Inc. as "the policy administration provider," but not as an owner of the Life Policies and there is no evidence that the Funds had any enforceable interests in the Life Policies owned by PSI.  *See e.g.*, Ex. 2 at 0211524.

[8] *See* Mueller Dep. Tr. 61:1-9, March 9, 2023 ("Ex. 14"); Excerpt of Mueller Sworn Accounting at 4000058 ("Ex. 15"); *In re deeproot Capital Management, LLC*, 21-51523-mmp, Dkt. 103, at 5 ¶ 10 (Bankr. W.D. Tex. Apr. 13, 2022) ("Ex. 11") (holding PSI as sole owner of the policies). Mueller founded PSI in 2012 and, at least in 2019, PSI served as the parent company for the Funds and the Affiliated Companies.  Ex. 3 at 164834 ("our ultimate parent company, [PSI]").

*See, e.g.*, Ex. 3 at 164827.  After PSI declared bankruptcy, however, the bankruptcy court found, "[PSI] is the sole and lawful owners of the [policies]."  Ex. 11 at 5, ¶ 10.

### 2. Failed to Disclose that Mueller Previously Sold Off Fractional Shares of the Insurance Policies

Even if the Funds had an ownership interest in the Life Policies, which they did not, they still would not have owned those policies in full because Mueller had previously sold at least 139 fractional shares of these policies.  *See* Ex. 1 ¶ 26.  More specifically, Mueller and PSI sold to outside investors shares in the Life Policies that entitled them to almost $6.5 million in returns when the policies matured, which represented 25% of the face value of Life Policies purportedly "securitiz[ing]" the investments in the Funds.[9]  Accordingly, a quarter of the face value of the Life Policies that Mueller claimed belonged to the Funds was actually owned by other investors who had nothing to do with the Funds.

PSI's sale of fractionalized shares of insurance policies had a significant negative impact on the Funds' investors.  For example, in or about August of 2017, PSI received $506,603 when policy MILU82 matured, but because PSI had sold all but a small portion of the policy, only $14,446 or less than 3% was available for the Funds' investors.  Ex. 1 ¶¶ 29-30, Appendix A-3. When policy HMIL48 matured, PSI received $94,021 but paid fractionalized share investors $95,221, leaving *nothing* for the Funds' investors.  *Id.* ¶ 31, Appendix A-3.  The sales of fractionalized shares were never disclosed to investors in the Funds.

---

[9] Ex. 1 ¶ 28. Investor's purchases of fractionalized shares of the Life Policies were documented in Life Settlement Certificates.  *See, e.g.*, Ex. 19.  For a table summarizing PSI's sales of fractionalized shares of Life Policies, *see* Ex. 1 ¶¶ 26-28, Appendix A-2.

### 3. Falsely Stated the Funds Would Invest at Least 50% of Assets in Life Insurance Policies

Even if the millions of dollars Mueller spent on his other businesses is viewed as "investment," which it was not, all seven versions of the PPMs unambiguously stated that (i) the Funds intended to "overwhelmingly" [10] allocate their assets in Life Policies and (ii) the Funds would "invest in [Life Policies] as the simple majority of our Fund Assets."[11]  In reality, Mueller spent only about 18.2% of the $66 million raised on such policies, using the rest of investors' money to fund his own businesses principally focused on developing a pinball machine, as well as misappropriating over $1.3 million for himself.  Ex. 1 ¶¶ 13-14, 20-21, 32 Dkt. 16-1.  Although May 2017 was the last time Mueller contracted to purchase a policy, he raised at least $54 million from investors using these materially false and misleading statements through at least June 2021.[12]

The PPMs also included disclosures about the maximum percentage of investors' assets Mueller could spend on the Funds' operating expenses and investments in his other businesses, such as deeproot Tech, deeproot Pinball, deeproot Studios, a car wash company, and others (collectively, the "Affiliated Companies").[13]  The PPMs allowed Mueller to spend between 2%

---

[10] *See* Ex. 2 at 211521; Ex. 3 at 164831; Ex. 4 at 164816; Ex. 5 at 14505; Ex. 6 at 164769; Ex. 7 at 164793; Ex. 8 at 13406.

[11] Ex. 2 at 211522; Ex. 3 at 164832; *see also* Ex. 4 at 164817 and Ex. 5 at 14506 (investments in affiliated companies limited to 45% of asset portfolio); Ex. 7 at 164795 and Ex. 8 at 13408 (investments in affiliated companies limited to 30% of asset portfolio).

[12] Ex. 1 ¶¶ 6, 11, 12. On occasion PSI purchased policies on installment contracts. *Id.* ¶ 9. PSI purchased a policy, BASH82, in May 2017 but defaulted on the policy in 2019. *Id.* ¶ 12. The last policy PSI purchased before BASHA82 was ANDR62 in April 2017.  *Id.* ¶ 10.

[13] *See, e.g.,* Ex. 2 at 211525; Ex. 3 at 164835-36. Mueller directed PSI or the Funds to purchase other assets as well including the Ohana Trust, which purchased a condominium in Hawaii for him and his family, and a food development company. Mueller Invest. Tr., Jun. 24, 2021, at 292:23-294:2; 354:10-355:18 ("Ex. 20").

and 20% on "Company Advances," which were supposed to cover the Funds' operating expenses and related items.  For example, the most recent 575 PPM stated:

> [T]he Company shall receive an advance of no less than [2%] and no more than [10%] of the Invested Capital of any Class C Shareholder. . . . This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.

Ex. 2 at 211526.  Any investor funds used as the Company Advance were to be returned in full to investors upon maturity of the investments.  *See, e.g.*, Ex. 3 at 164837.  Other PPMs included the same description of the Company Advance, but set the maximum at 20%.[14]  For investments in the Affiliated Companies, the PPMs also set a maximum percentage of investor money that that could be invested in those companies, and depending on the PPM, limited the companies that could receive the money.[15]  Taking these provisions into account, at Mueller's direction Deeproot was required to invest approximately at least $28.6 million in Life Polices.  Ex. 1 ¶¶ 23-24.  Mueller, however, invested less than half that amount on Life Policies—about $12 million.  *Id.* ¶ 13.

Mueller, the Funds' investment adviser, director, and executive officer, prepared, was responsible for, and therefore understood the Funds' investment allocations.  *See* Ex. 20 150:3-16; Section II.c.  From the outset, however, Mueller intended to use the Funds' assets to finance his pinball businesses.  In August 2015, as he was forming the Funds his attorney asked him, "why do

---

[14] *See* Ex. 3 at 164837; Ex. 4 at 164820; Ex. 5 at 14509; Ex. 6 at 164776; Ex. 7 at 164798; Ex. 8 at 13411.

[15] The first two dGRD PPMs stated Mueller could purchase an investment position in affiliated companies with up to 30% of the asset portfolio. Ex. 8 at 13408; Ex. 7 at 164795.  The final dGRD PPM omitted any reference to investments in affiliated companies.  *See* Ex. 6.  The two 575 PPMs used before November 2019 stated Mueller could invest up to 45% of the asset portfolio but only to invest in deeproot Tech.  Ex. 4. at 164817; Ex. 5 at 14506-07.  The final two 575 Fund PPMs allowed investments in several Affiliated Companies up to 50% of the asset portfolio.  *See* Ex. 2 at 211525; Ex. 3 at 164835.

we allow up to 30% in [Affiliated Companies]," Mueller answered, "I wanted to go higher. That's my back door Pinball."  Emails, Aug. 18, 2015 ("Ex. 10") at 27054-06.

