# EXHIBIT I

MOTION TO SEAL

# EXHIBIT 27

MOTION TO SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
**SAN ANTONIO DIVISION**

---

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

-AGAINST-

ROBERT J. MUELLER, DEEPROOT FUNDS LLC (A/K/A DPRT FUNDS, LLC), AND
POLICY SERVICES INC.,

DEFENDANTS,

-AND-

DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC,
DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621
SILICON DR LLC,

RELIEF DEFENDANTS.

---

EXPERT REPORT OF
BILL POST
SENIOR MANAGING DIRECTOR
FTI CONSULTING

SUBMITTED MARCH 17, 2023

PRIVILEGED & CONFIDENTIAL
DRAFT – SUBJECT TO CHANGE

TABLE OF CONTENTS

I.     PROFESSIONAL BACKGROUND ................................................................1

II.    SCOPE OF ASSIGNMENT ........................................................................3

III.   INFORMATION CONSIDERED ................................................................4

IV.    SUMMARY OF OPINIONS ......................................................................5

V.     FIDUCIARY DUTIES OF INVESTMENT ADVISERS AND SPONSORS OF
       UNREGISTERED SECURITIES ................................................................9

VI.    BACKGROUND ......................................................................................13
       A.   THE DEFENDANTS ........................................................................13
       B.   THE FUNDS' OPERATING AGREEMENTS ..........................................16
       C.   THE FUNDS' PPMs ........................................................................20

VII.   PRIVATE PLACEMENT MEMORANDA AND THE SALES AND
       MARKETING MATERIALS PROVIDED BY MUELLER AND THE FUNDS TO
       INVESTORS WERE NOT CONSISTENT WITH STATUTES, RULES AND
       REGULATIONS OR INDUSTRY CUSTOM AND PRACTICE ....................22
       A.   FAILURE TO DISCLOSE MATERIAL INFORMATION OR THE DISCLOSURE OF INACCURATE
            INFORMATION IN PPMs ................................................................24
       B.   MISREPRESENTATIONS IN MARKETING MATERIALS ........................32

VIII.  THERE WAS A LACK OF DOCUMENTATION SURROUNDING BUSINESS
       AND INVESTMENT ACTIVITIES OF THE FUNDS, WHICH WAS INCONSISTENT
       WITH INVESTMENT INDUSTRY CUSTOM AND PRACTICE ..................40
       A.   MISREPRESENTATION OF ACTUAL ORGANIZATIONAL STRUCTURE FOR THE DEEPROOT
            FAMILY OF FUNDS ........................................................................40
       B.   LACK OF DOCUMENTATION RELATING TO INVESTMENT PROCESS AND STRATEGY ........41
       C.   LACK OF INTERNAL CONTROLS ......................................................43
       D.   INADEQUATE BOOKS AND RECORDS ..............................................43
       E.   FAILURE TO PERIODICALLY PREPARE IN-HOUSE OR OBTAIN THIRD PARTY VALUATIONS
            ........................................................................................................45
       F.   IMPROPER USE OF INVESTOR FUNDS ............................................46

IX.    THE OPERATIONS AND ACTIONS OF MUELLER AND THE FUNDS WERE
       NOT CONSISTENT WITH AND DID NOT ADHERE TO THE REQUIREMENTS
       OF THE FIDUCIARY DUTIES OF LOYALTY AND CARE ........................54

MOTION TO SEAL

**EXHIBITS:**

Exhibit 1:  Curriculum Vitae
Exhibit 2:  Documents Relied Upon
Exhibit 3: Comparison of deeproot 575 Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses
Exhibit 4: Comparison of deeproot dGRD Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

MOTION TO SEAL

## I.   PROFESSIONAL BACKGROUND

1.   I am a Senior Managing Director in FTI Consulting's Forensic & Litigation Consulting practice and have over 29 years of experience as an investment management professional - as a chief executive officer, chief investment officer, portfolio manager, and chief compliance officer at various investment firms and trust companies.  Before joining FTI, I was a Founder and Senior Managing Partner at a strategic consulting and investment banking firm focused on the investment industry.

2.   I have served on the investment committees of endowments, trusts, and investment entities.  My investment management and advisory experience includes serving as the President and Chief Investment Officer ("CIO") of a multi-family office with investable assets in excess of $450 million dollars.  As CIO, I was responsible for the selection of outside or third-party investment managers including but not limited to, fixed income and equity managers, hedge fund managers, private equity managers, and venture professionals.  I have experience overseeing the investment of clients' assets in a variety of fixed income products, including certificates of deposit, as well as equities, real estate, venture capital, private equity, and hedge fund investments.  I have served in the role of portfolio manager of equities, fixed income, and alternative assets, with responsibility for investing client assets in individual stocks and fixed income and making direct private equity and venture investments.

3.   In addition to my management and advisory experience, I have also served as the managing partner and CIO of a hedge fund of funds, which required the establishment of integrated investment strategies using multiple hedge funds, the selection of hedge funds to implement those strategies, and the monitoring of the investment activities of a large number of hedge fund managers for compliance.

4.   I have also served as the President and Vice Chairman of a national bank and trust company, Fiduciary Trust of California, which managed several billion dollars' worth of investable assets of high-net-worth individuals, their families, and their foundations.  In this capacity, I was responsible for all investment and administrative activities and for producing periodic investment management reports on market conditions, the economy, and investment performance.

MOTION TO SEAL

5. I have worked as an investment professional for several large institutional investment management companies, specifically the Capital Group Companies (Capital Research and Capital Guardian Trust Company, collectively "Capital"). In my role as an investment professional at Capital, I participated in all aspects of the investment management process for trusts, wealthy clients and their families, foundations, and endowments. Such processes included, but were not limited to, internal investment committee meetings and meetings with portfolio managers and analysts covering various sectors of the stock market and economy.

6. I have also provided investment management consulting services to institutional trustees and investment management organizations including Wells Fargo Investment Management, Capital Research & Management, Capital Guardian Trust Company, Fiduciary Trust, Northern Trust, Stone & Youngberg, Alvarez & Marsal Investment Management, and Stifel Nicolaus & Co.

7. I practiced as a corporate, securities, and merger and acquisitions attorney providing advice to financial institutions, including private investment organizations such as hedge funds, venture funds and private equity funds. I prepared private placement memorandums, operating agreements, investment fund entities, subscription agreements and term sheets, contracts and co-investment agreements.

8. As an expert witness, I have served as an expert on over thirty matters in federal and state court, and in FINRA arbitrations. I have also served as a consultant on matters involving examination and analysis of investment processes and procedures and well as compliance and management relating to the finance industry and investment organizations. I have also provided testimony relating to the duties and standards of the regulatory framework which governs investment management organizations' business activities.

9. I am a member of the Chartered Financial Analyst Institute and the San Francisco Chapter of the CFA Institute and formerly held active FINRA Series 7, 65 and 3 General Securities Representative licenses. I am a licensed and active attorney in California, and an inactive attorney in the District of Columbia. I also belong to several professional organizations including the Association of Financial Professionals and the State Bar of California (since 1984). I earned a Bachelor of Arts degree from the University of Virginia, a Juris Doctor degree from the University of San Francisco Kendrick School of Law, completion of postgraduate work in financial management from the Naval Postgraduate School, a Chartered Financial Analyst

MOTION TO SEAL

Institute Investment Management certificate from the Harvard Business School, and completion of the Financial Analyst Program for the Chartered Financial Analyst Institute at Kellogg School of Management at Northwestern University.   I am a lecturer and project manager at the University of California - Berkeley, Hass School of Business, Master of Financial Engineering.

10. A copy of my curriculum vitae, including my testimony experience over the past ten years, is included as Exhibit 1.

## II.   SCOPE OF ASSIGNMENT

11. This matter relates to claims brought by the Securities and Exchange Commission (the "SEC") against Robert J. Mueller ("Mueller"), deeproot Funds, LLC (a/k/a dprt Funds) ("deeproot"), and Policy Services, Inc. ("Policy Services") (collectively, "Defendants") along with deeproot Tech LLC ("deeproot Tech"), deeproot Pinball LLC ("deeproot Pinball"), deeproot Studios LLC ("deeproot Studios"), deeproot Sports & Entertainment LLC ("deeproot Sports"), deeproot RE 12621 Silicon Dr. LLC ("deeproot Silicon"), Mueller, Jeffrey L. Mueller and Belinda G. Breen in their respective capacities as co-Trustees of the MB Hale Ohana Revocable Trust (collectively, "Relief Defendants").   The SEC has alleged violations of the Securities Exchange Act, the Securities, and the Investment Advisers Act by, among other things, making untrue statements of material fact; employing devices, schemes, or artifices to defraud; and engaging in acts, practices or courses of business that were fraudulent, deceptive or manipulative with respect to investors or prospective investors.[1]   The initial Complaint in this matter was filed on August 20, 2021.[2]

12. FTI has been retained by counsel for the SEC.   The specific areas on which I have been asked to opine include the following:

    a.   whether the materials and methods utilized by Mueller, Policy Services, and deeproot in connection with deeproot 575 Fund, LLC (the "575 Fund") and the deeproot Growth Runs Deep Fund, LLC (the "dGRD Fund") (collectively, the "Funds"), including private placement memoranda, marketing materials disseminated by the Funds, and/or

---

[1] Complaint dated August 20, 2021 ("Complaint"), ¶¶72-93.
[2] Complaint.

statements made to investors and potential investors were consistent with industry custom and practice in light applicable statutes, regulations, and industry guidelines;

b.  whether the business and investment operations and actions of Mueller, as well as deeproot and Policy Services under Mueller's control and direction, as the investment advisor to the Funds were consistent with industry custom and practice; and

c.  whether the operations and/or actions of Mueller and the Funds as investment advisers were consistent with and adhered to the requirements of the fiduciary duties of loyalty and care.

13. This report reflects my opinions and the analyses upon which they are based.  If called upon to testify in this action, I intend to provide testimony on these and related matters.  My opinions do not and are not intended to represent legal opinions.  Additionally, should Defendants submit an expert report on these and related matters or if additional facts are adduced in discovery after this report, I reserve the right to review and respond accordingly or amend this report.  This report is to be used for the specific purposes of this lawsuit and is not to be used for any other purpose without the express written consent of FTI.

14. FTI is being compensated for my time and services on an hourly basis at a billing rate of $880 per hour.  FTI's fees are not contingent upon the opinions expressed herein or the outcome of this matter.  In addition, my compensation is not contingent on the content or substance of my opinions nor the outcome of this matter.

## III.   INFORMATION CONSIDERED

15. My opinions contained in this report are based upon information available to me as of the date of this report along with my skills, knowledge, experience, education, and training.  In preparing this report, I or staff working under my direction considered documents produced by the parties in this matter, as well as publicly available information.  A listing of all documents considered is attached as Exhibit 2.

16. I understand that I may be asked to testify regarding my opinions contained herein as well as related matters, including those raised on cross examination, those necessary to rebut matters raised by Defendants' witnesses who testify concerning liability matters and those otherwise raised at trial by Defendants' attorneys or the trier-of-fact in relation to matters set forth in this

report.  I reserve the right to change, amend, modify or supplement my report and the opinions expressed herein due to any new facts or information that may become known to me prior to or during trial.

17. In connection with my anticipated testimony in this action, I may use as exhibits various documents produced in this litigation which refer to or relate to the matters discussed in this report.  In addition, I may create or assist in the creation of certain demonstrative exhibits to assist me during my testimony.

## IV.    SUMMARY OF OPINIONS

18. My opinions are based on my 29 years of experience in the investment advisory and financial services industry.  I have also applied the relevant principles and methods described below and how such principles, and the statutory and regulatory framework from which they are derived, are practically applied in industry custom and practice.

19. My opinions include the following:

    a. In my experience and opinion, the PPMs and marketing materials failed to comport with industry custom and practice, as they contained misleading and/or inaccurate information.  In certain instances, the PPMs and marketing materials also omitted material information that would typically be disclosed to investors or prospective investors per industry standards and information that a reasonable investor would have wanted to know.  The inaccuracies and omissions included, amongst other things, insufficient disclosure of relevant investment risk factors, misrepresentations regarding portfolio allocations, and lack of basis and insufficient rationale for any investments into affiliate entities in line with purported, though also misrepresented, investment strategies.  In any materials provided to investors, including PPMs and sales and marketing documents, the communications are required to be accurate, particularly if such information was materially different or stale from representations made in initial PPMs or marketing materials provided to investors and potential investors.  The Funds were required to provide accurate information and updates of material changes to investors or prospective investors.  Failure to do so would prevent an investor from making an informed decision regarding an investment in the Funds.

MOTION TO SEAL

b.  Contrary to custom and practice in the investment industry, there was a lack of documentation surrounding the business and investment activities of the Funds.  In particular, Mueller misrepresented the actual organizational structure of the deeproot family of funds.  I have not seen any documents in the record thus far disclosing to investors in the Funds that there was any formal relationship between the Funds and Policy Services.  I have not seen similar documentation for any other of the deeproot affiliates.  Furthermore, contrary to industry practice and norms, Mueller entered into several non-arms-length transactions involving the Funds that corresponded to payment of expenses at affiliate entities without formal approval of documentation or record keeping associated with such reimbursements.

c.  In addition, inconsistent with industry custom and practice for a typical investment fund, there was a lack of documentation in place memorializing the Funds' investment process and strategic investment activities or the accurate valuation of the holdings of the Funds.  The Funds also lacked documentation relating to any analysis of investment risks or an analysis of investment strategies which deviated from the Funds' stated portfolio allocations.  In my experience, industry best practice would involve analyzing all aspects of an investment and providing sufficient research and fundamental financial and sector analysis to demonstrate why an investment is appropriate relative to the overall investment strategy.  Thereafter, such reasoning and analysis should be included in any materials regarding changes in investment strategy or updates in investment performance to investors.  Failing to do so would, in my experience, constitute a material omission of information that an investor would want to know in order to make an informed decision to make an investment in the fund(s).

d.  The record does not indicate that there were any management controls in place or that deeproot had in place any professional oversight or experienced investment management or operational personnel that one would expect to be employed in an investment organization.  Regardless of the size of a fund, internal controls and a competent management staff and management structure represent best practices in the investment industry.  Internal controls are necessary for risk management, to ensure accountability, and identify any potential red flags relating to investment performance, operational performance, missing documentation, misstatements, or deviation from the investment plan or business projections and estimates.  Based on my review of the

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

record, the preparation and maintenance of the books and records for deeproot were not consistent with industry standards. Furthermore, in the management of the fund's assets, Mueller failed to implement or employ any processes or procedures to ensure that the valuation of the assets of deeproot were accurate. The maintenance of books and records was required under the terms of the operating agreement as referenced above and, in my experience, one would expect that the Manager of an investment fund would comply with every rule set forth the in operating agreement. Mueller also did not have a methodology or reliable process to accurately value the life insurance policies or analyze actuarial data about the policies and failed to disclose this to investors. Based on my review of the record, the lack of books and records and failure to regularly value any holdings of the Funds, was not communicated to investors in any PPM, marketing document, or investor communication. In my experience, the lack of the maintenance of books and records and the failure to regularly value all assets using a reliable methodology is information that an investor would have wanted to know prior to deciding to invest in the "Funds."

e.   Contrary to industry standard, custom, and practice, Mueller failed to accurately disclose the use of investor funds by an unrelated entity, Policy Services. There was no documentation or terms established between the entities which created a lender-borrower relationship which I would have expected to have been in place. The record indicates that the investments solicited by Mueller and his fundraisers were ultimately transferred into bank accounts not owned by the Funds. Based on my review of the record, the assets of the respective funds were co-mingled and there was no tracking or allocation of expenses and revenues between the 575 Fund and dGRD Fund or between the Funds and Policy Services.

f.   The record reflects that Policy Services paid Mueller's personal credit card expenses using investor funds which had been deposited into accounts of Policy Services. In my experience, a reimbursement process such as this should have been memorialized in an agreement between the Funds and Policy Services and should have been disclosed to investors.

g.   The PPMs included a "Company Advance" clause which, in my experience, is atypical in the industry. I have never seen the sort of "advance" language contained in the PPMs, and, in my experience, the use of the term "advance" is misleading in that it

obscures the concept of the creation of intercompany debt without definitive and binding terms between the Funds and Policy Services.  The record also reflects the absence of documentation regarding the "use of funds" or the authorization of the use of funds to ensure the advance was used for legitimate business purposes and consistent with the limits imposed the language of the PPMs.  Based on my experience in fund administration, Mueller's use of new investor funds to satisfy distribution obligations, under the guise of the Company Advance language, demonstrates characteristics similar to other Ponzi schemes that I have observed, including the payment of distributions to investors which did not come from successful investment activities but were funded by new investor money.

h.   The operations and actions of Mueller, deeproot, and the Funds were not consistent with and did not adhere to the requirements of the fiduciary duties of loyalty and care. The misleading or inaccurate statements and disclosures within the Funds' PPMs and marketing materials would fail to meet the requirements of the duty of care, which required Mueller to provide advice that was accurate, not misleading and did not omit material information.  Inaccurate or the lack of disclosure of material information prevents investors from full and complete knowledge of information which is required by an investor to make an informed decision.  In my experience, there is a requirement to disseminate accurate and complete information.  To withhold or provide misleading or incomplete information relating to business risk associated with the operations of fund is not compliant with the required standard of care.  The requirements of the duties of loyalty and care also include acting in the best interest of the Fund(s) as well as the client at all times, appropriately disclosing any potential or actual conflicts, which arose between the investment adviser, the Fund(s) and the interests of the client, and that the investment adviser would not place his personal financial interests above those of the Fund(s) or the clients.  There were multiple instances in which Mueller implemented policies at deeproot and the Funds, or included language in PPMs, or made investment decisions which all were not in the best interest of the Fund(s) or the Fund investors.  As a result, Mueller and deeproot failed to meet the requirements of the fiduciary duties of loyalty and care.

20.  My opinions are explained in greater detail in the sections that follow.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

## V.     FIDUCIARY DUTIES OF INVESTMENT ADVISERS AND SPONSORS OF UNREGISTERED SECURITIES

21.  Investment managers and advisors, including sponsors of private investment vehicles such as the deeproot family of funds and Mr. Mueller, which offer the sale of securities via a private placement are required to comply with statutory federal and state laws, as well as rules, regulations, and guidelines promulgated by federal and state securities and investment authorities, such as the SEC, FINRA and the Texas States Securities Board.  Furthermore, Mueller, as the sole shareholder and principal of the deeproot family of funds, held the formal position of Manager and was solely responsible for the investment and management activities of the family of funds.[3]  In this role, Mueller acted as an investment advisor, and in that capacity marketed and offered limited partnership interests to investors in connection with the sale of securities.  As an investment advisor, Muller and the deeproot family of companies and their investment activities were subject to federal law and the rules of the Securities Exchange Commission as well as state securities laws which govern their activities.

22.  According to the SEC, under federal law, "the Advisers Act [of 1940] establishes a federal fiduciary duty for investment advisers."[4]  SEC guidance relating to the standard of conduct for investment advisers has determined that "an investment adviser is a fiduciary."[5]  Similar standards have been adopted by professional organizations within the investment industry, such as the Investment Adviser Association ("IAA") (whose "members range from global asset managers to [] medium- and small-sized firms")[6] and the CFA Institute (which promotes ethics and professional standards of practice for investment professionals).[7]  I am not aware of any federal statute, state statute, rule or regulation which states that investment advisors managing and operating private pooled investment vehicles are exempt from adhering to the fiduciary duty standard in all business and investment activities.

---

[3] See e.g. 2018 dGRD Fund PPM SEC-DEEPROOT-E-0164786-4803 at 4789-4799); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808 at 4811 and 4820); and Exhibit 52.
[4] https://www.sec.gov/rules/interp/2019/ia-5248.pdf. See also https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf.
[5] https://www.sec.gov/rules/interp/2019/ia-5248.pdf, p. 2.
[6] https://investmentadviser.org/about-iaa/.
[7] See https://www.cfainstitute.org/en/about/vision.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

SEC Guidance

23.   The applicable fiduciary duties of an investment advisor are the duty of care and the duty of loyalty owed to clients, investors and potential investors.  While the term "fiduciary duty" is not explicitly defined in the Advisers Act of 1940, the SEC clarified in its 2019 interpretation that "an investment adviser's fiduciary duty under the Advisers Act comprises a duty of care and a duty of loyalty."[8]  In addition, SEC guidance has iterated that "the adviser's fiduciary duty is principles-based and applies to the entire relationship between the adviser and its client."[9]

24.   The duty of care includes "(i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship."[10]  The investment adviser must also avoid misleading clients in any way.  Generally, facts are "'material' if a reasonable investor would consider them to be important."[11]  If an investment adviser has reasonable belief that their activities as an advisor are not in the best interests of the client, they must consider those risks and determine whether the potential benefits justify those risks for the client(s) in question.  Additionally, in my experience, the adviser would be expected to disclose such risks in a transparent and understandable manner for each investment along with the relevant analysis performed which supported the adviser's conclusion.  In my experience, the Advisor is obligated to complete the relevant analysis and would typically involve both qualitative and quantitative assessments, with consideration of both macroeconomic factors along with factors specific to investors' needs and investment objectives and risk tolerance.  If certain risks are significant or unusual, the investment adviser should use extra caution, and should fully disclose additional relevant details on those risks.[12]

---

[8] https://www.sec.gov/rules/interp/2019/ia-5248.pdf. See also https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf.
[9] https://www.sec.gov/rules/interp/2019/ia-5248.pdf, p. 9.
[10] https://www.sec.gov/rules/interp/2019/ia-5248.pdf, p. 12.
[11] https://www.sec.gov/divisions/investment/advoverview.htm.
[12] See, for example, https://www.sec.gov/rules/interp/2019/ia-5248.pdf, p. 15.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

25.  Further, as part of the duty of care owed under the fiduciary duty to a client, an investment advisor also has a "duty to provide advice and monitoring over the course of the relationship."[13]  This duty is tied to the scope of the relationship.  "[W]hen the adviser has an ongoing relationship with a client and is compensated with a periodic asset-based fee, the adviser's duty to provide advice and monitoring will be relatively extensive as is consistent with the nature of the relationship."[14]

26.  The duty of loyalty involves the requirement that an investment adviser puts their clients' interest above their own.  The advisor must also "make full and fair disclosure to its clients of all material facts relating to the advisory relationship."[15]  In order for any disclosure to be "full and fair," "it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent."  It would be inappropriate for an investment adviser "to infer or accept client consent where the adviser was aware, or reasonably should have been aware, that the client did not understand the nature and import of the conflict."

27.  The concept of the duty of loyalty per SEC guidance is consistent with regulatory framework which prohibits an investment advisor from employing any scheme or artifice which is deceptive or communicates information, which is untrue, misleading, or omits a material fact.  Thus, any deceptive or untrue statements operate as a fraud in connection with the sale of a security.[16]

Investment Advisor Association Standards of Practice

28.  The IAA is an organization comprised of investment, legal professionals exclusively dedicated to advancing the interests and needs as a fiduciary investment adviser.  The Standards of Practice

---

[13] https://www.sec.gov/rules/interp/2019/ia-5248.pdf. See also https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf.

[14] https://www.sec.gov/rules/interp/2019/ia-5248.pdf. See also https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf.

[15] https://www.sec.gov/rules/interp/2019/ia-5248.pdf, pp. 21-22.

