IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>     Plaintiff, <br><br>        -against- <br><br> ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC., <br><br>     Defendants, <br><br>        -and- <br><br> DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST, <br><br>     Relief Defendants. | Civil Action No.:  5:21-cv-785-XR |

**DEFENDANT ROBERT MUELLER'S RESPONSE TO THE
SEC'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

Defendant Robert J. Mueller files his response in opposition to the SEC's motion for summary judgment (the "Motion," ECF No. 103), and in support would respectfully show:

**I.      INTRODUCTION**

The Motion should be summarily denied, and this case should proceed to the scheduled December 4th jury trial. This case is rife with factual disputes over how a "reasonable investor" would have read the offering documents, the issue of materiality, and,

most obviously, whether Mueller had the requisite intent to defraud (he did not). These central issues require weighing the evidence and assessing the credibility of witnesses, which are the exclusive province of the jury.

The SEC's Motion overstates some evidence and omits other evidence in an apparent effort to avoid trial.[1] The credible evidence reinforces that Mueller did nothing wrong and did not make "any representations to investors that were false or misleading." *See, e.g.,* Small Decl., Ex. A-2 at 68:21-24. The company's ultimate downfall (and loss of investor money) was precipitated not by any wrongdoing by Mueller but by the SEC's misguided zeal in bringing this action. As one witness explained, after the "SEC filing," "at that point, we were done." Small Decl., Ex. A-5 at 127:7-11.

## II.      OBJECTIONS TO THE SEC'S EVIDENCE

Mueller is concurrently filing his objections to the SEC's summary judgment evidence and motion to strike the SEC's undisclosed expert, and hereby incorporates those challenges.[2] *See* Fed. R. Civ. P. 10(c).

## III.      RESPONSE TO STATEMENT OF FACTS[3]

Far from the SEC's distorted characterization, Mueller was a well-intentioned, experienced, and prudent businessman. He started and grew the companies from 2012 to 2021 recruiting seasoned employees and attorneys along the way. Small Decl., Ex. A-5 at 13:5-8;

---

[1] The Court's Fact Sheet indicates that it may continue a trial setting if a dispositive motion cannot be ruled on sufficiently in advance of trial. In light of the ongoing expense and adverse impact this unfounded case has had on Mueller, he respectfully requests that the December 4th trial date *not* be continued and, if necessary, that the Motion be carried through trial.

[2] Even if all of the SEC's evidence were competent, Mueller has still demonstrated fact issues precluding summary judgment. In other words, Mueller's position is not dependent on his evidentiary challenges.

[3] The SEC's "statement of undisputed facts" is anything but. Further, to the extent that the SEC's argumentative "Introduction" is intended to be a factual statement, Mueller hereby objects to the entire section because (tellingly) there are no citations to the record. *See* Fed. R. Civ. P. 56(c)(1)(A). For the sake of brevity, the facts presented herein are limited to those necessary to demonstrate a genuine issue of material fact. Mueller reserves the right to present a complete and accurate picture of the events at trial.

Small Decl., Ex. A-3 at 18:13-19:3. By all accounts, Mueller and his team did significant amounts of research—not only on investments in life policies but also on other investment strategies—and everyone shared his optimism for a successful business. Small Decl., Ex. A-5 at 20:9-23:11, 25:7-17; Small Decl., Ex. A-1 at 39:7-22; Small Decl., Ex. A-2 at 100:22-101:12; Small Decl., Ex. A-6 at 233:8-235:11, 271:11-274:17; *see also* Small Decl. Ex. A-9 at 280:5-21.

In 2020, the supply chain disruptions and workplace challenges imposed by the unprecedented global pandemic were overwhelming. But the company had recovered and was likely just weeks away from substantial revenue when the SEC shut down the company (seemingly beholden to a "Ponzi" scheme theory that has since been discredited). Small Decl., Ex. A-5 at 74:5-77:22, 113:24-114:15, 122:4-21, 126:17-128:11, 172:15-23; Small Decl., Ex. A-9 at 280:5-21. As the company's chief engineer described through tears in his deposition: "There [were] a lot of passionate people that really wanted to see this to the end. They loved the project. They loved what they were doing. They were passionate for what we did." Ex. A-5 at 128:12-131:1. What is now abundantly clear after exhaustive discovery and depositions, however, is that there was no fraud.

Far from designing a fraudulent scheme, Mueller retained veteran securities counsel so that all risks and other disclosures would be properly made to investors. *See* Small Decl., Ex. A-9 at 81:8-11, 81:17-21, 113:21-114:3, 131:13-21; Small Decl., Ex. A-6 at 205:21-206:9; Small Decl., Ex. A-10. Mueller also hired other firms and professionals including due diligence consultants, banks, and accountants to advise and ensure that investors were receiving disclosures in compliance with SEC rules and regulations. *See* Small Decl., Ex. A-9 at 115:3-5 ("They provided advice and what the proper disclosures were for all of our documents and we relied on that."); *see also id.* at 33:6-13; 218:13-19; 307:18-22. As Mueller

3

instructed one of his lawyers, when it comes to disclosure to investors: "*Being truthful is the only option*." *See* Small Decl., Ex. A-6 at 285:4-293:6 (emphasis added).

The SEC rushed to file this case alleging (and perhaps believing) that Mueller had built a vast Ponzi scheme. ECF No. 1. To no surprise, after the completion of discovery the SEC realized that its initial theory was misguided and has backed off that position. But because the SEC has stood by its fraud allegation (however misguided), it must demonstrate that Mueller acted with an intent to deceive investors at the time that each of the alleged misstatements were made. None of the witnesses deposed came close to suggesting that Mueller acted in bad faith or with an intent to deceive—in fact, they all state the opposite—that Mueller was passionately pursuing the business activities promised to investors with a careful eye towards compliance. *See* Small Decl., Ex. A-2 at 179:13-17 ("Based on his actions and statements, was it your impression that Mr. Mueller believed everything he was doing was consistent with the law? A: Yes."); *see also* Small Decl., Ex. A-1 at 68:18-21; Small Decl., Ex. A-2 at 35:23-36:6, 41:6-42:13, 68:13-24, 178:4-11, 179:6-9. The SEC now equates the company's failure (that the SEC itself caused) with Mueller's fraud, which sets a dangerous precedent for future entrepreneurs. Fortunately, the law does not countenance such a theory.

## IV.  SUMMARY JUDGMENT STANDARD

The SEC seeks summary judgment as to liability only on all of its claims except disgorgement. The SEC carries the burden to establish that there is no genuine issue of material fact as to *every* element of *every* claim. *Sec. & Exch. Comm'n v. Temme*, No. 4:11-CV-655, 2014 WL 293937, at *1 (E.D. Tex. Jan. 27, 2014) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

To defeat summary judgment, Mueller need only show a genuine issue of material fact on *one* element of each claim. *See id.* The Court is obligated to view all evidence and draw all reasonable inferences in Mueller's favor. *See id.* Any determinations as to the weight of evidence or the credibility of witnesses are reserved for the jury. *Huggins v. Royalty Clearinghouse, Ltd.*, 121 F. Supp. 3d 646, 654 (W.D. Tex. 2015). Given the myriad of contested factual issues in the summary judgment record, the Court should deny the Motion.

## V.   ARGUMENT & AUTHORITIES

### A.  Legal standard.

The SEC's six causes of action arise under statutes regulating the sale and offering of securities that Courts typically analyze together. To prove a violation of Rule 10b-5 and Section 17(a)(1) for material representations or misleading omissions, the SEC must prove three elements: (1) material misrepresentations or omissions of material fact, (2) in connection with the purchase or sale of securities, (3) made with scienter. *SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018); *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008) (unpublished) (per curiam). To show a violation of Section 17(a)(2) or (a)(3), the SEC must show the same elements as for Rule 10b-5, except that it need only prove the defendant acted with negligence. *Id.* Conduct falling under Rule 10b-5 or Section 17(a) will also fall under its Section 206 corollary when committed by an investment advisor against a client or prospective customer. *See SEC v. Seghers*, 298 Fed. App'x 319, 328 (5th Cir. 2008) (per curiam).

