# Exhibit A-1

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF TEXAS

 3                 SAN ANTONIO DIVISION

 4                       - - -

 5   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 6                                    )
             Plaintiff,               )
 7                                    )  Case No.
             -against-                )  5:21-cv-785-XR
 8                                    )
     ROBERT J. MUELLER, DEEPROOT FUNDS )
 9   LLC (a/k/a dprt Funds, LLC),     )
     AND POLICY SERVICES INC.         )
10                                    )
             Defendants.              )
11                                    )
                 -and-                )
12                                    )
     DEEPROOT TECH LLC, DEEPROOT      )
13   PINBALL LLC, DEEPROOT STUDIOS LLC,)
     DEEPROOT SPORTS & ENTERTAINMENT  )
14   LLC, DEEPROOT RE 12621 SILICON   )
     DR LLC, AND ROBERT J. MUELLER,   )
15   JEFFREY L. MUELLER, AND BELINDA  )
     G. BREEN, AS CO-TRUSTEES OF THE  )
16   MB HALE OHANA REVOCABLE TRUST,   )
                                      )
17           Relief Defendants.       )
     _____)
18

19           VIDEOTAPED DEPOSITION OF

20                 ERIC DANDRIDGE

21           VIA REMOTE VIDEOCONFERENCE

22           THURSDAY, SEPTEMBER 22, 2022

23
     Stenographically Reported by:
24   Victoria L. Valine, CSR, RMR, CRR, RSA
     Texas CSR No. 11743
25   Job No. 220922VV
```

1

09:48  1    asking Robert Mueller during these webinars?

09:48  2        A.   Well, the webinars that I witnessed Robert

09:48  3    give were with established finders or advisors.  So they

09:48  4    really didn't ask a whole lot of questions.  They

09:48  5    already had a pretty good understanding of how

09:49  6    everything was working.

09:49  7        Q.   Do you recall Robert Mueller, in any of the

09:49  8    webinars that you were present with, discussing the

09:49  9    Pinball company?

09:49 10        A.   Yes.

09:49 11        Q.   And what do you recall about that?

09:49 12        A.   Right when I started working at Deeproot they

09:49 13    were supposed to have a big launch and reveal, and so

09:49 14    he -- he had talked about -- I think there had been some

09:49 15    delays, also, but he had talked about just -- you know,

09:49 16    we had done however many years of research and

09:49 17    development, and, you know, this is kind of where we're

09:49 18    hoping to get to.  I don't remember the specifics.

09:49 19        Q.   Okay.  Do you remember Pinball coming up

09:49 20    during most of the webinars that you participated in

09:49 21    with Robert Mueller?

09:49 22        A.   Yes.

09:49 23        Q.   Okay.  Oh, do you recall a presentation being

09:50 24    shown to financial advisors or finders during this

09:50 25    webinar?

39

| | | |
|---|---|---|
| 09:50 | 1 | A.   Yes. |
| 09:50 | 2 | MR. HULINGS:  Objection.  Form. |
| 09:50 | 3 | THE WITNESS:  Sorry. |
| 09:50 | 4 | MR. HULINGS:  It's okay. |
| 09:50 | 5 | MS. WARDEN:  I'm sorry.  What was the |
| 09:50 | 6 | objection? |
| 09:50 | 7 | MR. HULINGS:  Form. |
| 09:50 | 8 | THE WITNESS:  Yes. |
| 09:50 | 9 | MS. WARDEN:  Okay.  I am entering into the |
| 09:50 | 10 | record exhibit -- what I'm marking as Exhibit 4. |
| 09:50 | 11 | (Deposition Exhibit 4 marked.) |
| 09:50 | 12 | THE WITNESS:  Okay. |
| 09:50 | 13 | BY MS. WARDEN: |
| 09:50 | 14 | Q.   Do you have it open, Mr. Dandridge? |
| 09:50 | 15 | A.   I do. |
| 09:50 | 16 | Q.   Okay.  So Exhibit 4 is document 005715.  I'll |
| 09:50 | 17 | give you a moment to just scroll through it. |
| 09:50 | 18 | A.   Yes. |
| 09:51 | 19 | Q.   You've reviewed it? |
| 09:51 | 20 | A.   Yes. |
| 09:51 | 21 | Q.   Okay.  Do you recognize this PowerPoint? |
| 09:51 | 22 | A.   Yes. |
| 09:51 | 23 | Q.   And how are you familiar with it? |
| 09:51 | 24 | A.   This is one of the presentations that we used. |
| 09:51 | 25 | Q.   During the webinars with Robert Mueller? |

40

```
09:51  1        A.   Yes.
09:51  2        Q.   And did you use this presentation, Exhibit 4,
09:51  3   in any other context?
09:51  4        A.   Only -- only with presentations on -- with
09:51  5   advisors and potential clients.
09:51  6        Q.   Okay.  So did you give this presentation on
09:51  7   your own --
09:51  8        A.   Yes.
09:51  9        Q.   -- with -- okay.
09:51 10             Approximately how many webinars where Robert
09:51 11   Mueller was present do you recall this PowerPoint,
09:52 12   Exhibit 4, being shown?
09:52 13        A.   All of them.
09:52 14        Q.   Okay.  What is your understanding of who
09:52 15   prepared this PowerPoint?
09:52 16             MR. HULINGS:  Objection.  Foundation.
09:52 17   BY MS. WARDEN:
09:52 18        Q.   Do you know who prepared this PowerPoint?
