# Exhibit A-2

```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                   SAN ANTONIO DIVISION

SECURITIES AND EXCHANGE        *
COMMISSION,                    *
     Plaintiff,                *
                               *
     Against                   * Civil Action No:
                               * 5:1-cv-785-XR
ROBERT J. MUELLER,             *
DEEPROOT FUNDS LLC (A/K/A      *
DPRT FUNDS, LLC), AND          *
POLICY SERVICES, INC.,         *
     Defendants,               *
                               *
     And                       *
                               *
DEEPROOT TECH LLC, DEEPROOT    *
PINBALL LLC, DEEPROOT          *
STUDIOS LLC, DEEPROOT          *
SPORTS & ENTERTAINMENT LLC,    *
DEEPROOT RE 12621 SILICON      *
DR LLC, AND ROBERT J.          *
MUELLER, JEFFREY L.            *
MUELLER, AND BELINDA G.        *
BREEN, AS CO-TRUSTEES OF       *
THE MB HALE OHANA              *
REVOCABLE TRUST,               *
     Relief Defendants.        *
```

```
      *************************************
      REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
                   SCOTT ALLEN
                FEBRUARY 16, 2023
      *************************************
```

```
1              ANSWERS AND DEPOSITION OF SCOTT ALLEN, produced

2    as a witness at the instance of the Defendants, taken in

3    the above-styled and -numbered cause on the 16th day of

4    February, 2012, at 9:02 a.m., before Susan M. Foreman, a

5    Certified Shorthand Reporter in and for the State of

6    Texas, via Zoom teleconference, in the City of Dallas,

7    County of Dallas, and State of Texas, in accordance with

8    the agreement hereinafter set forth or in accordance

9    with the Federal Rules of Civil Procedure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.   And how did you get to deeproot Funds?

2    A.   I received a phone call from Nate Spradlin, who

3    was a -- a friend and former colleague, we went to

4    school together and previously worked together as well,

5    letting me know there was an opening with the business

6    development team at deeproot.  So he had called me and

7    -- and wanted to know if I was interested.

8    Q.   All right.

9              And that was early 2018?

10   A.   Correct, I think February is when he reached

11   out.

12   Q.   All right.

13              So you were at deeproot from March 2018 to

14   October 2020; is that right?

15   A.   Correct.

16   Q.   Now, it says here that you raised 38 million;

17   is that right?

18   A.   Yes.

19   Q.   And is that you by yourself?

20   A.   That would have been Nate and I collectively as

21   a business development team.

22   Q.   Okay.

23              And when you -- it says you raised 38

24   million, is that in -- in investments into deeproot

25   companies?

1      Q.  And was Mr. Mueller involved in any of this

2  training?

3      A.  He was a little bit, yes.

4      Q.  All right.

5           What was his role in the -- in the

6  training?

7      A.  More for clarification or in the -- yeah, more

8  for clarification or -- or just making sure that

9  everything was covered.

10     Q.  And from your prior jobs and your prior

11  training, is it fair to say that you knew that it was

12  your responsibility to make sure that any statement you

13  made to an investor was accurate?

14           MS. WARDEN:  Objection.

15     Q.  Let me rephrase to avoid the -- clear up the

16  objection.

17           MR. HULINGS:  I assume that's an objection

18  to form.

19           MS. WARDEN:  Yes.

20     Q.  In your previous jobs at Fidelity and E*TRADE

21  and your previous training -- let me start with the

22  jobs.  In your previous jobs at Fidelity and E*TRADE,

23  you were instructed that any statements you made to

24  investors had to be accurate, correct?

25     A.  Correct.

```
 1          Q.  You understood that the securities laws
 2     required that any statements you make to an investor be
 3     accurate to your knowledge; is that right?
 4          A.  Sure, correct.
 5          Q.  And the FINRA Series 7 and 63 licensing also
 6     taught you that you had an obligation to make sure that
 7     any statements you made to investors were accurate; is
 8     that right?
 9          A.  Correct.
10          Q.  And when you started your training at deeproot,
11     were you instructed in the same obligation?
12          A.  Yes.
13          Q.  So Mr. Spradlin told you that all of your
14     representations to investors had to be accurate?
15          A.  Correct.
16          Q.  And did Mr. Spradlin give any -- let me
17     rephrase.
18               Did Mr. Spradlin indicate to you that he
19     thought anything that he was telling investors was not
20     accurate?
21          A.  He did not.
22          Q.  Okay.
23               Did Mr. Mueller tell you to make sure that
24     your statements to investors were accurate?
25          A.  He did.
```

```
 1          Q.  Did he say or do anything during that training
 2     that made you think that -- let me rephrase that.
 3               Did he -- did he say anything that made you
 4     think at the time that his statements to investors were
 5     not accurate?
 6          A.  He did not.
 7          Q.  All right.
 8               Did your responsibilities that you
 9     described earlier in your testimony at deeproot -- were
10     they the same all the way through your time at deeproot?
11          A.  I would say so.
12          Q.  Okay.
13               Why don't we discuss the process for
14     bringing in new investors.  Can you describe generally
15     the process at deeproot for bringing in new investors?
16          A.  Yeah.  Primarily we worked through our finders,
17     as we would call them, who would work with their clients
18     or prospective clients to identify interested or
19     potential investors for, again, either the 575 or dGRD
20     Fund.  If they had anyone who was interested, they would
21     contact us, whether it was me or Nate, sometimes Robert,
22     to discuss that potential investment and then arrange
23     for -- for -- I'll go back a little bit.  For finders
24     who were not security licensed with a Series 65, we
25     would then arrange for myself or Nate, every once in a
```

1        Q.  All right.

2              So looking -- deeproot sought out

3    accredited investors in an attempt to comply with the

4    securities laws; is that fair?

5        A.  That's fair.

6        Q.  All right.

7              And tell me again the -- the sort of

8    information that was collected on the assets worksheet.

9        A.  A typical household net worth type

10   questionnaire with what are your total assets,

11   investable assets, whether that be in a -- an -- an

12   investment account, brokerage account, real estate, any

13   other property, but what would they define as their --

14   their total -- their total household assets.

15       Q.  Was deeproot targeting retirees?

16             MS. WARDEN:  Objection.  Jay, can I just

17   add a clarification?  When you say "deeproot," can you

18   just clarify what person or entity you're referring to?

19       Q.  So when I say "deeproot," do you understand I

20   mean the deeproot family of companies?

21       A.  I understand that, yes.

22       Q.  All right.

23             So when you and Mr. Spradlin and others at

24   deeproot were trying to get accredited investors to

25   invest in the deeproot Funds, were you targeting

1    retirees?

2        A.  We were not targeting any specific demographic

3    outside of knowing we needed -- and accredited investors

4    were the suitable potential investment investor profile.

5        Q.  Okay.

6            So after you identify a potential investor

7    and you go to the initial meeting, how were those

8    initial meetings conducted?

9        A.  They were primarily conducted over video

10   conference.

11       Q.  And who, in your experience, generally

12   participated in those interviews?

13       A.  It would be a member of the deeproot team,

14   myself, Nate, again, sometimes Robert, and the

15   respective finder who introduced the investor to us, and

16   then the investor.

17       Q.  All right.

18           And if the finder was not a -- did not have

19   a Series 65 -- am I saying that right?  A Series 65,

20   correct?

21       A.  Correct.

22       Q.  All right.

23           If the finder did not have a Series 65

24   certification, did they play any role in explaining the

25   investment?

```
1        A.  They were only supposed to provide a very brief
2    explanation of what the investment was but not to go
3    over any detailed information.
4        Q.  And was that pursuant to the instruction of --
5    of the deeproot companies?
6        A.  Correct, yeah, primarily from Robert in terms
7    of how to make sure we follow, you know, the regulations
8    in working with finders.
9        Q.  All right.
10            So was this another effort to attempt to
11   comply with the securities laws?
12            MS. WARDEN:  Objection.
13       A.  I would say so, yes.
14       Q.  All right.
15            How often did Mr. Mueller participate in
16   these initial interviews?
17       A.  With investors during my time there, not very
18   often.
19       Q.  About how many times, to the best of your
20   memory?
21       A.  Maybe -- maybe three or four.
22       Q.  All right.
23            And on those occasions, did he conduct the
24   presentation or did he just watch?
25       A.  Those would have been some that he conducted or
```

```
 1    was present to answer questions on a -- on a phone call.

 2         Q.  All right.

 3              So what sort of materials were provided to

 4    investors prior to that initial meeting?

 5         A.  There were brochures that finders were provided

 6    for using as the introductory method to the investor.

 7    That would have been the primary -- the primary

 8    material.

 9         Q.  Okay.

10              And who drafted those brochures?

11         A.  Robert.

12         Q.  And did he ever tell you whether anybody

13    assisted him in drafting those brochures?

14         A.  Not to my knowledge.

15         Q.  All right.

16              Did you have any input into the content of

17    those brochures?

18         A.  I did not.

19         Q.  Okay.  All right.

20              During the initial presentation, did you --

21    what -- what sort of materials were provided to the

22    potential investor?

