# Exhibit A-3

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
                       SAN ANTONIO DIVISION

SECURITIES AND EXCHANGE        )
COMMISSION                     )
                               )
          Plaintiff,           )
                               )
          -against-            ) Civil Action
                               ) No.: 5:21-cv-785-XR
ROBERT J. MUELLER, DEEPROOT    )
FUNDS LLC (a/k/a dprt Funds,   )
LLC), AND POLICY SERVICES,     )
INC.,                          )
                               )
          Defendants,          )
                               )
          -and-                )
                               )
DEEPROOT TECH LLC, DEEPROOT    )
PINBALL LLC, DEEPROOT          )
STUDIOS LLC, DEEPROOT          )
SPORTS & ENTERTAINMENT LLC     )
DEEPROOT RE 12621 SILICON      )
DR LLC, AND ROBERT J.          )
MUELLER, JEFFREY L. MUELLER,   )
AND BELINDA G. BREEN, AS       )
CO-TRUSTEES OF THE MB HALE     )
OHANA REVOCABLE TRUST,         )
                               )
          Relief Defendants.   )
```

```
                      VOLUME 1 OF 1
               ORAL AND VIDEOTAPED DEPOSITION OF
                      NATHAN SPRADLIN
                      MARCH 21, 2023
                   (CONDUCTED REMOTELY.)
```

1

2

3

4

5

6

7

8               ORAL AND VIDEOTAPED DEPOSITION OF NATHAN

9     SPRADLIN, produced at the instance of Defendants, and

10    duly sworn, was taken in the above-styled and numbered

11    cause on the 21st day of March, 2023, from 8:58 o'clock

12    a.m. to 5:14 o'clock p.m., before Monica Victor, a

13    certified shorthand reporter, in and for the State of

14    Texas, reported by computerized stenotype machine,

15    Nashville, Tennessee, pursuant to the Federal Rules of

16    Civil Procedure and the provisions stated on the record

17    or attached hereto.

18

19

20

21

22

23

24

25

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

1  You understand that there are a number of affiliated

2  entities that share the name deeproot?

3       A.  Correct.

4       Q.  Deeproot Capital Management is one of them?

5       A.  Yes.

6       Q.  Deeproot 575 Fund, LLC is another one?

7       A.  Yes.

8       Q.  And Policy Services is another one?

9       A.  Yes.

10      Q.  All right.  So if I say "deeproot," do you

11  understand that I mean the entire family of companies?

12      A.  Sure.  Yes.

13      Q.  Okay.  All right.  So how did you get connected

14  to deeproot?  How did you find -- how did you find

15  deeproot?

16      A.  I had let my sister know that I was opening --

17  open to moving out of Utah and I considered Texas

18  because she lived in Texas.  And so she -- I think she

19  posted something in her Facebook page that her brother

20  was looking for work opportunities.  And I believe

21  Robert reached out to her and said he was looking and

22  she connected us.

23      Q.  And do you know what the connection is

24  between -- you say Robert.  Do you mean Robert Mueller?

25      A.  Correct.

1      Q.   And do you know the connection between Robert
2   Mueller and your sister, if any?
3      A.   They went to the same church.
4      Q.   Okay.   And did you subsequently interview with
5   Robert Mueller?
6      A.   I did.
7      Q.   And he hired you?
8      A.   He did.
9      Q.   All right.   Let's take a look at a couple of
10   these bullets.   The second bullet says that you were
11   managing 50 percent year-over-year growth in capital
12   raise -- raised.   Do you see that?
13      A.   Correct.
14      Q.   What did you mean by 50 percent year-over-year
15   growth?
16      A.   The -- the capital coming in was growing
17   because I started at six or eight grand or -- and then
18   it went to, like, 12 or 13 grand -- or sorry -- million.
19   And then, like, 18 million.   So the capital was
20   increasing year over year.
21      Q.   Okay.   And so what -- what time frame, what
22   years would you say that you managed 50 percent of
23   year-over-year growth in capital?
24      A.   Well, at first it was Cary and I and then it
25   was Scott and I.   So throughout the whole time I was a

1   probably asked him if he was, like, getting an attorney

2   or anything of that nature.

3       Q.  Okay.  **Did you talk to him after his deposition**

4   **by the SEC?**

5       A.  After his deposition, I don't believe so

6   because I know it was very clear once we both got

7   attorneys that we were not supposed to talk with each

8   other.

9       Q.  Okay.  **When is the last time you talked to**

10  **Mr. Allen?**

11      A.  He messaged me through Instagram sometime last

12  year after the filing against Robert came out just to

13  ask if I had seen it or heard it.  It was a pretty quick

14  conversation over Instagram and that was it.

15      Q.  All right.  **In your testimony before the SEC**

16  **you mentioned a number of other people that you spoke**

17  **with after receiving word that the SEC was investigating**

18  **deeproot.  Do you recall that testimony?**

19      A.  I do.

20      Q.  **And one of those people was Raphael Vallier.**

21  **Am I saying that right?**

22      A.  Yeah, Vallier.

23      Q.  **V-A-L-L-I-E-R is his last name?**

24      A.  Yep.

25      Q.  **Okay.  And who is Mr. Vallier?**

```
 1        A.  He was an adviser that brought clients to -- to
 2   deeproot.
 3        Q.  Was he a broker-dealer?
 4        A.  No, I don't believe so.
 5        Q.  Was he a -- would you characterize him as a
 6   finder?
 7        A.  Yes.
 8        Q.  Okay.  And what did you speak about when you
 9   spoke to Mr. Vallier?
10        A.  He asked if I knew what was going on and what
11   it was about.  And then, as I testified with the SEC, he
12   asked if I knew of any fraud going on and I told him
13   that I didn't.  And then I told him that I was also
14   advised to just tell the truth and talk to the SEC and
15   that was the end of the conversation.
16        Q.  So you told Mr. Vallier that you were not aware
17   of any fraud at deeproot?
18        A.  Correct.
19        Q.  Okay.  There are a number of others mentioned
20   in your testimony.  Are there any other people that you
21   did not mention in your testimony before the SEC that
22   you recall speaking with after receiving a subpoena from
23   the SEC?
24        A.  No.  Greg -- Greg Talbot, another finder, tried
25   to contact me through my -- through Facet maybe early
```

1    action in this case?

2        A.   No.

3        Q.   All right.   Any third parties -- after -- the

4    time period after the filing of the complaint in this

5    case, have you had any contact with -- let me rephrase.

6    After the filing of the complaint in this case, have you

7    discussed the deeproot -- deeproot or your role therein

8    or Mr. Mueller with anybody other than your lawyer?   I

9    don't want to know about conversations with your lawyer.

10               MS. WARDEN:   Objection, compound.

11       A.   Nope, other than my wife.

12       Q.   (BY MR. HULINGS)   All right.   All right.   Let's

13   move on to deeproot.   You started at deeproot I believe

14   it was August of 2016.   Is that right?

15       A.   Correct.

16       Q.   And you had the same set of responsibilities

17   throughout your time at deeproot?

18       A.   My overall job role expanded, I would say, but

19   the -- the job was the same throughout.

20       Q.   Is it fair to say your primary responsibility

21   was to bring in new investments to deeproot?

22               MS. WARDEN:   Objection.

23       A.   Correct.

24       Q.   (BY MR. HULINGS)   And can you describe

25   generally how you made contact with potential investors?

1    of interaction.

2        Q.   (BY MR. HULINGS)   You had multiple

3    interactions with multiple investors and finders during

4    your time at deeproot.   Correct?

5        A.   Correct.

6        Q.   And so that -- those interactions gave you some

7    familiarity with the issues that finders and investors

8    were interested in.   Correct?

9        A.   Correct.

10       Q.   And at various times did you convey those

11   issues to -- let me rephrase.   At various times did you

12   describe what those issue were to Mr. Mueller?

13       A.   Yes.

14       Q.   And did you ask him to change some of the

15   presentations to address some of the issues that came up

16   in your interactions with investors and finders?

17       A.   I don't recall specifically that, but

18   some of -- yeah, some of the changes could have been

19   made because of discussions around that, but I don't

20   remember that direct correlation.

21       Q.   Did you ask him to put more detail about

22   Pinball in the -- in the presentations given to finders?

23       A.   I believe so.

24       Q.   All right.   And did he do that?

25       A.   From what I recall, yes.

1    presentation had -- also had, like, compensation and
2    things like that.
3        Q.  Okay.  And would you ever show or describe the
4    ppms to potential investors during that initial
5    videoconference?
6        A.  We discussed the ppm, yeah.
7        Q.  All right.  Did you ever -- were they visible
8    on a screen like a share screen like we just did in --
9    in this deposition?
10       A.  No.
11       Q.  Would the potential investor have a copy of the
12   ppm before your initial conversation?
13           MS. WARDEN:  Objection, foundation.
14       A.  Sometimes.  I guess it depended if the finder
15   gave them a copy of it beforehand.
16       Q.  (BY MR. HULINGS)  So in your conversations with
17   potential investors, at times you knew from the
18   conversation that they -- the investor had already
19   received a copy of the ppm?
20       A.  Correct.
21       Q.  All right.  Did the investors ask a lot of
22   questions during those -- let me rephrase it.  Did the
23   investors have an opportunity to ask questions during
24   that initial presentation?
25       A.  Yes.

```
 1        Q.  And did you answer those questions to the best
 2   of your ability?
 3        A.  Yes.
 4        Q.  And did you -- I mean, you understood that your
 5   responsibility -- did you understand that you had a
 6   responsibility to convey accurate information to
 7   potential investors?
 8        A.  Yes.
 9        Q.  And that you gained that understanding through
10   your training and experience in the securities industry?
11        A.  Yes.
12        Q.  And did Mr. -- Mr. Mueller also told you that
13   you had to answer all the questions accurately and
14   provide accurate information to investors?
15        A.  Yeah.  I mean, that was kind of a given, yes.
16        Q.  Okay.  So when you're describing the ppms and
17   giving the PowerPoint presentation to potential
18   investors, you understood that you had an obligation to
19   tell the truth?
20        A.  Yes.
21        Q.  And at any point, did you tell an investor --
22   at any point did you give an investor any information
23   that you thought was misleading?
24        A.  No, not at the time.
25        Q.  At any point while you're giving these
```

1  presentations, did you give an investor information that

2  you knew to be false?

3      A.  No.

4      Q.  After that initial videoconference, what was

5  the next step in the process in bringing in a new

6  investor to deeproot?

7      A.  Typically the finder -- if they were

8  interested, the finder would help them fill out the

9  application or give them the application to fill out and

10  then they would send it in to -- to deeproot.

11      Q.  All right.  I'm going to show you what's been

12  previously marked as Exhibit 10.  Okay.  Can you see

13  this document in front of you, Mr. Spradlin?

14      A.  I can.

15      Q.  And what is this document?

16      A.  An application.

17      Q.  Is this one of the applications that deeproot

18  used for a potential investor in the 575 Fund?

19      A.  Correct.

20      Q.  And in this case the investor's name is John

21  Gray.  Do you see that?

22      A.  I do.

23      Q.  All right.  And the handwriting that is

24  included in this agreement, would that be written by the

25  investor?

1  over the material and if any questions came up, we would

2  discuss the questions.

3      Q.  And did you ever discuss with Mr. Mueller why

4  deeproot was investing in deeproot Pinball and deeproot

5  Tech, its other affiliated entities?

6      A.  Yes.

7      Q.  And what was his explanation as to why deeproot

8  was making these investments?

9      A.  To provide for additional income into the fund

10  as you let the life insurance policies mature because

11  they're not providing any income until they mature.  So

12  there were other investments needed to basically build a

13  stronger foundation for the -- for the fund.

14      Q.  So you don't know when a life insurance policy

15  is going to mature.  Correct?

16      A.  Correct.

17      Q.  And so a life insurance policy matures when

18  somebody dies, and you don't know when someone is going

19  to die.  Correct?

20      A.  Correct.

21      Q.  And until the life insurance policy matures,

22  there are expenses.  Correct?

23      A.  Correct.

24      Q.  Paying life insurance premiums being one of

25  them.  Correct?

