# Exhibit A-4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| -against- | ) ) | |
| ROBERT J. MUELLER, DEEPROOT FUNDS, LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| -and- | ) ) | CIVIL ACTION NO. 5:21-cv-785-XR |
| DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Relief Defendants. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
KEN ABRAMSON
JUNE 15, 2023
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
 1          REMOTE ORAL AND VIDEOTAPED DEPOSITION of KEN
    ABRAMSON, produced as a witness at the instance of the
 2  Defendants, and duly sworn, was taken in the
    above-styled and numbered cause on June 15, 2023, from
 3  9:30 a.m. to 3:55 p.m., before Heather L. Garza, CSR,
    RPR, in and for the State of Texas, recorded by
 4  machine shorthand, at the offices of HEATHER L. GARZA,
    CSR, RPR, The Woodlands, Texas, pursuant to the
 5  Federal Rules of Civil Procedure and the provisions
    stated on the record or attached hereto; signature
 6  having been waived.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    Wildman, is that -- were you handling the same sorts
2    of clients?
3         A.   Basically, yes.  So the way our firm was
4    structured, I kind of had my clients, he kind of had
5    his clients, and we operated under one umbrella, but
6    we kind of managed the clients separately.
7         Q.   What was -- I mean, would you characterize
8    Policy Services as a small business?
9         A.   When it started, yes.
10        Q.   When you stopped working with Policy
11   Services, would you still call it a small business?
12             MS. WARDEN:  Objection as to form.
13        A.   I would say small to medium.
14        Q.   (BY MR. HULINGS)  Okay.  And what's your
15   definition of -- how are you evaluating the size in
16   this context?
17        A.   Usually revenues.  Revenues or volume of
18   work, one of the two.
19        Q.   Okay.  All right.  So trying to sum this up,
20   you've been in the accounting profession since
21   approximately 1982; is that right?
22        A.   Correct.  About 30 something years, yes.
23        Q.   And you've got a degree in accounting, and
24   you've passed your -- received your CPA, and you've
25   taken regular continuing education every year,

1  correct?

2      A.   That's correct.

3      Q.   And you've worked with clients of all kinds

4  over your career; is that right?

5              MS. WARDEN:  Objection; form.

6      A.   That's correct.

7      Q.   (BY MR. HULINGS)  And is it fair to say you

8  developed some expertise in the tax laws; is that

9  fair?

10     A.   To a degree, yes.

11     Q.   And -- and some expertise in -- you've

12  developed some expertise in the preparation of

13  financial statements?

14     A.   I did at one time, yes.

15     Q.   Okay.  And is it fair to say you developed

16  some expertise in the application of accounting

17  principles to how a company maintains its books and

18  records; is that correct?

19              MS. WARDEN:  Objection; vague as to

20  expertise.

21     Q.   (BY MR. HULINGS)  You can answer.

22     A.   Yes.

23     Q.   Do you understand what the term "expertise"

24  means?

25     A.   Yes.

1   Q.   What's your definition of "expertise," just
2   to clear up the record?
3   A.   I would say it's -- it's knowing the
4   principles and regulations, the rules effectively, and
5   applying them to the situation at hand.
6   Q.   Okay.  Clean up one thing.  So when you split
7   from Wildman in 2016, what was the reason for the
8   split?
9   A.   I was having issues with his maintaining his
10  licensing.
11  Q.   Explain why that led to splitting the
12  business up.
13  A.   If he's not licensed, he's not supposed to be
14  holding himself out as a CPA, and he was.
15  Q.   Okay.
16  A.   That puts potential burden on me, and I
17  didn't want it.
18  Q.   All right.  Okay.  When did you first meet
19  Russ Hagan?
20  A.   Let's see.  2013 -- I would say somewhere
21  around 2009/2010.
22  Q.   And how did you meet him?
23  A.   We were introduced by a acquaintance, I guess
24  you would say, who did corporate incorporations.
25  Q.   So was that an acquaintance an attorney?

1   2014 for Policy Services?

2       A.   I believe I did, but I didn't have it when

3   the SEC asked for it.

4       Q.   Okay.  Let's go through that.  We'll go back

5   to that in a second.  Can you describe the process you

6   go through to -- that -- let me rephrase.

7            Can you describe the process you went to --

8   went through to prepare the 2014 tax return for Policy

9   Services?

10      A.   Sure.  I would have obtained the QuickBooks

11  file from either Russ, Robert, or Charlotte.  I would

12  have gone through the file to look for anything that

13  was not considered reasonable under the tax code, and

14  then I would have prepared the returns.  I would have

15  sent a draft to -- I should have sent it to both

16  Robert and Russ for review, and then there would have

17  been -- I would have also sent at that time e-file

18  authorization forms, and if there were no questions on

19  the return, the client then signs the authorizations,

20  send them back to me, and then I file the returns

21  electronically.

22      Q.   All right.  And you mentioned that accounting

23  records from Policy Services, is that the general

24  ledger?

25      A.   That would include the general ledger, yes.

1          Q.    What else would be included in that?

2          A.    Well, the QuickBooks file would have the

3    general ledger.  It would have any journal entries

4    that were made.  It would have the -- I guess the cash

5    receipts and cash disbursements journals.  It can

6    produce financial statements, so it's a complete

7    accounting software package.

8          Q.    So you -- you got access to the QuickBooks

9    software?

10         A.    Correct.

11         Q.    So they didn't provide you with paper

12   versions of the QuickBooks --

13         A.    No.  No, no, no.

14         Q.    And when you mentioned you were looking for

15   anything that was not considered, is it normal or --

16         A.    I would say reasonable.

17         Q.    Reasonable.  What would be an example of

18   something that was not reasonable under accounting

19   principles?

20         A.    One recollection was when they were opening

21   their offices, there were improvements made to the

22   office space that they coded as expenses.  Those are

23   not expensed.  Those are capitalized and depreciated

24   over a period of time.

25         Q.    So you gave them -- so what did you do when

1    **signed engagement letter returned?**

2        A.   At the start of the engagement, that's

3    correct.

4        **Q.   All right.**

5        A.   I may have gotten it after the fact.

6        **Q.   Okay.  So Page 2, what is this document?**

7        A.   So because Policy Services is the filing

8    entity but it owned two of the LLCs, Deeproot Advisory

9    Services, and Deeproot Funds for tax purposes, they

10   get combined into one tax return filing, so that is

11   the combination of those entities activity into the

12   numbers that were then used on the tax return, and

13   that's part of that accounting time that you see.

14       **Q.   So this is a balance sheet, though?**

15       A.   Correct.

16       **Q.   And generally speaking, for people who aren't**

17   **in accounting, what's a balance sheet?**

18       A.   A balance sheet is a picture as of a specific

19   date, in this instance, December 31 of 2014, of the

20   assets, liabilities, and equity of the company.

