# Exhibit A-6

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
                          - - -
 3
 4   SECURITIES AND EXCHANGE           )
     COMMISSION,                       )
 5                                     )
              Plaintiff,               )
 6                                     )
          -against-                    ) Civil Action No.
 7                                     ) 5:21-cv-785-XR
     ROBERT J. MUELLER, DEEPROOT       )
 8   FUNDS LLC (a/k/a dprt Funds,      )
     LLC, AND POLICY SERVICES INC.,    )
 9                                     )
              Defendants.              )
10                                     )
              -and-                    )
11                                     )
     DEEPROOT TECH LLC, DEEPROOT       )
12   PINBALL LLC, DEEPROOT STUDIOS LLC,)
     DEEPROOT SPORTS & ENTERTAINMENT   )
13   LLC, DEEPROOT RE 12621 SILICON    )
     DR LLC, AND ROBERT J. MUELLER,    )
14   JEFFREY L. MUELLER, AND BELINDA   )
     G. BREEN, AS CO-TRUSTEES OF THE   )
15   MB HALE OHANA REVOCABLE           )
     TRUST,                            )
16                                     )
              Relief Defendants.       )
17   _____)
18
19        VIDEOTAPED DEPOSITION OF DENNIS J. CONCILLA
20                    Wednesday, July 12, 2023
                      9:35 a.m.
21                    Carlile Patchen & Murphy
                      950 Goodale Boulevard
22                    Suite 200
                      Columbus, Ohio  43212
23
     REPORTED BY:
24   SUSAN L. COOTS, RPR
     REGISTERED PROFESSIONAL REPORTER
25   JOB No. 230712ARSI
```

1

09:58   1           MR. HULINGS:  We -- we can talk about it off

        2   the record.

        3           MR. NASSE:  Yeah.

        4           MR. HULINGS:  I don't think it's actually

09:58   5   covered by any of the current requests, but we can talk

        6   about it.

        7           MR. NASSE:  Yeah.  We just learned about it

        8   right now.

        9           MR. HULINGS:  Okay.

09:58  10   BY MS. WARDEN:

       11      Q    Okay.  So, Mr. Concilla, do you recognize the

       12   document in front of you?

       13      A    Yes.

       14      Q    Okay.  What is it?

09:59  15      A    It's an engagement letter that I provided to

       16   Robert Mueller in April of 2013.

       17      Q    Okay.  Just look at the first page, sir.

       18   Is -- is that your name in the Sent -- the From line?

       19      A    Yes.

09:59  20      Q    Okay.  And you sent that email to

       21   contact@policy-services.net, correct?

       22      A    Yes.

       23      Q    And whose email address is that?

       24      A    I -- I don't remember, but I assume it's

09:59  25   Policy Services.

                                                              28

09:59   1        Q     Okay.

        2        A     Robert Mueller.

        3        Q     You assume it's Robert Mueller's email

        4   address?

09:59   5        A     I -- I assume, based on the caption.

        6        Q     Okay.  And is that your signature block at the

        7   bottom?

        8        A     Yes.

        9        Q     Okay.  And you copied G. Russell Hagan.  Who

09:59   10   is he?

        11        A     Russ Hagan was Robert Mueller's partner in

        12   2013 at Policy Services.

        13        Q     And why did you copy him on this email --

        14        A     Because --

10:00   15        Q     -- attaching an engagement letter?

        16        A     -- I had known Russ Hagan from a previous

        17   engagement.  Russ asked me to meet with he and

        18   Robert Mueller in regards to their venture, and -- and

        19   so I wrote this engage -- I -- I traveled to San Antonio

10:00   20   and met with them, looked at the operations, saw what

        21   they were doing, and -- and then I sent them this

        22   engagement letter.

        23        Q     Okay.  So you wrote on April 22nd, "Please

        24   find engagement letter attached."

10:00   25              And is -- are Pages 2 and 3 the document

                                                              29

10:01   1  you're looking at?  So it's SEC-Pulman-RE, five zeros

       2  and 4 through 5.  Is that the engagement letter?

       3      A    Yes.

       4      Q    All right.  And it's dated April 22nd, 2013?

10:01   5      A    Yes.

       6      Q    Okay.  And if you look at the last page, is

       7  that your name in the signature block?

       8      A    Yes.

       9      Q    And is that your signature?

10:01 10      A    It's a facsimile of my signature.

     11      Q    Or is that your electronic signature?

     12      A    It is, yes.

     13      Q    Okay.  All right.  Directing your attention to

     14  the last line of the first paragraph.  It says, "We

10:01 15  provide this letter to describe the basis on which our

     16  firm will provide legal services to you and be

     17  compensated for those services."

     18      Who is the "you" referring to in that

     19  sentence?

10:01 20      A    Policy Services.

     21      Q    Okay.  And at the top, you directed the

     22  engagement letter to Policy Services, and then, under

     23  that, Robert Mueller.  But who did you understand the

     24  client to be?

10:02 25      MR. HULINGS:  So objection to the description

                                 30

10:02  1    of the document which is inaccurate.

2    BY MS. WARDEN:

3        Q    Who did you understand your client to be, sir?

4        A    Policy Services.

10:02  5        Q    Okay.  And that's based upon what information?

6        A    I met with Russ Hagan and Robert Mueller who,

7    at the time, it was my understanding had formed Policy

8    Services, and they had asked me to represent them with

9    regards to certain transactions that they were

10:02 10   anticipating.

11       Q    Okay.  So let me break that down.  Who -- who

12   is the "they"?

13       A    "They" is Robert Mueller and Russ Hagan.

14       Q    Okay.  And they asked you to represent them

10:02 15   personally or Policy Services?

16       A    I -- I undertook the assignment to be on

17   behalf of Policy Services.

18       Q    And at any point did you represent

19   Robert Mueller personally?

10:03 20           MR. HULINGS:  So I'm going to object to the

21   extent that that goes outside the scope -- that question

22   goes outside the scope of the privilege waiver.  I think

23   the -- we're okay with that question being asked through

24   2018.  But any time after that, we object.

10:03 25   BY MS. WARDEN:

31

11:15   1          Q    Okay.  For both the dGRD and PPM -- and

       2     557 Funds?

       3               MR. HULINGS:  Same objections.

       4          A    Yes.

11:15   5          Q    And what is the equity approach that

       6     Mr. Mueller's referring to?

       7          A    You know, I don't -- I'm not sure I remember.

       8     I -- I -- I -- I -- I -- I think -- Well, I'd only be

       9     speculating.  I -- I don't recall really.

11:16  10          Q    Okay.  I'm going to hand you Tab 19 which I'll

      11     mark as Exhibit 91.

      12               (Deposition Exhibit 91 was marked for

      13                identification.)

      14     BY MS. WARDEN:

11:16  15          Q    Do you recognize this document?

      16          A    No.

      17          Q    Does it appear to be an August 12, 2015, email

      18     from you to Mr. Mueller?

      19          A    Yes.

11:16  20          Q    Okay.  You wrote, "In my mind, this is now

      21     ready."

      22               And it says there's attachment of a dGRD PPM,

      23     and that appears to be attached to this email

      24     MUELLER-2650 through 2667.

11:17  25               Do you see --

                                                                    76

11:17  1        A    Yes.

       2        Q    -- the dGRD PPM?

       3             What did you mean by, in your mind, this is

       4    now ready.

11:17  5        A    I had made all changes and comments that I

       6    thought were necessary.

       7        Q    Okay.  And so would you say the comment, "In

       8    my mind, this is now ready," were you providing

