# Exhibit A-9

CONFIDENTIAL

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   SECURITIES AND EXCHANGE          ) CONFIDENTIAL
     COMMISSION,                      )
 4                                    )
                    Plaintiff,        )
 5                                    )
         -against-                    ) Civil Action No.:
 6                                    ) 5:21-cv-785-XR
     ROBERT J. MUELLER, DEEPROOT      )
 7   FUNDS LLC (a/k/a dprt Funds,     )
     LLC), AND POLICY SERVICES INC.,  )
 8                                    )
                    Defendants,       )
 9                                    )
         -and-                        )
10                                    )
     DEEPROOT TECH LLC, DEEPROOT      )
11   PINBALL LLC, DEEPROOT STUDIOS LLC, )
     DEEPROOT SPORTS & ENTERTAINMENT  )
12   LLC, AND DEEPROOT RE 12621       )
     SILICON DR LLC, AND ROBERT J.    )
13   MUELLER, JEFFREY L. MUELLER, AND )
     BELINDA G. BREEN, AS CO-TRUSTEES )
14   OF THE MB HALE OHANA REVOCABLE TRUST,)
                                      )
15                  Relief Defendants. )
     _____ )
16
17   ORAL AND VIDEOTAPED DEPOSITION OF ROBERT MUELLER, produced
18   as a witness at the instance of the Plaintiff and duly
19   sworn, was taken in the above styled and numbered cause on
20   Thursday, March 9, 2023, from 9:36 a.m. to 7:35 p.m.,
21   before Janalyn Elkins, CSR, in and for the State of Texas,
22   reported by computerized stenotype machine, at the offices
23   of Davis Santos, PC, 719 Flores Street, San Antonio,
24   Texas, pursuant to the Federal Rules of Civil Procedure
25   and any provisions stated on the record herein.
```

1

CONFIDENTIAL

| | | |
|---|---|---|
| 10:19:55 | 1 | But you can answer. |
| 10:19:55 | 2 | THE WITNESS:  I didn't draft this document, |
| 10:20:00 | 3 | Mr. Concilla did.  He understood what we were going to |
| 10:20:02 | 4 | be doing.  So, I mean, I think his writing here speaks |
| 10:20:06 | 5 | for itself. |
| 10:20:07 | 6 | Q.  (BY MR. NASSE)  Yeah.  I guess my question is: |
| 10:20:09 | 7 | Does it reflect your recollection of the reason you |
| 10:20:13 | 8 | sought out Carlile Patchen services? |
| 10:20:15 | 9 | A.  I don't recollect specifically other than that |
| 10:20:20 | 10 | we didn't know what we didn't know and we were |
| 10:20:25 | 11 | seeking -- after being frustrated with local counsel, we |
| 10:20:28 | 12 | were seeking competent counsel to take us on a very |
| 10:20:33 | 13 | complex journey and relying on that counsel to do so. |
| 10:20:36 | 14 | Q.  And the journey related to Policy Services and |
| 10:20:40 | 15 | deeproot Inc. -- deeproot Funds? |
| 10:20:43 | 16 | MR. HULINGS:  Objection; calls for a legal |
| 10:20:46 | 17 | conclusion and vague as "related to." |
| 10:20:48 | 18 | THE WITNESS:  I think, like I said now, my |
| 10:20:50 | 19 | best recollection is we didn't know what we didn't know |
| 10:20:52 | 20 | at the time.  And Mr. Concilla in his mind, you'd have |
| 10:20:55 | 21 | to ask him, wrote this the way he did. |
| 10:20:58 | 22 | Q.  (BY MR. NASSE)  I guess my same question.  My |
| 10:21:06 | 23 | question is:  Your understanding, does it reflect the |
| 10:21:07 | 24 | nature of the reasons you were seeking advice from |
| 10:21:09 | 25 | Carlile Patchen? |

33

CONFIDENTIAL

| | | |
|---|---|---|
| 10:40:47 | 1 | called The Queue Fund; is that right? |
| 10:40:48 | 2 | A.  There were several -- if I recollect, there |
| 10:40:51 | 3 | were several goals for that representation for hiring |
| 10:40:55 | 4 | them as professionals for financial documents. |
| 10:40:58 | 5 | Q.  But it was in -- but one of those roles at |
| 10:41:01 | 6 | least was in connection with an S-1 that you were |
| 10:41:04 | 7 | considering filing for something called The Queue Fund; |
| 10:41:08 | 8 | is that correct? |
| 10:41:08 | 9 | A.  Yes, to the best of my recollection. |
| 10:41:10 | 10 | Q.  Okay.  And was Mr. Wik, as your understanding, |
| 10:41:14 | 11 | retained in any way in connection with the575 Fund LLC |
| 10:41:19 | 12 | or dGRD Fund LLC? |
| 10:41:21 | 13 | MR. HULINGS:  So objection; vague as to |
| 10:41:23 | 14 | "connection." |
| 10:41:24 | 15 | THE WITNESS:  I don't recollect |
| 10:41:26 | 16 | specifically if -- I don't recollect if there was an |
| 10:41:29 | 17 | engagement letter specifically or what the engagement |
| 10:41:32 | 18 | letter said. |
| 10:41:33 | 19 | Q.  (BY MR. NASSE)  Is your recollection -- do you |
| 10:41:35 | 20 | have any recollection of Mr. Wik providing edits or |
| 10:41:38 | 21 | comments on either the575 Fund PPM or the dGRD Fund PPM? |
| 10:41:46 | 22 | A.  Yes. |
| 10:41:51 | 23 | Q.  And when was that?  Do you have a specific |
| 10:41:54 | 24 | recollection? |
| 10:41:55 | 25 | A.  Well, we started with those documents -- |

47

CONFIDENTIAL

| | | |
|---|---|---|
| 11:30:36 | 1 | invested in this enterprise? |
| 11:30:38 | 2 | A.  The best I can recall is there was an investor |
| 11:30:40 | 3 | who was investing a sum of money and part of that we had |
| 11:30:47 | 4 | talked about this pinball enterprise.  And the main |
| 11:30:54 | 5 | reason why I remember that is that as we were going from |
| 11:30:57 | 6 | here to the575, there were discussions with Dennis and |
| 11:31:01 | 7 | Andy about how to deal with that, that situation. |
| 11:31:05 | 8 | Q.  Okay.  Do you recall what they told you about |
| 11:31:14 | 9 | that? |
| 11:31:15 | 10 | A.  No, I don't recall what we eventually did. |
| 11:31:18 | 11 | Q.  And then so who was the first drafter of this |
| 11:31:33 | 12 | PPM? |
| 11:31:35 | 13 | A.  Most of, if not all, of the documents that we |
| 11:31:45 | 14 | worked with Dennis and Andy were a collaborative.  Many |
| 11:31:49 | 15 | of them building upon previous documents.  So... |
| 11:31:55 | 16 | Q.  So I guess my question:  Did they give you this |
| 11:31:57 | 17 | as a template for a PPM or did you give that -- or did |
| 11:32:00 | 18 | you give to them as a template for PPM? |
| 11:32:03 | 19 | MR. HULINGS:  Objection; vague. |
| 11:32:05 | 20 | THE WITNESS:  If there was a template |
| 11:32:06 | 21 | given, it would have been from attorneys.  I mean, I'm |
| 11:32:08 | 22 | not -- I wasn't then and I'm not now a securities |
| 11:32:10 | 23 | attorney.  I would not be able to come up with this |
| 11:32:15 | 24 | language on my own, especially a template of it. |
| 11:32:17 | 25 | Q.  (BY MR. NASSE)  Do you have a specific |

73

CONFIDENTIAL

| | | |
|---|---|---|
| 11:43:02 | 1 | Q.  Okay.  In the context of this email, are you |
| 11:43:06 | 2 | seeking advice in your personal capacity or as it |
| 11:43:09 | 3 | related to deeproot? |
| 11:43:10 | 4 | MR. HULINGS:  Objection; it calls for a |
| 11:43:12 | 5 | legal conclusion and vague. |
| 11:43:16 | 6 | THE WITNESS:  I think the email speaks for |
| 11:43:18 | 7 | itself.  We're not talking really about either one. |
| 11:43:21 | 8 | We're talking about at this point a design and going |
| 11:43:25 | 9 | back and forth and getting his advice on how the design |
| 11:43:29 | 10 | could be translated to a securities compliant, |
| 11:43:32 | 11 | securities law compliant fund. |
| 11:43:35 | 12 | Q.  (BY MR. NASSE)  I guess my question:  What was |
| 11:43:36 | 13 | your understanding of applying that advice as related to |
| 11:43:41 | 14 | deeproot or in your personal capacity? |
| 11:43:45 | 15 | MR. HULINGS:  Objection; vague and calls |
| 11:43:46 | 16 | for legal conclusion. |
| 11:43:47 | 17 | THE WITNESS:  I don't know what was in his |
| 11:43:49 | 18 | mind and I don't recollect what was in my mind.  This |
| 11:43:52 | 19 | was one of countless times we were going back and forth |
| 11:43:54 | 20 | about how to take a design and translate that into a |
| 11:43:59 | 21 | securities compliant fund. |
| 11:44:01 | 22 | Q.  (BY MR. NASSE)  Is there -- is there anything |
| 11:44:02 | 23 | in this email chain where he's giving you advice about |
| 11:44:05 | 24 | personal matters unrelated to deeproot? |
| 11:44:07 | 25 | MR. HULINGS:  Objection.  Objection; vague, |

81

CONFIDENTIAL

