IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>    Plaintiff,<br>        -against-<br>ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,<br>    Defendants,<br>        -and-<br>DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621 SILICON DR LLC,<br>    Relief Defendants. | Civil Action No.: 5:21-cv-785-XR |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Robert Mueller's Response to the Securities and Exchange Commission's ("SEC" or "Commission") Motion for Summary Judgment ("Mueller's Response," cited herein as "Resp.," Dkt. 108, 108-1 to 108-19),[1] fails to identify any genuine disputes of material fact.[2] Instead, Mueller manufactures questions of fact where none exist by making self-serving statements unsupported by the record or applying flawed legal interpretations as to the import of certain

---

[1] Unless otherwise indicated by appendix number, all references to page numbers in this Response are to the ECF docket page number found in the header of the document.

[2] Mueller argues that the Court should abandon its standard practice of continuing a trial setting if a dispositive motion cannot be ruled on sufficiently in advance of trial. *See* Resp. at 2 n.1. Although the SEC stands ready to proceed to trial, there is nothing unique about the posture of this civil case that merits a departure from the Court's common-sense approach to judicial economy. Indeed, Mueller's sudden claims about the "expense and adverse impact" about the length of this litigation are curious in light of his four separate extensions of time to respond to the complaint and motion to stay the case entirely. *See* Dkt. 17, 24, 31, 34, 39.

documents and undisputed facts. Despite this scattershot effort, the essential material facts of Mueller's fraud remain undisputed−Mueller used millions in investor money as a piggy bank to fund and keep afloat his other businesses and investors lost all or virtually all their money−and Mueller cannot genuinely dispute these facts with empty rhetoric and self-serving statements. The Court should grant the SEC's Motion for Summary Judgment ("SEC's Motion," Dkt. 103).

## ARGUMENT

**I.  Mueller's False and Misleading Statements and Omissions Are Material as a Matter of Law.[3]**

At the outset, Mueller incorrectly urges that this Court has no ability to grant summary judgment because "falsity and materiality are questions for the jury." Resp. at 6. Mueller's Response ignores the scores of decisions granting summary judgment in SEC enforcement cases, supported by authority establishing that misrepresentations regarding how funds would be spent and misappropriating investor funds is material as a matter of law. *SEC v. Recile*, 10 F.3d 1093, 1097-1098 (5th Cir. 1993) (finding misrepresentations regarding how funds would be utilized to be material as a matter of law); *SEC v. Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *14 (W.D. Tex. Aug. 21, 2015) (granting summary judgment and holding " "Helms and Kaelin used investor funds for personal expenses"); *SEC v. Chiase*, No. 10-CV-5110, 2011 WL 6176209, at *4 (D.N.J. Dec. 12, 2011) (granting summary judgment and holding "[t]hese statements and omissions were material as a matter of law because any investor would obviously want to know that his financial adviser was misappropriating the investor's funds"). As these cases make clear, Mueller's efforts to conceal the true holdings and allocation of the purported core assets of the 575 and dGRD Funds contrary to his representations to investors,[4] his

---

[3] Consistent with FRCP 56(c)(1), all facts asserted herein are supported by exhibits attached to Plaintiff's Appendix and Declaration in Support ("Pl's Decl.").
[4] Dkt. 103-2, 11 at ¶ 25; 21-130.

2

diversion of investor funds for personal expenses, and his Ponzi payments to investors using new investor funds are dispositive evidence of materiality.

> II. There are No Genuine Disputes of Fact Concerning Mueller's Material False and Misleading Statements and Omissions.

Mueller's Response spends a considerable number of pages contending that there are genuine disputes concerning the falsity and materiality of certain statements or omissions but he does not, because he cannot, actually controvert any of the underlying material facts.

First, Mueller attempts a slight of hand by focusing, in isolation, on the word *invest* in PPM statements such as "[w]e will invest in Life Insurance Policies." Resp. at 7-8; Dkt. 103-2 at 48. But Mueller ignores the fact that the PPMs go beyond this statement and clearly state "[w]hen we *acquire* such a contract," and "[t]he Life Policies we *buy*." Dkt. 103-2 at 101. Moreover, Mueller fails to recognize that the "we" in all of these statements were the Funds. *Id.* There is no factual dispute that the Funds never invested, acquired, bought, or owned a single life insurance policy *or any interest in any life insurance*. Dkt. 103-3 at 2-16. As the U.S. Bankruptcy Court held, Policy Services Inc. *and not the Funds* was "the sole and lawful owners of the…Insurance Policies." *Id.* at 5.

