EXHIBIT 20.1

1

1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In the Matter of:        )

4                            )   File No. HO-14036-A

5   DEEPROOT 575 FUND, LLC   )

6

7   WITNESS:  Robert Mueller

8   PAGES:    1 through 287

9   PLACE:    Securities and Exchange Commission

10            100 F Street NE

11            Washington, D.C.

12   DATE:    Wednesday, June 23, 2021

13

14       The above-entitled matter came on for hearing,

15   via WebEx, pursuant to notice, at 9:08 a.m.

16

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25               (202)467-9200

28

1      Q    You've written and distributed private

2  placement memoranda.  Correct?

3      A    We have distributed it to investors prior

4  to subscription.  Correct.

5      Q    So when you distribute them you have some

6  sort of mechanism for keeping control of who's gotten

7  the PPM. Correct?

8      A    That answer is quite complicated but there

9  was a time where we put an identifier on there that

10  would match a PPM with an application and subscription

11  agreement.

12      Q    That's exactly the question I was asking a

13  few minutes ago.  Now, where do you keep a log of the

14  numbers you put on PPMs when you sent them out?

15          MR. PRITIKIN:  Objection.  That's assuming

16  there is a log but go ahead.

17      A    There -- there are some pages that Becca,

18  who is the clerk that takes care of that.  I do not know

19  if she keeps those logs.  I haven't seen those logs

20  since we stopped taking them.  So I'm not aware that

21  those logs even exist.

22      Q    But you haven't produced any old logs from

23  when you used this system.  Correct?

24      A    My struggle with answering this is my

25  understanding of the subpoenas that were originally done

63

1   would have been organized.  And some of them were

2   delisted or dormant for a while.  Some were not.  Some

3   are dormant now whereas they were not before.

4        Q     You've alluded to this.  But you've

5   formerly run some other investment funds.  Correct?

6        A     It's a very broad question.  I cannot

7   answer it.

8        Q     I'm happy to specify.  You mentioned the

9   Deeproot Short-Term Fixed Rate Debenture Fund LLC.

10  Correct?

11       A     Correct.

12       Q     There was also the Deeproot 3-Year Bonus

13  Income Debenture Fund LLC.

14       A     Yes.

15       Q     And there was the Deeproot 3-Year Bonus

16  Reset Debentures Fund LLC.

17       A     Yes.

18       Q     And the Deeproot Bonus Growth 5-Year

19  Debenture Fund LLC.

20       A     Yes.

21       Q     Are there any other investment funds that

22  you've run besides those and the current funds?

23       A     There -- I mean, I'm going to refer back to

24  the corporate org charts that I provided for relevant

25  lists in those time periods.

64

1      Q     What I'm asking, so the org chart that was

2   Exhibit 5 began at 2016.  And what I'm getting at is

3   that I believe these four funds I've named pre-dated --

4   largely pre-dated 2016.  Is that correct?

5      A     I do not remember.  They were organized

6   before then, but I don't remember exactly when a lot of

7   those placements happened and whether they happened

8   prior to 2016.

9      Q     These four funds, STFR, Short-Term Fixed

10  Rate Debenture Fund, 3-Year Bonus, 3-Year Bonus Reset

11  and the Bonus Growth 5-Year.  These four funds, are they

12  still active?

13     A     No.  None of them are taking new

14  subscriptions.

15     Q     Are they all wound up?

16     A     I don't know what wound up means.

17     Q     Well, have all the funds' investors been

18  paid back and the funds are now closed?

19     A     On some, but not others.

20     Q     Which ones are still open?

21     A     The Bonus Growth -- 5-Year Bonus Growth and

22  the 3-Year Bonus Reset.  I'm not sure on the Bonus

23  Reset.  And I know there was maybe one or two investors

24  left.  I don't know if those are in some -- have matured

25  or not.  But I know specifically that the 5-Year Bonus

1   Growth does have existing investors still.

2       Q    And so when you say existing investors,

3   these are investors who are still waiting for repayment

4   of their principal?

5       A    Correct.

6       Q    Are they still receiving some sort of

7   investment return?

8       A    For both of them, it's a deferred return at

9   maturity.  So  there are no periodic payments.

10      Q    Currently, you have the 575 Fund LLC and

11  the Deeproot Growth Runs Deep Fund LLC. Correct?

