EXHIBIT 23.1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                  SAN ANTONIO DIVISION

SECURITIES AND EXCHANGE       *
COMMISSION,                   *
     Plaintiff,               *
                              *
     Against                  * Civil Action No:
                              * 5:1-cv-785-XR
ROBERT J. MUELLER,            *
DEEPROOT FUNDS LLC (A/K/A     *
DPRT FUNDS, LLC), AND         *
POLICY SERVICES, INC.,        *
     Defendants,              *
                              *
     And                      *
                              *
DEEPROOT TECH LLC, DEEPROOT   *
PINBALL LLC, DEEPROOT         *
STUDIOS LLC, DEEPROOT         *
SPORTS & ENTERTAINMENT LLC,   *
DEEPROOT RE 12621 SILICON     *
DR LLC, AND ROBERT J.         *
MUELLER, JEFFREY L.           *
MUELLER, AND BELINDA G.       *
BREEN, AS CO-TRUSTEES OF      *
THE MB HALE OHANA             *
REVOCABLE TRUST,              *
     Relief Defendants.       *
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
SCOTT ALLEN
FEBRUARY 16, 2023
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
 1        Q.   And how did you get to deeproot Funds?
 2        A.   I received a phone call from Nate Spradlin, who
 3   was a -- a friend and former colleague, we went to
 4   school together and previously worked together as well,
 5   letting me know there was an opening with the business
 6   development team at deeproot.  So he had called me and
 7   -- and wanted to know if I was interested.
 8        Q.   All right.
 9             And that was early 2018?
10        A.   Correct, I think February is when he reached
11   out.
12        Q.   All right.
13             So you were at deeproot from March 2018 to
14   October 2020; is that right?
15        A.   Correct.
16        Q.   Now, it says here that you raised 38 million;
17   is that right?
18        A.   Yes.
19        Q.   And is that you by yourself?
20        A.   That would have been Nate and I collectively as
21   a business development team.
22        Q.   Okay.
23             And when you -- it says you raised 38
24   million, is that in -- in investments into deeproot
25   companies?
```

1   A.   Yes.
2   Q.   And -- and which were the -- the companies that
3   you raised investments for?
4   A.   That would have been specifically into the
5   deeproot 575 Fund and the deeproot Growth Runs Deep
6   Fund, or dGRD.
7   Q.   All right.
8        And so going forward, if I describe -- if I
9   sub- -- yeah, if I use the term the "575 Fund," you
10  understand that to mean the deeproot 575 Fund?
11  A.   Yes.
12  Q.   And if I say "the dGRD Fund," you understand
13  that to be the deeproot dGRD, deeproot Growth Runs Deep
14  Fund?
15  A.   Yes.
16  Q.   Kind of a mouthful.  I take it you did not come
17  up with those names?
18  A.   I did not.
19  Q.   Those -- those product lines existed before you
20  got there?
21  A.   Correct.
22  Q.   All right.
23       What was Mr. Spradlin's -- how did Mr.
24  Spradlin describe deeproot to you when he was recruiting
25  you for this job?

1  I'm gonna go on to some other documents in a moment.
2            All right.  And --
3       A.   And I often would refer to myself as business
4  development kind of more generally as well.
5       Q.   And give us a general sense of what your
6  responsibilities were.
7       A.   Primarily it was fundraising, a -- a sales type
8  business development role, but then also providing
9  service to investors, handling paperwork, processing
10 incoming applications, entering information into the
11 deeproot database website, those types of things as
12 well.
13      Q.   Okay.
14           And did you receive any kind of training
15 when you started?
16      A.   I did.
17      Q.   And from whom?
18      A.   Primarily Nate Spradlin.
19      Q.   All right.
20           And what did Mr. Spradlin teach you?
21      A.   How the fund offerings worked and how we worked
22 with the -- the finders that we worked with for -- for
23 receiving the investment, and then -- yeah, some of the
24 other -- some of the other items in terms of the
25 paperwork that we used and how to deal with that.

