## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      **Plaintiff,**<br><br>        -against-<br><br>**ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,**<br><br>      **Defendants,**<br><br>        -and-<br><br>**DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621 SILICON DR LLC,**<br><br>      **Relief Defendants.** | **Civil Action No.:  5:21-cv-785-XR** |

## PLAINTIFF'S MOTIONS *IN LIMINE* AND BRIEF IN SUPPORT

Plaintiff, Securities and Exchange Commission ("SEC") submits its motions *in limine*[1] as to Defendant Robert J. Mueller ("Mueller"), respectfully requesting the following:

- Motion *in limine* No. 1: *To Exclude Evidence of the Viability of Deeproot Businesses*

- Motion *in limine* No. 2: *To Exclude Evidence of the Adverse Consequences of Investigation or Verdict*

- Motion *in limine* No. 3: *To Exclude Reliance on Advice of Counsel Evidence*

---

[1] The SEC reserves the right to seek additional evidentiary rulings from the Court as the evidence is developed at trial.

- Motion *in limine* No. 4: *To Exclude Reliance on Accountants and Other Professionals Evidence*

- Motion *in limine* No. 5: *To Exclude Undisclosed Opinion Testimony*

- Motion *in limine* No. 6: *To Exclude Character Evidence*

- Motion *in limine* No. 7: *To Exclude Characteristics of the SEC or the SEC Staff*

- Motion *in limine* No. 8: *To Exclude Evidence Concerning SEC Investigative Techniques*

- Motion *in limine* No. 9: *To Admit Scott Allen Resignation Memorandum*

- Motion *in limine* No. 10: *To Impeach Mueller with His Prior Invocation of the Fifth Amendment Privilege if Necessary*

## I.  INTRODUCTION

Motions *in limine* allow the Court an opportunity to pre-screen documents and testimony that may be offered at trial in order to prevent irrelevant and unduly prejudicial evidence and argument from reaching the jury.  *See O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977); *United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988).  This Court has the inherent power to exclude irrelevant and prejudicial evidence prior to trial.  *United States v. Kirk*, No. SA-11-CR-449(2)-DAE, 2013 WL 6198221, at *2 (W.D. Tex. Nov. 27, 2013) (citing *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984) ("Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials.")).  Ruling on the issues presented herein, in advance of trial, prevents interruption during trial when it is clear that an issue will arise.  *See Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).

In order to limit the volume of pre-trial filings, and in the spirit of judicial economy, the SEC has refrained from filing individual motions *in limine*, instead including legal support for its

motions in a single filing.  The SEC stands ready to submit additional briefing on any topic for which the Court desires additional detail or legal authority.

## II.    ARGUMENT AND AUTHORITY

### A.    Motions to Exclude Evidence and Argument

The Commission moves *in limine* to exclude all statements, questions, evidence, offers of proof and arguments before the jury regarding the following:

### 1.    <u>Motion *in limine* No. 1</u>: Evidence of the Viability of Deeproot Businesses

Pursuant to Federal Rules of Evidence 401, 402 and 403, the SEC moves the Court to exclude evidence and argument regarding the business operations, manufacturing, development, marketing, or potential profitability of deeproot Tech LLC ("deeproot Tech"), deeproot Pinball LLC ("deeproot Pinball"), Deeproot Studios LLC, Deeproot Sports & Entertainment LLC, and Deeproot Re 12621 Silicon Dr LLC,  Mueller's so-called "deeproot Family of Companies,"[2] which are affiliated businesses owned or controlled by Mueller.

The viability or potential prospects of Mueller's pinball or other businesses are not on trial in this matter.  None of the SEC's claims that Mueller violated the anti-fraud provisions of the federal securities laws depend on whether or not his pinball company or other businesses had a viable path to profitability.  *See United States v. Peterson*, 101 F.3d 375, 382 (5th Cir. 1996) (upholding jury instructions in securities fraud case that excluded language concerning the defendant's belief in his business venture because "the practicality or reasonableness of the defendant's business ideas were not at issue.").  Like in *Peterson*, here the SEC makes no claims that Mueller made any misrepresentations or omissions that the purported operations of his pinball

---

[2] This is a term Mueller used in marketing and other materials when describing his various businesses.  Dkt. No. 1 ¶¶ 39, 49.

and other businesses were not *bona fide.*  Likewise, the SEC makes no claims that Mueller misrepresented the potential profitability of his pinball company.[3]  Instead, the SEC claims that Mueller misrepresented the manner and amounts in which he allocated investor funds to, among other things, his affiliated businesses.  Complaint at ¶¶ 54-63, Dkt. No. 1.  Whether or not Mueller's pinball or other businesses were actually engaged in their purported business activities, or would hypothetically be profitable at some point in the future, has no bearing on whether or not Mueller made investment allocations consistent with the disclosures to investors.  *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 425 (5th Cir. 2006) ("Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (citing Fed. R. Evid. 401).

Similarly, the SEC is not suing Mueller concerning his subjective belief that his pinball business would generate tens of millions of dollars in profits.  The genuineness of Mueller's belief in his business prospects is not the state of mind at issue in this case.  Instead, the SEC's claims allege that Mueller knowingly, recklessly, and/or negligently transferred millions in investor funds to himself, to other investors in Ponzi payments, and to his affiliated businesses in a manner and in amounts materially inconsistent with what he told investors in the Funds' PPMs and other marketing materials.  Like in *Peterson*, whether or not Mueller really believed the pinball business was viable has no relevance to whether or not (1) his investment allocation practices were

---

[3] To the contrary, the SEC makes clear in the Complaint that the Private Placement Memoranda ("PPMs") stated that the Funds could make "capital acquisition[s]" in Mueller's affiliated businesses. Dkt. No. 1 at ¶ 31-33.  The SEC alleges that the Funds never in fact made such "capital acquisitions" but rather that Mueller simply *gave* investor funds to his affiliated businesses for nothing in return.  Dkt. No. 1 at ¶¶ 34, 54-56, 61; Dkt. No. 110 at 3.

consistent with his statements to investors, (2) he could make Ponzi payments to existing investors, or (3) he could use investor funds for personal expenses.[4]  *Peterson*, 101 F.3d at 382.

As indicated by his Opposition to the SEC's Motion for Summary Judgment, as well as his proposed witness and exhibit lists, Mueller appears intent on turning this trial into a strawman argument that the SEC simply shutdown a startup business it did not like.  *See, e.g.*, Dkt. No. 108 at 2 ("The SEC now equates the company's failure (that the SEC itself caused) with Mueller's fraud, which sets a dangerous precedent for future entrepreneurs.").  For example, Mueller has extensively designated the deposition testimony of Craig Rushforth who served as President and Lead Mechanical Engineer at deeproot Tech. Dkt. No. 114 at 16.  The vast majority of Rushforth's designated testimony, which Mueller will try to elicit from Rushforth at trial, concerns the operations, development, marketing, and potential profitability of deeproot Tech and deeproot Pinball.  *Id.*  But Rushforth repeatedly testified he had no involvement with Fund investor disclosures or specific knowledge of the investment side of the business and thus had no insight as to whether Mueller's allocation of investor funds was consistent with those disclosures:

> Q.  Did you review any of the materials that were presented or provided to investors?
>   A.  No.

