EXHIBIT 3

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION
3                        - - -
4   SECURITIES AND EXCHANGE           )
    COMMISSION,                       )
5                                     )
            Plaintiff,                )
6                                     )
        -against-                     ) Civil Action No.
7                                     ) 5:21-cv-785-XR
    ROBERT J. MUELLER, DEEPROOT       )
8   FUNDS LLC (a/k/a dprt Funds,      )
    LLC, AND POLICY SERVICES INC.,    )
9                                     )
            Defendants.               )
10                                    )
            -and-                     )
11                                    )
    DEEPROOT TECH LLC, DEEPROOT       )
12  PINBALL LLC, DEEPROOT STUDIOS LLC,)
    DEEPROOT SPORTS & ENTERTAINMENT   )
13  LLC, DEEPROOT RE 12621 SILICON    )
    DR LLC, AND ROBERT J. MUELLER,    )
14  JEFFREY L. MUELLER, AND BELINDA   )
    G. BREEN, AS CO-TRUSTEES OF THE   )
15  MB HALE OHANA REVOCABLE           )
    TRUST,                            )
16                                    )
            Relief Defendants.        )
17  _____)
18
19       VIDEOTAPED DEPOSITION OF DENNIS J. CONCILLA
20                    Wednesday, July 12, 2023
                      9:35 a.m.
21                    Carlile Patchen & Murphy
                      950 Goodale Boulevard
22                    Suite 200
                      Columbus, Ohio  43212
23
    REPORTED BY:
24  SUSAN L. COOTS, RPR
    REGISTERED PROFESSIONAL REPORTER
25  JOB No. 230712ARSI
```

                                                           1

09:46  1      A     Really, I mean, I -- maybe a half a dozen

       2   times in the last 30, 40 years.  It's been state reg --

       3   state -- state regulatory actions.  It's actually been

       4   divorce actions where there's -- where they're trying to

09:46  5   see how to value a book of business on behalf of an

       6   investment adviser or broker.  I think I've testified

       7   before the Legislature on those issues.

       8      Q     Uh-huh.  So just to back up.  Did Mr. Hulings

       9   ask whether you would serve as an expert in this case?

09:46 10             MR. HULINGS:  Hold on.

      11             MS. SANSALONE:  Yeah.  I'm going to object

      12   based on privilege and leave it to Jay to assert that.

      13   But I think that that is invoking privilege.

      14             MR. HULINGS:  I agree and object.  Request the

09:47 15   witness not discuss communications with -- between his

      16   firm and our firm.

      17             MS. WARDEN:  Okay.

      18   BY MS. WARDEN:

      19      Q     So you -- Mr. -- Mr. Hulings served a Notice

09:47 20   of Expert Designation in this case, which you are

      21   looking at.  It's Exhibit 87.  Do you see that?

      22      A     I do.

      23      Q     Okay.  And he lists you as an expert in this

      24   case?

09:47 25      A     Yes.

                                                              16

09:47  1        Q    So when -- when did you first learn that you

2    would be listed as an expert in this case?

3        A    When I saw this filing.

4        Q    And that was a couple days ago?

09:47  5        A    Might have been yesterday.

6        Q    Okay.  And did you agree to be an expert in

7    this case?

8             MS. SANSALONE:  I think it's the same

9    objection.

09:47 10             MR. HULINGS:  Same objection.

11             MS. SANSALONE:  Same instruction.

12             MR. HULINGS:  Correct.

13             MS. WARDEN:  Okay.

14             MR. NASSE:  What's the privilege?

09:47 15             MR. HULINGS:  Attorney-client.

16             MR. NASSE:  If he's being retained as an

17    expert, that's --

18             MR. HULINGS:  He's not being retained.

19             MR. NASSE:  Or he's being asked to be an

09:48 20    expert.

21             MR. HULINGS:  He's not being --

22             MR. NASSE:  That's not privileged.

23             MR. HULINGS:  He's not being retained.

24             MR. NASSE:  How is that privileged?

09:48 25             MR. HULINGS:  Do you want to go off the record

17

09:48  1    and we can talk about this?

       2              MR. NASSE:  No.  Let's go -- Let's keep it on

       3    the record.

       4              I'd like to know what the -- what the basis

09:48  5    for a --

       6              MR. HULINGS:  Communications between -- We

       7    represent Robert Mueller.

       8              MR. NASSE:  Uh-huh.

       9              MR. HULINGS:  He was their counsel.  We're

09:48 10    discussing --

      11              MR. NASSE:  Not asking about his

      12    representation to him as a lawyer.  He's asking about

      13    whether he's an expert in this case.  That's the

      14    question.  A fact and -- and expert witness.

09:48 15              MR. HULINGS:  So he is a factual witness.  By

      16    the way, we skipped over the -- you know, to the extent

      17    such testimony can be characterized, he's being

      18    designated as an expert, basically, in an abundance of

      19    caution.

09:48 20              But communications between a client and

      21    client's representative and the client's from a lawyer

      22    are privileged.  Feel free to -- to make your case, and

      23    we can take it up later.  But we're going to assert the

      24    objection.

09:48 25              MR. NASSE:  But he's being -- you're -- the

                                                                    18

09:48  1  question is whether he's been asked to be an expert in

2  this case.  What is the privileged communication there?

3          MR. HULINGS:  His communications between

4  counsel about --

09:49  5          MR. NASSE:  It's not the purpose of the legal

6  representation or legal advice.

7          MR. HULINGS:  Make your objection and we'll

8  move on.

9          MR. NASSE:  You're telling him not to answer

09:49 10  so I'll --

11          MR. HULINGS:  You're perfectly free to

12  preserve this, and we can go talk about it with the

13  district court.  It's fine.

14          MR. NASSE:  Okay.

09:49 15          MR. HULINGS:  But we're going to make our

16  objection, and you've asked the question.  He's answered

17  it.  You know, so let's move on.

18          MR. NASSE:  So you -- but I told you, you

19  direct him not to answer the question on the grounds of

09:49 20  attorney-client.

21          MR. HULINGS:  I'm directing him not to answer

22  questions about communications with his former client's

23  representatives.  Yes.

24          MR. NASSE:  Okay.

09:49 25          MS. WARDEN:  And for the record, we disagree

19

09:53  1          A    I don't.

       2          Q    Okay.  Do you know who signed the tolling

       3     agreement on behalf of Carlile Patchen?

       4          A    I don't.

09:54  5          Q    And were you part of any conversations

       6     surrounding the tolling agreement between Carlile

       7     Patchen and Mr. Mueller?

       8               MS. SANSALONE:  I'm going to object.  And to

       9     the extent that that calls for communication involving

09:54 10     the firm's general counsel, outside counsel, anything

      11     related to that claim, the professional liability

      12     carrier, I'm going to instruct you not to answer based

      13     on privilege.  Anything outside that, you can feel free

      14     to answer.

09:54 15          A    Yeah.  I'm not sure where we are.  Again, the

      16     question is?

      17          Q    Are -- Have you been informed of Mr. Mueller's

      18     intent to file a malpractice lawsuit against Carlile

      19     Patchen?

09:54 20               MR. HULINGS:  Objection.

      21               MS. SANSALONE:  Again, same -- same objection.

      22     Same instruction.  I think you need -- If you could

      23     break that down by someone outside.  You know, you're

      24     hitting on privilege.

09:55 25               MS. WARDEN:  Okay.

                                                                    24

09:55  1          MS. SANSALONE:  Do you understand what

2    I'm saying here?

3          MR. NASSE:  To be clear:  We're not seeking

4    any privileged communication.

09:55  5          MS. SANSALONE:  No, I understand.

6          MR. NASSE:  We've restricted our focus.

7          MS. SANSALONE:  So if you can break the

8    question down to -- to the extent -- I don't -- I don't

9    mean to do your job here or give a speaking objection.

09:55 10   But I'm very mindful of this, especially in federal

11   court.  But...

12   BY MS. WARDEN:

13        Q    Have you had any -- any direct conversations

14   with Mr. Mueller in the past year?

09:55 15          MR. HULINGS:  Objection.  That --

16        A    In the past --

17          MR. HULINGS:  The existence of communications

18   directly with Mr. Mueller, that fact, you can answer

19   that.  Otherwise, the content in any communications with

09:55 20   Mr. Mueller, we'll object.

21        A    I don't believe so.

22        Q    Okay.  And has -- has -- Have you provided

23   Mr. Mueller with any promises regarding your testimony

24   in this case?

09:56 25          MR. HULINGS:  So, first of all, vague as to

25

09:56 1   "promises."  But also we're going to object on the basis

2   of privilege.

3          MS. SANSALONE:  And I'm going to -- I'm going

4   to object only in the sense of you're talking to a

09:56 5   40-plus-year-old lawyer who has an ethical obligation

6   and a legal duty to tell the truth.  It's, I guess, a

7   little offensive to ask a 40-year-old ethical lawyer

8   whether his -- his testimony is going to be swayed by

9   promises relative to a legal malpractice claim.

09:56 10          MS. WARDEN:  Okay.

11          MS. SANSALONE:  It's objective.

12          MS. WARDEN:  I ask that you not have a

13   speaking objection.  It's supposition.

14          MS. SANSALONE:  I know.  But it's -- it's an

09:56 15   offensive question to a 40-year-old lawyer -- I mean, a

16   40-year-plus lawyer who has never had an ethical

17   violation to think that his testimony is going to be

18   swayed in that regard.  Sorry.  I just get defensive of

19   my lawyer clients here.

09:57 20      A    I would prefer to think of me as a 40-year-old

21   lawyer, but --

22          MS. SANSALONE:  Right. 40-plus-year-old

23   practicing lawyer.

24      A    -- be that -- be that as it may.

09:57 25      Q    Okay.  Did -- did Mr. Mueller express any

26

09:57  1   concerns to you regarding the legal advice that you

       2   provided to him?

       3               MR. HULINGS:  Same -- same objection.  It's

       4   privileged.

09:57  5               MS. SANSALONE:  He's objected to privilege, so

       6   you're on notice, but not to answer.

       7               THE WITNESS:  I --

       8               MR. HULINGS:  Instruct you not to answer.

       9               THE WITNESS:  Okay.  I was going to say.

09:57 10               MS. SANSALONE:  Okay.

      11   BY MS. WARDEN:

      12       Q    Handing you what's previously been marked

      13   Exhibit 27.

      14               MS. SANSALONE:  Thank you.

09:58 15               Before we go on to the next -- looks like a

      16   new topic.  I understand that there is a protective

      17   order in this case.

      18               MS. WARDEN:  Yes.

      19               MS. SANSALONE:  Okay.  I -- I just would ask

09:58 20   that anything related to a tolling agreement or a

      21   purported alleged claim against my client be designated

      22   as confidential.  I mean, I don't think it's relevant to

      23   this action and I think it's a highly sensitive subject.

      24               MR. NASSE:  I think we would ask for

09:58 25   production of the tolling agreement.

                                                               27

10:05   1    Policy Services was limited and I think we had some

2    contact in 2018.

3         Q    So did -- did you ever do a -- a disengagement

4    letter?

10:05   5         A    No.

6         Q    Okay.  But if you had to -- to date when your

7    representation of Policy Services ended, when would you

8    put that at?

9              MR. HULINGS:  So objection to the extent --

10:05  10    Instruction not to answer to the extent that that --

11    that question goes to any time period after

12    December 2018.

13              THE WITNESS:  The objection again.

14              MR. HULINGS:  So the privilege waiver goes

10:05  15    through 2018.  So to the extent that it involves

16    anything after 2018, we're objecting and instructing you

17    not to answer.

18              So you'll probably have to read the question

19    again.  But to the extent the question applies to the

10:06  20    time period before, you know, including and before

21    December 2018, that's what you can answer.

22    BY MS. WARDEN:

23         Q    In December 2018, were you representing Policy

24    Services?

10:06  25         A    There -- there were -- As you point out, there

33

10:10   1          A      He was Of Counsel at the time.

         2          Q      Okay.  Did that change at some point through

         3   your representation of Mr. Mueller?

         4          A      No.

10:10   5          Q      Mr. Federico was always Of Counsel?

         6          A      Correct.

         7          Q      Okay.  And are you aware of when Mr. Federico

         8   stopped representing Policy Services?

         9          MR. HULINGS:  So same objection and

10:10  10   instruction.  You can answer to the extent it applies to

        11   December of 2018 and before.

        12          A      Same answer.  I don't -- you know, we -- we

        13   stopped actively representing them sometime in 2018.

        14   And they certainly could have called to ask a question

10:10  15   or to make an inquiry, but we weren't drafting anything

        16   for them after that date.

        17          Q      Who was the lead lawyer on the -- on Policy

        18   Services?

        19          A      I was the lead lawyer.

10:11  20          Q      Any other attorneys at Carlile Patchen work on

        21   work for Policy Services?

        22          A      Not that I recall.

        23          Q      Okay.  And any paralegals that you remember?

        24          A      Yes.

10:11  25          Q      Who?

                                                                     37

10:13 1   broker/dealer?

2       A    Broker/dealer, yes.

3          It was a limited purpose broker/dealer, which

4   I don't even think exists anymore under the code.  And

10:13 5   we advised that it would not accomplish --

6          MR. HULINGS:  I'm going to stop and -- and

7   object on the basis of attorney-client privilege.

8   I know you're asking in terms of Policy Services.  We

9   haven't -- You know, we don't agree that -- you know,

10:13 10   I think this is going to be litigated.  We don't agree

11   that the -- the representation was limited to Policy

12   Services.

13          And we have waived privilege as to drafting of

14   PPMs and other materials provided to investors.  So

10:13 15   communications that concern other matters, other than

16   materials provided to investors still covered by the

17   privilege waiver is not subject to the privilege waiver,

18   and so it's also not relevant.

19          But -- so we're going to object and instruct,

10:14 20   to the extent this line of questioning goes to any

21   communications with Mr. Mueller concerning -- concerning

22   any matter other than preparation of documents presented

23   to investors.

24          MS. WARDEN:  Okay.  The SEC doesn't agree.  I

10:14 25   mean, you proffered an advice-of-counsel defense, and so

39

