EXHIBIT 4

CONFIDENTIAL

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
2                     SAN ANTONIO DIVISION

3   SECURITIES AND EXCHANGE           ) CONFIDENTIAL
    COMMISSION,                       )
4                                     )
                   Plaintiff,         )
5                                     )
        -against-                     ) Civil Action No.:
6                                     ) 5:21-cv-785-XR
    ROBERT J. MUELLER, DEEPROOT       )
7   FUNDS LLC (a/k/a dprt Funds,      )
    LLC), AND POLICY SERVICES INC.,   )
8                                     )
                   Defendants,        )
9                                     )
        -and-                         )
10                                    )
    DEEPROOT TECH LLC, DEEPROOT       )
11  PINBALL LLC, DEEPROOT STUDIOS LLC,)
    DEEPROOT SPORTS & ENTERTAINMENT   )
12  LLC, AND DEEPROOT RE 12621        )
    SILICON DR LLC, AND ROBERT J.     )
13  MUELLER, JEFFREY L. MUELLER, AND  )
    BELINDA G. BREEN, AS CO-TRUSTEES  )
14  OF THE MB HALE OHANA REVOCABLE TRUST,)
                                      )
15                 Relief Defendants. )
    _____)
16
17  ORAL AND VIDEOTAPED DEPOSITION OF ROBERT MUELLER, produced
18  as a witness at the instance of the Plaintiff and duly
19  sworn, was taken in the above styled and numbered cause on
20  Thursday, March 9, 2023, from 9:36 a.m. to 7:35 p.m.,
21  before Janalyn Elkins, CSR, in and for the State of Texas,
22  reported by computerized stenotype machine, at the offices
23  of Davis Santos, PC, 719 Flores Street, San Antonio,
24  Texas, pursuant to the Federal Rules of Civil Procedure
25  and any provisions stated on the record herein.
                                                           1
```

**CONFIDENTIAL**

| | | |
|---|---|---|
| 09:38:23 | 1 | indicating that you were the target of a criminal |
| 09:38:24 | 2 | investigation; is that correct? |
| 09:38:26 | 3 | A. I don't remember the contents of the letter. I |
| 09:38:30 | 4 | understand from counsel that a letter was received. |
| 09:38:32 | 5 | Q. Okay. And have you received any -- any |
| 09:38:34 | 6 | indication from either counsel or from anyone else in |
| 09:38:38 | 7 | the government that you were no longer the target of a |
| 09:38:40 | 8 | criminal investigation? |
| 09:38:41 | 9 | MR. HULINGS: And I'm going to instruct the |
| 09:38:42 | 10 | witness not to provide any answers that reflect |
| 09:38:44 | 11 | communications from counsel on any subject, including |
| 09:38:48 | 12 | the subject raised in that question. |
| 09:38:53 | 13 | So I'm instructing you not to answer to the |
| 09:38:55 | 14 | extent the answer is based on communications with |
| 09:38:57 | 15 | counsel. |
| 09:39:00 | 16 | Q. (BY MR. NASSE) Do you have any response? Can |
| 09:39:02 | 17 | you answer that question without revealing privilege? |
| 09:39:07 | 18 | MR. HULINGS: If we can confer briefly on |
| 09:39:10 | 19 | the privilege question. |
| 09:39:11 | 20 | MR. NASSE: That's fine. |
| 09:39:12 | 21 | MR. HULINGS: Just a moment. |
| 09:39:15 | 22 | (Counsel confers with witness.) |
| 09:39:45 | 23 | MR. HULINGS: Okay. We're going to |
| 09:39:46 | 24 | instruct him not to answer that question. |
| 09:39:47 | 25 | Q. (BY MR. NASSE) Are you aware you are under |

7

CONFIDENTIAL

| | | |
|---|---|---|
| 09:41:26 | 1 | but I'm particularly pointing to page 12. |
| 09:41:29 | 2 | A. Thank you. |
| 09:41:34 | 3 | MR. HULINGS: Is this marked as an exhibit? |
| 09:41:35 | 4 | MR. NASSE: It's a pleading. I'm not going |
| 09:41:37 | 5 | to mark it as an exhibit. |
| 09:41:38 | 6 | MR. HULINGS: Okay. |
| 09:41:45 | 7 | Q. (BY MR. NASSE) Have you read page 12? Do you |
| 09:41:47 | 8 | see where the paragraph -- I don't have another copy, |
| 09:41:50 | 9 | but the paragraph where it says you are asserting the |
| 09:41:53 | 10 | advice of counsel defense? |
| 09:41:55 | 11 | MR. NASSE: You can have him read the |
| 09:41:57 | 12 | section if you want in the record. |
| 09:41:58 | 13 | THE WITNESS: Would you like me to read |
| 09:41:58 | 14 | No. 2? |
| 09:42:01 | 15 | Q. (BY MR. NASSE) Go ahead. Yes, please. |
| 09:42:03 | 16 | A. (Reading:) Mr. Mueller relied on the advice of |
| 09:42:05 | 17 | counsel in taking the actions that the SEC alleges are |
| 09:42:09 | 18 | the basis of its claims. Reliance on the advice of |
| 09:42:12 | 19 | counsel negates a willful violation of the law. See |
| 09:42:15 | 20 | United States versus Ragsdale, 426 F3d 765, 788 page -- |
| 09:42:21 | 21 | Fifth Circuit 2005. |
| 09:42:25 | 22 | Q. Okay. And you're still asserting that defense? |
| 09:42:26 | 23 | A. Yes. |
| 09:42:27 | 24 | Q. And have you ever been informed by anyone other |
| 09:42:29 | 25 | than counsel that you are under criminal investigation? |

9

CONFIDENTIAL

09:42:32   1             MR. HULINGS:   Objection; vague as to

09:42:34   2    "criminal investigation."

09:42:37   3        Q.  (BY MR. NASSE)   Criminal investigation

09:42:39   4    currently going on?

09:42:52   5             MR. HULINGS:   I'm going to instruct again

09:42:53   6    that if -- if the witness is not aware of the criminal

09:42:56   7    investigation outside of communications with counsel, if

09:43:02   8    there is a criminal investigation, that he not answer

09:43:05   9    the question.

09:43:07  10             If there is a source outside of counsel,

09:43:10  11    the witness can answer.   But the witness is instructed

09:43:13  12    not to reveal communications from counsel.

09:43:18  13             THE WITNESS:   I don't recall hearing of it

09:43:20  14    anywhere other than counsel.

09:43:22  15             MR. NASSE:   And just to be clear, the

09:43:24  16    reason, Jay, we're asking this is we want to make sure

09:43:28  17    the record is clear that he's aware there's a criminal

09:43:30  18    investigation and he's continuing to do this deposition.

09:43:33  19             MR. HULINGS:   I think that -- I mean, I

09:43:35  20    think that's pretty well established in the

09:43:37  21    communications ahead of the deposition.

09:43:39  22        Q.  (BY MR. NASSE)   All right.   And so,

09:43:42  23    Mr. Mueller, you're asserting the advice of counsel

09:43:45  24    defense based on the engagement of the law firm Carlile

09:43:49  25    Patchen & Murphy; is that correct?

                                                                    10

CONFIDENTIAL

```
09:50:41   1        Q.  Okay.  And is Dennis Concilla one of the
09:50:44   2   attorneys at Carlile Patchen that you retained?
09:50:47   3        A.  Yes.
09:50:47   4        Q.  Okay.  So does this appear to be an email
09:50:51   5   correspondence between yourself and Mr. Concilla in
09:50:57   6   April of 2023 -- I mean, excuse me, 2013?
09:51:02   7        A.  Like I said, without reading this, I don't
09:51:08   8   doubt that it's authentic.  But without reading it, I
09:51:12   9   don't -- I don't recollect.
09:51:13  10        Q.  Okay.  If you could go -- so these read from
09:51:16  11   the back forward.  So it's the second to last page
09:51:21  12   there's an email from -- dated April 19, 2013 at
09:51:26  13   11:21 a.m.  Do you see that, subject line:  "Follow-up
09:51:30  14   Conference Call"?
09:51:31  15        A.  Yes.
09:51:36  16        Q.  Okay.  And this is an email at the beginning
09:51:39  17   you say, (Reading:)  I wanted to get back to you
09:51:41  18   concerning the conference call with Andrew, Russ Hagan,
09:51:44  19   and myself last week.
09:51:45  20              Do you see that?
09:51:46  21        A.  Yes.
09:51:46  22              MR. HULINGS:  And I'm going to object to
09:51:49  23   this document as being including information that is
09:51:54  24   outside the scope of our privilege waiver, "ours"
09:51:56  25   meaning Mr. Mueller's.  We did not produce this
```

16

CONFIDENTIAL

