EXHIBIT 8

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                  SAN ANTONIO DIVISION


SECURITIES AND EXCHANGE      *
COMMISSION,                  *
     Plaintiff,              *
                             *
     Against                 * Civil Action No:
                             * 5:1-cv-785-XR
ROBERT J. MUELLER,           *
DEEPROOT FUNDS LLC (A/K/A     *
DPRT FUNDS, LLC), AND        *
POLICY SERVICES, INC.,       *
     Defendants,             *
                             *
     And                     *
                             *
DEEPROOT TECH LLC, DEEPROOT  *
PINBALL LLC, DEEPROOT        *
STUDIOS LLC, DEEPROOT        *
SPORTS & ENTERTAINMENT LLC,  *
DEEPROOT RE 12621 SILICON    *
DR LLC, AND ROBERT J.        *
MUELLER, JEFFREY L.          *
MUELLER, AND BELINDA G.      *
BREEN, AS CO-TRUSTEES OF     *
THE MB HALE OHANA            *
REVOCABLE TRUST,             *
     Relief Defendants.      *
```

```
            ***********************************
            REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
                         SCOTT ALLEN
                      FEBRUARY 16, 2023
            ***********************************
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

1          I'm showing you what has been marked as

2    Exhibit -- what I'm marking as Exhibit 18, but was

3    previously marked through your interview as Exhibit 7.

4               (Exhibit Number 18 marked.)

5         Q.  Do you see this document?

6         A.  Yes.

7         Q.  What is this document?

8         A.  That would be the -- the memo I attached with

9    my resignation outlining a -- a more detailed list of my

10   concerns and suggestions moving forward that I felt

11   would help the -- would help deeproot, and hopefully

12   things would be better moving forward.

13        Q.  All right.

14             I'm gonna highlight the first sentence

15   there of the second paragraph.  Do you see that?

16        A.  Uh-huh.

17        Q.  Is that a yes?

18        A.  Yes, I see it.

19        Q.  And the reference is Missed investor payments,

20   correct?

21        A.  Yes.

22        Q.  It says, While I have no knowledge or reason to

23   believe that you were doing -- anything you were doing

24   is fraudulent or illegal.

25             Did I read that correctly?

```
 1        A.  Yes.
 2        Q.  And did you believe that at the time?
 3        A.  At the time that I wrote this?
 4        Q.  Yes.
 5        A.  Yes.  Well, I -- I had doubts that his
 6   explanations for the way he was doing things were
 7   legitimate, which is why I chose to leave, but I didn't
 8   have any knowledge or any -- any concrete basis.  That
 9   was -- that was my opinion or -- or my personal feeling
10   that I had come to.
11        Q.  All right.
12                MR. HULINGS:  Move to strike everything
13   after "yes."
14        Q.  So you referenced that there are missed 575
15   periodic payments.  I've got that highlighted.  Do you
16   see that?
17        A.  Yes.
18        Q.  And how many payments did -- how many months of
19   payments were missed at the time you wrote this, to the
20   extent that you remember?
21        A.  From what I can remember, I think it was one
22   month behind.
23        Q.  And what's that total amount that you know of,
24   if you know?
25        A.  Oh, I -- I -- I don't know.  It would have been
```

```
 1    thousands of dollars.
 2        Q.  Okay.  All right.
 3                I'm gonna highlight the next couple
 4    sentences down.
 5                While it may not be your design or
 6    intention, in the functional operation it looks and
 7    feels like a Ponzi scheme, and I cannot and will not be
 8    part of it.
 9                Do you see that?
10        A.  Yes.
11        Q.  All right.
12                Did -- at any point previous to providing
13    this memorandum, did you express the concern to
14    Mr. Mueller that the 575 Fund was, in functional
15    operation, looking and feeling like a Ponzi scheme?
16        A.  Not in any direct, explicit way.
17        Q.  Okay.
18                And the next sentence says, I'm not making
19    accusations toward you or anyone else and do not know of
20    anything that would confirm that scenario.
21                Do you see that?
22        A.  Yes.
23        Q.  Is that -- was that statement accurate at the
24    time you wrote it?
25        A.  Yes.
```

1      Q.  Okay.

2              So what is your definition of a Ponzi

3      scheme?

