EXHIBIT 9

288

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:        )

4                             )   File No. HO-14036-A

5    DEEPROOT 575 FUND, LLC   )

6

7    WITNESS:  Robert Mueller

8    PAGES:    288 through 387

9    PLACE:    Securities and Exchange Commission

10             100 F Street NE

11             Washington, D.C.

12   DATE:     Thursday, June 24, 2021

13

14        The above-entitled matter came on for hearing,

15   via WebEx, pursuant to notice, at 9:03 a.m.

16

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25                (202)467-9200

1    SEC-Americus, A-M-E-R-I-C-U-S, dash E, dash 0000001

2    through 4.

3            (Mueller Exhibit 91 was marked for

4    identification.)

5        Q    Are you able to see Exhibit 91, sir?

6        A    Yes.

7        Q    And Exhibit 91 is a four-page document that

8    bears a heading on the top center of the first page

9    Americus Diamond 12362 I-H 10 West in San Antonio,

10   Texas.  And sir, I'll give you a moment to scroll

11   through the four pages of Exhibit 91.

12       A    Okay.

13       Q    Sir, do you recognize Exhibit 91?

14       A    It appears to be for a ring purchase.

15       Q    And why do you say that?

16       A    Because that's what it shows.

17       Q    On or about December 15th, 2018, you paid

18   James Van Winkle of Americus Diamond $6,247.11 for

19   jewellery again using the American Express card of

20   National Wealth Solutions.  Correct?

21           MR. PRITIKIN:  Objection.  That assumes

22   facts not in evidence.

23       A    I don't know who James Winkle [sic] is.

24   Americus Diamond.  I do remember I bought a diamond.  It

25   does look like it says American Express.

367

1       Q     And Mr. Van Winkle, an officer of Americus

2   Diamond, and the reason why I mention his name is

3   because the charge has variously shown as being to him

4   or to Americus Diamond.  So let me ask a fresh question.

5   On or about December 15th, 2018 you paid Americus

6   Diamond $6,247.11 for jewellery.  Correct?

7             MR. PRITIKIN:  Objection.

8       A     I appears so, yes.

9       Q     And again, you used the American Express

10  card of National Wealth Solutions.

11      A     I don't recall on that.  It says American

12  Express.

13      Q     Who was the jewellery for?

14      A     The best I can remember, around that time

15  period it was for my current wife, Kristi.

16      Q     And you married her approximately two

17  months after this purchase.  Correct?

18      A     I believe it was more than that, but it was

19  in early 2019 that we got married as talked about on the

20  record.

21      Q     And can you scroll to the description of

22  the jewellery you purchased?

23      A     Okay.

24      Q     And the description says it's a lady's

25  engagement ring.  Correct?

```
 1        A     Yes.  That is in the description.  Lady's

 2   engagement ring.

 3        Q     In fact, on January 12th, on or about

 4   January 12th of 2019 you charged another $2,802.59 to

 5   Americus Diamond.  Correct?

 6        A     I do not verify -- I'm sorry.  Do not

 7   remember that.

 8        Q     This over $9,000 in jewellery reflects

 9   personal expenses.  Correct?

10        A     I don't know.

11        Q     These expenses were paid using Deeproot

12   company money.  Correct?

13        A     I refuse to answer.  I invoke my right to

14   protection under -- against self-incrimination  under

15   the Fifth Amendment.

16        Q     Sir, we are not authorized to compel you to

17   give evidence or testimony as to which you assert your

18   privilege against self-incrimination pursuant to the

19   Fifth Amendment of the United States -- to the United

20   States Constitution and we have no intention of doing

21   so.  We also do not have the authority to compel your

22   testimony by granting you immunity from prosecution.

23   Any question that we ask hereafter will be with the

24   understanding that if you wish to assert your privilege

25   against self-incrimination you need merely state that
```

369

1    you refuse to answer on the grounds that your answer may

2    tend to incriminate you.  In other words, you are not

3    compelled to answer any further questions if you believe

4    that a truthful answer to the question might show that

5    you have committed a crime and you wish to assert your

6    privilege against self-incrimination under the Fifth

7    Amendment to the United States Constitution.

8    Accordingly, if you answer questions you will be doing

9    so voluntarily.  Do you understand all this?

