**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>    **Plaintiff,**<br><br>       **-against-**<br><br>**ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,**<br><br>    **Defendants,**<br><br>       **-and-**<br><br>**DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621 SILICON DR LLC,**<br><br>    **Relief Defendants.** | **Civil Action No.:  5:21-cv-785-XR** |

**DEFENDANT ROBERT J. MUELLER'S RESPONSE TO
PLAINTIFF'S MOTIONS *IN LIMINE* AND BRIEF IN SUPPORT**

TO THE HONORABLE COURT:

     Defendant Robert J. Mueller ("**Mueller**") files this Response to Plaintiff's Motions *in Limine* and Brief in Support (ECF No. 130), and in support would respectfully show:

## I.    INTRODUCTION

     1.    The SEC seeks exclusion of nearly all evidence that does not directly support its theory of the case before any witness testifies and before any foundation can be laid. Its requested evidentiary rulings require an improper pre-trial assessment of credibility, would deprive Mueller from presenting a defense, and amount to a re-urging of its summary judgment motion. The SEC's Motions *in Limine* should be denied.

## II.      RESPONSE TO MOTION *IN LIMINE* NO. 1:
### *To Exclude Evidence of the Viability of Deeproot Businesses*

2.      The SEC argues for the exclusion of evidence pertaining to the viability of the deeproot businesses on the grounds that the success or prospect of those businesses are "not on trial." ECF No. 130, p. 3. But SEC's Complaint and its entire enforcement action puts the viability of the deeproot business directly at issue. Among other things, the SEC alleges:

- that Mueller "told investors that the Funds' investments in the affiliated entities would provide more safety to the Funds' investment portfolios as well as <u>on-going revenue</u>" (ECF No. 1 ¶32) (emphasis added);

- that Mueller failed to investigate whether the deeproot businesses were "<u>*suitable investments*</u> for Client funds" (ECF No. 1 ¶58) (emphasis added);

- that Mueller lied to "convince investors that their <u>*assets would be safe*</u> in his care" (ECF No. 1 ¶40) (emphasis added); and

- that Mueller breached his fiduciary duty by failing to analyze whether the deeproot businesses "would ever be able to repay the principal investments, <u>*let alone generate a profit*</u>" (ECF No. 1 ¶62) (emphasis added).

3.      Each of these allegations, among others, directly implicates the success, viability, and even profitability of the deeproot companies. The SEC cannot proceed on these theories and at the same time prevent Mueller from rebutting them.

4.      Likewise, the SEC's portion of the joint pre-trial order identifies several witnesses who it plans to call to testify about "the deeproot business model and the Funds' ability to repay investors" as well as the "return" on the investors' investments:

A.      **Witnesses the SEC Expects to Call**[2]

1.      Scott Allen, 3009 Quail Hollow, McKinney, TX 75072.   The SEC anticipates that Allen will testify that he worked for deeproot in business development until October 2020, when he left over concerns regarding the deeproot business model and the Funds' ability to repay investors.   The SEC anticipates that Allen will also testify about the Funds' disclosures to investors, Mueller's management of the Funds and other deeproot businesses, and deeproot's internal controls.

3.      James Donnelly, 9297 E Caribbean Lane, Scottsdale, AZ 85260-2834.   The SEC anticipates that Mr. Donnelly, an investor in the 575 Fund, will testify about his investment in the 575 Fund, the information and factors he considered, and the return on his investment.

5.      Robert Kane, 3528 West Starr Pass Boulevard, Tucson, AZ 85745.   The SEC anticipates that Mr. Kane, an investor in the DGRD Fund, will testify about his investment in the DGRD Fund, the information and factors he considered, and the return on his investment.

6.      Brad Leon, 620 Vista View Drive, Ashville NC 28803-8572.   The SEC anticipates that Mr. Leon, an investor in the 575 Fund, will testify about his investment in the 575 Fund, the information and factors he considered, and the return on his investment.

*See* ECF No. 129 at p. 14-15. By questioning witnesses about the return on investment and the Funds' ability to repay investors the SEC has opened the door to evidence about very same topic— i.e., the viability of deeproot and whether investors could have been repaid absent external factors including the Covid-19 pandemic and the SEC's investigation.

5.      Further, in addition to rebutting the allegations in the SEC's Complaint and testimony from the SEC's witnesses, the viability of the deeproot businesses provides overall context and background to the transactions at issue and is directly relevant to the issues of materiality and intent. Federal Rule of Evidence 401 defines "relevant evidence" as "evidence

having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). This relevance standard is low. *Express Rent a Car LLC v. U-Save Fin. Services, Inc*., No. CV 07-4356, 2009 WL 10679830, at *1 (E.D. La. Apr. 24, 2009). Evidence is relevant if it has the "slightest bit of probative worth." *Id*. (citing 22 Wright & Graham, Federal Practice & Procedure § 5165).

6.      The only the case the SEC cites for this motion *in limine* is *United States v. Peterson*, 101 F.3d 375 (5th Cir. 1996). But the issue in *Peterson* was whether a jury instruction was proper *after* the close of the evidence admitted at trial. *Id*. at 382. *Peterson* simply does not support the notion of excluding relevant evidence before the trial begins.

7.      In addition to providing relevant background and context, the jury should be able to consider the nature and viability of the deeproot businesses when evaluating the materiality of the disclosures regarding those businesses and Mueller's intent regarding the same.

### III.      RESPONSE TO MOTION *IN LIMINE* NO. 2:
### *To Exclude Evidence of the Adverse Consequences of Investigation or Verdict*

8.      The SEC cites several cases for the proposition that Mueller cannot introduce evidence about any adverse effect a finding of liability might have. *See* ECF No. 130, pp. 8-9. But Mueller does not intend to offer evidence of the adverse impact this lawsuit or any verdict may have.

9.      Tellingly, the SEC does not cite any case to support the exclusion of the evidence Mueller does intend to offer—namely, evidence of how the SEC's investigation played a role in the demise of the companies. The SEC issued its *Wells* notice June 25, 2021 and proceeded with filing this action despite being offered a tolling agreement, despite being told that the companies were on the verge of sustainable profit, and despite being told that a shutdown would lead to

bankruptcy which would likely lead to investor loss. To the extent that the SEC wants to parade

itself in front of the jury as the protector of investors, and by all indications it does (*see* ECF No.

129-5, SEC's proposed jury instruction), then the jury should also be able to hear about how its

own actions contributed to, if not caused, the investor losses at issue.

### IV.   <u>RESPONSE TO MOTION *IN LIMINE* NO. 3:</u>
### *To Exclude Reliance on Advice of Counsel Evidence*

10.     This motion *in limine* is simply a regurgitation of the SEC's motion for summary

judgment on the same defense. *See* ECF No. 103. Mueller therefore incorporates his response to

the summary judgment, and all evidence submitted in support, in response to this motion *in limine*.

