# Exhibit A

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   SECURITIES AND EXCHANGE          ) CONFIDENTIAL
     COMMISSION,                      )
 4                                    )
                   Plaintiff,         )
 5                                    )
        -against-                     ) Civil Action No.:
 6                                    ) 5:21-cv-785-XR
     ROBERT J. MUELLER, DEEPROOT      )
 7   FUNDS LLC (a/k/a dprt Funds,     )
     LLC), AND POLICY SERVICES INC.,  )
 8                                    )
                   Defendants,        )
 9                                    )
        -and-                         )
10                                    )
     DEEPROOT TECH LLC, DEEPROOT      )
11   PINBALL LLC, DEEPROOT STUDIOS LLC, )
     DEEPROOT SPORTS & ENTERTAINMENT  )
12   LLC, AND DEEPROOT RE 12621       )
     SILICON DR LLC, AND ROBERT J.    )
13   MUELLER, JEFFREY L. MUELLER, AND )
     BELINDA G. BREEN, AS CO-TRUSTEES )
14   OF THE MB HALE OHANA REVOCABLE TRUST,)
                                      )
15                 Relief Defendants. )
     _____)
16

17   ORAL AND VIDEOTAPED DEPOSITION OF ROBERT MUELLER, produced

18   as a witness at the instance of the Plaintiff and duly

19   sworn, was taken in the above styled and numbered cause on

20   Thursday, March 9, 2023, from 9:36 a.m. to 7:35 p.m.,

21   before Janalyn Elkins, CSR, in and for the State of Texas,

22   reported by computerized stenotype machine, at the offices

23   of Davis Santos, PC, 719 Flores Street, San Antonio,

24   Texas, pursuant to the Federal Rules of Civil Procedure

25   and any provisions stated on the record herein.
```

                                                              1

CONFIDENTIAL

```
1                    A P P E A R A N C E S

2

   FOR THE PLAINTIFF:
3       DAVID A.NASSE
        KRISTEN WARDEN
4       CHARLIE DIVINE
        U.S. SECURITIES AND EXCHANGE COMMISSION,
5       DIVISION OF ENFORCEMENT
        100 F Street, N.E.
6       Washington, D.C.  20549-5917
        Tel:  (202) 551-4426
7       nassed@sec.gov
        Wardenk@sec.gov
8       Cdivine@sec.gov

9

   FOR THE DEFENDANTS:
10      JAY HULINGS
        DAVIS & SANTOS
11      719 S. Flores Street
        San Antonio, Texas  78204
12      Tel:  (210) 853-5882  Fax:  (210) 200-8395
        jhulings@dslawpc.com

13

14 FOR THE BANKRUPTCY TRUSTEE:
        RANDALL A. PULMAN
15      LESLIE HYMAN
        PULMAN, CAPPUCCIO & PULLEN, LLP
16      2161 NW Military Highway, Suite 400
        San Antonio, Texas  78213
17      Tel:  (210) 222-9494  Fax:  (210) 892-1610
        rpulman@pulmanlaw.com
18      Lhyman@pulmanlaw.com

19

   Also Present:
20      GABE SEYMORE  (Videographer)

21

22

23

24

25
```

2

CONFIDENTIAL

| | | |
|---|---|---|
| 12:27:40 | 1 | Q.  (BY MR. NASSE)  Did you ever tell Mr. Concilla |
| 12:27:43 | 2 | that you were taking loans from any of the funds? |
| 12:27:49 | 3 | MR. HULINGS:  Objection.  Okay.  So the -- |
| 12:27:56 | 4 | is that question limited to pre-2019? |
| 12:28:01 | 5 | MR. NASSE:  Sure.  Yes. |
| 12:28:03 | 6 | MR. HULINGS:  All right.  You can answer as |
| 12:28:07 | 7 | long as it's before January 1, 2019. |
| 12:28:11 | 8 | THE WITNESS:  We had very frank and robust |
| 12:28:13 | 9 | discussions about almost everything we did with Dennis |
| 12:28:17 | 10 | and Andy.  They had an insight into almost everything |
| 12:28:20 | 11 | that we did.  I don't know what you mean by loans.  We |
| 12:28:24 | 12 | talk about payments here.  But yes, they knew that was |
| 12:28:27 | 13 | happening and it just confirmed it that I refreshed his |
| 12:28:31 | 14 | memory about it here. |
| 12:28:33 | 15 | Q.  (BY MR. NASSE)  That you understood that |
| 12:28:34 | 16 | payments were happening indirectly? |
| 12:28:37 | 17 | Okay.  Do you have any specific |
| 12:28:39 | 18 | recollection of discussing taking out loans from any of |
| 12:28:42 | 19 | the deeproot businesses? |
| 12:28:44 | 20 | MR. HULINGS:  Objection; vague and loans -- |
| 12:28:48 | 21 | vague as to loans from the deeproot businesses. |
| 12:28:52 | 22 | MR. NASSE:  Well, I'm happy to clarify. |
| 12:28:54 | 23 | MR. HULINGS:  Yeah.  Just clean the |
| 12:28:55 | 24 | question up a little bit, yeah. |
| 12:28:57 | 25 | Q.  (BY MR. NASSE)  Do you have any specific |

112

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

| | | |
|---|---|---|
| 12:30:24 | 1 | in the process of -- in this August here as we just |
| 12:30:28 | 2 | talked about earlier, process of getting the dGRD term |
| 12:30:32 | 3 | sheet into a compliant -- securities compliant fund. |
| 12:30:36 | 4 | So, yeah, it wouldn't surprise me at all if |
| 12:30:40 | 5 | discussions around, you want the term loans or loans or |
| 12:30:44 | 6 | anything else came up during those periods. |
| 12:30:47 | 7 | Q.  (BY MR. NASSE)  Yeah.  And again, I mean, I |
| 12:30:48 | 8 | think you answered my -- I didn't ask you whether it |
| 12:30:50 | 9 | would surprise you.  I asked if there's any specific |
| 12:30:53 | 10 | recollection of any discussion regarding loans previous |
| 12:30:55 | 11 | to 2015 for Policy Services or any of its affiliated |
| 12:30:59 | 12 | businesses? |
| 12:30:59 | 13 | MR. HULINGS:  I believe it's been asked and |
| 12:31:01 | 14 | answered multiple times now. |
| 12:31:05 | 15 | THE WITNESS:  I don't recall specifically. |
| 12:31:08 | 16 | But I recall that we had conversations where that |
| 12:31:11 | 17 | conversation could have come up as I've already |
| 12:31:13 | 18 | answered. |
| 12:31:13 | 19 | Q.  (BY MR. NASSE)  Okay.  And did you recall |
| 12:31:16 | 20 | Carlile Patchen providing you any advice in terms of if |
| 12:31:19 | 21 | you were going to take loans, what would be required in |
| 12:31:21 | 22 | terms of disclosure or documentation? |
| 12:31:23 | 23 | MR. HULINGS:  Objection; vague and |
| 12:31:26 | 24 | compound. |
| 12:31:27 | 25 | But you can answer provided that it's prior |

114

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL

| | | |
|---|---|---|
| 12:31:28 | 1 | to 2019. |
| 12:31:31 | 2 | Q.  (BY MR. NASSE)  Yes. |
| 12:31:31 | 3 | A.  Sure.  They provided advice and what the proper |
| 12:31:34 | 4 | disclosures were for all of our documents and we relied |
| 12:31:38 | 5 | on that. |
| 12:31:39 | 6 | Q.  Yeah.  Do you have a specific recollection of |
| 12:31:40 | 7 | them providing that advice as it related to you taking |
| 12:31:44 | 8 | out loans from Policy Services, Inc. or any of its |
| 12:31:47 | 9 | affiliated businesses? |
| 12:31:48 | 10 | MR. HULINGS:  Objection; vague. |
| 12:31:50 | 11 | THE WITNESS:  If there was anything -- and |
| 12:31:52 | 12 | I can't recall the specific, you know, PPMs that either |
| 12:31:54 | 13 | are being referred here or after.  But yes, if there |
| 12:31:56 | 14 | were disclosures in that PPM regarding that, they either |
| 12:32:00 | 15 | gave the advice that it was necessary to put it in or it |
| 12:32:02 | 16 | was not necessary. |
| 12:32:04 | 17 | Q.  (BY MR. NASSE)  If you had a discussion? |
| 12:32:05 | 18 | A.  We did have -- we did have discussions, as I |
| 12:32:07 | 19 | said, regarding compensation and whether you want to |
| 12:32:12 | 20 | term it as a loan, as payment, as a salary, whatever. |
| 12:32:16 | 21 | Q.  Yeah.  I specifically loan -- a loan is |
| 12:32:19 | 22 | something you have to pay back.  Compensation |
| 12:32:21 | 23 | is something-- I mean, you're an attorney, Mr. Mueller, |
| 12:32:21 | 24 | correct? |
| 12:32:21 | 25 | REPORTER:  Is what? |

115

CONFIDENTIAL

```
12:33:22   1   but you're getting an answer.  And that's -- you may not

12:33:24   2   like it, but you're getting an answer.  You have asked

12:33:27   3   the same question four times now.

