# Exhibit B

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION
 3                        - - -
 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
             Plaintiff,               )
 6                                    )
         -against-                    ) Civil Action No.
 7                                    ) 5:21-cv-785-XR
     ROBERT J. MUELLER, DEEPROOT      )
 8   FUNDS LLC (a/k/a dprt Funds,     )
     LLC, AND POLICY SERVICES INC.,   )
 9                                    )
             Defendants.              )
10                                    )
             -and-                    )
11                                    )
     DEEPROOT TECH LLC, DEEPROOT      )
12   PINBALL LLC, DEEPROOT STUDIOS LLC,)
     DEEPROOT SPORTS & ENTERTAINMENT  )
13   LLC, DEEPROOT RE 12621 SILICON   )
     DR LLC, AND ROBERT J. MUELLER,   )
14   JEFFREY L. MUELLER, AND BELINDA  )
     G. BREEN, AS CO-TRUSTEES OF THE  )
15   MB HALE OHANA REVOCABLE          )
     TRUST,                           )
16                                    )
             Relief Defendants.       )
17   _____)
18
19       VIDEOTAPED DEPOSITION OF DENNIS J. CONCILLA
20                   Wednesday, July 12, 2023
                     9:35 a.m.
21                   Carlile Patchen & Murphy
                     950 Goodale Boulevard
22                   Suite 200
                     Columbus, Ohio  43212
23
     REPORTED BY:
24   SUSAN L. COOTS, RPR
     REGISTERED PROFESSIONAL REPORTER
25   JOB No. 230712ARSI
```

1

```
 1                   A P P E A R A N C E S
 2    FOR THE PLAINTIFF:
 3          DAVID A. NASSE
            KRISTEN M. WARDEN
 4          CHARLIE DIVINE (Via videoconference)
            U.S. SECURITIES AND EXCHANGE COMMISSION,
 5          DIVISION OF ENFORCEMENT
            100 F Street, N.E.
 6          Washington, D.C.  20549-5917
            Tel:  (202) 551-4426
 7          nassed@sec.gov
            wardenk@sec.gov
 8          divinec@sec.gov
 9
      FOR THE DEFENDANTS:
10          JAY HULINGS, Attorney at Law
            Davis & Santos
11          719 South Flores Street
            San Antonio, Texas  78204
12          Tel:  (212) 853-5882
            jhulings@dslawpc.com
13
14    FOR THE BANKRUPTCY TRUSTEE:
            LESLIE HYMAN
15          ANNA K. MacFARLANE
            Pulman, Cappuccio & Pullen, LLP
16          2161 NW Military Highway, Suite 400
            San Antonio, Texas  78213
17          Tel:  (210) 222-9494
18
      FOR THE WITNESS:
19          MONICA A. SANSALONE
            Gallaher Sharp, LLP
20          1215 Superior Avenue, 7th Floor
            Cleveland, Ohio  44114
21          Tel:  (216) 241-5310
            msansalone@gallaghersharp.com
22
23
24
25
```

2

1    APPEARANCES, continued.

2    FOR CARLILE PATCHEN & MURPHY
              BRYAN M. PRITIKIN
3              Carlile Patchen & Murphy
               950 Goodale Boulevard, Suite 200
4              Columbus, Ohio  43212
               Tel:  (614) 628-0775
5              bpritikin@cmplaw.com

6                              - - -

7    ALSO PRESENT:

8    Robert J. Mueller, via videoconference
     Phillip Park, Videographer
9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              3

10:03  1      Q     Up to December 2018, did you ever represent
       2  Mr. Mueller personally?
       3      A     No.  Except to the extent that he was the
       4  principal of a company that I was representing.  So as
10:03  5  an officer of the corporation, I considered my
       6  representation to be on behalf of Policy Services,
       7  Robert Mueller, Russ Hagan, when Russ Hagan was there.
       8           MS. SANSALONE:  Bless you.
       9  BY MS. WARDEN:
10:04 10      Q     Okay.  And did the scope of your
      11  representation of Policy Services, up through
      12  December 2018, change at any point?
      13      A     No.
      14           THE VIDEOGRAPHER:  Pardon me.
10:04 15           THE WITNESS:  Gesundheit.
      16  BY MS. WARDEN:
      17      Q     And do you recall Mr. Mueller ever asking you
      18  to represent him in his personal capacity?
      19           MR. HULINGS:  Objection to the extent that
10:04 20  that question goes to time period after December 2018.
      21      A     No.
      22      Q     When did you stop representing Policy
      23  Services?
      24      A     I -- I think it's hard to put a date on it.
10:04 25  I will tell you that by 2017, my relationship with

                                                              32

10:59  1   BY MS. WARDEN:
       2       Q    You -- you do not recall discussions with
       3   Mr. Mueller regarding placing 30 percent of investor
       4   funds into deeproot Pinball?
10:59  5       A    I do recall.
       6       Q    Okay.  And what did he tell you about that?
       7            MR. HULINGS:  Objection.  Vague.
       8       A    He thought it would -- He thought that it
       9   allowed some diversification for potential cash flow.
10:59 10       Q    Okay.  Did you share your concern that
      11   there -- I believe you said that there could not --
      12   there was a possibility that the Fund could not pay its
      13   existing investors?
      14            MR. HULINGS:  Objection.  Misstates prior
10:59 15   testimony.  And vague.
      16       A    I -- I think I expressed my general concern
      17   over his desire to put -- to move away from his core --
      18   his core structure, which -- which was to create life --
      19   a pool of life settlements as distinguished from
11:00 20   viaticals.
      21       Q    And what was Mr. Mueller's response to you?
      22       A    I don't recall exactly.  I can read what his
      23   response is.
      24       Q    Well, you mentioned having conversation with
11:00 25   Mr. Mueller about this, right?

                                                          65

11:15  1        Q    Okay.  For both the dGRD and PPM -- and

2    557 Funds?

3             MR. HULINGS:  Same objections.

4        A    Yes.

11:15  5        Q    And what is the equity approach that

6    Mr. Mueller's referring to?

7        A    You know, I don't -- I'm not sure I remember.

8    I -- I -- I -- I -- I -- I think -- Well, I'd only be

9    speculating.  I -- I don't recall really.

11:16 10        Q    Okay.  I'm going to hand you Tab 19 which I'll

11   mark as Exhibit 91.

12             (Deposition Exhibit 91 was marked for

13             identification.)

14   BY MS. WARDEN:

11:16 15        Q    Do you recognize this document?

16        A    No.

17        Q    Does it appear to be an August 12, 2015, email

18   from you to Mr. Mueller?

19        A    Yes.

11:16 20        Q    Okay.  You wrote, "In my mind, this is now

21   ready."

22             And it says there's attachment of a dGRD PPM,

23   and that appears to be attached to this email

24   MUELLER-2650 through 2667.

11:17 25             Do you see --

76

