```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
    SECURITIES AND EXCHANGE            .
 4  COMMISSION,                        .
                                       .
 5             PLAINTIFF,              .
          vs.                          . DOCKET NO. 5:21-CV-785-XR
 6                                     .
    ROBERT J. MUELLER, ET AL,          .
 7                                     .
               DEFENDANTS.             .
 8

 9

10         TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
11               UNITED STATES DISTRICT JUDGE
                    NOVEMBER 28, 2023
12

13

14  APPEARANCES:
    FOR THE PLAINTIFF:      CHARLIE L. DIVINE, ESQUIRE
15                          DAVID NASSE, ESQUIRE
                            KRISTEN M. WARDEN, ESQUIRE
16                          FERNANDO COMPOAMOR, ESQUIRE
                            US SECURITIES AND EXCHANGE COMMISSION
17                          100 F STREET, NE
                            WASHINGTON DC 20549-5917
18
    FOR THE DEFENDANT:      JASON DAVIS, ESQUIRE
19                          CAROLINE NEWMAN SMALL, ESQUIRE
                            DAVIS & SANTOS PC
20                          719 S. FORES STREET
                            SAN ANTONIO TX 78204
21

22  REPORTED BY:            GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
24

25
```

1          (San Antonio, Texas; November 28, 2023, at 10:00 a.m., in

2   open court.)

3          THE COURT:  21 Civil 785, SEC versus Mueller.

4          Who do we have for the government?

5          MR. DIVINE:  Good morning, Your Honor.  Charlie

6   Divine.  With me at counsel's table are Fernando Campoamor and

7   David Nasse, and behind me at the bench is Kristin Warden.

8          THE COURT:  Thank you.

9          And for Mr. Mueller?

10         MR. DAVIS:  Good morning, Your Honor.  Jason Davis is

11  here along with Caroline Small.

12         THE COURT:  Thank you.

13         So we've got a few motions.  Let's start with the

14  defendants' motion first, exclude evidence of Mueller's

15  compensation and personal expenses.

16         What's the government's response?  I've read your

17  briefs, so you can keep it short.

18         MR. NASSE:  David Nasse.

19         Good morning, Your Honor.

20         Yes, as set forth in our briefs, Your Honor, the

21  SEC's position is that it's entitled to prove its case with

22  the evidence at bar, and the defense cannot stipulate away

23  evidence.

24         In these expenses, I think if you look at the

25  exhibits, are not overly voluminous.  In fact, most of them

1  have been presented via summary evidence, but in fact goes to

2  show –– we have alleged fraud in this case, and the SEC is

3  entitled to show the reason, in part, when Mr. –– our

4  allegation, Mr. Mueller engaged in this fraud, which is, in

5  part, to sustain a certain lifestyle.

6        And to give the jury context beyond just a sort of

7  cold stipulation, I think the courts around the country have

8  said that the government can introduce evidence to that effect

9  to prove why Mr. Mueller engaged in this fraud, and we don't

10 think that these –– as you saw, these exhibits are going to be

11 totally inflammatory or, you know, let the jury draw any sort

12 of improper conclusions based on those exhibits, Your Honor.

13       So based on what we said in the briefs and the strong

14 law, I think, throughout the circuits around this country,

15 Your Honor, we think the SEC should be entitled to present

16 this evidence.

17       THE COURT:  Who is responding?  Mr. Davis.

18       So the government has to prove in this case scienter,

19 meaning that Mr. Mueller acted with intent to deceive, so why

20 doesn't this come in to establish motive and intent?

21       MR. DAVIS:  Your Honor, I think the answer is that if

22 the money was spent on charity by Mr. Mueller or spent at

23 Disney, it is irrelevant to the government's theory of the

24 case.

25       The theory of the case is that he shouldn't have

1  received that money, period.  We're stipulating on the amount

2  and what he received.  And so there is no other purpose to

3  introduce the evidence of the specific expenditures, whether

4  it be Disney, whether it be an engagement ring or anything

5  else; unless they are willing to stipulate that some

6  expenditures were okay, which I understand they are not.

7        And so, really, just take — there is no other

8  purpose for introducing that evidence, Your Honor.  It doesn't

9  go to showing of fraud any more than if we said every dime

10  that Mr. Mueller received he donated to charitable causes.

11        THE COURT:  If I understand your position right, you

12  haven't conceded that this amount of money was used for

13  fraudulent purposes.  You haven't done that next step.

14        MR. DAVIS:  We believe he was entitled to every

15  penny, but the point is they are saying he was not entitled to

16  those amounts.  So, really, their theory, Judge, is that he

17  shouldn't have received that money, end of story.  What he did

18  after he received it is irrelevant to their theory.

19        Now, if that's not true, if the nature of the

20  expenditures is important, then they can say so, and then I

21  think we have a different argument.

22        THE COURT:  Yeah.  No, the overwhelming weight of

23  authority here is that this evidence comes in.  Fifth Circuit

24  has said so as well, *Jensen 41 F.3d, 946.*

25        The motion is denied.

1              MR. DAVIS:  Yes, Your Honor.

2              THE COURT:  So then we now turn to the plaintiff's

3    motion in limine.  Let's take these one at a time.  The motion

4    to exclude evidence of the viability of the deeproot business.

5    Why don't we just take these one at a time; there's ten.

6              Government.

7              MR. NASSE:  Yes, Your Honor.

8              I think this evidence, it's our position, Your Honor,

9    that it doesn't go to any claim in our case.  The government

10   has not asserted that Pinball was a bad business plan.  We're

11   not putting Mr. Mueller's plan to generate revenue on trial.

12   That's not — that's not what the nature of our case is.  The

13   case is about how he allocated investor funds and was that

14   consistent with the Fund documents.

15             And I just want to address — you know, we received

16   defendants' papers last evening.  A couple points I would put

17   out.  The government did not shut down deeproot.  The

18   government sued Mr. Mueller and deeproot.  Nothing in the

19   SEC's complaint says that he couldn't continue to sell or

20   market Pinball.  That's not — that was not what our case was

21   about.

22             Our case was about what did he do with investor

23   funds.  Was it consistent with the fund documents.  Whether or

24   not Pinball was potentially viable, potentially profitable,

25   doesn't go to those claims.  Those aren't part — those are

1  not elements of what we're trying — any of the securities

2  fraud claims we are trying to prove here, Your Honor.

3          THE COURT:  So help me understand, though.

4          Deeproot is going to come into play here, right?  The

5  jury is going to hear about deeproot, so where is this line

6  that we are drawing here about what they — what cannot be

7  discussed?

8          MR. NASSE:  Yeah.  I think we'll find with the

9  background, Your Honor, of deeproot and what the businesses

10 were and what they were intended to do — again, we are not

11 contesting that this was a bonafide operation that wasn't —

12 it was, in fact, trying to build a pinball machine.  That's

13 not part of our case.  We don't allege that there's fraud

14 there or that it might have been potentially profitable.

15         That's — so I think that's the lie.  We have no

16 problem with — or even stipulated to — what the businesses

17 were and what their potential products were.  That's not an

18 issue.  And that they were, in fact, operating those

19 facilities.  We don't contest that there was a Pinball

20 factory, if you were, or plant or their engineers designed it.

21 That's not contested.

22         We don't contest any of those issues, and we don't

23 think that a deep dive — if you look at some of the exhibits,

24 a deep dive into the technical aspects of these pinball

25 machines, their marketing plans, the lengthy testimony about

1   what the projections were or how they came up with them,

2   that's just going to confuse the jury about what this case is

3   about and try to make it seem as though the SEC was just

4   trying to shut down this business or doesn't buy — or make

5   the case about whether Pinball or the other enterprises that

6   Mr. Mueller was funding were potentially viable, when that's

7   not an element of any of the claims we are bringing, Your

8   Honor.

9           THE COURT:  The response?

10          MR. DAVIS:  Your Honor, given the argument that we

11  just had, this is kind of an interesting position the SEC is

12  taking.  I just heard counsel say, "We'll stipulate that

13  Pinball is legitimate;" so, therefore, they can't put on

14  evidence to show that it was legitimate.

15          Now, the response to our motion to keep out

16  individual expenditures was that the SEC needs to be able to

17  prove — to "show its coherent narrative."  That was the

18  language in their response they filed, I think, on our motion

19  in limine.  And we are, likewise, entitled to put on our case

20  to show not only the coherent narrative and the background of

21  what happened, but also evidence that goes directly to

22  scienter and intent.

23          And even though the SEC, in response now, is saying

24  this is not part of our case, we are not trying to show that

25  Pinball is not legitimate, if you read the complaint and you

1  read the MSJ that was filed, as we've quoted in our brief,

2  Your Honor, they are talking about whether the deeproot

3  businesses were quote, "suitable investments."

4          They said that Mr. Mueller lied to convince investors

5  that, quote, "the assets would be safe and that they would

6  generate a profit."  So the evidence explaining what deeproot

7  is and the Pinball is very relevant.

8          And to be sure, Your Honor, we're not — I'm not

9  seeking to call an engineer and get into the intricacies of

10  the patents that were purchased for the pinball technology or

11  to get into the details, but the fact of the matter is, there

12  were numerous employees — I think once exceeding, like, 30.

13  There were patents that were purchased.  There were efforts

14  that were going on, to make this a profitable business.

15          And certainly, it's relevant, Judge, because it goes

16  directly to the state of mind that the SEC is alleging against

17  Mr. Mueller when he's talking to investors.

18          THE COURT:  Help me understand this.  So my

19  understanding is Mueller says to his investors:  We're going

20  to be making capital acquisitions in deeproot business.

21          How is any of this capital investments — or capital

22  acquisitions?

23          MR. DAVIS:  Well, Judge, there's a legal response to

24  that, too.  There are investments.  The money was spent on

25  Pinball.  There's a technical argument about whether the

1    nature of those investments were purchasing shares or not.
2    And we'll get into the materiality of that.
3            THE COURT:  I think there's twofold, isn't there?  So
4    one is the representation that there would be capital
5    acquisitions, and so I'm trying to figure out just what
6    capital was acquired.  And then the second part was whether or
7    not the funds received any interest in the deeproot business.
8    And so where is your evidence that the funds got anything out
9    of this Pinball?
10           MR. DAVIS:  Well, they would have, Judge.
11           So, for example, you're going to see the testimony,
12   and you'll hear from Mr. Mueller, you'll hear from some of the
13   employees that were directly involved in managing the Pinball
14   operation.  There were customer orders, over 125 customer
15   orders for pinball machines.  The prototype had been made.
16           You'll hear evidence that during the COVID pandemic,
17   they couldn't get products.  They couldn't get equipment, just
18   like every other industry.  But when they did start getting
19   it, there were customer orders, and that's why —
20           THE COURT:  But that's saying it was a viable
21   business, though.  What I'm trying to figure out is how does
22   it make its way back to the — to the investments that were
23   being sold here?
24           MR. DAVIS:  Because part of the theory, the imminence
25   theory, and part of what's in the PPM is that a certain amount

1   of money can be used for ancillary businesses, including
2   Pinball.  And so part of the allegations directly from the SEC
3   is that too much money was spent there or it wasn't a safe
4   investment; that it was used to finance Mr. Mueller's kind of
5   dream of a successful pinball business.
6          So how do we counter that other than with evidence of
7   what that was doing?  And we're not going to get into, like I
8   said, a voluminous discussion of the technology.  But not
9   allowing us to show that Pinball was real, that money did get
10  spent there, that the money was spent on "X," and that there
11  were returns that were expected and, in fact, imminent before
12  the SEC brought this action, or consistent with the
13  representations made to investors.  So it's directly relevant,
14  Your Honor, to their theory.
15          THE COURT:  Last word to you.
16          MR. NASSE:  Just a couple points, Your Honor.
17          The defense has indicated a witness list, that they
18  do intend to call a number of engineers:  Chris Rushforth,
19  Sean Gibson, Steve Bowden, Quinn Johnson.  Those are all
20  Pinball technical people working, so that's four witnesses.
21          They also want to call Mr. Mueller's bankruptcy
22  counsel who started the bankruptcy to provide testimony about
23  the value of the assets at bankruptcy.  So they do intend to
24  get into the weeds, if you will, on the value or viability of
25  the business with the -- and the technical details of the

1  business.

