**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff* | § § | SA-21-CV-00785-XR |
| -vs- | § § § | |
| ROBERT J MUELLER, DEEPROOT RE 12621 SILICON DR LLC, RELIEF DEFENDANT; DEEPROOT SPORTS & ENTERTAINMENT LLC, RELIEF DEFENDANT; | § § § § | |
| *Defendants* | | |

## <u>ORDER</u>

On this date, the Court considered the motion for summary judgment filed by Plaintiff (ECF No. 103), Defendant's response (ECF No. 108), Plaintiff's reply (ECF No. 110), and the parties' arguments at the hearing held on October 23, 2023. After careful consideration, Plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Plaintiff Securities and Exchange Commission ("SEC") alleges that Defendant Robert J. Mueller ("Defendant"), the founder and investment adviser to deeproot 575 Fund, LLC (the "575 Fund") and deeproot Runs Deep Fund, LLC (the "dGRD Fund" and, together with the 575 Fund, "the Funds"), defrauded more than 300 people who invested over $66 million into the Funds.

On August 20, 2021, the SEC initiated this action against Defendant and his investment advisory firm, deeproot Funds LLC ("deeproot"), alleging violations of Section 10(b) and Rules 10b-5(a)–(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a)–(c)] and Section 17(a)(1)–(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1)–(3)] (collectively, the "Antifraud Provisions"). The SEC also

alleged that Defendant violated Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1)–(2), (4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

The SEC contends that Defendant fraudulently induced individuals to invest in the Funds by inaccurately communicating that the Funds would invest "the simple majority of our Fund Assets" in "Life Policies," which provided the right to be paid the death benefit from a life insurance policy on a third-party. ECF No. 1 ¶¶ 2, 4; ECF No. 103 at 9. With the understanding that the Funds would pursue this strategy, investors in the 575 Fund committed their principal investment for five years and elected to receive either simple annual interest of 7% per year paid out in a lump sum at the end of the five-year term, or 5% simple annual interest paid out in monthly installments for each of the five years. ECF No. 1 ¶ 3. Investors in the dGRD Fund received a predetermined return when life policies matured and were paid in the order in which they invested. ECF No. 103 at 8–9.

The SEC alleges that Defendant departed from this promised investment strategy and, instead, engaged in a fraudulent scheme in which Defendant siphoned investor money into his other businesses. ECF No. 103 at 6. The SEC asserts that Defendant also misappropriated investor money for personal expenses "including, for example, [his] child's school tuition, vacations, a divorce, two weddings, jewelry, and a condominium in Kauai, Hawaii." *Id.* at 6. To conceal this fraud, Defendant allegedly used new investor funds "to make Ponzi-like payments" to older investors. *Id.* at 6.

The SEC asserts that Defendant perpetuated this fraudulent scheme by distributing Private Placement Memorandums ("PPMs") and other marketing materials that contained six categories of affirmative misstatements and material omissions:

First, the Funds' PPMs stated that the Funds would own the Life Policies in which they invested, but, in fact, Policy Services Inc. ("PSI")—an entity solely controlled by Defendant that the 2019 PPMs describe as the "Ultimate Parent" of the Funds—owned and controlled the Life Policies ("Category One").

Second, the PPMs failed to disclose that Defendant and PSI sold fractional shares of Life Policies to investors outside of the Funds ("Category Two").

Third, Defendant only invested around $12 million in Life Policies, despite representing that a "simple majority" of the Funds' $66 million in investments would be allocated to purchasing Life Policies ("Category Three").

Fourth, the PPMs disclosed that the Funds would secure "capital acquisitions" in deeproot-affiliated businesses, such as deeproot Tech, deeproot Pinball, a car wash company, and others (collectively, "Affiliated Companies"), but Defendant instead transferred investor assets from the Funds to the Affiliated Companies without purchasing any interest in them ("Category Four").

Fifth, the PPMs materially understated the amount of investor money that Defendant dedicated to operating expenses and investing in the Affiliated Companies ("Category Five").

Sixth, the PPMs permitted Defendant to make payments for certain expenses ("Company Advance provisions"), among other things, "nominal administration expenses," but Defendant failed to disclose that he intended to use the Company Advance provisions as a justification for making "Ponzi-like payments" to older investors using new investors' capital ("Category Six").

*Id.* at 10–18.

The SEC contends that, in failing to adhere to the promises made in the PPMs and other marketing materials, Defendant "breached customs and practices in the investment advisory industry." *Id.* at 13. According to the SEC, Defendant served as "an investment adviser and manager of the Funds" and so "had an obligation to act, consistent with industry custom and practice, as a fiduciary." *Id.* at 14. The SEC alleges that Defendant breached these fiduciary responsibilities by failing to, *inter alia*, document intercompany transactions; implement written

policies and controls to ensure compliance with spending limits dictated by the PPMs; and using the Funds' money to pay his personal expenses, including $1.1 million in credit card payments on his behalf. *Id.* at 13–15.

On August 18, 2023, the SEC moved for summary judgment on all of its claims against Defendant. ECF No. 103. On September 18, 2023, Defendant responded in opposition to the SEC's motion (ECF No. 108) and moved to strike much of the evidence proffered in support of the SEC's motion as inadmissible (ECF No. 109).

The Court heard oral arguments from the parties on the SEC's motion for summary judgment on October 23, 2023. The Court will first address Defendant's evidentiary objections before turning to the SEC's motion for summary judgment.

## DISCUSSION

### I.    Defendant's Evidentiary Objections

#### A.  Motion to Strike Declarations of Sachin Verma (Exs. 1 and 29) and to Exclude Verma from Testifying at Trial

Defendant objects to declarations proffered by Sachin Verma, a Certified Public Accountant and current Assistant Chief Accountant at the SEC (Exs. 1 and 29). ECF No. 109 at 2. Defendant asserts that the SEC failed to disclose Verma as an expert or fact witness pursuant to Rule 26(a)(2). *Id.* Accordingly, Defendant requests that the Court strike Verma's testimony from the summary judgment record and preclude him from testifying at trial. *Id.* The Court rejects Defendant's arguments.

As the SEC explains, Verma simply summarized voluminous records in Exhibit 29 by reviewing the Funds' financial records and performing basic calculations based on those records. ECF No. 111 at 8. In Exhibit 1, Verma updated and expanded his earlier work by performing additional calculations regarding, *inter alia*, the percent of investors' money spent on various

categories. *Id.* The SEC explains that it did not disclose Verma as an expert because it only relies on Verma to summarize the Funds' bank accounts and perform basic calculations. *Id.* at 9. The SEC is entitled to use "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006. Further, the Fifth Circuit "expressly allows summary witnesses to summarize voluminous records in complex cases." *SEC v. Lifepay Grp.*, LLC, No. CV H-18-1098, 2020 WL 1259328, at *6 (S.D. Tex. Feb. 26, 2020) (quoting *United States v. Baker*, 923 F.3d 390, 397 (5th Cir. 2019), *report and recommendation adopted*, 2020 WL 1308202 (S.D. Tex. Mar. 16, 2020)); *see also SEC v. Seghers,* 298 F. App'x 319, 326 (5th Cir. 2008) (finding that witness providing summary testimony "[need not] be qualified as an expert because the production of the chart required her only to add values listed on various statements and divide the totals to calculate a percentage").

Defendant also advances a series of unpersuasive arguments to exclude Verma's affidavit because it allegedly fails to identify specific source documents for Verma's calculations and includes "speculative" or "misleading" statements that "lack foundation." ECF No. 109 at 6–7. These arguments disregard the sources enumerated in Verma's declarations, including a list of accounts that Verma reviewed and summarized in preparing his declarations and specific documents identified by Bates number. ECF No. 111 at 11. The SEC also certifies that the "financial records for these accounts were produced in discovery." *Id.* at 11. Finally, if this matter proceeds to trial, the Court can allow for "full cross-examination and rebuttal testimony" of Verma, as well as an "appropriate limiting instruction" to ensure that Verma's testimony does not "carry undue weight with the jury." *Seghers*, 298 F. App'x at 326.

For these reasons, as well as those stated in open court at the November 28, 2023 pretrial conference, the Court denies Defendant's motion to strike Verma's declarations and exclude his testimony at trial.

### B.  Specific Objections to SEC Exhibits

In addition to Defendant's attempt to exclude Verma's affidavits and trial testimony, Defendant submits objections to several of the SEC's exhibits. However, the Fifth Circuit applies a flexible approach when considering summary judgment evidence, holding "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting FED. R. CIV. P. 56(c)(2); *see also Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial.") (quoting 11 MOORE'S FEDERAL PRACTICE - CIVIL ¶ 56.91 (2017)). Thus, the Court considers whether the SEC could present the evidence submitted in support of its motion for summary judgment in an admissible form, regardless of whether it was submitted in that form for purposes of the motion.

For the foregoing reasons, the Court overrules each of Defendant's objections.

### 1.  Defendant's Interrogatory Responses (Exhibit 9)

Defendant insists, without citing any supporting authority, that the SEC cannot introduce Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories before the Court has ruled on every objection raised in the document. Yet Defendant himself attaches this same document in his response to the SEC's motion for summary judgment. *See* ECF No. 108–19, Ex.

A-18. Further, "when a party relies on an opposing party's answers to interrogatories, the answers are admissible as admissions of a party opponent" at the summary judgment stage. *United States v. $49,660 U.S. Currency*, No. H-04-0673, 2005 WL 8179550, at *6 (S.D. Tex. Aug. 31, 2005). For these reasons, the Court overrules this objection.

### 2.  August 18, 2015 Email (Exhibit 10)

Defendant objects to an August 18, 2015 email between Defendant and his attorney, Dennis Concilla, asserting that the document is misleading without the context of the entire exchange. ECF No. 109 at 8. But Defendant offers no explanation as to how the email exchange is incomplete, let alone how the allegedly missing materials bear on any issue before the Court. *See Luman v. Diaz,* No. 19-4920, 2022 WL 4001234, at *9 (S.D. Tex. Sept. 1, 2022) (overruling objection where moving party failed to cite to the specific pages of the complete document or explain how else the complete document was relevant). The SEC also certified that it submitted the exhibit "in the same form that it was produced by defendant Mueller in this litigation." ECF No. 111 at 16. Defendant's objection is overruled.

### 3.  Deposition Transcripts of Defendant, Scott Allen, Dennis Concilla, and Andrew Frederico (Exhibits 14, 23, 31, and 33)

Defendant asserts that Exhibits 14, 23, 31, and 33 contain deposition testimony for which he properly and timely asserted objections, and, unless and until those objections are overruled, he objects to entering this deposition testimony into the record. ECF No. 109 at 8–22. As a starting point, Defendant fails to explain how this deposition testimony "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). The parties could easily introduce the witnesses' testimony into the record at trial simply by calling the witnesses.