### 4. Falsely Stated the Funds Purchased Shares or Other Interests in the Affiliated Companies

The PPMs that disclosed that the Funds could invest in the Affiliated Companies, falsely stated that the Funds' investments would be "capital acquisitions," which the PPMs described as "a purchase of an internal, affiliated investment position in another enterprise."[16] In reality, the Funds' purchased nothing from the Affiliated Companies and received nothing, or very little, in return for their purported investments.

The PPMs varied in how they described the Funds' investments in the Affiliated Companies. The PPMs for the 575 Fund through November 2019 stated that the 575 Fund would invest in deeproot Tech through the purchase of Class B Shares of deeproot Pinball, a subsidiary of deeproot Tech.  *See* Ex. 4 at 164818; Ex. 5 at 14507.  Mueller testified that he could not recall whether the Funds ever purchased Class B Shares of deeproot Pinball.  Mueller Dep. Tr. 46:24-47:4, Jun. 23, 2021 ("Ex. 14") at 137:19-139:6.  The PPMs for the 575 Fund *after* November 2019 disclosed that the fund could purchase interests in several of the Affiliated Companies.  Ex. 3 at 164835-36; Ex. 2 at 211525.   The disclosures in the dGRD PPMs were more general. They included the same description of investments as "acquisitions" and "purchases" but without details regarding the identities of the Affiliated Companies.  Ex. 8 at 13408; Ex. 7 at 164795.  After November 2019, the dGRD PPM made no reference to purchases in Affiliated Companies at all. *See* Ex. 6.

---

[16] Ex. 2 at 211525; Ex. 3 at 164835; Ex. 4 at 164817; Ex. 5 at 14506; Ex. 7 at 164795; Ex. 8 at 13408.  The final dGRD PPM omitted any reference to investments in affiliated companies.  *See* Ex. 6.

None of the PPM disclosures were accurate because, although Mueller transferred substantial assets from the Funds to the Affiliated Companies, Ex. 1 ¶ 21a-f, Mueller has been unable to produce any documentation of the Funds' interest or investments in the Affiliated Companies.   During his deposition, Mueller could not identify the location of records memorializing the Funds' investments or ownership of the Affiliated Companies.[17]

In 2017 Mueller retained a consultant to review financial records related to his plan to file a registration statement for yet another fund.  Ex. 14 at 46:24-47:4.  The consultant asked Mueller, "are there debt or investment agreements in place between [the Affiliated Companies] and the [F]unds, whereby the terms of the cash flow, repayment schedules, profit allocations, etc, are documented?").  Emails, March 18-20, 2017 ("Ex. 16") at 210797.  Mueller admitted that there was "no formal documentation other than our discretion," *id.*, and said he would "'paper'" the relationship internally.  *Id.* at 210796.  Mueller's attempt at papering this relationship was an Investment Allocation Agreement ("Allocation Agreement") dated March 23, 2017, between deeproot Funds and deeproot Tech that stated deeproot Tech would transfer 40% of its net profits to deeproot Funds.[18]  The Allocation Agreement, signed only by Mueller on behalf of all the entities, does not memorialize the Funds' "capital acquisitions" of an interest in deeproot Tech or any other entity, does not identify the amount invested in deeproot Tech, and is silent regarding the Funds' investments in Mueller's other Affiliated Companies and in deeproot Tech prior to March 2017. *See id.*  Thus, the statements in the PPMs regarding the Funds' "capital acquisitions,"

---

[17] *See, e.g.,* Ex. 14 at 138:17-141:17 (Mueller testified that although he believes the 575 Fund's purchase of the Class B shares of deeproot Pinball were documented, he cannot recall where those records are stored).

[18] Investment Allocation Agreement, Mar. 23, 2017 ("Ex. 17") at 213964; Ex. 3 at 164827, Ex. 8 at 13402 (deeproot Funds is the sole member of the 575 and dGRD Funds).

which the PPMs described as "a purchase of an internal, affiliated investment position in another enterprise[]" were materially false and misleading.  *See, e.g.*, Ex. 2 at 211525.

### 5.   Falsely Understated the Amount the Funds Would Invest in the Affiliated Companies and Spend on Operating Expenses

Just as the PPMs falsely overstated the percentage of investor money the Funds would spend to acquire Life Policies*,* the PPMs materially understated the amount Mueller would spend on operating expenses and investing in the Affiliated Companies from the Funds' assets.  Based on the PPMs' disclosures, and in light of the $66 million he raised from investors, the maximum total Mueller could arguably allocate to these two categories was $37.8 million.  Ex. 1 ¶¶ 22-24.  Mueller spent over $50.1 million of the Funds' investors' money on the Affiliated Companies or operating expenses.  Ex. 1 ¶ 21.  As a result, contrary to the representations in the PPMs, Mueller spent at least $12.3 million more of investors' money than permitted under the PPMs.  *Id.* ¶ 25.

### 6.   Failed to Disclose that Mueller Used the "Company Advance" to Make Ponzi-Like Payments

The 575 Fund allowed investors to choose to receive periodic interest payments or receive a lump sum.  *See, e.g.*, Ex. 3 at 164827-28.  If an investor elected periodic payments, as many did, the 575 Fund was required to make periodic monthly payments.  *Id.*; Ex. 24 at 1074; 575 Fund Operating Agreement, Feb. 26, 2108 at 0019802 ("Ex. 25") at 19797.  To satisfy the 575 Fund's obligations to pay its investors, the 575 Fund made payments to investors using almost $1.9 million of new investor money between the inception of the Funds and the Complaint (the "Relevant Period").  Ex. 1 ¶ 16; Ex. 14 at 168:21-170:17.

The PPMs did not disclose that the Funds could pay early investors with new investors' money.  Mueller argues that the "Company Advance" provisions in the PPMs, which describe payments for, among other things, "nominal administration expenses," allowed him to use new

investor assets to pay earlier investors.[19]  Mueller claims his attorneys agreed that the "nominal administration expenses" reference in the PPMs adequately disclosed that Mueller intended to pay early investors with new investor money.  Ex. 14 at 168:21-170:17.  As discussed *infra*, pages 33-34, however, Mueller's attorneys never made such a representation.  Mueller's attorney told Mueller that money is fungible, and that Mueller could use new investors' money to pay old investors so long as the Funds' investments also had investment returns.  *See* Concilla Dep. Tr. ("Ex. 31") at 179:17-180:19; Federico Dep. Tr. ("Ex. 33") at 73:4-73:22; Decl. of Concilla, Apr. 4, 2023 ("Ex. 41").  If the Funds lacked sufficient revenue to make these payments, Mueller's attorney testified "using new money from new investors to pay old investors" would be "the hallmark of a Ponzi scheme."  *See* Ex. 31 at 179:17-180:19, Ex. 33 at 73:4-73:22; Ex. 41.  Here, the Funds' investments never generated sufficient revenue to pay investors.  Ex. 1 ¶¶ 16-18.

Mueller also misled 575 Fund investors when he provided an explanation of why they had not received their periodic payments.  *See e.g.*, Allen Dep. Tr., Feb. 16, 2023 ("Ex. 23") at 156:22-158:1; 161:20-162:13.  On September 30, 2020, Mueller wrote a letter to 575 Funds investors where he stated, "[W]e experienced . . . cash flow delays in mid to late September that depleted our 575P payment reserves.  The result was that some 575P investors received their payment in September and others did not."  Mueller Ltr. to Investors, Sept. 30, 2020 ("Ex. 21").  What Mueller failed to disclose, however, was that the 575 Fund lacked cash flow because it did not receive enough new investor money to make the required periodic payments.   Ex. 23 at 161:20-162:13.