[16] See, for example, Section 10(b) of the Exchange Act which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors" (https://www.govinfo.gov/content/pkg/USCODE-2021-title15/pdf/USCODE-2021-title15-chap2B-sec78j.pdf).  See also Rule 10-b-5 (https://www.govinfo.gov/content/pkg/CFR-2014-title17-vol4/pdf/CFR-2014-title17-vol4-sec240-10b-5.pdf).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

set forth by the IAA is consistent with the guidance set forth by the SEC.  The IAA notes that "[17] Per the IAA, the requirements of the fiduciary duties owed by investment advisers include the following:[18]

> the duty at all times to place the interests of clients first;

> the duty to have a reasonable basis for its investment advice;

> the duty to seek best execution for client securities transactions where the adviser directs such transactions;

> the duty to make investment decisions consistent with any mutually agreed upon client objectives, strategies, policies, guidelines, and restrictions;

> the duty to treat clients fairly;

> the duty to make full and fair disclosure to clients of all material facts about the advisory relationship, particularly regarding conflicts of interest; and

> the duty to respect the confidentiality of client information.

CFA Institute Standards of Practice

29.  The Mission statement of the CFA Institute is "to promote the highest standards of ethics, education, and professional excellence for investment professionals and society globally."  The CFA Standards of Practice are also consistent with the guidance set forth by the SEC and the IAA.  Although the CFA Institute acknowledges that its standards are required for CFA Institute members and candidates, it also notes that the CFA Institute *Standards of Practice Handbook* "is intended for a diverse and global audience [including] supervisors and direct/indirect reports determining the nature of their responsibilities to each other, to existing and potential clients, and to the broader financial markets."[19]  In my experience, the CFA Institute standards are often followed even my non-members as they are in line with SEC standards and include industry best practice for those in the investment industry.

30.  The CFA Institute Standards of Practice note that there exists "a minimum benchmark for the duties of loyalty, prudence, and care that are required of all members and candidates regardless

---

[17] https://investmentadviser.org/wp-content/uploads/2021/09/Standards-of-Practice.pdf.
[18] https://investmentadviser.org/wp-content/uploads/2021/09/Standards-of-Practice.pdf.
[19] *Standards of Practice Handbook*, 11 ed. (2014), CFA Institute.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of whether a legal fiduciary duty applies."[20]  The CFA Institute standards also state, "Investment actions must be carried out for the sole benefit of the client and in a manner the member or candidate believes, given the known facts and circumstances, to be in the best interest of the client. Members and candidates must exercise the same level of prudence, judgment, and care that they would apply in the management and disposition of their own interests in similar circumstances."[21]

31. The CFA Institute also recommends comprehensive firm policies to ensure compliance, including, amongst other things, considering all relevant and available information relating to the client and the investment before acting, carrying out regular reviews of investments held in comparison to governing documents, disclosure of conflicts of interest, and disclosure of all forms of compensation arrangements.[22]

## VI.   BACKGROUND

### A.   THE DEFENDANTS

32. The following entities are Defendants:

    a.   In 2012, Mueller formed Policy Services Inc. as an "S" corporation in Nevada.[23] Policy Services was re-domiciled in Texas in 2016.[24]

    b.   In 2013, Mueller formed deeproot Funds LLC, a Texas limited liability company based in San Antonio, Texas.[25]  Mueller is both the sole officer and sole owner of this company.[26]

33. The following entities are Relief Defendants:

---

[20] *Standards of Practice Handbook*, 11 ed. (2014), CFA Institute, p. 82.
[21] *Standards of Practice Handbook*, 11 ed. (2014), CFA Institute, p. 81.
[22] *Standards of Practice Handbook*, 11 ed. (2014), CFA Institute, p. 86.
[23] Complaint, ¶18 and Defendant Robert J. Mueller's Amended Answer to Security and Exchange Commission's Complaint dated November 30, 2022 ("Answer"), ¶18.
[24] Complaint, ¶18 and Answer, ¶18.
[25] Complaint, ¶17 and Answer, ¶17.
[26] Complaint, ¶17 and Answer, ¶17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

a.  In March 2015, Mueller formed deeproot Tech LLC, a Texas limited liability company based in San Antonio, Texas.[27]  Deeproot Tech is a wholly-owned subsidiary of Policy Services, an entity previously established by Muller.[28]

b.  In March 2015, Mueller also formed deeproot Pinball LLC, a Texas limited liability company based in San Antonio, Texas.[29]  Deeproot Pinball is a wholly-owned subsidiary of deeproot Tech.[30]

c.  In April 2017, Mueller formed deeproot Sports & Entertainment LLC, a Texas limited liability company based in San Antonio, Texas.[31]  Deeproot Sports & Entertainment is a wholly-owned subsidiary of Policy Services.[32]

d.  In November 2018, Mueller formed deeproot Studios LLC, a Texas limited liability company based in San Antonio, Texas.[33]  Deeproot Studios LLC is a wholly-owned subsidiary of Policy Services.[34]

e.  In February 2020, Mueller formed deeproot RE 12621 Silicon Dr. LLC, a Texas limited liability company based in San Antonio, Texas.[35]

f.  The 575 Fund entered into an operating agreement dated September 1, 2015, and amended February 26, 2018, which named Mueller as the sole Manager of the 575 Fund.[36]

g.  The dGRD Fund entered into an operating agreement dated August 3, 2015, and amended February 26, 2018, which named Mueller as the sole Manager of the dGRD Fund.[37.]

---

[27] Complaint, ¶19 and Answer, ¶19.
[28] Complaint, ¶19 and Answer, ¶19.
[29] Complaint, ¶20 and Answer, ¶20.
[30] Complaint, ¶20 and Answer, ¶20.  See also Deposition of Robert L. Mueller dated March 9, 2023 (rough) ("Mueller Deposition"), p. 55.
[31] Complaint, ¶22 and Answer, ¶22.
[32] Complaint, ¶22 and Answer, ¶22.
[33] Complaint, ¶21 and Answer, ¶21.
[34] Complaint, ¶21 and Answer, ¶21.
[35] Complaint, ¶23 and Answer, ¶23.
[36] MUELLER 001067-1088 and Amended 575 Operating Agreement.
[37] MUELLER 001045-1066 and Amended dGRD Operating Agreement.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

34. Mueller, a Texas resident and current member of the Texas State Bar, is the "sole principal of the deeproot® family of companies [and] is the current Manager of the [deeproot 575 Fund, LLC and deeproot Growth Runs Deep Fund LLC.]"[38]  Between 2012 and 2020, Mueller founded multiple entities including the 575 Fund and the dGRD Fund.[39]

35. In February 2014 and December 2014, respectively, Mueller and deeproot, an entity wholly owned and operated by Mueller, formed the pooled investment funds deeproot Growth Runs Deep fund LLC and deeproot 575 Fund.[40]  Both entities are Texas limited liability companies, based in San Antonio, Texas.[41]  Mueller and deeproot, an entity solely owned and controlled by Mueller,[42] served as the investment advisor for the 575 Fund and dGRD fund.[43]  Mueller has stated that both the dGRD Fund and the 575 Fund are not and have never been registered with the SEC.[44]

36. Per the private placement memoranda ("PPMs"), deeproot "owns all of the Class A Membership Shares ('Class A Shares') and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Compan[ies]."[45]  Mueller made all management, operational, business and investment decisions for the Funds, specifically determining the strategy of the 575 Fund, choosing and purchasing the assets in which the 575 Fund invests, and the individual with the ultimate authority over investment decisions.[46]  Further, Mueller wrote

---

[38] See, e.g., Complaint, ¶16, 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4500) and 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3402).
[39] Complaint, ¶¶16-26 and Answer, ¶¶16-26.
[40] Complaint, ¶¶2, 25-26 and Answer, ¶¶25-26.
[41] Complaint, ¶¶25-26 and Answer, ¶¶25-26.
[42] Complaint, ¶17 and Answer, ¶17.
[43] Complaint, ¶¶25-26 and Answer, ¶¶25-26.
[44] Complaint, ¶¶25-26, Answer, ¶¶25-26.
[45] See, e.g., 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1517).
[46] Allen Investigative Testimony dated May 24, 2021 ("Allen Testimony"), 95:24-96:08; Mueller Investigative Testimony dated June 23, 2021 ("Mueller Testimony"), 150:03-16; 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4838); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1527); 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4777).  See also, Allen Deposition, pp. 195 and 197 ("In the two and a half years that you worked at deeproot, what was Mr. Mueller's position? A. The head of everything. Q. And everything to include what?  A. The deeproot Funds specifically, you know, he was the -- like, I think I mentioned it, he would have served as the -- the chief compliance role; he would have served as essentially the -- the head of the funds, so everything involved with that. And then the CEO, founder of all of the affiliates as well… Q. Did Mr. Mueller have the final say as to what was invested in the 575 Fund?...  A. Yes… Q. Who -- who pur- -- who purchased the assets in which the 575 Fund invested? A. Ultimately that would have been Robert.") and Allen Deposition, p. 193 ("Are you aware of who was in charge of keeping track of what investor funds were transferred into deeproot affiliates?  A. My understanding was that that would be Robert.")

and disseminated "reports to investors in the 575 Fund on the fund's status or its prospects or its investment returns" and "release[d] and publish[ed] that communication."[47]

37. In addition to being responsible for the business and administrative operations and investment activities of the Funds, Mueller had sole control over the creation and dissemination of all marketing materials used for the Funds, including supervising all fundraising activities and various personnel who worked in a fund-raising capacity from time to time.[48]

38.  Per the PPMs, "Mr. Mueller is responsible for deeproot®'s product design, marketing, and strategic planning areas."[49]

**B.   THE FUNDS' OPERATING AGREEMENTS**

39. Mueller, as founder, owner, and operator and sole manager of the 575 Fund created an Operating Agreement for the 575 Fund on September 1, 2015, amended on February 26, 2018 ("575 Operating Agreement").[50,51]   The 575 Operating Agreement (hereinafter, the "OA") stated the

---

[47] Allen Testimony, p. 98.  See also, Allen Deposition, pp. 43-44 ("So what sort of materials were provided to investors prior to that initial meeting? A. There were brochures that finders were provided for using as the introductory method to the investor. That would have been the primary -- the primary material. Q. Okay. And who drafted those brochures? A. Robert.")

[48] See Deposition of Eric Dandridge dated September 22, 2022, p. 29 (What is your understanding of who prepared the presentations? A. I believe Robert Mueller had prepared them."). See also Allen Deposition, p. 39 "So what sort of materials were provided to investors prior to that initial meeting? A. There were brochures that finders were provided for using as the introductory method to the investor. That would have been the primary -- the primary material. Q. Okay. And who drafted those brochures? A. Robert…During the initial presentation, did you -- what -- what sort of materials were provided to the potential investor? A. It was primarily the PowerPoint presentation. Q. Okay. And who drafted the PowerPoint? A. Robert.")

[49] SEC-DEEPROOT-E-0014509.

[50] MUELLER 001067-1088 (Initial 575 Operating Agreement) and SEC-DEEPROOT-E-0019790-9810 (Amended 575 Operating Agreement); Defendant Robert J. Mueller's Objections and Responses to Plaintiff's First Set of Interrogatories dated August 19, 2022.

[51] Upon review of both the Initial and Amended 575 Operating Agreements, there appear to be four differences: (i) The Initial 575 Operating Agreement includes reference to Class B shares, while the Amended 575 Operating Agreement contains reference to both Class B and Class C membership sales. [Preamble to the Initial 575 Operating Agreement and the Amended 575 Operating Agreement];
(ii) The Initial 575 Operating Agreement states the purpose of the 575 fund is to "engage generally in the design, manufacturing, and sale of pinball machines, and to engage in any and all other activities incidental or related to any of the foregoing" while the Amended 575 Operating Agreement states the purpose of the fund is to "engage generally in the sale of Class B and Class C Membership Interest." [¶3 of the Initial 575 Operating Agreement and the Amended 575 Operating Agreement];
(iii) Fractional shares in the Initial 575 Operating Agreement are rounded to the third decimal place whereas fractional shares in the Amended 575 Operating Agreement are rounded to the fifth decimal place. [¶14.a. of the Initial 575 Operating Agreement and the Amended 575 Operating Agreement]; and
(iv) Regarding the annual reporting, in the Initial 575 Operating Agreement, the Managers were required to prepare and deliver the financial statements within 90 days after the end of each fiscal year, but in the Amended 575 Operating

purpose of the Fund as "to engage generally in the sale of Class B and Class C Membership Interests, which invests in a pool of life insurance policies and other assets, on behalf of the Investors, and to engage in any and all other activities incidental or related to any of the foregoing."[52]  The 575 OA required the Manager, Mueller, pursuant to section 22(a), to maintain books and records which would be a full and accurate record of each transaction made by the Manager(s) (Mueller) on behalf of the Company (hereinafter, Company as referred to in the operating agreement for the 575 fund shall be referred to as the "575 Company").  The OA also required that any compensation paid to the Manager could only be paid if such compensation was approved by the majority of the Managers.[53]  The OA further set out the term of the Fund to "continue on a perpetual basis unless the [575] Company is sooner terminated and liquidated, and its affairs wound up pursuant to applicable provisions of the Texas Act and applicable provisions of this Agreement."[54]  The 575 Fund was authorized to issue a total of 5,500 shares: 1,500 Class A Shares, 1,000 Class B Shares, and 3,000 Class C Shares.[55]  Initial members, which Schedule 10(a) to the 575 Operating Agreement defines solely as "deeproot Funds, LLC" were issued the 1,500 Class A shares, which entitle the holder to two votes per share.[56]  The Class B and C shares entitled the holders to one vote per share and were held by investors.[57]  Regarding allocations, the 575 Operating Agreement defined both Priority Return and Invested Capital:[58]

> (A) "Priority Return" shall be defined by the Priority Return Election chosen by the Investor during a subscription term. For a deferred Priority Return Election, the Priority Return shall mean the cumulative deferred (and unpaid) returns calculated per annum by multiplying each respective Investor's Invested Capital by seven percent (7%); the deferred sum of which are paid at the Pay Date. For a periodic Priority Return Election, the Priority Return shall mean monthly payments calculated per annum by multiplying each respective Investor's Invested Capital by five percent (5%), and then dividing by twelve (12). Regardless of the Priority Return Election, priority returns shall be cumulative commencing on subscription… and any unpaid priority returns due on or

---

Agreement, the Managers were only required to provide the financial statements upon request. [¶22.a. of the Initial 575 Operating Agreement and the Amended 575 Operating Agreement]
[52] SEC-DEEPROOT-E-0019790-9810 at 9794.  I note that the initial operating agreement has no mention of the Class C shares (see footnote above).
[53] MUELLER 001067-1088 at 1080 and SEC-DEEPROOT-E-0019790-9810 at 9803.
[54] MUELLER 001067-1088 at 1072 and SEC-DEEPROOT-E-0019790-9810 at 9795.
[55] SEC-DEEPROOT-E-0019790-9810 at 9795. The initial operating agreement only issued 2,500 membership shares (MUELLER 001067-1088 at 1072).
[56] MUELLER 001067-1088 at 1072, 1074, and 1087 and SEC-DEEPROOT-E-0019790-9810 at 9795 and 9797.
[57] SEC-DEEPROOT-E-0019790-9810 at 9795 and 9797.  See also, MUELLER 001067-1088 at 1072 and 1074 for Class B shares.
[58] SEC-DEEPROOT-E-0019790-9810 at 9797.  See also, MUELLER 001067-1088 at 1074 for Class B shares.

about thirty (30) days… after the mandatory Call, such Call being pre-determined as five years less one day after the Start Date, by the [575] Company; and

(B) "Invested Capital" shall mean an amount equal to the contributed capital made to the Company by a Class B Member or Class C Member under Section 10(b) hereof, less any return of capital previously distributed to such Investor.

40.  The 575 Operating Agreement defined the duties of Mueller, as the Manager as:[59]

The Managers shall manage or cause to be managed the affairs of the [575] Company in a prudent and businesslike manner, devoting such portion of his time and effort to Company affairs as may reasonably be required for the effective management of such affairs… The Managers also shall cause to be filed such certificates and shall do such other acts as may be required by law to qualify and maintain the [575] Company as a limited liability company under the laws of the State of Texas and of any other jurisdiction in which the [575] Company transacts business.

41.  Further, the 575 Operating Agreement expressly prohibited the use of company funds for non-company purposes and specifically states the funds should not be commingled with personal funds stating:[60]

All cash receipts and other funds of the [575] Company shall be deposited to one or more bank accounts in the name of the [575] Company at one or more banks or other depositories selected by the Managers from time to time. Checks and other withdrawals from such accounts may be signed by the Managers or by any one or more other persons who may be selected by the Managers from time to time. All funds of the [575] Company shall be used solely for [575] Company purposes and shall not be commingled with funds of any Manager, Member or other person.

42.  Mueller also created an Operating Agreement for the dGRD Fund on August 3, 2015, amended February 26, 2018 ("dGRD Operating Agreement").[61,62]  Per this agreement, the stated purpose

---

[59] MUELLER 001067-1088 at 1079 and SEC-DEEPROOT-E-0019790-9810 at 9802.

[60] MUELLER 001067-1088 at 1079 and SEC-DEEPROOT-E-0019790-9810 at 9802.

[61] MUELLER 001045-1066 (Initial dGRD Operating Agreement) and SEC-DEEPROOT-0005760-5778 (Amended dGRD Operating Agreement).

[62] Upon review of both the Initial and Amended dGRD Operating Agreements, there appear to be three differences. (i) The Initial dGRD Operating Agreement states the purpose of the dGRD fund is to "engage generally in the sale of Class B Membership Interests…" while the Amended dGRD Operating Agreement states the purpose of the fund is to "engage generally in the sale of Class B and Class C Membership Interests…" [¶3 of the Initial dGRD Operating Agreement and the Amended dGRD Operating Agreement] (ii) Fractional shares and membership interest in the Initial dGRD Operating Agreement are rounded to the third decimal place whereas fractional shares in the Amended dGRD Operating Agreement are rounded to the fifth decimal place. [¶14.a. of the Initial dGRD Operating Agreement and the Amended dGRD Operating Agreement] (iii) Regarding the annual reporting, in the initial dGRD Operating Agreement, the Managers were required to prepare and deliver the financial statements within 90 days after the end of each fiscal year, but in the Amended dGRD Operating Agreement, the Managers were only required to provide the financial statements upon request. [¶22.a. of the Initial dGRD Operating Agreement and the Amended dGRD Operating Agreement].

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of the company was "to engage generally in the sale of Class B and Class C Membership Interests, to invest in a pool of life insurance policies on behalf of the Investors, and to engage in any and all other activities incidental or related to any of the foregoing."[63]  The dGRD Operating Agreement stated that the dGRD Fund "shall continue on a perpetual basis unless the [dGRD] Company is sooner terminated and its affairs wound up pursuant to applicable provisions of the Texas Act and applicable provisions of this Agreement."[64]  The dGRD Fund is authorized to issue 4,200 shares: 200 Class A Shares, 1,000 Class B Shares, and 3,000 Class C Shares.[65]  Initial members, which Schedule 10(a) to the dGRD Operating Agreement defines solely as "deeproot Funds, LLC" were issued the 200 Class A shares, which entitle the holder to one vote per share.[66]  The Class B and C shares do not entitle the holders to vote and were held by investors.[67]  The dGRD Operating Agreement also includes two definitions with respect to allocations:[68]

> (A) "Priority Return" shall mean a sum equivalent to a Class B or Class C Member's Invested Capital multiplied by a certain Liquidation Multiplier, as defined and assigned as per a certain private placement memorandum (respectively to each Class) of the offering; which shall be cumulative commencing on subscription (the "Start Date"), and due only upon a Call (as such 'Call' term is defined therein) by the Company; and

> (B) "Invested Capital" shall mean an amount equal to the contributed capital made to the [dGRD]Company by a Class B Member or Class C Member under Section 10(b) hereof, less any return of capital previously distributed to such Class B Member or Class C Member.

43. The duties of Mueller as the Manager of the fund are laid out in the dGRD Operating Agreement:[69]

> The Managers shall manage or cause to be managed the affairs of the [dGRD] Company in a prudent and businesslike manner, devoting such portion of his time and effort to [dGRD] Company affairs as may reasonably be required for the effective management of such affairs…The Managers also shall cause to be filed such certificates and shall do such other acts as may be required by law to qualify and

---

[63] SEC-DEEPROOT-0005760-5778 at 5763. MUELLER 001045-1066 at 1049.  I note that the initial operating agreement has no mention of the Class C shares (see footnote above).
[64] MUELLER 001045-1066 at 1050 and SEC-DEEPROOT-0005760-5778 at 5764.
[65] SEC-DEEPROOT-0005760-5778 at 5766. The initial operating agreement did not issue Class C shares (MUELLER 001045-1066 at 1052).
[66] SEC-DEEPROOT-0005760-5778 at 5764 and 5766.  See also, MUELLER 001045-1066 at 1050 and 1052.
[67] SEC-DEEPROOT-0005760-5778 at 5766 and 5766.  See also, MUELLER 001045-1066 at 1050 and 1052 for Class B shares.
[68] SEC-DEEPROOT-0005760-5778 at 5766.  See also, MUELLER 001045-1066 at 1052 for Class B shares.
[69] MUELLER 001045-1066 at 1055-1056 and SEC-DEEPROOT-0005760-5778 at 5771.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

> maintain the [dGRD] Company as a limited liability company under the laws of the State of Texas and of any other jurisdiction in which the [dGRD] Company transacts business.

44. Similar to the 575 Fund, the dGRD Operating Agreement specifies the location and use of funds received, stating:[70]

> All cash receipts and other funds of the [dGRD] Company shall be deposited to one or more bank accounts in the name of the [dGRD] Company at one or more banks or other depositories selected by the Managers from time to time. Checks and other withdrawals from such accounts may be signed by the Managers or by any one or more other persons who may be selected by the Managers from time to time. All funds of the [dGRD] Company shall be used solely for [dGRD] Company purposes and shall not be commingled with funds of any Manager, Member or other person.

## C. THE FUNDS' PPMS

45. Mueller, through deeproot, published a number of PPMs for the 575 Fund, but I understand from the record that the PPM's published on the following dates to be the primary operative PPMs: May 2015 ("2015 575 Fund PPM"), May 2018 ("2018 575 Fund PPM"), November 2019 ("2019 575 Fund PPM"), and January 2021 ("2021 575 Fund PPM").[71,72]

| 575 Fund Class B PPMs | | | | | |
|---|---|---|---|---|---|
| Name | Bates | Date on Doc. | Amended Date | Date of Use per Response to 'Rog 1 | Notes |
| 2015 575 Fund PPM | SEC-DEEPROOT-E-0014497-4512 | 9/1/2015 | n/a | May 2015-May 2018 | The Initial 575 Operating Agreement was created on 9/1/2015. (MUELLER 001067-1088) |
| 2018 575 Fund PPM | SEC-DEEPROOT-E-0164808-4823 | 9/1/2015 | n/a | May 2018-November 2019 | Appears to be identical to the 2015 575 Fund PPM |
| 2019 575 Fund PPM | SEC-DEEPROOT-E-0164824-4841 | 9/16/2019 | n/a | November 2019-end of relevant period | This was a new offering of Class B shares, not an amendment to the existing offering. I have seen no evidence that existing 575 Fund investors were informed of the new offering (at 4827). |

---

[70] MUELLER 001045-1066 at 1057 and SEC-DEEPROOT-0005760-5778 at 5771.