Genuine issues of material fact exist at least for elements (1) and (3) and therefore summary judgment must be denied.[4]

---

[4] Mueller reserves the right to contest element (2) at trial.

### B.  Material misrepresentations or omissions.

The SEC has to establish as a matter of law that Mueller made misrepresentations or omissions and that they were material. A misrepresentation is a statement that is false, and both falsity and materiality are questions for the jury. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 573 (S.D. Tex. 2002); *see also* 5th Cir. Pattern Jury Charge, No. 7.1 (2020).

A statement or omission is "material" if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest. *SEC v. Seghers*, 298 F. App'x 319, 328 (5th Cir. 2008). Materiality "is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). Thus, the determination "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are *peculiarly ones for the trier of fact*." *In re El Paso Elec. Co. Sec. Litig.*, No. 03-0004, 2004 WL 377555, at *16-17 (W. D. Tex. Feb. 23, 2004). (citing *SEC v. Fox*, 855 F.2d 247, 253 (5th Cir. 1988) (emphasis added).

Here, genuine issues of material fact exist as to whether each of the SEC's alleged misstatements or omissions was in fact a misstatement *and* whether each was material, although Mueller can defeat summary judgment by showing a fact issue on either one.

> i.    *Alleged misstatement #1: the Funds would "own" the life insurance policies.*

The SEC claims that the PPMs "falsely stated that the Funds would purchase and own the Life Policies in which they invested." *See* ECF No. 103, p. 5.  This is not true.

The PPMs—all drafted by counsel and other professional advisors[5]—all stated the following:

> deeproot 575 Fund, LLC (the "Company", "us", "we", or **the575™**) is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the Company; capital

> deeproot Growth Runs Deep Fund, LLC (the "Company", "us", "we", or "dGRD") is a new private equity investment offering that will invest in a number of asset classes including life settlements or ownership of life insurance policies insuring the lives of persons not employed or affiliated with the

> **Life Policies**
>
> We will invest in Life Policies (aka Life Settlements), which are sales to third parties, of existing life insurance contracts held on insureds who are 65 years of age or older. Policies are purchased for more than their cash surrender value but less than the net death benefits to be paid under the policies. These Life Settlements may, but are

*See* Ex. 5, p. i, 6; *see also* Exs. 2-4 at p. i, 6; Exs. 6-8 at p. i, 6.[6] The PPMs accurately and truthfully state that the Funds "will *invest in*" life policies which of course is different than saying "we will *own*" the life policies in which we invest. The passive language used to state the "policies *are* purchased" also does not state that the Funds will own the policies.

The same is true of the company's marketing materials, which stated, consistent with the PPMs, that the Funds would "invest" in (not "own") life insurance policies:

> **Assets**
>
> the575™ invests in a diversified portfolio of investments. Life policies must be from highly-rated carriers with insured ages 65+ and life expectancies between 3 & 12 years. Up to 45% of assets may be placed in private placement or capital acquisition sources to provide additional capital and liquidity for the the575™ Fund. Under a contingent security agreement, the portfolio of investments securitize and back up investor principal.

*See* ECF No., 103-2, Ex. 12, p. 3.[7]

---

[5] *See* Small Decl., Ex. A-8 at 150:17-151:1, 152:13-25; Small Decl., Ex. A-9 at 47:19-22, 73:11-15; Ex. A-18 at Interrogatory Nos. 5, 6.

[6] Unless otherwise indicated, citations herein to simply "Ex. __" refer to the SEC's exhibits to its Motion at ECF No. 103-2 to ECF No. 103-6.

[7] The SEC also argues that the marketing materials in Exhibit 13 to its Motion were also misleading on this point, but a review of the exhibit reveals that the only reference to life insurance policies simply identifies a

See Small Decl., Ex. A-11.[8]

A simply plain language analysis forecloses the SEC's argument because these statements are not false. At a minimum, the jury will have to decide the fact issue of whether the representations that the Funds will "invest" in life policies would lead a reasonable investor to conclude that such language required the Funds to "own" the policies it was investing in (and that the distinction would have been important).

The SEC cites no case supporting the proposition that a company misleads investors by investing in the very assets it promised but not owning "title" to them. Perhaps even more telling, the SEC could not find a single investor willing to testify that ownership of (versus investment in) the life policies was important to their investment decisions. Even the five investors from whom the SEC was able to secure statements did not mention ownership of the policies at all, much less state that this factor was important to them. See Exs. 35-38. In other words, even if there were a misstatement regarding ownership of the policies (which there was not), the SEC has no evidence of materiality.[9]

The Motion must be denied for any and all claims based on alleged misstatement #1.

       ii.    *Alleged omission #2: the Funds failed to disclose that "fractional shares" of the life policies had been sold.*

---

"diversified pool of policies" in a bullet point list on one slide—it does not mention ownership of life policies. *See* Ex. 13, filed under seal, at MUELLER 002845.

    [8] In fact, the company's former business development manager, in discussing marketing material (an Investment Portfolio Narrative) testified that there was nothing false or misleading about it. Small Decl., Ex. A-3 at 196:10-197:4, 198:13-199:15.

    [9] The SEC does not take issue with the organization structure—i.e., that all of the Funds and affiliates were consolidated as one entity for tax purposes and all ownership flowed up through one ultimate parent company. *See* Small Decl., Ex. A-4 at 54:15-61:5.

The SEC's next argument—a recently concocted theory of liability—is a corollary to its first, but also somewhat contradictory.  As already seen, the SEC complains that the Funds did not own the life policies, but at the same time complains that the Funds sold a portion of the policies. Although not entirely clear, it appears that what the SEC is attempting to argue is that investors were not told that the Funds were investing in life policies that other investors had an interest in. Notably, none of the five investors mention this in their declarations, much less state that it was important to their investment decision. *See* Exs. 35-38.

Obviously, the PPMs did not disclose anything about alleged fractional sales because the Funds cannot sell something they do not own (and never represented that they owned).[10] The PPMs also never suggested to investors that the respective fund was the only investor in the life policies—in fact the PPMs did not identify any particular life policy that would be invested in. To the contrary, they fully disclosed that such policies it was investing in were "bought and sold on the secondary market through life settlement agencies." *See* Exs. 2-8 at p. 6. More to the point, the PPMs expressly advised investors that they would not be privy to details regarding the specific policies and that the managers had total discretion in that regard:

> O.    Some Information may not be Provided.
> Notwithstanding compliance with Section 101.502 of the Texas Business Organizations Code, Class B Shareholders may not be permitted to request or receive sensitive, non-public, privileged or confidential information about the Company, including, but not limited to: details of underlying assets, sensitive accounting or transactions, trade secrets, identifiable payroll or personnel information, non-public (internal) marketing or sales information, etc.

> B.    Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares. Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

*See* Exs. 2-5 at p. 4, 6; Exs. 6-8 at p. 3, 5.

---

[10] The SEC argues that the Funds sold shares of the life policies to "outside investors," ECF No. 103 at p. 6, but Mueller testified that he didn't remember "ever selling a policy that we had to a third party." *See* Small Decl., Ex. A-9 at 260:20-21; *see also id*. at 261:14-15.

The lone case the SEC cites is from the Seventh Circuit from over forty years ago and involved a *pro se* defendant.  In *SEC v. Holschuh*, the district court found after a bench trial that the defendant made a material misrepresentation by stating the company seeking the investment owned certain assets when in fact the assets were owned by a convicted criminal who had served jailtime for tax evasion and was currently under indictment for bank fraud. 694 F.2d 130, 133, 134, 142 (9th Cir. 1982). The written solicitation materials specifically represented that the company "had title to the properties." *Id.* at 134. The defendant even presented investors with fake leases again representing that the company owned title to the assets and was leasing them to third parties. *Id*. at 135. The *pro se* defendant did not dispute that true ownership was material to the investors' decision. *Id*. at 142.