09:52 19        A.   I can't say for certain.  My assumption would
09:52 20   be Robert Mueller.
09:52 21        Q.   Okay.  And why do you assume that?
09:52 22        A.   Once again, he's the principal of the firm.
09:52 23        Q.   Did Robert Mueller provide this presentation
09:52 24   to you?
09:52 25        A.   I can't recall if it was him or Scott Allen
```

41

10:41  1    timeframe.

10:41  2        Q.   Okay.  So after the conversation you had with

10:41  3    Robert Mueller?

10:41  4        A.   Correct.

10:41  5        Q.   Okay.  And what did you tell -- oh, do you

10:41  6    recall which finders you had these discussions with in

10:41  7    roughly January, February 2021?

10:41  8        A.   I don't recall the specifics, but I do know

10:41  9    there were several.

10:41 10        Q.   Okay.  And what did you tell them?

10:41 11        A.   Exactly what Robert had mentioned to me, which

10:42 12    was there was a complaint filed against us.  We don't

10:42 13    know the specifics of the complaint, but, you know, it's

10:42 14    business as usual.

10:42 15        Q.   Did you have any concerns about Deeproot other

10:42 16    than concerns regarding a SEC complaint?

10:42 17             MR. HULINGS:  Objection.  Vague.

10:42 18             THE WITNESS:  The main concern was just that I

10:42 19    would lose my job if the complaint got more serious.  I

10:42 20    mean, that was the biggest thing for me was my ability

10:42 21    to provide for my family.

10:42 22    BY MS. WARDEN:

10:42 23        Q.   Did you ever have any concerns that Deeproot

10:43 24    would be unable to continue to pay its investors?

10:43 25             MR. HULINGS:  Objection.  Vague.

67

10:43  1              THE WITNESS:  No.

10:43  2  BY MS. WARDEN:

10:43  3      Q.   Okay.  Did you ever have any concerns that

10:43  4  Robert Mueller made inaccurate statements to potential

10:43  5  investors?

10:43  6              MR. HULINGS:  Objection.  Vague.  Lack of

10:43  7  foundation.  Assumes facts not in evidence.

      8  BY MS. WARDEN:

10:43  9      Q.   Did you join webinars with Robert Mueller

10:43 10  present where you talked to finders?

10:43 11              MR. HULINGS:  Objection.  Vague.

10:43 12              THE WITNESS:  There was one specific webinar

10:43 13  where a potential investor had a lot of questions that I

10:43 14  did not have the answers to.  So I -- I messaged Robert,

10:43 15  saw if he was available, and he was, and then he came in

10:44 16  and answered those questions.

10:44 17  BY MS. WARDEN:

10:44 18      Q.   In any of the webinars where you were present

10:44 19  with Robert Mueller, did you have any concerns that he

10:44 20  was saying anything that was not factually accurate?

10:44 21      A.   No.

10:44 22      Q.   All right.  Were you aware that Robert Mueller

10:44 23  used investor funds to pay personal expenses?

10:44 24              MR. HULINGS:  Objection.  Assumes facts not in

10:44 25  evidence.  Lack of foundation and vague.

                                                              68

11:14  1      Q.   Okay.  You mentioned that you had

11:14  2  communications, at some point, with potential investors,

11:14  3  not just finders, correct?

11:15  4      A.   Correct.

11:15  5      Q.   And some of those meetings early on in your

11:15  6  tenure you watched Mr. Mueller give presentations and

11:15  7  have discussions; is that right?

11:15  8      A.   Correct.

11:15  9      Q.   Were there any of these presentations or

11:15 10  discussions that you handled by yourself?

11:15 11      A.   Yes.

11:15 12      Q.   And approximately when did -- how many?

11:15 13      A.   I couldn't give you a number.

11:15 14      Q.   All right.  About what time did you start

11:15 15  giving those presentations or meetings with potential

11:15 16  investors by yourself?

11:15 17      A.   I would say near some point in November, give

11:15 18  or take.

11:15 19      Q.   And going forward from November of 2020, was

11:15 20  that?

11:15 21      A.   Yes.

11:15 22      Q.   So going forward from November 2020 were there

11:16 23  any of these meetings with potential investors that

11:16 24  Mr. Mueller participated in?

11:16 25      A.   Yes.  There was -- there was one.

85

11:20  1      Q.    What office was that?

11:21  2      A.    The Deeproot headquarters.

11:21  3      Q.    And do you remember roughly where that's

11:21  4  located?

11:21  5      A.    Off of Interstate 10 and De Zavala Road in San

11:21  6  Antonio.

11:21  7      Q.    And how many employees of the Deeproot

11:21  8  entities worked at that office, to the extent that you

11:21  9  remember?

11:21 10      A.    All I can speak to is the people I worked with

11:21 11  which was Mr. Mueller and Becca.  I don't know the

11:21 12  numbers on anybody else in any other entity.

11:21 13      Q.    Were there any other people working for the

11:21 14  Deeproot entities other than those two who were located

11:21 15  at that office?

11:21 16      A.    Just Scott Allen when I started, and then he

11:21 17  left.

11:21 18      Q.    Have you -- are you testifying that you've

11:21 19  never met any person who worked for, for example,

11:21 20  Deeproot Pinball?