23         A.  It was primarily the PowerPoint presentation.

24         Q.  Okay.

25              And who drafted the PowerPoint?
```

1     A.  Robert.

2     Q.  **Did you or Nate have any input into the**

3  **PowerPoint?**

4     A.  No.

5     Q.  **Do you -- do you recall when you testified --**

6  **when you were interviewed by the SEC, do you recall**

7  **telling them that you may have made minor edits to the**

8  **PowerPoint?  Do you recall that?**

9     A.  Correct, yeah, minor edits from, you know,

10 maybe changing a font or something like that, but not

11 into the changing of the content or material contained

12 in the presentation.

13    Q.  **Was there anything in those presentations that**

14 **you thought was false or misleading?**

15    A.  The material covered, to my knowledge, was

16 accurate.

17    Q.  **And you -- where were you working when you were**

18 **at deeproot, where physically were you -- let me**

19 **rephrase.**

20         **When you worked for deeproot, you lived in**

21 **San Antonio, correct?**

22    A.  Correct.

23    Q.  **And where were deeproot's offices?**

24    A.  In San Antonio.

25    Q.  **And did you primarily work in the office?**

```
 1                Who else worked at the deeproot companies
 2    in the San Antonio office?
 3        A.   The deeproot Tech and/or deeproot Pinball
 4    employees.
 5        Q.   And how many -- approximately how many
 6    employees worked for deeproot Tech and deeproot Pinball
 7    in San Antonio?
 8        A.   I'm not sure.  A lot more than -- than worked
 9    for the funds side.
10        Q.   Is it ten or is it more than ten?
11              MS. WARDEN:   Objection.
12        A.   I -- I'd take --
13        Q.   Well (simultaneous speaking) that was my bad.
14              Was it -- can you give an approximate
15    number?
16        A.   15 to 20.
17        Q.   And did you have access to those offices?
18        A.   I had access, yes.
19        Q.   You -- you could walk down to those offices and
20    see what those employees were doing?
21        A.   Yes.
22        Q.   To your knowledge, what were the employees in
23    the deeproot Tech and deeproot Pinball portions of the
24    deeproot companies doing while you were there?
25        A.   Working to create pinball machines.
```

1      Q.  And, to your knowledge, were they -- were they
2  designing machines?
3      A.  Yes, I believe so.
4      Q.  Was -- was this a technical process?  Wait, let
5  me rephrase.
6              That's -- that's not a good question.
7              To your knowledge, what was involved in
8  designing these pinball machines?
9      A.  I -- I'm not sure.  I -- I know there was a lot
10  of engineering design, coding, programming part of that,
11  but -- but that would be the extent of what I knew.
12      Q.  So the people that worked there included people
13  who knew how to do computer programming?
14              MS. WARDEN:  Objection, foundation.
15      Q.  To your knowledge, did the people who worked
16  there perform computer programming tasks?
17      A.  Some of them, yes.  Though that would have been
18  more through Chris Turner, Turner Logic that -- hired as
19  a vendor to do a lot of the -- more of the technical
20  programming work, but they also shared office space as
21  part of the deeproot facility.
22      Q.  All right.
23              Let's -- was -- what was Chris Turner's
24  connection to the deeproot companies?
25      A.  Hired as a vendor.

1      Q.  All right.

2          And, to your knowledge, what did he do,

3  Chris Turner, for the deeproot companies?

4      A.  A lot of the -- the coding and programming

5  necessary for -- he -- he did some -- some work also for

6  the deeproot Funds side, whether that was assisting in

7  building and maintaining the website, and the systems

8  that we used there.  He assisted in building a -- a

9  digital application process for either an iPad or, later

10  on, just to be done through a web browser, but the

11  primary focus while I was there was working on the --

12  the Pinball project.

13      Q.  And how many people were working for Chris

14  Turner, that you knew of?

15      A.  Maybe four or five.

16      Q.  And that -- that was in the deeproot offices?

17      A.  Correct.

18      Q.  Were there other offices -- did -- did the

19  deeproot family of companies have any offices anywhere

20  other than San Antonio?

21      A.  Yes, Salt Lake City, Utah.

22      Q.  All right.

23          And, to your knowledge, how many people

24  worked in Salt Lake City, Utah?

25      A.  At the highest, I think maybe 30 or 40.

1    Q.  And what did the folks in -- in Utah do for the
2  deeproot companies?
3    A.  That was an an- -- an animation studio, focused
4  on creating digital artwork and animation.
5    Q.  Was that for the pinball machines?
6    A.  For the pinball machines and I think other
7  projects that they could kind of also work on in
8  addition to the Pinball project.
9    Q.  Was there any part of the company of any -- was
10 there any part of the deeproot company that Robert
11 Mueller denied you access to?
12   A.  What do you mean by denied access to?
13   Q.  Did he ever tell you, You can't go to this part
14 of the business?
15   A.  No, there was never any interactions like that.
16   Q.  Okay.
17        Did he ever tell you that you weren't
18 allowed to know certain information about how the
19 deeproot family companies operated?
20   A.  Not explicitly, but there would be times he
21 wouldn't -- he wouldn't answer questions directly.
22   Q.  Okay.
23        And what -- what was the subject of those
24 conversations?  What -- what questions would he not
25 answer?

1    subparts?

2        A.  Yes.

3        Q.  **All right.**

4        A.  Or that they acknowledged that they had -- that

5    they had read it and understood it.

6        Q.  **Got it.**

7            **So subpart i says that they received copies**

8    **of the opera- -- offering documents, and it says, the**

9    **PPM.**

10           **Did I read that right?**

11       A.  Yes.

12       Q.  **And what does PPM stand for?**

13       A.  Private placement memorandum.

14       Q.  **And so this -- so you ask every investor to**

15   **indicate that they received a copy of the PPM before you**

16   **allowed them to invest; is that right?**

17           **MS. WARDEN:**  Objection.

18       A.  Yes.

19           **MS. WARDEN:**  Can you just clarify "you"?

20       Q.  **All right.**

21           **The deep- --**

22           **MR. HULINGS:**  That's a fair point.

23       Q.  **The deeproot family of companies, before they**

24   **allow an investor to invest, they require that the**

25   **investor indicate that they have received and are**

1    familiar with the contents of the PPMs for that

2    particular fund; is that right?

3         A.  Yes.

4         Q.  All right.

5                   The same -- it -- or let me actually move

6    on.

7                   On the next page, page 6, there's a number

8    of other initials next to paragraphs; is that right?

9         A.  Yes.

10        Q.  And, again, these are deeproot asks the

11   investors to indicate that they have read and

12   understood, and agree, depending on the paragraph, with

13   the content of these paragraphs?

14        A.  Yes.

15        Q.  And on the last page, you've got the -- the

16   signature of the investor; is that right?

17        A.  Correct.

18        Q.  And, again, on the next page -- so let me

19   rephrase the last question.

20                   When I said "the last page," I'm -- I'm on

21   page 7, correct?

22        A.  Correct.

23        Q.  And, again, on page 8, you've got signatures of

24   the investors, correct?

25        A.  Correct.

```
 1    different boxes on that form would be filled out; is
 2    that right?
 3         A.   Correct.
 4         Q.   Okay.
 5              But they still have to fill out a form and
 6    indicate that they have read the PPMs before deeproot
 7    would accept their money, correct?
 8         A.   Correct.
 9         Q.   All right.
10              So after they -- after an investor
11    transfers their funds, is there an account of some kind
12    opened up?
13         A.   Yes.
14         Q.   All right.
15              And can you describe that process, to the
16    best of your memory?
17         A.   So for accounts similar to the application we
18    just reviewed, if an account was being opened at Bank of
19    Utah, they would have a -- an IRA or an account opened
20    in their name at Bank of Utah.  I believe Bank of Utah
21    would provide them account statements.  I -- I'm not
22    entirely sure, but they'd -- as the custodian, they'd
23    have a relationship with Bank of Utah, and -- and the
24    investor.  We internally would create a record in our
25    database of the investment and the details that would
```

```
 1                  MS. WARDEN:  Objection.  Can you explain
 2   what you mean by misleading?
 3        Q.  Do you understand what the word "misleading"
 4   means?
 5        A.  Yes.
 6        Q.  What do you understand the word "misleading" to
 7   mean?
 8        A.  In- -- intentionally not representing the
 9   truth.
10        Q.  Did you ever mislead any investors?
11        A.  No.
12        Q.  All right.
13                  Was all the information you disclosed to
14   investors about the deeproot Funds accurate as far as
15   you knew?
16        A.  As far as I knew.
17        Q.  Okay.
18                  And did you answer investor's questions as
19   honestly as you could?
20        A.  As honestly as I could.
21        Q.  To your knowledge, did anyone at deeproot make
22   any representations to investors that were false or
23   misleading?
24        A.  Not to my knowledge.
25        Q.  All right.
```

1      Q.  So in other words, deeproot was representing to

2  investors that it would make sure that 50 percent of the

3  value of the fund was in life insurance policies?

4              **MS. WARDEN:**  Objection.

5     A.  Correct.

6      Q.  You did not represent to investors that

7  50 percent of their incoming investment would be placed

8  with life insur- -- would -- would be -- let me

9  rephrase.

10           You did not tell investors that 50 percent

11  of their investments would be used to purchase life

12  insurance policies?

13              **MS. WARDEN:**  Objection.  Unclear whether

14  you're referring to Mr. Allen or the deeproot family of

15  companies.

16              **MR. HULINGS:**  Right.  That speaking

17  objection is not appropriate.  You can just say vague,

18  and I'll rephrase.

19      Q.  Let's talk about you personally, Mr. Allen.  In

20  your communications with investors or finders, did you

21  represent that 50 percent of incoming investment into

22  the 575 Fund would be invested in purchasing life

23  insurance policies?

24     A.  Not that I can recall.

25      Q.  Did you represent that the 575 Fund would