```
 1        A.   Uh-huh.   Yes.
 2        Q.   And part of the purpose of -- and you
 3   understood that part of the purpose of investing in
 4   deeproot Tech, deeproot Pinball and these other entities
 5   was to generate liquidity for the fund so that it can
 6   pay expenses until the life insurance policies matured.
 7   Correct?
 8             MS. WARDEN:   Objection, vague as to
 9   generate liquidity and purpose.
10        Q.   (BY MR. HULINGS)   You can answer the question.
11   I'll clarify it later.
12        A.   Yeah.   Yeah.   So, yes, it's my understanding
13   that the purpose of those investments were to provide
14   additional benefits and liquidity into the fund.
15        Q.   And when you use the phrase "liquidity," what
16   do you mean?
17        A.   Cash flow.
18        Q.   Money?
19        A.   Income.   Money.
20        Q.   All right.
21        A.   Yes.
22        Q.   And you mentioned earlier that deeproot
23   Pinball -- that you knew that deep -- that deeproot was
24   investing money in its pinball business.   Correct?
25        A.   Correct.
```

```
 1        Q.   And there were a number of employees that
 2   deeproot paid to develop the pinball games?
 3        A.   Yes.
 4        Q.   So that included development of software.
 5   Correct?
 6        A.   I'd assume it, yes.  I believe so.
 7        Q.   So was -- deeproot was employing engineers at
 8   one point.  Correct?
 9        A.   Yes.
10        Q.   Was it also, through deeproot Studios,
11   employing artists?
12        A.   Yes.
13        Q.   And that was to provide art and other effects
14   for the pinball games among other purposes?
15        A.   Correct.
16        Q.   So deeproot Pinball was an ongoing -- deeproot
17   Pinball was a real business.  Correct?
18             MS. WARDEN:  Objection, vague.
19        A.   Correct.
20        Q.   (BY MR. HULINGS)  Did Robert -- did -- you
21   spoke with Robert Mueller at length about the pinball
22   business.  Correct?
23        A.   Many times I spoke with him about the pinball
24   business, yes.
25        Q.   And did he give you the impression that he
```

1  believed the deeproot Pinball business would eventually

2  yield income to deeproot?

3      A.  Yes, he did.

4      Q.  He thought the business was going to work.

5  Correct?

6      A.  Correct.

7      Q.  And did you share that belief at one point?

8      A.  At one point, yes.

9      Q.  And is it fair to say that it took longer to

10  develop the pinball machines than deeproot anticipated?

11     A.  Yes.

12     Q.  There were engineering problems at various

13  points?

14     A.  There were -- I don't know the ins and outs of

15  the business, but there were delays in the development.

16     Q.  Okay.  All right.  Let's move on.  Let's go to

17  page 9.  You see this?  Page 9?

18     A.  I'm seeing the initial one you showed me, the

19  very front cover.

20     Q.  All right.  So this is --

21     A.  There --

22     Q.  All right.  This -- this slide, page 10,

23  describes the 575 Fund.  Correct?

24     A.  Correct.

25     Q.  And this is the -- the 575 that we previously

```
 1        A.  Yes.
 2        Q.  And so did you convey to investors that it was
 3   required that they read the ppm before making an
 4   investment?
 5        A.  Yeah, we always recommended them reading it.
 6        Q.  Okay.  More than recommended.  It was required
 7   before they invested.  Correct?
 8        A.  I mean, it states required there, yes.  I can't
 9   say if they read it or not, but we always suggested and
10   recommended they -- they -- they read it.
11        Q.  And the application that we saw earlier
12   required that they indicate that they read -- the
13   application you saw earlier in this deposition required
14   that an investor indicate that they had read and
15   understood the ppm.  Correct?
16        A.  Correct.
17        Q.  All right.  Let's -- I'm going to do what's --
18   show you what's been previously marked as Exhibit 5.  Do
19   you see that?
20        A.  Yes.
21        Q.  Do you recognize this document?
22        A.  Yes.
23        Q.  What is this document?
24        A.  It looks like the first page in the 575 ppm.
25        Q.  All right.  And it says -- there's a date at
```

1    the bottom.  Do you see that?

2        A.  Yes.

3        Q.  Does it appear to be a document that was used

4    starting in September 16, 2019?

5        A.  Yes.

6        Q.  This would be one of the ppms that were

7    provided to investors prior to them -- prior to deeproot

8    accepting their investment?

9        A.  Correct.

10       Q.  All right.  And you would occasion -- on

11   occasion walk through this ppm with a potential

12   investor?

13       A.  If they had questions, I would typically point

14   them to, like, the -- like, the risk section or -- or --

15   or what we invest in within the ppm.

16       Q.  And you read this ppm thoroughly before

17   describing to an investor.  Correct?

18       A.  Yes.

19       Q.  And at the time you were at deeproot, did you

20   think that there was anything in this ppm that was

21   false?

22       A.  No.

23       Q.  Did you think that there was anything in this

24   ppm that was misleading?

25       A.  At the time, no.

```
1    Liquidity."  Do you see that?

2         A.  I do.

3         Q.  And did you ever describe -- did you ever tell

4    investors that there was -- one of the risk factors for

5    investing in the 575 Fund was a lack of liquidity?

6         A.  I don't recall specifically speaking to this

7    point.

8         Q.  Do you have an understanding of what the phrase

9    "liquidity" meant in the context of these risks?

10        A.  Yes.

11        Q.  And in this context it meant that they wouldn't

12   be able to sell their shares after they invested.

13   Correct?

14              MS. WARDEN:  Objection.

15        A.  Give me -- I -- let me read it real quick.

16   Yes.  Correct.

17        Q.  (BY MR. HULINGS)  Okay.  Let's go to page 8 of

18   the pdf, Section L.  It says, "No Guarantee of Fixed

19   Returns" -- "Fixed Returns."  Do you see that?

20        A.  Yes.

21        Q.  So you explained to investors that their

22   investment was not guaranteed.  Correct?

23        A.  I -- yes, I do recall that.

24        Q.  That there is a -- a possibility that their

25   investment might not result in a return that deeproot
```

 1   expected at the time of the investment.  Correct?

 2       A.  Yeah, but we were -- I was very specific and

 3   clear that there were no guarantees.

 4       Q.  All right.  It actually says at the end of the

 5   paragraph, "We may not be able to pay a periodic

 6   Priority Return or Liquidation Amount when due."  Do you

 7   see that?

 8       A.  I do.

 9       Q.  So the 575 Fund required that deeproot make

10   certain payments to investors.  Correct?

11       A.  Correct.

12       Q.  And those included monthly payments to -- to

13   investors depending on their election.  Correct?

14       A.  Yes.

15       Q.  And so you warned investors that there was a

16   possibility that deeproot might not be able to make

17   those periodic payments.  Correct?

18                MS. WARDEN:  Objection, vague.

19       A.  I don't recall having that specific

20   conversation with investors.

21       Q.  (BY MR. HULINGS)  You certainly didn't tell an

22   investor that their monthly payments were guaranteed.

23   Correct?

24       A.  Correct.

25       Q.  Okay.  All right.  Let's go to page 6.  It's

1        A.  Correct.

2        Q.  So in this case you've got expenses to

3    deeproot -- let me rephrase.  The -- a contract signed

4    by deeproot that requires it to make payments results in

5    an expense to deeproot.  Correct?

6                MS. WARDEN:  Objection, compound.

7        A.  Correct.

8        Q.  (BY MR. HULINGS)  So you would categorize as

9    expenses the payments that deeproot was required to make

10   based on its contracts.  Correct?

11               MS. WARDEN:  Objection, asked and answered.

12       A.  Correct.

13       Q.  (BY MR. HULINGS)  And so the 575 -- the

14   investments into the 575 Fund were made pursuant to a

15   contract.  Correct?

16               MS. WARDEN:  Objection, foundation.

17       A.  Correct.

18       Q.  (BY MR. HULINGS)  All right.  That's that

19   agreement that we saw earlier.  Correct?

20       A.  Yes.

21       Q.  And so that agreement with investors in some

22   cases required payments from deeproot to the investor.

23   Correct?

24       A.  Yes.

25       Q.  And so those payments that were required --

 1   that deeproot was required to make pursuant to its

 2   contract with investors were expenses for deeproot.

 3   Correct?

 4        A.   Correct.

 5        Q.   Okay.  All right.  Let's move on.  The Company

 6   Advance also mentions fund adviser fees.  Do you see

 7   that?

 8        A.   Fund -- yes.  Yes.

 9        Q.   Okay.  Who is the fund adviser for the 575

10   Fund?

11        A.   I would assume Robert.

12        Q.   So this is indicating to investors that Robert

13   Mueller was receiving some kind of a -- a payment for

14   services provided in the 575 Fund?

15             MS. WARDEN:   Objection, vague.

16        A.   Yes, I would assume so.

17        Q.   (BY MR. HULINGS)  All right.  Let's go a little

18   further down to -- all right.  So it -- on page 15 of

19   the pdf from the bottom is a paragraph that begins with

20   "Robert J. Mueller is the only executive of the

21   Company."  Do you see that?

22        A.   Yes.

23        Q.   The second sentence -- the third sentence says,

24   "Robert is paid a salary from the Ultimate Parent for

25   all services provided across all the entities."  Do you