21       **Q.   How was this particular balance sheet**

22   **generated?**

23       A.   Through QuickBooks.  Each of those entities

24   had a separate QuickBooks file that was maintained and

25   then the balance sheet for each entity was effectively

1   obtained through each QuickBooks file, and then this

2   Excel file combined those by just moving all the

3   digits in and then adding across.

4       **Q.   Did you create this document?**

5       A.   Yes.

6       **Q.   You say each entity had its own QuickBooks**

7   **file.  Is it the entities at the columns that say,**

8   **"Policy Services, DPRT Advisory Services and**

9   **Consolidated DPRT Funds"?**

10      A.   Yes.

11      **Q.   What about the entities on the left?**

12      A.   So those --

13      **Q.   Three-year bonus reset and the others**

14   **identified in that first column?**

15      A.   Yeah.  So those would have all had -- yes.

16   Those would have all had separate files and some of

17   those are actually part of that consolidated Deeproot

18   Funds, so there was multi-tiering in the ownership.

19   Policy Services owned Deeproot Funds, LLC, Deeproot

20   Funds, LLC owned some of those entities that you see

21   on the left column.

22      **Q.   Did you have to do separate tax returns for**

23   **those entities owned by Policy Services?**

24      A.   No.

25      **Q.   Just -- just for the parent entity, correct?**

```
 1        A.   Just -- correct.
 2        Q.   So there's some notes on the right and at the
 3   bottom.   Whose notes are those?
 4        A.   Notes on the right?
 5        Q.   Handwritten markings on the right and at the
 6   bottom.
 7        A.   Okay.  The right, if you're just referring to
 8   those, that's where I was combining multiple accounts
 9   to show one number on the tax return.
10        Q.   So that's your handwriting?
11        A.   I'm sorry?
12        Q.   So that's your handwriting?
13        A.   Yes.
14        Q.   That's what I was asking.  You made these
15   notes on --
16        A.   Yes.
17        Q.   -- the right side of the page?  And at the
18   bottom of the page?
19        A.   Yes.  Mine, as well.
20        Q.   All right.  So one of these Ys -- are those
21   Ys kind of at the top?
22        A.   It's actually a -- I guess just a notation
23   that that number was used on the tax return.
24        Q.   So if you go a little further down, there's a
25   grouping of the entries for, "Due from DR Wealth
```

1    Advisors and due from Deeproot Continuation Holdings,"

2    those are grouped for purposes of the tax returns; is

3    that correct?

4        A.   That is correct.

5        Q.   And why are those entries grouped for the tax

6    return?

7        A.   Because those are reported under the Deeproot

8    Continuation Holdings, Inc., return so that was a

9    separate entity of which I believe the DR Wealth

10   Advisors was a sub of Deeproot Continuation Holdings.

11   So that actually was shown as a receivable on the

12   Policy Services books.

13       Q.   Got it.  All right.  A little further down,

14   there's a grouping that appears to be for investor

15   acquisitions, commissions and fees, and, again,

16   investor acquisitions.  Why were those grouped?