       9    Mr. Mueller legal advice?

11:17 10             MR. HULINGS:  Objection.  That's pretty vague.

      11        A    Yes.

      12        Q    Okay.  And was -- was your comment in the

      13    email, "In my mind, this is now ready," was that based

      14    upon the information that Mr. Mueller had provided to

11:17 15    you at that time?

      16             MR. HULINGS:  Objection.  Vague as to "at that

      17    time."

      18    BY MS. WARDEN:

      19        Q    You can answer.

11:17 20        A    Yes.

      21        Q    Sorry?

      22        A    Yes.

      23        Q    And if you later learned that -- If

      24    Mr. Mueller came to you after August 12th, 2015, with

11:18 25    new information, how would you advise him?  How would

                                                              77

11:20  1    your legal advice regarding them?

       2         A    It -- it --

       3              MR. HULINGS:  Hold on.  Object -- objection.

       4    Vague.  Calls for a hypothetical.

11:20  5              You can answer, if you can.

       6         A    If the changes were material to the offering.

       7         Q    Okay.  And what do you mean by "material"?

       8         A    I mean material.  It's a standard.  If -- if

       9    the change is material.  If -- if -- if the new

11:20 10    information materially changed the deal.  I mean, if

      11    they changed their phone number, no.

      12         Q    Okay.  Handing you Tab 22, which I'll mark as

      13    Exhibit 92.

      14              (Deposition Exhibit 92 was marked for

11:21 15              identification.)

      16    BY MS. WARDEN:

      17         Q    Okay.  Mr. Concilla, do you recognize this

      18    document?

      19         A    No.

11:21 20         Q    Is it fair to say it's a September 1, 2015,

      21    email from -- emails between you and Mr. Mueller?

      22         A    Yes.

      23         Q    All right.  Is the reference -- Okay.  So you

      24    write, at 1:05 p.m., "Okay.  Andy and I have declared

11:21 25    the 575 done."

                                                                    80

11:21   1            Is the reference to Andy Mr. Federico?

2       A    Yes.

3       Q    All right.  And what did you mean by, "The

4   575 is done"?

11:22   5       A    It was -- In our mind, it was completed.

6       Q    Okay.  And it was completed.  Is it fair to

7   say it was completed based upon the information that

8   Mr. Mueller had provided to you as of September 1st,

9   2015?

11:22   10           MR. HULINGS:  Objection.  Vague.

11      A    Yes.

12      Q    And you're relying on Mr. Mueller to give you

13  complete and accurate information, correct?

14           MR. HULINGS:  Objection.  Leading and vague.

11:22   15      A    Yes.

16      Q    And if you later learned additional

17  information that would have changed your legal advice to

18  Mr. Mueller, would that impact the 575 PPM?

19           MR. HULINGS:  Vague.

11:22   20           MS. SANSALONE:  Objection.

21      A    It -- it --

22           MR. HULINGS:  It calls for -- it calls for

23  speculation.  It's vague.

24      A    I'm sorry.  It's too vague.

11:22   25           MR. HULINGS:  You can answer.

81

11:26  1    premiums because, as you know, it's possible."

2                   What are -- what are you referring to here?

3         A      The -- the -- Okay.  The -- the theory of --

4    of investing in a life settlement is that you're

11:27  5    purchasing an interest in someone else's insurance

6    policy.  You'll -- you'll be paid the -- the amount of

7    the policy upon the death of that individual.  Okay.

8                   You have to set aside a certain amount of

9    money to continue paying the premiums.  If you have set

11:27  10   aside an in -- an insufficient amount of money, then you

11   may have to go back to the investor to say, We need more

12   money to continue paying the premiums to protect your

13   investment.  And that's what I'm referring to here.

14        Q      Okay.  And the -- Exhibit 94 is a draft

11:28  15   deeproot Investor Presentation.  Do you recall providing

16   legal advice on Exhibit 94?

17        A      Yes.

18        Q      Okay.  Was your legal advice on Exhibit 94

19   limited to the information that Mr. Mueller provided to

11:28  20   you about the 575 and dGRD Funds?

21                  MR. HULINGS:  Vague.

22                  You can answer.

23        A      Yes.

24        Q      And you were relying on Mr. Mueller to give

11:28  25   you complete and accurate information, correct?

84

12:11  1      Q    Okay.  Is that a synonym for a Reg D?

2      A    Yes.

3      Q    And at the bottom, do you see it's dated

4  September 1, 2015?

12:11  5      A    Yes.

6      Q    Okay.  So I can represent to you that in

7  Mr. Mueller's interrogatory responses, he indicated that

8  Exhibit 36 that you're looking at --

9      A    Yes.

12:11 10      Q    -- was operative between May 2015 and

11  May 2018.  So were you representing Policy Services

12  between -- at any point between May 2015 and May 2018?

13      A    Periodically.

14      Q    So is the --

12:11 15      A    Yes.

16      Q    -- answer "Yes"?

17      A    Yes.

18      Q    Okay.

19      A    From time to time.

12:11 20      Q    All right.  And do you recall advising Policy

21  Services with respect to Exhibit 36?

22           MR. HULINGS:  Objection.  Vague.

23      A    Not -- not specifically.

24      Q    Do you regard -- do you recall providing legal

12:12 25  advice with respect to the 575 PPMs?

100

12:12  1        A     Yes.

       2        Q     Okay.  And is Exhibit 36 one of the 575 PPMs

       3   that you provided advice for?

       4        A     I'm -- I'm unaware of there being more than

12:12  5   one 575 Fund.

       6        Q     Okay.  All right.  So turning your attention

       7   to Page 6.

       8        A     Page -- Page 6 as in the numbering pages or in

       9   the -- in the --

12:12 10        Q     Sorry.  That was my PDF Page 6.  So 14502.

      11   Hold on.  So page 6 of 13 on the bottom.  So

      12   SEC-DEEPROOT-E-0014505.

      13        A     Yeah.  Got it.  Yes.

      14        Q     Are you aware of more than one 575 Fund PPM?

12:13 15        A     I am -- I am not aware of more than one

      16   575 PPM.

      17        Q     Did Mr. Mueller ever tell you that there was

      18   more than one 575 PPM?

      19        A     I don't recall.

12:13 20        Q     Okay.  All right.  So if you look at the

      21   bottom of Bates 14505, it -- Under the category, Life

      22   Policies, it says, "We will invest in Life Policies, AKA

      23   Life Settlements, which are sales to third parties of

      24   existing life insurance contracts held on insureds who

12:13 25   are 65 years of age or older."

                                                             101

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

13:18 1              MS. SANSALONE:  Let's -- let's move forward.

2      BY MS. WARDEN:

3         Q     Mr. Concilla, did Mr. Mueller inform you that

4      he would pay his investors in earlier funds, not the

13:18 5      575 or dGRD Funds with 575 and dGRD investor funds?

6              MR. HULINGS:  All right.  So vague and

7      ambiguous and argumentative.  Assumes facts not in

8      evidence.

9              You can answer, if you can.

13:19 10        A     Money is fungible.  So wherever the money is

11     coming from, or if it's going into an account, it could

12     be used for whatever purpose.

13             But did we have a specific discussion about

14     what I think you're asking; paying old investors with

13:19 15     new investor money?  We did not.

16        Q     Okay.  I'm going to reask it because it's --

17     it's -- that was muddy to me.

18             So did Mr. Mueller inform you that he would

19     pay his inventors with earlier funds --

13:19 20        A     I've already --

21        Q     -- with 575 and dGRD investor funds?

22             MR. HULINGS:  Okay.  So same objections as

23     asserted to the previous question.  And asked and

24     answered.