```
12:22:00  1   which I'm reading to refresh my memory.
12:22:14  2             Okay.  I'm sorry.  Repeat the question.
12:22:16  3        Q.  Yeah.  The question:  What did you mean by I
12:22:19  4   received indirectly -- "I indirectly received payments"?
12:22:23  5        A.  I believe we were talking about the fee that is
12:22:26  6   paid for the fund management and I was responding to him
12:22:31  7   that I receive no direct compensation from the fund, but
12:22:35  8   that I received indirect payments that we had talked
12:22:40  9   with Dennis and Andy before as did -- as did Russ when
12:22:45 10   he was with deeproot.
12:22:46 11        Q.  And indirect from what entity?
12:22:50 12             MR. HULINGS:  Objection; vague.
12:22:51 13             THE WITNESS:  I don't recall.
12:22:54 14        Q.  (BY MR. NASSE)  Well, what did you mean by
12:22:57 15   "indirectly"?
12:22:58 16        A.  That I receive payments from one of the
12:23:05 17   entities.  I don't remember specifically writing this or
12:23:08 18   what was in my mind when I wrote it.
12:23:10 19        Q.  Okay.  When you -- above when you say, "If I
12:23:23 20   answer falsely, then, dot, dot, well, you know," what
12:23:27 21   did you mean by that statement?
12:23:28 22        A.  I think it speaks for itself.  It's like -- I
12:23:32 23   think even there's an -- there's an email from Dennis
12:23:34 24   where he said he's never going to let us do anything
12:23:37 25   false and that's what I was saying there.
```

108

CONFIDENTIAL

```
12:26:33  1  know what was in Dennis's mind and I don't recollect
12:26:36  2  what was in mine.  But as before, most of our
12:26:40  3  representation was personal and business intertwined
12:26:44  4  with each other.
12:26:45  5      Q.  (BY MR. NASSE)  What do you see in here as
12:26:49  6  personal in this exhibit?
12:26:51  7              MR. HULINGS:  Objection; vague.
12:26:52  8              THE WITNESS:  I mean, we just went over it.
12:26:55  9  I mean, he's asking about personal compensation, about
12:26:57 10  what we report and what we don't, and my response to it.
12:27:01 11      Q.  (BY MR. NASSE)  It says "Personal compensation
12:27:05 12  from the funds for purposes of reporting;" is that
12:27:08 13  right?
12:27:08 14      A.  Well, I'm going to point to what the email
12:27:11 15  actually says.  This says, "While there's no direct
12:27:13 16  compensation," i.e., to myself, that's what was asked.
12:27:16 17  I indirectly received payments and Russ when he was with
12:27:19 18  us did as well.  Speaks for itself.
12:27:23 19      Q.  And those payments were disclosed to the
12:27:26 20  investors in those funds?
12:27:27 21              MR. HULINGS:  Objection; vague and -- just
12:27:31 22  vague.
12:27:32 23              THE WITNESS:  I don't recall what those
12:27:34 24  PPMs had in them in there regarding compensation or
12:27:38 25  payments to executives.
```

111

CONFIDENTIAL

```
12:27:40  1        Q.  (BY MR. NASSE)  Did you ever tell Mr. Concilla
12:27:43  2   that you were taking loans from any of the funds?
12:27:49  3              MR. HULINGS:  Objection.  Okay.  So the --
12:27:56  4   is that question limited to pre-2019?
12:28:01  5              MR. NASSE:  Sure.  Yes.
12:28:03  6              MR. HULINGS:  All right.  You can answer as
12:28:07  7   long as it's before January 1, 2019.
12:28:11  8              THE WITNESS:  We had very frank and robust
12:28:13  9   discussions about almost everything we did with Dennis
12:28:17 10   and Andy.  They had an insight into almost everything
12:28:20 11   that we did.  I don't know what you mean by loans.  We
12:28:24 12   talk about payments here.  But yes, they knew that was
12:28:27 13   happening and it just confirmed it that I refreshed his
12:28:31 14   memory about it here.
12:28:33 15        Q.  (BY MR. NASSE)  That you understood that
12:28:34 16   payments were happening indirectly?
12:28:37 17              Okay.  Do you have any specific
12:28:39 18   recollection of discussing taking out loans from any of
12:28:42 19   the deeproot businesses?
12:28:44 20              MR. HULINGS:  Objection; vague and loans --
12:28:48 21   vague as to loans from the deeproot businesses.
12:28:52 22              MR. NASSE:  Well, I'm happy to clarify.
12:28:54 23              MR. HULINGS:  Yeah.  Just clean the
12:28:55 24   question up a little bit, yeah.
12:28:57 25        Q.  (BY MR. NASSE)  Do you have any specific
```

                                                        112

CONFIDENTIAL

| | | |
|---|---|---|
| 12:28:58 | 1 | recollection of any discussions with anyone from Carlile |
| 12:29:02 | 2 | Patchen regarding you receiving or taking loans from any |
| 12:29:08 | 3 | entity owned or controlled by Policy Services, Inc.? |
| 12:29:15 | 4 | MR. HULINGS:  Provided that the answer is |
| 12:29:17 | 5 | prior to 2019, you can answer. |
| 12:29:19 | 6 | THE WITNESS:  Again, we talked about almost |
| 12:29:22 | 7 | everything.  I don't remember of the specific word loans |
| 12:29:25 | 8 | or payments or compensation was used at the time.  Here |
| 12:29:30 | 9 | it says "payments."  Probably used different terms in |
| 12:29:34 | 10 | different conversations.  But they understood that Russ |
| 12:29:38 | 11 | and I received, however you want to call it, from the |
| 12:29:44 | 12 | fund for our services.  That's where he mentions, I |
| 12:29:48 | 13 | believe, here fund management, fees for fund management |
| 12:29:53 | 14 | as an executive. |
| 12:29:54 | 15 | Q.  (BY MR. NASSE)  My -- so sitting here today, |
| 12:29:57 | 16 | you have no specific recollection of discussing taking |
| 12:30:00 | 17 | loans from Policy Services, Inc. or any of the |
| 12:30:03 | 18 | subsidiaries or affiliates? |
| 12:30:05 | 19 | MR. HULINGS:  Objection; vague as to |
| 12:30:06 | 20 | "loans." |
| 12:30:07 | 21 | THE WITNESS:  Like I said, I'm sure we did. |
| 12:30:09 | 22 | I don't recall specifically because we had very robust |
| 12:30:13 | 23 | discussions verbal and written about a lot of things. |
| 12:30:16 | 24 | And here we had already been with them for some time and |
| 12:30:22 | 25 | been through several funds that we had set up.  We were |

113

CONFIDENTIAL