The Funds never *invested* in, or *owned,* anything. Instead, Mueller took investor money and *gave* it to Policy Services, Mueller's own businesses, and himself. This fact would of course be material to investors particularly in light of the language of the PPMs stating that "we"− the Funds−would acquire interests in certain assets. Dkt. 103-2 at 30, 48, 67, 84, 101, 121, 140. This information is patently material as it would, of course, alter the total mix of information the investor would use in deciding to make an investment in the Funds. *Recile*, 10 F.3d at 1097-1098 (finding misrepresentations regarding how funds utilized was material as a matter of law).

Second, Mueller lacks any credible explanation for selling over 25% of the face value of the Life Policies supposedly held by the Funds to outside investors who had nothing to do with the Funds. Mueller tries to excuse it by relying on an irrelevant line in the PPMs as evidence that this fact was disclosed: "[life policies] were bought and sold on the secondary market through life settlement agencies." Resp. at 9. But this statement relates to how the Life Policies were acquired; not how nearly $6.5 million in returns from the acquired policies could be–and were–sold to other people. This conduct–akin to offering a house for sale but not disclosing that it has multiple liens on it–is plainly fraudulent.[5]

Third, Mueller relies on an absurd interpretation of the phrase "nominal administrative *expenses*" to justify paying existing investor *returns* with new investor money. Resp. at 10-13. No witness testimony supports this position. Mueller fails to mention that when Nate Spradlin was asked directly, "would you consider monthly payments that were made to 575P investors . . . nominal administrative expenses" he answered, "sitting here today, no." Spradlin Dep. Tr., Mar. 21, 2023 ("Ex. 52") at 238:9-16. Concilla testified when asked, "Would payments of existing investors solely from new investors be proper? No. And why not? . . . that would be kind of the hallmark of a Ponzi scheme." Dkt. 103-5 at 179:17-180:9. Moreover, the SEC does not dispute

---

[5] Mueller also asserts that his failure to disclose that he sold fractional interests in at least half of the life insurance policies is a "a recently concocted theory of liability[.]" Resp. at 9. This is not a new legal claim, as the SEC's complaint alleges that Mueller misrepresented that the Funds would invest a "simple majority of our Fund Assets" in life insurance policies and Mueller included life insurance policies as assets of the funds that Mueller and Policy Services "had purchased for Mueller's earlier investment funds." Dkt. 1 at ¶¶ 4-5. Mueller's failure to disclose that fractionalized shares of the Life Policies were held by outside investors is relevant to this claim because when those fractionalized interests are taken into account it is mathematically impossible for the Funds' purported asset allocation requirements to be accurate. Mueller admitted that the life policies that were partially sold off to others "would be part of the face value." Mueller Dep. Tr., Mar. 9, 2023 ("Ex. 14.1") at 300:8-25, 301:1-13. The fact that during discovery the SEC uncovered additional evidence of Mueller's fraud does not alter the SEC claims. Dkt. 103-2 at 11, 21-130; Dkt. 103-3 at 43-44.

that PPMs say returns may be insufficient to make monthly periodic payments. Resp. 13.[6] But, that is not what happened here. In reality, when returns were insufficient to pay monthly periodic payments, rather than admit it, Mueller hid his investment failure by taking the new investors' deposits and passing it off as investment returns to existing investors. This is the very definition of a Ponzi scheme. *United States v. Murray*, 648 F.3d 251, 256 (5th Cir. 2011) ("The term [Ponzi scheme] has come to be used to describe a scheme whereby the swindler uses money from later victims to pay earlier victims.") (quoting *Guidry v. Bank of LaPlace,* 954 F.2d 278, 280 n. 1 (5th Cir.1992)).