12      A    Correct.

13      Q    Are those the only two funds that you're

14  currently operating?

15      A    That we are taking subscriptions for.  That

16  is correct.

17      Q    And in terms of funds that have any

18  activity or any return of principal pending, it's just

19  the 575, the DGRD, and the one or two other funds we

20  just discussed -- older funds we just discussed.

21  Correct?

22      A    To the best of my recollection.  Yes.

23      Q    Can we agree to call the Deeproot Growth

24  Runs Deep Fund the DGRD Fund?

25      A    Yes.  That's how we normally abbreviate it.

1    reports.  I'd have to look at -- from those reports, to

2    determine where we were with at least the policy.  A

3    portion of the 575.  I'd have to sort of guesstimate

4    where expenses are currently and where they would go,

5    which would take some time and a lot of pulling together

6    with the assets of the 575.  And then I would try to

7    determine both percentages are against each other and

8    determine if we were still above 50 percent, close to

9    it, what we needed to do with that.

10        Q    How often, each year, do you engage in that

11   exercise?

12        A    Usually one to two times.  In past years

13   it's been more.  When we had a lot more investment in

14   the DGRD versus the 575.  Because we wanted to space

15   those, to not prejudice investors in the DGRD. But since

16   -- especially with COVID and the impact it had on our

17   business, and everyone's business last year, to the

18   present, in the last year, year and a half, it has not

19   happened more than about once or twice.

20        Q    Do you -- when you undertake this analysis,

21   do you document it?

22        A    No.  The documentation essentially for me

23   is just to do the transaction to do the purchase,

24   knowing when it would happen.

25        Q    Do you personally undertake that evaluation

150

1    the 575 Fund?  And the DGRD Fund?

2        A    Yes.

3        Q    Who determines the investment strategy of

4    the 575 Fund?

5        A    I do.

6        Q    Anyone else?

7        A    The design strategy would only be me.

8        Q    Who chooses the asset classes and the

9    actual assets in which the 575 Fund invests?

10       A    I make the final decision.

11       Q    You have the ultimate authority over these

12   investment decisions?

13       A    That is correct.

14       Q    Who purchases the actual assets in which

15   the 575 Fund invests?

16       A    I do as officer of the respective company.

17       Q    Other than attorneys, who has drafted the

18   language used in the 575 Fund PPM?

19       A    Myself.

20       Q    Only you?

21       A    No.  That actually brings me back to --

22   that's why I was looking at the different exhibits you

23   were handing in the dates.  Anything after the S-1 had

24   -- S-1 incorporating language, which would have been a

25   combination of attorneys, Centri Business Consulting,

153

1      Q     It was your choice to incorporate any

2    language that any of these other people may have

3    suggested.  Correct?

4      A     I think it was a very proper choice, in my

5    view, after the amount of time and effort and money that

6    was spent to properly vet some of these provisions.  I

7    think it was money well spent to use provisions that

8    have been vetted that well.

9      Q     But it was your choice as to what language

10   went into the PPM for the 575 Fund.  Correct?

11     A     Ultimately, yes.  The choice was mine.

12     Q     And that was true as to all versions of the

13   575 Fund PPM. Correct?

14     A     I would not say that that's -- it was

15   between me and counsel.

16     Q     And with respect to -- but other than

17   counsel, you had the final choice as to the language in

18   all versions of the 575 Fund PPM. Correct?

19     A     Correct.

20     Q     And counsel works for you.  Right?

21     A     I think that draws a legal conclusion.

22     Q     You're the one with the final authority

23   over the content of the 575 Fund PPM. Correct?

24     A     Sometimes.  Yes.

25     Q     On what occasions would you not be the one

155

```
1              (SEC Exhibit No. 39 was marked for
2          identification.)
3      A    Yes.
4      Q    Do you recognize Exhibit 39?
5      A    I do.
6      Q    And what is Exhibit 39.
7      A    It looks like the September 16, 2019 PPM
8  for the Deeproot Growth Runs Deep Fund, or the DGRD.
9      Q    And you were the person with ultimate
10 authority over the language that went into the PPM in
11 Exhibit 39.  Correct?
12     A    Yes.
13     Q    And you were the person with ultimate
14 authority over the language in all other DGRD Fund PPMs.
15 Correct?
16     A    Yes.
17     Q    Who has and exercises the authority to sell
18 an asset of the 575 Fund?
19     A    What do you mean by sale?
20     Q    Well, if you were to make decisions to
21 dispose of an asset of deeproot Tech or Pinball, if you
22 were to make a decision to sell a policy rather than to
23 hold it, a life insurance policy.  Who would be the
24 person with ultimate authority to make those decisions?
25     A    With counsel from numerous -- not just
```

163

1      Q    Well, how is the capital acquisition

2   documented or memorialized?