```
 1        Q.  Who -- who is Andrew Cherones?
 2        A.  I -- I don't recall.
 3        Q.  Okay.
 4            Do you recall --
 5        A.  From the -- from the -- from the looks of this
 6   e-mail, it looks like he was an investor in the 575
 7   Fund.
 8        Q.  Was your e-mail at the -- at the time you
 9   worked at deeproot scott@deeprootfunds.com?
10        A.  Yes.
11        Q.  Okay.
12            Do you recall the phone call that led to
13   this e-mail?
14        A.  I do not recall the phone call.
15        Q.  Okay.
16            And let's see.  Further up, you forward --
17   it's fair to say you forwarded this e-mail chain to
18   Mr. Mueller?
19        A.  Yes.
20        Q.  With an extra -- with a little bit more of a
21   description about the conversation with Mr. Cherones; is
22   that fair?
23        A.  Yes.
24        Q.  All right.
25            Does this refresh your memory about this
```

1          I'm showing you what has been marked as
2  Exhibit -- what I'm marking as Exhibit 18, but was
3  previously marked through your interview as Exhibit 7.
4          (Exhibit Number 18 marked.)
5      Q.  Do you see this document?
6      A.  Yes.
7      Q.  What is this document?
8      A.  That would be the -- the memo I attached with
9  my resignation outlining a -- a more detailed list of my
10 concerns and suggestions moving forward that I felt
11 would help the -- would help deeproot, and hopefully
12 things would be better moving forward.
13     Q.  All right.
14          I'm gonna highlight the first sentence
15 there of the second paragraph.  Do you see that?
16     A.  Uh-huh.
17     Q.  Is that a yes?
18     A.  Yes, I see it.
19     Q.  And the reference is Missed investor payments,
20 correct?
21     A.  Yes.
22     Q.  It says, While I have no knowledge or reason to
23 believe that you were doing -- anything you were doing
24 is fraudulent or illegal.
25          Did I read that correctly?

1    A.   Yes.
2    **Q.   And did you believe that at the time?**
3    A.   At the time that I wrote this?
4    **Q.   Yes.**
5    A.   Yes.  Well, I -- I had doubts that his
6    explanations for the way he was doing things were
7    legitimate, which is why I chose to leave, but I didn't
8    have any knowledge or any -- any concrete basis.  That
9    was -- that was my opinion or -- or my personal feeling
10   that I had come to.
11   **Q.   All right.**
12            MR. HULINGS:  Move to strike everything
13   after "yes."
14   **Q.   So you referenced that there are missed 575**
15   **periodic payments.  I've got that highlighted.  Do you**
16   **see that?**
17   A.   Yes.
18   **Q.   And how many payments did -- how many months of**
19   **payments were missed at the time you wrote this, to the**
20   **extent that you remember?**
21   A.   From what I can remember, I think it was one
22   month behind.
23   **Q.   And what's that total amount that you know of,**
24   **if you know?**
25   A.   Oh, I -- I -- I don't know.  It would have been

```
 1  thousands of dollars.
 2       Q.  Okay.  All right.
 3           I'm gonna highlight the next couple
 4  sentences down.
 5           While it may not be your design or
 6  intention, in the functional operation it looks and
 7  feels like a Ponzi scheme, and I cannot and will not be
 8  part of it.
 9           Do you see that?
10       A.  Yes.
11       Q.  All right.
12           Did -- at any point previous to providing
13  this memorandum, did you express the concern to
14  Mr. Mueller that the 575 Fund was, in functional
15  operation, looking and feeling like a Ponzi scheme?
16       A.  Not in any direct, explicit way.
17       Q.  Okay.
18           And the next sentence says, I'm not making
19  accusations toward you or anyone else and do not know of
20  anything that would confirm that scenario.
21           Do you see that?
22       A.  Yes.
23       Q.  Is that -- was that statement accurate at the
24  time you wrote it?
25       A.  Yes.
```