Ex. 1, Rushforth Dep. at 132:8-132:10.[5]

> Q.  All right.  And do you recall ever meeting with someone that you knew to be a potential investor in the 575 Fund?
>   A.  No.

> Q.  Do you recall -- do you know whether or not investors in the 575 Fund were provided materials by the Deeproot companies?

---

[4] This evidence is equally irrelevant to the SEC's Investment Advisers Act claims which allege that Mueller, as an investment adviser, breached his fiduciary duties to the Funds and their investors by, in part, engaging in the same conduct.  The business operations of Mueller's pinball and affiliated businesses have no bearing on Mueller's failures as an investment adviser.

[5] All exhibits are attached to the declaration accompanying this motion.

**A.**   I know that there was materials.  I know that things were shipped out, but I don't know specifically where they -- who they were shipped to and what, but I-- I do know that there was materials that were there in the office.

**Q.**   So "materials" meaning documents, contracts, and other written materials?
  **A.**   Correct.

**Q.**   Did you have any role in reviewing, drafting, or approving any of those materials?
  **A.**   No.

*Id.* at 133:3-134:3.

**Q.**   Okay.  Did you have an occasion to talk to Mr. Mueller about Deeproot 575 Fund?  I know Mr. Hulings asked you about it.  I just wanted to get your understanding of it.
  **A.**   I know he had various funds and investments.  That's really the extent.  I know that, you know, his investment stuff, but I don't know specifics on it.

*Id.* at 137:8-14

**Q.**   Did Mr. Mueller ever discuss with you whether he was having trouble finding investors in his insurance policy business?
  **A.**   No, not specifically.  You know, it -- everything -- our discussions were around, you know, there was investors, there was, you know, things.  So there was no specific to a specific product line or something.  When you talk about these plans, I'm going to call those product lines because you brought them up, but I didn't have knowledge like, hey, I have investors in these things.  I never got that specific with him.

*Id.* at 142:16-143:2

**Q.** You talked to Mr. Hulings about investors, and there's just one thing I wanted to clarify.  To your knowledge, were there ever any investors who invested directly in Deeproot Tech?
  **A.**   I -- I don't know honestly.

*Id*. at 143:3-7

Likewise, Mueller has included more than twenty exhibits on his proposed exhibit list, many of which were never produced in discovery, concerning his pinball prototypes and marketing of his pinball machines, including several promotional videos.  Dkt. No. 114 (marking pinball exhibits as D41-D46, D48-D52, and D100-D116).[6]

---

[6] The SEC has objected to many of these exhibits.  Dkt. No. 121.

Not only is this type of evidence or argument about the viability of Mueller's affiliated businesses wholly irrelevant to the question of whether not he committed securities fraud, it is also misleading, likely to cause confusion, and wasteful of the jury's time.   Fed. R. Evid. 403. Mueller's effort to introduce this type of evidence is an attempt to transform the SEC's case into a referendum on his pinball business plan or whether or not he was in fact trying to build and sell a pinball machine.   Mueller would apparently prefer to have the jury focus on his efforts to build a pinball machine while claiming, erroneously, that the SEC disputes such efforts.   The SEC makes no such claims, and even if true, Mueller's claims about the viability of his businesses have no tendency to make it more or less probable that he committed securities fraud as alleged in the Complaint.   That is simply not what this case is about.   Accordingly, the Court should exclude this evidence and argument entirely.   Fed. R. Evid. 401, 402, 403.

### 2.   __Motion *in limine* No. 2__: Adverse Consequences of Investigation or Verdict

Pursuant to Federal Rules of Evidence 401, 402, and 403, the SEC moves the Court to exclude evidence and argument regarding the adverse consequences the SEC's investigation and lawsuit have had or could have on Mueller's businesses or his professional or personal life.   Such evidence is irrelevant to the issue of whether Mueller violated the securities laws and would be an attempt to improperly influence the jury by confusion or distraction or appeal to sympathy.   *See, e.g.*, *United States v. Caldwell*, 257 F. App'x 764, 769 (5th Cir. 2007) (upholding exclusion of potentially "confusing" and cumulative evidence under Rule 403); *SEC v. Moran*, No. 95 Civ. 4472 (BN), 1995 WL 785953, at *1 (S.D.N.Y. Oct. 31, 1995) ("It is well settled that the trier of fact must consider only the factual issue of liability without regard to any potential consequences which may befall a defendant.")

 In his Opposition to the SEC's Motion for Summary Judgment, Mueller argued that the SEC's investigation caused the ultimate failure of his businesses.   "[deeproot's] ultimate downfall

(and loss of investor money) was precipitated not by any wrongdoing by Mueller but by the SEC's misguided zeal in bringing this action." Dkt. No. 108 at 2.  Further, Mueller claims that "the SEC shut down the company." *Id*. at 3.  Similarly, Mueller has cited deposition testimony concerning perceived adverse consequences of the SEC's investigation and enforcement action.  For example, Mueller cited to the deposition testimony of Craig Rushforth in which Mueller's counsel asked about Rushforth going on unemployment and finding alternative work.  *Id*. at 2 (citing Ex. A-5, Rushforth Dep. at 127:04-130:24).  None of this evidence relates to Mueller's alleged violations of securities laws.

Aside from being untrue, this supposed evidence relating to the SEC's investigation or the actual or potential consequences of this civil action does not have "any tendency to make the existence of a fact that is of consequence" to the jury's determination of whether Mueller violated the law "more probable or less probable."  Fed. R. Evid. 401.  Here, the SEC's conduct during the investigation and this litigation has no relevance to any fact in dispute.  What caused Mueller's businesses to ultimately file for bankruptcy has no relation to whether or not he committed securities fraud.  As discussed in Motion *in limine* No. 1, none of the SEC's claims turn on the cause of Mueller's businesses' failure, and certainly none of the collateral consequences that potentially flowed from Mueller being charged with securities fraud, have any tendency to show whether or not he actually committed securities fraud.  For this reason, courts consistently exclude evidence of adverse consequences in SEC actions.  In *SEC v. Spencer Pharm., Inc*., 58 F. Supp. 3d 165, 166 (D. Mass. 2014), the court granted the SEC's motion to exclude evidence or argument concerning the negative effects of the investigation or a finding of liability.  The court reasoned that "[n]one of the statutory provisions [including, as here, Section 10(b)], under which [defendant] is charged include an element related to either the effects of the investigation or the possible

consequences of trial.  Accordingly, such evidence is irrelevant to a determination of [defendant's] liability for the charges brought against him." *Id.*

Similarly, in *SEC v. Saul*, No. 90 C 2633, 1991 WL 218061 (N.D. Ill. Oct. 16, 1991), an insider trading case, the court concluded that "[t]estimony concerning the ramifications of a judgment against the defendants has such limited probative value and such substantial potential for prejudice and distraction that it [should] be precluded pursuant to Fed R. Evid. 403." *Id.* at *1. Further, "[s]peculation about the consequences [the defendants] might suffer from a jury finding against them would likely distract the jury from the allegations of the S.E.C.'s complaint and encourage deliberation based on emotional considerations which are improper." *Id.*; *see also SEC v. Jacobs*, No. 1:13-cv-1289, 2014 WL 12597832, at *5 (N.D. Ohio Feb. 25, 2014) (excluding adverse consequences evidence because it is irrelevant, "and even if such evidence were relevant, it is more prejudicial than probative"); *SEC v. Moran*, 1995 WL 785953 at *1 (granting the SEC's motion *in limine* to preclude the defendants from offering evidence regarding hardship or loss from the lawsuit because "[t]here is no relevant basis under which such proof could be offered.")