```
10:14   1    we're entitled to ask questions about the scope of the
        2    representation.
        3               MR. HULINGS:  And we're not going to change
        4    that on the fly in the middle of a deposition.  So if
10:14   5    you want to maintain it for the record --
        6               MS. WARDEN:  That's my objection.
        7               MR. HULINGS:  -- you want to take it to The
        8    Court, you can do that.
        9               But the objection and instruction stands.
10:14  10    BY MS. WARDEN:
       11       Q    I'm going to hand you, for the record, it's
       12    Tab 1, which I'm going to mark Exhibit 88.  88.
       13               I don't have one for you.
       14               MR. PRITIKIN:  That's fine.
10:14  15               (Deposition Exhibit 88 was marked for
       16               identification.)
       17    BY MS. WARDEN:
       18       Q    Take a minute to just briefly go through
       19    Exhibit 88, Mr. Concilla.
10:15  20       A    Okay.
       21       Q    Okay.  At some point did you work on an S-1
       22    offering for Policy Services?
       23       A    Yes.
       24       Q    Okay.  And when did that begin?
10:15  25       A    In -- in late 2014.  Well, maybe fall of 2014,
```

                                                              40

11:05   1    on August 21st, 2015, at 9:05 a.m., do you see where

      2    Mr. -- Oh, where you wrote to Mr. Mueller -- No.  Hold

      3    on.  Sorry.  Sorry.

      4         The top of the page, so 0002717, Mr. Mueller

11:06   5    wrote to you, "By the way, we just had a card from Idaho

      6    telling us that our annual report and renewal for DWA is

      7    coming in October.  It was my understanding that our

      8    settlement with them required us to withdraw those

      9    filings months ago."

11:06 10         Do you know what Mr. Mueller is talking about?

    11    A    Vaguely.

    12    Q    What?

    13    A    That -- that -- that --

    14         MR. HULINGS:  So hold on.  We talked about

11:06 15    this document before.  I'm going to object that

    16    communications regarding filings with State Securities

    17    Boards are not part of the privilege waiver.  They are

    18    also entirely irrelevant to any claim in this case.

    19    This is pure fishing.

11:06 20         And because -- because it is also outside the

    21    scope of the privilege waiver, we are going to object

    22    and instruct Mr. Concilla not to answer, other than

    23    describing what is on the page.

    24         MS. WARDEN:  So you produced this document.

11:06 25         MR. HULINGS:  Right.  And remember, I snapped

                                                            69

11:07 1    it back.  And -- and we -- I made an objection on the

2    record when it came up with Mr. Mueller and said that

3    this is -- that there was -- I then produced a redacted

4    version of this same document and asked that we use the

11:07 5    redacted version.

6         It -- it -- it doesn't matter.  For purposes

7    of today --

8         MS. WARDEN:  Uh-huh.

9         MR. HULINGS:  I'm instructing him not to

11:07 10   answer anything other than what's on the page.  The --

11   we've talked about this at length.  Communications about

12   State Securities Board filings are -- are not -- A, not

13   relevant.  I mean, just wildly out of scope of your

14   allegations.  And, two, are not part of our privilege

11:07 15   waiver.  So, again, we're not going to change that in --

16   on the fly in the middle of a deposition.  I've made the

17   objection.  I've made the instruction.  You can preserve

18   whatever rights you want.  We'll deal with it later.

19        MR. NASSE:  No.  I mean, no.  For the record,

11:07 20   we disagree.  Obviously, we believe it's relevant

21   because the advice goes to scienter and whether he --

22   and so that's all his scienter and his advice from this

23   counsel.  So, obviously, we disagree.  We're going to

24   obviously raise it with The Court.

11:08 25        MR. HULINGS:  Understood.  That's -- that is

70

11:08  1    not something Mr. Concilla is going to resolve.

       2              MR. NASSE:  Agreed.

       3    BY MS. WARDEN:

       4         Q    Mr. Concilla, did you provide advice to

11:08  5    Mr. Mueller regarding the Idaho State Securities Board?

       6              MR. HULINGS:  You can answer that question.

       7         A    Yes.

       8         Q    And what advice did you provide?

       9              MR. HULINGS:  He cannot answer that question.

11:08 10              Objection.  And instruct him not to answer.

      11    It's privileged.

      12              MS. WARDEN:  Okay.  The SEC disagrees with

      13    your instruction.

      14    BY MS. WARDEN:

11:09 15         Q    If you can turn to Page 2 of that email,

      16    Mr. Concilla.

      17         A    Yes.

      18         Q    You write -- Directing your attention to where

      19    you say, "I don't believe you're using any finder's fees

11:09 20    so it would be only the commissions.  Question two is

      21    more complicated.  There's a fee that is paid to dR for

      22    fund management, but I don't believe there's any direct

      23    compensation to you as an executive."

      24              What did Mr. Mueller inform you regarding

11:09 25    finder's fees?

                                                                    71

11:38   1        Q     And the dGRD PPM was not an SEC filing,

        2    correct?

        3        A     Correct.

        4              MS. WARDEN:  Okay.  We can take a break.

11:38   5              THE VIDEOGRAPHER:  Okay.  And so we are going

        6    off the record at 11:39 a.m.

        7              (Recess taken.)

        8              THE VIDEOGRAPHER:  We're back on the record at

        9    12:03 p.m.

12:02  10    BY MS. WARDEN:

       11        Q     Mr. Concilla, I had just a quick followup on

       12    Exhibit 94, which is that Investor Presentation, if you

       13    can pull that out.  MUELLER-002816 through 2851.

       14              If you can turn to -- they're not numbered,

12:02  15    but it's MUELLER-2838.  It says Private Equity Fund at

       16    the top.

       17        A     Uh-huh.

       18        Q     Are you there?  Okay.  Perfect.

       19              And you previously testified that you provided

12:03  20    legal advice on this deeproot -- draft deeproot Investor

       21    Presentation.

       22        A     Yeah.

       23        Q     Exhibit 94, correct?

       24        A     Yes.

12:03  25        Q     Okay.  At the bottom of 2838, it says, "All

                                                                    92

12:03   1   principal is securitized or backed up by the assets of

        2   the Fund."

        3           Do you see that?

        4       A   Yes.

12:03   5       Q   If you learn that the Funds did not have any

        6   assets, would that statement still be accurate?

        7           MR. HULINGS:  Objection.  Hypothetical.  Calls

        8   for facts not in evidence.  Calls for speculation.  And

        9   it's vague.

12:03  10           But you can answer, if you can.

       11       A   Yes.

       12       Q   If you learn that the assets -- the Fund did

       13   not have any assets, that statement would still be

       14   accurate?

12:04  15       A   No, it would not be accurate.  It would not be

       16   accurate.

       17       Q   It would not be accurate?

       18       A   Would not be accurate.

       19       Q   Okay.

12:04  20           MR. HULINGS:  That happened a little quickly.

       21   Just give me a second to --

       22           THE WITNESS:  Okay.

       23           MR. HULINGS:  -- interpose the objections.

       24           All the same objections to the previous

12:04  25   question we'll assert to the question that was just

                                                              93

12:04  1  asked.

2  BY MS. WARDEN:

3      Q    And why would it not be accurate?

4           MR. HULINGS:  Same objections.

12:04  5      A    Because this would be -- I'm sorry.  But

6  you're saying if there were no assets, would this be

7  accurate?  It -- of course not.  I mean, it -- it -- it

8  really speaks for itself.  I mean, I -- Why would it not

9  be accurate?

12:04 10      Q    Would it be a misrepresentation then?

11           MR. HULINGS:  Objection.

12      A    It would not be accurate.

13      Q    Okay.

14           MR. HULINGS:  So it would call -- Vague as to

12:04 15  "misrepresentation."  Calls for a legal conclusion.

16  Calls for speculation.  Lack of foundation.  Vague.

17  You can answer.

18           THE WITNESS:  I did.

19           MR. HULINGS:  Just got to preserve the

12:04 20  objections for --

21           THE WITNESS:  Yeah, I -- No, I -- I

22  understand.

23  BY MS. WARDEN:

24      Q    If you learned that the Funds, again, did not

12:05 25  have any assets, would you advise Mr. Mueller to amend

94

12:06   1           MS. WARDEN:  Oh, yeah.

        2    BY MS. WARDEN:

        3        Q    Did Mr. Mueller ever tell you that the 575 or

        4    dGRD Fund never held any assets?

12:06   5           MR. HULINGS:  So objection.  To the extent

        6    that that calls for testimony regarding a communication

        7    after December 2018, you're instructed not to answer

        8    anything that takes place after that date.  It's also

        9    pretty vague.

12:06  10           But you can answer.

       11        A    Okay.  This -- this -- this was accompanied by

       12    an email that was dated 2015, I believe.  So as of this

       13    date, no.

       14        Q    Okay.  Let's make sure we're accurate.  As of

12:06  15    -- the email is Exhibit 93?

       16        A    I believe so, yes.

       17        Q    Which is August --

       18           MS. SANSALONE:  Exhibit 93 is September 24th,

       19    2015.

12:07  20    BY MS. WARDEN:

       21        Q    So as of September 24th, 2015, is it fair to

       22    say Mr. Mueller never told you that the 575 Fund and

       23    dGRD Fund never held any assets?

       24           MR. HULINGS:  Objection.  Vague.

12:07  25        A    No.  He never told me that it didn't hold any

                                                                    96

12:07   1   assets as of that date.

2       Q    And if that were the case, would you have