```
09:51:59  1    document.  This was produced by the trustee.
09:52:01  2                We reserve the right to demand that this
09:52:04  3    document be struck from the record and returned by the
09:52:09  4    SEC at the appropriate time.  And object to any further
09:52:12  5    questioning on the content of this email, which again,
09:52:21  6    is not produced by Mr. Mueller.  It includes information
09:52:24  7    particularly on the back --
09:52:25  8                MR. NASSE:  I think we're done with the
09:52:27  9    speaking objections.
09:52:28 10                MR. HULINGS:  Well, it's not an objection.
09:52:30 11    I'm objecting to privilege.
09:52:32 12                MR. NASSE:  Yeah, I understand.  But I
09:52:32 13    would say under the local rule, you have a right to
09:52:36 14    inquire on the scope and nature of the privilege.
09:52:38 15    You're asserting a privilege.  We have a right to
09:52:38 16    inquire on it.
09:52:38 17                We don't believe this document is
09:52:39 18    privileged based on the fact it wasn't -- it's in the
09:52:43 19    trustee's possession and the fact that the nature of the
09:52:45 20    document itself, which we'll get into, explores the
09:52:48 21    scope of the privilege.
09:52:49 22                So I intend to ask questions about it.  You
09:52:52 23    are going to instruct the witness not to answer any
09:52:54 24    questions about this; is that correct?
09:52:56 25                MR. HULINGS:  I am going to instruct the
```

17

CONFIDENTIAL

| | | |
|---|---|---|
| 09:52:57 | 1 | witness not to answer any questions about this |
| 09:53:00 | 2 | particular document because it includes information that |
| 09:53:03 | 3 | is outside of Mr. Mueller's -- the scope of |
| 09:53:07 | 4 | Mr. Mueller's privilege waiver. |
| 09:53:09 | 5 | You are entitled to ask about the nature of |
| 09:53:11 | 6 | the representation.  We are not objecting to the |
| 09:53:14 | 7 | engagement letter.  But we are objecting to this email |
| 09:53:17 | 8 | which includes information that is outside of the scope |
| 09:53:19 | 9 | of our waiver. |
| 09:53:20 | 10 | MR. NASSE:  Well, I think it goes to the |
| 09:53:22 | 11 | waiver because he identifies a different entity as the |
| 09:53:26 | 12 | client so... |
| 09:53:27 | 13 | MR. HULINGS:  You can certainly ask him |
| 09:53:28 | 14 | about that.  But the document itself includes |
| 09:53:32 | 15 | information that is outside of our waiver.  If you want |
| 09:53:34 | 16 | to redact it, and we can talk about it then.  But right |
| 09:53:38 | 17 | now looking at this it includes information that is |
| 09:53:41 | 18 | outside the scope of our waiver.  It is privileged.  So |
| 09:53:44 | 19 | we are instructing him not to answer questions based on |
| 09:53:46 | 20 | this document. |
| 09:53:47 | 21 | Q.  (BY MR. NASSE)  Mr. Mueller, did you tell |
| 09:53:49 | 22 | Dennis Concilla the client for purposes of this |
| 09:53:52 | 23 | engagement in 2013, was Policy Services, Inc.? |
| 09:53:56 | 24 | A.  I don't recall that conversation. |
| 09:53:58 | 25 | Q.  Okay.  And I refer you to Exhibit 6 to refresh |

18

CONFIDENTIAL

| | | |
|---|---|---|
| 09:59:47 | 1 | You respond at 11:44 a.m. the same day, |
| 09:59:50 | 2 | (Reading:)  Hi, Dennis.  Policy Services will be |
| 09:59:51 | 3 | preferable until deeproot is finalized. |
| 09:59:55 | 4 | MR. HULINGS:  So objection to reading from |
| 09:59:59 | 5 | an exhibit that is unredacted and privileged in part and |
| 10:00:04 | 6 | reserve the right to move to strike. |
| 10:00:07 | 7 | But you can answer the question. |
| 10:00:09 | 8 | THE WITNESS:  I see that.  That's what I |
| 10:00:12 | 9 | wrote. |
| 10:00:12 | 10 | Q.  (BY MR. NASSE)  Okay.  Do you recall any |
| 10:00:13 | 11 | conversation with Mr. Concilla where you said you were |
| 10:00:16 | 12 | personally a client? |
| 10:00:17 | 13 | A.  We had a lot of conversations where there were |
| 10:00:21 | 14 | a lot of clients that were mentioned over the years. |
| 10:00:23 | 15 | Q.  Okay.  Do you have any specific recollection of |
| 10:00:25 | 16 | telling Mr. Concilla that you were engaged in a personal |
| 10:00:28 | 17 | capacity? |
| 10:00:29 | 18 | A.  So I would have to answer that using something |
| 10:00:33 | 19 | that Mr. Concilla and Andy Frederica said, which I |
| 10:00:37 | 20 | understand is privileged. |
| 10:00:39 | 21 | Q.  I want your understanding. |
| 10:00:40 | 22 | A.  Yes, absolutely. |
| 10:00:42 | 23 | Q.  So your understanding -- do you have any |
| 10:00:44 | 24 | specific recollection of telling Mr. Concilla or anyone |
| 10:00:48 | 25 | else at Carlile Patchen that you were retained in a |

22

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

```
10:00:50   1   personal capacity?
10:00:53   2               MR. HULINGS:  So objection to the extent it
10:00:54   3   calls for information outside of our privilege waiver.
10:00:58   4   So the privilege waiver is communications regarding --
10:01:01   5   within a particular date range within -- regarding
10:01:06   6   certain subjects.  SEC has that waiver.
10:01:12   7               So if the answer is within the scope of
10:01:15   8   that waiver, you can provide a response.  If it is
10:01:18   9   outside the scope of the waiver, you are instructed not
10:01:20  10   to respond.
10:01:21  11               MR. NASSE:  Yeah, I'll just say again the
10:01:22  12   speaking objections are unneeded.  And I will also say
10:01:25  13   that you're trying to have sword and shield here.
10:01:27  14   You're saying he received advice of counsel based on the
10:01:30  15   fact that he has individual representation.  You are not
10:01:32  16   letting me inquire about whether he was individually
10:01:35  17   retained.  So --
10:01:36  18               MR. HULINGS:  I disagree with that, that
10:01:38  19   that's what's going on.  I move to strike the
10:01:41  20   commentary.  It -- this is -- you know, there is a
10:01:43  21   limited privilege waiver.  We need to protect that --
10:01:46  22   the limited scope of the waiver.  I understand that you
10:01:48  23   don't agree.  But we need to make sure the record is
10:01:51  24   clear that we are not waiving any -- that we are
10:01:55  25   instructing him not to answer outside of the scope of
```

                                                                23

**CONFIDENTIAL**

| | | |
|---|---|---|
| 10:01:57 | 1 | the existing privilege waiver. |
| 10:01:59 | 2 | If it is within the scope of the existing |
| 10:02:01 | 3 | privilege waiver, he is instructed he can answer. |
| 10:02:01 | 4 | MR. NASSE:  I understand you're instructing |
| 10:02:09 | 5 | him.  But I believe we don't agree -- why don't you put |
| 10:02:09 | 6 | for the record, we're not going to argue eating up time. |
| 10:02:10 | 7 | But we'll put for the record that we do not agree and |
| 10:02:11 | 8 | that you raised an advice of counsel defence, which I |
| 10:02:14 | 9 | understand the law is a complete waiver once you do |
| 10:02:15 | 10 | that.  So your arguments about a limited waiver are just |
| 10:02:21 | 11 | incorrect under the law. |
| 10:02:22 | 12 | So go ahead and try to answer. |
| 10:02:24 | 13 | MR. HULINGS:  So we disagree with that |
| 10:02:26 | 14 | statement of the law and move to strike it. |
| 10:02:32 | 15 | Q.  (BY MR. NASSE)  Can you answer the question? |
| 10:02:33 | 16 | A.  I don't recall the question after that back and |
| 10:02:35 | 17 | forth. |
| 10:02:35 | 18 | Q.  Do you recall any specific conversations with |
| 10:02:38 | 19 | Mr. Concilla or anyone else at Carlile Patchen telling |
| 10:02:43 | 20 | them that you wish to be engaged as a client in an |
| 10:02:46 | 21 | individual capacity? |
| 10:02:46 | 22 | MR. HULINGS:  Same objection and |
| 10:02:48 | 23 | instruction. |
| 10:02:49 | 24 | THE WITNESS:  Since you're referring to |
| 10:02:53 | 25 | this time period, it would seem to me through advice of |

24

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

| | | |
|---|---|---|
| 10:02:56 | 1 | counsel that all of those communications would be |
| 10:02:58 | 2 | privileged. |
| 10:02:59 | 3 | Q. (BY MR. NASSE)  So you're not answering on the |
| 10:03:01 | 4 | basis of privilege.  Am I clear? |
| 10:03:03 | 5 | A.  I'm taking the advice of my counsel. |
| 10:03:05 | 6 | Q.  Okay. |
| 10:03:12 | 7 | MR. HULINGS:  Let me talk to him again. |
| 10:03:14 | 8 | You're asking about this -- this is a dangerous area. |
| 10:03:17 | 9 | This is -- you're going to have to be patient.  We can |
| 10:03:18 | 10 | go off the record to preserve your time.  But we |
| 10:03:21 | 11 | need to -- you know, this is -- we're asking about |
| 10:03:22 | 12 | privilege issues, so it will require occasional |
| 10:03:25 | 13 | communications about the scope of privilege. |
| 10:03:28 | 14 | MR. NASSE:  He answered so I'm ready to |
| 10:03:31 | 15 | move on so... |
| 10:03:32 | 16 | MR. HULINGS:  Okay. |
| 10:03:34 | 17 | Q. (BY MR. NASSE)  You said you testified that you |
| 10:03:43 | 18 | use the email address Contact@PolicyServices.net; is |
| 10:03:48 | 19 | that correct? |
| 10:03:48 | 20 | A.  It's one of many emails that I used. |
| 10:03:50 | 21 | Q.  Okay.  And that email address is hosted -- is |
| 10:03:54 | 22 | owned by Policy Services? |
| 10:03:56 | 23 | MR. HULINGS:  Objection as to "owned." |
| 10:03:58 | 24 | Q. (BY MR. NASSE)  It's hosted on Policy Services |
| 10:04:00 | 25 | servers? |

25

CONFIDENTIAL

| | | |
|---|---|---|
| 10:05:01 | 1 | MR. HULINGS:  Same objection.  Instruct the |
| 10:05:03 | 2 | witness to pause to give us a chance to object unless |
| 10:05:06 | 3 | it's about privilege and you're instructed you can |
| 10:05:09 | 4 | answer.  But we need a chance to object to maintain the |
| 10:05:11 | 5 | record so that we can address evidentiary issues later |
| 10:05:15 | 6 | in the case. |
| 10:05:16 | 7 | Q.  (BY MR. NASSE)  And this engagement of Carlile |
| 10:05:19 | 8 | Patchen in 2013 was for Policy Services, Inc.; is that |
| 10:05:31 | 9 | correct? |
| 10:05:31 | 10 | MR. HULINGS:  Objection; vague as to form |
| 10:05:35 | 11 | and asks for a legal conclusion. |
| 10:05:37 | 12 | THE WITNESS:  I don't remember specifically |
| 10:05:39 | 13 | about the engagement letter.  But it was my |
| 10:05:46 | 14 | understanding that there were multiple clients involved. |
| 10:05:53 | 15 | Q.  (BY MR. NASSE)  And when you met -- what is |
| 10:05:56 | 16 | that understanding based on? |
| 10:05:58 | 17 | A.  Privileged discussions that we've already been |
| 10:06:02 | 18 | over. |
| 10:06:02 | 19 | Q.  So you're not answering that question on the |
| 10:06:04 | 20 | basis of privilege?  That's what I'm asking. |
| 10:06:06 | 21 | A.  That is correct. |
| 10:06:08 | 22 | Q.  Did you have meetings with Carlile Patchen or |
| 10:06:10 | 23 | telephone calls with Carlile Patchen in the presence of |
| 10:06:15 | 24 | Russ Hagan? |
| 10:06:19 | 25 | MR. HULINGS:  Again, our privilege waiver |

27

CONFIDENTIAL

```
10:06:21   1   is -- I understand the SEC doesn't like it and I don't
10:06:25   2   appreciate the SEC laughing, but there is a limited
10:06:28   3   privilege waiver that is currently -- is what we have
10:06:32   4   agreed to waive and that has dates and subject matter
10:06:36   5   limitations.  So if you want to show him the letter, we
10:06:40   6   can do that or if you want us to pause and I can refresh
10:06:43   7   his memory with the privilege waiver, we can do that.
10:06:46   8   But there's a date range and there's subject matter
10:06:48   9   limitations.
10:06:49  10            So to the extent that Mr. Hagan -- to the
10:06:52  11   extent that that question calls for information that was
10:06:55  12   within the waiver, he can answer.  If it's outside the
10:06:58  13   waiver, then he's instructed not to answer.
10:07:08  14        Q.  (BY MR. NASSE)  Can you answer the question?
10:07:09  15        A.  Could you repeat it?
10:07:10  16        Q.  Did you have --
10:07:11  17        A.  Sir, smiling and laughing at me is
10:07:13  18   unprofessional.
10:07:14  19        Q.  I'm not smiling or laughing.  I'm asking you a
10:07:17  20   question.
10:07:17  21        A.  It is.
10:07:17  22        Q.  I will move to strike that because it's not
10:07:19  23   accurate.
10:07:20  24            Did you have discussions with Dennis
10:07:22  25   Concilla or anyone else at Carlile Patchen in the
```

28

CONFIDENTIAL