4              MS. WARDEN:  Objection, form.

5              MR. HULINGS:  All right.  We're gonna --

6      we're gonna --

7      A.  My personal --

8              MR. HULINGS:  Hold on.  Hold on.  Hold on.

9              Beyond form, what's the basis for your

10     objection so I can clear up the question, if necessary?

11             MS. WARDEN:  Vague.

12             MR. HULINGS:  All right.

13     Q.  What is your understanding of what the term

14     "Ponzi scheme" means?

15     A.  A scheme that is reliant upon new investor

16     money to honor promises made to previous investors.

17     Q.  Okay.  So let's unpack that.  Is that the

18     understanding you had at the time?

19     A.  At the time, yes.

20     Q.  All right.

21             Does -- does it make a difference to your

22     definition of whether a company's a Ponzi scheme as to

23     whether or not the company had assets?

24             MS. WARDEN:  Objection, foundation.

25     Q.  You can ignore that objection.  Go ahead.

1          A.   Well, I think -- I think that's why, you know,

2     I mentioned there the way that Robert had communicated

3     hi- -- the -- the way that the company was operating.  I

4     -- like, while I never may have gone to him and said,

5     Robert, this looks like a Ponzi scheme, is this a Ponzi

6     scheme.  While we may never have had that conversation,

7     it doesn't mean there wasn't a thought somewhere along

8     the way, saying, man, this -- this feels a little funny,

9     why -- why are we doing things this way.

10               Some of those questions were addressed in

11     meetings with potential broker-dealers when we were --

12     when he was discussing the compliance or the -- the --

13     the structure of the fund, whether that's reviewing the

14     PPM or -- or -- or discussing the operations.  I had

15     heard him give several explanations to people outside of

16     deeproot, whether those be finders or prospective

17     finders or other -- other institutions we were looking

18     to work with, that more or less addressed that and had

19     an explanation from him that appeared to be aboveboard.

20               And, you know, so his role as the -- as the

21     head of the company and active chief compliance officer,

22     I relied on things that he said in terms of balancing my

23     -- you know, my personal feelings or -- or internal

24     questions.  And so he would explain this as the fund is

25     a business like any other business that's reliant on

1    cash flows to operate, and based on how you -- how you

2    do the accounting or whichever accounting method that

3    you use, everything we're doing is aboveboard; it's just

4    a -- a very -- there's a -- there's a, you could say

5    unique way that we have to operate as a business to be

6    able to do what we do.  And so that -- that -- that

7    sufficed for a time for me to -- to continue working

8    there, until it -- until I -- I just no longer believed

9    that to be reliable.

10          Q.  All right.

11                MR. HULINGS:  So I'm going to move to

12   strike as nonresponsive.

13          Q.  Let's -- let's kind of break this down a little

14   bit more.  You made -- you know, you put in your -- your

15   letter that in functional operation it looks and -- it,

16   meaning the 575 Fund, looks and feels like a Ponzi

17   scheme, correct?

18          A.  Yes.

19          Q.  All right.

20                So give me the complete factual basis for

21   that statement at the time.

22          A.  He was not able to make the 575 periodic

23   payments.  There had not been enough investment capital

24   come in to account for those missed payments.

25          Q.  Okay.

1              **So --**

2       A.  Or -- or there was not enough incoming

3   investment capital that would have met the level that

4   needed to go out to those payments.

5       **Q.  All right.**

6              **And is that the complete factual basis for**

7   **your statement at the time?**

8       A.  That -- that was from -- that was from my

9   understanding.  I didn't know what other sources of

10  income were coming in from other -- from the other

11  affiliates, and so it -- it looked to me as if the only

12  way payments were being made were based on funding of

13  new investment dollars.