10        A    Don't agree with all the language, but I do

11   understand it.

12        Q    You should be aware that if you refuse to

13   answer a question based on your Fifth Amendment

14   privilege, a judge or a jury may take an adverse

15   inference against you in a civil action that the SEC may

16   determine to bring against you.  That means that the

17   judge or jury would be permitted to infer that your

18   answer to the question might incriminate you.  Do you

19   understand?

20        A    I heard what you said.

21        Q    Mr. Mueller, this is not the only jewellery

22   that you've purchased from Americus Diamond.  Correct?

23             MR. PRITIKIN:  Objection.

24        A    I don't know.

25        Q    You bought jewellery from Americus Diamond

1   for your second wife. Leah.  Correct?

2        A    I don't remember.

3        Q    Sir, I am now showing what has been marked

4   as Exhibit 92.  And Exhibit 92 bears the Bates number

5   SEC-Americus-E0000005 through 8.  America -- Exhibit 92

6   is another four page document.  It also says Americus

7   Diamond on the top center of the front page.  It also

8   has the address 12362 IH 10 West in San Antonio, Texas.

9             (Mueller Exhibit 92 was marked for

10   identification.)

11        Q    Sir, do you recognize Exhibit 92?

12        A    I'm looking through it.

13        Q    Please take your time.

14        A    It appears to be again a purchase for

15   jewellery, Americus Diamond, around the time that --

16   that I was engaged to Leah as you mentioned.

17        Q    And at the bottom of page 2, it

18   specifically gives the name of Ms. Leah Nelson.

19   Correct?  Near the description of the jewellery.  I'm

20   sorry.  I spoke over you.  I apologize.

21        A    I do see that.

22        Q    You do see where it says Leah Nelson in

23   Exhibit 92?

24        A    Yes.

25        Q    And on or about the next day, December

371

1    15th, you charged another $2,976.88 on the National

2    Wealth Solutions card at Americus Diamond.  Correct?

3              MR. PRITIKIN:  Objection.

4        A    I don't know.  That's not shown on this

5    exhibit.

6        Q    This exhibit shows that on December 14th,

7    2015, you charged $5,351.88 using the American Express

8    card of NWS at Americus Diamond.  Correct?

9              MR. PRITIKIN:  Objection.

10       A    It appears to be that amount and it says

11   American Express on it.

12       Q    This jewellery was purchased using Deeproot

13   company money.  Correct?

14       A    I refuse to answer.  I invoke the right

15   against self-incrimination under the Fifth Amendment.

16       Q    Sir, I'm now showing you what's been marked

17   as Exhibit 93.

18              (Mueller Exhibit 93 was marked for

19   identification.)

20       Q    And sir, Exhibit 93 bears the Bates range

21   SEC-RFPA-AMEX-E-0002809 through 29 and it is another

22   American Express duplicate copy account statement of the

23   credit card of National Wealth Solutions ending in

24   4251001.  Sir, do you recognize Exhibit 93?

25       A    Appears to be a duplicate copy of an Amex

1    statement.

2         Q    Do you have any reason to question the

3    authenticity of this account statement?

4         A    It appears to be what it is.

5         Q    Sir, can I direct your attention to page 6

6    of 21?

7         A    Okay.

8         Q    I'd like to direct your attention to an

9    entry on or about February 15 of 2016 for $4,845.37.

10        A    Okay.

11        Q    Do you see that entry, sir?

12        A    Yes.

13        Q    So, sir, on or about February 15th, 2016,

14   you charged to the NWS Amex card $4,845.37 to Wolf

15   Weddings & Events.  Correct?

16             MR. PRITIKIN:  Objection.

17        A    I see that that's listed here on the

18   statement.

19        Q    Wolf Weddings & Events is a full-service

20   wedding company in San Antonio.  Correct?

21        A    I don't know.  I assume so.

22        Q    And also, on or about January 22nd, 2016,

23   you had earlier charged money for Wolf Weddings &

24   Events.  Correct?

25             MR. PRITIKIN:  Objection.

373

1      A    Are you asking me to looking or are you

2   just asking me the question?

3      Q    I'm just asking you the question, sir.

4      A    I don't know.

5      Q    All in all, you spent -- you charged

6   $7,795.37 in expenses at Wolf Weddings & Events.