*See* ECF No. 108.

11.     The SEC is attempting to gut one of Mueller's primary defenses before trial begins.

The proper and conservative approach is to allow the evidence to develop throughout trial and then

determine whether a jury instruction is appropriate based on testimony and evidence received.

12.     Contrary to the SEC's statements in its Motion *in Limine*, Mueller's deposition

testimony shows that <u>*he did seek and receive advice*</u> from veteran securities lawyers regarding

many of the central actions and disclosures at issue in this case:

> **Q. (BY MR. NASSE) Did you ever tell Mr. Concilla that you were taking loans**
> **from any of the funds?**
> MR. HULINGS: Objection. Okay. So the -- is that question limited to pre-2019?
> **MR. NASSE: Sure. Yes.**
> MR. HULINGS: All right. You can answer as long as it's before January 1, 2019.
> THE WITNESS: *<u>We had very frank and robust discussions about almost</u>*
> *<u>everything we did with Dennis and Andy. They had an insight into almost</u>*
> *<u>everything that we did. I don't know what you mean by loans. We talk about</u>*
> *<u>payments here. But yes, they knew that was happening and it just confirmed it that</u>*
> *<u>I refreshed his memory about it here.</u>*

*See* Mueller Depo at 112:1-14 (emphasis added).[1]

---

[1] The excerpts from the Mueller deposition are attached hereto as **<u>Exhibit A</u>**.

**Q. (BY MR. NASSE) Okay. And did you recall Carlile Patchen providing you any advice in terms of if you were going to take loans, what would be required in terms of disclosure or documentation?**

MR. HULINGS: Objection; vague and compound. But you can answer provided that it's prior to 2019.

**Q. (BY MR. NASSE) Yes.**

A. Sure. They provided advice and what the proper disclosures were for all of our documents and we relied on that.

**Q. Yeah. Do you have a specific recollection of them providing that advice as it related to you taking out loans from Policy Services, Inc. or any of its affiliated businesses?**

MR. HULINGS: Objection; vague.

THE WITNESS: If there was anything – and I can't recall the specific, you know, PPMs that either are being referred here or after. But yes, if there were disclosures in that PPM regarding that, they either gave the advice that it was necessary to put it in or it was not necessary.

**Q. (BY MR. NASSE) If you had a discussion?**

A. We did have -- we did have discussions, as I said, regarding compensation and whether you want to term it as a loan, as payment, as a salary, whatever.

*See* Mueller Depo at 114:19-115:20.

**Q. (BY MR. NASSE) Do you have any specific recollection of any advice you received regarding loans, not compensation or pay, specifically loans from – you taking loans from Policy Service, Inc. or any of its affiliated enterprises?**

MR. HULINGS: Same objections; argumentative, vague, asked and answered five times now.

THE WITNESS: We had wide-ranging discussions on a lot of issues including of course payments and anything that would be regarded payments as they would need to be disclosed or not in the PPMs.

*See* Mueller Depo at 117:5-15.

**Q. If you could go to paragraph -- so it's page ending in Bates 4 -- 504. And there's a paragraph F at the top of that page. Do you see that?**

A. Yes.

**Q. And just go ahead and you can review that paragraph. Just let me know when you're done.**

A. Okay.

**Q. Okay. Do you recall receiving advice from Carlile Patchen or any other counsel specifically as related to the text in paragraph F?**

A. My recollection is that all -- all these paragraphs in this section came in one form or another from -- you said CPM or Carlile Patchen & Murphy, yes.

**Q. Okay. Do you recall any specific conversations or -- with -- I'll use your term, CPM, regarding the text of paragraph F?**

A. I know that we had conversations about all of these. I cannot remember specifically what was said.

*See* Mueller Depo at 119:14-120:7.

**Q. Did you -- do you recall any specific discussions with Carlile Patchen regarding what's paragraph M in Exhibit 36?**
THE REPORTER: M or N?
MR. NASSE: M, Mike.
THE WITNESS: Again, this likely would have come from them. I'm sure we discussed it. I don't recall specifically our back and forth over this. Most of these when -- when they advised that we needed to disclose something, unless there's something glaring on there that we might need to correct them about a fact or another issue, typically, take your attorney's advice.
**Q. (BY MR. NASSE) And when they provide that advice, again, that would be either over the telephone or an email?**
A. Yes.

*See* Mueller Depo at 122:10-25.

**Q. Okay. On the bottom of that same page, Bates No. 4505, there's underlying assets in the subsection life policies. Do you see that?**
A. Yes.
**Q. In your discussions with Carlile -- did you have discussions with Carlile Patchen regarding this section of the PPM?**
A. Yes.

*See* Mueller Depo at 127:3-11.

Do you recall discussions with counsel regarding the life policy provisions in the PPM in Exhibit 36 where you disclose that neither the company as defined in this document nor the fund itself would hold title to the policy -- to the life policies?
MR. HULINGS: Objection; vague.
THE WITNESS: Yes, it was one of many elements that we talked about and how we structured the multiple companies that we were working with.

**Q. (BY MR. NASSE) When were those discussions?**
A. They would have been when we were drafting this.

*See* Mueller Depo at 128:1-12.

**Q. Did you -- did you ever tell Carlile Patchen that only Policy Services held title to the life policies?**
MR. HULINGS: Objection; vague. I think misstates prior evidence.
THE WITNESS: When are you referring to?

**Q. (BY MR. NASSE) At this time when you were drafting this document.**
A. I didn't need to tell them. They already knew.
**Q. And how do you know that?**
A. I think I was pretty clear a second ago that Dennis and Andy by this time knew intimately everything we were doing and how everything were structured and that Policy Services had held title to all the policies since prior to them even becoming our attorneys.

*See* Mueller Depo at 128:24-129:13.

**Q. Do you recall discussing whether Policy Services should be disclosed in this PPM?**
A. I'm sure we did.
**Q. Do you have a recollection of doing so?**
A. We're talking about, you know, eight to nine years ago. We're talking about voluminous emails, edits, and verbal conversations, hours upon hours upon hours. I don't remember every little detail. But I can remember general concepts. And, yes, when we go over this together, we're going over it to make sure that everything is correct and that we've provided them all the information they need to determine whether it needs to be disclosed.

*See* Mueller Depo at 130:4-16.

**Q. Did you discuss this provision with Carlile Patchen?**
A. I don't remember this specific provision being there in the final one. But again, that's just recollection. But again, we discussed everything in here. They made the determination of what needs to be disclosed or not based upon our discussions and collaboration. And they specifically signed off emphatically that everything in here was legal, securities compliant, and we were ready to proceed with subscriptions.