12:33:29   4              MR. NASSE:  I haven't got an answer.

12:33:31   5        Q.  (BY MR. NASSE)  Do you have any specific

12:33:32   6   recollection of any advice you received regarding loans,

12:33:35   7   not compensation or pay, specifically loans from -- you

12:33:38   8   taking loans from Policy Service, Inc. or any of its

12:33:43   9   affiliated enterprises?

12:33:43  10              MR. HULINGS:  Same objections;

12:33:46  11   argumentative, vague, asked and answered five times now.

12:33:50  12              THE WITNESS:  We had wide-ranging

12:33:51  13   discussions on a lot of issues including of course

12:33:54  14   payments and anything that would be regarded payments as

12:33:58  15   they would need to be disclosed or not in the PPMs.

12:34:10  16              MR. NASSE:  Just note for the record

12:34:11  17   nothing about loans in your answer.

12:34:13  18              MR. HULINGS:  Move to strike.

12:34:14  19              MR. NASSE:  I think we are -- I think we

12:34:18  20   can take a break for lunch if you want.  Off the record.

12:34:21  21              VIDEOGRAPHER:  We are off the record at

12:34:24  22   12:34 p.m.

12:34:25  23              (Brief recess.)

01:29:34  24              VIDEOGRAPHER:  We are back on the record at

01:29:56  25   1:30 p.m.
```

117

CONFIDENTIAL

```
01:32:16  1   offering details and there's a paragraph number 15.
01:32:20  2              Do you see where I'm at?
01:32:21  3       A.  Yes.
01:32:21  4       Q.  And you see there's the second sentence says,
01:32:24  5   (Reading:)  The fund advisor or managers retain sole and
01:32:28  6   absolute discretion over due diligence purchase and
01:32:29  7   maintenance of the assets.
01:32:30  8              Do you see that?
01:32:32  9       A.  I do.
01:32:32 10       Q.  Okay.  And you were the manager of the575 Fund?
01:32:35 11       A.  Yes.
01:32:36 12       Q.  Was there a separate fund advisor for 575 Fund?
01:32:42 13       A.  Not to my recollection.
01:32:47 14       Q.  If you could go to paragraph -- so it's page
01:33:01 15   ending in Bates 4 -- 504.  And there's a paragraph F at
01:33:14 16   the top of that page.
01:33:15 17              Do you see that?
01:33:16 18       A.  Yes.
01:33:17 19       Q.  And just go ahead and you can review that
01:33:28 20   paragraph.  Just let me know when you're done.
01:33:35 21       A.  Okay.
01:33:54 22       Q.  Okay.  Do you recall receiving advice from
01:33:59 23   Carlile Patchen or any other counsel specifically as
01:34:02 24   related to the text in paragraph F?
01:34:08 25       A.  My recollection is that all -- all these
```

119

CONFIDENTIAL

01:34:11  1  paragraphs in this section came in one form or another

01:34:15  2  from -- you said CPM or Carlile Patchen & Murphy, yes.

01:34:22  3      Q.  Okay.  Do you recall any specific conversations

01:34:24  4  or -- with -- I'll use your term, CPM, regarding the

01:34:30  5  text of paragraph F?

01:34:32  6      A.  I know that we had conversations about all of

01:34:38  7  these.  I cannot remember specifically what was said.

01:34:41  8      Q.  In your conversations regarding this PPM, do

01:34:47  9  you recall any specific conversations with CPM regarding

01:34:54 10  your ability to take loans from Policy Services or any

01:34:59 11  of its affiliated entities?

01:35:01 12          MR. HULINGS:  So objection; vague as to

01:35:03 13  loans and asked and answered.

01:35:13 14          THE WITNESS:  Sorry.  I don't see anything

01:35:15 15  about loans in this paragraph.

01:35:16 16      Q.  (BY MR. NASSE)  Yeah, in general, in connection

01:35:18 17  with drafting this PPM for 575.

01:35:21 18      A.  So, like, the previous questions before we took

01:35:22 19  a break and --

01:35:23 20      Q.  Well, I'm asking specific as to this document.

01:35:27 21      A.  It would be the same answer that I've answered

01:35:29 22  those -- that question multiple times.

01:35:32 23      Q.  And in your conversations about paragraph F,

01:35:41 24  which it said some agreements, including those involving

01:35:44 25  compensation, are not arm's length, did you discuss with

120

CONFIDENTIAL

01:37:00  1   discussions on all these and how we operated our

01:37:04  2   business internally with Dennis and Andy.  We didn't

01:37:07  3   hide anything from them.

01:37:09  4       Q.  To paragraph -- so it's on page ending in 4505,

01:37:22  5   paragraph M, (Reading:)  Inadequate valuations and their

01:37:26  6   affect on the counting and class B shares, the company

01:37:29  7   and the class B shares.

01:37:30  8              Do you see that?

01:37:31  9       A.  Yes.

01:37:32  10      Q.  Did you -- do you recall any specific

01:37:34  11  discussions with Carlile Patchen regarding what's

01:37:38  12  paragraph M in Exhibit 36?

01:37:43  13             THE REPORTER:  M or N?

01:37:45  14             MR. NASSE:  M, Mike.

01:37:47  15             THE WITNESS:  Again, this likely would have

01:38:07  16  come from them.  I'm sure we discussed it.  I don't

01:38:10  17  recall specifically our back and forth over this.  Most

01:38:14  18  of these when -- when they advised that we needed to

01:38:16  19  disclose something, unless there's something glaring on

01:38:21  20  there that we might need to correct them about a fact or

01:38:24  21  another issue, typically, take your attorney's advice.

01:38:27  22      Q.  (BY MR. NASSE)  And when they provide that

01:38:29  23  advice, again, that would be either over the telephone

01:38:31  24  or an email?

01:38:33  25      A.  Yes.

                                                                  122

CONFIDENTIAL

```
01:43:37  1   the years, including these conversations, would be in
01:43:42  2   those documents.
01:43:43  3        Q.  Okay.  On the bottom of that same page, Bates
01:43:53  4   No. 4505, there's underlying assets in the subsection
01:43:57  5   life policies.
01:43:58  6                 Do you see that?
01:43:58  7        A.  Yes.
01:43:59  8        Q.  In your discussions with Carlile -- did you
01:44:06  9   have discussions with Carlile Patchen regarding this
01:44:09 10   section of the PPM?
01:44:18 11        A.  Yes.
01:44:18 12        Q.  Okay.  And in those discussions did you
01:44:19 13   disclose to Carlile Patchen that the company, this is
01:44:26 14   deeproot funds as defined here nor the fund themselves,
01:44:30 15   would hold title to the life policies?
01:44:33 16                 MR. HULINGS:  Vague.
01:44:34 17                 THE WITNESS:  I don't know if I agree with
01:44:36 18   your characterization.  My recollection is this was
01:44:38 19   copied over to some extent from our previous funds that
01:44:42 20   had been talked about and vetted over a long period of
01:44:45 21   time.
01:44:45 22        Q.  (BY MR. NASSE)  Yeah, that's fine.  But my
01:44:50 23   question is:  Do you recall conversations with them
01:44:52 24   where you talk about this provision -- these provisions
01:44:56 25   in the PPM, the life policy --
```

127

CONFIDENTIAL

| | | |
|---|---|---|
| 01:44:58 | 1 | Do you recall discussions with counsel |
| 01:45:00 | 2 | regarding the life policy provisions in the PPM in |
| 01:45:04 | 3 | Exhibit 36 where you disclose that neither the company |
| 01:45:09 | 4 | as defined in this document nor the fund itself would |
| 01:45:13 | 5 | hold title to the policy -- to the life policies? |
| 01:45:16 | 6 | MR. HULINGS:  Objection; vague. |
| 01:45:17 | 7 | THE WITNESS:  Yes, it was one of many |
| 01:45:19 | 8 | elements that we talked about and how we structured the |
| 01:45:24 | 9 | multiple companies that we were working with. |
| 01:45:26 | 10 | Q.  (BY MR. NASSE)  When were those discussions? |
| 01:45:28 | 11 | A.  They would have been when we were drafting |
| 01:45:31 | 12 | this. |
| 01:45:31 | 13 | Q.  Do you have a specific recollection of the date |
| 01:45:33 | 14 | or time when those discussions occurred? |
| 01:45:35 | 15 | A.  Of course, I don't. |
| 01:45:36 | 16 | Q.  As far as you know, are you aware of any |
| 01:45:39 | 17 | records of those conversations? |
| 01:45:41 | 18 | A.  If they would have happened, they would have |
| 01:45:44 | 19 | either been, you know, with the older funds.  They would |
| 01:45:47 | 20 | have been tied in with the new funds.  They would have |
| 01:45:51 | 21 | been verbal conversations, email or it would have been, |
| 01:45:53 | 22 | as we've talked about before, updates to the actual |
| 01:45:56 | 23 | document itself here. |
| 01:45:57 | 24 | Q.  Did you -- did you ever tell Carlile Patchen |
| 01:46:02 | 25 | that only Policy Services held title to the life |

128

CONFIDENTIAL