```
11:17   1        A    Yes.
        2        Q    -- the dGRD PPM?
        3             What did you mean by, in your mind, this is
        4   now ready.
11:17   5        A    I had made all changes and comments that I
        6   thought were necessary.
        7        Q    Okay.  And so would you say the comment, "In
        8   my mind, this is now ready," were you providing
        9   Mr. Mueller legal advice?
11:17  10             MR. HULINGS:  Objection.  That's pretty vague.
       11        A    Yes.
       12        Q    Okay.  And was -- was your comment in the
       13   email, "In my mind, this is now ready," was that based
       14   upon the information that Mr. Mueller had provided to
11:17  15   you at that time?
       16             MR. HULINGS:  Objection.  Vague as to "at that
       17   time."
       18   BY MS. WARDEN:
       19        Q    You can answer.
11:17  20        A    Yes.
       21        Q    Sorry?
       22        A    Yes.
       23        Q    And if you later learned that -- If
       24   Mr. Mueller came to you after August 12th, 2015, with
11:18  25   new information, how would you advise him?  How would
```

77

11:26  1  premiums because, as you know, it's possible."

2          What are -- what are you referring to here?

3      A     The -- the -- Okay.  The -- the theory of --

4  of investing in a life settlement is that you're

11:27  5  purchasing an interest in someone else's insurance

6  policy.  You'll -- you'll be paid the -- the amount of

7  the policy upon the death of that individual.  Okay.

8          You have to set aside a certain amount of

9  money to continue paying the premiums.  If you have set

11:27 10  aside an in -- an insufficient amount of money, then you

11  may have to go back to the investor to say, We need more

12  money to continue paying the premiums to protect your

13  investment.  And that's what I'm referring to here.

14      Q     Okay.  And the -- Exhibit 94 is a draft

11:28 15  deeproot Investor Presentation.  Do you recall providing

16  legal advice on Exhibit 94?

17      A     Yes.

18      Q     Okay.  Was your legal advice on Exhibit 94

19  limited to the information that Mr. Mueller provided to

11:28 20  you about the 575 and dGRD Funds?

21          MR. HULINGS:  Vague.

22          You can answer.

23      A     Yes.

24      Q     And you were relying on Mr. Mueller to give

11:28 25  you complete and accurate information, correct?

84