2          I would also point out that the sections of the

3  complaint they point to don't go to the viability of the

4  business.  For instance, Mr. Davis mentioned assets would be

5  safe.  That's from paragraph 40 of the complaint.  That's a

6  paragraph that refers to life insurance policies.  Has nothing

7  to do with Pinball.

8          Paragraph 32, that's quoting from the PPM and

9  describing how the PPMs, as Your Honor pointed out, describe

10 the capital acquisitions.  It's not about the viability of the

11 business.  It's simply laying out the facts of what's in the

12 PPMs, Your Honor.

13         So again, this case is not about what could

14 potentially be profitable.  It's about whether Mr. Mueller's

15 actions comported with the text of the PPMs and the other fund

16 documents, Your Honor.

17         THE COURT:  Yeah.  I'm going to allow some limited

18 testimony about deeproot, but the testimony is going to be

19 limited to what the representations were that Mr. Mueller made

20 regarding deeproot.  And then Mr. Mueller can respond to that

21 and talk about the business, but the viability of the

22 business, I still don't understand how that is relevant here.

23 It has little probative value to the allegations in this case.

24         So I'm not going to go — allow the jury to hear the

25 evidence of the viability of the business, the technical

1  components of the pinball.  All of that is not relevant.  So

2  that's granted in part, denied in part.

3          If anybody has questions about this ruling as we go

4  on, at trial, we can approach the bench first.

5          That's number two.

6          Moving to — or number one.

7          Number two, adverse consequences of investigation or

8  verdict.

9          What's the government's position there?

10         MR. NASSE:  Your Honor, it's really of a similar vein

11  of the viability.

12         Again, our allegations relate to activities or

13  statements made by Mr. Mueller pre-2021 before the government

14  filed its complaint.  And again, the viability or potential

15  viability of this business, the SEC didn't shut down the

16  Pinball or other business.  There's nothing that prevented him

17  from doing so.  If it was so close to reaping on the precipice

18  of profits, as Mr. Davis stated, he could have done so, you

19  know — continued to do that right after we filed the

20  complaint.

21         So those don't go to any of the factual bases of our

22  claims, Your Honor.  So it's a similar vein; that the SEC

23  caused or shut down deeproot.  It's just not factually correct

24  that we did so, Your Honor.

25         THE COURT:  And your response?

1    MR. DAVIS:  Judge, it's not — it wasn't entirely

2    clear what they were trying to prevent.  It's kind of like if

3    it's a criminal case, obviously, you can't tell the jury what

4    would happen.  Like, you can't get into a sentence, for

5    example, or what would be the prospective sentence.  So in the

6    sense that it's worded as the "consequences of the verdict,"

7    we're not intending to get into that.

8         Now, what counsel just said is that — and it kind of

9    goes into, I think, one of other motions in limine, is that

10   you can't talk about what the SEC did in its investigation.

11   You know, the — prior to filing — and this is Defense

12   Exhibit 83 — and I have a copy, Your Honor.  I can also pull

13   it up.  May I approach?

14        THE COURT:  Yes.  So before we get into detail, what

15   exactly — I thought the government was just trying to limine

16   out an argument that the SEC investigation caused the business

17   to fail.  Is that your sole point here?

18        MR. NASSE:  Yes, Your Honor, that's it.

19        MR. DAVIS:  And look, obviously, it wasn't the only

20   cause of failure, but what — I've provided the Court with a

21   copy of —

22        THE COURT:  But why do you want to make that

23   argument?

24        MR. DAVIS:  Well, I'll — we'll tell you, Judge.

25        They are arguing that the investors' money was a

1  complete loss.  And they are also arguing — in fact, you can

2  see from their designation a description of the anticipated

3  testimony of investors about the safety of their investment.

4  And I think it's — let me quote it so it's accurate:  "About

5  the return on the investment, the safety, the ability to repay

6  the suitable investments; that the money would be safe."

7          So the SEC acknowledges that the PPMs say certain

8  monies can be spent on these other businesses.  We're going to

9  fight about what — how to apply the formulas and the numbers

10  in this case.  But certainly, they are saying, yes, some of

11  this money could have been spent over here.  And they are also

12  making the argument that the investors were duped, among other

13  reasons, because those weren't suitable, and that it wasn't a

14  safe investment.

15          And so the evidence that will be shown will be that,

16  for example, on the Pinball side, there were orders.  There

17  was an order that was imminent.  When the SEC came in and

18  notified us that they were going to file this case and seek an

19  injunction to freeze all the assets — it's interesting that

20  counsel just said, "We didn't stop them from operating."  When

21  the SEC files an enforcement action and freezed every one of

22  your accounts, the business is done.  No one is going to get

23  involved with it.  They don't know what to do with it.  I

24  mean, that's just reality.

25          So the Exhibit, Defense 38, that I provided to the

1  Court and counsel, was an offer made to the SEC before saying:
2  Well, hold on guys.  Come down here.  Look at this business.
3  Let us show you what's going on with the Pinball.  This thing
4  that was slowed up by COVID is now going.  They have
5  prototypes.  They have customer orders.  They bought IPs so
6  that they can do these machines —— I'm not a pinball expert ——
7  Goonies machines and other machines that were apparently very
8  popular.
9       But if you file suit because you've prepared it, all
10  of that is done.  In fact, the offer made in Defendants'
11  Exhibit 83 to the SEC was we'll give you a tolling agreement.
12  We'll put a freeze on the account.  You can make sure you can
13  see what's going out, if you actually think that Mr. Mueller
14  or anyone else is taking money out of this, but don't do this,
15  because you're going to kill this, and it's going to result in
16  damage and loss to the investors just at the time where this
17  thing is going.
18       That offer was denied.  For what reason?  For what
19  reason, Judge?  You get a tolling argument.  You get an
20  agreement:  Send down your guys.  You can look at the
21  accounts.  And it's because, you know, it's the government.
22  They had it prepared.  They have a protocol.  And I
23  understand, it's not the call made at this level, but it's
24  made at the higher levels, and we need to go file this.  We
25  get a press release.  Your Honor signs the —— based on the

1  complaint, signs the freeze, and the investors lose

2  everything.

3          So is that the sole cause?  Of course not, Judge,

4  because we don't know what would have happened other than we

5  knew that orders were imminent.  But it is a relevant fact

6  when they are going to say the investors lost all their money;

7  it wasn't a suitable investment; the expectation of getting a

8  profit wasn't real; it was somehow part of a fraud.  It goes

9  directly to Mr. Mueller's scienter and his intent.  Directly

10 to it.

11         We're not going to argue, Judge, it's the sole cause,

12 because it wasn't.  It was just the final nail in the coffin.

13         THE COURT:  So I know your argument here is, well,

14 that's not relevant to the misrepresentation claim, but why

15 isn't it relevant now to a safe investment?

16         You can argue from there.

17         MR. NASSE:  That's not our argument.  Our claims are

18 not — I guess if we open that door, we can address that.

19         Our claims are not that we're going to say that these

20 investments were marketed as safe and that investors were told

21 that and that was a misrepresentation.  If you look at our

22 claims, they don't — that's not one of our claims of

23 misrepresentation, that these investments were safe.  And

24 they, in fact, weren't.

25         So that's not an element of our claims.  Our claims

1   are how we allocated the money.  Was it in accordance with

2   those PPMs.  And did he use that money in accordance with the

3   PPMs, not whether the investments themselves were safe.  So

4   that -- I don't believe that argument is relevant to our

5   claims, Your Honor.

6        And I will say, some investors that testify may say

7   that they thought that was safe, but that's not an element.

8   That's not what we're trying to prove, Your Honor.

9        MR. DAVIS:  Your Honor, back to the government's --

10   the SEC's argument about a coherent narrative.  If they are

11   willing to stipulate that the Pinball business was viable, it

12   posed a safe investment, then we'll consider that stipulation.

13        THE COURT:  But they are saying that that's not even

14   part of their claims.

15        MR. DAVIS:  But the problem with that argument,

16   Judge, is what they are trying to do is narrow this case to

17   say, Judge, here's dollars in an account.  Here's how it was

18   spent.  That's it.  The problem with that is that these

19   claims, almost all of them -- there is a negligence claim --

20   these claims require intent and scienter.  This information

21   goes directly to that.  And --

22        THE COURT:  But the scienter goes to what he was

23   saying at the time he said it, right?  Or what he represented

24   in writing or verbally, not to what happened with the business

25   and why it stopped operating.

1          MR. DAVIS:  But the facts, post-representation, are
2  certainly relevant.  Just because they want to get into the
3  facts, why is it relevant that he went to Disney?  For the
4  same reason it's relevant that he spent money on a viable
5  business that they are not contesting, I guess, presented a
6  safe investment, but for the closing of the business and the
7  bankruptcy.
8          So we can't get into the mind, Judge, at a time
9  without looking at the circumstances around it on the
10  scienter.
11         THE COURT:  So this is a motion in limine, only this
12  is not final evidentiary ruling.  Right now — I mean, I'm
13  looking at the claims of the government, and this is all
14  dealing with the misrepresentations allegedly made, and so any
15  negative effects stemming from the investigation aren't
16  relevant to the representations that were allegedly made
17  regarding the Fund's ownership positions.
18         And so right now I see just prejudice and confusion
19  resulting from going down this sidetrack, but depending on how
20  the arguments are made, you can approach the bench, and I'll
21  reconsider this.
22         MR. DAVIS:  Your Honor, does that mean that on the
23  flip side, I anticipate the SEC — maybe they won't; maybe
24  this will be simple.  I anticipate they are going to say that
25  the business failed and that the investors lost their money.

1  Maybe they are not, because under their theory, that wouldn't
2  be relevant either.  But if they are, as part of their
3  coherent narrative, then we need to have that discussion now,
4  because otherwise, it's one side without the other, Your
5  Honor.
6          MR. NASSE:  Your Honor, I think the parties have
7  stipulated to the fact that these entities went into
8  bankruptcy as a matter of fact, and I think we would be fine
9  with saying that these entities went into bankruptcy.
10         MR. DAVIS:  That's not the point, respectfully,
11  Judge.  If they are saying that, that means they are intending
12  to offer that fact, that the business failed, which means the
13  jury needs to hear the relevant evidence regarding that.
14         THE COURT:  Why — if this is a misrepresentation
15  claim to the investors, why is that necessary?
16         MR. DAVIS:  Well, then the evidence that the business
17  went into bankruptcy or failed, then, would also, under that
18  theory, not be necessary.  Because if that's the only
19  government's theory is that there were some statements made at
20  the time that I solicited your investment, and I didn't spend
21  the money as I represented, then they shouldn't be allowed to
22  introduce the fact that the businesses failed or went into
23  bankruptcy.
24         THE COURT:  Yeah.  The ruling — this is a grant for
25  now.  I'll reconsider this at the time of trial.

1          MR. DAVIS:  And then, Judge, on that fact, then, are

2     they going to be allowed to introduce the fact of the

3     bankruptcy or their failure?

4          THE COURT:  Well, I heard that you guys stipulated to

5     that.  If you are withdrawing the stipulation, then we can

6     consider that at trial.