Further, while Defendant points the Court to numerous extracted pages of deposition testimony, he seeks rulings on generalized form objections—such as vagueness or

argumentativeness—or simply "same objections" without identifying for the Court the previous objection. *See* ECF No. 109 at 16. Quite simply, "[t]he court is not required to review large quanta of evidence to ferret out inadmissible statements. Rather, Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken." *Tucker v. SAS Inst. Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006) ("Objections lacking specificity do not satisfy the requirements of Rule 103.").

Accordingly, the Court overrules Defendant's objections to this deposition testimony.

### 4. References to Mueller's Invocation of the Fifth Amendment against Self-Incrimination (Exhibit 20)

Defendant objects to excerpts of his June 23, 2021 interview with the SEC in which Defendant invoked his Fifth Amendment right against self-incrimination. ECF No. 109 at 8. Defendant argues that, because the June 2021 interview predated this litigation and because he answered every question asked of him at later depositions, these invocations of his constitutional rights carry no evidentiary weight and must be excluded under Fed. R. Evid. 402 and 403. *Id.* The Court disagrees.

First, courts are permitted to consider at the summary judgment stage interview testimony provided prior to an enforcement action but during the SEC's investigation. *See SEC v. Carter*, No. 4:19-CV-100-SDJ-KPJ, 2020 WL 6379239, at *5 (E.D. Tex. Sept. 4, 2020) (quoting *SEC v. Am. Commodity Exch., Inc.,* 546 F.2d 1361, 1369 (10th Cir. 1976)) ("Congress has chosen to authorize the SEC to subpoena witnesses and to take question and answer statements under oath . . . these are equivalent to affidavits in terms of the quality of the evidence involved."), *report and recommendation adopted*, No. 4:19-CV-100-SDJ, 2020 WL 6304889 (E.D. Tex. Oct. 28, 2020). Likewise, courts are permitted to take invocations of the Fifth Amendment into account in

evaluating a motion for summary judgment, and the decision to "draw an adverse inference based on a defendant's invocation of the Fifth Amendment in a civil proceeding is left to the discretion of the District Court." *SEC v. Milles*, No. 19-CV-714-RP, 2022 WL 206808, at *5 (W.D. Tex. Jan. 24, 2022). Accordingly, the Court overrules Defendant's objection.[1]

### 5.   Scott Allen Resignation Letter Dated October 7, 2020 (Exhibit 22)

Defendant contends that Scott Allen's resignation letter is inadmissible hearsay. ECF No. 109 at 9. He further challenges Allen's statement that "it looks and feels like a Ponzi scheme" as irrelevant and otherwise unfairly prejudicial. *Id.* Finally, Defendant objects that this statement is improper lay opinion, lacks foundation, and calls for a legal conclusion. *Id.*

As the Court ruled during the November 28, 2023 pretrial conference, the resignation letter could be admitted as a business record under Fed. R. Evid. 803(6) and any hearsay statements contained within the letter could be cured by having Scott Allen testify to them. Because the letter and its contents could be presented in an admissible form at trial, Defendant's objection is overruled.

### 6.   Expert Reports of Bill Post (Exhibits 27 and 28)

Defendant alleges that certain opinions within SEC expert Bill Post's reports are "improper legal opinions that invade the province of the Court." ECF No. 109 at 9–10. Specifically, Defendant objects to Post's allusions to "Ponzi schemes" or any opinion concerning Post's conclusion that Defendant "did not adhere to the requirements of the fiduciary duties of loyalty and care." *Id.* at 10. Defendant also urges the Court to strike opinions concerning the propriety of the classification of certain expenses, loans, and compensation under Fed. R. Evid. 702 because

---

[1] However, for the reasons stated in open court at the November 28, 2023 pretrial conference, the Court will not allow the SEC to impeach Defendant with his prior invocation of his Fifth Amendment privilege at trial.

"Mr. Post does not purport to be a CPA or otherwise qualified to render expert opinions into accounting principles." *Id.* at 10.

Here, the Court concludes that Post's opinions do not improperly advance a legal opinion. First, the Court interprets Post's comments on "fiduciary duties" in the context of adherence to "industry custom and practice" rather than specific legal obligations. *See, e.g.*, ECF No. 104-9, Ex. 27 at 54. As to his allusions to Ponzi schemes, Post is not asserting that Defendant's actions satisfy the legal definition of a Ponzi scheme; rather, he is opining that Defendant "demonstrates characteristics similar to other Ponzi schemes *that I have observed.*" *Id.* at 13, 58 (emphasis added). Defendant's objection under Rule 403 is also unwarranted because, at the summary judgment stage, there is no risk of confusing a jury. *Smith Tank & Steel, Inc. v. Frio Water Holdings, Ltd.,* No. 5:18-CV-202-H, 2020 WL 13490862, at *5 (N.D. Tex. Jan. 3, 2020) ("At the summary judgment stage, there is no danger that failing to exclude this evidence would mislead or confuse the jury.").

Finally, Defendant did not file a *Daubert* motion challenging Post's qualifications by the August 18, 2023 deadline set forth in the operative scheduling order. *See* ECF No. 102. Because Defendant missed this deadline without explanation, the Court will not now consider their veiled *Daubert* motion. *See Queen Trucking, Inc. v. GMC,* No. 1:06-CV-052-C-ECF, 2007 WL 4458919, at *6 (N.D. Tex. June 8, 2007) (finding that the court need not entertain a "thinly veiled *Daubert* challenge" because "it is untimely"). For these reasons, the Court overrules Defendant's objections to Post's expert reports.

### 7.  Investor Declarations (Exhibits 34, 35, 36, 37, and 38)

Defendant objects to the five Funds investor declarations submitted by the SEC in support of its motion for summary judgment. First, Defendant objects to the investors' testimony regarding

his anticipated investment returns "[u]nder the terms of my investment agreement," asserting that the agreement "speaks for itself" and the testimony advances "improper legal conclusion[s]." *See, e.g.*, ECF No. 109 at 24–25; ECF No. 103-5, Ex. 36 at 96. But courts routinely consider investor testimony as speaking "to their own perception of being misled" and "not based on specialized knowledge." *Carter*, 2020 WL 6379239, at *5.

Defendant also challenges statements describing investors' conversations with financial advisors in exhibits 34, 36, 37, and 38 as hearsay. ECF No. 109 at 24–25. The SEC responds that these statements—that the financial advisors recommended Defendant's investment vehicles— were not offered to prove the matter asserted. ECF No. 111 at 26. Indeed, the SEC notes that the financial advisors' promises regarding the Funds' profitability were not true. *Id.* Because the identified statements could be offered as evidence that such statements were made and not for the truth of the statements, the Court rejects Defendant's hearsay argument. *See Carter*, 2020 WL 6379239, at *5 (accepting declarations of various investors where the statements are "are offered as evidence that such statements were made—not for the truth of the statements. In fact, Plaintiff asserts that statements were not accurate representations.") (emphasis in original).

Finally, Defendant objects to some variation of the statement contained in each affidavit, that, "[a]s a result of Mueller's fraud scheme, my retirement plans have been significantly impacted." *See, e.g.*, ECF No. 103-5, Ex. 37 at 104. Defendant asserts that such statements are "[c]onclusory; inadequate foundation, assumes facts not in evidence, calls for legal conclusion, improper expert opinions." ECF No. 109 at 24–25. The Court disagrees. Such statements squarely "speak to their own perception of being misled." *Carter*, 2020 WL 6379239, at *5.

Accordingly, Defendant's objections as to the investors' declarations are overruled.

II.    **The SEC's Motion for Summary Judgment**

The SEC seeks summary judgment as to Defendant's liability for violations of the Antifraud Provisions (Counts I–IV) and violations of Section 206 of the Advisers Act (Counts V–VI). Defendant's liability under Section 206 of the Advisers Act turns in part on his liability under § 17(a)(1) and (3) of the Exchange Act. *Seghers*, 298 F. App'x at 327–28. Thus, the Court will address the SEC's claims under Section 17(a) of the Securities Act and Rule 10b-5 of the Exchange Act's implementing regulations before addressing its claims under the Advisers Act.

A.  **Legal Standard**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant

must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

### B.  Violations of the Antifraud Provisions (Counts I–IV)

Section 17(a) of the Securities Act prohibits the offer or sale of securities by use of interstate commerce:

> (1) to employ any device, scheme, or artifice to defraud;
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

>   (3) to engage in any transaction, practice, or course of business which operates
>   or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1)–(3).

Section 10(b) of the Exchange Act empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b–5, which prohibits, in connection with the purchase or sale of any security, the use of interstate commerce:

>   (a) To employ any device, scheme, or artifice to defraud,

>   (b) To make any untrue statement of a material fact or to omit to state a material
>   fact necessary in order to make the statements made, in the light of the
>   circumstances under which they were made, not misleading, or

>   (c) To engage in any act, practice, or course of business which operates or
>   would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5.

While Section 17(a) and Rule 10b-5 contain substantially similar language, courts have recognized two important nuances in their interpretations of the Antifraud Provisions. First, the Supreme Court has read a scienter requirement into all three subsections of Rule 10b-5 and into Section 17(a)(1). *Aaron v. SEC*, 446 U.S. 680, 697 (1980). To establish a violation under Section 17(a)(2) or (a)(3), however, the SEC need only show that the defendant acted with negligence. *See id.*; *see also SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018). Second, Section 17(a)(2) alone among the Antifraud Provisions contains a requirement that the defendant "obtain money or property" by means of a false or misleading statement. *See* 15 U.S.C. § 77q(a)(2).

Outside of these two exceptions, "the basic precepts of Section 17(a) and 10(b) are the same, [and] they [should] be analyzed as one." *SEC v. Helms*, Civ. No. A-13-CV-01036 (ML), 2015 WL 5010298, at *12 (W.D. Tex. Aug. 21, 2015); *SEC v. Spence & Green Chem. Co.,* 612

F.2d 896, 903 (5th Cir. 1980) ("[T]he proscriptions of section 17(a) are substantially the same of those of section 10(b) and rule 10b-5."). Both provisions require that any prohibited statement or conduct be made or performed in connection with the purchase or sale of any security. *See* 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b–5; *see also Sethi*, 910 F.3d at 206. They further require that the "securities" be offered or sold through the use of interstate communications, commerce, or the mails. 15 U.S.C. § 78j(b), 17 C.F.R. §§ 240.10b-5(a)–(c), 15 U.S.C. §§ 77q(a)(1)–(3).