Mueller was aware that his management of the Funds raised concerns that he was operating a fraudulent Ponzi scheme.  Scott Allen, who worked for Mueller in business development until

---

[19] Ex. 14 at 157:12-18; *see also* Ex. 2 at 211526 (defining Company Advance to include "nominal administration expenses").

he resigned in October 2020 (Ex. 23 at 16:19-17:6; 148:2-5; Allen Resignation Memo, Oct. 7, 2020 ("Ex. 22")), wrote Mueller a resignation letter that included the following statement:

> [A]s evidence with the recent missed 575-Periodic payments, it has become clear that your chosen strategies and methods up to this point have been relying entirely on incoming capital from new investors to be able to honor commitments to previous investors. While it may not be your design or intention . . . in functional operation it looks and feels like a Ponzi scheme, and I cannot and will not be part of it.

Ex. 22 at 79.  Allen also stated that he was not making any accusations and had no knowledge to confirm that Mueller was operating a Ponzi scheme.  *Id.*  Mueller, however, never amended the PPMs or otherwise disclosed to investors that he used new investor money to make the periodic payments to investors.  *See, e.g.,* Exs. 2, 3, 5.

The PPMs and marketing materials similarly failed to disclose that the Funds' money would be used to pay off investors in Mueller's other funds. Prior to creating the 575 and dGRD Funds, Mueller created four other "Debenture Funds."  Ex. 20 at 63:1-19.  As of June 2021, at least some of the investors in the Debenture Funds were still awaiting repayment of their principal and investment return.  Ex. 20 at 64:4-65:12.

Deeproot financial records show that investors in the Debenture Funds received almost $3.8 million from the Funds. Ex. 1 ¶ 17.  As discussed above, none of the PPMs or other marketing materials disclosed that investors' money could be used to pay investors in *other funds* including the Debenture Funds.  *See* Exs. 3-7.

## C.    Mueller Breached the Fiduciary Duties He Owed to the Funds

Mueller breached the fiduciary duties that he owed to the Funds by ignoring the promises he made in the PPMs and the Funds' operating agreements.  In doing so, he also breached customs and practices in the investment advisory industry.  As the investment adviser to the Funds and the sole shareholder and principal of deeproot, Mueller had "broad authority," and the Funds relied

"exclusively on our Advisor or Manager(s) [*i.e.*, Mueller] to make sound investment decisions for them."  *See, e.g.*, Ex. 2 at 0211519.

The Funds' Operating Agreements also required Mueller, as manager, to conduct the affairs of the Funds in a "prudent and businesslike manner" and maintain accurate books and records of each transaction made by Mueller on behalf of the Funds.[20]  The Operating Agreements also limited Mueller's use of the Funds' money "solely for [the Funds'] purposes" and instructed that the Funds' money and Mueller's money should not be commingled.  *Id.*

Mueller, as an investment adviser and manager of the Funds, also had an obligation to act, consistent with industry custom and practice, as a fiduciary. The SEC designated Bill Post as an expert, a financial professional with over 29 years of experience in the industry.[21]  In his report, Post identified industry customs and practices that investment advisers in Mueller's position typically follow to protect investors' interests, including documenting intercompany transactions, investments, and the rationales for investment decisions.  Ex. 27 ¶¶ 67, 69, 70, 73-79.

As the Funds' adviser and manager, Mueller failed to meet the standards common in the industry and that he set in the Funds' PPMs and Operating Agreements.  For example, the Funds did not have a written policy or controls to ensure compliance with the 20% limit set in the "Company Advance" provision—a limit exceeded by millions—and Mueller did not document his valuation of the Funds' assets to ensure investments in the Affiliated Companies conformed to the limits set in the PPMs.  Ex. 14 at 147:11-16; Ex. 20 at 101:20-24.  Finally, Mueller paid the

---

[20] *See, e.g.,* Ex. 24; Ex. 25; dGRD Fund Operating Agreement, Feb. 26, 2018 at 0005771 ("Ex. 26") (collectively Exs. 24-26, the "Operating Agreements"); *see also* Ex. 9 (identifying Exs. 24, 25, 26 as Operating Agreements of the Funds).

[21] Expert Report of Bill Post ¶¶ 1-2, Mar. 17, 2023 ("Ex. 27"); *see also* Supplemental Expert Report of Bill Post, Apr. 27, 2023 ("Ex. 28").

expenses of Affiliate Companies without documenting the expenses and the investment reasons for the transfers.  *See* Ex. 27 ¶ 67, 69-71; Ex. 20 at 163:1-164:2.

Mueller used the Funds' money to pay his personal expenses,[22] which not only violated the terms of the Operating Agreements but was also a breach of his fiduciary duty and contrary to industry custom and practice.  *See* Ex. 27 ¶ 93; Ex. 24 at 001079.  For the period September 2015 to February 2019, on a nearly monthly basis, Mueller paid his American Express bill using PSI's bank account.  Ex. 27 ¶¶ 93-96.  In total, PSI made at least $1.1 million in credit card payments on Mueller's behalf.  *Id.* ¶ 96.  Mueller was thus able to use the Funds' assets to buy jewelry, cruises, and to pay a wedding planner, catering, his personal tax bills, medical bills, his child's school tuition, and for attorneys to represent him during his second divorce.  Ex. 1 ¶ 32; Ex. 20 at 367:1-368:15, 370:3-15, 371:6-15, 373:18-23, 375:21-25, 378:5-23, 383:1-384:1; Ex. 45 at 0003259; Ex. 46 at 0000012-14; Ex. 47 at 0000005-8; Ex. 48 at 0002809-2829; Ex. 49 at 0003067-79.

### D.  The deeproot Entities' Attorneys Did Not Provide Legal Advice to Mueller Regarding the Alleged Misstatements, Omissions, or Ponzi-like Payments

Beginning in April 2013, the deeproot Entities were represented by Dennis Concilla and Andrew Federico of Carlile Patchen & Murphy LLP ("CPM").[23]  CPM's engagement was limited

---

[22] *See* Ex. 1 ¶ 32; Decl. of Verma, Oct. 6, 2021 ¶ 11 ("Ex. 29").  During his investigative testimony, Mueller asserted his Fifth Amendment privilege when asked whether certain personal expenses, including jewelry, private school tuition, wedding expenses, travel expenses, medical expenses, and personal legal bills, were paid for using deeproot Funds.  Ex. 20 at 368:8-15; 370:3-15; 371:6-15; 373:18-23; 375:21-25; 378:5-23; 383:1-25; American Express Statement, July 9, 2018 ("Ex. 45") at 0003259; Americus Diamond Receipt, December 15, 2018 ("Ex. 46") at 0000012-14; Americus Diamond Receipt, December 14, 2015 ("Ex. 47") at 0000005-8; American Express Statement, Mar. 9, 2016 ("Ex. 48 at 0002809-2829; American Express Statement, Mar. 9, 2017 ("Ex. 49") at 0003067-79.

[23] Email Attaching Engagement Ltr., Apr. 22, 2013 ("Ex. 30"); Ex. 31 at 31:3-17; 36:13-17; 37:17-19.

to corporate matters, representing Mueller only as a company officer.[24] CPM represented the deeproot Entities through 2018 but CPM's primary work ended before 2017.  Ex. 31 32:22-33:02; 35:17-20.