[71] Defendant Robert J. Mueller's Objections and Response to Plaintiff's First Set of Interrogatories dated August 19, 2022, p. 3; 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-512), 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823), 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841), 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530).

[72] I note these dates do not tie exactly to the dates in the documents themselves. In the absence of additional information I have used the dates provided by Mr. Mueller in his responses to the first set of interrogatories (see Defendant Robert J. Mueller's Objections and Response to Plaintiff's First Set of Interrogatories dated August 19, 2022, p. 3).

MOTION TO SEAL

| 575 Fund Class C PPMs | | | | | |
|---|---|---|---|---|---|
| Name | Bates | Date on Doc. | Amended Date | Date of Use per Response to 'Rog 1 | Notes |
| 2021 575 Fund PPM | SEC-DEEPROOT-E-0211514-1530 | 2/26/2018 | 1/1/2021 | January 2021-end of relevant period | This was an offering for Class C shares (at 1514). |

46. Per the initial 2015 575 Fund PPM, the 575 Fund was described as "a securitized investment in a pool of life settlement policies and capital acquisition in deeproot Tech, which offers investors either a growth or income option in five-year terms."[73]   The PPM describes the details of the fund, requiring an election of the shareholder's preferred returns structure as either "i) deferred (i.e. growth) - a simple fixed rate of seven percent (7%) per annum of the Invested Capital; the cumulative sum of deferred Priority Returns to be paid lump-sum on the Pay Date; or ii) periodic (i.e. income) - a fixed rate of five percent (5%) per annum of the Invested Capital, paid in monthly pro rata payments, commencing sixty days after the Start Date."[74]   While this return structure offered investors a five-year return with either a seven or five percent return rate which was the basis for the 2015 575 Fund name, the return rates and related structure were changed over time from the 2015 PPM, as evidenced by subsequent PPMs.[75,76]

47. Deeproot, through Mueller, published PPMs for the dGRD Fund, but I understand from the record that the three PPMs related to the dGRD Fund published in August 2015 ("2015 dGRD PPM"), May 2018 ("2018 dGRD PPM"), and October 2019 ("2019 dGRD PPM") to be the primary operative PPMs.[77,78]

---

[73] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4500).
[74] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4501).
[75] See, e.g., 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4828).
[76] See Exhibit 3 for additional differences between the 575 Fund PPMs.
[77] Defendant Robert J. Mueller's Objections and Response to Plaintiff's First Set of Interrogatories dated August 19, 2022, pg. 4; 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416), 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803), 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780).
[78] I note these dates do not tie exactly to the dates in the documents themselves.  In the absence of additional information I have used the dates provided by Mr. Mueller in his responses to the first set of interrogatories (see Defendant Robert J. Mueller's Objections and Response to Plaintiff's First Set of Interrogatories dated August 19, 2022, pg. 4).

| dGRD Fund Class B PPMs | | | | | |
|---|---|---|---|---|---|
| Name | Bates | Date on Doc. | Amended Date | Date of Use per Response to 'Rog 2 | Notes |
| 2015 dGRD Fund PPM | SEC-DEEPROOT-E-0013399-3416 | 8/3/2015 | n/a | August 2015-May 2018 | The Initial dGRD Operating Agreement was created on 8/3/2015. (MUELLER 001045-1067) |
| 2018 dGRD Fund PPM | SEC-DEEPROOT-E-00164786-4803 | 8/3/2015 | n/a | May 2018-October 2019 | Appears to be identical to the 2015 dGRD Fund PPM. |
| 2019 dGRD Fund PPM | SEC-DEEPROOT-E-0164762-4780 | 9/16/2019 | n/a | October 2019-end of relevant period | This was a new offering of Class B shares, not an amendment to the existing offering. I have seen no evidence that existing dGRD Fund investors were informed of the new offering (at 4765). |

| dGRD Fund Class C PPMs | | | | | |
|---|---|---|---|---|---|
| Name | Bates | Date on Doc. | Amended Date | Date of Use per Response to 'Rog 2 | Notes |
| 2018 dGRD Fund Class C PPM | SEC-DEEPROOT-E-0128503-8539 | 2/26/2018 | 4/26/2018 | n/a | Not included in Mueller's Response to Interrogatories. |
| 2019 dGRD Fund Class C PPM | SEC-DEEPROOT-E-0152250-2268 | 2/26/2018 | 10/24/2019 | n/a | Not included in Mueller's Response to Interrogatories. |

48. Per the initial 2015 dGRD Fund PPM, the dGRD Fund "provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw.'"[79] Similar to the 575 Fund PPMs, Mueller amended the language between the dGRD Fund PPMs over time.[80]

## VII. PRIVATE PLACEMENT MEMORANDA AND THE SALES AND MARKETING MATERIALS PROVIDED BY MUELLER AND THE FUNDS TO INVESTORS WERE NOT CONSISTENT WITH STATUTES, RULES AND REGULATIONS OR INDUSTRY CUSTOM AND PRACTICE

49. An offering memorandum or PPM is a formal document that states the objectives, risks, and terms of an investment involved with a private placement deal. This document includes items such as the fund's financial statements, a detailed description of the fund's business operations,

---

[79] 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3402).
[80] See Exhibit 4 for differences between the dGRD Fund PPMs.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

information on the deal terms, and detail on all relevant risks.  Sufficient detail within PPMs are required because investors use them within their own due diligence process.[81]

50.  In the course of their investment activities in raising funds from investors and investing those funds, deeproot and Mueller, as the manager and principal of deeproot, created PPMs, marketing materials, and an equity fund investor packets.[82]  These materials contained descriptions, including the investment strategy and objectives of the Funds, the return profile to an investor, the management and administration of the deeproot family funds, and several investment strategies which were intended to produce positive returns for the investors.

51.  Both the PPM and the marketing materials were provided to potential investors, some of whom invested in the family of funds.  Mueller had a duty to ensure that any information contained in the PPMs, or the marketing material was accurate, not misleading, and did not omit material information relating to the Funds' administration or investment activities.[83]

52.  Additionally, once an investment was made by an investor into the Funds, Mueller, in his role as principal and manager of the Funds, provided updates to investors on a schedule determined by Mueller.  In any of the updates to investors, or revised PPMs provided to investors or potential investors, the communications were required to be accurate, particularly if such information was materially different from representations made in the initial PPMs or marketing materials provided to investors and potential investors.   For example, in the event that there were circumstances relating to the investments which deviated materially from projections or assumptions set forth in the PPM or marketing materials, such information or change in circumstances should have been disclosed to all investors in each investor communication and appropriately revised in a timely manner.   The Funds were required to provide accurate information and updates of material changes to investors or prospective investors.  Failure to do so would prevent an investor from making an informed decision regarding an investment in the Funds and is inconsistent with industry standards.

---

[81] https://www.investopedia.com/terms/o/offeringmemorandum.asp.
[82] See e.g. 2018 dGRD Fund PPM (SEC-DEEPROOT-E-0164786-4803), 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780), and 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823).
[83] https://www.govinfo.gov/content/pkg/CFR-2014-title17-vol4/pdf/CFR-2014-title17-vol4-sec240-10b-5.pdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

53. In my review of the record and based on my experience as an investment professional and portfolio manager, the PPMs and marketing materials relating to deeproot contained numerous misstatements, inaccuracies, and misleading statements, and omitted material information about the investment and administrative activities of the deeproot family of funds. Additionally, in my experience and opinion, the PPMs and marketing materials failed to meet the standards of industry practice and custom which require accurate and complete disclosure (not omitting) of all relevant and material information regarding the investment results of the Funds, investment strategy, and investment risks, as discussed more fully below.

A. FAILURE TO DISCLOSE MATERIAL INFORMATION OR THE DISCLOSURE OF INACCURATE INFORMATION IN PPMs

54. Industry custom and practice requires that PPMs contain accurate and/or not misleading information as well as a full disclosure of all material information related to the investments activities or the operations of the company. Although the PPMs identified Mueller as the sole principal and manager,[84] the PPMs failed to describe fundamental information about the operational staff of the Funds in finance, risk management and compliance roles. In my experience, an investment organization would have identified and described the qualifications and experience of the staff of the investment business. Based on my review of the record, Mueller did not employ experienced personnel in certain key positions in his organization and his failure to disclose that his staff was inexperienced was a risk factor which, in my experience, is typical in professionally-managed investment organizations.

55. Additionally, my review of the record indicates that the financial conditions and circumstances relating to the investment activities of the Funds degraded over time and failed to meet projections, and Mueller chose to actively not communicate that material change in financial condition to investors and potential investors.[85] Mueller and deeproot should have disclosed the changes in business circumstances not only to his investors but also in marketing materials. In my experience, I would expect any investment advisory firm and fund to provide full and

---

[84] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4509); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4820); 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4837); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1527); 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4799); 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4776).
[85] CYCL006121-6122.

accurate disclosure to ensure that any clients or potential clients have current, accurate information to make informed decisions during the investment process.

56. Based on my review of the record, Mueller and deeproot did not disclose material negative changes in financial and performance conditions which, in my experience, is information that an investor would have wanted to know prior to making an investment decision. A failure to disclose negative changes in the financial conditions which diverged from previously-published and disseminated materials is inconsistent with industry custom and practice.

57. Further there were numerous examples of inaccurate information in the PPMs as follows:

    a. The PPMs for both Funds stated that they would "invest in Life Policies (aka Life Settlements)."[86] The record indicates that neither Fund actually invested in, or owned, any life policies. Rather, all the life policies were owned and acquired by Policy Services.[87] I have not seen any documentation that the Funds held any interest in the life policies owned by Policy Services. Moreover, it appears that interests in at least some of the life policies held by Policy Services, but purportedly allocated to the Funds, were sold to investors in other funds operated or advised by Mueller.[88] As far as I have seen, Policy Services was never disclosed as the owner of the life policies.[89] The record also indicates that the 575 Fund "purchased" life policies as a "turn-key package" by investing in the dGRD Fund, which in turn was purportedly invested in life insurance policies.[90] This fact was not disclosed until the 2019 PPM. Moreover, as the dGRD Fund never held any life policies this 2019 PPM "turn-key package"

---

[86] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4505); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4816); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3407); and 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4794). See also, 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4832); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1522); 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4771).

[87] Mueller Deposition, pp. 57-58; Sworn Accounting of Robert J. Mueller dated October 14, 2021 (SEC-RJM-E-0000015-0017 and 0058).

[88] Mueller Deposition, pp. 296-298.

[89] Later PPMs mentions Policy Services as an administrator. For example, the 2019 dGRD Fund PPM stated, "We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc" (at 4772). The 2019 and 2021 575 Fund PPMs included the following statement: "using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'" (at 4834 and 1524, respectively). However, those were mentions of Policy Services as the portfolio administrator, not the owner of the policies. Furthermore, the statement were also misleading in that they imply that Policy Services is an independent entity; in reality, Mueller controlled Policy Services.

[90] Investigative Testimony of Robert Mueller, Vol. I dated June 23, 2021 ("Mueller Inv. Test. Vol I"), p. 99.

MOTION TO SEAL

statement is itself misleading. I have seen no evidence in the record that this investment structure and the involvement of specifically Policy Services was accurately or fully disclosed in any of the PPMs for either Fund. In my experience, this would be material information relevant to any investor or prospective investor because the involvement of Policy Services meant that investors' contributions were not owned by the Funds, the entities to which the PPMs and marketing documents represented the investors were contributing.[91] The use of an undocumented affiliate to conduct investment activities, without disclosure and without contractual obligations,[92] presents risks to the investor that should be set forth in the PPMs and communicated to investors for their consideration. As noted above, it was not until the 2019 575 Fund PPM and the 2021 575 Fund PPM that deeproot disclosed, "[w]e anticipate all Life Policies purchased by this Fund will be purchased as a turn-key package through an affiliate offering with the deeproot Growth Runs Deep Fund, LLC." These two PPMs mention the dGRD Fund and yet none of the distributed dGRD Fund PPMs, which Mueller indicated were operative at the time, included a similar disclosure. Further, I have seen no evidence in the record that Policy Services was a formal "affiliate" of the Funds, nor evidence that this investment structure and the involvement of specifically Policy Services was accurately and adequately disclosed in any PPM.

b. The PPMs for both Funds described various portfolio asset allocations stating either that that "the simple majority" of the Fund's assets would be invested in life insurance policies, or that capital acquisitions in assets other than life policies would be limited to percentages less than fifty 50 percent.[93] The PPMs provide no further detail

---

[91] See, e.g. 2015 marketing material for the 575 Fund at JR000140 and SEC-DEEPROOT-E-0011222-1223; 2020 Investor Approved Presentation at SEC-DEEPROOT-E-0093401-3419; 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416); and 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803).

[92] I discuss the false statements relating to the risks written in the PPMs relating to Policy Services below.

[93] The 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4832); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1522); 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4770), each state "We will invest in Life Insurance Policies... as the simple majority of our Fund Assets." Both the 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4506-4507) and 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4817-4818) specify a maximum capital acquisition component, stating "[w]e minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio." The 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4835-4836) increases this percentage, stating "[w]e minimize this risk by limiting the capital acquisition component of the Company to no more than fifty percent (50%) of the asset portfolio."

regarding how the "simple majority" or stated percentages were calculated.  The PPMs do not state whether these allocations were to be determined based on investment value or allocation of investor funds.[94]  Furthermore, I have seen no additional detail in the PPMs or in any other materials for the Funds regarding how the Funds would determine what constituted a "simple majority," whether the "simple majority" aligned with any investment strategy or plan, or how the "simple majority" would be tracked consistently over time. Further, as noted above, since the Funds never actually owned or acquired any life policies, these asset allocation statements in the PPMs for both Funds were misleading because no assets were "invested" in life policies, never mind a "simple majority."

c.  The PPMs for both Funds stated that they would engage "capital acquisitions" which they described as "a purchase of an internal, affiliated investment position in another enterprise…"[95]  The record indicates that neither of the Funds purchased anything from deeproot affiliates, or from any other entity or party, but rather simply funded those entities on-going operations.[96]  The fact that no capital acquisitions were made is material information that I would have expected to have been disclosed to investors.  If the investment strategies and activities deviated from what was disclosed to investors, I would have expected all investors to be informed in writing.

d.  The 2015 575 Fund PPM was one of the few PPMs which provided specific detail on the affiliate investment in deeproot Tech/deeproot Pinball.[97]  The 2015 575 Fund PPM mentions that "Capital acquisition in [deeproot Pinball] would consist of the purchase of [deeproot Pinball] Class B Shares that [the 575 Fund] would hold."[98]  The PPM

---

This statement is again changed in the 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1525), to state ""We minimize this risk by limiting the certain allocations of the funds in the575 to less than fifty percent (50%) of the asset portfolio. We call these collectively the minority allocations." Per the 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3408) and the 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4795), in the dGRD Fund, "[w]e minimize this risk by limiting the capital acquisition component of the Company to thirty percent (30%) of the asset portfolio."

[94] Disclosure materials as described in greater detail below reference allocation of investors' funds.

[95] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4506); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4817); 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4835); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1525); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3408); and 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4795).  I note the 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780) did not contain this language.

[96] The "Investment Allocation Agreement is discussed below.

[97] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4506-4507). See also, 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4817-4818).

[98] 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4818).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

also stated that deeproot Pinball "is offering up to $6,000,000 of Class B Membership Shares [] at a price of $1,000 per Class B Share."[99] However, Mueller testified that deeproot Pinball never sold any Class B shares to the 575 Fund or the dGRD Fund.[100] I have not seen anything in the record indicating that this PPM was amended or that investors or potential investors who received this PPM were notified as to this inaccuracy.[101]

e. The 575 Fund and dGRD Fund PPMs did not consistently disclose the fact that Policy Services was owned and controlled by Mueller and that Policy Services participated or was part of the overall investment administration or the implementation of the investment activities of deeproot.[102]  It was not until the 2019 and 2021 PPMs in which Mueller's role in Policy Services was disclosed: "Robert… has been the principal officer, director, or manager of Policy Services, Inc., and all of the deeproot® family of companies since 2012."[103]  In my experience, it would be irregular and insufficient to omit the involvement of deeproot affiliates as significant and material contributors to the overall deeproot investment activities in versions of the PPMs which were distributed to potential investors.  Policy Services is only mentioned in the PPMs beginning in 2019, but only in the "Risk Factors" section.[104]  And yet, the PPMs, as mentioned above, admit that Mueller was involved with Policy Services since 2012.

f. There was a lack of detail in the PPMs relating to the risks associated with the affiliate investments.  The only tangential mention is, for example, Section F of the 575 Fund PPMs and Section G of the dGRD Fund PPMs titled, "Some Agreements, Including

---

[99] 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4818).

[100] Mueller Inv. Test. Vol I, p. 173.

[101] Mueller testified, "Only one investor ever invested in it before we changed the direction, and that investor has since paid back."  He also implied that the 2018 PPM was potentially not "the correct version" (see Mueller Inv. Test. Vol I, p. 174).  Regardless, I see no documentation relating to the justification for the change in direction along with supporting analysis and details nor any notifications to any investors or potential investors who might have received the incorrect PPM.  Further, Mueller's responses to the first set of interrogatories admitted that this 2018 PPM was operative for the 575 fund (See Defendant Robert J. Mueller's Objections and Responses to Plaintiff's First Set of Interrogatories dated August 19, 2022, p. 3).

[102] See also Mueller Deposition, p. 215.

[103] See 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4838); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1527); 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4777).

[104] See, for example, 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4772) ("…by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'" and "We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc.")

Those Involving Compensation, Not at Arms-Length."[105]  Section F, only mentioned compensation-related agreements, namely the return Class A shareholders (including Mueller) receive over Class B shareholders with the justification: "However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return."[106]  There was no description of the specific risks associated with entering into non-arms-length transactions, including, amongst other things, lack of accountability and due diligence, bias in any valuations (inflated values), lack of compliance, heightened chance of misrepresentations, and increased potential for fraud.  Even if such an arrangement was appropriate (which, as I explain in Section VIII below, it is not), the "opinion" was not based on an analysis of the risks to the Funds for each investment or for the portfolio overall.

g.  The description of risks in the PPMs relating to the involvement of Policy Services was misleading and incomplete based on my review and analysis of the record.  The 2019 dGRD Fund PPM stated that the use of Policy Services was beneficial because the Funds would be unable to "raid the piggy bank."[107]  There is no explanation or detail in any disclosure document of the Funds regarding policies and procedures in place to prevent such a "raid" despite representations by Mueller and the Funds to the contrary.  The statement regarding the benefit of the use of Policy Services within the dGRD PPM was false and contrary to Mueller's actual activities.  As described in further detail below, the use of Policy Services did not prevent Mueller from using investor funds to pay personal expenses without authorization.

h.  In my review of the record, there is no evidence which indicates that Defendants before beginning their investment activities, engaged in any risk management analysis or once investment activities were underway, engaged in any ongoing risk management monitoring or mitigation efforts, despite representations by the Funds

---

[105] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4504); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4815); 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4830); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1520); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3405); 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4792); and 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4768).
[106] 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4830).
[107] 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4772).

that their strategies were "Safe[] by Design."[108]  The 2019 575 Fund PPM had a section titled "Capital Acquisition in deeproot Affiliates" in which deeproot and Mueller wrote: "A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines."[109]  The PPMs fail to disclose any strategy or methodology which explains how specific investments in the affiliate entities would provide short-term liquidity to the Funds and what formal or even informal analysis was performed to justify why the investments in affiliate entities would constitute "safer diversification."  Further, I have seen no evidence in the record that this statement was accurate at any time the Funds were operating.  I would have also expected a disclosure regarding how this expressed strategy could have produced short term liquidity and why there was a need for short-term liquidity.

i.   The 575 Fund PPMs and dGRD Fund PPMs stated, "deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds."[110]  There is no further detail of those funds at issue or explanation of any associated risks of affiliate entities owning shares in the Funds.  I would have expected disclosure and explanation of the investment rationale or requirement and how that was relevant to the overall investment strategy of the Funds as well as disclosure and explanation of the risks such as potential increased influence from non-independent investors, risks from comingled assets, and risks on liquidity due to the presence of affiliated funds all tied to deeproot.

j.   The 575 Fund PPMs and dGRD Fund PPMs stated that the Funds would provide "ongoing information," including "a statement of Company's unaudited financial

---

[108] See DEEPROOT FUNDS_005713 at 5715.
[109] 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4835).
[110] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4504); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4815); 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4830); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1520); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3405); 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4792); and 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4768).

condition and internal valuation of our portfolio, or digital access to the same…"[111]   I have not seen evidence in the record that regular financial statements and internal valuations were prepared by the Funds.  In fact, as I describe in further detail below, Mueller's recordkeeping was not consistent with industry custom and standards or requirements set forth in the operating agreements of the Funds.  In my experience, if a company did not maintain records in contravention of regulations and industry practice, deeproot would have to disclose the absence of such records to investors.

k.   The PPMs contained contradicting information from one another with regard to PPMs for Class B Shareholders and Class C Shareholders as relating to who would have preferential rights.  For example, in the FAQ section, the 2019 575 Fund PPM stated, "Class B shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency."[112]   However the 2021 575 Fund PPM for Class C Shareholders stated, "Class C shares have a preferential right to assets over any other shareholders (including Class A Shareholders) should the unfortunate occur and the Company is forced to wind-up due to insolvency."[113]   Class B and Class C shareholders can't both have preferential rights "over any other shareholders," and I did not see any further disclosures that either class of shareholders were made aware if any of their rights were subordinated by the other.

l.   The PPMs falsely represented, "In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit."[114]   The statement in the PPM appears inconsistent with the justification for investment in affiliates due to the alleged need for short-term liquidity.  In actuality, the books and records for the 575 Fund included

---

[111] 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4508); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4819); 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4836); 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1525); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3410); 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4797); and 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4775).
[112] 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4841). See also, 2015 575 Fund PPM (SEC-DEEPROOT-E-0014497-4512 at 4512); 2018 575 Fund PPM (SEC-DEEPROOT-E-0164808-4823 at 4823); 2015 dGRD Fund PPM (SEC-DEEPROOT-E-0013399-3416 at 3416); 2018 dGRD Fund PPM (SEC-DEEPROOT-E-00164786-4803 at 4802-4803); and 2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4780).
[113] 2021 575 Fund PPM (SEC-DEEPROOT-E-0211514-1530 at 1530).
[114] See, for example, 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4831).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

no reserves to pay investor obligations from the Class B Shareholders. I did not see anything in the deeproot financial records that there was anything labeled as "reserve account."[115] In my review of deeproot 575 Fund's only bank account with Wells Fargo Bank ending '8673, I noted that the daily bank balance was often less than $1,000. Upon review of the bank statements, it was evident that investor money was regularly withdrawn within less than a week after it was received. These investor funds were used to pay for the following:[116]

- expenses and investments of the Defendants,
- prior investors, or
- expenses charged to Mr. Mueller's personal credit card.

After accounting for these withdrawals, the available cash to deeproot 575 investors was the minimal amount of cash in its bank account. This cash balance, often less than $1,000, was inadequate to pay Class B Shareholder obligations totaling millions of dollars.[117] Moreover, in letters sent to 575 Fund investors in August and September 2020, Mueller and deeproot represented, "While we try to keep adequate reserves for things like this, the prolonged nature of the pandemic (which could stretch into 2021) makes it difficult to time and account for payments on a daily basis."[118] As stated above, there does not appear to have been any fund specifically set aside as reserves; regardless, the cash balances as detailed above was inadequate over time.