The facts of the *Holschuh* case are a far cry from those present here. Here, the PPMs made no representations as to ownership or title to the life policies. The question of whether a reasonable investor would have considered this information important to their investment decision (even though none of the SEC's witnesses could say that) is an issue of fact that the jury must resolve.

The Motion must be denied for any and all claims based on alleged omission #2.

        iii.    *Alleged omission #3: failure to disclose that "Company Advances" were used to make monthly payments to investors.*

This alleged material omission pertains only to the 575 Fund, under which only *some* investors elected to receive monthly interest payments over five years with their principal investment returned at the end of year five. *E.g.,* Ex. 5 at p. 2 ¶6; Small Decl., Ex. A-2 at 80:13-81:4, 81:12-82:1.

The PPMs disclosed that the Funds had limited assets when they began. *See id*., p. 4 ("The Company has recently commenced operations."). They also disclosed that due to the

unpredictable nature of life insurance policies (i.e., the inability to predict with certainty when someone will die), the Funds may not have sufficient returns to make the periodic monthly payments:

> L.    No Guarantee of Fixed Returns.
>    Consistent and predictable growth is ideal in the Company's effort to provide the respective return. In the short-term, if overall growth in the value of our portfolio falls below our obligations to the Class B Shareholders, our excess reserves would be expected to cover the deficit.  However, there is a risk that a longer term deficit will exceed our reserves, potentially lowering the return.  As the actual death of an insured, maturity of any life policy, or return of capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquidation Amount when due.

*See, e.g.,* Exs. 2-8 at p. 5. Accordingly, the PPMs disclosed that the company would be taking an advance (to be fully repaid) of up to 20% of each investor's capital for use towards certain items, including "nominal administrative expenses:"

> **Company Advance**
>    The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees.  Despite an advance, one hundred percent (100%) of the Class B Shareholder's Principal shall be returned at the Pay Date.

*See* Exs. 2-8 at p. 10.

The SEC's witnesses testified that had they known investor funds could be used to make monthly payments to investors, it would have been important to their investment decision. *See* Ex.34-38. But their boilerplate declarations are belied not only by the language in the PPMs (including the disclosed risks which all investors had to certify they understood) but also by the testimony of others who understood this provision to allow the company to use the advance to pay investors' monthly period payments.

Nathan Spradlin (Business Development Director):

**Q.** Did you think that periodic payments from the 575 Fund could be paid to investors based upon the company advance provision in the ppm?
    **A.** Yes.

**Q.** Yes, you thought monthly payments --
    **A.** Yeah.

> **Q.**  -- for 575P investors could be paid based upon this provision in the company advance?
>    **A.**  Correct.

*See* Small Decl., Ex. A-3 at 237:10-22.

> **Q.**  So you could read the advance section of the ppms and make up your own mind about whether or not the payments were adequately addressed in that section of the ppms. Correct?
>    **A.**  Yes.  I'm capable of making up my own mind.  I don't recall if I specifically had a doubt and then read that in the ppm to confirm that doubt.  I don't recall that.
>
> **Q.**  But you gave presentations to investors after this conversation with Mr. Mueller. Correct?
>    **A.**  Correct.
>
> **Q.**  And there -- you -- deeproot accepted investments from investors after you had this conversation with Mr. Mueller.  Correct?
>    **A.**  Correct.
>
> **Q.**  And if you had thought that the 575 -- let me rephrase.  If you had thought that the advance – you would not have given presentations to investors encouraging them to invest in the 575 Fund if you believed that there was anything improper, misleading or false about the advance section of the ppms.  Correct?
>    **A.**  Correct.
>
> **Q:** You were not -- in your role at deeproot, you were not going to intentionally mislead a potential investor.  Correct?
>    **A**. Correct.

Small Decl., Ex. A-3 at 176:11-177:18.[11]

> **Q.**  And you told the SEC in your deposition that you did not think that deeproot was operating like a Ponzi scheme.  Is that right?
>    **A.**  That's correct.

Small Decl., Ex. A-3 at 179:1-16. Even looking back on it today, Spradlin testified that he does not believe they made any misleading statements to investors and did not believe there was any fraud. *Id.* at 43:8-15, 78:17-79:25; 278:24-279:14. Obviously, Mueller himself denied that it was a Ponzi scheme or that the monthly payments to investors were somehow

---

[11] *See also* Small Decl., Ex. A-1 at 100:14-101:10, 114:10-116:9 (Eric Dandridge); Small Decl., Ex. A-2 at 187:16-1; 188:2-15 (Scott Allen).

improper. *See* Small Decl., Ex. A-8 at 212:16-214:18, 246:1-10.[12] The SEC also ignores

pertinent testimony from other witnesses:

<u>Dennis Concilla</u> (Company Securities Counsel):

**Q.** And just to follow up, are -- are investor payments operational expenses?
    **A.**   I think they could be.

**Q.** Could payments from the Company Advance be used to pay investment returns?
    **A.**   I think they could.  Yes.

*See* Small Decl., Ex. A-6 at 167:18-22, 169:16-19.

<u>Ken Abramson</u> (Company Accountant):

**Q.** Could Policy Services have made a payment from a bank account where other investor money was pooled to repay that investment and -- and be compliant with accounting standards?
    **A.**   Yes.

*See* Small Decl., Ex. A-4 at 204:20-205:1.

Despite knowing of and failing to cite all of this exonerating testimony, the SEC rashly

characterizes these payments as evidence of a Ponzi scheme, but that is simply inflammatory

and factually inaccurate. The PPMs expressly state that returns may be insufficient to make

the monthly payments. Multiple witnesses testified that they understood, and the PPM

sufficiently disclosed, that funds would be used in that manner.[13] There is therefore certainly

a genuine issue of material fact as to whether, when construed together, the PPMs sufficiently

disclosed this information.

---

[12] Moreover, Mueller explained that the investors' funds were maintained in the same account as other sources of money, including interest and maturity of some policies. Small Decl., Ex. A-8. at 258:11-259:1. The SEC is aware that the attorneys advised Mueller that the monthly payments were proper, *see* Ex. 41 ¶5 (under seal), Small Decl., Ex. A-6 at 190:14-191:14, 192:14-193:21, 195:9-14, which Allen also conceded, *see* Small Decl., Ex. A-2 at 162:22-163:14.
[13] Indeed, the Mueller got advice from his lawyers on this very provision. *See* Small Decl. Ex. A-9 at 157:19-159:25; 165:16-25.

The two cases relied upon by the SEC on this point are easily distinguishable. First, in *SEC v. Smart*, the evidence showed that the defendant lied to investors about where he was employed, falsely stated he was an investment advisor, and fabricated and provided false statements of accounts to investors, among other things. 2011 WL 2297659, at *3-4 (D. Utah, June 8, 2011). Smart did not track, record, or monitor the status the funds he raised from investors. *Id.* at *6. More importantly, the defendant refused to answer questions during discovery and invoked his Fifth Amendment rights. *Id.* at *2, 18-19. The court drew adverse inferences on twenty-four different issues and concluded that "Smart's silence and failure to contest these assertions is evidence of acquiescence to the fact that he knowingly and purposefully defrauded investors." *Id.* at *19. To no surprise, the court granted summary judgment, as the SEC's allegations were all but conceded by the defendant.

 By contrast, Mueller has cooperated with the government and answered nearly every question posed to him at his deposition.[14] Unlike in *Smart*, there are no allegations here that Mueller fabricated investor statements or failed to track investor funds. To the contrary, the company's former accountant testified that was done. *See* Small Decl., Ex. A-4 at 53:6-54:10, 65:9-66:25; *see also* Ex. A-9 at 149:23-150:8. Nor has Mueller has not conceded, indeed he vehemently denies, that he defrauded investors. Put simply, the *Smart* case is not instructive at all on the disposition of the Motion.