11:21 21      A.    No.  I -- I don't -- I have met Deeproot

11:21 22  Pinball people.  I just can't speculate how many people

11:21 23  were in the office.  I don't know.

11:21 24      Q.    All right.  So let's -- were there people

11:22 25  working for Deeproot Pinball who were located at the San

89

11:22  1    Antonio headquarters of the Deeproot entities?

11:22  2         A.   Yes.

11:22  3         Q.   Were there more than -- was there more than

11:22  4    one?

11:22  5         A.   Yes.

11:22  6         Q.   Approximately how much -- was it more than 10?

11:22  7         A.   I believe so.  I'm not certain.  I only went

11:22  8    to that department in person two or three times.

11:22  9         Q.   And what is your understanding of what people

11:22 10    in that department did for the companies?

11:22 11         A.   They were working on manufacturing pinball

11:22 12    machines.

11:22 13         Q.   And how did you gain that understanding?

11:22 14         A.   Based off of the two or three times I walked

11:22 15    through with -- I believe his name was Craig.  He was

11:22 16    like over Pinball, and he would show me this is

11:23 17    something we're working on, this is something we're

11:23 18    working on, this is something we're working on.

11:23 19         Q.   So when you said he would show you something,

11:23 20    can you describe what it is that he showed you?

11:23 21         A.   Different toppers that would go on top of the

11:23 22    games, some artwork they were doing, some prototypes

11:23 23    with just like the -- just like plywood frames of

11:23 24    different games, et cetera.

11:23 25         Q.   Did you ever see any of the actual pinball

90

11:23  1  machines?

11:23  2      A.   Yes.

11:23  3      Q.   How many?

11:23  4      A.   I believe I only saw two or three that were

11:23  5  completed and fully functional.

11:23  6      Q.   And around when was that that you saw those

11:23  7  machines?

11:23  8      A.   I'd say near the end of my tenure.  I don't

11:23  9  have a specific date.

11:23 10      Q.   Do you have any doubts that Pinball --

11:24 11  Deeproot Pinball was a real company?

11:24 12      A.   No.

11:24 13           MS. WARDEN:  Objection.

11:24 14  BY MR. HULINGS:

11:24 15      Q.   Is your -- is it your understanding that --

11:24 16  that the Deeproot employees who worked on Pinball were

11:24 17  being paid?

11:24 18      A.   Correct.

11:24 19      Q.   Is it your understanding that the Deeproot

11:24 20  entities were spending money on developing and building

11:24 21  pinball machines?

11:24 22      A.   Correct.

11:24 23      Q.   And you know this in part because you saw the

11:24 24  actual pinball machines, correct?

11:24 25      A.   Yes.

91

11:26  1    started at Deeproot.

11:26  2        Q.    All right.  Let's look at the PPM.  I believe

11:26  3    that is Exhibit 5.  If you don't mind pulling that up.

11:26  4        A.    Okay.  I've got to log back in.  One second.

11:26  5    I'm sorry.

11:26  6        Q.    Sure.

11:26  7        A.    Okay.

11:26  8        Q.    Okay.  And this is a Class B Membership Shares

11:26  9    PPM; is that right?

11:26 10        A.    Yes.

11:26 11        Q.    And I believe you testified earlier that you

11:26 12    personally sent this to advisors; is that right?

11:26 13        A.    Yes.

11:26 14        Q.    And did you ever personally send this to

11:27 15    potential investors?

11:27 16        A.    No.

11:27 17        Q.    Did you have any communications with potential

11:27 18    investors about the content of this PPM?

11:27 19        A.    No.

11:27 20        Q.    When you had meetings with potential

11:27 21    investors, were they required to have seen the PPM by

11:27 22    the time they had their conversation with you?

11:27 23        A.    I don't believe so.

11:27 24        Q.    So explain to me when -- your understanding as

11:27 25    to when an investor was required to read the PPM before

93

11:27  1    investing.

11:27  2        A.    Before they -- they submitted their

11:27  3    application.

11:27  4        Q.    So would that be at the end of the process?

11:27  5        A.    Yeah.  The application is one of the last

11:27  6    steps in the process.

11:27  7        Q.    So by the time the application is submitted,

11:28  8    you had already had a conversation with these potential

11:28  9    investors?

11:28 10        A.    Correct.

11:28 11        Q.    Okay.  Let's go to the page that says page 3

11:28 12    of 15 at the bottom.

11:28 13        A.    Okay.

11:28 14        Q.    There's a section at the top that says,

11:28 15    "Suitability Standards for Investors."

11:28 16              Do you see that?

11:28 17        A.    Yes.

11:28 18        Q.    And the first sentence says,

11:28 19              "Investment in the Class B shares of the

11:28 20          company offered hereby involves a high

11:28 21          degree of risk."

11:28 22              Do you see that?

11:28 23        A.    Yes.

11:28 24        Q.    Did you explain to potential investors that

11:28 25    the investments in the 575 Fund involved a high degree

94

11:28  1    of risk?

11:28  2        A.    Yes.   We had conversations about that this is

11:28  3    by no means guaranteed and it is a risky investment.

11:28  4        Q.    Can you describe the -- the kinds of risks

11:29  5    that you explained to potential investors?