```
 1    maintain an investment portfolio in which 50 percent of
 2    the value of the fund would be comprised of life
 3    insurance policies?
 4         A.   That's what I would -- that -- that's what I
 5    remember and how -- representing that.
 6         Q.   And what is the face value of a life insurance
 7    policy?
 8              MS. WARDEN:   Objection, foundation.
 9         Q.   Do you know what the face value of a life
10    insurance policy is?
11         A.   Yes.
12         Q.   What is the face value of a life insurance
13    policy?
14         A.   The amount we would receive on a -- a death --
15    a death claim payout.
16         Q.   All right.
17              So, to your knowledge, what was the total
18    value -- let me rephrase.
19              Do you remember what the total value -- the
20    total face value -- well, let me rephrase.
21              Just trying to be accurate and careful
22    here.
23              So do you recall what the total face value
24    of the life insurance policies owned by the deeproot
25    family of companies was at the time that you worked
```

1    there?

2        A.  I can't recall any -- any firm number.

3        Q.  If I told you it was approximately 36 million,

4    does that sound right?

5        A.  That sounds -- that sounds right.

6        Q.  All right.

7            So if the deeproot family of companies

8    owned insurance policies with a total face value of 36

9    million, that means that the deeproot family of

10   companies could invest up to $36 million in the 575

11   Fund --

12           MS. WARDEN:  Objection, form.

13           MR. HULINGS:  You got to let me finish the

14   question before you object.  I'll start it over.

15       Q.  So based -- the representation that you and

16   others at deeproot were making to investors was that the

17   575 Fund could allocate -- could invest up to the total

18   face value of the insurance policies in other

19   investments, such as deeproot Tech and deeproot Pinball;

20   is that right?

21       A.  That was Robert's explanation.

22       Q.  Okay.

23           That was the explanation that you gave to

24   potential investors, correct?

25       A.  If -- if they had asked about that specific

```
 1    dynamic.
 2         Q.  And when you gave this presentation or preses-
 3    -- presentations like it to finders, that's what you
 4    explained, correct?
 5         A.  If we discussed that -- that part of the -- how
 6    the fund worked.
 7         Q.  Is that a yes?
 8         A.  Yes, yes.
 9         Q.  So if the total face value of the insurance
10    policies was 36 million, does that mean that the 575
11    Fund could invest up to 36 million in other entities and
12    still be complying with this representation to
13    investors?
14              MS. WARDEN:  Objection, foundation.
15         A.  Yeah, I -- I would say that would be fair.
16         Q.  And that's based on your knowledge of how the
17    deeproot family of companies operated at the time; is
18    that right?
19         A.  That is based on Robert's explanation of how
20    the fund would operate.
21         Q.  And did you see anything at your time at
22    deeproot that was inconsistent with those
23    representations?
24         A.  Not any concrete numbers.
25         Q.  All right.
```

```
 1                    We'll come back to that.  Let's move on.
 2                    I'm going to skip ahead to page 10.  This
 3       slide, the title the top left says the 575; is that
 4       right?
 5            A.  Yes.
 6            Q.  And then in the bullets below it says five
 7       years.
 8                    That's the first bullet, right?
 9            A.  Yes.
10            Q.  And then the next two bullets start with 7
11       percent and then 5 percent; is that right?
12            A.  Correct.
13            Q.  Can you explain what options were presented to
14       investors when they invested in the 575 Fund?
15            A.  So they could choose either a deferred return,
16       which is the -- the second bullet point of 7 percent,
17       meaning 7 percent annually over the five years, to be
18       paid upon maturity in addition to their principal.  So a
19       $100,000 investment in five years would receive a return
20       of the $100,000 plus 35,000.
21                    The 5 percent would be 5 percent annually.
22       The 5 percent annual return would be paid out monthly
23       over those five years, and then after the five years
24       their principal would be returned.
25            Q.  Okay.
```

```
 1              And was this part of the subscription

 2   agreement?

 3        A.   That would have been, to the best of my

 4   knowledge, defined in the subscription agreement.

 5        Q.   So the subscription agreement, to your

 6   knowledge, was a contract between the deeproot entities

 7   and the investor?

 8        A.   Yes.

 9        Q.   So depending on the option chosen by the

10   investor, deeproot had a contractual obligation to --

11   let me rephrase.

12              Say the investor chose the 7 percent

13   option.  That created a contractual obligation by the

14   deeproot entities to pay the 7 percent plus interest at

15   the end of the term of investment; is that right?

16        A.   Correct.

17        Q.   And same with the sec- -- the last bullet, the

18   5 percent.  If the investor chose the 5 percent

19   annualized monthly options, that created a contractual

20   obligation by deeproot to pay the monthly payments

21   required under the agreement; is that right?

22        A.   Correct.

23        Q.   That was your understanding of the subscription

24   agreement at the time you were discussing it with

25   investors?
```

1          A.   Yes.

2          Q.   Okay.

3               Skip ahead to the dGRD Fund.  I'm looking

4     at page 13 of this PowerPoint.  And do you -- it says

5     dGRD at the top of this slide.  Do you see that?

6          A.   I see that.

7          Q.   Can you explain how the dGRD Fund worked?

8          A.   Yeah, it was a -- we would also call it the Q

9     Fund because of the mechanism in which the investors

10    would be paid.  So it was a first-in, first-out queue,

11    meaning the first investors were assigned positions at

12    the front of the queue, and then in -- the subsequent

13    queue positions assigned following that would be in

14    order of investment coming in from those -- those new

15    investors.  The investors at the -- at the front of the

16    queue due next to be paid would be paid upon maturity of

17    life insurance policies.

18         Q.   So when you say maturity of the life insurance

19    policy, what does that mean?

20         A.   Or a payout, a death claim payout on a -- on a

21    policy.

22         Q.   So a -- this is probably a good time to back up

23    a little bit.  These life insurance policies, what were

24    these policies?

25         A.   They were previously existing policies that we

```
 1          Q.  And in your experience working at deeproot, is
 2   that example an accurate description about how a -- a
 3   payout would work in the dGRD Fund?
 4          A.  I'm sorry, a -- a -- I didn't hear the full
 5   question.
 6          Q.  Oh, yeah.  The -- the example on this slide
 7   describes what happens if a $275,000 policy matures; is
 8   that right?
 9          A.  Correct.
10          Q.  And is that hypothetical scenario described in
11   this slide an accurate depiction of -- of the way the
12   dGRD Fund is supposed to work?
13          A.  Yes.
14          Q.  Okay.
15                 All right.  Let's skip ahead to page 23 of
16   this presentation.  So this slide at the top says
17   Required Reading.
18                 Do you see that?
19          A.  Yes.
20          Q.  And then the next -- the first bullet is
21   Private Placement Memorandum, or PPM.
22                 Do you see that?
23          A.  Yes.
24          Q.  And in -- in this slide, are you telling
25   finders that an investor had to read the PPM before
```

1    making an investment?

2        A.  Yes.

3        Q.  And is that consistent with the

4    representation -- representations you made and others at

5    deeproot -- let me rephrase.

6              Is that consistent with the representations

7    you made to potential investors, to the extent they

8    asked, when you worked at deeproot?

9        A.  That's consistent.  We -- we had a similar

10   slide to this for the investor presentations, making

11   sure they knew that they would be given a PPM and it was

12   their responsibility to read it.

13       Q.  Okay.

14             And you mentioned that this presentation

15   was targeted towards finders, correct?

16       A.  Correct.

17       Q.  And was the presentation provided to investors

18   similar to this presentation?

19       A.  Similar.  The 575 slides going over those two

20   options and the dGRD slides would have been very

21   similar, if not identical slides, in the investor

22   presentation.

23       Q.  What about the 575 slides?

24       A.  Yes.

25       Q.  They would --

1    machines.

2         Q.  **All right.**

3                   **So there were actual machines being --**

4         A.   I -- I saw physi- -- I saw physical machines

5    being attempted to be built.

6         Q.  **All right.**

7                   **So deeproot Pinball was a -- was a real**

8    **company?**

9         A.   I -- I think that's fair to say.

10        Q.  **And did you talk to Robert Mueller about the**

11   **deeproot Pinball business?**

12        A.   Yeah, yeah.  Some -- I -- I mean, that's fairly

13   vague.  I mean --

14        Q.  **Yeah, it is.**

15        A.   -- yes, we discussed --

16        Q.  **I'm asking -- go ahead.**

17        A.   We discussed the deeproot business with Robert,

18   or the Pinball, the deeproot Pinball business with

19   Robert.

20        Q.  **Did he express to you a belief that he thought**

21   **that -- let me rephrase.**

22                   **In his discussions with you, did he**

23   **indicate that he was optimistic that the deeproot**

24   **Pinball business would succeed?**

25                   **MS. WARDEN:**  Objection, vague.