```
1        Q.  Every day or almost every day.  Correct?
2        A.  For a time, yes, every day or frequently, every
3    so -- every few days or whatnot.
4        Q.  Okay.  All right.  Are you familiar with an
5    entity called FactRight?
6        A.  Yes.
7        Q.  What is FactRight?
8        A.  They're a due diligence company.
9        Q.  All right.  So what does FactRight do?
10       A.  They provide a -- from what I remember --
11   basically a due diligence report for other companies,
12   broker-dealers, to use so that they don't have to go
13   through that process of due diligence.  They're
14   basically relying on FactRight to go through that due
15   diligence for them.
16       Q.  All right.  And --
17       A.  In some way, shape or form.
18       Q.  And so was -- is there a report that FactRight
19   provided to its clients?
20       A.  Yeah, we had the report.  I can't remember if
21   they were provided it or not, but, yes.
22       Q.  I'm -- I'm going to -- I'm going to show to you
23   in a second.  But your memory was -- is that -- is it
24   your memory that FactRight as part of its business would
25   provide a report to its clients?
```

```
 1        A.  Yes, I believe so.
 2        Q.  And the report was a due diligence report on,
 3   in this case, deeproot.  Correct?
 4        A.  Correct.
 5        Q.  All right.  And was there a -- was there a time
 6   where deeproot worked with FactRight?
 7        A.  What do you mean by worked with?
 8        Q.  Yeah, that's fair.
 9        A.  Like, did we use them to get the report?
10        Q.  That -- that's fair.  So did you undergo the
11   due diligence that -- did you undergo due diligence
12   conducted by FactRight?  "You" meaning deeproot.
13        A.  Deeproot did, yes.  Yes.
14        Q.  And were you involved in -- were you -- did you
15   engage in any communications directly with FactRight
16   regarding the due diligence?
17        A.  I believe I was part of some of the
18   conversations.  I don't recall how involved I was at
19   that time.
20        Q.  Who else would have been involved?
21        A.  Primarily Robert and whoever else was there at
22   the time, either Cary or Scott.
23        Q.  And why did deeproot undergo the diligence
24   process conducted by FactRight?
25        A.  I believe it was -- I think we were trying to
```

1  get on with a couple broker-dealers and so I -- I
2  believe it was recommended for us to go through that
3  process.
4       Q.  **All right.**
5       A.  For deeproot to go through that process.
6       Q.  **What's a broker-dealer?**
7       A.  Broker-dealer?
8       Q.  **Yes.**
9       A.  A company that can -- that has basically
10 advisers underneath it, basically a bigger platform to
11 bring in more clients for deeproot.
12      Q.  **So it's fair to say that a broker-dealer would**
13 **be able to present deeproot's -- is it fair to say that**
14 **a broker-dealer would be able to introduce deeproot to**
15 **potential investors?**
16      A.  Yes.
17      Q.  **And so part of the reason why deeproot went**
18 **through the diligence process with FactRight was to be**
19 **able to meet new broker-dealers through FactRight.**
20 **Correct?**
21      A.  Yes.
22      Q.  **And the -- hopefully, the end result of that**
23 **was additional investors for the deeproot funds.**
24 **Correct?**
25      A.  Correct.

1    Q.   Okay.  Do you recall the information that was

2    requested by FactRight when they did their diligence?

3    A.   I'm sure the ppms.  I -- I don't recall a whole

4    lot of information.  I think we did some kind of audit

5    or something of that sort.

6    Q.   What -- what do you recall as the -- the nature

7    of the audit?  What do you mean by audit?

8    A.   I believe it was a -- yeah.  I -- I -- I

9    don't -- I -- I was -- I wasn't involved heavily and I

10   don't know if it was a financial audit or audit of how

11   the funds worked, but some -- I think some third party

12   came in and did an audit.

13   Q.   All right.  So you -- you used the phrase

14   "audit."  So what -- what makes you think that this was

15   an audit, just from your memory?  What do you recall

16   about the interactions with FactRight to make you think

17   that there was an audit conducted?

18   A.   From what I recall, there was a separate --

19   there was a separate company that came in to review --

20   and this could not be associated with FactRight.  I

21   could be remembering not correctly here.  But there --

22   at some point there was a -- a company that came in and

23   reviewed at a deeper level either the functioning of the

24   funds or the financials or something of that sort.

25   Q.   All right.  Did -- did FactRight have a -- are

```
 1    you aware of FactRight's reputation within the financial
 2    services industry?
 3         A.  Yes.
 4         Q.  And could you describe that reputation for us?
 5         A.  From what I know, they -- they -- they were
 6    always at conferences that we would go to.  And I think
 7    there was FactRight and another firm that did the due
 8    diligence reports and many others had used or relied on
 9    the FactRight report.
10         Q.  So obtaining FactRight's -- obtaining a --
11    obtaining a positive report -- well, let me put it this
12    way.  So it was in deeproot's interest -- well, let me
13    rephrase.  Having a diligence report conducted by
14    FactRight would help potential investors gain confidence
15    that deeproot was a worthy investment.  Is that fair --
16              MS. WARDEN:  Object --
17         Q.  (BY MR. HULINGS) -- to say?
18              MS. WARDEN:  Objection, vague as to help
19    and worthy investment.
20         A.  That's correct.
21         Q.  (BY MR. HULINGS)  Okay.  And that's why
22    deeproot went through the diligence process.  Correct?
23              MS. WARDEN:  Objection, foundation.
24         A.  Correct.
25         Q.  (BY MR. HULINGS)  Okay.  You -- you were
```

1    working at deeproot at the time.  Correct?

2        A.  Yes.

3        Q.  And you spoke with Robert Mueller about the

4    FactRight diligence process?

5        A.  Yes.

6        Q.  And you gained an understanding as to why

7    deeproot was undergoing the process.  Correct?

8        A.  Yes.

9        Q.  Okay.  Let's look at an e-mail.  I'm going to

10   share my screen.  All right.  You see the e-mail in

11   front of you?

12       A.  Yes.

13       Q.  And for the record, the Bates number here is

14   EPROD-SEC-DEF00160142.  Okay.  You see the CC?  It's

15   your e-mail address.  Correct?

16       A.  Yes.

17            MR. HULINGS:  And -- just a moment.  Well,

18   you know, we've been going about an hour again.  This is

19   going to take a little while.  So my goal was to take a

20   break about every hour.  So if it's all right with

21   everybody, this is probably a good time to -- to pause.

22            MR. SHEDLOCK:  Sure.

23            MR. HULINGS:  Ten minutes.

24            MR. SHEDLOCK:  Okay.

25            MS. WARDEN:  All right.

```
 1                    THE VIDEOGRAPHER:  Off the record, 11:21.
 2               (Recess 11:21 a.m. to 11:33 a.m.)
 3                    THE VIDEOGRAPHER:  Our time is 11:33.
 4      We're on the record.
 5                    MR. HULINGS:  Okay.  So for the record, I
 6      showed an e-mail previously that had the -- that I sort
 7      of mislabeled as Exhibit 47.  I'm now showing -- I'm
 8      sorry -- I mislabeled as Exhibit 46.  I'm now showing an
 9      e-mail -- or going to be showing an e-mail that we're
10      designating as Exhibit 46.  And let me clean this up.
11           Q.  (BY MR. HULINGS)  All right.  So okay,
12      Mr. Spradlin, I'm showing you what is going to be marked
13      as Exhibit 46.  The Bates number for that is
14      EPROD-SEC-DEF00160142.  All right.  Do you see this
15      e-mail in front of you?
16           A.  I do.
17           Q.  All right.  It's from someone named Russell
18      Putnam.  Do you see that?
19           A.  Yeah.
20           Q.  And -- and who is Russell Putnam?
21           A.  I believe somebody that worked at FactRight.
22           Q.  And actually on the same page the signature is
23      down below and says, "Due Diligence Analyst."  Do you
24      see that?
25           A.  Yes.
```

1      Q.  In fact, he's up -- up near where your attorney

2  is in Eden Prairie, Minnesota.  Do you see that?

3      A.  Yes.

4      Q.  All right.  And this e-mail is to

5  scott@deerootadvisors.com.  Do you see that?

6      A.  I do.

7      Q.  Is that Scott Allen's e-mail address?

8      A.  Yes.

9      Q.  And you are CC'd.  Correct?

10     A.  Yes.

11     Q.  Okay.  Who is Ashley Hunecke, Hunecke?

12     A.  I do not recall who that is.  Possibly somebody

13  at FactRight.

14     Q.  All right.  So -- okay.  So Robert Mueller

15  isn't on this e-mail at all.  Correct?

16     A.  No.

17     Q.  And do you recall this -- this e-mail?

18     A.  Not specifically, no.

19     Q.  Let's go down to page 7, which is the first

20  e-mail in the chain.  Page 8.  Do you see there's an

21  e-mail at the bottom of page 8 that is from Russell

22  Putnam to you and to Scott Allen.  Do you see that?

23     A.  Yes.

24     Q.  It actually indicates a CC to Ashley Hunecke

25  who is at FactRight.  Do you see that?

1    ETA at this point when everything will completed."  Do

2    you see that?

3         A.  I do.

4         Q.  Do you have an understanding what "everything"

5    that is used in this e-mail refers to?

6         A.  I do not.  I see in the subject line it says,

7    "deeproot Review," which I think you -- I think the

8    report was good for a year or two and then you had to

9    renew it.  So I think this was due to a renewal.

10        Q.  So prior to these e-mails, deeproot had already

11   gone through the FactRight diligence process once.

12   Correct?

13        A.  Correct.

14        Q.  And this was part of the renewal process.

15   Correct?

16        A.  I believe so.

17        Q.  And that renewal would gain access to

18   FactRight's clients, including broker-dealers, for

19   another period of time, however long the renewal lasted.

20   Correct?

21        A.  Can you repeat that one?

22        Q.  Yeah.  That was a terrible question.  I'm

23   sorry.  So after -- we talked about this a little bit

24   before, but when FactRight finishes a report, it makes

25   that report available to its clients.  Correct?