17       A.   Because those are the invest -- that's the

18   money that came in from the investors, so there was a

19   total of, $7,067,000 that was received from investor

20   funds.  The separate accounts investor acquisitions

21   not ID'd, that 5,000, I didn't know where those came

22   from, and that was something that at a later date,

23   Mr. Hagan or Mr. Mueller or Charlotte was supposed to

24   research and let me know where those came from.  The

25   commissions and fees for the 2,000,003 were the

```
 1    commissions that Policy Services effectively earned on
 2    those policies, but was not able to collect yet or was
 3    not -- yeah, was not able to collect yet -- wait a
 4    minute.  I'm sorry.  That's an asset.  So those were
 5    commissions that were paid out for the acquisition of
 6    those policies, but they were not expensed yet because
 7    we were not recognizing the income on those policies,
 8    so under the accounting matching principle, those
 9    would be expensed when the policy paid off.  The 4
10    million -- looks like it's 4,000,690 can't read the
11    number too well -- that was the actual money that was
12    invested into the life insurance policies.
13        Q.   Okay.  So the 2,300,000 and change for
14    commission and fees, to whom was that paid to your
15    knowledge?
16        A.   Those were paid for various things.  So they
17    were either commissions to outside people for the
18    purchase of the policy or they were money that was
19    received from investors that was being earmarked to
20    pay future life insurance premiums on those policies.
21        Q.   Got it.  So did Policy Services around this
22    time, if they got an investor -- let me rephrase.
23             Did Policy Services take an advance on moneys
24    received from investors?
25                  MS. WARDEN:  Objection; vague as
```

```
 1    to "advance."
 2        Q.    (BY MR. HULINGS)   You can answer.
 3        A.    What do you mean by an advance?
 4        Q.    So there's -- Policy Services paid for
 5    certain expenses, correct?
 6        A.    So policy Services, when they got money in
 7    from an investor, a portion of that money would be
 8    used to actually buy the policy.  There was also a set
 9    aside for future premiums to keep that policy intact
10    for the life expectancy of that person.  There were
11    commissions paid to outside, if you want to call them
12    sales representatives, for finding the policy, and
13    that's what's in that account.
14        Q.    So the money that was paid in -- so Policy
15    Services paid -- had business expenses, correct?
16              MS. WARDEN:   Objection --
17        A.    Yes.
18              MS. WARDEN:   -- mischaracterizes
19    testimony.
20              MR. HULINGS:   Okay.  Let me see how I'm
21    going to address that.
22        Q.    (BY MR. HULINGS)   Policy Services paid rent,
23    correct?
24        A.    Yes.
25        Q.    Policy Services paid salaries, correct?
```

```
 1       A.   Yes.
 2       Q.   Where did the money come from to pay, for
 3   example, salaries?
 4       A.   The money basically came from investments
 5   that Policy Services made, so they were earning
 6   interest on some of their money.  Part of it was
 7   probably from some of the set aside that came in from
 8   the investors that was not needed to pay -- to pay the
 9   -- to purchase the premium or purchase the policy or
10   for the remaining premiums.  So there was a -- a
11   small, if you want to call it, a profit percentage, I
12   guess, that was used to pay for the day-to-day
13   operations of the company.
14       Q.   And that small profit percentage was taken
15   out of the money that investors provided to Policy
16   Services?
17            MS. TULLY:  Objection; speculation.
18       A.   Part of it was a commission that Policy
19   Services earned, yes.
20       Q.   (BY MR. HULINGS)  Okay.  All right.  So let me
21   -- this is relatively important to the case, so let's
22   kind of be specific here.  So to your knowledge, when
23   Policy Services took investor money, did Policy
24   Services take a commission out of that investor money?
25       A.   I believe they did.
```

```
 1              MS. WARDEN:  Objection; vague.
 2       Q.   (BY MR. HULINGS)  You said you believe that
 3   they did?
 4       A.   Yes.
 5       Q.   How would that commission be accounted for on
 6   a balance sheet?
 7       A.   It wouldn't be.  It should be on the income
 8   statement.
 9       Q.   Okay.  Would that be revenue to --
10       A.   Yes.
11       Q.   -- Policy Services?
12            And then the salary paid out would be an
13   expense?
14       A.   That would be correct.
15       Q.   So as money comes in, some of the money is
16   used to -- as money comes in from an investor, some of
17   the money is used to pay commissions, some of it is
18   used to pay -- to purchase the life insurance policy,
19   and some small percentage is revenue to Policy
20   Services, correct?
21       A.   That was my understanding, yes.
22       Q.   And was there anything improper to your
23   knowledge under the accounting rules or the tax laws
24   about treating a portion of those incoming funds as
25   revenue to Policy Services?
```

```
 1                    MS. WARDEN:  Objection; lack of
 2    foundation; asks for a conclusion.
 3                    MS. TULLY:  Speculation.
 4       Q.   (BY MR. HULINGS)  You can answer.
 5       A.   No.
 6       Q.   So to your knowledge, based on your
 7    experience and training, familiarity with the tax laws
 8    and accounting principles, there's nothing improper
 9    about treating a portion of the money received from
10    investors as revenue to Policy Services; is that
11    correct?
12                    MS. WARDEN:  Same objection.
13                    MS. TULLY:  Objection; speculation.
14       A.   No.  If -- if they earned a commission on
15    each policy that was disclosed, and my understanding
16    was that was disclosed as part of the sales material,
17    then that is the correct accounting treatment under
18    tax law.
19       Q.   (BY MR. HULINGS)  Okay.  So on the -- on the
20    left column, you have a series of entries that is due
21    from, for example, DR 3 year growth --
22       A.   Right.
23       Q.   Due from DR 3 year bonus reset, for example.
24    And so is it your understanding that each of these
25    entities, DR 3 year bonus reset and DR bonus both,
```

```
 1    Services was intend -- that is money that Policy
 2    Services was going to transfer but had not transferred
 3    yet, correct?
 4               MS. WARDEN:  Objection; vague.
 5         A.   As of that date, that's correct.
 6         Q.   (BY MR. HULINGS)  And you understood the
 7    question?
 8         A.   Yes.
 9         Q.   So all of these entries, these draw -- these
10    entries on this balance sheet, were these drawn from
11    the QuickBooks entries?
12         A.   Yes.
13         Q.   So is it fair to say the Policy Services was
14    tracking the flow of money between the various
15    entities through QuickBooks?
16         A.   Yes.
17               MS. WARDEN:  Objection; vague as
18    to "tracking."
19         Q.   (BY MR. HULINGS)  So it was keeping records
20    regarding -- it's fair to say that Policy Services was
21    keeping records of the various transfers of funds
22    between the entities identified in this balance sheet,
23    correct?
24               MS. WARDEN:  Same -- same objection.
25         A.   As long as they were involved in the
```

```
 1   transaction, yes.
 2       Q.   (BY MR. HULINGS)  And did each of these
 3   separate entities have their own bank accounts?
 4       A.   I believe they did.
 5       Q.   So --
 6       A.   Should have.
 7       Q.   So -- excuse me.  The bank account records
 8   would provide another way of tracking the movement of
 9   funds between these entities, correct?
10            MS. WARDEN:  Objection; foundation.
11       A.   Yes, that's correct.
12       Q.   (BY MR. HULINGS)  And that answer is based on
13   your familiarity with Policy Services business
14   records, the bank statements, and your experience as
15   an accountant; is that fair?
16       A.   When we -- when we do the accounting records,
17   they're basically generated off the activity from the
18   bank accounts.
19       Q.   So -- so you have some firsthand knowledge of
20   that, there are bank accounts for each of these
21   separate entities?
22       A.   Yes.
23       Q.   And you have firsthand knowledge of the
24   content of those bank accounts, correct?
25       A.   I'd have to look at the records, but yes.
```

```
 1        Q.    No.   Talking about contract between the
 2   entities.   Are you aware of any requirement that
 3   required a formal written contract between the
 4   entities for these funds to be transferred?
 5        A.    No.
 6              MS. WARDEN:   Objection.
 7        Q.    (BY MR. HULINGS)   All right.   Okay.   Let's go
 8   down a little further.   You've got fixed assets.   Just
 9   briefly, what are these?
10        A.    So those are the assets that the company
11   owned.   They're all under Policy Services.   I think
12   most of them are pretty self-explanatory, and the
13   reason they're grouped is on the tax return, we only
14   enter one number.
15        Q.    We'll go down a little lower under,
16   "Liabilities and equity."   Do you see where we are?
17        A.    Yep.
18        Q.    It says, "Payable to investors," and Policy
19   Services, it's approximately 7.8 million.   Do you see
20   that?
21        A.    Yes.
22        Q.    What is that payable -- how is that number
23   7.8 million derived?
24        A.    That is the amount that was received from the
25   investors.
```

```
 1      A.    Those, I believe, are the actual policies
 2   that were purchased.
 3      Q.    And, again, these -- was this document
 4   generated from the QuickBooks record?
 5      A.    Yes.
 6      Q.    All right.  And under the next page, still
 7   the balance sheet, under, "Liabilities and equity,"
 8   there's something called "SWEEP."  What is "SWEEP"?
 9      A.    SWEEP was a account that, I believe,
10   Mr. Mueller set up for money going in and out of the
11   various policies, and those are the policies that were
12   identified.
13      Q.    This was -- the SWEEP account was another --
14   was this another way for Policy Services to track the
15   flow of money to and from investors?
16      A.    Yes.
17            MS. WARDEN:   Objection; mischaracterizes
18   testimony and vague.
19      Q.    (BY MR. HULINGS)  All right.  The next page,
20   you've got -- it looks like you've got an insurance
21   policy and some names underneath it.  What does that
22   indicate?
23      A.    So that indicates that on that policy, there
24   were, whatever, 10, 15 investors in that policy.
25      Q.    And on Page 10, Bates number at the bottom is
```

1    computer date of 3/10/2015 will be transmitted," and

2    then there's the rest of the sentence, and that is

3    marked through.   Why is it marked through?

4        A.    Because I cleared the diagnostic.

5        Q.    Understood.

6        A.    That's just indicating that the computer

7    system used that date as the filing date.

8        Q.    Got it.  All right.  Let's go to Page 6.

9    What is this page right here?

10       A.    Okay.  So that is the summary of the tax

11   return for 2014 and a comparison to the 2013 return.

12       Q.    And how is this generated?

13       A.    By the software.

14       Q.    What kind of software were you using?

15       A.    It's called Lacerte.

16       Q.    Could you spell that?

17       A.    L-A-C-E-R-T-E.

18       Q.    Where did these numbers come from?

19       A.    Those are -- well, the numbers above the

20   ordinary business income and loss are all input by me

21   into the system.

22       Q.    Where did you get those numbers to input

23   them?