13:19 25        A     I'm -- I'm confused.  You're saying his

                                                          152

14:32  1          MR. HULINGS:  Vague and ambiguous.  Assumes

       2   facts not in evidence.  Argumentative.  Misleading.

       3      A    Operational expenses could be nominal

       4   expenses.

14:32  5      Q    Well, how -- how -- how would you define

       6   operational expenses?

       7      A    Again -- again, expenses that are associated

       8   with day-to-day operations.  Did the electric bill get

       9   paid?  Did the phone bill get paid?  Those are all

14:33 10   operational expenses.

      11      Q    Did Mr. Mueller inform you that he would use

      12   575 and dGRD investor funds to pay off credit card

      13   purchases for personal expenses?

      14          MR. HULINGS:  So vague and ambiguous.  Assumes

14:33 15   facts not in evidence.  Argumentative.  Misleading.

      16          You can answer.

      17      A    No.

      18      Q    And just to follow up, are -- are investor

      19   payments operational expenses?

14:33 20          MR. HULINGS:  Vague and ambiguous.

      21   Argumentative.  Calls for a legal conclusion.

      22      A    I think they could be.

      23      Q    And did Mr. Mueller inform you that 575 and

      24   dGRD investor funds would be used to pay for investor

14:34 25   payments?

                                                              167

14:35   1       Q    Did Mr. Mueller inform you that he would use

        2  575 and dGRD investor funds to initiate cash transfers

        3  for personal expenses?

        4            MR. HULINGS:  So same set of -- Well, let me

14:35   5  repeat them.  Calls for -- facts -- relies on facts not

        6  in evidence.  It's argumentative.  It's vague and

        7  misleading.

        8            You can answer.

        9       A    No.

14:35  10       Q    Could payments from the Company Advance be

       11  used to pay investment returns?

       12            MR. HULINGS:  So hold on.  That's -- that's

       13  vague and ambiguous.  And argumentative.  And calls for

       14  a legal conclusion.

14:36  15       A    Say it again, please.  Could --

       16       Q    Could payments from the Company Advance be

       17  used to pay investment returns?

       18            MR. HULINGS:  Same objections.

       19       A    I think they could.  Yes.

14:36  20       Q    Like, pay the payouts at the end of the term?

       21  At the end of an investor's term.

       22            MR. HULINGS:  Asked and answered.  Vague and

       23  ambiguous.

       24       A    Yeah.  I'm sorry.  I can't -- I don't --

14:36  25  I don't understand the question because you're saying

                                                              169

15:18   1   Argumentative.

        2   BY MR. HULINGS:

        3        Q    You can answer.

        4        A    I -- I don't -- I think it's unlikely that

15:18   5   that conversation ever took place.

        6        Q    All right.  Ask a little bit about -- You --

        7   you just testified that it would not be proper for --

        8   Let me rephrase.

        9             You were just asked questions about your

15:19  10   Declaration.  Do you recall that?

       11        A    I do.

       12        Q    And one --

       13        A    I remember that much.

       14        Q    One of the questions concerned whether or not

15:19  15   it was proper to use new investor funds to pay old

       16   investors.

       17        A    Correct.

       18        Q    Do you recall that?

       19             And you made a distinction, based on the way

15:19  20   the question was asked, about writing the word "solely."

       21   Do you recall that?

       22        A    Yes.

       23        Q    And what did you mean by "sole" -- why was

       24   "solely" important in your response?

15:19  25        A    Because, as I explained in my Declaration, and

                                                              190

15:19   1   earlier here today --

2              (Telephone interruption.)

3              THE WITNESS:  Sorry, this is one of those

4       clients that won't let me retire.

15:20   5              Because if -- if -- I think it's important

6       because, again, going back to my issue of, you know,

7       money's fungible, if -- if -- if the underlying

8       investments are making money and that money is coming

9       into a bank account and new investor money is also going

15:20  10       into that bank account, then I don't think it's improper

11      that that money is commingled.

12             On the other hand, if there is no other money

13      coming in from any other source, then I would -- It's my

14      opinion that that would be improper.

15:20  15      Q    So any other source -- Let me follow up on

16      that.

17             Does it matter what kind of source the

18      other -- Let me rephrase.

19             So could -- So what your testimony is is that,

15:20  20      if new investor funds are put in the same bank account

21      as any other source of funds, that bank account could be

22      used to -- to make payments to previous investors?

23             MS. WARDEN:  Objection.  Mischaracterizes

24      prior testimony.

15:21  25             MR. HULINGS:  I'm asking him what his

191

15:21   1   testimony is so he can answer.

        2        A    I think that's a little too broad.

        3        Q    Okay.

        4        A    I mean, if you robbed a bank and you put it in

15:21   5   the bank account, and then new investor money came in,

        6   no, I don't think you could use that money.

        7             The PMM lays out how -- how the asset -- how

        8   the money will be invested and how the returns will

        9   be -- will -- will occur.  And if that's occurring, then

15:21  10   I think you could commingle that money.  I think it's

       11   probably bad practice, but I think I could commingle

       12   that money.

       13             But if there is no other source of money --

       14        Q    Could it be a loan?  Could the other source of

15:21  15   money that goes into the bank account from which

       16   payments to previous investors are made -- Do you need a

       17   break?

       18        A    No.  No.  No.  No.  I'm just thinking hard.

       19        Q    Okay.  So if -- so if --

15:21  20        A    Could it be a loan?

       21        Q    Yeah.  So -- All right.  Not a -- not a bank

       22   robbery.

       23        A    Okay.  Okay.

       24        Q    But if there was a return --

15:22  25        A    Uh-huh.

                                                               192

15:22  1      Q    -- on a policy -- Let me rephrase.

       2           If a policy --

       3      A    Matured.

       4      Q    -- matured --

15:22  5      A    Yes.

       6      Q    -- and resulted in revenue that was deposited

       7 in a bank account --

       8      A    Yes.

       9      Q    -- that bank account could be used to pay

15:22 10 previous investors?

      11      A    Yes.

      12           MS. WARDEN:  Objection.  Leading.

      13 BY MR. HULINGS:

      14      Q    Could that bank account have been used to pay

15:22 15 previous investors?

      16      A    Yes.

      17      Q    And that bank account could be -- could that

      18 bank account be used to pay previous investors, even

      19 though new investor funds were also deposited in that

15:22 20 bank account?

      21      A    Yes.

      22      Q    Okay.  What about a loan?  If deeproot took

      23 out a loan and the proceeds from that loan were placed

      24 in the bank account, could that bank account be used to

15:22 25 pay previous investors?

                                                              193

15:23   1   investors could be considered expenses of the fund under

    2   the Company Advance section; is that right?

    3        A    I see -- I see where you're going.

    4             MS. WARDEN:  Objection.  Mischaracterizes

15:24   5   testimony.

    6        A    I think it goes back to the issue of