```
12:30:24   1   in the process of -- in this August here as we just
12:30:28   2   talked about earlier, process of getting the dGRD term
12:30:32   3   sheet into a compliant -- securities compliant fund.
12:30:36   4           So, yeah, it wouldn't surprise me at all if
12:30:40   5   discussions around, you want the term loans or loans or
12:30:44   6   anything else came up during those periods.
12:30:47   7       Q.   (BY MR. NASSE)   Yeah.   And again, I mean, I
12:30:48   8   think you answered my -- I didn't ask you whether it
12:30:50   9   would surprise you.   I asked if there's any specific
12:30:53  10   recollection of any discussion regarding loans previous
12:30:55  11   to 2015 for Policy Services or any of its affiliated
12:30:59  12   businesses?
12:30:59  13           MR. HULINGS:   I believe it's been asked and
12:31:01  14   answered multiple times now.
12:31:05  15           THE WITNESS:   I don't recall specifically.
12:31:08  16   But I recall that we had conversations where that
12:31:11  17   conversation could have come up as I've already
12:31:13  18   answered.
12:31:13  19       Q.   (BY MR. NASSE)   Okay.   And did you recall
12:31:16  20   Carlile Patchen providing you any advice in terms of if
12:31:19  21   you were going to take loans, what would be required in
12:31:21  22   terms of disclosure or documentation?
12:31:23  23           MR. HULINGS:   Objection; vague and
12:31:26  24   compound.
12:31:27  25           But you can answer provided that it's prior
```

114

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

| | | |
|---|---|---|
| 12:31:28 | 1 | to 2019. |
| 12:31:31 | 2 | Q.  (BY MR. NASSE)  Yes. |
| 12:31:31 | 3 | A.  Sure.  They provided advice and what the proper |
| 12:31:34 | 4 | disclosures were for all of our documents and we relied |
| 12:31:38 | 5 | on that. |
| 12:31:39 | 6 | Q.  Yeah.  Do you have a specific recollection of |
| 12:31:40 | 7 | them providing that advice as it related to you taking |
| 12:31:44 | 8 | out loans from Policy Services, Inc. or any of its |
| 12:31:47 | 9 | affiliated businesses? |
| 12:31:48 | 10 | MR. HULINGS:  Objection; vague. |
| 12:31:50 | 11 | THE WITNESS:  If there was anything -- and |
| 12:31:52 | 12 | I can't recall the specific, you know, PPMs that either |
| 12:31:54 | 13 | are being referred here or after.  But yes, if there |
| 12:31:56 | 14 | were disclosures in that PPM regarding that, they either |
| 12:32:00 | 15 | gave the advice that it was necessary to put it in or it |
| 12:32:02 | 16 | was not necessary. |
| 12:32:04 | 17 | Q.  (BY MR. NASSE)  If you had a discussion? |
| 12:32:05 | 18 | A.  We did have -- we did have discussions, as I |
| 12:32:07 | 19 | said, regarding compensation and whether you want to |
| 12:32:12 | 20 | term it as a loan, as payment, as a salary, whatever. |
| 12:32:16 | 21 | Q.  Yeah.  I specifically loan -- a loan is |
| 12:32:19 | 22 | something you have to pay back.  Compensation |
| 12:32:21 | 23 | is something-- I mean, you're an attorney, Mr. Mueller, |
| 12:32:21 | 24 | correct? |
| 12:32:21 | 25 | REPORTER:  Is what? |

115

CONFIDENTIAL