Fourth, Mueller attempts to characterize the SEC as merely quibbling about the "manner" in which Mueller diverted millions in investor funds to his own affiliated business and that there is "conflicting language" in PPM's Mueller himself wrote that create a genuine issue of fact. Resp. at 16-17. Neither is correct. Instead, the very language Mueller cites is indicative of his fraud here. Mueller said the Funds would make "capital acquisition" in these affiliated companies and then defined that capital acquisition as the purchase by the Funds of Class B shares. *Id.* at 16. After extensive discovery there is no evidence that the Funds ever purchased any Class B shares. Ex. 14.1 at 137:19-139:6.

Mueller goes on to argue that another document, never disclosed to investors, the Contingent Pledge and Security Agreement,[7] Dkt. 108-14, gives the "Funds" a security interest

---

[6] The SEC likewise does not base it claims on which accounts investor returns may have been paid out of, but rather that Mueller had no source of actual revenue to pay investor returns so he relied on the investments of new investors to do so in an unsustainable shell game. Dkt. 103 at 11-13; Dkt. 103-2, 6 at ¶ 16.

[7] Mueller also cites to the Investment Allocation Agreement (Resp. at 17-18), but as the SEC explained in its Motion for Summary Judgment, Dkt. 103 at 33, this non-arms-length agreement, signed only by Mueller on behalf of all the parties is, in reality, evidence of Mueller's intent to continue his deception. *Id.* at 33. The Investment Allocation Agreement, Dkt. 103-3 at 51-55, was prepared only three days after a business consultant asked Mueller if there were "investment

in all of the life policies, as well as other affiliates and assets[.]" Resp. at 17.  It does not.  The Contingent Pledge and Security Agreement, which was apparently signed in 2020, five years *after* the start of Mueller's fraud, was never perfected.[8]  This document provided the Funds with no interest in the affiliated companies and PSI unless and until other conditions precedent occurred, and Mueller proffered no evidence that any of these "condition[s] precedent" were satisfied at any time.  Dkt. 108-14 at 4.  Moreover, when asked about the Contingent Pledge and Security Agreement during his investigative testimony, Mueller had no recollection of the purpose of the agreement and did not think it was not an agreement between the Funds and Deeproot-related entities.  Mueller Invest. Tr., Jun. 23, 2021 ("Ex. 20.1") at 177:2-5, 9-13, 23-25; 178:1-3.

      Fifth, Mueller claims there are genuine disputes that Mueller made false statements about how investor assets were spent among life policies, affiliated companies, and Operating Expenses.  Mueller's apparent argument is that somehow the Court should take a blind eye to $22 million entirely as magically erased from Deeproot's balance sheet.[9]  Resp. at 20.  This is not a genuine or material dispute of fact.  Mueller—as a self-professed expert witness—does not offer any explanation for how the $22 million was spent, but rather, argues that "there is no one

---

agreements in place between [the affiliated companies] and the [F]unds"?  Mueller responded, "there is no formal documentation and that "I will 'paper' those internally."  *Id.* at 46-50. Mueller's attempt to conflate the sham Investment Allocation Agreement with evidence that the Funds' investors received an "internal, affiliated investment position" in the Affiliated Companies (Resp. at 17) should be rejected.

[8] This document also states that the agreement was "originally executed on February 8, 2016," yet neither Mueller nor anyone else has produced a February 8, 2016 version.  Dkt. 108-14.

[9] The SEC addresses Mueller's argument about Verma's Declaration (Dkt. 103-2 at 1-20) in its Response to Mueller's (1) Objections to Evidence In SEC's Motion for Summary Judgment and (2) Motion to Strike, filed on this date.  Mueller's reliance on *Via Vadis, LLC and AC Tech., S.A. v. Blizzard Entm't, Inc.*, 2021 WL 6116794, at *3 (W.D. Tex. Dec. 26, 2021), *see* Resp. at 20, is misplaced for the reasons set forth in the SEC's Response.

way to evaluate the Funds' portfolio and therefore to determine allocation." *Id.*[10] Even if Mueller had presented actual evidence regarding certain expenditures, which he does not, a factual dispute about certain expenses is immaterial for purposes of summary judgment in this matter. The fact remains this $22 million was not spent on Life Policies. The evidence of the diversion of investor funds is overwhelming because Mueller does not dispute that of $66.3 million raised from investors, he spent a little more than $11.1 million on insurance policies.[11] Dkt. 103-2, 3 at ¶ 5; 5 at ¶ 15.