3      A    From which perspective?

4      Q    From the perspective of the 575 Fund or the

5   DGRD Fund having its investors' money go to a Deeproot

6   affiliate.

7      A    Correct.  But if you could help me, is it

8   from an accounting perspective or a legal perspective.

9      Q    From the perspective --

10      A    Because things are either one of those.

11      Q    From the perspective of documenting, what

12   interest, the 575 Fund, the DGRD Fund, gets in return

13   for the money.

14      A    So, from a documentation standpoint, the

15   way that I understand the accountants document that, is

16   through the bay [sic] transactions.  Up until COVID hit,

17   my understanding was that the intercompany tracked

18   transactions as they came into Deeproot Funds, to the

19   account, then to the Fund, and then to be placed.  And

20   since COVID, because it's been so complicated to

21   continue that, is that we've gone to more of a direct

22   route.

23      Q    Other than bank records, how is the

24   interest acquired by the 575 Fund or the DGRD Fund

25   memorialized or documented?

164

1      A    I mean, it's financial.  I mean, it's going

2   to be in the transactions.

3           BY MR. BAGNALL:

4      Q    So, Mr. Mueller, this is George Bagnall

5   again.  Can you hear me, sir?

6      A    Yes.

7      Q    Maybe it would help if we took a step back

8   and you could tell us more about how you operate your

9   businesses in this way.  So, after investor money comes

10  into the fund, either the 575 Fund or the DGRD Fund, who

11  makes the decision whether or not to invest some of that

12  money in any of the Deeproot affiliated businesses?

13     A    Ultimately, that decision is my decision.

14  And as I've said before, a few moments ago, the way that

15  operated -- we operated for the most part, I don't know

16  when we started that process, but I know that the

17  process was there for a long period of time and it

18  created all kinds of accounting nightmares, trying to

19  trace the intercompanies' transfers.  But that money

20  would come directly into the Deeproot Funds, sweep

21  account, bank account.  It would then be transferred

22  less the finder fee or advisory fee or commission to the

23  actual fund bank account.  And then from the fund bank

24  account, it would be transferred and placed directly

25  with Policy Services or with deeproot Tech, Deeproot

1    another purpose, and I just can't recall.

2        Q    Do you have any other recollection of what

3    the purpose of this agreement at Exhibit 66 would've

4    been?

5        A    No.  Unless you'd like to enlighten me on

6    where you received it.  That would very much help

7    without me having to go back and try to look back

8    through the documents and records and notes.

9        Q    You mentioned before the break that there

10   was an agreement between the funds and the

11   Deeproot-related entities.  We discussed that before the

12   break.  Is Exhibit 66 that agreement?

13       A    No, it is not.

14       Q    It's not?  Okay.  I think we'll move on.

15            BY MR. BAGNALL:

16       Q    So, Mr. Mueller, do you see there at the

17   first page of -- sorry.  This is George Bagnall.  Do you

18   see at the top of Exhibit 66 in the opening paragraph,

19   it references in the second to last line both the 575

20   Fund and the DGRD Fund?  Do you see that?

21       A    Yes.  That's what I mentioned before.  I

22   saw that immediately.

23       Q    And so this agreement that -- I'm sorry if

24   I'm making you repeat yourself.  I was just a little

25   confused maybe by the answer.  So this doesn't govern

178

1    any of the relationship, the financial relationship

2    between the funds the related businesses?

3        A    I do not know why this was created.  I

4    would have to review it and go back for notes and try to

5    figure out.  I don't know if it was trying to close a

6    hole in something else or if it was presented to an

7    investor or a financial advisor for another purpose.  I

8    just can't remember.

9        Q    So the agreement that we were talking about

10   before the break, was it created before or after the

11   date, November 20, 2020?

12       A    Could you give me a second, sir?  I'm

13   flipping through this --

14       Q    Sure.

15       A    -- here.

16       Q    Yeah.  And just as you're flipping through,

17   you'll notice in the bottom right-hand corner, there's

18   some Bates stamps there.  Maybe there's not.  I thought

19   there were.