```
 1        Q.   Okay.
 2             So what is your definition of a Ponzi
 3   scheme?
 4             MS. WARDEN:  Objection, form.
 5             MR. HULINGS:  All right.  We're gonna --
 6   we're gonna --
 7        A.   My personal --
 8             MR. HULINGS:  Hold on.  Hold on.  Hold on.
 9             Beyond form, what's the basis for your
10   objection so I can clear up the question, if necessary?
11             MS. WARDEN:  Vague.
12             MR. HULINGS:  All right.
13        Q.   What is your understanding of what the term
14   "Ponzi scheme" means?
15        A.   A scheme that is reliant upon new investor
16   money to honor promises made to previous investors.
17        Q.   Okay.  So let's unpack that.  Is that the
18   understanding you had at the time?
19        A.   At the time, yes.
20        Q.   All right.
21             Does -- does it make a difference to your
22   definition of whether a company's a Ponzi scheme as to
23   whether or not the company had assets?
24             MS. WARDEN:  Objection, foundation.
25        Q.   You can ignore that objection.  Go ahead.
```

1    A.  Well, I think -- I think that's why, you know,
2 I mentioned there the way that Robert had communicated
3 hi- -- the -- the way that the company was operating.  I
4 -- like, while I never may have gone to him and said,
5 Robert, this looks like a Ponzi scheme, is this a Ponzi
6 scheme.  While we may never have had that conversation,
7 it doesn't mean there wasn't a thought somewhere along
8 the way, saying, man, this -- this feels a little funny,
9 why -- why are we doing things this way.
10              Some of those questions were addressed in
11 meetings with potential broker-dealers when we were --
12 when he was discussing the compliance or the -- the --
13 the structure of the fund, whether that's reviewing the
14 PPM or -- or -- or discussing the operations.  I had
15 heard him give several explanations to people outside of
16 deeproot, whether those be finders or prospective
17 finders or other -- other institutions we were looking
18 to work with, that more or less addressed that and had
19 an explanation from him that appeared to be aboveboard.
20              And, you know, so his role as the -- as the
21 head of the company and active chief compliance officer,
22 I relied on things that he said in terms of balancing my
23 -- you know, my personal feelings or -- or internal
24 questions.  And so he would explain this as the fund is
25 a business like any other business that's reliant on

1  cash flows to operate, and based on how you -- how you
2  do the accounting or whichever accounting method that
3  you use, everything we're doing is aboveboard; it's just
4  a -- a very -- there's a -- there's a, you could say
5  unique way that we have to operate as a business to be
6  able to do what we do.  And so that -- that -- that
7  sufficed for a time for me to -- to continue working
8  there, until it -- until I -- I just no longer believed
9  that to be reliable.
10        Q.  All right.
11            MR. HULINGS:  So I'm going to move to
12  strike as nonresponsive.
13        **Q.  Let's -- let's kind of break this down a little**
14  **bit more.  You made -- you know, you put in your -- your**
15  **letter that in functional operation it looks and -- it,**
16  **meaning the 575 Fund, looks and feels like a Ponzi**
17  **scheme, correct?**
18        A.  Yes.
19        Q.  All right.
20            **So give me the complete factual basis for**
21  **that statement at the time.**
22        A.  He was not able to make the 575 periodic
23  payments.  There had not been enough investment capital
24  come in to account for those missed payments.
25        Q.  Okay.

1                So --
2        A.   Or -- or there was not enough incoming
3   investment capital that would have met the level that
4   needed to go out to those payments.
5        Q.   All right.
6                And is that the complete factual basis for
7   your statement at the time?
8        A.   That -- that was from -- that was from my
9   understanding.  I didn't know what other sources of
10  income were coming in from other -- from the other
11  affiliates, and so it -- it looked to me as if the only
12  way payments were being made were based on funding of
13  new investment dollars.
14       Q.   Okay.  So have you ever heard the phrase "money
15  is fungible"?
16       A.   Maybe not that specific phrase, but that sounds
17  like something I've heard.
18       Q.   All right.
19               Do you agree with that statement?
20       A.   Sure.
21       Q.   Okay.
22               So if the source of payments to investors
23  has -- or if -- let me rephrase.
24               If the source of payments to investors is
25  funded by more than new investments, does that make the

```
 1    obligations -- a -- an obligation of the deeproot
 2    entities to make a payment, correct?
 3         A.   Correct.
 4         Q.   And obligations driven -- or, you know, an
 5    obligation under a contract to make a payment, correct?
 6         A.   In some cases, yes.
 7         Q.   So if -- if the deeproot entities have a
 8    contract that requires them to make a monthly payment
 9    to, say, a landlord, that would be an expense, correct?
10         A.   Yes.
11         Q.   And if the deeproot entities had a contractual
12    obligation to make a monthly payment under a
13    subscription agreement, that could also be an expense?
14         A.   Sure.
15         Q.   So the fact that one of those expenses goes to
16    a former investor, is that what makes this a Ponzi
17    scheme, under your definition?
18         A.   If the only source of -- if the only source of
19    money to pay -- to pay previous investor commitments is
20    new investors, it would.
21         Q.   Well, let me ask you this.  Do you recall the
22    PPMs making reference to reserve funds?
23         A.   Yes.
24         Q.   Do you recall recommending to Mr. Mueller that
25    deeproot increase the amount of its reserve funds?
```