In truth, Mueller wishes to focus on the SEC's investigation and enforcement action in order to put the SEC on trial and confuse the jury with irrelevant and prejudicial evidence and arguments.  Permitting such a sideshow would distract the jury from the actual evidence and charges before them.  *See, e.g., United States v. Day*, 700 F.3d 713, 728 (4th Cir. 2012) (affirming exclusion of report about mishandling of evidence because its "limited probative value" was outweighed by the unfair prejudice); *United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001) (holding that defense summation "amounted to an (improper) invitation for the jury to consider the government's choice of investigative techniques.") (citation omitted); *United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) (allegations that investigation was "sloppy" were irrelevant).

Mueller is free to challenge the sufficiency of the SEC's evidence at trial but should not be permitted to attack the SEC's case through inflammatory references to the SEC's investigation and conduct, or the consequences of this case for Mueller.  In sum, the manner in which the SEC exercised its investigatory and enforcement authority in this matter does not make it more or less likely that Mueller committed securities fraud.

      **3.**   **<u>Motion _in limine_ No. 3</u>: Reliance on Advice of Counsel**

Pursuant to Federal Rules of Evidence 401, 402, and 403, the SEC moves the Court to exclude evidence and argument that Mueller relied on the advice of counsel.

         *a.*  *Legal Standard for Advice of Counsel*

In the Fifth Circuit, reliance on the advice of counsel is not a formal defense, but rather "a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud."  *SEC v. Snyder*, 292 Fed. App'x 391, 406 (5th Cir. 2008) (quoting *Peterson*, 101 F.3d at 381.  However, "[a]s with all evidence, the advice of counsel defense may only be presented during trial if it is relevant."  *United States v. Impastato*, 543 F. Supp. 2d 569, 573 (E.D. La. 2008); *see also United States v. Crinel*, No. CR 15-61, 2016 WL 6441249, at *12 (E.D. La. Nov. 1, 2016) (holding that introduction of advice of counsel evidence should be handled pre-trial).  Moreover, as a general rule, "[a]dvice of counsel, *when given on full disclosure of all the facts* and followed in good faith, may be a matter to be considered by the jury in determining the appellant's guilt." *Impastato*, 543 F. Supp. 2d at 573 (quoting *United States v. Thaggard,* 477 F.2d 626, 632 (5th Cir. 1973) (emphasis added)).  Finally, assertions of reliance on counsel requires a waiver of the attorney client privilege. *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) ("The great weight of authority holds that the attorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege

to protect against disclosure of such information would be manifestly unfair to the opposing

party.") (internal quotations omitted); *In re Taxable Mun. Bond Sec. Litig.*, No. MDL 863, 1993

WL 323069, at *3 (E.D. La. Aug. 18, 1993) (same).

> b. *Mueller Did Not Seek, and His Lawyers Did Not Provide, Legal Advice Relevant to the Claims at Issue*

Here, evidence of Mueller's supposed good faith reliance on attorneys is irrelevant to the

claims at issue and would be unduly prejudicial for several reasons.  First, evidence of the

involvement of the deeproot entities' outside attorneys, Carlisle Patchen & Murphy LLP ("Carlisle

Patchen") in this matter is irrelevant and would be unduly prejudicial because Mueller never

sought or obtained legal advice regarding the conduct at issue in this case.  As an initial matter,

Federico testified that he did not advise Mueller, or anyone else for that matter, on the PPMs or

marketing material for either Fund:

> **Q.**   And did you advise Policy Services on this PPM, Exhibit 36 [575 Fund PPM]?
>   **A.**   Not that I recall.
>
> **Q**. You -- you did not advise Policy Services on -- on a 575 PPM?
>   **A.**    That's correct.
>
> Ex. 2, Federico Dep. at 41:21-42:1.
>
> **Q**.  And based on that testimony, you -- you did not provide legal advice on any investor disclosures or marketing materials that went to 575 investors, correct?
>   [objection]
>    **A.** That's correct.
>
> *Id.* at 48:10-48:14.
>
> **Q.**    And it's your testimony that you did not recall providing any legal advice on any dGRD PPM, correct?
>    **A.**    That's correct.
>
> *Id.* at 58:8-58:11.

Second, Concilla testified that he only helped draft the first 575 and DGRD PPMs and a separate draft registration statement ("SEC Form S-1") for an entirely different fund.[7]   Most critically, both attorneys testified that Mueller did not seek advice about whether Mueller's actions comported with the PPM provisions at issue in this case. *See, e.g.*:

> **Q.**  Did Mr. Mueller seek legal advice from you regarding whether the 575 Fund never investing in or owning any life policies was adequately disclosed in a 575 PPM at any time?
>> [Objection]
>> **A.**  No.
>
> **Q.**  Did you provide Mr. Mueller with legal advice regarding whether the 575 Fund never investing in or --or owning any life policies was adequately disclosed in [the 575 Fund PPM]?
> [Objection]
>> **A.**   No.
>
> **Q.**   Did you provide Mr. Mueller with legal advice regarding whether the 575 Fund never investing in or owning any life policies was adequately disclosed in a 575 PPM at any time?
>> [Objection]
>> …
>> [Objection]
>> **A.**  No.

Ex. 3, Concilla Dep. at 104:3-105:5.[8]

> **Q.**   Did you ever advise Mr. Mueller that he could use the Company Advance to pay investment returns?
>> [Objection]
>> **A.**  Here we go.  I think I just answered that.  I mean, did -- did I ever advise him that he could use what source of money?
>
> **Q.**  The Company Advance.
>> **A.**   The Company Advance.  No.  I -- We never had a conversation about that.
>
> **Q.**   Did you provide Mr. Mueller with legal advice about using the Company Advance to pay off investors in earlier deeproot funds?
>> **A.**   No.

---

[7] Ex. 3, Concilla Dep. at 100:24-25; 101:1-5; 101:14-19; 114:15-19; 115:15-22; 161:14-17.

[8] *See also* Ex. 3, Concilla Dep. at 117:19-122:1 (as to the DGRD Fund PPM).

*Id.* at 171:4-171:17.[9]

**Q.**   My question is, Mr. Concilla, did Mr. Mueller seek legal advice from you regarding whether the 575 Fund's failure to purchase anything from the deeproot affiliates was adequately disclosed in Exhibit 36?
[Objection].
   **A.**   No.

**Q.**   Okay.   Did Mr. Mueller inform you that he used 575 funds to pay the deeproot affiliates' expenses?
[Objection]
   **A.**   No.

**Q.**   Did Mr. --
   **A.**   Not that I recall.

*Id*. at 137:14-138:6.

**Q.**   Okay.   Did Mr. Mueller ever seek legal advice from you regarding how he should calculate the percentage ownership interest that the 575 Fund had in life policies?
   **A.**   No.   His objections.   No.

*Id*. at 143:6-143:10.

**Q**. Okay.   Did Mr. Mueller seek legal advice from you regarding whether the fact that neither the 575 Fund, nor Policy Services, purchasing any new life insurance policies after April 2017 was adequately disclosed in Exhibit 36?
   [Objection]
   **A.**   No.