3   expected him to tell you that?

4       MR. HULINGS:  Hold on.  Objection.  Calls for

12:07   5   speculation.  Lack of foundation.  Hypothetical.  Vague.

6       A    Yes.

7       Q    Direct your attention to the third sentence,

8   under Class B Shares, "Preferential\priority rights

9   receive dividends or distributions of capital," in the

12:07  10   parenthetical, "(Priority Return)."

11       A    We're back -- that's Page 38?

12       Q    Yes.

13       A    Okay.

14       Q    Sorry.  Page 2838.

12:08  15       A    Yes.

16       Q    Okay.  Do you see where it says, "Preferential

17   priority rights receive dividends or distributions of

18   the capital (Priority Return)"?

19       A    Yes.

12:08  20       Q    Okay.  If you -- Did Mr. Mueller ever tell you

21   that the Funds offered new classes of shares?

22       MR. HULINGS:  Objection.  Vague as to time.

23   And an instruction that, anything after December 2018,

24   instruct him not to answer.  Objecting on privilege

12:08  25   grounds.

97

12:11  1          Q     Okay.  Is that a synonym for a Reg D?

       2          A     Yes.

       3          Q     And at the bottom, do you see it's dated

       4     September 1, 2015?

12:11  5          A     Yes.

       6          Q     Okay.  So I can represent to you that in

       7     Mr. Mueller's interrogatory responses, he indicated that

       8     Exhibit 36 that you're looking at --

       9          A     Yes.

12:11 10          Q     -- was operative between May 2015 and

      11     May 2018.  So were you representing Policy Services

      12     between -- at any point between May 2015 and May 2018?

      13          A     Periodically.

      14          Q     So is the --

12:11 15          A     Yes.

      16          Q     -- answer "Yes"?

      17          A     Yes.

      18          Q     Okay.

      19          A     From time to time.

12:11 20          Q     All right.  And do you recall advising Policy

      21     Services with respect to Exhibit 36?

      22                MR. HULINGS:  Objection.  Vague.

      23          A     Not -- not specifically.

      24          Q     Do you regard -- do you recall providing legal

12:12 25     advice with respect to the 575 PPMs?

                                                              100

12:12  1        A    Yes.

       2        Q    Okay.  And is Exhibit 36 one of the 575 PPMs

       3    that you provided advice for?

       4        A    I'm -- I'm unaware of there being more than

12:12  5    one 575 Fund.

       6        Q    Okay.  All right.  So turning your attention

       7    to Page 6.

       8        A    Page -- Page 6 as in the numbering pages or in

       9    the -- in the --

12:12 10        Q    Sorry.  That was my PDF Page 6.  So 14502.

      11    Hold on.  So page 6 of 13 on the bottom.  So

      12    SEC-DEEPROOT-E-0014505.

      13        A    Yeah.  Got it.  Yes.

      14        Q    Are you aware of more than one 575 Fund PPM?

12:13 15        A    I am -- I am not aware of more than one

      16    575 PPM.

      17        Q    Did Mr. Mueller ever tell you that there was

      18    more than one 575 PPM?

      19        A    I don't recall.

12:13 20        Q    Okay.  All right.  So if you look at the

      21    bottom of Bates 14505, it -- Under the category, Life

      22    Policies, it says, "We will invest in Life Policies, AKA

      23    Life Settlements, which are sales to third parties of

      24    existing life insurance contracts held on insureds who

12:13 25    are 65 years of age or older."

                                                              101

12:13  1            Do you see that?

       2       A    Yes.

       3       Q    Okay.  Did Mr. Mueller inform you that the

       4  575 Fund never invested in or owned any life policies?

12:14  5            MR. HULINGS:  Objection.  That assumes

       6  incorrect facts not in evidence.  Calls for -- So based

       7  on -- on -- on that, we object.  It's also vague.

       8  BY MS. WARDEN:

       9       Q    You can answer.

12:14 10       A    Oh, okay.  No, he did not.

      11       Q    Did Mr. Mueller seek legal advice from you

      12  regarding whether the 575 Fund never investing in or

      13  owning any life policies was adequately disclosed in

      14  Exhibit 36?

12:14 15            MR. HULINGS:  So objection, based -- based on

      16  assuming facts not in evidence.  Assuming false or

      17  inaccurate basis for the question.  It's also -- so that

      18  makes it vague and misleading.

      19            You can answer, if you can.

12:14 20       Q    Do -- do you need me to repeat the question?

      21            MS. SANSALONE:  Or you can read it right

      22  there.

      23       A    Not -- not that I recall specifically.

      24       Q    Did Mr. Mueller seek legal advice from you

12:15 25  regarding whether the 575 Fund never investing in or

                                                            102

12:16   1    through December 31, 2018.  So you don't need to caveat.

        2        A    Thank you.

        3        Q    Okay.  So let me reask the question and we'll

        4    take it from there.

12:16   5            Did Mr. Mueller seek legal advice from you

        6    regarding whether the 575 Fund never investing in or

        7    owning any life policies was adequately disclosed in a

        8    575 PPM at any time?

        9            MR. HULINGS:  So we're going to object.  It

12:17  10    assumes facts not in evidence.  Object that the

       11    underlying factual assertion is not accurate.  Object

       12    that it's vague.

       13            You can answer.

       14        A    No.

12:17  15        Q    Did you provide Mr. Mueller with legal advice

       16    regarding whether the 575 Fund never investing in or --

       17    or owning any life policies was adequately disclosed in

       18    Exhibit 36?

       19            MR. HULINGS:  Same -- same objections.

12:17  20        A    No.

       21        Q    Did you provide Mr. Mueller with legal advice

       22    regarding whether the 575 Fund never investing in or

       23    owning any life policies was adequately disclosed in a

       24    575 PPM at any time?

12:17  25            MR. HULINGS:  Same objections.

                                                                    104

12:17  1       A    Isn't that the same question?

       2       Q    No.  One is grounded in Exhibit 36, and one is

       3  saying at any time.

       4            MR. HULINGS:  Asked and answered.

12:18  5       A    No.

       6       Q    Okay.  Did Mr. Mueller inform you that the

       7  life policies were owned and acquired by Policy

       8  Services?

       9            MR. HULINGS:  Objection.  Vague.

12:18 10            You can answer.

      11       A    We saw a previous email where he says they

      12  have interests in life settlements.  Policy Services has

      13  interests in life settlements.  So to the extent that in

      14  his email he told me they had interests in life

12:18 15  settlements, the answer would be yes.

      16       Q    Did Mr. Mueller ever tell you that the life

      17  policies purportedly held by the 575 and dGRD Fund were

      18  owned by Policy Services?

      19       A    No.

12:19 20       Q    Did Mr. Mueller seek legal advice from you

      21  regarding whether Policy Services owning the life

      22  policies was adequately disclosed in Exhibit 36?

      23       A    No.

      24       Q    Did Mr. Mueller seek legal advice from you

12:19 25  regarding whether Policy Services owning the life

                                                              105

12:19  1   policies was adequately disclosed in a 575 PPM at any

       2   time?

       3       A    I'm -- I'm sorry.  I don't understand the

       4   distinction in your question.  But the answer is no.

12:19  5   I mean, you -- It seems like the same question over and

       6   over.

       7       Q    I know.  So the first question is -- is asking

       8   whether he told you about whether a disclosure was

       9   adequate in Exhibit 36.  And then the second question is

12:19 10   whether he told you a disclosure was adequate at any

      11   time, like, in any subsequent PPM that you may or may

      12   not be aware.

      13            MR. HULINGS:  So to the extent there's a

      14   question there, it's vague and compound.  Maybe you want

12:20 15   to ask that one again.

      16       A    No.

      17       Q    Did you provide Mueller -- Mr. Mueller with

      18   legal advice regarding whether Policy Services owning

      19   the life policies was adequately disclosed in

12:20 20   Exhibit 36?

      21       A    No.

      22       Q    Did you provide Mr. Mueller with legal advice

      23   regarding whether Policy Services owning the life

      24   policies was adequately disclosed in a 575 PPM at any

12:20 25   time?

                                                              106

12:20   1      A    No.

        2      Q    Did Mr. Mueller inform you that Policy

        3  Services did not grant any ownership interest in the

        4  life policies to the 575 Fund?

12:20   5           MR. HULINGS:  So hold on.  That -- that's a

        6  different version of the question.  I'm objecting to

        7  facts -- assuming facts not in evidence.  The factual

        8  assertion is inaccurate.  And it's a vague question.

        9           You can answer.

12:20  10      A    No.

       11      Q    Did Mr. Mueller seek legal advice from you

       12  regarding whether the fact that Policy Services did not

       13  grant any ownership interest in the life policies of the

       14  575 Fund was adequately disclosed in Exhibit 36?

12:21  15           MR. HULINGS:  That's the same -- the same

       16  objections.  That's -- assumes facts not in evidence.

       17  It's based on a factual assertion that is false and is

       18  vague and misleading.

       19      A    No.

12:21  20      Q    Did Mr. Mueller seek legal advice from you

       21  regarding whether the fact that Policy Services did not

       22  grant any ownership interest in the life policies of the

       23  575 Fund was adequately disclosed in a 575 PPM at any

       24  time?

12:21  25           MR. HULINGS:  Same objections.  Asked and

                                                              107