```
10:34:36   1   what did you seek Carlile Patchen's advice for?
10:34:40   2       A.  There were quite a few issues.  I don't recall
10:34:43   3   all of them.  And even if I did recall them, I think
10:34:47   4   you're -- at least admitting from what I understand from
10:34:52   5   your question that they would be privileged.
10:34:54   6       Q.  I don't think your lawyer has instructed you
10:34:58   7   not to answer.
10:34:58   8           MR. HULINGS:  Well, so the question was
10:34:59   9   without revealing the substance of any --
10:35:01  10       Q.  (BY MR. NASSE)  Can you do so?
10:35:02  11       A.  I cannot do so, to the best of my recollection.
10:35:05  12       Q.  So sitting here today, you have -- you have no
10:35:13  13   recollection of receiving advice not related to Policy
10:35:18  14   Services, Inc. or deeproot Funds or deeproot Capital
10:35:22  15   Management or their affiliates or subsidiaries without
10:35:26  16   revealing privileged information?
10:35:28  17           MR. HULINGS:  So I will, again, instruct to
10:35:31  18   not reveal the substance of any communications.  You can
10:35:34  19   reveal the general topics if you can without revealing
10:35:37  20   the substance.  And I'm also going to object on
10:35:41  21   vagueness grounds.
10:35:43  22           THE WITNESS:  Without revealing privileged
10:35:47  23   information, no, I cannot.
10:36:13  24           MR. NASSE:  So we are at 29, I think?
10:36:17  25           THE REPORTER:  28.
```

44

CONFIDENTIAL

```
12:03:29   1        Q.  And again, it appears you respond, "Don't
12:03:32   2   understand how this is a fund."
12:03:33   3               If you look at the email above on August --
12:03:43   4   sort of goes over the bottom of the second page to the
12:03:46   5   top of the first -- third page, August 20th, you respond
12:03:50   6   to Ms. Carron that you had sent -- you know, (Reading:)
12:03:55   7   Sent Mr. Concilla an email on this, but he hasn't got
12:03:58   8   back to me.
12:03:58   9               Is that fair to say?
12:04:00  10        A.  Are you talking about on --
12:04:05  11        Q.  It's the bottom of -- bottom of the second
12:04:07  12   page, top of the third page, sort of the email.
12:04:10  13        A.  There's two emails there.  So it looks like --
12:04:14  14        Q.  She just follows up --
12:04:16  15        A.  She notes, "and then I email all of them back?"
12:04:19  16        Q.  Yeah.  And in that email from you on the very
12:04:22  17   top it says, (Reading:)  By the way, just had a card
12:04:24  18   from Idaho telling us our annual report of renewal for
12:04:29  19   DWA was coming in October.  It's my understanding that
12:04:32  20   our settlement with them requires us to withdraw those
12:04:36  21   filings months ago.
12:04:38  22               Do you see that?
12:04:39  23        A.  I see that.
12:04:39  24        Q.  What is -- what is -- what is -- did something
12:04:40  25   occur in Idaho related to deeproot?
```

96

CONFIDENTIAL

| | | |
|---|---|---|
| 12:04:43 | 1 | MR. HULINGS:  So I'm going to instruct him |
| 12:04:45 | 2 | not to answer.  And we will be snapping this back and |
| 12:04:45 | 3 | redacting it as a document that should have been |
| 12:04:52 | 4 | redacted because it exceeds the scope of the privilege. |
| 12:04:56 | 5 | MR. NASSE:  So Are you instructing him not |
| 12:04:57 | 6 | to answer? |
| 12:04:58 | 7 | MR. HULINGS:  Yes, I am. |
| 12:04:58 | 8 | Q.  (BY MR. NASSE)  Okay.  Were deeproot Funds or |
| 12:05:00 | 9 | Policy Services or any of their affiliates the subject |
| 12:05:04 | 10 | of any investigation by Idaho securities regulators? |
| 12:05:09 | 11 | MR. HULINGS:  I'm instructing you not to |
| 12:05:12 | 12 | answer question. |
| 12:05:12 | 13 | MR. NASSE:  The fact of that investigation |
| 12:05:14 | 14 | is privileged? |
| 12:05:14 | 15 | MR. HULINGS:  All right.  So without |
| 12:05:18 | 16 | disclosing the content of any communication with |
| 12:05:21 | 17 | counsel, you can answer the question about the existence |
| 12:05:24 | 18 | of an investigation. |
| 12:05:27 | 19 | THE WITNESS:  My understanding and |
| 12:05:28 | 20 | recollection is it was not an investigation. |
| 12:05:31 | 21 | Q.  (BY MR. NASSE)  What was it? |
| 12:05:32 | 22 | A.  They had -- |
| 12:05:34 | 23 | Q.  I'm sorry.  When you say, "they," who do you |
| 12:05:36 | 24 | mean? |
| 12:05:36 | 25 | A.  Idaho. |

97

CONFIDENTIAL

| | | |
|---|---|---|
| 12:05:38 | 1 | Q.  Idaho.  What agency? |
| 12:05:40 | 2 | A.  You had -- you had someone in the Idaho -- I |
| 12:05:42 | 3 | don't remember if it was Department of Securities or |
| 12:05:44 | 4 | what the entity was -- and after registering our Form D |
| 12:05:51 | 5 | in that state through the -- and I don't remember the |
| 12:05:55 | 6 | abbreviation for the -- NASA or EFD or whatever, the |
| 12:05:59 | 7 | system where you file your Form D notices in the states |
| 12:06:03 | 8 | that are under that system had a problem with, I |
| 12:06:07 | 9 | believe, some -- a single sentence on our website.  And |
| 12:06:16 | 10 | Dennis -- |
| 12:06:19 | 11 | MR. HULINGS:  Hold on.  No. |
| 12:06:19 | 12 | THE WITNESS:  Okay. |
| 12:06:20 | 13 | MR. HULINGS:  Instruct you not to disclose |
| 12:06:22 | 14 | the content of any communications with Mr. Concilla |
| 12:06:24 | 15 | about anything other than drafting of PPMs. |
| 12:06:27 | 16 | THE WITNESS:  There was a settlement as it |
| 12:06:29 | 17 | says. |
| 12:06:30 | 18 | Q.  (BY MR. NASSE)  Okay.  There was a settlement |
| 12:06:31 | 19 | with the Idaho State Securities regulator? |
| 12:06:35 | 20 | A.  Dennis dealt with it.  That's all I know. |
| 12:06:38 | 21 | Q.  Do you know what entity entered into the |
| 12:06:40 | 22 | settlement? |
| 12:06:41 | 23 | A.  No, I don't recall. |
| 12:06:42 | 24 | Q.  Okay.  Was it you personally entered into the |
| 12:06:44 | 25 | settlement? |

98

CONFIDENTIAL

| | | |
|---|---|---|
| 12:27:40 | 1 | Q.  (BY MR. NASSE)  Did you ever tell Mr. Concilla |
| 12:27:43 | 2 | that you were taking loans from any of the funds? |
| 12:27:49 | 3 | MR. HULINGS:  Objection.  Okay.  So the -- |
| 12:27:56 | 4 | is that question limited to pre-2019? |
| 12:28:01 | 5 | MR. NASSE:  Sure.  Yes. |
| 12:28:03 | 6 | MR. HULINGS:  All right.  You can answer as |
| 12:28:07 | 7 | long as it's before January 1, 2019. |
| 12:28:11 | 8 | THE WITNESS:  We had very frank and robust |
| 12:28:13 | 9 | discussions about almost everything we did with Dennis |
| 12:28:17 | 10 | and Andy.  They had an insight into almost everything |
| 12:28:20 | 11 | that we did.  I don't know what you mean by loans.  We |
| 12:28:24 | 12 | talk about payments here.  But yes, they knew that was |
| 12:28:27 | 13 | happening and it just confirmed it that I refreshed his |
| 12:28:31 | 14 | memory about it here. |
| 12:28:33 | 15 | Q.  (BY MR. NASSE)  That you understood that |
| 12:28:34 | 16 | payments were happening indirectly? |
| 12:28:37 | 17 | Okay.  Do you have any specific |
| 12:28:39 | 18 | recollection of discussing taking out loans from any of |
| 12:28:42 | 19 | the deeproot businesses? |
| 12:28:44 | 20 | MR. HULINGS:  Objection; vague and loans -- |
| 12:28:48 | 21 | vague as to loans from the deeproot businesses. |
| 12:28:52 | 22 | MR. NASSE:  Well, I'm happy to clarify. |
| 12:28:54 | 23 | MR. HULINGS:  Yeah.  Just clean the |
| 12:28:55 | 24 | question up a little bit, yeah. |
| 12:28:57 | 25 | Q.  (BY MR. NASSE)  Do you have any specific |

112

CONFIDENTIAL

| | | |
|---|---|---|
| 12:28:58 | 1 | recollection of any discussions with anyone from Carlile |
| 12:29:02 | 2 | Patchen regarding you receiving or taking loans from any |
| 12:29:08 | 3 | entity owned or controlled by Policy Services, Inc.? |
| 12:29:15 | 4 | MR. HULINGS:  Provided that the answer is |
| 12:29:17 | 5 | prior to 2019, you can answer. |
| 12:29:19 | 6 | THE WITNESS:  Again, we talked about almost |
| 12:29:22 | 7 | everything.  I don't remember of the specific word loans |
| 12:29:25 | 8 | or payments or compensation was used at the time.  Here |
| 12:29:30 | 9 | it says "payments."  Probably used different terms in |
| 12:29:34 | 10 | different conversations.  But they understood that Russ |
| 12:29:38 | 11 | and I received, however you want to call it, from the |
| 12:29:44 | 12 | fund for our services.  That's where he mentions, I |
| 12:29:48 | 13 | believe, here fund management, fees for fund management |
| 12:29:53 | 14 | as an executive. |
| 12:29:54 | 15 | Q.  (BY MR. NASSE)  My -- so sitting here today, |
| 12:29:57 | 16 | you have no specific recollection of discussing taking |
| 12:30:00 | 17 | loans from Policy Services, Inc. or any of the |
| 12:30:03 | 18 | subsidiaries or affiliates? |
| 12:30:05 | 19 | MR. HULINGS:  Objection; vague as to |
| 12:30:06 | 20 | "loans." |
| 12:30:07 | 21 | THE WITNESS:  Like I said, I'm sure we did. |
| 12:30:09 | 22 | I don't recall specifically because we had very robust |
| 12:30:13 | 23 | discussions verbal and written about a lot of things. |
| 12:30:16 | 24 | And here we had already been with them for some time and |
| 12:30:22 | 25 | been through several funds that we had set up.  We were |

113

CONFIDENTIAL

| | | |
|---|---|---|
| 12:30:24 | 1 | in the process of -- in this August here as we just |
| 12:30:28 | 2 | talked about earlier, process of getting the dGRD term |
| 12:30:32 | 3 | sheet into a compliant -- securities compliant fund. |
| 12:30:36 | 4 | So, yeah, it wouldn't surprise me at all if |
| 12:30:40 | 5 | discussions around, you want the term loans or loans or |
| 12:30:44 | 6 | anything else came up during those periods. |
| 12:30:47 | 7 | Q.  (BY MR. NASSE)  Yeah.  And again, I mean, I |
| 12:30:48 | 8 | think you answered my -- I didn't ask you whether it |
| 12:30:50 | 9 | would surprise you.  I asked if there's any specific |
| 12:30:53 | 10 | recollection of any discussion regarding loans previous |
| 12:30:55 | 11 | to 2015 for Policy Services or any of its affiliated |
| 12:30:59 | 12 | businesses? |
| 12:30:59 | 13 | MR. HULINGS:  I believe it's been asked and |
| 12:31:01 | 14 | answered multiple times now. |
| 12:31:05 | 15 | THE WITNESS:  I don't recall specifically. |
| 12:31:08 | 16 | But I recall that we had conversations where that |
| 12:31:11 | 17 | conversation could have come up as I've already |
| 12:31:13 | 18 | answered. |
| 12:31:13 | 19 | Q.  (BY MR. NASSE)  Okay.  And did you recall |
| 12:31:16 | 20 | Carlile Patchen providing you any advice in terms of if |
| 12:31:19 | 21 | you were going to take loans, what would be required in |
| 12:31:21 | 22 | terms of disclosure or documentation? |
| 12:31:23 | 23 | MR. HULINGS:  Objection; vague and |
| 12:31:26 | 24 | compound. |
| 12:31:27 | 25 | But you can answer provided that it's prior |

114

CONFIDENTIAL

| | | |
|---|---|---|
| 12:31:28 | 1 | to 2019. |
| 12:31:31 | 2 | Q. (BY MR. NASSE)  Yes. |
| 12:31:31 | 3 | A. Sure.  They provided advice and what the proper |
| 12:31:34 | 4 | disclosures were for all of our documents and we relied |
| 12:31:38 | 5 | on that. |
| 12:31:39 | 6 | Q. Yeah.  Do you have a specific recollection of |
| 12:31:40 | 7 | them providing that advice as it related to you taking |
| 12:31:44 | 8 | out loans from Policy Services, Inc. or any of its |
| 12:31:47 | 9 | affiliated businesses? |
| 12:31:48 | 10 | MR. HULINGS:  Objection; vague. |
| 12:31:50 | 11 | THE WITNESS:  If there was anything -- and |
| 12:31:52 | 12 | I can't recall the specific, you know, PPMs that either |
| 12:31:54 | 13 | are being referred here or after.  But yes, if there |
| 12:31:56 | 14 | were disclosures in that PPM regarding that, they either |
| 12:32:00 | 15 | gave the advice that it was necessary to put it in or it |
| 12:32:02 | 16 | was not necessary. |
| 12:32:04 | 17 | Q. (BY MR. NASSE)  If you had a discussion? |
| 12:32:05 | 18 | A. We did have -- we did have discussions, as I |
| 12:32:07 | 19 | said, regarding compensation and whether you want to |
| 12:32:12 | 20 | term it as a loan, as payment, as a salary, whatever. |
| 12:32:16 | 21 | Q. Yeah.  I specifically loan -- a loan is |
| 12:32:19 | 22 | something you have to pay back.  Compensation |
| 12:32:21 | 23 | is something-- I mean, you're an attorney, Mr. Mueller, |
| 12:32:21 | 24 | correct? |
| 12:32:21 | 25 | REPORTER:  Is what? |

115

CONFIDENTIAL