14      **Q.  Okay.  So have you ever heard the phrase "money**

15  **is fungible"?**

16      A.  Maybe not that specific phrase, but that sounds

17  like something I've heard.

18      **Q.  All right.**

19              **Do you agree with that statement?**

20      A.  Sure.

21      **Q.  Okay.**

22              **So if the source of payments to investors**

23  **has -- or if -- let me rephrase.**

24              **If the source of payments to investors is**

25  **funded by more than new investments, does that make the**

1    entity not a Ponzi scheme?

2              MS. WARDEN:  Objection, vague.

3        A.   I'm not sure I'm -- I'm the expert on Ponzi

4    schemes to be able to answer that from a legal basis.

5        Q.   Well, you made the accusation that the -- the

6    company was a Ponzi scheme, and you just gave a

7    explanation of what a Ponzi scheme is, so I'm asking

8    you, based on your understanding of the phrase "Ponzi

9    scheme," if the source of the funds of payments to old

10   investors is funded by more than just new investments,

11   does that still meet the definition of a Ponzi scheme,

12   based on your understanding?

13       A.   I -- I -- I would say -- I would say that would

14   not meet the definition of a -- of a Ponzi scheme.

15       Q.   Right.  Okay.

16            So -- and you just said that you didn't

17   know what other sources of funds were coming into the

18   deeproot entities at the time other than investor funds,

19   correct?  Let me rephrase that.  That was -- that was

20   messy.

21            You were aware of how much investor funds

22   were coming in at the time, correct?

23       A.   Correct.

24       Q.   And would you be aware of a policy that

25   matured?

1    A.  Yes.

2    Q.  Would you -- would you be aware of any revenues

3  or cash flow from any of the deeproot affiliates?

4    A.  Not necessarily.

5    Q.  And would you be aware if, say, Mr. Mueller

6  took out a loan?

7    A.  Not unless he told me.

8    Q.  Did you have access to the bank accounts?

9    A.  I did not.

10   Q.  So you mentioned that whether or not there is a

11  separate set of funding other -- other than new investor

12  funds is important to determining whether or not

13  something is a Ponzi scheme, right?

14   A.  I would say so.

15   Q.  And you actually didn't know at the time

16  whether or not there was another source of funds for the

17  575 Fund?

18   A.  Correct.

19   Q.  Okay.

20       So if -- if a business has more expenses

21  than it has revenues, does that make it a Ponzi scheme?

22       MS. WARDEN:  Objection, form.

23   A.  No.

24   Q.  So that just means the business is losing

25  money, right?

```
1          A.   Yes.
2          Q.   And lots of businesses have expenses that
3     exceed revenues, correct?
4          A.   Yes.
5          Q.   Tesla, for a long time, is a company that had
6     expenses that exceeded revenues, correct?
7          A.   Sure, to my understanding, yes.
8          Q.   Is it your understanding that is a -- as
9     someone who invests in companies for a living, that it's
10    common for start-up companies to have expenses that
11    exceed revenues?
12         A.   Yes.
13         Q.   All right.
14              And just because expenses exceed revenues
15    doesn't make that company a Ponzi scheme?
16         A.   Correct.
17         Q.   So we talked earlier about the deeproot
18    expenses.  Do you remember that?
19         A.   Yes.
20         Q.   And -- and I believe that you may remember that
21    the investors were told that 20 percent of the money
22    they invest could be used for deeproot expenses.  Is --
23    is that about right?
24         A.   That's about right.
25         Q.   And -- and we talked about expenses being
```

1    obligations -- a -- an obligation of the deeproot

2    entities to make a payment, correct?

3         A.   Correct.

4         Q.   And obligations driven -- or, you know, an

5    obligation under a contract to make a payment, correct?

6         A.   In some cases, yes.

7         Q.   So if -- if the deeproot entities have a

8    contract that requires them to make a monthly payment

9    to, say, a landlord, that would be an expense, correct?

10        A.   Yes.

11        Q.   And if the deeproot entities had a contractual

12   obligation to make a monthly payment under a

13   subscription agreement, that could also be an expense?