7   Correct?

8           MR. PRITIKIN:  Objection.

9      A    I don't know.

10     Q    These expenses were for your wedding to

11  your second wife Leah in -- these expenses were for your

12  wedding to your second wife Leah.  Correct?

13          MR. PRITIKIN:  Objection.

14     A    Would appear to be around that time.

15     Q    And you married Ms. Leah Nelson in February

16  of 2016.  Correct?

17     A    To the best of my memory, yes.

18     Q    You paid these expenses for Wolf Weddings &

19  Events with Deeproot company money.  Correct?

20          MR. PRITIKIN:  Objection.

21     A    I refuse to answer.  I invoke my right to

22  -- against self-incrimination within the Fifth

23  Amendment.

24     Q    Sir, I'm now going to display what has been

25  marked as Exhibit 94.  Exhibit 94 bears the Bates range

374

1    SEC-RFPA-E-0003081 through 89.

2            (Mueller Exhibit 94 was marked for

3    identification.)

4        Q    Sir, can you see Exhibit 94 now?

5        A    I can.

6        Q    Exhibit 94 is another duplicate copy of an

7    American Express card statement for the National Wealth

8    Solutions credit card ending in 4 to 51001.  It has a

9    closing date of 04/07/17.  And, Mr. Mueller, do you

10   recognize Exhibit 94?

11       A    Not specifically.  It appears to again look

12   like all the others to be a duplicate copy of an Amex

13   statement for that time period.

14       Q    I'd like to direct your attention to page 5

15   of 9, sir.

16       A    Okay.

17       Q    And I'd like to direct your attention to

18   charges on or about March 30th of 2017 for British

19   Airways.  Do you see those charges?

20       A    I see them.

21       Q    Sir, on or about March 30th of 2017 you

22   charged $2,960.41 to British Airways.  Correct?

23            MR. PRITIKIN:  Objection.

24       A    I see that number on the statement.

25       Q    And on that -- on or about March 30th of

1    2017 you also charged $2,507.33 to British Airways.

2    Correct?

3          MR. PRITIKIN:  Objection.

4      A    I do see that amount listed.

5      Q    And this American Express card statement

6    shows that you purchased airline flights to London in

7    the name of you and your child.  Correct?

8          MR. PRITIKIN:  Objection.

9      A    I don't know.

10     Q    Sir, did you travel to London on British

11   Airways or a British Airways affiliated carrier with

12   your daughter?

13     A    And I've travelled before with my daughter

14   on British Airways.  I don't recall this specific trip.

15     Q    Sir, between September 2016 and March of

16   2017, in fact, you used the American Express card in the

17   name of National Wealth Solutions to pay over $13,000 to

18   British Airways.  Correct?

19         MR. PRITIKIN:  Objection.

20     A    I don't know.

21     Q    But these were personal travel expenses

22   which were paid for using Deeproot company money.

23   Correct?

24     A    I refuse to answer.  I invoke my right

25   against self-incrimination under the Fifth Amendment.

376

1       Q      Now, sir, by Deeproot company money, I'm

2    referring to money from a bank account held in the name

3    of any business of the Deeproot family of businesses.

4    Do you understand that?

5       A      I understand you saying that.

6       Q      And in particular, I'm referring to money

7    that originated from investor contributions to the DGRD

8    fund or the 575 Fund.  Do you understand that?

9       A      I understand that that's what you're doing.

10      Q      My explaining that, does that cause you to

11   change any of the answers you've given so far?

12      A      I think that my answers stand as is.

13      Q      Thank you, sir.  Let's go to Exhibit 95.

14             (Mueller Exhibit 95 was marked for

15   identification.)

16      Q      Sir, I'm showing now Exhibit 95 which bears

17   the Bates range SEC-RFPA-AMEX-E-0003067 through 79.  And

18   this is another duplicate copy of an American Express

19   credit card statement for the National Wealth Solutions

20   credit card account ending in 4251001.

21             Sir, do you recognize Exhibit 95?

22      A      Not especially, but it appears to be a

23   duplicate copy of an Amex statement from that time

24   period.

25      Q      Sir, may I please direct your attention to

377

1    page 6 of 13?