**Q. Do you recall discussing with Carlile Patchen how you were determining the allocation percentage, the 45 percent as listed in the paragraph I just read to you?**
MR. HULINGS: Objection; vague.
THE WITNESS: Of course we did since that was a major component. I don't recall the specific conversations, but, of course, we would have.

*See* Mueller Depo at 131:11-132:4.

**Q. (BY MR. NASSE) Yeah. My question wasn't asking for a legal opinion. You're the fund manager and advisor. So my question is: As a fund manager and advisor, did you disclose to them that deeproot – 575 Fund LLC did not own any -- would not own any portion of deeproot Tech?**
MR. HULINGS: So vague as to -- as to "own." You can answer.
THE WITNESS: As I've said before, I'm sure we discussed it and I can't remember if I said that specifically because I'm not going to put words in my mouth and I'm

not going to let you do it either. I can tell you that Dennis and Andy knew exactly how we were organized because they helped set it up. They knew what needed to go in here and didn't need to go in here and they knew what needed to be disclosed and not disclosed to investors and we took their advice.

*See* Mueller Depo at 134:7-24.

> **Q. Do you have any specific recollections of conversations with Carlile Patchen regarding the company advance provision in Exhibit 36?**
>
> A. I'm sure we had conversations about it throughout the entire process. I don't believe this was a provision in the prior Debenture funds. This was introduced later on. And so, yes, I'm sure we had a lot of conversations about this paragraph.

*See* Mueller Depo at 145:11-18.

> **Q. (BY MR. NASSE) And your discussions with Carlile Patchen regarding the company advance, did you discuss the fact whether you needed controls or processes to ensure you would stay within the 20 percent limit of company advance?**
> MR. HULINGS: Objection as to controls and processes, vague.
> THE WITNESS: I'm sure that we discussed a wide ranging when it comes to this about controls. Not just in this provision as we discussed before and I answered before is that we, over many years, had talked about how we processed our business and what internal controls that we use.

*See* Mueller Depo at 146:3-15.

> **Q. (BY MR. NASSE) So let me just ask you this: So an investor comes in and they invest $100,000. Do you take that 20 -- do you take the $20,000 and put it in a separate account?**
> MR. HULINGS: Objection; improper hypothetical, and vague and ambiguous.
> THE WITNESS: That was not usually how we were advised to do the flow of funds.
> **Q. (BY MR. NASSE) Did you -- well, I didn't ask about the flow of funds. I asked how would you segregate the money to be used for company advance?**
> A. We were never advised to segregate it.
>
> **Q. Did you ever tell -- did you ever discuss with Carlile Patchen how you were using company advance?**
> A. We did discuss it -- sorry --
> MR. HULINGS: Go ahead.
> THE WITNESS: We did discuss it, of course, especially when we went through the DRSS 1 process.

*See* Mueller Depo at 151:6-23.

**Q. Right. But you didn't submit -- you didn't -- nothing in your DRS was a submission on behalf of 575 or dGRD?**
A. I think I've been clear and I will restate it is that these funds were a progression of work product from the very beginning that built on each other. We used vetted language. And so when we got to the S-1 and DRS processes and we had brought in Centri to start writing the financial terms and disclosures and then BDO having to audit that and then working with our attorneys during that process, we were using and started with the existing funds and the fund disclosures and the processes of controls that we had in relation to them.

*See* Mueller Depo at 152:5-17.

**Q. (BY MR. NASSE) And did you ever discuss with Carlile Patchen how you were monitoring the 20 percent in the company advance?**
MR. HULINGS: Asked and answered.
THE WITNESS: Yeah, I'm sure we did.

*See* Mueller Depo at 153:15-19.

**Q. (BY MR. NASSE) The company advance provision says this amount, I'm looking at -- I think it's the second sentence. (Reading:) This amount covers agent compensation, if any, nominal administration expenses, IRA fees and other compensation marketing costs and the fund advisor fees. Do you see that?**
A. Yes.

**Q. Okay. Did you have any -- do you recall any discussions with Carlile Patchen specifically about the -- what was covered under nominal administration expenses?**
MR. HULINGS: Assuming that is before January 2019, you can answer.
**MR. NASSE: Yes. Yes.**
THE WITNESS: Yes. This whole section, again, came from them as we are trying to disclose what -- what the company advance could be used for. And my recollection is that nominal administration expenses, I mean, speak for itself.

**Q. (BY MR. NASSE) I just want to make sure I understand. You do recall a specific conversation with Carlile Patchen regarding what was covered under the term "nominal administration expenses"?**
MR. HULINGS: So object as to vague as to "specific conversation." Are you looking for a date or the fact that a conversation took place?
**MR. NASSE: The fact that the -- we'll start there. The fact that a conversation took place.**
THE WITNESS: Yes.

**Q. (BY MR. NASSE) Okay. When was that?**

A. It was multiple conversations between maybe spring, March, and whenever we -- whenever we finalized this.

**Q. In 2015?**

A. 2015.

**Q. Okay. And when you say "we," you and Mr. Concilla?**

A. And Andy, I believe.

**Q. And Mr. Federico?**

A. Yes.

*See* Mueller Depo at 154:12-156:2.

**Q. (BY MR. NASSE) And in those discussions did you ask Carlile Patchen whether the term "nominal administration expenses" could cover priority return payments to investors?**

A. My understanding in the advice I received is that 575 payment -- 575 P payments due investors are expenses of the fund and they would be included.

**Q. Okay. So there -- so Carlile Patchen told you that nominal administration expenses, that provision could be used to pay prior to return payments to 575 Fund investors?**

A. Over the multiple times we did it in one form or another, yes.

**Q. What do you mean by "one form or another"?**

A. Well, I mean, administration expenses is pretty broad and that's intentionally why they wanted it. And as I've testified before with -- we didn't hide anything from Dennis and Andy. And in their view being compliant with securities laws and in their view of proper disclosure to investors, they took a much longer section than this that was proposed previously and they boiled it down to this abbreviated by boiling a lot of the other stuff down to nominal administration expenses.

**Q. I just want to make sure I understand. What did you ask them about nominal administration expenses as related to payments of priority return payments to 575 Fund investors?**

MR. HULINGS: Asked and answered.

THE WITNESS: I mean, I have answered that, is that a wide-ranging area and an amount of expenses that could come up, especially down the road, were talked about and they boiled them down to nominal administration expenses.

**Q. (BY MR. NASSE) And those wide-ranging things, among those was specifically mentioned priority return payments to 575 investors?**

MR. HULINGS: Asked and answered.

THE WITNESS: Dividends, maturities, yes, payments to investors were expenses of the fund and those would be included in that.