```
01:46:05  1   policies?
01:46:06  2             MR. HULINGS:  Objection; vague.  I think
01:46:08  3   misstates prior evidence.
01:46:10  4             THE WITNESS:  When are you referring to?
01:46:12  5        Q.  (BY MR. NASSE)  At this time when you were
01:46:14  6   drafting this document.
01:46:14  7        A.  I didn't need to tell them.  They already knew.
01:46:17  8        Q.  And how do you know that?
01:46:18  9        A.  I think I was pretty clear a second ago that
01:46:23 10   Dennis and Andy by this time knew intimately everything
01:46:27 11   we were doing and how everything were structured and
01:46:30 12   that Policy Services had held title to all the policies
01:46:32 13   since prior to them even becoming our attorneys.
01:46:36 14        Q.  Did you discuss with Carlile Patchen why Policy
01:46:44 15   Services is nowhere referenced in this PPM?
01:46:44 16             THE REPORTER:  Is?
01:46:44 17             MR. NASSE:  Policy Services is nowhere
01:46:53 18   referenced in this PPM.
01:46:53 19             MR. HULINGS:  Objection; that's vague and
01:46:55 20   argumentative.
01:46:56 21             THE WITNESS:  Without -- without going
01:46:57 22   through the entire PPM to confirm that, I can't -- I
01:47:02 23   can't answer that.
01:47:03 24        Q.  (BY MR. NASSE)  Well, my question is --
01:47:04 25        A.  There had to be some reference.  I just don't
```

129

**CONFIDENTIAL**

01:47:07  1   know where the reference might be.  And if it's not

01:47:10  2   there, then at the time Dennis and Andy must not have

01:47:13  3   felt it necessary.

01:47:13  4       Q.  Do you recall discussing whether Policy

01:47:17  5   Services should be disclosed in this PPM?

01:47:19  6       A.  I'm sure we did.

01:47:20  7       Q.  Do you have a recollection of doing so?

01:47:23  8       A.  We're talking about, you know, eight to nine

01:47:26  9   years ago.  We're talking about voluminous emails,

01:47:32  10  edits, and verbal conversations, hours upon hours upon

01:47:37  11  hours.  I don't remember every little detail.  But I can

01:47:39  12  remember general concepts.

01:47:41  13           And, yes, when we go over this together,

01:47:42  14  we're going over it to make sure that everything is

01:47:45  15  correct and that we've provided them all the information

01:47:47  16  they need to determine whether it needs to be disclosed.

01:47:51  17      Q.  Let's go to 506.  If you go to the bottom of

01:48:28  18  page 506, Exhibit 36, Capital Acquisition deeproot Tech.

01:48:32  19           Do you see that?

01:48:33  20      A.  Yes.

01:48:34  21      Q.  In the last sentence of the first paragraph

01:48:40  22  there, (Reading:)  We minimize this risk by limiting the

01:48:45  23  capital acquisition component of a company to 45 percent

01:48:48  24  of the asset portfolio.

01:48:50  25           Do you see that?

                                                                    130

CONFIDENTIAL

| | | |
|---|---|---|
| 01:48:51 | 1 | A.  Yes. |
| 01:48:51 | 2 | Q.  And the company is -- capitalized defined term |
| 01:48:55 | 3 | is deeproot Funds -- 575 Fund LLC; is that right? |
| 01:48:59 | 4 | A.  I'm sorry.  Please repeat your question. |
| 01:49:02 | 5 | Q.  What -- company is the575 Fund in this |
| 01:49:06 | 6 | document? |
| 01:49:08 | 7 | A.  Deeproot 575 Fund LLC. |
| 01:49:10 | 8 | Q.  Correct.  That's the company that's referred |
| 01:49:14 | 9 | to -- |
| 01:49:14 | 10 | A.  That's the issuer, yes. |
| 01:49:16 | 11 | Q.  Did you discuss this provision with Carlile |
| 01:49:22 | 12 | Patchen? |
| 01:49:22 | 13 | A.  I don't remember this specific provision being |
| 01:49:25 | 14 | there in the final one.  But again, that's just |
| 01:49:28 | 15 | recollection.  But again, we discussed everything in |
| 01:49:31 | 16 | here.  They made the determination of what needs to be |
| 01:49:36 | 17 | disclosed or not based upon our discussions and |
| 01:49:40 | 18 | collaboration.  And they specifically signed off |
| 01:49:42 | 19 | emphatically that everything in here was legal, |
| 01:49:45 | 20 | securities compliant, and we were ready to proceed with |
| 01:49:49 | 21 | subscriptions. |
| 01:49:49 | 22 | Q.  Do you recall discussing with Carlile Patchen |
| 01:49:54 | 23 | how you were determining the allocation percentage, the |
| 01:49:57 | 24 | 45 percent as listed in the paragraph I just read to |
| 01:50:00 | 25 | you? |

131

**CONFIDENTIAL**

| | | |
|---|---|---|
| 01:50:00 | 1 | MR. HULINGS:  Objection; vague. |
| 01:50:02 | 2 | THE WITNESS:  Of course we did since that |
| 01:50:03 | 3 | was a major component.  I don't recall the specific |
| 01:50:08 | 4 | conversations, but, of course, we would have. |
| 01:50:10 | 5 | Q.  (BY MR. NASSE)  Do you recall Carlile Patchen |
| 01:50:15 | 6 | ever telling you that -- advising you that you do not |
| 01:50:18 | 7 | have to disclose that Policy Services owned all the life |
| 01:50:21 | 8 | policies? |
| 01:50:21 | 9 | MR. HULINGS:  Objection; vague. |
| 01:50:24 | 10 | THE WITNESS:  My answer would be is if they |
| 01:50:27 | 11 | signed off on this and if it, indeed, does not disclose |
| 01:50:32 | 12 | that, then they felt that that was okay and we took |
| 01:50:35 | 13 | their advice. |
| 01:50:36 | 14 | Q.  (BY MR. NASSE)  Okay.  My question was:  Do you |
| 01:50:38 | 15 | have a recollection of them saying -- affirmatively |
| 01:50:41 | 16 | saying to you, you do not need to disclose Policy |
| 01:50:44 | 17 | Services, Inc. in this PPM? |
| 01:50:46 | 18 | MR. HULINGS:  Objection; vague, asked and |
| 01:50:47 | 19 | answered. |
| 01:50:48 | 20 | THE WITNESS:  I believe I have answered |
| 01:50:50 | 21 | that. |
| 01:50:51 | 22 | Q.  (BY MR. NASSE)  So it's "no" you don't have a |
| 01:50:54 | 23 | recollection of that? |
| 01:50:56 | 24 | MR. HULINGS:  Argumentative. |
| 01:50:57 | 25 | THE WITNESS:  I said that there was |

132

CONFIDENTIAL

| | | |
|---|---|---|
| 01:52:12 | 1 | conclusion and I don't remember when it comes to talking |
| 01:52:18 | 2 | about the ownership and the structure of our companies, |
| 01:52:22 | 3 | which Dennis and Andy were completely involved in and |
| 01:52:25 | 4 | advised on.  I don't recall what their specific legal |
| 01:52:29 | 5 | counsel was other than that they felt it was okay as is |
| 01:52:34 | 6 | and we move forward. |
| 01:52:35 | 7 | Q.  (BY MR. NASSE)  Yeah.  My question wasn't |
| 01:52:38 | 8 | asking for a legal opinion.  You're the fund manager and |
| 01:52:41 | 9 | advisor.  So my question is:  As a fund manager and |
| 01:52:45 | 10 | advisor, did you disclose to them that deeproot -- 575 |
| 01:52:50 | 11 | Fund LLC did not own any -- would not own any portion of |
| 01:52:53 | 12 | deeproot Tech? |
| 01:52:56 | 13 | MR. HULINGS:  So vague as to -- as to |
| 01:53:00 | 14 | "own." |
| 01:53:00 | 15 | You can answer. |
| 01:53:02 | 16 | THE WITNESS:  As I've said before, I'm sure |
| 01:53:04 | 17 | we discussed it and I can't remember if I said that |
| 01:53:09 | 18 | specifically because I'm not going to put words in my |
| 01:53:12 | 19 | mouth and I'm not going to let you do it either. |
| 01:53:15 | 20 | I can tell you that Dennis and Andy knew |
| 01:53:19 | 21 | exactly how we were organized because they helped set it |
| 01:53:22 | 22 | up.  They knew what needed to go in here and didn't need |
| 01:53:25 | 23 | to go in here and they knew what needed to be disclosed |
| 01:53:27 | 24 | and not disclosed to investors and we took their advice. |
| 01:53:30 | 25 | Q.  (BY MR. NASSE)  So you told Carlile Patchen |

134

CONFIDENTIAL

| | | |
|---|---|---|
| 02:08:32 | 1 | MR. HULINGS:  So it misstates the evidence, |
| 02:08:34 | 2 | also asked and answered, and it's vague. |
| 02:08:36 | 3 | THE WITNESS:  I'm sure we did have the |
| 02:08:38 | 4 | conversations with him -- with them as we were going |
| 02:08:40 | 5 | through this with Centri and with BDO.  I cannot recall |
| 02:08:43 | 6 | a specific conversation. |
| 02:08:46 | 7 | Q.  (BY MR. NASSE)  Go to page Bates No. 4509. |
| 02:09:10 | 8 | This is a provision at the top that says, "Company |
| 02:09:12 | 9 | advance." |
| 02:09:14 | 10 | A.  I see it. |
| 02:09:17 | 11 | Q.  Do you have any specific recollections of |
| 02:09:19 | 12 | conversations with Carlile Patchen regarding the company |
| 02:09:22 | 13 | advance provision in Exhibit 36? |
| 02:09:25 | 14 | A.  I'm sure we had conversations about it |
| 02:09:34 | 15 | throughout the entire process.  I don't believe this was |
| 02:09:38 | 16 | a provision in the prior Debenture funds.  This was |
| 02:09:43 | 17 | introduced later on.  And so, yes, I'm sure we had a lot |
| 02:09:47 | 18 | of conversations about this paragraph. |
| 02:09:49 | 19 | Q.  You don't have any recollection of a specific |
| 02:09:53 | 20 | conversation? |
| 02:09:53 | 21 | MR. HULINGS:  Objection; vague as to |
| 02:09:55 | 22 | specific conversation.  Are you looking for dates? |
| 02:09:57 | 23 | MR. NASSE:  Yeah, a date or time of when. |
| 02:10:01 | 24 | THE WITNESS:  I don't recollect in the |
| 02:10:02 | 25 | months that we were designing and drafting this back and |

145

CONFIDENTIAL