```
12:09    1        Q    -- Investor Presentation was attached --
         2        A    Yes.
         3        Q    -- did Mr. Mueller inform you that other
         4   classes would have the same priority rights?
12:09    5        A    No.  Same priority rights as the Class B
         6   Shares; is that what you're saying?
         7        Q    Correct.
         8        A    No.
         9        Q    Okay.  And if Mr. Mueller had told you that,
12:09   10   would you advise Mr. Mueller to revise that statement?
        11             MR. HULINGS:  Objection.  Calls for
        12   speculation.  Lack of foundation.  Assumes facts not in
        13   evidence.  It's vague.
        14             You can answer, if you can.
12:09   15        A    Yes.
        16        Q    Okay.  I'm handing you what's previously been
        17   marked Exhibit 36.  It's Bates 14497 through 14512.
        18             Mr. Concilla, do -- do you recognize this
        19   document?
12:10   20        A    Yes.
        21        Q    Okay.  And -- and what is it?
        22        A    It's a -- it's a Reg D on behalf of deeproot
        23   575 Fund.
        24        Q    Okay.  Is it a Private Placement Memorandum?
12:11   25        A    Yes.
```

99

12:11   1          Q      Okay.  Is that a synonym for a Reg D?

        2          A      Yes.

        3          Q      And at the bottom, do you see it's dated

        4   September 1, 2015?

12:11   5          A      Yes.

        6          Q      Okay.  So I can represent to you that in

        7   Mr. Mueller's interrogatory responses, he indicated that

        8   Exhibit 36 that you're looking at --

        9          A      Yes.

12:11  10          Q      -- was operative between May 2015 and

       11   May 2018.  So were you representing Policy Services

       12   between -- at any point between May 2015 and May 2018?

       13          A      Periodically.

       14          Q      So is the --

12:11  15          A      Yes.

       16          Q      -- answer "Yes"?

       17          A      Yes.

       18          Q      Okay.

       19          A      From time to time.

12:11  20          Q      All right.  And do you recall advising Policy

       21   Services with respect to Exhibit 36?

       22                 MR. HULINGS:  Objection.  Vague.

       23          A      Not -- not specifically.

       24          Q      Do you regard -- do you recall providing legal

12:12  25   advice with respect to the 575 PPMs?

                                                                      100

12:12  1        A     Yes.

       2        Q     Okay.  And is Exhibit 36 one of the 575 PPMs

       3  that you provided advice for?

       4        A     I'm -- I'm unaware of there being more than

12:12  5  one 575 Fund.

       6        Q     Okay.  All right.  So turning your attention

       7  to Page 6.

       8        A     Page -- Page 6 as in the numbering pages or in

       9  the -- in the --

12:12 10        Q     Sorry.  That was my PDF Page 6.  So 14502.

      11  Hold on.  So page 6 of 13 on the bottom.  So

      12  SEC-DEEPROOT-E-0014505.

      13        A     Yeah.  Got it.  Yes.

      14        Q     Are you aware of more than one 575 Fund PPM?

12:13 15        A     I am -- I am not aware of more than one

      16  575 PPM.

      17        Q     Did Mr. Mueller ever tell you that there was

      18  more than one 575 PPM?

      19        A     I don't recall.

12:13 20        Q     Okay.  All right.  So if you look at the

      21  bottom of Bates 14505, it -- Under the category, Life

      22  Policies, it says, "We will invest in Life Policies, AKA

      23  Life Settlements, which are sales to third parties of

      24  existing life insurance contracts held on insureds who

12:13 25  are 65 years of age or older."

                                                            101

```
12:41   1            MR. HULINGS:  Vague and misleading.

        2       A    Again, I -- I -- I don't know.  I don't know.

        3   That's my answer.

        4       Q    If you had provided Policy Services legal

12:42   5   advice regarding a new dGRD PPM around May 2018, would

        6   you have expected there to be emails between you and

        7   Mr. Mueller?

        8            MR. HULINGS:  So hold on.  Hold on.  Lack of

        9   foundation.  Calls for speculation.  Hypothetical.  It's

12:43  10   vague and misleading.

       11            You can answer, if you can.

       12       A    Yeah.

       13            MS. SANSALONE:  What he said.

       14       A    What he said.  Yes.

12:43  15            Yes, I would have expected there to be email.

       16   We communicated a lot through email.

       17       Q    Yeah.  How -- Would you say email was the most

       18   frequent form of communication between you and

       19   Mr. Mueller?

12:43  20       A    Yes.

       21       Q    Okay.  And were phone calls between you and

       22   Mr. Mueller a rare occasion?

       23            MR. HULINGS:  Objection.  Vague.

       24            MS. SANSALONE:  Objection.  Yeah.  Go ahead.

12:43  25       A    I -- I -- When we were actively working on
```

124

12:43   1   something, we emailed a lot and we spoke a lot by

        2   telephone.

        3       Q   Okay.  I'm handing you what is Tab 33, which

        4   I'll mark Exhibit 100.

12:44   5           (Deposition Exhibit 100 was marked for

        6           identification.)

        7           MS. SANSALONE:  We hit the big line.  100.

        8           THE WITNESS:  Yeah, I know.  Are we allowed to

        9   go over 100?

12:44  10           MS. SANSALONE:  I think there's a federal rule

       11   on that.

       12           THE WITNESS:  I think there's a federal --

       13   there's got to be a federal rule.

       14   BY MS. WARDEN:

12:44  15       Q   For the record, this is SEC-DEEPROOT-E- --

       16           MR. HULINGS:  I wish there was.

       17           THE WITNESS:  Yeah.

       18   BY MS. WARDEN:

       19       Q   -- 0164762 through 0164780.

12:45  20           MR. HULINGS:  It's fair to say the trial in

       21   this case is going to have more than 100 exhibits.

       22           THE WITNESS:  Wow.

       23           MR. HULINGS:  Thousands probably.

       24           THE WITNESS:  I would say.  Tens of thousands

12:45  25   of pages.

                                                              125

```
13:18   1                MS. SANSALONE:  Let's -- let's move forward.

        2     BY MS. WARDEN:

        3          Q    Mr. Concilla, did Mr. Mueller inform you that

        4     he would pay his investors in earlier funds, not the

13:18   5     575 or dGRD Funds with 575 and dGRD investor funds?

        6                MR. HULINGS:  All right.  So vague and

        7     ambiguous and argumentative.  Assumes facts not in

        8     evidence.

        9                You can answer, if you can.

13:19  10          A    Money is fungible.  So wherever the money is

       11     coming from, or if it's going into an account, it could

       12     be used for whatever purpose.

       13                But did we have a specific discussion about

       14     what I think you're asking; paying old investors with

13:19  15     new investor money?  We did not.

       16          Q    Okay.  I'm going to reask it because it's --

       17     it's -- that was muddy to me.

       18                So did Mr. Mueller inform you that he would

       19     pay his inventors with earlier funds --

13:19  20          A    I've already --

       21          Q    -- with 575 and dGRD investor funds?

       22                MR. HULINGS:  Okay.  So same objections as

       23     asserted to the previous question.  And asked and

       24     answered.