7          MR. DAVIS:  Well, we would be.  If that's the order,

8     if we're not going to be allowed to explain why the company

9     went into bankruptcy or the circumstances around that, then

10    certainly, we would — you know, I'll confer with counsel, but

11    that shouldn't be a stipulated fact if we can't get into the

12    facts around that.

13         THE COURT:  You guys know this case much better than

14    I do, but, I mean, it would seem to be — the fact that these

15    businesses failed would actually inure some sympathy to your

16    client, because otherwise they would be left with the

17    impression that it's an ongoing business.  If it's an ongoing

18    business, what's he doing with three marriages being paid for

19    with investor funds?

20         But it's your case.  I mean, that's the initial

21    thought that's waving over my head.

22         MR. DAVIS:  And that's why the motion in limine on

23    that was so important, Judge, the fact that those were the

24    issues of importance to the Court — and by the way, it wasn't

25    quite accurate, but I get the point.  If there are multiple

1 | marriages or divorces spent on the money, completely
2 | inflammatory and irrelevant, because the government's theory
3 | is he shouldn't have had that money.  It should be the same
4 | whether he took that money down to the Food Bank and gave it
5 | all to the Food Bank.
6 |        But that's precisely why, Judge, even you, with your
7 | extensive experience there, having to call balls and strikes,
8 | if it's sticking in your mind, what's it going to do to a jury
9 | here when that's not part of the government's theory,
10 | according to them?
11 |        THE COURT:  But it is relevant to the scienter, so
12 | that's the difference here.  That's the ruling.
13 |        Moving on to three.  Advice of counsel.  So — why
14 | don't you just stay there.
15 |        So help me understand how your client told counsel
16 | everything — outside counsel everything they needed to know
17 | and that they provided a legal opinion that he relied on.
18 |        MR. DAVIS:  Judge, I'd like to first talk about the
19 | first point that you raised, which is the full disclosure
20 | issue.  And, you know, one of the cases cited by the SEC,
21 | the — it's kind of difficult — I think it's *Impastato*.
22 |        I'll get the spelling later.
23 |        THE COURT:  I-M-P-A-S-T-A-T-O.
24 |        MR. DAVIS:  Yes, Your Honor.  I think it was a
25 | Louisiana case.  But basically recognized — and I think the

1  *Snyder* case, too, recognized that that's a jury question; that

2  the level of disclosure, whether it was full disclosure or

3  not, should be submitted to the jury.

4        So this is not appropriate for a motion in limine

5  saying you can't get into that.  So that's the threshold

6  issue.  In fact, we cited directly that court's discussion of

7  that, and I think the *Snyder* case just reinforces that.  And

8  that was a large part.

9        THE COURT:  But, I mean, there's got to be enough

10  fact issues to go to a jury.  So tell me where are there fact

11  issues that may go to a jury on this?

12        MR. DAVIS:  Sure, Judge.  I guess we'll put it into

13  context.

14        If you read the SEC's motion, it creates the

15  impression that Robert Mueller went to these lawyers, the

16  securities lawyers, just prior to the PPM and said, "Hey,

17  guys, I'm going to raise some money."  That's not what this

18  was.

19        What you had was over two and a half years of

20  representation –– actually, two years and five months –– by

21  these lawyers prior to that PPM that's the subject of this

22  case, the first PPM.  That's the real subject of this case.

23  There are several, but that's the in-time.

24        So this argument, number one, that there wasn't full

25  disclosure and that the lawyers weren't familiar with the

1  business is belied by the extensive experience and

2  representation that they had these entities and Mr. Mueller,

3  number one.

4          By "extensive," hundreds of thousands of dollars

5  worth of legal bills and hours.  Mr. Concilla described, Your

6  Honor — I think as he said, "We talked all the time."  We had

7  emails and phone calls all the time, consistent with

8  Mr. Mueller's testimony.

9          So this notion that they weren't fully aware, having

10 set up this structure for the business themself, is just

11 belied by the facts.  So that description, Your Honor —

12 obviously, we didn't question our own witness, Mr. Mueller,

13 during his deposition, but you will hear testimony, and you

14 see glimpses of it, even through the SEC questions of

15 Mr. Mueller in his deposition about extensive and thorough

16 discussions with his lawyers at all stages two and a half

17 years leading up to the PPM.

18         Now, what they point to is Mr. Concilla's statements

19 during his deposition that he couldn't recall certain things;

20 that he does say there are lots of discussions.  We were

21 talking — I think he almost said — every day during the

22 critical time.

23         Mr. Concilla was hospitalized, Your Honor, for a

24 large period of time.  We had to set up his deposition, you

25 know, working around that.  He was ill.  There was a serious

1  illness.  In fact, that's one of the reasons why we've agreed

2  if he has to testify, to do it remotely at his request.

3         He's admitted candidly that he doesn't recall things.

4  He's also admitted candidly that he wouldn't dispute if

5  Mr. Mueller did recall things that he couldn't recall.

6         So — but what we do have — and that's why we cited

7  so many clips — is we have both Mr. Mueller and Mr. Concilla

8  in their testimony — and you'll hear more from Mr. Mueller —

9  talked about the extensive discussions and advice into

10  different areas leading up to the PPMs, which are the

11  representations that are at issue in this case.

12         THE COURT:  There was no, like, warranty letter or

13  letter provided by counsel as to the parameters of the

14  disclosures?  Nothing like that?

15         MR. DAVIS:  Not as to the — you mean as to the scope

16  of representation or as to the disclosure?

17         THE COURT:  No, to the scope of, "this is to affirm

18  that the following disclosures were made."  I mean, the stuff

19  you would normally see a lawyer recap.

20         MR. DAVIS:  You know, I guess look at it from this

21  perspective, Judge.  You have Mr. Mueller going to these guys

22  who are undisputedly veteran.  I mean, the guy has 40 years.

23  In all these offerings, I think the Court may have seen his

24  resume in connection with some of the disclosures as a

25  nonretained expert.

1          So what can Mr. Mueller do as a client but go to

2    these folks and pay them top dollar, pay hundreds of thousands

3    of dollars, and spend —— who knows? —— thousands of billable

4    hours getting advice from them.

5          So if there aren't documents like that other

6    securities lawyers give, it shouldn't be on Mr. Mueller.  Why

7    is that important?  It's important because Mr. Concilla, in

8    his deposition, answered the following questions:  "When you

9    said 'We're done, I approve this,' did you mean that you

10   approved all the disclosures and that this was acceptable and

11   in compliance to give to investors?"

12         "Yes."

13         Over and over and over again.  And in terms of the

14   challenges, Judge, you know, when you look at the case law,

15   the relevance issue is, well, our —— was the advice related to

16   the issues that are at issue in this case?  And that's why we

17   cited so many excerpts, because both Mr. Mueller and

18   Mr. Concilla describe the areas that are of concern in this

19   case.

20         For example, loans and compensation.  "Yes."

21         "Critically, when you blessed the PPMs, did you know

22   that there was no revenue; in other words, that investor money

23   was going to come in at a time when you knew that investor

24   money or that company money was going to be paying these?"

25         "Yes, we knew that."

1          Now, Mr. Concilla said, "I don't recall a specific
2   conversation about investor money being used to pay other
3   investors," but he says, "If I had been asked, yes, I believe
4   money is fungible, as long as there's money from other
5   sources," which there was.
6          You will hear, Judge, that there was money from other
7   sources in these accounts.  There were both loans, and I think
8   one or two of the policies had paid off.  Then Mr. Concilla
9   says there is nothing wrong with that.  Money is fungible.
10          Mr. Mueller certainly will testify, he remembers
11  those conversations in the context of this, and that was
12  precisely why he proceeded and relied upon Mr. Concilla and
13  the law firm.
14          So back to the Court's question, was there
15  disclosure?  You have two and a half years of evidence that
16  will be uncontested of an attorney/client relationship
17  specifically with these companies, the predecessors, going
18  forward, that shows that these lawyers were very familiar with
19  this operation and the structure.  They set it up.
20          You have the testimony from Mr. Mueller and
21  Mr. Concilla talking about the various different topics, and
22  you have Mr. Mueller saying, "Yes, I relied upon them.  Yes, I
23  had these conversations."
24          If you read the SEC's brief, Judge, you think that
25  specific conversations about these different areas that are at

1  issue never happened.  We've given you sworn testimony of

2  Mr. Mueller, even not in response to our questioning — to

3  their questioning — talking specifically that he did get such

4  advice.

5       That is the evidence that is necessary.  If they have

6  a challenge about the extent of that, then that is for the

7  jury to decide.  They can argue to the jury, well, they didn't

8  tell them this.  They didn't tell them that.  But there's

9  certainly enough evidence, Your Honor, to justify that issue

10  being at play in this case.

11       THE COURT:  So — to the government.

12       So defendant says that they have provided some amount

13  of information that should potentially be heard by the jury.

14  I mean, why shouldn't I go on the safe side, allow them to do

15  what they are going to attempt to do?

16       Mueller says whatever he's going to say, the attorney

17  or attorneys — plural — say what they are going to say, then

18  I decide whether or not the reliance on counsel argument can

19  go to the jury.  Perhaps, if you guys are correct, and it's

20  not met, then I don't provide such an instruction, and I tell

21  the jury to disregard all the evidence they previously heard

22  on this point.  Why isn't that the safer route?

23       MR. NASSE:  Yes, Your Honor, I think it's exactly for

24  the point you raised at the outset.  There needs to be some

25  modicum of facts behind some of these assertions of privilege.

1          And you — at our last hearing, Your Honor, you

2     specifically asked the defense counsel to provide you specific

3     examples of where the lawyers were provided — asked a

4     specific question with the appropriate information and what

5     their response was.

6          And here in the motion, you have, I think, ten to

7     twelve pages of citations to the attorneys' depositions.  And

8     not a single one of them, if you look at them closely,

9     indicate that there was a specific question asked about the

10    issues in this case, the information they provided.

11         In fact, to the very issue where Mr. Davis just

12    raised about Ponzi payments, the question they cited, where he

13    says "money is fungible," but the entire quote is, "So

14    wherever this money is coming from or if it's going into an

15    account, it could be used for whatever purpose.  But did we

16    have a specific discussion of what I think you are asking,

17    paying all investors with new investors' money?  We did not."

18         So it's not that we didn't recall or some sort of a

19    vague answer.  It's "We did not."

20         THE COURT:  What did Mr. Mueller say in his

21    affidavit?

22         MR. NASSE:  Mr. Mueller — if you look at their

23    statements, are vague assertions.  We don't dispute that

24    Carlile Patchen provided advice of the drafting of the initial

25    documents.  We're not saying that there are some technical —

1          THE COURT:  That's not going to get them there.

2          MR. NASSE:  Yeah.  That's the — and I think the case

3   law is clear on that.  It's what did they know after the fact,

4   after those funds launched, his — what his conduct was in

5   relation — in light of the representations in the PPMs.

6          His assertions are we had discussion — our vague

7   sort of statements of, we had discussions all the time.  We

8   talked about everything, but the very — the citation that

9   Mr. Davis mentioned about the loans, if you look at that

10  entire transcript, you see me going repeatedly, like, asking

11  Mr. Mueller:  "Do you recall a specific conversation?"

12          "Well, we talked about everything.  We talked about

13  all kinds of — we must have talked about it."

14          Those are his types of responses; whereas the

15  lawyers, when they are deposed, are very definitive and say,

16  "No, we did not," on all the core issues; whether there was a

17  legally enforceable interest in the life policies or the

18  affiliated business.

19          As you pointed out, what does capital acquisition

20  mean?  In fact, their testimony was exactly contrary to that.