While there is "considerable overlap among" the subsections within each of the Antifraud Provisions, *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019), the middle prongs of both Section 17(a) and Rule 10b-5 explicitly address materially misleading statements or omissions, while the first and third prongs of each provision describe fraudulent conduct more generally. Courts typically analyze the first and third prongs together and refer to them as "scheme liability." *See, e.g.*, *SEC v. Bowen*, No. 3:22-CV-1415-S, 2023 WL 6166780, at *8 (N.D. Tex. Sept. 21, 2023) ("Even if Bowen did not make or use any false statements for purposes of Rule 10b-5(b) or Section 17(a)(2) liability, he may still be subject to scheme liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3)."); *Yoshikawa v. Exxon Mobil Corp.*, No. 3:21-CV-00194-N, 2023 WL 5489054, at *8 (N.D. Tex. Aug. 24, 2023) (analyzing scheme liability under Rule 10b-5(a) and (c)); *SEC v. Rio Tinto PLC*, 41 F.4th 47, 48 (2nd Cir. 2022) (analyzing claims for scheme liability under Section 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) of the Exchange Act).

Traditionally, scheme liability has "hinge[d] on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *SEC v. Farmer,* No. 4:14-CV-2345, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015). Courts in the Fifth Circuit have acknowledged a wide range of qualifying deceptive acts, including "[m]arket manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate

or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company." *In re Enron Corp. Secs.,* 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002). The Supreme Court recently clarified, however, that the knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1). *Lorenzo*, 139 S.Ct. at 1100–02 (holding that these provisions "capture a wide range of conduct," including the "dissemination of false or misleading material"); *see also Malouf v. SEC,* 933 F.3d 1248, 1260 (10th Cir. 2019) (finding that *Lorenzo* also controls Section 17(a)(3) because this provision "is virtually identical to Rule10b-5(c), which *Lorenzo* did address"). As the Second Circuit aptly summarized, "misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination." *Rio Tinto*, 41 F.4th 47, 48 (2nd Cir. 2022) (emphasis in original).

Because the SEC's theory of scheme liability appears to be premised in part on Defendant's dissemination of misleading marketing materials, the Court will analyze each category of misstatements and omissions Rule10b-5(b) and under Section 17(a)(2) before reaching the SEC's claims for scheme liability under Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3).

a. *Material Misrepresentations and Omissions in Violation of Section 17(a)(2) and Rule 10b-5(b) (Counts I–II)*

To establish liability under the Antifraud Provisions based on misleading communications, the SEC must demonstrate that Defendant made (i) a material misrepresentation or materially misleading omission, (ii) with the requisite state of mind, (iii) in connection with the offering, purchase, or sale of securities (iv) that were offered or sold through the use of interstate communications, commerce, or the mails. *See Sethi*, 910 F.3d at 206 (quoting *Seghers*, 298 F. App'x at 327) (identifying elements of a Rule 10b-5 violation premised on misleading

representations and omissions); 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b–5. Liability under Section 17(a)(2) requires a fifth element: evidence that the defendant "obtain[ed] money or property" through his false or misleading statement(s). *See* 15 U.S.C. § 77q(a)(2).

The parties do not appear to dispute that elements (3) and (4) are satisfied here—that Defendant's allegedly violative statements, omissions, and conduct occurred in connection with the purchase and sale of securities, which Defendant offered or sold using interstate commerce and the mails. The Court agrees.

The distribution of Defendant's allegedly misleading marketing materials coincided with the purchase and sale of interests in the Funds, *see* ECF No. 103 at 34, which the PPMs explicitly described as "securities." *See, e.g.*, ECF No. 103-2, Ex. 2 at 22. This nexus is sufficient to establish that Defendant's misleading statements were made "in connection with" the purchase or sale of securities. *Roland v. Green*, 675 F.3d 503, 511 (5th Cir. 2012) (concluding that the requisite connection exists where "there is a relationship in which the fraud and the stock sale coincide or are more than tangentially related") (citation omitted).

Likewise, it is undisputed that Defendant used email and a mailing service to disseminate the misleading statements in the marketing materials. *See* ECF No. 103-3, Ex. 20 at 67, 77 (Defendant's testimony that he used a "mailing service that mailed hard copies" of PPMs and at least one letter to investors in the Funds); ECF No. 103-6, Ex. 44 at 6 (emails to Defendant from two investors regarding late payments of interest deposits, attaching an August 22, 2020 letter from Defendant containing alleged misrepresentations). Again, this uncontroverted evidence is sufficient to establish as a matter of law, that Defendant used the mails and interstate commerce to distribute the allegedly misleading statements and omissions in the Funds' marketing materials.

*See Helms*, 2015 WL 5010298, at *13 (defining "interstate commerce" to include "emails, phone calls, and wire transfers, to communicate with investors.").

The parties' primary disputes on summary judgment center on the first two elements of the SEC's claims under Section 17(a)(2) and Rule10b-5(b)—whether Defendant (i) made materially misleading statements or omissions with (ii) the requisite state of mind. The SEC seeks summary judgment on these elements with respect to six categories of alleged misrepresentations and omissions addressed herein. Defendant disputes not only the materiality of each category of statements and omissions and his state of mind in making them, but also whether the disclosures and representations in the Funds' marketing materials were, in fact, misleading.

### (i) *Defendant's Material Misrepresentations and Omissions*

A defendant makes a misrepresentation if "the information disclosed, understood as a whole, would mislead a reasonable potential investor." *Laird v. Integration Res.,* 897 F.2d 826, 832 (5th Cir. 1990). The misrepresentation is "material" if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002). Courts consider an omission "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total' mix of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

*Category One: The PPMs and Marketing Materials Falsely Stated the Funds Would Own Life Policies*

The SEC asserts that the PPMs inaccurately represented that the Funds would own Life Policies when, in fact, the Funds held no such ownership interest in Life Policies. ECF No. 104-1 at 11. Specifically, the SEC cites to language in the PPMs stating: "when we *acquire* such a contract" and "[t]he Life Policies we *buy*." *Id.*; *see, e.g.*, ECF No. 103-2, Ex. 6 at 101 (emphasis

added). Other marketing materials, including the 575 Fund Overview and the deeproot Investor Presentation, also stated that the Funds would invest in Life Policies and that there were "underlying assets backed by multiple layers." ECF No. 104-1 at 11; ECF No. 103-3, Ex. 12 at 19; ECF No. 105-2, Ex. 13 at 23. Finally, the SEC argues that it was inaccurate for the PPMs to promise investors "a securitized investment in a pool of life settlement policies." *See, e.g.*, ECF 103-2, Ex. 3 at 43.

The SEC asserts that these representations are inaccurate because the Funds never held any ownership stake in the Life Policies. ECF No. 103 at 10. Indeed, Defendant has testified that PSI— an entity solely owned and controlled by Defendant—was the only entity that held title or ownership of Life Policies in 2019. ECF No. 103-3, Ex. 14 at 26; *see also* ECF No. 103-3, Ex. 11 at 6 (opinion of bankruptcy court presiding over PSI's bankruptcy proceedings in the Western District of Texas, concluding that "[PSI] is the sole and lawful owners of the In-Force Insurance Policies and Lapsed Insurance Policies"). Consequently, the SEC argues, "[t]he Funds never *invested* in, or *owned,* anything. Instead, Mueller took investor money and *gave* it to Policy Services, Mueller's own businesses, and himself." ECF No. 110 at 3.

Defendant counters that the Funds never represented that they owned any interest in Life Policies. ECF No. 108 at 9. Rather, Defendant contends that the PPMs accurately stated that the Funds would "invest" in Life Policies. *Id.* at 7. As one example, Defendant points to PPM language indicating that the 575 Fund "will *invest* in a number of asset classes including life settlement **_or_** ownership of life insurance policies." (emphasis added). *See, e.g.*, ECF No. 103-2, Ex. 2 at 22; Ex. 6 at 93. Defendant argues that other passive language in the PPMs—"Policies are purchased at a discount"—also does not state that the Funds will directly own the policies. *Id.* at 30. Defendant also identifies examples of the Funds' marketing materials indicating that it "invests" (rather than

owns) Life Policies, as well as a slide deck that references a "diversified pool of policies" without explicitly mentioning ownership. ECF No. 103-3, Ex. 12 at 19; ECF No. 104-3, Ex. 13 at 32.

Given these statements, Defendant asserts that a "plain language analysis" of the PPMs and marketing materials gives rise to a "fact issue of whether the representations that the Funds will 'invest' in life policies would lead a reasonable investor to conclude that such language required the Funds to 'own' the policies it was investing in (and that the distinction would have been important)." ECF No. 108 at 8. However, Defendant's narrow focus on the phrase "invest" fails to explain the PPMs' explicit references to "*acquir[ing]* such a contract" and "[t]he Life Policies we *buy*," informing investors that the Funds would hold an ownership interest in the Life Policies. ECF No. 103-2, Ex. 6 at 101 (emphasis added).

The Court agrees with the SEC that there is no fact issue as to whether the PPMs misrepresented that the Funds would purchase Life Policies. *Seghers*, 298 F. App'x at 328 (5th Cir. 2008) ("[T]he standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor."). Nonetheless, the Court concludes that there is a genuine dispute of a fact concerning the materiality of this misrepresentation. As Defendant observes, the SEC has not provided any investor testimony indicating that ownership of—rather than investment in[2]—an asset is material as a matter of law. ECF No. 108 at 8. Moreover, it is undisputed that PSI served as the Funds' parent entity. *See Id.* at 8; ECF No. 108-5, Ex. A-4 at 10–17; ECF No. 103 at 10 (noting that certain PPMs refer to PSI as the Funds' "ultimate parent entity"). Indeed, the SEC's complaint alleges that "Mueller used Policy Services to purchase and hold life insurance policies *for and on behalf* of the Funds." ECF No. 1 ¶ 18 (emphasis added). Given the relationship between PSI and the Funds, the Court concludes that the

---

[2] As discussed in greater detail under Category Four, the parties also dispute whether the Funds held an investment interest in the Life Policies.

materiality of Defendant's misrepresentations as to the Funds' ownership of Life Policies is a question for the jury. *See TSC*, 426 U.S. at 450 (concluding that determinations of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

*Category Two: Marketing Documents Failed to Disclose that Mueller Previously Sold off Fractional Shares of the Insurance Policies*

Next, the SEC asserts that the PPMs and marketing materials omitted that PSI and Defendant sold fractionalized shares of Life Policies to outside investors. ECF No. 103 at 6. A declaration submitted by SEC Assistant Chief Accountant, Sachin Verma, includes an appendix cataloging, *inter alia,* policies sold to outside investors, the investment closing date, the outside investment, and the outside investor ownership stake. ECF No. 103-2, Ex. 1 at 16. These sales resulted in death benefits under the Life Policies being owed to investors outside of the Funds. ECF No. 103 at 23. The SEC identifies two policies that matured, but, due to PSI having sold a portion of its interest in them, resulted in the Funds' investors claiming either a small piece or nothing from the policies. *See id.* at 14; ECF No. 103-2, Ex. 1 at 12. The SEC alleges that the sales of these fractionalized shares were never disclosed to investors in the Funds.