Mueller created the initial draft of the Funds' PPMs.  Ex. 31 at 50:6-51:9; 75:21-76:4; Email Attaching Draft dGRD PPM, Aug. 4, 2015 ("Ex. 32").  Concilla only advised on the original 575 PPM, Ex. 5, in effect between May 2015 and May 2018, and the original dGRD PPM, Ex. 8, in effect between August 2015 and May 2018.  Ex. 31 at 101:14-19; 112:16-22; 121:23-122:1; Ex. 9 at 3-4; Email Attaching dGRD PPM, Aug. 12, 2015 ("Ex. 42").  Mueller did not tell Concilla about, or ask him to provide legal advice regarding, the three subsequent 575 PPMs, Exs. 2-4, and the two subsequent dGRD PPMs, Exs. 7, 6.  *Id.*  Federico does not recall advising Mueller on any of the Funds' PPMs.  Federico Dep. Tr. ("Ex. 33") 41:15-42:6; 56:11-57:2.

Mueller never sought legal advice or disclosed to CPM the key factual bases that the SEC contends constitute misrepresentations or omissions.  For example, Mueller never informed CPM that PSI, not the Funds, owned the Life Policies or that PSI did not grant the Funds interests in the Life Policies. Ex. 31 at 92:25-94:12; 102:3-23; 106:22-108:20; Ex. 33 at 46:14-47:16.

Mueller also never informed CPM that the Funds did not purchase interests in the Affiliated Companies.  Mueller never told CPM that neither Fund purchased Class B shares in deeproot Pinball as stated in the 575 PPM that Concilla reviewed.  Ex. 31 at 92:25-94:12. When shown Exhibit 18, a list of policies backing investments, Concilla stated that the document was misleading

---

[24] Ex. 31 at 32:1-21; *see also* Ex. 33 at 45:8-20. Mueller, after asserting an advice of counsel defense, dkt. 75 at 12, waives application of the attorney-client privilege and work product doctrines for communications between Mueller and CPM before January 1, 2019. Ltr. Hulings to SEC, Dec. 12, 2022 ("Ex. 39"). The bankruptcy trustee waived the attorney client privilege for communications between the CPM and the Debtor Defendants. Waiver of Att'y Client Piv. and Confid., Jan. 27, 2023 ("Ex. 40").

if it failed to disclose that deeproot sold fractionalized interests in the same policies. *Id.* at 160:3-23; Assets Backing Up Investments ("Ex. 18"). When asked, Concilla stated that he understood the Funds' would have enforceable interests in the Life Policies and Affiliated Companies and would have advised Mueller to amend the PPMs if they did not. *Id.* at 92:25-94:12; 96:21-25; 301:13-303:9.

Mueller did not seek legal advice about, nor did he disclose to CPM, that he paid investors in his Debenture funds with the Funds' assets. *See Id.* at 152:3-153:7; 153:23-154:16; Ex. 33 at 113:4-23. Mueller also did not tell CPM that he paid earlier 575 Fund investors with money he obtained from new Fund investors. Ex. 31 at 179:17-180:9; 181:3-10.

Mueller claims that, based on advice that he allegedly received from CPM, he understood that he could pay the Funds' earlier investors using money he obtained from new investors as long as the same accounts in which he deposited the new investors' funds also received other revenue. Ex. 14 at 161:16-162:7; 168:15-170:17. Concilla and Federico do not recall offering Mueller that advice and, when asked at their depositions, stated that paying new investors with old investors' money without additional income would constitute a Ponzi scheme. *See* Ex. 31 at 179:17-180:19; Ex. 33 at 72:17-73:7; Ex. 41.

Mueller also never informed CPM, or sought legal advice regarding, what the SEC contends are Mueller's failures to meet the promises or standards set in the PPMs and Operating Agreements and custom and practice in the industry. For example, Mueller never informed CPM that he did not have a consistent methodology or documented process to accurately value the Life Policies or the Affiliated Companies. *See* Ex. 31 at 142:20-143:19; 145:1-9; Ex. 33 at 66:3-12. He also did not inform CPM that there were no internal financial controls at deeproot. Ex. 31 at 143:20-144:23; Ex. 33 at 66:19-22. Mueller also never informed CPM that he failed to track and

document that the "Company Advance" did not exceed the maximum 20% disclosed in the PPMs or that he failed to segregate the Company Advance Funds. Ex. 31 at 164:17-165:16.

Mueller also contends that CPM knew and approved of his use of investor funds to pay personal expenses. *See*, Ex. 14 at 112:25-114:18. Concilla and Federico, however, do not recall Mueller telling them that he used the Funds' money to pay personal expenses. Ex. 31 at 167:11-17; Ex. 33 at 65:18-66:2.

### E.    Mueller's Misrepresentations, Omissions, and Breaches of His Duties Were Material to Investors' Investment Decisions

Mueller's misrepresentations, omissions, breaches of his duties as outlined in the PPMs and Operating Agreements, and failure to act consistent with industry custom and practice were material to investors. Attached as exhibits to this motion are declarations of five of the over three hundred investors in the Funds.[25] These investors entrusted Mueller with their retirement savings. Ex. 34 ¶¶ 6, 14, 15; Ex. 35 ¶¶ 4, 12, 13; Ex. 36 ¶¶ 5, 6, 15, 16; Ex. 37 ¶¶ 7, 14, 15; Ex. 38 ¶¶ 6, 14, 15. As a result of Mueller's actions, these five investors lost a total of more than $2.2 million in principal and had their retirement substantially impacted. *Id.* For example, Brad Leon invested $1,000,000 in the 575 Fund less than two weeks before Mueller gave sworn testimony to the SEC,[26] by cashing out 70% of his savings in his federal government retirement account. Ex. 34

---

[25] *See* Leon Decl. ("Ex. 34"); Donnelly Decl. ("Ex. 35"); Gray Decl. ("Ex. 36"); Kane Decl. ("Ex. 37"); Thompson Decl. ("Ex. 38").

[26] Compare date of Ex. 15 at 0000019 (Mueller accounting recording $1,000,000 deposit from Brad Leon on Jun. 11, 2021) with date of Ex. 20 at 1 (transcript of Mueller testimony dated June 23, 2021).

¶¶ 2, 10.  As a result, Mr. Leon will have to work many more years before he can retire.  Ex. 34 ¶ 15.

At the time they made their investments, investors understood that that they were making a safe investment, backed by the Funds' purchase of Life Policies.  *See, e.g.*, Ex. 34 ¶ 6; Ex. 35 ¶ 5; Ex. 36 ¶¶ 7, 9; Ex. 37 ¶ 7, 10; Ex. 38 ¶¶ 7, 10.  They also believed that they would receive returns on their investment from the Funds' Life Policy investments.  *Id.*  No one told them that the Funds could use their money to pay other investors or that they would receive other investors' money—facts each would have considered important to their investment decision.  Ex. 34 ¶¶ 10-12; Ex. 35 ¶¶ 6-10; Ex. 36 ¶¶ 11-13; Ex. 37 ¶¶ 8-12; Ex. 38 ¶¶ 8-12.  No one told them the role that the Affiliated Companies would play in their investments—a fact each would have considered important to their investment decisions.  *Id.*  And no one told them their investment funds could be used by Mueller to pay personal expenses including, a condo in Hawaii, vacations, weddings, and a divorce.  *Id.*

## III.   LEGAL STANDARD

Summary judgment should be granted when the pleadings, affidavits, and other supporting papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Rule 56).  A factual issue is not genuine unless "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

Once the movant has met its initial burden of identifying the absence of a genuine issue of material fact, to defeat summary judgment the non-movant must "go beyond the pleadings and by

her own affidavits [and through discovery] designate specific facts showing that there is a genuine issue for trial." *Celtic Marine Corp. v. James C. Justice Cos. Inc.* 760 F.3d 477, 481 (5th Cir. 2014) (quoting *Celotex,* 477 U.S. at 324). The disputed facts must be material to the outcome of the litigation and supported by evidence to allow "a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587. A party cannot defeat summary judgment by relying on conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *See Turner v. Baylor Richardson Med. Ctr.,* 475 F.3d 337, 343 (5th Cir. 2007). Likewise, summary judgment is appropriate "even in cases where elusive concepts such as motive or intent are at issue, if the nonmoving party rests merely upon conclusory allegation, improbable inferences, and unsupported speculation." *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994) (quotations omitted).