## B. MISREPRESENTATIONS IN MARKETING MATERIALS

58. In my opinion, information in deeproot's marketing materials misrepresented how deeproot operated as well as omitted material information about the business, manager oversight, general management oversight, risk management and the investment activities of deeproot.

---

[115] Per QuickBooks Production, 575 Fund balance sheets as of December 30, 2017 and June 30, 2019.
[116] Declaration of Sachin Verma dated October 6, 2021 ("Verma Declaration"), ¶¶10-11 and 15-16. See also Wells Fargo Production.
[117] See, for example, Declaration of Robert J. Mueller dated October 14, 2021, Exhibit B; Wells Fargo bank statements produced on June 22, 2020; July 15, 2020; September 1, 2020; March 1, 2021; April 12, 2021 and May 17, 2021.
[118] Exhibits 73 and 74.

MOTION TO SEAL

<u>Portfolio Allocation Misrepresentations</u>

59. Representations set forth in the 2015 marketing materials that the portfolio allocation of the 575 Fund would be 55-80% life insurance policies, 5-45% tech capital investments, and 5% in cash[119] were misleading in my opinion.   Additional marketing materials and investment portfolio narratives revised in 2019 and 2020 represented similar allocations.[120]

  

60. Mueller could not point to any specific methodology in which deeproot tracked portfolio allocation but instead indicated the allocation would be a "ballpark figure."[121]   In my experience, marketing presentations are required to closely and accurately align with representations and information provided in the PPM(s).  Marketing presentations are required to be accurate and not misstate or misrepresent the investment strategies, return projections or any other material facts that may have also been published in the PPM.  I would have expected the marketing materials to accurately reflect the portfolio allocation being implemented in practice.  I also would have expected a documented, consistent methodology and process to ensure that the portfolio allocation strategy was being met, with any related updates to marketing materials and communication with investors if that strategy ever deviated or changed.

---

[119] Exhibit 49 (JR000140): 2015 marketing material for the 575 Fund; SEC-DEEPROOT-E-0011222-1223 at 1223: 2015 marketing material for the 575 Fund.  It was contemplated that up to 30% of private placements for the dGRD Fund (see Mueller Deposition, p. 83 and Deposition Exhibit 34).
[120] DEEPROOT FUNDS 005626-5712 at 5701 (2019 Investor Approved Presentation); SEC-DEEPROOT-E-0093401-3419 at 3410 (2020 Investor Approved Presentation); SEC-DEEPROOT-E-0093421-3431 at 3422 (2020 Portfolio Narrative).
[121] Mueller Inv. Test. Vol I, pp. 98-99.  Mueller was also inconsistent as to whether the portfolio allocation was based on fair market value or investor funds allocated (see Mueller Deposition, pp. 289-292 and 301-303).  The inconsistency and lack of a formal policy to determine portfolio allocation is further evidence of Mueller and deeproot's deviation from custom and practice.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

61. In addition to a lack of any administrative mechanism to track portfolio allocations, I understand the record demonstrates that investments in life insurance policies or affiliates were not made as represented in the marketing materials.

    a. Life Policies: Marketing materials prepared for the Funds contain language that the Funds' investments would be "backed up" by life insurance policies.[122]  Pursuant to records provided by the SEC, the Funds purchased no life insurance policies directly in their names. Instead, the Funds transferred money to Policy Services to buy or service life insurance policies without clear documentation and understanding of their ownership interest in those policies.[123]  Furthermore, bank records show that during the first two years from September 24, 2015 to September 29, 2017, the Funds paid at least $7.6 million to Policy Services, Inc., which included a total loss of approximately $3.4 million for a failed attempt to buy a single life policy.  The balance was used to pay premiums on life insurance policies purchased by Mr. Mueller's prior funds and to buy new life insurance policies in the name of Policy Services.  In the next four years after September 2017, neither the Funds nor Policy Services purchased any new insurance policies[124] despite raising over $50 million from investors[125] - instead, the Defendants paid only $3.5 million for premiums on previously purchased life insurance policies and used the rest for Pinball and other business activities. These activities were inconsistent with the marketing materials of the Funds.  Moreover, I understand that fractionalized interests in the life policies purportedly allocated to the Funds' portfolios had previously been sold to investors who pre-dated the 575 and DGRD Funds.[126]  Despite this fact, Mueller often listed the full face value of the life

---

[122] See, for example, JR000140, SEC-DEEPROOT-E-0011222 at 1223.

[123] QuickBooks Production, 575 Fund, dGRD Fund, and Policy Services inception-to-date general ledgers.

[124] QuickBooks production, 575 Fund, dGRD Fund and Policy Services inception-to-date general ledgers and balances sheets as of June 30, 2019. See also, for example, Declaration of Robert J. Mueller dated October 14, 2021, Exhibit B; Wells Fargo bank statements produced on June 22, 2020; July 15, 2020; September 1, 2020; March 1, 2021; April 12, 2021 and May 17, 2021. I also understand that the last policy to be purchased by the Defendants was for the insured Margaret Basha, which closed on May 6, 2017. (See MySQL database backups produced by Turner Logic. See also Deposition of Thomas Andrew, ("Andrew Deposition"), Ex. 12, which is a spreadsheet prepared by Thomas Andrew, the Principal of Cycladic International LLC, an entity that sold life insurance policies to the Defendants. While slightly different, the date of sale on this spreadsheet confirms that the last two policies were sold in May 2017.)

[125] Verma Declaration, ¶5.  See also, for example, Declaration of Robert J. Mueller dated October 14, 2021, Exhibit B; Wells Fargo bank statements produced on June 22, 2020; July 15, 2020; September 1, 2020; March 1, 2021; April 12, 2021 and May 17, 2021.

[126] Mueller Deposition, p. 296-298.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

policies as assets of the Funds when the Funds would never be able to realize the full face value of these life policies.  Based on my experience, this would be disclosed to investors and potential investors.

    b.  Capital Acquisitions in Deeproot Affiliates: Based on my review of the books and records of the 575 and dGRD Funds,[127] there were no investments made into any deeproot affiliates, including deeproot Tech and Pinball.  Instead, the Funds paid the expenses for these entities and recorded receivables.  These receivables resulted in the funds providing interest free loans to the affiliates.[128]  Since there were no formal investments in the affiliates, contrary to what was represented to investors in marketing materials, the funds would not have received the benefits of any profits. Based on my experience, this is material information that would be disclosed to investors and potential investors.

62.  Similar vague and misleading representations relating to portfolio allocation were made in marketing and disclosure materials as well.  In or around 2018, an "Equity Fund Packet" for the deeproot family of funds was prepared and included marketing materials, an asset allocation disclosure, and copies of PPMs.[129]  I have not seen any documentation indicating that the portfolio allocation represented in this packet of materials was followed either.

<u>Investment Strategy and Rationale, Misrepresentations and Omissions</u>

63.  In early 2020, an "Investment Portfolio Narrative" prepared by Mueller "to provide an updated picture of the overall portfolio"[130] to prospective finders to describe deeproot's investment rationale for its investment in the pinball industry:[131]

---

[127] QuickBooks Production, 575 Fund and dGRD Fund inception-to-date general ledgers, balance sheets as of December 31, 2017 and June 30, 2019.
[128] QuickBooks Production, 575 Fund And dGRD Fund balance sheets as of December 31, 2017, and June 30, 2019.
[129] Exhibit 52 (SEC-DEEPROOT-E-0002280-2341).
[130] Allen Deposition, pp. 129-131. See also, Mueller Inv. Test. Vol I, pp. 235-237.
[131] Exhibit 72 (SEC-DEEPROOT-E-0013223-3236). See Mueller Inv. Test. Vol I, pp. 235-237.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> So, with the 'normal list' out, we brainstormed on projects that: weren't correlated, were self-collateralized, had a reasonable startup cost, had great return potential, had fairly mitigatable risk, and were/was something we could manage ourselves without a lot of trial-and-error or ramp-up-learning. Well... with my happenstance introduction to the pinball market in 2015, it seemed most sensible at the time that a Pinball project fit all of these parameters, and made perfect sense to go that direction (for the reasons that follow).

There is no evidence in the record that deeproot conducted an analysis or provided any basis for its claim that the pinball business met any of the alleged requirements for a "great return potential" or "mitigatable risk," and could be managed "without a lot of trial-and-error or ramp-up-learning."[132]  Because deeproot did not engage in any back-testing, investment analysis, or risk management processes, there is no support in the record for the statement that the pinball business could mitigate risk to deeproot's underlying business.  Even if the above statement constituted only an investment thesis, there is no reliable and similar investment thesis to support this assertion and there is insufficient detail on the research and analysis associated with the alleged investment thesis to demonstrate that the strategy could produce positive returns net of costs to the Funds.  It is common industry standard to include a track record of success of a similar strategy or both quantitative and qualitative research to support a communicated investment thesis.  It is also customary to include information such as, for example, how long the investor expects to hold the investment, exit opportunities, and considerations of macroeconomic factors in investment and exit – all of which would be considered in the context of any investment plan or policy already in place.  The investment thesis would then be utilized to develop a specific investment plan for implementation and periodic review by management.  None of these investment management functions existed for the Funds and each investment in the form and manner I would expect are standard and customary in the industry.

64.  Similarly, the Equity Fund Packet from 2018 had an "Allocation Modification Disclosure" for the 575 Fund stating that the PPM was amended "to allow between 0% and 20% to be directed to Sports and Entertainment and between 0% and 20% to be directed to Commercial Real Estate."[133]  The reasoning provided was "making the magic happen only gets more challenging in an ever-changing marketplace.  Those challenges are best resolved by being proactive.  In looking forward over the next three to five years, we have found two key and critical diversification opportunities that will decrease external risk, create additional short-term

---

[132] Exhibit 72 (SEC-DEEPROOT-E-0013223-3236).
[133] Exhibit 52, p. 3 (SEC-DEEPROOT-E-0002280-2341 at 2282).

revenues, while not dramatically affecting the overall lower risk profile of our funds."[134]  The assertion was false based on my review of the record and unsupported by the most rudimentary investment analysis. I have not seen any indication that any of the investments made into deeproot affiliates provided short-term income.  Furthermore, the reasoning alleged listed in the Allocation Modification Disclosure is inconsistent with disclosures in other materials in the Equity Fund Packet.  For example, the "deeproot Funds Commercial Real Estate Allocation Disclosure" (the "Real Estate Disclosure") listed the following contradictory statements with misleading or omitted additional relevant information is below.[135]

a. "Owning commercial real estate poses inherent risks not usually found in other type of real estate, many risks of which cannot be foreseen."[136]  I see no disclosure as to how acknowledgement of such risks reconcile with deeproot's misrepresentation that the commercial real estate market would "decrease external risk" and not affect the "risk profile of [the Funds]" as written in the proxy statement.[137]

b. "In order to maintain diversified safety within the funds, we voluntarily are limiting the exposure of each respective fund in and to the allocation.  The following maximum percentages are as to Principal received from existing and future investors.  This minimizes the investment risk to you and to us.  Any additional outlays are permitted as long as the total investor risk does not exceed two times the current notice."[138]  There is no indication anywhere in the Equity Fund Packet as to how "total investor risk" would be measured or tracked or how limiting the investment to "principal received" would minimize risk.

c. "While policies will always be our main focus, they have a few inherent shortcomings when it comes to income and short term liquidity.  The limited use of commercial real estate will help offset those shortcomings by adding a reasonably risk-leveraged asset class that provides income and liquidity."[139]  These statements are false.  It is widely known in the investment industry that real estate investments are not liquid assets.  In addition, as noted above, the statements were false and misleading because the Funds

---

[134] Exhibit 52, p. 3 (SEC-DEEPROOT-E-0002280-2341 at 2282).
[135] Exhibit 52, pp. 21-27 (SEC-DEEPROOT-E-0002280-2341 at 2300-2306).
[136] Exhibit 52, p. 21 (SEC-DEEPROOT-E-0002280-2341 at 2300).
[137] SEC-FHC-E-0003332 and SEC-DEEPROOT-E-0037281-7282 at 7281.
[138] Exhibit 52, p. 22 (SEC-DEEPROOT-E-0002280-2341 at 2301).
[139] Exhibit 52, p. 22 (SEC-DEEPROOT-E-0002280-2341 at 2301).

were not buying life policies, and even Policy Services had not purchased a new life policy since May 2017.

d.  "In addition, it is also easier to adequately value commercial real estate, which increases the liquidity factor." [140]  I have not seen any valuations performed or commissioned of any of deeproot's commercial real estate investments.

e.  There are no projections or estimates of revenues or costs in the disclosure.  This is inconsistent with other materials provided to investors as described below.

65.  The Equity Fund Packet also included a "deeproot Funds Sports and Entertainment Allocation Disclosure" (the "Sports Disclosure"). [141]  Similar to the Real Estate Disclosure, the Sport Disclosure contains, in my opinion, a number of inaccurate or misleading statements or contains relevant material omissions.

a.  The alleged investment opportunity involved "scout[ing] out potential cities to organize and operate a minor league soccer team…"[142]  The investment in an effective startup is contradictory to the proxy statement relating to "decrease external risk." [143]  Furthermore, in my experience, it is well known in the investment industry that startups involve increased risk due to increased potential for failure.  There is no reconciliation in the Sports Disclosure regarding how investment in a new venture would not impact the risk profile of the existing asset portfolio, particularly in combination with the investment to be made in the real estate industry.

b.  "This allocation would substantially increase the national and regional exposure of the deeproot brand.  The more recognition the deeproot brand has, the more investment made.  The more investments made, the more capital/assets in the funds; the more capital/assets, the safer your money will be." [144]  I have seen no evidence in the record demonstrating that any real analysis was conducted to understand the impact to returns "recognition" from an investment in the sports industry would have on deeproot, including, for example, how much new funds would have been generated from the

---

[140] Exhibit 52, p. 23 (SEC-DEEPROOT-E-0002280-2341 at 2302).
[141] Exhibit 52, p. 28 (SEC-DEEPROOT-E-0002280-2341 at 2307).
[142] Exhibit 52, p. 28 (SEC-DEEPROOT-E-0002280-2341 at 2307).
[143] SEC-FHC-E-0003332 and SEC-DEEPROOT-E-0037281-7282 at 7281.
[144] Exhibit 52, p. 29 (SEC-DEEPROOT-E-0002280-2341 at 2308).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

recognition to make a meaningful impact relative to the investments made into the sports team.

c.   The "Sports Disclosure" lists a number of "Basic Startup Risks" without any quantification of those risks, how deeproot would mitigate those risks, or any sensitivity analyses on potential returns if those risks materialized.[145]  While there is a separate section entitled "Summary of Risk Avoidance Measures,"[146] nothing in his section indicates any quantitative assessment was made, what market research was actually conducted and the identification of relevant sources, or an operational plan as to who to implement and achieve mitigation.  In particular, there is no explanation as to what the "expense threshold and ceilings that maximize entertainment value and profitability" would be, how it was determined, or how it would be tracked.[147]  All of this information, in my experience, would have wanted to be known by an investor.

d.   The Sports Disclosure repeats the same verbiage relating to "Maximum Exposure per Fund" as the Real Estate Disclosure.[148]  Similarly, the Sports Disclosure is vague for failing to describe the fund's methodology for how "total investor risk" was measured and tracked and how the "Maximum Percentage Investment" of 20% might actually impact the overall risk profile of the Funds' overall portfolios.[149]

e.   The Sports Disclosure, unlike the Real Estate Disclosure, includes a "generic" pro forma.[150]  I have seen no evidence in the record indicating that this pro forma was ever updated to reflect current or changed assumptions and/or whether actual performance was tracked against projections.  I have also seen nothing in the record as to whether Mueller, deeproot, or Howard Cornfield, who was named in the disclosure as the individual who would serve as the General Manager, ever solicited or prepared proposals to implement an investment strategy in the sports industry or, if proposals were made, specific details regarding the status of those proposals and investment activities.

---

[145] Exhibit 52, pp. 29-30 (SEC-DEEPROOT-E-0002280-2341 at 2308-2309).
[146] Exhibit 52, p. 34 (SEC-DEEPROOT-E-0002280-2341 at 2312).
[147] Exhibit 52, p. 34 (SEC-DEEPROOT-E-0002280-2341 at 2312).
[148] Exhibit 52, p. 30 (SEC-DEEPROOT-E-0002280-2341 at 2309).
[149] Exhibit 52, p. 30 (SEC-DEEPROOT-E-0002280-2341 at 2309).
[150] Exhibit 52, p. 36 (SEC-DEEPROOT-E-0002280-2341 at 2315).

MOTION TO SEAL

## VIII.    THERE WAS A LACK OF DOCUMENTATION SURROUNDING BUSINESS AND INVESTMENT ACTIVITIES OF THE FUNDS, WHICH WAS INCONSISTENT WITH INVESTMENT INDUSTRY CUSTOM AND PRACTICE

### A.    MISREPRESENTATION OF ACTUAL ORGANIZATIONAL STRUCTURE FOR THE DEEPROOT FAMILY OF FUNDS

66.    Mueller prepared organizational charts for the deeproot family of funds in 2016, 2019, and 2020.[151]  I have not seen any documents in the record thus far disclosing to investors in the Funds that there was any formal relationship between the Funds and Policy Services.  I have also not seen any documents in the record indicating that investors were notified that investor funds would be used to pay the operational expenses of the Defendants and Relief Defendants.[152]  Bank records for Defendants indicate that there were at least $32 million of transfers  made  to the Relief Defendants' bank accounts or paid directly by Defendants for the benefit of Relief Defendants; these funds were used for credit cards and others expenses during the relevant period.[153]  2Based on my review of the books and records, there were no significant inflows aside from investor funds flowing into the Defendants' accounts.[154]  Therefore, I have seen nothing in the record to indicate that the Defendants could have paid for even their operating expenses from any profits or investment revenue income, as the vast majority of the inflows to the Defendants' accounts consisted of investor funds.

67.    In addition, contrary to industry practice and norms, Mueller entered into several non-arms-length transactions involving the Funds that corresponded to payment of expenses at affiliate entities without formal approval for the payment of those expenses. There was also no documentation or record keeping associated with such reimbursements.  Instead of investing directly into the affiliated entities, deeproot would receive funds from investors and then pay

---

[151] See Exhibit 5; Mueller Inv. Test. Vol I, pp. 46-47.
[152] The PPMs and other statements concerning "capital acquisitions" was misleading for the reasons discussed above and would not have informed investors that there investments were paying the operating expenses of these entities with nothing in return. The only related disclosure I have seen are references in later PPMs relating to Mueller's compensation: "Robert is paid a salary from the Ultimate Parent for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed from the Ultimate Parent downwards, may earn a commission on any Preferred Shares sold" (2019 dGRD Fund PPM (SEC-DEEPROOT-E-0164762-4780 at 4777)) and 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4838)).
[153] Verma Declaration, ¶10.
[154] QuickBooks Production, 575 Fund, dGRD Fund and Policy Services inception-to-date General Ledgers and annual trial balances.

expenses of the affiliated entities without formal authorization and without any basis for how such expenditures were the financial responsibility of the Funds. For example, per Mr. Mueller's own accounting provided in Exhibit B of his Declaration dated October 14, 2021, between January 8 and June 22, 2021 Deeproot Funds "dF Sweep Acct" made at least 45 wire payments totaling over $1.2 million to various creditors for the Pinball business;[155] QuickBooks and bank records from 2015 to 2020 show a similar pattern of Deeproot Funds making payments on behalf of affiliate entities.[156]

68.  Furthermore, contrary to industry custom and practice, in 2017, well after the payment of those expenses, Mueller created a historical vs contemporaneous "papering" of the relationship between deeproot and deeproot Tech as the Investment Allocation Agreement to formalize the payments sent between affiliates.[157]  Prior to the "papering," "there [was] no formal documentation other than [Mueller's undocumented] discretion."[158]  The Investment Allocation Agreement also indicated that periodic reports would be created and sent by the Manager as relating to "the status of the Funds" and "anticipated investment capital receipts payable to the Investment Affiliate."[159]  I have not seen copies of any of these reports in the record thus far.  I have also not seen any other similar agreements for any other affiliate entities.

## B.  Lack of Documentation Relating to Investment Process and Strategy

69.  My review of the record indicates that, inconsistent with industry custom and practice for a typical investment fund, there was a lack of documentation in place memorializing the Funds' investment process and strategic investment activities or the accurate valuation of the holdings of the Funds.  The Funds also lacked documentation relating to any analysis of investment risks or an analysis of investment strategies which deviated from the Funds' stated portfolio allocations.  The failure to conduct any investment return analysis or analysis of the allocations is inconsistent with industry standards and practice.

---

[155] Mr. Mueller described these vendor payments from the Deeproot Funds bank account as "Pinball wire," which relate to the Pinball business run by Deeproot Tech.
[156] For example, Deeproot Funds used investor funds to make all of the payments in 2016 and 2017 for Deeproot Sports and Entertainment from its Wells Fargo Bank account ending in -2385.
[157] Exhibits 67 (SEC-DEEPROOT-E-0210796-0800) and 68 (SEC-DEEPROOT-E-0213963-3966).
[158] Exhibit 67 (SEC-DEEPROOT-E-0210796-0800 at 0797).
[159] Exhibit 68 (SEC-DEEPROOT-E-0213963-3966 at 3963).  With at least 90 days written notice, the Manage could also provide net income, profits, or principal upon request.

70. As mentioned above, marketing materials stated that the portfolio allocation of the 575 Fund would be 55-80% life insurance policies, 5-45% tech capital investments, and 5% in cash.[160] Mueller and deeproot never consistently explained with sufficient analysis and quantitative detail how or why an investment in, for example, the pinball industry is non-correlated to the insurance policy business and could provide an income stream to the Funds in the event insurance policy revenue from death benefits faltered.  While the disclosure mentions profits and risks, there is no investment analysis to support the projection or quantification of those profits and risks, and no update or guidance to investors on profits and risks when business and investment activities failed to achieve the investment objectives communicated to investors.  In my experience, industry best practice involves investment managers analyzing all aspects of an investment and providing sufficient detail including both quantitative and qualitative assessments to investors to demonstrate why an investment is appropriate relative to the overall investment strategy.  Thereafter, such reasoning and analysis should be included in any materials regarding changes in investment strategy or updates in investment performance to investors.  Failing to do so would, in my experience, constitute a material omission which negatively impacts an investor's ability to make an informed decision.

71. As relating to investments in affiliates, Mueller claims he conducted due diligence with a number of professionals.[161]  I have not seen any documents in the record supporting this claim.  If Mueller did utilize the expertise of any outside professionals, I would expect the relevant information to be included in Mueller's analysis, along with identification of the related sources and attachments of any third-party analyses.

72. It wasn't until 2020 when deeproot and Muller prepared an Investment Portfolio Narrative which presented "an accounting of transactions as of Q2 2019."[162]  I have not seen any evidence in the record indicating that this document was sent to investors.  I have also not seen any other detailed narratives such as this one in the record.  This absence of periodic, detailed documentation supports my conclusion that Mueller failed to provide material information to investors and potential investors about the business and investment activities of the Funds.