The second case, *SEC v. Roor*, is equally if not more unavailing. There, the defendant marketed himself as an "internationally oriented businessman and financial expert" when in fact he was a former cruise ship waiter and department store manager. 2004 WL 1933578, at

---

[14] The SEC refers to Mueller invoking the Fifth Amendment in response to certain questions, but that was during an interview in the investigation. At the deposition in this lawsuit, Mueller did not assert the Fifth Amendment and he was advised not to answer only a handful of questions based on attorney-client privilege.

*1 (S.D.N.Y. Aug. 30, 2004). Roor claimed that the Federal Reserve was involved in a "massive investment opportunity conspiracy to benefit the wealthy" promising investors "what can only be described as phantasmagorical returns" (i.e., 500% to 1,000% annually). *Id*. at *5. Roor's co-defendant had already pled guilty to securities crimes involving the same investment scheme, which the court noted had gained popularity in recent years. *See id*. The court noted that his plea "constitutes estoppel" in a "subsequent civil proceeding as to those matters." *Id*. at *7. That summary judgment was granted in that case is unremarkable.

There is also a dispute over, if there were an omission, whether it was material. The SEC cites three cases to support materiality, but again these cases are distinguishable.  In *SEC v. Blackburn*, the court held that the identity of the company's leadership was material, particularly where that leader is a four-time convicted tax felon. 15 F. 4th 676, 679, 681 (5th Cir. 2021).[15] Here, Mueller was disclosed as the company's manager and there is no allegation to the contrary.

The *SEC v. Sethi* case involved a *pro se* litigant who offered no evidence to rebut the SEC's summary judgment evidence. 910 F.3d 198, 206 (5th Cir. 2018). The defendants in *SEC v. Milles* were also *pro se*, and the court observed that "multiple evidentiary issues plague" their responses to summary judgment. No. 19-cv-714, 2022 WL 206808, at *15 (W.D. Tex. 2022). For example, they invoked the Fifth Amendment leading to an adverse inference, they offered "unsubstantiated assertions" in response to summary judgment, and they attached 130-pages of documents without a single reference to the same. *Id*.

---

[15] The court also observed that the defendant failed to "identify any disputed issues" in his response to the summary judgment motion. *Id*. at 680.

By contrast, Mueller has presented competent summary judgment evidence with specific and proper citations to the same, has not invoked the Fifth Amendment in this litigation, and is not subject to an adverse inference. This record contains conflicting evidence on multiple issues, resolution of which is not proper on summary judgment.

The Motion must be denied for any and all claims based on alleged omission #3.

  iv.  <u>Alleged misstatement #4</u>: the Funds' interest in the affiliated companies would be by "capital acquisition."

The SEC does not challenge that the PPMs disclosed the *fact* that the Funds invested in certain affiliates was disclosed,[16] but rather it alleges that the *manner* of those investments was not disclosed. Even on the surface of this argument, there is conflicting language in the PPMs that a jury will need to resolve.

Specifically, the PPMs described the investments in affiliates as a "purchase," an "investment," and an "internal, affiliated investment position:"

**Capital Acquisition in deeproot Tech**

A capital acquisition is a purchase of an internal, affiliated investment position in another enterprise, wherein such enterprise is intended to enhance Company's reputability, safety, or financials through joint venture, partnership or collaboration, or minimize pool risk, lower administrative overhead or expenses, or to develop additional product lines. There is a high risk in this type of investment, which may yield higher gains or higher losses. We minimize this risk by limiting the capital acquisition component of the Company to forty-five percent (45%) of the asset portfolio.

The purpose of this investment type is: i) to provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and ii) the safer diversifying of underlying assets away from just life policies.

Currently, deeproot Tech's sole project is deeproot Pinball, LLC ("dP") which is anticipated to be a multi-year project, starting in 2016 or 2017. Capital acquisition in **dP** would consist of the purchase of **dP** Class B Shares that Company will hold, as are further outlined below.

---

[16] Nor could they, as the PPMs expressly disclosed as much and so did the sales team when meeting with finders, advisors, and potential investors. *See* Small Decl., Ex. A-2 at 102:1-13.

*See* Exs. 4-5 at p. 7-8; *see also* Exs. 2-3 at p. 9; Exs. 7-8 at p. 7.[17] A jury will need to resolve this conflicting language. *See SEC. v. Seghers,* 298 Fed. Appx. 319, 328 (5th Cir. 2008) ("[T]he standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor.").

The SEC focuses only on one term—"capital acquisition"—and alleges that such acquisition did not occur because Class B shares of the affiliates were never issued to the Funds. But the SEC's own evidence presents a genuine issue of material fact on this point. When asked whether the Class B shares were issued to the Funds, Mueller stated that he did not recall. Ex. 14 at 140:8-10.  The SEC lawyer pressed Mueller and argued that if the SEC had not found the shares in the corporate records, then "it would be fair to say there were none?" But Mueller responded: "*No, that would be very false*." *Id.* at 140:11-13 (emphasis added). The SEC's claim that the Funds received "nothing, or very little" in return for their investment, *see* ECF No. 103, p. 9, is also not true. The Funds received a security interest in all of the life policies, as well as other affiliates and assets, pursuant to a Contingent Pledge and Security Agreement conveniently omitted from the Motion. *See* Small Decl., Ex. A-13.

The SEC's own evidence confirms that what the PPMs' other language described—an "internal, affiliated investment position"—is exactly what occurred. Specifically, the Funds entered into an Investment Allocation Agreement, which provided that the affiliates would deliver to the Funds 40% of the net profits. *See* Ex. 17.[18] The company's former accountant testified that all of the money was being tracked in Quickbooks including the flow of money

---

[17] The 2019 PPM for the dGRD fund did not mention capital acquisitions of affiliates. *See* Ex. 6. The SEC agrees. *See* ECF No. 103, p. 6 at n.16. In fact, the 2019 dRDG PPM did not generate any investments. Small Decl., Ex. A-2 at 253:22-254:23.

[18] As discussed in more detail below in the section on scienter, one e-mail exchange the SEC relies on demonstrates that Mueller was actively seeking advice from a consultant on this very issue (investment in affiliates) and further shows that Mueller agreed to take the advice provided. *See* Ex. 16.

from the Funds to the affiliates. *See* Small Decl., Ex. A-4 at 53:6-54:10, 65:9-66:25; *see also* Ex. A-9 at 149:23-150:8. Even assuming there were no formal "shares" issued to the Funds from the affiliates, the accountant confirmed that no formal documentation was required to effectuate the "internal investment position," Small Decl., Ex. A-4 at 68:1-5, and the SEC's argument otherwise simply exalts form over substance.[19]

The Court cannot resolve this conflicting language in the PPMs because, at this stage, all evidence presented by Mueller "must be believed and all justifiable inferences from that evidence must be drawn" in his favor. *In re Compaq Sec. Litig.*, 848 F. Supp. 1307, 1320 (S.D. Tex. 1993). Only the jury can resolve the evidence and determine if a misrepresentation was made. *See id.*

Even if the SEC could establish a misrepresentation, they cannot and have not presented evidence of materiality. Under the summary judgment standard, the Court can and should infer from the fact that none of the five investors who provided declarations to the SEC were willing to state that the *manner* in which the Funds invested in affiliates was important to their investment decision that it was, in fact, not important.

The Motion must be denied for any and all claims based on alleged misstatement #4.

     v.     <u>*Alleged misstatements #5 and #6*</u>*: amounts to be spent on affiliated entities, operating expenses, and life policies*.

The SEC argues that the PPMs misrepresented: (i) the amounts that would be invested in life insurance policies; (ii) the amounts used for company advances; and (iii) the amounts used for affiliate investments. *See* ECF No. 103, p.7-8, 11. These arguments are intertwined

---

[19] The accountant also testified that he obtained the Quickbooks files to prepare the tax returns and looked for anything that would "not be considered reasonable under the tax code." *Id.* at 46:7-47:10, 99:8-100:15. He ultimately concluded that nothing in the company's books was improper and everything, include the tax returns, complied with general accounting principles and the tax code. *Id.* at 60:15-61:18, 182:19-183:10, 184:7-24. The SEC has proffered no evidence to the contrary.

because they all implicate the PPMs' disclosure of how the company funds would be allocated.

      a.  <u>Company advances (expenses) and affiliate investments</u>.