11:29  6        A.    Typically, they would ask what kind of risk,

11:29  7    and, you know, you could lose all of your principal is

11:29  8    the biggest one we covered.

11:29  9        Q.    All right.   There's also -- any other risks

11:29 10    that you can recall talking to potential investors

11:29 11    about?

11:29 12        A.    No.

11:29 13        Q.    All right.   In the second paragraph of the

11:29 14    "Suitability Standards for Investors" section, can you

11:29 15    please take a second to read that.

11:29 16              Let me know when you're ready.

11:29 17        A.    Okay.

11:29 18        Q.    Did the 575 Fund -- did the Deeproot entities

11:30 19    require certain income and asset thresholds for

11:30 20    investors in the 575 Fund?

11:30 21        A.    Yes.

11:30 22        Q.    And what is your understanding as to why the

11:30 23    Deeproot entities required those asset and income

11:30 24    thresholds?

11:30 25        A.    Because if -- if the investor lost, you know,

                                                              95

11:30  1   a hundred percent of the principal invested, they still

11:30  2   have the ability to have additional savings and have

11:30  3   income to continue sustaining their current lifestyle.

11:30  4        Q.   Is that because these investments are risky?

11:30  5        A.   Yes.

11:30  6             MS. WARDEN:  Objection.

11:30  7   BY MR. HULINGS:

11:30  8        Q.   And is that actually what the PPM says in that

11:30  9   second paragraph, that the investments involve a high

11:30 10   degree of risk?

11:30 11        A.   Yes.

11:30 12        Q.   The next section down under "Risk Factors,"

11:31 13   do you see that?

11:31 14        A.   Yes.

11:31 15        Q.   Is it fair to say that this section of the PPM

11:31 16   on page 3 and page 4 describe a series of risk factors

11:31 17   involved with investments in the 575 Fund?

11:31 18        A.   Yes.

11:31 19        Q.   Now that you see this, do you recall

11:31 20   discussing any of these particular risk factors with

11:31 21   potential investors?

11:31 22        A.   Dependence on managers, would be one.  That

11:31 23   came up, and lack of liquidity, also.

11:31 24        Q.   Let's take those one at a time.

11:31 25             What do you recall explaining to potential

96

11:31  1    investors about dependence on managers?

11:31  2        A.    That it's -- you know, just like it says.   In

11:31  3    the event Mr. Mueller was incapacitated or dies, there's

11:32  4    no assurance that a satisfactory replacement would be

11:32  5    found.

11:32  6        Q.    And what do you recall telling investors about

11:32  7    the lack of liquidity?

11:32  8        A.    That, you know, this is a time commitment.

11:32  9    That you can't, in like a year or two years, say, you

11:32 10    know, I really need to access these funds, I need my

11:32 11    money back.   That's just not an option.   This is a

11:32 12    strict time commitment that you're willing to invest in.

11:32 13        Q.    Okay.  If you scroll to the next page, I want

11:32 14    to call your attention to sub-paragraph I.   It starts

11:32 15    with "our ability or inability."

11:32 16            Do you see that?

11:32 17        A.    Yes.

11:32 18        Q.    Does this paragraph deal with the difficulty

11:32 19    in identifying the right investments for the 575 Fund?

11:33 20        A.    Yes.

11:33 21        Q.    So some of the risk -- let me ask it this way.

11:33 22            So the 575 Fund would get a return on a

11:33 23    particular insurance policy when the insured dies,

11:33 24    correct?

11:33 25        A.    Yeah.   I mean, the 575 Fund was a strict

97

11:34  1  expected to, right?

11:34  2       A.   Correct.

11:34  3       Q.   Meaning that there would be fewer liquidity

11:35  4  events from the life insurance investments, correct?

11:35  5       A.   Could you repeat the question?  You cut out at

11:35  6  the beginning.

11:35  7       Q.   So -- is that part of the liquidity problem --

11:35  8  let me rephrase.

11:35  9            Is that part of the liquidity risk in the

11:35 10  575 Fund is knowing -- is not being able to predict with

11:35 11  certainty when the life insurance policies would yield a

11:35 12  return?

11:35 13            MS. WARDEN:  Objection.  Vague.

11:35 14            THE WITNESS:  Correct.  That would be a

11:35 15  liquidity risk.

11:35 16  BY MR. HULINGS:

11:35 17       Q.   And were there expenses that had to be paid to

11:35 18  maintain the life insurance policies?

11:35 19            MS. WARDEN:  Objection.  Foundation.

11:35 20  BY MR. HULINGS:

11:35 21       Q.   Do you -- do you know whether or not there

11:35 22  were expenses that needed to be paid to maintain the

11:35 23  life insurance policies?

11:35 24       A.   Yes.

11:35 25       Q.   What were those expenses?

99

11:36  1        A.   Premiums.

11:36  2        Q.   And do you have an understanding of how --

11:36  3   what the amounts of those premiums might be in a given

11:36  4   year?

11:36  5        A.   No.

11:36  6        Q.   Do you have knowledge as to how the Deeproot

11:36  7   entities paid these premiums for the life insurance

11:36  8   policies that they purchased?

11:36  9        A.   No.