```
 1        A.  He was very optimistic.
 2        Q.  Did he express to you the belief that the
 3   deeproot Pinball business would result in a positive
 4   cash flow for the 575 Fund?
 5             MS. WARDEN:  Objection, vague.
 6        A.  That is how he represented it.
 7        Q.  He thought deeproot Pinball -- he expressed to
 8   you that he thought deeproot Pinball would make money
 9   eventually --
10        A.  Yes.
11        Q.  -- right?
12        A.  Yes.
13        Q.  Did he do anything or say anything that made
14   you believe that -- let me rephrase.
15             Did he do -- did Robert Mueller say or do
16   anything to make you believe that that optimism about
17   the potential success of deeproot Pinball was anything
18   other than genuine?
19             MS. WARDEN:  Objection, form.
20        A.  Yeah, can you rephrase your question, please?
21        Q.  Did he -- based on his actions, did he make --
22   let me rephrase.
23             Did he give you the impression that he
24   thought deeproot Pinball was going to succeed?
25        A.  Yes.
```

1    **Q.  And when you were explaining the investment in**

2  **the 575 Fund to potential investors, you didn't hide the**

3  **fact that the investments were going into deeproot**

4  **Pinball and deeproot Tech, right?**

5          MS. WARDEN:  Objection, vague.

6  A.  Correct.

7  **Q.  All right.**

8          **You told potential investors in the 575**

9  **Fund that their money would be invested in these**

10  **deeproot affiliates, right?**

11  A.  We told them that the investments would be made

12  in life insurance policies and other assets, including

13  deeproot affiliates.

14  **Q.  All right.**

15          **Let's go to page 11.  Do you see the**

16  **section that says Company Advance?**

17  A.  Yes.

18  **Q.  All right.**

19          **Actually, the -- before we get into that,**

20  **this is going to be a long discussion.  Why don't we**

21  **take our break?  It's been about -- been about an hour.**

22  A.  Okay.

23          **MR. HULINGS:**  Kristen, all right with you?

24          **MS. WARDEN:**  Yes.

25          THE VIDEOGRAPHER:  Off the record at

1      Q.  All right.

2           Well, let me ask you this.  In all of your

3      conversations with investors and finders, did you ever

4      discuss the company advance?

5      A.  Maybe a few times.

6      Q.  And in those few times, what did you tell

7      investors the company advance would be used for?

8      A.  That that was used to cover all of our

9      expenses, and that --

10     Q.  It's also --

11     A.  -- as it -- as it states there in that last

12     sentence, that ultimately they would still receive

13     100 percent of their principal paid back.

14     Q.  All right.

15          So what is your understanding of what is

16     included in the term "expenses"?

17     A.  All sorts of things.

18     Q.  So let's -- let's talk about a few of those.

19     So a -- are -- is it fair to say that expenses are

20     obligations that must be paid for the fund to operate?

21               MS. WARDEN:  Objection, form.

22     A.  Yeah, I would say so.

23     Q.  All right.

24          Do you have a different definition of

25     expenses?

1      A.  No, oth- -- other than just broadly all the
2   costs associated with -- with operating the fund.
3      **Q.  All right.**
4              **So --**
5      A.  Materials, you know, electric bills, you know,
6   facilities, whatever, yeah.
7      **Q.  So utilities, the electric- -- electric bill,**
8   **right?**
9      A.  Yep.
10     **Q.  And what about rent for the building, would**
11  **that be included?**
12     A.  Yes.
13     **Q.  And they rented -- deeproot leased the**
14  **building, correct?**
15     A.  To my knowledge, yes.
16     **Q.  So they had a contract with a landlord that**
17  **required them to pay rent?**
18     A.  Yes.
19     **Q.  And so part of this company advance could be**
20  **used to pay the pent for the building that deeproot**
21  **occupied, right?**
22     A.  Sure.
23     **Q.  Part of this company advance could be used to**
24  **pay the electric bill, right?**
25     A.  Sure.

 1      Q.  If there is a contract with a cleaning crew to
 2   come clean the offices, that could be included within
 3   this company advance, right?
 4      A.  Yes.
 5      Q.  What about salaries of -- what about your
 6   salary, would that be included?
 7      A.  Sure.
 8      Q.  What about Mr. Mueller's salary?
 9             MS. WARDEN:  Objection (simultaneous
10   speaking.)
11      A.  That would be my understanding.
12      Q.  You -- you can answer.
13      A.  Yeah, I -- that would be my understanding, that
14   his -- his salary would also -- his compensation would
15   be su- -- included amongst those kind of listed expenses
16   there.
17      Q.  Did you ever tell a potential investor that you
18   were working for free?
19      A.  No.
20      Q.  Did you ever tell a potential investor that
21   Robert Mueller was working for free?
22      A.  No.
23      Q.  Would it have been reasonable to expect --
24   would it be reasonable for an investor to expect that
25   Robert Mueller was working for free?

1        Q.   Do you have any reason to believe that that
2   sentence is inaccurate?
3        A.   I do not.
4        Q.   And so it was your understanding that -- did
5   you ever tell an investor that Robert Mueller wasn't
6   receiving a salary?
7        A.   No.
8        Q.   All right.
9                  Who was the ultimate parent of the 575
10  Fund?
11       A.   That's a good que- -- I'm not -- I don't
12  remember for sure --
13       Q.   Okay.
14       A.   -- how he had it structured, as to who would
15  have been the ultimate parent referred to there.
16       Q.   Who owned the policies?
17       A.   I believe Policy Services owned the policies.
18       Q.   And -- and who -- and your paycheck, you said,
19  came from Policy Services?
20       A.   Yes.
21       Q.   So the -- the PPM is telling potential
22  investors that the company advance could be up to
23  20 percent of their principal?
24             MS. WARDEN:  Objection, form.
25       Q.   Is it your understanding --

1      A.   Correct.

2      Q.   -- of the -- yes, okay.

3      A.   That was my understanding.

4      Q.   All right.

5           Did that -- did you ever -- you mentioned

6  that you -- you spoke to investors about the company

7  advance at least a few times, right?

8      A.   Uh-huh.

9      Q.   And is that a yes?

10     A.   Yes.

11     Q.   Sorry.  For -- for the -- for the deposition

12  you have to say yes or no or -- or -- you can't say um

13  or -- or anything like that.

14          But does -- to your knowledge, do any of

15  the materials that are provided to investors, including

16  the PPMs and the PowerPoints you described, identify the

17  amount of money that Mr. Mueller was supposed to be

18  paid?

19     A.   Not that I'm aware of.

20     Q.   Did you ever tell a potential investor the

21  amount of money that Mr. Mueller was to be paid?

22     A.   I did not.

23     Q.   And you made sure your representations to

24  investors were accurate, correct?

25     A.   Correct.

```
 1        A.   There may have been.
 2        Q.   All right.
 3             Did they include similar statements about
 4   risks and company advances, to your memory?
 5        A.   Yeah, to the best that I can recall.
 6        Q.   All right.
 7             And there were separate PPMs for the dGRD
 8   Fund; is that right?
 9        A.   Yes.
10        Q.   And those PPMs, as far as you remember, also
11   made representations to investors about potential risks,
12   company advances, and -- and the payments to Mr.
13   Mueller?
14        A.   Yes.
15        Q.   And do you have any reason to believe that any
16   statement in any of the PPMs was false?
17             MS. WARDEN:   Objection --
18        A.   I have no --
19             MS. WARDEN:   -- asked and answered.
20        Q.   You -- you can answer.
21        A.   I -- I have no -- no reason to believe anything
22   represented was false.
23        Q.   All right.
24             Do you have any reason to believe that any
25   statement in the PPMs was misleading?
```

```
 1              MS. WARDEN:  Objection, asked and answered.

 2      Q.  You can answer.

 3      A.  Not to my knowledge.

 4      Q.  All right.  Okay.

 5              So we mentioned earlier that there were

 6  other communications with investors after they made

 7  investments.  Do you remember that?

 8      A.  Yes.

 9      Q.  All right.

10              So I'm gonna put one up here.  Okay.  I'm

11  gonna share my screen.  Okay.  I'm gonna mark this as

12  Exhibit 11.  It has an exhibit number from -- of 74 from

13  your SEC -- from the SEC interview.

14                  (Exhibit Number 11 marked.)

15      Q.  Do you recognize this document?

16      A.  I do.

17      Q.  What is this document?

18      A.  This is a letter to 575 periodic investors.

19      Q.  All right.

20              And do you recall when this letter was

21  sent?

22      A.  I -- I see the date.  That would be -- it -- it

23  -- but I -- that was around the time that I left.