```
 1    be made at the sole discretion of FactRight.  Do you see
 2    that?
 3         A.  Yes.
 4         Q.  And do you recall any communications with
 5    Mr. Mueller about changes that needed to be made to
 6    FactRight reports?
 7         A.  Changes that needed to be -- I don't recall.  I
 8    vaguely feel like there were -- I mean, there were
 9    changes as we went back and forth -- as deeproot went
10    back and forth with the initial due diligence -- due
11    diligence report, but I don't recall any specific
12    changes or changes related to this review.
13         Q.  What -- what do you recall about the
14    discussions with Mr. Mueller regarding the initial
15    FactRight report?
16         A.  I -- I don't remember specifics.  I just
17    remember -- I think there was a conversation where -- I
18    mean, they were -- they sent the draft back and then I
19    think Robert -- I -- I don't -- I don't have a whole lot
20    of information.  It's a vague memory.
21         Q.  All right.  Are you aware of -- did -- did
22    Mr. Mueller indicate to you during the diligence process
23    with FactRight that he intended to give FactRight all of
24    the information it requested?
25         A.  Yeah.
```

1    Q.  So Mr. Mueller said he intended to give
2    FactRight all the information it requested?
3    A.  I -- I don't remember those exact words, but
4    they needed specific information to be able to do their
5    report, and I believe he provided all that.
6    Q.  All right.  And then there's -- the next e-mail
7    up is an e-mail from you to -- to Mr. Mueller.  Correct?
8    A.  Yes.
9    Q.  It says, "See attached for FactRight drafts.
10   See below e-mail.  Need to review in the next five
11   days."  Correct?
12   A.  Yes.
13   Q.  All right.  This is October 15th, 2019?
14   A.  Yes.
15   Q.  And do you recall any communications with
16   Mr. Mueller subsequent to that e-mail?
17   A.  No --
18   Q.  All right.
19   A.  -- not specifically.
20   Q.  Okay.  So Mr. Mueller responds to you and to
21   Scott Allen but not to Mr. Putnam.  Correct?  The
22   following the e-mail?
23   A.  Yeah.  Yeah.
24   Q.  And he identifies in this e-mail some changes
25   that he thinks should be made to the two reports.

1   October 15th."  Do you see that?

2       A.  Yes.

3       Q.  All right.  And then it says that "The reports

4   will only be available to broker-dealers and registered

5   investment advisers through the FactRight report center

6   website."  Do you see that?

7       A.  Yes.

8       Q.  Did you ever access this website?

9       A.  The FactRight report center website.  I'm --

10  I'm not sure.

11      Q.  Okay.  It also says that you agree not to

12  distribute the report directly and will request

13  interested parties to register for access at the

14  website.  Correct?

15      A.  Yes.

16      Q.  All right.  Let's look at some of these

17  reports.  Let me go down to page 9.  All right.  This

18  doc -- page 9 says the FactRight Due Diligence Report

19  for deeproot.  Offering:  Deeproot 575 Fund, LLC.  Do

20  you see that?

21      A.  Yes.

22      Q.  Do you recall reviewing this document?

23      A.  I don't recall reviewing it, but I probably

24  did.

25      Q.  Does it look -- does this look familiar to you?

1        A.  Yes.  Yes.

2        Q.  So whether or not you reviewed this particular

3   document, at some point you reviewed due diligence

4   reports by FactRight that looked like this?

5        A.  Yes.

6        Q.  All right.  Okay.  Let's go page 12.  You see

7   this, it says, "Executive Summary"?

8        A.  Yes.

9        Q.  All right.  At the bottom there's a section

10  that says, "Use of funds."  See that?

11       A.  Yes.

12       Q.  And there's a line that says, "Upright

13  Expense" -- "Upfront Expense Maximum."  Do you see that?

14       A.  Yes.

15       Q.  And it has percentage of equity at 20 percent.

16  Correct?

17       A.  Yes.

18       Q.  So is this the -- did you understand this

19  upfront expense maximum to be the -- the company advance

20  identified in the ppms?

21       A.  I would assume so.

22       Q.  I mean, you're -- we reviewed the ppms a

23  little -- earlier in the deposition.  Correct?

24       A.  Yes.

25       Q.  And the ppms, at least at one time, had a

```
 1    20 percent company advance --

 2         A.  Correct.

 3         Q.  -- identifying that the company could take a 20

 4    percent advance from any funds invested in the -- in

 5    this case, the 575 Fund.  Correct?

 6         A.  Correct.

 7         Q.  All right.  So that -- that is consistent with

 8    the representations that you were making to investors

 9    about the company advance.  Correct?

10              MS. WARDEN:  Objection --

11         A.  Correct.

12              MS. WARDEN:  -- form.

13         A.  Correct.

14         Q.  (BY MR. HULINGS)  And, in fact, on the next

15    page, on page 13, it says, "Total Up Front Advance."  Do

16    you see that?

17         A.  Yes.

18         Q.  And it says two percent minimum capped at 20

19    percent.  Correct?

20         A.  Yes.

21         Q.  And that is also consistent with the company

22    advance section of the ppms.  Correct?

23         A.  Correct.

24         Q.  All right.  Under Operating Fees, the next

25    section down, it says, "Asset Management Fee."  Do you
```

```
 1    see that?
 2        A.  Yes.
 3        Q.  It says, "The fund will pay an asset management
 4    fee indirectly."  Do you see that?
 5        A.  I do.
 6        Q.  And did you understand what the term
 7    "indirectly" meant in this?
 8        A.  Not that I recall.
 9        Q.  So are you familiar with -- you're aware that
10    the deeproot 575 Fund paid a management fee to Policy
11    Services.  Correct?
12        A.  That was outlined in the ppm, yes.
13        Q.  Yes.  And Policy Services paid your salary and
14    Robert Mueller's.  Correct?
15        A.  Correct.  I'm -- yes.
16        Q.  All right.  So this report indicates that the
17    asset management fee would be paid to -- under the last
18    column -- to manager.  Correct?
19        A.  Yes.
20        Q.  So, in other words, this report is telling
21    potential investors or potential broker-dealers that
22    Robert Mueller will be paid through the asset management
23    fee.  Correct?
24             MS. WARDEN:  Objection, misstates
25    testimony.
```

```
 1        A.   It's stating that it will pay a asset
 2   management fee or campaign asset manager fee to the
 3   manager.
 4        Q.   (BY MR. HULINGS)  All right.  Okay.  And who is
 5   the manager of the 575?
 6        A.   Robert.
 7        Q.   All right.  Let's go down to page 14 toward the
 8   bottom.  Do you see under the -- the bullet that starts
 9   with "The Fund will then pay the Advance to the
10   Manager"?  Do you see that?
11        A.   Yes.
12        Q.   And then it identifies -- the second bullet
13   identifies reimbursement of organizational and
14   offering -- sorry -- reimbursement of organizational and
15   offering expenses.  Do you see that?
16        A.   Yes.
17        Q.   Are you aware -- did you have any discussions
18   with Robert about what the organizational and offering
19   expenses would be?
20        A.   Not that I recall.
21        Q.   All right.  Then there's another bullet that
22   says, the organizing -- operating and dis- -- the
23   organizational and offering -- the O&O expenses include
24   administration expenses.  Do you see that?
25        A.   Yes.
```

```
1        Q.  Also states that the O&O expenses would include
2   other compensations expenses.  Correct?
3        A.  Yes.
4        Q.  So this bullet in the FactRight report is
5   consistent with deeproot's representations in its ppms
6   about how the advance would be used.  Correct?
7                MS. WARDEN:  Objection, calls for a legal
8   conclusion.
9        A.  I understand them to be similar, yes.
10       Q.  (BY MR. HULINGS)  This paragraph in the
11  FactRight report is consistent with your representation
12  to investors as to how the company advance would be
13  spent.  Correct?
14               MS. WARDEN:  Vague as -- objection, vague
15  as to spent.
16       A.  Yes.  I -- I don't recall referencing this in
17  the FactRight report.  I recall referencing the ppm.  It
18  seems consistent in how the language is written.
19       Q.  (BY MR. HULINGS)  Are you aware that -- of
20  FactRight expressing any concerns about how the
21  administrative expenses were disclosed in the ppms?
22               MS. WARDEN:  Objection, vague as to
23  concerns.
24       A.  I don't recall any conversations around
25  concerns of FactRight.
```

```
 1        Q.   (BY MR. HULINGS)   Are you aware whether
 2   FactRight indicated to deeproot that there was something
 3   wrong or misleading or false -- let me rephrase.  Did --
 4   are you aware whether FactRight indicated to deeproot
 5   that its company advance section in the ppms was false
 6   or misleading in any way?
 7                MS. WARDEN:   Objection, calls for a legal
 8   conclusion.
 9        A.   I'm not aware of that.
10        Q.   (BY MR. HULINGS)   And you -- do you recall
11   FactRight recommending any changes to the ppms regarding
12   the company advance section?
13        A.   No, do not recall any conversation on that.
14        Q.   Let's go to the next page.  It says,
15   "Management represented that the remaining 11 percent of
16   offering proceeds covers agent compensation, if any,
17   nominal administration expenses, IR" -- RA -- "IRA fees,
18   other compensation, marketing costs, and Fund adviser
19   fees." Do you see that?
20        A.   Yes.
21        Q.   Is this paragraph also consistent with the
22   representations that you made in the ppms and other
23   investor materials?
24        A.   Yes.
25        Q.   All right.  So, again, deeproot isn't hiding
```

```
 1    the fact that Robert Mueller is going to be paid for his
 2    services.  Correct?
 3                    MS. WARDEN:  Objection, form.
 4         A.  Correct.
 5         Q.  (BY MR. HULINGS)  And FactRight -- you
 6    mentioned that FactRight is a company that provides due
 7    diligence on funds like the deeproot funds.  Correct?
 8         A.  Correct.
 9         Q.  And it's describing the way Robert Mueller
10    would be paid in its report provided to broker-dealers
11    and others.  Correct?
12                    MS. WARDEN:  Objection, misstates
13    testimony.
14         A.  Yes.  Correct.
15         Q.  (BY MR. HULINGS)  And they are describing that
16    method of payment in a way that does not indicate that
17    there's anything wrong with that method of payment.
18    Correct?
19                    MS. WARDEN:  Objection, misstates
20    testimony.
21         A.  Yeah.  Can you rephrase this question?  Sorry.
22         Q.  (BY MR. HULINGS)  Sure.  Are you aware whether
23    in this paragraph or anywhere else in the report
24    FactRight is telling broker-dealers or others of its
25    clients that there was something improper --
```