24       A.    From the prior document that we looked at

25   where I combined the balance sheet and profit and loss

```
 1   statements.
 2       Q.   The ultimate source of those are the
 3   QuickBooks records for --
 4       A.   That is correct.
 5               MS. WARDEN:  Objection; leading.
 6               Sorry, Mr. Abramson, if you don't mind,
 7   just give me, like --
 8               THE WITNESS:  No problem.  Sorry.
 9               MS. WARDEN:  -- two seconds before
10   answering.
11       Q.   (BY MR. HULINGS)  So is the ultimate source of
12   the information that is reflected in this page the
13   QuickBooks documents for Policy Services?
14       A.   For Policy Services and the related
15   subsidiaries, yes.
16       Q.   Okay.  And on Page 8, the document
17   says, "Shareholder's Basis Computation."  Do you see
18   this?
19       A.   Yes.
20       Q.   What is "basis"?  What is loss of excessive
21   basis?  What does that mean?
22       A.   So basis in an S Corporation is the initial
23   contribution that you purchase your stock with, plus
24   any subsequent contributions to the company for
25   capital, plus any profits that the company has, less
```

```
 1    you already submitted an extension?  I want to make
 2    sure."  Do you see that?
 3         A.   Yes.
 4         Q.   Did you understand this is Mr. Mueller
 5    telling you that even in April, Ms. Acker hadn't
 6    finished completing the QuickBooks?
 7         A.   Yes.
 8              MS. WARDEN:  Objection.
 9              THE WITNESS:  Sorry.
10         Q.   (BY MR. HULINGS)  So the next paragraph
11    says, "As for my own taxes, I would like to discuss
12    the overages."  Mr. Mueller says, "My own taxes," do
13    you understand that to be his personal income tax
14    returns?
15         A.   Yes.
16         Q.   The next sentence says, "You said it would be
17    a loan, but I'd like to 1099 some of that money out,
18    unless you want to keep it as is.  I need to know
19    whether I'll just file my own taxes as-is without the
20    K-1's or file an extension."  Okay.  It says, you said
21    it would be a loan, so that appears to be referring to
22    a previous conversation.  Is that your understanding?
23         A.   I don't know what the overages are.
24         Q.   Okay.  Do you recall a conversation prior to
25    this April 4 e-mail in which you discussed
```

1    can skip that.  All right.  So the next question

2    is, "What overages are you referring to?  I have not

3    seen any books in about a year."  Is that consistent

4    with your memory that you hadn't seen the -- are you

5    -- are you telling Mr. Mueller that you hadn't seen

6    the QuickBooks for Policy Services since completing

7    the March -- since March 2015?

8        A.   That is correct.  So since the 2014 complete

9    year.

10       Q.   All right.  So this is -- this kind of gets

11   to the heart of this.  I'm going to read this.  "If

12   you are referring to distributions in excess of basis

13   within the S-Corp. that would be considered dividends

14   to you for amounts not adjusted through the loan

15   account.  The dividends have not deductible to the

16   Corporation but are includable in your individual tax

17   returns."  Okay.  So let's walk through that sentence.

18       A.   Okay.

19       Q.   So if -- if there are distributions -- when

20   you're saying -- referring to distributions in excess

21   of basis, what is -- what are you referring to in that

22   sentence?

23       A.   So as we discussed basis before, you must

24   have basis in a corporation -- in an S Corporation to

25   be able to take profit distributions.  Okay?  So

1   distributions and dividends are two completely

2   separate things.  Distributions are distributions of

3   previously taxed profits that in this case Policy

4   Services never had.  Dividends are dividends similar

5   to what you receive from purchasing stock in a public

6   company, and those are taxable to an individual.

7      **Q.   And are they taxable as income or capital**

8   **gains?**

9      A.   They are taxable as dividends if -- let's

10   see.  Did they have qualified dividends back then?  I

11   don't remember when qualified dividends came into

12   play.  If they would qualify as qualified dividends,

13   which these would have, they would have been taxed at

14   a 15 percent rate.

15      **Q.   So if Mr. Mueller is getting distributions in**

16   **excess of basis, that would be considered dividends --**

17   **so help me understand.  Why would that be considered**

18   **dividends to Mr. Mueller?**

19      A.   Because he doesn't have basis to distribute a

20   previously taxed item.

21      **Q.   And because it's dividend, it would have to**

22   **be --**

23      A.   Tax --

24      **Q.   -- tax returns; is that right?**

25      A.   That would be correct.  They would be

1    dividends on his tax return.

2        Q.   So the next sentence -- then you say that,

3    but they are includable in your individual tax

4    returns, correct?

5        A.   Yes.

6        Q.   All right.  Next sentence says, "As the sole

7    owner of the corporation, it would be very difficult

8    to substantiate a reason for you to be paid and

9    treated as an independent contractor where a 1099

10   would be issued."  Why is that the case, that a sole

11   owner of a corporation can't receive a 1099?

12       A.   Because if you're an employee of the company,

13   you can't also be an independent contractor under the

14   Internal Revenue Code.

15       Q.   Okay.

16       A.   There are some very minor situations where

17   that may apply, but I didn't feel they did in this

18   case.

19       Q.   And you were -- were you aware at the time of

20   this e-mail that Policy Services had paid Mr. Mueller

21   a salary?

22       A.   Yes.

23       Q.   So he was an employee of Policy Services?

24       A.   Yes.

25              MS. WARDEN:  Objection; leading.

```
1        Q.   (BY MR. HULINGS)  And so as an employee of
2   Policy Services, is it your understanding that
3   Mr. Mueller could not take a -- could not file a 1099?
4        A.   He shouldn't, yes.
5        Q.   All right.  So then in red, Mr. Mueller
6   says, "The overages we spoke about in January from the
7   XLSX sheet I sent you.  When we talked before you said
8   loans (if you do not have sufficient basis), from the
9   corporation, but did not mention dividends."  So
10  Mr. Mueller appears to be referring to a telephone
11  conversation in January of 2016, correct?
12               MS. WARDEN:  Objection; leading.
13       A.   I believe so.
14       Q.   (BY MR. HULINGS)  All right.  Let me -- let me
15  -- I think that's a baseless objection, but I'm going
16  to rephrase the question to avoid a pointless fight.
17            Did you -- is it your understanding -- do you
18  recall a conversation in January 2016 with Mr. Mueller
19  that he is referring to in this e-mail?
20       A.   No.
21       Q.   Do you recall receiving a spreadsheet in
22  January 2016 from Mr. Mueller that will be referred to
23  as XL SX?
24       A.   I think he means Excel file by that.  I don't
25  recall receiving it, but he is referring to it so I
```

1    may have.

2       Q.   All right.  So the next -- so he says, "When

3    we talked before you said loans if you do not have

4    sufficient basis from the corporation."  What is your

5    understanding of that phrase?

6       A.   Well, in other words, he doesn't have basis

7    because Policy Services losses have exceeded money he

8    has put into the company.

9       Q.   And so what does that mean -- so if he's

10   received money from the company in excess of his

11   salary or in addition to his salary, does that mean

12   that he can treat that money provided by the company

13   as a loan from the company to Mr. Mueller?