    7   whether -- what's the sole -- what -- what -- what is --

    8   where is the sole source of the money.

    9        Q    So if the Company Advance is placed in the

15:24  10   same bank account as other revenues, could that bank

   11   account be used to pay new -- pay previous investors?

   12        A    If there's a reasonable expectation that the

   13   assets are paying dividends or paying interest or

   14   paying, then -- then yes.

15:24  15        Q    Is it a reasonable expectation that the assets

   16   are paying dividends?

   17             MS. WARDEN:  Objection.  Vague.

   18   BY MR. HULINGS:

   19        Q    I haven't even finished the question yet.

15:24  20             But let me -- Could it be -- is it -- would it

   21   be acceptable if there is a reasonable expectation that

   22   the assets will at some point pay dividends?

   23             MS. WARDEN:  Same objection.

   24        A    This is a very slippery slope.  I mean, I --

15:25  25   I -- I suppose it's possible that you could do that.

                                                            195

15:33  1  through this pile and find it -- in which you told

2  Mr. Mueller, "Andy and I say that the" -- something to

3  the effect that, "Andy and I say the 575 PPM was done"?

4      A    Yes.

15:34  5      Q    All right.  And in that PPM, it's stated that

6  investors could select an option in which they would be

7  paid on a monthly basis a certain amount of money?

8      A    Yes.

9      Q    And you're -- you're also aware that those

15:34 10  PPMs required that that monthly payment begin 60 days

11  after that selection is made?

12          MS. WARDEN:  Objection.  Vague as to

13  "required."

14      A    Yeah.  Yeah, I -- I -- I believe that's

15:34 15  correct.

16      Q    And so if there were no assets of the 575 Fund

17  when it began, and no sources of funding, other than new

18  investor money when the 575 Fund began, where did you

19  think the month -- the source of the funds for the

15:34 20  monthly -- Let me rephrase.

21          You previously testified that you're not aware

22  of any other funds provided to the 575 Fund at the time

23  it was initiated; is that right?

24      A    (Witness nodded.)

15:35 25          MS. SANSALONE:  You have to answer verbally.

203

15:35  1          A     Oh, yes.  Yes.

       2          Q     So the -- to your knowledge, the only source

       3    of funds at the beginning for the 575 Fund was new

       4    investor money; is that right?

15:35  5          A     Yes.  I addressed this in an email.

       6          Q     All right.  And you had that knowledge before

       7    you told Mr. Mueller that the 575 PPM had been approved?

       8                MS. WARDEN:  Objection.  Asked and answered.

       9          A     Yes.

15:35 10          Q     And so you knew that the 575 Fund had no funds

      11    in which to pay the monthly payments to 575 P investors,

      12    other than new investor funds; is that right?

      13                MS. WARDEN:  Objection.  Leading.  You just

      14    have to give me a couple seconds to do the objections.

15:35 15                Leading.  Mischaracterizes prior testimony.

      16    Calls for speculation.

      17    BY MR. HULINGS:

      18          Q     None of those are valid so you can answer.

      19                MS. WARDEN:  Object to that.

15:36 20    BY MR. HULINGS:

      21          Q     We've had a lot of depositions together, so

      22    we --

      23          A     Yeah, I get it.  I get it.  This is my first

      24    and on -- and only.

15:36 25          Q     Let me -- let me actually start that over.  I

                                                                    204

15:36  1   think there's too much back and forth.  Okay.  All

       2   right.  Let's break it in pieces.

       3            So the email -- Let me put -- Give me a

       4   second.

15:36  5            Do you recall the email where it says the nine

       6   -- this is done?

       7       A    Yeah, I do.  I recall that.  Yes.

       8       Q    Anybody remember what number that is?

       9       A    No.  It's a short email.

15:36 10            MS. SANSALONE:  It was one of the earlier ones

      11   today.

      12            MR. HULINGS:  It was one of the earlier ones.

      13            Ms. Warden, it's your exhibit.

      14   BY MR. HULINGS:

15:36 15       Q    Okay.  Exhibit 92.  On September 1st, 2015,

      16   you wrote an email to Mr. Mueller, stating, and I quote,

      17   "Andy and I have declared the 575 done."

      18       A    Uh-huh.

      19       Q    Do you recall that?

15:37 20       A    Yes.

      21       Q    And then it next says, Remember, of course --

      22   "Remembering, of course, that our job is to make sure it

      23   is compliant with the law and the disclosures are

      24   adequate."

15:37 25            Do you see that?

                                                              205

15:37   1      A     Yes.

        2      Q     So when you -- when you are telling

        3   Mr. Mueller that the 575 is done, what are you

        4   communicating to him?

15:37   5      A     That the PPM is -- is completed and -- and

        6   fulfills his obligation on -- under the law.

        7      Q     So in the next sentence, it says, your job is

        8   to make sure it is compliant with the law and

        9   disclosures are adequate.

15:37 10      A     Correct.

      11      Q     So are you communicating to Mr. Mueller that

      12   the 575 PPM is compliant with the law and the

      13   disclosures are adequate based on the information

      14   available to you at the time?

15:38 15      A     Yes.

      16         MS. WARDEN:  Objection.  Asked and answered.

      17   BY MR. HULINGS:

      18      Q     Okay.  And that was as of September 1st, 2015,

      19   correct?

15:38 20      A     Yes.

      21      Q     All right.  So prior to that date, you knew

      22   that the 575 Fund had no assets?

      23         MS. WARDEN:  Objection.  Asked and answered.

      24         MR. HULINGS:  Yeah.  You objected so I'm

15:38 25   repackaging it to -- to deal with the objections.

                                                   206

15:38  1  BY MR. HULINGS:

       2       Q    Do you -- do you recall that?

       3       A    Yes.

       4       Q    And we're going to do this with an exhibit,

15:38  5  but it's one of the many.

       6       A    Can we do it by committee?

       7       Q    Yeah.  And we're going to take a break in a

       8  second, I promise.

       9       A    Okay.

15:38 10       Q    You can probably see where I'm going with

      11  this?  So you --

      12       A    I -- I -- I do, and --

      13       Q    So let me -- let me ask the question to -- so

      14  that it's teed up properly.

15:39 15       A    Do you want me to ask the question?

      16       Q    No, I can get there.  I'm trying to do it in a

      17  way that -- that minimizes the potential for objections.

      18   Okay?

      19       A    Okay.

15:39 20       Q    So before September 1, 2015, you knew that the

      21  575 P -- Let me rephrase.

      22            Prior to September 1, 2015, you knew that the

      23  only potential source of funds from which the 575 Fund

      24  could make a payment to 575 P investors within 60 days

15:39 25  was new investor funds; is that right?

                                                              207

15:58   1        A      I honestly don't.  I -- I don't.

        2        Q      So --

        3        A      It was -- it was a couple years after the

        4  engagement started.

15:58   5        Q      So it's fair to say approximately 2015 through

        6  the end of your representation, Mr. Mueller was the sole

        7  owner of all of the entities we've collectively been

        8  calling the deeproot family of companies?

        9        A      Yes.

15:58  10        Q      Okay.  And during that time, you provided

       11  legal advice to Robert Mueller?

       12        A      Yes.

       13        Q      And that was after Mr. Mueller requested legal

       14  advice from you?

15:58  15        A      Yes.