```
12:33:22  1   but you're getting an answer.  And that's -- you may not
12:33:24  2   like it, but you're getting an answer.  You have asked
12:33:27  3   the same question four times now.
12:33:29  4              MR. NASSE:  I haven't got an answer.
12:33:31  5        Q.  (BY MR. NASSE)  Do you have any specific
12:33:32  6   recollection of any advice you received regarding loans,
12:33:35  7   not compensation or pay, specifically loans from -- you
12:33:38  8   taking loans from Policy Service, Inc. or any of its
12:33:43  9   affiliated enterprises?
12:33:43 10              MR. HULINGS:  Same objections;
12:33:46 11   argumentative, vague, asked and answered five times now.
12:33:50 12              THE WITNESS:  We had wide-ranging
12:33:51 13   discussions on a lot of issues including of course
12:33:54 14   payments and anything that would be regarded payments as
12:33:58 15   they would need to be disclosed or not in the PPMs.
12:34:10 16              MR. NASSE:  Just note for the record
12:34:11 17   nothing about loans in your answer.
12:34:13 18              MR. HULINGS:  Move to strike.
12:34:14 19              MR. NASSE:  I think we are -- I think we
12:34:18 20   can take a break for lunch if you want.  Off the record.
12:34:21 21              VIDEOGRAPHER:  We are off the record at
12:34:24 22   12:34 p.m.
12:34:25 23              (Brief recess.)
01:29:34 24              VIDEOGRAPHER:  We are back on the record at
01:29:56 25   1:30 p.m.
```

117

CONFIDENTIAL

| | | |
|---|---|---|
| 01:35:47 | 1 | CPM or any counsel that you had no internal controls |
| 01:35:54 | 2 | regarding the spending of funds for deeproot 575? |
| 01:35:59 | 3 | MR. HULINGS:  Just to clarify, this is a |
| 01:36:03 | 4 | privilege issue.  We haven't waived the privilege for |
| 01:36:06 | 5 | any communications with counsel other than CPM.  I think |
| 01:36:09 | 6 | that's actually true of the trustee as well. |
| 01:36:11 | 7 | But with that instruction, that we're just |
| 01:36:14 | 8 | talking about CPM communications, you can answer. |
| 01:36:17 | 9 | THE WITNESS:  Would you repeat the |
| 01:36:18 | 10 | question? |
| 01:36:18 | 11 | Q.  (BY MR. NASSE)  Yeah.  Did you have any |
| 01:36:19 | 12 | discussions -- in regards to paragraph F the some |
| 01:36:24 | 13 | agreements -- let me rephrase. |
| 01:36:25 | 14 | In regards to paragraph F, some agreements |
| 01:36:29 | 15 | including those involving compensation at arm's length, |
| 01:36:32 | 16 | do you recall any specific discussions regarding the |
| 01:36:37 | 17 | lack of internal controls at Policy Service, Inc. or its |
| 01:36:45 | 18 | affiliates? |
| 01:36:45 | 19 | MR. HULINGS:  Objection; vague as to "lack |
| 01:36:45 | 20 | of internal controls." |
| 01:36:46 | 21 | THE WITNESS:  I would -- I would respond |
| 01:36:47 | 22 | first that that's a false statement.  We did have |
| 01:36:48 | 23 | controls and it was discussed and clarified in the |
| 01:36:51 | 24 | previous transcript that we talked about earlier. |
| 01:36:54 | 25 | And secondly, we had wide-ranging |

121

CONFIDENTIAL

| | | |
|---|---|---|
| 01:37:00 | 1 | discussions on all these and how we operated our |
| 01:37:04 | 2 | business internally with Dennis and Andy.  We didn't |
| 01:37:07 | 3 | hide anything from them. |
| 01:37:09 | 4 | Q.  To paragraph -- so it's on page ending in 4505, |
| 01:37:22 | 5 | paragraph M, (Reading:)  Inadequate valuations and their |
| 01:37:26 | 6 | affect on the counting and class B shares, the company |
| 01:37:29 | 7 | and the class B shares. |
| 01:37:30 | 8 | Do you see that? |
| 01:37:31 | 9 | A.  Yes. |
| 01:37:32 | 10 | Q.  Did you -- do you recall any specific |
| 01:37:34 | 11 | discussions with Carlile Patchen regarding what's |
| 01:37:38 | 12 | paragraph M in Exhibit 36? |
| 01:37:43 | 13 | THE REPORTER:  M or N? |
| 01:37:45 | 14 | MR. NASSE:  M, Mike. |
| 01:37:47 | 15 | THE WITNESS:  Again, this likely would have |
| 01:38:07 | 16 | come from them.  I'm sure we discussed it.  I don't |
| 01:38:10 | 17 | recall specifically our back and forth over this.  Most |
| 01:38:14 | 18 | of these when -- when they advised that we needed to |
| 01:38:16 | 19 | disclose something, unless there's something glaring on |
| 01:38:21 | 20 | there that we might need to correct them about a fact or |
| 01:38:24 | 21 | another issue, typically, take your attorney's advice. |
| 01:38:27 | 22 | Q.  (BY MR. NASSE)  And when they provide that |
| 01:38:29 | 23 | advice, again, that would be either over the telephone |
| 01:38:31 | 24 | or an email? |
| 01:38:33 | 25 | A.  Yes. |

122

CONFIDENTIAL

01:40:13   1   one.

01:40:13   2       Q.   (BY MR. NASSE)   Okay.   Did you discuss the fact

01:40:15   3   that you did not have a written or specific valuation

01:40:19   4   policy with CPM?

01:40:23   5       A.   Misstates my testimony.   I said that I couldn't

01:40:25   6   recall.

01:40:26   7       Q.   Sure.

01:40:26   8       A.   And again, we didn't hide anything from Dennis

01:40:29   9   and Andy.   They were very good about drilling down and

01:40:32 10   asking questions when we were going back and forth.

01:40:35 11       Q.   Okay.   But I'm not sure that answered my

01:40:39 12   question.

01:40:39 13           My question was:   Do you recall discussing

01:40:41 14   with them the fact that -- well, that you at least right

01:40:45 15   now cannot recall any -- let me -- I'll rephrase.

01:40:49 16           Do you recall any discussions with them

01:40:51 17   about the lack of a valuation policy?

01:40:54 18           MR. HULINGS:   Objection; vague, asked and

01:40:57 19   answered.

01:40:57 20           THE WITNESS:   Again, I can't specifically

01:41:01 21   remember what was discussed regarding this section and

01:41:08 22   we likely at some point discussed something like that

01:41:12 23   and we took their advice, whatever it was.

01:41:15 24       Q.   (BY MR. NASSE)   But as you sit here today, no

01:41:20 25   specific recollection of such discussions?

124

CONFIDENTIAL

| | | |
|---|---|---|
| 01:44:58 | 1 | Do you recall discussions with counsel |
| 01:45:00 | 2 | regarding the life policy provisions in the PPM in |
| 01:45:04 | 3 | Exhibit 36 where you disclose that neither the company |
| 01:45:09 | 4 | as defined in this document nor the fund itself would |
| 01:45:13 | 5 | hold title to the policy -- to the life policies? |
| 01:45:16 | 6 | MR. HULINGS:  Objection; vague. |
| 01:45:17 | 7 | THE WITNESS:  Yes, it was one of many |
| 01:45:19 | 8 | elements that we talked about and how we structured the |
| 01:45:24 | 9 | multiple companies that we were working with. |
| 01:45:26 | 10 | Q.  (BY MR. NASSE)  When were those discussions? |
| 01:45:28 | 11 | A.  They would have been when we were drafting |
| 01:45:31 | 12 | this. |
| 01:45:31 | 13 | Q.  Do you have a specific recollection of the date |
| 01:45:33 | 14 | or time when those discussions occurred? |
| 01:45:35 | 15 | A.  Of course, I don't. |
| 01:45:36 | 16 | Q.  As far as you know, are you aware of any |
| 01:45:39 | 17 | records of those conversations? |
| 01:45:41 | 18 | A.  If they would have happened, they would have |
| 01:45:44 | 19 | either been, you know, with the older funds.  They would |
| 01:45:47 | 20 | have been tied in with the new funds.  They would have |
| 01:45:51 | 21 | been verbal conversations, email or it would have been, |
| 01:45:53 | 22 | as we've talked about before, updates to the actual |
| 01:45:56 | 23 | document itself here. |
| 01:45:57 | 24 | Q.  Did you -- did you ever tell Carlile Patchen |
| 01:46:02 | 25 | that only Policy Services held title to the life |

128

CONFIDENTIAL

01:46:05  1  policies?

01:46:06  2                    MR. HULINGS:  Objection; vague.  I think

01:46:08  3  misstates prior evidence.

01:46:10  4                    THE WITNESS:  When are you referring to?

01:46:12  5        Q.  (BY MR. NASSE)  At this time when you were

01:46:14  6  drafting this document.

01:46:14  7        A.  I didn't need to tell them.  They already knew.

01:46:17  8        Q.  And how do you know that?

01:46:18  9        A.  I think I was pretty clear a second ago that

01:46:23 10  Dennis and Andy by this time knew intimately everything

01:46:27 11  we were doing and how everything were structured and

01:46:30 12  that Policy Services had held title to all the policies

01:46:32 13  since prior to them even becoming our attorneys.

01:46:36 14        Q.  Did you discuss with Carlile Patchen why Policy

01:46:44 15  Services is nowhere referenced in this PPM?

01:46:44 16                    THE REPORTER:  Is?

01:46:44 17                    MR. NASSE:  Policy Services is nowhere

01:46:53 18  referenced in this PPM.

01:46:53 19                    MR. HULINGS:  Objection; that's vague and

01:46:55 20  argumentative.

01:46:56 21                    THE WITNESS:  Without -- without going

01:46:57 22  through the entire PPM to confirm that, I can't -- I

01:47:02 23  can't answer that.

01:47:03 24        Q.  (BY MR. NASSE)  Well, my question is --

01:47:04 25        A.  There had to be some reference.  I just don't

                                                              129

**CONFIDENTIAL**

01:48:51  1        A.   Yes.

01:48:51  2        Q.   And the company is -- capitalized defined term

01:48:55  3   is deeproot Funds -- 575 Fund LLC; is that right?

01:48:59  4        A.   I'm sorry.  Please repeat your question.

01:49:02  5        Q.   What -- company is the575 Fund in this

01:49:06  6   document?

01:49:08  7        A.   Deeproot 575 Fund LLC.

01:49:10  8        Q.   Correct.  That's the company that's referred

01:49:14  9   to --

01:49:14  10       A.   That's the issuer, yes.

01:49:16  11       Q.   Did you discuss this provision with Carlile

01:49:22  12  Patchen?

01:49:22  13       A.   I don't remember this specific provision being

01:49:25  14  there in the final one.  But again, that's just

01:49:28  15  recollection.  But again, we discussed everything in

01:49:31  16  here.  They made the determination of what needs to be

01:49:36  17  disclosed or not based upon our discussions and

01:49:40  18  collaboration.  And they specifically signed off

01:49:42  19  emphatically that everything in here was legal,

01:49:45  20  securities compliant, and we were ready to proceed with

01:49:49  21  subscriptions.

01:49:49  22       Q.   Do you recall discussing with Carlile Patchen

01:49:54  23  how you were determining the allocation percentage, the

01:49:57  24  45 percent as listed in the paragraph I just read to

01:50:00  25  you?

                                                                  131

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