Mueller also cites to supposed "caveats" in the PPMs, boilerplate language that allocations my not "prove accurate," and that Mueller—as the fund manager—had "absolute discretion." Resp. at 21. The cited "caveats" do not actually even mention asset allocations but rather focus on "assumptions" in financial forecasts. Resp. 21. None of the cited disclosures say that Mueller could or would deviate from the Funds' express asset allocation requirements. *Id*. Moreover, Mueller's generalized and vague statements about portfolio manager discretion does not absolve him of his material misstatements to investors. *See San Antonio Fire & Police Pension Fund v. Syneos Health Inc.,* 75 F.4th 232, 245 (4th Cir. 2023) ("Vague, boilerplate disclaimers will not cut it.").[12]

---

[10] This admission alone should be conclusive at least of Mueller's negligence as an investment adviser. His communications to investors are rife with definitive statements about how the portfolio was to be allocated, but under oath he has never been able to articulate how in fact he calculated or measured that allocation. Dkt. 103-2 at 21-149; Dkt. 108-9 at 5:13-25.

[11] Mueller's reference to *James v. United States*, 2013 WL 12106710, at *2 (W.D. Tex. June 24, 2013), Resp. at 20-21, is deceptive because it was a Federal Tort Claims Act case, not a securities law case, and the court has a more limited role on summary judgment proceedings involving competing experts.

[12] See also *United Paperworkers v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (holding that buried disclosures are inadequate); *In re Alstom*, 406 F.Supp.2d 433, 453 n. 11 (S.D.N.Y. 2005) (holding that "[a]n investor should not be called upon to piece together buried information from distinct parts of financial statements").

Finally, since Mueller's Response admits that that Mueller diverted investor funds for personal expenses and American Express bills (Resp. at 34), there is no genuine dispute of material fact here about the material omissions. As discussed more fully in in Section I, *supra*, it is well-settled that an adviser's failure to tell investors that he or she is misappropriating an investor's funds is material as a matter of law. *See Helms*, 2015 WL 5010298, at *14 (granting summary judgment and holding " "Helms and Kaelin used investor funds for personal expenses"); *Chiase*, 2011 WL 6176209, at *4 (granting summary judgment and holding "[t]hese statements and omissions were material as a matter of law because any investor would obviously want to know that his financial adviser was misappropriating the investor's funds"). His argument that he was "substantially underpaid for his services" is wholly irrelevant. *Resp.* at 34.

### III.  Mueller Acted With Scienter and Unreasonably.

There is ample evidence that Mueller acted with scienter. Mueller was a signatory on all deeproot Entities' bank accounts, Dkt. 103-2 at 15, and knowingly diverted investor funds in at least four ways that violated the promises made in the PPMs: (1) paying his personal expenses; (2) paying fractionalized share investors; (3) repaying investors in the Debenture Funds; and (4) making ponzi-like payments to earlier investors. *Id.* at 6-8, 12-13, 15. Mueller drafted or approved all PPMs and marketing materials presented to investors.[13] As director and executive officer of the 575 and dGRD Funds, Mueller was ultimately responsible for the contents of the PPMs presented to investors[14] and was the only person aware that the investment allocations of the Funds differed substantially from the PPM's disclosures.

Mueller's select quotes from his attorneys (Resp. at 29-32; Dkt. 108-7 at 7-13) do not alter the fact that his attorneys and other advisors never had the full set of facts on which to

---

[13] Dkt. 103-2 at 33; 51; 67; 85-86; 93-111; 122; 141; Dkt. 103-3 at 72:17-25, 73:1-25, 74:1-16.
[14] *Id.*

render such advice.  For example, Mueller's lawyers did not know that the PPM contained false statements and omissions of material facts because Mueller did not tell them.[15]  Mueller's conduct after the PPMs were finalized went against the representations that Mueller made in the PPMs.  Instead, when asked about Mueller's actions, Mr. Federico testified that that he would "not have advised Mr. Mueller to use new money to pay old investors in other funds or in this one."  Dkt. 103-5 at 84:16-18.  Mr. Concilla testified that "using new money from new investors to pay old investors" would be "the hallmark of a Ponzi scheme."  *Id.* at 62:4-9.  Moreover, in most instances, Mueller did not receive any attorney advice regarding the statements at issue.[16]

Mueller's attempt to argue that Fact Right, a third-party due diligence firm that issued a report on Deeproot, provided a "stamp of approval" on Deeproot likewise fails.  Dkt. 108 at 32.  An advice of due diligence consultants defense was not included in Mueller's Amended Answer and, regardless, it does not raise any genuine issue of material fact.  Dkt. 75.  Fact Right's Due Diligence report about Deeproot contained the following disclaimer: "This report is largely based on information received from the sponsor that the sponsor has represented to be true and correct."  Fact Right Due Diligence Report, Oct. 15, 2019 ("Ex. 53") at 0031118.