20       A    I'm not -- I just want to make sure as I'm

21   flipping through here.  I'm not contesting the

22   legitimacy of the document.  I just -- believe me.  As

23   you all said, there are a lot of documents.  Maybe not

24   as many as you wanted and maybe not as soon as you

25   wanted, but there are a lot of documents that I had to

255

1   you want and then I'll read that section then.  I think

2   that would be easier in this case since like --

3        Q    Okay.  Do you recognize Exhibit 73?

4        A    Must have been an e-mail that we must have

5   received.  I don't remember the e-mail in question.

6        Q    Do you recognize the letter that's attached

7   to it?

8        A    Letter, I believe was the letter we sent

9   out to all 575 P investors. This is the letter I

10  referred to before, so.  Oh wait. Let me read this. I

11  apologize, 'cause there was an August letter that we

12  sent out.

13            Yea, I'm sorry. This is not that letter.

14  This was the letter we sent out in August -- the time

15  that 575 P would be paid because it was getting out of

16  control.

17       Q    Okay. You drafted this letter. Correct?

18       A    Yes.

19       Q    And this letter was transmitted to 575 Fund

20  investors. Right?

21       A    Correct.

22       Q    How was it transmitted to those investors?

23       A    We sent the letter through a third party

24  mailing service that mailed hard copies to all

25  investors.

288

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:        )

4                             )   File No. HO-14036-A

5    DEEPROOT 575 FUND, LLC   )

6

7    WITNESS:  Robert Mueller

8    PAGES:    288 through 387

9    PLACE:    Securities and Exchange Commission

10             100 F Street NE

11             Washington, D.C.

12   DATE:     Thursday, June 24, 2021

13

14       The above-entitled matter came on for hearing,

15   via WebEx, pursuant to notice, at 9:03 a.m.

16

17

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25              (202)467-9200

292

 1   wait until the end as well.

 2           MR. PRITIKIN:  Nothing at this point.

 3      Q    Okay.  Thank you.  I have a few clean-up

 4   questions, Mr. Mueller.  Have you ever tried to become

 5   an associated person of a broker dealer?

 6      A    Depends what you mean by try.  I took some

 7   -- as I disclosed, I took some education to sit for

 8   Series 7 but it never went any further than that.

 9      Q    Did you take any other steps relating to

10   trying to become an associated person of a broker

11   dealer?

12      A    Not that I recall.

13      Q    And when was that that you did the training

14   for the Series 7?

15           MR. PRITIKIN:  Objection.  That

16   mischaracterizes his testimony.

17      Q    Correct me if I'm wrong, Mr. Mueller, but I

18   believe you did some education, some Series 7 prep and

19   when did you do that?

20      A    I don't recall.  It was -- if I had to

21   narrow it down to a timeline it was before the 575 and

22   the DGRD were put into place.

23      Q    What is the Food Development Corporation of

24   Texas?

25      A    FDC, as I call it. It is a company that

293

```
 1    works with either NGOs, governments, or other

 2    corporations typically in North Africa and we invested

 3    equity prior to Deeproot.  I invested my own equity and

 4    then through Policy Service in the early days before

 5    Deeproot really got going, we added some additional

 6    money and then we purchased some additional equity

 7    shares.  I believe probably about two years ago.

 8         Q    What have you received from that

 9    investment?  What has the Deeproot family of companies

10    received from that investment in Food Development

11    Corporation of Texas?

12         A    So we have not received any distributions.

13    We have not received any dividends from that, from that

14    equity.

15         Q    Now, you mentioned -- I think you mentioned

16    that the investment happened before Deeproot got going

17    and then in recent years, for the sake brevity, Policy

18    Services Inc.  has sent $385,000 between July 2016 and

19    April 2020 to FDC of Texas.  I'm wondering have you

20    received any sort of stock certificates or other

21    certificated investments in FDC?

22         A    There are other share certificates.  There

23    were agreements which confirmed those shares.

24         Q    What percentage of FDC does the Deeproot

25    family of companies own?
```

294

1       A    I don't recall the specific number but it

2   is just less than 50 percent from my best recollection.