```
 1        A.   I do.
 2        Q.   And what is it?
 3        A.   This is the memo that accompanied my
 4   resignation letter.
 5        Q.   Okay.
 6             And did I show you -- the exhibit that I
 7   just showed you that's Exhibit 18, was that your
 8   resignation letter?
 9        A.   The document previous to this one, yes.
10        Q.   Okay.
11             And did -- did the two of those -- did
12   those documents go together?
13        A.   Yes.
14        Q.   Okay.
15             Tell me, just in your own words, why did
16   you decide to write the resignation letter, which is
17   Exhibit 18, and then the attached memo, which is
18   Exhibit 22?
19        A.   I wanted a -- a -- an official resignation
20   letter with me leaving, and as I explained a little bit
21   earlier today, I knew what me leaving would do to the
22   potential fundraising efforts, and the reality of -- of
23   what my leaving would mean for the company, and I -- I
24   didn't want to leave him empty-handed.
25             I wanted to provide some suggestions and --
```

```
 1   and make sure that any of my concerns that had not been
 2   explicitly stated before, that Robert had a chance to --
 3   to at least hear them and see them and know that there
 4   were -- that they -- that they did exist, and then
 5   provide constructive feedback towards what I thought
 6   would help things run better moving forward.
 7        Q.  And you mentioned you wanted an official
 8   resignation letter.  Did you believe it was part of your
 9   job responsibilities to transmit an official resignation
10   letter to Mr. Mueller?
11        A.  Yeah, that's the professional thing to do.
12        Q.  And I think you -- you mentioned that you
13   transmitted it via Slack, right, to Mr. Mueller and Ms.
14   Lee?
15        A.  Yes, as well as physical copies under their
16   respective doors.
17        Q.  Okay.
18            And did you ever get a response from --
19   from Mr. Mueller?
20        A.  I received a response e-mailed from Stephanie
21   on behalf of the company, I think a week later.
22        Q.  Oh, okay.
23            So -- but my question was, did you ever get
24   a response from Mr. Mueller?
25        A.  I haven't looked at it since the day I received
```

```
 1    it would be something that I -- I think he should
 2    consider as how he is -- as how he was operating the
 3    business.
 4         Q.  In writing that, in function it looks and feels
 5    like a Ponzi scheme, is it fair to say you're basing
 6    that off your -- just your opinion of -- of what you
 7    observed in your time at deeproot?
 8         A.  Correct, I can --
 9             MR. HULINGS:  Objection -- hold on, hold
10    on, hold on.  Objection as to vagueness for now.
11         Q.  Is the sentence if -- it looks and feels like a
12    Ponzi scheme, is that based on your observation or
13    someone else's?
14             MR. HULINGS:  Objection, compound.
15         A.  That was mine.
16         Q.  Okay.
17             And can you date-stamp for us when you
18    became concerned that in functional operation that
19    deeproot looked and felt like a Ponzi scheme?
20             MR. HULINGS:  Objection, vagueness as to
21    the phrase "date-stamp."
22             MS. WARDEN:  Sorry.
23         Q.  Can you tell me when you first became concerned
24    that deeproot looked and felt like a Ponzi scheme?
25         A.  It -- it was more of a building development
```

```
 1   throughout the last nine to 12 months I was there.
 2   Again, hearing him explain how things operated and
 3   having a justification of why it was acceptable, I -- I
 4   grew to doubt that and no longer want to accept it as --
 5   I -- I no longer believed him that he was -- that he
 6   actually knew what he was -- that -- that he was
 7   actually competent and -- and knowing what he was doing.
 8        Q.  Okay.
 9            And I believe you testified that you don't
10   recall directly discussing with Mr. Mueller your concern
11   that deeproot felt like a Ponzi scheme, correct?
12        A.  Correct.
13        Q.  Okay.
14            But did you share your concern -- concerns
15   with Mr. Mueller about deeproot's -- did you share your
16   concerns with Mr. Mueller about deeproot?
17        A.  Yeah, I --
18            MR. HULINGS:  Objection, vague.
19        A.  Yeah, I think -- I think I discussed that
20   already fairly extensively today with other documents
21   highlighting things Nate and I had discussed and things
22   that, you know, we had -- we had attempted to discuss
23   with Robert previously.
24        Q.  Okay.
25            And let's just unpack this.  So you
```