*Id*. at 130:6-130:13.

**Q.**   And did you provide any legal advice regarding Policy Services' recordkeeping or bookkeeping?
   **A.**   I don't think so.

Ex. 2, Federico Dep. at 23:12-23:14.

The record is clear that while Carlile Patchen assisted in drafting the initial Fund PPMs, it

did not provide any advice to Mueller as to whether that language was accurate or sufficient in

---

[9] Concilla also told the Department of Justice he did not recall having conversation with Mueller about whether or not paying existing investors with funds provided by new investors was permissible. Ex. D61, Dec. of Concilla.

light of Mueller's actions.[10]  Mueller never sought such advice.  As courts have noted "a party may not avoid liability under the securities laws by simply retaining outside counsel to prepare required documents."  *SEC v. Sethi Petroleum, LLC*, No. 4:15-CV-00338, 2017 WL 3386047, at *4 (E.D. Tex. Aug. 7, 2017), *aff'd sub nom. SEC v. Sethi*, 910 F.3d 198 (5th Cir. 2018).

Mueller by contrast offers only generalized and evasive claims that he spoke with lawyers "about almost everything" and had "discussions on a lot of issues" but was repeatedly unable to recall specific conversations about the actions at issue in this case.  *See, e.g.*, Ex. 4, Mueller Dep. at 112:15-117:17; 119:22-120:22; 157:12-162:5; 193:18-197:09; 201:10-14; 210:3-18; 217:22-224:14; 238:8-23; 255:15-24; 286:2-25.  The law requires more than such vague claims of reliance on the advice of counsel.  *See SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *13 (N.D. Tex. Jan. 8, 2021), *aff'd sub nom. SEC v. Hallam*, 42 F.4th 316 (5th Cir. 2022) (holding as insufficient "to demonstrate good faith with respect to the various alleged securities violations[]" general descriptions of "the professionals on whose advice [the defendant] purportedly relied, but [] does not state who gave him advice, what specific advice he was given or when, or whether any of the conduct that violated the securities laws was based on the advice of an attorney, accountant, or auditor").

The SEC does not allege that the text of the PPMs was, in isolation, *per se* illegal, rather the SEC claims that the PPMs were false and/or misleading in light of Mueller's actions about which he never sought legal advice.  As Mueller never sought or obtained legal advice concerning the fraudulent misrepresentations at issue, the Court should exclude evidence of involvement of

---

[10] Further, any advice that Mueller received from Carlile Patchen was limited to the first 575 Fund and DGRD Fund PPMs, because Mueller did not seek advice from Concilla or Federico for subsequent PPMs.  Ex. 3, Concilla Dep. at 101:14-19; 112:16-22; 115:4-22; 116:5-11; 116:20-22; 121:23-122:1; 126:7-12.

attorneys merely in the drafting of documents as irrelevant and unduly prejudicial.  Fed. R. Evid. 401, 402, 403.

### c.  Mueller Did Not Make Full and Accurate Disclosures to Counsel

Even if Mueller had sought legal advice regarding the misrepresentations, the record is clear that Mueller never made full and accurate disclosure to Carlile Patchen of the key facts that the SEC contends constitute misrepresentations or omissions.  Concilla and Federico's  testimony proves that Mueller never informed them of the following: (1) that Policy Services, not the Funds, owned the life policies;[11] (2) that Policy Services did not grant the Funds interests in the life policies;[12] (3) that the Funds did not purchase any life policies after April 2017, Ex. 3, Concilla Dep. at 129:17-22; (4) that the Funds did not purchase interests in the affiliated companies or that Mueller paid the affiliated companies' expenses with what were essentially interest free loans from the Funds, *id.* at 136:11-138:16; (5) that neither Fund purchased Class B shares in deeproot Pinball, *id.* at 173:6-174:1; (6) that Mueller paid investors in his earlier Debenture funds with money from the Funds' investors, *id.* at 152:3-153:7; 153:23-154:16; (7) that Mueller made Ponzi payments to Fund investors with money he obtained from new investors in Funds, Ex. 2, Federico Dep. at 113:4-23; Ex. 3, Concilla Dep. at 179:17-180:9; 181:3-10; and (8) that Mueller used the Funds' money to pay personal expenses, Ex. 3, Concilla Dep. at 167:11-17; Ex. 2, Federico Dep. at 65:18-66:2.  In fact, Concilla testified that he understood the Funds would have enforceable interests in the life policies and affiliated companies and that he would have advised Mueller to amend the PPMs if they were not.  Ex. 3, Concilla Dep. at 92:25-94:12, 96:21-97:6, 301:18-303:9.

---

[11] Ex. 3, Concilla Dep. at 92:25-94:12; 102:3-23; 105:16-19; 106:22-109:12; 119:7-13; 121:13-16; Ex. 2, Federico Dep. at 46:14-47:16.

[12] Ex. 3, Concilla Dep. at 92:25-94:12; 102:3-16; 106:22-108:20; Ex. 2, Federico Dep. at 46:14-47:16

Mueller also failed to inform Carlile Patchen regarding his numerous failures to meet his fiduciary duties to the Funds.  Mueller did not tell Carlile Patchen that he lacked a consistent methodology to accurately value the life policies or the affiliated companies, Ex. 3, Concilla Dep. at 142:20-19; 145:1-9; Ex. 2, Federico Dep. at 66:3-12, or that he had failed to ensure that the "Company Advance" did not exceed the maximum 20% disclosed in the PPMs, Ex. 3, Concilla Dep. at 164:17-165:16.  Mueller also did not disclose key facts relating to the operation of the Funds, including that there were no internal financial controls, Ex. 3, Concilla Dep. at 143:20-144:23; Ex. 2, Federico Dep. at 66:19-22, or that he failed to segregate the Company Advance Funds, Ex. 3, Concilla Dep. at 164:17-165:16.  Mueller's failure to disclose the above facts to Carlile Patchen precludes any reliance on any advice he allegedly received.  *See SEC v. Huff*, 758 F. Supp. 2d 1288, 1351 (S.D. Fla. 2010) *aff'd*, 455 F. App'x 882 (11th Cir. 2012) (finding defendants could not rely on advice of counsel as a defense because they did not disclose all relevant facts); *SEC v. Johnson*, 174 F. App'x 111, 114-15 (3d Cir. 2006) (finding good faith reliance on the advice of an accountant defense available "only when all pertinent facts are disclosed to the professional").

### d.  *Mueller Has Not Sufficiently Waived the Attorney-Client Privilege*

Lastly, Mueller has not sufficiently waived the attorney-client privilege necessary to invoke reliance on counsel.  Rather, Mueller employs an overly narrow waiver of privilege as a sword to claim advice of counsel when it suits his interests only to retreat behind the privilege as a shield whenever the SEC has sought to explore the details of any relevant advice he may have received.  *Conkling*, 883 F.2d at 434 ("The attorney-client privilege 'was intended as a shield, not a sword'") (quoting *Pitney–Bowes, Inc. v. Mestre,* 86 F.R.D. 444, 446 (S.D. Fla. 1980)).