```
12:21   1   answered.

        2         A     No.  It's really -- Thank you.

        3         Q     Did you provide Mr. Mueller with legal advice

        4   regarding whether the fact that Policy Services did not

12:21   5   grant any ownership interest in the life policies of the

        6   575 Fund was adequately disclosed in Exhibit 36?

        7         MR. HULINGS:  Same objections.  And asked and

        8   answered.

        9         A     No.

12:21  10         Q     Did you provide Mr. Mueller with legal advice

       11   regarding whether the fact that Policy Services did not

       12   grant any ownership interest in the life policies of

       13   the 575 Fund was adequately disclosed in a 575 PPM at

       14   any time?

12:22  15         MR. HULINGS:  So asked and answered, which is

       16   clear in the objections.  It's -- Make sure I preserve

       17   them.  Assumes facts not in evidence.  Based on a false

       18   factual predicate.  And vague and misleading.  In

       19   addition to the asked and answered.

12:22  20         A     No.

       21         Q     Did Mr. Mueller inform you that there was no

       22   legal relationship between the 575 Fund and Policy

       23   Services prior to 2020?

       24         MR. HULINGS:  So same objections.  Assumes

12:22  25   facts not in evidence.  Based on a false factual
```

                                                              108

12:22  1   predicate.  Vague and misleading as to multiple terms in

2   the question.

3           You can answer, if you can.

4   A    I -- I -- That there was no relationship

12:22  5   between -- Is the question did he inform me that there

6   was no relationship between the two companies?

7   Q    Between the 575 Fund and Policy Services prior

8   to 2020.

9   A    I thought there --

12:22 10          MR. HULINGS:  So same objections.  It's also

11   argumentative at this point.

12   A    No, he did not inform me they were not.

13   Q    Did Mr. Mueller seek legal advice from you

14   regarding whether the lack of a legal relationship

12:23 15   between the 575 Fund and Policy Services prior to 2020

16   was adequately disclosed in Exhibit 36?

17          MR. HULINGS:  Okay.  So, again, assumes facts

18   not in evidence.  Based on a false factual predicate.

19   It's vague and misleading.  It's asked and answered.

12:23 20   And argumentative.  Harassing at this point.

21   A    What he said.

22          MR. HULINGS:  You can answer, if you can.

23   A    What he said.

24   Q    So it --

12:23 25   A    I -- I mean --

109

12:25   1      Q      Did you provide legal advice to Mr. Mueller

        2   regarding whether the lack of a legal relationship

        3   between the 575 Fund and Policy Services prior to

        4   2020 was adequately disclosed in a 575 PPM --

12:25   5                  MR. HULINGS:  Same objection.

        6                  MS. WARDEN:  I'm not done.

        7   BY MS. WARDEN:

        8      Q      -- at any time?

        9                  MR. HULINGS:  Same objections.

12:25  10      A      I'm sorry.  I just don't understand the

       11   distinction that you seem to -- The answer is no, I

       12   guess.  But it is vague.  I mean, I -- I don't know.

       13   Did I ever have a conversation with him?

       14      Q      It's actually very specific.

12:26  15      A      Maybe on your side of the table.

       16      Q      After Exhibit 36 was finalized, did

       17   Mr. Mueller ever inform you that he wanted to amend the

       18   575 PPM?

       19      A      Not that I recall.

12:26  20      Q      And I think you said you're not aware of

       21   whether Exhibit 36 was amended, correct?

       22      A      I'm -- I'm not aware.

       23      Q      Okay.  And do you recall -- Okay.  Let me show

       24   you another exhibit.

12:27  25                  Okay.  Handing -- I'm marking -- This is Tab

                                                              112

12:28  1   BY MS. WARDEN:

      2     Q    Did -- did you represent -- Your waiver

      3   applies -- Mr. Mueller's waiver applies to

      4   December 2018.  December 31, 2018, right?

12:28  5     A    Uh-huh.

      6     Q    So did you represent Policy Services in 2018?

      7     A    Yes.

      8     Q    Okay.  Mr. Mueller's interrogatory response

      9   represented that this PMM was in effect between May 2018

12:29 10   and November 2019.  So you already said that you did not

    11   advise Policy Services on this PPM, right; Exhibit 97?

    12     A    Yeah.

    13     MR. HULINGS:  So there's -- Let me object to

    14   that.  All of wind up to the question being

12:29 15   argumentative.  The question is just, Did you advise him

    16   on this PPM?  Is that the question?

    17   BY MS. WARDEN:

    18     Q    Did you advise Mr. Mueller on Exhibit 97?

    19     A    I don't believe so.

12:29 20     Q    Do you know who did?

    21     A    I don't.

    22     Q    Handing you what's been previously marked

    23   Exhibit 5.  Do you recognize this document,

    24   Mr. Concilla?

12:30 25     A    No.

114

```
12:30   1        Q    Okay.  It's dated September 16, 2019.  Were
        2   you representing Policy Services on that date?
        3        A    Not to my knowledge.
        4        Q    Did you advise Policy Services on exhibit --
12:30   5   on Exhibit 5?
        6             MR. HULINGS:  So that's a -- that's a little
        7   vague.  It's also technically within the -- outside the
        8   privilege waiver.  But I think -- and I also think it's
        9   been asked and answered:  Did you advise on this
12:30  10   document?
       11             But you can answer that question --
       12        A    No.
       13             MR. HULINGS:  -- I guess.
       14   BY MS. WARDEN:
12:30  15        Q    So let me reask it because it got muddy.
       16             Did you advise Policy Services on Exhibit 5?
       17        A    Not that I recall.
       18        Q    Did you advise Robert Mueller on Exhibit 5?
       19             MR. HULINGS:  Objection.  The same object --
12:31  20   same objections.
       21             You can answer that.
       22        A    No.
       23        Q    Did Carlile Patchen advise Policy Services on
       24   Exhibit 5?
12:31  25             MR. HULINGS:  I'm going to make sure I'm going
```

115

```
12:31   1    to object to that being vague and misleading.

        2           You can answer.

        3           MS. WARDEN:  I'll rephrase.

        4    BY MS. WARDEN:

12:31   5        Q    Did any attorneys at Carlile Patchen advise

        6    Policy Services on Exhibit 5?

        7           MR. HULINGS:  So I'm going to -- Same

        8    objections.  Vague and misleading.  If you want me to

        9    clarify the basis for the objection, I can.  But it's

12:31  10    vague and misleading.