```
12:32:21  1        Q.  (BY MR. NASSE)  You're an attorney, right,
12:32:26  2   Mr. Mueller?
12:32:26  3        A.  I answered earlier on that I was.
12:32:28  4        Q.  Okay.  So you understand the difference between
12:32:31  5   pay or compensation and a loan?
12:32:34  6                MR. HULINGS:  Objection.  It's actually
12:32:38  7   vague.
12:32:38  8                But you can answer.
12:32:39  9                THE WITNESS:  And argumentative.  But with
12:32:42 10   that said, I do understand that as a layperson.  I don't
12:32:45 11   know if being an attorney changes any of the insight
12:32:50 12   into that.
12:32:51 13        Q.  (BY MR. NASSE)  So even better.  So no legal
12:32:53 14   conclusion.
12:32:54 15                So if it's -- do you ever recall any -- or
12:32:57 16   any advice you received, specific advice from
12:33:00 17   Mr. Concilla or Carlile Patchen regarding what was
12:33:04 18   required if you wanted to take loans from Policy
12:33:07 19   Services, Inc. or any of its affiliated businesses?
12:33:09 20                MR. HULINGS:  So asked and answered, vague,
12:33:12 21   argumentative.  It's asked and answered several times.
12:33:16 22   I don't know how many more times we're going to do this.
12:33:19 23                MR. NASSE:  Well, the answers are not
12:33:20 24   responsive.  He's talking about --
12:33:20 25                MR. HULINGS:  You may not like the answer,
```

116

CONFIDENTIAL

| | | |
|---|---|---|
| 12:33:22 | 1 | but you're getting an answer.  And that's -- you may not |
| 12:33:24 | 2 | like it, but you're getting an answer.  You have asked |
| 12:33:27 | 3 | the same question four times now. |
| 12:33:29 | 4 | MR. NASSE:  I haven't got an answer. |
| 12:33:31 | 5 | Q.  (BY MR. NASSE)  Do you have any specific |
| 12:33:32 | 6 | recollection of any advice you received regarding loans, |
| 12:33:35 | 7 | not compensation or pay, specifically loans from -- you |
| 12:33:38 | 8 | taking loans from Policy Service, Inc. or any of its |
| 12:33:43 | 9 | affiliated enterprises? |
| 12:33:43 | 10 | MR. HULINGS:  Same objections; |
| 12:33:46 | 11 | argumentative, vague, asked and answered five times now. |
| 12:33:50 | 12 | THE WITNESS:  We had wide-ranging |
| 12:33:51 | 13 | discussions on a lot of issues including of course |
| 12:33:54 | 14 | payments and anything that would be regarded payments as |
| 12:33:58 | 15 | they would need to be disclosed or not in the PPMs. |
| 12:34:10 | 16 | MR. NASSE:  Just note for the record |
| 12:34:11 | 17 | nothing about loans in your answer. |
| 12:34:13 | 18 | MR. HULINGS:  Move to strike. |
| 12:34:14 | 19 | MR. NASSE:  I think we are -- I think we |
| 12:34:18 | 20 | can take a break for lunch if you want.  Off the record. |
| 12:34:21 | 21 | VIDEOGRAPHER:  We are off the record at |
| 12:34:24 | 22 | 12:34 p.m. |
| 12:34:25 | 23 | (Brief recess.) |
| 01:29:34 | 24 | VIDEOGRAPHER:  We are back on the record at |
| 01:29:56 | 25 | 1:30 p.m. |

117

CONFIDENTIAL

| | | |
|---|---|---|
| 01:32:16 | 1 | offering details and there's a paragraph number 15. |
| 01:32:20 | 2 | Do you see where I'm at? |
| 01:32:21 | 3 | A.  Yes. |
| 01:32:21 | 4 | Q.  And you see there's the second sentence says, |
| 01:32:24 | 5 | (Reading:)  The fund advisor or managers retain sole and |
| 01:32:28 | 6 | absolute discretion over due diligence purchase and |
| 01:32:29 | 7 | maintenance of the assets. |
| 01:32:30 | 8 | Do you see that? |
| 01:32:32 | 9 | A.  I do. |
| 01:32:32 | 10 | Q.  Okay.  And you were the manager of the575 Fund? |
| 01:32:35 | 11 | A.  Yes. |
| 01:32:36 | 12 | Q.  Was there a separate fund advisor for 575 Fund? |
| 01:32:42 | 13 | A.  Not to my recollection. |
| 01:32:47 | 14 | Q.  If you could go to paragraph -- so it's page |
| 01:33:01 | 15 | ending in Bates 4 -- 504.  And there's a paragraph F at |
| 01:33:14 | 16 | the top of that page. |
| 01:33:15 | 17 | Do you see that? |
| 01:33:16 | 18 | A.  Yes. |
| 01:33:17 | 19 | Q.  And just go ahead and you can review that |
| 01:33:28 | 20 | paragraph.  Just let me know when you're done. |
| 01:33:35 | 21 | A.  Okay. |
| 01:33:54 | 22 | Q.  Okay.  Do you recall receiving advice from |
| 01:33:59 | 23 | Carlile Patchen or any other counsel specifically as |
| 01:34:02 | 24 | related to the text in paragraph F? |
| 01:34:08 | 25 | A.  My recollection is that all -- all these |

119

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

| | | |
|---|---|---|
| 01:34:11 | 1 | paragraphs in this section came in one form or another |
| 01:34:15 | 2 | from -- you said CPM or Carlile Patchen & Murphy, yes. |
| 01:34:22 | 3 | Q.  Okay.  Do you recall any specific conversations |
| 01:34:24 | 4 | or -- with -- I'll use your term, CPM, regarding the |
| 01:34:30 | 5 | text of paragraph F? |
| 01:34:32 | 6 | A.  I know that we had conversations about all of |
| 01:34:38 | 7 | these.  I cannot remember specifically what was said. |
| 01:34:41 | 8 | Q.  In your conversations regarding this PPM, do |
| 01:34:47 | 9 | you recall any specific conversations with CPM regarding |
| 01:34:54 | 10 | your ability to take loans from Policy Services or any |
| 01:34:59 | 11 | of its affiliated entities? |
| 01:35:01 | 12 | MR. HULINGS:  So objection; vague as to |
| 01:35:03 | 13 | loans and asked and answered. |
| 01:35:13 | 14 | THE WITNESS:  Sorry.  I don't see anything |
| 01:35:15 | 15 | about loans in this paragraph. |
| 01:35:16 | 16 | Q.  (BY MR. NASSE)  Yeah, in general, in connection |
| 01:35:18 | 17 | with drafting this PPM for 575. |
| 01:35:21 | 18 | A.  So, like, the previous questions before we took |
| 01:35:22 | 19 | a break and -- |
| 01:35:23 | 20 | Q.  Well, I'm asking specific as to this document. |
| 01:35:27 | 21 | A.  It would be the same answer that I've answered |
| 01:35:29 | 22 | those -- that question multiple times. |
| 01:35:32 | 23 | Q.  And in your conversations about paragraph F, |
| 01:35:41 | 24 | which it said some agreements, including those involving |
| 01:35:44 | 25 | compensation, are not arm's length, did you discuss with |

120

CONFIDENTIAL

| | | |
|---|---|---|
| 02:24:00 | 1 | Q.  You said this discussion is in an email? |
| 02:24:02 | 2 | A.  It started with an email and the discussion was |
| 02:24:04 | 3 | as we went to the Pinball PPM -- |
| 02:24:07 | 4 | Q.  Again, and my question is:  Is there discussion |
| 02:24:10 | 5 | of nominal administration expenses are used in that term |
| 02:24:12 | 6 | in an email? |
| 02:24:13 | 7 | MR. HULINGS:  Asked and answered. |
| 02:24:15 | 8 | THE WITNESS:  I can't recall if it's in an |
| 02:24:17 | 9 | email or if it was verbal.  But it happened many, many |
| 02:24:23 | 10 | times so I'm sure there's likely an email out there, I |
| 02:24:25 | 11 | just -- I don't know without going back and looking. |
| 02:24:28 | 12 | Q.  (BY MR. NASSE)  And in those discussions did |
| 02:24:31 | 13 | you ask Carlile Patchen whether the term "nominal |
| 02:24:35 | 14 | administration expenses" could cover priority return |
| 02:24:39 | 15 | payments to investors? |
| 02:24:42 | 16 | A.  My understanding in the advice I received is |
| 02:24:48 | 17 | that 575 payment -- 575 P payments due investors are |
| 02:24:52 | 18 | expenses of the fund and they would be included. |
| 02:24:55 | 19 | Q.  Okay.  So there -- so Carlile Patchen told you |
| 02:24:59 | 20 | that nominal administration expenses, that provision |
| 02:25:02 | 21 | could be used to pay prior to return payments to 575 |
| 02:25:07 | 22 | Fund investors? |
| 02:25:09 | 23 | A.  Over the multiple times we did it in one form |
| 02:25:12 | 24 | or another, yes. |
| 02:25:13 | 25 | Q.  What do you mean by "one form or another"? |

157

CONFIDENTIAL

02:25:16  1    A.  Well, I mean, administration expenses is pretty
02:25:20  2  broad and that's intentionally why they wanted it.  And
02:25:24  3  as I've testified before with -- we didn't hide anything
02:25:29  4  from Dennis and Andy.  And in their view being compliant
02:25:35  5  with securities laws and in their view of proper
02:25:40  6  disclosure to investors, they took a much longer section
02:25:44  7  than this that was proposed previously and they boiled
02:25:47  8  it down to this abbreviated by boiling a lot of the
02:25:52  9  other stuff down to nominal administration expenses.
02:25:56 10    Q.  I just want to make sure I understand.  What
02:25:59 11  did you ask them about nominal administration expenses
02:26:02 12  as related to payments of priority return payments to
02:26:06 13  575 Fund investors?
02:26:07 14             MR. HULINGS:  Asked and answered.
02:26:08 15             THE WITNESS:  I mean, I have answered that,
02:26:11 16  is that a wide-ranging area and an amount of expenses
02:26:19 17  that could come up, especially down the road, were
02:26:23 18  talked about and they boiled them down to nominal
02:26:27 19  administration expenses.
02:26:28 20    Q.  (BY MR. NASSE)  And those wide-ranging things,
02:26:30 21  among those was specifically mentioned priority return
02:26:35 22  payments to 575 investors?
02:26:36 23             MR. HULINGS:  Asked and answered.
02:26:38 24             THE WITNESS:  Dividends, maturities, yes,
02:26:41 25  payments to investors were expenses of the fund and

158

CONFIDENTIAL