14        A.   Sure.

15        Q.   So the fact that one of those expenses goes to

16   a former investor, is that what makes this a Ponzi

17   scheme, under your definition?

18        A.   If the only source of -- if the only source of

19   money to pay -- to pay previous investor commitments is

20   new investors, it would.

21        Q.   Well, let me ask you this.  Do you recall the

22   PPMs making reference to reserve funds?

23        A.   Yes.

24        Q.   Do you recall recommending to Mr. Mueller that

25   deeproot increase the amount of its reserve funds?

1    A.  Yes.

2    Q.  What was supposed to be the source of funding

3  for those reserve funds under your recommendation to

4  Mr. Mueller?

5    A.  I -- that was his responsibility to figure that

6  out, but I would -- I would imagine initially it would

7  be from the investment coming in, apart from those being

8  allocated as a -- an -- the assets to -- part of that

9  could be a reserve asset.

10    Q.  All right.

11        So if the reserve fund is funded by

12  investor contributions and then makes payments to -- let

13  me -- let me back up.

14        So the -- what was the reserve fund

15  supposed to be used for?

16    A.  Expenses.

17    Q.  Okay.

18        Could the reserve fund, under your

19  recommendation, be used to pay the required monthly

20  expenses to 575 investors?

21    A.  I guess -- I guess so if -- if that -- if -- if

22  Robert felt, as the one ultimately responsible for that,

23  that that was within compliance.  That's his decision to

24  make.

25    Q.  But you're making a recommendation to him that

1    **-- that the company increase its reserve funds, correct?**

2         A.   Yes.

3         **Q.   And on your recommendation, was -- was -- were**

4    **you recommending that they increase the reserve funds to**

5    **make sure that payments to investors would be made?**

6                   MS. WARDEN:   Objection.

7         A.   It -- it would be made -- it would be to make

8    sure that expenses did not get missed again, as he had

9    missed many expenses.

10        **Q.   All right.**

11                   **Including the required payments to**

12   **investors in the 575 Fund?**

13        A.   I'm not sure when we made that recommendation

14   there had been missed payments to 575 investors.

15        **Q.   Okay.**

16                   **But at the time you made the**

17   **recommendation, it was conceivable that the reserve**

18   **funds would be used to make monthly payments to 575**

19   **investors?**

20        A.   It -- that would not have been the -- the

21   intention for our recommendation for the reserve fund.

22        **Q.   Would it have been a possibility under the**

23   **reserve fund?**

24                   MS. WARDEN:   Objection, speculative.

25        **Q.   Under your recommendation?**

1          A.   Yeah, I mean, that --

2          Q.   A possibility?

3          A.   -- that is speculative.  At -- at the end of

4     the day, we were -- we were relying on Robert, as the

5     chief compliance officer of the funds, to make sure he

6     followed things within what he said he was doing, the

7     appropriate -- the appropriate bounds by which the funds

8     were offered.

9                    MR. HULINGS:  Move to strike as

10    nonresponsive.

11         Q.   Let's -- in the -- in all of your

12    communications with investors, did you ever explain --

13    did anybody ever ask -- let me rephrase.

14                    In all of your communications with

15    investors, did anyone ask about the reserve funds?

16         A.   Not that I can recall.

17         Q.   All right.

18                    Did you ever tell anybody, any -- did you

19    ever tell any investors or finders what the source of

20    the funds or the reserve funds would be?

21         A.   Not that I can recall.

22         Q.   Did you ever tell investors that the re- -- the

23    reserve funds would never be funded by investor

24    contributions?

25         A.   Not -- not that I can remember.

1    Q.  All right.

2         In all -- in your communications with

3    investors, you explained that the life insurance

4    policies are not liquid, correct?

5    A.  Correct.

6    Q.  You also explained that you didn't know when

7    any of those life in pol- -- life insurance policies may

8    result in the payments to the deeproot companies,

9    correct?