2        A    Okay.

3        Q    I'd like to direct your attention to

4    charges on or about February 11th of 2017 to Disney

5    Cruise Lines.

6             Do you see those charges?

7        A    Yes.

8        Q    Sir, on or about February 11th, 2017 you

9    used the Amex card of National Wealth Solutions to

10   charge $6,637.61 and separately $8,953.08 to Disney

11   Cruise Lines.

12            Is that correct?

13            MR. PRITIKIN:  Objection.

14       A    I see both of those amounts there on the

15   charge lines.

16       Q    Sir, in fact, between April of 2016 and

17   February of 201 you used the Amex card of National

18   Wealth Solutions, NWS, to charge over $26,000 for Disney

19   Cruise Lines.  Correct?

20       A    I don't know.

21       Q    In fact, you also used the American Express

22   card in the name of Policy Services Inc.  between June

23   2017 and March 2019 to pay over $28,000 to Disney Cruise

24   Lines.  Correct?

25            MR. PRITIKIN:  Objection.

378

1          A     I don't know.

2          Q     These expenditures to Disney Cruise Lines

3     were personal travel for you and your family.  Correct?

4          A     I don't know.

5          Q     This personal travel was paid for with

6     Deeproot company money.  Correct?

7                MR. PRITIKIN:  Objection.

8          A     I refuse to answer.  I invoke my right

9     against self-incrimination under the Fifth Amendment.

10          Q     Sir, between March of 2016 and March of

11     2019 you also used the Amex card of National Wealth

12     Solutions to pay over $15,000 to Princess Cruise Lines.

13     Correct?

14                MR. PRITIKIN:  Objection.

15          A     I don't know.

16          Q     This was personal travel.  Correct?

17          A     I don't know.

18          Q     These charges to Princess Cruise Lines were

19     paid for with Deeproot company money.  Correct?

20                MR. PRITIKIN:  Objection.

21          A     I refuse to answer.  I invoke the right --

22     sorry.  I invoke my right against self-incrimination

23     under the Fifth Amendment.

24          Q     Sir, on or about February 5th, 2018, you

25     charged 7,000 -- over $7,500 to cruises and more using

379

1    the NWS Amex card.  Correct?

2            MR. PRITIKIN:  Objection.  Paul, do you

3    have a document you're referencing?

4        Q    So I have lots of documents.

5            MR. PRITIKIN:  Okay.  If you want to ask

6    the question on a document I ask that you put it up.

7        Q    Mr. Mueller, have you ever reimbursed any

8    Deeproot or Deeproot-affiliated entity for any of the

9    charges we've discussed on these American Express cards?

10       A    I don't know.

11       Q    Have you ever reimbursed any entity in the

12   Deeproot family of businesses for the money we've

13   discussed to the Utah Jazz or the payments concerning

14   the Hawaii condominium?

15       A    I don't know.

16           MR. BOHR:  Can we go off the record?

17           MR. PRITIKIN:  Sure.

18           MR. BOHR:  Let's go off the record at

19   12:07.

20           (Whereupon a discussion was held off the

21   record.)

22           MR. BOHR:  Let's go back on the record at

23   12:17.

24           BY MR. BOHR:

25       Q    Mr. Mueller, do you understand you're still

1    under oath?

2        A    I do.

3        Q    And can you confirm that the SEC and you

4    had no substantive discussions while we were off the

5    record?

6        A    Yes.

7        Q    Thank you, sir.  Sir, I'd like to ask you a

8    question and before I ask it, I want to make abundantly

9    clear that I'm not asking you for any privileged

10   communications or information.  But I'd like to ask you

11   have you ever retained a lawyer named Rebecca Carrillo

12   for personal -- a personal legal representation?

13       A    That name does not sound familiar.

14       Q    It's Rebecca --

15       A    I --

16       Q    I'm sorry.  What?

17       A    So I apologize.  I followed that up with I

18   don't recall.

19       Q    So I'll spell the last name for the benefit

20   of the court reporter and in case it refreshes your

21   recollection.  It's first name is Rebecca and the last

22   name is C-A-R-R-I-L-L-O. And she's a divorce lawyer.

23   Does that refresh your recollection, Mr. Mueller?

24       A    No.

25       Q    Sir, again, without asking for any

381

1    privileged communications or substance have you ever

2    retained a law firm with the name Wilson, Pennypacker &

3    Thomson for personal legal matters?

4          A    I believe they handled one of my divorces.

5          Q    Do you ever use them for a business-related

6    matter?