**Q. (BY MR. NASSE) Prior to return payments?**

A. That's what I just said.

**Q. MR. NASSE: Well, You said dividends.**

THE WITNESS: Sorry, I should have waited.

MR. HULINGS: Asked and answered. Go ahead.

**Q. (BY MR. NASSE) And when -- do you have a recollection of when that conversation occurred?**

A. That's also been asked and answered and we did it over a long period of time because this was a very key area of the PPM and it started again with the email where I was pointing out that Russ had left and I was pointing out here's where we are. We need to find a solution to where we're going to accomplish our goals, take care of investors. And so this is what started the very, very lengthy discussion and vetting of different fund designs and the language, proper disclosures that should go in there between that time period.

**Q. And you say "lengthy discussion." That was a discussion in person, over the phone?**

A. Emails, phone, everything we talked about before, trading back and forth and changes in the documents.

*See* Mueller Depo at 157:12-159:25.

**Q. Okay. Did -- regardless of -- not even in the  context of nominal administrative expenses, did Carlile Patchen ever advise you that it was permissible to pay existing investors with new investor investments?**

A. Yes.

**Q. When did that occur?**

A. It occurred continuously throughout the representation, including after the privilege waiver date.

*See* Mueller Depo at 161:3-11.

**Q. (BY MR. NASSE) Not asking you anything about after December 2019, when did you have conversation where Carlile Patchen advised you that it was permissible to pay existing investor with new investor investments?**

A. We had many conversations about the reality of being an issuer and complying with securities laws. And Dennis was very adamant during a lot of these conversations including about this provision that money was fungible, it's common sense as well. And a lot of our discussions, when it came into, like, disclosure of this, what the process would be, what the internal controls would be, were around that concept that Dennis kept coming back to as one of his -- his major themes.

**Q. And it was permissible?**

A. It's an expense of the fund.

**Q. Did you -- did you ever ask Mr. Concilla or anyone at Carlile Patchen whether doing so would be Ponzi scheme?**

MR. HULINGS: Objection; vague, and legal conclusion as to "Ponzi scheme." But you can answer.

THE WITNESS: I believe there's an email. We might have even reviewed -- that was disclosed, we might have even reviewed it already where Dennis gave a brief

example of a Ponzi scheme. So no, he did not consider what we were doing or any of the disclosures or our internal processes or controls a Ponzi scheme.

**Q. (BY MR. NASSE) Okay. We can go back. I believe he says -- he discusses what are the hallmarks of a Ponzi scheme. Does that sound right?**
A. I believe he discusses in context to that email a -- one of the elements of a Ponzi scheme as I understand it and as it related to that specific conversation.

*See* Mueller Depo at 161:16-163:1.

**MR. NASSE: Another example of him saying that it was permissible to pay existing investors with new investor money.**
MR. HULINGS: That was misstating his prior testimony. And so we'll call it vague.
THE WITNESS: We had wide-ranging, frank advice about the realities of being an issuer in a complex gotcha SEC enforcement environment. And just as it says here, what is likely to draw attention and scrutiny and what isn't. And that is why in the company advance they determined that the nominal administration expenses, meaning the expense of the fund, being one of his big things that money was fungible and the575 fee payments were expenses of the fund that it was proper disclosure, proper process.

*See* Mueller Depo at 165:11-25.

**Q. (BY MR. NASSE) And so you -- deeproot Policy Services, Inc. and its affiliates under your direction did pay existing investors with new investor money, correct?**
MR. HULINGS: So object to vagueness, argumentative. But you can answer.
THE WITNESS: We took the advice that we were given by competent securities counsel who we didn't hide anything from and we followed their advice.

*See* Mueller Depo at 167:13-22.

**THE WITNESS: As I said before, Dennis -- one of Dennis's major things was money was fungible. Payments to investors are expenses of the funds. That is why they chose the language and proper disclosure they did and we followed their advice.**

*See* Mueller Depo at 169:8-12.

**Q. (BY MR. NASSE) And when you say -- you said because it is -- it was expenses, what is the "it" you're referring to?**
A. You were asking about the575 P payments as an expense of the fund according to Dennis and Andy as disclosed that they felt was good disclosure, those expenses of the funds can be paid fungible money in the fund, one dollar in is -- could be interchanged with a dollar out, and that was proper according to their advice and we took their advice.

*See* Mueller Depo at 170:8-17.

> **Q. (BY MR. NASSE) Did you ever ask Carlile Patchen whether you should disclose in the PPM that you would pay existing investors with new investor funds?**
> MR. HULINGS: You can answer.
> THE WITNESS: Yes. And this was one of the con -- and we talked about several times. But the company advance section and the language therein was their response to those types of discussions.

*See* Mueller Depo at 171:3-10.

> **Q. (BY MR. NASSE) All right. Was -- to your knowledge, was the investment allocation agreement ever provided to investors?**
> A. I believe that conversation came up and, no, we did not due to that conversation.
> **Q. A conversation with Carlile Patchen?**
> A. Yes.
> **Q. When did that conversation occur?**
> A. It would have occurred around this time period, I'm sure.
> **Q. And you had it with Mr. Concilla and Mr. Federico or just one?**
> A. I don't remember.

*See* Mueller Depo at 197:10-22.

> **Q. Okay. In the sentence, (Reading:) In addition by using our ultimate parent company, Policy Service, Inc., our sole affiliated policy administration provider between us and the insurance carrier, we are unable to, quote, raid the piggy bank. Did you ask Carlile Patchen about that sentence of the PPM?**
> A. These were disclosures written with the help of Jerry and Phil during the S-1 process and vetted by Andy and Dennis and since it was vetted used in the updated PPM here.
>
> **Q. When you say, vetted by Jerry and Phil, that was in connection with the DRS for The Queue Fund; is that correct?**
> A. That is correct.
>
> **Q. Okay. And you're saying that you use those -- that same terms in this PPM?**
> A. This section, I believe, is word for word right out of the DRS for The Queue Fund, but as best I could recollect.

*See* Mueller Depo at 215:21-216:15.

> **Q. (BY MR. NASSE) Did you discuss the fact that the575 was purchasing its interest in life policies through buying positions in the dGRD Fund with Carlile Patchen?**

A. Yes.

*See* Mueller Depo at 264:20-24.