```
02:10:06  1   forth.  I don't recall exactly when or where we added or
02:10:12  2   discussed the company advance during that period.
02:10:14  3        Q.  (BY MR. NASSE)  And your discussions with
02:10:15  4   Carlile Patchen regarding the company advance, did you
02:10:22  5   discuss the fact whether you needed controls or
02:10:25  6   processes to ensure you would stay within the 20 percent
02:10:31  7   limit of company advance?
02:10:33  8              MR. HULINGS:  Objection as to controls and
02:10:36  9   processes, vague.
02:10:38 10              THE WITNESS:  I'm sure that we discussed a
02:10:41 11   wide ranging when it comes to this about controls.  Not
02:10:45 12   just in this provision as we discussed before and I
02:10:49 13   answered before is that we, over many years, had talked
02:10:52 14   about how we processed our business and what internal
02:10:55 15   controls that we use.
02:10:57 16        Q.  (BY MR. NASSE)  What were the internal controls
02:10:58 17   to ensure you didn't exceed 20 percent of the company
02:11:03 18   advance provision?
02:11:04 19              MR. HULINGS:  Objection; vague as the term
02:11:08 20   "controls."
02:11:09 21              MR. NASSE:  I'm using it the way he used it
02:11:10 22   in his prior answer.
02:11:12 23              THE WITNESS:  They knew we documented in
02:11:13 24   paper.  They knew we documented online.  They knew we
02:11:17 25   kept -- had reports and spreadsheets.  They knew we kept
```

146

CONFIDENTIAL

```
02:16:26   1            THE WITNESS:  Again, I've answered that.  I
02:16:28   2   don't know specifically in the QuickBook files or
02:16:30   3   accounting records how the bookkeeper and how the
02:16:33   4   accountants managed those accounts, titled those
02:16:36   5   accounts, et cetera.
02:16:37   6       Q.  (BY MR. NASSE)  So let me just ask you this:
02:16:38   7   So an investor comes in and they invest $100,000.  Do
02:16:43   8   you take that 20 -- do you take the $20,000 and put it
02:16:47   9   in a separate account?
02:16:48  10            MR. HULINGS:  Objection; improper
02:16:50  11   hypothetical, and vague and ambiguous.
02:16:53  12            THE WITNESS:  That was not usually how we
02:16:55  13   were advised to do the flow of funds.
02:16:59  14       Q.  (BY MR. NASSE)  Did you -- well, I didn't ask
02:17:03  15   about the flow of funds.  I asked how would you
02:17:08  16   segregate the money to be used for company advance?
02:17:11  17       A.  We were never advised to segregate it.
02:17:14  18       Q.  Did you ever tell -- did you ever discuss with
02:17:17  19   Carlile Patchen how you were using company advance?
02:17:21  20       A.  We did discuss it -- sorry --
02:17:24  21            MR. HULINGS:  Go ahead.
02:17:25  22            THE WITNESS:  We did discuss it, of course,
02:17:28  23   especially when we went through the DRSS 1 process.
02:17:31  24       Q.  (BY MR. NASSE)  And again, that process was
02:17:35  25   related to a different fund, correct?
```

                                                            151

CONFIDENTIAL

```
02:17:36  1        A.  No.  As I think I've stated several times today
02:17:39  2    is that we started that whole process with reviewing
02:17:42  3    where we were at that point and that is the dGRD and
02:17:46  4    the575.
02:17:49  5        Q.  Right.  But you didn't submit -- you didn't --
02:17:51  6    nothing in your DRS was a submission on behalf of 575 or
02:17:55  7    dGRD?
02:17:57  8        A.  I think I've been clear and I will restate it
02:18:01  9    is that these funds were a progression of work product
02:18:04 10    from the very beginning that built on each other.  We
02:18:08 11    used vetted language.  And so when we got to the S-1 and
02:18:13 12    DRS processes and we had brought in Centri to start
02:18:18 13    writing the financial terms and disclosures and then BDO
02:18:22 14    having to audit that and then working with our attorneys
02:18:25 15    during that process, we were using and started with the
02:18:29 16    existing funds and the fund disclosures and the
02:18:31 17    processes of controls that we had in relation to them.
02:18:41 18        Q.  So you can't recall -- I just want to make
02:18:44 19    sure.  You have no recollection of a written policy
02:18:46 20    governing the company advance?
02:18:48 21                MR. HULINGS:  Asked and answered.
02:18:50 22                THE WITNESS:  I have answered.  I answered
02:18:52 23    that several times.
02:18:53 24        Q.  (BY MR. NASSE)  And you have no recollection of
02:18:56 25    a specific report that would tell you whether you had
```

152

CONFIDENTIAL

02:19:01  1   exceeded or under the 20 percent as described in the

02:19:05  2   company advance?

02:19:05  3          MR. HULINGS:  Hold on.  Asked and answered

02:19:08  4   and vague as "specific report."

02:19:10  5          THE WITNESS:  When I asked for a report

02:19:12  6   from Chris, I got a big bill.  So when we did reports,

02:19:15  7   we tried to do reports in the system that would have and

02:19:18  8   hold multiple purposes.  So I do not -- it might have

02:19:21  9   been there in some form or fashion specifically, but I

02:19:23 10   don't recall there being an actual specific report that

02:19:27 11   we asked him to program that would have pulled and

02:19:30 12   compiled and aggregated the data for the 20 percent.  I

02:19:35 13   would have likely gone to one or more other reports that

02:19:38 14   were multi-use.

02:19:40 15      Q.  (BY MR. NASSE)  And did you ever discuss with

02:19:48 16   Carlile Patchen how you were monitoring the 20 percent

02:19:51 17   in the company advance?

02:19:55 18          MR. HULINGS:  Asked and answered.

02:19:56 19          THE WITNESS:  Yeah, I'm sure we did.

02:19:58 20      Q.  (BY MR. NASSE)  And who was your bookkeeper?

02:20:02 21      A.  Her name was Charlotte Acker.

02:20:04 22      Q.  And how often did she reconcile the company

02:20:09 23   books?

02:20:10 24      A.  It varied year to year.  It started being more

02:20:14 25   less toward the end of the year for -- it could be a

153

CONFIDENTIAL

```
02:20:18  1   week and a half.  It could be three weeks.  It just
02:20:21  2   depended on the amount of data and getting the
02:20:24  3   accountants to direct her what to do and then
02:20:27  4   reconciling all of the -- whatever entries she had
02:20:31  5   questions on.
02:20:32  6       Q.  And you would provide her information that she
02:20:35  7   would enter into QuickBooks?
02:20:38  8       A.  I --
02:20:38  9           MR. HULINGS:  Go ahead.
02:20:39 10           THE WITNESS:  I would provide her some of
02:20:41 11   the information.
02:20:42 12       Q.  (BY MR. NASSE)  The company advance provision
02:20:56 13   says this amount, I'm looking at -- I think it's the
02:20:58 14   second sentence.  (Reading:)  This amount covers agent
02:21:00 15   compensation, if any, nominal administration expenses,
02:21:05 16   IRA fees and other compensation marketing costs and the
02:21:07 17   fund advisor fees.
02:21:09 18           Do you see that?
02:21:10 19       A.  Yes.
02:21:10 20       Q.  Okay.  Did you have any -- do you recall any
02:21:13 21   discussions with Carlile Patchen specifically about
02:21:15 22   the -- what was covered under nominal administration
02:21:17 23   expenses?
02:21:20 24           MR. HULINGS:  Assuming that is before
02:21:22 25   January 2019, you can answer.
```

154

CONFIDENTIAL