13:19  25          A    I'm -- I'm confused.  You're saying his
```

                                                                    152

14:32  1              MR. HULINGS:  Vague and ambiguous.  Assumes

       2    facts not in evidence.  Argumentative.  Misleading.

       3         A    Operational expenses could be nominal

       4    expenses.

14:32  5         Q    Well, how -- how -- how would you define

       6    operational expenses?

       7         A    Again -- again, expenses that are associated

       8    with day-to-day operations.  Did the electric bill get

       9    paid?  Did the phone bill get paid?  Those are all

14:33 10    operational expenses.

      11         Q    Did Mr. Mueller inform you that he would use

      12    575 and dGRD investor funds to pay off credit card

      13    purchases for personal expenses?

      14              MR. HULINGS:  So vague and ambiguous.  Assumes

14:33 15    facts not in evidence.  Argumentative.  Misleading.

      16              You can answer.

      17         A    No.

      18         Q    And just to follow up, are -- are investor

      19    payments operational expenses?

14:33 20              MR. HULINGS:  Vague and ambiguous.

      21    Argumentative.  Calls for a legal conclusion.

      22         A    I think they could be.

      23         Q    And did Mr. Mueller inform you that 575 and

      24    dGRD investor funds would be used to pay for investor

14:34 25    payments?

                                                                   167

14:35 1      Q    Did Mr. Mueller inform you that he would use

2    575 and dGRD investor funds to initiate cash transfers

3    for personal expenses?

4              MR. HULINGS:  So same set of -- Well, let me

14:35 5    repeat them.  Calls for -- facts -- relies on facts not

6    in evidence.  It's argumentative.  It's vague and

7    misleading.

8              You can answer.

9      A    No.

14:35 10     Q    Could payments from the Company Advance be

11   used to pay investment returns?

12             MR. HULINGS:  So hold on.  That's -- that's

13   vague and ambiguous.  And argumentative.  And calls for

14   a legal conclusion.

14:36 15     A    Say it again, please.  Could --

16     Q    Could payments from the Company Advance be

17   used to pay investment returns?

18             MR. HULINGS:  Same objections.

19     A    I think they could.  Yes.

14:36 20     Q    Like, pay the payouts at the end of the term?

21   At the end of an investor's term.

22             MR. HULINGS:  Asked and answered.  Vague and

23   ambiguous.

24     A    Yeah.  I'm sorry.  I can't -- I don't --

14:36 25   I don't understand the question because you're saying

169

```
15:16  1        A    Yes.
       2        Q    So I want to clarify which -- which it is.  So
       3   in the context of this -- the context of whether or not
       4   you spoke with Mr. Mueller about whether new investor
15:16  5   funds could be used to make payments to previous
       6   investors, is your testimony today that you don't recall
       7   having that conversation with --
       8             MS. WARDEN:  Objection.  Vague.
       9   BY MR. HULINGS:
15:16 10        Q    -- with Mr. Mueller?  You can answer.
      11             MS. WARDEN:  And mischaracterizes prior
      12   testimony.
      13        A    I -- I think it's fair to say that I've --
      14   Again, I've tried my best.  Could there have been a
15:16 15   conversation that I don't recall?  There -- there
      16   certainly could be.  But on some of these issues, I just
      17   know what my answer would have been.
      18        Q    So Mr. Mueller have -- may have a different
      19   recollection?
15:16 20        A    He may.
      21        Q    All right.  Pull out another example.  Do
      22   you -- do you recall being asked something to the effect
      23   by -- Let me rephrase.
      24             Do you remember being asked by Ms. Warden
15:17 25   something to the effect that, Did you have a
```

188

```
15:18   1   Argumentative.
        2   BY MR. HULINGS:
        3       Q    You can answer.
        4       A    I -- I don't -- I think it's unlikely that
15:18   5   that conversation ever took place.
        6       Q    All right.  Ask a little bit about -- You --
        7   you just testified that it would not be proper for --
        8   Let me rephrase.
        9            You were just asked questions about your
15:19  10   Declaration.  Do you recall that?
       11       A    I do.
       12       Q    And one --
       13       A    I remember that much.
       14       Q    One of the questions concerned whether or not
15:19  15   it was proper to use new investor funds to pay old
       16   investors.
       17       A    Correct.
       18       Q    Do you recall that?
       19            And you made a distinction, based on the way
15:19  20   the question was asked, about writing the word "solely."
       21   Do you recall that?
       22       A    Yes.
       23       Q    And what did you mean by "sole" -- why was
       24   "solely" important in your response?
15:19  25       A    Because, as I explained in my Declaration, and
```

190