21  They expected there to be a legally enforceable interest in

22  the entities that the funds were investing in.  In fact, they

23  said if they had known that there wasn't, they would have

24  advised Mr. Mueller to amend the PPMs.

25          Whether he could use personal — use investor funds

1  for personal expenses.  There is no citation in any of their

2  documents where — that he provided — asked that question

3  specifically to Carlile Patchen and they provided any

4  guidance.

5         Whether he could use — they just cited — pay

6  returns to other investors with new investor money, whether he

7  could use the company advance to pay those investors.  They

8  have views about what the document said, but at every

9  opportunity, they always said they didn't have those specific

10  conversations with Mr. Mueller.

11         So our view is in light of the fact that there's not

12  a factual basis to introduce the supposed advice of counsel,

13  the prejudice, Your Honor, outweighs the relevancy here.

14         THE COURT:  So Mr. Davis, you are telling me that

15  in — and I can't pronounce the lawyer's name, and then your

16  client's affidavit, those are the two places that you believe

17  allow you to raise this to the jury.  Is there any other

18  places that you think support?

19         MR. DAVIS:  Well, it's our client's testimony, Judge,

20  from his deposition from the SEC, and it's what we anticipate

21  he will testify to.  I want to slow this down, because there

22  are statements being made — or if you just look, Your Honor,

23  at what we have filed, there are some examples in there.

24         So, for example:  "Did Carlile Patchen" — that's the

25  law firm where Mr. Concilla was — "ever advise you that it

1  was permissible to pay existing investors with new investor

2  investments?"

3          "Answer:  Yes."

4          "Question:  When did that occur?"

5          "Answer:  It occurred continuously throughout the

6  representation, including after there was a privilege waiver

7  date."

8          "Question:  Did you have a conversation where Carlile

9  Patchen advised you it was permissible?"

10         "Answer:  Yes.  We had many conversations."

11         And he was adamant -- Mr. Concilla -- this is

12 Mr. Mueller talking about Mr. Concilla.

13         THE COURT:  You are citing from your client's --

14         MR. DAVIS:  Deposition answers that are sworn, that

15 are part of our response.  Dennis was adamant about the

16 provision that money was fungible.  That's exactly what

17 Mr. Concilla testified to.

18         Now, Mr. Concilla testified -- just as I said and as

19 counsel said -- we didn't have those conversations.  But when

20 asked by Mr. Hulings in the deposition, he said, "You know,

21 we're talking about eight years ago."  He said, "Yes, it may

22 have.  Mr. Mueller could have a different recollection."

23         But Mr. Concilla says, "I know what I would have

24 said," which is exactly how Mr. Mueller describes it; that

25 money is fungible.  It's not a Ponzi scheme if there are other

1 monies in the account.

2        Here's another example.  Again, sworn testimony from

3 our client.  This was the SEC asking Mr. Mueller.

4        "Question:  Did you ask Carlisle Patchen whether you

5 should disclose that you would pay existing investors with new

6 investor funds?"

7        "Answer" — not vague, not equivocal — "Yes.  We

8 talked about it several times."

9        The company advance section and the language therein

10 was their response to these types of discussions.

11        So we cited Mr. Concilla's testimony.  When

12 Mr. Hulings asked Mr. Concilla, "Do you think that the company

13 advance section could be used to pay investors?"

14        "Answer:  Yes.  That could be proper."

15        So is there evidence, Your Honor, that supports this?

16 Yes.  And I could keep going.  For example, Mr. Concilla was

17 asked — it said:

18        "Question:  You don't recall discussions with

19 Mr. Mueller regarding placing 30 percent of investor funds

20 into deeproot Pinball?"

21        Mr. Concilla said:  "I do recall."

22        And they said:  "What did he tell you about that?"

23        He said, "He thought it would allow some

24 diversification of cash flow."

25        This is Mr. Concilla.

1        THE COURT:  But where is that evidence that the
2   lawyer is actually providing him advice?

3        MR. DAVIS:  Because those conversations, Judge, are
4   part of his advice and approval, which is what I'm getting to,
5   the culmination of that, which is, yes, these PPMs, with my
6   knowledge, based upon these discussions, are good to go.  They
7   are compliant with the securities laws, and may be presented
8   to investors.

9        THE COURT:  And there was no written memorialization
10  of any of this?

11       MR. DAVIS:  There's sworn testimony from
12  Mr. Concilla, Judge.

13       So let me give you ——

14       THE COURT:  No.  I'm still wrapping my head around
15  this complex deal being put together by Carlisle Patchen and
16  there is no formal letter blessing this.

17       MR. DAVIS:  Well, that may be a mal —— well, there's
18  a tolling agreement.  That may be a malpractice issue, Judge,
19  but we don't have to guess now, because what Mr. Concilla
20  remembers is, quote, "Did you provide legal advice with
21  respect to the PPMs?"

22       "Yes."

23       THE COURT:  But there's no doubt about that.  The
24  question is what the representations were and did he bless the
25  representations being made.

1          MR. DAVIS:  Right, Judge, but the representations

2    were in the PPM.  Their point is that, well, he did -- the way

3    it was actually set up, the way that it was working was

4    inconsistent.

5          What this evidence, the sworn testimony, shows is

6    that Mr. Concilla and his firm were very familiar with the

7    structure and the setup, were very familiar with that.  And so

8    when you have Mr. Mueller, who obviously remembers -- he's on

9    trial here.  You have a securities lawyer, a 40-year veteran,

10   who has been through a health crisis and isn't well enough to

11   come to -- live here, asked to remember one of many, many

12   clients' conversations eight years ago and says, "Yes,

13   Mr. Mueller, I wouldn't doubt that he would remember this

14   stuff" -- basically -- "better than me."

15         THE COURT:  So we keep talking about one lawyer.  I

16   thought you guys were going to have more than one lawyer.

17         MR. DAVIS:  There is two.  They're both from the same

18   firm.  Mr. Concilla was the lead lawyer.  There's a

19   Mr. Federico.  Honestly, I think Mr. Concilla was the lead

20   lawyer, and he's probably the one we would call.

21         THE COURT:  No, I'm talking about them.

22         MR. DAVIS:  Oh, them.

23         THE COURT:  Yes.

24         MR. NASSE:  Yes, that's right, Your Honor.  There is

25   another lawyer, Mr. Federico.  Same firm.  He testified in his

1   deposition that he didn't advise Mr. Mueller on either PPM, so
2   that was his testimony.  He did advise him on other funds, but
3   not these two PPMs.
4        *(Off-the-record discussion.)*
5        MR. DAVIS:  I was going to say, Judge — I mean
6   again, we're getting to whether the Court should go down the
7   safe route, and the U.S. versus — or the *SEC versus Snyder*
8   case actually goes directly to what you've said, Judge, which
9   is why isn't it safer to listen to this and then make that
10  decision.
11       In that case, the Fifth Circuit observed that, quote,
12  "The defendant does not have the burden of proving any, quote,
13  'elements' of the defense before the jury can weigh the
14  defendant's theory of reliance."
15       And to deprive — given the testimony, the sworn
16  testimony already from Mr. Concilla and Mr. Mueller, to
17  deprive Mr. Mueller of putting this information before the
18  jury — and at the end of this case, Your Honor, you can
19  decide whether — whatever decisions you want to make in terms
20  of what written instruction, if any, get provided, not only is
21  it the safe route, it's the route that's dictated by the Fifth
22  Circuit and in fairness in this case.
23       When Mr. Concilla stated, "your opinion that you
24  communicated to Mr. Mueller" — this is an example, Judge —
25  "was that the PPMs for the 575 Fund and the GRD Fund

1  adequately disclosed that he would be receiving compensation
2  in some form."
3          He said implicitly, yes.  He said, "I don't" —
4  again, it doesn't speak to it specifically, but implicitly,
5  yes.
6          So, again, we go back to where we started, which was
7  we're going to talk about these expenditures.  Mr. Mueller
8  shouldn't have gotten that money.  Kind of a strange theory.
9  He shouldn't have been compensated.  And here is direct
10 testimony from Mr. Concilla, said, of course, you know, my
11 advice included that area.
12         THE COURT:  What about the alternative argument that,
13 well, you invoke the attorney-client privilege at various
14 times during the deposition of this Concilla?
15         MR. DAVIS:  I'm glad that there is argument.  That
16 the waiver — there was a waiver that was given.  And I think
17 we can all agree that a waiver — you don't have to give up
18 all of your attorney-client relationship in order to meet the
19 burden of the reliance, so there was no assertion of privilege
20 on anything that was covered by this area on the reliance.
21         And so — and if there was an issue — and that's why
22 reading this deposition — Mr. Hulings did the deposition from
23 our side.  If there was an issue, the record is complete with
24 Mr. Hulings taking a break, coming back after conferring with
25 Mr. Mueller, and say, okay, this would be within the scope.

1   You can answer.

2           So some of the examples of what Your Honor is

3   mentioning was actually before that happened, Mr. Mueller

4   reentered and answered some of those questions.  Some he

5   didn't.  So, for example, there wasn't a waiver on post-2019

6   discussions, because that's not relevant to their claims or

7   defenses.  There wasn't a waiver on the SEC investigation.

8   That's not relevant -- I think we can all agree -- to their

9   claims or defenses.

10          So the waiver of attorney-client privilege was even

11  broader than necessary to match these issues on this advice.

12  And if they didn't agree with anything of that; for example --

13  I don't recall, because I wasn't there.  I think Mr. Nasse may

14  have been in those depositions with Mr. Mueller.  There was a

15  discussion -- because I've read the transcript a few times --

16  there was a discussion between Mr. Hulings and Mr. Nasse where

17  they said, well, we disagree with this exertion of privilege.

18  We'll take that up with the Court.

19          That never happened.  So if there was a dispute about

20  the scope of privilege or the -- or that then it could have

21  been taken up, but on a motion in limine to say King's X, even

22  though I've got sworn testimony from Mueller and Concilla and

23  I've got a waiver, you can't put any of that evidence on,

24  Judge, would just not, in our view, be an appropriate result.

25          THE COURT:  What about the accountants?  Are you

1  going to try to argue that accountants gave some kind of

2  accounting advice that's relevant here?

3          MR. DAVIS:  Well, we are, depending upon their

4  theory.  Again, the SEC has kind of molded their theory, and

5  now it's more limited.  So I don't know if they are going to

6  get into the fact of how Mr. Mueller received compensation, or

7  what's noncompensation or loan proceeds.  If they are, then we

8  need to show that he was advised to book it that way by

9  accountants.  If they are not, then we don't need to.

10          So if that comes up, Judge, if they say,

11  "Mr. Mueller, why was this booked as a loan or AR?"  Then I

12  think it's undisputed that the accountants provided him that

13  advice to do that, and he testified to it.

14          If they are not going to get into that, then I don't

15  think we need the accountants.

16          THE COURT:  But I thought they testified that they

17  never provided any kind of tax or other advice concerning

18  compliance of security laws.  Is that true or not?

19          MR. DAVIS:  That may be true, but that's not the

20  point on the money coming out.  What they did do is prepare

21  the tax returns.  And what they did do is prepare those tax

22  returns consistent with how Mr. Mueller received these funds.