Defendant asserts that the PPMs never communicated to investors that Funds' investors were the only parties invested in the Life Policies. ECF No. 108 at 9. Rather, Defendant argues that because the PPMs did not represent that the Funds owned the Life Policies, the Funds could not disclose a sale in something they never owned. *Id.* at 9. As noted above, this argument ignores that the PPMs do, in fact, state that the Funds would purchase or acquire an interest in Life Policies.

Defendant also argues that the PPMs did not identify specific Life Policies to be invested in and disclosed that these policies "are bought and sold in a secondary market through policy

brokers." *See, e.g.*, ECF No. 103-2, Ex. 2 at 30. Defendant points to language in the PPMs that communicated to investors that shareholders may not be permitted to receive information related to "details of underlying assets" and must "rely exclusively" on managers with "broad authority and discretion to identify and investment in life policies." ECF No. 108 at 9; *see, e.g.*, ECF No. 103-2, Ex. 2 at 27.

At the summary judgment stage, the Court will not resolve the disputed factual question of whether such disclosures were insufficient to alert investors to the possibility of outside investors with an interest in the same Life Policies as the Funds or PSI's ability to sell interests in those Life Policies to outside investors. Further, disputing the materiality of any omission, Defendant points out that none of the five investors who submitted declarations for the SEC complain that they were not informed about the outside investors in the policies. Defendant has thus identified a material fact dispute properly left for the jury's determination. *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996) ("Because materiality is a mixed question of law and fact, it is usually left for the jury.").

*Category Three: Marketing Documents Falsely Stated the Funds Would Invest At Least 50% of Assets in Life Insurance Policies*

Third, the SEC alleges that Defendant misrepresented the use and allocation of investors' funds. All seven versions of the Funds' PPMs stated that (1) "the overwhelming intended allocation of investment funds [go] to life policies;" and (2) the Funds would "invest in [Life Policies] as the simple majority of our Fund Assets." ECF No. 103 at 2; *see, e.g.*, ECF No. 103-2, Ex. 3 at 47. The SEC alleges that, in reality, Defendant only spent 18.2% of the $66 million (around $12 million) on Life Policies, violating the PPMs' promise to spend a "simple majority" on Life Policies. ECF No. 103 at 7. For the reasons detailed below, the SEC fails to establish as a matter of law that these statements constitute a material misrepresentation.

The SEC explains that the PPMs provide disclosures regarding the maximum percentage of investors' assets Defendant could spend on the Funds' operating expenses and investments in his other businesses (collectively, the "Affiliated Companies").[3] *Id.* at 7. The PPMs also provided how much the Funds could spend on "Company Advance,"[4] which could cover "agent compensation (if any), nominal administrative expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees." *See, e.g.*, ECF No. 103-2, Ex. 3 at 53. Therefore, the amount that the Funds could spend on Affiliated Companies and Company Advance affected the amount required to be spent on Life Policies.

The SEC alleges that after accounting for the maximum permissible Company Advance spending (20%) and investments in Affiliated Companies (50% for the 575 Fund; 30% percent for the dGRD Fund), the Funds were obligated to invest approximately $28.6 million of the $66 million raised in Life Policies. ECF No. 103 at 8. Contrary to this requirement, the Funds only spent around $12 million on Life Policies. *Id.* The SEC contends that Defendant, as the investment adviser, director, and executive director, prepared and was responsible for the Funds' investment allocations. *Id.*

Defendant objects to the methodology used by the SEC to reach this conclusion, noting that the PPMs are silent as the proper method of calculating the appropriate allocations. ECF No. 108 at 22. Specifically, Verma reached these numbers by first subtracting the maximum amount

---

[3] The maximum amount permitted for investing in Affiliated Companies differed by PPM: for instance, the two 575 PPMs used prior to November 2019 permitted up to 45% of the asset portfolio into deeproot Tech (ECF No. 103-2, Ex. 4. at 68; Ex. 5 at 85–86), while the two most recent 575 Fund PPMs provided for investments in several Affiliated Companies up to 50% of the portfolio (ECF No. 103-2, Ex. 2 at 33; Ex. 3 at 51). The first two dGRD PPMs permitted up to 30% of the asset portfolio to be invested in Affiliated Companies (ECF No. 103-2, Ex. 7 at 122; Ex. 8 at 141), while the final dGRD PPM did not reference Affiliated Companies expenses.

[4] For Company Advance, the SEC identifies that the January 1, 2021 575 Fund PPM allowed the Funds to spend no less than two percent and no more than ten percent (ECF No. 103-2, Ex. 2 at 34), while all other PPMs permitted no less than two percent and no more than twenty percent, to be spent for "Company Advance." *See, e.g.*, ECF No. 103-2, Ex. 3 at 53.

allowed for the Company Advance provisions (20%) from the total amount raised by the Funds, and then used this *balance* to calculate the maximum amount allowed for investments in Affiliated Companies (50% for 575 Fund; 30% for dGRD). ECF No. 103, Ex. 1 ¶¶ 22–25. Defendant proposes an alternative calculation method: by calculating the Company Advance provisions and Affiliated Companies investments against the total investor funds raised (rather than first deducting the Affiliated Companies investments as the SEC urges), the Funds would be required to spend around $12 million on Life Policies—the precise amount the Funds actually invested in Life Policies. ECF No. 108 at 22.[5] In doing so, Defendant raises a material fact issue regarding how the PPMs' allocation requirements would be analyzed by a reasonable investor, precluding the Court from finding, as a matter of law, that Defendant's allocations contradicted the PPMs.

Defendant also asserts that the "simple majority" and "overwhelming intended" allocation of company funds to Life Policies needs to be read in the full context of the PPMs. *Id.* at 21. Here, Defendant points to a fairly generic disclosure in each of the PPMs: "This information has been prepared based upon currently available data and necessarily incorporates significant assumptions as to factual matters. There is no assurance that these assumptions are, or will prove, accurate in all material respects." *See, e.g.*, ECF No. 103-2, Ex. 2 at 27. Defendant argues that this language indicated that the PPMs provided a "projected allocation with the caveat that it may not 'prove accurate'" and that, ultimately, the fund manager "has 'absolute discretion' over investment decisions." ECF No. 108 at 21. The parties thereby advance conflicting interpretations of how these disclosures shaped allocation requirements, and the Court leaves it for the jury to resolve this material fact dispute.

---

[5] In other words, Defendant proposes that, using the limits of the 575 Fund, assuming that 70% of total investments were spent collectively on Company Advance (20%) and investments in Affiliated Companies (50%), of the remaining 30% ($19.8 million), Defendant would only need to invest a simple majority (or approximately $10 million) in Life Polices.

*Category Four: The PPMs Falsely Stated the Funds Purchased Shares or Other Interests in the Affiliated Companies*

The SEC also alleges that the PPMs inaccurately stated that the Funds' investments in the Affiliated Companies would be "capital acquisitions." ECF No. 103 at 9. The PPMs characterize "capital acquisitions" as "a purchase of an internal, affiliated investment in another enterprise." *See, e.g.*, ECF No. 103-2, Ex. 2 at 33. Two of the 575 Fund PPMs filed until November 2019 stated, "Capital acquisition in [deeproot Pinball, LLC] would consist of purchase of [deeproot Pinball, LLC] Class B Shares that Company will hold." ECF No. 103-2, Ex. 4 at 69; *id.*, Ex. 5 at 86. Later 575 Fund PPMs list several Affiliated Companies that "the Company will invest in." *See, e.g.*, ECF No. 103-2, Ex. 3 at 51–52. The SEC acknowledges that the dGRD PPMs used only the general language of a "purchase of an internal, affiliated investment position" without specifying any particular Affiliated Companies, and the final dGRD PPM did not mention capital acquisitions at all. *See, e.g.*, ECF No. 103-2, Ex. 8 at 141.

The SEC asserts that these PPM disclosures constitute misrepresentations because, while Defendant transferred assets from the Funds to the Affiliated Companies, the SEC contends that Defendant has not been able to produce documentation substantiating the Funds' interest in the Affiliated Companies. ECF No. 103 at 10. Specifically, the SEC points to an email chain in which Defendant concedes that "there is no formal documentation other than our discretion" in response to a consultant asking, "are there debt or investment agreements in place between those businesses and the funds, whereby the terms of the cash flow, repayment schedules, profit allocations, etc., are documented?" ECF No. 103-3, Ex. 16 at 46–47. Defendant also promised to "paper those internally," which the SEC alleges resulted in an Internal Allocation Agreement that failed to memorialize the Funds' purchase of any interest in the Affiliated Companies or even identify the amount invested. ECF No. 103 at 24. The SEC also asserts that the Internal Allocation Agreement

25

was not an arms-length transaction, signed only by Defendant on behalf of all parties, and, in reality, evidence of Defendant's intent to continue a deception. *Id.* at 33.

Defendant responds by noting how certain PPMs define capital acquisition as "the purchase of dP Class B shares," but also use the more general terms "purchase," an "investment," and an "internal, affiliated investment position." ECF No. 108 at 16–17. As with the misrepresentation concerning the ownership of Life Policies identified above, however, Defendant cannot deny the existence of specific promises within the PPMs—the purchase of Class B shares—by pointing to other instances of more generalized language. Here, there is no factual dispute that the Funds never purchased Class B shares in the Affiliated Companies.[6]

Nonetheless, the jury will need to evaluate the materiality of this misrepresentation, particularly because Defendant offers evidence that the Funds still acquired an "internal, affiliated investment" in the Affiliated Companies, even if not through the purchase of Class B shares. For example, Defendant argues that an Investment Allocation Agreement provided that the Affiliated Companies would deliver to the Funds 40% of their net profits, undermining the SEC's assertion that the Funds "received nothing, or very little, in return for the purported investment." ECF No. 103 at 9. Defendant points to deposition testimony from the company's former accountant, Ken Abramson, indicating that money was being tracked in Quickbooks, including the flow of money from the Funds to the Affiliated Companies. ECF No. 108-5, Ex. A-4 at 9–10, 18–19. Defendant also points to Abramson's testimony that he was not aware of any requirement for a formal written contract between the entities for funds to be transferred. *Id.* at 20. The jury will need to weigh such

---

[6] Defendant attempts to manufacture a material dispute as to the issuance of Class B shares by pointing to his own deposition testimony that he did not recall whether Class B shares were issued to the Funds. ECF No. 108 at 17. He further cites his response when asked if it would be fair to say there were no Class B shares issued if the SEC could not locate them in the corporate records: "No, that would be very false." *Id.* at 17. In doing so, Defendant has not advanced competent summary judgment evidence of a fact issue as to whether the Funds ever acquired Class B shares in the Affiliated Companies.

evidence to determine whether the Internal Allocation Agreement was sufficient to establish the kind of "capital acquisition" articulated in the PPMs, and, in turn, whether this renders the misrepresentation regarding Class B shares immaterial.