## IV.    ARGUMENT

### A.    The Court Should Grant Summary Judgment as to Counts 1 Through 4

In its First through Fourth Counts, the SEC asserts that Mueller violated Section 10(b) and Rules 10b-5(a)-(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5(a)-(c)] and Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)-(3)] (collectively, the "Antifraud Provisions"). A defendant violates the Antifraud Provisions if the SEC establishes by a preponderance of the evidence: (1) that a defendant made a material misrepresentation or omission of material fact, **or** employed a fraudulent scheme **or** engaged in an act that operated as a fraud; (2) with the required mental state; (3) in connection with the purchase or sale of, or in the offer or sale of, any security; and (4) that the defendant made use of, or caused the use of, interstate commerce. *See generally, Aaron v. SEC,* 446 U.S. 680 (1980); *SEC v. Gann,* 565 F.3d 932, 936 (5th Cir. 2009); *SEC v. Seghers,* 298 F. App'x 319, 327-28 (5th Cir. 2008). "[T]he proscriptions of [S]ection 17(a) are

substantially the same as those of Section 10(b) and Rule 10b-5," thus courts frequently analyze the Antifraud Provisions together. *See SEC v. Farias,* 2022 WL 3031082 at *3 (W.D. Tex. Aug. 1, 2022) (quoting *SEC v. Spence & Green Chem. Co.,* 612 F.2d 896, 903 (5th Cir. 1980)); *SEC v. Helms*, Civ. No. A-13-CV-01036 (ML), 2015 WL 5010298 at *12 (W.D. Tex. Aug. 21, 2015).

Misstatements are material if "the information disclosed, understood as a whole, would mislead a reasonable potential investor." *SEC v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018) (quotation omitted); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). As such, the Antifraud Provisions of the securities statutes and regulations impose a "duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quotation omitted). The terms "device," "scheme," "act," and "practice" in Rules 10b-5(a) and (c), as well as Section 17(a)(l) and (3)) are "expansive" and designed to "capture a wide range of conduct" in addition to the making of statements. *Lorenzo v. SEC,* 139 S. Ct. 1094, 1101-2 (2019). For this reason, courts often find violations of Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(l) and (3) when a defendant disseminates a materially false or misleading statement to potential investors, or otherwise perpetrates a scheme with intent to defraud. *See Lorenzo,* 139 S. Ct. at 1101-2; *SEC v. Silea,* 2022 WL 269105 at *3-12 (E.D. Tex. Jan. 27, 2022).

Violations of Section 17(a)(l) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder require proof of scienter. *Aaron,* 446 U.S. at 695-96 (scienter is a necessary element of a violation of Section 10(b) under the Exchange Act and Section 17(a)(1) of the Securities Act). Violations of Sections 17(a)(2) and (3) of the Securities Act, however, require

only negligence, not scienter. *Aaron*, 446 U.S. at 696-97; *see SEC v. Hopper,* 2006 WL 778640 at *9 (S.D. Tex. Mar. 24, 2006). Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). In the Fifth Circuit, scienter can be established by showing that a defendant acted intentionally or with severe recklessness. *See Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981) (*en banc*).

### B.   Mueller Made Material Misrepresentations and Omissions and Employed a Fraudulent Scheme

No genuine dispute exists that Mueller violated (i) Exchange Act Rule 10b-5(b) and Securities Act Section 17(a)(2) by making material misrepresentations and omissions; and (ii) Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3) by employing a fraudulent scheme.

#### 1.   Mueller's Misrepresentations and Omissions Violated Section 10(b), Rule 10b-5(b), and Section 17(a)(2)

There is overwhelming evidence that Mueller enticed investors to invest in the Funds with numerous untrue statements and omissions in violation of Section 10(b) of the Exchange Act, Rule 10b-5(b), and Securities Act Section 17(a)(2) and for which there is no triable question of fact. Mueller made multiple types of misrepresentations to investors, including, misrepresenting the use and allocation of investors' funds, misrepresenting the Funds' ownership interests in life insurance policies, and misrepresenting the interest acquired in the Affiliated Companies.

First, Mueller misrepresented that the Funds would own the life insurance policies. The PPMs discussed the Funds purchasing, buying, and investing in Life Policies. *See, e.g.*, Ex. 6 at 164770. Instead, Policy Services Inc. ("PSI") owned the policies and the Funds had ***no*** ownership interest in the policies Mueller controlled. Ex. 11 at 5 ¶ 10 (holding PSI as owner of the policies). The PPMs stated that by investing in the Funds, investors were receiving a "securitized investment

in a pool of life settlement policies" that would back their investments.  Ex. 3 at 164827.  After PSI declared bankruptcy, however, the bankruptcy court authorized the sale of the Life Policies. *See* Ex. 11 at 5, 7.  A reasonable investor would consider it important to know that the Funds would not have an ownership interest in life insurance policies, as promised.

Second, Mueller failed to disclose to investors that he previously sold fractional interests in at least half of the life insurance policies that were allegedly owned by the Funds.  Neither the PPMs nor the marketing materials disclosed that between November 2012 and November 2016 Mueller sold off portions of the Life Policies allegedly owned by the Funds to ***other*** investors. Exs. 2-7.  In total, Mueller sold approximately 139 fractionalized shares in at least 11 of the 19 policies Mueller later identified as assets for PSI.  Ex. 1 ¶¶ 27-28; Ex. 15 at 000058.  As a result, approximately 25% of the death benefits of the Life Policies was owed to investors outside the Funds.  Ex. 1 ¶ 28.  Mueller's omission of this fact is material because it concerns the true ownership of the purported core asset of the Funds—the policies—and would have affected a reasonable investor's choice to invest in the Funds.  *See SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982) (finding that "information concerning the true ownership of [investment properties] would have been important to the offerees in making their investment decisions").  It also made any statements by Mueller about the assets in the Funds' investment portfolios materially false.

Third, Mueller misrepresented the use and allocation of investors' funds.  Despite promising investors that the Funds' assets would be intended to "overwhelmingly" invested in life insurance policies, Mueller invested only 18% of the approximately $66 million raised on such policies.  Ex. 1 ¶ 14.  All seven versions of the Funds' PPMs declared: (1) "the overwhelming intended allocation of investment funds [go] to life policies"; and (2) the Funds would "invest in [Life Policies] as the simple majority of our Fund Assets."  *See, e.g.*, Ex. 3 at 164831-32.  Having

chosen to speak on his allocation of investor assets in life insurance policies, Mueller had a duty to disclose the truth.  "It is well-established precedent…that once a company speaks on an issue or topic, there is a duty to tell the whole truth[.]"  *In re Vivendi, S.A. Secur. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (quotation omitted); *SEC v. Thompson*, 238 F. Supp. 3d 575, 597 (S.D.N.Y. 2017).  Here, the omitted fact—that Mueller used less than 18% of investor funds to buy life insurance policies or pay life insurance policy premiums—is so obviously material that reasonable minds cannot differ because it would clearly impact the investor's assessment of the strength and safety of a potential investment.  *See TSC Indus., Inc.*, 426 U.S. at 449.