---

[160] Exhibit 49 (JR000140): 2015 marketing material for the 575 Fund.
[161] Mueller Deposition, p. 304.
[162] Exhibit 72 (SEC-DEEPROOT-E-0013223-3236 at 3224).

MOTION TO SEAL

## C.   LACK OF INTERNAL CONTROLS

73.   The record does not indicate that there were any management controls in place or that deeproot had in place any professional oversight or management personnel that one would expect to be employed in an investment organization.  Regardless of the size of a fund, internal controls and a competent management staff and structure represent best practices in the investment industry and best practice to assist the advisor in adhering to the fiduciary duty owed to investors, particularly if all decision-making is concentrated with one entity or individual.  Internal controls are necessary to ensure accuracy and accountability and to protect the financial integrity of the Funds.

74.   I see no evidence in the record that Mueller conducted, or documented that he conducted, any analysis in advance of any transfer of assets to determine whether these transfers were inconsistent with the obligations of the Manager as set forth in the Operating Agreements for the Funds.  Mueller testified that he did not recall preparing any documented written analysis regarding whether the amount or nature of compensation for agents or finders was consistent with the market, and, as he stated, "I don't think I was ever told or aware that I needed to."[163] The Manager is required to conduct business in a manner which is consistent with the governing documents of the Funds, with representations made to investors, and with the requirements of the fiduciary duties of loyalty and care owed to investors.  These duties prevent that the Manager from acting in the Manager's interests where they are contrary to the interests of investor or constitute an unresolved conflict of interest, where they damage or undermine the fund financially, or where they improperly use the assets of the business for the personal benefit of the Manager.  In my experience, additional oversight and layers of decision-making safeguards are typical and necessary in a fund of any size to ensure any action by the Manager is always in the best interest of investors.  Furthermore, in my experience, a Manager having absolute authority in decision-making does not absolve them from the fiduciary duty standards.

## D.   INADEQUATE BOOKS AND RECORDS

75.   Industry standards and the Operating Agreements of 575 Fund and the dGRD Fund require the maintenance of financial records to ensure expenses, return information, and other financial

---

[163] Mueller Deposition, pp. 201-202.

information required to file accurate tax returns are maintained.  The record shows that there were no internal financial controls, and no employees at deeproot that supervised the day-to-day financial activities of deeproot.  Contrary to industry custom and practice, annual QuickBooks files would be prepared by an external bookkeeper in a two to three-week period based on information and inputs provided by Mueller.[164]

76.  The maintenance of books and records was required as referenced above but would be expected of the Manager of an investment fund like the Funds. The lack of books and records, based on my review of the record, was not communicated to investors in any PPM or marketing document or investor communication.  In my experience the lack of the maintenance of books and records is information that an investor would have wanted to know.  Further industry custom and practice as well as statutory rules and regulation requires management to maintain accurate financial records to ensure the accuracy of limited partner ownership interest, accounting of distributions and redemptions, expenses, "earned" management fees, and investment returns.  Without financial records, in my experience, it would be difficult if not impossible to ensure accuracy and full disclosure of material, necessary and required information to investors and regulatory and tax authorities.

77.  Mueller also testified that he was the only one with sufficient information to perform an analysis of the Funds' portfolio allocation.[165]  In my experience it is unusual for a Manager to exercise their duties fully and completely without the necessary administrative and investment personnel support.  Based on my experience, this information should have been communicated to investors and Mueller had a fiduciary duty to ensure that all investment analyses were accurate and protected the interests of the investors.

78.  Nonetheless, with regard to the valuation methodologies utilized by Mueller, my review of the record supports a finding that his methodologies were unreliable and inconsistent with what I would expect at a business in the investment advisory industry.  Mueller states that, to determine portfolio value he engages in the following practice one to two times a year:

I'd have to run several different reports.  I'd have to look at -- from those reports, to determine where we were with at least the policy.  A portion of the 575.  I'd have to

---

[164] Mueller Inv. Test. Vol I, pp. 127-128; Mueller Deposition, pp. 151-152.
[165] Mueller Inv. Test. Vol I, pp. 100-102.

sort of guesstimate where expenses are currently and where they would go, which would take some time and a lot of pulling together with the assets of the 575. And then I would try to determine both percentages are against each other and determine if we were still above 50 percent [the allocation percentage], close to it, what we needed to do with that.166

79. Infrequent estimates of value, even if performed internally, using "guesstimates" are not to the standard of industry custom and practice. Mueller's process is atypical and is further evidence as to the lack of document process and adherence to that process of any consistent, frequent way to maintain adequate books and records.

### E.   FAILURE TO PERIODICALLY PREPARE IN-HOUSE OR OBTAIN THIRD PARTY VALUATIONS

80. Mueller was obligated as the Manager to ensure that valuations of assets were accurate and that values were not misstated to investors or Federal and State tax authorities. The record shows that there was no process or procedures in place to ensure that the valuation of the assets of deeproot were accurate. Industry custom and practice dictates those periodic valuations should have been completed by experienced and competent internal personnel or by a credible third-party firm, and that any valuations communicated had sufficient detail and accuracy for investors to know the actual value of their holdings.

81. The PPMs represented that Mueller and deeproot would prepare in-house valuations of the Funds' portfolio but did not specify how this would be accomplished. In addition, the Investment Allocation Agreement stated that valuations would be prepared "in good faith by Investment Affiliate to reflect its fair market value, or by any third-party valuation professional or firm Investment Affiliate deems appropriate."167 Mueller only reported affiliate financial statements on a cost basis in QuickBooks and never obtained third-party valuations.168 Mueller also testified that valuations can be costly and take time, with the cost of third-party valuations not worth the result. He also questioned the reliability of fair market value.169 It is unclear why Mueller would include valuations in the reporting requirements in the PPMs and the Investment Allocation Agreement if he disagreed with their usefulness. Regardless, Mueller's view is inconsistent with

---

166 Mueller Inv. Test. Vol I, p. 101.
167 Exhibit 68 (SEC-DEEPROOT-E-0213963-3966 at 3964).
168 Mueller Inv. Test. Vol I, p. 189.
169 Mueller Inv. Test. Vol I, pp. 190-192.

my experience in the industry and in representations ultimately communicated to investors and prospective investors.

82. Rather than prepare or commission valuations for each of the investments in the Funds' portfolios, Mueller testified that he would sometimes base the portfolio value on the amount of capital allocated "and not the value of the actual assets."[170]  When asked whether the allocation was based on the value of the assets in the portfolio, Mueller testified, "I don't believe there's any valuation here[.]"[171]  Mueller's methodology is not consistent with industry custom and practice as relating to determination of fair market value and is not only misleading but also an omission hindering investors' ability to understand the value of their investments and how they might make future investment decisions.  It is also not consistent with industry custom and practice that Mueller and deeproot did not employ any consistent methodology in valuing investments.

83. Mueller also did not have a methodology to accurately value the life insurance policies purchased.  Mueller testified that the metric he was able to utilize to value the life insurance portfolio held by Policy Services is "whatever we chose it to be."[172]  This statement is arbitrary and inconsistent with my experience of how investment organizations conduct valuation responsibilities.  The fiduciary duty of the Manager requires that valuations are accurate and utilize a reliable method for determining actual market value. Mueller's admission indicates his failure to utilize any accepted industry methodology and fails to ensure the process results in accurate information.

## F.  IMPROPER USE OF INVESTOR FUNDS

84. The Manager, in executing his duties owed to the company, is required to not act in a manner contrary to the interests of deeproot or its investors.  Maintaining records relating to expenses, revenue, returns, disbursements, distributions, redemptions, etc. are requirements of management to implement and manage.  The Manager must ensure only allowable expenses are authorized and reimbursed and, as such, must be expenses of the fund and not personal in nature.

---

[170] Mueller Deposition, pp. 290-292 and 299-300.
[171] Mueller Deposition, p. 290.
[172] Mueller Inv. Test. Vol I, pp. 94-97.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In my experience, the correct identification of business expenses is a fiduciary duty of a manager and the management team.

85. In my experience, a CFO or auditor would independently review expenses, approvals, and the reimbursement to ensure that they were legitimate expenses of the fund and specifically not personal in nature. In this matter, because Mueller made all decisions, administratively and as the CFO, in my experience it would have been more important and crucial that a third-party review all of Mueller's decisions about the identification and reimbursement of fund expenses reimbursed by the Funds. I have not seen any evidence that such review and approval of expenses, risk mitigation, or administrative process was in place at deeproot.

Payments Between Mueller and the Funds Were Conducted Via Policy Services

86. The record indicates that payments between Mueller and the Funds were carried out via Policy Services. For example, the QuickBooks data files include the following transactions:[173]

| Entity | Type | Date | Name | Memo | Split | Amount |
|---|---|---|---|---|---|---|
| 575 Fund | Transfer | 09/17/2018 | | Funds Transfer | Due to Policy Services, Inc. | -$96,000.00 |
| Policy Services | Transfer | 09/17/2018 | | Funds Transfer | Due from DR 575 Fund | $96,000.00 |
| Policy Services | Check | 09/17/2018 | American Express | | A/R--Robert Mueller | -$96,000.63 |

87. As shown in the table above, it appears Policy Services received $96,000 from the 575 Fund to pay American Express, which had the effect of increasing "A/R—Robert Mueller" on the balance sheet of Policy Services. Had these payments been legitimate business costs, there would be no need to create an accounts receivable asset, but rather the payments would have been recorded as an expense. Moreover, from 2015-2019, the "A/R—Robert Mueller" asset reported by Policy Services grew to nearly $2 million, as reported in both internal accounting records and in the tax returns for Policy Services, shown below:[174]

---

[173] See, QuickBooks Production, Policy Services and 575 Fund inception-to-date general ledgers.
[174] See, QuickBooks Production, Policy Services and 575 Fund inception-to-date general ledgers and Policy Services balance sheet as of June 30, 2019

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MOTION TO SEAL

| Reporting Period | Amount Per QuickBooks[175] | Amount Per Tax Return[176] |
|---|---|---|
| December 31, 2015 | $579,941 | $312,691 |
| December 31, 2016 | $943,380 | $945,610 |
| December 31, 2017 | $1,202,111 | $1,231,392 |
| December 31, 2018 | $1,546,965 | $1,549,195 |
| December 31, 2019 | $1,938,690 | N/A[177] |

88. As another example, the trial balances of the 575 Fund, dGRD Fund and Policy Services reflect the following balances as of December 31, 2020:[178]

| Entity | Account | Amount |
|---|---|---|
| 575 Fund | Intercompany Receivable/Payable: Due to Policy Services, Inc. | $13,280,209.51 |
| dGRD Fund | Intercompany Receivable/Payable: Due to Policy Services, Inc. | $8,668,259.11 |
| Policy Services | Intercompany Loans: Due from DR 575 Fund | -$13,280,209.51 |
| Policy Services | Intercompany Loans: Due from DR Growth Runs | -$8,668,259.11 |

89. The intercompany loans and receivables above were generated from the Funds transferring cash to Policy Services.[179]  Other than Policy Services issuing paychecks and holding the life insurance policies,[180] neither of which was disclosed in the PPMs, I have seen no documentation supporting why the Funds would make such transfers to Policy Services.

90. I have not seen anything in the record verifying that the payments between Mueller and the Funds were explicitly intended to be carried out via Policy Services or why such an arrangement would be beneficial to the Funds.  The transfers between Mueller and the Funds, and between the Funds and Policy Services, appear to be ad hoc and not tied to any services Policy Services provided the Funds.  I would have expected an agreement supporting the practice of the payment of only authorized loans or expenses along with documentation relating to the reason for and recordation

---

[175] See QuickBooks Production, 575 Fund and Policy Services inception-to-date general ledger.
[176] See, SEC-WSM-E-0000087-0100 at 0095 (2015 Policy Services Tax Return), SEC-WSM-E-0000101-0117 at 0113 (2016 Policy Services Tax Return), SEC-WSM-E-0000118-0135 at 0130 (2017 Policy Services Tax Return), SEC-WSM-E-0000136-0155 at 0149 (2018 Policy Services Tax Return), MUELLER 000871-0886 (2019 Policy Services Tax Return).
[177] The 2019 Policy Services Tax Return was self-prepared and did not report "A/R—Robert Mueller."
[178] See, for example, QuickBooks Production, Policy Services, 575 Fund, and dGRD Fund December 31, 2020, trial balances.
[179] For example, per QuickBooks Production the inception-to-date general ledger of the 575 Fund identifies a number of transfers out of the 575 Fund's '8673 bank account, which are subsequently recorded as "Due to Policy Services, Inc." See QuickBooks Production, 575 Fund inception-to-date general ledger.
[180] See, e.g., Allen Deposition, May 24, 2021, 40:05-17. In addition, when asked what Policy Services does, Mueller testified "It owns and maintains the life insurance policies that the Deeproot family of companies as you have defined has purchased." (Mueller Inv. Test. Vol I, p. 57).

of the payments.   I have also not seen any documentation setting forth the duties and responsibilities between the Funds and Policy Services provided to the Funds – as mentioned above, only the PPMs indirectly mention Policy Services' relationship with the Funds.

91.  For example, the Fund Operating Agreements required the following:

> A person serving as a Manager ["The initial Manager is ROBERT J. MUELLER"] shall be entitled to receive compensation for services rendered to the Company as a Manager only if and as approved from time to time by a majority of the Managers. A person serving as an officer shall be entitled to receive compensation for services rendered to the Company as an officer only if and as approved from time to time by the Managers. All Managers and officers shall be entitled to reimbursement of reasonable expenses incurred by them on behalf of the Company.181

92.  The Fund Operating Agreements did not authorize or make any mention of the arrangement for compensation that Mueller appears to have set up for himself via Policy Services.  I have also seen no evidence relating to loan documents for any loans made to Mueller.  I would have expected accurate and comprehensive fully authorized and executed loan documentation indicating loan terms, payment schedule, interest, any penalties, and, if required, any covenants. As of June 30, 2017, the deeproot balance sheet showed over $20 million in loans receivable from affiliated deeproot entities.[182]  As of June 30, 2019, the deeproot balance sheet showed over $37 million in loans receivable from affiliated deeproot entities.[183]  By December 31, 2020, the deeproot trial balance included over $50 million in loans receivable.[184]

<u>Payment of Mueller Credit Card Balances Using Deeproot Investor Contributions</u>

93.  Mueller also used investor funds to pay personal credit card expenses and initiate cash transfers for personal expenses. Although the Fund Operating Agreements allowed for reimbursement of reasonable business expenses incurred by a Manager on behalf of the Company.  Based on my experience, my review of the credit card charges concluded that the expenses do not appear to relate to any reimbursable business activities I would expect to be incurred on behalf of an

---

[181] See, for example, MUELLER 001045-066 at 1055, 1057-1058 and MUELLER 001067-1088 at 1077, 1080.
[182] See, for example, QuickBooks Production, Deeproot Funds LLC General Ledger Report extracted as of November 30, 2022; Deeproot Funds LLC Balance Sheet as of December 31, 2017.
[183] See, for example, QuickBooks Production, Deeproot Funds LLC General Ledger Report extracted as of November 30, 2022; Deeproot Funds LLC Balance Sheet as of June 30, 2019.
[184] See, for example, QuickBooks Production, Deeproot Funds LLC General Ledger Report extracted as of November 30, 2022; Deeproot Funds LLC Trial Balance as of December 31, 2020.

investment advisory/investment management firm.  Even if such expenses were allowed, I see no documented request for approval nor the related approval of such expenses.  And even if such approval was documented, the lack of a process to insure independent oversight (Mueller would be both the requester and approver) is inconsistent with industry custom and best practice.

94.   The following is an example of Mueller's use of investor funds to pay for his American Express credit card via the Policy Services bank account.

95.   Policy Services' bank account received funds from deeproot (which is the primary bank account receiving investor contributions) and transferred investor funds to a separate Policy Services account ending '3081 which in multiple instances paid the full statement balance of Mueller's American Express statements.



96.   Policy Services' books and records regularly showed that Mueller's American Express statements were then booked as accounts receivables from Mueller himself.  I have seen nothing in the OAs which permitted Mueller to use investor funds to pay for personal expenses.  I have also not seen any provision in the OAs which would allow Mueller to receive loans from deeproot affiliates, with the original funding of those loans being investor funds.  Between September 2015 and June 2019, Mueller recorded over $1.1 million from Policy Services to American Express as accounts receivables due to Policy Services from himself as shown in the table below.[185]

| QuickBooks Account | Type | Date | QuickBooks Name | Amount |
|---|---|---|---|---|
| A/R--Robert Mueller | Check | 09/24/2015 | American Express | 1,700.35 |
| A/R--Robert Mueller | Check | 11/02/2015 | American Express | 3,050.82 |
| A/R--Robert Mueller | Check | 01/25/2016 | American Express | 39,145.35 |
| A/R--Robert Mueller | Check | 01/25/2016 | American Express | 30,000.00 |
| A/R--Robert Mueller | Check | 03/23/2016 | American Express | 15,657.83 |

---

[185] See, for example, QuickBooks Production, General Ledger Detail for Policy Services Inc. as of December 2020.

| A/R--Robert Mueller | Check | 04/14/2016 | American Express | 29,378.05 |
|---|---|---|---|---|
| A/R--Robert Mueller | Check | 05/03/2016 | American Express | 53,000.00 |
| A/R--Robert Mueller | Check | 06/17/2016 | American Express | 5,425.97 |
| A/R--Robert Mueller | Check | 06/24/2016 | American Express | 25,657.15 |
| A/R--Robert Mueller | Check | 07/11/2016 | American Express | 37,611.63 |
| A/R--Robert Mueller | Check | 08/24/2016 | American Express | 23,450.95 |
| A/R--Robert Mueller | Check | 09/26/2016 | American Express | 28,000.00 |
| A/R--Robert Mueller | Check | 10/24/2016 | American Express | 42,053.32 |
| A/R--Robert Mueller | Check | 11/22/2016 | American Express | 7,624.74 |
| A/R--Robert Mueller | Check | 12/27/2016 | American Express | 19,343.43 |
| A/R--Robert Mueller | Check | 01/17/2017 | American Express | 60,669.79 |
| A/R--Robert Mueller | Check | 02/21/2017 | American Express | 32,159.48 |
| A/R--Robert Mueller | Check | 03/24/2017 | American Express | 27,531.63 |
| A/R--Robert Mueller | Check | 04/27/2017 | American Express | 29,295.17 |
| A/R--Robert Mueller | Check | 05/24/2017 | American Express | 1,501.41 |
| A/R--Robert Mueller | Check | 06/14/2017 | American Express | 8,390.98 |
| A/R--Robert Mueller | Check | 07/24/2017 | American Express | 32,141.55 |
| A/R--Robert Mueller | Check | 08/24/2017 | American Express | 7,841.42 |
| A/R--Robert Mueller | Check | 09/25/2017 | American Express | 8,867.88 |
| A/R--Robert Mueller | Check | 10/27/2017 | American Express | 6,983.92 |
| A/R--Robert Mueller | Check | 11/22/2017 | American Express | 6,000.00 |
| A/R--Robert Mueller | Check | 12/26/2017 | American Express | 37,348.57 |
| A/R--Robert Mueller | Check | 01/24/2018 | American Express | 7,723.77 |
| A/R--Robert Mueller | Check | 02/21/2018 | American Express | 25,133.75 |
| A/R--Robert Mueller | Check | 03/26/2018 | American Express | 24,385.58 |
| A/R--Robert Mueller | Check | 04/24/2018 | American Express | 12,984.10 |
| A/R--Robert Mueller | Check | 05/23/2018 | American Express | 16,442.28 |
| A/R--Robert Mueller | Check | 06/28/2018 | American Express | 15,013.77 |
| A/R--Robert Mueller | Check | 07/20/2018 | American Express | 46,326.25 |
| A/R--Robert Mueller | Check | 08/27/2018 | American Express | 17,616.03 |
| A/R--Robert Mueller | Check | 09/17/2018 | American Express | 96,000.63 |
| A/R--Robert Mueller | Check | 10/24/2018 | American Express | 20,482.20 |

| A/R--Robert Mueller | Check | 11/26/2018 | American Express | 17,535.02 |
|---|---|---|---|---|
| A/R--Robert Mueller | Check | 12/24/2018 | American Express | 45,210.26 |
| A/R--Robert Mueller | Check | 01/24/2019 | American Express | 44,719.31 |
| A/R--Robert Mueller | Check | 02/21/2019 | American Express | 20,379.83 |
| A/R--Robert Mueller | Check | 06/28/2019 | American Express | 117,937.63 |
| **Total** | | | | **1,147,721.80** |

Atypical Company Advance Clause

97. The PPMs also included a Company Advance clause which further allowed Mueller access to the Funds' assets:

> The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier.186

98. I am unfamiliar with, in the context of my experience as an investment professional, and have never observed this sort of "advance" language relating to operating expenses and compensation arrangements with management (for example, a commission). Based on my experience, this advance language is unusual in the industry. Additionally, in my experience, the use of the term "advance" is misleading in that it obscures the concept of debt or inter-company liability which the advance represents. I have also seen no documentation indicating that the Company Advance per the PPMs was tracked to ensure the "advance" was used for a legitimate business purpose, that the Company Advance was only used for expenses of the "Company" (i.e. the Fund), that the funds applied to the advance never exceeded the stated limit of 20%, or that there were protections and processes in place to ensure that 100% of the Class B Shareholders' principal

---

186 See, for example, 2019 dGRD PPM (SEC-DEEPROOT-E-0164762-4780 at 4776).

would be returned even if there was use of the advance.[187]  In fact, Mr. Mueller admitted that the funds subject to the company advance were not segregated.[188]

99. Mueller claims that dividends, redemptions, or any distributions to investors were "nominal administration expenses" under the Company Advance provision.[189]  I have not seen any policy that explicitly documented that such investor distributions could be categorized as "nominal administration expenses" per the Company Advance clause.  Even if there was documentation allowing for payments to investors to be categorized as "nominal administration expenses," in my experience, it would be atypical to label or identify such payments as an administrative expense.

100. In my experience, treating or classifying investor distributions as expenses disguises and obfuscates the fact that distributions made to investors did not come from the Funds but from money from new investors.  Based on my experience in fund administration, Mueller's use of new investor funds to satisfy distribution obligations, under the guise of the Company Advance language, demonstrates characteristics similar to other Ponzi schemes that I have observed, including the payment of distributions to investors which did not come from successful investment activities but were funded by new investor money.

Leveraging Fund Assets to Pay Investor Returns

101. Mueller further used investor funds by leveraging fund assets, specifically the life insurance policies, for loans from third parties to pay investor returns. For example, Policy Services entered into a factoring arrangement with Premier Global Corp. to "factor certain of [Policy Services'] obligations to pay Periodic Election interest payments to the investors in the deeproot 575 Fund, LLC."[190]  To secure Policy Services repayment and performance of the amounts due under this arrangement:

---

[187] Mueller testified that he had documented how the 20% limit was to be tracked but also admitted there were no related written policies.  I have also not seen anything in the financial records produced, or any other contemporaneous analyses, indicating Mueller and deeproot tracked the advance in "reports and spreadsheets" (see Mueller Deposition, pp. 143-148).
[188] See Mueller Deposition, p. 149.
[189] See, Mueller Deposition, p. 156.
[190] SEC-DEEPROOT-E-0186463-6471 at 6464.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> [Policy Services] hereby grants to PGC a first priority lien on, and security interest in the [Perry] life insurance policy, owned by Client, and defined in Exhibits C, D, and E, hereinafter called the "Policy", and constructively assigns to PGC the Policy as collateral to secure Client's full performance of all of the obligations of Client due or to become due per this Agreement.191

102. Factoring arrangements are expensive relative to other options, and this arrangement should have been disclosed in advance of engaging in this type of borrowing activity.  Beyond disclosing this arrangement due to the costs, disclosure was required in the event that the life insurance policies did not produce death benefits in the anticipated time frames.  Further, the utilization of factoring is not the typical type of debt that an investment firm would utilize, particularly when there are less expensive options.  In my experience, this is information that an investor would have wanted to know, and under the requirements of the fiduciary duties of loyalty and care, Mueller and deeproot should have communicated and explained that investor funds were being used in a manner inconsistent with offering documents given to investors.