Each of the PPMs contained the following language, which was vetted and approved by veteran securities counsel:

<div style="border:1px solid">

**Company Advance**

      The Company shall receive an advance of no less than two percent (2%) and no more than twenty percent (20%) of the initial principal of any Class B Shareholder. This amount covers agent compensation (if any), nominal administration expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees. Despite an advance, <u>one hundred percent (100%)</u> of the Class B Shareholder's Principal shall be returned at the Pay Date.

</div>

*See* Exs. 2, 4-5, 7, 8 at p. 10; Ex. 3 at p. 11; Ex. 6 at p. 12. The SEC does not take issue with the concept of the Funds using 20% of funds raised to cover administrative expenses, compensation, marketing expenses, etc. Indeed, the SEC admits that $13.2 million of the $66 million in funds raised (i.e., 20%) could be advanced to the company to use on such expenses. *See* Ex. 1, p. 9 ¶23.

The amount the SEC claims to have actually been spent on expenses is not identified. Instead, the SEC bluntly groups a variety of transactions together and, with no analysis or explanation, concludes that they are for affiliates *or* operating expenses. *See* Ex. 1 ¶21. The only "evidence" supporting the SEC's characterization is the conclusory statement of its undisclosed expert witness (who is subject to a Motion to Strike being filed concurrently with this response). *See id.*[20] Indeed, the SEC's expert plainly admits that he cannot characterize over $15 million of the amount the SEC alleges was improperly spent, instead he just

---

      [20] The SEC does not refer to anything in Mr. Post's opinion about the allocation of funds. Instead, they appear to rely on him solely for the notion that Mueller's recordkeeping was allegedly not up to par with industry customs and standards which, of course, is much different that fraud. *See, e.g.*, ECF No. 103, p. 14-15 (citing ¶¶ 67-71 in Post's report discussing best practices).

concludes that those payments "appear to be for the benefit" of the affiliates.[21] *See id.* ¶21(f). His numbers also include nearly $7 million in periodic and maturity payments to investors, which cannot reasonably be categorized as affiliate investments. *See id.* ¶¶21(i), (j). *Via Vadis, LLC v. Blizzard Entm't, Inc.*, No. 1:14-CV-00810-LY, 2021 WL 6116794, at *3 (W.D. Tex. Dec. 26, 2021) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence."), *report and recommendation adopted*, No. 1:14-CV-810-LY, 2022 WL 563252 (W.D. Tex. Jan. 19, 2022).

When this $22 million of improperly allocated money is removed from the expert's opinion, the amounts spent are well within the amounts the SEC concedes are permitted. *See* Ex. 1 ¶25 (concluding that the Fund spent $12 million more than it should have on expenses and affiliates).

Mueller, who was designated as an expert witness, testified that there is no one way to evaluate the Funds' portfolio and therefore to determine allocation. *See* Small Decl., Ex. A-8 at 94:7-95:15; 190-:16-193:6. It could be based on the face value, or cost basis, or something in between. *See id.* Even the SEC's disclosed expert, Mr. Post, agrees and concedes that because the PPMs do not identify the method of calculating "allocation," the phrase is open to interpretation. *See* Ex. 27 at p. 27 (stating that allocations could be based on "investment value" or "allocation of investor funds"). At a minimum, and even assuming the SEC's undisclosed expert's conclusory opinions are not excluded, there is a fact issue over how the allocations should be calculated. *See James v. United States,* No. CV SA-12-CA-800-FB, 2013 WL 12106710, at *2 (W.D. Tex. June 24, 2013) ("In a battle of competing experts, it is not

---

[21] As discussed below, Mueller specifically sought advice of counsel on the affiliate investment and followed their advice. *See, e.g.,* Small Decl., Ex. A-9 at 307:8-15.

the role of the Court upon a motion for summary judgment to pick between these experts or to pre-try the case.").

    b.  <u>Life policies</u>

The PPMs stated that the "simple majority" or "overwhelming intended" allocation of company funds would be to life policies. Exs. 2-6 at p. 6; Exs. 7-8 at p. 5. Of course, these statements cannot be read in a vacuum and must be read in context with the other disclosures contained in the PPM, including the following:

> INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL FORECASTS, HAS BEEN OBTAINED FROM THE COMPANY AND THE MANAGERS AND FROM OTHER SOURCES DEEMED RELIABLE. THIS INFORMATION HAS BEEN PREPARED BASED UPON CURRENTLY AVAILABLE DATA AND NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AS TO FACTUAL MATTERS. THERE IS NO ASSURANCE THAT THESE ASSUMPTIONS ARE, OR WILL PROVE, ACCURATE IN ALL MATERIAL RESPECTS, SO THAT, AMONG OTHER THINGS, THE FINANCIAL FORECASTS CONTAINED HEREIN CAN, OR WILL, BE ATTAINED.

> 15.    Class A Shareholders retain all standard voting rights. The Fund Advisor or Manager(s) retain sole and absolute discretion over due diligence, purchase, and maintenance of the assets.

> B.    <u>Investors will not be able to evaluate our portfolio of Investments prior to purchasing Class B Shares.</u> Our Advisor or Manager(s) have broad authority and discretion to identify and invest in life policies, private placements, and cash or cash-equivalents. Consequently, Class B Shareholders must rely exclusively on our Advisor or Manager(s) to make sound investment decisions for them.

*See* Exs. 2, 6-8 at p. 2-3, Ex. 3 at p. 2-4, Exs. 4-5 at p. 3-4. In other words, the PPMs provided a projected allocation with the caveat that it may not "prove accurate" and that, ultimately, the fund manager has "absolute discretion" over investment decisions. *See* Exs. 2-5 at p. 3, 4; Exs. 6-8 at p. 2, 3.

But for argument's sake, and even utilizing the SEC's proposed numbers as to the amounts of funds raised, one permissible allocation of those could be as follows:

|  | **575 Fund** | **dGRD Fund** | **Citation** |
|---|---|---|---|
| Investor Funds Raised | $54 million | $12 million | SEC's MSJ, ECF No. 103-2, Ex. 1 ¶23[22] |
| (Less) Company Advances | $10.8 million (20% of Funds Raised) | $2.4 million (20% of Funds Raised) | 575 PPMs[23] dGRD PPMs[24] |
| (Less) Affiliate Acquisitions[25] | $27 million (50% of Funds Raised) | $3.6 million (30% of Funds Raised) | 575 PPMs[26] dGRD PPMs[27] |
| Amount Remaining | $16.2 million | $6 million | **TOTAL $22.6 million** |
| Amount Spent on Life Policies: | | | $12 million |
| **Total Percentage on Life Policies**: | | | **53%** |

Under this scenario, of the $66 million raised in investor funds (the number used by the SEC), there was a total of $22.6 million available for investment in life policies. The SEC alleges that Mueller spent "about $12 million" on life policies. *See* ECF No. 103, p. 8. This equates to 53% of the Funds—more than the simple majority the SEC contends was required.[28] Even considering just this one alternative allocation scenario raises a genuine issue of material fact as to how a reasonable investor would have understood them to be calculated. The SEC's vague and conclusory assertions about "improper uses" simply cannot support granting summary judgment.

---

[22] For the sake of simplicity, Mueller has rounded the SEC's numbers to whole numbers.

[23] Exs. 2, 4, 5 at p. 10, Ex. 3 at p. 11.

[24] Ex. 6 at p. 12, Ex. 7 at p. 10, Ex. 8 at p. 10.