11:36 10        Q.   But you do have an understanding that the

11:36 11   Deeproot entities had to pay the premiums to maintain

11:36 12   the life insurance investments; is that right?

11:36 13        A.   Correct.

11:36 14        Q.   So you mentioned earlier in the 575 Fund that

11:36 15   investors have to choose the type of return that they

11:36 16   receive; is that right?

11:36 17        A.   Yes.

11:36 18        Q.   So you could choose either a deferred payment

11:37 19   or a periodic payment; is that right?

11:37 20        A.   Yes.

11:37 21        Q.   And when those payments became due, that would

11:37 22   be a payment that would have to be made by the fund to

11:37 23   the investor, correct?

11:37 24        A.   That's my understanding, correct.

11:37 25        Q.   So payment of these -- the payment of these

                                                              100

11:37  1    returns for the fund is an expense, correct?

11:37  2         A.   I'm not sure, to be honest with you.

11:37  3         Q.   So it's a payment that the fund is required to

11:37  4    make at a particular date, correct?

11:37  5         A.   That is the agreement, yes.

11:37  6         Q.   So, for the fund, making these payments is

11:37  7    part of administering the fund, right?

11:37  8              MS. WARDEN:  Objection.

11:37  9              THE WITNESS:  I'm -- yeah.  It sounds

11:37 10    reasonable to assume that.

11:37 11    BY MR. HULINGS:

11:37 12         Q.   Okay.  Let me ask it a different way then.

11:38 13              What's your understanding of -- what expenses

11:38 14    did the 575 Fund have?

11:38 15         A.   Maintaining policy premiums and then helping

11:38 16    fund, you know, any expenses related to the affiliate --

11:38 17    the Deeproot affiliate companies.

11:38 18         Q.   So the 575 Fund was also required to make, in

11:38 19    some cases, periodic payments to investors, correct?

11:38 20         A.   Right.

11:38 21         Q.   So those periodic payments would be another

11:38 22    expense of the fund, correct?

11:38 23         A.   I -- I guess so.  I'm not sure how -- if that

11:38 24    is a -- qualified as an expense.  I don't -- I don't

11:38 25    know.  That wasn't -- I have no idea.

101

11:38  1        Q.   Did anybody describe -- scratch that.

11:38  2             Let's go -- let's try to move on to page 6 of

11:39  3    15 --

11:39  4        A.   Okay.

11:39  5        Q.   -- where it says "Underlying Assets."

11:39  6             Do you see that?

11:39  7        A.   I do.

11:39  8        Q.   Okay.  And page 6 and 7 describe the life

11:39  9    insurance policies; is that an accurate summary?

11:39 10        A.   Yes.

11:39 11        Q.   And, if you go to page 8, there's a section

11:39 12    that says "Risk Illiquidity."

11:39 13             Do you see that?

11:39 14        A.   Yes.

11:39 15        Q.   This is another paragraph explaining the

11:39 16    liquidity risks associated with investing in the

11:39 17    575 Fund?

11:39 18        A.   Yes.

11:39 19        Q.   And, in part, that is -- as I read the first

11:39 20    sentence,

11:39 21             "A life policy matures when the

11:39 22          underwritten insured dies."

11:40 23             Is that right?

11:40 24        A.   Yes.

11:40 25        Q.   Then the next sentence is,

                                                              102

11:40  1          "Until that time, the policy is

11:40  2       practically illiquid."

11:40  3          Do you see that?

11:40  4     A.   Yes.

11:40  5     Q.   Is that consistent with what you explained to

11:40  6  potential investors in the 575 Fund?

11:40  7     A.   Yes.

11:40  8     Q.   Then the next section says "Risk Unknown

11:40  9  Maturities."

11:40 10          Do you see that?

11:40 11     A.   Yes.

11:40 12     Q.   The first sentence is,

11:40 13          "There is no guaranteed method of

11:40 14       predicting the death of an insured."

11:40 15          Do you see that?

11:40 16     A.   Yes.

11:40 17     Q.   Is that consistent with the way in which you

11:40 18  explained the 575 Fund to potential investors?

11:40 19     A.   Yes.

11:40 20     Q.   The next section says, "Risks Out of Control

11:40 21  Premium Costs."

11:40 22          Do you see that?

11:40 23     A.   Yes.

11:40 24     Q.   The first sentence says,

11:40 25          "Life policies usually require premiums

103

11:40  1          to be paid periodically until maturity."

11:40  2              Do you see that?

11:40  3     A.   Yes.

11:40  4     Q.   So this paragraph explains to potential

11:40  5  investors that -- that the 575 Fund will be required to

11:41  6  pay premiums, correct?

11:41  7     A.   Yes.

11:41  8     Q.   And that in some cases it may not be known

11:41  9  what those premiums will be, correct?

11:41 10     A.   Yes.

11:41 11     Q.   And that is consistent with what you explained

11:41 12  to potential investors in your conversations with them?

11:41 13     A.   Correct.

11:41 14     Q.   Let's scroll down to page 9.  It says "Capital

11:41 15  Acquisition in Deeproot Affiliates."

11:41 16              Do you see that?

11:41 17     A.   Yes.

11:41 18     Q.   And this -- the last -- so there is a sentence

11:41 19  in the first paragraph that says,

11:41 20          "There is a high risk in this type of

11:41 21          investment which may yield higher gains or

11:41 22          higher losses."