24      Q.  All right.

25              Did you have any input into the content of
```

1      this letter?

2          A.  Not that I can recall.

3          Q.  All right.

4              Do you -- do you recall seeing a draft of

5      this letter?

6          A.  I -- Robert might have asked me to proofread it

7      after he -- after he wrote it.

8          Q.  All right.

9              You say "might have."  Do you remember that

10     happening?

11         A.  I -- I don't remember for sure, but it -- it

12     was regular for him to create something and ask us to

13     review it for typos and things like that.

14         Q.  All right.

15             So you -- it was a standard practice of

16     Mr. Mueller, before a communication went out to

17     investors in either of the funds, to show you a draft

18     and ask you to review it; is that fair?

19             MS. WARDEN:  Objection, asked --

20         A.  He would -- he would have us read it -- he

21     would have us read it before he -- before it was sent.

22         Q.  So you had the opportunity to tell Mr. Mueller

23     if you thought something was false or misleading?

24         A.  Sure.  I -- I mean, he wouldn't send it

25     without, you know, without -- this specific letter, I --

```
 1    he did not send it before giving me an opportunity to
 2    read it.
 3         Q.  All right.
 4              So he didn't send this specific letter
 5    without giving you an opportunity to review it; is that
 6    -- is that what your testimony is?
 7         A.  Correct.  I -- I -- I believe I read this
 8    before it was sent.
 9         Q.  All right.
10              And if there was something in this letter
11    that was inaccurate, would you have informed Mr. Mueller
12    of that?
13         A.  I would have asked him questions if I didn't
14    understand it.
15         Q.  Do you remember asking any questions about this
16    letter?
17         A.  I -- I don't.  I don't fully recall.  I think
18    by this point I had made up my mind I was going to
19    leave, and so I wasn't as -- yeah, I -- you know, I -- I
20    was more operating under the mindset of I wasn't going
21    to be there very long after this anyway.
22         Q.  Okay.
23              So in this letter or previous letters,
24    would you have -- if there was something that was
25    incorrect in a letter, would you have mentioned that to
```

1    **Mr. Mueller?**

2         A.  We -- we would have -- we would have asked him

3    about it if it -- if it appeared to be contrary to our

4    understanding or what -- or what would have been

5    explained to investors.

6         **Q.  And to your memory, were there any**

7    **communications sent to investors that you believed were**

8    **inaccurate?**

9         A.  Not to my knowledge.

10        **Q.  Okay.**

11             **Okay.  Let's move on.**

12             **I'm gonna show you Exhibit -- what I'm**

13   **gonna mark as Exhibit 12.**

14             **(Exhibit Number 12 marked.)**

15        **Q.  Okay.  Do you see that document?**

16        A.  I do see this, yes.

17        **Q.  All right.**

18             **What is this?**

19        A.  This was a -- a -- a bonus agreement between

20   Robert, Nate, and myself.

21        **Q.  All right.**

22             **How did this agreement come about?**

23        A.  At the beginning -- beginning of 2019, Robert

24   approached Nate and myself with some bonus proposals.

25   You can maybe call those employment incentives, to --

```
 1          A.   Yeah.
 2          Q.   What do you think the -- what do you think you
 3     had -- you and Nate had raised in 2019 up to August 9th
 4     for the deeproot fund?
 5          A.   I can't recall.  Again, there was -- what --
 6     what brought about this specific agreement was there was
 7     a general total funding target that we had discussed
 8     earlier with Robert, and we had, in our eyes, felt that
 9     we had accomplished that, in line with what those verbal
10     agreements were, despite, you know, again, Robert not
11     honoring his side of the agreement.
12          Q.   Okay.
13               Let's go to the next line.  On the first
14     payroll after August (sic) 1st, 2019, it says, Employer
15     agrees to raise the base salary of Nate and Scott to
16     twice the salary each respectively earned on or about
17     January 1, 2019.
18               Is that right?  Did I --
19          A.   Yes.
20          Q.   -- read that correct?
21          A.   Yes.
22          Q.   So Mr. Mueller agreed to double your salary,
23     right?
24          A.   He -- he signed this -- he signed this
25     agreement.
```

1    Q.  So that would have taken your salary from
2    60,000 to 120,000?
3    A.  I think I was making more by that point, so I
4    think it would have been something like 70- or 75,000 to
5    up, you know, around 150,000.
6    Q.  Okay.
7         That doesn't include bonuses?
8    A.  Correct.
9    Q.  That's significantly more than you had made in
10   your previous jobs, right?
11   A.  Correct.
12   Q.  And more than you're making now, correct?
13   A.  Correct.
14   Q.  Okay.  The next line, Prior to December 31,
15   2019, it says, Employer agrees to pay Nate and Scott
16   each a $25,000 bonus to be paid on a prescheduled pay
17   date after successfully completing a metric.
18         And then it describes the metric.  Do you
19   recall if you met that metric?
20   A.  I don't recall.
21   Q.  All right.
22         Do you know if that net bonus was paid?
23   A.  I believe it was.
24   Q.  All right.
25         Then it says, On or after October 1st,

```
 1     2019, Employer agrees to advance or reimburse an annual
 2     golf membership not to exceed $4,000 per employee.
 3                    Do you see that?
 4         A.  Yes.
 5         Q.  And who -- who suggested the idea of an --
 6     payment of an annual golf membership?
 7         A.  I -- I believe that would have been me and Nate
 8     together.
 9         Q.  All right.
10                    Do you play golf?
11         A.  Some.
12         Q.  All right.
13                    Was the golf membership paid?
14         A.  It was not.
15         Q.  Okay.  Does your current employer pay for a
16     golf membership?
17         A.  No.
18         Q.  All right.
19                    And is that your signature at the bottom of
20     the page?
21         A.  Yes.
22         Q.  And, to your knowledge, is that Mr. Mueller's
23     signature and Mr. Spradlin's signature?
24         A.  Yes.
25         Q.  All right.
```

```
 1              After you signed this agreement, did the
 2   amount that you and Mr. Spradlin brought into the
 3   deeproot Funds go up or down?
 4        A.   I believe it went down.
 5        Q.   All right.
 6              How much lower was the -- all right.
 7              How much lower was the money raised after
 8   this agreement compared to the money raised prior to
 9   this agreement?
10        A.   I'm not sure.  I -- I would say it was -- it
11   wasn't negligible.
12        Q.   Did Mr. Mueller ever complain about this
13   agreement?
14              MS. WARDEN:  Objection, vague.
15        Q.   You do understand what the word "complain"
16   means?
17        A.   Yes.
18        Q.   Yeah.  You can answer.
19        A.   He -- he decreased our salaries following this,
20   where -- when funding was lower.
21        Q.   Did he end up laying off employees at the
22   deeproot entities?
23        A.   Yeah, yes, he did.
24        Q.   Do you and -- do you recall conversations
25   between you, Mr. Spradlin, and Mr. Mueller about how the
```

1    deeproot companies should be operated?

2        A.  Yes.

3        Q.  All right.

4                So do you recall discussions prior to the

5    entry of this bonus agreement about how deep- --

6    deeproot companies should be operated?

7        A.  I think I couldn't identify a specific

8    conversation, but I -- I think we likely discussed some.

9        Q.  Do you recall making recommendations to

10   Mr. Mueller about how he should be running these

11   companies?

12       A.  We raised concerns about the number of

13   employees and -- and how large some of the affiliates

14   were -- were growing as quickly as they were.

15       Q.  So you expressed concern about the expenses of

16   the deeproot companies?

17               MS. WARDEN:  Objection.  Sorry, I didn't

18   mean to interrupt.  Objection, form.

19       Q.  You said you expressed concerned.  Did you

20   express concerns about the amount of expenses of the

21   deeproot companies?

22       A.  I -- I would say that -- that was fair, yes.

23       Q.  Did you express concern about the -- the amount

24   of expenses at the Utah office?

25       A.  Yes.

1    Q.   Did you express concern about getting Pinball

2    launched quickly?

3    A.   Yes.

4    Q.   And tell me why that was important.

5    A.   We were -- we were representing deeproot Funds

6    and the -- and the investment offerings to the investors

7    and to the finders, the people that we were working

8    with.  And so from my perspective, we wanted to make

9    sure that promises to investors would be able to be met.

10   Q.   So why was the getting Pinball launched quickly

11   important to the deeproot companies' bottom line?  Do

12   you understand the expre- -- the phrase "bottom line"?

13   A.   Uh-huh, uh-huh.  Well, there's a lot of

14   research and development, a lot of -- a lot of work

15   being done to -- to start that, to -- to -- to hopefully

16   get those -- to get that company selling machines, and

17   we were getting questions from -- whether prospective

18   investors or some of the finders, on the status of what

19   those projects were.

20   Q.   So you needed to bring in revenue; is that fair

21   to say?

22   A.   That's fair.

23             MS. WARDEN:   Objection, form.

24   Q.   And so selling pinball machines would be a way

25   to bring in revenue?