```
 1          A.  No.
 2          Q.  -- in the way --
 3                  MS. WARDEN:  Object --
 4                  MR. HULINGS:  Wait.  Let me finish the
 5     question and -- let me finish the question before
 6     there's an objection.  So let me just stop for a second.
 7          Q.  (BY MR. SPRADLIN)  So, Mr. Spradlin, sometimes
 8     we have to give -- you have to give me a chance to ask
 9     the question.  You have to give Ms. Warden to -- a
10     chance to put her objection on the record.  We can't
11     talk over each other because the court reporter needs to
12     be able to get us all down.  So let me start that again.
13                  Are you aware of any -- in this paragraph
14     or anything else in this report in which FactRight
15     expressed to broker-dealers or other of its customers
16     that there was anything improper with the way deeproot
17     was compensating Mr. Mueller?
18                  MS. WARDEN:  Objection, vague.  Compound.
19     Calls for speculation.
20          Q.  (BY MR. HULINGS)  You can ignore those --
21          A.  No.
22          Q.  -- objections and answer.
23          A.  No.
24          Q.  Okay.  All right.  Let's go to page 16.  And --
25     all right.  It says, "Targeted" -- under "Investment
```

 1    Overview."  Do you see that?

 2         A.  Yes.

 3         Q.  And the first sentence under Targeted

 4    Investment says, "FactRight reviewed offering

 5    documentation to identify whether the Fund's investment

 6    strategy is reasonable and clearly articulated and to

 7    determine whether the Manager has the discretion to

 8    diverge from the articulated strategy."  Do you see

 9    that?

10         A.  Yes.

11         Q.  Is this paragraph consistent with what you

12    understood FactRight to be doing during this due

13    diligence review?

14         A.  Yes.

15         Q.  Part of what FactRight was doing was trying to

16    determine whether or not deeproot's investment strategy

17    was reasonable.  Correct?

18                   MS. WARDEN:  Objection, misstates

19    testimony.

20         A.  Correct.

21         Q.  (BY MR. HULINGS)  And then the report proceeds

22    to describe the investment strategy of the 575 Fund.

23    Correct?

24         A.  Yes.

25         Q.  Including that 50 percent or more of the assets

 1    of the 575 Fund would be in the dGRD fund.  Correct?

 2        A.  Yes.

 3        Q.  And then it subsequently describes the

 4    structure of the dGRD fund and the business plan of the

 5    dGRD fund.  Correct?

 6        A.  Yes.

 7        Q.  And deeproot had the opportunity to -- to make

 8    any changes to this section during the review process.

 9    Correct?

10        A.  Yes.

11        Q.  All right.  Let's scroll down to page 18.  It

12    says, "Other Underlying Funds."  Do you see that?

13        A.  Yes.

14        Q.  And this part of the report describes the 49

15    percent of the portfolio of the 575 Fund that may be

16    invested in the deeproot affiliated entities like

17    deeproot Pinball.  Correct?

18        A.  Yes.

19        Q.  And is this description -- and if you need to

20    take a second, that's fine -- consistent with your

21    understanding of deeproot's investments in deeproot

22    Sports and Entertainment, deeproot Pinball and -- and

23    other deeproot investments?

24        A.  Yes.

25        Q.  And this summary is consistent with the

1    representations you were making to other investors about

2    how deeproot -- deeproot's 575 Fund portfolio was

3    structured.  Correct?

4              MS. WARDEN:  Objection, vague.

5        A.  Correct.

6        Q.  (BY MR. HULINGS)  All right.  Let's go to page

7    19, the paragraph -- the first full paragraph.  And it

8    says, "The Manager may cause the Fund to transact in

9    affiliated acquisitions and sales without further

10   restriction."  Do you see that?

11       A.  Yes.

12       Q.  The next sentence says, "These transactions

13   will not be negotiated on a third-party, arm's length

14   basis."  Do you see that?

15       A.  I do.

16       Q.  Is that sentence -- do you believe that

17   sentences to be accurate?

18       A.  I'm not sure -- really sure what he meant by

19   that.

20       Q.  Okay.  Do you understand what it means to

21   negotiate an agreement at third-party, arm's length

22   basis?

23              MS. WARDEN:  Objection, calls for a legal

24   conclusion.

25       A.  No.

1      Q.  Okay.  You testified previously that you don't

2   remember telling any -- an investor that deeproot was

3   not permitted to take out loans.  Correct?

4      A.  Correct.

5      Q.  And this sentence is consistent with your

6   representations to investors.  Correct?

7              MS. WARDEN:  Objection, misstates

8   testimony.

9      A.  It is consistent with my understanding of our

10   ability to use leverage, but leveraging debt didn't

11   really come up a lot.

12      Q.  (BY MR. HULINGS)  So the paragraph of that

13   section says, "The Manager represented to FactRight that

14   it does not intend to leverage the Fund."  Do you see

15   that?

16      A.  Yes.

17      Q.  And it says, "FactRight believes that the

18   Fund's intended leverage strategy is reasonable, but the

19   Manager in the Underlying Funds may utilize leverage at

20   any time."  Do you see that?

21      A.  Yes.

22      Q.  So FactRight, an independent due diligence

23   company, has reviewed deeproot's materials and

24   determined that deeproot reserved the right to borrow

25   money if it decided.

1              **MS. WARDEN:**  Objection --

2         **Q.   (BY MR. HULINGS)   Is that fair?**

3              **MS. WARDEN:**  -- calls for a legal

4    conclusion.  Misstates testimony.  Compound.

5              **MR. HULINGS:**  Ms. Warden, you've got to let

6    me finish the sentence before --

7              **MS. WARDEN:**  I thought you were done.

8              **MR. HULINGS:**  -- before you object.

9              **THE REPORTER:**  One at a time, please.

10              **MR. HULINGS:**  Thank you.

11              **THE REPORTER:**  Thank you.

12         **Q.   (BY MR. HULINGS)   So this report is telling**

13    **broker-dealers that deeproot may borrow money in the**

14    **future.  Correct?**

15              **MS. WARDEN:**  Objection, form.

16         A.  Yes.  It is saying that it has the ability to

17    use leverage.

18         **Q.   (BY MR. HULINGS)   All right.  Okay.  Let's stay**

19    **on page 21 and go to the bottom.  This -- this section**

20    **says, "Distributions."  Do you see that?**

21         A.  Yes.

22         **Q.   Take a second to read the -- the Distributions**

23    **paragraph and the -- the rest of the page here.  Just**

24    **take a second to read that, if you don't mind.  Let me**

25    **know when you're done.**

1        A.   Okay.

2        Q.   All right.  Do these bullets under -- in the

3   Distribution section describe the various forms of

4   payments that could be made to investors in the 575

5   Fund?

6                MS. WARDEN:   Objection, vague.

7        A.   Yeah.

8        Q.   (BY MR. HULINGS)  And do those descriptions in

9   this section accurately describe the payments that could

10   be made to the 575 Fund at this time?

11        A.   I believe so.

12        Q.   All right.  Call your attention to the bullet

13   that says, "The Fund may make distributions from any

14   source."  Do you see that?

15        A.   Yes.

16        Q.   The sub bullet says, "As a result, the Fund may

17   be able to provide the preferred return with funds not

18   earned through its operations."  Do you see that?

19        A.   Yes.

20        Q.   You're aware of the sources of funds to the 575

21   Fund.  Correct?

22        A.   Yes.

23        Q.   And based on your understanding of those

24   sources of funds, what funds -- let me just -- let me

25   rephrase with out using funds so many times.  You are

```
 1    familiar with the moneys that were raised by the 575
 2    Fund.  Correct?
 3         A.  Correct.
 4         Q.  You're also familiar with the moneys that would
 5    be earned by the 575 funds through its operations.
 6    Correct?
 7                   MS. WARDEN:  Objection, vague.
 8         A.  Correct.  Through the life policies and other
 9    entities that could come from that.
10         Q.  (BY MR. HULINGS)  So it's a life --
11                   THE REPORTER:  Can you repeat that answer?
12    I didn't understand it.
13         A.  I was just saying, yes, from the potential life
14    policies and the other operations that could come in the
15    future.
16         Q.  (BY MR. HULINGS)  So -- so if a life policy
17    matures, the payment from the life insurance policy
18    would be funds earned through the operations of the 575
19    Fund.  Correct?
20                   MS. WARDEN:  Objection, calls for
21    speculation.
22                   MR. SHEDLOCK:  You can answer.
23         A.  Correct.
24         Q.  (BY MR. HULINGS)  So funds going into the 575
25    funds that were not earned through operations, would
```

```
 1    that include investments by investors?

 2        A.   That's how I -- that's how I understand it,

 3    yes.

 4        Q.   So is this paragraph indicating to

 5    broker-dealers that there's anything improper about the

 6    fund providing preferred returns with funds not earned

 7    through its operations?

 8              MS. WARDEN:   Objection, vague.   Compound.

 9    Calls for a legal conclusion.

10        A.   No.

11        Q.   (BY MR. HULINGS)   Are you aware of FactRight

12    ever informing deeproot that it was improper for the 575

13    Fund to provide preferred returns to investors with

14    funds not earned through its operations?

15              MS. WARDEN:   Objection, vague.

16        A.   I'm not aware.

17        Q.   (BY MR. HULINGS)   And you testified earlier

18    that Fact -- well, let me rephrase it.   FactRight was

19    well known within the financial services industry.

20    Correct?

21        A.   Yes.

22        Q.   It had a reputation for being diligent in its

23    reviews of the companies it recommended.   Correct?

24              MS. WARDEN:   Objection, misstates

25    testimony.
```

```
 1        A.   It -- yeah.   It's reputation -- reputation,
 2   from my understanding was that many people relied on --
 3   many broker-dealers and such relied on their reports.
 4        Q.   (BY MR. HULINGS)   And -- and this report is
 5   stating that the 575 Fund may use funds from new
 6   investors to pay returns to previous investors.   Is that
 7   a fair reading of this?
 8             MS. WARDEN:   Objection, misstates
 9   testimony.
10        A.   It doesn't say the investors, but from my
11   understanding, that's assumed.
12        Q.   (BY MR. HULINGS)   Okay.   So what you have here
13   is a report from a well-respected due diligence company
14   indicating that the 575 Fund may use funds from new
15   investors to pay premiums to old investors.   That's how
16   deeproot understood this paragraph.   Correct?
17             MS. WARDEN:   Objection, misstates
18   testimony.   Vague.   Calls for a legal conclusion and
19   asked and answered.
20        A.   That's how I understand it.
21        Q.   (BY MR. HULINGS)   So did this -- you are aware
22   that Mr. Mueller likely -- are you aware that
23   Mr. Mueller read this report?
24        A.   I would assume he read it, yes.
25        Q.   And you read this report.   Correct?
```