14               MS. TULLY:  Objection; speculation.

15               MS. WARDEN:  Same objection.

16      A.   If there's intent to have it paid back, then

17   yes, it can be a loan.  If there's no intent for a

18   repayment, then it should be a dividend.

19      Q.   (BY MR. HULINGS)  Okay.  All right.  So he

20   says, "When we talked before -- and it's a in

21   different font, loans if you do not have sufficient

22   basis from the corporation."  So does that refresh

23   your memory that you may have told Mr. Mueller that he

24   could treat money received from Policy Services in

25   excess of his paycheck as a loan from the corporation?

```
 1                    MS. WARDEN:  Objection.  He said he
 2      didn't have a conversation with him.
 3                    MR. HULINGS:  That's not what he said.
 4      I'm asking for his memory, and if he doesn't remember,
 5      that's fine.
 6           Q.   (BY MR. HULINGS)  So you can answer the
 7      question, Mr. Abramson.
 8           A.   Can you repeat it?
 9           Q.   Yeah.  Okay.  Mr. Mueller says, "When we
10      talked before."  See that?
11           A.   Yes.
12           Q.   You testified previously that you didn't
13      remember the conversation; is that right?
14           A.   Yes.  Because I don't know when he's
15      referring to "talked" if that's telephone or e-mail
16      but...
17           Q.   So he -- he appears to have pasted something
18      in a different font that says, "Loans (if you do not
19      have sufficient basis), from the corporation."  Do you
20      recall telling Mr. Mueller that he could treat funds
21      received from the corporation in excess of his salary
22      as a loan if he did not have sufficient basis?
23           A.   I don't recall that, but it appears that I
24      did.
25           Q.   Okay.  And explain to us again why that would
```

```
 1    be the case?  Why would it be acceptable under the tax
 2    laws and the accounting principles for Mr. Mueller to
 3    treat funds received from the corporation in excess of
 4    his salary as a loan from the corporation?
 5         A.   So let's say he was taking funds during the
 6    year periodically.  I don't recall if he was taking
 7    salary on a periodic basis or just an annual salary at
 8    year-end.  He may have taken salary, assuming that
 9    there would be basis from income or -- or other
10    sources, that because I hadn't seen the accounting
11    records, I was unaware of.  So if he took too much
12    out, he could repay it the following year within a few
13    months, and there's no issue with it from a tax
14    standpoint.  If he is taking additional funds with no
15    intent to repay those, then they should be classified
16    as dividends and taxable income.
17         Q.   All right.  Okay.  Let's go up a little
18    further.  So you've got an e-mail from you April 5th
19    at 11:12 a.m.  Do you see that?
20         A.   Yes.
21         Q.   Appears to be a response to Mr. Mueller's
22    comments in red, correct?
23         A.   Okay.
24         Q.   All right.  So let's walk through this.  "In
25    order to deduct" -- he writes, "In an S-Corporation
```

1   the concept of basis and equity is as follows:  In

2   order to deduct losses from the entity the shareholder

3   must have basis to be able to deduct a loss."  Do you

4   see that?

5        A.   Yes.

6        Q.   And then it says, "Basis is defined as your

7   stock purchase plus additional equity contributions

8   plus net income less net losses less distributions."

9   Do you see that?

10       A.   Yes.

11       Q.   That's the same definition of basis we just

12  discussed earlier in your deposition, correct?

13       A.   Correct.

14       Q.   All right.  Then you tell Mr. Mueller, "In

15  order to be able to take distributions from an

16  S-Corporation there must be prior or current years

17  undistributed profits."  Do you see that?

18       A.   Correct.

19       Q.   Okay.  Next paragraph, "If distributions are

20  made in excess of basis then they are treated like

21  dividends."  Do you see that?

22       A.   Yes.

23       Q.   Meaning that they're -- "The downside to

24  dividends is that they are considered distributions of

25  equity and therefore provide no deduction to the

1    corporation."

2        A.   Correct.

3        Q.   **Explain what you meant by, "No deduction to**

4    **the corporation."**

5        A.   Dividends are a distribution of retained

6    earnings so if a dividend is issued, it reduces the

7    retained earnings of the corporation.  It is not an

8    expense that reduces income.

9        Q.   **So if it was paid in salary, that would be**

10   **deductible as an expense, correct?**

11       A.   That is correct.

12            **MS. WARDEN:**  Objection; leading.

13       Q.   **(BY MR. HULINGS)  Let me -- if -- if a payment**

14   **to Mr. Mueller was treated as salary, that would --**

15   **would that be deductible as an expense to the**

16   **corporation?**

17       A.   Yes.

18       Q.   **All right.  The next sentence says, "They are**

19   **taxable to the shareholders and may be qualified**

20   **dividends if the stock is owned for at least six**

21   **months."  Do you see that?**

22       A.   Yes.

23       Q.   **When you say "they," that's distributions of**

24   **equity or dividends, correct?**

25       A.   That is correct.

1      Q.   All right.  Okay.  Then you've got

2   Mr. Mueller's response later that day, April 5th, 9:47

3   a.m..  Mr. Mueller -- do you see this?

4      A.   Yes.

5      Q.   Okay.  This is a little further up, but it's

6   on Page 2 of the document.  It says, "Okay, thanks for

7   the explanation.  I've owned more than six months so

8   it'll be qualified dividends according to your e-mail.

9   However, the IRS site says," and then he quotes from

10  the IRS site.  Do you see that?

11     A.   Yes.

12     Q.   So then he asks you, "They are qualified

13  dividends or LTCG?"  Do you see that?

14     A.   Yes.

15     Q.   The LTCG means long-term capital gains?

16     A.   Yes.

17     Q.   All right.  And he says, "Most were payments

18  of my AMEX bill, which essentially were a

19  distribution."  Do you see that?