       16        Q      And he was -- That legal advice that you

       17  provided to Mr. Mueller, some of that could have

       18  concerned Policy Services; is that right?

       19        A      Yes.

15:59  20        Q      Some of that advice could have concerned other

       21  entities in which he was the owner, correct?

       22        A      Yes.

       23        Q      Under those circumstances, do you think

       24  Mr. Mueller reasonably could have believed that you

15:59  25  represented him in a personal capacity?

                                                                  213

15:59  1            MS. WARDEN:  Objection.  Calls for

       2  speculation.  Lack of foundation.

       3  BY MR. HULINGS:

       4       Q    You can answer.

15:59  5       A    Yes.

       6       Q    Okay.  And, in part, because he asked for

       7  legal advice?

       8       A    Yes.

       9       Q    And you provided that legal advice?

15:59 10       A    Yes.

      11       Q    All right.  Earlier today, you mentioned that

      12  some of the documents that we've been discussing today,

      13  at least the PPMs, were based on a draft originally

      14  provided by a Texas lawyer.  Do I have that right?

15:59 15       A    Yes.  That's my recollection.

      16       Q    Okay.  Who provided you the draft from the

      17  Texas lawyer?

      18       A    Robert Mueller.

      19       Q    Okay.  Do you remember when he provided you

16:00 20  that draft?

      21       A    Right at the beginning of our representation.

      22       Q    So --

      23       A    2013.  Sometime --

      24       Q    Okay.

16:00 25       A    -- in early 2013.

                                                              214

16:03  1      A    It -- it -- this reminds me that, yes, there

2  was originally a -- a debenture fund.

3      Q    So the first sentence says, "Here are the

4  final docs for the five-year fund."

16:03  5           Do you see that?

6      A    Yes.

7      Q    So when your -- when you send final docs to a

8  client, what are you communicating to the client?

9            MS. WARDEN:  Objection.  Vague.

16:03 10      A    That -- that we -- we have reviewed this and

11  we -- and we feel that it's appropriate and adequate

12  and -- and that you can start selling it.

13      Q    So this email is representing to the

14  recipients that it is your legal opinion that this

16:04 15  document complies with the securities laws based on the

16  information available to you; is that right?

17      A    Yes.

18      Q    Okay.  And -- and part of the purpose of your

19  representation was to review documents that are being

16:04 20  provided to investors to ensure that they comply with

21  the securities laws; is that right?

22      A    Yes.

23      Q    And that includes ensuring that -- Does that

24  include ensuring that there -- no statements in these

16:04 25  documents were materially misleading, based on the

218

16:04   1   information available to you?

2        A    Yes.

3        Q    If you -- Was it your practice that, if you

4   saw some language in a PPM that you thought was

16:05   5   inappropriate or misleading, would you inform your

6   clients of that fact?

7             MS. WARDEN:  Objection.  Calls for

8   speculation.

9        A    Yes.

16:05  10       Q    And during the course of your representation,

11  or in the course of the time working with Mr. Mueller,

12  you -- did you send him multiple drafts of PPMs that

13  included changes that you were recommending?

14       A    Yes.

16:05  15       Q    To your knowledge or memory, did Mr. Mueller

16  ever refuse to incorporate one of your proposed changes

17  into a PPM?

18            MS. WARDEN:  Objection.  Vague as to "refuse."

19       A    I -- I -- I -- I don't believe so, no.

16:05  20       Q    All right.  Did -- Do you recall whether these

21  documents were drafted based on the draft provided by

22  the Texas lawyer?

23       A    You know, I honestly can't answer that because

24  I -- I just remember that there was -- that I -- we'd

16:06  25  gotten a draft and we reviewed the draft, and we felt

219

16:06  1  that it needed quite a bit more.

 2      Q    But the -- the draft that you were provided

 3  was early in the representation?

 4      A    Very early in the representation so it would

16:06  5  make sense to me --

 6      Q    Yeah.

 7      A    -- that this was based off of that.

 8      Q    And when you review a document, make changes,

 9  and then tell a client, "This is done," does it then

16:06 10  become your work product?

11      A    I believe it does, yes.

12      Q    Yeah.  And so it is your legal advice to a

13  client that the document is sufficient, complies with

14  the law, and can be given to investors?

16:06 15      A    Yes.

16      MS. WARDEN:  Objection.  Asks for a legal

17  conclusion.

18  BY MR. HULINGS:

19      Q    Okay.  Let's look at page -- let's go to

16:06 20  Page 2 of the -- the bottom of document will have

21  Page 2.  It's Page 6 of the PDF, but it's -- The number

22  at the bottom will be 2.

23      And for the record, this -- Even though this

24  particular printout, which I had to have done at a

16:07 25  Kinko's here, doesn't have the confidential stamp on it.

    220

16:16  1  to your clients saying it's been approved, you're

2  communicating to them that they can spend money in a

3  manner that is consistent with the representations in

4  the PPMs?

16:17  5       MS. WARDEN:  Objection.  Leading.  Misstates

6  the evidence.

7  BY MR. HULINGS:

8       Q    How do you misstate the evidence?  I'm reading

9  the document.  I don't know.

16:17 10      A    I was going to say, I don't know.

11           Yeah.  I think the answer to your question is,

12  yes.  We're saying -- Again, remember this is business

13  of the company.

14      Q    Right.

16:17 15      A    So this is the general business model of the

16  company.  And this is what we're trying -- This is what

17  we're going to try to accomplish as a company --

18      Q    Yes.

19      A    -- is create this portfolio.

16:17 20      Q    And so your understanding of what you were

21  communicating to your clients was that they could spend

22  a particular investor's money in -- in -- that didn't --

23  Let me rephrase.

24           It was your -- what you're communicating to

16:17 25  your clients, based on this document, is that they could

229

16:17  1  spend a particular investor's money in a way that didn't

 2  comply with the 60, 20, 10, 10 breakout?

 3          MS. WARDEN:  Objection.  Mischaracterize prior

 4  testimony.

16:18  5  BY MR. HULINGS:

 6      Q   I'm asking for your testimony now.

 7      A   Okay.  Okay.  As -- as long as in -- as long

 8  as it mirrors this in totality, all of the investor

 9  funds meet this criteria.

16:18 10      Q   Okay.

11      A   And that's -- that's perfectly okay.

12      Q   All right.  Okay.  So the next section down

13  says Life Settlements.  Do you see that?

14      A   Yes.

16:18 15      Q   So at some point during the time you worked

16  with Mr. Mueller and Mr. Hagan, were they selling shares

17  in actual life policies, do you recall?

18      A   I -- I do recall, and -- and the answer is

19  yes.  There were a number of -- in -- in -- throughout

16:18 20  that time period -- Well, there were companies that were

21  in the business of buying viaticals.  I don't -- I

22  don't -- I don't want to get into a lengthy description

23  of the difference.

24          But -- so this -- so this industry started

16:19 25  during the AIDS crisis --

                                                              230

16:21    1    documents in a second, and I'm jumping ahead a little

         2    bit.

         3             Do you recall having those communications with

         4    Mr. Mueller about why Pinball?

16:21    5        A    Yes.

         6        Q    And -- and tell us about those conversations.

         7        A    That's a pretty general question, Jay.

         8        Q    Let me ask:  When -- when did he first -- when

         9    did he first raise the idea of investing in Pinball?

16:22   10        A    Gosh, I -- I actually don't remember when