```
01:50:00   1                    MR. HULINGS:  Objection; vague.
01:50:02   2                    THE WITNESS:  Of course we did since that
01:50:03   3   was a major component.  I don't recall the specific
01:50:08   4   conversations, but, of course, we would have.
01:50:10   5       Q.  (BY MR. NASSE)  Do you recall Carlile Patchen
01:50:15   6   ever telling you that -- advising you that you do not
01:50:18   7   have to disclose that Policy Services owned all the life
01:50:21   8   policies?
01:50:21   9                    MR. HULINGS:  Objection; vague.
01:50:24  10                    THE WITNESS:  My answer would be is if they
01:50:27  11   signed off on this and if it, indeed, does not disclose
01:50:32  12   that, then they felt that that was okay and we took
01:50:35  13   their advice.
01:50:36  14       Q.  (BY MR. NASSE)  Okay.  My question was:  Do you
01:50:38  15   have a recollection of them saying -- affirmatively
01:50:41  16   saying to you, you do not need to disclose Policy
01:50:44  17   Services, Inc. in this PPM?
01:50:46  18                    MR. HULINGS:  Objection; vague, asked and
01:50:47  19   answered.
01:50:48  20                    THE WITNESS:  I believe I have answered
01:50:50  21   that.
01:50:51  22       Q.  (BY MR. NASSE)  So it's "no" you don't have a
01:50:54  23   recollection of that?
01:50:56  24                    MR. HULINGS:  Argumentative.
01:50:57  25                    THE WITNESS:  I said that there was
```

CONFIDENTIAL

01:52:12  1   conclusion and I don't remember when it comes to talking

01:52:18  2   about the ownership and the structure of our companies,

01:52:22  3   which Dennis and Andy were completely involved in and

01:52:25  4   advised on.  I don't recall what their specific legal

01:52:29  5   counsel was other than that they felt it was okay as is

01:52:34  6   and we move forward.

01:52:35  7      Q.  (BY MR. NASSE)  Yeah.  My question wasn't

01:52:38  8   asking for a legal opinion.  You're the fund manager and

01:52:41  9   advisor.  So my question is:  As a fund manager and

01:52:45  10  advisor, did you disclose to them that deeproot -- 575

01:52:50  11  Fund LLC did not own any -- would not own any portion of

01:52:53  12  deeproot Tech?

01:52:56  13          MR. HULINGS:  So vague as to -- as to

01:53:00  14  "own."

01:53:00  15          You can answer.

01:53:02  16          THE WITNESS:  As I've said before, I'm sure

01:53:04  17  we discussed it and I can't remember if I said that

01:53:09  18  specifically because I'm not going to put words in my

01:53:12  19  mouth and I'm not going to let you do it either.

01:53:15  20          I can tell you that Dennis and Andy knew

01:53:19  21  exactly how we were organized because they helped set it

01:53:22  22  up.  They knew what needed to go in here and didn't need

01:53:25  23  to go in here and they knew what needed to be disclosed

01:53:27  24  and not disclosed to investors and we took their advice.

01:53:30  25      Q.  (BY MR. NASSE)  So you told Carlile Patchen

                                                              134

CONFIDENTIAL

```
01:53:31  1   that Deep -- that 575 LLC would not hold any interest in
01:53:39  2   deeproot Tech?
01:53:41  3                 MR. HULINGS:  Asked and answered, vague,
01:53:43  4   argumentative.
01:53:45  5                 THE WITNESS:  I didn't make that statement.
01:53:49  6        Q.  (BY MR. NASSE)  You did not make that statement
01:53:51  7   to Carlile Patchen?
01:53:51  8        A.  No, I did not make that statement that you just
01:53:53  9   said in your question.
01:53:54 10        Q.  I'm asking, did you ever say that to Carlile
01:53:57 11   Patchen?
01:53:57 12        A.  I've answered this question over and over
01:53:59 13   again.
01:53:59 14        Q.  Well, Mr. Mueller, the word "own" was vague so
01:54:02 15   I said interests.
01:54:04 16                 MR. HULINGS:  Is there a question?
01:54:05 17        Q.  (BY MR. NASSE)  Yeah.  The question was:  Did
01:54:06 18   you tell Carlile Patchen that 575 LLC would not hold any
01:54:12 19   interests in deeproot Tech?
01:54:14 20        A.  Whether I did or didn't, they already knew it.
01:54:17 21        Q.  And how do you know that?
01:54:21 22                 MR. HULINGS:  Asked and answered.
01:54:22 23                 Go ahead.
01:54:23 24                 THE WITNESS:  It has been asked and
01:54:24 25   answered -- asked and answered multiple times.  Y'all
```

                                                                    135

CONFIDENTIAL

01:54:28 1  already know this, so you're asking something y'all

01:54:31 2  already know, that Dennis and Andy were intimately

01:54:34 3  involved in the setup and creation of all of our funds

01:54:37 4  back from the inception of the engagement.  They already

01:54:40 5  knew what our structure is.  We hid nothing from them.

01:54:43 6  They knew almost every detail of everything that we did,

01:54:47 7  especially as it pertained to anything that involved the

01:54:49 8  PPM.  So they already knew it.

01:54:53 9      Q.  (BY MR. NASSE)  But you have no specific

01:54:56 10 recollection of a conversation regarding that?

01:54:58 11     A.  I'm sure we had many conversations about this

01:55:00 12 issue.

01:55:01 13     Q.  Yeah, I didn't ask you if you had many.  I

01:55:04 14 asked if you had a specific recollection of one.

01:55:06 15          MR. HULINGS:  Asked and answered.

01:55:07 16     Q.  (BY MR. NASSE)  Can you name one?

01:55:08 17          MR. HULINGS:  Asked and answered and

01:55:09 18 argumentative and starting to get harassing.

01:55:11 19          THE WITNESS:  I have answered.

01:55:12 20     Q.  (BY MR. NASSE)  Can you name one meeting where

01:55:16 21 you discussed what that -- that 575 Fund would not hold

01:55:20 22 any interests in deeproot Tech?

01:55:22 23          MR. HULINGS:  So -- hold on.  That's vague,

01:55:24 24 argumentative, asked and answered several times.

01:55:27 25          MR. NASSE:  I asked for one example.

136

CONFIDENTIAL

02:08:32  1            MR. HULINGS:  So it misstates the evidence,

02:08:34  2  also asked and answered, and it's vague.

02:08:36  3            THE WITNESS:  I'm sure we did have the

02:08:38  4  conversations with him -- with them as we were going

02:08:40  5  through this with Centri and with BDO.  I cannot recall

02:08:43  6  a specific conversation.

02:08:46  7       Q.  (BY MR. NASSE)  Go to page Bates No. 4509.

02:09:10  8  This is a provision at the top that says, "Company

02:09:12  9  advance."

02:09:14 10       A.  I see it.

02:09:17 11       Q.  Do you have any specific recollections of

02:09:19 12  conversations with Carlile Patchen regarding the company

02:09:22 13  advance provision in Exhibit 36?

02:09:25 14       A.  I'm sure we had conversations about it

02:09:34 15  throughout the entire process.  I don't believe this was

02:09:38 16  a provision in the prior Debenture funds.  This was

02:09:43 17  introduced later on.  And so, yes, I'm sure we had a lot

02:09:47 18  of conversations about this paragraph.

02:09:49 19       Q.  You don't have any recollection of a specific

02:09:53 20  conversation?

02:09:53 21            MR. HULINGS:  Objection; vague as to

02:09:55 22  specific conversation.  Are you looking for dates?

02:09:57 23            MR. NASSE:  Yeah, a date or time of when.

02:10:01 24            THE WITNESS:  I don't recollect in the

02:10:02 25  months that we were designing and drafting this back and

                                                             145

CONFIDENTIAL