Lacking credible facts in the record that contradict Mueller's culpable state of mind, Mueller seeks to buttress his arguments against scienter by citing testimony from individuals he refers to as lay witnesses.  Dkt. 108 at 25-29.  The proffered testimony, from former employees and a tax advisor, stand for the unremarkable premise that none of them were aware that Mueller was engaged in fraud and that he did not admit his misrepresentations as set out in the SEC's

---

[15] Dkt. 103-5 at 20-22; 26-31; 36-37; 40-43; 49-51; 58-63; 74-75; 80-81; 84.

[16] Dkt. 103-5 at 25:1-5, 14-16; 26:11-25; 27:15-25; 28:1-4, 17-25; 29:1, 11-25; 30:1-20; 71:21-25; 72:1-12; 78:19-25; 79:1-2, 13-24.

Motion to them.  As the testimony Mueller quotes demonstrates, these witnesses assumed that Mueller was acting consistent with his representations to investors.  Mueller's failure, or inability, to rebut these material facts is alone sufficient for the Court to grant summary judgment.[17]  *See Lubbe v. Milanovich,* No. A-18-CV-1011-RP, 2022 WL 3129106, at *13 (W.D. Tex. Feb. 25, 2022) (Mag. J. Lane) (granting summary judgment because plaintiff "did not attempt to rebut [d]efendant's legal argument").

**IV.**     **Mueller Does Not Dispute the SEC's Evidence in Support of Scheme Liability and the Investment Advisers Act Counts.**

Mueller's Response does not dispute any of the evidence the Commission has offered in support of the Rules 10b-5(a) and (c) and Sections 17(a)(1) and (3) (Counts Three and Four) and the Investment Advisers Act of 1940 and Rule 206(4)-8 thereunder (Counts Five and Six), nor has he provided evidence to dispute these facts.  Dkt. 108, 108-1–108-19.  Thus, there is truly no genuine dispute of material fact here with regard to the affirmatively untrue statements, the material omissions, and deceptive conduct which violated Rules 10b-5(a) and (c), Sections 17(a)(1) and (3), and the Advisers Act Sections 206(1), (2) and (4) and Rule 206(4)-8.

## CONCLUSION

For the reasons stated in the Commission's moving papers and above, the Commission respectfully requests that the Court grant its Motion for Summary Judgment as to liability on all counts against Mueller.

---

[17] Mueller's Response dedicated half a page to argue that the cases cited by the SEC in support of granting summary judgment on scienter are distinguishable because they involved "truly egregious facts and often defendants who do not meaningfully challenge the summary judgment motion itself." Resp. at 33.  The facts of Mueller's fraud are truly egregious, as detailed in the SEC's Motion, Dkt. 103, and the fact that Mueller thinks the defendants' briefings in those cases were inadequate is irrelevant.

Date: October 2, 2023

Respectfully submitted,

*/s/ Kristen M. Warden*
Kristen M. Warden, Trial Counsel
Charlie Divine, Trial Counsel
David Nasse, Supervisory Trial Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4661 (Warden)
(202) 551-6673 (Divine)
(202) 551-4426 (Nasse)
wardenk@sec.gov
divinec@sec.gov
nassed@sec.gov

*Counsel for Plaintiff Securities and Exchange Commission*

**CERTIFICATE OF SERVICE**

I certify that on the 2nd day of October 2023, a true and correct copy of the SEC's Reply In Support of Motion for Summary Judgment was filed electronically through the Court's CM/ECF system, which will send copies to all counsel of record.

/s/ Kristen M. Warden
Kristen M. Warden

*Counsel for Plaintiff United States Securities and Exchange Commission*