3       Q    Have you ever provided any legal advice to

4   FDC?

5       A    I don't know if I've provided legal advice

6   to FDC as most of their dealings are with international

7   law which I'm not versed in.  I can't recall though.  It

8   might have happened that a question was asked or I was

9   asked to look over a document or something but I can't

10  recall specifics.

11      Q    Who owns the other 49 or 50 or 51 percent,

12  the remainder of the equity of FDC?

13      A    A gentleman named Frank Kartchner as far I

14  know.

15      Q    Thank you.  In addition to the loan we

16  discussed yesterday you've obtained other loans for the

17  Deeproot family of companies.  Correct?

18      A    Yes.  I did notice after in clarifying

19  yesterday's questions about that, I did recall after

20  getting back to my hotel room and doing some work that

21  there is a line of credit through Wells Fargo for Policy

22  Services.

23      Q    How much is that line of credit?

24      A    It's in the 30 -- $30,000 range.  I don't

25  remember the exact amount.

354

1        A    I do.

2        Q    What is Exhibit 85?

3        A    It was a distribution for the purchase of a

4   condo in Kauai.

5        Q    Can you spell Kauai for the record?

6        A    K-A-U-A-I.

7        Q    And that's in Hawaii, obviously.  Right?

8        A    It's a county in Hawaii that I'm aware of.

9   Yes.

10       Q    On or about November 15, 2016 you wired

11  $135,000 from the bank account of Policy Services, Inc.

12  to Old Republic Title and Escrow in Hawaii.  Correct?

13       A    That is correct.

14       Q    What was the purpose -- you described this

15  a little bit.  But can you tell us what the purpose of

16  this expenditure was, more fully?

17       A    The purpose was to go toward the purchase

18  price of a condo in Kauai.

19       Q    This was approximately half of the purchase

20  price and closing costs for that condo.  Correct?

21       A    I don't recall.

22       Q    That condominium was titled in the name the

23  MB, as in Mike Bravo, the MB Hale Ohana Trust.  Correct?

24       A    That sounds correct.  Yes.

25       Q    And for the record, Poly Ohana is two

355

1   words, H-A-L-E O-H-A-N-A. Mr. Mueller, you, your father,

2   and your stepmother have been the three trustees of the

3   MB Hale Ohana Trust.  Correct?

4       A    I don't remember exactly who the trustees

5   are.  We're all grantors of the trust.

6       Q    And you're a beneficiary of this trust.

7   Correct?

8       A    We would all be as grantors.  Yes.

9       Q    You used $135,000 of investor funds towards

10  the purchase of a condominium in Hawaii.  Correct?

11      A    I would not characterize it like that.  I

12  do not believe that's a correct statement.

13      Q    This was a personal expense.  Correct?

14      A    I would not consider it a personal or a

15  business expense.

16      Q    If it's not a personal or a business

17  expense, then what is it?

18      A    It's a distribution.

19      Q    What documentation exists for this

20  distribution?  Other than payment records.  Other than

21  bank records or QuickBooks records and the like.

22      A    So, it was accounted for that year by

23  Charlotte, Ms. Acker as a distribution.  And it was

24  discussed with the accountants.  As I recall, anything

25  else beyond that, I do not recall.

1      Q    And Mr. Van Winkle, an officer of Americus

2   Diamond, and the reason why I mention his name is

3   because the charge has variously shown as being to him

4   or to Americus Diamond.  So let me ask a fresh question.

5   On or about December 15th, 2018 you paid Americus

6   Diamond $6,247.11 for jewellery.  Correct?

7           MR. PRITIKIN:  Objection.

8      A    I appears so, yes.

9      Q    And again, you used the American Express

10  card of National Wealth Solutions.

11     A    I don't recall on that.  It says American

12  Express.

13     Q    Who was the jewellery for?

14     A    The best I can remember, around that time

15  period it was for my current wife, Kristi.

16     Q    And you married her approximately two

17  months after this purchase.  Correct?

18     A    I believe it was more than that, but it was

19  in early 2019 that we got married as talked about on the

20  record.

21     Q    And can you scroll to the description of

22  the jewellery you purchased?

23     A    Okay.

24     Q    And the description says it's a lady's

25  engagement ring.  Correct?

368

1        A    Yes.  That is in the description.  Lady's

2   engagement ring.

3        Q    In fact, on January 12th, on or about

4   January 12th of 2019 you charged another $2,802.59 to

5   Americus Diamond.  Correct?

6        A    I do not verify -- I'm sorry.  Do not

7   remember that.