On December 16, 2022, counsel for Mueller informed the SEC that he waived the attorney-client privilege only as to "communication between Mr. Mueller and attorneys at Carlile Patchen that took place before January 1, 2019, and which concerned the drafting of or revisions to PPMs and other materials that were presented or provided to potential investors in the "'deeproot' entities." Ex. 5. In doing so, counsel for Mueller emphasized the "limited" nature of the waiver.[13] *Id*. Despite claiming to waive the privilege, Mueller has repeatedly refused to answer relevant questions or been instructed not to answer by his counsel during discovery on the basis of privilege. Even a cursory review of Mueller's deposition transcript reveals that it is rife with refusals to answer on the basis of privilege in a blatant attempt to frustrate discovery that would explore whether or not Mueller actually sought relevant advice, what information he provided to his attorneys, what (if any) advice he received or whether Mueller followed it. *See, e.g.*, Ex. 4, Mueller Dep. at 7:5-15; 7:23-8:2; 9:24-10:14; 16:16-18:20; 22:23-25:5; 27:25-28:13; 44:17-23; 96:24-98:15; 193:18-24; 195:21-196:3; *see SEC v. Mapp*, No. 4:16-CV-00246, 2017 WL 8780604, at *2 (E.D. Tex. Dec. 4, 2017) (holding that it would be unduly prejudicial in SEC enforcement action to allow defendants to present evidence of involvement of lawyers without fulsome discovery). Mueller even refused to answer questions concerning whether he was even the client in the supposed engagement giving rise to the advice. *Id*. at 17:17-18:20.

Mueller took a similar approach in the depositions of the Concilla and Federico invoking the privilege repeatedly. *See, e.g.*, Ex 3, Concilla Dep. at 16:8-19:23; 24:5-27:8; 33:3-12; 37:7-11; 39:24-40:9; 69:4-70:25; 71:8-11; 174:16-176:7; 180:20-24; Ex. 2, Federico Dep. at 69:19-70:7. Given Mueller's refusal to properly waive the privilege, it would be "manifestly unfair" for

---

[13] Accordingly, at the very least Mueller cannot rely on advice of counsel for any of his actions that occurred after January 1, 2019.

him to be allowed to introduce evidence of attorney involvement. *Conkling*, 883 F.2d at 434 (quoting *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D. Wash. 1975)); *see also Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 442 (W.D. Tex. 2017) ("[P]arties invoking the advice-of-counsel defense in litigation are routinely ordered to turn over work product supporting this defense.").

For the foregoing reasons, the Court should exclude any good faith reliance on counsel evidence or argument entirely as irrelevant and unduly prejudicial.[14]

### 4.   Motion *in limine* No. 4: Reliance on Accountants and Other Professionals

For the same reasons as set forth in motion *in limine* No. 3, the SEC moves to exclude any evidence or argument concerning Mueller's supposed good faith reliance on accountants or other advisers.  *See Snyder*, 292 F. App'x at 406  ("We find no meaningful distinction between the reliance on counsel and reliance on an accountant.").

The SEC is not suing Mueller for tax fraud.  The SEC is also not suing Mueller for accounting fraud—even under the securities laws.  Both of the accountants who assisted Mueller in preparing Policy Services' tax returns during the period at issue in this matter, Ken Abramson and George C. Williams, have submitted sworn declarations attesting to the fact that they never provided any review or advice on the Funds' PPMs or other disclosures to investors.  Ex. P345,[15] Abramson Dec.; Ex. D93, Williams Dec.  Both accountants also affirmed that they never provided any kind of tax or other advice concerning compliance with the federal securities laws.  *Id*.  Further, neither accountant ever conducted any kind of audit of the Funds themselves or Mueller's affiliated

---

[14] If Concilla and Federico are allowed to testify, the SEC may call them in its case-in-chief and may ask the Court to allow the SEC to lead the witnesses pursuant to Federal Rule of Evidence 611(c)(2).

[15] Exhibits that begin with the prefix P or D are proposed trial exhibits marked either by the Plaintiff SEC ("P") or Defendant Mueller ("D").

businesses.  *Id*.  The one accountant that Mueller deposed, Abramson, testified emphatically that

he did not provide any securities law related advice.

> **Q.**   And it is not -- do you have any -- you don't provide advice to your clients about
> how to comply with securities laws?
> **A.**   No.  Absolutely not.
>
> **Q**.   That's not --
> **A.**   I don't know them.  I don't advise on it.
>
> **Q.**   That is not in your -- that is not -- is it fair to say, that's not part of your -- the
> services you provide?
> **A.**   Correct.
>
> **Q.**   You don't have -- do you have any experience in that area?
> **A.**   None.
>
> **Q.**   Okay.  Are you qualified to provide securities advice?
> **A.**   None.
>
> **Q.**   Did Mr. Mueller ever ask you to provide him with advice on how to comply with the
> securities laws?
> **A**.   No.

Ex. 6, Abramson Dep. at 172:7-173:3.

Whether Mueller received advice about the proper tax treatment of certain income flows

has no bearing on whether his conduct rendered the Funds' PPMs or other disclosures false or

misleading.  Likewise, tax advice has no tendency to make it more or less likely that Mueller acted

with the requisite scienter applicable to the anti-fraud provisions of the federal securities laws.

Fed. R. Evid. 401, 403.

Similarly, other advisers, Centri Business Consulting, LLC and BDO USA, LLP, that

Mueller retained to advise on an entirely different investment vehicle not at issue in this case

submitted declarations attesting to the fact that they provided no advice concerning either the 575

or DGRD Fund.  Ex. D92, Wik Dec. (Centri); Ex. D99, Forrett Dec. (BDO).  Both advisors

submitted sworn declarations attesting to the fact that they did not provide any advice concerning

the facts the SEC alleges rendered the Fund PPMs false and misleading. *Id.* Mueller chose not to depose either advisor. Accordingly, any supposed advice from these advisers is completely irrelevant and allowing evidence of their involvement in an entirely unrelated offering would be unduly prejudicial and create confusion with the jury.

The SEC asks that any argument or evidence concerning supposed good faith reliance on accountants including Ken Abramson, George Williams or advisers Centri Consulting, LLC or BDO USA, LLP be excluded. Fed. R. Evid. 401, 402, 403.

### 5. **Motion *in limine* No. 5**: **Undisclosed Opinion Testimony**

The Court should preclude Mueller and Craig Rushforth from providing opinion testimony at trial. Contrary to the requirements of Federal Rule of Civil Procedure 26(a)(2)(C), Mueller failed to provide a "summary of the facts and opinions" for any opinion testimony for these two potential witnesses. *See* Ex. P33, Def.'s Ltr. Expert Designations. Similarly, Mueller did not identify any specific materials that allegedly support any opinions to be provided at trial, and merely referred the SEC to the thousands of "documents produced in discovery in this case." *Id.* at 4-5.

The deadline for Mueller to identify expert witnesses was April 6, 2023. *See* Dkt. No. 86. Mueller sent a letter that day designating himself and Rushforth, among others, as non-retained expert witnesses. *Id.* at 3-5. Regarding his opinions, Mueller vaguely claimed he could generally opine as to the customs and practices in: (1) "the financial industry, including…" how "investments were secured;" (2) the "management, oversight, design, and regulations of funds that involve life insurance policies;" and (3) "the pinball industry" about the "design, manufacture, marketing, and sale of pinball games." *Id.* at 4. In addition, Mueller claimed he could opine or

testify about: (4) "the opinions offered by other experts designated in this case." *Id.*  Nowhere did Mueller specify what opinions he would actually offer, or the basis for such opinions.  *Id.*

Mueller also stated that Rushforth could opine about: (1) the "processes, procedures, and technical issues regarding the design and manufacture of pinball machines …" and (2) the "time necessary to complete the pinball machines at issue … and the revenues that were expected from the sales of those machines." *Id.* at 5.