       11        A    Not to my knowledge.

       12        Q    All right.  I'm handing you what's been

       13    previously marked Exhibit 6.  Mr. Concilla, do you

       14    recognize this document?

12:31  15        A    No.

       16        Q    Okay.  At the bottom, it says -- Do you see it

       17    says dated February 26.  Last amended January 1, 2021,

       18    correct?

       19        A    Yes.

12:32  20        Q    Okay.  Did you advise Policy Services on

       21    Exhibit 6?

       22        A    No.

       23           MR. HULINGS:  I mean, I'm going to object to

       24    that as vague and misleading, but the answer stands.

12:32  25    BY MS. WARDEN:
```

                                                            116

12:32    1          Q     Did you advise Robert Mueller on Exhibit 6?

         2                MR. HULINGS:  Same objections.

         3          A     Can -- can we assume that when you ask a

         4    question it's Policy Services or deeproot or Robert

12:32    5    Mueller?

         6                MR. NASSE:  As long as Mr. Hulings won't

         7    object that it's compound.

         8                MR. HULINGS:  For purposes of this -- I mean,

         9    we can assume that for purposes of the question that it

12:32   10    applies to any of the three.  We can unpack it later, if

        11    you want.  It's your question.

        12                MS. SANSALONE:  Did you advise anybody?  Might

        13    be an easier way to do it.

        14          A     The answer is still no.

12:33   15          Q     Okay.  And you were never aware of Exhibit 6,

        16    correct?

        17                MR. HULINGS:  Objection.  Vague.

        18          A     Not that I recall.

        19          Q     Handing you what's been -- what is Tab 13, and

12:33   20    I'm going to mark it Exhibit 98.

        21                (Deposition Exhibit 98 was marked for

        22                identification.)

        23                MR. HULINGS:  So the previous document, the --

        24    is that -- that's Exhibit 6 --

12:33   25                MS. WARDEN:  Yeah.

                                                                    117

12:34  1          MR. HULINGS:  -- from earlier.

       2          And this is 97?

       3          MS. WARDEN:  98.

       4   BY MS. WARDEN:

12:34  5      Q    Mr. Concilla, do you recognize this document?

       6      A    Yes.

       7      Q    Okay.  And what is it?

       8      A    It's a PPM for deeproot Growth Runs Deep Fund

       9   dated August 3rd, 2015.

12:34 10      Q    Okay.  And I can represent to you that in

      11   Mr. Mueller's interrogatory responses, he indicated this

      12   PPM was operative between August 2015 through May 2018.

      13          Did you advise Policy Services on Exhibit 98?

      14          MR. HULINGS:  So objection to the statement

12:34 15   prior to the question assumes facts not in evidence.

      16   It's vague.

      17          You can answer.

      18      A    Yes.

      19      Q    If you can turn to Page 6 of 15, which is

12:34 20   SEC-DEEPROOT-E-0013407.

      21      A    Okay.  6 of 15, is that what you're referring

      22   to?

      23      Q    Yes.  Exactly.

      24      A    Okay.

12:35 25      Q    Do you see the section, Life Policies?

                                                              118

12:35   1        A    Yes.

        2        Q    Directing your attention to the first

        3   sentence.  "We will invest in Life Policies, AKA Life

        4   Settlements, which are sales to third parties of

12:35   5   existing life insurance contracts held on insureds who

        6   are 65 or older."

        7             Did Mr. Mueller inform you that the dGRD Fund

        8   never invested in or owned any life policies?

        9             MR. HULINGS:  So objection to assumes facts

12:35  10   not in evidence.  It's a false factual predicate.  Vague

       11   and misleading.

       12             You can answer.

       13        A    No.

       14        Q    Did Mr. Mueller seek legal advice from you

12:35  15   regarding whether the dGRD Fund never investing in or

       16   owning any life policies was adequately disclosed in

       17   Exhibit 38 (sic)?

       18             MR. HULINGS:  So for purposes of the next

       19   several -- what I anticipate to be the next several

12:35  20   questions, when I say "Same objections," I mean

       21   objections just asserted to the previous question.

       22        A    Not that I recall.

       23        Q    Well --

       24             MR. HULINGS:  And I assert the same objections

12:36  25   to the previous question for clarify.

                                                              119

12:36  1   BY MS. WARDEN:

       2        Q    The question is did Mueller seek legal advice

       3   from you regarding whether the dGRD Fund never investing

       4   in or owning any life policies was adequately disclosed

12:36  5   in the dGRD Fund in Tab -- in Exhibit 98?

       6             MR. HULINGS:  Same objections.

       7        A    Same answer.  Not that I recall.  I don't ever

       8   recall having that conversation.

       9             MR. HULINGS:  Do you want to take a --

12:36 10             MS. WARDEN:  We can take a break.

      11             MS. SANSALONE:  No.  Go ahead.

      12   BY MS. WARDEN:

      13        Q    Did Mr. Mueller seek legal advice from you

      14   regarding whether the dGRD Fund never investing in or

12:36 15   owning any life policies was adequately disclosed in a

      16   dGRD PPM at any time?

      17             MR. HULINGS:  So same objections.  Asked and

      18   answered.

      19        A    Not that I recall.

12:36 20        Q    Did you provide Mr. Mueller with legal advice

      21   regarding whether the dGRD Fund never investing or

      22   owning in any life policies was adequately disclosed in

      23   Exhibit 98?

      24             MR. HULINGS:  Same objections.  Asked and

12:37 25   answered.

                                                               120

12:37 1      A     Not that I recall.

2      Q     Did you provide Mr. Mueller with legal advice

3  regarding whether the dGRD Fun never investing in or

4  owning any life policies was adequately disclosed in a

12:37 5  dGRD PPM at any time?

6            MR. HULINGS:  Same objections.

7      A     Same answer.  Not that I recall.

8      Q     Did Mr. Mueller inform you that the life

9  policies were owned and acquired by Policy Services?

12:37 10           MR. HULINGS:  Objection.  Vague.

11     A     I don't understand the question.  You -- you

12 -- Just ask it again.

13     Q     Yeah.  Did Mr. -- did Mr. Mueller ever tell

14 you that the life policies that were purportedly held by

12:38 15 the 575 and dGRD Fund were owned by Policy Services?

16     A     No.

17           MR. HULINGS:  Hold on.

18           THE WITNESS:  I'm sorry.

19           MR. HULINGS:  Objection that that is vague and

12:38 20 misleading.  Assumes fact not in evidence.  False

21 factual predicate.  Asked and answered multiple times.

22 BY MS. WARDEN:

23     Q     After Exhibit 98 was finalized, did

24 Mr. Mueller ever inform you that he wanted to amend the

12:38 25 dGRD PPM?

121

```
12:38   1        A    Not that I recall.
        2        Q    And -- Okay.  Handing you what I'll mark
        3   Exhibit 99.
        4             (Deposition Exhibit 99 was marked for
12:39   5             identification.)
        6             MS. SANSALONE:  Thank you.
        7   BY MS. WARDEN:
        8        Q    This is Tab 32.  SEC-DEEPROOT-E-0164786
        9   through 0164803.  Mr. Concilla, do you recognize this
12:39  10   document?
       11        A    It's the same as the previous exhibit.
       12        Q    It's different.  It's -- it's a different
       13   exhibit.
       14             So I can represent to you that in
12:39  15   Mr. Mueller's interrogatory response, he indicated this
       16   dGRD PPM was operative between May 2018 through
       17   October 2019.
       18             MR. HULINGS:  So it assumes facts not in
       19   evidence.
12:40  20             Is there a question?
       21             MS. WARDEN:  Yeah.
       22   BY MS. WARDEN:
       23        Q    Did you advise Policy Services on Exhibit
       24   91 -- 99?
12:40  25        A    I -- I don't --
```

                                                          122

```
12:45   1    BY MS. WARDEN:

        2         Q    Do you recognize this document, Mr. Concilla?

        3         A    No.

        4         Q    So I can represent to you that, in

12:45   5    Mr. Mueller's interrogatory responses, he indicated

        6    Exhibit 100 was operative between October 2019 through

        7    August 2021.  Did you advise Policy Services on

        8    Exhibit 100?

        9              MR. HULINGS:  So object to the statement prior

12:45  10    to the question.  Object to facts not in evidence.  And

       11    vague and misleading.

       12         A    No.

       13         Q    If you had advised on a PPM around

       14    October 2019, would you have expected there to be emails

12:46  15    between you and Mr. Mueller?

       16              MR. HULINGS:  Calls for speculation.  Lack of

       17    foundation.  Hypothetical.  Vague and ambiguous.

       18    Misleading.

       19              MS. SANSALONE:  I'll echo those same

12:46  20    objections.

       21         A    Yes.

       22              MS. WARDEN:  Do you want a break?

       23              THE WITNESS:  Is lunch here yet?  If lunch

       24    isn't here, then we should keep going, unless you

12:46  25    want --
```

126

```
12:49  1   a false hyp -- factual predicate.  Vague and misleading.

       2   Argumentative.

       3       A    I -- I -- Okay.  This is dated September 1st,

       4   2015, and then you gave me a date of 2017.  So --

12:49  5       Q    Uh-huh.

       6       A    -- I'm not sure.  I don't understand the

       7   question.

       8       Q    It's just a question of whether Muel --

       9   Mr. Mueller informed you, right, at any time, okay, that

12:49 10   neither the 575 Fund nor Policy Services purchased any

      11   new life insurance policies after April 2017?

      12            MR. HULINGS:  Same objections.

      13   BY MS. WARDEN:

      14       Q    So you represented Mr. Mueller post

12:50 15   April 2017, correct?

      16       A    Yes.

      17       Q    Okay.  Did Mr. Mueller ever tell you at any

      18   time that neither the 575 Fund, nor Policy Services,

      19   purchased any new life insurance policies after

12:50 20   April 2017?