```
02:26:44   1    those would be included in that.
02:26:45   2         Q.  (BY MR. NASSE)  Prior to return payments?
02:26:45   3         A.  That's what I just said.
02:26:45   4         Q.  MR. NASSE:  Well, You said dividends.
02:26:49   5              THE WITNESS:  Sorry, I should have waited.
02:26:51   6              MR. HULINGS:  Asked and answered.  Go
02:26:53   7    ahead.
02:26:53   8         Q.  (BY MR. NASSE)  And when -- do you have a
02:26:54   9    recollection of when that conversation occurred?
02:26:56  10         A.  That's also been asked and answered and we did
02:26:59  11    it over a long period of time because this was a very
02:27:01  12    key area of the PPM and it started again with the email
02:27:07  13    where I was pointing out that Russ had left and I was
02:27:11  14    pointing out here's where we are.  We need to find a
02:27:16  15    solution to where we're going to accomplish our goals,
02:27:18  16    take care of investors.
02:27:20  17              And so this is what started the very, very
02:27:24  18    lengthy discussion and vetting of different fund designs
02:27:28  19    and the language, proper disclosures that should go in
02:27:33  20    there between that time period.
02:27:35  21         Q.  And you say "lengthy discussion."  That was a
02:27:38  22    discussion in person, over the phone?
02:27:39  23         A.  Emails, phone, everything we talked about
02:27:41  24    before, trading back and forth and changes in the
02:27:44  25    documents.
```

159

CONFIDENTIAL

02:27:46  1        Q.  Well, let's start with phone conversations.

02:27:52  2             Do you have a recollection of any phone

02:27:55  3   conversations where you specifically mentioned paying

02:28:00  4   priority return payments to -- under the revision of

02:28:05  5   nominal administrative expenses?

02:28:06  6             MR. HULINGS:  I think that's been asked and

02:28:08  7   answered --

02:28:08  8             MR. NASSE:  I'm asking for phone

02:28:08  9   conversations.

02:28:08 10             MR. HULINGS:  Are you asking for a specific

02:28:08 11   date or a date range?

02:28:10 12             MR. NASSE:  Any phone -- do you recall any

02:28:11 13   specific phone conversations, and if he does, then I'll

02:28:14 14   ask the date.

02:28:15 15             THE WITNESS:  Most of our conversations

02:28:17 16   during that period were phone conversation so it would

02:28:19 17   have been a good majority of them.

02:28:25 18        Q.  (BY MR. NASSE)  And sitting here today, do you

02:28:26 19   have any recollection of emails where specifically the

02:28:29 20   issue of paying nominal administrative expenses, using

02:28:34 21   that provision to pay 575 Fund investors?

02:28:38 22        A.  I don't know without going back.  I know this

02:28:41 23   provision was boiled down, so I'd have to -- I don't

02:28:43 24   know if it was specifically mentioned in the email or if

02:28:46 25   it was in the tracking for the editing of the document

160

CONFIDENTIAL

02:28:50   1    that was attached to an email.  I just can't recall

02:28:54   2    without looking back.

02:28:55   3         Q.  Okay.  Did -- regardless of -- not even in the

02:29:27   4    context of nominal administrative expenses, did Carlile

02:29:31   5    Patchen ever advise you that it was permissible to pay

02:29:34   6    existing investors with new investor investments?

02:29:41   7         A.  Yes.

02:29:42   8         Q.  When did that occur?

02:29:44   9         A.  It occurred continuously throughout the

02:29:48  10    representation, including after the privilege waiver

02:29:51  11    date.

02:29:52  12              MR. HULINGS:  Let's not discuss anything

02:29:53  13    after the privilege waiver date.  You're instructed not

02:29:58  14    to answer anything about after the privilege waiver

02:30:01  15    date.

02:30:01  16         Q.  (BY MR. NASSE)  Not asking you anything about

02:30:03  17    after December 2019, when did you have conversation

02:30:08  18    where Carlile Patchen advised you that it was

02:30:10  19    permissible to pay existing investor with new investor

02:30:16  20    investments?

02:30:17  21         A.  We had many conversations about the reality of

02:30:20  22    being an issuer and complying with securities laws.  And

02:30:28  23    Dennis was very adamant during a lot of these

02:30:30  24    conversations including about this provision that money

02:30:32  25    was fungible, it's common sense as well.

161

CONFIDENTIAL

| | | |
|---|---|---|
| 02:30:36 | 1 | And a lot of our discussions, when it came |
| 02:30:38 | 2 | into, like, disclosure of this, what the process would |
| 02:30:41 | 3 | be, what the internal controls would be, were around |
| 02:30:44 | 4 | that concept that Dennis kept coming back to as one of |
| 02:30:48 | 5 | his -- his major themes. |
| 02:30:50 | 6 | Q.  And it was permissible? |
| 02:30:51 | 7 | A.  It's an expense of the fund. |
| 02:30:54 | 8 | Q.  Did you -- did you ever ask Mr. Concilla or |
| 02:30:59 | 9 | anyone at Carlile Patchen whether doing so would be |
| 02:31:02 | 10 | Ponzi scheme? |
| 02:31:03 | 11 | MR. HULINGS:  Objection; vague, and legal |
| 02:31:05 | 12 | conclusion as to "Ponzi scheme." |
| 02:31:08 | 13 | But you can answer. |
| 02:31:09 | 14 | THE WITNESS:  I believe there's an email. |
| 02:31:10 | 15 | We might have even reviewed -- that was disclosed, we |
| 02:31:14 | 16 | might have even reviewed it already where Dennis gave a |
| 02:31:18 | 17 | brief example of a Ponzi scheme.  So no, he did not |
| 02:31:21 | 18 | consider what we were doing or any of the disclosures or |
| 02:31:27 | 19 | our internal processes or controls a Ponzi scheme. |
| 02:31:31 | 20 | Q.  (BY MR. NASSE)  Okay.  We can go back.  I |
| 02:31:32 | 21 | believe he says -- he discusses what are the hallmarks |
| 02:31:35 | 22 | of a Ponzi scheme.  Does that sound right? |
| 02:31:38 | 23 | A.  I believe he discusses in context to that email |
| 02:31:42 | 24 | a -- one of the elements of a Ponzi scheme as I |
| 02:31:47 | 25 | understand it and as it related to that specific |

162

CONFIDENTIAL

| | | |
|---|---|---|
| 03:40:28 | 1 | not. |
| 03:40:29 | 2 | So to the extent -- so that might be |
| 03:40:32 | 3 | outside of our privilege waiver.  To the extent -- |
| 03:40:35 | 4 | depending on how you're asking it. |
| 03:40:36 | 5 | MR. NASSE:  Yeah, I would just note for the |
| 03:40:38 | 6 | record we disagree because this reflects a state of mind |
| 03:40:42 | 7 | of what he knew as it related to the575 funds even if it |
| 03:40:45 | 8 | was in the context of the S-1.  I know that's not |
| 03:40:48 | 9 | your -- that you disagree, your position, but I just |
| 03:40:50 | 10 | want to make that clear for the record. |
| 03:40:52 | 11 | MR. HULINGS:  I don't know that that's an |
| 03:40:53 | 12 | accurate description of our record.  But we agree that |
| 03:40:56 | 13 | we disagree. |
| 03:41:00 | 14 | Q.  (BY MR. NASSE)  So I can repeat the question if |
| 03:41:01 | 15 | you want, Mr. Mueller, or if you cannot answer -- |
| 03:41:04 | 16 | MR. HULINGS:  Go ahead and repeat it and |
| 03:41:06 | 17 | I'll decide whether to instruct. |
| 03:41:09 | 18 | Q.  (BY MR. NASSE)  Did you discuss the |
| 03:41:11 | 19 | paragraph -- the header "inter-fund pool" in Exhibit 37 |
| 03:41:15 | 20 | with Carlile Patchen? |
| 03:41:17 | 21 | MR. HULINGS:  So you are instructed to |
| 03:41:24 | 22 | answer -- you are instructed not to answer to the extent |
| 03:41:27 | 23 | that the communication is outside of discussions |
| 03:41:30 | 24 | regarding PPMs or other disclosures to investors. |
| 03:41:35 | 25 | THE WITNESS:  I don't recall. |

193

CONFIDENTIAL

03:41:49  1              MR. NASSE:  Okay.  Tab 31.

03:42:12  2              MR. HULINGS:  Not Exhibit 31, tab 3 is --

03:42:15  3              MR. NASSE:  It will be Exhibit 38.

03:42:15  4              MR. HULINGS:  Got it.

03:42:17  5              MR. NASSE:  I've got a document with a

03:42:19  6    title, "Investment Allocation Agreement."

03:42:37  7              (Exhibit 38 was marked.)

03:42:44  8         Q.  (BY MR. NASSE)  Mr. Mueller, do you recognize

03:42:45  9    what's been marked as Exhibit 31 [sic]?

03:42:47 10         A.  I'm sorry.  I couldn't hear.

03:42:48 11         Q.  I apologize.  Do you recognize the document

03:42:51 12    that's been put before you marked as Exhibit 38?

03:42:55 13         A.  It appears to be the investment allocation

03:42:58 14    agreement between deeproot Funds and deeproot Tech.

03:43:02 15         Q.  Did you write this agreement?

03:43:05 16         A.  I edited this agreement.

03:43:08 17         Q.  Who initially drafted this agreement?

03:43:12 18         A.  The template was from our first attorney on an

03:43:20 19    advisory form, if I remember correctly.  And I edited it

03:43:25 20    and then sent it off for approval.

03:43:31 21         Q.  By "sent it off for approval," do you mean sent

03:43:34 22    it off to Carlile Patchen?

03:43:36 23              MR. HULINGS:  So communications regarding

03:43:38 24    the investment allocation agreement are outside of the

03:43:41 25    existing privilege waiver unless they relate to the

                                                              194

CONFIDENTIAL

| | | |
|---|---|---|
| 03:43:45 | 1 | disclosures in the575 or dGRD.  Whether or not the -- |
| 03:43:53 | 2 | the fact of whether or not you discussed the investment |
| 03:43:55 | 3 | allocation agreement is the sort of thing that would be |
| 03:43:59 | 4 | in a privilege log, so that's not privileged.  You can |
| 03:44:02 | 5 | state that.  But you're instructed not to reveal any |
| 03:44:05 | 6 | communications regarding the investment allocation |
| 03:44:08 | 7 | agreement with Carlile Patchen. |
| 03:44:15 | 8 |     Q.  (BY MR. NASSE)  I just point to the last page |
| 03:44:16 | 9 | of this document.  It's Exhibit A and there are funds |
| 03:44:19 | 10 | listed.  Do you see there?  And among those funds listed |
| 03:44:23 | 11 | are deeproot 575 Fund and deeproot Growth Run's Deep |
| 03:44:26 | 12 | Fund; is that right? |
| 03:44:28 | 13 |     A.  I see that. |
| 03:44:29 | 14 |     Q.  So investment allocation fund relates to those |
| 03:44:33 | 15 | two funds; is that correct? |
| 03:44:34 | 16 |         MR. HULINGS:  Document speaks for itself, |
| 03:44:36 | 17 | objection. |
| 03:44:36 | 18 |         MR. NASSE:  My question for counsel is:  Do |
| 03:44:38 | 19 | you still maintain the instruction given that -- |
| 03:44:40 | 20 |         MR. HULINGS:  Yeah, because it's -- I mean, |
| 03:44:42 | 21 | look.  We've got a written privilege waiver.  It |
| 03:44:44 | 22 | concerns communications -- the privilege waiver -- I |
| 03:44:47 | 23 | know, hold on -- involves drafting of PPMs and other |
| 03:44:51 | 24 | materials provided to investors. |
| 03:44:53 | 25 |         And to the extent the communications about |

195

CONFIDENTIAL