10   A.  Correct.

11   Q.  So at the beginning of this fund, what other

12   possible source for payments under the 575 Fund could

13   there be other than --

14         MS. WARDEN:  Objection.

15   Q.  -- investor funds?

16         MS. WARDEN:  Sorry.

17   Q.  To your knowledge.

18   A.  Some of the other affiliates.

19   Q.  Okay.

20         Do you remember -- did you talk to Mr. --

21   or actually let me -- let me rephrase.

22         When did you first develop the concern that

23   the 575 Fund was run like a Ponzi scheme?

24   A.  It -- it would have been there during the

25   summer of 2020.

1      Q.  All right.

2      A.  It would have been where I -- where I no longer

3   accepted Robert's explanation for how it was aboveboard.

4           MR. HULINGS:  Move to strike everything

5   after "2020."

6      **Q.  So after you developed this opinion, you**

7   **continued to speak to investors about investing in the**

8   **575 Fund, correct?**

9      A.  Sure, yes.  I continued to work there, doing my

10  job.

11     **Q.  All right.**

12           **And part of your job was speaking to**

13  **prospective investors about an investment in the 575**

14  **Fund?**

15     A.  Correct.

16     **Q.  And did you tell any investor that you thought**

17  **the 575 Fund was run like a Ponzi scheme?**

18     A.  No, my job was to relay the information as

19  outlined in the PPM and within Robert's direction.

20     **Q.  All right.**

21           **And do you think any of your communications**

22  **with investors in the summer of 2020 through the fall of**

23  **2020 were false or misleading?**

24     A.  I did not intentionally provide any false or

25  misleading statements to investors.

1      Q.   So even though you thought or you suspected

2    that the company was run like a Ponzi scheme, you still

3    made the same presentation to investors and did not at

4    the time think that it was false or misleading.  Do I

5    have that right?

6      A.   That's fair.

7      Q.   And when you spoke to -- when you had that

8    conversation on October 6th and that e-mail referred to

9    before the break -- do you remember that?

10     A.   Yes.

11     Q.   Did you tell that investor that you thought the

12   deeproot entities were run like a Ponzi scheme?

13     A.   I did not.

14     Q.   In fact, you told him that he had been warned

15   that he could lose money on the -- on the investment,

16   right?

17     A.   Correct.

18     Q.   Did you ever talk to Nate Spradlin about your

19   concerns that the deeproot entities were run like a

20   Ponzi scheme?

21     A.   Not explicitly.

22     Q.   Okay.

23          Did you talk to Mr. Spradlin after you left

24   -- let me -- let me rephrase.

25          Did you talk to Mr. Spradlin about the memo

1   that you gave Mr. Mueller?

2       A.  I may have.  I don't remember for sure, but I

3   may have discussed it.

4       Q.  All right.

5           Do you remember discussing your suggestion

6   that the 575 Fund was a Ponzi scheme during those

7   conversations with Mr. Spradlin?

8       A.  I may have told him that I -- that I -- that I

9   raised that concern to Robert in the memo.

10      Q.  And what did Mr. Spradlin say?

11      A.  I don't remember.

12      Q.  All right.

13          Are you aware that Mr. Spradlin also was

14  interviewed by the SEC?

15      A.  I am.

16      Q.  All right.

17          Are you aware that he told them he did not

18  think the 575 Fund was run like a Ponzi scheme?

19      A.  I'm not aware.

20      Q.  All right.  Let me -- let me -- let me read you

21  part of what I will represent was Mr. Spradlin's

22  statement.

23          My understanding of a Ponzi scheme is where

24  there's no assets being purchased and solely money

25  coming in and going out.  But that's -- again, the

1       A.  I do.

2       **Q.  And what is it?**

3       A.  This is the memo that accompanied my

4  resignation letter.