7          A    Business was in actually -- I'm sorry.  It

8    was two divorces and business matters were involved in

9    one of those.

10         Q    A similar question.  Again, without

11   requesting any privileged communications or substance

12   have you ever retained a law firm by the name of Banack

13   & Langley for any personal legal representation?

14         A    It was personal and business to my best

15   recollection.

16         Q    And for the benefit of the court reporter

17   that's B-A-N-A-C-K, ampersand, L-A-N-G-L-E-Y. Did you

18   use Deeproot company money to pay for personal legal

19   representation from Wilson, Pennypacker & Thomson?

20         A    I refuse to -- I refuse to respond or

21   answer.

22              I invoke my right against self-incrimination

23   under the Fifth Amendment.

24         Q    Sir, did you use Deeproot company money to

25   pay for personal legal representation in the law firm of

382

```
 1   Banack & Langley?

 2       A    I think it mischaracterizes my statement

 3   but at this point, I refuse to answer beyond that.  I

 4   invoke my right against self-incrimination under the

 5   Fifth Amendment.

 6       Q    Sir, if I ask you whether you used Deeproot

 7   company money for any other expenditure at any time on

 8   the credit card of National Wealth Solutions will you

 9   continue to assert your Fifth Amendment privilege?

10       A    Yes.

11       Q    Sir, if I ask you whether you used Deeproot

12   company money for any credit card purchase on a credit

13   card in the name of Policy Services Inc.  will you

14   continue to assert your Fifth Amendment privilege?

15       A    Would you repeat that, please?

16       Q    If I ask you whether you used Deeproot

17   company money for any purchase on a credit card in the

18   name of Policy Services will you continue to assert your

19   Fifth Amendment privilege?

20       A    I will on some.

21       Q    If I ask you whether you used Deeproot

22   company money for any purchases on a credit card of

23   Deeproot Tech will you continue to assert your Fifth

24   Amendment privilege?

25       A    I may on some.
```

383

1        Q    Sir, you used Deeproot company money to pay

2    for your daughter's educational expenses.  Correct?

3            MR. PRITIKIN:  Objection.

4        A    Refuse to answer.  I invoke my right

5    against self-incrimination under the Fifth Amendment.

6        Q    Sir, you used Deeproot company money to pay

7    for medical expenses.  Correct?

8            MR. PRITIKIN:  Objection.

9        A    I refuse to answer.  I invoke my right

10   against self-incrimination under the Fifth Amendment.

11       Q    Sir, you used Deeproot company money to pay

12   personal income tax bills.  Correct?

13           MR. PRITIKIN:  Objection.

14       A    I refuse to answer.  I invoke my right

15   against self-incrimination under the Fifth Amendment.

16       Q    Sir, you used Deeproot company money to pay

17   for the condominium in Hawaii.  Correct?

18           MR. PRITIKIN:  Objection.

19       A    I refuse to answer.  I invoke my right

20   against self-incrimination under the Fifth Amendment.

21       Q    Sir, you used Deeproot company money to pay

22   for the catering, photography, and wedding planning

23   expenses for your 2019 wedding.  Correct?

24           MR. PRITIKIN:  Objection.

25       A    I refuse to answer.  I invoke my right

1   against self-incrimination under the Fifth Amendment.

2       Q    Mr. Mueller, before we conclude your

3   testimony do you wish to clarify anything or add

4   anything to the statements you have made over the course

5   of your testimony whether yesterday or today?

6       A    Like for a chance to speak with my

7   attorneys before I answer that question.

8       Q    Sure.  We can go off the record.  How long

9   do you need?

10      A    A few minutes.  Five minutes.

11          MR. BOHR:  Five minutes.  Okay.  Let's go

12  off the record at 12:25.

13          (Whereupon a discussion was held off the

14  record.)

15          MR. BOHR:  We're back on the record at

16  12:30.

17          BY MR. BOHR:

18      Q    Mr. Mueller, do you understand you're still

19  under oath?

20      A    I do.

21      Q    And can you confirm that the SEC and you

22  had no substantive discussions while we were off the

23  record?

24      A    Yes.

25      Q    Thank you, sir.  Mr. Mueller, when we went