> **[D]id you have any -- any written documentation of how you determined that the capital acquisitions as described in here were appropriate or suitable for the575 fund?**
> MR. HULINGS: So just to -- maybe I can help here just to clarify. We're talking about – not talking about whether this language was disclosed to lawyers. You're just saying did you do anything written --
> **MR. NASSE: Correct.**
> MR. HULINGS: -- as part of the analysis that's reflected in here. Is that an accurate --
> **MR. NASSE: Correct.**
> MR. HULINGS: Okay.
> THE WITNESS: Yes. So again, we detailed this in the second rogs to several things. We had extensive research and analysis in deeproot Tech and deeproot Pinball well before we ever started it and when we started it. We provided most of that to Dennis and Andy who signed off on it very early on. And you can imagine two seasoned security attorneys when they're -- when you mention the word, hey, we want to get into Pinball, you can imagine the number of in-depth questions making sure that we had done that analysis.

*See* Mueller Depo at 274:21-275:18.

13.     Moreover, Carlisle Patchen & Murphy LLP attorney Dennis Concilla's testimony

further supports the admission of such evidence:

> **Q.   Up to December 2018, did you ever represent Mr. Mueller personally?**
> A.    No.  Except to the extent that he was the principal of a company that I was representing.  So as an officer of the corporation, I considered my representation to be on behalf of Policy Services, Robert Mueller, Russ Hagan, when Russ Hagan was there.

*See* Concilla Depo at 32:1-7.[2]

> **Q.   You -- you do not recall discussions with Mr. Mueller regarding placing 30 percent of investor funds into deeproot Pinball?**
> A.   I do recall.
> **Q.   Okay.  And what did he tell you about that?**
> MR. HULINGS: Objection.  Vague.
> A.    He thought it would -- He thought that it allowed some diversification for potential cash flow.

---

[2] The excerpts from the Concilla deposition are attached hereto as **Exhibit B**.

*See* Concilla Depo at 65:2-9.

> **Q.   Does it appear to be an August 12, 2015, email from you to Mr. Mueller?**
> A.   Yes.
>
> **Q.   Okay.  You wrote, "In my mind, this is now ready." And it says there's attachment of a dGRD PPM, MUELLER-2650 through 2667. Do you see –**
> A.   Yes.
> **Q.   -- the dGRD PPM? What did you mean by, in your mind, this is now ready.**
> A.   I had made all changes and comments that I thought were necessary.
>
> **Q.   Okay.  And so would you say the comment, "In my mind, this is now ready," were you providing Mr. Mueller legal advice?**
> MR. HULINGS:  Objection.  That's pretty vague.
> A.   Yes.
>
> **Q.   Okay.  And was -- was your comment in the email, "In my mind, this is now ready," was that based upon the information that Mr. Mueller had provided to you at that time?**
> MR. HULINGS:  Objection.  Vague as to "at that time."
> BY MS. WARDEN: You can answer.
> A.   Yes.
> **Q.   Sorry?**
> A.   Yes.

*See* Concilla Depo at 76:17-77:22.

> **Q.   Okay.  And the -- Exhibit 94 is a draft deeproot Investor Presentation. Do you recall providing legal advice on Exhibit 94?**
> A.   Yes.
>
> **Q.   Okay.  Was your legal advice on Exhibit 94 limited to the information that Mr. Mueller provided to you about the 575 and dGRD Funds?**
> MR. HULINGS:  Vague. You can answer.
> A.   Yes.

*See* Concilla Depo at 84:14-23.

> **Q.   Okay.  Is it a Private Placement Memorandum?**
> A.   Yes.
>
> **Q.   Okay.  Is that a synonym for a Reg D**?
> A.   Yes.
>
> **Q.   And at the bottom, do you see it's dated September 1, 2015?**

A.   Yes.

**Q.   Okay.   So I can represent to you that in Mr. Mueller's interrogatory responses, he indicated that Exhibit 36 that you're looking at --**
A.   Yes.
**Q.   -- was operative between May 2015 and May 2018.   So were you representing Policy Services between -- at any point between May 2015 and May 2018?**
A.   Periodically.
**Q.   So is the --**
A.   Yes.
**Q.   -- answer "Yes"?**
A.   Yes.
**Q.   Okay.**
A.   From time to time.

*See* Concilla Depo at 99:24-100:19.

**Q.   Do you regard -- do you recall providing legal advice with respect to the 575 PPMs?**
A.   Yes.

*See* Concilla Depo at 100:24-101:1.

**Q.   Okay.   And were phone calls between you and Mr. Mueller a rare occasion?**
MR. HULINGS:  Objection.  Vague.
MS. SANSALONE:  Objection.  Yeah.  Go ahead.
A.   I -- I -- When we were actively working on something, we emailed a lot and we spoke a lot by telephone.

*See* Concilla Depo at 124:21-125:2.

**Q.   Mr. Concilla, did Mr. Mueller inform you that he would pay his investors in earlier funds, not the 575 or dGRD Funds with 575 and dGRD investor funds?**
MR. HULINGS:  All right.  So vague and ambiguous and argumentative.  Assumes facts not in evidence. You can answer, if you can.
A.   Money is fungible.  So wherever the money is coming from, or if it's going into an account, it could be used for whatever purpose. But did we have a specific discussion about what I think you're asking; paying old investors with new investor money?  We did not.

*See* Concilla Depo at 152:3-15.

**Q.   And just to follow up, are -- are investor payments operational expenses?**

MR. HULINGS:  Vague and ambiguous. Argumentative.  Calls for a legal conclusion.

A.   I think they could be.

*See* Concilla Depo at 167:18-22.

**Q.   Could payments from the Company Advance be used to pay investment returns?**

MR. HULINGS:  Same objections.

A.   I think they could.  Yes.

*See* Concilla Depo at 169:16-19.

A.   I -- I think it's fair to say that I've -- Again, I've tried my best.  Could there have been a conversation that I don't recall?  There -- there certainly could be.  But on some of these issues, I just know what my answer would have been.

**Q.  So Mr. Mueller have -- may have a different recollection?**

A.   He may.

*See* Concilla Depo at 188:13-20.

**Q.   One of the questions concerned whether or not it was proper to use new investor funds to pay old investors.**

A.   Correct.

**Q.   Do you recall that? And you made a distinction, based on the way the question was asked, about writing the word "solely." Do you recall that?**

A.   Yes.

**Q.   And what did you mean by "sole" -- why was "solely" important in your response?**

A.   Because, as I explained in my Declaration, and earlier here today --

 (Telephone interruption.)

THE WITNESS:  Sorry, this is one of those clients that won't let me retire. Because if -- if -- I think it's important because, again, going back to my issue of, you know, money's fungible, if -- if -- if the underlying investments are making money and that money is coming into a bank account and new investor money is also going into that bank account, then I don't think it's improper that that money is commingled. On the other hand, if there is no other money coming in from any other source, then I would -- It's my opinion that that would be improper.

*See* Concilla Depo at 190:14-191:14.