```
02:21:24   1                    MR. NASSE:  Yes.  Yes.
02:21:26   2                    THE WITNESS:  Yes.  This whole section,
02:21:27   3   again, came from them as we are trying to disclose
02:21:33   4   what -- what the company advance could be used for.  And
02:21:37   5   my recollection is that nominal administration expenses,
02:21:40   6   I mean, speak for itself.
02:21:42   7       Q.  (BY MR. NASSE)  I just want to make sure I
02:21:44   8   understand.  You do recall a specific conversation with
02:21:47   9   Carlile Patchen regarding what was covered under the
02:21:49  10   term "nominal administration expenses"?
02:21:52  11                    MR. HULINGS:  So object as to vague as to
02:21:54  12   "specific conversation."  Are you looking for a date or
02:21:56  13   the fact that a conversation took place?
02:21:59  14                    MR. NASSE:  The fact that the -- we'll
02:22:01  15   start there.  The fact that a conversation took place.
02:22:01  16                    THE WITNESS:  Yes.
02:22:04  17       Q.  (BY MR. NASSE)  Okay.  When was that?
02:22:05  18       A.  It was multiple conversations between maybe
02:22:14  19   spring, March, and whenever we -- whenever we finalized
02:22:18  20   this.
02:22:19  21       Q.  In 2015?
02:22:20  22       A.  2015.
02:22:20  23       Q.  Okay.  And when you say "we," you and
02:22:22  24   Mr. Concilla?
02:22:24  25       A.  And Andy, I believe.
```

155

CONFIDENTIAL

02:22:25   1        Q.   And Mr. Federico?

02:22:26   2        A.   Yes.

02:22:27   3        Q.   And what was -- what was the nature -- what did

02:22:35   4   they tell you about nominal administration expenses?

02:22:39   5        A.   Well, there was an email that kind of started

02:22:41   6   all of this off including the Pinball in early 2015.

02:22:44   7   And it talked about the realities the business and

02:22:48   8   the struggles we were facing with the Debenture funds.

02:22:54   9   And the question was covering contingencies, revenue

02:23:00  10   gaps down the road, a catch-all, so to speak.

02:23:04  11             And I'm more blunt usually and just would

02:23:09  12   like to write things out pretty bluntly.  And as we were

02:23:12  13   talking about this company advance and some of these

02:23:15  14   things, they advised that we narrow it down to this

02:23:18  15   language, that this was adequate disclosure.

02:23:22  16        Q.   Okay.  Let's break that down a bit.

02:23:26  17             When you say, "cover various expenses,"

02:23:28  18   what expenses are you specifically referring to?

02:23:31  19        A.   Exactly what -- your question a minute ago was

02:23:34  20   about administrative -- or administration expenses as it

02:23:39  21   reads.  That's exactly what we're talking about.

02:23:43  22   Expenses of the administration of the fund, of operating

02:23:47  23   the fund, et cetera.

02:23:48  24        Q.   Okay.  And you said this is in an email?

02:23:58  25        A.   I'm sorry?

                                                                   156

CONFIDENTIAL

02:24:00   1       Q.  You said this discussion is in an email?

02:24:02   2       A.  It started with an email and the discussion was

02:24:04   3   as we went to the Pinball PPM --

02:24:07   4       Q.  Again, and my question is:  Is there discussion

02:24:10   5   of nominal administration expenses are used in that term

02:24:12   6   in an email?

02:24:13   7               MR. HULINGS:  Asked and answered.

02:24:15   8               THE WITNESS:  I can't recall if it's in an

02:24:17   9   email or if it was verbal.  But it happened many, many

02:24:23  10   times so I'm sure there's likely an email out there, I

02:24:25  11   just -- I don't know without going back and looking.

02:24:28  12       Q.  (BY MR. NASSE)  And in those discussions did

02:24:31  13   you ask Carlile Patchen whether the term "nominal

02:24:35  14   administration expenses" could cover priority return

02:24:39  15   payments to investors?

02:24:42  16       A.  My understanding in the advice I received is

02:24:48  17   that 575 payment -- 575 P payments due investors are

02:24:52  18   expenses of the fund and they would be included.

02:24:55  19       Q.  Okay.  So there -- so Carlile Patchen told you

02:24:59  20   that nominal administration expenses, that provision

02:25:02  21   could be used to pay prior to return payments to 575

02:25:07  22   Fund investors?

02:25:09  23       A.  Over the multiple times we did it in one form

02:25:12  24   or another, yes.

02:25:13  25       Q.  What do you mean by "one form or another"?

157

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

02:25:16  1      A.  Well, I mean, administration expenses is pretty

02:25:20  2  broad and that's intentionally why they wanted it.  And

02:25:24  3  as I've testified before with -- we didn't hide anything

02:25:29  4  from Dennis and Andy.  And in their view being compliant

02:25:35  5  with securities laws and in their view of proper

02:25:40  6  disclosure to investors, they took a much longer section

02:25:44  7  than this that was proposed previously and they boiled

02:25:47  8  it down to this abbreviated by boiling a lot of the

02:25:52  9  other stuff down to nominal administration expenses.

02:25:56 10      Q.  I just want to make sure I understand.  What

02:25:59 11  did you ask them about nominal administration expenses

02:26:02 12  as related to payments of priority return payments to

02:26:06 13  575 Fund investors?

02:26:07 14              MR. HULINGS:  Asked and answered.

02:26:08 15              THE WITNESS:  I mean, I have answered that,

02:26:11 16  is that a wide-ranging area and an amount of expenses

02:26:19 17  that could come up, especially down the road, were

02:26:23 18  talked about and they boiled them down to nominal

02:26:27 19  administration expenses.

02:26:28 20      Q.  (BY MR. NASSE)  And those wide-ranging things,

02:26:30 21  among those was specifically mentioned priority return

02:26:35 22  payments to 575 investors?

02:26:36 23              MR. HULINGS:  Asked and answered.

02:26:38 24              THE WITNESS:  Dividends, maturities, yes,

02:26:41 25  payments to investors were expenses of the fund and

158

**CONFIDENTIAL**

| | | |
|---|---|---|
| 02:26:44 | 1 | those would be included in that. |
| 02:26:45 | 2 | Q.  (BY MR. NASSE)  Prior to return payments? |
| 02:26:45 | 3 | A.  That's what I just said. |
| 02:26:45 | 4 | Q.  MR. NASSE:  Well, You said dividends. |
| 02:26:49 | 5 | THE WITNESS:  Sorry, I should have waited. |
| 02:26:51 | 6 | MR. HULINGS:  Asked and answered.  Go |
| 02:26:53 | 7 | ahead. |
| 02:26:53 | 8 | Q.  (BY MR. NASSE)  And when -- do you have a |
| 02:26:54 | 9 | recollection of when that conversation occurred? |
| 02:26:56 | 10 | A.  That's also been asked and answered and we did |
| 02:26:59 | 11 | it over a long period of time because this was a very |
| 02:27:01 | 12 | key area of the PPM and it started again with the email |
| 02:27:07 | 13 | where I was pointing out that Russ had left and I was |
| 02:27:11 | 14 | pointing out here's where we are.  We need to find a |
| 02:27:16 | 15 | solution to where we're going to accomplish our goals, |
| 02:27:18 | 16 | take care of investors. |
| 02:27:20 | 17 | And so this is what started the very, very |
| 02:27:24 | 18 | lengthy discussion and vetting of different fund designs |
| 02:27:28 | 19 | and the language, proper disclosures that should go in |
| 02:27:33 | 20 | there between that time period. |
| 02:27:35 | 21 | Q.  And you say "lengthy discussion."  That was a |
| 02:27:38 | 22 | discussion in person, over the phone? |
| 02:27:39 | 23 | A.  Emails, phone, everything we talked about |
| 02:27:41 | 24 | before, trading back and forth and changes in the |
| 02:27:44 | 25 | documents. |

159

CONFIDENTIAL