```
15:19    1    earlier here today --
         2              (Telephone interruption.)
         3              THE WITNESS:  Sorry, this is one of those
         4    clients that won't let me retire.
15:20    5              Because if -- if -- I think it's important
         6    because, again, going back to my issue of, you know,
         7    money's fungible, if -- if -- if the underlying
         8    investments are making money and that money is coming
         9    into a bank account and new investor money is also going
15:20   10    into that bank account, then I don't think it's improper
        11    that that money is commingled.
        12              On the other hand, if there is no other money
        13    coming in from any other source, then I would -- It's my
        14    opinion that that would be improper.
15:20   15         Q    So any other source -- Let me follow up on
        16    that.
        17              Does it matter what kind of source the
        18    other -- Let me rephrase.
        19              So could -- So what your testimony is is that,
15:20   20    if new investor funds are put in the same bank account
        21    as any other source of funds, that bank account could be
        22    used to -- to make payments to previous investors?
        23              MS. WARDEN:  Objection.  Mischaracterizes
        24    prior testimony.
15:21   25              MR. HULINGS:  I'm asking him what his
```

                                                                      191

15:23  1    investors could be considered expenses of the fund under

       2    the Company Advance section; is that right?

       3        A    I see -- I see where you're going.

       4            MS. WARDEN:  Objection.  Mischaracterizes

15:24  5    testimony.

       6        A    I think it goes back to the issue of

       7    whether -- what's the sole -- what -- what -- what is --

       8    where is the sole source of the money.

       9        Q    So if the Company Advance is placed in the

15:24 10    same bank account as other revenues, could that bank

      11    account be used to pay new -- pay previous investors?

      12        A    If there's a reasonable expectation that the

      13    assets are paying dividends or paying interest or

      14    paying, then -- then yes.

15:24 15        Q    Is it a reasonable expectation that the assets

      16    are paying dividends?

      17            MS. WARDEN:  Objection.  Vague.

      18    BY MR. HULINGS:

      19        Q    I haven't even finished the question yet.

15:24 20            But let me -- Could it be -- is it -- would it

      21    be acceptable if there is a reasonable expectation that

      22    the assets will at some point pay dividends?

      23            MS. WARDEN:  Same objection.

      24        A    This is a very slippery slope.  I mean, I --

15:25 25    I -- I suppose it's possible that you could do that.

                                                                    195

15:35 1          A      Oh, yes.  Yes.

2          Q      So the -- to your knowledge, the only source

3      of funds at the beginning for the 575 Fund was new

4      investor money; is that right?

15:35 5          A      Yes.  I addressed this in an email.

6          Q      All right.  And you had that knowledge before

7      you told Mr. Mueller that the 575 PPM had been approved?

8                 MS. WARDEN:  Objection.  Asked and answered.

9          A      Yes.

15:35 10         Q      And so you knew that the 575 Fund had no funds

11     in which to pay the monthly payments to 575 P investors,

12     other than new investor funds; is that right?

13                MS. WARDEN:  Objection.  Leading.  You just

14     have to give me a couple seconds to do the objections.

15:35 15                Leading.  Mischaracterizes prior testimony.

16     Calls for speculation.

17     BY MR. HULINGS:

18         Q      None of those are valid so you can answer.

19                MS. WARDEN:  Object to that.

15:36 20     BY MR. HULINGS:

21         Q      We've had a lot of depositions together, so

22     we --

23         A      Yeah, I get it.  I get it.  This is my first

24     and on -- and only.

15:36 25         Q      Let me -- let me actually start that over.  I

204

15:37  1      A     Yes.

 2      Q     So when you -- when you are telling

 3   Mr. Mueller that the 575 is done, what are you

 4   communicating to him?

15:37  5      A     That the PPM is -- is completed and -- and

 6   fulfills his obligation on -- under the law.

 7      Q     So in the next sentence, it says, your job is

 8   to make sure it is compliant with the law and

 9   disclosures are adequate.

15:37 10      A     Correct.

11      Q     So are you communicating to Mr. Mueller that

12   the 575 PPM is compliant with the law and the

13   disclosures are adequate based on the information

14   available to you at the time?

15:38 15      A     Yes.

16       MS. WARDEN:  Objection.  Asked and answered.

17   BY MR. HULINGS:

18      Q     Okay.  And that was as of September 1st, 2015,

19   correct?

15:38 20      A     Yes.

21      Q     All right.  So prior to that date, you knew

22   that the 575 Fund had no assets?

23       MS. WARDEN:  Objection.  Asked and answered.

24       MR. HULINGS:  Yeah.  You objected so I'm

15:38 25   repackaging it to -- to deal with the objections.

         206

16:03    1        A    It -- it -- this reminds me that, yes, there

         2   was originally a -- a debenture fund.

         3        Q    So the first sentence says, "Here are the

         4   final docs for the five-year fund."

16:03    5             Do you see that?

         6        A    Yes.

         7        Q    So when your -- when you send final docs to a

         8   client, what are you communicating to the client?

         9             MS. WARDEN:   Objection.   Vague.

16:03   10        A    That -- that we -- we have reviewed this and

        11   we -- and we feel that it's appropriate and adequate

        12   and -- and that you can start selling it.

        13        Q    So this email is representing to the

        14   recipients that it is your legal opinion that this

16:04   15   document complies with the securities laws based on the

        16   information available to you; is that right?

        17        A    Yes.

        18        Q    Okay.  And -- and part of the purpose of your

        19   representation was to review documents that are being

16:04   20   provided to investors to ensure that they comply with

        21   the securities laws; is that right?

        22        A    Yes.

        23        Q    And that includes ensuring that -- Does that

        24   include ensuring that there -- no statements in these

16:04   25   documents were materially misleading, based on the

                                                                    218

16:04   1   information available to you?

     2       A     Yes.

     3       Q    If you -- Was it your practice that, if you

     4   saw some language in a PPM that you thought was

16:05   5   inappropriate or misleading, would you inform your

     6   clients of that fact?

     7       MS. WARDEN:  Objection.  Calls for

     8   speculation.

     9       A     Yes.

16:05  10        Q    And during the course of your representation,

    11  or in the course of the time working with Mr. Mueller,

    12  you -- did you send him multiple drafts of PPMs that

    13  included changes that you were recommending?

    14      A     Yes.

16:05  15        Q    To your knowledge or memory, did Mr. Mueller

    16  ever refuse to incorporate one of your proposed changes

    17  into a PPM?

    18       MS. WARDEN:  Objection.  Vague as to "refuse."

    19      A    I -- I -- I -- I don't believe so, no.

16:05  20        Q    All right.  Did -- Do you recall whether these

    21  documents were drafted based on the draft provided by

    22  the Texas lawyer?

    23      A    You know, I honestly can't answer that because

    24  I -- I just remember that there was -- that I -- we'd

16:06  25   gotten a draft and we reviewed the draft, and we felt

219

16:16  1    to your clients saying it's been approved, you're

       2    communicating to them that they can spend money in a

       3    manner that is consistent with the representations in

       4    the PPMs?

16:17  5             MS. WARDEN:  Objection.  Leading.  Misstates

       6    the evidence.

       7    BY MR. HULINGS:

       8       Q    How do you misstate the evidence?  I'm reading

       9    the document.  I don't know.

16:17 10       A    I was going to say, I don't know.

      11             Yeah.  I think the answer to your question is,

      12    yes.  We're saying -- Again, remember this is business

      13    of the company.

      14       Q    Right.

16:17 15       A    So this is the general business model of the

      16    company.  And this is what we're trying -- This is what

      17    we're going to try to accomplish as a company --

      18       Q    Yes.

      19       A    -- is create this portfolio.

16:17 20       Q    And so your understanding of what you were

      21    communicating to your clients was that they could spend

      22    a particular investor's money in -- in -- that didn't --

      23    Let me rephrase.

      24             It was your -- what you're communicating to

16:17 25    your clients, based on this document, is that they could

                                                                   229

16:17  1    spend a particular investor's money in a way that didn't

       2    comply with the 60, 20, 10, 10 breakout?

       3              MS. WARDEN:  Objection.  Mischaracterize prior