23  He didn't prepare the tax returns.

24          So the securities laws, we are not going to ask an

25  accountant to talk about securities laws.  But if they're

1    getting into, "Hey, why did you take — why was this booked as
2    a loan as opposed to W-2 comp or something else" —
3         THE COURT:  Well, I'm confused.  Why does that all
4    come into this case?
5         MR. DAVIS:  I don't think it should.
6         THE COURT:  What's the government say?
7         MR. NASSE:  Yeah, I don't think that's our position.
8         It was our view that, based on some of their witness
9    designations, Your Honor, that they were going to say, well,
10   the accountant said it was a loan; therefore, it was
11   permissible.  And our claim is that it may have been
12   permissible under the tax code, but it wasn't done necessarily
13   in accordance with the PPM and the disclosures to investors.
14        Introducing that evidence of an accountant is undue
15   privilege that will tell — you know, indicate to the jury
16   that there was some advice maybe that related to securities
17   compliance, because it's a professional, and we just think
18   that's an undue prejudice, given the fact that the actual is
19   relevant.
20        THE COURT:  Respond to that.
21        MR. DAVIS:  Yes.  I don't think we are going to offer
22   testimony of an accountant to say that loans were consistent
23   with securities laws or the PPM.  So that's not — I think
24   we're missing each other there.  We'd like to keep them on
25   board, because if they go forward and say, well, you received

1  your compensation based on the tax laws in a different way,
2  then that's why we would call them.  It sounds like they are
3  not planning on doing that, so maybe we just saved half a day
4  of trial.
5          MR. NASSE:  The only concern with that, Your Honor, I
6  think is if Mr. Mueller gets up and testifies and says, Well,
7  I ran this by my accountant, and they said it was — you
8  know —
9          THE COURT:  Yes.
10          MR. NASSE:  — appropriate.
11          THE COURT:  The ruling right now on that one, on
12  reliance of accountant — that's the motion in limine by the
13  government — is granted.
14          Now, let's go back to the attorneys.  I'm really
15  wrestling with this.  I'm concerned that if I deny it at this
16  stage — and again, this is just a motion in limine.  So it's
17  not — but I think I need to provide you enough guidance as to
18  how we're going to go forward in trial.
19          This is a very close call, and since it's such a
20  close call, I'll allow the lawyers to come up and then
21  Mr. Mueller to come up and say what they have to say, and
22  we'll see whether it's enough to get a jury instruction.  And
23  if it's not, the risk from the defendants' perspective is I'll
24  also instruct the jury to disregard all the evidence that they
25  heard on that point.

1        MR. DAVIS:  And Judge, we'll — we understand the

2    Court's ruling.  We'll take that up at the time.  There is

3    some case law that says, look, even if you don't get the

4    instruction, it can go towards your state of mind and good

5    faith, but we'll take that up at the time, Judge.

6        In terms of the instruction not to consider, I don't

7    think we have to get into that now, but at that time, Judge,

8    we'll reserve our right to show you some authority on that

9    point.

10        THE COURT:  I got it.  Thank you.

11        Number five, undisclosed opinion testimony.  Is there

12    any such?

13        MR. DAVIS:  I'm going to let Ms. Small address that

14    one, Your Honor, with the Court's permission.

15        MS. SMALL:  Good morning, Your Honor.  Caroline Small

16    for the defendant.

17        To your point, there is no undisclosed expert

18    testimony.  We timely disclosed our four nonretained experts

19    on April 6th.  There's been no —

20        THE COURT:  So this motion in limine is only talking

21    about Craig Rushford [sic], I believe, right?

22        MS. SMALL:  He was disclosed, Your Honor, on

23    April 6th.  They took his deposition two months later in June.

24    So he has been disclosed.  There was never any *Daubert*

25    challenge or any pretrial motion on these folks regarding the

1    sufficiency of the disclosures, regarding their

2    qualifications, regarding anything.  So the timeliness of the

3    challenge to the kind of sufficiency of their disclosures, the

4    nature and scope of their expertise, their qualifications,

5    that door is closed.

6            THE COURT:  And what is he going to talk about?  He's

7    a facility engineer?

8            MS. SMALL:  So all four disclosures, Your Honor, it

9    was Mr. Rushforth, the two lawyers we've just discussed, and

10   Mr. Mueller.  Really, this was a conservative approach we took

11   that said, hey, these guys are fact witnesses, right?  They

12   were on the ground.  Everybody understands and agrees that

13   they have relevant, factual testimony.

14           But some of the things they are going to talk about

15   could be construed as having kind of technical expertise under

16   Rule 702.  So just out of an abundance of caution -- and our

17   disclosures say this -- to the extent that any of their

18   testimony can be construed as having any technical expertise

19   under 702, we are letting you know now that they might offer

20   testimony on those areas.

21           And so it really is -- it's not a typical kind of we

22   are offering them -- we are not going to be offering them for

23   opinions about, you know, the SEC Regs or anything like that.

24   But just out of an abundance of caution, if they are going to

25   offer any kind of technical expertise -- just outside of what

1   the jury might understand.  Hey, this is the process of when

2   you raise money for a start-up company.  Or the lawyers, this

3   is the process you go through when you are vetting PPMs or

4   Mr. Mueller, you know —

5          THE COURT:  What's a facility engineer do?

6          MS. SMALL:  Mr. Rushforth can talk about deeproot

7   Pinball.  We understand the Court's instruction on motion in

8   limine — the government's motion in limine, number one.

9          But just to the extent that he's on the stand and

10  saying, yes, we were ordering patents.  We were doing these

11  things in the warehouse.  We were building things, we

12  didn't — we wanted to prophylactically address any objection

13  that says wait a minute, now he's talking about the design of

14  pinball, and this gets into expertise we didn't know about.

15         It was really just a cautionary measure to put the

16  government on alert that there might be some, I'll call it

17  "scientific," but sort of technical testimony that these fact

18  witnesses may be offering.

19         It's all going to be based, all four of them, on

20  their perception under Rule 701, but just out of abundance of

21  caution, we wanted to disclose them as potential experts,

22  which was timely done, as I mentioned, back in April.  All of

23  these witnesses were deposed after those disclosures, with the

24  exception of Mr. Mueller.

25         And again, there's been no challenge from the

1  government under the Court's scheduling order —— I believe

2  that deadline passed in August —— to file any challenge to any

3  expert, retained or unretained.

4          So to the government's motion in limine, any

5  undisclosed expert testimony, we're not going into.  We agree

6  that we will be limited by the disclosures that were timely

7  served in April.

8          We will stick to the strict letter and scope of those

9  disclosures, which were fulsome.  They were not cursory, as in

10  the cases that the government cited that you authored —— one

11  of them —— where it was just kind of see medical records, and

12  it was 29 doctors.  That's not the case here.

13          These are four fact witnesses that the government has

14  known about.  They were all deposed.  There is fulsome

15  disclosure about the scope of their testimony.  It's not just,

16  hey, go see a thousand documents.  And, really, Your Honor,

17  it's just a precautionary measure.

18          So I don't think we are really arguing over anything.

19  We don't intend to go outside of the scope of the disclosures

20  that have been made, so with that, I'm not sure ——

21          THE COURT:  But given my earlier ruling, Rushforth

22  doesn't even come in, does he?

23          MS. SMALL:  He may come in, because he was on the

24  ground, and he will have —— he was there at the time.  He was

25  there at the time that the disclosures were being made.  He

1  was a fact witness.  He was observing Mr. Mueller, and he may

2  have evidence that, given the Court's first ruling, may not go

3  so much to the technical area.  That may be moot, Your Honor.

4  It depends how the testimony plays out.  And as Mr. Divine

5  said, we have to hear the context of the story, right?

6          So it will depend.  I would like to reserve the right

7  to see how the testimony plays out.  But he was also a fact

8  witness on the ground observing Mr. Mueller and observing

9  representations that were going on, so to that extent, he may

10  have knowledge about the circumstances surrounding the

11  disclosures made at the time, which is certainly relevant to

12  the scienter.

13          THE COURT:  Government's response?

14          MR. CAMPOAMOR:  Thank you, Your Honor.  Fernando

15  Campoamor for the SEC.

16          Your Honor, just to be clear, the motion that we

17  filed did not pertain to all four witnesses.  It was just only

18  to Mr. Rushforth and to Mr. Mueller himself.

19          As to Mr. Rushforth, in light of the Court's ruling,

20  we don't understand how his testimony would come in at all,

21  because he very clearly testified at his deposition that he

22  had no knowledge at all about the PPMs or representation to

23  investors or any of the sort.  So I don't understand what has

24  just been argued to the Court about how his testimony is

25  relevant.

1          Now, as to Mr. Mueller, there's a couple of things
2     here that we highlighted in the motion and that were not
3     addressed in the response that was filed late afternoon
4     yesterday, late afternoon.  And that is, by the time we got
5     those disclosures from Mr. Mueller, he had already been
6     deposed.  So we never -- the government never had the chance
7     to sort of try to even explore this so-called fulsome
8     disclosures, and respectfully, we disagree.
9          The disclosures were so general, as Mr. Mueller
10    reserves himself the right to respond to any expert testimony.
11    So, for example, we don't know if Mr. Mueller is going to try
12    to respond to our expert, Bill Post, or what he's going to say
13    about Mr. Post's expert opinions.  We have no idea what he's
14    going to say about that.
15          So there is case law, as this Court ruled, in that
16    *Knighton versus Lawrence* case, that is very specific that the
17    other side needs to say what the actual opinions are and what
18    the basis is.  And of course, we're not going to object to
19    fact testimony about, I was here on this day or I did this or
20    I ordered or I even applied for a patent.  But to the extent
21    that they want to provide opinion testimony, that was not
22    disclosed.
23          And something that was not addressed is we did send a
24    letter to the defense back in June before the deadline that
25    says, Please, these disclosures are deficient.  Can you please

1  tell us what it is that they are going to say, and they did

2  not respond.

3         So as to the *Daubert* deadline, all I can say is this

4  was not technical testimony or we are not going to challenge

5  their credibility or credentials, but now that we are headed

6  for trial, we need to know what they are going to say, and

7  they haven't said.  So we do not believe that they should be

8  allowed to provide opinion testimony.  And in Mr. Rushforth's

9  case, we don't even know how he's relevant.

10         THE COURT:  So with regard to Mr. Rushforth — this

11  limine number five — no expert testimony will be allowed by

12  him.  I also question how he's going to have any factual

13  testimony that he can provide, but — you can try, but I'll

14  allow the government to take him up on voir dire when he takes

15  the witness stand, and if he says what the government says

16  he's going to say, I don't know how he's going to have any

17  relevant testimony to offer here, even as a fact witness.

18         Now, with regard to Mr. Mueller.  So I'm hearing that

19  he never provided a letter indicating what specific areas of

20  the law he would be testifying in as an expert.

21         What's the response to that?

22         MS. SMALL:  I do have our expert designations, Your

23  Honor.  May I approach?

24         THE COURT:  Yes.

25         MS. SMALL:  For the record, this is also on file at

1   Docket 130-14.  I'll hand a copy to you.

2              THE COURT:  So these were filed 13 days ago?

3              MS. SMALL:  No, no, no.  I'm sorry, Your Honor.  This

4   was an exhibit that was filed 13 days ago.  These were

5   actually served April 6th, which is the deadline in the

6   scheduling order.

7              Now, April 6th was three months after they had

8   deposed Mr. Mueller, but there were still three months left in

9   discovery, okay?  So they chose to depose Robert — I mean, I

10  wasn't involved.  I can't speak to the scheduling, but they

11  chose to depose Robert before the expert deadline.  That's

12  fine.

13             And then they get disclosure saying, okay, hey, just

14  out of an abundance of caution, Mr. Mueller might offer

15  testimony that could be considered expert under 702.  They get

16  that disclosure in April.

17             They have all of April, all of May, all of June, and

18  half of July to raise an issue with the Court about

19  Mr. Mueller's designation.  They do not.  They have all of

20  those months to say, hey, wait a minute.  We need to go back

21  and depose him on this now that you have designated us.  They

22  never made that request to counsel.  They never made that

23  request to the Court.