Defendant also argues that the Funds received security interests in all of the Life Policies, as well as other Affiliated Companies, pursuant to a Contingent Pledge and Security Agreement ("Contingent Pledge"). ECF No. 108 at 17. The SEC objects to this characterization of the Contingent Pledge, asserting that it only provided the Funds with an interest in the Affiliated Companies if certain conditions precedent occurred and that Defendant offered no evidence that those conditions had occurred. ECF No. 110 at 6. The SEC also points out Defendant's deposition testimony that he had no recollection of this document. ECF No. 110, Ex. 20.1 at 13–14. However, at the summary judgment stage, the Court will not weigh competing interpretations of the Investment Allocation Agreement or Contingent Pledge and leaves these considerations for the jury. *See generally Luig v. N. Bay Enters.*, 55 F. Supp. 3d 942, 949 (N.D. Tex. 2014) ("If there is ambiguity regarding a contract term, a grant of a motion for summary judgment would be improper because the interpretation of the ambiguity would be a factual issue.").

Finally, Defendant points out that the five investor declarations submitted by the SEC do not question the *manner* of the Funds' investment in the affiliates. ECF No. 108 at 18. Ultimately, the materiality of the nature of Funds' investment—through the Internal Allocation Agreement or Contingent Pledge rather than ownership of Class B shares—is a question best left for the jury.

Accordingly, the Court concludes that the PPMs contain a misrepresentation—there is no factual dispute as to whether the Funds acquired Class B shares in the Affiliated Companies—but finds a genuine dispute of fact as to the materiality of this misrepresentation.

*Category Five: The PPMs Falsely Understated the Amount the Funds Would Invest in the Affiliated Companies and Spend on Operating Expenses*

The SEC provides evidence that the PPMs materially understated the amount Defendant would spend on operating expenses and investing in the Affiliated Companies from the Funds' assets. Based on the allocation requirements contained in the PPMs, the SEC argues that the maximum amount that Defendant could allocate of the $66 million raised from investors to these two categories was $37.8 million. ECF No. 103 at 16. Instead, as Verma summarized from his review of the Funds' financial records, Defendant spent over $50.1 million of the Funds' money on Affiliated Companies or operating expenses. *Id.* at 11.

Defendant raises several objections to the SEC accountant's characterizations of payments. First, Defendant alleges that Verma improperly groups "Affiliated Companies" and "Operating Expenses" together without distinguishing between the two, writing, "$50,126,341 was transferred to the Affiliated Business *or* spent on operating costs." ECF No. 108 at 19; ECF No. 103-2, Ex. 1 at 8 (emphasis added). Defendant next objects to the statement, "between May 1, 2015 and September 9, 2021, $15,625,099 in payments that, based on the Financial Records, *appear to be* for the benefit of the Affiliated Businesses were transferred from the Deeproot accounts." ECF No. 103-2, Ex. 1 at 8. Finally, Defendant asserts that the $1.8 million paid "as periodic payments and maturity proceeds to 575 Fund investors" and the $5 million paid to "investors in the Debenture Funds as maturity payments when they became due" cannot be considered either payment towards "Affiliated Companies" or "Operating Expenses." *Id.* at 9. Defendant asserts that this constitutes $22 million in funds improperly allocated as "Affiliated Companies" or "Operating Expenses." ECF No. 108 at 20.

The SEC argues that in failing to explain how this $22 million was actually spent, Defendant has failed to carry its burden in demonstrating that there is a material fact dispute. ECF

No. 110 at 6. The Court disagrees. Defendant has raised credible questions about whether the Funds exceeded the amount that the PPMs provided would invest in the Affiliated Companies and Operating Expenses, which will need to be adjudicated by the jury.

More fundamentally, there also appears to be a dispute as to how to properly calculate the actual allocation of investors' money under the terms of the PPMs—whether the portfolio should be valued at face value, or cost basis, or "somewhere between that spectrum." ECF 108 at 20. Defendant points to his own testimony on the subject, ECF No. 108-9, Ex. A-8 at 5–6, 10–12, and to competing methodologies described by the SEC's expert, Bill Post. *See* ECF No. 108 at 20 (citing Post's statement that because the PPMs do not identify the method of calculating "allocation," the term could be based on "investment value" or "allocation of investor funds."). At the summary judgment stage, the Court declines to weigh the competing evidence offered by Defendant and the SEC's accountant or other expert witnesses, and it concludes that there is a material fact dispute regarding the Funds' portfolio value for jury adjudication.[7]

For these reasons, the Court concludes that a material fact dispute exists regarding whether the PPMs falsely understated the amount the Funds would invest in the Affiliated Companies and spend on Operating Expenses.

*Category Six: Marketing Documents Failed to Disclose that Mueller Used the "Company Advance" to Make Ponzi-Like Payments*

The SEC contends that the "Company Advance" provisions in the PPMs—which permit payments for "agent compensation (if any), nominal administrative expenses, IRA fees, other compensation, marketing costs, and the Fund Advisor fees" (ECF No. 103-2, Ex. 3 at 53)—did

---

[7] Although Mueller was designated as an expert witness in this case, the Court ruled at the November 28, 2023 pretrial conference that Mueller could not testify in that capacity because he failed to provide a summary of his opinions by the deadline set forth in the scheduling order. Nonetheless, Mueller will be permitted to testify to his valuation practices with respect to the Funds' portfolios as a fact witness, based on his personal knowledge.

not constitute sufficient disclosure that Defendant used new investments to pay existing investors. ECF No. 103 at 16–17. The SEC provides an affidavit from Verma asserting that a review of the Funds' financial records revealed around $1.8 million in new deposits from the Funds' investors being used to make periodic and maturity payments to earlier 575 Fund investors "because there were no other sources of funds to pay the investors." ECF No. 103-2, Ex. 1 at 6.

The SEC also argues that Defendant misled 575 Fund investors when he provided an explanation in a September 30, 2020 letter to investors concerning why they had not received their periodic payments. Defendant wrote, "[W]e experienced . . . cash flow delays in mid to late September that depleted our 575P payment reserves. The result was that some 575P investors received their payment in September and others did not." ECF No. 103-4, Ex. 21 at 2. The SEC points to deposition testimony from Scott Allen, an employee in business development, that, in fact, some investors remained unpaid not due to "cash flow *delays*" but because there had not been enough investment capital coming to the 575 Fund to make their payments. ECF No. 103-4, Ex. 23 at 14–15.

Further, the SEC argues that Defendant failed to amend the Funds' PPMs to more robustly disclose the use of new investor money to make periodic payments to older investors, even after Allen submitted a resignation letter, stating, "[I]t has become clear that your chosen strategies and methods up to this point have been relying entirely on incoming capital from new investors to be able to honor commitments to previous investors." ECF No. 103-4, Ex. 22 at 4. Finally, the SEC alleges that Defendant's failure to explicitly disclose in PPMs and marketing materials that the Funds' money would be used to pay investors in other funds, including preexisting "Debenture Funds", constituted a material omission. ECF No. 103 at 18.

Defendant responds by pointing to language in the PPMs explaining that the Funds may not have sufficient returns to make the periodic monthly payments: "As the actual death of an insured, maturity of any life policy, or return capital from a capital acquisition are unknown at the time of investment, we may not be able to pay a periodic Priority Return or Liquation Amount when due." ECF No. 108 at 11; *see, e.g.*, ECF No. 103-2 at 29. The PPMs recognized this uncertainty by allowing for the Funds to take an advance of up to 20% of investors' capital for use towards such Company Advance expenses as "nominal administration expenses." ECF No. 108 at 11.

Defendant then provides deposition testimony from Business Development Director, Nathan Spradlin, indicating that he understood that the Funds were permitted to make periodic payments to investors based upon the Company Advance provisions. ECF No. 108-4, Ex. A-3 at 75. Spradlin further testified that he did not believe the Funds were operating like a Ponzi scheme. *Id.* at 63. Defendant also identifies testimony from Company Securities Counsel, Dennis Concilla, indicating that he thought that payments from the Company Advance could be used to pay investment returns. ECF No. 108-7, Ex. A-6 at 16.[8]

In presenting this evidence, Defendant has raised a material fact issue regarding whether the PPMs, when construed together, sufficiently disclosed that funds allocated to Company Advance would be used to pay earlier investors. *See SEC v. Blackburn,* 431 F. Supp. 774, 812 (E.D. La. 2019) (finding no material misrepresentation as a matter of law where investor materials disclosed funds could be used to "pay expenses and further fund Company operations on a day-to-

---

[8] The SEC objects that Spradlin also testified that he would not consider monthly payments made to 575 Fund investors a "nominal administrative expense" and that Concilla also testified that paying existing investors solely from new investors would not be proper. ECF No. 110 at 4. However, the Court "does not weigh conflicting deposition testimony at the summary judgment stage because this would constitute a credibility determination, which is solely within the province of the jury." *Phillips v. Starbucks Corp.*, 624 F. Supp. 530, 542 n.5 (D.N.J. 2022).

day basis" and defendants used these expenditures for "consulting, legal, credit cards, accounting, loan payments, commissions, and other miscellaneous expenses").

It is undisputed, however, that the PPMs failed to disclose that investor funds could be used to repay investors *outside of* the Funds, including four funds established by Defendant before 2016 (the "Debenture Funds"). ECF No. 103 at 13; ECF No. 103-3, Ex. 20 at 68–70. From his review of the Funds' financial records, Verma identified $3.8 million transferred from the Funds to these Debenture Funds. ECF No. 103-2, Ex. 1 at 6–7. Defendant offers no competent summary judgment evidence to rebut the SEC's argument on this point. The Court thus finds that PPMs' failure to disclose that Defendant diverted $3.8 million to earlier Debenture Funds' investors constitutes an omission.