Fourth, Mueller misrepresented that the Funds would acquire an ownership interest in the Affiliated Companies.  For example, the PPMs claimed that the investments would be "capital acquisition[s]," described as "a purchase of an internal, affiliated investment position in another enterprise."  *See, e.g.*, Ex. 3 at 0164835.  However, Mueller failed to inform investors that they would have *no* interests in the Affiliated Companies.  As shown by an email exchange from March 2017 discussing the Funds' ownership interests, Mueller wrote:  "there is no formal documentation other than our discretion" and "I will 'paper those internally."  Ex. 16 at 0210796-97.  The Allocation Agreement that Mueller later prepared to "paper" the purported investments, however, did not memorialize the Funds' purchase of an interest in deeproot Tech, did not identify the amount invested in deeproot Tech, and was silent regarding the Funds' investments in Mueller's other Affiliated Companies and deeproot Tech prior to March 2017.  *See* Ex. 17; Ex. 16 at 0210796-97.

Fifth, Mueller misrepresented the amount the Funds would spend on operating expenses and investments in the Affiliated Companies, which were principally focused on his personal pinball venture.  The PPMs included disclosures about the maximum amount Mueller, as the

investment adviser and manager of the Funds, could use on operating expenses and on Affiliated Companies.  *See, e.g.*, Ex. 3 at 164835-37.  These disclosures, viewed in the manner most favorable to Mueller, allowed him to spend a total of $37.8 million of investor money on operating expenses and as investments in affiliates.  Ex. 1 ¶¶ 23-24.

Contrary to the representations in the PPMs, there is ample, undisputed evidence that Mueller diverted over $50.1 million of 575 and dGRD investor funds to the Affiliated Companies or for alleged operating expenses—or $12.3 million more than what was disclosed in the PPMs as the maximum contribution or investments in the PPMs.  Ex. 1 ¶ 25.  This diversion to Mueller's businesses, including his pinball venture, was intentional.  For example, as demonstrated in a series of August of 2015 emails, when an attorney asked why Mueller allocated 30% of investor funds to other companies, Muller responded, "I wanted to go higher. That's my back door Pinball."  Ex. 10 at 002704-05.  Mueller's diversion of at least $12.3 million of investor funds to the Affiliated Companies and "operating expenses" in a manner contrary to his representations to investors is material as a matter of law.  *See SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993); Ex. 1 ¶ 25.

Sixth, Mueller did not disclose that he diverted investor funds to pay investors in the Debenture Funds.  *See* Exs. 2-8, Ex. 1 ¶ 17.  Deeproot's financial records show that investors in the Debenture Funds received approximately $3.8 million in 575 and dGRD investors' money.  *Id*.  Clearly, disclosure of the true use of 575 and dGRD investor's money would have been material to 575 and dGRD investors.  *See, e.g., SEC v. Smart*, 2011 WL 2297659, at *22 (D. Utah 2011) (granting summary judgment against defendants on basis of misrepresentations concerning misuse and misappropriation of investor funds in Ponzi scheme); *SEC v. Roor*, 2004 WL 1933578, at *5 (S.D.N.Y. 2004) (granting summary judgment against defendants on basis of misrepresentations concerning sham securities offering and misappropriation of investor funds).

Similarly, Mueller failed to disclose that he used new investor funds to make Ponzi-like payments to existing investors under the guise of the "Company Advance" provision of the PPM. The PPMs did not disclose that the Funds could make the periodic payments to early investors' with new investors' money. *See* Exs. 2-8. Yet this is exactly what Mueller did. There is ample, undisputed evidence that during the relevant period, the 575 Fund made periodic monthly payments to investors and repaid investor principal using approximately $1.9 million of new investor money, Ex. 1 ¶ 16, and Mueller admitted to using new investor money for this purpose. Ex. 14 at 168:21-170:17. Mueller also purposely avoided disclosing his practice when he wrote to investors in September 2020 about cashflow difficulties. Ex. 21; Ex. 23 at 161:20-162:13. Scott Allen, who resigned from deeproot in October 2020, told Mueller in his resignation letter that this practice "looks and feels like a Ponzi scheme, and I cannot and will not be part of it." Ex. 22 at 000079. Despite Mr. Allen's very clear concern about Mueller's use of Ponzi-like payments to pay existing investors, Mueller did not update the Funds' disclosures. *Id.*; Exs. 2-8.

Each of the previous six categories of misrepresentations and omissions, and all of them together, were material because they concern the potential profitability and risk from investing in the Funds. Here, five unrebutted investor Declarations submitted in support of this Motion underscore that the Funds' investors would have wanted to know the facts that were blatantly omitted from the Funds PPMs and marketing materials. *Sethi,* 910 F.3d at 206; *SEC v. Blackburn,* 15 F. 4th 676, 680-681 (5th Cir. 2021) (affirming summary judgment in part because "a reasonable investor would have wanted to know the true identity of who was leading the company") (quotation omitted); *SEC v. Milles,* 2022 WL 206808 at *4 (W.D. Tex. Jan. 24, 2022) (summary judgment for SEC granted in part because defendants gave "the impression that they were experienced and successful in the oil and gas business, [but], the SEC's summary judgment evidence suggests that

these representations were falsehoods.").  In addition, the $1.9 million in Ponzi-like payments was a diversion of investor funds from their disclosed purposes, which is material as a matter of law. *Recile*, 10 F.3d at 1097-1098; Ex. 1 ¶ 16.

### 2.   Mueller Engaged in Deceptive, Manipulative, and Fraudulent Conduct in Violation of Rules 10b-5(a) and (c) and Sections 17(a)(1) and (3)

There is no genuine dispute that Mueller violated Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3) by employing a fraudulent scheme and engaging in deceptive acts that operated as a fraud.  A defendant who knowingly disseminates a false statement to investors with the intent to deceive violates Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3).  Mueller's entire course of conduct in operating deeproot, as well as his dissemination of the misleading statements, constitutes deceptive conduct.  *See Lorenzo*, 139 S.C. at 1101-02, 1104; *see SEC v. World Tree Fin.,* 43 F. 4th 448, 461-64 (5th Cir. 2022).

Also, Mueller's misappropriation of at least $12.3 million for the benefit of the Affiliated Companies and alleged "operating expenses," including $1.9 for Ponzi-like payments for the 575 Fund, $3.8 million for the Debenture Funds, and $1.3 million for personal expenses, constitute deceptive conduct.  Ex. 1 ¶¶ 16-17, 24-25, 32; *See, e.g., SEC v. Scoville*, 913 F.3d 1204, 24 (10th Cir. 2019) (a Ponzi scheme is "inherently deceptive because it generates a false appearance of profitability") (quotation omitted); *SEC v. Alliance Leasing Corp.*, No. 98-cv-1810, 2000 WL 35612001, at *8-9 (S.D. Cal. Mar. 20, 2000) ("the disclosures of commissions and other compensation is fundamental to securities laws").

### 3.   Mueller Acted with the Required Mental State

#### i.   Mueller Acted With Scienter or At Least Severe Recklessness, In Violation of Exchange Act Section 10(b) and Rules 10b-5(b) Thereunder and Securities Act Section 17(a)(1)

Mueller's actions were, at a minimum, reckless, which is shown in three ways. *First*, as the director and executive officer of the Funds (Ex. 2 at 211527; Ex. 6 at 164777), Mueller was ultimately responsible for the contents of the PPMs presented to investors, and he was aware of the investment allocations of the Funds, which differed substantially from the PPMs' disclosures.[27] Mueller either drafted or approved all the PPMs and other marketing materials presented to investors. *Id.*; Ex. 20 at 153:9-19; 155:13-16.