## IX.   THE OPERATIONS AND ACTIONS OF MUELLER AND THE FUNDS WERE NOT CONSISTENT WITH AND DID NOT ADHERE TO THE REQUIREMENTS OF THE FIDUCIARY DUTIES OF LOYALTY AND CARE

103. The investment advisory and investment management industries are principles-based, and industry custom and practice are premised upon adherence to the requirements of the fiduciary duties an investment adviser owes to their client.[192]  As such, it is appropriate to assess the actions of an investment adviser, as well as the operations of an investment advisory firm, against the requirements of the fiduciary duty standards.  As outlined above in Section V, the applicable fiduciary duties in this matter include the duty of care and the duty of loyalty.

104. The communication of misleading or inaccurate statements and disclosures within the Funds' PPMs and marketing materials as outlined in Sections VI and VII would fail to meet the requirements of the duty of care, which involves the duty to operate the investment business in a manner that is in the best interest of the client.  Inaccurate or a lack of disclosure of material information prevents investors from full knowledge of information which is required to make an

---

[191] SEC-DEEPROOT-E-0186463-6471 at 6465.  The Perry life insurance policy was one of the policies "backing up investor principal" (see Exhibit 62 identifying "PER437," which is the Perry policy).
[192] See Section V above.

informed decision.  In my experience, there is a requirement to disseminate accurate and complete information.  To withhold or sanitize information relating to business risk associated with the operations of fund is not compliant with the required standard of care.

105. My review of the record revealed that Mueller even actively withheld negative information from investors about the performance of the Funds.  In an email dated April 5, 2019, Mueller wrote, "Under the PPM, we have to notify investors is [sic] there is a 'default' of any kind on an underlying asset.  However, it is gray area whether a breach of contract with a remedy is equal to a default that we would need to notify investors about.  I look forward to reading the language carefully to avoid at all costs having a duty to inform investors; which would be the end of the business."[193]  Mueller's attempts to avoid the disclosure of material information to investors, in my experience, is inconsistent with Mueller's fiduciary duties and fails to provide material information which investors would have wanted to know.

106. The PPMs are also evidence to the fact that deeproot's investment strategy was never adequately and fully disclosed and/or was misleading and vague and potentially harmed the interests of investors while benefiting the Manager or parent entities.  For example, the 2019 575 Fund PPM explained, "we and our parent entity(ies), as Class A Shareholders, will receive any returns from the pool of investments over the returns due and payable to Class B Shareholders. Our return may be potentially large and the magnitude of this return has been determined without the benefit of arms-length bargaining.  However, in our opinion, the risk of loss to us and the fees and charges paid by us in connection with the investments, justifies the division of the total potential return."[194]  The requirements of the duty of loyalty and care include acting in the best interest of the client at all times, appropriately disclosing any potential or actual conflicts, which  arose between the investment advisers  and the interest of the client, that the investment adviser would prioritize the benefit of the client over their own potential gain.  Because the 575 Fund allowed the Manager/Investment Advisor an unlimited return, it was theoretically possible that the Manager could strip 100% of any realized gain out of the 575 Funds, to the detriment of the investors in that fund.  This "right" created a conflict of interest between deeproot and its affiliates.  Deeproot and management had a fiduciary duty to identify conflicts, to resolve such

---

[193] CYCL006121-6122.
[194] 2019 575 Fund PPM (SEC-DEEPROOT-E-0164824-4841 at 4830).

MOTION TO SEAL

conflicts, or, if they could not be resolved, to disclose those conflicts to ensure investors' interests were protected.  The record does not reflect any management communication of the conflict or procedures to identify and resolve conflicts of interest which would be consistent with the requirements of the fiduciary duty of loyalty and care.  Under the duty of loyalty and care, it is improper for deeproot to enrich itself to the detriment of investors.

107. As referenced above, Mueller testified that he did not document or create documentation or financial records to ascertain that the 575 Fund invested at least 50% of its portfolio in life insurance policies, as represented in the PPMs.[195]  This failure to maintain records should have been disclosed to investors and was not.  Mueller had a fiduciary duty to keep accurate records to protect the interests of the investors and the record supports the conclusion that Mueller did not maintain records, much less accurate records and this was not communicated or disclosed to investors.

---

[195] Mueller Inv. Test. Vol I, pp. 100-101.

MOTION TO SEAL

*****

My report, with supporting exhibits, is contained herein, and presents my opinion and the bases and reasons thereof.  The exhibits are an integral part of this report and support the opinions contained herein. To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report.  This report was prepared solely for the above-captioned matter and should not be used for any other purpose without prior written authorization.


By:

Bill Post

Date:  March 17, 2023

MOTION TO SEAL

Exhibit 1

# Bill Post

Senior Managing Director
Forensic & Litigation Consulting

50 California Street Suite 1900 San Francisco, CA 94111
+1 415 283 4256 T | +1 415 602 4554 M
Bill.Post@fticonsulting.com

## Education

B.A., University of Virginia

J.D., University of SanFrancisco – Kendrick School of Law

Financial Management, Naval Postgraduate School

CFA Institute Investment Management, Harvard Business School

CFA Financial Analyst Program, Kellogg School of Management, Northwestern University

## Certifications

State Bar of California(active)

Admitted, United States District Court, Northern District of California (active)

District of Columbia Bar(inactive)

FINRA - formerly Series 7, 3, 63, 66

## Associations

Chartered Financial Analyst Institute (CFAInstitute)

CFA Society of SanFrancisco

Association of FinancialProfessionals (AFP)

Bill Post is a Senior Managing Director in the Dispute Advisory Services practice within the Forensic & Litigation Consulting segment and is based in San Francisco. He has 30 years of experience as an investment management professional, including roles as CEO, CIO, chief compliance officer and portfolio manager. Mr. Post is an expert in the investment management of equity, fixed income and alternative assets, and direct investing in hedge funds, venture capital and private equity.

Prior to entering the investment industry, Mr. Post was a private practice attorney specializing in corporate and securities law, M&A transactions, and private placements. His clients included broker dealers, investment managers, private equity, hedge and venture funds and corporate clients, including startups and companies in the financial services industry. Mr. Post advised SEC/FINRA regulated investment organizations on the delivery of investment management services, organizational investment vehicles and due diligence and disclosures, compliance and operational, administration, marketing, fund raising, management fees, and investment entity structures.

Mr. Post was a portfolio manager of global equities and fixed income as an investment professional for over 30 years at the Capital Group, Capital Guardian Trust Company, Franklin Templeton, and Fiduciary Trust. He was the founder, CEO and CIO of Franklin Templeton Alternative Assets and CEO/CIO of two multi-strategy hedge fund of funds, President and Chairman of Fiduciary Trust of California and CEO/CIO of a large family office. He was also CEO/CIO/CCO of Alvarez & Marsal Investment Management, a SEC registered RIA.

Mr. Post provides expert witness testimony related to corporate entity and LLC formation and management, fiduciary duty ("FD") (SEC/FINRA) and FD associated with corporate governance, conflict of interest, investment methodologies, the UniformFraudulent Transfer Act, compliance (SEC, FINRA and the banking industry), due diligence, disclosures, risk factors, management fees, performance reporting, compliance, hedge fund administration, investment banking, private placements, direct investing, passive investing and utilization of index funds, asset allocation, and the documentation associated with private placement fund raising, corporate and investment entity management, board of director governance, and M&A transactions related to the sale or purchase of business.

Mr. Post has been employed as an expert witness by the SEC and SEC-appointed receivers in several high-profile matters, including the Allen Stanford/Stanford Financial Group Ponzi scheme case. He provided expert testimony for the receiver in the U.S. District Court for the EasternDistrict of Pennsylvania in a hedge fund Ponzi scheme with a successful outcome for the government. Mr. Post has provided expert testimony in many other securities related matters including due diligence, non-public confidential information, proxy disclosures, risk factors, disclosures, investment standards and practices, fund raising, compliance, fiduciary duty, sales practices, and licensing.

**EXPERTS WITH IMPACT™**



Bill Post

Mr. Post is a member of the CFA Institute, the State Bar of California, and inactive member of the District of Columbia Bar. He formerly held FINRA license Series 7, and formerly 3, 63 & 66. He is also a former U.S. Navy Supply Corps officer and served five years of active duty with tours shipboard and as the controller of all airwings at Naval Air Station Alameda and Moffett Federal Airfield in California.

## Employment History

### CBC CAPITAL LLC

*FOUNDER and SENIOR MANAGING PARTNER – 2016 to 2019*

— CBC LLC provides strategic consulting and operational/business operations, identified investment opportunities and direct investment advice to the investment industry relating to high-net-worth platforms, private equity, venture, and hedge funds, including marketing and private placement documentation, sales and marketing and institutional and high net worth client servicing. Mr. Post provided consulting services to the financial services industry, private equity, venture, and law firms including expert witness services regarding SEC/FINRA and industry compliance, fiduciary, and suitable products standards.

### ALVAREZ & MARSAL INVESTMENT MANAGEMENT LLC, ALVAREZ & MARSAL LLC

*Managing Director, National Practice Leader of A&M Investment business (AMIM) – 2013 - 2016*

— AMIM is an SEC registered RIA (managed assets in excess of $100mm) and Mr. Post served as, as co-CEO, Chief Investment Officer and Chief Compliance Officer. AMIM provided fixed income management services to large institutional clients including corporations, state and local government and large foundations and endowments. Was responsible for all investment management activities, marketing, compliance, and administrative requirements.

— Provided services relating to the Investment Industry with a specific focus on alternative investment vehicles such as Hedge Funds, Private Equity and Venture Funds. Provided expert witness testimony related to compliance and fiduciary standards for SEC and FINRA registered investment advisors. Provided consulting services relating to the Investment Industry with a specific focus on alternative investment vehicles such as Hedge Funds, Private Equity and Venture Funds. Focused on third-party administrative and investment services (onshore-offshore) relating to alternative asset class investment managers, including marketing and private placement documentation, sales and marketing, institutional client servicing.

### STONE & YOUNGBERG-STIFEL NICOLAUS & COMPANY, INC. (Broker-Dealers)

*SENIOR VICE PRESIDENT – 2009 to 2013*

— Senior portfolio manager of equities and fixed income. Managed the liquid assets of the Lehman Brothers Estate for the court appointed receivership. Stifel Nicolaus, acquired S&Y and S&Y is now part of the full-service national brokerage and investment banking firm established in 1890. Responsible for building and implementing a national Family Office - equity and fixed income advisory fee business. S&Y was the largest public finance company in the Western US.

### BHP INVESTMENTS (multi-family office with $650mm in investable assets)

*PRESIDENT AND MANAGING DIRECTOR – 2004 to 2009*

— Founded by Mr. Post and two families in January 2004 as multifamily office investment management business with a focus on long public market equity, alternative assets including hedge funds, direct early round venture, and private equity investments with portfolio companies of Silicon Valley venture firms of Kleiner Perkins, NEA and other Silicon Valley based investment funds such as Silver Lake, TPG, Fortress and KKR.

— BHP allocated assets as well as the selection, due diligence, and monitoring of asset in alternative investments including hedge funds, venture, private equity, and real estate investments.

— Mr. Post was the CIO and Portfolio Manager for separate accounts investing in global equity and fixed income. Mr. Post managed three large-cap strategies, concentrated (15 positions), value (25 positions) and S&P (80 positions).



Bill Post

## FIDUCIARY TRUST INTERNATIONAL OF CALIFORNIA

*VICE CHAIRMAN & CEO – 2001 to 2004*

— Fiduciary Trust International is a multi-billion-dollar investment management business providing Global Equity and Fixed Income and Alternative Asset (hedge funds/private equity) management services to institutional and HNW clients. Mr. Post was responsible for all investment and management of the business which operated in the 22 Western States and was an equity portfolio manager. Responsible for the Franklin Templeton acquisition and integration and re-branding of Fiduciary Trust International. Mr. Post was a member of the management committee for Fiduciary Trust International, New York City.

## FT ALTERNATIVE ASSETS

*PRESIDENT & SENIOR MANAGING DIRECTOR – 2000 to 2004*

— Founder, CEO and Chief investment officer of FT Alternative Assets, a division of a public company. FT Alternatives managed hedge fund of fund strategies, and private equity fund of fund strategies. Held Series 3 Commodities License.

## FT WEALTH MANAGEMENT

*PRESIDENT & FOUNDER – 2000 to 2004*

— Founder, senior portfolio manager and CIO of FT Alternative Assets and FT Wealth Management. FTAA managed two Hedge Fund of Funds with approximately 16 external hedge fund managers for each strategy. FWM managed global equity and fixed income separate accounts for ultra-high net worth clients, foundations, and endowments. Responsible for all investment and management functions for both businesses.

## CAPITAL GROUP COMPANIES, CAPITAL GARDIAN TRUST COMPANY, CAPITAL RESEARCH (AMERICAN FUNDS)

*SENIOR VICE PRESIDENT – 1995 to 2000*

— Responsible for developing Capital's HNW private asset management business in the Western United States including San Francisco, Seattle, Salt Lake City, Denver, San Diego, and Houston. Responsibilities included Global Equity Portfolio management and client acquisition.

## WELLS FARGO SECURITIES, INC.

*VICE PRESIDENT – 1994 to 1995*

— Series 7 equity portfolio manager and assisted in the integration of Wells Fargo Securities with Wells Fargo Bank. Assisted in developing marketing and distribution strategies of investment products to high-net-worth clients.

—

## UNITED STATES NAVY

*LIEUTENANT, SUPPLY CORPS*

— CFO and Controller, NARU, NAS Alameda, NARU NAS Moffet Field.

— Graduated from Navy Supply Corps School, Athens, GA.

— Financial Management, Naval Postgraduate School, Monterey, CA.

## ADDITIONAL LEGAL & FINANCIAL EXPERIENCE

— Attorney in private practice with a focus on corporate, securities, transactional law, private placements for real estate, startups, private equity, venture investing, limited partnerships, and limited liability companies.

— Staff member, tax section, United States Senate Finance Committee, Office of Chief Legal Counsel.

— Staff member, Tax department, Touche Ross & Co (now Deloitte & Touche).



MOTION TO SEAL

Bill Post

— Section Lecturer, Legal Writing & Research, University of San Francisco School of Law.

— Current Lecturer and Project Leader, Haas School of Business, Master of Financial Engineering, UC Berkeley.



MOTION TO SEAL

# Bill Post

Senior Managing
Director
FTI Consulting
Forensic and Litigation Consulting
Three Times Square, 9th floor
New York, NY 10036
+1.415.602.4554
**bill.post@fticonsulting.com**

## EXPERT WITNESS EXPERIENCE

### TESTIMONY

- **Justin Albert v. Legion Partners Asset Management, LLC, Raymond T. White, Christopher Kiper**; In the Superior Court of California for the County of Los Angeles (Case No. BC706304-2019)

- **Gil A. Miller as the Trustee of the Randall Victims Private Actions Trust v. Union Central Life Insurance Company, Ameritas Life Insurance Corp., Ameritas Life Insurance Corp. of New York, and Acacia Life InsuranceCompany**; In the United States District Court for the District of Utah (Case No. 2:14 - CV - 00575 - JNP - PMW) (Expert Report: August 10, 2017)

- **Ralph S. Janvey, as Receiver for the Stanford International Bank, LTD., et al., v. GMAG LLC, Magness Securities LLC, and Gary D. Magness as an individual and as trustee of the Gary D. Magness Irrevocable Trust**; In the United States District Court for the Northern District of Texas (Case No. 3:15 - CV - 401 - N - BG) (Expert Report: May 20, 2016 subject to Protective Order)

- **Louis C. Bechtle, as Receiver for Acorn II, L.P., Acorn Capital Management, LLC et al. v. Diana Wister and William Wister, et al.**; In the United States District Court for the Eastern District of Pennsylvania (Case No. 13 3798) (Export Report: June 2014)

- **Jane A. Bartelme, trustee of the Jane A. Bartelme Trust, et al. v. Myxolidian, LLC, CMR CAPITAL, LLC formerly known as CMR DEVELOPMENT GROUP, LLC;** In the Superior Court of Arizona for the County of Maricopa (Case No. 1100077240), (Expert Report for plaintiff: August 25, 2014)

- **Robert Kadoch and Kathleen Kadoch v. Donna Grant, David C. Gilbert, Tiburon Land Company**; In the Superior Court of California for the County of Marin (Case No. CIV1504439 - 2019)

- **William Rosario Alessi and Sonia Alessi v. Bobby Haulk as a Sergeant of the Waxhaw Police Department,Michael T. Eiss as the Chief of Police of the Waxhaw Police Department, the town of Waxhaw**; In the United States District Court for the Western District of North Carolina - Charlotte Division (Case No.3:14 - cv - 00482) (Expert Report for Defendant: September 11, 2015)

- **In re Platinum - Beechwood Litigation, Martin Trott et al v. Platinum Management (NY), et al.**; In the United States District Court, Southern District of New York (Case No. 18 - cv - 10936) (Expert Report for Plaintiff-2019 -  subject to protective order)

MOTION TO SEAL

- **NECA - IBEW Pension Trust Fund, et al, v. Precisions Castparts Corp. et al;** In the United States District Court, District of Oregon, Portland Division (Case N. 3:16 - cv - 01756 - YY) (Expert Rebuttal Report 2020 - Subject to a protective order)

- **ATIF, Inc., Daniel Stermer, Creditor Trustee, v. Old Republic National Title Insurance Co.;** in the U.S. Bankruptcy Court-Middle District of Florida (Case N. 18-ap-00531-FMD) (Expert Rebuttal Report and Deposition for defendants-2020)

- **CKE Associates, LLC v. Nehal Chopra, Ratan Capital Group**; in the Superior Court of the State of California, County of Los Angeles, Case No. BC695080 (Subject to a protective order - Arbitration witness 2019)

- **FIH, LLC v. Foundation Capital Partners LLC, et al**; in the United States District Court for the District ofConnecticut, Case No. 3:15 - cv - 00785 (JBA) (Expert Report - 2019)

- **Schley, Yvonne Q. Schley Irrevocable Trust v. Peapack-Gladstone Bank, Trustee of the Yvonne Q.Schley Irrevocable Trust**; in the Superior Court of the State of New Jersey Somerset County (CaseSOM-L-1298-17) (Expert Report-August 30, 2021)

- **Cerner Middle East Limited v. Belbadi Enterprises LLC**, et al; in the Superior Court of the State of Washington, County of Clark, Case No. 16-2-01395-7 (Testimony for Plaintiff-alter ego-2020)

- **Arcadian Capital llc v. Cura Partners Inc**; in the United States District Court, Central District of California, Western Division (Case No. 2:20-CV-03372) (March 2021, Rebuttal and Rebuttal to Rebuttal subject to a Protective Order)

- **John Bernard v. Bank of New York Mellon**; in the United States District Court for the Western District of Pennsylvania (Case No. 2:18-CV-00783-RJC-CRE) (January 22, 2021, Rebuttal Expert Report)

- **In Re PFA Insurance Marketing Litigation**; in the United States District Court, Northern District of California, Oakland Division (Case No. 4:118-CV-03771-YGR) (Expert Report-October 8, 2021)

- **Ancor Partners v. Landon Capital Partners llc, Nexgen**; in the United States District Court, Northern District of Texas, Fort Worth Division (Case No. 4:20-cv-01326-P) (Expert Report-November 5, 2021)

- **Lee v. UAW Retiree Medical Benefits Trust;** in the United States District Court, Eastern District of Michigan, Southern Division (Case No. 2:20-cv-13060) (Expert Report- November 2021)

MOTION TO SEAL

- **General Blake Crowe, Lynne Crowe v. Lincoln Financial Advisors**, CRD #3978 and T. Prieur CRD #4296010, (FINRA Arbitration No. 21-02340) (November 2022-Testimony before Arb. Panel)

- **Steinke v. Aon Investments, Hewitt Ennisknupp, Hamilton Lane Advisors**; in the Court of Common Pleas of Philadelphia County, Pennsylvania (Case No. 210601197) (Expert Report-June 2021)

- **Raymond James Financial v. Deutsche Bank Securities, Deutsche Bank**, (FINRA Arbitration No. 21-02318) (2023)

ADDITIONAL EXPERT CONSULTING **** NON LITIGATION

- I have provided advice and consulting services relating to investment principals holding the CFA credential in relation to an investigation regarding the disclosure of material non - public information and an inquiry by the CFA Institute regarding a potential breach of ethics (2019).

- I have advised a $15 billion - dollar hedge fund regarding a review of all investment and administrative procedures and controls and the replacement and hiring of a fund's administrator (2016).

- I have advised the estate of one of the largest public company the Bankruptcy Court in Norway regarding the corporate governance failures and the recovery of assets which were diverted from the estate.

- I have advised a Sovereign Wealth Fund and led an investigation regarding the placement of $800 million in investable assets with a European Investment Manager to determine whether the investment management company was a sham or front for a kickback scheme involving sub - advisors (2016).

MOTION TO SEAL

# Exhibit 2

**Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et al**      MOTION TO SEAL                  **Exhibit 2**
**Documents Relied Upon**

All documents cited in my report and Exhibits.