[25] The SEC deducts the allocations for Affiliate Acquisitions from the balance remaining after the Company Advance deduction. *See* ECF No. 103-2, Ex. 1 ¶23. The PPMs do not contemplate or direct that manner of calculation. As Mueller disputes the SEC's manner of calculations, there is a fact issue of fact the jury will have to decide—i.e., how a reasonable investor would understand the allocations were to be calculated.

[26] Exs. 4-5 at p. 7-8; Exs. 2-3 at p. 9.

[27] Exs. 7-8 at p. 7. The 2019 PPM for the dGRD fund did not mention capital acquisitions of affiliates. *See* Ex. 6. The SEC agrees. *See* ECF No. 103, p. 6 n.16.

[28] There is also a factual dispute over whether to use the purchase price of the policies or the face value of the policies when determining allocations. *See, e.g., See* Ex. 27 at p. 27. Using sound business judgment, the company bought policies with a face value of over $30 million) at a discount ($12 million), but now the SEC attempts to wield that against Mueller to artificially support its alleged allocation deficit. Obviously, if the $30 million face value of the policies is considered, and assuming the SEC's figure of $66 million in funds raised is correct, then the jury would then have to determine whether that's constitutes a "simply majority."

Even if the SEC established the allocation statements were false as a matter of law—which they cannot—summary judgment would still be inappropriate because there are fact questions as to materiality. To be sure, none of the five investor witnesses mention an improper allocation of assets to expenses, much less state that this factor was important to them. *See* Exs. 35-38. This makes sense because, unless or until statements as to allocations are proved false, and *to what degree*, materiality cannot be assessed. In other words, a reasonable investor may not believe a 15% deviation in promised allocations is material but may consider a 50% deviation material. Materiality is therefore intertwined with the disputed evidence as to how a reasonable investor would have understood the PPM's language on allocation and how that allocation was to be achieved.

Accordingly, the Motion must be denied for any and all claims based on alleged misstatements #5 and #6.

vi.    *Summary of misrepresentation, omissions, and materiality*.

The evidence in the summary judgment record is conflicting on whether each of the alleged misstatements and omissions would have been material to a reasonable investor in light of the "total mix of information made available." *In re El Paso Elec. Co. Sec. Litig.*, No. 03-0004, 2004 WL 377555, at *16 (W. D. Tex. Feb. 23, 2004). At a fundamental level, there is also conflicting evidence as to whether the statements were false and whether some of the omissions were truly omissions, including language in the PPMs themselves. Any determination as to whether a material misrepresentation or omission occurred, at this stage, would require the Court to weigh and evaluate the credibility of the SEC's evidence and witnesses against that of Mueller—an exercise which is improper. *See Huggins v. Royalty Clearinghouse, Ltd.*, 121 F. Supp. 3d 646, 654 (W.D. Tex. 2015) ("[A] court may not make

credibility determinations or weigh the evidence in ruling on a motion for summary judgment.").  The SEC relies on cases involving *pro se* defendants, defendants who presented no evidence in opposition to summary judgement, were subject to an adverse inference, or some combination of those facts, none of which are present here.

Because there are genuine issues of material fact on element (1) of the SEC's claims, the Motion must be denied on that ground alone.

## C. Scienter.

Even assuming arguendo the SEC could establish element (1) of its claims as a matter of law, there are genuine issues of material fact as to whether Mueller acted with scienter as required for element (3). This is an alternative and independent basis on which the Court can and should deny summary judgment.

Scienter is a mental state that embraces an intent to deceive, manipulate, or defraud. *SEC v. Seghers*, 298 Fed. App'x 319, 328 (5th Cir. 2008). Scienter includes "severe recklessness," which is limited to "highly unreasonable omissions or misrepresentations" that are "an extreme departure from the standard of care." *Id*. The SEC carries the burden to show the absence of any dispute of material fact regarding Mueller's state of mind. *Pac. Ins. Co., Ltd. v. Louisiana Auto. Dealers Ass'n*, 273 F.3d 392 (5th Cir. 2001) ("We recognize that cases which turn on state of mind are rarely appropriate for summary judgment.") (collecting and quoting prior Fifth Circuit cases). While the mere presence of an intent element does not automatically preclude summary judgment, its presence commands that the court "be vigilant to draw every reasonable inference from the evidence in the record in a light most flattering to the

nonmoving party." *Pac. Ins. Co., Ltd. v. Louisiana Auto. Dealers Ass'n*, No. 01-30081, 2001 WL 1013089, at *5 (5th Cir. 2001).[29]

    *i.*      *Lay witness testimony regarding Mueller's good faith*.[30]

Lay witnesses testified that at all times Mueller was acting in good faith, trying to do right by his investors and the company, and earnestly communicated with investors about the company:

<u>Nate Spradlin</u> (Director of Business Development)

**Q.** All right.  Do you recall at a different time Mr. Mueller stating that attorneys had approved the ppms before they were issued?
    **A.**  I recall him referencing the attorneys and creating the ppm with them.  I don't know if he used the word "approved" or not.

**Q.** And when -- when Mr. – when you asked Mr. Mueller -- well, in this conversation that we're discussing with Mr. Mueller, did Mr. Mueller give you any reason to think that Mr. Mueller believed he was doing some wrong?
    **A.** No.

**Q.** So is it fair to say Mr. Mueller gave you the impression that he believed that the ppms adequately disclosed how the 575P payments were being made?
    **A.** Yes.

Small Decl., Ex. A-3 at 174:10-175:3

<u>Eric Dandridge</u> (Business Development Manager):

**Q.**  Did you ever have any concerns that Deeproot would be unable to continue to pay its investors?
    **A.**  No.

*See* Small Decl., Ex. A-1 at 67:23-68:1.

**Q.**  In any of the webinars where you were present with Robert Mueller, did you have any concerns that he was saying anything that was not factually accurate?

---

[29] The SEC attempts to bypass this heavy burden by moving for summary judgment on Mueller's advice of counsel "defense." However, it is settled law in the Fifth Circuit that reliance on counsel is not a true defense; rather, it is a means of showing good faith and absence of an intent to defraud, thereby defeating the element of scienter. *See SEC v. Snyder*, 292 Fed. App'x 391, 406 (5th Cir. 2008). Accordingly, the SEC cannot move or obtain summary judgment on this "defense." *See id.* Nor does Mueller have any burden to establish "full disclosure" to the attorneys, which, as a matter of fact, he did. *See infra* Note 35.

[30] Of course, Mueller himself testified that he acted in good faith. *See* Small Decl., Ex. A-8 at 262:5-263:25.

> **A.** No.

*Id.* at 68:18-21.[31]

> <u>Ken Abramson</u> (Company Accountant):
>
> **Q.** Just to clear it up for the record, did you discontinue working with Mr. Mueller because you thought he was doing anything improper?
> **A.** No.

*See* Small Decl., Ex. A-4 at 148:23-149:1.

> **Q.** When you file the tax return for Policy Services, was there anything -- was there any -- when you filed the tax returns for Policy Services, was there any information included on that tax return that you thought was inaccurate?
> **A.** No.
>
> **Q.** Was there any information that you thought did not comply with accounting principles?
> **A.** No.
>
> **Q.** Is it part of your job to make sure that the tax returns filed by Policy Services complied with the tax laws?
> **A.** Yes.

*Id.* at 182:19-183:10.

> **Q**. So you understand what I -- what I am referring to when I -- I say that you -- you considered it part of your professional obligations to inform your clients when there was something in their books and records that you considered to not be reasonable?
> **A.** Correct.
>
> **Q.** And in the -- in preparing Policy Services tax returns, you, on occasion, informed Mr. Mueller and Mr. Hagan and Ms. Acker of certain entries that you considered to not be reasonable?
> **A.** Correct.
>
> **Q.** And to your memory, did they ever refuse to accept your advice?
> **A.** Not that I remember.

*Id.* at 184:7-24.

---

[31] The "webinars" were with advisors and/or investors. *See* Small Decl., Ex. A-1 at 85:1-25.