11:41 23              Do you see that?

11:41 24     A.   Yes.

11:41 25     Q.   And then it says,

                                                               104

11:41  1            "We minimize this risk by limiting the

11:41  2       capital acquisition component of the

11:42  3       company to no more than 50 percent of the

11:42  4       asset portfolio."

11:42  5            Do you see that?

11:42  6       A.   Yes.

11:42  7       Q.   So did you explain to potential investors that

11:42  8  some of the money in the fund would go to Deeproot

11:42  9  affiliates?

11:42 10       A.   Yes.

11:42 11       Q.   Did you tell them about Deeproot Pinball?

11:42 12       A.   Yes.

11:42 13       Q.   Did they ask questions about Deeproot Pinball?

11:42 14       A.   Yes.

11:42 15       Q.   And did you answer those to the best of your

11:42 16  ability?

11:42 17       A.   Yes.

11:42 18       Q.   Was there any secret that the Deeproot

11:42 19  entities were spending money invested in the 575 Fund

11:42 20  into Deeproot Pinball?

11:42 21       A.   No.  That was common knowledge.

11:42 22       Q.   And that last sentence I read to you,

11:42 23            "We minimize the risk by limiting the

11:42 24       capital acquisition component of the

11:42 25       company to no more than 50 percent of the

105

11:42  1          asset portfolio."

11:43  2               Do you see that?

11:43  3          A.   Yes.

11:43  4          Q.   Now, the PPM does not say that they'll be

11:43  5   limiting the capital acquisition component of the

11:43  6   company to 50 percent of what is raised at a particular

11:43  7   time, correct?

11:43  8          A.   It does not specifically say that.

11:43  9          Q.   It says the entire asset portfolio, correct?

11:43 10          A.   Of the asset portfolio.

11:43 11          Q.   So that's all the money that had been invested

11:43 12   in the 575 Fund, including investments from prior to a

11:43 13   particular investor putting in new money, correct?

11:43 14               MS. WARDEN:  Objection.  Foundation.

11:43 15   BY MR. HULINGS:

11:43 16          Q.   Let me -- let me ask this.

11:43 17               Did you tell investors that 50 percent of

11:43 18   their particular investment would go to life insurance

11:43 19   policies?

11:44 20          A.   I explained to the investors that at least

11:44 21   50 percent of the portfolio must maintain life insurance

11:44 22   policies.

11:44 23          Q.   And your understanding at the time was that

11:44 24   the portfolio included the total portfolio of the

11:44 25   575 Fund, correct?

                                                          106

11:44  1        A.    Correct.

11:44  2        Q.    And that is how you explained it to potential

11:44  3   investors?

11:44  4        A.    Correct.

11:44  5        Q.    All right.  A little later on -- further down

11:44  6   the page, the PPM lists Deeproot Tech, Deeproot Pinball,

11:44  7   Deeproot Manufacturing, among others.

11:44  8             Do you see that?

11:44  9        A.    Yes.

11:44 10        Q.    And, to your understanding, were these

11:44 11   Deeproot affiliates in which the 575 Fund was investing?

11:44 12        A.    To my knowledge, yes.

11:44 13        Q.    And, if you go to page 10, there's a section

11:44 14   that says "Other Asset Classes."

11:44 15        A.    Yes.

11:44 16        Q.    It says that,

11:44 17             "The company reserves the right to

11:45 18          include other assets or asset classes with

11:45 19          reasonable notice to Class B shareholders."

11:45 20             Do you see that?

11:45 21        A.    Yes.

11:45 22        Q.    Do you recall discussing this reservation of

11:45 23   rights with any potential investors?

11:45 24        A.    No.

11:45 25        Q.    Do you recall any potential investors asking

                                                                    107

11:45  1    about investments in other assets or asset classes other

11:45  2    than the Deeproot affiliates?

11:45  3         A.   Not that I can recall.

11:45  4         Q.   Do you recall ever telling a Deeproot investor

11:45  5    that Robert Mueller worked for free?

11:45  6         A.   No.

11:45  7         Q.   Is it your understanding that Mr. Mueller was

11:45  8    paid for his services to the Deeproot entities?

11:45  9         A.   Yes.

11:45 10         Q.   Do you know which entity paid Mr. Mueller?

11:45 11         A.   I do not.

11:45 12         Q.   Which entity paid your salary?

11:46 13         A.   Policy Services.

11:46 14         Q.   And it's probably a good time to clarify.

11:46 15    There are a number of different entities that are --

11:46 16    that carry the name Deeproot, right?

11:46 17         A.   Yes.

11:46 18         Q.   And what is your understanding of the

11:46 19    relationship between Policy Services and the other

11:46 20    entities that carry the name Deeproot?

11:46 21         A.   They're affiliate companies.

11:46 22         Q.   And so when I've said Deeproot entities

11:46 23    throughout this deposition, do you understand that to

11:46 24    mean all of the entities that are affiliated with each

11:46 25    other that carry the name Deeproot?

                                                              108

11:47  1          no less than 2 percent and no more than 20

11:47  2          percent of the initial principal of any

11:47  3          Class B shareholder."