```
 1        A.   Yes.
 2        Q.   And so you told Mr. Mueller that it was
 3   important to get pinball masho -- machines sold quickly
 4   so they could bring in revenue for the deeproot
 5   companies?
 6        A.   Well, we told him it was important for revenues
 7   to be generated.
 8        Q.   Okay.
 9             Did you ever recommend that Mr. Mueller
10   bring in a CFO?
11        A.   We did.
12        Q.   All right.
13             Did you ever ask him how you could partner
14   with him as a part owner of these companies?
15        A.   No.
16        Q.   Okay.
17             I'm gonna show you what's been -- what I'm
18   gonna mark as Exhibit 13.
19             (Exhibit Number 13 marked.)
20        Q.   Do you recognize this document?
21        A.   Looks familiar.
22        Q.   All right.
23             It's Bates numbered SEC-AllenS-E, a bunch
24   of zeros, and the number 9.  Do you see that at the
25   bottom right?
```

```
 1        A.  Yes.
 2        Q.  Did -- did you produce this document in
 3   response to the SEC's subpoena?
 4        A.  I think so.  I -- I can't remember everything
 5   that was provided, but --
 6        Q.  Do -- do you recall --
 7        A.  -- if it came to me, then --
 8        Q.  Well, let me ask a question.  Do you recall
 9   drafting this document?
10        A.  I recall -- I recall working on this with Nate.
11        Q.  All right.
12             Was this document ever provided to
13   Mr. Mueller?
14        A.  Not that I can recall.
15        Q.  All right.
16             Is this a -- this is -- what is meant --
17   what have you and -- what was the purpose of this
18   document when you and Mr. Spradlin were drafting it?
19        A.  Brainstorming things that -- that we wanted to
20   discuss with Robert.
21        Q.  Okay.
22             So is this consistent -- the contents of
23   this document consistent with what you eventually spoke
24   to Mr. Mueller about?  If you want me to scroll through
25   it, I can do that.  I'm on page 2.
```

```
 1          A.   Yeah, I would say it's consistent.
 2          Q.   All right.
 3                    I'm going to stop the share.  Let's see.
 4     I'm going to show you a document -- I'm gonna go a
 5     little out of order here, and I'm gonna mess things up
 6     for Ms. Warden.  I'm gonna add a number, so this is
 7     going to be Exhibit 19.
 8                    MS. WARDEN:  No.
 9                    MR. HULINGS:  Sorry.
10                    MS. WARDEN:  Can you -- wait, can you --
11     can I give you another number?
12                    MR. HULINGS:  Sure.
13                    MS. WARDEN:  All right.  Please label it
14     Exhibit 25.
15                    MR. HULINGS:  25, all right.
16                    (Exhibit Number 25 marked.)
17          Q.   Okay.  All right.
18                    Mr. Allen, do you recognize this document?
19          A.   It looks familiar.
20          Q.   It says deeproot Family of Companies,
21     Investment Portfolio Narrative 2020.
22                    Do you see that?
23          A.   Uh-huh.
24          Q.   And do you recall --
25          A.   I'm sorry, yes, I see that.
```

```
 1          Q.  Yes.
 2                  Do you recall -- I mean, so the -- part of
 3      the second page says Part I, Investment Portfolio and
 4      Analysis.
 5                  Do you see that?
 6          A.  Yes.
 7          Q.  Do you recall the -- the circumstances that led
 8      to the creation of this document?
 9          A.  Not very well.
10          Q.  All right.
11                  What do you recall about it?
12          A.  Needing to provide a --
13          Q.  Let me ask -- let me ask a follow-up question.
14      I can -- I can be more specific.
15                  Do you remember --
16          A.  Wanting -- wanting to provide -- wanting to
17      provide an updated picture of the overall portfolio.
18          Q.  To whom?
19          A.  Prospective finders, I think primarily to
20      prospective finders.
21          Q.  All right.
22                  And do you recall going to a conference in
23      Hawaii with prospective finders?
24          A.  Yes.
25          Q.  And then was that around February 2020?
```

```
 1        A.   Yes.
 2        Q.   So before the lockdowns?
 3        A.   Yes.
 4        Q.   And after that conference, do you remember
 5   telling Mr. Mueller that we needed to give an -- let me
 6   rephrase.
 7             Do you -- after that conference, do you
 8   remember telling Mr. Mueller that deeproot needed to
 9   provide more information about its portfolio to
10   prospective finders?
11        A.   That sounds familiar.
12        Q.   All right.
13             And do you remember whether this document
14   was the result of that advice that you gave Mr. Mueller?
15        A.   That sounds accurate.
16        Q.   All right.
17             Do you recall reviewing a draft of this
18   document?
19        A.   I don't recall reviewing it, but I -- I may
20   have.
21        Q.   Okay.  And here is -- and do you recall -- do
22   you remember this document well enough to be able to --
23   let me -- let me rephrase.
24             Is there anything in this document that at
25   the time you thought was inaccurate?
```

```
 1        A.   We were relying on numbers provided by Robert.

 2        Q.   Is that a yes or a no?

 3        A.   I -- I would -- that's an I don't know.  We --

 4   we --

 5        Q.   At the time did you think that there was

 6   anything in this document that was inaccurate?

 7             MS. WARDEN:  Ob- -- objection, asked and

 8   answered.

 9        Q.   You can answer.

10        A.   At the time I didn't know how he came to the

11   numbers, but I didn't -- I didn't have reason to

12   believe -- I -- I didn't -- I didn't know anything that

13   would prove it to be inaccurate.

14        Q.   All right.

15             Based on what you know now, do you think

16   there's anything in this document that's inaccurate?

17        A.   I'm not sure.

18        Q.   Okay.

19             So you don't know whether there's something

20   in that document now that's inaccurate?

21             MS. WARDEN:  Objection, asked and answered.

22        Q.   You can answer.

23        A.   Yeah.  Again -- again, the -- the figures are

24   things that were provided by Robert.  I no longer -- I

25   -- I no longer -- I'm not of -- of a position now where
```

```
 1              I'm showing you what has been marked as

 2   Exhibit -- what I'm marking as Exhibit 18, but was

 3   previously marked through your interview as Exhibit 7.

 4              (Exhibit Number 18 marked.)

 5        Q.  Do you see this document?

 6        A.  Yes.

 7        Q.  What is this document?

 8        A.  That would be the -- the memo I attached with

 9   my resignation outlining a -- a more detailed list of my

10   concerns and suggestions moving forward that I felt

11   would help the -- would help deeproot, and hopefully

12   things would be better moving forward.

13        Q.  All right.

14              I'm gonna highlight the first sentence

15   there of the second paragraph.  Do you see that?

16        A.  Uh-huh.

17        Q.  Is that a yes?

18        A.  Yes, I see it.

19        Q.  And the reference is Missed investor payments,

20   correct?

21        A.  Yes.

22        Q.  It says, While I have no knowledge or reason to

23   believe that you were doing -- anything you were doing

24   is fraudulent or illegal.