```
 1    maybe JP's manager --
 2         Q.  Okay.
 3         A.  -- above JP.
 4         Q.  And the CCs in this e-mail, one of them is
 5    Scott Allen.  Correct?
 6         A.  Yeah.
 7         Q.  And the other is deeproot Funds.  Do you see
 8    that?
 9         A.  Yes.
10         Q.  What is the deeproot Funds e-mail?
11         A.  I don't remember.
12         Q.  Okay.  All right.  So let's scroll down to the
13    first e-mail in the chain.  This is an e-mail from you
14    to Mr. McLaughlin.  Right?
15         A.  Yes.
16         Q.  And then there's also to Mr. Parker at Folio?
17         A.  Yes.
18         Q.  CC'ing Mr. Mueller and Mr. Allen?
19         A.  Yes.
20         Q.  And -- and there's also a CC to Ken Norensberg.
21    Do you see that?
22         A.  Yes.
23         Q.  Who's Ken Norensberg?
24         A.  He was a consultant, I guess you could say, for
25    deeproot.
```

1          Q.  And do you -- do you recall Mr. Norensberg's
2    background?
3          A.  Yes.  He -- I believe he was -- he had his own
4    company and he was on the FINRA board, I believe.
5          Q.  And what kind of services did he provide to
6    deeproot?
7          A.  He -- I can't remember why Robert initially
8    hired him, but I know he would come into town as well
9    as, like, talk to us about conferences to go do or
10   basically make introductions to people in his network,
11   other broker-dealers and things of that nature.
12         Q.  Are you aware of whether Mr. Norensberg
13   reviewed the deeproot ppms?
14         A.  I believe he did.
15         Q.  All right.  And you're aware of any changes
16   that Mr. Norensberg recommended to the deeproot ppms?
17         A.  Not aware of any changes he made or
18   recommended.
19         Q.  Are you aware of Mr. Norensberg expressing any
20   concerns about the company advance section of the ppms?
21              MS. WARDEN:  Objection, vague as to
22   concerns.
23         A.  I'm not aware.
24         Q.  (BY MR. HULINGS)  Are you aware of
25   Mr. Norensberg recommending any changes to the

 1    company advance section to the ppms?

 2         A.  No, I'm not aware.

 3         Q.  Are you aware of Mr. Norensberg telling

 4    deeproot that it was improper for -- let me rephrase.

 5    Did Mr. Norensberg express any -- did Mr. Norensberg

 6    express to deeproot that there were any problems in the

 7    way that the 575 Fund was making payments to its

 8    investors?

 9                   MS. WARDEN:  Objection, vague.  Calls for a

10    legal conclusion.

11         A.  Not that I'm aware.

12         Q.  (BY MR. HULINGS)  All right.  Did deeproot make

13    contact with Folio through Mr. Norensberg?  Do you

14    recall that?

15         A.  I do not recall.

16         Q.  All right.  And are you aware of the company

17    that eventually acquired Folio?

18         A.  Now that you said that, vaguely, at maybe

19    towards the end of my time.  I don't recall.  I don't

20    remember a whole lot about that.

21         Q.  You're -- are you aware that Goldman Sachs

22    later acquired Folio?

23         A.  That -- now, they -- that sounds familiar.  I'm

24    not sure when it happened though.

25         Q.  Okay.  All right.  So this is an e-mail

1      A.  Yes.

2      Q.  **What did you mean by "good to close"?**

3      A.  They had a different process to funding the

4  account.  So they had to close -- basically once they

5  closed, then they sent the -- sent the investment

6  dollars.

7      Q.  **Okay.  And so these are investors that deeproot**

8  **gained through the Folio website.  Correct?**

9          MS. WARDEN:  Objection, misstates

10  testimony.

11     A.  Correct.

12     Q.  **(BY MR. HULINGS)  And does -- do these e-mails**

13  **refresh your memory as to the kind of diligence that**

14  **Folio conducted in order to permit deeproot to be listed**

15  **on their website?**

16     A.  Yes.  I mean, Folio had a relationship with

17  FactRight and used that FactRight report as their due

18  diligence prior to working with deeproot.

19     Q.  **So are you aware of Folio informing deeproot**

20  **that it needed to change any of its ppms?**

21     A.  Not that I recall.

22          MS. WARDEN:  Objection, vague.

23     Q.  **(BY MR. HULINGS)  All right.  Do you re --**

24     A.  Not that I recall.

25     Q.  **Okay.  Sorry.  Do you recall Folio ever**

1    **indicating to deeproot that it needed to change the**

2    **advance section of the -- of its ppms?**

3         A.   No.

4              MR. HULINGS:  All right.  Okay.  This is a

5    good stopping point before I change the subject.  So I

6    think we should take a break now.  Maybe an hour for

7    lunch, if that sounds good to everybody.

8              MR. SHEDLOCK:  Back at 1:40?

9              MR. HULINGS:  Great.

10             MS. WARDEN:  Mr. Hulings, can you share

11   your exhibits used so far?

12             MR. HULINGS:  Sure.  I'll send you an

13   e-mail.

14             MS. WARDEN:  Okay.

15             THE VIDEOGRAPHER:  All right.  Off the

16   record, 12:40.

17             (Recess 12:40 p.m. to 1:40 p.m.)

18             THE VIDEOGRAPHER:  The time is 1:40.  We're

19   on the record.

20        Q.   (BY MR. HULINGS)  **Okay.  Mr. Spradlin, welcome**

21   **back.  Before the break we were -- you might recall we**

22   **were talking about Folio and FactRight.  Do you recall**

23   **that?**

24        A.   Yes.

25        Q.   **Are you aware of any other entities that**

```
 1        A.   What I told of the source of income?  Yeah.
 2        Q.   Okay.  And do you recall telling the SEC that
 3   the source of income for the 575 Fund did not come up
 4   often?  Sound familiar?
 5        A.   Yes.
 6        Q.   Do you recall any occasions in which it did
 7   come up?
 8        A.   Not specific occasions, no.
 9        Q.   Do you have any memory of who may have raised
10   the issue when it did come up?
11        A.   Around income?
12        Q.   Yes, the source of income --
13        A.   From the --
14        Q.   -- for the 575 Fund.
15        A.   No.
16        Q.   All right.  Do you recall the SEC also asked
17   you where deeproot got the money to make the 575
18   payments?  Slightly paraphrased, but do you remember a
19   question to that effect?
20        A.   Yes.
21        Q.   All right.  And do you recall telling the SEC
22   that payments were made, at least in part, from new
23   investor funds as stated in the ppms?  Do you recall an
24   answer to that effect?
25        A.   Yes.
```

1    Q.  All right.  And do you recall the SEC asked you

2  some follow-up questions to which you responded -- to

3  which you identified the advance section of the ppms?

4  Do you recall that?

5    A.  Yes.

6    Q.  All right.  So you also told the SEC that you

7  asked Mr. Mueller whether it was okay -- I think using

8  your words -- let me rephrase.  Well, I think you --

9  you -- the SEC also asked you whether you spoke with

10  Mr. Mueller about making payments from new investor

11  funds to pay the 575 guaranteed payments.  Do you recall

12  that?

13    A.  Yes.

14    Q.  All right.  And you told the SEC that you did

15  remember that conversation.  Do you recall that?

16    A.  Yes.  I remember having the conversation.

17    Q.  Okay.  I want you to tell me everything you

18  remember about that conversation.  Let's start with was

19  it one conversation or more than one conversation?

20         MS. WARDEN:  Objection, compound.

21         MR. HULINGS:  All right.  Fine.

22    Q.  (BY MR. HULINGS)  Was it one conversation?

23    A.  I believe it was one conversation.

24    Q.  All right.  Do you remember approximately when

25  that conversation took place?

1    Q.  Did you tell anyone else other than your

2  attorney -- I don't want to know about that.  Did you

3  tell anyone else at deeproot about this conversation?

4    A.  Not that I recall.

5    Q.  Do you recall Mr. Mueller mentioning anything

6  about advice from the attorneys?

7    A.  With regard to that conversation?

8    Q.  Yes.

9    A.  No.

10   Q.  All right.  Do you recall at a different time

11 Mr. Mueller stating that attorneys had approved the ppms

12 before they were issued?

13         MS. WARDEN:  Objection, asked and answered.

14   A.  I recall him referencing the attorneys and

15 creating the ppm with them.  I don't know if he used the

16 word "approved" or not.

17   Q.  (BY MR. HULINGS)  And when -- when Mr. -- when

18 you asked Mr. Mueller -- well, in this conversation that

19 we're discussing with Mr. Mueller, did Mr. Mueller give

20 you any reason to think that Mr. Mueller believed he was

21 doing some wrong?

22   A.  No.

23   Q.  So is it fair to say Mr. Mueller gave you the

24 impression that he believed that the ppms adequately

25 disclosed how the 575P payments were being made?

```
 1              MS. WARDEN:  Objection, misstates testimony
 2   and vague.
 3        A.  Yes.
 4        Q.  (BY MR. HULINGS)  Did Mr. Mueller, at any point
 5   after that conversation, do anything to give you the
 6   impression that Mr. Mueller believed he was -- let me
 7   rephrase.  Well, let me ask it this way:  In this
 8   conversation in 2019, you had had -- you previously had
 9   a Series 7 and Series 63.  Correct?
10        A.  Correct.
11        Q.  And you had then and are still a certified
12   financial adviser?
13        A.  Correct.
14              MR. SHEDLOCK:  Objection.  It misstates
15   testimony.  Certified financial planner, I believe.
16              THE WITNESS:  Yes.  Yes.
17              MR. HULINGS:  Thank you.  Yeah.
18        Q.  (BY MR. HULINGS)  And is there a difference
19   between a certified financial planner and a certified
20   financial adviser?
21        A.  It's a CFP, certified financial planner, or a
22   financial adviser.
23        Q.  Okay.  But you had a certified financial
24   planner certificate?
25        A.  Correct.
```

1      Q.   Okay.  You had also read the ppms pretty

2  thoroughly by this point?

3      A.   I had read the ppms several times --

4      Q.   And you had --

5      A.   -- yes.

6      Q.   And you had explained -- sorry to cut you off.

7  And you had -- you had explained ppms to potential

8  investors and -- and others who had questions about

9  them?

10     A.   Correct.

11     Q.   So you could read the advance section of the

12  ppms and make up your own mind about whether or not the

13  575P payments were adequately addressed in that section

14  of the ppms.  Correct?

15             MS. WARDEN:   Objection, calls for

16  speculation.

17     A.   Yes.  I'm capable of making up my own mind.  I

18  don't recall if I specifically had a doubt and then read

19  that in the ppm to confirm that doubt.  I don't recall

20  that.

21     Q.   (BY MR. HULINGS)  But you gave presentations to

22  investors after this conversation with Mr. Mueller.

23  Correct?

24     A.   Correct.

25     Q.   And there -- you -- deeproot accepted

1    investments from investors after you had this
2    conversation with Mr. Mueller.  Correct?
3         A.  Correct.
4         Q.  And if you had thought that the 575 -- let me
5    rephrase.  If you had thought that the advance -- you
6    would not have given presentations to investors
7    encouraging them to invest in the 575 Fund if you
8    believed that there was anything improper, misleading or
9    false about the advance section of the ppms.  Correct?
10             MS. WARDEN:  Objection, vague.  Compound.
11   Calls for a legal conclusion.
12        A.  Correct.
13        Q.  (BY MR. HULINGS)  You were not -- in your role
14   at deeproot, you were not going to intentionally mislead
15   a potential investor.  Correct?
16             MS. WARDEN:  Objection, calls for a legal
17   conclusion.
18        A.  Correct.
19        Q.  (BY MR. HULINGS)  And so even after this
20   conversation, you elected to go forward with your
21   solicitation of new investments into the 575 Fund.
22   Correct?
23        A.  Correct.
24        Q.  Okay.  Do you recall during your SEC deposition
25   that you were asked about Scott Allen's departure memo?

1        Q.   Okay.  All right.  Do you recall describing

2   your understanding of a Ponzi scheme to the SEC in your

3   2021 deposition?

4        A.   Yes.

5        Q.   And I'm going to read it to you.  "My

6   understanding of a Ponzi scheme is where there's no

7   assets being purchased and solely money coming in and

8   going out."  Was that -- was that your testimony?

9        A.   Correct.

10       Q.   And at -- at the time you were at deeproot, was

11   that your understanding of what a Ponzi scheme was?

12       A.   Yes.

13       Q.   And you told the SEC in your deposition that

14   you did not think that deeproot was operating like a

15   Ponzi scheme.  Is that right?

16       A.   That's correct.

17       Q.   And -- and the reason you gave the SEC is that

18   deeproot spent the money it received from investors in

19   the way that it told investors it would spend that

20   money.  Correct?

21       A.   Can you repeat that?

22       Q.   Yeah.  I'm -- I'm paraphrasing your -- your

23   testimony a little bit.  So the company was spending --

24   so the company -- the 575 Fund represented to investors

25   that it would spend money that it received from

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1   investors on deeproot Pinball.  Correct?
 2        A.  Yes.
 3        Q.  And it also represented that it would be
 4   spending some of that money on deeproot Studios?
 5        A.  Correct.
 6        Q.  And all of the other affiliated entities that
 7   are referenced in the presentations and the ppms that
 8   we've talked about earlier today.  Correct?
 9        A.  Correct.
10        Q.  So deeproot was representing that it would
11   spend investor money on all of these affiliated
12   investments as disclosed in the ppms.  Correct?
13             MS. WARDEN:  Objection, misstates
14   testimony.
15        A.  Correct.
16        Q.  (BY MR. HULINGS)  And you were aware that
17   deeproot was, in fact, spending money on deeproot
18   Pinball, deeproot Studios, and these other affiliated
19   entities.  Correct?
20        A.  Correct.
21        Q.  So at the time -- is it fair to say that at the
22   time you did not think that deeproot was running a Ponzi
23   scheme because it was using the money provided by
24   investors in the manner that it told investors it would
25   use the money?  Correct?
```

```
 1                 MS. WARDEN:   Objection, calls for
 2   speculation.  Calls for a legal conclusion.
 3        A.  Correct.
 4        Q.  (BY MR. HULINGS)  Okay.  Let's change the
 5   subject a little bit.  I'm going to show you what's been
 6   previously marked as Exhibit 12.  Okay.  Do you see this
 7   document?
 8        A.  I do.
 9        Q.  All right.  What -- what is this document?
10        A.  Bonus agreement.
11        Q.  All right.  And this is an agreement that you,
12   Mr. Allen, and Mr. Mueller signed?
13        A.  Correct.
14        Q.  On August 9th, 2019?
15        A.  Yes.
16        Q.  And did you draft this document?
17        A.  I think he told us to propose an agreement and
18   so we proposed it and then he -- I think he made some
19   final edits and then we signed it.
20        Q.  Okay.  So "he" is -- is Robert Mueller?
21        A.  Yes.
22        Q.  All right.  And was there a conversation with
23   Mr. Mueller prior to you providing the original draft of
24   this bonus agreement to Mr. Mueller?
25        A.  Yes.
```