20     A.   Yes.

21     Q.   Does that -- are you familiar with QuickBooks

22  where -- are you familiar with QuickBooks entries of

23  Policy Services that indicate payments from Policy

24  Services to AMEX for a card in the name of

25  Mr. Mueller?

```
1         A.    I don't recall that, but he's bringing it up.
2         Q.    And he's saying that these are essentially a
3    distribution.  Do you see that?
4         A.    Okay.
5         Q.    Is that -- that's what the e-mail says, which
6    essentially are a distribution?
7         A.    Yes.
8         Q.    Okay.  Mr. Mueller says, "I am getting more
9    and more confused.  Or are they a loan which stays
10   internal pending profits?  Which might happen this tax
11   year.  Again confused."  So this -- how -- whether or
12   not -- the determination of whether or not these --
13   the payments of Mr. Mueller's AMEX bill are a
14   distribution or a loan, that -- does that have any
15   impact on Policy Services' tax returns?
16        A.    Not really.  But if Policy Services had a
17   profit this year, which he's indicating it might, then
18   it could have been a taxable -- it could have been a
19   distribution of previously taxed income because it
20   would have been taxed in that current year and not
21   taxable to him as a dividend.
22        Q.    Okay.  Let's explain that.  So is that
23   another way of saying that he could treat it as a loan
24   temporarily until they are tax -- until there is
25   profits and then reduce his profits from the loan
```

```
 1    amount?
 2                  MS. WARDEN:  Objection; leading and
 3    vague.
 4        Q.   (BY MR. HULINGS)  So let me -- do you
 5    understand that question?
 6        A.   I'm not sure.
 7        Q.   Not sure how the taxes work.  That's
 8    basically it.  Trying to get at how do you do this?
 9        A.   So I think -- I think what you're trying to
10    ask is if there was a profit that created enough
11    income to exceed the prior year losses, then he would
12    have had basis, and he is allowed to take
13    distributions without having to pick them up as
14    taxable income.
15        Q.   So how would you treat a loan from the
16    corporation on the year that he had sufficient basis?
17        A.   It wouldn't be a loan.  It would be a
18    distribution.
19        Q.   And so it would be taxed that year when there
20    was sufficient basis?
21        A.   So what would happen is the income from the
22    company that year would be taxable to him, his pro
23    rata portion, and then his distribution reduces his
24    basis.  So he was at -- if he was at a negative
25    500,000, let's say, and his distributable income was
```

```
 1   600,000 for the year, he would have had a hundred
 2   thousand of basis, which he could distribute up to the
 3   hundred thousand without any subsequent tax
 4   consequence.
 5       Q.   Okay.  Needless to say, Mr. Mueller, he says
 6   several times that he was confused, correct?
 7       A.   Okay.
 8       Q.   Well, and -- and you're -- you're giving
 9   Mr. Mueller advice on how he should treat payments to
10   him on his personal income taxes?
11            MS. WARDEN:  Objection; leading.
12       Q.   (BY MR. HULINGS)  Are you giving him advice --
13   let me rephrase it.  We asked this two different ways.
14   Okay?  Mr. Mueller is asking -- is it correct to say
15   Mr. Mueller is asking for your advice as to how he
16   should treat payments from Policy Services to him on
17   his personal income tax returns?
18            MS. WARDEN:  Same objection.
19       A.   I would say no.  I think he's asking -- I --
20   I think the confusion is coming in in the terminology
21   of distributions and dividends, and because we didn't
22   have the accounting knowledge at this time that we're
23   having this discussion on what the profitability or
24   loss for Policy Services was, I'm trying to explain to
25   him how the different situations are handled from a
```

1    some fairly complex issues here, and I think we have

2    different definitions of what counts as leading,

3    particularly with a third-party witness that has

4    signed a declaration requested by the SEC so as far as

5    I'm concerned, I'm considering this witness hostile

6    enough that I can ask any questions.  It's not a --

7    that's a legal term.  It's not a reflection on you,

8    Mr. Abramson.

9         A.    Understood.

10              MR. HULINGS:   For the record, I don't

11   think any of these questions are actually leading, and

12   I think I'm entitled to lead, but to avoid unnecessary

13   pointless and --

14              MS. WARDEN:   I disagree for the record.

15              (Speaking simultaneously.)

16              MR. HULINGS:   -- I will ask questions.

17        Q.    (BY MR. HULINGS)  There may be a lot of

18   different versions of these questions, Mr. Abramson,

19   just to avoid these baseless objections so bear with

20   me.

21        A.    Okay.

22        Q.    All right.  Let's go up one more.  So we've

23   got an e-mail from you, Mr. Mueller dated April 5th,

24   2016, at 3:08 p.m.  See that?

25        A.    Yes.

1    Q.   This is a response to the previous e-mail we
2  just discussed; is that right?
3    A.   Correct.
4    Q.   The first paragraph you said that, "A
5  qualified dividend is treated the same as a long-term
6  capital gain and then it's taxed at 15 to 20 percent
7  depending on your income level?
8    A.   Correct.
9    Q.   All right.   Next paragraph says, "If you
10 treat these as loans, they are not currently taxable
11 as they would be considered loans to you from the
12 corporation.   In years that there are profits (and you
13 have positive basis), you can then treat the loans as
14 distributions of income and not pay tax a second time
15 on the funds."
16   A.   Okay.
17   Q.   So is that -- do you standby that description
18 of how Mr. Mueller could treat payments from Policy
19 Services to him or for his -- for his -- or for --
20           MS. WARDEN:   Objection -- sorry.
21           MR. HULINGS:   I didn't hear the
22 objection.
23           MS. WARDEN:   My objection is vague as
24 to "standby."
25   Q.   (BY MR. HULINGS)   You understand what I mean

```
 1    by "standby"?
 2         A.   Are you saying that do I agree that that's
 3    something I'm asking?
 4         Q.   No, no.  Let me rephrase.  All right.  So
 5    this -- this second paragraph of this e-mail that
 6    starts with, "If you treat these as loans" --
 7         A.   Yes.
 8         Q.   Do you consider that paragraph to be an
 9    accurate statement of the tax laws in general
10    accounting principles?
11         A.   Yes.
12         Q.   Okay.  And so they're -- are you telling
13    Mr. Mueller that he can treat payments from Policy
14    Services for his personal AMEX bill as a loan in that
15    current tax year?
16              MS. TULLY:  Objection; mischaracterizes
17    the evidence; speculation.
18              MS. WARDEN:  Same objection.  The e-mail
19    speaks for itself.
20         Q.   (BY MR. HULINGS)  You can answer.
21         A.   I'm sorry.  Just restate it again.
22         Q.   All right.  No, you know what, let's -- so
23    let me ask -- let me ask it this way.  To your
24    knowledge, was there anything improper under the tax
25    laws and accounting principles by Mr. Mueller treating
```

```
 1   payments by Policy Services of his American Express
 2   bill as a loan from Policy Services in tax year 2015?
 3               MS. WARDEN:  Objection; asks for a legal
 4   conclusion; vague.
 5               MS. TULLY:  Same objections.
 6       A.   My opinion, no.
 7       Q.   (BY MR. HULINGS)  Is it in your experience
 8   common for sole owners of LLCs or S-Corp.'s to take
 9   loans from those entities?
10               MS. TULLY:  Objection; speculation;
11   vague as to "common."
12               MS. WARDEN:  Same objection.
13       A.   Yes, it occurs.
14       Q.   (BY MR. HULINGS)  Is there anything -- does it
15   violate accounting principles for an owner of a
16   company to take a loan from his company?
17               MS. TULLY:  Objection; speculation;
18   incomplete hypothetical.
19       A.   As long as it's documented and interest is
20   paid on the loan and the loan has terms for repayment,
21   no.
22       Q.   (BY MR. HULINGS)  All right.  Okay.  A little
23   further up, you've got -- let me actually stop on
24   that.  When it says, "As long as the loan is
25   documented," to comply with accounting principles, how
```

1    as loans they are not currently taxable."  Do you see

2    that?

3        A.    Yes.

4        Q.    Did you ever tell Mr. Mueller that if he

5    treats these payments as loans, he is required to

6    prepare a note?