        11    exactly that was.  I would -- my guess is in the '15,

        12    '14/'15 period of time he raised this issue.

        13        Q    And did he explain to you why he thought

        14    investing in Pinball was a good investment?

16:22   15        A    He -- he -- he did explain to me why he

        16    thought that that made sense.

        17        Q    To -- to your memory -- to your memory -- to

        18    the best of your memory, what did he tell you about why

        19    he thought it was a good investment?

16:22   20        A    Well, that -- you know, that -- that

        21    pinball -- pinballs -- pinball machines were a -- a

        22    growing industry and there was a lot of interest.

        23    And -- and he for -- he knew somebody or somehow got

        24    involved with somebody that was designing pinball

16:22   25    machines, and he thought he could -- he could be part of

                                                                   233

16:22  1   designing the next best greatest thing in pinball

2   machines.  And that this would be a cash flow that would

3   offset this problematic issue of about when people die.

4          We also talked a lot about, like, real estate

16:23  5   investments and other -- and other kinds of investments.

6   But that's what he thought.

7      Q    So by the time he raised the idea of investing

8   in pinball, had you been working together for a couple

9   years by this point?

16:23 10      A    Yeah, probably.  Yeah.

11      Q    So you had many conversations with Mr. Mueller

12   over the phone and -- and at least one in person?

13      A    Yes.

14      Q    And based on those prior communications, did

16:23 15   you think that Mr. Mueller was -- genuinely believed

16   that he could make Pinball profitable when he was

17   telling you this?

18          MS. WARDEN:  Objection.  Vague and ambiguous

19   as to "genuinely believed" and "profitable."

16:23 20      A    He believed that.

21      Q    He told you that he thought he could make

22   Pinball -- the Pinball business work?

23      A    Yes.

24      Q    And based on your experience with him, did you

16:24 25   believe that he believed that he could make it work?

234

16:24   1             MS. WARDEN:  Objection.

        2              MR. NASSE:  Speculation.

        3              MS. WARDEN:  Confusing.

        4    A    Well, I believed that he believed.

16:24   5    Q    In other words, this wasn't -- this was a real

        6  business venture?

        7    A    Well --

        8              MS. WARDEN:  Objection as to -- Vague and

        9  ambiguous as to characterization.

16:24 10    A    It was he believed that this was a legitimate

     11  business that could produce cash flow and income.

     12    Q    Okay.  So that's -- Coming back to the

     13  document in front of us, that's not part of this

     14  document?

16:24 15    A    It is not.

     16    Q    Okay.  All right.  Let's go to page -- All

     17  right.  Let's see.  Let's go to Page 14.  I'm sorry.

     18    A    I -- I see -- I see you paid for the expensive

     19  stock paper.

16:25 20    Q    I didn't.  You know, I -- I -- we've done a

     21  lot of these depositions remotely, and I would have been

     22  fine doing this one remotely.  You've got all your

     23  documents there and you can pick them on the fly.

     24    A    Yeah.  Right.

16:25 25    Q    And you realize you need a document after

235

17:14  1      Q      -- Mr. Mueller --

       2      A      Yeah.

       3      Q      -- that he needed to restructure this fund --

       4      A      Yes.

17:14  5      Q      -- the -- the Tech fund in a different way?

       6      A      Yes.

       7      Q      To make it simpler?

       8      A      Yes.

       9      Q      And to make it an equity fund?

17:14 10      A      Yes.

      11      Q      All right.  And in response, Mr. Mueller sends

      12   an email, which is at the top of that document, to you

      13   and Mr. Federico saying, Attached -- "See attached for

      14   the first project."  For first project.

17:14 15             Do you see that?

      16      A      Yes.

      17      Q      And that -- if you recall the previous email,

      18   he said he had three projects.  Do you recall that?

      19      A      Yes.

17:14 20      Q      All right.  So when he says, "for the first

      21   project," did you understand that to mean here are

      22   details regarding that first tech project that I

      23   mentioned?

      24      A      Yes.

17:15 25      Q      All right.  So you get to the attachments, you

                                                                271

17:15   1   have a -- a draft letter, the first page.  You've got

        2   some spreadsheets, that's --

        3        A    Yes.

        4        Q    -- titled Projected Budget.  Do you see that?

17:15   5        A    Yes.

        6        Q    And the next page -- Let me just -- I'll give

        7   you a Bates number of -- which is 1551.  Do you see

        8   that?

        9        A    I'm sorry.  Next page.

17:15  10        Q    It says the bot -- the Bates number is 1551.

       11        A    Oh, okay.  Yes.

       12        Q    So this -- Does this appear to be

       13   Mr. Mueller's description of the business plan for

       14   deeproot Pinball?

17:15  15        A    Yes.

       16        Q    And look at the first page.  There's a summary

       17   of the history of the pinball industry.  Do you see

       18   that?

       19        A    Yes.

17:16  20        Q    The second page has a summary of the business

       21   plan.  Do you see that?

       22        A    Yes.

       23        Q    And the third page has timeline and targets.

       24   Do you see that?

17:16  25        A    Yes.

                                                                  272

17:16  1      Q    Fourth page has a proposed description of a

2   potential production facility?

3      A    Yes.

4      Q    Fifth page has a proposed structure by the end

17:16  5   of 2017?

6      A    Yes.

7      Q    And then the next page has hardware

8   competitive advantages, and it includes a fair amount of

9   detail about software platforms and other doc -- and

17:16 10   other technical information?

11      A    Yes.

12      Q    Last page says -- or the second-to-last page

13   says Assembly Efficiency.  Do you see that?

14      A    Yeah.

17:16 15      Q    I'm going to stop there.  Is it -- is it --

16   does it appear from these documents to you -- Did it

17   appear to you at the time when you received this

18   document that Mr. Mueller had done substantial diligence

19   into the potential pinball business?

17:17 20           MS. WARDEN:  Objection.  Vague as to

21   "diligence."

22   BY MR. HULINGS:

23      Q    Do you understand what the word "diligence"

24   means?

17:17 25      A    No.

273

17:17  1        Q     Okay.

       2        A     Not in this context.

       3        Q     All right.  Do you understand when --

       4        A     Oh, yes.

17:17  5        Q     -- someone says "due diligence"?

       6        A     Oh, yes.  Oh, I'm sorry.  Yes, of course.  Of

       7   course.

       8        Q     Did it appear --

       9        A     Yes.

17:17 10        Q     -- having reviewed this document that

      11   Mr. Mueller had conducted significant due diligence into

      12   whether or not Pinball would be a successful business?

      13        A     I have no recollection of this document.  But

      14   yes, now having -- having now reviewed it, I would say,

17:17 15   yeah, I -- I guess he did do a lot of homework.

      16        Q     Okay.

      17        A     Due diligence.

      18        Q     All right.  Going to show you what has been --

      19   what we're going to mark as 10 --

17:17 20              MS. WARDEN:  8.

      21              MR. HULINGS:  8.

      22              (Deposition Exhibit 108 was marked for

      23              identification.)

      24              MS. SANSALONE:  Thanks.

17:17 25   BY MR. HULINGS:

                                                              274