```
02:13:44  1              MR. HULINGS:  Objection; vague as to
02:13:45  2   "standard report."
02:13:47  3              THE WITNESS:  We had a lot of reports.
02:13:48  4   I've been locked out of the system for well over a year,
02:13:53  5   maybe a year and a half.  So it's hard to remember what
02:13:57  6   tools and reports were available in the system.
02:14:00  7       Q.  (BY MR. NASSE)  Do you ever -- do you have a
02:14:02  8   recollection of querying a report that would tell you
02:14:06  9   whether you had exceeded the company advance or not?
02:14:08 10              MR. HULINGS:  Objection; argumentative.
02:14:10 11              THE WITNESS:  I don't believe there was a
02:14:13 12   specific report that said 20 percent advance on it.
02:14:18 13       Q.  (BY MR. NASSE)  What -- how would you determine
02:14:22 14   whether or not you had exceeded the 20 percent advance?
02:14:25 15       A.  We did that on a regular basis.  It was
02:14:32 16   reconciliation of the accounting records with the
02:14:35 17   records that we had in the online portal.
02:14:41 18       Q.  And where would the records of those reports be
02:14:44 19   maintained?
02:14:44 20       A.  I'm sorry?
02:14:45 21       Q.  Those reconciliation reports, are they
02:14:48 22   maintained somewhere?
02:14:48 23       A.  I don't know if they were reconciliation
02:14:50 24   reports.  They were work product and other work in
02:14:54 25   reconciling those.  As our bookkeeper entered in
```

149

CONFIDENTIAL

02:14:58  1    transactions, we went over those transactions.  We

02:15:01  2    talked with our accountants about the rules and

02:15:04  3    processes that we were entering those transactions under

02:15:07  4    and then reconciling that against the separate data that

02:15:13  5    we -- that includes bank statements and everything, all

02:15:17  6    the flow of money, and reconciling that against our

02:15:20  7    internal accounting data for investors, transactions,

02:15:24  8    their accounts.

02:15:35  9        Q.  So in that process is there a line item or

02:15:38 10    header that says percentage of towards company advance?

02:15:46 11                MR. HULINGS:  Objection; vague.

02:15:48 12                THE WITNESS:  In where?

02:15:49 13        Q.  (BY MR. NASSE)  In what you just described.

02:15:51 14        A.  I don't know how -- I haven't been in to the

02:15:55 15    books where the bookkeeper and the accounts worked.  I

02:15:58 16    don't know if there's something in those record that

02:16:00 17    says specifically that.  But I mean, this seems to be

02:16:03 18    just a simple mathematical equation.  So I wouldn't

02:16:07 19    imagine and I don't ever remember that we took so much

02:16:11 20    time and effort to do something that could have been and

02:16:14 21    we did very quickly do the math on.

02:16:17 22        Q.  Was there a separate account for the company

02:16:19 23    advance?

02:16:22 24                MR. HULINGS:  Objection; vague as

02:16:26 25    "account."

                                                                  150

CONFIDENTIAL

| | | |
|---|---|---|
| 02:20:18 | 1 | week and a half.  It could be three weeks.  It just |
| 02:20:21 | 2 | depended on the amount of data and getting the |
| 02:20:24 | 3 | accountants to direct her what to do and then |
| 02:20:27 | 4 | reconciling all of the -- whatever entries she had |
| 02:20:31 | 5 | questions on. |
| 02:20:32 | 6 | Q.  And you would provide her information that she |
| 02:20:35 | 7 | would enter into QuickBooks? |
| 02:20:38 | 8 | A.  I -- |
| 02:20:38 | 9 | MR. HULINGS:  Go ahead. |
| 02:20:39 | 10 | THE WITNESS:  I would provide her some of |
| 02:20:41 | 11 | the information. |
| 02:20:42 | 12 | Q.  (BY MR. NASSE)  The company advance provision |
| 02:20:56 | 13 | says this amount, I'm looking at -- I think it's the |
| 02:20:58 | 14 | second sentence.  (Reading:)  This amount covers agent |
| 02:21:00 | 15 | compensation, if any, nominal administration expenses, |
| 02:21:05 | 16 | IRA fees and other compensation marketing costs and the |
| 02:21:07 | 17 | fund advisor fees. |
| 02:21:09 | 18 | Do you see that? |
| 02:21:10 | 19 | A.  Yes. |
| 02:21:10 | 20 | Q.  Okay.  Did you have any -- do you recall any |
| 02:21:13 | 21 | discussions with Carlile Patchen specifically about |
| 02:21:15 | 22 | the -- what was covered under nominal administration |
| 02:21:17 | 23 | expenses? |
| 02:21:20 | 24 | MR. HULINGS:  Assuming that is before |
| 02:21:22 | 25 | January 2019, you can answer. |

154

CONFIDENTIAL

| | | |
|---|---|---|
| 02:21:24 | 1 | MR. NASSE:  Yes.  Yes. |
| 02:21:26 | 2 | THE WITNESS:  Yes.  This whole section, |
| 02:21:27 | 3 | again, came from them as we are trying to disclose |
| 02:21:33 | 4 | what -- what the company advance could be used for.  And |
| 02:21:37 | 5 | my recollection is that nominal administration expenses, |
| 02:21:40 | 6 | I mean, speak for itself. |
| 02:21:42 | 7 | Q.  (BY MR. NASSE)  I just want to make sure I |
| 02:21:44 | 8 | understand.  You do recall a specific conversation with |
| 02:21:47 | 9 | Carlile Patchen regarding what was covered under the |
| 02:21:49 | 10 | term "nominal administration expenses"? |
| 02:21:52 | 11 | MR. HULINGS:  So object as to vague as to |
| 02:21:54 | 12 | "specific conversation."  Are you looking for a date or |
| 02:21:56 | 13 | the fact that a conversation took place? |
| 02:21:59 | 14 | MR. NASSE:  The fact that the -- we'll |
| 02:22:01 | 15 | start there.  The fact that a conversation took place. |
| 02:22:01 | 16 | THE WITNESS:  Yes. |
| 02:22:04 | 17 | Q.  (BY MR. NASSE)  Okay.  When was that? |
| 02:22:05 | 18 | A.  It was multiple conversations between maybe |
| 02:22:14 | 19 | spring, March, and whenever we -- whenever we finalized |
| 02:22:18 | 20 | this. |
| 02:22:19 | 21 | Q.  In 2015? |
| 02:22:20 | 22 | A.  2015. |
| 02:22:20 | 23 | Q.  Okay.  And when you say "we," you and |
| 02:22:22 | 24 | Mr. Concilla? |
| 02:22:24 | 25 | A.  And Andy, I believe. |

155

CONFIDENTIAL

```
02:24:00  1        Q.  You said this discussion is in an email?
02:24:02  2        A.  It started with an email and the discussion was
02:24:04  3   as we went to the Pinball PPM --
02:24:07  4        Q.  Again, and my question is:  Is there discussion
02:24:10  5   of nominal administration expenses are used in that term
02:24:12  6   in an email?
02:24:13  7             MR. HULINGS:  Asked and answered.
02:24:15  8             THE WITNESS:  I can't recall if it's in an
02:24:17  9   email or if it was verbal.  But it happened many, many
02:24:23 10   times so I'm sure there's likely an email out there, I
02:24:25 11   just -- I don't know without going back and looking.
02:24:28 12        Q.  (BY MR. NASSE)  And in those discussions did
02:24:31 13   you ask Carlile Patchen whether the term "nominal
02:24:35 14   administration expenses" could cover priority return
02:24:39 15   payments to investors?
02:24:42 16        A.  My understanding in the advice I received is
02:24:48 17   that 575 payment -- 575 P payments due investors are
02:24:52 18   expenses of the fund and they would be included.
02:24:55 19        Q.  Okay.  So there -- so Carlile Patchen told you
02:24:59 20   that nominal administration expenses, that provision
02:25:02 21   could be used to pay prior to return payments to 575
02:25:07 22   Fund investors?
02:25:09 23        A.  Over the multiple times we did it in one form
02:25:12 24   or another, yes.
02:25:13 25        Q.  What do you mean by "one form or another"?
```

157

CONFIDENTIAL

02:25:16  1      A.  Well, I mean, administration expenses is pretty

02:25:20  2  broad and that's intentionally why they wanted it.  And

02:25:24  3  as I've testified before with -- we didn't hide anything

02:25:29  4  from Dennis and Andy.  And in their view being compliant

02:25:35  5  with securities laws and in their view of proper

02:25:40  6  disclosure to investors, they took a much longer section

02:25:44  7  than this that was proposed previously and they boiled

02:25:47  8  it down to this abbreviated by boiling a lot of the

02:25:52  9  other stuff down to nominal administration expenses.

02:25:56 10      Q.  I just want to make sure I understand.  What

02:25:59 11  did you ask them about nominal administration expenses

02:26:02 12  as related to payments of priority return payments to

02:26:06 13  575 Fund investors?

02:26:07 14              MR. HULINGS:  Asked and answered.

02:26:08 15              THE WITNESS:  I mean, I have answered that,

02:26:11 16  is that a wide-ranging area and an amount of expenses

02:26:19 17  that could come up, especially down the road, were

02:26:23 18  talked about and they boiled them down to nominal

02:26:27 19  administration expenses.

02:26:28 20      Q.  (BY MR. NASSE)  And those wide-ranging things,

02:26:30 21  among those was specifically mentioned priority return

02:26:35 22  payments to 575 investors?

02:26:36 23              MR. HULINGS:  Asked and answered.

02:26:38 24              THE WITNESS:  Dividends, maturities, yes,

02:26:41 25  payments to investors were expenses of the fund and

                                                              158

CONFIDENTIAL