8        Q    This over $9,000 in jewellery reflects

9   personal expenses.  Correct?

10       A    I don't know.

11       Q    These expenses were paid using Deeproot

12   company money.  Correct?

13       A    I refuse to answer.  I invoke my right to

14   protection under -- against self-incrimination  under

15   the Fifth Amendment.

16       Q    Sir, we are not authorized to compel you to

17   give evidence or testimony as to which you assert your

18   privilege against self-incrimination pursuant to the

19   Fifth Amendment of the United States -- to the United

20   States Constitution and we have no intention of doing

21   so.  We also do not have the authority to compel your

22   testimony by granting you immunity from prosecution.

23   Any question that we ask hereafter will be with the

24   understanding that if you wish to assert your privilege

25   against self-incrimination you need merely state that

370

1      for your second wife. Leah.  Correct?

2          A    I don't remember.

3          Q    Sir, I am now showing what has been marked

4      as Exhibit 92.  And Exhibit 92 bears the Bates number

5      SEC-Americus-E0000005 through 8.  America -- Exhibit 92

6      is another four page document.  It also says Americus

7      Diamond on the top center of the front page.  It also

8      has the address 12362 IH 10 West in San Antonio, Texas.

9              (Mueller Exhibit 92 was marked for

10     identification.)

11         Q    Sir, do you recognize Exhibit 92?

12         A    I'm looking through it.

13         Q    Please take your time.

14         A    It appears to be again a purchase for

15     jewellery, Americus Diamond, around the time that --

16     that I was engaged to Leah as you mentioned.

17         Q    And at the bottom of page 2, it

18     specifically gives the name of Ms. Leah Nelson.

19     Correct?  Near the description of the jewellery.  I'm

20     sorry.  I spoke over you.  I apologize.

21         A    I do see that.

22         Q    You do see where it says Leah Nelson in

23     Exhibit 92?

24         A    Yes.

25         Q    And on or about the next day, December

371

1    15th, you charged another $2,976.88 on the National

2    Wealth Solutions card at Americus Diamond.   Correct?

3              MR. PRITIKIN:  Objection.

4         A    I don't know.  That's not shown on this

5    exhibit.

6         Q    This exhibit shows that on December 14th,

7    2015, you charged $5,351.88 using the American Express

8    card of NWS at Americus Diamond.  Correct?

9              MR. PRITIKIN:  Objection.

10        A    It appears to be that amount and it says

11   American Express on it.

12        Q    This jewellery was purchased using Deeproot

13   company money.  Correct?

14        A    I refuse to answer.  I invoke the right

15   against self-incrimination under the Fifth Amendment.

16        Q    Sir, I'm now showing you what's been marked

17   as Exhibit 93.

18              (Mueller Exhibit 93 was marked for

19   identification.)

20        Q    And sir, Exhibit 93 bears the Bates range

21   SEC-RFPA-AMEX-E-0002809 through 29 and it is another

22   American Express duplicate copy account statement of the

23   credit card of National Wealth Solutions ending in

24   4251001.  Sir, do you recognize Exhibit 93?

25        A    Appears to be a duplicate copy of an Amex

373

1        A    Are you asking me to looking or are you

2    just asking me the question?

3        Q    I'm just asking you the question, sir.

4        A    I don't know.

5        Q    All in all, you spent -- you charged

6    $7,795.37 in expenses at Wolf Weddings & Events.

7    Correct?

8             MR. PRITIKIN:  Objection.

9        A    I don't know.

10       Q    These expenses were for your wedding to

11   your second wife Leah in -- these expenses were for your

12   wedding to your second wife Leah.  Correct?

13            MR. PRITIKIN:  Objection.

14       A    Would appear to be around that time.

15       Q    And you married Ms. Leah Nelson in February

16   of 2016.  Correct?

17       A    To the best of my memory, yes.

18       Q    You paid these expenses for Wolf Weddings &

19   Events with Deeproot company money.  Correct?

20            MR. PRITIKIN:  Objection.

21       A    I refuse to answer.  I invoke my right to

22   -- against self-incrimination within the Fifth

23   Amendment.

24       Q    Sir, I'm now going to display what has been

25   marked as Exhibit 94.  Exhibit 94 bears the Bates range

375

1    2017 you also charged $2,507.33 to British Airways.