Before the close of discovery, *see* Dkt. No. 93, and Rushforth's deposition, the SEC asked Mueller to "supplement his disclosure by June 14 stating the opinions the witnesses may offer and a brief account of the materials on which they rely." Ex. 7, SEC's Ltr., June 7, 2023.  Mueller did not respond to the SEC's letter or supplement his April 6, 2023, disclosures.

As this Court previously held in *Knighton v. Lawrence*, No. SA-14-CV-718-XR, 2016 WL 4250484, at *2-3 (W.D. Tex. Aug. 9, 2016), opinion testimony from non-retained witnesses can be excluded when a party fails to provide the disclosures required under Rule 26(a)(2)(C).   In *Knighton*, defendant designated multiple non-retained medical service providers as experts, and merely pointed to thousands of pages of medical records as the basis for their expected opinion testimony.  *Id.* at *1.  Under Rule 26(a)(2)(C), however, the proponent of an expert witness *must* disclose by the deadline in the scheduling order *both* the subject matter of the expected testimony and a "summary of the facts and opinions which the witness is expected to testify."  *Id.* at *2 (quoting Fed. R. Civ. P. 26(a)(2)(C)).  The mere reference in defendant's disclosure to the existing medical records was "not sufficient to meet the requirements …" of Rule 26(a)(2)(C), and the expert designations were therefore not "timely made under the scheduling order deadline."  *Id.* at *2.  Finally, this Court explained that "the purpose of requiring a 'summary of the facts and

opinions' is to permit the opposing party to prepare an effective cross-examination." *Id.* at *3 (citing *Hoover v. United States Dep't of the Interior*, 611 F.2d 1132, 1142 (5th Cir. 1980)).

Mueller's failure to provide the required information under Rule 26(a)(2)(C) is neither harmless nor justified and warrants exclusion of the proffered opinion testimony at this late stage of the case shortly before trial. *See* Fed. R. Civ. P. 37(c)(1); *Logan v. Westfield Ins. Co.*, No. CV 17-29, 2020 WL 412216, at *5 (W.D. La. Jan. 24, 2020) (listing factors to consider in excluding testimony). *First*, by failing to provide the required information, the SEC will not be able to effectively prepare for cross-examination at trial because it does not know what opinions will be offered, their basis, or what documents from the thousands produced in discovery allegedly support the undisclosed opinions. This is particularly problematic for Mueller's testimony at trial, as his deposition was taken on March 9, 2023, *before* he made his deficient "expert" disclosures. Moreover, the SEC has no information about what opinions Mueller intends to offer at trial in response to the SEC's expert, Bill Post. *See* Ex. P33 at 4 ("Mueller may also testify regarding the opinions offered by other experts…."). *Second*, there is no justification for Mueller's failure to provide the information required by Rule 26(a)(2)(C), particularly after the SEC asked Mueller to supplement his deficient disclosures. *See* Ex. 7. Mueller's decision to ignore the SEC's request, made *before* Mueller took Rushforth's deposition on June 16, 2023, also prevented the SEC from exploring any alleged opinions from Rushforth that Mueller intends to elicit a trial and that were not covered at his deposition and therefore remain unknown to the SEC.

Finally, from the limited and vague descriptions Mueller provided in his letter of April 6, 2023, it does not appear that Rushforth's proffered opinion testimony is important for the case,

which also supports its exclusion under Rule 37(c)(1).[16]  *See Logan*, 2020 WL 412216, at *5.  As discussed in the SEC's motion *in limine* No. 1, evidence regarding the functioning, marketing, or viability of Mueller's companies, including deeproot Pinball, is irrelevant to the question of whether he violated the securities laws.  In short, as it did in *Knighton*, the Court should exclude any opinion testimony from Mueller or Rushforth.

### 6.  <u>Motion *in limine* No. 6</u>: Character Evidence

Federal Rule of Evidence 404(a)(1) prohibits the admission of character evidence in civil cases to prove that a person acted in accordance with such character or trait on a particular occasion.  *Wilson v. Baucom,* No. 22-50066, 2023 WL 4288350, at *6 (5th Cir. June 30, 2023) ("The district court correctly held that the Federal Rules of Evidence disallow character evidence in civil cases and that the exceptions listed in Federal Rule of Evidence 404(a)(2) only apply in criminal cases, as the title and content of Rule 404(a)(2) make clear.").  When Rule 404(a) was amended in 2006, the accompanying Advisory Committee Notes explained, "The Rule has been amended to clarify that in a civil case evidence of a person's character *is never admissible to prove that the person acted in conformity* with the character trait…*even where closely related to criminal charges*" (emphasis added).  *See SEC v. Acord*, No. 09-21977-CIV, 2010 WL 11505963, at *1 (S.D. Fla. Aug. 23, 2010) (citing the 2006 Committee Notes and granting the SEC's motion to exclude four character witnesses).

The Court should preclude Mueller from offering any evidence or argument concerning his favorable character, reputation, good works, and/or contributions to the community.  *See Kemin*

---

[16] If the Court allows Rushforth to testify at trial, the SEC plans to object to his offering any opinion testimony without Mueller laying the proper foundation, particularly concerning Rushforth's proffered expertise in the "revenue" expected from sales of pinball machines. Ex. P33, Muller's Expert Designation at 5.

*Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, No. 4:02-cv-40327, 2004 WL 5508752, at *11 (S. D. Iowa Sept. 4, 2004).  Any argument or evidence on these topics to bolster Mueller's credibility would constitute an improper attempt to unfairly engender the jury's favoritism through irrelevant evidence.  The fact that the SEC may challenge Mueller's veracity in this case does not open the door for evidence of his alleged good character.  *Renda v. King*, 347 F.3d 550, 554 (3d Cir. 2003) ("Direct attacks on a witness's veracity in the particular case do not open the door for evidence of the witness's good character.").  Courts have repeatedly held that vigorous cross examination, close questioning of a defendant's version of the facts, and establishing that a defendant's testimony is contradicted by other evidence in the case, including inconsistencies with the testimony of other witnesses, do not constitute attacks on a defendant's reputation for truth and veracity.  *See United States v. Dring*, 930 F.2d 687, 692 n.6 (9th Cir. 1991) ("[I]t is not merely attacks on truthfulness which trigger rehabilitation, but rather attacks on a witness's prior history or general character for truthfulness….  The Government placed Dring's veracity in the instant case at issue, but not his reputation for veracity."); *United States v. Jackson*, 588 F.2d 1046, 1055 (5th Cir. 1979); *United States v. Thomas*, 768 F.2d 611, 618 (5th Cir. 1985); *United States v. Danehy*, 680 F.2d 1311, 1314 (11th Cir. 1982).  Accordingly, Mueller should be prevented from seeking to introduce evidence of his alleged good reputation and character before the jury at trial.