      21            THE DEFENDANT:  Same objections.

      22       A    No.  But I don't -- but it -- you -- you asked

      23   me about this sentence, and that answer has nothing to

      24   do with this sentence.

12:50 25            "We minimize this risk by limiting the capital
```

                                                                    129

12:50  1    acquisition component of the company to 45 percent of

       2    the asset portfolio."  I don't understand the

       3    connection.  But the answer to that -- Okay.

       4         Q    Is?

12:50  5         A    Is no.

       6         Q    Okay.  Did Mr. Mueller seek legal advice from

       7    you regarding whether the fact that neither the

       8    575 Fund, nor Policy Services, purchasing any new life

       9    insurance policies after April 2017 was adequately

12:51 10    disclosed in Exhibit 36?

      11              MR. HULINGS:  Objection.  Same objections.

      12    Asked and answered.

      13         A    No.

      14         Q    Did you provide Mr. Mueller with legal advice

12:51 15    regarding whether the fact that neither the 575 Fund,

      16    nor Policy Services, purchasing any new life insurance

      17    policies after April 2017 was adequately disclosed in

      18    Exhibit 36?

      19              MR. HULINGS:  Same objections.  Asked and

12:51 20    answered.

      21              MS. SANSALONE:  And asked and answered.  Yeah.

      22         A    I -- No.  I mean, again, I'm sorry.  But to my

      23    ear, you're asking the same question over and over and

      24    over.

12:51 25         Q    It's a slightly different question.  And I

                                                              130

12:56    1    record at 12:57 p.m.

         2            (Recess taken.)

         3            THE VIDEOGRAPHER:  Back on the record at

         4    1:00 p.m.

12:59    5    BY MS. WARDEN:

         6        Q    Mr. Concilla, can we turn back to Exhibit 36.

         7    It's the 575 PPM dated September 1, 2015, at the bottom.

         8        A    Okay.

         9        Q    Can you turn to Page 7 of 13.

12:59   10        A    Okay.

        11        Q    The last paragraph.  Capital Acquisition in

        12    deeproot Tech.  It says, "A capital acquisition is a

        13    purchase of an internal affiliated investment position

        14    in another enterprise, wherein such enterprise is

13:00   15    intended to enhance Company's reputability, safety, or

        16    financials through joint venture, partnership, or

        17    collaboration, or minimize pool risk, lower administrate

        18    -- administrative overhead or expenses, or to develop

        19    additional product lines."

13:00   20            Did Mr. Mueller inform you that the 575 Fund

        21    did not purchase anything from the deeproot affiliates?

        22            MR. HULINGS:  Okay.  So objection.  Assumes

        23    facts not in evidence.  False factual predicate.  Vague

        24    and misleading.  And argumentative.

13:00   25        A    No.

                                                                    136

13:00 1      Q     Did Mr. Mueller seek legal advice from you

2    regarding whether the 575 Fund's failure to purchase

3    anything from the deeproot affiliates was adequately

4    disclosed in Exhibit 36?

13:01 5            MR. HULINGS:  Same -- same objections as

6    asserted to the previous question.  And asked and

7    answered.

8            MS. SANSALONE:  Yeah.  I think this is where

9    we get into where this is getting repetitive.  If the

13:01 10   prior answer is no --

11           MS. WARDEN:  This is different.  We -- I --

12   I have --

13   BY MS. WARDEN:

14      Q     My question is, Mr. Concilla, did Mr. Mueller

13:01 15   seek legal advice from you regarding whether the

16   575 Fund's failure to purchase anything from the

17   deeproot affiliates was adequately disclosed in

18   Exhibit 36?

19           MR. HULINGS:  Same objections as to the

13:01 20   previous -- as asserted to the previous question.  And

21   asked and answered.

22      A     No.

23      Q     Okay.  Did Mr. Mueller inform you that he used

24   575 funds to pay the deeproot affiliates' expenses?

13:01 25           MR. HULINGS:  So objection.  Assumes facts not

137

13:01  1   in evidence.  It is vague and misleading.  And ambiguous

       2   and argumentative.

       3           And -- and you can answer, if you can.

       4       A   No.

13:01  5       Q   Did Mr. --

       6       A   Not that I recall.

       7       Q   Did Mr. Mueller inform you that he used

       8   575 Funds to provide deeproot affiliates with

       9   interest-free loans?

13:02 10           MR. HULINGS:  Okay.  So let's -- running

      11   through the Rules of Evidence in my head so we can get

      12   them all.

      13           That assumes facts not in evidence.  It's a

      14   false factual predicate.  There is -- It is vague.

13:02 15   Misleading.  Argumentative.  Asked and answered.

      16       A   No.

      17           MS. WARDEN:  That's a brand new question.

      18   It's not asked and answered.

      19           MR. HULINGS:  Oh, that's right.  Well,

13:02 20   that's -- that's right.

      21           THE WITNESS:  Sort of.

      22           MR. HULINGS:  Yeah.

      23           THE WITNESS:  It's sort of a different

      24   question.  But only sort of.

13:02 25   BY MS. WARDEN:

                                                            138

13:07   1    through 0013236.

        2              MR. HULINGS:  So I'm going to object that this

        3    document is dated -- Well, the previous testimony

        4    established this is from 2020.  So by definition, it's

13:07   5    outside the scope of the privilege waiver.  But if

        6    you're going to ask were -- were there any

        7    communications about this document, I think you know the

        8    answer.  But we can do that.

        9    BY MS. WARDEN:

13:07  10         Q    Well, first, do you recognize this document,

       11    Mr. Concilla?

       12         A    No.

       13         Q    All right.  Did you have any communications

       14    with Mr. Mueller regarding Exhibit 25?

13:07  15         A    No.

       16         Q    I have a couple questions that's not about

       17    this exhibit, so you can --

       18         A    Good.

       19         Q    -- put it away.

13:08  20              Did Mr. Mueller ever inform you that he did

       21    not have a methodology or documented process to

       22    accurately value life insurance policies to report to

       23    575 and dGRD investors?

       24              MR. HULINGS:  Okay.  So assumes facts not in

13:08  25    evidence.  False factual predicate.  Argumentative.

                                                                142

13:08  1   It's vague.  It's misleading.

2          You can answer, if you can.

3     A   I'm sorry.  I don't know that I can.  I mean,

4   "...ever inform you that he did not have a methodology."

13:09  5         The answer is no.

6     Q   Okay.  Did Mr. Mueller ever seek legal advice

7   from you regarding how he should calculate the

8   percentage ownership interest that the 575 Fund had in

9   life policies?

13:09 10     A   No.  His objections.  No.

11         MR. HULINGS:  Yes.  Yes.  Vague and ambiguous.

12         THE WITNESS:  Yeah.

13  BY MS. WARDEN:

14     Q   Did Mr. Mueller ever show you a methodology of

13:09 15  how he was valuing the life insurance policies owned by

16   the 575 and dGRD Funds?

17         MR. HULINGS:  Vague and ambiguous.  And asked

18   and answered.

19     A   No.

13:10 20     Q   Did Mr. Mueller ever inform you that there

21   were no internal finance controls at deeproot?

22         MR. HULINGS:  So objection.  Assumes facts not

23   in evidence.  False factual predicate.  Very

24   argumentative.  Vague.  Misleading.

13:10 25         You can answer, if you can.

143

13:10  1      A     No.

       2      Q     And did Mr. Mueller ever seek legal advice

       3   from you regarding whether the lack of internal

       4   financial controls was adequately disclosed --

13:10  5             MR. HULINGS:  So that's --

       6   BY MS. WARDEN:

       7      Q     -- in the 575 PPM?

       8             MR. HULINGS:  So that's an extremely

       9   argumentative question, so start -- start there this

13:10 10   time.  Vague and ambiguous.  Assumes facts not in

      11   evidence.  And false factual predicate.  Asked and

      12   answered.

      13   BY MS. WARDEN:

      14      Q     Sorry.  Can you answer, sir?

13:10 15      A     No.

      16   BY MS. WARDEN:

      17      Q     Did Mr. Mueller ever show you documented

      18   internal financial controls of deeproot?

      19             MR. HULINGS:  Objection as to vague and

13:11 20   ambiguous.  Argumentative.

      21             THE WITNESS:  And I think asked and answered.

      22             MR. HULINGS:  Asked and answered.

      23      A     No.

      24      Q     Did Mr. Mueller ever inform you that there

13:11 25   were -- he employed -- Strike that.

                                                              144

13:11  1          Did Mr. Mueller ever inform you that there

2  were no processes or procedures in place to ensure that

3  the valuation of the 575 and dGRD assets were accurate?

4          MR. HULINGS:  Okay.  So assumes facts not in

13:11  5  evidence.  False factual predicate.  It is

6  argumentative.  It is vague.  It is misleading.  I think

7  it's been asked and answered.

8          MS. SANSALONE:  It's been asked and answered.

9    A   No.

13:12 10    Q   And I assume -- Is it fair to say Mr. Mueller

11  did not seek legal advice from you regarding whether the

12  lack of processes or procedures in place to ensure the

13  valuation of the funds were adequately disclosed?

14          MR. HULINGS:  Same objections as asserted to

13:12 15  the previous question, including asked and answered.

16          MS. SANSALONE:  And I'm going to say something

17  else just to protect the record since you had asked for

18  additional time the other day.

19          This is -- I mean, this could have been done

13:12 20  so much more efficiently had these an -- these questions

21  been asked in the right way and not repetitive.  So,

22  I mean, there's no way we're going to be on seven hours

23  at this point.  So whatever time he needs, we need to

24  make sure it's accommodated because time is ticking.

13:12 25         MS. WARDEN:  Okay.  I'm going to object to the

145

13:18  1          MS. SANSALONE:  Let's -- let's move forward.

      2   BY MS. WARDEN:

      3       Q    Mr. Concilla, did Mr. Mueller inform you that

      4   he would pay his investors in earlier funds, not the

13:18  5   575 or dGRD Funds with 575 and dGRD investor funds?

      6          MR. HULINGS:  All right.  So vague and

      7   ambiguous and argumentative.  Assumes facts not in

      8   evidence.

      9          You can answer, if you can.

13:19 10       A    Money is fungible.  So wherever the money is

     11   coming from, or if it's going into an account, it could

     12   be used for whatever purpose.

     13          But did we have a specific discussion about

     14   what I think you're asking; paying old investors with

13:19 15   new investor money?  We did not.

     16       Q    Okay.  I'm going to reask it because it's --

     17   it's -- that was muddy to me.

     18          So did Mr. Mueller inform you that he would

     19   pay his inventors with earlier funds --

13:19 20       A    I've already --

     21       Q    -- with 575 and dGRD investor funds?

     22          MR. HULINGS:  Okay.  So same objections as

     23   asserted to the previous question.  And asked and

     24   answered.

13:19 25       A    I'm -- I'm confused.  You're saying his

                                                          152

13:19   1   investors in earlier funds?  Okay.  I thought these were

2   the first.  I thought these were the only two funds, so

3   I guess, no.  The answer is no.

4        Q    Did Mr. Mueller ever seek legal advice --

13:20   5        A    No.

6        Q    -- regarding that issue?

7        A    No.

8             MR. HULINGS:  Same objections as to the