```
03:44:57  1   the investment allocation agreement with Carlile Patchen
03:44:59  2   concern disclosures in PPMs or materials from investors,
03:45:05  3   then it is covered by the waiver.  Otherwise, it is not.
03:45:10  4             MR. NASSE:  Yeah.  I think we need to go
03:45:11  5   off the record.
03:45:11  6             MR. HULINGS:  Okay.  Let me -- let me just
03:45:13  7   clarify with him whether or not that --
03:45:15  8             MR. NASSE:  Yeah, but --
03:45:17  9             VIDEOGRAPHER:  We are off the record at
03:45:18 10   3:45 p.m.
03:45:20 11             (Discussion off the record.)
03:47:47 12             VIDEOGRAPHER:  We are back on the record at
03:47:54 13   3:48 p.m.
03:47:55 14       Q.  (BY MR. NASSE)  Mr. Mueller, did you discuss
03:47:58 15   the investment allocation agreement that's been marked
03:48:00 16   as Exhibit 38 with Carlile Patchen?
03:48:03 17             MR. HULINGS:  All right.  And so pursuant
03:48:06 18   to our privilege waiver, Mr. Mueller's privilege waiver,
03:48:10 19   I'm instructing him to answer only if you discussed the
03:48:12 20   investment allocation agreement in the context of
03:48:15 21   discussions concerning disclosures in PPMs or other
03:48:19 22   disclosures to investors.
03:48:20 23             If it is outside of -- if the
03:48:24 24   communications with Carlile Patchen do not relate to
03:48:26 25   PPMs or disclosures to investors, then you're instructed
```

196

CONFIDENTIAL

03:48:30   1   not to answer.

03:48:32   2           MR. NASSE:  And just for the record, we

03:48:34   3   disagree with that characterization of the privilege.

03:48:36   4           Go for it.

03:48:37   5           MR. HULINGS:  You can answer.

03:48:38   6           THE WITNESS:  Do I get to answer?  Okay.  I

03:48:41   7   know this was sent to them.  I do not recall ever

03:48:44   8   discussing it in detail with them.  Might have happened.

03:48:47   9   I don't recall.

03:48:48   10       Q.  (BY MR. NASSE)  All right.  Was -- to your

03:48:49   11   knowledge, was the investment allocation agreement ever

03:48:51   12   provided to investors?

03:48:54   13       A.  I believe that conversation came up and, no, we

03:49:07   14   did not due to that conversation.

03:49:10   15       Q.  A conversation with Carlile Patchen?

03:49:12   16       A.  Yes.

03:49:13   17       Q.  When did that conversation occur?

03:49:14   18       A.  It would have occurred around this time period,

03:49:20   19   I'm sure.

03:49:20   20       Q.  And you had it with Mr. Concilla and

03:49:22   21   Mr. Federico or just one?

03:49:24   22       A.  I don't remember.

03:49:25   23       Q.  Okay.  Do you remember if that conversation was

03:49:26   24   over the phone or an email?

03:49:29   25       A.  I don't remember if it was email or phone.

                                                                   197

CONFIDENTIAL

03:55:12  1        A.  They don't appear to be cc'd on here.  But yes,
03:55:20  2   I recall that -- that at least the finder, training for
03:55:30  3   finders was at least presented to them at one point, I
03:55:33  4   don't recall, it was more like a notice, if I recall
03:55:37  5   correctly.  But the investor presentation was actually
03:55:40  6   sent to them for -- for approval.
03:55:44  7             In other words, there were several
03:55:45  8   different versions of it, but at some point, I don't
03:55:48  9   know if it was this specific one.
03:55:50 10        Q.  Excuse me.  Yeah.  We'll get to the investor
03:55:54 11   presentation.  But my question was:  Do you have a
03:55:58 12   recollection of this version of the presentation being
03:56:01 13   shared with Carlile Patchen?
03:56:02 14        A.  I do not recall.
03:56:03 15        Q.  Okay.  If you go to page ending in 6744.
03:56:25 16        A.  Okay.
03:56:25 17        Q.  Do you see under class B shares the last bullet
03:56:29 18   says, (Reading:)  All principle is securitized or backed
03:56:32 19   up by the assets of the company.
03:56:35 20             Do you see that?
03:56:36 21        A.  I see that.
03:56:37 22        Q.  Do you recall discussing that language with
03:56:39 23   Carlile Patchen?
03:56:41 24        A.  I believe it's in the PPM, so, yes.
03:56:49 25        Q.  You believe that sentence is in the PPM?

                                                              201

CONFIDENTIAL