5       **Q.  Okay.**

6            **And did I show you -- the exhibit that I**

7  **just showed you that's Exhibit 18, was that your**

8  **resignation letter?**

9       A.  The document previous to this one, yes.

10      **Q.  Okay.**

11           **And did -- did the two of those -- did**

12 **those documents go together?**

13      A.  Yes.

14      **Q.  Okay.**

15           **Tell me, just in your own words, why did**

16 **you decide to write the resignation letter, which is**

17 **Exhibit 18, and then the attached memo, which is**

18 **Exhibit 22?**

19      A.  I wanted a -- a -- an official resignation

20 letter with me leaving, and as I explained a little bit

21 earlier today, I knew what me leaving would do to the

22 potential fundraising efforts, and the reality of -- of

23 what my leaving would mean for the company, and I -- I

24 didn't want to leave him empty-handed.

25           I wanted to provide some suggestions and --

```
 1   and make sure that any of my concerns that had not been
 2   explicitly stated before, that Robert had a chance to --
 3   to at least hear them and see them and know that there
 4   were -- that they -- that they did exist, and then
 5   provide constructive feedback towards what I thought
 6   would help things run better moving forward.
 7        Q.  And you mentioned you wanted an official
 8   resignation letter.  Did you believe it was part of your
 9   job responsibilities to transmit an official resignation
10   letter to Mr. Mueller?
11        A.  Yeah, that's the professional thing to do.
12        Q.  And I think you -- you mentioned that you
13   transmitted it via Slack, right, to Mr. Mueller and Ms.
14   Lee?
15        A.  Yes, as well as physical copies under their
16   respective doors.
17        Q.  Okay.
18             And did you ever get a response from --
19   from Mr. Mueller?
20        A.  I received a response e-mailed from Stephanie
21   on behalf of the company, I think a week later.
22        Q.  Oh, okay.
23             So -- but my question was, did you ever get
24   a response from Mr. Mueller?
25        A.  I haven't looked at it since the day I received
```

```
1    it would be something that I -- I think he should

2    consider as how he is -- as how he was operating the

3    business.

4        Q.  In writing that, in function it looks and feels

5    like a Ponzi scheme, is it fair to say you're basing

6    that off your -- just your opinion of -- of what you

7    observed in your time at deeproot?

8        A.  Correct, I can --

9            MR. HULINGS:  Objection -- hold on, hold

10   on, hold on.  Objection as to vagueness for now.

11       Q.  Is the sentence if -- it looks and feels like a

12   Ponzi scheme, is that based on your observation or

13   someone else's?

14           MR. HULINGS:  Objection, compound.

15       A.  That was mine.

16       Q.  Okay.

17           And can you date-stamp for us when you

18   became concerned that in functional operation that

19   deeproot looked and felt like a Ponzi scheme?

20           MR. HULINGS:  Objection, vagueness as to

21   the phrase "date-stamp."

22           MS. WARDEN:  Sorry.

23       Q.  Can you tell me when you first became concerned

24   that deeproot looked and felt like a Ponzi scheme?

25       A.  It -- it was more of a building development
```

```
 1    throughout the last nine to 12 months I was there.
 2    Again, hearing him explain how things operated and
 3    having a justification of why it was acceptable, I -- I
 4    grew to doubt that and no longer want to accept it as --
 5    I -- I no longer believed him that he was -- that he
 6    actually knew what he was -- that -- that he was
 7    actually competent and -- and knowing what he was doing.
 8         Q.  Okay.
 9              And I believe you testified that you don't
10    recall directly discussing with Mr. Mueller your concern
11    that deeproot felt like a Ponzi scheme, correct?
12         A.  Correct.
13         Q.  Okay.
14              But did you share your concern -- concerns
15    with Mr. Mueller about deeproot's -- did you share your
16    concerns with Mr. Mueller about deeproot?
17         A.  Yeah, I --
18              MR. HULINGS:  Objection, vague.
19         A.  Yeah, I think -- I think I discussed that
20    already fairly extensively today with other documents
21    highlighting things Nate and I had discussed and things
22    that, you know, we had -- we had attempted to discuss
23    with Robert previously.
24         Q.  Okay.
25              And let's just unpack this.  So you
```