**Q.   So if the Company Advance is placed in the same bank account as other revenues, could that bank account be used to pay new -- pay previous investors?**

A.   If there's a reasonable expectation that the assets are paying dividends or paying interest or paying, then -- then yes.

*See* Concilla Depo at 195:9-14.

**Q.   So the -- to your knowledge, the only source of funds at the beginning for the 575 Fund was new investor money; is that right?**
A.   Yes.  I addressed this in an email.

**Q.   All right.  And you had that knowledge before you told Mr. Mueller that the 575 PPM had been approved?**
MS. WARDEN:  Objection.  Asked and answered.
A.   Yes.

*See* Concilla Depo at 204:2-9.

**Q.    So when you -- when you are telling Mr. Mueller that the 575 is done, what are you communicating to him?**
A.    That the PPM is -- is completed and – and fulfills his obligation on -- under the law.

**Q.    So in the next sentence, it says, your job is to make sure it is compliant with the law and disclosures are adequate.**
A.   Correct.

**Q.    So are you communicating to Mr. Mueller that the 575 PPM is compliant with the law and the disclosures are adequate based on the information available to you at the time?**
A.   Yes.

*See* Concilla Depo at 206:2-15.

**Q.    So when your -- when you send final docs to a client, what are you communicating to the client?**
MS. WARDEN:  Objection.  Vague.
A.    That -- that we -- we have reviewed this and we -- and we feel that it's appropriate and adequate and -- and that you can start selling it.

**Q.    So this email is representing to the recipients that it is your legal opinion that this document complies with the securities laws based on the information available to you; is that right?**
A.   Yes.

**Q.   Okay.  And -- and part of the purpose of your representation was to review documents that are being provided to investors to ensure that they comply with the securities laws; is that right?**

A.   Yes.

Q.   **And that includes ensuring that -- Does that include ensuring that there --
-- no statements in these documents were materially misleading, based on the
information available to you?**
A.   Yes.

*See* Concilla Depo at 218:7-219:2.

Q.   **And so your understanding of what you were communicating to your
clients was that they could spend a particular investor's money in -- in -- that
didn't --Let me rephrase.**
**It was your -- what you're communicating to your clients, based on this
document, is that they could spend a particular investor's money in a way that
didn't comply with the 60, 20, 10, 10 breakout?**
MS. WARDEN:  Objection.  Mischaracterize prior testimony.
**BY MR. HULINGS:**
Q.   **I'm asking for your testimony now.**
A.   Okay.  Okay.  As -- as long as in -- as long as it mirrors this in totality, all of
the investor funds meet this criteria.
Q.   **Okay.**
A.   And that's -- that's perfectly okay.

*See* Concilla Depo at 229:20-230:11.

Q.   **So by the time he raised the idea of investing in pinball, had you been
working together for a couple years by this point?**
A.   Yeah, probably.  Yeah.

Q.   **So you had many conversations with Mr. Mueller over the phone and --
and at least one in person?**
A.   Yes.

Q.   **And based on those prior communications, did      you think that  Mr.
Mueller was -- genuinely believed that he could make Pinball profitable when
he was telling you this?**
MS. WARDEN:  Objection.  Vague and ambiguous as to "genuinely believed" and
"profitable."
A .   He believed that.

Q.   **He told you that he thought he could make Pinball -- the Pinball business
work?**
A.   Yes.
Q.   **And based on your experience with him, did you believe that he believed
that he could make it work?**
MS. WARDEN:  Objection.

MR. NASSE:  Speculation.
MS. WARDEN:  Confusing.
A.   Well, I believed that he believed.

**Q.   In other words, this wasn't -- this was a real business venture?**
A.   Well --
MS. WARDEN:  Objection as to -- Vague and ambiguous as to characterization.
A.   It was he believed that this was a legitimate business that could produce cash flow and income.

*See* Concilla Depo at 234:7-235:11.

**Q.   That you -- that this PPM communicates to them that there will be salaries paid out of the money that they provide?**
MS. WARDEN:  Objection.  Evidence speaks for itself.
BY MR. HULINGS:
**Q.   You can answer.**
A.   Yes.

**Q.   Okay.  And is -- Would it be inconsistent in your -- with the language in the PPM that one of the people receiving the salaries would be Robert Mueller?**
A.   It would not be inconsistent.

*See* Concilla Depo at 239:23-240:9.

**All right.  Then the last bullet says, "You and I have discussed, and you know we need, immediate income to cover immediate expenses.  It will take years for the life settlements in the other funds to pay off to accomplish this, or we pay.  These tech projects can not only provide the immediate income to cover admin expenses in the short term, but they take the burden off the other fund balance sheets."**
**Do you see that?**
A.   I do.

**Q.   So that's -- Is that also consistent with your communications with him about the idea of the Tech Fund providing short-term income?**
A.   It is consistent with what he believed.

*See* Concilla Depo at 264:10-23.

**Q.   "Indirect payments are okay if you mean that you draw a salary from dR and the funds paid dR for management."  Do you see that?**
A.   Yes.

**Q.   Let's stop there before we go on to the next thing. So you're telling Mr. Mueller that the 575 Fund, for example --**
A.   Right.
**Q.   -- could pay a fee to a different deeproot entity --**
A.   Yes.
**Q.   -- and that that deeproot entity could pay Mr. Mueller a salary?**
A.   Yes.

**Q.   All right.  And that is your understanding of how Mr. Mueller was getting paid at this time, based on his representation to you?**
A.   Okay.
**Q.   Well, I guess that --**
A.   I mean, that's -- I mean --
**Q.   That's what's in this email.**
A.   My -- Again, what I'm saying is this could -- this could be one way to do it. Yes.

*See* Concilla Depo at 287:15-288:14.

**Q.   Okay.  All right.  So your legal advice to Mr. Mueller in -- and when you approved of the PPMs for the dGRD Fund and the 575 Fund, your -- the legal opinion you communicated to Mr. Mueller was that he could take a salary that was from the funds provided --**
MS. WARDEN:  Objection.
HULINGS:  Hold on.
BY MR. HULINGS:
**Q.   -- from the funds provided by investors by the 575 or dGRD Funds?**
MS. WARDEN:  Objection.  Mischaracterizes prior testimony.
MR. HULINGS:  It isn't prior testimony.  It's his current testimony.
MS. WARDEN:  Okay.
BY MR. HULINGS:
**Q.   Go ahead.**
A.   Providing it was reasonable.

*See* Concilla Depo at 297:21-298:13.

**Q.   And -- and your opinion that you communicated to Mr. Mueller was that the PPMs for the 575 Fund and dGRD Fund adequately disclosed that he would be receiving compensation in some form?**
MS. WARDEN:  Asked -- Objection.  Asked and answered.
A.   Yeah.  I don't -- Again, I don't -- it doesn't speak to that specifically.  But implicitly, yes.