```
02:28:50  1    that was attached to an email.  I just can't recall
02:28:54  2    without looking back.
02:28:55  3         Q.  Okay.  Did -- regardless of -- not even in the
02:29:27  4    context of nominal administrative expenses, did Carlile
02:29:31  5    Patchen ever advise you that it was permissible to pay
02:29:34  6    existing investors with new investor investments?
02:29:41  7         A.  Yes.
02:29:42  8         Q.  When did that occur?
02:29:44  9         A.  It occurred continuously throughout the
02:29:48 10    representation, including after the privilege waiver
02:29:51 11    date.
02:29:52 12              MR. HULINGS:  Let's not discuss anything
02:29:53 13    after the privilege waiver date.  You're instructed not
02:29:58 14    to answer anything about after the privilege waiver
02:30:01 15    date.
02:30:01 16         Q.  (BY MR. NASSE)  Not asking you anything about
02:30:03 17    after December 2019, when did you have conversation
02:30:08 18    where Carlile Patchen advised you that it was
02:30:10 19    permissible to pay existing investor with new investor
02:30:16 20    investments?
02:30:17 21         A.  We had many conversations about the reality of
02:30:20 22    being an issuer and complying with securities laws.  And
02:30:28 23    Dennis was very adamant during a lot of these
02:30:30 24    conversations including about this provision that money
02:30:32 25    was fungible, it's common sense as well.
```

161

CONFIDENTIAL

02:30:36  1          And a lot of our discussions, when it came

02:30:38  2  into, like, disclosure of this, what the process would

02:30:41  3  be, what the internal controls would be, were around

02:30:44  4  that concept that Dennis kept coming back to as one of

02:30:48  5  his -- his major themes.

02:30:50  6      Q.  And it was permissible?

02:30:51  7      A.  It's an expense of the fund.

02:30:54  8      Q.  Did you -- did you ever ask Mr. Concilla or

02:30:59  9  anyone at Carlile Patchen whether doing so would be

02:31:02  10  Ponzi scheme?

02:31:03  11          MR. HULINGS:  Objection; vague, and legal

02:31:05  12  conclusion as to "Ponzi scheme."

02:31:08  13          But you can answer.

02:31:09  14          THE WITNESS:  I believe there's an email.

02:31:10  15  We might have even reviewed -- that was disclosed, we

02:31:14  16  might have even reviewed it already where Dennis gave a

02:31:18  17  brief example of a Ponzi scheme.  So no, he did not

02:31:21  18  consider what we were doing or any of the disclosures or

02:31:27  19  our internal processes or controls a Ponzi scheme.

02:31:31  20      Q.  (BY MR. NASSE)  Okay.  We can go back.  I

02:31:32  21  believe he says -- he discusses what are the hallmarks

02:31:35  22  of a Ponzi scheme.  Does that sound right?

02:31:38  23      A.  I believe he discusses in context to that email

02:31:42  24  a -- one of the elements of a Ponzi scheme as I

02:31:47  25  understand it and as it related to that specific

162

CONFIDENTIAL

02:31:50  1  conversation.

02:31:50  2      Q.  But in that conversation you're not discussing

02:31:54  3  using new investor money to pay existing investors?

02:31:59  4              MR. HULINGS:  Well, do you want to show him

02:32:01  5  the document?

02:32:01  6              MR. NASSE:  Yeah.  Sure.  I think it's back

02:32:09  7  here.  It's tab 23, so Exhibit 35.  I think it's the

02:33:02  8  bottom of the first page of Exhibit 35.

02:33:04  9              THE WITNESS:  Okay.

02:33:06  10     Q.  (BY MR. NASSE)  And he says -- well, it's an

02:33:07  11 over general -- I think this is what you're referring

02:33:09  12 to, (Reading:)  Well, it's an overgeneralization, but

02:33:11  13 the hallmark of a Ponzi-style scheme is large portions

02:33:15  14 of principle payments going to pay fees and salaries.

02:33:18  15             Do you see that?

02:33:19  16     A.  Yeah.  Essentially to management as he says two

02:33:22  17 or three sentences before, correct.

02:33:24  18     Q.  Great.  There he's not talking about paying

02:33:27  19 existing investors with new investor investments?

02:33:30  20             MR. HULINGS:  Hold on.

02:33:30  21             THE WITNESS:  Okay.

02:33:31  22             MR. HULINGS:  Objection.  The document

02:33:32  23 speaks for itself.

02:33:33  24             THE WITNESS:  Yeah, I would agree.  It does

02:33:35  25 speak for itself.

                                                              163

**CONFIDENTIAL**

| | | |
|---|---|---|
| 02:34:27 | 1 | and I've answered that. |
| 02:34:28 | 2 | Q. (BY MR. NASSE) What was your -- |
| 02:34:29 | 3 | A. I used -- by the way, I used this email in my |
| 02:34:31 | 4 | previous response as one example that Dennis would go |
| 02:34:34 | 5 | through when he talked about the realities of being an |
| 02:34:37 | 6 | issuer and complying with securities laws. |
| 02:34:40 | 7 | Q. Do you have a specific recollection of another |
| 02:34:43 | 8 | example? |
| 02:34:46 | 9 | MR. HULINGS: Objection; vague. Example of |
| 02:34:49 | 10 | what? |
| 02:34:50 | 11 | MR. NASSE: Another example of him saying |
| 02:34:52 | 12 | that it was permissible to pay existing investors with |
| 02:34:56 | 13 | new investor money. |
| 02:34:58 | 14 | MR. HULINGS: That was misstating his prior |
| 02:34:59 | 15 | testimony. And so we'll call it vague. |
| 02:35:01 | 16 | THE WITNESS: We had wide-ranging, frank |
| 02:35:07 | 17 | advice about the realities of being an issuer in a |
| 02:35:11 | 18 | complex gotcha SEC enforcement environment. And just as |
| 02:35:17 | 19 | it says here, what is likely to draw attention and |
| 02:35:20 | 20 | scrutiny and what isn't. And that is why in the company |
| 02:35:25 | 21 | advance they determined that the nominal administration |
| 02:35:29 | 22 | expenses, meaning the expense of the fund, being one of |
| 02:35:33 | 23 | his big things that money was fungible and the575 fee |
| 02:35:37 | 24 | payments were expenses of the fund that it was proper |
| 02:35:39 | 25 | disclosure, proper process. |

165

CONFIDENTIAL

02:36:47  1   being an issuer.

02:36:48  2                    MR. HULINGS:  That's not what -- that

02:36:48  3   misstates prior testimony and argumentative.

02:36:51  4                    THE WITNESS:  Yeah, I did not say that.

02:36:52  5   What I said is a lot of the frank discussion that Dennis

02:36:56  6   Concilla especially, Andy, too, at times had with us

02:37:00  7   including around this provision and advice around this

02:37:02  8   provision was in justifying their counsel was because of

02:37:08  9   the very difficult complex environment that an issuer of

02:37:14 10   securities had to deal with under the SEC's laws, rules,

02:37:20 11   as well as the enforcement divisions.  And it's -- I

02:37:24 12   mean it's right here in this email as well.

02:37:26 13        Q.  (BY MR. NASSE)  And so you -- deeproot Policy

02:37:34 14   Services, Inc. and its affiliates under your direction

02:37:36 15   did pay existing investors with new investor money,

02:37:39 16   correct?

02:37:40 17                    MR. HULINGS:  So object to vagueness,

02:37:43 18   argumentative.

02:37:45 19                    But you can answer.

02:37:46 20                    THE WITNESS:  We took the advice that we

02:37:48 21   were given by competent securities counsel who we didn't

02:37:52 22   hide anything from and we followed their advice.

02:37:56 23        Q.  (BY MR. NASSE)  And that included -- just to

02:38:01 24   make sure, that advice that you followed included paying

02:38:05 25   existing investors with new investor funds?

167

CONFIDENTIAL

| | | |
|---|---|---|
| 02:38:59 | 1 | answered.  It's vague and ambiguous.  It's |
| 02:39:02 | 2 | argumentative. |
| 02:39:02 | 3 | And to the -- again, the privilege waiver |
| 02:39:05 | 4 | does not exceed January 1, 2019, so to the extent the |
| 02:39:10 | 5 | answer involves communications after that, you are |
| 02:39:12 | 6 | instructed not to answer.  But you can answer as to the |
| 02:39:19 | 7 | question relating to prior to 2019. |
| 02:39:22 | 8 | THE WITNESS:  As I said before, Dennis -- |
| 02:39:24 | 9 | one of Dennis's major things was money was fungible. |
| 02:39:28 | 10 | Payments to investors are expenses of the funds.  That |
| 02:39:32 | 11 | is why they chose the language and proper disclosure |
| 02:39:35 | 12 | they did and we followed their advice. |
| 02:39:38 | 13 | Q.  (BY MR. NASSE)  And in following their |
| 02:39:40 | 14 | advice -- I mean, it's -- I mean, it's a nonresponsive |
| 02:39:44 | 15 | answer.  My question was very simple.  I understand what |
| 02:39:47 | 16 | you're saying their advice was.  You're saying you |
| 02:39:49 | 17 | followed their advice.  I'm asking:  Did that include |
| 02:39:53 | 18 | paying -- and I'll be more specific -- paying priority |
| 02:39:57 | 19 | return payments to existing 575 investors with |
| 02:40:04 | 20 | investments from new 575 investors? |
| 02:40:06 | 21 | MR. HULINGS:  So that's -- that is vague |
| 02:40:09 | 22 | and ambiguous, that is argumentative, and it has been |
| 02:40:13 | 23 | asked and answered. |
| 02:40:17 | 24 | You can answer again if you can follow the |
| 02:40:22 | 25 | question. |

169

CONFIDENTIAL