       4    testimony.

16:18  5    BY MR. HULINGS:

       6         Q    I'm asking for your testimony now.

       7         A    Okay.  Okay.  As -- as long as in -- as long

       8    as it mirrors this in totality, all of the investor

       9    funds meet this criteria.

16:18 10         Q    Okay.

      11         A    And that's -- that's perfectly okay.

      12         Q    All right.  Okay.  So the next section down

      13    says Life Settlements.  Do you see that?

      14         A    Yes.

16:18 15         Q    So at some point during the time you worked

      16    with Mr. Mueller and Mr. Hagan, were they selling shares

      17    in actual life policies, do you recall?

      18         A    I -- I do recall, and -- and the answer is

      19    yes.  There were a number of -- in -- in -- throughout

16:18 20    that time period -- Well, there were companies that were

      21    in the business of buying viaticals.  I don't -- I

      22    don't -- I don't want to get into a lengthy description

      23    of the difference.

      24              But -- so this -- so this industry started

16:19 25    during the AIDS crisis --

                                                                230

16:22  1  designing the next best greatest thing in pinball

2  machines.  And that this would be a cash flow that would

3  offset this problematic issue of about when people die.

4           We also talked a lot about, like, real estate

16:23  5  investments and other -- and other kinds of investments.

6  But that's what he thought.

7      Q   So by the time he raised the idea of investing

8  in pinball, had you been working together for a couple

9  years by this point?

16:23 10      A   Yeah, probably.  Yeah.

11      Q   So you had many conversations with Mr. Mueller

12  over the phone and -- and at least one in person?

13      A   Yes.

14      Q   And based on those prior communications, did

16:23 15  you think that Mr. Mueller was -- genuinely believed

16  that he could make Pinball profitable when he was

17  telling you this?

18           MS. WARDEN:  Objection.  Vague and ambiguous

19  as to "genuinely believed" and "profitable."

16:23 20      A   He believed that.

21      Q   He told you that he thought he could make

22  Pinball -- the Pinball business work?

23      A   Yes.

24      Q   And based on your experience with him, did you

16:24 25  believe that he believed that he could make it work?

234

16:24 1                    MS. WARDEN:  Objection.

2                    MR. NASSE:  Speculation.

3                    MS. WARDEN:  Confusing.

4         A    Well, I believed that he believed.

16:24 5         Q    In other words, this wasn't -- this was a real

6    business venture?

7         A    Well --

8                    MS. WARDEN:  Objection as to -- Vague and

9    ambiguous as to characterization.

16:24 10         A    It was he believed that this was a legitimate

11    business that could produce cash flow and income.

12         Q    Okay.  So that's -- Coming back to the

13    document in front of us, that's not part of this

14    document?

16:24 15         A    It is not.

16         Q    Okay.  All right.  Let's go to page -- All

17    right.  Let's see.  Let's go to Page 14.  I'm sorry.

18         A    I -- I see -- I see you paid for the expensive

19    stock paper.

16:25 20         Q    I didn't.  You know, I -- I -- we've done a

21    lot of these depositions remotely, and I would have been

22    fine doing this one remotely.  You've got all your

23    documents there and you can pick them on the fly.

24         A    Yeah.  Right.

16:25 25         Q    And you realize you need a document after

235

16:29   1               MS. WARDEN:  Which investors?

        2               MR. HULINGS:  Are you serious?  Okay.

        3 BY MR. HULINGS:

        4      Q    So do you understand --

16:29   5               MR. NASSE:  Investors in this fund?  Not the

        6 funds that were actually in this case.

        7               MR. HULINGS:  Okay.  Yes.  That's --

        8 BY MR. HULINGS:

        9      Q    Do you understand that when -- when --

16:30 10      A    Yes.

     11      Q    -- you provide a PPM --

     12      A    Yes.

     13      Q    -- to an investor, you're -- to someone who

     14 gives --

16:30 15      A    The debenture holders.

     16      Q    Thank you.

     17      A    The debenture holders.

     18      Q    All right.  So you're communicating to the

     19 debenture holders that provide money to this fund --

16:30 20      A    Yes.

     21      Q    -- based on this PPM?

     22      A    Yes.

     23      Q    That you -- that this PPM communicates to them

     24 that there will be salaries paid out of the money that

16:30 25 they provide?

                                                        239

16:30  1              MS. WARDEN:  Objection.  Evidence speaks for

       2  itself.

       3  BY MR. HULINGS:

       4       Q    You can answer.

16:30  5       A    Yes.

       6       Q    Okay.  And is -- Would it be inconsistent in

       7  your -- with the language in the PPM that one of the

       8  people receiving the salaries would be Robert Mueller?

       9       A    It would not be inconsistent.

16:30 10       Q    Okay.  All right.  All right.  Let's -- I'm

      11  going to show you a new exhibit.  This one is not on

      12  fancy paper.  Call this Exhibit --

      13              THE REPORTER:  103.

      14              MR. HULINGS:  -- 103.  There you go.  There

09:43 15  you go.

      16              MS. SANSALONE:  Thanks.

      17              MR. HULINGS:  Mind if I keep one for a second?

      18              MS. SANSALONE:  No, you can.  We're good.

      19              (Deposition Exhibit 103 was marked for

16:31 20              identification.)

      21  BY MR. HULINGS:

      22       Q    All right.  Okay.  Do you recognize this

      23  document?

      24       A    No.

16:31 25       Q    Take -- take a second to review it.

                                                                 240

17:07  1       A    Let me see.  Is this covered by -- by the

       2  waiver?

       3       Q    It's -- I think it -- I think it actually --

       4       A    It was not successful.

17:07  5       Q    Okay.

       6       A    And he was a charlatan.

       7       Q    Got it.  Jacob.

       8       A    Jacob.

       9       Q    All right.  Thank you.

17:07 10            All right.  Then the last bullet says, "You

      11  and I have discussed, and you know we need, immediate

      12  income to cover immediate expenses.  It will take years

      13  for the life settlements in the other funds to pay off

      14  to accomplish this, or we pay.  These tech projects can

17:08 15  not only provide the immediate income to cover admin

      16  expenses in the short term, but they take the burden off

      17  the other fund balance sheets."

      18            Do you see that?

      19       A    I do.

17:08 20       Q    So that's -- Is that also consistent with your

      21  communications with him about the idea of the Tech Fund

      22  providing short-term income?

      23       A    It is consistent with what he believed.

      24       Q    Okay.  All right.  Let's get to the heart of

17:08 25  this.

                                                                  264

17:39   1   context.

        2        A    I -- I would agree with your statement, by the

        3   way.

        4        Q    Yes.

17:39   5        A    But what I'm saying here is, you know, there's

        6   been an inquiry and you have to answer truthfully.  It

        7   has nothing to do with the PPM, per se.

        8        Q    Okay.  So a little further on, this wasn't

        9   asked.  Let's -- let's talk about this.  It says, "On

17:40  10   the compensation issue again the question is there to

       11   determine whether a significant amount of the principal

       12   went to management."

       13             Do you see that?

       14        A    Yes.

17:40  15        Q    "Indirect payments are okay if you mean that

       16   you draw a salary from dR and the funds paid dR for

       17   management."

       18             Do you see that?

       19        A    Yes.

17:40  20        Q    Let's stop there before we go on to the next

       21   thing.

       22             So you're telling Mr. Mueller that the

       23   575 Fund, for example --

       24        A    Right.

17:40  25        Q    -- could pay a fee to a different deeproot

                                                                  287

17:40  1   entity --

2        A    Yes.

3        Q    -- and that that deeproot entity could pay

4   Mr. Mueller a salary?

17:40  5        A    Yes.

6        Q    All right.  And that is your understanding of

7   how Mr. Mueller was getting paid at this time, based on

8   his representation to you?

9        A    Okay.

17:40 10        Q    Well, I guess that --

11        A    I mean, that's -- I mean --

12        Q    That's what's in this email.

13        A    My -- Again, what I'm saying is this could --

14   this could be one way to do it.  Yes.

17:40 15        Q    Okay.  And then the next line says, "While

16   it's an over generalization, the hallmark of a Ponzi

17   scheme is large portions of the principal payments going

18   to pay fees and salaries."

19             Do you see that?

17:41 20        A    Yes.

21        Q    And then you said, "Remind me again what the

22   575 is.  I thought you wanted to replace them with the

23   FIFO deal."

24             We'll get to that in a second.

17:41 25        A    Yeah.

288