24             And so, really, this is kind of too little, too late,

25  Your Honor.  The disclosures were timely made.  They are

1  sufficient.  It's really out of an abundance of caution.  If

2  they wanted to know, hey, how are you going to respond to our

3  expert Bill Post, they needed to confer with us or pursue that

4  with the Court, and they did neither.

5          THE COURT:  Last word to you-all.

6          MR. CAMPOAMOR:  Yes, Your Honor.

7          For example, this is the extent of the disclosure.

8  "Mr. Mueller may also testify regarding the opinions offered

9  by other experts designated in this case."  That's the extent

10 of it.

11         And we did actually include, which is — we did

12 include the disclosures from them, which was P33 for our

13 motion, but as Exhibit 7 to our motions in limine, we also

14 included our June 7, 2023, letter where we asked defense

15 counsel to please provide the actual disclosures that are

16 called for by the rule for nonretained experts.  They did not

17 respond.

18         So it was their election not to provide that, and so

19 now that we're getting ready for trial, we just wanted to

20 raise it for the Court.  No, they have not raised — they have

21 not provided us the opinions.  They have not provided us the

22 basis.  They should not be allowed to provide opinion

23 testimony.  We are not objecting to them being fact witnesses,

24 but opinion testimony should not be allowed.

25         THE COURT:  Yeah.  So I am looking at — pages 3 and

1  4 are discussing Mr. Mueller.  Where is he giving us a summary

2  of the facts and opinions as to which he's expecting to

3  testify?

4         MS. SMALL:  And, just to be very clear, the

5  foundation upon which an opinion is offered or an expert

6  testifies, that is a direct *Daubert* challenge.  That deadline

7  was August 18th.  That's a preliminary matter.

8         To the extent we're going to have a *Daubert* challenge

9  now and attack the sufficiency or the foundation of

10  Mr. Mueller's opinions —

11         THE COURT:  I'm just focused on where is the summary

12  of facts and opinions?

13         MS. SMALL:  It's in the disclosure, Your Honor.

14         It's, "Mr. Mueller is going to testify regarding the

15  custom and practices of the financial services industry.?

16         THE COURT:  And so where is does he get the next,

17  "and I opine the following"?

18         MS. SMALL:  So his specific opinions are not listed

19  in here.  It's a summary of the basis of his opinions and a

20  summary of what they will be.  That's all that's required for

21  a nonretained expert.  It's not an exhaustive requirement,

22  particularly a defendant who's been deposed in this lawsuit,

23  who's been deposed during the investigation.  This is a very,

24  very, very late *Daubert* challenge, right?

25         THE COURT:  But doesn't Mr. *Daubert* [sic] get to talk

1  about most of this stuff just as a fact witness?

2          MS. SMALL:  100 percent, Your Honor.

3          But this is kind of a — this was a cautionary

4  measure to say what we didn't want was Mr. Mueller to take the

5  stand, talk about his personal observations and experience

6  under 701, and then get an objection saying this is technical.

7  Now he's talking about the securities industry and raising

8  money and he wasn't disclosed as an expert.

9          So our disclosure is very — where does it say —

10  "Mr. Mueller is expected to provide relevant factual testimony

11  in this litigation.  And to the extent that any such testimony

12  could be characterized as expert opinion, he's being

13  designated as a nonretained expert.  He has not been employed

14  to provide expert testimony, and is not a person whose duties

15  regularly involve giving expert testimony."

16          THE COURT:  I'm still stuck on where does he say what

17  his opinions are, though?  That's where I'm stuck on.

18          MS. SMALL:  Well, it describes the subject matter and

19  the categories of his opinions, Your Honor.  And again, this

20  is a nonretained expert, but the thoroughness of those

21  disclosures, Your Honor, can't be raised in a motion in

22  limine.  Let's think about that.  We now have no opportunity

23  to cure that, right?

24          THE COURT:  Well, you can ask for a continuance.

25          MS. SMALL:  We could, but let's talk about how —

1          THE COURT:  You said you never.  You don't have.  But
2    I'm just telling you, you do.
3          MS. SMALL:  Fair enough.  But had it occurred as it
4    should have, a motion in limine could have been filed.
5          And by the way, their letter didn't say we need to
6    depose him again.  We need to understand this, that, and the
7    other.  It just said you need to supplement.  It appears from
8    our side we thought they were sufficient, and we didn't.
9          Okay.  So had that progressed, maybe we would have
10   supplemented.  Had a motion been filed, we could have cured.
11   Had a motion been filed and a hearing been held, a proper
12   *Daubert* hearing, a gatekeeping, we could have called
13   Mr. Mueller to the stand, and we could have fleshed all this
14   out.
15         But to cut us off before the testimony even develops,
16   I think is improper.  Let's see how the testimony develops.
17   It might not even be 702.  The Court might decide this is
18   purely based on his observations on the ground floor under
19   701, and it's fine.
20         So it's a little bit academic, but I just want to
21   make sure that we're not cutting off or limiting Mr. Mueller's
22   testimony in any way because we didn't disclose it.  Does that
23   make sense?
24         THE COURT:  Yes.
25         MR. CAMPOAMOR:  Your Honor, they are offering him as

1  an expert on the regulation of funds that involved life

2  insurance policies.  That's one of the other things, in

3  addition to responding to expert opinions offered by the SEC.

4  We don't know what his opinions are.  We don't know the basis.

5  They never provided it.  He should not be allowed to opine on

6  them.

7          THE COURT:  Yeah.  Did you want to say one last word

8  on that or not?

9          MS. SMALL:  No, Your Honor.

10          THE COURT:  So he needed — or you–all needed –– or

11  collectively, the actual opinions needed to be provided; they

12  weren't.  So Mr. Mueller will be able to testify as a fact

13  witness in this case, but he will not be allowed to testify in

14  any kind of an expert capacity.

15          Number six, character evidence.

16          MS. SMALL:  And ––

17          THE COURT:  Yeah.

18          MS. SMALL:  Number six.  Yes, Your Honor.  I'm sorry.

19          THE COURT:  So I'm not sure exactly what we are

20  dealing with here.  You don't identify anything.

21          MR. NASSE:  Yes, Your Honor.

22          This was a slightly — you know, prophylactic in

23  nature.  I think if you look at some of the witnesses they

24  have identified and the topics they're expected to testify;

25  for instance, Mr. Mueller's brother, his father, his

1   mother—in—law, about his character for good faith.

2         Again, we don't believe that that is relevant or

3   appropriate.  We believe that is sort of character evidence

4   that's not permissible under the rule, so I'm not entirely

5   sure whether they intend to offer those witnesses really for

6   those purposes, but that was the genesis of filing this

7   motion, Your Honor.

8         MS. SMALL:  Your Honor, I'm also not entirely —— you

9   know, I can't predict what their cross—examination of

10   Mr. Mueller is going to be in their case—in—chief, so it's

11   hard to predict what rehabilitation might be necessary under

12   Rule 608, but I will say that to the extent —— obviously, the

13   Court's aware to the extent that his truthfulness or character

14   for truthfulness is attacked, then we will be offering

15   testimony in response under Rule 608 to rehabilitate him.

16         Rule 608 deals with character evidence for the

17   purpose of attack and rehabilitation.  So we have to wait and

18   see what they do with Mr. Mueller before we can offer or

19   decide whether to rehabilitate him under Rule 608 with any

20   kind of reputation or opinion evidence.

21         THE COURT:  So have you read that *Wilson* case that

22   came out of the Fifth Circuit in June of this year?

23         MS. SMALL:  I have not, Your Honor.

24         THE COURT:  So, I mean, there, the Fifth Circuit is

25   saying that in civil cases, character evidence generally does

1  not come in at all.  And so what am I supposed to do with

2  that?

3          MS. SMALL:  So I — I have not read that case, but

4  I've read cases similar, and I don't know if the Court there

5  is talking about propensity evidence under 404, because that's

6  a very different analysis.

7          So character evidence can serve two masters, right?

8  It can be used to rehabilitate a witness whose character has

9  been impeached, right?  That's Rule 608, and it could also be

10 used for propensity.  And 401 says you're not doing that.

11 You're not going there, right?  You can't say that because

12 he's been a stand-up, honest, you know, kid and adult, that

13 he's telling the truth today.

14         THE COURT:  So then what are the family members going

15 to say?

16         MS. SMALL:  So what can be — they are there for —

17 if his character is attacked — right? — they are there to

18 rehabilitate him with opinion and reputation evidence.  That

19 comes in under Rule 608, if they attack his character for

20 truthfulness, right?  So they are there in case that occurs.

21         But secondly — so 404 is not an issue, because we're

22 not offering propensity evidence, right?  404 says that's not

23 happening.

24         608, we reserve the right, and that's why those

25 witnesses are listed, because we don't know what they are

1  going to do with Mr. Mueller on cross-examination.  We don't

2  know what they are going to say in their opening statement,

3  right?  So we'll see if they attack his character, and then we

4  can approach and discuss, you know, where that takes us under

5  Rule 608.

6        But character evidence can also be admissible under

7  401, 402, 403, if it is for some other purpose other than

8  propensity under 404 and other than 608 to rehabilitate a

9  witness.  In some cases, that kind of evidence can be shown

10  for scienter, for example.  Right?  So what Mr. Mueller was

11  doing, how —

12        THE COURT:  How would the family know that?

13        MS. SMALL:  They were there observing him at the time

14  period, right?

15        THE COURT:  They weren't present for any of these

16  conversations or statements, were they?

17        MS. SMALL:  I don't think so, but Mr. Divine said in

18  his first motion in limine — and our motion in limine says

19  we've got to give the jury context.  We agree.  So what

20  Mr. Mueller was doing, he was going on Disney cruises.  The

21  jury, we know, is going to hear that, right?  We've also got

22  to hear what else was he doing?  What was he saying to his

23  family members?  What were they observing, right?

24        THE COURT:  How is that relevant to what he was

25  saying to investors?  I'm stuck on that.

1          MS. SMALL:  Because the jury is now going to hear

2   that the company failed, although they are not going to hear

3   why.  They are going to assume that it failed because of the

4   fraud.  That's what they are going to assume, since we're not

5   going to be able to tell them why the company failed.

6          But we've got to be able to give them context.  We've

7   got to be able to get them get to know Mr. Mueller a little

8   bit and say here's what he was doing at this time.  Here's

9   what was going on.  Here's what the business plan was.  Here's

10  how he intended to get these investors' money.

11         THE COURT:  Isn't that sounding like propensity?

12         MS. SMALL:  No, not at all, Your Honor.  We're not

13  saying that on X date, he told the truth, and so he's telling

14  the truth now.  That's not what we're saying.  We're not

15  saying he was a Boy Scout growing up, and he swore an oath to

16  tell the truth at Boy Scouts, so he's telling the truth to you

17  here today.

18         We're saying around this time and circumstance, what

19  did the folks in the business, what did folks on the ground

20  floor, what did the folks he was working with observe about

21  him.  What did they observe about his intent?  They are

22  talking about motive.  What did they observe about him?  That

23  goes directly to scienter.

24         In fact, the jury charge itself — I think it's on

25  page 25 of the jury charge.  It talks about — it's

instructing the jury on scienter, and it talks about all the
facts and circumstances, because there's never going to be
direct evidence of — not never.  There's usually not direct
evidence of scienter, right?

So it's telling the jury — this is the agreed
instruction.  You have to consider everything around that time
period, all the facts and circumstances that were happening,
whether Mr. Mueller is on a Disney cruise or whether he's in
the office telling people:  We're going to do a great job.
We're going to raise this money.  We're going to pay the
investors back.  Everything is going well.  All of that kind
of thing.

What was he telling the lawyers?  To the extent that
he's telling the lawyers, "Truth is the only option."  That's
a quote.  That's a direct quote.  That kind of evidence can be
relevant to scienter, and right now, Your Honor, we're just
talking about how that kind of character evidence can come in
apart from Rule 608, right?