The Court also concludes that Defendant's omission was material as a matter of law. The PPMs identified specific uses for all investor capital and established how much capital Defendant could devote to each enumerated purpose. Nonetheless, $3.8 million in investor funds was redirected to a purpose never disclosed in the PPMs for the benefit of a class of investors outside of the Funds. It simply strains credulity to suggest that a reasonable investor would not consider these undisclosed payments representing over 5% of total investments as significantly altering "the 'total' mix of information made available." *TSC*, 426 U.S. at 449. A reasonable investor would clearly consider the diversion of 5% of aggregate funds to a purpose that would by definition never generate any revenue—or even, unlike charitable contributions, good will—"important in making a decision to invest." *Tchuruk*, 291 F.3d at 359.

Considering similar circumstances, courts have found the diversion of investor funds to undisclosed purposes material as a matter of law at the summary judgment stage. *See SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993) (upholding summary judgment in favor of SEC as to

its fraud claims based on evidence that defendant diverted investor funds to an undisclosed use); *SEC v. Advance Body Imaging, LP*, No. SACV 07–1140 DOC (JTLx), 2009 WL 10673586, at *2– 3 (C.D. Cal Mar. 18, 2009) (granting summary judgment in favor of the SEC for violations of the Antifraud Provisions based on uncontested evidence that defendant promised in the PPMs to use a certain percentage of investor funds to operate a medical scanning business but instead used funds for several undisclosed purposes); *see also SEC v. Shavers*, No. 4:13–CV–416, 2014 WL 4652121, at *8 (E.D. Tex. Sept. 14, 2014) (granting summary judgment in favor of the SEC for violations of the Antifraud Provisions where defendant misrepresented "the use" of investor funds).

Accordingly, the Court finds as a matter of law that Defendant made a material omission in failing to disclose that investor funds could be diverted to investors in external Debenture Funds. Whether Defendant sufficiently disclosed the Funds' use of new investments to pay to earlier investors, however, is a question for the jury.

*(ii)   Defendant's State of Mind as to his Misstatements and Omissions*

The SEC insists that Defendant acted with scienter, or at least negligence, in making the six categories of allegedly misleading representations and omissions that the SEC identified in the PPMs. Given the facts issues as to the sufficiency of Defendant's disclosures about outside investors in the Life Policies (Category Two), the proportion of the Funds allocated to purchasing Life Funds (Category Three) and to Affiliated Companies and Operating Expenses (Category Five), and the use of new investor money to pay earlier investors (Category Six), the Court cannot draw any conclusions about whether Defendant knew or should have known that those disclosures were deficient. Thus, the Court will limit its analysis of Defendant's state of mind to his statements and omissions regarding the Funds' ownership of Life Policies (Category One), acquisition of

Class B shares in Affiliated Companies (Category Four), and the material omission that Defendant diverted money from the Funds to Debenture Funds' investors (Category Six).

### (a)   Scienter under Rule 10b-5(b)

In securities fraud matters, scienter is "the mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The SEC can prove scienter by demonstrating that Defendant acted with severe recklessness. *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (en banc). The Fifth Circuit defines severe recklessness as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*

The SEC asserts three bases for finding that, as a matter of law, Defendant acted with scienter. First, the SEC alleges that Defendant, as the director and executive officer of the Funds, was ultimately responsible for the contents of the PPMs presented to investors, and "he was aware of the investment allocations of the Funds, which differed substantially from the PPMs' disclosures." ECF No. 103 at 33. The SEC alleges that Defendant either drafted or approved all the PPMs and other marketing materials. *Id.*

Second, the SEC contends that Defendant, as the sole decisionmaker over the Funds, knew, or was reckless in not knowing, that his representations about the Funds' investments in the Affiliated Companies (Category Four) were materially false and misleading. Specifically, the SEC cites an email in which a consultant asked Defendant whether the Funds had "debt or investment agreements in place between those [Affiliated Companies] and the funds, whereby the terms of the cash flow, repayment schedules, profit allocations, etc, are documented?" ECF No. 103-3, Ex. 16

34

at 47. Defendant responded, "there is no formal documentation," but he would "'paper' those internally." *Id.* The SEC asserts that the resulting Allocation Agreement was not an arms-length agreement and indicated his intent to continue the fraud. ECF No. 103 at 34.

Finally, the SEC argues that Defendant was a signatory on all deeproot Entities' bank accounts, and those financial records provide evidence that Defendant diverted investor funds in ways not disclosed in the PPMs. *Id.* at 28. Specifically, the SEC asserts that Defendant used the Funds' money to: 1) pay personal expenses; 2) pay investors who purchased fractionalized shares of the Life Policies; 3) repay investors in the Debenture Funds; and 4) make Ponzi-like payments to earlier investors. *Id.* at 33.

In response, Defendant identifies the deposition testimony of several "lay witnesses," who he characterizes as testifying to his good faith and honest communications with investors. ECF No. 108 at 25. For example, Defendant points to testimony from Director of Business Development, Nate Spradlin, articulating that he understood that Defendant believed that the PPMs contained adequate disclosures. ECF No. 108-4, Ex. A-3 at 59. Likewise, Defendant identifies testimony from Business Development Manager, Scott Allen, who—despite submitting a letter of resignation expressing his concerns regarding the amount of capital coming in to cover investor payments—testified that he did not believe Defendant designed the 575 Fund as a Ponzi scheme and agreed that Defendant believed he was acting consistently with the law. ECF No. 108-3, Ex. A-2 at 64. The jury will need to evaluate these witnesses' credibility to determine Defendant's motive and intent. *See Pac. Ins. Co., Ltd. v. La. Auto. Dealers Ass'n*, No. 01-30081, 2001 WL 1013089, at *4 (5th Cir. Aug. 3, 2001) (collecting cases by the Fifth Circuit holding that "cases which turn on state of mind are rarely appropriate for summary judgment" because they involve subjective issues of motive and intent).

Defendant also asserts that his reliance on counsel demonstrates his good faith. In the Fifth Circuit, a good faith reliance on the advice of counsel "is not a defense to securities fraud. It is simply a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud." *Peterson*, 101 F.3d at 406. Under this analysis, a party cannot avoid liability under the securities laws "by simply retaining outside counsel to prepare the required documents." *SEC v. Sethi Petro, LLC,* No. 4:15-CV-00338*, 2017 WL 3386047, at *4 (E.D. Tex. Aug. 7, 2017). Nevertheless, the SEC bears the burden to prove intent to deceive. *SEC v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008).

Here, Defendant hired two securities attorneys, Dennis Concilla and Andrew Frederico of Carlile, Patchen, & Murphy, to review the Funds' initial offering documents. ECF No. 108 at 29–30. However, the parties vigorously dispute the nature and extent of disclosures that Defendant made to his attorneys. Specifically, the SEC points to deposition testimony from Defendant's attorneys to support that they could not have known that the PPMs contained false statements and omissions of material facts because Defendant did not inform them of critical relevant facts. ECF No. 103 at 38–39.

Defendant disputes this characterization. At his deposition, Defendant insisted that "[w]e had very frank and robust discussions about almost everything we did with [the lawyers]" and "[w]e took the advice that we were given by competent securities counsel who we didn't hide anything from and we followed their advice." ECF No. 108-10, Ex. A-9 at 9, 33. Defendant also testified that his attorneys "knew intimately everything we were doing and how everything were structured." *Id.* at 18.

More compellingly, Defendant also provides numerous examples of his attorneys testifying about advice they provided regarding the specific misrepresentations at the heart of this case. For

example, Concilla testified that he advised Defendant that the 575 Fund and dGRD's respective

PPMs were compliant with the law and that they made adequate disclosures. ECF No. 108-7, Ex.

A-6 at 25, 41–42. Further, Defendant points to Concilla's deposition testimony indicating that

payments to investors could be considered "operational expenses" or "payments from the

Company Advance." ECF No. 103-5, Ex. 31 at 58; ECF No. 108-7, Ex. A-6 at 16. Likewise,

Concilla both testified and submitted an affidavit expressing his view that because "money is

fungible," there are circumstances under which it would not be improper to make payments to

previous investors from an account that comingled both new investor funds and funds from other

sources. ECF No. 108-7, Ex. A-6 at 18–20; ECF No. 104-7, Ex. 41 at 3–4. Finally, Concilla

testified that he communicated his legal opinion to Defendant that he could take a salary from

individuals' investments in the Funds provided that it was reasonable. ECF No. 108-7, Ex. A-7 at

52–53.

In its reply, the SEC objects that Defendant's "select quotes from his attorneys" do not

dispel the fatal problem that Defendant's attorneys and advisors "never had the full set of facts on

which to render such advice." ECF No. 110 at 8–9. Yet this argument elides that the competing

deposition testimony advanced by both parties creates a material fact dispute that the Court cannot

resolve at the summary judgment stage.[9] Indeed, district courts in the Fifth Circuit have suggested

that "the jury is charged with the task of determining whether full disclosure was made to the

attorney which ultimately will affect whether Defendant was in good faith when he sought legal

advice." *United States v. Impastato,* No. 05-325, 2007 WL 2463310, at *10 (E.D. La. Aug. 28,

2007) (denying government's motion *in limine* to preclude defendant from raising a reliance on

counsel defense where government identified specific information that Defendant failed to relate

---

[9] During a pretrial status conference held on November 28, 2023, Defendant identified additional deposition testimony from Defendant and Concilla regarding the extent of Defendant's disclosures.

to counsel); *see also Snyder*, 292 Fed. at 405 (finding, when considering a jury instruction, that defendant did not have the burden of proving any "elements" of his theory of reliance on accountants—including fully informing accountants of all relevant facts—before the jury could consider reliance argument). Given the disputed nature and extent of counsel's advice to Defendant, the Court cannot find as a matter of law that Defendant acted with scienter.

*(b)   Negligence under Section 17(a)(2)*

The SEC insists that even if the Court disagrees with its belief that Defendant acted with scienter, "there is no doubt that he at least acted negligently." ECF No. 103 at 34. Under the Antifraud Provisions, negligence is "the degree of care that an ordinarily careful person would use under the same or similar circumstances." *SEC v. Shanahan*, 646 F.3d 536, 545 (8th Cir. 2011). Such negligence "may consist either of *doing* something that a reasonably careful person *would not do* under like circumstances, or in *failing* to do something a reasonably careful person *would do* under like circumstances." *SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015).