*Second*, as the sole decision maker over the Funds and deeproot, Mueller knew, or was reckless in not knowing, that his representations about the Funds' investments in the Affiliated Companies were materially false or misleading. When a business consultant asked him on March 2017, if there were "investment agreements in place between [the Affiliated Companies] and the [F]unds"?, Mueller responded, "there is no formal documentation" and that "I will 'paper' those internally." Ex. 16 at 0210796-97. Mueller's subsequent drafting of the Allocation Agreement between deeproot Funds and deeproot Tech—which was prepared only three days after this email—was a non-arms-length agreement, signed only by him on behalf of all the parties, and evidenced his intent to continue his deception. *Id.*; Ex. 17.

*Third*, Mueller was a signatory on all deeproot Entities' bank accounts. Ex. 1, Appx. A-1. The financial records provide ample, undisputed evidence that Mueller diverted investor funds in at least four ways that were not disclosed in the PPMs: (1) using the Funds' money to pay his personal expenses; (2) paying investors who purchased fractionalized shares of the Life Policies; (3) repaying investors in the Debenture Funds; and (4) making Ponzi-like payments to earlier investors. *See* Ex. 1 ¶¶ 16-18, 21, 32.

---

[27] Ex. 2 at 211525; Ex. 10 at 002704-06; Ex. 3 at 0164835; Ex. 4 at 164817; Ex. 5 at 14506-07; Ex. 6; Ex. 7 at 164795; Ex. 8 at 13408; Ex. 20 at 150:3-16.

> ii.   **Mueller Also Acted Negligently In Violation of Sections 17(a)(2)-(3)**

Securities Act Sections 17(a)(2) and (3) and Advisers Act Section 206(2) and (4) require, at most, a showing of negligence.  *Aaron*, 446 U.S. at 696-97; *Seghers,* 298 F. App'x at 328.  While the SEC believes the evidence strongly supports that Mueller acted with scienter in his disclosure failures, there is no doubt that he at least acted negligently and therefore violated Sections 17(a)(2) and 17(a)(3) of the Securities Act.

> **4.   Mueller's Conduct Was "In Connection With the Purchase or Sale" and "In the Offer or Sale" of Securities**

In the Fifth Circuit, "a misrepresentation is 'in connection with' the purchase or sale of securities if there is a relationship in which the fraud and the stock sale coincide or are more than tangentially related . . . ."  *Roland v. Green,* 675 F.3d 503, 520 (5th Cir. 2012) (quoting Madden v. Cowen & Co., 576 F.3d 957, 964 (9th Cir. 2009)).  Here, there is no genuine dispute that Mueller's marketing of the Funds—through PPMs and other documents that contained affirmative misstatements and material omissions—coincided with the purchase and sale of securities because all of the PPMs expressly stated on the first page, "these securities are offered."[28]

> **5.   Mueller Also Obtained Money or Property**

Securities Act Section 17(a)(2) has the additional element that defendant "obtain money or property" by means of a false or misleading statement.  15 U.S.C. § 77q(a)(2).  There is no genuine dispute as to this element because Mueller admitted to "receiv[ing] payroll compensation" for his

---

[28] Ex. 2 at 0211514; Ex. 3 at 0164824; Ex. 4 at 0164808; Ex. 5 at 0014497; Ex. 6 at 0164762; Ex. 7 at 0164786; Ex. 8 at 0013399.

management of the Funds.  Ex. 14 at 310:7-9.  This fact alone satisfies the element.  S*ee SEC v. Stoker*, 865 F. Supp. 2d 457, 463-464 (S.D.N.Y. 2012).  Mueller also misappropriated at least $1.3 million in investor money for personal expenses, as discussed in Section II.c, *supra*.  Ex. 1 ¶ 32. Since Mueller was the "sole shareholder and principal of the deeproot family of companies," he personally benefitted from his siphoning of the Funds' assets into the Affiliated Companies.  Ex. 3 at 0164827; Ex. 1, Appx. A-1; Ex. 1 ¶ 21, Ex. 15 at 0000016.

### 6.   Mueller Offered and Sold Securities Using Means of Interstate Commerce

The Antifraud Provisions require that "securities" be offered or sold through the use of interstate communications, commerce, or the mails.  15 U.S.C. §78j(b), 17 C.F.R. § 240.10b-5(a)-(c), 15 U.S.C. § 77q(a)(1)-(3). These elements are undisputed.  Mueller sold interests in the Funds, which the PPMs described as "securities."  *See* Ex. 2 at 0211514; Ex. 3 at 0164824; Ex. 4 at 0164808; Ex. 5 at 0014497; Ex. 6 at 0164762; Ex. 7 at 0164786; Ex. 8 at 0013399.  Moreover, Mueller satisfied the interstate commerce element because he testified that he "distributed" PPMs to investors and sent information about the Funds to "a . . . mailing service that mailed hard copies to all investors."  Ex. 20 at 0028:1-4; 0255:23-25.  Mueller also emailed at least two 575 investors about his August 22, 2020, letter concerning the delay in making periodic payments.  Email, September 4, 2020 ("Ex. 44").

### C.   The Court Should Grant Summary Judgment as to Counts Five and Six

In its Fifth and Sixth Counts, the SEC asserts that Mueller violated Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1)-(2), (4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].  Investment advisers have "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading" clients. *SEC v. Capital Gains Research*

*Bureau, Inc.*, 375 U.S. 180, 194 (1963).   An investment adviser is "any person who, for compensation, engages in the business of advising others, . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ."  15 U.S.C. § 80b-2(a)(11).

Sections 206(1) and (2) of the Advisers Act prohibit an investment adviser from employing any devise, scheme, or artifice to defraud clients or engage in any transaction, practice, or course of business that defrauds clients.  15 U.S.C. §§ 80b-6(1)-(2).  Section 206(4) of the Advisers Act makes it unlawful to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  *Id.* § 80b-6(4).  Rule 206(4)-8 of the Advisers Act provides that an investment adviser may not, among other things, "engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor…."   17 C.F.R. § 275.206(4)-8(a)(2).  While the "client" to whom an adviser's fiduciary duties are owed under Sections 206(1) and (2) is the fund, not the fund's investors, *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006), Section 206(4) and Rule 206(4)-8 apply to investors.   *Id.* at 881 n.6 (distinguishing Section 206(4) of the Advisers Act from Sections 206(1) and (2)).

The elements of a primary violation of Sections 206(1), (2), and (4) have been interpreted as substantively indistinguishable from Section 17(a) of the Securities Act, with the exception that Section 206(1) requires fraudulent intent, while Sections 206(2) and (4) simply require negligence by the primary wrongdoer.  *See Seghers,* 298 Fed. Appx. at 327-28 (citing *Steadman v. SEC,* 603 F.2d 1126, 1134 (5th Cir.1979)); *SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).

**D.     Mueller's Actions and Omissions Also Violated Advisers Act Sections 206(1), (2), and (4) and Rule 206(4)-8 Thereunder**

**1.   Mueller Acted With Scienter In Violation Section 206(1)**

The Court should grant summary judgment as to the SEC's Advisers Act Section 206(1) count for the same reasons as shown for the Antifraud Provisions.  *See* Sections II.b, IV.b, *supra*.

There is no dispute that Mueller is an "investment adviser" within the meaning of the statute because the Funds' were Mueller's clients and he admitted to "receiv[ing] payroll compensation." 15 U.S.C. § 80b-2(a)(11); Ex. 14 310:7-9, *see SEC v. Haarman,* No. 21-CV-235, 2022 WL 2782648 at *3 (W.D. Tex. Jan. 25, 2022). Moreover, misappropriating investor funds plainly violates this provision. *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 654 (D. Conn. 2018). Thus, summary judgment should be granted for the SEC as to the Section 206(1) Count.