### Bates Stamped Documents

| | | | |
|---|---|---|---|
| CYCL006121-6122 | SEC-DEEPROOT-E-0011222-1223 | SEC-DEEPROOT-E-0093401-3419 | SEC-DEEPROOT-E-0211514-1530 |
| DEEPROOT FUNDS 005626-5712 | SEC-DEEPROOT-E-0013399-3416 | SEC-DEEPROOT-E-0093421-3431 | SEC-FHC-E-0003332 |
| DEEPROOT FUNDS_005715 | SEC-DEEPROOT-E-0014497-4512 | SEC-DEEPROOT-E-0164762-4780 | SEC-WSM-E-0000087-0100 |
| JR000140 | SEC-DEEPROOT-E-0014509 | SEC-DEEPROOT-E-0164808-4823 | SEC-WSM-E-0000101-0117 |
| MUELLER 000871-0886 | SEC-DEEPROOT-E-00164786-4803 | SEC-DEEPROOT-E-0164824-4841 | SEC-WSM-E-0000118-0135 |
| MUELLER 001045-1066 | SEC-DEEPROOT-E-0037281-7282 | SEC-DEEPROOT-E-0186463-6471 | SEC-WSM-E-0000136-0155 |
| MUELLER 001067-1088 | SEC-DEEPROOT-E-0019790-9810 | SEC-DEEPROOT-0005760-5778 | |

### Depositions and Other Testimony

Investigative Testimony of Scott Allen dated May 24, 2021
Deposition of Thomas Andrew dated May 27, 2021
Investigative Testimony of Robert Mueller, Vol. I dated June 23, 2021 and related Exhibits
Deposition of Eric Dandridge dated September 22, 2022
Deposition of Scott Allen dated February 16, 2023
Deposition of Robert L. Mueller dated March 9, 2023 and related Exhibits

### Exhibits

| | | | |
|---|---|---|---|
| Exhibit 5 | Exhibit 52 | Exhibit 68 | Exhibit 73 |
| Exhibit 12 | Exhibit 62 | Exhibit 72 | Exhibit 74 |
| Exhibit 49 | Exhibit 67 | | |

### Pleadings

Complaint dated August 20, 2021
Defendant Robert J. Mueller's Objections and Responses to Plaintiff's First Set of Interrogatories dated August 19, 2022
Defendant Robert J. Mueller's Amended Answer to Security and Exchange Commission's Complaint dated November 30, 2022

### Additional Produced Documents

Declaration of Sachin Verma dated October 6, 2021
Declaration of Robert J. Mueller dated October 14, 2021
Deeproot Funds LLC Balance Sheet as of December 31, 2017
Deeproot Funds LLC Balance Sheet as of June 30, 2019
Deeproot Funds LLC General Ledger Report extracted as of November 30, 2022
MySQL database backups produced by Turner Logic

**Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et al**                    MOTION TO SEAL                                                          **Exhibit 2**
**Documents Relied Upon**

**Additional Produced Documents (Continued)**

   QuickBooks Production

   Sworn Accounting of Robert J. Mueller dated October 14, 2021

   Wells Fargo bank statements produced on June 22, 2020; July 15, 2020; September 1, 2020; March 1, 2021; April 12, 2021 and May 17, 2021

**Public Sources**

   https://investmentadviser.org/about-iaa/

   https://investmentadviser.org/wp-content/uploads/2021/09/Standards-of-Practice.pdf

   https://www.cfainstitute.org/en/about/vision

   https://www.govinfo.gov/content/pkg/CFR-2014-title17-vol4/pdf/CFR-2014-title17-vol4-sec240-10b-5.pdf

   https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf

   https://www.govinfo.gov/content/pkg/USCODE-2021-title15/pdf/USCODE-2021-title15-chap2B-sec78j.pdf

   https://www.investopedia.com/terms/o/offeringmemorandum.asp

   https://www.sec.gov/divisions/investment/advoverview.htm

   https://www.sec.gov/rules/interp/2019/ia-5248.pdf

   *Standards of Practice Handbook* , 11 ed. (2014), CFA Institute

MOTION TO SEAL

Exhibit 3

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds, et al.

MOTION TO SEAL

Exhibit 3

Comparison of deeproot 575 Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

| Category | ¶/§ | 2015 575 Fund PPM<br>*SEC-DEEPROOT-E-0014497-4512* | 2018 575 Fund PPM<br>*SEC-DEEPROOT-E-0164808-4823* | 2019 575 Fund PPM<br>*SEC-DEEPROOT-E-0164824-4841* | 2021 575 Fund PPM<br>*SEC-DEEPROOT-E-0211514-1530* |
|---|---|---|---|---|---|
| Class/Offering | n/a | Class B, Initial Offering (4500) | Class B, Initial Offering (4811) | Class B, New Offering (4827) | Class C (1517) |
| Purpose | n/a | "the575™ provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot Tech, which offers investors either a growth or income option in five year terms." (4500) | "the575™ provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot Tech, which offers investors either a growth or income option in five year terms." (4811) | "the575™ provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot affiliates, which offers investors either a growth or income option in five year terms." (4827) | "the575™ provides a securitized investment in a pool of life settlement policies and capital acquisition in deeproot affiliates, which offers investors either a growth or income option in five year terms." (1517) |
| Structure | 1 | "The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof." (4500) | "The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof." (4811) | "The Company is initially offering up to $75,000,000, or 3,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share, or a fraction thereof." (4827) | "The Company is initially offering up to $75,000,000, or 3,000 Class C Membership Shares ("Class C Shares") at a price of $25,000 per Class C Share, or a fraction thereof." (1517) |
| Offering Detail | 4/5 | "the575™ is an equity investment with a Mandatory Call five years, less one day... from the Start Date." (4500) | "the575™ is an equity investment with a Mandatory Call five years, less one day... from the Start Date." (4811) | "The575™ is an equity investment with a Mandatory Call five years, less one day... from the Start Date." (4827) | "the575™ is an equity investment with a Mandatory Call five years, less one day (or "subscription term"), from the Start Date." (1517) |
| Priority Return | 5/6 | "On or before the Start Date, a Class B Shareholder must make an irrevocable election as to how to receive the Priority Return. The "Priority Return" may either be: i) deferred (i.e. growth) - a simple fixed rate of seven percent (7%) per annum of the invested Capital; the cumulative sum of deferred Priority Returns to be paid lump-sum on the Pay Date; or ii) periodic (i.e. income) - a fixed rate of five percent (5%) per annum of the Invested Capital, paid in monthly pro rata payments, commencing sixty days after the Start Date." (4501) | "On or before the Start Date, a Class B Shareholder must make an irrevocable election as to how to receive the Priority Return. The "Priority Return" may either be: i) deferred (i.e. growth) - a simple fixed rate of seven percent (7%) per annum of the invested Capital; the cumulative sum of deferred Priority Returns to be paid lump-sum on the Pay Date; or ii) periodic (i.e. income) - a fixed rate of five percent (5%) per annum of the Invested Capital, paid in monthly pro rata payments, commencing sixty days after the Start Date." (4812) | "On or before the Start Date, a Class B Shareholder must make an irrevocable election as to how to receive the Priority Return. The "Priority Return" may either be: i) deferred (i.e. growth) - a simple fixed rate, lumpsum return of the invested Capital; or ii) periodic (i.e. income) - a fixed rate of either five percent (5%) of invested Capital if less than $400,000.00, or seven percent (7%) per annum of invested Capital $400,000.00 or higher, paid in either monthly or quarterly payments. The irrevocable election defined in this paragraph will herein be referred to as the "Priority Return Election." (4832) | "On or before the Start Date, a Class C Shareholder must make an irrevocable election as to how to receive the Priority Return. The "Priority Return" may either be: i) deferred (i.e. growth) - a simple fixed rate per annum of the Invested Capital paid in either monthly or quarterly payments. The irrevocable election defined in this paragraph will herein be referred to as the "Priority Return Election."... The deferred fixed rate return at maturity as a capital gain shall be 45% (or a simple equivalent of 9% per annum) for Principal under $500,000.00; and 55% ( or a simple equivalent of 11 % per annum) for contemporaneous subscriptions of Principal $500,000.00 or over. The periodic fixed rate per annum shall be seven percent (7%) for Principal under $500,000.00; and nine percent (9%) for Principal under $500,000.00 or over. The fixed rate on deferred or periodic Priority Return Election may be negotiated at market rates for all institutional amount of Principal over $1.5 Million." (1517-1518) |
| Liquidation Amount | 6/7 | "On or about the thirtieth (30th ) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount", being equal to: i) the Invested Capital; and ii) a bonus (if any), as defined infra in sub-paragraph 9. If the deferred Priority Return Election was chosen, the Company will also pay any un-paid deferred cumulative Priority Returns." (4501) | "On or about the thirtieth (30th ) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount", being equal to: i) the Invested Capital; and ii) a bonus (if any), as defined infra in sub-paragraph 9. If the deferred Priority Return Election was chosen, the Company will also pay any un-paid deferred cumulative Priority Returns." (4812) | "On or about the thirtieth (30th ) day after each Class B Shareholder's Mandatory Call ("Pay Date"), the Company will pay to the order of the respective Class B Shareholder the "Liquidation Amount", being equal to: The Liquidation Amount shall be equal to the invested Capital, plus one of the following:<br>(a) if deferred, and the Invested Capital was less than $400,000.00, a lump sum capital gain of 35% of the Invested Capital.<br>(b) if deferred, and the Invested Capital was $400,000.00 or greater, a lump sum capital gain of 45% of the Invested Capital.<br>(c) if periodic, any unpaid priority returns." (4828) | n/a |
| Bonus Opportunities | 9 | "» For the initial subscription term only: a bonus equal to five percent (5%) of the Invested Capital will be credited on the Start Date, and paid on the Pay Date, unless renewed in part or in full, for any subscription wherein Invested Capital equals or exceeds $350,000.00.<br>» For all renewal subscription terms: If permitted by the Company at the time of renewal, and if the Class B Shareholder renews at least ninety percent (90%) of the prior subscription term's Liquidation Amount, then a bonus equal to five percent (5%) of the renewed Invested Capital will be credited on the renewed Start Date, and paid on the renewed Pay Date, unless renewed in part or in full again." (4501) | "» For the initial subscription term only: a bonus equal to five percent (5%) of the Invested Capital will be credited on the Start Date, and paid on the Pay Date, unless renewed in part or in full, for any subscription wherein Invested Capital equals or exceeds $350,000.00.<br>» For all renewal subscription terms: If permitted by the Company at the time of renewal, and if the Class B Shareholder renews at least ninety percent (90%) of the prior subscription term's Liquidation Amount, then a bonus equal to five percent (5%) of the renewed Invested Capital will be credited on the renewed Start Date, and paid on the renewed Pay Date, unless renewed in part or in full again." (4812) | n/a | n/a |
| Other Offering Details | 15 | "Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets." (4502) | "Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets." (4813) | "Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager( s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets." (4828) | "Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager( s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets." (1518) |
| Other Offering Details | 17 | "Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in nonsecuritization of a majority of Class B Shareholder positions." (4502) | "Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in nonsecuritization of a majority of Class B Shareholder positions." (4813) | n/a | n/a |
| Risks | III.A. | "Lack of Operating History. The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise." (4503) | "Lack of Operating History. The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise." (4814) | "Even though the Company has been in operation since 2015, it is still is subject to all the risks of a new business enterprise. The current version of this Offering will not necessarily have the benefit of a track record or success that the previous Offering enjoyed. However, many of the affiliates that money might be invested in may not have any operating history and thus be subject to the foreseeable risks of a startup." (4829-4830) | "Lack of Operating History. The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise." (1519) |

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds, et al.
Comparison of deeproot 575 Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

Exhibit 3

| Category | ¶/§ | 2015 575 Fund PPM<br>*SEC-DEEPROOT-E-0014497-4512* | 2018 575 Fund PPM<br>*SEC-DEEPROOT-E-0164808-4823* | 2019 575 Fund PPM<br>*SEC-DEEPROOT-E-0164824-4841* | 2021 575 Fund PPM<br>*SEC-DEEPROOT-E-0211514-1530* |
|---|---|---|---|---|---|
| Risks | III.B. | "Investors will not be able to evaluate our portfolio of investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (4503) | "Investors will not be able to evaluate our portfolio of investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (4814) | "Investors will not be able to evaluate our portfolio of investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (4830) | "Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class C Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class C Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (1519) |
| Risks | III.C. | "Investment in the Class B Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon." (4503) | "Investment in the Class B Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon" (4814) | "Investment in the Class B Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon." (4830) | "C. Investment in the Class C Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class C Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon." (1519) |
| Underlying Assets: Life Policies | IV | "Life Policies. We will invest in Life Policies ( aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older...We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments...In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured." (4505-4506) | "Life Policies. We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older...We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments...In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured." (4816-4817) | "Life Policies. We will invest in Life Insurance Policies... as the simple majority of our Fund Assets. We anticipate that all Life Policies purchased by this Fund will be purchased as a turn-key package through an affiliate offering with the deeproot Growth Runs Deep Fund, LLC. As disclosed in that fund, the following disclosures would ultimately apply to any purchase made hereunder...The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes. Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity... " (4832-4833) | "We will invest in Life Insurance Policies... as the simple majority of our Fund Assets. We anticipate that all Life Policies purchased by this Fund will be purchased as a turn-key package through an affiliate offering with the deeproot Growth Runs Deep Fund, LLC. As disclosed in that fund, the following disclosures would ultimately apply to any purchase made hereunder....The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes. Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity." (1522) |
| Underlying Assets: Life Policies: Sourcing | | n/a | n/a | "There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy. In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies. Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured...The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies." (4833) | "There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy. In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies. Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured ...The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies." (1523) |
| Underlying Assets: Life Policies: Risks | | n/a | n/a | " Sourcing...Illiquidity...Unknown Maturities...Out of Control Premium Costs... Life Policy Forfeiture or Lapse...Carrier Rehabilitation or Liquidation" (4834-4835) | " Sourcing...Illiquidity...Unknown Maturities...Out of Control Premium Costs... Life Policy Forfeiture or Lapse...Carrier Rehabilitation or Liquidation" (1523-1524) |
| Underlying Assets: Life Policies: Risks | | n/a | n/a | "by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'" (4834) | "by using our ultimate parent company, Policy Services, Inc., as our sole affiliated policy administration provider between us and the insurance carrier, we are unable to 'raid the piggy bank'" (1524) |

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds, et al.

MOTION TO SEAL

Comparison of deeproot 575 Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

Exhibit 3

| Category | ¶/§ | 2015 575 Fund PPM SEC-DEEPROOT-E-0014497-4512 | 2018 575 Fund PPM SEC-DEEPROOT-E-0164808-4823 | 2019 575 Fund PPM SEC-DEEPROOT-E-0164824-4841 | 2021 575 Fund PPM SEC-DEEPROOT-E-0211514-1530 |
|---|---|---|---|---|---|
| Underlying Assets: Capital Acquisition | IV | "Capital Acquisition in deeproot Tech… There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio… Currently, deeproot Tech's sole project is deeproot Pinball, LLC ("dP") which is anticipated to be a multiyear project, starting in 2016 or 2017. Capital acquisition in dP would consist of the purchase of dP Class B Shares that Company will hold." (4506-4507) | "Capital Acquisition in deeproot Tech…There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio… Currently, deeproot Tech's sole project is deeproot Pinball, LLC ("dP") which is anticipated to be a multiyear project, starting in 2016 or 2017. Capital acquisition in dP would consist of the purchase of dP Class B Shares that Company will hold" (4817-4818) | "Capital Acquisition in deeproot Affiliates. A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to no more than fifty percent (50%) of the asset portfolio…. Class B Shareholders are investing with the expectation of absolute reliance on the management team to successfully start, administer and execute these affiliates, in whatever form or structure may dictate. The enhanced risk of this reliance is minimized by limiting the portfolio exposure in affiliates, and the pro rata sub-project distribution with this portfolio exposure. The Class B Shareholders do not share in any equity, debt, risks, profits, or losses with these affiliates. The Class B Shareholders sole 'bargain' is the enhanced returns of this Offering in return for the minimized commiserate risk. Currently, the Company will invest in the following enterprises…deeproot Tech…deeproot Pinball… deeproot Manufacturing… deeproot Studios…deeproot Toys…deeproot Games…deeproot Sports & Entertainment." (4835-4836) | n/a |
| Underlying Assets: Minority Allocations | IV | n/a | n/a | n/a | "We minimize this risk by limiting the certain allocations of the funds in the575 to less than fifty percent (50%) of the asset portfolio. We call these collectively the minority allocations. The first minority allocation are capital acquisitions, being a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. The purpose of this investment type is: i) to provide short term liquidity; ii) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and iii) the safer diversification of underlying assets away from just life policies. Currently, the following assets class may also be invested in using minority allocations. A subscribed investor maybe request disclosure information about any of these:<br>• Capital acquisition in tech (deeproot Tech, deeproot Studios, deeproot Pinball)<br>• Real Estate<br>• Small Businesses Car Wash<br>• Sports & Entertainment development, and venue and team management<br>• Factoring and financing of Construction Accounts Receivable" (1525) |
| Underlying Assets: Other Asset Classes | IV | "Other Asset Classes. The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders." (4507) | "Other Asset Classes. The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders." (4818) | "Other Asset Classes. The Company reserves the right to include other assets or asset classes, with reasonable notice to Class B Shareholders." (4835) | "Other Asset Classes. The Company reserves the right to include other assets or asset classes, with reasonable notice to Class C Shareholders." (1525) |
| Documents Required to be Provided Without Request | V | "We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:<br>» notice of any default of any underlying asset<br>» notice of a failure to pay a Liquidation Amount to any Class B Shareholder<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values<br>» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders" (4508) | "We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:<br>» notice of any default of any underlying asset<br>» notice of a failure to pay a Liquidation Amount to any Class B Shareholder<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values<br>» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders" (4819) | "We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:<br>» notice of any default of any underlying asset<br>» notice of a failure to pay a Liquidation Amount to any Class B Shareholder<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values<br>» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders" (4836) | "We have an affirmative duty to provide some ongoing information without need for any Class C Shareholders' prior requests. These include:<br>» notice of any default of more than 50% of asset value or investor Liquidation Amounts exceeding 25% of the Offering<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory litigation, proceeding or decision regarding us that directly and significantly affects the Class C Shareholders' rights or values" (1525) |

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds, et al.
Comparison of deeproot 575 Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

MOTION TO SEAL

Exhibit 3

| Category | ¶/§ | 2015 575 Fund PPM<br>*SEC-DEEPROOT-E-0014497-4512* | 2018 575 Fund PPM<br>*SEC-DEEPROOT-E-0164808-4823* | 2019 575 Fund PPM<br>*SEC-DEEPROOT-E-0164824-4841* | 2021 575 Fund PPM<br>*SEC-DEEPROOT-E-0211514-1530* |
|---|---|---|---|---|---|
| **Documents Required to be Provided Upon Request** | V | "We also have a duty to release certain information only upon request by a Class B Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (4508) | "We also have a duty to release certain information only upon request by a Class B Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (4819) | "We also have a duty to release certain information only upon request by a Class B Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (4836) | "We also have a duty to release certain information only upon request by a Class C Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (1526) |
| **Documents Not Provided** | V | "We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest<br>» any information concerning another Class B Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (4508) | "We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest<br>» any information concerning another Class B Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (4819) | "We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest<br>» any information concerning another Class B Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (4836-4837) | "We retain the right to not release certain information to any Class C Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class C Shareholder's interest<br>» any information concerning another Class C Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (1526) |
| **Company Advance** | VI | "The Company shall receive an advance of no less than two percent (2 % ) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date." (4509) | "The Company shall receive an advance ofno less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date." (4819) | "The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date." (4837) | "In lieu of a management fee, the Company shall receive an advance of no less than two percent (2 % ) and no more than ten percent (10%) of the Invested Capital of any Class C Shareholder. This is not a fee. Rather this is an advance out of Invested Capital. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class C Shareholder's Principal shall be returned at the Pay Date." (1526-1527) |
| **Admin, Structure, & Fees** | VII | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (4509) | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (4820) | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (4837) | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (1527) |
| **Principals & Advisors** | VIII | "Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas" (4509) | "Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas." (4820) | "There is only one director and executive officer of the Company: Robert J. Mueller... Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities. Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold. He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled  most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises...Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the dGRD Fund. Robert is paid a salary from the Ultimate Parent for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed from the Ultimate Parent downwards, may earn a commission on any Preferred Shares sold. Any marketing or travel expenses on behalf of the dGRD Fund will be expensed by invoice." (4838) | "There is only one director and executive officer of the Company: Robert J. Mueller....Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities. Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold. He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises. ... Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the575 Fund. Robert is paid a salary from an affiliate for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed may earn a commission on any Class C Shares sold. Any marketing or travel expenses on behalfofthe575 will be expensed by invoice." (1527) |

Notes/Sources:
    This Annex only includes the 575 Fund PPMs Mueller identifies as operational in his Response to Interrogatory 1 (see, Defendant Robert J. Mueller's Objections and Responses to Plaintiff's First Set of Interrogatories dated August 19, 2022).

MOTION TO SEAL

Exhibit 4

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et al.
Comparison of deeproot dGRD Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