Scott Allen (Business Development Manager):

The SEC places unwarranted emphasis on a resignation letter authored by Scott Allen, a disgruntled former Business Development Manager.[32] However, at his deposition Allen recanted his Ponzi reference and admitted that at the time he wrote the resignation letter, he had "no knowledge or reason to believe that you were doing -- anything you were doing is fraudulent or illegal." *See id.* at 156:22-24.   In reality, Allen was simply offering some suggestions and used poor choice of words:

> **Q.** Did you intend this memo to accuse Mr. Mueller of doing anything illegal?
> **A.** No.  I -- I mean, I -- you can see that underlined there.  I was -- I was not making accusations.  I knew my leaving, especially with Nate not being there, was going to put their – the fundraising effort for the funds in a difficult spot, because it -- and so it was an intention of I can't be here anymore, however, I want to at least provide some suggestions that I think may help you moving forward.

*Id.* at 180:7-16.[33]

> **Q.** At the time you wrote this, did you think that Mr. Mueller designed the 575 Fund as a Ponzi scheme?
> **A.** I didn't -- no, I did not think that was his design or intention.

*Id.* at 178:4-11.

> **Q.** Did he -- did he say anything to you that indicated to you that he thought he was doing something wrong?
> **A.** No.

*Id.* at 179:6-9.

> **Q.** Let me rephrase.  Based on his actions and statements, was it your impression that Mr. Mueller believed that everything he was doing was consistent with the law?
> **A.** Yes.

> **Q.** Did he ever tell you to keep any secret from the investors?

---

[32] When Allen resigned, there were pending disputes about performance and compensation. Small Decl., Ex. A-8 at 234:5-19; 244:12-245:9. Allen later admitted that he never made as much money as he made with the company and has not since. Small Decl., Ex. A-2 at 125:13-136:13.

[33] Allen's credibility, which only the jury can evaluate, was significantly undermined by his other testimony. Even after Allen claimed he first had concerns about the company, he continued to meet with investors and make the same representation, and he did not tell any investor that he allegedly had concerns about the company. *Id.* at 170:22-172:17, 250:19-251:10.

A. No.

*Id.* at 179:13-20.

Q. Did Mr. Mueller tell you to make sure that your statements to investors were accurate?
A. He did.

Q. Did he say or do anything during that training that made you think that -- let me rephrase that. Did he -- did he say anything that made you think at the time that his statements to investors were not accurate?
A. He did not.

*See* Small Decl., Ex. A-2 at 35:23-36:6. Conveniently, the SEC did not include this or other

similar testimony from Allen that a jury may consider when evaluating his credibility or when

deciding whether Mueller acted with scienter:

Q. If the finder did not have a Series 65 certification, did they play any role in explaining the investment?
A. They were only supposed to provide a very brief explanation of what the investment was but not to go over any detailed information.

Q. And was that pursuant to the instruction of -- of the deeproot companies?
A. Correct, yeah, *primarily from Robert in terms of how to make sure we follow, you know, the regulations* in working with finders.

Q. All right. So was this another effort to attempt to comply with the securities laws?
A. I would say so, yes.

*Id.* at 41:23-42:13 (emphasis added).

Q. Was there anything in those presentations [to potential investors] that you thought was false or misleading?
A. The material covered, to my knowledge, was accurate.

*Id.* at 44:13-16.

Q. Was all the information you disclosed to investors about the deeproot Funds accurate as far as you knew?
A. As far as I knew.

*Id.* at 68:13-16.

Q. To your knowledge, did anyone at deeproot make any representations to investors that were false or misleading?
A. Not to my knowledge.

*Id.* at 68:21-24.

> **Q.** And there were separate PPMs for the dGRD Fund; is that right?
> **A.** Yes.
>
> **Q.** And those PPMs, as far as you remember, also made representations to investors about potential risks, company advances, and -- and the payments to Mr. Mueller?
> **A.** Yes.
>
> **Q.** And do you have any reason to believe that any statement in any of the PPMs was false?
> **A.** I -- I have no -- no reason to believe anything represented was false.

*Id.* at 118:7-22.

> **Q.** Do you have any reason to believe that any statement in the PPMs was misleading?
> **A.** Not to my knowledge.

*Id.* at 118:24-119:3.

> **Q.** So you had the opportunity to tell Mr. Mueller if you thought something was false or misleading?
> **A.** Sure.  I -- I mean, he wouldn't send it without, you know, without -- this specific letter, I -- he did not send it before giving me an opportunity to read it.

*Id.* at 120:22-121:2.

> **Q.** And to your memory, were there any communications sent to investors that you believed were inaccurate?
> **A.** Not to my knowledge.

*Id.* at 122:6-9.

> ii.    *Attorneys and due diligence advisors.*

In addition to testimony from witnesses who were working with Mueller on the ground floor and observing his behavior, conduct, and intentions, the record is also replete with testimony and evidence from lawyers and advisors who confirmed that they were engaged by Mueller to vet the company's operations and ensure regulatory compliance.

Mueller made the prudent decision to seek legal counsel to draft, review, and approve offering documents that would be presented to potential investors. *See* Small Decl., Ex. A-9 at 81:8-11, 81:17-21, 113:21-114:3, 131:13-21; Small Decl., Ex. A-6 at 205:21-206:9; Small

Decl., Ex. A-10. Mueller engaged veteran securities lawyers, Dennis Concilla and Andrew Frederico at the law firm of Carlile, Patchen, & Murphy, who at the time had a combined total of over sixty years' experience in securities law. *See* Small Decl., Ex. A-7 at 8:6-9:1, Small Decl. A-6 at 28:11-31:17. Concilla, based in Ohio, traveled to San Antonio, met Mueller, then decided to sign them up as clients. *See* Small Decl. A-6 at 29:19-22.

In addition to providing legal advice as it pertained to compliance with securities law, the veteran lawyers drafted and approved the company's offering documents.[34] *Id.* at 76:10-77:22, 80:12-81:11, 84:14-23, 100:24-101:1; *see also supra* note 5.  Having worked closely with Mueller, visited his offices, and with full understanding of the structure and risks, the lawyers drafted and approved PPMs and specifically advised Mueller and warranted that they:

- fully complied with the law, including SEC rules and regulations;

- fully and properly made all necessary disclosures; and

- did not contain or omit anything that would have been misleading to investors.

*Id.* at 205:15-207:3, 218:7-219:19, 220:8-15; Small Decl., Ex. A-7 at 88:8-22.[35]

For example, Concilla testified:

**Q.**   So when you -- when you are telling Mr. Mueller that the 575 is done, what are you communicating to him?
   **A.**   That the PPM is -- is completed and – and fulfills his obligation on -- under the law.

**Q.**   So in the next sentence, it says, your job is to make sure it is compliant with the law and disclosures are adequate.

---

[34] Years later, Mueller made minor revisions to the PPMs, but the terms most relevant to this litigation were unchanged from the versions approved by the attorneys.
[35] The SEC falsely claims that Mueller did not make a full disclosure to the attorneys. But this is belied by the record. *See* Small Decl., Ex. A-9 at 112:10-11 ("They had insight into almost everything we did."); 112:9-10 ("We have very frank and robust discussions about almost everything we did with [the lawyers]."); 112:25-113:14 ("Again, we talked about almost everything."); 121:25-122:3 ("And secondly, we had wide-ranging discussions on all of these and how we operated our business internally with [they lawyers]. We didn't hide anything from them."); 167:20-22 ("We took the advice that we were given by competent securities counsel who we didn't hide anything from and we followed their advice."); *see also id*. at 117:12-15; 124:8-10; 128:1-9; 129:9-14; 131:13-132:4; 134:16-24; 135:24-136:8; 145:11-18; 154:20-155:6.

> **A.**   Correct.
>
> **Q.**   So are you communicating to Mr. Mueller that the 575 PPM is compliant with the law and the disclosures are adequate based on the information available to you at the time?
> **A**.   Yes.

Small Decl., Ex. A-8 at 206:2-15.