11:47  4             Did I read that right?

11:47  5      A.   Yes.

11:47  6      Q.   And did you explain to potential investors

11:47  7  that up to 20 percent of their principal could be used

11:47  8  as an advance by the Deeproot entities?

11:47  9      A.   No.

11:47 10      Q.   Did any potential investors ask about the

11:48 11  advance?

11:48 12      A.   No.

11:48 13      Q.   A little further on, the next sentence

11:48 14  mentions "Other Compensation."

11:48 15             Do you see that?

11:48 16      A.   Yes.

11:48 17      Q.   And did you ever have to explain to a

11:48 18  potential investor what compensation was paid through

11:48 19  their investment?

11:48 20      A.   I didn't, no.

11:48 21      Q.   Are you aware of anybody else explaining that?

11:48 22      A.   I know part of the application for finders was

11:48 23  they had to disclose the amount of their finder fee.

11:48 24      Q.   All right.  Let's go to the next page, page 12

11:48 25  out of 15.

                                                            110

11:48  1        A.    Okay.

11:48  2        Q.    And there's the second to last paragraph that

11:49  3   starts with,

11:49  4              "Robert J. Mueller is the only executive

11:49  5          of the company."

11:49  6              Do you see that?

11:49  7        A.    I do.

11:49  8        Q.    The third sentence of that paragraph says,

11:49  9              "Robert is paid a salary from the

11:49 10          ultimate parent for all services provided

11:49 11          across all the entities."

11:49 12              Do you see that?

11:49 13        A.    Yes.

11:49 14        Q.    Who do you understand is the ultimate parent

11:49 15   referred to in this paragraph?

11:49 16        A.    I'm not sure who the ultimate parent company

11:49 17   was.

11:49 18        Q.    Does this sentence say how much the salary is

11:49 19   going to be?

11:49 20        A.    No.

11:49 21        Q.    And do you -- did you ever have to explain to

11:49 22   a Deeproot investor Robert Mueller's salary?

11:49 23        A.    No.

11:49 24        Q.    Is there any -- did you ever -- did anybody

11:49 25   ever tell you what Robert Mueller's salary would be?

                                                                      111

11:49  1          A.    No.

11:49  2          Q.    And we read the section earlier about the

11:50  3     advance up to 20 percent for, among other things,

11:50  4     compensation.

11:50  5                Do you recall that?

11:50  6          A.    Yes.

11:50  7          Q.    So is that disclosing to potential investors

11:50  8     that Mr. Mueller could receive up to 20 percent of a

11:50  9     particular investor's investment as compensation?

11:50 10          A.    Um -- yeah.  Theoretically it could mean that.

11:50 11          Q.    Okay.  This PPM also doesn't explain how that

11:50 12     salary is paid, correct?

11:50 13          A.    Not to my knowledge.

11:50 14          Q.    So did you ever tell a potential investor that

11:50 15     Mr. Mueller only received payroll?

11:50 16          A.    No.

11:50 17          Q.    Are you aware of anybody else at Deeproot

11:50 18     explaining to any potential investor that Mr. Mueller

11:50 19     only received a salary or other payment through a

11:50 20     payroll service?

11:51 21          A.    No.

11:51 22          Q.    Do you recall -- did you or anybody at

11:51 23     Deeproot ever -- to your knowledge, ever represent to a

11:51 24     potential investor that Mr. Mueller never was paid

11:51 25     directly by the company?

                                                                  112

11:58  1   finders from the Deeproot entities while you were

11:58  2   employed there?

11:58  3        A.   Do I remember any conversations with finders

11:59  4   and advisors?

11:59  5        Q.   Do you recall any communications?

11:59  6             Do you recall any emails or newsletters being

11:59  7   sent to finders and advisors by the Deeproot entities

11:59  8   during the time you were employed there?

11:59  9        A.   Yes.

11:59 10        Q.   Okay.  All right.  Please click on Exhibit 8.

11:59 11             (Deposition Exhibit 8 marked.)

11:59 12             THE WITNESS:  Okay.

11:59 13   BY MR. HULINGS:

11:59 14        Q.   And, if you look at the top, it's an email --

11:59 15   disregard the -- disregard the -- my name at the top.

11:59 16   That's just how it printed.

11:59 17             Do you see it says, "Deeproot Funds

11:59 18   Contact@DeeprootFunds"?

11:59 19             Do you see that?

11:59 20        A.   Yes.

11:59 21        Q.   And then it's the To line, is that your Gmail

11:59 22   when you were at the Deeproot entities?

11:59 23        A.   Yes.

11:59 24        Q.   And this is an email from Robert Mueller?

11:59 25        A.   Yes.

114

11:59  1      Q.   And he is forwarding a newsletter that he sent

12:00  2   to advisors and finders, correct?

12:00  3      A.   Correct.

12:00  4      Q.   So let's scroll down to the second page.  And

12:00  5   do you see where it says "575P Payments"?

12:00  6           Do you see that?

12:00  7      A.   Yes.

12:00  8      Q.   So the last sentence of that paragraph says,

12:00  9           "As before, your continued business and

12:00 10        support helps us keep reserves for 575P

12:00 11        payments current."

12:00 12           Do you see that?

12:00 13      A.   Yes.