25              Did I read that correctly?
```

1              **So --**

2       A.  Or -- or there was not enough incoming

3  investment capital that would have met the level that

4  needed to go out to those payments.

5       **Q.  All right.**

6              **And is that the complete factual basis for**

7  **your statement at the time?**

8       A.  That -- that was from -- that was from my

9  understanding.  I didn't know what other sources of

10  income were coming in from other -- from the other

11  affiliates, and so it -- it looked to me as if the only

12  way payments were being made were based on funding of

13  new investment dollars.

14       **Q.  Okay.  So have you ever heard the phrase "money**

15  **is fungible"?**

16       A.  Maybe not that specific phrase, but that sounds

17  like something I've heard.

18       **Q.  All right.**

19              **Do you agree with that statement?**

20       A.  Sure.

21       **Q.  Okay.**

22              **So if the source of payments to investors**

23  **has -- or if -- let me rephrase.**

24              **If the source of payments to investors is**

25  **funded by more than new investments, does that make the**

1    entity not a Ponzi scheme?

2              MS. WARDEN:   Objection, vague.

3         A.   I'm not sure I'm -- I'm the expert on Ponzi

4    schemes to be able to answer that from a legal basis.

5         Q.   Well, you made the accusation that the -- the

6    company was a Ponzi scheme, and you just gave a

7    explanation of what a Ponzi scheme is, so I'm asking

8    you, based on your understanding of the phrase "Ponzi

9    scheme," if the source of the funds of payments to old

10   investors is funded by more than just new investments,

11   does that still meet the definition of a Ponzi scheme,

12   based on your understanding?

13        A.   I -- I -- I would say -- I would say that would

14   not meet the definition of a -- of a Ponzi scheme.

15        Q.   Right.  Okay.

16             So -- and you just said that you didn't

17   know what other sources of funds were coming into the

18   deeproot entities at the time other than investor funds,

19   correct?  Let me rephrase that.  That was -- that was

20   messy.

21             You were aware of how much investor funds

22   were coming in at the time, correct?

23        A.   Correct.

24        Q.   And would you be aware of a policy that

25   matured?

1      A.   Yes.

2      Q.   Would you -- would you be aware of any revenues

3  or cash flow from any of the deeproot affiliates?

4      A.   Not necessarily.

5      Q.   And would you be aware if, say, Mr. Mueller

6  took out a loan?

7      A.   Not unless he told me.

8      Q.   Did you have access to the bank accounts?

9      A.   I did not.

10     Q.   So you mentioned that whether or not there is a

11 separate set of funding other -- other than new investor

12 funds is important to determining whether or not

13 something is a Ponzi scheme, right?

14     A.   I would say so.

15     Q.   And you actually didn't know at the time

16 whether or not there was another source of funds for the

17 575 Fund?

18     A.   Correct.

19     Q.   Okay.

20          So if -- if a business has more expenses

21 than it has revenues, does that make it a Ponzi scheme?

22          MS. WARDEN:   Objection, form.

23     A.   No.

24     Q.   So that just means the business is losing

25 money, right?

1      A.  Yes.

2      Q.  And lots of businesses have expenses that

3   exceed revenues, correct?

4      A.  Yes.

5      Q.  Tesla, for a long time, is a company that had

6   expenses that exceeded revenues, correct?

7      A.  Sure, to my understanding, yes.

8      Q.  Is it your understanding that is a -- as

9   someone who invests in companies for a living, that it's

10  common for start-up companies to have expenses that

11  exceed revenues?

12     A.  Yes.

13     Q.  All right.

14         And just because expenses exceed revenues

15  doesn't make that company a Ponzi scheme?

16     A.  Correct.

17     Q.  So we talked earlier about the deeproot

18  expenses.  Do you remember that?

19     A.  Yes.

20     Q.  And -- and I believe that you may remember that

21  the investors were told that 20 percent of the money

22  they invest could be used for deeproot expenses.  Is --

23  is that about right?

24     A.  That's about right.

25     Q.  And -- and we talked about expenses being

1    obligations -- a -- an obligation of the deeproot

2    entities to make a payment, correct?

3         A.   Correct.

4         Q.   And obligations driven -- or, you know, an

5    obligation under a contract to make a payment, correct?

6         A.   In some cases, yes.

7         Q.   So if -- if the deeproot entities have a

8    contract that requires them to make a monthly payment

9    to, say, a landlord, that would be an expense, correct?

10        A.   Yes.

11        Q.   And if the deeproot entities had a contractual

12   obligation to make a monthly payment under a

13   subscription agreement, that could also be an expense?

14        A.   Sure.

15        Q.   So the fact that one of those expenses goes to

16   a former investor, is that what makes this a Ponzi

17   scheme, under your definition?

18        A.   If the only source of -- if the only source of

19   money to pay -- to pay previous investor commitments is

20   new investors, it would.

21        Q.   Well, let me ask you this.  Do you recall the

22   PPMs making reference to reserve funds?

23        A.   Yes.

24        Q.   Do you recall recommending to Mr. Mueller that

25   deeproot increase the amount of its reserve funds?

```
 1        Q.  All right.

 2             In all -- in your communications with

 3   investors, you explained that the life insurance

 4   policies are not liquid, correct?

 5        A.  Correct.

 6        Q.  You also explained that you didn't know when

 7   any of those life in pol- -- life insurance policies may

 8   result in the payments to the deeproot companies,

 9   correct?

10        A.  Correct.

11        Q.  So at the beginning of this fund, what other

12   possible source for payments under the 575 Fund could

13   there be other than --

14             MS. WARDEN:  Objection.

15        Q.  -- investor funds?

16             MS. WARDEN:  Sorry.

17        Q.  To your knowledge.

18        A.  Some of the other affiliates.

19        Q.  Okay.

20             Do you remember -- did you talk to Mr. --

21   or actually let me -- let me rephrase.

22             When did you first develop the concern that

23   the 575 Fund was run like a Ponzi scheme?

24        A.  It -- it would have been there during the

25   summer of 2020.
```

```
 1        Q.  All right.
 2        A.  It would have been where I -- where I no longer
 3   accepted Robert's explanation for how it was aboveboard.
 4             MR. HULINGS:  Move to strike everything
 5   after "2020."
 6        Q.  So after you developed this opinion, you
 7   continued to speak to investors about investing in the
 8   575 Fund, correct?
 9        A.  Sure, yes.  I continued to work there, doing my
10   job.
11        Q.  All right.
12             And part of your job was speaking to
13   prospective investors about an investment in the 575
14   Fund?
15        A.  Correct.
16        Q.  And did you tell any investor that you thought
17   the 575 Fund was run like a Ponzi scheme?
18        A.  No, my job was to relay the information as
19   outlined in the PPM and within Robert's direction.
20        Q.  All right.
21             And do you think any of your communications
22   with investors in the summer of 2020 through the fall of
23   2020 were false or misleading?
24        A.  I did not intentionally provide any false or
25   misleading statements to investors.
```

1      Q.   So even though you thought or you suspected

2   that the company was run like a Ponzi scheme, you still

3   made the same presentation to investors and did not at

4   the time think that it was false or misleading.  Do I

5   have that right?

6      A.   That's fair.

7      Q.   And when you spoke to -- when you had that

8   conversation on October 6th and that e-mail referred to

9   before the break -- do you remember that?

10      A.   Yes.

11      Q.   Did you tell that investor that you thought the

12   deeproot entities were run like a Ponzi scheme?

13      A.   I did not.

14      Q.   In fact, you told him that he had been warned

15   that he could lose money on the -- on the investment,

16   right?

17      A.   Correct.

18      Q.   Did you ever talk to Nate Spradlin about your

19   concerns that the deeproot entities were run like a

20   Ponzi scheme?

21      A.   Not explicitly.

22      Q.   Okay.

23           Did you talk to Mr. Spradlin after you left

24   -- let me -- let me rephrase.

25           Did you talk to Mr. Spradlin about the memo

 1   collateralized loan, something like that, yeah, that
 2   would be fair.
 3        Q.   Okay.
 4             All right.  A little later on in the memo,
 5   or that same sentence says, it may not be your design or
 6   intention.
 7             At the time you wrote this, did you think
 8   that Mr. Mueller designed the 575 Fund as a Ponzi
 9   scheme?
10        A.   I didn't -- no, I did not think that was his
11   design or intention.
12        Q.   Okay.
13             You mentioned that Mr. Mueller talked about
14   cash flow; is that right?
15        A.   Yes.
16        Q.   And he said the -- is it -- is it fair to say
17   that he said that deeproot was operating like any other
18   business, using cash flow to pay expenses, correct?
19        A.   That's a paraphrase of that, yes, but yes.
20        Q.   Okay.
21             And so was it your impression, based on
22   those statements, that he was treating payments to
23   investors in the 575 Fund, the monthly payments, like
24   any other expense of the deeproot businesses?
25             MS. WARDEN:  Objection, vague.

1      A.   Maybe not any other expenses, but that he felt

2   justified in the way he was handling the payments to

3   investors.

4      Q.   Did he say or do anything that made you think

5   -- let me -- let me -- let me rephrase.

6           Did he -- did he say anything to you that

7   indicated to you that he thought he was doing something

8   wrong?

9      A.   No.

10     Q.   So based on his actions, you got the impression

11  that he thought everything he was doing was legitimate?

12          MS. WARDEN:   Objection, vague.

13     Q.   Let me rephrase.   Based on his actions and

14  statements, was it your impression that Mr. Mueller

15  believed that everything he was doing was consistent

16  with the law?

17     A.   Yes.

18     Q.   Did he ever tell you to keep any secret from

19  the investors?

20     A.   No.

21     Q.   Did he ever tell you to delete any documents?

22     A.   No.

23     Q.   Did he ever tell you to shred anything?

24     A.   Not outside of things that would have been

25  treated as garbage or -- or not really needed.

1    Q.  So a little later on in the -- in the memo,

2  under Suggestions for improvement -- do you see that?

3    A.  Yes.

4    Q.  So this memo isn't accusing Mr. Mueller of

5  doing anything illegal?

6              MS. WARDEN:  Objection, form.

7    Q.  Did you intend this memo to accuse Mr. Mueller

8  of doing anything illegal?

9    A.  No.  I -- I mean, I -- you can see that

10  underlined there.  I was -- I was not making

11  accusations.  I knew my leaving, especially with Nate

12  not being there, was going to put their -- the

13  fundraising effort for the funds in a difficult spot,

14  because it -- and so it was an intention of I can't be

15  here anymore, however, I want to at least provide some

16  suggestions that I think may help you moving forward.

17    Q.  All right.

18              You didn't recommend that Mr. Mueller just

19  shut the business down?

20    A.  Not that I can recall.

21    Q.  All right.

22              And under Suggestions for improvement, the

23  first one is Planning and Budgeting, correct?

24    A.  Correct.

25    Q.  So you -- essentially you're telling

```
 1         A.   Uh-huh.

 2         Q.   And -- is that a yes?

 3         A.   Yes.

 4         Q.   And this is the document that was you and

 5   Mr. Spradlin brainstorming?

 6         A.   Correct.

 7         Q.   And if you look at the first page, on the

 8   bullet that starts with Game plan.

 9                   Do you see that?

10         A.   Yes.

11         Q.   It says, Game plan for setting up reserves for

12   payroll, investors, and premium payments, along with

13   rent.

14                   Do you see that?

15         A.   I see that.

16         Q.   So at the least the -- at least the time you

17   and Mr. Spradlin wrote this, the idea was to use

18   reserves for investor payments?