1    were asking questions about the deeproot Pinball

2    business.  Is that fair?

3         A.  Yes.  Yes.

4         Q.  And based on those conversations, did you make

5    any recommendations to Mr. Mueller about how he should

6    respond to those questions?

7         A.  I believe we told him to write up some kind of

8    answer to some of the questions that were being asked so

9    we could provide them to the finders.

10        Q.  All right.  Okay.  I'm going to show what you

11   has previously been introduced as Exhibit 25.  Okay.  Do

12   you recognize this document?

13        A.  I believe so.

14        Q.  So what is this?

15        A.  Basically a summary of -- I think a summary of

16   the investments or -- or, more specifically, the -- the

17   Pinball.  And now you have to scroll down.

18        Q.  Okay.  Let me -- so it says, "We have recently

19   received the following questions which we intend to

20   answer in this narrative."  Do you see that?

21        A.  Yes.

22        Q.  Is this document the document that Mr. Mueller

23   prepared in response to your recommendation that he

24   provide answers on how the Pinball operation was being

25   managed?

```
 1              MS. WARDEN:  Objection --
 2       A.  Yes.
 3              MS. WARDEN:  -- compound.
 4       A.  Yes, it looks like it.
 5       Q.  (BY MR. HULINGS)  All right.  And so Part 1 of
 6  this document states "Investment Portfolio Analysis."
 7  Do you see that?
 8       A.  Yes.
 9       Q.  And it includes this Q2 2019 portfolio graphic
10  that we've seen before.  Correct?
11       A.  Correct.
12       Q.  Is this the -- appear to be the same graphic or
13  something similar that was included in the PowerPoint
14  presentations that you provided to investors?
15       A.  Yes.
16       Q.  All right.  Then if we go to page 6 -- let me
17  scroll through.  Is the -- is page 2, 3, and 4 of this
18  document -- does this summarize the investments that
19  deeproot was making in the affiliated entities through
20  575 Fund?
21       A.  Yes.
22       Q.  So that includes Pinball, Tech, the Life
23  Policies, Art and Animation, and Real Estate.  Correct?
24       A.  Correct.
25       Q.  And the real estate that is referenced in this
```

```
 1    document is the debt funding by note for the
 2    construction of a car wash.  You see that?
 3         A.  Yes.
 4         Q.  And were you involved in the negotiations
 5    regarding the -- the note for this car wash?
 6         A.  I was involved in the conversations early on.
 7    And then I think at some point the agreement changed and
 8    I was not involved in those conversations.
 9         Q.  Okay.  You were aware that -- that deeproot had
10    loaned money through a note for the construction of a
11    car wash.  Correct?
12         A.  Yes.
13         Q.  All right.  Let's go to page 6.  And this
14    section is Pinball Narrative.  Do you see this?
15         A.  Yes.
16         Q.  And 6 through -- page 6 through 14, is this a
17    summary of deeproot's pinball business?
18              MS. WARDEN:  Objection, misstates
19    testimony.
20         A.  It appears to be.
21         Q.  (BY MR. HULINGS)  Okay.  And did you review
22    this document after you received it from Mr. Mueller?
23         A.  Probably.
24         Q.  Were you aware of anything that's in this
25    document that is false?
```

```
 1        A.  Not to my memory, not that I'm aware of.
 2        Q.  So this 8-page description about the pinball
 3   business, are you aware of anything that this document
 4   left out of that description of the pinball business?
 5               MS. WARDEN:  Objection, vague as to left
 6   out.
 7        A.  Not that I'm aware of.
 8        Q.  (BY MR. HULINGS)  Let me put it this way.  Are
 9   you aware of any material information regarding the
10   management of the pinball business that was omitted from
11   this document?
12               MS. WARDEN:  Objection.
13        A.  Not --
14               MS. WARDEN:  Calls for a legal conclusion.
15        A.  Not that I'm aware of.
16        Q.  (BY MR. HULINGS)  Did you provide this document
17   to any finders?
18        A.  I believe so.
19        Q.  Did you -- to the extent that you can recall,
20   did you produce -- provide this document to more than
21   one finder?
22        A.  Most likely.
23        Q.  Do you recall how many finders you provided
24   this to?
25        A.  I don't.  Most likely anybody that had
```

```
 1   like we had no right to, you know, question his ability
 2   to run the business.
 3        Q.  And -- and those concerns, were they -- were
 4   they the concerns we discussed earlier regarding the
 5   amount of expenditures of -- of deeproot?
 6        A.  They were regarding the MACU building, the
 7   scaling of the -- of Pinball -- of the -- of the
 8   business.  They were regarding the Basha policy.  So
 9   there were several things that -- that kind of built on
10   each other.
11        Q.  All right.  So can you tell me all of the --
12   all of the concerns that you expressed to Mr. Mueller
13   that led to the strained relationship?  You said there
14   were several.
15        A.  I mean -- yeah.  Those -- those are ones that I
16   just stated that I remember.  Yeah.  It's -- I'm sure
17   there are others, but --
18        Q.  So not included on that list is any concern
19   about the contents of the ppms.  Right?
20                MS. WARDEN:  Objection, vague.
21        A.  Correct.
22        Q.  (BY MR. HULINGS)  And so put another way, when
23   you were -- when you offering criticisms to Mr. Mueller
24   about how the deeproot businesses were being run, you
25   were not suggesting changes to the ppms.  Correct?
```

```
 1    Counsel.
 2         Q.  (BY MS. WARDEN)  Did you provide Exhibit 5 to
 3    deeproot investors?
 4         A.  Yes.
 5         Q.  Okay.  And did you provide Exhibit 5 to finders
 6    as well?
 7         A.  I believe so, yes.  Yes.  Yes.
 8         Q.  Okay.  And did you provide any instructions to
 9    the finders about how ppms should be distributed to
10    potential investors?
11         A.  I'm sure we did.  I think so.
12         Q.  And do you recall what those instructions were?
13         A.  On how they should distribute them to
14    investors?
15         Q.  Uh-huh.
16         A.  No, I do not recall that.
17         Q.  Okay.  Did Mr. Mueller give you any guidance
18    with respect to how the ppms should be distributed to
19    potential investors and finders?
20         A.  I mean, if I would have given instructions,
21    those would have come from Robert.
22         Q.  And you mentioned previously today that it's
23    your understanding Robert Mueller prepared the ppms in
24    consultation with his attorney, Dennis Concilla.  Is
25    that correct?
```

```
 1         A.   That's -- that's my understanding.
 2         Q.   Okay.  What conversations do you recall -- do
 3    you recall Robert Mueller discussing advice he received
 4    from Dennis Concilla?
 5         A.   No.
 6         Q.   Do you recall Robert Mueller discussing Dennis
 7    Concilla at all?
 8         A.   I think at the beginning that's -- that --
 9    like, I know that that was the attorney that he -- or
10    I -- I believe that that was the attorney that he used.
11    So his name was brought up, but I don't remember any
12    specific conversations around that.
13         Q.   And you don't recall the context in which
14    Dennis Concilla's name was brought up by Mr. Mueller?
15         A.   No.  I mean, I believe he was the -- a
16    securities attorney that helped in the drafting of the
17    ppms.
18         Q.   Okay.  And you're basing that understanding on
19    what?
20         A.   On just my understanding of how this was all
21    structured.
22         Q.   From --
23         A.   That he had consulted an attorney to write the
24    ppms.  That -- that's -- that's my understanding, but
25    that understanding doesn't come from, like, a specific
```

 1    memory around a conversation that we had.

 2        Q.  Okay.  Do you recall Robert Mueller discussing

 3    any other Carlile Patchen attorneys?

 4        A.  I thought there were two, but I don't recall

 5    any names.

 6        Q.  Okay.  Do you recall Robert Mueller ever

 7    telling you that the ppms were approved by his

 8    attorneys?

 9        A.  I don't recall that specific language.

10        Q.  Do you recall Robert Mueller ever telling you

11    that disclosures to investors generally were approved by

12    his attorneys?

13            MR. HULINGS:  Objection, vague as to

14    disclosed generally.

15        A.  Don't recall.

16        Q.  (BY MS. WARDEN)  Okay.  All right.  I'm going

17    to direct your attention to pdf page 9.  Okay.  Do you

18    see in bold Life Policies?  So the first sentence that I

19    highlighted.  "We will invest in Life Insurance

20    Policies, Life Policies, Policies, Contracts as the

21    simple majority of our Fund Assets."  Did --

22        A.  Yes.

23        Q.  Did Mr. Mueller ever explain to you how "simple

24    majority of our fund assets" was calculated?