7        A.    I don't know that loans ever occurred while I

8    was working on the account, so, no, I probably did

9    not.

10        Q.    So to clarify, you don't recall ever telling

11    Mr. Mueller that a note was required for a loan?

12              MS. WARDEN:   Objection; asked and

13    answered.

14        A.    No.  Because to the best of my knowledge,

15    there was never a loan in place.

16        Q.    (BY MR. HULINGS)  Okay.  So let's go a little

17    further.  April 5th, 2016, an e-mail from Mr. Mueller

18    to you at 1:15 p.m.  Do you see that?

19        A.    Yes.

20        Q.    And obviously there are different time zones

21    here, so we don't know how -- I mean, we don't know --

22    the -- the e-mails don't reflect the time zone so --

23        A.    That's okay.

24        Q.    All right.  So Mr. Mueller then says, "Can we

25    treat 176,930 as long-term capital gains and the rest

1    as loans.  Which would be easiest?"  Do you see that?

2        A.   Yes.

3        Q.   And then you respond.  "We can treat it as

4    such when the returns are prepared."  What is your

5    understanding of what you meant when you said "as

6    such"?

7        A.   In other words, he wants to take 176 plus as

8    dividends and the rest as loans.

9        Q.   What you're telling him -- what you're

10   telling him is that he can treat it as long term

11   capital gains and the rest as loans when the returns

12   are prepared; is that a fair summary?

13            MS. WARDEN:   Objection; mischaracterizes

14   the evidence and leading.

15       A.   Yes.

16       Q.   (BY MR. HULINGS)  Okay.  All right.  And it

17   says -- next sentence says, "There should have been a

18   1099-div issued to you from the dividends, which is

19   due to the IRS February 29, 2016."  Do you see that?

20       A.   Yes.

21       Q.   But then you say, "Since it is not deductible

22   and you are reporting the income I don't see a big

23   issue with it, but that is what should have happened."

24   See that?

25       A.   Yes.

1    accounting and tax preparation services to Mr. Mueller
2    and his affiliated companies?
3        A.   Well, partly because with their split, I knew
4    I need to spend the time on Mr. Hagan's, along with
5    other new clients that I picked up during that tax
6    period.  So I just didn't have the time to handle
7    Mr. Mueller's.
8        Q.   And were there -- is that the only reason or
9    any other reasons?
10               MS. WARDEN:  Objection; leading.
11       A.   Well -- well, with -- with the split, I
12   didn't want -- I felt it was a conflict to do both.
13       Q.   (BY MR. HULINGS)  Was there anything in -- did
14   you discontinue working with Mr. Mueller because you
15   thought he was doing anything improper?
16       A.   No.
17               MS. WARDEN:  Objection; leading.
18       A.   No.
19       Q.   (BY MR. HULINGS)  Okay.  Let me try to think
20   how I can rephrase that question to make it less
21   leading.  I don't think it was leading.  How about --
22   well, I think you've answered it.  I think we're fine.
23               Just to clear it up for the record, did you
24   discontinue working with Mr. Mueller because you
25   thought he was doing anything improper?

```
 1        A.    No.

 2        Q.    All right.  After -- a little further on, you

 3   say, "We wish to remind you that your 2015 federal

 4   corporate income tax returns are due by September 15,

 5   2016."  That's in the second-to-last paragraph of the

 6   letter.  Do you see that?

 7        A.    Correct.

 8        Q.    That basically gives Mr. Mueller two months

 9   to find a new CPA; is that about right?

10        A.    Correct.

11        Q.    Is that enough time in your experience to --

12   for a new CPA to review documents and prepare returns?

13              MS. WARDEN:  Objection; vague.

14        A.    I don't know.  I've taken on new clients with

15   shorter periods than that.

16        Q.    (BY MR. HULINGS)  So in your experience, you

17   think you could have prepared a tax return in the two

18   months that you were giving a client in this case?

19              MS. WARDEN:  Objection; speculative.

20        A.    Depending on when the records came in, yes.

21        Q.    (BY MR. HULINGS)  All right.

22        A.    At this time I don't think the records were

23   available.

24        Q.    Did you have any -- are you aware of who

25   Mr. Mueller retained?
```

```
 1       A.   When you say taking revenue funds, what do
 2   you mean by that?
 3       Q.   Let me ask it another way.  Did you ever tell
 4   Mr. Mueller that he could not treat for accounting
 5   purposes money provided by investors as revenue Policy
 6   Services?
 7       A.   No.
 8       Q.   In your opinion -- well, you filed the tax
 9   returns for those years, correct?
10       A.   Correct.
11       Q.   Would you have -- if there was something
12   inappropriate, illegal, or contrary to accounting
13   principles in -- in that practice of treating account
14   -- some of the money provided by investors as revenue
15   to Policy Services, would you have filed the tax
16   return as it was written?
17            MS. WARDEN:  Objection; vague; compound;
18   speculative; asks for a legal conclusion.
19       Q.   (BY MR. HULINGS)  So let me see if I can
20   address that objection.  It doesn't ask for a legal
21   conclusion because it just asks you whether you would
22   have filed something.  It's not compound, but let me
23   ask it this way:  When you file the tax return for
24   Policy Services, was there anything -- was there any
25   -- when you filed the tax returns for Policy Services,
```

1    was there any information included on that tax return

2    that you thought was inaccurate?

3         A.   No.

4         Q.   Was there any information that you thought

5    did not comply with accounting principles?

6         A.   No.

7         Q.   Is it part of your job to make sure that the

8    tax returns filed by Policy Services complied with the

9    tax laws?

10        A.   Yes.

11        Q.   Is it part of your job to ensure that the tax

12   returns filed by Policy Services complied with

13   generally accepted accounting principles?

14        A.   No.

15        Q.   Was it your job to advise the client about

16   generally accepted accounting principles when

17   appropriate for purposes of preparing tax returns?