```
17:26    1   PPM was finalized, the business structure of -- of the
         2   dGRD Fund didn't change.
         3            MS. WARDEN:  Objection.
         4   BY MR. HULINGS:
17:26    5        Q    Is that right?
         6            MS. WARDEN:  Lack of foundation.
         7        A    I don't believe it did.  But you'd have to
         8   look at the documents --
         9        Q    Okay.
17:26   10        A    -- and make that determination.
        11        Q    So we can -- we can go back and go through
        12   line by line --
        13        A    Let's not.
        14        Q    -- on the PPM.  But let -- let me -- let me
17:26   15   ask it this way.
        16        A    No.
        17        Q    Do you recall that the PPM for the dGRD Fund
        18   discloses that 30 percent of the asset portfolio could
        19   be spent on deeproot Tech and other affiliated entities?
17:26   20        A    Yes.
        21        Q    All right.  And you approved that PPM?
        22        A    Yes.
        23        Q    So your representation to Mr. Mueller, by
        24   approving that PPM, is it adequately described the risk
17:27   25   that comes with the business structure as described in
```

283

17:27  1  this email?

2       A    Yes.

3       Q    All right.  So you may have had concerns about

4  how to describe this, but your representation to

17:27  5  Mr. Mueller, by signing off on the dGRD PPM, is that

6  those concerns were addressed by how it was described in

7  the PPM?

8            MS. WARDEN:  Objection.  Asked and answered.

9       A    Yes.

17:27 10           MR. HULINGS:  All right.  Okay.  I'm skipping

11  exhibits.  Why don't we take a -- a shorter break.

12           THE WITNESS:  I don't need a break.

13           MR. HULINGS:  I do.

14           THE WITNESS:  Okay.

17:27 15           THE VIDEOGRAPHER:  Okay.

16           THE WITNESS:  See, the young guy.  The young

17  guys needs a break.

18           MR. HULINGS:  I just -- I don't want to waste

19  your time.

17:28 20           THE WITNESS:  Yeah.  Yeah.  That's all right.

21           MR. HULINGS:  So I want to go through and find

22  the right ones.

23           THE VIDEOGRAPHER:  We're going off the record

24  at 5:29 p.m.

17:28 25           (Recess taken.)

284

17:37   1          THE VIDEOGRAPHER:  We're back on the record at

      2   5:38 p.m.

      3   BY MR. HULINGS:

      4      Q    Okay.  Let's look at Exhibit 35 which is an

17:37   5   email, August 21, 2015, from Mr. Concilla to

      6   Mr. Mueller.

      7      A    Okay.

      8      Q    Mr. Concilla, do you recall seeing this

      9   document earlier today?

17:37  10      A    Yes.

     11      Q    All right.  And I want to draw your attention

     12   to the second page is an email from you, August 20,

     13   2015, at 4:46 p.m.  Do you see that?

     14      A    Yes.

17:38  15      Q    All right.  So there is the -- the -- halfway

     16   down it says, "Question two is more complicated."

     17          Do you see that?  Reading the same --

     18      A    Yes.

     19      Q    All right.  It says, "There is a fee that is

17:38  20   paid to dR for fund management, but I don't believe

     21   there's any direct compensation to you as an executive.

     22   There were no promotional fees paid to my knowledge."

     23          Do you see that?

     24      A    Yes.

17:38  25      Q    So then if you look at the response on a

                                                            285

17:38  1  little further up from Mr. Mueller, August 21, 2015,

    2  9:09 a.m., about halfway down, Mr. Mueller says, "While

    3  there is no direct compensation, I indirectly received

    4  payments (and even more so Russ when he was with us,

17:38  5  still continues)."

    6          And do you see that?

    7      A   Yes.

    8      Q   All right.  That's calling your attention to

    9  the next line up, which is the next page.  There's an

17:39 10  email from you dated August 21, 2015, at 9:05 a.m. to

   11  Mr. Mueller.  Do you see that?

   12      A   Yes.

   13      Q   And this is the -- the email that you

   14  testified earlier where it says, "You have no choice as

17:39 15  long as I'm your lawyer but to answer truthfully."

   16      A   Yes.

   17      Q   Do you see that?

   18          Okay.  Is that consistent with your other

   19  communications with Mr. -- to Mr. Mueller that you were

17:39 20  going to make sure that PPMs were accurate to the best

   21  of your knowledge?

   22      A   Okay.

   23      Q   Okay.

   24      A   You're taking it out of context.

17:39 25      Q   Well, I'll go through the rest and put it in

                                                          286

17:39   1    context.

2    A    I -- I would agree with your statement, by the

3    way.

4    Q    Yes.

17:39   5    A    But what I'm saying here is, you know, there's

6    been an inquiry and you have to answer truthfully.  It

7    has nothing to do with the PPM, per se.

8    Q    Okay.  So a little further on, this wasn't

9    asked.  Let's -- let's talk about this.  It says, "On

17:40  10    the compensation issue again the question is there to

11    determine whether a significant amount of the principal

12    went to management."

13          Do you see that?

14    A    Yes.

17:40  15    Q    "Indirect payments are okay if you mean that

16    you draw a salary from dR and the funds paid dR for

17    management."

18          Do you see that?

19    A    Yes.

17:40  20    Q    Let's stop there before we go on to the next

21    thing.

22          So you're telling Mr. Mueller that the

23    575 Fund, for example --

24    A    Right.

17:40  25    Q    -- could pay a fee to a different deeproot

287

17:40  1   entity --

2         A    Yes.

3         Q    -- and that that deeproot entity could pay

4   Mr. Mueller a salary?

17:40  5   A    Yes.

6         Q    All right.  And that is your understanding of

7   how Mr. Mueller was getting paid at this time, based on

8   his representation to you?

9         A    Okay.

17:40 10   Q    Well, I guess that --

11        A    I mean, that's -- I mean --

12        Q    That's what's in this email.

13        A    My -- Again, what I'm saying is this could --

14   this could be one way to do it.  Yes.

17:40 15   Q    Okay.  And then the next line says, "While

16   it's an over generalization, the hallmark of a Ponzi

17   scheme is large portions of the principal payments going

18   to pay fees and salaries."

19             Do you see that?

17:41 20   A    Yes.

21        Q    And then you said, "Remind me again what the

22   575 is.  I thought you wanted to replace them with the

23   FIFO deal."

24             We'll get to that in a second.

17:41 25   A    Yeah.

288

17:41  1        Q    But so the -- the question about the Ponzi --

2    "The hallmark of a Ponzi-style scheme is large portions

3    of the principal payments going to pay fees and salary."

4            See that?

17:41  5        A    Yes.

6        Q    What -- what did you understand the words

7    "large portions" to be?

8        A    A -- a majority of the funds.

9        Q    Okay.  So if -- so if Mr. Mueller received

17:41 10    5 percent of the funds in salary, would be that a large

11    portion of -- a large portion of the principal payments

12    that is a hallmark of a Ponzi scheme?

13            MS. WARDEN:  Objection.  Calls for

14    speculation.  Vague and ambiguous.

17:41 15    BY MR. HULINGS:

16        Q    So you said a majority -- so if it's -- put it

17    this way.  You testified that a majority of the funds

18    would be an example --

19        A    Yeah.

17:42 20        Q    -- of large principal payments would be a

21    hallmark of a Ponzi scheme.

22        A    Right.

23        Q    Is that right?

24        A    Yes.

17:42 25        Q    And so would 10 percent principal payments

289

17:42 1    being used for -- for compensation be -- would meet the

2    defi -- would that meet the definition of a Ponzi scheme

3    under this --

4         A    Okay.

17:42 5        Q    -- email?

6         A    Let me -- let me clarify here.  I will -- I

7    will say now, for the record, that I misspoke here.

8         Q    Okay.

9         A    I really did.  I mean, you know, we -- we --

17:42 10   we have a tendency -- and I hate seeing that I do it.

11   But I did it.  You throw Ponzi out there as if -- as if

12   it applies, and it doesn't always apply.

13              I -- I probably would have said, in