```
02:26:44  1   those would be included in that.

02:26:45  2       Q.  (BY MR. NASSE)  Prior to return payments?

02:26:45  3       A.  That's what I just said.

02:26:45  4       Q.  MR. NASSE:  Well, You said dividends.

02:26:49  5           THE WITNESS:  Sorry, I should have waited.

02:26:51  6           MR. HULINGS:  Asked and answered.  Go

02:26:53  7   ahead.

02:26:53  8       Q.  (BY MR. NASSE)  And when -- do you have a

02:26:54  9   recollection of when that conversation occurred?

02:26:56 10       A.  That's also been asked and answered and we did

02:26:59 11   it over a long period of time because this was a very

02:27:01 12   key area of the PPM and it started again with the email

02:27:07 13   where I was pointing out that Russ had left and I was

02:27:11 14   pointing out here's where we are.  We need to find a

02:27:16 15   solution to where we're going to accomplish our goals,

02:27:18 16   take care of investors.

02:27:20 17           And so this is what started the very, very

02:27:24 18   lengthy discussion and vetting of different fund designs

02:27:28 19   and the language, proper disclosures that should go in

02:27:33 20   there between that time period.

02:27:35 21       Q.  And you say "lengthy discussion."  That was a

02:27:38 22   discussion in person, over the phone?