2    Correct?

3              MR. PRITIKIN:  Objection.

4         A    I do see that amount listed.

5         Q    And this American Express card statement

6    shows that you purchased airline flights to London in

7    the name of you and your child.  Correct?

8              MR. PRITIKIN:  Objection.

9         A    I don't know.

10        Q    Sir, did you travel to London on British

11   Airways or a British Airways affiliated carrier with

12   your daughter?

13        A    And I've travelled before with my daughter

14   on British Airways.  I don't recall this specific trip.

15        Q    Sir, between September 2016 and March of

16   2017, in fact, you used the American Express card in the

17   name of National Wealth Solutions to pay over $13,000 to

18   British Airways.  Correct?

19             MR. PRITIKIN:  Objection.

20        A    I don't know.

21        Q    But these were personal travel expenses

22   which were paid for using Deeproot company money.

23   Correct?

24        A    I refuse to answer.  I invoke my right

25   against self-incrimination under the Fifth Amendment.

378

1          A     I don't know.

2          Q     These expenditures to Disney Cruise Lines

3     were personal travel for you and your family.  Correct?

4          A     I don't know.

5          Q     This personal travel was paid for with

6     Deeproot company money.  Correct?

7                MR. PRITIKIN:  Objection.

8          A     I refuse to answer.  I invoke my right

9     against self-incrimination under the Fifth Amendment.

10         Q     Sir, between March of 2016 and March of

11    2019 you also used the Amex card of National Wealth

12    Solutions to pay over $15,000 to Princess Cruise Lines.

13    Correct?

14               MR. PRITIKIN:  Objection.

15         A     I don't know.

16         Q     This was personal travel.  Correct?

17         A     I don't know.

18         Q     These charges to Princess Cruise Lines were

19    paid for with Deeproot company money.  Correct?

20               MR. PRITIKIN:  Objection.

21         A     I refuse to answer.  I invoke the right --

22    sorry.  I invoke my right against self-incrimination

23    under the Fifth Amendment.

24         Q     Sir, on or about February 5th, 2018, you

25    charged 7,000 -- over $7,500 to cruises and more using

383

1       Q    Sir, you used Deeproot company money to pay

2   for your daughter's educational expenses.   Correct?

3            MR. PRITIKIN:  Objection.

4       A    Refuse to answer.  I invoke my right

5   against self-incrimination under the Fifth Amendment.

6       Q    Sir, you used Deeproot company money to pay

7   for medical expenses.   Correct?

8            MR. PRITIKIN:  Objection.

9       A    I refuse to answer.  I invoke my right

10  against self-incrimination under the Fifth Amendment.

11      Q    Sir, you used Deeproot company money to pay

12  personal income tax bills.   Correct?

13           MR. PRITIKIN:  Objection.

14      A    I refuse to answer.  I invoke my right

15  against self-incrimination under the Fifth Amendment.

16      Q    Sir, you used Deeproot company money to pay

17  for the condominium in Hawaii.   Correct?

18           MR. PRITIKIN:  Objection.

19      A    I refuse to answer.  I invoke my right

20  against self-incrimination under the Fifth Amendment.

21      Q    Sir, you used Deeproot company money to pay

22  for the catering, photography, and wedding planning

23  expenses for your 2019 wedding.   Correct?

24           MR. PRITIKIN:  Objection.

25      A    I refuse to answer.  I invoke my right

384

1   against self-incrimination under the Fifth Amendment.

2       Q    Mr. Mueller, before we conclude your

3   testimony do you wish to clarify anything or add

4   anything to the statements you have made over the course

5   of your testimony whether yesterday or today?

6       A    Like for a chance to speak with my

7   attorneys before I answer that question.

8       Q    Sure.  We can go off the record.  How long

9   do you need?

10      A    A few minutes.  Five minutes.

11          MR. BOHR:  Five minutes.  Okay.  Let's go

12  off the record at 12:25.

13          (Whereupon a discussion was held off the

14  record.)

15          MR. BOHR:  We're back on the record at

16  12:30.

17          BY MR. BOHR:

18      Q    Mr. Mueller, do you understand you're still

19  under oath?

20      A    I do.

21      Q    And can you confirm that the SEC and you

22  had no substantive discussions while we were off the

23  record?

24      A    Yes.

25      Q    Thank you, sir.  Mr. Mueller, when we went