### 7.   Motion *in limine* No. 7: Characteristics of the SEC or the SEC Staff

The Court should preclude Mueller from presenting argument or evidence in the jury's presence regarding the SEC's trial or investigative staff, including their backgrounds, areas of practice, or the size of their agency, as these items are irrelevant and unduly prejudicial.  *See generally* Fed. R. Evid. 402, 403; *Rosenberg v. Cottrell, Inc.*, No. 05-545-MJR, 2007 WL 2028789,

at *4 (S.D. Ill. July 12, 2007) (ordering excluded *in limine* evidence or argument about the size of the law firm representing a defendant).

### 8.  <u>Motion *in limine* No. 8</u>: SEC Investigative Techniques

The Court should preclude Mueller from referring to the actions and conduct of the SEC and its staff during the course of its investigation, its internal deliberations, and the views of individual Commissioners.  These factors have nothing to do with the facts of consequence in the jury's determination of this action nor could they make the existence of any "fact [that is of consequence to the determination of the action] more or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001) (holding that the defense's summation "amounted to an (improper) invitation for the jury to consider the government's choice of investigative techniques"); *United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) ("Merely showing that an investigation is sloppy does not establish relevance.").

### B.    Motions to Admit Certain Evidence

### 1.  <u>Motion in limine No. 9</u>: Scott Allen Resignation Memorandum (P106)

SEC Exhibit P106 is a resignation memo from Scott Allen, a former deeproot business development employee, who wrote to Mueller expressing his concerns about the Funds' ability to repay investors.  Ex. P106.  In the memo, Allen warned Mueller that the 575 Fund "looks and feels like a Ponzi scheme."  Ex. P106.  The SEC respectfully requests that the Court grant this motion *in limine*, overrule Mueller's objections to P106, and provisionally admit the exhibit.  *Harris v. BMW of N. Am., LLC*, No. 4:19-CV-00016, 2022 WL 125345, at *1 (E.D. Tex. Jan. 12, 2022) (quoting *Harkness v. Bauhaus U.S.A., Inc.*, 2015 WL 631512, at *1 (N.D. Miss. Feb. 13, 2015))

("The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.").

Mueller objected to this exhibit, stating that Allen's resignation memo is hearsay, lacks foundation, calls for a legal conclusion, and is unduly prejudicial under Federal Rule of Evidence 403. Dkt. No. 123 at 8; *see also* Mueller's Objs. SEC's Mot. Summ. J. Evid., Dkt. No. 109 at 9 (referring to summary judgment Exhibit 22).  Exhibit P106 is admissible under the business record exception to the rule against hearsay and is also admissible as non-hearsay evidence.  *See* SEC's Resp. Mueller's Objs. SEC's Summ. J. Evid. at 13-16, Dkt. No. 111.

Allen's resignation memo is a deeproot business record pursuant to Rule of Evidence 803(6) which allows the admission of business records "made at or near the time of the matters recorded," "prepared by…a person with knowledge," "engaged in a regularly conducted business activity," as a "regular practice of the business," and "retained and kept."  Allen, who was deposed at length about the memo, stated that he prepared the memo at or near the time of his resignation, based on his personal knowledge, in fulfillment of his professional responsibilities as an employee of the deeproot companies, and transmitted the memo to Mueller and human resources.  Ex. 8, Allen Dep. at 239:15-240:21; 242:11-15; 242:23-243:7.

The memo is also admissible as non-hearsay evidence of notice to Mueller.  "Evidence introduced to prove merely that notice was given is not offered to prove the truth of the matter asserted therein and, therefore, is not hearsay." *United States v. Central Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984) (citations omitted).  Allen's resignation memo put Mueller on notice of Allen's concerns, all of which are material to Mueller's state of mind.  Not only did Allen warn Mueller that his business "looks and feels like a Ponzi scheme," he told him why: "it has become clear that your chosen strategies and methods…have been relying entirely on incoming capital

from new investors to be able to honor commitments to previous investors." Ex. P106.  Allen also alerted Mueller that his disclosures to investors were potentially misleading when he wrote that Mueller's "explanations of 'accounting methods' and attributing the missed payments to 'cashflow' difficulties" were not consistent with maintaining compliance and operating legitimately.  *Id.*  Allen also alerted Mueller that Mueller was failing to meet his fiduciary obligations when he suggested that Mueller hire a financial officer or controller to assist with planning and budgeting because his methods were "not sustainable."  *Id.*

Courts routinely find that out of court statements offered to show notice and establish state of mind are admissible non-hearsay under Federal Rule of Evidence 801(c)(2).  *Central Gulf Lines*, 747 F.2d at 319; *El-Bawab v. Jackson State Univ.*, No. 3:11CV553-DPJ-FKB, 2013 WL 3884128, at *9-10 (S.D. Miss. July 26, 2013) (finding email was offered to show notice and not the truth of the matter asserted in the email and therefore was not hearsay under Federal Rule of Evidence 801(c)(2)); *Air Liquide Am. Corp. v. Crain Bros., Inc.*, 11 F. Supp. 2d 709, 716 n. 13 (S.D. Tex. 1997) (noting that out-of-court statements offered to show their effect on the state of mind of the listener, such as to establish notice, intent, or knowledge are admissible non-hearsay).

Mueller also objects that the memo is prejudicial, offers a lay opinion, lacks foundation, and calls for a legal conclusion because of Allen's statement that the 575 Fund "looks and feels like a Ponzi scheme." Dkt. No. 109 at 9 (articulating Mueller's Rule 403 argument).  *First*, Allen can clearly provide the foundation for the document.  Allen explained during his deposition his understanding of a Ponzi scheme as "[a] scheme that is reliant upon new investor money to honor promises made to previous investors." Ex. 8 at 159:15-16; 166:15-23.  Allen explained that he concluded that the 575 Fund looked and felt like a Ponzi scheme after listening to Mueller's explanations about cash flow, accounting, and the business model.  *Id.* at 159:21-162:13.  Allen's

warning to Mueller was based on his personal knowledge and observations and is not an improper lay opinion or a legal conclusion. *See Webb v. Lincoln Par. Sheriffs Off.*, No. CV 17-1605, 2019 WL 6312896, at \*4 (W.D. La. Nov. 21, 2019) (holding testimony "is not speculation, argument, or a legal conclusion because it is either something [the witness] actually said or the thoughts motivating his actions."), *appeal dismissed and remanded sub nom. Webb v. Stone*, 821 F. App'x 369 (5th Cir. 2020).

*Second*, Allen's statement to Mueller that the 575 Fund looked and felt like a Ponzi scheme also does not meet the high standard of "unfair prejudice" that warrants exclusion under Federal Rule of Evidence 403. *United States v. Williams,* 132 F.3d 1055, 1059-60 (5th Cir. 1998) ("Although relevant evidence is inherently prejudicial, the exclusion of such evidence under Rule 403 is allowed only when it is *unfair* prejudice….") (emphasis in original). "Evidence is not prejudicial merely because admitting it may sway the jury against a party. [P]rejudicial cannot be equated with harmful in all cases; rather, it connotes harmful plus non-probative." *Graef v. Chemical Leaman Corp.,* 106 F.3d 112, 118 (5th Cir. 1997) (quotations omitted). In this case, Allen's memo to Mueller has great probative value in assisting the jury in evaluating not only what happened at deeproot but also Mueller's understanding and state of mind. Exclusion of Allen's memo under Rule 403 is not warranted because the Rule's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Pace*, 10 F.3d 1106, 1115–16 (5th Cir. 1993) (quotations omitted).