9   previous question.

13:20  10   BY MS. WARDEN:

11        Q    Okay.  Did Mr. Mueller inform you that he

12   would pay investors who owned fractionalized shares in

13   specific life settlement policies with 575 and

14   dGRD investor funds?

13:20  15        A    I don't understand the question.

16   Fractionalized shares.

17             MR. HULINGS:  I'm going to put a vague and

18   ambiguous --

19             THE WITNESS:  Yeah.

13:20  20             MR. HULINGS:  -- and argumentative objection

21   there.

22   BY MS. WARDEN:

23        Q    Did Mr. Mueller ever tell you that he would

24   pay 575 or dGRD investors -- Sorry.  That he would take

13:20  25   575 and dRG -- dGRD investor money and he would pay --

153

13:20  1  take that money and pay people who owned shares of the

2  life settlement policies owned by Policy Services?

3           MR. HULINGS:  Okay.  So hold on.  There's a --

4  there's a lack of foundation.  Calls for speculation.

13:20  5  It's argumentative.  It's vague and ambiguous.  It's

6  misleading.  Assumes facts not -- not in evidence.

7           You can answer, if you can.

8    A   I don't think I can.  So if fractionalized who

9  were not investors in the -- in -- in the two funds?

13:21  10         MR. NASSE:  Yes.

11  BY MS. WARDEN:

12    Q   Correct.

13    A   So we're paying people outside of the funds

14  with that money?

13:21  15         MR. HULINGS:  Same objections.

16    A   Yeah.  No.

17    Q   Okay.  And did Mr. Mueller ever seek legal

18  advice regarding whether that was proper?

19          MR. HULINGS:  Same objections as asserted to

13:21  20  the previous questions.  And it's asked and answered.

21          MS. SANSALONE:  This -- this is the perfect

22  example of the problem.

23  BY MS. WARDEN:

24    Q   Okay.  Let's do -- Handing you what's been

13:22  25  previously marked Exhibit 40, DEEPROOTFUNDS-005625.

154

14:22  1                MR. HULINGS:  Which one is 36?

       2                MS. WARDEN:  The 575 PPM.

       3                THE WITNESS:  The September 2015.

       4                MR. HULINGS:  Got it.

14:23  5                Yeah.  I think you do, but that's all

       6     right.  I have it.  So...

       7                MS. SANSALONE:  Okay.

       8                MR. NASSE:  Familiar with that one.

       9                THE WITNESS:  You've memorized it.

14:23 10                MR. HULINGS:  Familiar with that one.  Seen

      11     that one before.

      12                THE WITNESS:  You've memorized it.

      13     BY MS. WARDEN:

      14          Q    Okay.  And, Mr. Concilla, you -- you already

14:23 15     testified you -- you advised on exhibit -- You advised

      16     Policy Services on Exhibit 36, correct?

      17          A    Yeah.  Yeah.  And I -- and I feel like I have

      18     to clarify that answer.  I advised on a -- on a 575 PPM

      19     or -- in -- in September of 2015.  Whether it's this one

14:23 20     or not, I don't know.  I've seen a lot of PPMs that

      21     I've never seen before.

      22          Q    Okay.

      23          A    Okay.  So -- but, yes, I think.

      24          Q    Okay.  So if you can turn to Page 10 of 15

14:24 25     I think.

                                                                   161

14:27  1      A      Xerox machines.  Lighting.  But that -- that

       2   is my concept of nominal expenses.

       3      Q      Okay.  Was it a normal part of your practice,

       4   when you're advising on PPMs, to explain what

14:28  5   constitutes a nominal administrative expense to your

       6   clients?

       7      A      Yes.

       8      Q      Did Mueller seek legal advice regarding what

       9   types of expenses he believed fell under the category of

14:28 10   nominal administration expenses?

      11          MR. HULINGS:  Asked and answered.  Vague and

      12   ambiguous.

      13      A      I -- I -- I feel like we had discussions, but

      14   I can't give you any specifics or relate it to a

14:28 15   particular -- Again, I think there's an email somewhere

      16   where I discuss it.

      17      Q      Okay.  Did Mr. Mueller inform you that the

      18   Company Advance was not being tracked to ensure that it

      19   was used for a business purpose?

14:29 20          MR. HULINGS:  Okay.  So argumentative.

      21   Assumes facts not in evidence.  False factual predicate.

      22   Vague and ambiguous.  Misleading.

      23      A      No.

      24      Q      So the Company Advance has this 20 percent

14:29 25   cap.  Did -- did you ever advise Mr. Mueller as to how

                                                              164

14:29  1   he should track the -- the way Company Advance funds are

2   spent?

3        A    I don't recall a specific discussion.

4        Q    Did Mr. Mueller ever seek legal advice from

14:30  5   you regarding whether he should track the Company

6   Advance?

7             MR. HULINGS:  I think that's asked and

8   answered.  Vague and ambiguous.

9   BY MS. WARDEN:

14:30 10        Q    I think -- Sorry.  I did just ask that.  I'll

11   strike that.

12             Did Mr. Mueller ever show you how he was

13   tracking expenses?  Show you.

14             MR. HULINGS:  Vague and ambiguous and asked

14:30 15   and answered, but you can answer.

16        A    No.

17        Q    Did Mr. Mueller inform you that there were not

18   protections and processes in place to ensure that

19   100 percent of 575 investors' principal would be

14:30 20   returned as promised in the PPM, Exhibit 40?

21             MR. HULINGS:  Vague and ambiguous.  And

22   I'm sorry.  Could you repeat that question?

23             MS. WARDEN:  Sure.

24             MR. HULINGS:  I got lost in it.

14:31 25             MS. WARDEN:  Sure.

165

14:32   1          MR. HULINGS:  Vague and ambiguous.  Assumes

        2  facts not in evidence.  Argumentative.  Misleading.

        3      A    Operational expenses could be nominal

        4  expenses.

14:32   5      Q    Well, how -- how -- how would you define

        6  operational expenses?

        7      A    Again -- again, expenses that are associated

        8  with day-to-day operations.  Did the electric bill get

        9  paid?  Did the phone bill get paid?  Those are all

14:33  10  operational expenses.

       11      Q    Did Mr. Mueller inform you that he would use

       12  575 and dGRD investor funds to pay off credit card

       13  purchases for personal expenses?

       14          MR. HULINGS:  So vague and ambiguous.  Assumes

14:33  15  facts not in evidence.  Argumentative.  Misleading.

       16          You can answer.

       17      A    No.

       18      Q    And just to follow up, are -- are investor

       19  payments operational expenses?

14:33  20          MR. HULINGS:  Vague and ambiguous.

       21  Argumentative.  Calls for a legal conclusion.

       22      A    I think they could be.

       23      Q    And did Mr. Mueller inform you that 575 and

       24  dGRD investor funds would be used to pay for investor

14:34  25  payments?

                                                              167

14:58   1       Q    Did you have any conversations with
        2   Mr. Mueller about whether investors would have an
        3   ownership interest in the deeproot affiliates?
        4            MR. HULINGS:  Vague and ambiguous.
14:59   5       A    No.
        6       Q    Okay.  If you can turn to Exhibit 36 again.
        7   It's the 575 PPM.
        8       A    Yeah.
        9       Q    If you could turn to Pages 7 through 8.
14:59  10       A    Okay.
       11       Q    Okay.  At the top of Page 8 -- Sorry.  This is
       12   SEC-DEEPROOT-E-0014507.
       13            Do you see where it says, "deeproot Tech's
       14   sole project is deeproot Pinball, LLC, which is
15:00  15   anticipated to be a multi-year project starting in
       16   2016 or 2017.  Capital acquisition in dP would consist
       17   of the purchase of dP Class B Shares that Company will
       18   hold."
       19            Did Mr. Mueller inform you that the 575 or
15:00  20   dGRD Funds did not purchase any Class B Shares in
       21   deeproot Pinball, LLC?
       22            MR. HULINGS:  So objection.  Assumes facts not
       23   in evidence.  It's argumentative.  It's vague and
       24   ambiguous.  And misleading.
15:00  25            You can answer it, if you can.

                                                             173

15:00   1          A      No.

        2          Q      Okay.  I'm showing you what's Tab 37 that I'll

        3    mark as Exhibit 101.

        4                 (Deposition Exhibit 101 was marked for

15:01   5                 identification.)

        6                 MS. SANSALONE:  Thanks.

        7    BY MS. WARDEN:

        8          Q      Do you recognize this, Mr. Concilla?

        9          A      Yes.

15:01  10          Q      And what is it?

       11          A      It's my Declaration that I provided in this

       12    matter.

       13          Q      And if you look at the second page, is that

       14    your signature?

15:01  15          A      Yes.

       16          Q      Okay.  Why did you prepare this Declaration?

       17                 MR. HULINGS:  Hold on.  Hold on.  Hold on.

       18                 So communications between Mr. Mueller's

       19    counsel and his prior counsel are privileged.  This

15:01  20    document is not privileged.  But communications leading

       21    up to the execution of this document are privileged.  So

       22    we are objecting to the question and instructing the

       23    witness not to answer.

       24                 MS. WARDEN:  The SEC opposes that instruction.

15:02  25    And I'm -- I'm asking for the -- for the facts that --

                                                                    174

15:02 1    so the fact of why he -- he was asked.

2                    MR. HULINGS:  To the extent the facts of why

3    he was asked to sign a Declaration, to the extent that

4    involves any communications with counsel for

15:02 5    Mr. Mueller, that is privileged, and we're instructing

6    him not to answer.  Document speaks for itself.

7                    MR. NASSE:  You're objecting.  It's your

8    position that you have attorney-client regarding the

9    presentation of a factual Declaration.  I just want to

15:02 10   make sure I'm understanding your objecting.

11                   MR. HULINGS:  We -- we are telling you that we

12   have --

13                   MR. NASSE:  That you put into evidence.

14                   MR. HULINGS:  We -- we have communications --

15:02 15   No.

16                   MR. NASSE:  You can have this fact --

17                   MR. HULINGS:  You can smirk if you want.

18   You're also burning your own time.

19                   MR. NASSE:  You've been putting this as a fact

15:02 20   witness.  He's a fact witness.

21                   MR. HULINGS:  Correct.

22                   MR. NASSE:  You put a Declaration on it.

23                   MR. HULINGS:  Yes.

24                   MR. NASSE:  She can ask how -- why it was

15:03 25   prepared and those communications relating to those

175

15:03   1   preparations.

2              MR. HULINGS:  I'm -- I'm glad that you think

3   that.  And we disagree, and -- and --

4              MR. NASSE:  Our objection is noted.

15:03   5              MR. HULINGS:  Yes.  But he's instructed not to

6   answer anything that involves discussions regarding how

7   this Declaration came to be.

8   BY MS. WARDEN:

9         Q    Did you prepare this Declaration?

15:03  10         A    No.

11         Q    Who prepared it?

12         A    My -- Matt Brown of this office.  My former

13   partner.

14         Q    At your request?

15:03  15              MR. HULINGS:  Stop.  Now you're -- now you're

16   asking for communications between him and his lawyer.

17              MS. SANSALONE:  Yeah.  That's a -- that's a

18   problem.

19   BY MS. WARDEN:

15:03  20         Q    Okay.  Did you review this Declaration for

21   factual accuracy?

22         A    Yes.

23         Q    Are there -- Okay.  If you turn to the bottom

24   of Page 1, "I explained to the government officials that

15:04  25   I could not recall ever having such a conversation with

176