```
04:10:50  1        A.  If it states that, then that was the intent to
04:10:53  2   state when it was first ready for subscription.
04:10:57  3        Q.  Okay.  And did you seek legal advice from
04:11:02  4   Carlile Patchen in connection with this PPM as marked
04:11:06  5   Exhibit 6?
04:11:07  6        A.  I don't recall.
04:11:07  7        Q.  Okay.
04:11:19  8        A.  I mean, we -- at this point, y'all had
04:11:21  9   subpoenaed the deeproot companies.  And so I don't
04:11:25 10   believe there's --
04:11:26 11             MR. HULINGS:  Hold on.  So it's a fair
04:11:29 12   point at this point, do you mean February 26, 2018 or
04:11:33 13   January 1, 2021?  If you can clarify that, that will
04:11:36 14   affect the issues.
04:11:39 15        Q.  (BY MR. NASSE)  Yeah, in February or
04:11:41 16   thereabouts in February of 2018, did you seek Carlile
04:11:45 17   Patchen's advice regarding this PPM?
04:11:47 18        A.  I don't recall specifically.
04:11:48 19        Q.  Okay.  Why issue the class C membership shares?
04:12:03 20             MR. HULINGS:  Hold on.  Objection; vague.
04:12:07 21             You can answer.
04:12:08 22             THE WITNESS:  The class C membership shares
04:12:11 23   were meant for institutional funds versus retail funds
04:12:15 24   like the class B.  I believe somewhere in there it
04:12:18 25   states it.
```

210

CONFIDENTIAL

04:21:46  1        Q.  Do you recall them ever telling you you could?

04:21:48  2        A.  I don't recall either way.

04:21:50  3        Q.  Okay.  And you -- I just want to -- you have no

04:21:55  4   recollection of discussing this specific sentence

04:21:58  5   regarding "raid the piggy bank" with Carlile Patchen?

04:22:00  6        A.  Well, y'all false pled that in your complaint

04:22:03  7   about what the context of that statement actually meant.

04:22:07  8   And here it was specifically meant and is an industry

04:22:10  9   term for going to the life policy and drawing out the

04:22:14 10   cash value of a life policy, which we've never done.

04:22:18 11   And so it was appropriate language for the context and

04:22:23 12   the meaning it was meant -- meant to talk about here in

04:22:27 13   this section.

04:22:29 14             MR. NASSE:  Yeah, we'll strike the

04:22:29 15   commentary on the complaint.  You can save that for your

04:22:32 16   pleadings.

04:22:34 17        Q.  (BY MR. NASSE)  Was -- did you discuss in --

04:22:45 18   when preparing that sentence or working on that sentence

04:22:47 19   the fact that you were the sole owner of Policy

04:22:56 20   Services, Inc. and all the other entities?

04:22:58 21             MR. HULINGS:  Objection; vague.

04:22:59 22        Q.  (BY MR. NASSE)  Let me rephrase.  Let me

04:23:01 23   rephrase.

04:23:01 24             In preparing -- in writing -- or in -- let

04:23:04 25   me say, in including this sentence in this PPM that's in

217

CONFIDENTIAL

| | | |
|---|---|---|
| 04:23:09 | 1 | Exhibit 5, did you discuss with anyone the fact that you |
| 04:23:13 | 2 | owned -- solely owned Policy Services, Inc. or all the |
| 04:23:17 | 3 | other deeproot subsidiaries and affiliates? |
| 04:23:21 | 4 | A.  I don't recall that specific phrase or topic |
| 04:23:28 | 5 | ever came up. |
| 04:23:29 | 6 | Q.  Okay.  So how does the fact that the Policy |
| 04:23:41 | 7 | Services holds the life policies prevent whoever is |
| 04:23:48 | 8 | referred to as "we" here from raiding the piggy bank? |
| 04:23:52 | 9 | MR. HULINGS:  I'm going to object to vague |
| 04:23:57 | 10 | from following that question.  It's also asking him to |
| 04:24:00 | 11 | interpret the document.  Maybe asking for a legal |
| 04:24:04 | 12 | conclusion. |
| 04:24:06 | 13 | THE WITNESS:  I think it speaks for itself. |
| 04:24:07 | 14 | I mean, this has been vetted by very competent parties, |
| 04:24:16 | 15 | including FactRight, including Folio, which is now |
| 04:24:16 | 16 | Goldman Sachs, including the professionals I've talked |
| 04:24:18 | 17 | about before in counsel.  I would have to believe that |
| 04:24:23 | 18 | all of them found that this language was appropriate and |
| 04:24:25 | 19 | descriptive and proper in their respective fields. |
| 04:24:29 | 20 | Q.  (BY MR. NASSE)  But you testified you didn't |
| 04:24:31 | 21 | recall whether you sought or received Carlile Patchen |
| 04:24:37 | 22 | advice regarding this PPM in general or this specific |
| 04:24:39 | 23 | sentence. |
| 04:24:40 | 24 | A.  I don't believe that was my testimony.  I don't |
| 04:24:42 | 25 | recall this specific sentence or this section about what |

218

CONFIDENTIAL

04:24:46 1    we specifically discussed or not discussed.  This, like

04:24:49 2    everything else, was very collaborative back and forth

04:24:52 3    with lots of edits.

04:24:54 4        Q.  Just for the record, you did testify you didn't

04:24:56 5    recall whether Carlile Patchen provided you any advice

04:24:59 6    in connection with this PPM.

04:25:01 7        A.  I believe -- I did say that, but in a different

04:25:09 8    context than you're using it now.  In the context of the

04:25:13 9    language that's in this PPM, it's very different.

04:25:18 10       Q.  You refer to "piggy bank" as an industry term.

04:25:22 11   What does piggy bank mean as far as you're saying it's

04:25:25 12   an industry term?

04:25:26 13       A.  So raiding the piggy bank, when it comes to

04:25:28 14   life insurance policies, is taking or robbing the policy

04:25:31 15   of its cash value, usually with universal policies and

04:25:40 16   whole life.

04:25:40 17       Q.  And explain to me how the structure of Policy

04:25:44 18   Services, Inc. in connection with 575 Fund prevents

04:25:56 19   robbing the piggy bank or raiding the piggy bank?

04:26:00 20                 MR. HULINGS:  You can answer.

04:26:00 21                 THE WITNESS:  I think it speaks for itself.

04:26:02 22       Q.  (BY MR. NASSE)  Maybe explain it to me because

04:26:03 23   I don't understand it.

04:26:04 24       A.  Well, you're asking me to interpret this

04:26:06 25   document and I think it speaks for itself in terms of

                                                              219

CONFIDENTIAL

| | | |
|---|---|---|
| 04:26:10 | 1 | the entire paragraph talking about the illiquidity.  I |
| 04:26:16 | 2 | mean, life insurance policies are not liquid that I |
| 04:26:21 | 3 | understand with the exception of three events.  And what |
| 04:26:25 | 4 | we're talking about here throughout the whole paragraph |
| 04:26:29 | 5 | is that fact. |
| 04:26:34 | 6 | Q.  Correct me if I'm wrong.  You stated that the |
| 04:26:36 | 7 | term -- or the phrase "raid the piggy bank" refers to |
| 04:26:40 | 8 | robbing life policies of their cash value. |
| 04:26:43 | 9 | A.  Correct. |
| 04:26:43 | 10 | Q.  My question is:  How does the structure of |
| 04:26:46 | 11 | Policy Services, Inc. as discussed in this paragraph, |
| 04:26:49 | 12 | prevent stealing the cash value from life policies? |
| 04:26:54 | 13 | A.  Again, I'm going to answer -- sorry if there's |
| 04:26:58 | 14 | an objection.  But again, I'm going to answer the same |
| 04:27:01 | 15 | as I did before.  I think that sentence speaks for |
| 04:27:03 | 16 | itself. |
| 04:27:04 | 17 | Q.  I'm not -- |
| 04:27:11 | 18 | MR. HULINGS:  Before you go on. |
| 04:27:13 | 19 | Q.  (BY MR. NASSE)  Let me -- |
| 04:27:14 | 20 | MR. HULINGS:  Maybe we can take a break and |
| 04:27:17 | 21 | we can consult for a second and then we can come back. |
| 04:27:20 | 22 | MR. NASSE:  Sure.  Go off the record. |
| 04:27:23 | 23 | VIDEOGRAPHER:  We're off the record at |
| 04:27:25 | 24 | 4:29 p.m. |
| 04:27:26 | 25 | (Brief recess.) |

220

CONFIDENTIAL

| | | |
|---|---|---|
| 04:32:58 | 1 | VIDEOGRAPHER:  We are back on the record at |
| 04:33:09 | 2 | 4:33 p.m. |
| 04:33:10 | 3 | Q.  (BY MR. NASSE)  Mr. Mueller, what processes or |
| 04:33:11 | 4 | procedures did you put in place to ensure you weren't |
| 04:33:17 | 5 | able to, quote, raid the piggy bank? |
| 04:33:20 | 6 | MR. HULINGS:  Vague as "processes" and |
| 04:33:23 | 7 | "procedures." |
| 04:33:23 | 8 | But you can answer. |
| 04:33:24 | 9 | THE WITNESS:  Again, raid the piggy bank |
| 04:33:27 | 10 | means to take out the cash value and to use it, possibly |
| 04:33:35 | 11 | threatening the either lapse or something else of the |
| 04:33:39 | 12 | policy -- damage to the policy, and to minimize the |
| 04:33:44 | 13 | illustration of the under -- and underwriting of the |
| 04:33:48 | 14 | policy, something that we never did. |
| 04:33:55 | 15 | Q.  (BY MR. NASSE)  Right.  The question:  Were |
| 04:33:56 | 16 | there any processes or procedures you had in place to |
| 04:34:00 | 17 | prevent that? |
| 04:34:01 | 18 | MR. HULINGS:  Same objection. |
| 04:34:02 | 19 | But you can answer. |
| 04:34:02 | 20 | THE WITNESS:  I controlled Policy Services |
| 04:34:05 | 21 | and I was the fund manager for the575.  I knew |
| 04:34:11 | 22 | whether through my own knowledge about the dangers of |
| 04:34:12 | 23 | doing that and through advice of counsel and working |
| 04:34:15 | 24 | through this S-1 process that we're not going to do it. |
| 04:34:19 | 25 | We disclose to investors we're not going to do it. |

221

CONFIDENTIAL

04:34:22   1      Q.   (BY MR. NASSE)   So it was your discretion?

04:34:24   2      A.   I don't know about my discretion.   It's

04:34:27   3   something that I never did and I never would do.   And

04:34:29   4   that's why we talked about that a lot of companies who

04:34:36   5   were the owners and held policies for the benefit of

04:34:39   6   others had done this historically.

04:34:42   7            I believe we talked about life partners in

04:34:45   8   the last -- there's many others in the last -- of the

04:34:48   9   transcript.   But there's many others.   Our point here

04:34:51  10   was to talk about the illiquidity and that all policies

04:34:56  11   were held by Policy Services.   As you can see there

04:35:00  12   under the sole affiliated policy administration

04:35:02  13   provider, as we've talked about earlier today, that we

04:35:06  14   are unable to raid the piggy bank mainly because legal

04:35:10  15   advice not to do so, financial advice not to do so, and

04:35:13  16   I was never going to do it.

04:35:15  17      Q.   So it was based on legal advice; you weren't

04:35:23  18   going to do it.   You said a third thing.

04:35:26  19      A.   Financial advice.

04:35:27  20      Q.   Financial advice.   When you say here -- it says

04:35:33  21   in this document, in this sentence, (Reading:)   By using

04:35:39  22   our ultimate parent Policy Services Inc. or so

04:35:43  23   affiliated policy administration between us and the

04:35:46  24   insurance cancel, we are unable to raid the piggy bank.

04:35:53  25            What -- what was preventing you from

222

CONFIDENTIAL