*See* Concilla Depo at 299:4-11.

**Q.   And that doesn't mean that 45 percent of every investor dollar that comes in --**

A.   No.  It means 45 percent of the total amount of investments made is the limit.

*See* Concilla Depo at 308:19-22.

14.     The SEC's motion cherry-picks from the depositions but fails to include the excerpts above and elsewhere that show the testimony would be both relevant and supportive of Mueller's position.

15.     The cases cited by the SEC may set forth the proper analytical framework but ultimately do not support the SEC's motion.  For example, the court in *Impastato* recognized that the advice of counsel defense is not available when the allegations do not require a showing of willfulness.  *See United States v. Impastato*, 543 F. Supp. 2d 569, 573 (E.D. La. 2008).  But here, it is undisputed that the securities fraud claims in this case do require such a showing so the defense is available and "supported by the law."  *Id* at 574.  The court further recognized that even when not available as a "defense," advice of counsel may still be relevant to negate the requisite *mens rea*. *Id*. at 579-80.  Finally, the *Impastato* court expressly rejected one of the SEC's main arguments in this case—that Mr. Mueller should be precluded from raising the advice of counsel defense because he allegedly "never made full and accurate disclosure" to his lawyers. *See* ECF No. 130, at p. 15. The *Impastato* court recognized that "it is the task of the jury to make such determination." *Impastato*, 543 F. Supp. 2d. at 573 n.3 ("[T]he jury is charged with the task of determining whether full disclosure was made to the attorney which ultimately will affect whether Defendant was in good faith when he sought legal counsel.").

16.     Similarly, in the *Faulkner* case (another SEC enforcement action), Judge Fitzwater recognized that "reliance on the advice of counsel or another professional is an accepted means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud."

*SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551 at *13 (N.D. Tex. Jan. 8, 2021) (cleaned

up).  In that case, the issue came up—not in the context of a motion *in limine*—but rather when

the court was weighing the amount of penalty to impose after liability has been stipulated via an

agreed judgment. *Id*. The court found that the defendant failed to produce evidence "identifying

who gave him advice, what specific advice he was given or when, or whether any of the conduct

that violated the securities law was based on the advice." *Id*. Here, the opposite is true. The

deposition excerpts from both Mr. Mueller and Mr. Concilla show the "who, what, and when" of

the advice given to Mr. Mueller (notwithstanding the SEC's selective clipping of the depositions

in its motion).[3]

## V.    RESPONSE TO MOTION *IN LIMINE* NO. 4:
### To Exclude Reliance on Accountants and Other Professionals Evidence

17.    Mueller incorporates his response to Motion *in Limine* No. 3 above, as well as his

response to the SEC's motion for summary judgment, ECF No. 108, which is fully incorporated

herein.

---

[3] Contrary to the SEC's argument, Mueller waived the attorney-client privilege for _all_ matters regarding the PPMs and disclosures to investors. *See* ECF No. 130-6 (letter from Mueller confirming waiver). The SEC's claim that Mueller continued to assert the privilege even after the waiver is disingenuous at best. The SEC includes certain deposition testimony excerpts without context and even cutting off sequential pages of testimony that undercuts its arguments. Mueller properly asserted privilege when: (1) the SEC asked Mueller about _this_ investigation (ECF No. 130-5 at pp. 7, 10); (2) the SEC asked questions about a 2013 fund not at issue in this lawsuit (*id*. at pp. 16-19); and (3) the SEC questions Mueller about an Idaho state investigation (*id*. at pp. 97-99). Although the SEC did not provide the deposition pages for the Court to see for itself, Mueller actually answered many of the questions (after receiving a cautionary instruction) that the SEC claims were obstructed. *See id*. at pp. 27-28, 193, 196-97, 286). In one egregious example, counsel for Mueller actually offered to discuss the issue with Mueller off the record in an obvious answer to find a way to answer the question without waiving privilege but the SEC refused—thereby manufacturing an issue to try and paint Mueller in a bad light. *See id*. at pp. 22-25.

Tellingly, despite saying several times during Mueller's deposition that the SEC would raise the privilege issue with the Court, it never did. If the SEC had complaints about the scope of Mueller's privilege claims, the time to challenge those claims was during discovery. If the Court agreed with the SEC, then Mueller would have had an opportunity to cure the deficiency and disclose the required information. For whatever reason, the SEC chose not to follow that procedure. But the SEC should not be allowed to lay in waiting and sandbag Mueller on the eve of trial with discovery disputes that it failed to timely raise.

18.     By way of example, as discussed in the summary judgment response, Mueller relied

upon experienced professionals (not just attorneys):

> 13          THE WITNESS:  I think it speaks for itself.
> 14   I mean, this has been vetted by very competent parties,
> 15   including FactRight, including Folio, which is now
> 16   Goldman Sachs, including the professionals I've talked
> 17   about before in counsel.  I would have to believe that
> 18   all of them found that this language was appropriate and
> 19   descriptive and proper in their respective fields.

> 11          A.  I think we've answered this in multiple
> 12   questions back and forth today about my research and due
> 13   diligence, working with a number of professionals who
> 14   have vetted the language and the underlying assets over
> 15   the years, and frankly, our continued performance.
> 16          Q.  Okay.  When you say outside -- when you say
> 17   "experts," who are you referring to specifically?
> 18          A.  Talking about my counsel, talking about Jerry
> 19   Wik from Centri, Phil.  I'm talking about FactRight,
> 20   Folio, now Goldman Sachs.  Everyone that we went to who
> 21   exercised their due diligence on our company and our
> 22   underlying assets, we passed with flying colors.

*See* ECF No. 108-10 (Ex. A-9 to Mueller's response for summary judgment) at 218:13-19; 307:18-

22.

19.     Additionally, evidence regarding Mueller's reliance on outside professionals is

relevant to rebut part of the SEC's case.  In the SEC's portion of the joint pre-trial order identifies

the following witnesses who will testify regarding the Funds' accounting and books:

> 2.     Jeffrey Anderson, 100 F Street NE, Washington, DC 20549.  The SEC
> anticipates that Anderson will testify about financial records he reviewed and summaries he
> prepared.

> 2.     Charlotte Acker, 2313 Brittany Grace, New Braunfels, TX 78130-8937.
> The SEC anticipates that Ms. Acker would testify that she assisted deeproot with bookkeeping and preparing QuickBooks records, all at Mueller's direction.

*See* ECF No. 129, at p. 15-16. The SEC also intends to call Bill Post, its expert witness, who offers multiple and repeated opinions regarding Mueller's books and records and specifically attacks Muller's alleged failure to have any "professional oversight." *See* SEC trial Exhibit P-19, *in passim*. Once again, the SEC proposes to have the trial be completely one-sided; offering its version of the events to the jury but prohibiting any evidence that counters its narrative.