```
02:40:22  1              THE WITNESS:  One of Dennis's major themes
02:40:26  2   was the fungibility of money.  It's also common sense,
02:40:29  3   which I don't know why you can't get yourself.  Because
02:40:33  4   it was expenses, because we were -- it's disclosed
02:40:38  5   according to them, proper disclosure, and our processes
02:40:43  6   controls that Andy and Dennis helped form and knew well
02:40:46  7   of, we acted upon their advice.
02:40:51  8        Q.  (BY MR. NASSE)  And when you say -- you said
02:40:52  9   because it is -- it was expenses, what is the "it"
02:40:55 10   you're referring to?
02:40:57 11        A.  You were asking about the575 P payments as an
02:41:02 12   expense of the fund according to Dennis and Andy as
02:41:06 13   disclosed that they felt was good disclosure, those
02:41:10 14   expenses of the funds can be paid fungible money in the
02:41:14 15   fund, one dollar in is -- could be interchanged with a
02:41:17 16   dollar out, and that was proper according to their
02:41:20 17   advice and we took their advice.
02:41:23 18        Q.  Did you ever ask Carlile Patchen whether you
02:41:27 19   could disclose -- you should disclose in the PPM that
02:41:30 20   you were paying existing investors with new investor
02:41:34 21   funds?
02:41:34 22              MR. HULINGS:  So --
02:41:36 23              MR. NASSE:  I'm talking about in the
02:41:38 24   context before 2019.
02:41:40 25              MR. HULINGS:  Okay.  I'm going to object to
```

170

CONFIDENTIAL

| | | |
|---|---|---|
| 02:41:42 | 1 | vague.  I'm not even sure I follow that question.  You |
| 02:41:45 | 2 | might want to try it again. |
| 02:41:46 | 3 | Q.  (BY MR. NASSE)  Did you ever ask Carlile |
| 02:41:48 | 4 | Patchen whether you should disclose in the PPM that you |
| 02:41:50 | 5 | would pay existing investors with new investor funds? |
| 02:41:54 | 6 | MR. HULINGS:  You can answer. |
| 02:41:56 | 7 | THE WITNESS:  Yes.  And this was one of the |
| 02:42:01 | 8 | con -- and we talked about several times.  But the |
| 02:42:04 | 9 | company advance section and the language therein was |
| 02:42:06 | 10 | their response to those types of discussions. |
| 02:42:26 | 11 | MR. HULINGS:  If we're going to change |
| 02:42:28 | 12 | topics or exhibits, I think we should take a break. |
| 02:42:31 | 13 | MR. NASSE:  I'm still on the exhibit PPM. |
| 02:42:33 | 14 | MR. HULINGS:  We might still take a break. |
| 02:42:35 | 15 | How much longer on this? |
| 02:42:36 | 16 | MR. NASSE:  Not much longer.  Well, depends |
| 02:42:39 | 17 | on his answer, five, ten minutes. |
| 02:42:41 | 18 | MR. HULINGS:  Okay. |
| 02:42:44 | 19 | Q.  (BY MR. NASSE)  If I can refer you to the |
| 02:42:52 | 20 | bottom of the page, it's ending in 4510.  It's -- this |
| 02:42:57 | 21 | is Contingent Security Agreement.  And you see there it |
| 02:43:11 | 22 | says, (Reading:)  The company -- and then this document |
| 02:43:13 | 23 | that refers to the575 Fund for the LLC -- agrees to |
| 02:43:16 | 24 | immediately grant a security interest to class B |
| 02:43:20 | 25 | shareholders and all assets and holds in the company's |

171

CONFIDENTIAL

| | | |
|---|---|---|
| 03:48:30 | 1 | not to answer. |
| 03:48:32 | 2 | MR. NASSE:  And just for the record, we |
| 03:48:34 | 3 | disagree with that characterization of the privilege. |
| 03:48:36 | 4 | Go for it. |
| 03:48:37 | 5 | MR. HULINGS:  You can answer. |
| 03:48:38 | 6 | THE WITNESS:  Do I get to answer?  Okay.  I |
| 03:48:41 | 7 | know this was sent to them.  I do not recall ever |
| 03:48:44 | 8 | discussing it in detail with them.  Might have happened. |
| 03:48:47 | 9 | I don't recall. |
| 03:48:48 | 10 | Q.  (BY MR. NASSE)  All right.  Was -- to your |
| 03:48:49 | 11 | knowledge, was the investment allocation agreement ever |
| 03:48:51 | 12 | provided to investors? |
| 03:48:54 | 13 | A.  I believe that conversation came up and, no, we |
| 03:49:07 | 14 | did not due to that conversation. |
| 03:49:10 | 15 | Q.  A conversation with Carlile Patchen? |
| 03:49:12 | 16 | A.  Yes. |
| 03:49:13 | 17 | Q.  When did that conversation occur? |
| 03:49:14 | 18 | A.  It would have occurred around this time period, |
| 03:49:20 | 19 | I'm sure. |
| 03:49:20 | 20 | Q.  And you had it with Mr. Concilla and |
| 03:49:22 | 21 | Mr. Federico or just one? |
| 03:49:24 | 22 | A.  I don't remember. |
| 03:49:25 | 23 | Q.  Okay.  Do you remember if that conversation was |
| 03:49:26 | 24 | over the phone or an email? |
| 03:49:29 | 25 | A.  I don't remember if it was email or phone. |

197

CONFIDENTIAL

| | | |
|---|---|---|
| 04:17:41 | 1 | during the investigation -- |
| 04:17:42 | 2 | MR. HULINGS:  No, no, no.  Yeah, okay. |
| 04:17:44 | 3 | Fair enough.  So other than -- okay.  So to the extent |
| 04:17:51 | 4 | that your answer concerns prior to January 1, 2019, you |
| 04:17:58 | 5 | can answer. |
| 04:17:58 | 6 | THE WITNESS:  I cannot answer. |
| 04:18:00 | 7 | Q.  (BY MR. NASSE)  Okay.  As it relates to |
| 04:18:35 | 8 | Exhibit 5, so it's the September 2019 PPM, did you seek |
| 04:18:47 | 9 | legal advice from Carlile Patchen in connection with |
| 04:18:49 | 10 | the -- with Exhibit 5? |
| 04:18:52 | 11 | A.  I can't recall. |
| 04:18:57 | 12 | Q.  If you can turn to page in Exhibit 5 ending in |
| 04:19:22 | 13 | 4834, and I'm pointing specifically to the provision -- |
| 04:19:36 | 14 | the paragraph titled, "Risks Illiquidity." |
| 04:19:39 | 15 | Do you see that? |
| 04:19:40 | 16 | A.  I see that. |
| 04:19:42 | 17 | Q.  Okay.  Read the entire paragraph, but I'm |
| 04:19:46 | 18 | pointing specifically to the sentence, "In addition, by |
| 04:19:50 | 19 | using our ultimate parent." |
| 04:19:53 | 20 | A.  Okay. |
| 04:19:54 | 21 | Q.  Okay.  In the sentence, (Reading:)  In addition |
| 04:19:56 | 22 | by using our ultimate parent company, Policy Service, |
| 04:20:00 | 23 | Inc., our sole affiliated policy administration provider |
| 04:20:03 | 24 | between us and the insurance carrier, we are unable to, |
| 04:20:07 | 25 | quote, raid the piggy bank. |

215

CONFIDENTIAL

04:20:11  1          Did you ask Carlile Patchen about that
04:20:15  2  sentence of the PPM?
04:20:18  3      A.  These were disclosures written with the help of
04:20:20  4  Jerry and Phil during the S-1 process and vetted by Andy
04:20:25  5  and Dennis and since it was vetted used in the updated
04:20:28  6  PPM here.
04:20:30  7      Q.  When you say, vetted by Jerry and Phil, that
04:20:41  8  was in connection with the DRS for The Queue Fund; is
04:20:45  9  that correct?
04:20:45 10      A.  That is correct.
04:20:46 11      Q.  Okay.  And you're saying that you use those --
04:20:50 12  that same terms in this PPM?
04:20:52 13      A.  This section, I believe, is word for word right
04:20:55 14  out of the DRS for The Queue Fund, but as best I could
04:21:00 15  recollect.
04:21:02 16      Q.  Okay.  Did Mr. Wik ever advise you that you get
04:21:05 17  to use that language in the575 fund PPM?
04:21:09 18      A.  I don't recall.
04:21:13 19      Q.  Did Mr. Forret ever advise you to use the
04:21:16 20  language from the Queue Fund DRS submission in the575?
04:21:25 21      A.  I don't recall.
04:21:26 22      Q.  Did Carlile Patchen ever advise you to use the
04:21:31 23  language used in the Queue Fund S-1 DRS in the575 Fund
04:21:37 24  PPM as reflected in Exhibit 5?
04:21:43 25      A.  I don't recall them ever telling me I couldn't.

216

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL

```
06:12:43   1              MR. NASSE:  Are we back on the record?

06:12:46   2        Q.  (BY MR. NASSE)  I'll refer you to, again, on

06:12:49   3    Exhibit 36 page ending 4505 regarding underlying assets

06:12:54   4    life policies.  And 575 Fund invested in life policies

06:13:17   5    through buying positions in the dGRD Fund; is that

06:13:22   6    right?