```
17:49   1              MS. WARDEN:  Objection.  Assumes fact -- I
        2   mean -- Sorry.  Calls for speculation.  Leading.  Vague
        3   and ambiguous.  Asked and answered.
        4   BY MR. HULINGS:
17:49   5        Q    Like I said, I don't care.  But go ahead.
        6        A    No.
        7        Q    Okay.  All right.  All right.  So this is
        8   August 21, 2015, correct?
        9        A    Yes.
17:49  10        Q    And by this point, you knew that Mr. Mueller
       11   was taking a salary indirectly?
       12              MS. WARDEN:  Objection.
       13   BY MR. HULINGS:
       14        Q    So the --
17:49  15              MS. WARDEN:  Vague as to "indirectly."
       16   BY MR. HULINGS:
       17        Q    So he knew that --
       18        A    I -- I don't -- I -- I -- I'm not -- I -- I --
       19   I'm not prepared to say I knew that he was.  What I did
17:50  20   know is that he could.
       21        Q    Okay.  All right.  So your legal advice to
       22   Mr. Mueller in -- and when you approved of the PPMs for
       23   the dGRD Fund and the 575 Fund, your -- the legal
       24   opinion you communicated to Mr. Mueller was that he
17:50  25   could take a salary that was from the funds provided --
```

                                                              297