So if 608 never happens, if they never impugn his
character, we're talking about a different way that this
character evidence might come in.  It might still come in
under 608 depending on what they do on cross-examination.

THE COURT:  I'm going to hold off ruling on this.
I'm going to look at 608, because I've been fixed on 404(a),
and under 404(a), the Fifth Circuit's ruling on, this doesn't

1    come in, but I will take another look at 608.

2            MS. SMALL:  And I will advise the Court that under

3    608 the Advisory Committee Notes, they also confirm that,

4    quote, "Evidence of misconduct, including corruption" — and

5    their whole case is about embezzlement — right? — that

6    Mr. Mueller took all the investors' money — "that that can

7    open the door for opinion and reputation evidence under Rule

8    608."

9            THE COURT:  I'll look at —

10           MS. SMALL:  That's the Advisory Committee Note on

11   Subsection A to Rule 608.

12           The cases — the government actually cites the *Renda*

13   *v. King* in the Third Circuit and the *U.S. v. Dring*, D-R-I-N-G,

14   in the Ninth Circuit, both of these cases address these

15   topics.  Once you attack the character, and an attack on

16   character is accusing someone of fraud, embezzlement,

17   corruption, those all open the door to this kind of evidence

18   under 608.

19           MR. NASSE:  Your Honor, I know you're going to take

20   this under advisement, but I just want to address that last

21   point.

22           The cases she cited clearly go directly contrary to

23   what the counsel has just stated.  They state a case —

24   particularly on fraud, us going through how Mr. Mueller lied

25   or made misrepresentations to investors does not impute his

1  character for truthfulness in general.

2         Now, if we were to say, he is a liar and has lied

3  throughout his life; therefore, he lied in these instances,

4  that would be opening the door.  But in cases of fraud, in

5  particular, the courts have been pretty uniform that vigorous

6  cross-examination of whether he told the truth in a particular

7  instance as relevant to the claims in this case, does not open

8  the door to this kind of character evidence, Your Honor.

9         MS. SMALL:  And, Your Honor, I agree with Mr. Nasse.

10         That is what the cases say, but they go one step

11  further, and they talk about the difference between a direct

12  attack on a witness's credibility.  That's impeachment.

13  That's a prior inconsistent statement.  That's bias, right?

14  You have an interest in the outcome of this litigation.

15  Impeaching him with deposition testimony or testing his

16  veracity about the statements at issue in this case.

17         I agree that doesn't open the door, but it does say,

18  in particular in the 1983 case, the Section 1983, the *Bivens*

19  case, in *Renda v. King,* all it took there for the door to be

20  opened -- it was a 1983 case, and the defense -- the

21  plaintiff's counsel argued in opening statement that the

22  police officer abused his role and committed misconduct.

23         And the Court said, "By saying he abused his role and

24  committed misconduct in his official scope as a police

25  officer, that was enough to trigger the corruption exception

1    under 608, and all of that good character evidence under 608

2    should come in."

3         They found error in that case.  So I do agree with

4    Mr. Nasse.  They are saying, yes, of course they are going to

5    ask him:  You lied in the PPM.  This wasn't true.  You told

6    investors this.

7         That goes to the veracity of his statements at issue

8    in this case.  And I agree with him.  The cases are very clear

9    that doesn't open the door, but they go one step further.  The

10   complaint is littered with allegations regarding embezzlement.

11        They say that "you raided the piggy bank," and I

12   encourage you to look at Footnote 3 and the *Dring* case and

13   also that Third Circuit case that the SEC cites, and we'll see

14   how the arguments and the questioning play out, but I do think

15   there's an opportunity here that the door will be opened under

16   Rule 608.

17        And as I mentioned, some of this evidence could be

18   relevant to scienter as well.

19        THE COURT:  Okay.  Seven and eight, questioning

20   regarding how the SEC did its investigations.  That's granted.

21        Number nine, Scott Allen resignation memorandum.

22        MR. DIVINE:  Good morning, Your Honor.  Charlie

23   Divine on behalf of the SEC.

24        Your Honor, we made two arguments, and this started

25   with the defendants' objections to the SEC summary judgment

1  evidence.  They objected to the Scott Allen memo on several

2  grounds.  One, that it's hearsay; two, that it calls for an

3  improper legal opinion; and three, that it lacks foundation.

4       And so we laid out our case in the brief.  We think

5  it both meets the hearsay exception for a business record.

6  And even if it doesn't, it can be admitted not for the truth

7  of the matter asserted, but as a notice to Mr. Mueller of all

8  the concerns Mr. Allen pointed out in the memo about

9  Mr. Mueller's conduct with respect to the business.

10       THE COURT:  So let's focus on the hearsay, because

11  it's obviously a business record.

12       So to the defendant, why doesn't it come in with a

13  limiting instruction to the jury?

14       MR. DAVIS:  It might, Judge.  The statement in this

15  memo about Ponzi, the witness recanted that during his

16  deposition.  In fact, on the face of the letter itself, he

17  says, look, I'm not alleging you did anything wrong.  It just

18  kind of feels like a Ponzi.  So that is the language that is

19  under 403 should not be thrown into the jury box.

20       This witness testified that, no, I don't believe that

21  Robert Mueller was involved in a Ponzi scheme or did anything

22  inappropriate.  You're going to hear the evidence from these

23  witnesses, Judge.

24       These guys were actually the ones in direct contact

25  with the investors.  Testified that they never said anything

1   false or misleading to any investors.  They don't have any

2   knowledge that that has been done by anyone.  In fact, the

3   bold, underlined portion of this -- and I don't know if the

4   Court has a copy of the memo.

5          May I approach, Your Honor?

6          THE COURT:  I have a copy.

7          MR. DAVIS:  May I approach, Your Honor?

8          THE COURT:  Yeah.

9          MR. DAVIS:  So we're really talking about the content

10  about whether some of these statements should be thrown into

11  the jury box.  Particularly when Mr. Allen, when deposed, you

12  know, basically said what you see here, Your Honor, on the

13  face of this exhibit bold and underlined, "I'm not making any

14  accusations towards you or anyone else," and, quote, "Do not

15  know of anything that would confirm that scenario."

16         The evidence will show that a couple of these fellows

17  didn't get the raises they wanted, because they weren't

18  raising money.  And we were talking about a pandemic.  We were

19  talking about all these global downturns, and so that they

20  left.  And so this fellow recanted that.

21         So the question is, should this be thrown in there,

22  that you have a former employee, you know, saying it feels

23  like a Ponzi scheme, when he's, not only on the face of this

24  exhibit, but also in his deposition, saying, number one, I

25  don't have knowledge to say that; number two, I don't believe

1  it happened.

2  THE COURT:  So is Allen going to be a witness in this

3  case?

4  MR. DAVIS:  Yes, sir.

5  THE COURT:  So then why can't we just ask him the

6  questions and avoid the memo?

7  MR. DAVIS:  That's fine with us, Judge.

8  MR. DIVINE:  Your Honor, the only thing that I would

9  like to address — just quickly — is with respect to

10 Mr. Allen, I don't think that he recanted his testimony at

11 all — or recanted the memo at all in his deposition.

12 What he said is exactly what's in the memo.  And he

13 said that he didn't have any evidence that it was a Ponzi

14 scheme, but it sure looked and felt like it to him.  And him

15 telling that to Mr. Mueller, I think, is notice to

16 Mr. Mueller.

17 The other thing that's —

18 THE COURT:  Yes.  So my whole point is there's an

19 easy way of doing things and a hard way of doing things, so

20 the easiest way is just asking him at the witness stand these

21 things, that way I don't get in trouble with admitting what

22 may be a hearsay statement.

23 MR. DIVINE:  And would Your Honor consider redacting

24 that portion so that we can talk about the rest of the memo,

25 because there's also other concerns raised in the memo about

how the business is functioning and some of the internal
controls and processes at the business, which were
important -- are important to the SEC's theory of the case.

THE COURT:  So right now it is a business record, but
it does contain hearsay, so that's a problem for you-all.  You
can cure it by just having Mr. Allen answer questions
directly, or you can cure it by conversing with the other side
and see what other redactions you-all can enter into and get
an agreement that it comes in that way.

That's the ruling on that one.

Number ten, Mr. Mueller's prior invocation of the
Fifth.

MR. CAMPOAMOR:  Good morning, Your Honor.  Fernando
Campoamor for the SEC.

Yes, Your Honor, we wanted to raise this issue now,
because we want to obviously avoid this coming up at trial.

And part of the reason is we don't know, although we
suspect we know, what Mr. Mueller is going to say now, to
those -- in answer to those questions; that is, he previously
took the Fifth on essentially all questions that had to do
with whether he used investors' monies, investor funds to pay
for personal expenses.

Based on what they filed in their motion for summary
judgment, it looks like Mr. Mueller is not going to say that
he thought that was fine; that he had reasons to believe that

1  that was fine, maybe because he talked to Mr. Concilla or

2  maybe because he consulted with accountants; I'm not exactly

3  sure, but he appears to be one to do that.

4          And to us, it appears completely inconsistent with

5  what seems to be an after-the-fact explanation for why he used

6  the funds this way when, before, he clearly personally had

7  that fear and concern that it would incriminate him if he

8  answered.  And so we thought it would be inconsistent and

9  therefore improper impeachment if he now offers an explanation

10  to those questions.

11          THE COURT:  So it's now kind of unduly prejudicial to

12  have the Fifth Amendment being thrown out there.  You can

13  achieve the same result by asking him these questions instead

14  of telling him, "Well, you refused to answer; isn't that

15  correct?"

16          MR. CAMPOAMOR:  So, yes, and we can certainly answer

17  it, and — but is the Court suggesting that we do not mention

18  the Fifth and just say "You previously refused to answer that

19  question?"

20          THE COURT:  Yeah, the 403 balancing factors here seem

21  to indicate that throwing out the Fifth is pretty harsh.

22          MR. CAMPOAMOR:  And that's why we wanted to raise it

23  and discuss it.  So is the Court saying that we would be

24  allowed to at least say, "Mr. Mueller, you previously refused

25  to answer those questions"?

1    THE COURT:  Yes.

2    MR. CAMPOAMOR:  Okay.

3    THE COURT:  You just omit ——

4    MR. CAMPOAMOR:  The Fifth.

5    THE COURT:  —— the Fifth.

6    MR. CAMPOAMOR:  Okay.  Understood.  Thank you.

7    THE COURT:  Okay.  I think we've gotten through all

8  the motions.  I've got to get on a call here in a couple

9  minutes.

10    So you are asking for ten days.  I can give you nine.

11  I'm having to move a criminal trial if this case is going

12  forward, because I had a criminal trial the second week.  It

13  sounds like we're still going to trial.

14    I mean, is there any money to secure out of

15  Mr. Mueller?

16    MR. DAVIS:  The answer, Judge, is ——

17    THE COURT:  Well, he's still paying you, so...

18    MR. DAVIS:  Well, I could approach and tell you about

19  that statement, Judge.  He's got relatives that don't like

20  what the SEC is doing and helping, but ——

21    So is there any money to be had from Mr. Mueller?

22  The answer is no.  And we've had —— we won't get into the

23  extensive discussions, the substance of it ——

24    THE COURT:  I'm not going to get there either.  I

25  just want to make sure we've fully explored everything and why

1  we are doing something, because otherwise I'm moving a lot of

2  things around to fit you in.  So if it has to be tried, it has

3  to be tried, but I don't want to be surprised here that this

4  one goes away, and I've imposed on one of my colleagues to

5  take a criminal case for me that didn't need to occur.