In support of its negligence argument, the SEC relies on the same evidence offered in support of its scienter argument. Defendant likewise directs the Court to review the arguments made throughout its brief instead of substantively engaging with the negligence standard.[10] Because of the factual disputes identified above, the Court cannot find as a matter of law that there is no material fact dispute regarding the reasonableness of Defendant's conduct. Indeed, in securities fraud cases, negligence "is typically a jury determination on an objective standard." *SEC*

---

[10] Earlier in his brief, Defendant argues that the PPMs themselves disclosed to investors that the Funds had limited assets when they began, and that the Funds may not have sufficient returns to make the periodic monthly payments. ECF No. 108 at 11–12. Further, Defendant points to deposition testimony from Funds' employees indicating that Defendant hired attorneys to craft the PPMs, avoided saying anything inaccurate during investor webinars, and instructed Allen to ensure that statements to investors were accurate. *Id.* at 25–28. Defendant also identifies third-party consultants who conducted due diligence and reviewed PPMs. *Id.* at 32.

*v. Fitzgerald*, 135 F. Supp. 2d 992, 1020 (N.D. Cal. 2001); *SEC v. Cole*, No. 12–cv–8167 (RJS).
2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015) (finding that the "parties' factual disputes"
preclude the court from a finding as to the reasonableness of defendant's conduct at the summary
judgment stage). Accordingly, the Court reserves the negligence question for the jury.

*(iii)  Defendant's Receipt of Money or Property (Section 17(a)(2) only)*

Section 17(a)(2) alone among the Antifraud Provisions contains another requirement: the
defendant must "obtain money or property" by means of a false or misleading statement. 15 U.S.C.
§ 77q(a)(2). To satisfy this element, the SEC directs the Court to Defendant's deposition testimony
acknowledging that he received "compensation" from PSI and to Verma's summary testimony
indicating that Defendant misappropriated $1.3 million of investor funds for personal use. ECF
No. 103-2, Ex. 1 at 5–6; ECF No. 103-3, Ex. 14 at 42. Again, Defendant does not respond to this
argument. Accordingly, the Court finds as a matter of law that the SEC has fulfilled this element.
*See SEC v. Stoker*, 865 F. Supp. 2d 457, 464 (S.D.N.Y. 2012) (finding that indirectly profiting
from the fraud through increased compensation sufficient to satisfy the "money or property"
element of Section 17(a)(2)).

*b.  Scheme Liability in Violation of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)*

The SEC also asserts that Defendant violated Exchange Act Rules 10b-5(a) and (c) and
Securities Act Section 17(a)(1) and (3) by employing a fraudulent scheme and engaging in
deceptive acts that operated as a fraud. ECF No. 103 at 32. "Rule 10b-5(a), (c), and § 17(a)(1), (3)
prohibit, in the offer or sale of securities, the employment of any device, scheme, or artifice to
defraud; and the engaging in any act, practice, or course of business that operates or would operate
as a fraud or deceit on any person." *SEC v. Narayan*, No. 3:16-cv-1417-M, 2017 WL 4652063, at
*3 (N.D. Tex. Aug. 28, 2017). To succeed on such a "scheme liability" theory, a plaintiff must

prove that "the defendant . . . engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Farmer,* 2015 WL 5838867, at *14.

Here, the SEC identifies several deceptive acts or schemes in support of its theory of scheme liability, including Defendant's "dissemination" of misleading disclosures about the Funds and his undisclosed diversion of fund investments, including (1) $12.3 million to the Affiliated Companies and alleged "operating expenses"; (2) $1.9 million in Ponzi-like payments to earlier investors in the 575 Fund; (3) $3.8 million in payments to investors in the Debenture Funds; and (4) $1.3 million for personal expenses. ECF No. 103 at 32. The SEC further alleges that Defendant's "entire course of conduct" constitutes a deceptive scheme. *Id.*

First, the SEC asserts that Defendant's dissemination of materially false or misleading statements to potential investors can also be used to establish scheme liability violations under Exchange Act Rules 10b-5(a) and (c) and Securities Act Section 17(a)(1) and (3). *Id.* at 21, 27. The Court agrees. Since the Supreme Court's ruling in *Lorenzo* that such conduct includes the "dissemination of false or misleading material," 139 S.Ct. at 1100–02, district courts in the Fifth Circuit have found scheme liability violations where defendants "intentionally made, disseminated, and directed others to make and/or disseminate various materially false statements." *SEC v. Carter*, 2020 WL 6304889, at *5; *SEC v. Silea*, No. 4:20-CV-737-SDJ, 2022 WL 269105, at *12 (E.D. Tex. Jan. 27, 2022) (finding scheme liability violations based on defendant "making the material misrepresentations" and sending account statements that were "steeped in deception" to investors).

The SEC directs the Court to language in the PPMs and Defendant's own deposition testimony indicating that he was responsible for disseminating the challenged representations

about the Funds. The PPMs, for example, described Defendant as the "one director and executive officer of the Company," with responsibility for "supervis[ing] all investor and client care" and "for deeproot's product design, *marketing*, and strategic planning areas, as well as operation and management of multiple entities." ECF No. 103-2, Ex. 2 at 35 (emphasis added). Likewise, Defendant's testified that he "distributed" the PPMs and exercised ultimate authority over the language included in the Funds' PPMs. ECF No. 103-3, Ex. 20 at 67, 73–74. Defendant offers no rebuttal evidence in response to the SEC's scheme liability argument. Accordingly, the Court concludes that Defendant's dissemination of the materially misleading Category Six statements and omissions regarding payments to outside Debenture Funds' investors identified above constituted a "device, scheme, or artifice to defraud" and an "act, practice, or course of business that operates or would operate as a fraud or deceit on any person" under Securities Act Section 17(a)(1) and (3) and Exchange Act Rules 10b-5(a) and (c).

Next, the SEC asserts that the "misappropriation of at least $12.3 million for the benefit of the Affiliated Companies and alleged 'operating expenses,' including $1.9 million for Ponzi-like payments for the 575 Fund, $3.8 million for the Debenture Funds, and $1.3 million for personal expenses" constitute deceptive conduct. ECF No. 103 at 32. Given the fact questions about the adequacy of Defendant's disclosures regarding the Funds' investments in Affiliated Companies and Operating Expenses, the Court cannot find, as a matter of law, that the diversion of funds to those purposes amounted to deceptive conduct. *See SEC v. Laura,* No. 18-cv-5075 (HG) (VMS), 2023 WL 4238153, at *15 (E.D.N.Y. June 28, 2023) (denying SEC's motion for summary judgment as to scheme liability for the same reasons the motion was denied as to misrepresentation liability).

Likewise, in light of the fact issues as to whether the PPMs' Company Advance provision sufficiently disclosed the use of $1.9 million in new investor money to pay older investors, the bald assertion that Defendant made "Ponzi-like payments" is insufficient to establish that the payments were deceptive or manipulative as a matter of law. *See Narayan,* 2017 WL 4652063, at *11 (finding, at the motion to dismiss stage, that "the fact that [defendants] used funds from a later investor to pay an earlier investor does not, in and of itself, establish deceptive conduct" for scheme liability).

On the other hand, the Court concludes that both Defendant's undisclosed diversion of $3.8 million from investors to earlier Debenture Funds' investors and his diversion of $1.3 million for personal expenses do constitute deceptive schemes or acts for the purpose of establishing scheme liability. *See SEC v. Montgomery,* No. SA-20-CA-598-FB, 2021 WL 210749, at *4 (W.D. Tex. Jan. 20, 2021) (granting SEC's motion for final judgment by default as to scheme liability violations where defendant "misused investor funds by using offering proceeds contrary to disclosures about how such proceeds would be used"). Courts have concluded that a defendant's use of investors' money for undisclosed purposes can serve as a basis for scheme liability when the investors expected that money to go towards the defined purpose of the investment vehicle. *See Laura,* 2023 WL 4238153, at *15 ("It is well established that an undisclosed intent to misappropriate funds is sufficient to establish scheme liability on a motion for summary judgment"); *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) (finding scheme liability sufficiently pled at the motion to dismiss stage where "the core misconduct alleged by the SEC is that defendants raised money under false pretenses and then channeled the proceeds to corporate insiders").

The SEC has presented competent summary judgment evidence that Defendant misappropriated $3.8 million from investors by diverting this money to earlier Debenture Funds' investors. The SEC has also advanced sufficient evidence that, between January 2016 and July 2019, Defendant engaged in a scheme to divert $1.3 million of investor funds from the proposed Life Policy investments for his personal gain, including payments for "[a] child's school tuition, vacations, a divorce, two weddings, jewelry, and a condominium in Kauai, Hawaii." ECF No. 103 at 6; ECF No. 103-2, Ex. 1 at 8–9.

In response, Defendant offers nothing to rebut or justify the payments to the Debenture Funds' investors, but defends the use of Funds' investments to cover his personal expenses as part of his compensation, insisting that he "was substantially underpaid for his services." ECF No. 108 at 34. Defendant testified that he "receive[d] no direct compensation from the fund, but [instead] received indirect payments that we had talked with [the attorneys about] before we did." ECF No. 108-10 at 7. In support of the propriety of this practice, Defendant cites the deposition testimony of the company's former accountant, Ken Abramson, and attorney, Dennis Concilla. At his deposition, Abramson identified scenarios in which Defendant could treat money received "from the company in excess of his salary or in addition to his salary" as a loan. ECF No. 108-5, Ex. A-4 at 29. When asked, whether, to his knowledge, there was "anything improper under the tax laws and accounting principles by Mr. Mueller treating payments by Policy Services of his American Express bill as a loan from Policy Services in tax year 2015," Abramson responded, "My opinion, no." *Id.* at 40–41. When asked whether it was common for "sole owners of LLCs or S-Corp.'s to take loans from those entities," Abramson answered, "Yes, it occurs." *Id.* Concilla testified at his deposition that Defendant "could" take a "salary indirectly," "[p]roviding it was reasonable." ECF No. 108-7 at 52–53. As to the proper disclosure of potential personal loans in the Funds' PPMs,

Defendant testified that his attorneys "either gave the advice that it was necessary to put it in or it was not necessary." ECF No. 108-10, Ex. A-9 at 12.