### 2. Mueller Also Acted Negligently In Violation of Sections 206(2) and (4)

For the reasons stated above, the Court should conclude that there is no dispute that Mueller violated Sections 206(2) and (4) because Mueller's 575 and dGRD marketing documents contained false statements and omissions of material facts, and grant summary judgment as to the Sections 206(2) of the Advisers Act part of the SEC's Fifth Count and the SEC's Sixth Count.

### E. Mueller Is Unable to Demonstrate that He Relied on the Advice of Counsel

In the Fifth Circuit, reliance on the advice of counsel is not a formal defense, but rather "[i]t is simply a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud." *SEC v. Snyder*, 292 Fed. App'x 391, 406 (5th Cir. 2008) (*quoting United States v. Peterson*, 101 F.3d 375, 381 (5th Cir. 1996)). The Commission has conducted extensive discovery on this issue, and the factual record demonstrates that the purported advice of counsel defense is without merit as a matter of law.

### 1. Mueller Did Not Seek, and His Lawyers Did Not Provide, Legal Advice Relating to the Alleged Misrepresentations and Omissions to Investors

Mueller cannot rely on advice of counsel where there is no evidence that he sought or obtained legal advice regarding his fraudulent misrepresentations and omissions. Concilla and Federico—the CPM attorneys who provided advice to deeproot—testified that Mueller did not seek advice about the PPM provisions that the SEC contends constitute misrepresentations or

omissions.[29]  In fact, Federico did not advise PSI on *any* 575 or dGRD PPM,[30] and Concilla only

advised PSI on the *first* 575 and dGRD PPMs.  Ex. 5, Ex. 9 at 3; Ex. 31 at 100:24-25; 101:1-5;

101:14-19; 114:15-19; 115:15-18; 161:14-17; Ex. 42.  Concilla's advice was limited to the drafting

of the Form S-1 documents for what would have been a separate publicly-traded fund, and advice

about the drafting of the first 575 Fund PPM. Ex. 31 at 40:21-25; 41:1-22; 49:19-25; 50: 1-14.

Mueller did not seek advice from Concilla or Federico regarding subsequent PPMs for either

Fund.[31]  The Fifth Circuit requires evidence that professionals provided a defendant with advice

on the statements at issue.  *See Synder*, 292 Fed. App'x at 406 (to evaluate good faith reliance on

a professional, a jury could consider whether defendant sought advice and whether the professional

had all the relevant facts).  Because there is no evidence that Mueller sought or obtained legal

advice relating to the fraudulent misrepresentations at issue, the Court should grant summary

judgment on this purported defense.

### 2.   Mueller Cannot Demonstrate that He Made Complete Disclosure of Relevant Facts to Counsel

Even if Mueller had sought legal advice regarding the misrepresentations, the record is

clear that Mueller never made full and accurate disclosure to CPM of the key facts that the SEC

contends constitute misrepresentations or omissions.  Counsel's testimony proves that Mueller

never informed them of the following:  (1) that PSI, not the Funds, owned the policies;[32] (2) that

PSI did not grant the Funds interests in the Life Policies, Ex. 31 at 92:25-94:12; 102:3-16; 106:22-

---

[29] *See, e.g.*, Ex. 31 at 102:11-103:16; 104:5-108:20; 111:12-25; 115:4-12; 119:14-22; 120:2-8; 120:13; 121:2-7; 130:6-22; Ex. 33 at 45:8-20; 113:16-23.

[30] Ex. 33 at 41:15-42; 48:10-22; 56:11-57:24; 58:5-11.

[31] Ex. 31 at 101:14-19; 112:16-22; 115:4-22; 116:5-11; 116:20-22; 121:23-122:1; 126:7-12.

[32] *Id.* at 92:25-94:12; 102:3-16; 105:16-19; 106:22-109:12; 119:7-13; 121:13-16; Ex. 33 at 46:14-47:16.

108:20; 107:2-10; Ex. 33 at 46:14-47:16; (3) that the Funds did not purchase any policies after April 2017, Ex. 31 at 129:17-22; (4) that the Funds did not purchase interests in the Affiliated Companies or that he paid the Affiliate Companies' expenses with what were essentially interest free loans from the Funds, *id.* 136:11-138:16; (5) that neither Fund purchased Class B shares in deeproot Pinball, *id.* 173:6-174:1; (6) that he paid investors in his earlier Debenture funds with money from the Funds' investors, *id.* 152:3-153:7; 153:23-154:16; Ex. 33 at 113:4-23; (7) that he made Ponzi-like payments to Fund investors with money he obtained from new investors in Funds, Ex. 31 at 179:17-180:9; 181:3-10; and (8) that he used the Funds' money to pay personal expenses, *id.* 167:11-17; Ex. 33 at 65:18-66:2.  In fact, Concilla testified that he understood the Funds' would have enforceable interests in the Life Policies and Affiliated Companies and that he would have advised Mueller to amend the PPMs if they were not.  *Id.* 92:25-94:12, 96:21-96:6, 301:18-303:9.

Mueller also failed to inform CPM regarding his numerous failures to meet his fiduciary duties to the Funds.  Mueller did not tell CPM that he lacked a consistent methodology to accurately value the Life Policies or the Affiliated Companies (*id.* 142:20-19, 145:1-9; Ex. 33 at 66:3-12), or that he had failed to ensure that the "Company Advance" did not exceed the maximum 20% disclosed in the PPMs.  *Id.* 164:17-165:16.  Mueller also did not disclose key facts relating to the operation of the Funds, including that there were no internal financial controls (*id.* 143:20-144:23; Ex. 33 at 66:19-22), or that he failed to segregate the Company Advance Funds.  *Id.* 164:17-165:16.

Mueller's failure to disclose the above facts to CPM precludes any reliance on any advice he allegedly received.  *See SEC v. Huff*, 758 F. Supp. 2d 1288, 1351 (S.D. Fla. 2010) *aff'd*, 455 F. App'x 882 (11th Cir. 2012) (Defendants could not rely on advice of counsel as a defense because they did not disclose all relevant facts); *SEC v. Johnson*, 174 F. App'x 111, 114-15 (3d Cir. 2006)

(finding good faith reliance on the advice of an accountant defense available "only when all pertinent facts are disclosed to the professional").

     **F.**     **Remedies To Be Determined At A Later Date**

     If the Court grants the SEC's motion, the SEC will separately offer evidence regarding the appropriate injunctive relief as well as the amount of disgorgement and civil penalties in an amount to be determined upon motion by the SEC.

**V.**     **CONCLUSION**

     For all the foregoing reasons, the Court should grant the Commission's Motion for Summary Judgment against Mueller and grant the Commission such other relief as it may be entitled.  A proposed Order is attached to this Motion.

Date: August 18, 2023

Respectfully submitted,

*/s/ Kristen M. Warden*
Kristen M. Warden, Trial Counsel
Charlie Divine, Trial Counsel
David Nasse, Supervisory Trial Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4661 (Warden)
(202) 551-6673 (Divine)
(202) 551-4426 (Nasse)
wardenk@sec.gov
divinec@sec.gov
nassed@sec.gov

*Counsel for Plaintiff Securities and Exchange Commission*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 18th day of August 2023, a true and correct copy of the redacted Motion for Summary Judgment as to Liability on All Counts Against Defendant Robert J. Mueller and on Mueller's Advice of Counsel Defense was filed electronically through the Court's CM/ECF system, which will send copies to all counsel of record.

I also certify that on the 18th day of August 2023, a true and correct copy of the unredacted Motion for Summary Judgment as to Liability on All Counts Against Defendant Robert J. Mueller and on Mueller's Advice of Counsel Defense and the exhibits that were filed under seal, were emailed to all counsel of record.

*/s/ Kristen M. Warden*
Kristen M. Warden

*Counsel for Plaintiff United States Securities and Exchange Commission*