Exhibit 4

| Category | ¶/§ | 2015 dGRD Fund PPM SEC-DEEPROOT-E-0013399-3416 Class B, Initial Offering | 2018 dGRD Fund PPM SEC-DEEPROOT-E-00164786-4803 Class B, Initial Offering | 2019 dGRD Fund PPM SEC-DEEPROOT-E-0164762-4780 Class B, New Offering |
|---|---|---|---|---|
| Overview | n/a | "deeproot Growth Runs Deep Fund, LLC... is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in other deeproot® entities; and cash or cash equivalents." (3399) | "deeproot Growth Runs Deep Fund, LLC... is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital investments in other deeproot® entities; and cash or cash equivalents." (4786) | "deeproot Growth Runs Deep Fund, LLC... is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; and cash or cash  equivalents." (4762) |
| Ownership | n/a | "deeproot Growth Runs Deep Fund, LLC... is a Texas limited liability company of which deeproot Funds, LLC... is the sole member. dF owns all of the Class A Membership Shares...and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company." (3402) | "deeproot Growth Runs Deep Fund, LLC... is a Texas limited liability company of which deeproot Funds, LLC... is the sole member. dF owns all of the Class A Membership Shares... and Robert J. Mueller, the sole principal of the deeproot® family of companies is the current Manager of the Company." (4789) | "deeproot Growth Runs Deep Fund, LLC... is a Texas limited liability company of which deeproot Funds, LLC... is the sole member. dF owns all of the Class A Membership Shares... and Robert J. Mueller, the sole shareholder and principal of the deeproot® family of companies is the current Manager of the Company." (4765) |
| Purpose | n/a | "The Fund provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw'. Other features include: renewal bonuses, above average pre-determined returns (38% to 60%), and no anticipated future premium obligations." (3402) | "The Fund provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw'. Other features include: renewal bonuses, above average pre-determined returns (38% to 60%), and no anticipated future premium obligations." (4789) | "The dGRD provides a securitized investment in a pool of life settlement policies that removes the inherent risks in relying on the maturity of a single policy, or the unknown wait for an entire pool to mature. By utilizing a First-In First-Out ("FIFO") Queue, investors are put on an equal, fair footing with each other: secured and profiting off of a 'pool' of policies, and not just a singular 'luck-of-the-draw'... A modified version of the Offering of Class B Shares existed previously and has been closed to new investment. That FIFO Queue/Fund will continue in its current form and payout for all of those investors. The Class B Shareholders of this 2019 Version will start in a new FIFO Queue with segregated, pooled assets materially supporting and backing up their investments." (4765) |
| Structure | 1 | "The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class B Shares") at a price of $25,000 per Class B Share." (3402) | "The Company is initially offering up to $25,000,000, or 1,000 Class B Membership Shares ("Class Shares") at a price of $25,000 per Class B Share." (4789) | "The Company is initially offering up to $50,000,000, or 2,000 Class B Membership Shares ("Class Shares") at a price of $25,000 per Class B Share." (4765) |
| Manager | 2/3 | "The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager." (3402) | "The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager." (4789) | "The Company will have a board of Managers who will be responsible for the management of the Company. Robert J. Mueller has been designated as the initial Manager." (4765) |
| Offering Basics | 5-9/ 5-10/ 4-9 | "The offering is made up of a chronological 'Queue' of segmented 1 share ($25,000) investment positions... A position may be fractional (ie. less than $25,000 or 1 share). Each investment position is assigned a predetermined rate... This is the equivalent of a lump-sum priority or preferred return...The Class B Shares are subject to Mandatory Calls, and as assets mature, the Company calls and pays off the positions based on their respective order in the FIFO Queue, as further described in this PPM. Each Class B Shareholder has two options upon a Mandatory Call: i) to renew (ie. reinvest) the position(s) in return for an increased Liquidation Multiplier (ie. bonus); or ii) receive a sum equal to the position(s)' initial principal, multiplied by the Liquidation Multiplier, paid 30 days after the Call Date. All calls are made in the sole discretion of the Company and are absolute, and without recourse. The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature." (3402-3403) | "The offering is made up of a chronological 'Queue' of segmented 1 share ($25,000) investment positions... A position may be fractional (ie. less than $25,000 or 1 share). Each investment position is assigned a predetermined rate... This is the equivalent of a lump-sum priority or preferred return...The Class B Shares are subject to Mandatory Calls, and as assets mature, the Company calls and pays off the positions based on their respective order in the FIFO Queue, as further described in this PPM. Each Class B Shareholder has two options upon a Mandatory Call: i) to renew (ie. reinvest) the position(s) in return for an increased Liquidation Multiplier (ie. bonus); or ii) receive a sum equal to the position(s)' initial principal, multiplied by the Liquidation Multiplier, paid 30 days after the Call Date. All calls are made in the sole discretion of the Company and are absolute, and without recourse. The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature. There are no costs, fees, or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VII or VIII herein." (4789-4790) | "The offering is made up of a chronological 'Queue' of segmented 1 share ($25,000) investment positions... A position may be fractional (ie. less than $25,000 or 1 share). Each investment position is assigned a predetermined rate... This is the equivalent of a lump-sum return. Each investment position is assigned a predetermined rate (the "Liquidation Multiplier"). This is the equivalent of a lump-sum return. The Liquidation Multiplier is currently set at 1.525, or a 52.5%  percentage equivalent for investment amounts less than $750,000.00. For investment amounts $750,000.00 or higher, the Liquidation Multiplier will increase by an additional 0.125 or 12.5% percentage equivalent to a fixed 1.65 or 65% percentage equivalent. The Class B Shares are subject to Mandatory Calls which are involuntary sales of stock back to the Company. As assets mature, the Company calls and pays off the positions based on their respective order in the FIFO Queue, as further described in this PPM. At a Mandatory Call, a Class B Shareholder with called shares will receive a sum equal to the position(s)' initial principal, multiplied by the Liquidation Multiplier, paid 30 days after the Call Date. All calls are made in the sole discretion of the Company and are absolute, and without recourse. The Company is responsible for all premiums or outlays to maintain the assets in return for an advance of principal, and a share of any assets that mature. There are no costs, fees or expenses that will be assessed against a Class B Shareholder's account, other than those disclosed in Articles VII or VIII herein." (4765-4766) |
| Class A Rights | 10/11 | "Class A Shareholders retain all voting rights. The Fund Advisor or Manager(s) retain sole discretion over due diligence, purchase, and maintenance of the assets." (3403) | "Class A Shareholders retain all voting rights. The Fund Advisor or Manager(s) retain sole discretion over due diligence, purchase, and maintenance of the assets." (4790) | "Class A Shareholders retain all voting rights. The Fund Advisor or Manager(s) retain sole discretion over due diligence, purchase, and maintenance of the assets." (4766) |
| Class B Rights | 11-12/ 12/13 | "Class B Shareholders have a right to receive certain information, as further described herein; and retain a right to consent to any substantial changes to the Offering, or to the ownership or management of the Company. Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in nonsecuritization of a majority of Class B Shareholder positions." (3403) | "Class B Shareholders have a right to receive certain information, as further described herein; and retain a right to consent to any substantial changes to the Offering, or to the ownership or management of the Company. Class B Shareholders are granted a contingent security interest in and to the underlying assets, pro rata, as a pool. As such, the Company agrees to not accept future principal, if doing so would result in nonsecuritization of a majority of Class B Shareholder positions." (4790) | "The Company has sold Class B Shares to Class B Shareholders in a separate series of shares and quote. Any assets purchased by this Company for Class B Shareholders will be earmarked solely for Class B Shareholders. Class B Shareholders have a right to receive certain information, as further described herein; and retain limited voting rights, such as the right to consent to: i) any substantial changes to this Offering, ii) substantial changes to the ownership or management of the Company, iii) the sale, lease, exchange, or disposal of all or substantially all of the Company's property asserts; iv) any requirement that forces the majority of Class B Shareholders to make additional capital contributions; or v) any amendment or restatement of the Articles of the Company that would adversely impact the rights, privileges, or benefits of any Class B Shareholder." (4766) |

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et al.
Comparison of deeproot dGRD Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

MOTION TO SEAL

Exhibit 4

| Category | ¶/§ | 2015 dGRD Fund PPM SEC-DEEPROOT-E-0013399-3416 | 2018 dGRD Fund PPM SEC-DEEPROOT-E-00164786-4803 | 2019 dGRD Fund PPM SEC-DEEPROOT-E-0164762-4780 |
|---|---|---|---|---|
| Risk Factors | III.A. | "Lack of Operating History. The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise." (3404) | "Lack of Operating History. The Company has recently commenced operations and has no evidence other than that presented herein to predict future earnings. As such, the Company will be subject to all the risks of a new business enterprise." (4791) | "Even though the Company has been in operation since 2015, it still is subject to all the risks of a new business enterprise. The current version of this Offering will not necessarily have the benefit of a track record of success that the previous Offering enjoyed. "(4767) |
| Risk Factors | III.B. | "Investors will not be able to evaluate our portfolio of investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (3404) | "Investors will not be able to evaluate our portfolio of investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (4791) | "Investors will not be able to evaluate our portfolio of investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them." (4767) |
| Risk Factors | III.C. | "Investment in the Class B Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon." (3404) | "Investment in the Class B Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon." (4791) | "Investment in the Class B Shares involves an enhanced degree of risk. We will only be able to meet our obligations to the Class B Shareholders and achieve our own internal objectives by obtaining enhanced returns from our investment portfolio. Although our Advisor or Manager(s) will apply governing criteria and reasonable business judgment to their investment decisions, each investment will generally imply an enhanced risk than other traditional investments offered in the open market. There is the potential risk of losing part or all of any given underlying investment or of not achieving its expected return thereon." (4767) |
| Risk Factors | III.D. | "Term, duration, or length of investment is unknown. While the advantage of the FIFO Queue feature of the dGRD is to put Class B Shareholders on an equal footing and a better chance to achieve the average anticipated hold time of the investment, the Company cannot make any guarantee or guess as to the term, duration, or length of the investment." (3404) | "Term, duration, or length of investment is unknown. While the advantage of the FIFO Queue feature of the dGRD is to put Class B Shareholders on an equal footing and a better chance to achieve the average anticipated hold time of the investment, the Company cannot make any guarantee or guess as to the term, duration, or length of the investment." (4768) | "Term, duration, or length of investment is unknown. While the advantage of the FIFO Queue feature of the dGRD is to put Class B Shareholders on an equal footing and a better chance to achieve the average anticipated hold time of the investment, the Company cannot make any guarantee or guess as to the term, duration, or length of the investment." (4768) |
| Risk Factors | III.G. | "deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder, and take no preference in the FIFO Queue." (3405) | "deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder, and take no preference in the FIFO Queue." (4792) | "deeproot Funds, LLC operates other investment funds. Those funds may, from time to time, purchase Class B Shares in the Company to hold as assets in those other funds. Should dF purchase Class B Shares, they are subject to the same identical terms as any other Class B Shareholder, and take no preference in the FIFO Queue." (4768) |
| Risk Factors | III.O. | "We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act." (3406) | "We intend to restrict investment in our securities (including the Debentures) to a maximum of 100 Class B Shareholders in order to meet an exemption from registration under the Investment Company Act." (4793) | "We intend to restrict investment in our securities to the maximum number of Class B Shareholders permitted under then-current federal law, in order to meet an exemption from registration under the Investment Company Act." (4769) |
| Underlying Assets: Life Policies | IV | "Life Policies. We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older… We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles…In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured." (3407) | "Life Policies. We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older… We will seek to minimize risk by investing in policies issued by a diverse range of highly-rated insurance carriers; and in policies that vary: by life expectancy, by net death benefits, and by annual premium payments. We intend to reduce the life expectancy risk by investing only in contracts where the life expectancy was reviewed by an experienced independent medical professional and/or actuary, as well as by diversifying the investments across insured individuals' varying ages and medical profiles…In the past, our principals have purchased life insurance policies through secondary market transactions directly from a middle source provider. The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Each policy considered by us will be underwritten by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured." (4794) | "Life Policies. We will invest in Life Insurance Policies… as the majority of our Fund Assets… The Manager intend to diversify a portfolio of Life Policies amongst multiple types, amounts, and underwriting classes. Utilizing a diversified portfolio minimizes: overall risk, premium expenses, cost of insurance fluctuations, mortality expenses, carrier default, and hold times to maturity." (4771) |
| Underlying Assets: Life Policies: Sourcing | IV | n/a | n/a | "There are two main markets to source policies from. The primary market constitutes sales directly from the insured to us. We have never bought directly from the primary market for many reasons; chief amongst them the expertise required to properly vet a policy before purchase. The secondary market constitutes sales where the policy has already been sold out of the primary market, and a third party, middle source provider, or broker holds and is selling the policy. In the past, our Manager have purchased Life Policies through secondary market transactions directly from a middle source provider (ie. Broker). The middle source provider purchased the policy directly from an owner/insured that purchased the life insurance in the primary market. Ongoing, we will continue to use brokers to purchase secondary market policies. Each policy we consider will be reviewed by an independent third party medical actuarial firm who will issue a report providing a life expectancy estimate on each insured. …The policies we will purchase are whole, universal, or convertible term life insurance policies issued by well-rated life insurance companies." (4771) |

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et al.
Comparison of deeproot dGRD Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses

MOTION TO SEAL

Exhibit 4

| Category | ¶/§ | 2015 dGRD Fund PPM<br>SEC-DEEPROOT-E-0013399-3416 | 2018 dGRD Fund PPM<br>SEC-DEEPROOT-E-00164786-4803 | 2019 dGRD Fund PPM<br>SEC-DEEPROOT-E-01647762-4780 |
|---|---|---|---|---|
| Underlying Assets: Life Policies: Risks | | n/a | n/a | " Sourcing...Illiquidity...Unknown Maturities...Out of Control Premium Costs... Life Policy Forfeiture or Lapse...Carrier Rehabilitation or Liquidation" (4771-4773) |
| Underlying Assets: Life Policies: Risks | | n/a | n/a | "We, on the other hand, have arranged for our portfolio to be administered by Policy Services, Inc." (4772) |
| Underlying Assets: Capital Acquisition | IV | "A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to thirty percent (30%) of the asset portfolio. The Company reserves the right to consider other future assets or asset classes, with reasonable notice to Class B Shareholders." (3408) | "A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to thirty percent (30%) of the asset portfolio. The Company reserves the right to consider other future assets or asset classes, with reasonable notice to Class B Shareholders." (4795) | n/a |
| Terms: FIFO Queue | V | "Investments by Class B Shareholders are queued in 1 share ($25,000.00) increments ("position"), or a part thereof if less, by the chronological order in which investments are initially received (or renewed) on a first-in, firstout ('FIFO') basis. Queue positions are numbered in sequential order based on a timestamp of when the i) Class B Shareholder's Application and Subscription Agreement was approved, and ii) the minimum qualifying principal was actually received... As assets mature and positions are called: i) Class B Shareholders are paid each's Liquidation Amount on the Pay Date, in order of Mandatory Calls on each's ordered position in the FIFO queue; and ii) the uncalled or remaining positions in the FIFO Queue advance in the same order to fill the called position(s), and are re-numbered respectively." (3408) | "Investments by Class B Shareholders are queued in 1 share ($25,000.00) increments ("position"), or a part thereof if less, by the chronological order in which investments are initially received (or renewed) on a first-in, firstout ('FIFO') basis. Queue positions are numbered in sequential order based on a timestamp of when the i) Class B Shareholder's Application and Subscription Agreement was approved, and ii) the minimum qualifying principal was actually received... As assets mature and positions are called: i) Class B Shareholders are paid each's Liquidation Amount on the Pay Date, in order of Mandatory Calls on each's ordered position in the FIFO queue; and ii) the uncalled or remaining positions in the FIFO Queue advance in the same order to fill the called position(s), and are re-numbered respectively." (4795) | "Investments by Class B Shareholders are queued in 1 share ($25,000.00) increments ("position"), or a part thereof if less, by the chronological order in which investments are initially received (or renewed) on a first-in, firstout ('FIFO') basis. Queue positions are numbered in sequential order based on a timestamp of when the i) Class B Shareholder's Application and Subscription Agreement was approved, and ii) the minimum qualifying principal was actually received... As assets mature and positions are called: i) Class B Shareholders are paid each's Liquidation Amount on the Pay Date, in order of Mandatory Calls on each's ordered position in the FIFO queue; and ii) the uncalled or remaining positions in the FIFO Queue advance in the same order to fill the called position(s), and are re-numbered respectively." (4773) |
| Terms: Mandatory Call | V | "A Class B Shareholder's position is subject to a Mandatory Call when all of the following events have occurred: i) an asset matures, or life policy matures due to the death of the insured(s); ii) the Company receives the maturity amount, or for life policies, the death benefit(s) or Face Value of the life policy from insurance carrier; iii) the Class B Shareholder owns the next position in the FIFO queue; iv) enough net proceeds exist from the maturity, to pay the Liquidation Amount of the next Class B Shareholder's position in the FIFO queue; and v) the Company conveys written notification of a Mandatory Call, the Liquidation Amount, Pay Date, and a right to Renew to the Class B Shareholder" (3408-3409) | "A Class B Shareholder's position is subject to a Mandatory Call when all of the following events have occurred: i) an asset matures, or life policy matures due to the death of the insured(s); ii) the Company receives the maturity amount, or for life policies, the death benefit(s) or Face Value of the life policy from insurance carrier; iii) the Class B Shareholder owns the next position in the FIFO queue; iv) enough net proceeds exist from the maturity, to pay the Liquidation Amount of the next Class B Shareholder's position in the FIFO queue; and v) the Company conveys written notification of a Mandatory Call, the Liquidation Amount, Pay Date, and a right to Renew to the Class B Shareholder" (4795-4796) | "A Class B Shareholder's position is subject to a Mandatory Call when all of the following events have occurred: i) an asset matures, or life policy matures due to the death of the insured(s); ii) the Company receives the maturity amount, or for life policies, the death benefit(s) or Face Value of the life policy from insurance carrier; iii) the Class B Shareholder owns the next position in the FIFO queue; iv) enough net proceeds exist from the maturity, to pay the Liquidation Amount of the next Class B Shareholder's position in the FIFO queue; and v) the Company conveys written notification of a Mandatory Call, the Liquidation Amount, and the Pay Date to the Class B Shareholder" (4773) |
| Terms: Renewals | V | "In lieu of accepting the Liquidation Amount for any matured position, a Class B Shareholder may reinvest... part or all of the Liquidation Amount. If a renewal investment is elected, having been received by the Company in writing at least three business days before the Pay Date, of at least ninety percent (90%) of the Liquidation Amount, then the Class B Shareholder shall receive a bonus of 0.05 added to their Base Liquidation Multiplier on the renewed position. A renewal bonus ( or renewal bonuses) is not cumulative. In all cases, a Class B Shareholder's renewed investment is placed at the end of the FIFO queue, as of the Pay Date." (3409) | "In lieu of accepting the Liquidation Amount for any matured position, a Class B Shareholder may reinvest... part or all of the Liquidation Amount. If a renewal investment is elected, having been received by the Company in writing at least three business days before the Pay Date, of at least ninety percent (90%) of the Liquidation Amount, then the Class B Shareholder shall receive a bonus of 0.05 added to their Base Liquidation Multiplier on the renewed position. A renewal bonus ( or renewal bonuses) is not cumulative. In all cases, a Class B Shareholder's renewed investment is placed at the end of the FIFO queue, as of the Pay Date." (4796) | n/a |
| Terms: Liquidation Multiplier | V | "The Liquidation Multiplier determines the future value of the Class B Shareholder's position at the Mandatory Call. It is based on the Class B Shareholder's registration type... and is pre-determined by the amount of aggregate/cumulative principal then invested in such Class B Shareholder's registration, at the time of investment... Once set by the Company at investment, the Liquidation Multiplier for each position will not change until called. The Base Liquidation Multiplier will increase by 0.05 for a qualifying renewal. The Liquidation Multiplier may never exceed 1.65 without prior written Company approval, signed by the Company's Manager(s) and the Company's Fund Advisor." (3409) | "The Liquidation Multiplier determines the future value of the Class B Shareholder's position at the Mandatory Call. It is based on the Class B Shareholder's registration type... and is pre-determined by the amount of aggregate/cumulative principal then invested in such Class B Shareholder's registration, at the time of investment... Once set by the Company at investment, the Liquidation Multiplier for each position will not change until called. The Base Liquidation Multiplier will increase by 0.05 for a qualifying renewal. The Liquidation Multiplier may never exceed 1.65 without prior written Company approval, signed by the Company's Manager(s) and the Company's Fund Advisor." (4796) | "The Liquidation Multiplier determines the future value of the Class B Shareholder's position at the Mandatory Call. It is pre-determined by the Company. Once set by the Company at investment, the Liquidation Multiplier for each position will not change until called. For investment amounts less than $750,000.00, the current Liquidation Multiplier is currently set at 1.525, or a percentage equivalent of 52.5% of the invested queue position or principal. An extra 0.125 or 12.5% percentage equivalent shall be added to the Liquidation Multiplier if an investment amount contemporaneously is $750,000 or higher. While the Liquidation Multiplier represents the total investment return, the realized annualized return can only be calculated after a Call has occurred." (4773-4774) |
| Terms: Liquidation Multiplier | V | Cumulative Principal    Base Liquidation Multiplier<br>Under $100,000.00    1.38<br>$100,000.00 - $199,999.99    1.43<br>$200,000.00 - $399,999.99    1.46<br>$400,000.00 - $699,999.99    1.50<br>$700,000.00 - $999,999.99    1.55<br>$1.000,000.000 +    1.60 | Cumulative Principal    Base Liquidation Multiplier<br>Under $100,000.00    1.38<br>$100,000.00 - $199,999.99    1.43<br>$200,000.00 - $399,999.99    1.46<br>$400,000.00 - $699,999.99    1.50<br>$700,000.00 - $999,999.99    1.55<br>$1.000,000.000 +    1.60 | n/a |
| Terms: Voting Rights | V | "Class B Shareholders do not receive voting rights, as to the ownership, management, or administration of the Company." (3410) | "Class B Shareholders do not receive voting rights, as to the ownership, management, or administration of the Company." (4797) | "Class B Shareholders do not receive voting rights, as to the ownership, management, or administration of the Company." (4774) |

Securities and Exchange Commission v. Robert J. Mueller, deeproot Funds LLC, et al.
Comparison of deeproot dGRD Fund PPMs Listed in Defendant Robert J. Mueller's Interrogatory Responses
MOTION TO SEAL
Exhibit 4

| Category | ¶/§ | 2015 dGRD Fund PPM<br>SEC-DEEPROOT-E-0013399-3416 | 2018 dGRD Fund PPM<br>SEC-DEEPROOT-E-00164786-4803 | 2019 dGRD Fund PPM<br>SEC-DEEPROOT-E-0164762-4780 |
|---|---|---|---|---|
| Documents Required to be Provided Without Request | VI | "We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:<br>» notice of any default of any underlying asset<br>» notice of a failure to pay a Liquidation Amount to any Class B Shareholder<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values<br>» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders" (3410) | "We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:<br>» notice of any default of any underlying asset<br>» notice of a failure to pay a Liquidation Amount to any Class B Shareholder<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values<br>» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders" (4797) | "We have an affirmative duty to provide some ongoing information without need for any Class B Shareholders' prior requests. These include:<br>» notice of any default of any underlying asset<br>» notice of a failure to pay a Liquidation Amount to any Class B Shareholder of this Offering<br>» a statement of account at least once annually, or digital access to the same<br>» a statement of Company's unaudited financial condition and internal valuation of our portfolio, or digital access to the same<br>» notice of any adverse regulatory or legal notice, proceeding or decision regarding us that directly and significantly affects the Class B Shareholders' rights or values<br>» notice of any other event that has a significant potential to negatively affect our ability to return principal and interest to the Class B Shareholders" (4775) |
| Documents Required to be Provided Upon Request | VI | "We also have a duty to release certain information only upon request by a Class B Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (3411) | "We also have a duty to release certain information only upon request by a Class B Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (4798) | "We also have a duty to release certain information only upon request by a Class B Shareholder. These include:<br>» a statement of account value at the time of request<br>» a statement of Company's current financial condition at the time of request" (4775) |
| Documents Not Provided | VI | "We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest<br>» any information concerning another Class B Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (3411) | "We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest<br>» any information concerning another Class B Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (4798) | "We retain the right to not release certain information to any Class B Shareholder. This information includes but is not limited to:<br>» copies of any confidential, privileged or proprietary information that does not directly involve any Class B Shareholder's interest<br>» any information concerning another Class B Shareholder's interest<br>» specific positions, investments, assets, or transactions underlying in our portfolio<br>» private or non-public information regarding us, any of our officers, any of our employees, or any of our strategic partners, assigns, or third party administrators" (4775) |
| Company Advance | VII | "The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier." (3411) | "The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier." (4798) | "The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, one hundred percent (100%) of the Class B Shareholder's principal shall be returned at the Pay Date, along with a return equal to the percentage equivalent of a Class B Shareholder's Liquidation Multiplier." (4776) |
| Admin, Structure, & Fees | VIII | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (3412) | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (4799) | "The Company is managed by a Board of Managers. However, the sole current Manager is Robert J. Mueller, Esq. All fees are subject to reasonable changes at any time, in Company's sole discretion, without prior notice." (4776) |
| Admin, Structure, & Fees | VIII | "Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas." (3412) | "Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas." (4799) | "There is only one director and executive officer of the Company: Robert J. Mueller… Mr. Mueller is responsible for deeproot's product design, marketing, and strategic planning areas, as well as operation and management of multiple entities. Robert is the architect and implementer of all products, services, or designs Policy Services, Inc. or the deeproot® family of companies have marketed or sold. He has also personally managed all aspects of the administrative functions of the enterprises, supervised all investor or client care, handled most of the clerical and processing of investor or client paperwork, designed the IT systems and client portal, and is chiefly responsible for the growth and success of all the enterprises. … Robert J. Mueller is the only executive of the Company. He receives no direct compensation from the dGRD Fund. Robert is paid a salary from the Ultimate Parent for all services provided across all the entities. Neither he, nor any other executive or personnel serving or employed from the Ultimate Parent downwards, may earn a commission on any Preferred Shares sold. Any marketing or travel expenses on behalf of the dGRD Fund will be expensed by invoice." (4777) |
| Admin, Structure, & Fees | VIII | "Aaron F. Flores, Fund Advisor for dGRD, Manager, deeproot Advisory Services, LLC" (3412) | n/a | n/a |
| Admin, Structure, & Fees | VIII | "Advisory Agreement & Philosophy. The investment advisory agreement between deeproot Advisory Services, deeproot Funds and us provides that we are the Advisor's client and have given the Advisor discretionary authority to invest our funds as it sees fit in accordance with our investment objectives. For those advisory services, the Advisor will earn investment management fees equal to one-quarter of one percent (0.25%) per annum of the assets under management ('AUM'). The investment management fees will payable on a periodic basis, of at least one payment each semiannual calendar period, based on the invoice of the Advisor." (3413) | n/a | n/a |