> **Q.**   Okay.  And -- and part of the purpose of your representation was to review documents that are being provided to investors to ensure that they comply with the securities laws; is that right?
> **A.**   Yes.
>
> **Q.**   And that includes ensuring that -- Does that include ensuring that there -- no statements in these documents were materially misleading, based on the information available to you?
> **A.**   Yes.
>
> **Q.**   If you -- Was it your practice that, if you saw some language in a PPM that you thought was inappropriate or misleading, would you inform your clients of that fact?
> **A.**   Yes.
>
> **Q.**   And during the course of your representation, or in the course of the time working with Mr. Mueller, you -- did you send him multiple drafts of PPMs that included changes that you were recommending?
> **A.**   Yes.
>
> **Q.**   To your knowledge or memory, did Mr. Mueller ever refuse to incorporate one of your proposed changes into a PPM?
> **A.**   I -- I -- I -- I don't believe so, no.

*Id.* at 218:18-219:19.

> With respect to the funds invested in affiliates, specifically, Concilla testified:
>
> **Q.**   Do you recall that the PPM for the dGRD Fund discloses that 30 percent of the asset portfolio could be spent on deeproot Tech and other affiliated entities?
> **A.**   Yes.
>
> **Q.**   All right.  And you approved that PPM?
> **A.**   Yes.
>
> **Q.**   So your representation to Mr. Mueller, by approving that PPM, is it adequately described the risk that comes with the business structure as described in this email?
> **A.**   Yes.
>
> **Q.**   All right.  So you may have had concerns about how to describe this, but your representation to Mr. Mueller, by signing off on the dGRD PPM, is that those concerns were addressed by how it was described in the PPM?
> **A.**   Yes.

*Id.* at 283:17-284:9.

Even beyond engaging veteran securities lawyers, Mueller went the extra mile to engage various other consultants to conduct due diligence of the company and to share their findings with the advisors and investors. Small Decl., Ex. A-3 at 104:4-109:8. One of those consultants was a company called FactRight—a well-known and well-respected due diligence company that was widely used in the industry. *Id.* at 104:4-109:8, 141:24-143:11. Consistent with his mantra to the lawyers that "being truthful is the only option," Mueller's direction to the company was to provide FactRight all of the specific information they needed to do their investigation. *Id.* at 117:21-118:5. FactRight not only reviewed financials, they also vetted the structure and functioning of the Funds themselves. *Id.* at 104:4-109:8, 110:11-111:16, 117:21-118:5, 121:16-126:18, 127:1-128:14, 129:13-132:5; Small Decl., Ex. A-12.

Ultimately, after their due diligence and independent investigation, FactRight issued a report on the company and endorsed it as a suitable investment. Small Decl., Ex. A-3 at 104:4-109:8. This "stamp of approval" provided confidence to Mueller and third-party sales organizations (such as Folio/Goldman Sachs) that the company was not only viable but a worthy investment. *Id.* Mueller engaged FactRight not just once, but twice, to evaluate and ensure that all disclosures were being properly made. *Id.* at 113:10-6. Mueller engaged at least two other consultants who similarly conducted due diligence, reviewed the PPMs, and found no issues. *Id.* at 153:23-155:2, 162:12-163:3.

      *iii.*     *There are genuine issues of material fact as to scienter.*

The SEC has no direct evidence of scienter. Instead, it claims that scienter is established as a matter of law based on three unremarkable facts: (i) Mueller was a director and officer of the company; (ii) Mueller was the sole decision maker; (iii) Mueller was a

32

signatory on the bank accounts. *See* ECF No. 103, p. 28-29. This cannot plausibly establish scienter, much less to the degree necessary to obtain summary judgment. If these facts were all that required to show scienter, then nearly every CEO would be deemed to have acted with scienter and the element would be rendered meaningless.

The summary judgment cases cited by the SEC involved truly egregious facts and often defendants who did not meaningfully challenge the summary judgment motion itself. *See Sethi*, 910 F.3d at 206; *Milles*, 2022 WL 206808, at *15; *Holschuh*, 694 F.2d 130, 133, 134, 142; *see also SEC v. Farias*, No. 20-00885, 2022 WL 3031082, at *2 (W.D. Tex.  Aug. 1, 2022) (entering default judgment against a pro se defendant); *SEC v. Silea*, No. 20-737, 2022 WL 269105, at *2 (E.D. Tex. Jan. 27, 2022) (granting summary judgment against pro se defendant who "not address the summary-judgment record, cite to any evidence, or identify any genuine issue of material fact"); *SEC v. Helms*, No. 13-01036, 2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) (granting summary judgment against *pro se* defendants where they "failed to respond to the motion for summary judgment or otherwise provide evidence rebutting or controverting the SEC's evidence"). Even in *Blackburn*, the Fifth Circuit acknowledges how rare it is to grant summary judgment on the question of scienter, but noted that the unique facts of that case warranted it. *Blackburn*, 15 F.4th at 681.

Receiving advice from professionals is a "means of demonstrating good faith" and "an absence of any intent to defraud." *SEC v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008). "[T]he jury is free to decide for itself whether the facts demonstrate that the defendant acted with scienter in light of the advice he received from his attorneys or accountants. The defendant does not have the burden of proving any 'elements' of the defense before the *jury can weigh the defendant's theory of reliance*." *Id*. (emphases added).

Here, there is substantial evidence for the jury to consider and certainly enough to raise a genuine issue of material fact.

### D. Negligence.

The SEC does not meaningfully address its negligence claims in its Motion other than to argue that for the same reasons it believes it has established fraud as a matter of law, it has also established negligence. *See* ECF No. 103, p. 29. "'Negligence' is the failure to exercise reasonable care under all the circumstances." *SEC v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93, 107 (D. Conn. 2019). For all of the reasons discussed above, including the reasons discussed with regards to scienter, there are issues of material fact that preclude summary judgment on the SEC's negligence claims.[36]

## VI.   CONCLUSION

There are multiple genuine issues of material fact on element (1) (material representations or misleading omissions) and element (3) (that were made with scienter) for each of the alleged misstatements and omissions claimed by the SEC. Even if the SEC could somehow establish that any alleged misstatements or omission was material as a matter of law (which itself requires a factual determination of what a reasonable investor would believe), it cannot establish that Mueller acted with scienter or negligence. For any one of these independent reasons, summary judgment should be denied and this case allowed to proceed to trial.

---

[36] For example, the SEC highlights the company's alleged payments of Mueller's personal expenses and AMEX bills, despite its awareness that Mueller was substantially underpaid for his services. Further, the company accountant testified that there is nothing wrong with paying such expenses in lieu of compensation. *See* Small Decl., Ex. A-4 at 117:10-121:18, 122:9-129:4, 135:4-11, 135:22-136:13. Mueller also disclosed the fact that he was receiving "indirect compensation" to his attorneys, who testified that "he could" take a salary indirectly. *See id.*, Ex. A-9 at 108:3-10; 111:11-113:14; 115:17-20; Ex. A-6 at 297:10-20.

## VII.   PRAYER

Accordingly, for the reasons discussed herein, Mueller respectfully requests that the

Court deny the SEC's Motion. Mueller further requests any other relief to which he may be

entitled at law or in equity.


Dated:  September 18, 2023

                                        Respectfully submitted,

                                        DAVIS & SANTOS, PLLC

                                 By: /s/ Caroline Newman Small
                                        Jason M. Davis
                                        State Bar No. 00793592
                                        Email:  jdavis@dslawpc.com
                                        Caroline Newman Small
                                        State Bar No. 24056037
                                        Email:  csmall@dslawpc.com
                                        719 S. Flores Street
                                        San Antonio, Texas 78204
                                        Tel: (210) 853-5882
                                        Fax: (210) 200-8395
                                        *Counsel for Defendant Robert J. Mueller*

### <u>CERTIFICATE OF SERVICE</u>

I certify that on September 18, 2023, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

<div align="right">

*/s/ Caroline Newman Small*
Caroline Newman Small

</div>