12:00 14      Q.   All right.  So what is your understanding of

12:00 15   what the term "your continued business and support"

12:00 16   means?

12:00 17      A.   Bringing new investor money in.

12:00 18      Q.   And this is stating that the new investor

12:00 19   money will go to reserves for the 575P payments,

12:00 20   correct?

12:00 21      A.   That's what it looks like, yes.

12:01 22      Q.   And the -- is this also disclosing that the

12:01 23   reserves are used to make 575P payments?

12:01 24      A.   It seems to imply that, yes.

12:01 25      Q.   And the payments referred to, are those the --

                                                                    115

12:01  1    the agreed payouts to investors in the 575 Fund?

12:01  2        A.   For the periodic payments, that's what it's

12:01  3    referencing.

12:01  4        Q.   So, in other words, this is stating that new

12:01  5    investments would be used to make payments to previous

12:01  6    investors?

12:01  7             MS. WARDEN:  Objection.

12:01  8             THE WITNESS:  They could definitely mean that,

12:01  9    yeah.

12:01 10    BY MR. HULINGS:

12:01 11        Q.   And this is an email that went to all the

12:02 12    advisors and finders; is that what this appears to be?

12:02 13        A.   Yes.

12:02 14        Q.   Do you recall receiving this email from

12:02 15    Mr. Mueller?

12:02 16        A.   Yes.

12:02 17        Q.   And, if you scroll all the way down to the

12:02 18    bottom, it's from you and Mr. Mueller, correct?

12:02 19        A.   That's how it is signed, yes.

12:02 20        Q.   Do you recall giving any input into this

12:02 21    before it went out?

12:02 22        A.   I do not.

12:02 23        Q.   You don't remember or you did not?

12:02 24        A.   I don't recall providing any input to this.

12:02 25        Q.   And, if Mr. Mueller is putting in an email

116

12:13  1          Q.   Okay.

12:13  2               MS. WARDEN:  That's all the questions I have.

12:13  3               MR. HULINGS:  Okay.  Quick clarifications on a

12:13  4     couple things.

12:13  5                         FURTHER EXAMINATION

12:13  6     BY MR. HULINGS:

12:13  7          Q.   You mentioned the conversation that

12:14  8     Mr. Mueller had with you about monthly running totals of

12:14  9     expenses.

12:14 10               Do you recall that bit of testimony a couple

12:14 11     seconds ago?

12:14 12          A.   Yes.

12:14 13          Q.   Did Mr. Mueller show you any documents in

12:14 14     that --

12:14 15          A.   No.

12:14 16          Q.   -- conversation?

12:14 17               And on Pinball you had -- is it fair to say

12:14 18     you had multiple conversations with potential investors

12:14 19     about Deeproot Pinball; is that right?

12:14 20          A.   Yes.

12:14 21          Q.   And you didn't mislead any of these potential

12:14 22     investors, did you?

12:14 23          A.   No.

12:14 24          Q.   So you had to make sure before you told

12:14 25     potential investors about Deeproot Pinball that what you

                                                                    126

12:14  1  were saying was accurate, right?

12:14  2      A.   Yeah.   Correct.   I went off the information I

12:14  3  was given.

12:14  4      Q.   And part of that information is that you

12:14  5  communicated with Deeproot Pinball employees and were

12:15  6  able to verify that they were building pinball machines;

12:15  7  is that correct?

12:15  8      A.   That is correct.

12:15  9          MS. WARDEN:  Objection.  Mischaracterization.

12:15 10  BY MR. HULINGS:

12:15 11      Q.   Were you party -- did you participate in any

12:15 12  of the accounting decisions for the Deeproot entities?

12:15 13      A.   No.

12:15 14      Q.   So whether a particular -- or how a particular

12:15 15  payment to Mr. Mueller was accounted for was not a --

12:15 16  was not a decision that you were part of, correct?

12:15 17      A.   That is correct.

12:15 18          MR. HULINGS:  I will -- I'll reserve further

12:15 19  questions.  I think that's it.

12:15 20          MS. WARDEN:  I have one other.

12:15 21                    FURTHER EXAMINATION

12:15 22  BY MS. WARDEN:

12:15 23      Q.   Mr. Dandridge, in Exhibit 8 it references --

12:16 24  do you have it in front of you?

12:16 25      A.   I've got it pulled back up, yes.

                                                            127

1    STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION

2                         - - -

3         I, VICTORIA L. VALINE, CSR NO. 11743, RMR,

4    CRR, RSA, certify:  That the foregoing proceedings were

5    remotely taken before me via videoconference at the time

6    herein set forth; at which time the witness was duly

7    sworn; that a record of the proceedings was made by me

8    using machine shorthand which was thereafter transcribed

9    under my direction; and that the transcript is a true

10   record of the testimony so given.

11        Further, that the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of

14   transcript not requested.

15        The dismantling, unsealing, or unbinding of

16   the original transcript will render the Stenographer's

17   Certificate null and void.

18        I further certify that I am not financially

19   interested in the action, and I am not a relative or

20   employee of any attorney of the parties, nor of any of

21   the parties.

22        Dated this 27th day of September, 2022.

23

24   _____

        Victoria L. Valine, CSR License #11743

25