19         A.   That's fair.

20         Q.   And then the next list says, Current expenses

21   that we know about, and there's Payroll of $600,000 a

22   month, right?

23         A.   Correct.

24         Q.   And then there's BCBS; is that Blue Cross Blue

25   Shield?
```

1        A.   I believe so.

2        Q.   And then you've got the next column is a

3    hundred thousand dollar a month investor premiums.

4                 Do you see that?

5        A.   Yes.

6        Q.   So that would include the regular payments to

7    575 Fund investors?

8        A.   I think so.  The fact that it says premiums, I

9    can't remember why we called them premiums instead of

10   payments, but that's plausible that's what that was.

11       Q.   And at the least, this is -- the hundred

12   thousand dollar a month investor premiums, these are

13   payments to investors?

14       A.   I -- I believe that's what that's referring to,

15   yes.

16       Q.   And then it has -- the next line is a hundred

17   thousand a month miscellaneous, for example, utilities;

18   is that right?

19       A.   Yeah, there -- if he had disclosed to us in

20   expenses that he was -- that he was checking against

21   incoming funding, he would give us a miscellaneous

22   option sometimes.  So we didn't always know what that

23   was, but...

24       Q.   All right.

25                 Well, you then skip down to rents.  You've

 1    got 750,000 a year for rent?

 2         A.   That was what we were told.

 3         Q.   And then 2 million a year for rent in Utah?

 4         A.   That's what we were told.

 5         Q.   So you had some information about what the

 6    expenses of the deeproot entities were, correct?

 7         A.   Some, yes.

 8         Q.   And when you were making the list of expenses

 9    at the time, you put in the same category as all the

10    other expenses, payments to investors?

11         A.   Okay.

12         Q.   Is that a yes?

13         A.   It's on that bulleted list.  I'm not gonna

14    argue, that's what's shown on the screen.

15         Q.   But you and Mr. Spradlin wrote this, correct?

16         A.   Yes, yes.

17         Q.   This was your brainstorming session about what

18    to bring up with Mr. Mueller in your discussions, right?

19         A.   Yes.

20         Q.   So this reflected your understanding of the

21    deeproot entities at the time, right?

22         A.   Sure.

23         Q.   All right.

24              So a little further down, you've got a

25    bullet that says Reserves.

```
 1          Q.  Did you have discussions with Mr. Mueller about
 2    bringing in a comptroller in the summer or fall of 2020?
 3          A.  It -- it would have been earlier in 2020 or
 4    potentially in 2019.
 5          Q.  Okay.
 6              And what was Mr. Mueller's response?
 7          A.  That he appreciated us raising that concern but
 8    more or less saying it wasn't gonna happen.
 9          Q.  And "it" that you're referring to is bringing
10    in an independent controller -- comptroller?
11          A.  Correct, someone else to -- to assist him in
12    managing the books.
13          Q.  Okay.
14              And I believe you previously testified that
15    -- I just want to ask this, going back to this clause
16    that I'm highlighting for you in Exhibit 18, in
17    functional operation, it looks and feels like a Ponzi
18    scheme.
19              I believe you testified that you never told
20    investors about your concern, right, that deeproot
21    looked and felt like a Ponzi scheme; is that correct?
22          A.  That -- that's correct.
23          Q.  Okay.
24              And why did you not tell investors about
25    your concern that deeproot looked and felt like a Ponzi
```

1    scheme?

2        A.  Well, I didn't -- I didn't know for sure.  You

3    know, I'm not a -- I'm not an attorney, I'm not, you

4    know, a regulations -- I'm not a regulator.  So I --

5    I -- that was beyond my expertise.  I -- I knew I was

6    conveying the information in line with what I was -- how

7    I was instructed to with the PPM and -- and how the

8    investments were supposed to be represented to the

9    investors, and in line with what Robert's answers toward

10   specific questions would be.

11       Q.  Okay.

12              I'm gonna stop sharing this.  I'm gonna

13   show you -- okay.  Do you see what's been marked as --

14   previously been marked Exhibit 22?

15       A.  I see it.

16       Q.  Okay.

17              Bates SEC-AllenS-E-0000081.

18              So this is the other half, the other piece

19   of your resignation letter that you already testified

20   about, dated October 7, 2020.  Highlighting for you this

21   clause -- no, it's not gonna highlight.  But the -- the

22   second paragraph, the second sentence, I am resigning

23   due to personal reasons as well as concerns regarding

24   the viability of deeproot Funds as an investment

25   offering.

```
 1   investment policy -- the -- that the policies were not
 2   maturing and the diversification of the assets was not
 3   working.  And I did not see a path forward where they
 4   were going to work at all.
 5              MS. WARDEN:  If we can take a five-minute
 6   break, I think we're -- I'm close to wrapping up.
 7              THE VIDEOGRAPHER:  Off the record at
 8   3:51 p.m.
 9                   (Brief recess.)
10              THE VIDEOGRAPHER:  The time is 3:57 p.m.
11   We're back on the record.
12      Q.  Mr. Allen, have you had any discussions with
13   Robert Mueller since you left deeproot?
14      A.  I have not.
15              MS. WARDEN:  We have no quest- -- no
16   further questions at this time.
17              MR. HULINGS:  All right.  I've got some
18   quick redirect.  Just a moment.
19                   RE-EXAMINATION
20   BY MR. HULINGS:
21      Q.  All right.
22              Mr. Allen, I'm gonna show you -- not that
23   -- not that button.  Mr. Allen, I'm gonna show you
24   Exhibit 7.  Do you recall seeing this exhibit during
25   Ms. Warden's questioning?
```

1      A.   I do.

2      Q.   **And what is this?**

3      A.   The -- the dGRD PPM.

4      Q.   **For Class C membership shares, correct?**

5      A.   Correct.

6      Q.   **And last amended October 24, 2019?**

7      A.   Yes.

8      Q.   **Mr. Allen, does -- do you know how many**

9   **investors invested in the dGRD Class C membership shares**

10  **after October 24, 2019?**

11     A.   I do not know.

12     Q.   **Would it surprise you to hear that the answer**

13  **is zero?**

14     A.   No.

15     Q.   **Do you know how many investors in Class C**

16  **membership shares in the dGRD Fund from February 26,**

17  **2018, forward, do you know how many of those there were?**

18     A.   In the Class C membership shares?

19     Q.   **Correct.**

20     A.   I think it was zero.

21     Q.   **So in other words, this PPM did not result in**

22  **any investments into the dGRD Fund?**

23     A.   The best that I can recall, that is correct.

24     Q.   **Okay.**

25          **You mentioned in a -- a conversation with**

```
 1              Mr. Allen, you -- both from your testimony
 2   today and then some of the documents we've described,
 3   you expressed some criticisms of Mr. Mueller's
 4   management style; is that correct?
 5        A.  Yes.
 6        Q.  Is it fair to say that the PPMs and other
 7   materials provided to investors did not make any
 8   representations about the management style of the
 9   managers?
10              MS. WARDEN:  Objection, vague.
11        Q.  You can answer.
12        A.  That's fair.
13        Q.  The PPMs also did not make any guarantees that
14   the managers of the deeproot entities would not make
15   mistakes, right?
16        A.  That's fair, yeah, correct.
17        Q.  And the PPMs and the other materials provided
18   to investors didn't guarantee that the businesses
19   described in those materials would be successful?
20        A.  Correct.
21        Q.  In fact, they represented the opposite; that
22   these businesses may not be successful, correct?
23        A.  Correct.
24        Q.  So whether Mr. -- so Mr. Mueller's mistakes or
25   weaknesses in management style or business decisions
```

1    STATE OF TEXAS       )

2    COUNTY OF DALLAS    )

3

4          I, Susan M. Foreman, A Certified Shorthand

5    Reporter duly commissioned and qualified in and for the

6    State of Texas, do hereby certify that there came before

7    me on the 16th day of February, 2023, at 9:02 a.m., via

8    Zoom teleconference, the following named person, to-wit:

9    SCOTT ALLEN, who was by me duly sworn to testify the

10   truth, the whole truth, and nothing but the truth of

11   knowledge touching and concerning the matters in

12   controversy in this cause; and that he was thereupon

13   examined upon oath and his examination reduced to

14   typewriting under my supervision; that the deposition is

15   a true record of the testimony given by the witness.

16          I further certify that pursuant to the FRCP

17   Rule 30(e)(1) that the signature of the deponent:

18          __X__ was requested by the deponent or a party

19   before the completion of the deposition, and that

20   signature is to be before any notary public and returned

21   within 30 days from date of receipt of the transcript;

22          ____ was not requested by the deponent or a

23   party before the completion of the deposition.

24          I further certify that I am neither attorney

25   or counsel for, nor related to or employed by any of the

1  parties to the action in which this deposition is taken,

2  and further that I am not a relative or employee or any

3  attorney or counsel employed by the parties hereto, or

4  financially interested in the action.

5         Certified to me this 2 day of March, 2023.

6

7

8  _Susan M. Foreman_

Susan M. Foreman
Texas CSR Number 5240
Worldwide Court Reporters
12621 Featherwood Drive
Suite 290
Houston, Texas   77034
(713) 572-2000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25