25        A.  Not that I recall.

```
1    Mr. Mueller did any analysis of whether such capital
2    investments in deeproot affiliates were suitable
3    investments for his investor funds?
4              MR. HULINGS:  Objection, vague as to
5    analysis.
6         A.   Yeah.  Can you clarify that for me?
7         Q.   (BY MS. WARDEN)  Are you aware of whether
8    Mr. Mueller performed any research prior to making
9    investment in deeproot affiliates?
10             MR. HULINGS:  Vague as to research.
11        A.   I -- I believe so.  I was -- I was always under
12   the impression that -- yeah -- like, he knew what he was
13   doing with Pinball, if that's what you're asking.
14        Q.   (BY MS. WARDEN)  Okay.  But based upon
15   Mr. Mueller's own research?
16             MR. HULINGS:  Objection, vague as to
17   research.
18        A.   Yeah.  I'm -- I'm --
19        Q.   (BY MS. WARDEN)  Are you aware of whether
20   Mr. Mueller hired any independent people to analyze
21   whether or not to make investments in deeproot
22   affiliates?
23             MR. HULINGS:  Objection as to independent
24   people.  Vague.
25        A.   Yeah.  I'm -- I'm unaware of what he did
```

1    payment fit into this paragraph or not.  I don't recall

2    that.  But, like, reading it, administrative expense --

3    expenses, like if I were to list out administrative

4    expenses, it would be, like, office paper and computer

5    supplies and like that.  That kind of stuff is how I

6    would classify that.  But when I was working there --

7    again, without really specifically looking at this

8    paragraph for those 575P payments, I'm not sure how I

9    intended or understood that at that time.

10        Q.  (BY MS. WARDEN)  Did you think that periodic

11   payments from the 575 Fund could be paid to investors

12   based upon the company advance provision in the ppm?

13             MR. HULINGS:  Calls for a legal conclusion.

14   Calls for an opinion from a lay witness and asked and

15   answered.

16        A.  Yes.

17        Q.  (BY MS. WARDEN)  Yes, you thought monthly

18   payments --

19        A.  Yeah.

20        Q.  -- for 575P investors could be paid based upon

21   this provision in the company advance?

22        A.  Correct.

23        Q.  Because a monthly payment to 575P investors

24   could be a nominal administration expense in your

25   opinion?

```
 1    told you that he was using new investor money to pay
 2    existing -- no -- to pay --  Scratch that.
 3                 When Mr. Mueller told you that he was using
 4    new investor funds to make up the missed payroll
 5    payments, what was your reaction?
 6         A.  I assumed that was okay and part of the normal
 7    operating of the business.
 8         Q.  Okay.  And did Mr. Mueller -- sorry -- did
 9    Mr. Mueller tell you -- did he cite to any -- did he
10    cite the ppm?
11                 MR. HULINGS:  Objection, vague as to --
12         A.  No.
13                 MR. HULINGS:  -- cite.  Sorry.
14         A.  No.  I believe -- I don't think there was a
15    concern around that.
16         Q.  (BY MS. WARDEN)  Okay.  At some point did you
17    become aware that deeproot was unable to make 575P
18    monthly payments to existing investors?
19         A.  Yes.
20         Q.  Okay.  And roughly when did you become aware of
21    this?
22         A.  Sorry.  The question was if I was aware if they
23    missed -- that he was missing, yeah.
24         Q.  Yeah.
25         A.  I mean, I'm not sure, like, whenever the first
```

```
 1          Q.  With Mr. Mueller?

 2          A.  Yes.

 3          Q.  Okay.  And what was your reaction to learning

 4    that Mr. Mueller was making monthly 575P payments with

 5    new investor funds?

 6                MR. HULINGS:  Objection, vague as to

 7    reaction and asked and answered.

 8          A.  Yeah.  I mean, I -- I don't think there was --

 9    I didn't -- it wasn't a matter of, like, finding out

10    that he was doing this and thinking he was doing

11    something wrong.  At -- at -- at some point learned

12    that's how the fund was operating and at some point had

13    a conversation, maybe it was early on in training or,

14    again, when we referenced it, this conversation we had

15    around that being okay and legal.  But, I mean, in -- in

16    2019, early on when he missed the payments and then

17    resumed them, the concern was around missing the

18    payment, not around if that was legal to -- to do so.

19          Q.  (BY MS. WARDEN)  Okay.  Let me just unpack

20    that.  Who do -- do you recall Mr. Mueller telling you

21    that using new investor funds to pay existing investors

22    was legal?

23                MR. HULINGS:  Asked and answered a couple

24    times.

25          A.  Yeah.  I mean, based on my training and then,
```

```
 1    again, the conversation we had in 2019 that we
 2    referenced, you know, yes, I assumed that that was
 3    legal.
 4        Q.  (BY MS. WARDEN)  No, no, no.  My question was
 5    do you recall Mr. Mueller saying that it was legal for
 6    him to pay existing 575P investors with new investor
 7    funds?
 8            MR. HULINGS:  Vague and asked and answered.
 9        A.  The only specific conversation I remember
10    around that was the one we already discussed later in
11    2019 where he referenced the ppm and the -- and the
12    advance.  That's what I was referencing.
13        Q.  (BY MS. WARDEN)  Oh, I see.  In the
14    conversation where you discussed, Mr. Mueller referred
15    to the ppm and as support for using new investor funds
16    to pay existing 575P investors.  Is that fair?
17            MR. HULINGS:  Objection, vague.
18        A.  That is --
19            MR. HULINGS:  Asked and answered.  Sorry.
20        A.  That -- that is the only conversation, specific
21    conversation I -- I recall.  Yeah.  I mean, it was
22    likely discussed earlier on, but that is the only
23    conversation I recall.
24        Q.  (BY MS. WARDEN)  Okay.  Did you ever ask
25    Mr. Mueller about potential concerns relating to
```

1    these presentations to finders or investors?

2         A.  Not specifically.  I -- I -- I think it was in

3    regards to the overall allocation of the funds or the

4    investments.  They would have been outlined in the --

5    the presentations that I believe you-guys have.  So I

6    don't remember specifically what exactly we changed.

7         Q.  Earlier today you testified that you did not

8    give misleading information to any investors at the

9    time.  Do you recall that?

10             MR. HULINGS:  Objection, misstates prior

11   testimony.

12        A.  Correct.

13        Q.  (BY MS. WARDEN)  Okay.  At some point did you

14   come to learn that you did provide misleading

15   information to potential deeproot investors?

16             MR. HULINGS:  Objection, calls for a legal

17   opinion.  Calls for speculation.  Calls for -- it's a --

18   lack of foundation.  It's also incredibly irrelevant.

19        A.  No.  I don't believe there's a point where I

20   felt that I was -- that I had given misrepresentation

21   other than when I quit.  I no longer felt confident in

22   the company.  I didn't feel comfortable moving forward

23   or discussing with investors or anything like that.

24        Q.  (BY MS. WARDEN)  Okay.  So today I guess --

25   sitting here today, you don't think that you made any

 1   **misleading statements to any potential deeproot**
 2   **investors?**
 3                **MR. HULINGS:**  So -- hold on.  So that's --
 4   it calls for a legal conclusion.  It's vague.  It's
 5   argumentative.  It's asked and answered and -- and not
 6   relevant.
 7       A.  Sitting here today, I -- misleading information
 8   to investors.  I -- I don't -- I don't believe so.  I
 9   think, as I testified to the SEC prior to that, I'm sure
10   that deeproot could have disclosed more and disclosed it
11   sooner, but the -- from my understanding and opinion
12   that -- that -- that the information was disclosed and
13   at the time I was comfortable sharing the information on
14   the fund.
15       Q.  **(BY MS. WARDEN)  What -- what was the**
16   **additional information that deeproot could have**
17   **disclosed more of?**
18                **MR. HULINGS:**  Objection, calls for a legal
19   conclusion.  Calls for speculation.  Vague.
20       A.  I would say more disclosure probably around
21   Pinball.  I think he started scaling that more and more,
22   probably could have disclosed that, more of that sooner.
23       Q.  **(BY MS. WARDEN)  Disclosed that more investor**
24   **funds were -- were going to the Pinball company.  Is**
25   **that -- is that fair?**

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION
3
SECURITIES AND EXCHANGE          )
4   COMMISSION                       )
                                     )
5            Plaintiff,              )
                                     )
6            -against-               )  Civil Action
                                     )  No.: 5:21-cv-785-XR
7   ROBERT J. MUELLER, DEEPROOT      )
    FUNDS LLC (a/k/a dprt Funds,     )
8   LLC), AND POLICY SERVICES,       )
    INC.,                            )
9                                    )
             Defendants,             )
10                                   )
             -and-                   )
11                                   )
    DEEPROOT TECH LLC, DEEPROOT      )
12  PINBALL LLC, DEEPROOT            )
    STUDIOS LLC, DEEPROOT            )
13  SPORTS & ENTERTAINMENT LLC       )
    DEEPROOT RE 12621 SILICON        )
14  DR LLC, AND ROBERT J.            )
    MUELLER, JEFFREY L. MUELLER,     )
15  AND BELINDA G. BREEN, AS         )
    CO-TRUSTEES OF THE MB HALE       )
16  OHANA REVOCABLE TRUST,           )
                                     )
17           Relief Defendants.  )
18
                    VOLUME 1 OF 1
19      ORAL AND VIDEOTAPED DEPOSITION OF
                   NATHAN SPRADLIN
20                  MARCH 21, 2023
                (CONDUCTED REMOTELY)
21
22       I, MONICA VICTOR, Certified Shorthand Reporter in
    and for the State of Texas, hereby certify to the
23  following:
         That the witness, NATHAN SPRADLIN, was duly sworn
24  by the officer and that the transcript of the oral
    deposition is a true record of the testimony given by
25  the witness;
```

1   Mr. H. Jay Hulings.

        That a copy of this certificate was served on all
2   parties and/or the witness shown herein on

                        .
3       I further certify that pursuant to FRCP No.
    30(e)(2) that the signature of the deponent:
4   __X__ was requested by the deponent or a party before
    the completion of the deposition and that the signature
5   is to be returned within 30 days from date of receipt of
    the transcript.  If returned, the attached Changes and
6   Signature Page contains any changes and the reasons
    therefor;
7   _____ was not requested by the deponent or a party
    before the completion of the deposition.
8       I further certify that I am neither counsel for,
    related to, nor employed by any of the parties in the
9   action in which this proceeding was taken, and further
    that I am not financially or otherwise interested in the
10  outcome of the action.
11      Certified to by me this _6_ day of _April_   202_
12
13      _Monica Victor_
14  _____
    Monica Victor, CSR No. 3076
    Expiration: January 31, 2025
15  FIRM REGISTRATION NO. 223
    WORLDWIDE COURT REPORTERS, INC.
16  12621 Featherwood Drive
    Suite 290
17  Houston, Texas 77034
    Phone: 713.572.2000
18  Facsimile: 713.572.2009
19
20
21
22
23
24
25