18        A.   Well, in preparing tax returns, they were

19   filed, I believe, on the cash basis of accounting,

20   which is not generally accepted accounting principles

21   so --

22        Q.   All right.

23        A.   -- based on your question, I would say no.

24        Q.   Thank you -- thank you for the clarification.

25        A.   Sure.

```
1        Q.    But if there was -- if you identify
2   information in Policy Services books and records that
3   you thought was not reasonable, it was your practice
4   to inform your clients of that fact; is that right?
5                MS. WARDEN:   Objection; vague as to
6   reasonable; speculative.
7        Q.    (BY MR. HULINGS)   You used the word reasonable
8   earlier in your testimony, correct?
9        A.    Yes.
10       Q.    So you understand what I -- what I am
11  referring to when I -- I say that you -- you
12  considered it part of your professional obligations to
13  inform your clients when there was something in their
14  books and records that you considered to not be
15  reasonable?
16       A.    Correct.
17       Q.    And in the -- in preparing Policy Services
18  tax returns, you, on occasion, informed Mr. Mueller
19  and Mr. Hagan and Ms. Acker of certain entries that
20  you considered to not be reasonable?
21       A.    Correct.
22       Q.    And to your memory, did they ever refuse to
23  accept your advice?
24       A.    Not that I remember.
25                MR. HULINGS:   All right.  I'm going to
```

```
 1        A.   I don't remember if they ended up cashing out
 2   the policy to provide funds to -- for the refund or
 3   whether they used funds from either other funds that
 4   they were holding to pay future premiums or other
 5   investors' money.  I don't know where the funds came
 6   from.
 7        Q.   So one of the possibilities is that -- so let
 8   me put it this way:  When investor invests funds in
 9   Policy Services, those funds aren't escrowed in a
10   separate bank account?
11        A.   No.
12        Q.   Those funds are combined with the funds of
13   other investors and then spent in ways we've
14   discussed --
15             MS. WARDEN:   Objection -- sorry.
16             MS. TULLY:   Objection; speculation.
17             MS. WARDEN:   And objection; misstates
18   testimony.
19        Q.   (BY MS. WARDEN)  It's just a question.  Does
20   it -- when investor -- when an investor deposits money
21   into Policy Services, it doesn't -- it's not escrowed
22   into a particular bank account?
23        A.   No.  It's effectively put into a pool of
24   funds.
25        Q.   With other investor funds?
```

1    A.    Yes.

2    Q.    And that money is, in your experience in

3  working with Policy Services and reviewing the

4  QuickBooks records and other documents, that money is

5  spent in various ways that we've discussed today?

6    A.    Yes.

7    Q.    So you ever hear the phrase money is

8  fungible?

9    A.    As long as they are tracking how much is due

10  to each investor, which they were, yes.

11    Q.    So would there be anything that violates the

12  -- it would be -- so these -- the funds who -- the

13  payment to the investor that asks for their money back

14  could have been made from new investor funds, correct?

15           MS. WARDEN:  Objection; speculative;

16  vague.

17    A.    In other words, a new investor could have

18  effectively purchased the policy that the exiting

19  investor was invested in.

20    Q.    (BY MR. HULINGS)  Could Policy Services have

21  made a payment from a bank account where other

22  investor money was pooled to repay that investment and

23  -- and be compliant with accounting standards?

24           MS. WARDEN:  Objection; speculative;

25  vague.

1      A.   Yes.

2      Q.   (BY MR. HULINGS)  So when you learned that

3   Policy Services had returned that investor's

4   investment, did you tell Mr. Mueller or Mr. Hagan that

5   they were doing anything wrong?

6      A.   No.

7      Q.   And you mentioned earlier that none of these

8   policies matured during the time that you were working

9   with Policy Services, correct?

10      A.   That's my recollection, yes.

11      Q.   So that leaves, as the source of the funds to

12   repay this investor, funds from new investors,

13   correct?

14           MS. WARDEN:  Objection; misstates

15   testimony.

16           MS. TULLY:  Speculation.

17           MS. WARDEN:  Leading.

18      Q.   (BY MR. HULINGS)  What other possible source

19   of funds could have been used to repay this investor

20   if none of the policies had matured, other than new

21   investor funds?

22           MS. TULLY:  Objection; speculation.

23      A.   Well, part of the funds that were pooled from

24   prior investors were being maintained by Policy

25   Services for future expenses.  It could have come out

```
1    of that pool.  It could have -- they could have sold
2    the policy that the investor was invested in.  I -- I
3    don't recollect whether that was done or not.  Or it
4    came from money that other investors placed with the
5    company.
6          Q.   (BY MR. HULINGS)  Okay.
7          A.   I mean, those were the only three sources of
8    funds from -- for anything.
9          Q.   And you didn't tell Mr. Mueller or Mr. Hagan
10   that there was anything inappropriate when using any
11   one of those three sources of funds to repay this
12   investor?
13         A.   No.
14         Q.   All right.  Okay.  You mentioned earlier that
15   you didn't verify the data that related to the
16   expenses in the Deeproot QuickBooks entries; is that
17   right?
18         A.   Right.
19         Q.   When you say "verify," what do you mean by
20   that?
21         A.   So if you're doing an audit or a review of
22   the books, you are applying some kind of statistical
23   or sampling or actual inspection of records, looking
24   at contracts, looking at various documents to -- to
25   make sure that the transactions are accurate.  All I
```

```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
2                       SAN ANTONIO DIVISION
3
      SECURITIES AND EXCHANGE      )
4     COMMISSION,                  )
                                   )
5          Plaintiff,              )
                                   )
6             -against-           )
                                   )
7     ROBERT J. MUELLER,           )
      DEEPROOT FUNDS, LLC          )
8     (a/k/a dprt Funds,           )
      LLC), AND POLICY             )
9     SERVICES, INC.,              )
                                   )
10         Defendants.             )
                                   )
11            -and-                )      CIVIL ACTION NO.
                                   )      5:21-cv-785-XR
12    DEEPROOT TECH LLC,           )
      DEEPROOT PINBALL LLC,        )
13    DEEPROOT STUDIOS LLC,        )
      DEEPROOT SPORTS &            )
14    ENTERTAINMENT LLC,           )
      DEEPROOT RE 12621            )
15    SILICON DR LLC, AND          )
      ROBERT J. MUELLER,           )
16    JEFFREY L. MUELLER, AND      )
      BELINDA G. BREEN, AS         )
17    CO-TRUSTEES OF THE MB        )
      HALE OHANA REVOCABLE         )
18    TRUST,                       )
                                   )
19         Relief Defendants.      )
20
21    THE STATE OF TEXAS :
      COUNTY  OF  HARRIS :
22
23           I, HEATHER L. GARZA, a Certified Shorthand
24    Reporter in and for the State of Texas, do hereby
25    certify that the facts as stated by me in the caption
```

```
 1   hereto are true; that the above and foregoing answers
 2   of the witness, KEN ABRAMSON, to the interrogatories
 3   as indicated were made before me by the said witness
 4   after being first remotely duly sworn to testify the
 5   truth, and same were reduced to typewriting under my
 6   direction; that the above and foregoing deposition as
 7   set forth in typewriting is a full, true, and correct
 8   transcript of the proceedings had at the time of
 9   taking of said deposition.
10
11          I further certify that I am not, in any
12   capacity, a regular employee of the party in whose
13   behalf this deposition is taken, nor in the regular
14   employ of his attorney; and I certify that I am not
15   interested in the cause, nor of kin or counsel to
16   either of the parties;
17
18          That the amount of time used by each party at
19   the deposition is as follows:
20             MR. HULINGS - 03:50:19
               MS. TULLY - 00:00:00
21             MS. WARDEN - 00:21:37
22
               GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
23       this, the 6TH day of JULY, 2023.
24
25
```

HEATHER L. GARZA, CSR, RPR, CRR
Certification No.:   8262
Expiration Date:   04-30-24


Worldwide Court Reporters, Inc.
Firm Registration No. 223
12621 Featherwood Drive, Suite 290
Houston, TX 77034
800-745-1101