14   retrospect, the hallmark of a fraud is if a substantial

17:42 15   portion of the money is going to pay salaries and -- and

16   expenses and not to the underlying investments.

17        Q    Okay.

18        A    Now, that's separate from you asked me is

19   5 percent too much.  What -- what Robert was

17:43 20   legitimately going to be paid was for the management of

21   the Fund.  Okay.  Management fees for something in

22   excess of $10 million, which this appears to be, would

23   be closer to a half a percent to maybe a full percent,

24   maybe a point and a half.  5 percent would be a very,

17:43 25   very high management fee for a fund.

290

17:43  1        Q    Okay.  So what if the -- For this

       2  particular -- for one fund, so there are multiple funds

       3  here.

       4        A    There are.  With multiple components, I might

17:43  5  add.

       6        Q    Right.

       7        A    And so, you know, it's one thing to manage a

       8  portfolio of investments.  Think of it as a mutual fund.

       9  It's another thing to say that I'm managing a real

17:44  10  estate portfolio.  I'm managing a tech portfolio.  I'm

       11  buying a -- actively buying and selling life

       12  settlements.  So, you know, it would -- it would change

       13  based on the amount of work that's actually being

       14  performed.

17:44  15        Q    So it's reasonable for Mr. Mueller to take a

       16  salary for managing the Pinball business?

       17        A    It absolutely could be.

       18        Q    And --

       19        A    Yes.

17:44  20        Q    And reasonable to get a management fee for

       21  managing the 575 Fund?

       22             MS. WARDEN:  Objection.  Vague as to

       23  "reasonable."

       24        A    Again, reasonable is -- you know, again, it

17:44  25  goes to -- again, it would go -- it would go to the --

                                                                    291

17:44  1   an understanding of what the job duties were and how
       2   much time it took.
       3            Q     Yeah.
       4            A     And -- and skill set.  Obviously, a lot of
17:44  5   people get paid a lot of money for very little time.
       6   It's -- Some of them might be in the room.
       7            (Laughter.)
       8            It -- it -- it's -- it -- it goes -- it -- you
       9   know, so there's a lot that goes into what would be
17:44 10   reasonable under the circumstances.
      11            Q     All right.  So let's go up to the next --
      12   Mr. Mueller's response, which I don't believe you were
      13   asked about earlier.  It's a little further up the page,
      14   10:26 a.m., August 21, 2015.  Do you see that?
17:45 15            A     Yes.
      16            Q     Mr. Mueller's response is, "Correct, being
      17   truthful is the only option."
      18            Do you see that?
      19            A     Yes.
17:45 20            Q     So Mr. Mueller's agreeing with you that he
      21   intends to be truthful in how things are -- how the
      22   PPMs --
      23            A     He --
      24            Q     -- describe the business?
17:45 25            MS. WARDEN:  Objection.  Misstates the

                                                        292

17:45   1  evidence.

        2       A     Yes.

        3       Q     Okay.  And then he says, "Anything we put for

        4  comp would be in line or less with the PPM amount."

17:45   5             Do you see that?

        6       A     Yes.

        7       Q     When he says, "in line with the PPM amount,"

        8  did you understand that to mean the Company Advance?

        9       A     No.

17:46  10       Q     Okay.  What did you understand the PPM amount

       11  to be?

       12       A     Well, frankly, again, with retrospect now,

       13  I look at this and I go, the PPM doesn't say.  It says

       14  that the company can take an advance for certain

17:46  15  purposes.  That's actually different than a management

       16  fee.

       17       Q     Right.

       18       A     So it -- a management fee might not -- would

       19  not come under an advance.  A management fee is an

17:46  20  ongoing cost of doing business.

       21       Q     And so the -- If you recall, the management

       22  fee -- or the advance told inves -- the PMM -- we can --

       23  we'll look at it in a second --

       24       A     Right.

17:46  25       Q     -- said that the company could take 20 percent

                                                            293

17:49  1            MS. WARDEN:  Objection.  Assumes fact -- I

     2    mean -- Sorry.  Calls for speculation.  Leading.  Vague

     3    and ambiguous.  Asked and answered.

     4    BY MR. HULINGS:

17:49  5        Q    Like I said, I don't care.  But go ahead.

     6        A    No.

     7        Q    Okay.  All right.  All right.  So this is

     8    August 21, 2015, correct?

     9        A    Yes.

17:49 10        Q    And by this point, you knew that Mr. Mueller

    11    was taking a salary indirectly?

    12            MS. WARDEN:  Objection.

    13    BY MR. HULINGS:

    14        Q    So the --

17:49 15            MS. WARDEN:  Vague as to "indirectly."

    16    BY MR. HULINGS:

    17        Q    So he knew that --

    18        A    I -- I don't -- I -- I -- I'm not -- I -- I --

    19    I'm not prepared to say I knew that he was.  What I did

17:50 20    know is that he could.

    21        Q    Okay.  All right.  So your legal advice to

    22    Mr. Mueller in -- and when you approved of the PPMs for

    23    the dGRD Fund and the 575 Fund, your -- the legal

    24    opinion you communicated to Mr. Mueller was that he

17:50 25    could take a salary that was from the funds provided --

                                                              297

17:50    1              MS. WARDEN:  Objection.

         2              MR. HULINGS:  Hold on.

         3    BY MR. HULINGS:

         4         Q    -- from the funds provided by investors by the

17:50    5    575 or dGRD Funds?

         6              MS. WARDEN:  Objection.  Mischaracterizes

         7    prior testimony.

         8              MR. HULINGS:  It isn't prior testimony.  It's

         9    his current testimony.

17:50   10              MS. WARDEN:  Okay.

        11    BY MR. HULINGS:

        12         Q    Go ahead.

        13         A    Providing it was reasonable.

        14         Q    Okay.

17:50   15         A    I hate -- I hate to get off on a tangent here,

        16    but, you know, we're -- we've all been acting as if you

        17    open the SEC regulations and it says, Here's what a PMM

        18    must have.  That -- that -- there is no such thing.

        19    What we put in a PPM is based on 100 years of

17:51   20    litigation.

        21         Q    Right.  Yeah.

        22         A    That -- and that's what forms what a

        23    securities lawyer feels is necessary to put in a PPM.

        24    So -- so no, there is no regulation that says -- As

17:51   25    I said earlier, you don't even need a PMM.  You just

                                                                      298

```
 1                        CERTIFICATE

 2   State of Ohio      :
                              SS:
 3   County of Franklin:

 4           I, Susan L. Coots, Notary Public in and for

 5   the State of Ohio, duly commissioned and qualified,

 6   certify that the within named DENNIS J. CONCILLA was by

 7   me duly sworn to testify to the whole truth in the cause

 8   aforesaid; that the testimony was taken down by me in

 9   stenotypy in the presence of said witness, afterwards

10   transcribed upon a computer; that the foregoing is a

11   true and correct transcript of the testimony given by

12   said witness taken at the time and place in the

13   foregoing caption specified.

14           I certify that I am not a relative, employee,

15   or attorney of any of the parties hereto, or of any

16   attorney or counsel employed by the parties, or

17   financially interested in the action.

18           IN WITNESS WHEREOF, I have set my hand and

19   affixed my seal of office at Columbus, Ohio, on this

20   18th day of July, 2023.

21                          _____
                            SUSAN L. COOTS, Notary Public
22                          in and for the State of Ohio and
                            Registered Professional Reporter.
23

24   My Commission Expires January 10, 2025.

25
```