02:27:39 23       A.  Emails, phone, everything we talked about

02:27:41 24   before, trading back and forth and changes in the

02:27:44 25   documents.
```

159

CONFIDENTIAL

02:34:27  1   and I've answered that.

02:34:28  2        Q.   (BY MR. NASSE)   What was your --

02:34:29  3        A.   I used -- by the way, I used this email in my

02:34:31  4   previous response as one example that Dennis would go

02:34:34  5   through when he talked about the realities of being an

02:34:37  6   issuer and complying with securities laws.

02:34:40  7        Q.   Do you have a specific recollection of another

02:34:43  8   example?

02:34:46  9             MR. HULINGS:   Objection; vague.   Example of

02:34:49 10   what?

02:34:50 11             MR. NASSE:   Another example of him saying

02:34:52 12   that it was permissible to pay existing investors with

02:34:56 13   new investor money.

02:34:58 14             MR. HULINGS:   That was misstating his prior

02:34:59 15   testimony.   And so we'll call it vague.

02:35:01 16             THE WITNESS:   We had wide-ranging, frank

02:35:07 17   advice about the realities of being an issuer in a

02:35:11 18   complex gotcha SEC enforcement environment.   And just as

02:35:17 19   it says here, what is likely to draw attention and

02:35:20 20   scrutiny and what isn't.   And that is why in the company

02:35:25 21   advance they determined that the nominal administration

02:35:29 22   expenses, meaning the expense of the fund, being one of

02:35:33 23   his big things that money was fungible and the575 fee

02:35:37 24   payments were expenses of the fund that it was proper

02:35:39 25   disclosure, proper process.

                                                              165

CONFIDENTIAL

| | | |
|---|---|---|
| 02:36:47 | 1 | being an issuer. |
| 02:36:48 | 2 | MR. HULINGS:  That's not what -- that |
| 02:36:48 | 3 | misstates prior testimony and argumentative. |
| 02:36:51 | 4 | THE WITNESS:  Yeah, I did not say that. |
| 02:36:52 | 5 | What I said is a lot of the frank discussion that Dennis |
| 02:36:56 | 6 | Concilla especially, Andy, too, at times had with us |
| 02:37:00 | 7 | including around this provision and advice around this |
| 02:37:02 | 8 | provision was in justifying their counsel was because of |
| 02:37:08 | 9 | the very difficult complex environment that an issuer of |
| 02:37:14 | 10 | securities had to deal with under the SEC's laws, rules, |
| 02:37:20 | 11 | as well as the enforcement divisions.  And it's -- I |
| 02:37:24 | 12 | mean it's right here in this email as well. |
| 02:37:26 | 13 | Q.  (BY MR. NASSE)  And so you -- deeproot Policy |
| 02:37:34 | 14 | Services, Inc. and its affiliates under your direction |
| 02:37:36 | 15 | did pay existing investors with new investor money, |
| 02:37:39 | 16 | correct? |
| 02:37:40 | 17 | MR. HULINGS:  So object to vagueness, |
| 02:37:43 | 18 | argumentative. |
| 02:37:45 | 19 | But you can answer. |
| 02:37:46 | 20 | THE WITNESS:  We took the advice that we |
| 02:37:48 | 21 | were given by competent securities counsel who we didn't |
| 02:37:52 | 22 | hide anything from and we followed their advice. |
| 02:37:56 | 23 | Q.  (BY MR. NASSE)  And that included -- just to |
| 02:38:01 | 24 | make sure, that advice that you followed included paying |
| 02:38:05 | 25 | existing investors with new investor funds? |

167

CONFIDENTIAL

04:23:09  1   Exhibit 5, did you discuss with anyone the fact that you

04:23:13  2   owned -- solely owned Policy Services, Inc. or all the

04:23:17  3   other deeproot subsidiaries and affiliates?

04:23:21  4       A.  I don't recall that specific phrase or topic

04:23:28  5   ever came up.

04:23:29  6       Q.  Okay.  So how does the fact that the Policy

04:23:41  7   Services holds the life policies prevent whoever is

04:23:48  8   referred to as "we" here from raiding the piggy bank?

04:23:52  9           MR. HULINGS:  I'm going to object to vague

04:23:57 10   from following that question.  It's also asking him to

04:24:00 11   interpret the document.  Maybe asking for a legal

04:24:04 12   conclusion.

04:24:06 13           THE WITNESS:  I think it speaks for itself.

04:24:07 14   I mean, this has been vetted by very competent parties,

04:24:16 15   including FactRight, including Folio, which is now

04:24:16 16   Goldman Sachs, including the professionals I've talked

04:24:18 17   about before in counsel.  I would have to believe that

04:24:23 18   all of them found that this language was appropriate and

04:24:25 19   descriptive and proper in their respective fields.

04:24:29 20       Q.  (BY MR. NASSE)  But you testified you didn't

04:24:31 21   recall whether you sought or received Carlile Patchen

04:24:37 22   advice regarding this PPM in general or this specific

04:24:39 23   sentence.

04:24:40 24       A.  I don't believe that was my testimony.  I don't

04:24:42 25   recall this specific sentence or this section about what

                                                                  218

CONFIDENTIAL

| | | |
|---|---|---|
| 05:43:22 | 1 | Q.  Were any of the policies listed in Exhibit 40, |
| 05:43:27 | 2 | had they been sold as life settlements prior to 2015? |
| 05:43:33 | 3 | MR. HULINGS:  Objection; vague as to "sold |
| 05:43:35 | 4 | as life settlements." |
| 05:43:36 | 5 | THE WITNESS:  Maybe I'm not understanding |
| 05:43:38 | 6 | your question. |
| 05:43:38 | 7 | Q.  (BY MR. NASSE)  Had any of the policies listed |
| 05:43:40 | 8 | here been sold by -- already been sold by Policy |
| 05:43:43 | 9 | Services, Inc. prior to 2015? |
| 05:43:45 | 10 | MR. HULINGS:  Objection; vague.  May 2015? |
| 05:43:45 | 11 | You said 2015. |
| 05:43:51 | 12 | MR. NASSE:  2015 is what I meant. |
| 05:43:53 | 13 | Q.  (BY MR. NASSE)  Prior to 2015. |
| 05:43:53 | 14 | A.  Oh, I'm sorry.  I'm completely confused now. |
| 05:43:56 | 15 | Q.  The policies listed here, had any of these |
| 05:43:59 | 16 | already been sold prior to 2015?  That's the question. |
| 05:44:05 | 17 | A.  The date of this was April of 2019. |
| 05:44:09 | 18 | Q.  Correct.  I'm asking if any of these policies |
| 05:44:16 | 19 | had already been sold to other third parties. |
| 05:44:18 | 20 | A.  I don't remember ever selling a policy that we |
| 05:44:21 | 21 | had to a third party. |
| 05:44:22 | 22 | Q.  Okay.  Did you remember selling any rights or |
| 05:44:25 | 23 | other interests in policies to other third parties? |
| 05:44:28 | 24 | MR. HULINGS:  Objection; vague as to |
| 05:44:30 | 25 | "rights or interests." |

260

CONFIDENTIAL

05:44:31 1          THE WITNESS:  Or third parties.  What do

05:44:33 2  you mean by "third parties"?

05:44:36 3      Q.  (BY MR. NASSE)  People other than Policy

05:44:37 4  Services, Inc. or its affiliates?

05:44:39 5      A.  Which would be all the deeproot companies?

05:44:42 6      Q.  No.  Those -- yeah.  Anything other than those,

05:44:45 7  yes.  Any third party other than those.

05:44:48 8          MR. HULINGS:  Maybe we should restart the

05:44:50 9  question with that understanding because I think we've

05:44:53 10  kind of lost the thread here.  So objection; vague.

05:44:55 11     Q.  (BY MR. NASSE)  Had any of the policies listed

05:44:57 12  in Exhibit 41 already been sold by Policy Services, Inc.

05:45:02 13  to third parties?

05:45:04 14     A.  I don't remember selling any of our policies to

05:45:09 15  a third party.

05:45:11 16     Q.  Okay.  Had you sold any economic interest in

05:45:17 17  any of the life policy settlements listed in Exhibit 41

05:45:22 18  to third parties?

05:45:24 19         MR. HULINGS:  So objection; vague.

05:45:26 20         You can answer if you understand the

05:45:27 21  question.

05:45:28 22         THE WITNESS:  You're obviously getting at

05:45:30 23  something.  I don't know -- you're trying to be really

05:45:32 24  obtuse about it.  I'm telling you unless you can provide

05:45:35 25  me something specific maybe to get my mind and

261

CONFIDENTIAL

06:36:14  1   looking at things that related to pinball?

06:36:16  2        A.  I think that anyone who has an interest in a

06:36:20  3   hobby, in an industry, and a passion will find sources,

06:36:27  4   reference sources and they will keep up with it.

06:36:30  5        Q.  And the hobby and passion was your hobby and

06:36:33  6   passion for pinball?

06:36:35  7        A.  I think I have a lot of public statements about

06:36:41  8   how I got into Pinball.  And I think that was very

06:36:49  9   important and supported how we could be very successful

06:36:53 10   in pinball, yes.  I did have a passion for it.  I think

06:36:57 11   investors should know about that.  I mean, I think

06:37:00 12   that's reasonable.  I did have a passion for it.  We

06:37:03 13   were going to succeed at Pinball.  We had done and

06:37:09 14   created some of the most advanced IP ever for Pinball

06:37:12 15   which, you know, is decades old.  And I built a great

06:37:17 16   organization with great people who were all just as

06:37:20 17   passionate as I was to make sure that those profits came

06:37:25 18   back to investors.

06:37:26 19        Q.  But that never happened?

06:37:27 20        A.  It happened because you forcibly closed the

06:37:30 21   company to make sure it didn't happen.

06:37:33 22              MR. NASSE:  Strike.  And that's actually

06:37:34 23   inaccurate.

06:37:35 24              MR. HULINGS:  No.  You asked the question.

06:37:36 25   You got an answer.

                                                              280

CONFIDENTIAL

07:25:47  1   each investment in deeproot affiliates was in the best

07:25:51  2   interests of the investors of the575 or dGRD investors?

07:25:55  3               MR. HULINGS:  So objection; argumentative,

07:25:57  4   misstates his -- his testimony and vague.

07:26:02  5               You can answer.

07:26:09  6               THE WITNESS:  Could you repeat the

07:26:10  7   question?

07:26:11  8       Q.  (BY MR. NASSE)  How did you determine that the

07:26:12  9   investments in deeproot affiliates were in the best

07:26:18 10   interests of the575 or dGRD fund investors?

07:26:21 11       A.  I think we've answered this in multiple

07:26:24 12   questions back and forth today about my research and due

07:26:27 13   diligence, working with a number of professionals who

07:26:31 14   have vetted the language and the underlying assets over

07:26:35 15   the years, and frankly, our continued performance.

07:26:42 16       Q.  Okay.  When you say outside -- when you say

07:26:47 17   "experts," who are you referring to specifically?

07:26:50 18       A.  Talking about my counsel, talking about Jerry

07:26:53 19   Wik from Centri, Phil.  I'm talking about FactRight,

07:27:03 20   Folio, now Goldman Sacks.  Everyone that we went to who

07:27:08 21   exercised their due diligence on our company and our

07:27:13 22   underlying assets, we passed with flying colors.

07:27:16 23       Q.  Did they provide advice on whether your

07:27:19 24   investment decisions were in the best interests of the

07:27:22 25   investors?  That was the question I'm asking.

307

CONFIDENTIAL

1          REPORTER'S CERTIFICATION
           DEPOSITION OF ROBERT MUELLER
2              TAKEN MARCH 9, 2023

3          I, Janalyn Elkins, Certified Shorthand

4    Reporter in and for the State of Texas, hereby certify

5    to the following:

6          That the witness, ROBERT MUELLER, was duly

7    sworn by the officer and that the transcript of the oral

8    deposition is a true record of the testimony given by

9    the witness;

10         That the original deposition was delivered to

11   DAVID A.NASSE;

12         That a copy of this certificate was served on

13   all parties.

14

15         I further certify that pursuant to FRCP No.

16   30(f)(i) that the signature of the deponent was

17   requested by the deponent or a party before the

18   completion of the deposition and that the signature is

19   to be returned within 30 days from date of receipt of

20   the transcript.  If returned, the attached Changes and

21   Signature Page contains any changes and the reasons

22   therefor.

23         I further certify that I am neither counsel

24   for, related to, nor employed by any of the parties in

25   the action in which this proceeding was taken, and

315

CONFIDENTIAL

1    further that I am not financially or otherwise

2    interested in the outcome of the action.

3              Certified to by me this 16th day of March 2023.

4

5

6              /s/ _Janalyn Elkins_

7              Janalyn Elkins, CSR No. 3631
               Expiration:  1/31/2025

8              Hoffman Reporting & Video Services
               Firm Registration No. 93

9              Taken on behalf of
               Gradillas Court Reporters

10             400 N. Brand Boulevard, Suite 950
               Glendale, California  91203

11             PH:  (424) 239-2800
               Fax: (818) 662-5150

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        316