Mueller himself has tacitly conceded both the probative value and fairness of P106 by designating for trial Mr. Allen's deposition testimony about the memo and what he meant when he warned Mueller of a potential Ponzi scheme. *Compare* Mueller's Rule 26(a)(3) Pretrial Disclosures, Dkt. No. 114 at 9 (designating testimony on pages 156-59, 161-67, and 170-173

discussing Deposition Exhibit 18, which is the same memo marked as P106), *with* Ex. 8, Allen Dep. at 156:1-173:11.  Accordingly, the SEC requests the Court overrule Mueller's objections to P106 and provisionally admit P106 subject to the SEC establishing foundation for admission at trial.

### 2.  **Motion *in limine* No. 10**: Mueller's Prior Invocation of Fifth Amendment

During trial it may become necessary to impeach Mueller's testimony as to certain topics that he previously refused to answer after invoking the Fifth Amendment to the U.S. Constitution. Because defense counsel will likely object as unduly prejudicial to this use of Mueller's prior refusal to answer questions under the Fifth Amendment as impeachment, *see, e.g.*, Dkt. No. 109 at 8-9, the SEC seeks an *in limine* ruling to avoid an extended bench conference during trial.

During his sworn testimony taken on June 24, 2021, Mueller refused to answer many questions about his misuse of company money to pay personal expenses.  Specifically, he invoked his Fifth Amendment right not to answer whether he used company money to pay: (1) over $9,000 for jewelry at Americus Diamond, *see* Ex. 9, Mueller Tr.  at 368:8-15; 371:12-15; (2) over $4,800 for his 2016 wedding expenses at Wolf Weddings & Events, *id.* at 373:15-23; (3) over $13,000 for personal trips on British Airways, *id.* at 375:15-25; (4) over $43,000 to Disney Cruise Lines and Princess Cruise Lines, *id.* at 377:21-378:23; (5) the law firms of Wilson, Pennypacker & Thompson and Banack & Langley for divorce proceedings and/or personal legal representation, *id.* at 380:25-382:5; (6) his daughter's education expenses, *id.* at 383:1-5; (7) medical expenses, *id.* at 383:6-10; (8) income tax bills, *id.* at 383:11-15; (9) for a condominium in Hawaii, *id.* at 383:16-20; and (10) for catering, photography and wedding planning expenses for his 2019 wedding, *id.* at 383:21-384:1.

On February 14, 2022, in his answer to the Complaint, Mueller similarly and repeatedly asserted his right against self-incrimination.  *See* Dkt. No. 43.  With his amended answer filed November 30, 2022, Mueller withdrew his prior Fifth Amendment assertions, but generally denied the allegations for which he had previously asserted his right against self-incrimination.  *Cf.* Amended Answer, Dkt. No. 75 *with* Original Answer, Dkt. No. 43.  Subsequently, the SEC took Mueller's deposition.  *See* Ex. 4, Mueller Dep.  Mueller did not assert his Fifth Amendment rights at his deposition but, because of time constraints and defense counsel's refusal to allow for more time, the SEC was not able to ask Mueller the same questions it had previously asked him during his testimony on June 24, 2021, about the misuse of company money to pay for personal expenses.  *See* Ex. 4, Mueller Dep. at 312:1-14.  On November 1, 2023, defense counsel represented to the SEC that Mueller will *not* assert his right against self-incrimination at trial and will answer all questions.  As a result, the SEC expects that Mueller will now answer at trial the questions he previously refused to answer.

The SEC expects Mueller to claim at trial that he did not believe there was anything wrong with using company funds to pay for his personal expenses.  In his opposition to the SEC's Motion for Summary Judgment, Mueller claimed it was appropriate to use company money to pay for his personal expenses because he allegedly disclosed his "indirect compensation" to his attorneys and that, as an accountant allegedly testified, "*there is nothing wrong* with paying such expenses in lieu of compensation."  Dkt. No. 108 at 34 n. 36 (emphasis added).  If Mueller believed that there was *nothing wrong* with using company money to pay for his expenses, such as a condo in Hawaii, jewelry, cruise vacations, *etc.*, there was no reason for him to have previously asserted his Fifth Amendment right against self-incrimination and refuse to answer those questions when he was, at the same time, willing to answer other questions about his businesses and actions.  In short, his

prior assertions under the Fifth Amendment contradict Mueller's *after-the-fact* rationalization and excuse for his misuse of company funds and helps to prove that, contrary to his "nothing wrong" assertion, he *knew* that his misuse of company funds was wrong.

As the Supreme Court previously held, in the proper circumstances, silence in the face of an accusation is a relevant fact not barred from evidence by the Due Process Clause. *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (citations omitted). The decision as to whether a person's invocation of the Fifth Amendment should be admitted "into evidence is committed to the discretion of the district court." *Hijonosa v. Butler*, 547 F.3d 285, 291-92 (5th Cir. 2008) (citing *FDIC v. Fid. & Deposit Co.*, 45 F.3d 969, 977 (5th Cir. 1995). Whether this type of evidence should be admitted will ultimately depend on the balancing of the probative value of the evidence in a particular case versus the risk of unfair prejudice. *See, id.* at 292-93; *cf. Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 673-74 (5th Cir. 1999) (reversing decision to exclude probative evidence) *with Harrell v. DCS Equipment Leasing Corp.*, 951 F.2d 1453, 1464-65 (5th Cir. 1992) (affirming decision to exclude evidence as unfairly prejudicial).

The use of Mueller's prior Fifth Amendment invocation as impeachment evidence of his expected "nothing wrong" testimony is highly relevant and not unduly prejudicial in this case. Mueller will claim that he never thought using company money to pay his personal expenses was wrong, and that he had a reason to hold that belief. Because the SEC will need to prove Mueller's scienter to prevail at trial, it is essential that it be allowed to present evidence that contradicts Mueller's testimony as to his state of mind or belief. Moreover, Mueller's assertion of his Fifth Amendment rights was not limited to the SEC investigation, but continued over a year into this litigation until he filed his Amended Complaint. Impeachment evidence will always be prejudicial as it is offered to "'discredit a witness … to reduce the effectiveness of [his] testimony by bringing

forth evidence which explains why the jury should not put faith in [his] testimony.'" *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993), *reh'g denied & opin. clarified*, 3 F.3d 123 (5th Cir. 1993) (citation omitted).  However, this impeachment evidence is not unduly prejudicial under the facts of this case and should be allowed under Fed. R. Evid. 401 and 402.


Dated:  November 15, 2023

Respectfully submitted,

*/s/ Charlie L. Divine*
Kristen M. Warden, Trial Counsel
David Nasse, Supervisory Trial Counsel
Fernando Campoamor, Trial Counsel
Charlie Divine, Trial Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4661 (Warden)
(202) 551-4426 (Nasse)
(202) 551-8523 (Campoamor)
(202) 551-6673 (Divine)
wardenk@sec.gov
nassed@sec.gov
campoamorsanchezf@sec.gov
divinec@sec.gov

*Counsel for Plaintiff Securities and Exchange Commission*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 15, 2023, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, which will send copies to all counsel of record.

*/s/ Charlie L. Divine*
Charlie L. Divine

*Counsel for Plaintiff United States Securities and Exchange Commission*