```
15:06  1   or law.
       2        Q    Okay.  Would payments of existing investors
       3   solely from new investor funds be proper?
       4             MR. HULINGS:  Objection.  Vague.  Ambiguous.
15:06  5   Calls for a legal conclusion.
       6        A    I just want to make sure I understand.
       7             MR. HULINGS:  Lack of foundation.  Calls for
       8   speculation.
       9             Give me more time and I'll think of more --
15:06 10   I'll think of more administrative rules.
      11             MS. SANSALONE:  Can you see the question?
      12             THE WITNESS:  I don't.  I don't.  It -- it
      13   goes --
      14             MS. WARDEN:  Here, I'll repeat it.
15:06 15             MS. SANSALONE:  Oh, no, no.  It's right here.
      16   It's probably easier for him to read it.
      17             Okay.  "Would payments of existing investors
      18   solely from new investors be proper?"
      19        A    No.
15:06 20        Q    And why not?
      21        A    Because it says "solely."
      22        Q    Yes.  So -- so why would payments to existing
      23   investors only from new investor funds be improper?
      24             MR. HULINGS:  Okay.  Hold on.
15:06 25             It calls for a legal conclusion.  Lack of
```

179

15:06  1  foundation.  Calls for speculation.  Vague and

2  ambiguous.

3              You can answer.

4      A    I believe that would -- that would be kind of

15:07  5  the hallmark of a Ponzi scheme where you're -- where

6  you're not -- you're not investing the money in a way

7  that's creating an investment return but, instead,

8  you're using new money from new investors to pay old

9  investors, so there is no enterprise.

15:07 10      Q    If revenue or funds from other sources is not

11  sufficient to cover obligations or returns to existing

12  investors, is it proper to use new investor funds to pay

13  existing investors?

14              MR. HULINGS:  So it calls for a legal

15:07 15  conclusion.  It's vague and ambiguous.  Argumentative.

16      A    I believe it does not.  I -- I think I

17  answered that properly.  I believe you could not do that

18  under those circumstances, or that it would be improper,

19  I guess, is -- in my mind.

15:08 20      Q    Did Mr. Mueller ever ask you that question?

21              MR. HULINGS:  Vague and ambiguous.  And

22  obviously instruct him not to answer if it -- if that

23  conversation took place outside the waiver period.

24      A    I don't think I can answer that question.

15:08 25      Q    Based upon attorney-client privilege --

180

15:08  1             MR. NASSE:  Within the waiver period.

2  BY MS. WARDEN:

3     Q    Within the waiver period, did you ever -- Did

4  Mr. Mueller ever ask you the question that if revenue or

15:08  5  funds from other sources is not sufficient to cover

6  obligations or returns to existing investors, is it

7  proper to use new investor funds to pay existing

8  investors?

9             MR. HULINGS:  Vague and ambiguous.

15:09 10     A    No.

11     Q    And then, Mr. Concilla, you didn't have access

12  to deeproot's bank accounts at any time, correct?

13     A    No.  But when the SEC subpoenaed that bank

14  information, it came through this office.  So I had

15:09 15  that.

16             MR. HULINGS:  During -- during the --

17             MS. WARDEN:  Yeah, that's separate.

18             MR. HULINGS:  -- investigation period.

19             THE WITNESS:  Right.  Right.

15:09 20           MR. HULINGS:  So that, we'll, yeah, instruct

21  you not to answer.

22  BY MS. WARDEN:

23     Q    Yeah.  I don't want to know --

24             MR. HULINGS:  Unless you mean --

15:09 25  BY MS. WARDEN:

181

```
17:53   1   Let me just find it.  Just a second.
        2        A    I can ask the question and then answer it.
        3             MS. SANSALONE:  Might have been more efficient
        4   all day if we'd done it that way.
17:53   5             THE WITNESS:  Might have been more efficient.
        6   Yeah.  Right.
        7   BY MR. HULINGS:
        8        Q    All right.  Let's look at Exhibit 36.
        9        A    Okay.
17:53  10             MS. SANSALONE:  Oh, right there on the top.
       11             THE WITNESS:  Yeah.  All right.
       12   BY MR. HULINGS:
       13        Q    Look at Page 6 of 13.
       14        A    Okay.
17:53  15        Q    Bottom of page says Life Policies.  Do you see
       16   that?
       17        A    Yeah.
       18        Q    It says, "We will invest in life policies."
       19        A    Yes.
17:54  20        Q    Does that say that the 575 Fund will purchase
       21   and maintain legal title to individual life insurance
       22   policies?
       23        A    It implies that.
       24        Q    Okay.  Does -- does that --
17:54  25        A    I'm sorry.
```

301

17:54  1     Q   Does it -- does it prevent the 575 from --

2  from investing in another entity that then owned the --

3  the life insurance policies?

4        MS. WARDEN:  Objection.  Calls for

17:54  5  speculation.  Vague.

6     A   It -- it -- it -- Again, as long as there is

7  a -- a possessory interest, as long as the 575 Fund has

8  some document which says you owe -- you own this, and

9  that's --

17:54 10     Q   Okay.  So that sum document, does that

11  document have to be a formal written contract signed by

12  one entity and signed by the other entity?

13     A   In my judgment, yes.

14     Q   All right.  Is it -- would it be permissible

17:55 15  under this description of invest that there is some

16  other document that tracks -- which tracks the ownership

17  interests in particular funds?  Does it have to be a

18  contract?

19     A   It does -- I don't believe it has to be a

17:55 20  contract, but it has to be enforceable.  But -- but,

21  remember, we have a fairly incestuous group of companies

22  here.

23     Q   Uh-huh.

24     A   So, in theory, you could have a spreadsheet

17:55 25  that -- that -- that does that, but it has to be

302

17:55  1   ultimately enforceable by the entity that's seeking to

2   recover the --

3        Q    Got it.  So -- but for purposes of tracking

4   the investments --

17:55  5        A    Yes.

6        Q    -- a spreadsheet would have been sufficient,

7   if it's enforceable?

8             MS. WARDEN:  Objection.

9        A    If it's enforceable.

17:55 10             MS. WARDEN:  Speculative.

11   BY MR. HULINGS:

12        Q    Okay.  Well, what about a database?  Would

13   that be -- could that --

14        A    A database is a spreadsheet, by the way.

17:56 15             MS. WARDEN:  Same objection.

16   BY MR. HULINGS:

17        Q    Okay.  Well, kind of not, but that's okay.

18        A    I'm an old programmer, by the way.

19        Q    Do you know who Chris Turner is?

17:56 20        A    Yeah.

21        Q    Do -- are you aware that Mr. Turner created

22   the database for the deeproot companies?

23        A    No, I am not -- I -- I -- no.

24        Q    You never had that --

17:56 25        A    That's not the Chris Turner I'm thinking of.

303