```
04:35:56   1   raiding the piggy bank as described in that sentence?
04:36:03   2              MR. HULINGS:  So objection to the extent
04:36:04   3   that you're asking for legal interpretation of the
04:36:06   4   document.
04:36:07   5              You can answer to the extent you can.
04:36:11   6              THE WITNESS:  I don't think we were trying
04:36:12   7   to convey what you're trying to convey here in your
04:36:15   8   context.  However, at the end of the day I was.  I was
04:36:18   9   the barrier and I did exactly as we told investors that
04:36:22  10   we would do in that I did not ever raid the piggy bank.
04:36:27  11       Q.  (BY MR. NASSE)  Did you ever have discussions
04:36:32  12   with Carlile Patchen whether the fact that you were the
04:36:34  13   barrier and there were no other procedures was
04:36:38  14   sufficiently disclosed in this PPM?
04:36:40  15       A.  That would have gone back to wide-ranging
04:36:43  16   discussions during the drafting and advice and counsel
04:36:48  17   around that for the DRS and S-1.
04:36:51  18       Q.  But no discussion that you can recall as to the
04:36:57  19   PPM here as reflected in Exhibit 5?
04:37:03  20              MR. HULINGS:  So object as to vagueness
04:37:05  21   with discussion of particular date.  I mean, date range,
04:37:09  22   what -- vague as to --
04:37:12  23       Q.  (BY MR. NASSE)  Sure.  I'll rephrase the
04:37:13  24   question.
04:37:15  25              You said -- and correct me if I'm wrong, I
```

CONFIDENTIAL

04:37:18  1   believe your testimony is that you received that in the

04:37:21  2   context of the DRS for the Queue fund.

04:37:25  3             My question is:  Did you receive any advice

04:37:27  4   as to the fact that you, as you said, were the barrier

04:37:31  5   was sufficiently disclosed in the PPM that as marked as

04:37:38  6   Exhibit 5?

04:37:39  7       A.  I don't know if I understand the question.

04:37:46  8   What I've answered before is that Dennis and Andy had

04:37:50  9   intimate knowledge of everything we did.  Had been

04:37:52 10   working with us for years.  I don't recall specifically,

04:37:55 11   but sometimes when you just know something and trust

04:37:58 12   somebody and you're providing counsel and advice to

04:38:02 13   them, sometimes it doesn't even need to be said.  But I

04:38:08 14   can't recall.

04:38:09 15       Q.  Tab 37.  I'll mark as Exhibit 40 a document,

04:39:03 16   Assets Backing Up Investments, dated April 1, 2019.

04:39:07 17             (Exhibit 40 was marked.)

04:39:26 18       Q.  (BY MR. NASSE)  Mr. Mueller, do you recognize

04:39:28 19   the document that's been marked as Exhibit 40?

04:39:32 20       A.  I recall that -- as it states on the top, that

04:39:40 21   we had created this for maybe at the request of an agent

04:39:45 22   or finder.

04:39:46 23       Q.  Okay.  And when you say, "we," do you mean you

04:39:50 24   or who else -- what do you mean by "we"?

04:39:52 25       A.  My recollection, especially with the date, is

224

CONFIDENTIAL

| | | |
|---|---|---|
| 05:03:17 | 1 | forced our hand and so we had little option. |
| 05:03:20 | 2 | Q. And at the time in the April 2019 time frame, |
| 05:03:26 | 3 | did you discuss with Carlile Patchen whether the |
| 05:03:29 | 4 | surrender of the Basha policy had to be disclosed to |
| 05:03:31 | 5 | investors? |
| 05:03:32 | 6 | A. I don't remember discussing with them about |
| 05:03:35 | 7 | that specific issue. |
| 05:03:36 | 8 | Q. Okay. Excluding any consultations with counsel |
| 05:03:40 | 9 | after December 20, 2019, did you ever have conversations |
| 05:03:50 | 10 | with Carlile Patchen regarding whether you had to |
| 05:03:52 | 11 | disclose the surrender of the Basha policy to investors? |
| 05:03:56 | 12 | A. Could you repeat the question? |
| 05:03:58 | 13 | Q. Sure. |
| 05:03:58 | 14 | A. I'm sorry. |
| 05:03:59 | 15 | Q. Excluding any communications that occurred |
| 05:04:04 | 16 | after December 20, 2019, did you have any conversations |
| 05:04:08 | 17 | with Carlile Patchen seeking their advice as to whether |
| 05:04:10 | 18 | you had to disclose the surrender of the Basha policy to |
| 05:04:15 | 19 | investors? |
| 05:04:15 | 20 | A. So I'm understanding you meaning the dates, |
| 05:04:17 | 21 | that was there any discussion before that date? |
| 05:04:19 | 22 | Q. Correct. |
| 05:04:20 | 23 | A. I do not remember or recall. |
| 05:04:21 | 24 | Q. Okay. Did you or the deeproot companies |
| 05:04:24 | 25 | disclose to investors the surrender of the Basha policy? |

238

CONFIDENTIAL

```
05:24:56   1              THE WITNESS:  That's sort of a compound so
05:24:58   2    I'll address the first one is, did we surrender policy
05:25:02   3    under the agreement that we were provided by Tom and his
05:25:04   4    counsel?  Yes, we did that.  I think we talked about
05:25:08   5    that before.  It was about a week later.
05:25:10   6              Did we tell investors at the time there was
05:25:13   7    no default?  We didn't expect there to be a fault, we
05:25:16   8    had no notice or otherwise that we weren't going to get
05:25:20   9    our full money back so, no, we did not since there was
05:25:23  10    no default and again, my reading of the PPM there was no
05:25:27  11    duty to disclose.
05:25:29  12         Q.  (BY MR. NASSE)  And again, that was your
05:25:31  13    understanding of your duty to disclose?
05:25:34  14         A.  I was reading the PPM just like you can.
05:25:37  15         Q.  Okay.  And not from what you've been told --
05:25:40  16    what you understood your duty was based on advice of
05:25:43  17    counsel?
05:25:44  18         A.  Again, I don't --
05:25:46  19              MR. HULINGS:  Go ahead.
05:25:47  20         Q.  (BY MR. NASSE)  I'm not asking you for any
05:25:49  21    communications you had with Mr. McKinnie.
05:25:52  22         A.  As to CPM, as I already answered, I don't
05:25:56  23    recall ever going to them and asking them about that
05:25:59  24    specific topic.
05:26:06  25              MR. NASSE:  We can take a break.  We can go
```

255

CONFIDENTIAL

| | | |
|---|---|---|
| 06:46:23 | 1 | trying to keep track of time. |
| 06:46:25 | 2 | Q.  (BY MR. NASSE)  I'll hand you what's been |
| 06:46:35 | 3 | previously marked as Exhibit 25, the investment |
| 06:46:49 | 4 | portfolio narrative. |
| 06:47:05 | 5 | Mr. Mueller, do you recognize what's been |
| 06:47:07 | 6 | marked as 25? |
| 06:47:08 | 7 | A.  I believe it's the same thing that we were |
| 06:47:10 | 8 | talking about before.  It was when you asked the |
| 06:47:12 | 9 | question about its inception.  And based upon what's |
| 06:47:15 | 10 | written here as well as the questions that Nate and |
| 06:47:19 | 11 | Scott got received and passed on to me that I drafted |
| 06:47:23 | 12 | this. |
| 06:47:23 | 13 | Q.  Okay.  Did you consult with counsel in drafting |
| 06:47:38 | 14 | this? |
| 06:47:39 | 15 | A.  I don't recollect -- sorry. |
| 06:47:39 | 16 | MR. HULINGS:  It's outside the scope of the |
| 06:47:41 | 17 | waiver.  But you can -- I think you can disclose whether |
| 06:47:43 | 18 | or not you discussed the subject with counsel and |
| 06:47:46 | 19 | whether or not you remember that without revealing the |
| 06:47:49 | 20 | content of any communications that you may have had with |
| 06:47:52 | 21 | any attorneys. |
| 06:47:54 | 22 | THE WITNESS:  I'm sure most of the things |
| 06:47:57 | 23 | in here I had discussed with Andy and Dennis many times |
| 06:48:00 | 24 | before and they already knew.  But I cannot recall if I |
| 06:48:04 | 25 | specifically discussed this with Dennis and Andy. |

286

CONFIDENTIAL

| | | |
|---|---|---|
| 07:33:43 | 1 | "written approval." |
| 07:33:45 | 2 | Q.  (BY MR. NASSE)  Written approval -- |
| 07:33:46 | 3 | MR. HULINGS:  Written approval from whom? |
| 07:33:49 | 4 | Q.  (BY MR. NASSE)  -- as described in |
| 07:33:51 | 5 | paragraph 23. |
| 07:33:51 | 6 | A.  I don't see anything -- I'm sorry. |
| 07:33:53 | 7 | MR. HULINGS:  Calls for a legal conclusion. |
| 07:33:55 | 8 | THE WITNESS:  I don't see anything in |
| 07:33:57 | 9 | paragraph 23 that talks about -- that says written |
| 07:33:58 | 10 | approval. |
| 07:33:59 | 11 | Q.  (BY MR. NASSE)  Are you aware of any -- go |
| 07:34:00 | 12 | ahead. |
| 07:34:00 | 13 | A.  Would you like to point?  I don't understand |
| 07:34:03 | 14 | where you're looking for where it says written approval. |
| 07:34:05 | 15 | Q.  Well, I mean, is there any documentation of an |
| 07:34:06 | 16 | approval of compensation you received? |
| 07:34:11 | 17 | A.  Maybe I'm confused.  I was never paid by |
| 07:34:14 | 18 | the 575. |
| 07:34:16 | 19 | Q.  Yeah.  And you -- you were the only manager of |
| 07:34:19 | 20 | 575; is that right? |
| 07:34:20 | 21 | A.  Yes. |
| 07:34:21 | 22 | Q.  Okay.  And throughout its existence? |
| 07:34:24 | 23 | A.  Yes.  And I will qualify that up to the |
| 07:34:38 | 24 | bankruptcy, of course, when... |
| 07:34:39 | 25 | Q.  Understood. |

311

CONFIDENTIAL

```
07:34:42   1              MR. HULINGS:  So probably at the time.  Is
07:34:45   2   there something short to wrap up or do we need to go off
07:34:50   3   the record for where exactly we are on the clock?
07:34:52   4              MR. NASSE:  We have more questions to ask.
07:34:54   5   We'd like more time.  We can put that on the record.
07:34:57   6   You've indicated that you are not going to agree to
07:35:00   7   that.
07:35:00   8              MR. HULINGS:  The SEC had a certain amount
07:35:02   9   of time.  How it chose to use its time is up to the SEC.
07:35:07  10   And I think we've -- you know, it has the time that is
07:35:10  11   allowed and that's it.  We're not agreeing to more.
07:35:12  12              MR. NASSE:  We, of course, reserve our
07:35:14  13   rights to seek more time under the Rules.  We can go off
07:35:17  14   the record.
07:35:17  15              VIDEOGRAPHER:  We are off the record at
07:35:19  16   7:35 p.m.
07:35:20  17              (Proceedings concluded at 7:35 p.m.)
          18
          19
          20
          21
          22
          23
          24
          25
```

312