20.     The SEC's arguments about the extent of the advice given is a nonstarter. Receiving advice from professionals is a "means of demonstrating good faith" and "an absence of any intent to defraud." *SEC v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008). "[T]he *jury* is free to decide for itself whether the facts demonstrate that the defendant acted with scienter in light of the advice he received from his attorneys or accountants. The defendant does not have the burden of proving any 'elements' of the defense before the *jury* can weigh the defendant's theory of reliance." *Id*. (emphases added).

## VI.     RESPONSE TO MOTION *IN LIMINE* NO. 5:
### *To Exclude Undisclosed Opinion Testimony*

21.     The SEC does not dispute Mueller's timely disclosure of non-retained expert witnesses.  Rather, having elected not to file any *Daubert* motions, the SEC now claims that the disclosure itself was deficient to a point warranting wholesale exclusion of any expert testimony. This is not the proper subject of a *in limine*, and in any event fails on the merits.

22.     The scheduling order required *all* pretrial motions, including *Daubert* motions but excluding motions *in limine*, to be filed by August 18, 2023. *See* ECF No. 101. Thus, to the extent the SEC had any challenge to Mueller's or Rushforth's expert testimony under Fed. R. Evid. 702,

703, *Daubert*, or Fed. R. Civ. P. 37, it should have been raised at that time. The SEC should not be permitted to guise an untimely pre-trial *Daubert* motion as a motion *in limine*.

23.     Moreover, the thrust of the SEC's argument that the disclosures themselves are deficient rings hollow. The disclosures, attached hereto as **Exhibit C**, sufficiently describe the subject matter of their opinions and a summary of the same. *See* Fed. R. Civ. P. 26(a)(2)(C). This Court's decision in *Knighton v. Lawrence* does not support the SEC's argument. No. SA-14-CV-718-XR, 2016 WL 4250484, at *2-3 (W.D. Tex. Aug. 9, 2016). There, the defendant's disclosures for 29 non-retained medical providers simply stated "the substance of the medical providers' testimony may be found in the medical records of the Plaintiff at BCSO RECORDS 000353-000344, and BEXARCTY 000001-002574, previously produced in this case" and did not provide a summary of the testimony to be offered. *Id*. at *1.[4] By contrast, Mueller did not simply refer to thousands of documents in his disclosures but provided detailed information for each non-retained expert. *See* **Exhibit C**.

24.     The SEC could have challenged Mueller's experts in a proper and timely pre-trial motion but it elected not to. The SEC should not be allowed to cure this failure in a motion *in limine*, but in any event the relief should be denied because Mueller's disclosures were adequate.

## VII.     RESPONSE TO MOTION *IN LIMINE* NO. 6:
### *To Exclude Character Evidence*

25.     The SEC's motion in *limine* to exclude character evidence is premature and misguided given that the SEC alleges that Mueller essentially intentionally and willfully lied to investors. The SEC does not dispute that character evidence is admissible "after the witness's

---

[4] Notably, the plaintiff in *Knighton* filed a pre-trial motion to exclude, not a motion *in limine*, to address the perceived deficiencies in that case. Likewise, the only other case cited by the SEC also involved a pre-trial motion to exclude and not a motion *in limine*. *See Logan v. Westfield Ins. Co.*, No. CV 17-29, 2020 WL 412216, at *5 (W.D. La. Jan. 24, 2020).

character for truthfulness has been attacked." Fed. R. Civ. P. 608. Clearly, the allegations place Mueller's character at issue.  Since it is impossible to predict how the evidence, argument and questioning will unfold at trial, this motion *in limine* should be denied. Any objections as to this type of evidence can be addressed during trial if and when necessary.

26.     Further, although it is not clear, but to the extent that the SEC is seeking to exclude simple background evidence regarding Mueller's history, education and life experiences, such evidence is appropriate background and should not be excluded under Fed. R. Civ. P. 404.

### VIII.   RESPONSE TO MOTION *IN LIMINE* NO. 7:
#### *To Exclude Characteristics of the SEC or the SEC Staff*

27.     It is not exactly clear what evidence the SEC is seeking to exclude. However, evidence of the "background" and "areas of practice" of any SEC witness who takes the stand is certainly relevant to assessing their credibility and should not be excluded, particularly at the motion *in limine* stage.  Moreover, the actions of the SEC personnel in the course and scope of the investigation should be information that the jury should be able to consider.

### IX.   RESPONSE TO MOTION *IN LIMINE* NO. 8:
#### *To Exclude Concerning SEC Investigative Techniques*

28.     Mueller incorporates his response to Motion *in Limine No. 2* above.

### X.   RESPONSE TO MOTION *IN LIMINE* NO. 9:
#### *To Admit Scott Allen Resignation Memorandum*

29.     Mueller incorporates his objections to the SEC's exhibit P-106 as set forth in the joint pre-trial order. *See* ECF No. 129-1, at p. 9.

### XI.   RESPONSE TO MOTION *IN LIMINE* NO. 10:
#### *To Impeach Mueller with His Prior Invocation of the Fifth Amendment Privilege if Necessary*

30.     Mueller is not asserting his Fifth Amendment privilege in this case. The fact that he previously asserted it is of no moment because the SEC deposed Mueller after the waiver and

he will not assert the privilege at trial. The SEC complains that it did not have sufficient deposition time to re-ask the questions to which the privilege was previously asserted, but how it chose to conduct its deposition should not penalize Mueller.

31.     Mueller assures the Court that the Fifth Amendment privilege will not be invoked at trial, and any effort by the SEC to refer to Mueller's prior invocation is a transparent attempt to obtain an adverse inference and inflame and improperly influence the jury.[5]

## **PRAYER**

For these reasons, Defendant Robert J. Mueller respectfully prays that the Court deny Plaintiffs Motions *in Limine*.  Defendant further prays for all other relief to which it is entitled.

Dated:  November 27, 2023

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By: */s/ Caroline Newman Small*
Jason M. Davis
State Bar No. 00793592
Email:  *jdavis@dslawpc.com*
Caroline Newman Small
State Bar No. 24056037
Email:  *csmall@dslawpc.com*
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

***Counsel for Defendant Robert J. Mueller***

---

[5] Tellingly, none of the cases cited by the SEC support the notion that a litigant's prior invocation of the Fifth Amendment privilege can be used as impeachment evidence when the witness has waived the privilege. *See* ECF No. 130, pp. 31-32.

### CERTIFICATE OF SERVICE

I certify that on the 27th day of November 2023, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*/s/ Caroline Newman Small*
Caroline Newman Small