06:13:22   7        A.  That is correct.

06:13:23   8        Q.  Okay.  Is that fact disclosed in the PPM here

06:13:25   9    as Exhibit 36?

06:13:27  10        A.  I don't know without reading it.  I don't

06:13:30  11    recall.

06:13:31  12        Q.  Okay.  I mean, we can go back off the record if

06:13:35  13    you want but -- or if you are not going to count the

06:13:39  14    time, you can read that section or I can make the

06:13:42  15    representation that it is not but...

06:13:45  16              MR. HULINGS:  Why don't we just go based on

06:13:48  17    the representation and his memory.  I mean, otherwise,

06:13:51  18    we have to go off the record for him to review and it's

06:13:53  19    going to take a while.

06:13:55  20        Q.  (BY MR. NASSE)  Did you discuss the fact that

06:13:58  21    the 575 was purchasing its interest in life policies

06:14:04  22    through buying positions in the dGRD Fund with Carlile

06:14:07  23    Patchen?

06:14:07  24        A.  Yes.

06:14:08  25        Q.  And what did they tell you with regards to
```

264

CONFIDENTIAL

06:28:41  1              THE WITNESS:  I want to make sure coming

06:28:43  2   back in that we're on Exhibit 5, correct?

06:28:48  3       Q.  (BY MR. NASSE)  Correct.

06:28:50  4       A.  Okay.  I mean, this is consistent with all of

06:28:57  5   the discussions Andy and Dennis and I had back to the

06:29:02  6   very beginning of 2015 especially regarding the purpose

06:29:08  7   of the575, the dGRD, and bringing in other capital --

06:29:13  8   other capital acquisitions as part of the allocations.

06:29:20  9       Q.  Do you recall preparing any written analysis to

06:29:29 10   come to the conclusions that are reflected in the

06:29:30 11   paragraph that we discussed in Exhibit 5, the purpose of

06:29:33 12   this type of investment?

06:29:35 13              MR. HULINGS:  Objection; vague as to

06:29:37 14   "written analysis."

06:29:37 15              But you can answer if you understand it.

06:29:39 16              THE WITNESS:  I'm sure there was verbal

06:29:41 17   communication.  There might have even been some editing

06:29:45 18   that was done of this paragraph.  I just don't remember.

06:29:48 19       Q.  (BY MR. NASSE)  Yeah.  To be clear, I'm not

06:29:50 20   asking about the editing of this paragraph.  I'm asking

06:29:52 21   did you have any -- any written documentation of how you

06:29:56 22   determined that the capital acquisitions as described in

06:30:00 23   here were appropriate or suitable for the575 fund?

06:30:09 24              MR. HULINGS:  So just to -- maybe I can

06:30:12 25   help here just to clarify.  We're talking about -- not

                                                              274

CONFIDENTIAL

```
06:30:14   1   talking about whether this language was disclosed to
06:30:18   2   lawyers.  You're just saying did you do anything
06:30:20   3   written --
06:30:21   4                  MR. NASSE:  Correct.
06:30:21   5                  MR. HULINGS:  -- as part of the analysis
06:30:23   6   that's reflected in here.  Is that an accurate --
06:30:25   7                  MR. NASSE:  Correct.
06:30:26   8                  MR. HULINGS:  Okay.
06:30:26   9                  THE WITNESS:  Yes.  So again, we detailed
06:30:28  10   this in the second rogs to several things.  We had
06:30:31  11   extensive research and analysis in deeproot Tech and
06:30:38  12   deeproot Pinball well before we ever started it and when
06:30:41  13   we started it.  We provided most of that to Dennis and
06:30:45  14   Andy who signed off on it very early on.  And you can
06:30:49  15   imagine two seasoned security attorneys when they're --
06:30:54  16   when you mention the word, hey, we want to get into
06:30:56  17   Pinball, you can imagine the number of in-depth
06:30:59  18   questions making sure that we had done that analysis.
06:31:02  19        Q.  (BY MR. NASSE)  Where would -- where would we
06:31:05  20   find that analysis?
06:31:12  21                  MR. HULINGS:  Objection; vague as to
06:31:13  22   "analysis."
06:31:14  23        Q.  (BY MR. NASSE)  The analysis you just
06:31:16  24   described, where would we find a document or record of
06:31:18  25   it?
```

275

**CONFIDENTIAL**

```
 1                      CERTIFICATE OF WITNESS

 2

 3

 4          I, ROBERT MUELLER, do hereby declare under

 5     penalty of perjury that I have read the entire

 6     foregoing transcript of my deposition testimony,

 7     or the same has been read to me, and certify that

 8     it is a true, correct and complete transcript of

 9     my testimony given on March 9, 2023, save and

10     except for changes and/or corrections, if any, as

11     indicated by me on the attached Errata Sheet, with

12     the understanding that I offer these changes and/or

13     corrections as if still under oath.

14          _____ I have made corrections to my deposition.

15          _____ I have NOT made any changes to my deposition.

16

17     Signed:  _____

18              ROBERT   MUELLER

19     Dated this ___8th___ day of ___September___ of 20_23_.

20

21

22

23

24

25
                                                        313
```

**CONFIDENTIAL**

1

ERRATA SHEET

2

Deposition of: ROBERT MUELLER
Date taken:  MARCH 9, 2023

3

Case:  SEC v. MUELLER, et al.

4

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 15 | 5 | Replace "entity" with "persons or entities" | Clarification |
| 35 | 18 | Add "than" after "personally" | Correction |
| 69 | 20 | Replace "company, Wisconsin" with "company in Wisconsin" | Correction |
| 77 | 11 | Replace "in" with "and" | Correction |
| 78 | 22 | Replace "dead" with "debt" | Correction |
| 78 | 23 | Replace "dead" with "debt" | Correction |
| 88 | 4 | Replace "used" with "the usual" | Correction |
| 89 | 10 | Replace "it's" with "that's" | Correction |
| 113 | 7 | Replace "of" with "if" | Correction |
| 126 | 18 | Replace "a trustee" with "the Bankruptcy trustee" | Clarification |
| 139 | 15 | Replace "Medio" with "BDO" | Correction |
| 151 | 23 | Replace "DRSS 1" with "DRS, S-1" | Correction |
| 152 | 17 | Replace "of" with "and" | Correction |
| 172 | 25 | Replace "Wik" with "Wick" | Correction |
| 175 | 20 | Replace "counsel advice" with "counsel or advice" | Correction |
| 176 | 13 | Replace "it was" with "was it" | Correction |
| 188 | 1 | Replace "dues" with "due to's" | Correction |
| 204 | 7 | Replace "DBs" with "BDs" | Correction |
| 211 | 12 | Replace "DBs" with "BDs" | Correction |
| 218 | 17 | Replace "in" with "and" | Correction |
| 239 | 15 | Replace "Becka" with "Becca" | Correction |
| 239 | 18 | Replace "Dendridge" with "Dandridge" | Correction |
| 252 | 7 | Replace "Yeah," with "No," | Clarification |
| 255 | 7 | Replace "fault" with "default" | Correction |
| 275 | 15 | Replace "security" with "securities" | Correction |
| 294 | 3 | Replace "pull" with "pool" | Correction |

Signed _____

Dated ___9 - 8 - 2023_____

314

**GRADILLAS COURT REPORTERS**
(424) 239-2800

CONFIDENTIAL

```
1                    REPORTER'S CERTIFICATION
                   DEPOSITION OF ROBERT MUELLER
2                      TAKEN MARCH 9, 2023

3              I, Janalyn Elkins, Certified Shorthand

4    Reporter in and for the State of Texas, hereby certify

5    to the following:

6              That the witness, ROBERT MUELLER, was duly

7    sworn by the officer and that the transcript of the oral

8    deposition is a true record of the testimony given by

9    the witness;

10             That the original deposition was delivered to

11   DAVID A.NASSE;

12             That a copy of this certificate was served on

13   all parties.

14

15             I further certify that pursuant to FRCP No.

16   30(f)(i) that the signature of the deponent was

17   requested by the deponent or a party before the

18   completion of the deposition and that the signature is

19   to be returned within 30 days from date of receipt of

20   the transcript.  If returned, the attached Changes and

21   Signature Page contains any changes and the reasons

22   therefor.

23             I further certify that I am neither counsel

24   for, related to, nor employed by any of the parties in

25   the action in which this proceeding was taken, and
```

315

CONFIDENTIAL

1    further that I am not financially or otherwise

2    interested in the outcome of the action.

3            Certified to by me this 16th day of March 2023.

4

5

6    /s/ _Janalyn Elkins_

7    Janalyn Elkins, CSR No. 3631
     Expiration:  1/31/2025

8    Hoffman Reporting & Video Services
     Firm Registration No. 93

9    Taken on behalf of
     Gradillas Court Reporters

10   400 N. Brand Boulevard, Suite 950
     Glendale, California  91203

11   PH:  (424) 239-2800
     Fax: (818) 662-5150

12

13

14

15

16

17

18

19

20

21

22

23

24

25

316

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**