```
17:50    1              MS. WARDEN:  Objection.

         2              MR. HULINGS:  Hold on.

         3    BY MR. HULINGS:

         4         Q    -- from the funds provided by investors by the

17:50    5    575 or dGRD Funds?

         6              MS. WARDEN:  Objection.  Mischaracterizes

         7    prior testimony.

         8              MR. HULINGS:  It isn't prior testimony.  It's

         9    his current testimony.

17:50   10              MS. WARDEN:  Okay.

        11    BY MR. HULINGS:

        12         Q    Go ahead.

        13         A    Providing it was reasonable.

        14         Q    Okay.

17:50   15         A    I hate -- I hate to get off on a tangent here,

        16    but, you know, we're -- we've all been acting as if you

        17    open the SEC regulations and it says, Here's what a PMM

        18    must have.  That -- that -- there is no such thing.

        19    What we put in a PPM is based on 100 years of

17:51   20    litigation.

        21         Q    Right.  Yeah.

        22         A    That -- and that's what forms what a

        23    securities lawyer feels is necessary to put in a PPM.

        24    So -- so no, there is no regulation that says -- As

17:51   25    I said earlier, you don't even need a PMM.  You just
```

298

17:51  1   need a Subscription Agreement.  So we do our best to try

      2   to put in all the information that would be material to

      3   an investor making a decision.

      4       Q    And -- and your opinion that you communicated

17:51  5   to Mr. Mueller was that the PPMs for the 575 Fund and

      6   dGRD Fund adequately disclosed that he would be

      7   receiving compensation in some form?

      8         MS. WARDEN:  Asked -- Objection.  Asked and

      9   answered.

17:51 10       A    Yeah.  I don't -- Again, I don't -- it doesn't

   11   speak to that specifically.  But implicitly, yes.

   12       Q    Okay.

   13       A     Implicitly.  Again, the reason for -- the

   14   reason to go to the equity idea was that -- was that he

17:51 15   owned some equity and they owned some equity, and all

   16   boats rise.

   17       Q    Okay.  All right.  Let me kind of skip ahead

   18   then.

   19         Do you -- The PPMs for both the 575 Fund and

17:52 20   the dGRD Fund disclosed that some of the funds would

   21   go -- be transferred in between different deeproot

   22   entities; is that fair?

   23         MS. WARDEN:  Objection.  Vague.

   24   BY MR. HULINGS:

17:52 25       Q    Do you understand the question?

299

18:08  1  calculated consistent with this disclosure, Exhibit 36?

       2        A    I do not recall such a conversation.

       3             MS. WARDEN:  No further questions.

       4             MR. HULINGS:  I do have one redirect on that.

18:08  5                      FURTHER EXAMINATION

       6  BY MR. HULINGS:

       7        Q    Did you consider it part of your

       8  responsibilities as Mr. Mueller's lawyer to direct him

       9  as to how he should calculate the value of his asset

18:08 10  portfolio?

      11        A    Did I consider it?

      12        Q    I can -- I can simplify it, if you want me to.

      13        A    "Did you consider it part of your..."

      14             I -- I -- I believe it self-explanatory.

18:09 15        Q    And what do you --

      16        A    That -- that 45 percent of the assets -- We're

      17  going to limit these capital acquisitions of internal

      18  affiliated investments to 45 percent.

      19        Q    And that doesn't mean that 45 percent of every

18:09 20  investor dollar that comes in --

      21        A    No.  It means 45 percent of the total amount

      22  of investments made is the limit.

      23             MR. HULINGS:  Okay.  No further questions

      24  until trial.

18:09 25             THE WITNESS:  I'm not going.

                                                                   308

```
 1                            CERTIFICATE

 2   State of Ohio       :
                                SS:
 3   County of Franklin:

 4              I, Susan L. Coots, Notary Public in and for

 5   the State of Ohio, duly commissioned and qualified,

 6   certify that the within named DENNIS J. CONCILLA was by

 7   me duly sworn to testify to the whole truth in the cause

 8   aforesaid; that the testimony was taken down by me in

 9   stenotypy in the presence of said witness, afterwards

10   transcribed upon a computer; that the foregoing is a

11   true and correct transcript of the testimony given by

12   said witness taken at the time and place in the

13   foregoing caption specified.

14              I certify that I am not a relative, employee,

15   or attorney of any of the parties hereto, or of any

16   attorney or counsel employed by the parties, or

17   financially interested in the action.

18              IN WITNESS WHEREOF, I have set my hand and

19   affixed my seal of office at Columbus, Ohio, on this

20   18th day of July, 2023.

21   _____
                     SUSAN L. COOTS, Notary Public
22                   in and for the State of Ohio and
                     Registered Professional Reporter.
23

24   My Commission Expires January 10, 2025.

25
```