6          MR. DAVIS:  Washington wants a pound of flesh, not

7  these gentlemen — and gentle-ladies, but the answer is no,

8  and you'll hear that through his testimony.  I'm not doing

9  anything but forecasting kind of the reality of it.  He's also

10  basically unemployable, given this.

11          I will say, Judge, that we are set — we are going to

12  file a motion if this case is proceeding.  I'm set on

13  December 8th in Judge Hanks' court in Houston on a docket

14  call, final pretrial, that actually Ms. Small and I are both

15  on.  So if that happens, maybe one of us won't be here that

16  day, if we have to go cover that.  It's a civil RICO case.

17          THE COURT:  And just mention that you are set over

18  here.  I saw Judge George Hanks just the other day, so I'm

19  sure he'll — if it's just something minor, I'm sure he'll

20  reschedule for you.

21          MR. DAVIS:  Yes, Your Honor.

22          And Judge Crane did the same for this case.  I

23  thanked him for that.  We were set, and he understood that we

24  were set here.

25          So we are going to visit, Judge — we'll continue —

1   as in all cases, we will continue to see if we can get a

2   solution.  It's difficult.

3         THE COURT:  Pare down the witness list as much as you

4   can, because I'm not sure a jury is going to want to hear this

5   for nine days, but...

6         MR. DAVIS:  I don't think it will go the full days,

7   but that — you can hold me to that, Judge, on our side.

8   Judge, I don't know if we are going to visit about the time or

9   openings or for voir dire?

10         THE COURT:  Yeah.  Thank you for that.

11         How much time do you want for voir dire?  I normally

12   give 30 to 45 minutes each side.

13         MR. DAVIS:  Well, then I would ask for 45 minutes,

14   Judge, for voir dire.  30 minutes for opening from our side.

15         MR. DIVINE:  Your Honor, that's fine.  30 minutes is

16   fine for voir dire and 25 to 30 minutes for our opening, Your

17   Honor.

18         THE COURT:  It's 45 for voir dire and 30 for opening.

19   Both sides.

20         So the way I do voir dire, you can ask individually

21   one by one.  You can ask questions of the panel as a whole.

22   I'll ask all the general questions in advance, and based upon

23   some of the questions you've submitted to me before, whatever

24   I don't ask, you can ask the panel.  Some are more slanted to

25   one side or the other.  I try to avoid myself posing those

1    questions to the jury panel, so you will be able to do so,

2    though.

3            MR. DAVIS:  Judge, will it be six plus two

4    alternates, or —

5            THE COURT:  Yeah, we better have two alternates here.

6            MR. DIVINE:  How many strikes do you typically allow?

7            THE COURT:  I'm sorry?

8            MR. DIVINE:  How many strikes do you typically allow?

9            THE COURT:  For a six-person, it's — God, I've

10   already forgotten now.

11           MR. DIVINE:  Three, Your Honor?

12           THE COURT:  Well, let me put it this way.

13           I'm going to answer my own question just because I'm

14   doing the jury excuses right now.  Everybody wants to be

15   excused.  So the number of strikes will be dependent upon how

16   many people show up in this room, and so it's not looking

17   good.  I'll tell you that.  I'm astounded by the number of

18   people who want out either because — apparently anxiety is

19   the new excuse for jury duty.  So mental health problems are

20   galore.

21           So that's a long way of saying I don't know until the

22   day.  Assuming we have a number of people show up, then I will

23   provide ample number of strikes.  If we're going to barely

24   meet it, well, we'll see.

25           MR. DAVIS:  Yes, sir.  Judge, will we get the cards

1  that morning?

2          THE COURT:  You'll get them that morning.

3          Anything else?

4          MR. DIVINE:  Your Honor, we had several housekeeping

5  matters.  I know that you're out of time.  One that I really

6  want to make sure we get in front of the Court is potential

7  remote testimony.  There are three witnesses at issue here.

8  Mr. Concilla, who both parties have agreed to allow to testify

9  remotely, if Your Honor is amenable.

10          THE COURT:  That's fine.

11          MR. DIVINE:  Okay.  Then there's Mr. Federico, who is

12  the other attorney.  He is on vacation in Colorado and has

13  asked to testify remotely.  Both parties agree to allow him to

14  testify remotely, but the defendant — and I'll let them

15  correct me if I'm wrong.  I'm just trying to get in front of

16  Your Honor, the defendant would like to also play his

17  deposition designations if he testifies remotely.

18          THE COURT:  No.  We're only going to hear it once.

19          MR. DAVIS:  Judge, I'll — we'll use them to impeach

20  him if he testifies differently, we've preserved our argument.

21  I think we'll argue about why it should be admitted, not only

22  for impeachment, but for substantive, given he was sworn and

23  both parties were present.

24          THE COURT:  You should be prepared to ask him all the

25  questions you intend to ask him when he's appearing remotely.

1          MR. DAVIS:  We agree with that, Judge.  And there's

2     one other witness.

3          THE COURT:  You have a witness?

4          MR. DAVIS:  Spradlin.

5          MR. DIVINE:  Yes, Mr. Spradlin is another one of the

6     business development people.  I'll let them present

7     Mr. Spradlin.

8          MR. DAVIS:  Consistent with the Court's order on

9     getting the people here live, we subpoenaed him.  Got a call

10    from the lawyer, a letter from a lawyer saying that he's going

11    to be out.  He's an important witness.  You know, in order to

12    keep things moving, we don't mind him being remote if we have

13    to.

14         He has been deposed.  He'll be an important witness.

15    We just didn't know if the Court — he probably doesn't have

16    the legal unavailability argument, Judge, if we pushed it, but

17    if he can appear remotely, and apparently they are offering

18    that, we don't oppose that, Judge.

19         THE COURT:  If you both agree to remote, that's fine

20    with me.

21         MR. DIVINE:  Yes, Your Honor.  We both agree to

22    remote.

23         MR. DAVIS:  We don't want to make him too mad if he's

24    here, Judge, in person.

25         MR. DIVINE:  Your Honor, so your courtroom fact,

1  we've reviewed it as carefully as we can.  It doesn't look

2  like to us you typically require the parties to exchange

3  opening presentations.  We plan to use a PowerPoint.

4          We also —

5          THE COURT:  I don't require it, but I encourage you

6  both to — if you're going to use PowerPoints for opening,

7  exchange them only to avoid what may come up to be an

8  objection that stops us.

9          MR. DIVINE:  Yes.  So that was what I wanted to raise

10 is we think that, you know, it's a fairly complex case.  There

11 are some things that we plan to explain a little bit in an

12 opening, like, the preponderance standard, what an investment

13 fund is, and I think it's going to come up what a Ponzi scheme

14 is.  It's short explanations.  That was one thing we wanted to

15 flag for the Court.

16         THE COURT:  So, again, exchange — if there's going

17 to be an objection to that, try to work it out.  If not, call

18 us up, and we'll intervene.

19         If you are using a definition of a Ponzi scheme that

20 comes from a Fifth Circuit or U.S. Supreme Court case, I'll

21 allow that.

22         MR. DIVINE:  And then —

23         MR. DAVIS:  Judge, we object to that, but we'll raise

24 it at the time.  If they give us the PowerPoint.  We can do it

25 on Monday.

1    MR. DIVINE:  And then two logistic points.

2    So we have -- we plan to deliver to Your Honor's

3  chambers what amounts to, I think, 16 binders of exhibits

4  labeled 1 through 380.  And we have a separate set also that

5  we would plan to use for witnesses, if that is your

6  preference.

7    THE COURT:  Let's keep it just to one set.  And if I

8  need the binders, I'll take them from the witnesses after

9  trial.

10    MR. DIVINE:  Okay.  Because the other thing I was

11  going to suggest is then we plan to come to Court with a

12  separate set for each witness and say, okay, here's your tiny

13  pile of actual exhibits that you need to look at.

14    THE COURT:  So let's just do the one set.  I'm

15  anticipating that whatever the jury does, it will be the

16  inevitable motions for summary judgment as a matter of law,

17  post-verdict, so I'll probably need the exhibits, because this

18  case ain't going away anytime soon.

19    MR. DAVIS:  Do you want -- I guess we can bring a

20  copy of ours, and I guess the SEC will bring a copy of theirs?

21  Just to have, like, at least just one binder?

22    THE COURT:  So I always want you guys to bring one

23  set of binders, because as big of a fan of technology I am,

24  you have to plan for failure.

25    MR. DAVIS:  Yes, sir.  But everything during trial

1  but for technological glitches, we'll all be technological?

2          THE COURT:  Will all be via the monitors, yes.

3          MR. DAVIS:  Excellent.

4          MR. DIVINE:  Your Honor, do you have any objection,

5  at least for certain exhibits like a PPM, which is an 18-page

6  legal document, having a witness have a hard copy that they

7  can flip through, and that they can look at it?

8          THE COURT:  Yes, that's fine.

9          MR. DIVINE:  Okay.

10          I'm looking through my list to make sure I've got

11  everything.  My colleagues are going to tell me I forgot the

12  one that thought was the most important.

13          MR. DAVIS:  Well —

14          MR. DIVINE:  Do you have something?

15          MR. DAVIS:  No.  I was going to say while he's

16  looking, Judge, I just want to get clarity on the Pinball

17  ruling, because it came back up with Mr. Rushforth.

18          So we can talk about Pinball.  We just can't get into

19  the details.  Certainly can't get into technology, but we can

20  describe that it existed, it had employees, like, more of a

21  general description?

22          THE COURT:  That's correct.  But then I'm not going

23  to let you go into the marketing plans, the financials, any of

24  that stuff.

25          MR. DAVIS:  Okay.  We'll take that up, Judge, and

1  reurge it.  I know that's a ruling on the limine.  So we won't

2  get into the financials, but we'll get into, like, the general

3  business description.

4       And as I understand it, we've withdrawn our

5  stipulation or our agreement upon the fact of the business

6  failing and that investors lost money.  Is that going to be

7  allowed just for direction of opening?

8       THE COURT:  You can say the business is no longer in

9  operation or the business failed, period, but not because the

10  SEC were such bad guys or because of this complaint that they

11  lodged against us.  You can't do that second step.

12       MR. DAVIS:  Currently, unless the evidence later

13  brings it up?  So we can talk about economic factors, not the

14  SEC being part of the causation?

15       THE COURT:  That's fine.

16       MR. DIVINE:  On that same vein, is it okay to say

17  that the businesses went into bankruptcy?

18       THE COURT:  I thought you had a stipulation to that.

19       MR. DAVIS:  We did when we were -- when we thought we

20  were going to be able to counter why.  We can confer, Judge.

21  We've been able to confer on almost everything, Judge.

22       THE COURT:  I'm ten minutes late.

23       Let's -- what else?

24       MR. DIVINE:  That's a lot of pressure, Your Honor.

25       All right.  Last thing.  We plan to ask this Court to

1 exclude all of the witnesses pursuant to Federal Rule of

2 Evidence 615, with one exception, which would be our expert

3 Mr. Post, and ask him to be able to watch the testimony.

4          THE COURT:  Experts are excused from the rule.

5          MR. DIVINE:  I believe that's all we have, Your

6 Honor.  Thank you for your patience.

7          MR. DAVIS:  That's it, Judge.  Thank you.

8          THE COURT:  We'll see you-all.

9                          -o0o-

10     I certify that the foregoing is a correct transcript from

11 the record of proceedings in the above-entitled matter.  I

12 further certify that the transcript fees and format comply

13 with those prescribed by the Court and the Judicial Conference

14 of the United States.

15

16 Date:  12/04/23          /s/  *Gigi Simcox*
                            United States Court Reporter
17                          262 West Nueve Street
                            San Antonio TX 78207
18                          Telephone:  (210)244-5037

19

20

21

22

23

24

25