Both Defendant's belief that he "was substantially underpaid for his services" and deposition testimony he cites are simply irrelevant to the question at hand, however, which is whether the diversion of assets from the Funds' investment purposes for Defendant's personal benefit constitutes a deceptive act under the SEC's theory of scheme liability. Abramson's deposition testimony speaks only to tax laws and accounting principles, not to compliance with relevant securities laws.[11] Further, even if Abramson's analysis extended to securities laws, he testified only as to the theoretical conditions under which Defendant *could* accept payments on top of his salary as a loan. Defendant has not proffered any evidence that all of the required conditions were met in this specific instance. Nor has Defendant directed the Court to any evidence that his diversion of investor funds to vacations, weddings, and property in Hawaii constituted a "reasonable" indirect salary. More importantly, testimony concerning Concilla's advice to Defendant bears on the scienter element of scheme liability under Rules 10b-5(a) and (c) and Section 17(a)(1), not on the inherently deceptive nature of Defendant's conduct.

Finally, in pleading scheme liability, the SEC broadly asserts that "Mueller's entire course of conduct in operating deeproot" constitutes a deceptive or manipulative act. ECF No. 103 at 32. But given the numerous fact issues identified above, the Court cannot find as a matter of law that Defendant's "entire course of conduct" was deceptive.[12] Still, the Court concludes that there is no

---

[11] The Court further observes that Abramson's testimony specifically concerned the 2015 tax year, but the misappropriated payments identified by the SEC extended from January 2016 to July 2019. ECF No. 103-2, Ex. 1 at 9.

[12] The SEC also fails to identify individual deceptive or manipulative acts in support of this argument. *See SEC v. Bowen*, No. 3:22-CV-1415-S, 2023 WL 6166780, at *9 (N.D. Tex. Sept. 21, 2023) ("Because the parties neither meaningfully address scheme liability nor cite any case law supporting their respective positions, the Court will not attempt to guess at what their arguments might be.").

material fact dispute that Defendant committed the kind of deceptive act in furtherance of a scheme required to establish scheme liability.[13]

### c.  Defendant's State of Mind as to Scheme Liability

#### (i)  Scienter under Rule 10b-5(a), (c) and Section 17(a)(1)

With respect to the dissemination of materially misleading statements, the Court finds for the same reasons identified above that that there are still genuine issues of material fact as to whether Defendant had the requisite scienter. Likewise, when construing the evidence most favorably for the nonmovant, Defendant's reliance on counsel argument precludes the Court from finding that diverting funds for personal use or to earlier Debenture Funds' investors meets the scienter standard.

#### (ii)  Negligence under Section 17(a)(3)

Again, because the Court has already concluded that Defendant's negligence with regard to materially misleading statements is a matter best left for the jury, the Court also leaves it to the jury to determine whether (i) dissemination of these misrepresentations and (ii) diverting investor funds to earlier Debenture Funds' investors was negligent.  *See Fitzgerald*, 135 F. Supp. at 1020 (negligence "is typically a jury determination on an objective standard").

However, it is indisputable that Defendant was negligent in diverting investor funds in a manner contrary to the PPMs for his personal enrichment. *SEC v. Zouvas*, No. CV-17-00427-PHX-SPL, 2019 WL 4016687, at *5 (D. Ariz. Aug. 26, 2019) (finding Defendant "is correct in that questions of negligence are typically reserved for the jury; however, a court is not precluded from

---

[13] In its reply, the SEC asserts, "since Mueller's Response admits that . . . Mueller diverted investor funds for personal expenses and American Express bills (Resp. at 34), there is no genuine dispute of material fact here for material omissions." ECF No. 110 at 8. However, the SEC did not seek summary judgment as to an omission regarding Defendant's alleged failure to adequately disclose his use of investor funds for personal expenses. The SEC only invokes this misappropriation in the context of the Category Three statements that a simple majority of the Funds' assets would be invested in life insurance policies. ECF No. 103 at 12.

granting summary judgment on a finding of negligence where the facts lend themselves to only that conclusion"). Even assuming the Court accepted Defendant's argument that such payments to himself constituted an indirect salary or loans from the Funds, Defendant failed to do what "a reasonably careful person *would do* under like circumstances" by failing to document *any* kind of reimbursement or approval process for such personal use of investor funds and then communicate that process to investors. *Cole*, 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015); *see also* ECF No. 104-9, Ex. 27 at 12, 54-55 (testimony from SEC expert witness explaining why Defendant's policies regarding use of investor funds to pay personal credit card balances "is inconsistent with industry custom and practice"). Instead of doing so, Defendant undertook a course of action in which he withdrew investor funds—without implementing or communicating policies to ensure independent oversight of these withdrawals—in a manner contrary to the disclosures contained in the PPMs. As the investor affidavits affirm, "No one from Deeproot informed me that Mueller would use investor funds for personal use, including to pay for his daughter's private school tuition, a condo in Hawaii, vacations for him and his family, his second wedding, his second divorce, his third wedding, and jewelry for both witnesses. This information would have been important to me in making a decision of whether or not to invest in the 575 Fund." *See e.g.,* ECF No. 103-5 at 108.

In essence, Defendant fails to present competent summary judgment evidence disputing such negligent practices in relation to his misappropriation of investor funds. The Fifth Circuit has granted summary judgment as a matter of law on such misappropriation claims and the Court does so here. *See Recile*, 10 F.3d at 1098 (granting summary judgment where Defendants "diverted over $3,000,000 to personal use" because to "claim that such diversion does not constitute misuse is simply incredible"); *see also Helms*, 2015 WL 5010298, at *3 (granting summary judgment with

respect to SEC's scheme liability allegations where defendants disclosed specific uses for investor funds but then "misappropriated" funds for "spending on themselves, and their families, friends, and associates").

### C.  Violations of the Advisers Act (Counts V and VI)

Section 206 of the Investment Advisers Act "is drawn from § 17(a)(1) and (3) the Exchange Act, and conduct falling within § 17(a)(1) and (3) will fall within the analogous provisions of § 206 when committed by an investment adviser against a client or prospective client." *Seghers*, 298 F. App'x at 327–28.

The SEC can also establish a violation of each section by showing "the investment adviser made a material misrepresentation with a culpable state of mind." *ZPR Inv. Mgmt. v. SEC*, 861 F.3d 1239, 1247 (11th Cir. 2017). Section 206(1) requires the SEC to show that the adviser acted with scienter, while Section 206(2) and (4) simply require a showing of negligence. *Id.* Accordingly, "the only additional elements the SEC needs to prove [beyond those contained in the Antifraud Provisions] to establish Section 206 violations is that the defendant's conduct occurred while acting as an investment adviser for a client." *SEC v. Jaitley*, No. 1:21-CV-832-DAE, 2023 WL 9105678, at *11 (W.D. Tex. Nov. 13, 2023), *report and recommendation adopted by* 2024 WL 36011 (W.D. Tex. Jan. 3, 2024).

Section 202(a)(11) defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). A person "who owns and manages the funds of an investment adviser company and is compensated by the investment adviser company by a salary or a percentage of net profits or capital gains is considered an investment adviser for the purposes of Section 206." *SEC v. Haarman*, No. 21-CV-832-DAE, 2022

WL 2782648, at *3 (W.D. Tex. Jan. 25, 2022), *report and recommendation adopted by* 2022 WL 2763163 (W. D. Tex. March 11, 2022).

The SEC asserts that Defendant indisputably qualifies as an investment adviser within the meaning of the statute because the Funds were Defendant's clients and he acknowledged that he received "compensation" for his work advising the Funds. ECF No. 103-3, Ex. 14 at 42. The Court agrees with this analysis. Further, Defendant introduces no evidence disputing his status as an investment adviser. The Court therefore finds that Defendant was an "investment adviser" within the meaning of the statute.

For the same reasons as stated above with respect to the Antifraud Provisions, the Court concludes as a matter of law that Defendant violated Section 206(2) and (4) because of his misappropriation of investor funds for personal use.

## CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment (ECF No. 103) is **GRANTED IN PART** and **DENIED IN PART.**

With respect to the violations of the Antifraud Provisions (Counts I–IV), the motion is **GRANTED** as follows:

1.      All six Categories of challenged misstatements and omissions in Defendant's representations to the Funds' investors were made in connection with the offering, purchase, or sale of securities using interstate commerce within the meaning of Section 17(a) of the Securities Act and Rule 10b-5 of the Exchange Act's implementing regulations.

2.      Defendant obtained money within the meaning of Section 17(a)(2) of the Securities Act by means of all six Categories of challenged misstatements and omissions in Defendant's representations to the Funds' investors.

3.      Defendant's Category One statements regarding the ownership of Life Policies constituted a misrepresentation under Section 17(a)(2) and Rule 10b-5(b).

4.      Defendant's Category Four statements regarding the Funds' acquisition of Class B shares in Affiliated Companies constituted a misrepresentation under Section 17(a)(2) and Rule 10b-5(b)

5.      Defendant's Category Six omission regarding payments to outside Debenture Funds' investors constituted a material omission under Section 17(a)(2) and Rule 10b-5(b).

6.      Defendant's dissemination of the Category Six material omissions regarding payments to outside Debenture Funds' investors, his diversion of investor funds to Debenture Funds' investors, and his personal misappropriation of investor funds constitute deceptive schemes, acts, or practices for the purpose of establishing scheme liability under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c).

7.      Defendant committed the deceptive act of misappropriating investor funds for personal use with negligence under Section 17(a)(3).

With respect to the SEC's claims for violations of the Advisers Act (Counts V–VI), the motion is **GRANTED** as to Defendant's status as an investment adviser within the meaning of Section 202(a)(11). The Court further concludes that Defendant violated Sections 206(2) and (4) of the Advisers Act because of his negligent misappropriation of investor funds for personal use.

The motion is **DENIED** in all other respects. Accordingly, the following questions remain to be tried by the jury:

1.      Whether Defendant's disclosures about outside investors in the Life Policies (Category Two), the proportion of the Funds allocated to purchasing Life Policies (Category Three) and to Affiliated Companies and Operating Expenses (Category Five), and the use of new

investor money to pay earlier Funds' investors (Category Six) were (a) material misrepresentations or omissions and (b) made with scienter or negligence.

2.      Whether Defendant's misrepresentations regarding the ownership of Life Policies (Category One) and the Funds' acquisition of Class B shares in Affiliated Companies (Category Four) were (a) material and (b) made with scienter or negligence.

3.      Whether Defendant misappropriated funds for the benefit of the Affiliated Companies and alleged "operating expenses," including for Ponzi-like payments, for the purpose of establishing scheme liability.

4.      Whether Defendant's deceptive act of personal misappropriation of investor funds was performed with scienter.

5.      Whether all other alleged deceptive acts—including, e.g., the dissemination of materially misleading disclosures and Defendant's diversion of investor funds to Debenture Funds' investors—were performed with scienter or negligence.

It is so **ORDERED**.

**SIGNED** this 11th day of January, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE