**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>    **Plaintiff,**<br><br>        -against-<br><br>**ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,**<br><br>    **Defendants,**<br><br>        -and-<br><br>**DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, AND DEEPROOT RE 12621 SILICON DR LLC,**<br><br>    **Relief Defendants.** | **Civil Action No.:  5:21-cv-785-XR** |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION
FOR FINAL JUDGMENT AND REMEDIES AGAINST DEFENDANT MUELLER**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................1

**PROCEDURAL HISTORY** .......................................................................................3

    I.   The Court's Order Granting Partial Summary Judgment ....................................3

    II.  Mueller's Consent and Judgment.......................................................................4

    III. The SEC's Settlement with the Debtor Defendants...........................................5

**FACTUAL BACKGROUND** .....................................................................................6

    I.   Mueller controlled the Funds, the Debtor Defendants, and the other deeproot companies ...........................................................................................................6

    II.  Mueller did not disclose that he would use $2,264,959 of Investors' money to pay his salary and personal expenses.......................................................................7

    III. Mueller misrepresented the ownership and the amount he spent on life policies ..............8

    IV. Mueller diverted $37,172,579 to, or for the benefit of, the Debtor Defendants and Affiliated Companies without the Funds receiving anything in return .............................9

    V.  Mueller used at least $1,861,425 of Investors' money to make Ponzi-like payments to earlier 575 Fund Investors ...............................................................................11

    VI. Mueller used at least $3,758,684 of Investors' money to pay investors in the Debenture Funds................................................................................................................13

    VII. Investors suffered significant losses as a result of Mueller's fraudulent conduct...........13

**ARGUMENT** ...........................................................................................................15

    I.   The Court should order Mueller to disgorge $52,116,414 and pay $16,583,273 in prejudgment interest...........................................................................................15

        A. The Court should order Mueller to individually disgorge $2,264,959 ........................16

        B. The Court should order Mueller to disgorge $49,851,455 jointly and severally with the Debtor Defendants ..................................................................................17

            1. Mueller and the Entity Defendants engaged in concerted wrongdoing...............17

2. The Entity Defendants received $49,851,455 as a result of their concerted wrongdoing with Mueller ..................................................................................19

C. The Court should order Mueller to pay $16,583,273 in prejudgment interest.............22

II. The Court should order Mueller to pay a $2,264,959 civil penalty...................................23

A. Mueller's conduct was egregious................................................................................24

B. Mueller acted with a high degree of scienter .............................................................26

C. Mueller's actions created substantial losses for Investors .........................................28

D. Mueller's fraudulent operation of the Funds and their predecessors was recurrent .....28

E. Mueller refuses to accept responsibility for his wrongdoing .......................................29

F. Mueller's financial condition does not warrant a reduced penalty...............................29

**CONCLUSION** ...........................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Broad v. Rockwell Int'l Corp.*,
    642 F.2d 929 (5th Cir. 1981) ...................................................................... 26

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976).................................................................................... 26

*SEC v. AmeraTex Energy, Inc.*,
    No. 4:18-CV-00129, 2021 WL 1061395 (E.D. Tex. Mar. 18, 2021) ..................... 17, 22

*SEC v. AmeriFirst Funding, Inc.*,
    No. 30-CV-1188, 2008 WL 1959843 (N.D. Tex. May 5, 2008) .................................. 19

*SEC v. Blatt*,
    583 F.2d 1325 (5th Cir. 1978) .................................................................... 16

*SEC v. Carter*,
    No. 4:19-CV-100-SDJ-KPJ, 2022 WL 7376257 (E.D. Tex. Aug. 29, 2022).............. 17

*SEC v. Farias*,
    No. SA-20-CV-00885-XR, 2022 WL 3031082 (W.D. Tex. Aug. 1, 2022) ................. 26

*SEC v. Faulkner*,
    No. 3:16-CV-1735-D, 2021 WL 75551 (N.D. Tex. Jan. 8, 2021).......................... 17, 19

*SEC v. Fowler*,
    6 F.4th 255 (2d Cir. 2021) .......................................................................... 16

*SEC v. Gilman*,
    No. 3:18-CV-1421-L, 2021 WL 4125195 (N.D. Tex. Sept. 9, 2021) ................... 29, 30

*SEC v. Gordon*,
    No. 3:21-CV-1642-B, 2021 WL 5086556 (N.D. Tex. Nov. 1, 2021) ........................ 18

*SEC v. Halek*,
    537 F. App'x 576 (5th Cir. 2013) .......................................................... 16, 19

*SEC v. Hallam*,
    42 F.4th 316 (5th Cir. 2022) .................................................... 15, 16, 17, 21

*SEC v. Helms*,
    No. A-13-CV-01036 ML, 2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) ........... 24, 25

*SEC v. Hughes Capital Corp.*,
  124 F.3d 449 (3d. Cir. 1997) ............................................................ 22

*SEC v. Johnson*,
  43 F.4th 382 (4th Cir. 2022) ........................................................... 18

*SEC v. Life Partners Holdings, Inc.*,
  71 F. Supp. 3d 615 (W.D. Tex. 2014) .......................................... 24

*SEC v. Liu*,
  591 U.S. 71 (2020) ............................................................ 15, 17, 19

*SEC v. Liu*,
  No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022) ......................................... 21

*SEC v. Merch. Capital, LLC*,
  486 Fed. Appx. 93 (11th Cir. 2012) ............................................. 17

*SEC v. Montgomery*,
  No. SA-20-CA-598-FB, 2021 WL 210749 (W.D. Tex. Jan. 1., 2021) ......................... 22

*SEC v. Morris*,
  No. 3:20-CV-02958-B, 2022 WL 9497046 (N.D. Tex. Oct. 14, 2022) ...................... 16

*SEC v. Myers*,
  No. 4:15-CV-00300, 2018 WL 11353113 (E.D. Tex. July 25, 2018) ............. 25, 29, 30

*SEC v. Offill*,
  No. 3:07-CV-1643-D, 2012 WL 1138622 (N.D. Tex. 5, 2012) ................................. 25

*SEC v. Petros*,
  No. 3:10-CV-1178-M, 2013 WL 1091236 (N.D. Tex. Mar. 1, 2013) ........................ 26

*SEC v. Provident Royalties*,
  No. 09-CV-01238, 2013 WL 5314354 (N.D. Tex. Sept. 23, 2013) ............................ 26

*SEC v. Sample*,
  No. 3:14-CV-1218-B, 2017 WL 5569873 (N.D. Tex. Nov. 20, 2017) ....................... 29

*SEC v. Sethi Petroleum, LLC*,
  No. 4:15-CV-00338, 2017 WL 3386047 (E.D. Tex. 7, 2017) ................................... 29

*SEC v. Stack*,
  No. 23-50327, 2024 WL 4199017 (5th Cir. Sept. 16, 2024) ........................................ 19

*SEC v. United Energy Partners, Inc.*,
   88 F. App'x 744 (5th Cir. 2004) ............................................................... 22, 24

*SEC v. Voight*,
   No. CV H-15-2218, 2021 WL 5181062 (S.D. Tex. June 28, 2021) ........... 18, 21, 23, 24

*SEC v. World Tree Financial, L.L.C.*,
   43 F.4th 448 (5th Cir. 2022) ................................................................. 6, 18, 19

*United States v. Impastato*,
   543 F. Supp. 2d 569 (E.D. La. 2008) .......................................................... 27

*United States v. Thaggard*,
   477 F.2d 626 (5th Cir. 1973) ................................................................... 27

**Statutes and Rules**

15 U.S.C. § 77q .................................................................................... 3

15 U.S.C. § 77t .................................................................................... 23

15 U.S.C. § 78j .................................................................................... 3

15 U.S.C. § 78u .................................................................................. 15, 23

15 U.S.C. § 80b-6 .................................................................................. 3

15 U.S.C. § 80b-9 ................................................................................. 23

17 C.F.R. § 201.1001 ............................................................................. 23

17 C.F.R. § 240.10b-5 ............................................................................. 3

17 C.F.R. § 275.206(4)-8 .......................................................................... 3

## PRELIMINARY STATEMENT

At least 300 people lost an estimated $58 million in two investment funds created, operated, and marketed by Robert Mueller.  Mueller told investors the funds invested an overwhelming majority of their assets in life insurance policies.  Instead, Mueller funneled more than half of the money to keep his own companies afloat or to spend on personal expenses including jewelry, vacations, real estate, weddings, divorce lawyers, school tuition, and his salary.

The parties negotiated a bifurcated settlement in this matter memorialized in a Consent signed by Mueller and ratified by the Court's Judgment.  The Judgment states that Mueller will pay disgorgement, prejudgment interest, and a civil penalty.  The SEC now moves for final judgment, including the specific amounts of these monetary remedies.

To recruit investors in the deeproot 575 Fund, LLC ("575 Fund") and the deeproot Growth Runs Deep Fund, LLC ("dGRD Fund") (together, the "Funds"), Mueller promised investors their money would be invested primarily in life insurance policies or "life policies" with smaller investments in other companies primarily owned by Mueller.  The Court, in granting the SEC partial summary judgment, already found that Mueller made multiple misrepresentations to the Funds' investors ("Investors").  The Court found Mueller misrepresented that the Funds would purchase the life policies and acquire shares of Mueller's pinball development company, deeproot Tech.  The Court also found that Mueller failed to disclose to Investors that he would use their money to pay investors in other funds (the "Debenture Funds").  The Court also found that Mueller's diversion of the Funds' money to pay for his personal expenses "constituted a deceptive scheme or act."

In the Consent, the parties agreed that for purposes of this motion, the Court would deem as true the allegations in the Complaint.  The Complaint alleges that Mueller made additional

misrepresentations, made Ponzi-like payments to Investors, and funneled millions of the Funds' assets to his affiliated companies.

The Complaint also alleges that Mueller was responsible for the fraudulent conduct of the deeproot companies and was the primary beneficiary of the fraud.  There is no dispute that Mueller owned, controlled, and managed the deeproot companies.  Mueller was responsible for the Funds' investment decisions, management, and Private Placement Memorandums ("PPMs") and other marketing materials.  Mueller also controlled the bank accounts involved in the scheme and used those accounts to transfer the Funds' assets to his affiliated companies and for his personal benefit.

Based on the Court's previous findings, the allegations in the Complaint, and the other evidence cited in this motion, it is clear that Mueller engaged in a six-year fraudulent scheme.  An SEC accountant has reviewed the deeproot companies' books and records and summarized the unjust enrichment Mueller and his companies received.  Consistent with Supreme Court and Fifth Circuit precedent, the Court should order Mueller to disgorge the net proceeds of his scheme.  Specifically, the Court should order Mueller to disgorge $52,116,414, which includes $2,264,959 in salary and personal benefits and $49,851,455 in net proceeds he received through his affiliated companies.  The Court should order Mueller to pay $16,583,273 in prejudgment interest.  And the Court should find the "Debtor Defendants" (deeproot Funds LLC ("deeproot Funds"), Policy Services Inc. ("Policy Services"), deeproot Tech LLC ("deeproot Tech"), deeproot Pinball, LLC ("deeproot Pinball"), and deeproot Studios, LLC ("deeproot Studios")) jointly and severally liable up to the amounts previously ordered by the Court.

The Court should also order Mueller to pay a $2,264,959 third-tier civil penalty equal to his gross pecuniary gain.  Mueller's misrepresentations and decision to divert Investors' money

from the Funds was egregious, executed with scienter, recurrent, and catastrophic for Investors. Mueller, however, has refused to accept responsibility for his actions. Mueller therefore meets all of the relevant factors for a third-tier penalty for violating securities laws.

## PROCEDURAL HISTORY

### I.    The Court's Order Granting Partial Summary Judgment

The Complaint alleges that Mueller violated "Antifraud Provisions" of federal securities law.[1]  Compl., ECF No. 1 ¶¶ 72-94.  The Court, in granting the SEC partial summary judgment, found Mueller liable under Section 17(a)(3) of the Securities Act and Sections 206(2) and (4) of the Adviser's Act for negligent misappropriation of investor funds for his personal benefit.  ECF No. 138, SJ Ord., 49.

The Court also found Mueller made three categories of misrepresentations or omissions as a matter of law.  *Id.*, 20, 27, 32.  First, the Court found "the PPMs misrepresented that the Funds would purchase [l]ife [p]olicies."  *Id.*, 20.  Second, the Court found that certain PPMs misrepresented that the Funds would acquire Class B shares in certain deeproot companies.  *Id.*, 27.  Third, the Court found "that the PPMs failed to disclose that investor funds could be used to repay investors *outside of* the Funds, including funds established by Defendant before 2016 (the 'Debenture Funds')."  *Id.*, 32 (emphasis in original).  The Court found that the PPMs' failure to disclose that Mueller diverted approximately $3.8 million to Debenture Funds' investors constituted a "material" omission.  *Id.*

---

[1] The Antifraud Provisions the Complaint alleges Mueller violated are Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rules 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)]; Sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)-(3)]; and Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), (2), (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

The Court also found that Mueller "obtained money or property" by means of a false and misleading statement, *id.*, 39, and that the SEC established scheme liability, *id.*, 44-45. The Court explained that Mueller's undisclosed diversion of approximately $3.8 million from the Funds to Debenture Fund investors "constituted a device, scheme or artifice to defraud." *Id.*, 41 (internal quotations omitted). Likewise, the Court found that Mueller's diversion of $1.3 million for personal expenses−including payments for "a child's school tuition, vacations, a divorce, two weddings, jewelry, and a condominium in Kauai, Hawaii," "constitute[d] deceptive schemes or acts for the purpose of establishing scheme liability." *Id.*, 42-43.

## II.    Mueller's Consent and Judgment

On June 21, 2024, the Court entered a Judgment against Mueller ("Judgment") after he consented to a bifurcated settlement resolving all liability and non-monetary relief sought by the SEC. ECF No. 162, Judgment; ECF No. 161-2, Mueller Consent ("Consent"). The Judgment stated that Mueller "shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty" and that the Court would determine the amounts of each. ECF No. 162, 6.

The Consent states the parties' agreement that for this motion and any hearing "***the allegations of the Complaint shall be accepted as and deemed true by the Court***." Consent ¶ 6 (emphasis added); *see also* Ex. 1, May 28, 2024 Status Conf. Tr., 20:14-21:10. Thus, for purposes of this motion, the factual allegations in the Complaint establish that Mueller violated the securities laws by defrauding the Funds and their Investors.

III.     **The SEC's Settlement with the Debtor Defendants**

In January 2023, before discovery closed, the SEC and the Debtor Defendants reached a settlement.[2]  ECF No. 80-4, 1-3.  On January 13, 2023, this Court entered a Final Judgment against the Debtor Defendants.  ECF No. 81 ("Debtor Defendant Final Judgment").  The Debtor Defendant Final Judgment ordered disgorgement and prejudgment interest from the Debtor Defendants jointly and severally with each other as outlined in Table 1, below.  *Id.*, 2-7.  The settlement amounts are based on the Debtor Defendants' receipt of Investor money.  *Id.*  Mueller is not a party to the Debtor Defendant Final Judgment and, thus, is not bound by it.

**Table 1:  Debtor Defendants' Joint and Several Liability**

| Defendant | Disgorgement | Prejudgment Interest | Total | Joint and Several Liability |
|---|---|---|---|---|
| deeproot Funds and Policy Services | $48,064,717 | $4,522,350 | $52,587,067 | Jointly and severally liable with (i) each other for $52,587,067; and (ii) with deeproot Tech, deeproot Pinball, and deeproot Studios as described below. |
| deeproot Tech and deeproot Pinball | $14,162,565 | $1,332,538 | $15,495,103 | Jointly and severally liable with each other and with deeproot Funds and Policy Services for $15,495,103. |
| deeproot Studios | $3,745,925 | $352,449 | $4,098,374 | Jointly and severally liable with deeproot Funds and Policy Services for $4,098,374. |

---

[2] The Debtor Defendants and other deeproot entities filed voluntary Chapter 7 petitions in the Western District of Texas (the "Bankruptcy Court").  *In re Deeproot Capital Management LLC, et. al.*, ECF No. 21-51523 (Bankr. W.D. Tex.) (the "Bankruptcy Cases").  J. Patrick Lowe was appointed Chapter 7 Trustee ("Trustee").  Bankr. Dkt. No. 19.  The Complaint also named relief defendants deeproot Sports & Entertainment LLC ("deeproot Sports") and deeproot RE 12621 Silicon Dr LLC ("deeproot RE").  On May 2, 2022, the Clerk of the Court entered a default judgment against both.  ECF No. 58.  On November 28, 2022, the SEC dismissed its claims against relief defendant Ohana Trust, ECF No. 74.

## FACTUAL BACKGROUND

**I.     Mueller controlled the Funds, the Debtor Defendants, and the other deeproot companies.**

Mueller began marketing the Funds in September 2015 and continued to accept

investments through August 2021.[3]  Compl. ¶ 1; Ex. 2, Anderson Decl. ¶ 5.  During that time,

more than 300 people invested $66,350,037 in the Funds.  Ex. 2 ¶ 5.  From the first investment to

the last, Mueller was responsible for the actions of the deeproot companies, including the Funds.

Mueller and deeproot Funds also served as investment advisers to the Funds.[4]  SJ Ord.,

48; Compl. ¶ 1.  Mueller also served as the sole director and executive officer of the Funds.

Compl. ¶ 39.  The PPMs described Mueller as:

> [R]esponsible for deeproot's product design, marketing, and strategic planning
> areas, as well as operation and management of multiple entities. Robert is the
> architect and implementer of all products, services, or designs . . . . He has also
> personally managed all aspects of the administrative functions of the enterprises,
> supervised all investor or client care, handled most of the clerical and processing
> of investor or client paperwork, designed the IT systems and client portal, and is
> chiefly responsible for the growth and success of all the enterprises.

Ex. 3, 0211527.

Deeproot Funds also held all the controlling membership shares of the Funds. Ex. 10,

Mueller Invest. Tr., 58:14-59:16; *see e.g.* Ex. 3, 0211517.  Mueller was the sole owner, officer,

and director of deeproot Funds.  Ex. 3, 0211527; Ex. 10, 61:13-18.  As the investment adviser to

the Funds and the sole shareholder and principal of deeproot Funds, Mueller had "broad

---

[3] *See also*, Ex. 3, 575 PPM, Jan. 1, 2021; Ex. 4, 575 PPM, Sept. 16, 2019; Ex. 5, 575 PPM, Sept. 1, 2015; Ex. 6, 575 PPM, Sept. 1, 2015; Ex. 7, dGRD PPM, Sept. 16, 2019; Ex. 8, dGRD PPM, August 3, 2015; Ex. 9, dGRD PPM, August 3, 2015 (collectively, Exs. 3-9 the "PPMs").

[4] As investment advisers, Mueller and deeproot Funds owed a fiduciary duty to their clients, the Funds.  *See SEC v. World Tree Financial, L.L.C.*, 43 F.4th 448, 461 (5th Cir. 2022) (citations omitted).

authority," and the Funds relied "exclusively on our Advisor or Manager(s) [*i.e.*, Mueller] to make sound investment decisions for them."  Ex. 3, 0211519.

Mueller was also the sole shareholder of Policy Services and served as "the principal officer, director, or manager."  Ex. 7, 0164777; Compl. ¶ 18; Ex. 10, 62:17-63:3.  Mueller used Policy Services to purchase and hold life policies.  Compl. ¶ 18.  Most of the Affiliated Companies,[5] including, deeproot Tech, deeproot Pinball, and deeproot Studios were wholly-owned subsidiaries of Policy Services and thus owned and controlled by Mueller.  Compl. ¶¶ 19-23.

When the Funds received investments, the money was deposited in deeproot Funds' accounts.  Ex. 10, 58:14-18.  Mueller controlled deeproot Funds', Policy Services', and the Affiliated Companies' bank accounts, through which he commingled the Funds' assets.  Compl. ¶ 65; Ex. 2 ¶¶ 14, 17, Appendix A-1.  In short, Mueller, who owned the Debtor Defendants, the Funds, and most of the Affiliated Companies, was responsible for their management, finances, and marketing, including the PPMs and marketing materials that conveyed misrepresentations to Investors.  *See* Compl. ¶¶ 17-23, 25-26, 28, 39; Ex. 10, 58:14-59:16; 155:13-16; Ex. 3, 0211527. He ultimately and solely made all the strategic decisions for all of these entities.

## II.    Mueller did not disclose that he would use $2,264,959 of Investors' money to pay his salary and personal expenses.

The PPMs represented that the Funds would *not* pay Mueller a salary.  *See, e.g.*, Ex. 3, 0211527.  Nevertheless, as alleged in the Complaint, after the Funds obtained Investor money, Mueller used that money to pay himself on an *ad hoc* basis.  Compl. ¶ 65.  SEC Assistant Chief

---

[5] As discussed below, *see infra* at 9-11, Mueller transferred the Funds' assets to the Debtor Defendants and to the "Affiliated Companies" (deeproot Tech, deeproot Pinball, deeproot Studios, deeproot Sports, deeproot RE, a car wash, and a food development company).

Accountant, Jeffrey Anderson, reviewed deeproot's financial records and calculated that between 2015 and 2021, Mueller paid himself at least $1,046,936 in salary.[6]  Ex. 2 ¶ 21.  There is no evidence in the record of any written compensation agreement or plan and certainly no evidence of any disclosure to investors of Mueller's compensation.  Compl. ¶ 65; Ex. 10, 312:4-314:25.

In addition, as this Court has already found, Mueller failed to disclose to Investors that he used the Funds' assets to pay hundreds of personal expenses.  SJ Ord., 42-43, 45. Anderson identified at least $1,218,023 in payments from the Funds' assets on behalf of Mueller or Mueller's family.  Ex. 2 ¶ 22.  When the SEC took Mueller's testimony during the investigation that preceded this litigation, Mueller invoked his Fifth Amendment rights and refused to answer questions related to his personal expenses.  Ex. 10, 368:8-384:1.

### III.   Mueller misrepresented the ownership and the amount he spent on life policies.

All seven versions of the PPMs unambiguously stated that (i) the Funds intended to "overwhelmingly"[7] allocate their assets in Life Policies and (ii) the Funds would "invest in [Life Policies] as the simple majority of our Fund Assets."[8]  In reality, Mueller last purchased a life policy in April 2017 and spent only $12,043,198 of the $66,350,037 raised on policies.  Ex. 2 ¶¶ 5, 9, 12; *see also* Compl. ¶¶ 5, 54.

---

[6] Anderson's Declaration summarizes his review of financial records and provides support for the SEC's request for disgorgement and civil penalty.  In some instances, Anderson's summaries differ from those cited in the SEC's motion for summary judgment and the Complaint.  The difference is due to reclassifications of transactions based on new information and revisions made after discussing demonstrative exhibits with defense counsel.

[7] *See* Ex. 3, 0211521; Ex. 4, 0164831; Ex. 5, 0164816; Ex. 6, 0014505; Ex. 7, 0164769; Ex. 8, 0164793; Ex. 9, 0013406.

[8] Compl. ¶¶ 4, 30; Ex. 3, 0211522; Ex. 4, 0164832; *see also* Ex. 5, 0164817 and Ex. 6, 0014506 (investments in affiliated companies limited to 45% of asset portfolio); Ex. 8, 0164795 and Ex. 9, 0013408 (investments in affiliated companies limited to 30% of asset portfolio).

This Court has already found that the Funds' PPMs falsely stated that the Funds would purchase and own the life policies.  SJ Ord., 20.  In reality, the Funds never owned a single life policy.  Instead, Policy Services purchased and owned the life policies.  Compl. ¶ 18.  Moreover, the PPMs' statements that the Funds owned the policies were also false and misleading because Mueller failed to disclose to the Funds or their Investors that he had already sold to other investors fractional shares in the life policies totaling almost $6.5 million.  *See* Ex. 2 ¶¶ 19-20.  Those fractional shares represented 25% of the face value of life policies purportedly serving as the "securitized" assets in the Funds.  *Id*. ¶ 20.

## IV.    Mueller diverted $37,172,579 to, or for the benefit of, the Debtor Defendants and Affiliated Companies without the Funds receiving anything in return.

The PPMs falsely stated that the 575 Fund would use "less than fifty percent (50%) of the asset portfolio" to make "capital acquisitions" in the Affiliated Companies.  *See, e.g.*, Ex. 3, 0211525; *see also* Compl. ¶¶ 4, 31.  Some of the PPMs described a "capital acquisition" as "a purchase of an internal, affiliated investment position in another enterprise."  Compl. ¶ 33; Ex. 4, 0164835.  Others were more specific.  For example, the PPMs for the 575 Fund from its inception through November 2019 stated that the 575 Fund would invest in Class B Shares of deeproot Pinball.  *Id.* ¶ 33; Ex. 5, 0164818; Ex. 6, 0014507.  Regardless of the language, the purported purpose of the investments in the Affiliated Companies was to provide safe diversification, revenue, and liquidity.  *Id.* ¶ 32.

Anderson reviewed the Debtor Defendants' bank records and identified $21,547,480 that Mueller transferred directly from Policy Services and deeproot Funds (together the "Entity Defendants") to the Affiliated Companies.  Ex. 2 ¶¶ 16-17.  Anderson also identified an estimated $15,625,099 of the Funds' assets that Mueller spent from the Entity Defendants' bank

accounts for the benefit of the Affiliated Companies.  *Id.* ¶ 17.  In total, Mueller spent

$37,172,579 of the Funds' money on the Affiliated Companies.[9]

Moreover, as alleged in the Complaint, the Funds never actually received any ownership

or other interests in return for the $37,172,579 Mueller funneled to the Affiliated Companies.

Compl. ¶¶ 34, 56; *see also* Ex. 2 ¶ 17.  For example, the Court found that the PPMs' reference to

the 575 Fund acquiring Class B shares in deeproot Pinball was a clear "misrepresentation,"

holding that "there is no factual dispute as to whether the Funds acquired Class B shares in the

Affiliated Companies[.]"  SJ Ord., 27.  Instead of purchasing interests in the Affiliated

Companies, Mueller used the Funds' available cash to fund the Affiliated Companies' ongoing

operations on an *ad hoc* basis without documenting the Funds' interests in the Affiliated

Companies.  Compl. ¶¶ 34, 54-56.

In a March 2017 email, a financial consultant asked Mueller whether there were "'debt or

investment agreements in place'" between the Funds and the Affiliated Companies.  *Id.* ¶ 61; Ex.

11, Emails, 0210797.  Mueller responded, "there is no formal documentation other than our

discretion."  *Id.*  When the consultant suggested that Mueller memorialize the transactions,

Mueller responded, "I will 'paper' those internally."  *Id.* ¶ 61; Ex. 11, 0210796-97.  Mueller's

attempt to "paper" transactions was an "Investment Allocation Agreement" between deeproot

Funds and deeproot Tech that Mueller signed on behalf of both companies.  *Id.* ¶ 62; Ex. 12,

0213963-65.  The Allocation Agreement grants the Funds 40% of deeproot Tech's net income

but did not mention any of the other Affiliated Companies.  Ex. 12, 0213964.  The Allocation

Agreement does not memorialize the Funds' "capital acquisitions" of an interest in deeproot

---

[9] As discussed below, *see infra* at 20, the $37,172,579, diverted for the benefit of the Affiliated Companies is part of, but not all of, the unjust enrichment the SEC seeks from Mueller on a joint and several basis with the Debtor Defendants.

Tech, does not identify the amount invested, and is silent regarding the Funds' investments in Mueller's other Affiliated Companies. *Id.* Moreover, there is no evidence to suggest that Mueller disclosed the Allocation Agreement to Investors and that instead of a "capital acquisition" the Funds interests would be limited to 40% of some speculative future net profits.

Mueller previously argued a Contingent Pledge and Security Agreement ("Contingent Pledge Agreement"), Ex. 27, apparently signed in 2020 gives the "Funds…a security interest in all of the life policies, as well as other affiliates and assets[.]" ECF No. 108, Opp. Mot. SJ., 17. When asked about the Contingent Pledge Agreement during his investigative testimony, Mueller had no recollection of the purpose of the agreement and did not think it was an agreement between the Funds and deeproot-related entities. Ex. 10, 177:2-178:8. What is clear is that the agreement does *not* memorialize a "capital acquisition." In short, there is no evidence to dispute what the Complaint alleges: "the Funds have no documented ownership or other interest in any of the [Affiliated Companies]." Compl. ¶ 56.

**V.    Mueller used at least $1,861,425 of Investors' money to make Ponzi-like payments to earlier 575 Fund Investors.**

Investors in the 575 Fund committed their principal for five years and elected to receive either a monthly interest payment or a lump sum interest payment at the end of the five years. Compl. ¶ 3. The PPMs Mueller drafted promised Investors they would be repaid from revenue generated from life policies and the Affiliated Companies. Compl. ¶¶ 30-32. From inception through July 2, 2021, Mueller paid 575 Fund Investors $4,079,633 in principal and interest. Ex. 2 ¶ 14; *see also* Compl. ¶ 43. Over the same period of time, the Funds did not generate sufficient returns to pay the 575 Investors. *Id.* To make up the shortfall, Mueller transferred $1,861,425 in new deposits from Investors to earlier 575 Fund Investors. *Id.*

Mueller made the Ponzi-like payments despite having studied a Ponzi-like scheme also involving investments in life insurance policies.  Compl. ¶ 48.  During this litigation, Mueller has argued that the "Company Advance" provisions in the PPMs, which describe payments for, among other things, "nominal administration expenses," allowed him to use new Investor assets to pay earlier investors.  Ex. 23, Mueller Dep. Tr., 157:12-18.  However, as alleged in the Complaint, the PPMs did not disclose that the Funds could pay early Investors with new Investors' money.  Compl. ¶¶ 45-46; *see also* Exs. 3-9.

In his deposition, Mueller claimed that he asked attorneys from Carlile Patchen & Murphy LLP ("CPM") whether the PPMs should disclose that he would pay earlier Investors with new Investor funds.  Ex. 23, 171:3-10.  According to Mueller, "the company advance section and the language therein was [CPM's] response to those types of discussions."  *Id.*  However, Mueller's attorneys never made such a representation.  The Trustee for the Debtor Defendants sued CPM in an adversary proceeding.  *See In re Lowe, Chapter 7 Trustee v. CPM*, Adv. Proc. No. 23-05089-MMP (Bankr. W.D. Tex.) ("Adversary Proceeding").  In its Answer, CPM denied that "Mueller told them that 'his intention was to pay previous existing investors with new investor money.'"  Ex. 24, Answer ¶ 26.  CPM also denied that it "advised Mueller that it was permissible to pay existing investors with new investor investments."  *Id.*  Attorneys from CPM testified similarly during discovery:  "using new money from new investors to pay old investors" would be "the hallmark of a Ponzi scheme."  *See* Ex. 13, Concilla Dep. Tr., 179:17-180:19.  Here, as Anderson's summary of the bank records proves, the life policies and Affiliated Companies never generated sufficient income to pay Investors.  Ex. 2 ¶ 14.

VI.   **Mueller used at least $3,758,684 of Investors' money to pay investors in the Debenture Funds.**

As this Court has already found, the PPMs and marketing materials failed to disclose that the investors' funds would be used to pay off investors in the Debenture Funds.  SJ Ord., 32. Anderson's review and summary of the financial records establishes that investors in the Debenture Funds received $3,758,684 of Investors' money.  Ex. 2 ¶ 15.  This Court found that Mueller's failure to disclose payments to the Debenture Fund investors was a material omission. SJ Ord., 32.

VII.   **Investors suffered significant losses as a result of Mueller's fraudulent conduct.**

Mueller's actions created catastrophic losses of an estimated $58 million for his advisory clients, the Funds, and their Investors.  Ex. 2 ¶ 30.  Many of the Funds' Investors used a significant portion of their retirement savings to invest in the Funds and have suffered near total losses as a result of Mueller's fraudulent actions.

For example, 575 Fund investor Brad Leon, a nurse anesthetist for the Department of Veterans Affairs, invested 80% of his retirement savings, $1 million, in the 575 Fund at the age of 68.  Ex. 14, Leon Decl. ¶¶ 2, 5, 9.  Charles McClain, an oil and gas consultant in West Texas for 40 years, invested nearly $500,000 in the Funds based on Mueller's lies, which "represented approximately half of [his] life savings."  Ex. 15, McClain Decl. ¶¶ 1-2, 7, 11.  Likewise, Brenda Jennings, a 32-year UPS employee who invested $270,000 in the Funds, lost "a significant portion of [her] 401(k) retirement savings that [she] had diligently saved for 32.5 years[.]"  Ex. 16, Jennings Decl. ¶¶ 2, 5-8, 13.  Investors Robert Kane, Sandra Thompson, John Gray, and James Donnelly all said that, as a result of Mueller's fraudulent scheme, their retirement plans have been significantly impacted.  Ex. 17, Kane Decl. ¶ 15; Ex. 18, Thompson Decl. ¶ 15; Ex. 19, Gray Decl. ¶ 16; Ex. 20, Donnelly Decl. ¶ 13.

Mueller's actions created victims across generations.  Mr. Leon, Ms. Jennings, Mr. McClain, and Ms. Carlotta Grice for example, all had plans to leave their children and grandchildren a portion of the money that they invested in the Funds.  Ex. 14 ¶ 12; Ex. 16 ¶¶ 14-15; Ex. 15 ¶¶ 13-14; Ex. 21, Grice Decl. ¶ 11.  Those funds would have gone to paying educational expenses for children and grandchildren and assisting children with buying a home, among other purposes.  Ex. 21 ¶ 11; Ex. 16 ¶ 14; Ex. 15 ¶ 13.

These catastrophic losses are not just economic—the Funds' Investors also suffered impacts to their careers, their relationships, their ability to take care of their sick loved ones, and their mental health.  Ex. 14 ¶ 13; Ex. 21 ¶¶ 10-13; Ex. 16 ¶¶ 14, 17-18; Ex. 15 ¶¶ 13, 16.  For example, at least two Investors were taking care of their sick and elderly family members when they learned that they were a victim of Mueller's fraudulent scheme.  Ex. 21 ¶ 10; Ex. 16 ¶¶ 17-18.  Ms. Jennings learned she lost her $270,000 investment in 2021 when her husband was experiencing serious health issues.  Ex. 16 ¶ 17.  Ms. Jennings' lost investment "could have been used to help pay for care for [her] elderly sick husband, but instead [she] was left to arrange for his care without those funds."  *Id.*  Similarly, Ms. Grice was helping to pay for nursing and private care for her elderly mother when she learned in 2021 that her $57,000 investment in the dGRD Fund was gone.  Ex. 21 ¶ 10.  Ms. Grice needed those funds to pay for medical care for her mother, who ended up passing away in September 2023.  *Id.*

Finally, Investors have suffered psychological stress and trauma as a result of Mueller's action.  Since learning that Mueller defrauded her, Ms. Grice stated she is suffering from "significant emotional stress," and has "difficulty trusting people."  *Id.* ¶ 12.  The impact on her livelihood has been palpable:  she had to take six months of unpaid leave from her job in early 2023 before ultimately having to leave her job in May 2024.  *Id.* ¶ 13.  As Mr. McClain put it,

"Mr. Mueller stole $500,000 of my hard-earned money and he has caused me a lot of aggravation."  Ex. 15 ¶ 16.

Documents provided by the Trustee in the Bankruptcy Cases indicate that the Trustee has obtained only $4,111,299, net, through Chapter 7 bankruptcy proceedings.  Ex. 2 ¶ 30.

## ARGUMENT

**I.     The Court should order Mueller to disgorge $52,116,414 and pay $16,583,273 in prejudgment interest.**

The Court should order Mueller to disgorge the unjust enrichment he generated through his fraudulent scheme: $52,116,414 with $16,583,273 in prejudgment interest.  The purpose of disgorgement is to deny a defendant unjust enrichment obtained through violations of the securities laws.  *SEC v. Hallam*, 42 F.4th 316, 341 (5th Cir. 2022).  In this case, Mueller received unjust enrichment in two ways, both of which are appropriate for disgorgement.  First, he directly received $2,264,959 of illegally obtained money:  $1,046,936 in salary; and $1,218,023 in personal expenses.  Second, Mueller, as the sole owner, shareholder, and individual in control of the Debtor Defendants, was the ultimate beneficiary of the $49,851,455 of unjust enrichment the Debtor Defendants received.

In *SEC v. Liu*, 591 U.S. 71, 74-75 (2020) the Supreme Court found that Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] authorizes the SEC to seek a "disgorgement award" that "does not exceed a wrongdoer's net profits and is awarded for victims."  Disgorgement is also authorized under amendments to the Exchange Act that Congress enacted after *Liu*.  *See* Exchange Act, 15 U.S.C. § 78(u)(d)(7) ("[T]he Commission may seek, and any Federal court may order, disgorgement."); Exchange Act, 15 U.S.C. § 78u(d)(3)(A)(ii) (granting jurisdiction to

"require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment").[10]

"[T]he SEC has the burden reasonably to approximate the defendant's 'unjust enrichment' attributable to the securities violation," which "may not include 'income earned on ill-gotten profits,'" "but it may include interest." *Hallam*, 42 F.4th at 341 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)); *see also SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021). Once the SEC establishes a reasonable approximation of the defendant's ill-gotten gains, the burden shifts to the defendant, who "must prove that the requested amount is 'unreasonable.'" *Hallam*, 42 F.4th at 341 (quoting *SEC v. Halek*, 537 F. App'x 576, 581 (5th Cir. 2013).

### A. The Court should order Mueller to individually disgorge $2,264,959.

The allegations in the Complaint, the Court's Summary Judgment Order, and additional evidence provided by the SEC, establish that Mueller unjustly enriched himself when he used the Funds' assets to pay himself $1,046,936 in salary and took another $1,218,023 to pay his family's personal expenses. *See* Ex. 2 ¶¶ 21-22. The Court in its Summary Judgment Order found that Mueller used the Funds' money to pay personal expenses by diverting money from the purchase of life policies. SJ Ord., 39, 43. Anderson's declaration establishes that Mueller received at least $1,046,936 in salary during the relevant period and that the source of the $1,046,936 came from investments in the Funds. Ex. 2 ¶¶ 21-22.

---

[10] The Fifth Circuit has stated that these amendments "authorize legal 'disgorgement' apart from the equitable 'disgorgement' permitted by *Liu*." *SEC v. Hallam*, 42 F.4th at 341. The Fifth Circuit also stated that the amendments "ratif[y] the pre-*Liu* disgorgement framework used by every circuit court of appeals." *Id.* at 338; see also *SEC v. Morris*, No. 3:20-CV-02958-B, 2022 WL 9497046, at *3 (N.D. Tex. Oct. 14, 2022) (discussing Hallam). In this case, any difference in approach between legal disgorgement and equitable disgorgement is immaterial.

To the SEC's knowledge, Mueller does not dispute the amount of his compensation, only whether he should disgorge it.  However, the case law is clear, funds a defendant "received as compensation for his role in the [securities fraud scheme] clearly constitute 'net profits'" and are subject to disgorgement under both *Liu* and the Fifth Circuit's application of disgorgement.[11] *See SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *5 (N.D. Tex. Jan. 8, 2021), *aff'd sub nom. SEC v. Hallam*, 42 F.4th 316 (5th Cir. 2022) (quoting *Liu*, 591 U.S. at 74); *SEC v. Carter*, No. 4:19-CV-100-SDJ-KPJ, 2022 WL 7376257, at *2 (E.D. Tex. Aug. 29, 2022), *report and recommendation adopted as modified*, No. 4:19-CV-100-SDJ, 2022 WL 4587526 (E.D. Tex. Sept. 29, 2022) (ordering legal disgorgement of "salary received for selling securities in violation of federal securities laws") *SEC v. Merch. Capital, LLC*, 486 Fed. Appx. 93, 96 (11th Cir. 2012) ("We know of no authority. . . which holds that salaries received, if modest and/or reasonable, cannot be considered ill-gotten gains."); *SEC v. AmeraTex Energy, Inc.*, No. 4:18-CV-00129, 2021 WL 1061395, at *5 (E.D. Tex. Mar. 18, 2021) (ordering disgorgement of salary, commissions, and bonuses).  Here, Mueller's salary clearly constitutes ill-gotten gains because it was taken directly from investments in the Funds, obtained through the misrepresentations and omissions alleged in the Complaint, and not subject to any agreement.  *See* Compl. ¶¶ 8, 65.

### B.  The Court should order Mueller to disgorge $49,851,455 jointly and severally with the Debtor Defendants.

#### 1.  Mueller and the Entity Defendants engaged in concerted wrongdoing.

Under *Liu* the Court has "flexibility" to impose joint and several liability against "individuals or partners" engaged in "concerted wrongdoing."  *Liu*, 591 U.S. at 82-83, 91.  Joint

---

[11] Mueller's *ad hoc* salary payments to himself were inconsistent with the PPMs which promised that Mueller would take no direct compensation from the Funds, *see, e.g.*, Ex. 3, 0211527, and the Funds' operating agreements which required the Funds' managers to approve salary payments, *compare, e.g.*, Ex. 29, Operating Agreement, 001080, *with* ECF No. 1 ¶ 8.

and several liability for disgorgement is particularly appropriate where an individual defendant controlled an entity defendant and they collectively engaged in bad acts.  *See SEC v. Johnson*, 43 F.4th 382, 389-93 (4th Cir. 2022) (upholding the imposition of joint and several liability between an individual and entity he controlled and owned).  For example, in *SEC v. World Tree Financial,* the Fifth Circuit affirmed a joint and several disgorgement award against an individual defendant and the entity he founded, where the individual served as both the chief executive officer and the chief investment officer for the entity.  43 F.4th at 455, n.15; *see also*, *SEC v. Gordon*, No. 3:21-CV-1642-B, 2021 WL 5086556, at *10 (N.D. Tex. Nov. 1, 2021) (ordering joint and several disgorgement against individual and entities he managed and controlled); *SEC v. Voight*, No. CV H-15-2218, 2021 WL 5181062, at *12 (S.D. Tex. June 28, 2021), *aff'd*, No. 21-20511, 2023 WL 1778178 (5th Cir. Feb. 6, 2023) (holding individual and entity that he founded and controlled jointly and severally liable).

In this case, there is no doubt that Mueller and the Entity Defendants he controlled acted collectively because the Entity Defendants could only act through Mueller.  Mueller was the sole shareholder and controlled Policy Services, which in turn, owned and controlled the Affiliated Companies.  Ex. 7, 0164777; Compl. ¶¶ 18-23; Ex. 10, 62:17-63:3.  Mueller and deeproot Funds, as investment advisers to the Funds, "had exclusive control over, and responsibility for, managing the Funds and their investments."  Compl. ¶¶ 17, 29.  Mueller was also responsible for "the content of communications to prospective and actual investors," and "exclusively controlled the bank accounts, investments, and other assets of the Funds."  *Id.* ¶ 42.  The PPMs described Mueller as "the architect and implementer of all products, services, or designs [of the Debtor Defendants]" and that Mueller "personally managed all . . . administrative functions of the enterprises."  Ex. 3, 0211527.

As a result, Mueller and deeproot Funds shared responsibility for the misrepresentations made to Investors including misrepresentations that they invested the "majority of assets" in life insurance policies and made "capital acquisitions" in the Affiliated Companies. *See, e.g.,* Compl. ¶¶ 30-31.  Further, Mueller ignored corporate formalities of the Entity Defendants when he commingled Investors' money in the accounts of Policy Services and deeproot Funds and then used those accounts to (i) pay the Affiliated Companies contrary to the promises in the PPMs; and (ii) divert Investor funds for Mueller's personal gain. *See Id.* ¶¶ 18, 60, 64-71.  As such, Mueller as the sole owner and shareholder of the Debtor Defendants was the ultimate beneficiary of his fraudulent scheme. *See Id.* ¶¶ 17-24.  Applying the principles discussed in *Liu* and Fifth Circuit case law, the Court should hold Mueller jointly and severally liable with the Debtor Defendants. *See Liu* 591 U.S. at 90-91; *World Tree Fin., L.L.C.*, 43 F.4th at 455, n.15 ("*Liu* allows for [joint and several] liability where 'partners engaged in concerted wrongdoing'— exactly the situation here."); *Halek*, 537 F. App'x at 581-82.[12]

**2.      The Entity Defendants received $49,851,455 as a result of their concerted wrongdoing with Mueller.**

"[T]he proper starting point for a disgorgement award is the total proceeds received from the sale of the securities." *Faulkner*, 2021 WL 75551, at *3 (quoting *SEC v. AmeriFirst Funding, Inc.*, No. 30-CV-1188, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008)).  As

---

[12] In an unpublished opinion, the Fifth Circuit recently overturned a disgorgement award entered against the nominal CEO of an issuer engaged in offering fraud.  The appeals court overturned the award to the extent it exceeded the amount the defendant kept or from which the defendant benefitted.  *SEC v. Stack*, No. 23-50327, 2024 WL 4199017, at *2 (5th Cir. Sept. 16, 2024) (noting that most of the investor proceeds were transferred from the issuer to a separate individual).  The Fifth Circuit declined to address whether, in the alternative, the individual defendant could be held jointly and severally liable for the full investor proceeds and nothing in the opinion limits this Court's ability to award joint and several disgorgement here.  Moreover, *Stack* is distinguishable from this case where Mueller was the manager and sole shareholder of the Debtor Defendants and as such was the beneficiary of any transfers to the Debtor Defendants.

summarized by Anderson, Mueller raised, through the Funds, $66,350,037 from Investors, which was deposited in the Entity Defendants' bank accounts.  Ex. 2 ¶ 5; Compl. ¶ 5.  Of this amount, Mueller and the Entity Defendants misappropriated $49,851,455.  *Id.* ¶ 24.  The remainder, as detailed in Table 2 below, either went to Mueller or his family, was spent on life insurance policies, or was used to make Ponzi-like payments to Investors.

**Table 2:  Joint and Several Disgorgement with Debtor Defendants**

| Description | Amount |
|---|---|
| Total Raised from Investors | $66,350,037 |
| (Insurance Policy Costs) | ($12,043,198) |
| (Payments to Investors) | ($1,861,425) |
| (Mueller Personal Expenses) | ($1,218,023) |
| (Mueller Salary) | ($1,046,936) |
| (Ohana Trust) | ($329,000) |
| | **$49,851,455** |

*Id.* ¶ 24.  The SEC is not seeking to disgorge funds spent on life policies or paid to Investors.

Included in the $49,851,455 in net profits is the $21,547,480 Mueller transferred directly from the Entity Defendants accounts to the Affiliated Companies accounts.  *Id.* ¶ 17, Appendix A-4.  It also includes an estimated $15,625,099 Mueller spent paying the Affiliated Companies' expenses.  *Id.*  These amounts should be considered net profits of the Entity Defendants and Mueller because those transfers were not made for the benefit of the Funds or their Investors; they did not constitute (i) "capital acquisitions" in the Affiliated Companies, or (ii) purchases of Class B shares in deeproot Pinball.  *See* Compl. ¶¶ 31, 34, 54-63; SJ Ord., 27; Ex. 5, 0164817-18.  As alleged in the Complaint, "[Mueller and deeproot Funds] diverted the majority of [investor funds] to the Relief Defendants and Mueller's own pockets, contravening the investment allocation strategy of the Funds presented to investors."  *Id.* ¶ 54.

Mueller's attempt to "internally" "paper" the transactions with the Allocation Agreement in 2017 and the Contingent Pledge Agreement in 2020 did not convey to the Funds an ownership interest in the Affiliated Companies. *Id.* ¶ 62; Ex. 12, 0213964; Ex. 27, 021968.  When the Bankruptcy Court was asked to consider whether the Funds had an ownership interest in the life insurance policies, it found "[Policy Services] is the sole and lawful owners of the [policies]." Ex. 28, Bankruptcy Order, ¶ 10.  Just as the Allocation Agreement and the Contingent Pledge Agreement did not provide the Funds and their Investors with an ownership interest in the life policies, they also did not convey an ownership interest or "capital acquisition" in the Affiliated Companies.  At bottom, as alleged in the Complaint, "the Funds have no documented ownership or other interest in any of the [Affiliated Companies]."  Compl. ¶ 56.

Courts routinely order defendants to disgorge funds spent or "invested" contrary to disclosures made to Investors and not made for Investors' benefit. *Hallam,* 42 F.4th at 342 (holding disgorgement appropriate even if investments "were partially legitimate" because "all of the securities transactions during the relevant period were unlawful"); *SEC v. Liu,* No. 21-56090, 2022 WL 3645063, at *2-3 (9th Cir. Aug. 24, 2022), *cert. denied*, 143 S. Ct. 2495, 216 L. Ed. 2d 454 (2023) (affirming disgorgement of investment in proton therapy machine made contrary to representations in offering material); *Voight*, 2021 WL 5181062, at *12 (holding defendant and entities jointly and severally liable because defendant "used each of those entities as his alter ego to engage in concerted wrongdoing to carry out the fraud").  Accordingly, Mueller's transfers of the Funds' money to his Affiliated Companies should be considered net profits to the Debtor Defendants and Mueller.  As such, Mueller should be held jointly and severally liable with the Debtor Defendants up to the amounts in the Debtor Defendant Final Judgment, as summarized in Table 1 above.

**C. The Court should order Mueller to pay $16,583,273 in prejudgment interest.**

It is well-settled that courts have discretion to award prejudgment interest on disgorgement amounts for violations of securities laws. *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 747 (5th Cir. 2004); *SEC v. Montgomery*, No. SA-20-CA-598-FB, 2021 WL 210749, at *6 (W.D. Tex. Jan. 1., 2021). The Court's Judgment, already entered in this litigation, states Mueller "shall pay" prejudgment interest, which will be "based on the rate of interest used by the Internal Revenue Service." Judgment, 6.

As summarized below, Anderson calculated the prejudgment interest due using the rate used by the Internal Revenue Service for both the amount the SEC seeks individually from Mueller and the amount the SEC seeks jointly and severally with the Debtor Defendants.

**Table 3: Prejudgment Interest Calculation**

| Principal Amount | Prejudgment Interest |
|---|---|
| $2,264,959 | $720,703 |
| $49,851,455 | $15,862,571 |
| | **$16,583,273** |

Ex. 2 ¶¶ 25-28. Holding Mueller jointly and severally liable with the Debtor Defendants for prejudgment interest is consistent with the approach taken by other courts in this circuit. *See, e.g.*, *AmeraTex Energy, Inc.*, 2021 WL 1061395, at *3 ("Similar to disgorgement, a court is likely to order joint and several liability against defendants as to prejudgment interest . . . when the defendants 'collaborate or have close relationships in engaging in the illegal conduct.'") (quoting *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d. Cir. 1997)). Accordingly, the Court should order Mueller to individually pay $16,583,273 in prejudgment interest, $15,862,571

of which the Court should order jointly and severally with the Debtor Defendants up to the amounts set forth in the Court's Debtor Defendant Final Judgment.[13]

## II.    The Court should order Mueller to pay a $2,264,959 civil penalty.

The Securities Act, Exchange Act, and Advisers Act each authorize courts to impose civil penalties, and establish an escalating, three-tier structure for securities violations. 15 U.S.C. § 77t(d) (Securities Act); 15 U.S.C. §78u(d)(3) (Exchange Act); 15 U.S.C. § 80b-9(e)(2) (Advisers Act); 17 C.F.R. § 201.1001 (increasing statutory amounts to reflect inflation).  These penalties are designed to punish and deter because, without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains.  *Voight*, 2021 WL 5181062, at *14 (quotations and citations omitted).

A third-tier penalty requires that the violation "involve fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and that "such violation directly or indirectly result in substantial losses or create a significant risk of substantial losses to other persons."  15 U.S.C. § 77t(d)(2)(C) (Securities Act); 15 U.S.C. § 78u(d)(3)(B)(iii) (Exchange Act); 15 U.S.C. § 80b-9(e)(2)(C) (Advisers Act).  The maximum third-tier civil penalty is the greater of the gross pecuniary gain or the statutory maximum per violation.  15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 80b-9(e)(2)(C).

In support of a motion seeking imposition of a civil penalty, the SEC need only make "a proper showing" that a violation occurred and a penalty is warranted.  *See, e.g.*, 15 U.S.C.

---

[13] The disgorgement amount the SEC seeks from Mueller jointly and severally with the Debtor defendants, $49,851,455, as summarized in Table 2, is different than the amount the SEC agreed to with the Debtor Defendants, $48,064,717, as summarized in Table 1.  The difference is due to new information learned during discovery and discussed with defense counsel before the December 2023 trial date.  In this motion, the SEC is not seeking to modify the Debtor Defendant Final Judgment.

§ 77t(d)(1) (Securities Act).  In this case, where the parties have agreed that the Court will impose a penalty and "the allegations of the Complaint shall be accepted and deemed as true," the only question is the amount of the penalty the Court should order.  *See* Consent ¶ 6.  The following factors are relevant in determining the amount of a civil penalty:  "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  *SEC v. Life Partners Holdings, Inc.*, 71 F. Supp. 3d 615, 623 (W.D. Tex. 2014), *rev'd on oth*er grounds 854 F.3d 765 (5th Cir. 2017).  In considering these factors, the Court has discretion to impose the penalty it finds appropriate.  *See Voight*, 2021 WL 5181062, at *14-15; *SEC v. Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *21 (W.D. Tex. Aug. 21, 2015), *adhered to on reconsideration*, No. A-13-CV-01036 ML, 2015 WL 6438872 (W.D. Tex. Oct. 20, 2015); s*ee also United Energy Partners, Inc.*, 88 F. App'x at 747.

### A.    Mueller's conduct was egregious.

The Court's findings in support of its Summary Judgment Order alone are sufficient to establish that Mueller acted egregiously.  For example, the Court has already found that Mueller, an attorney and an investment adviser who owed the Funds a fiduciary duty,  "committed the kind of deceptive act . . . required to establish scheme liability" and that Mueller's use of the Funds' assets to repay Debenture Fund investors "constituted a 'device, scheme or artifice to defraud,' and an 'act, practice, or course of business that operates or would operate as a fraud or deceit on any person.'"  SJ Ord., 41, 44-45.  The Court also found Mueller's use of Investors' money to pay for personal expenses was a "deceptive scheme or act[]."  *Id.*, 42-43.

Moreover, the scope and audacity of Mueller's fraudulent scheme, clearly establishes the egregiousness of his conduct.  Mueller lied to Investors and told them he would invest the majority of the Funds' $66,350,037 in life policies when he spent only $12,043,198.  *See* Compl. ¶ 4; Ex. 2 ¶¶ 5, 12.  Mueller lied to Investors and told them the Funds would own the life policies when the policies were owned by Policy Services.  SJ Ord., 20.  Mueller failed to disclose that he had already sold off fractional shares in 25% of the total value of the policies.  Ex. 2 ¶¶ 19-20.

Mueller lied to Investors about making "capital acquisitions" in the Affiliated Companies.  Mueller lied when he said the Funds would purchase Class B shares in deeproot Pinball.  SJ Ord., 27.  Mueller lied when he said investments in the Affiliated Companies would provide safety, liquidity, and revenue, when in reality the Funds received nothing in return. Compl. ¶¶ 32, 62.  Mueller also failed to disclose that because none of his businesses made any significant money, he was forced to use Investor money to make $1,861,425 in Ponzi-like payments to 575 Fund Investors and $3,758,684 in payments to Debenture Funds' investors.  *See* Ex. 2 ¶¶ 14-15.  All while an active member of the Texas bar.  Compl. ¶ 16.

Courts faced with similar circumstances have found defendants acted egregiously.  *See, e.g.*, *SEC v. Myers*, No. 4:15-CV-00300, 2018 WL 11353113, at *9 (E.D. Tex. July 25, 2018) (finding defendant who misspent investor proceeds and misrepresented expenditures acted egregiously); *Helms*, 2015 WL 5010298, at *18-19 (finding defendant who took money for personal gain, duped hundreds of investors, and violated fiduciary duties acted egregiously); *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *4 (N.D. Tex. 5, 2012) (finding attorney defendant acted egregiously in making misrepresentations).  Based on the allegations of the Complaint, the Court's own findings, and the additional evidence offered by the SEC, there is clear grounds to find Mueller acted egregiously.

### B.     Mueller acted with a high degree of scienter.

Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Fifth Circuit, scienter can be established by showing that a defendant acted intentionally or with severe recklessness.  *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (*en banc*).  In this case, the allegations in the Complaint, the Court's Summary Judgment Order, and the evidence presented by the SEC establish that Mueller acted with a minimum of severe recklessness.

Mueller was responsible for all the actions of the Funds and the Debtor Defendants. Compl. ¶¶ 17, 39.  Mueller was the sole shareholder of each of the Debtor Defendants or their parent entities and the Funds.  *Id.* ¶¶ 17-26; Ex. 10, 61:13-18.  Mueller also managed the Debtor Defendants and the Funds and was responsible for "product design," "marketing," "operations," "management," "administrative functions," "investor or client care," "client paperwork," and even the "IT systems."  Ex. 3, 0211527; *see also* Compl. ¶¶ 39, 42.  Mueller also controlled the Debtor Defendants' bank accounts.  *See* Ex. 2 ¶ 14, FN 4, Appendix A-1.  In short, if the Deeproot companies acted, or transacted, they did so at Mueller's direction.  *See* Compl. ¶ 42.

Courts routinely find that defendants like Mueller who were solely responsible for repeated misrepresentations and the relevant financial transactions, acted with a high degree of scienter.  *See, e.g.*, *SEC v. Farias*, No. SA-20-CV-00885-XR, 2022 WL 3031082, at *6-7 (W.D. Tex. Aug. 1, 2022) (finding high degree of scienter where defendant was sole managing member; made repeated misrepresentations; responsible for the PPMs and marketing materials; had control over company's bank accounts; and responsible for the investor funds); *SEC v. Provident Royalties*, No. 09-CV-01238, 2013 WL 5314354, at *7 (N.D. Tex. Sept. 23, 2013) (finding scienter where defendant actively participated and benefited from the fraud and was an officer and control person); *SEC v. Petros*, No. 3:10-CV-1178-M, 2013 WL 1091236, at *6

(N.D. Tex. Mar. 1, 2013) (holding high degree of scienter where defendant was "the sole director and officer"), *report and recommendation. adopted*, 2013 WL 1092849 (N.D. Tex. Mar. 14, 2013).

In this litigation, Mueller has argued that his reliance on purported advice he received from CPM demonstrates he acted with a low degree of scienter.  However, any advice CPM provided was tainted by Mueller's failure to disclose his fraudulent conduct.  The parties have briefed Mueller's so-called reliance on counsel on multiple occasions.  *See, e.g.*, ECF Nos. 103, 108, 110, 130, 132; *see also* Ex. 22, Pretrial Conference Tr., 40:19-25 (the Court stating whether to exclude Mueller's advice of counsel defense entirely was a "very close call").  In short, reliance on counsel is relevant only if counsel's advice is "*given on full disclosure of all the facts* and followed in good faith." *United States v. Impastato*, 543 F. Supp. 2d 569, 573 (E.D. La. 2008) (quoting *United States v. Thaggard*, 477 F.2d 626, 632 (5th Cir. 1973) (emphasis added)). In CPM's Answer to the Trustee's Complaint, the CPM attorneys unambiguously denied that Mueller made full disclosure to CPM.  For example, the CPM attorneys deny that Mueller told them the Funds would not own the life policies or that Mueller told them he intended to use new Investor money to repay earlier Investors.  Ex. 24, ¶ 26.

CPM's Answer is consistent with the CPM attorneys' testimony during discovery. Mueller only asked the CPM attorneys to review the original PPMs.  *See* Ex. 13, 100:24-101:19; 114:8-116:11-21.  Mueller never discussed with CPM that the Funds did not own the life policies.  *See Id.*, 104:3-105:5; 118:5-122:1.  Mueller never discussed with CPM using the Company Advance to pay Fund Investors or investors in the Debenture Funds. *See Id.*, 171:4-171:17.  And Mueller never disclosed to CPM that he failed to purchase for the Funds interests in the Affiliated Companies.  *Id.*, 136:11-138:6.

Mueller's failure to fully disclose to his attorneys the reality of how he operated the Funds is further evidence of his state of mind.  Notably, Mueller, an attorney, who studied at least one life policy company that made Ponzi-like payments to investors, never told CPM he planned to do the same.  *See* ECF No. 1, ¶¶ 16, 48-49; Ex. 25, Portfolio Narrative, 6; Ex. 24 ¶ 26. Mueller's failure to make full disclosure to his former attorneys undermines any claim he has that their advice mitigates his scienter.

C.   **Mueller's actions created substantial losses for Investors.**

More than 300 people invested a total of $66,350,037 in the Funds.  Ex. 2 ¶ 5.  A few 575 Fund Investors were lucky and received some money back, $4,079,633, in interest and maturity payments.  *Id.* ¶ 14.[14]  In the more than three years since the Complaint was filed, the Trustee has collected a net total of $4,111,299 for the creditors of the deeproot entities that filed under Chapter 7.  *Id.* ¶ 29.  Some of that money may ultimately make its way to the Funds and their Investors, but even if all of the money the Trustee has collected went to the benefit of Investors, they will still have lost more than $58 million.  *Id.* ¶ 30.

Investors loss of principal has had a significant impact on their lives.  Investors lost their retirement savings, could not support children and grandchildren, could not provide medical care for elderly relatives, and suffered stress and trauma.  *See Supra*, 13-14.  The devastating impact to the Funds' Investors is more than enough to find Mueller caused "substantial losses."

D.   **Mueller's fraudulent operation of the Funds and their predecessors was recurrent.**

The first investment in the Funds was made in September 2015.  Ex. 2 ¶ 5.  Over the next six years, the Funds solicited at least the 300 Investors who invested, *id.*, and likely multiples

---

[14] As discussed above, of that $4,079,633, at least $1,861,425 was in the form of Ponzi-like payments from new investments.  Ex. 2 ¶ 14, Appendix A-3.

more who fortunately decided not to invest.  The Funds, however, were not Mueller's first experience in selling investors interests in life policies.  Mueller also operated the Debenture Funds, which although not the subject of the allegations in the Complaint, apparently were also troubled, as evidenced by Mueller's use of $3,758,684 of the Funds' money to repay investors in the Debenture Funds.  *Id.*  ¶ 15.

Courts have found that defendants engaged in securities violations for shorter periods of time involving fewer investors acted recurrently.  *See, e.g.*, *Myers,* 2018 WL 11353113, at *9 (holding conduct over a 13-month period involving 60 investors in multiple states "recurrent"); *SEC v. Sethi Petroleum*, LLC, No. 4:15-CV-00338, 2017 WL 3386047, at *4 (E.D. Tex. 7, 2017) (finding efforts to recruit more than 90 investors was not a "one-time mistake").  Both the length, six years, and the number of victims defrauded, 300, weigh in favor of a stiff civil penalty.

### E.  Mueller refuses to accept responsibility for his wrongdoing.

Mueller has consistently maintained that he engaged in no wrongdoing in connection with the fraudulent conduct alleged in the Complaint.  Mueller instead blames the Funds' accountants and attorneys, COVID, and even the SEC for the demise of the Funds and the loss of Investors' money.  ECF No. 108 at 2-3.  Notably, Mueller's agreement to enter into a bifurcated settlement by which the Court will accept as true the allegations in the Complaint for purposes of this motion does not constitute an admission of wrongdoing by Mueller.  *See SEC v. Gilman*, No. 3:18-CV-1421-L, 2021 WL 4125195, at *9 (N.D. Tex. Sept. 9, 2021) (finding defendant did not admit wrongdoing by entering into a bifurcated no admit/no deny settlement).  Mueller's refusal to accept any responsibility for his actions weighs in favor of a substantial third-tier civil penalty.

### F.  Mueller's financial condition does not warrant a reduced penalty.

A defendant asserting inability to pay as a reason for a reduced penalty must establish their financial condition by a preponderance of evidence.  *SEC v. Sample*, No. 3:14-CV-1218-B,

2017 WL 5569873, at *4 (N.D. Tex. Nov. 20, 2017).  Mueller, however, has entirely failed to respond or object to the SEC's discovery requests regarding his financial condition during the remedies phase of this proceeding and thus there is no current evidence of his inability to pay. On July 25, 2024, the SEC issued requests for production to Mueller regarding his financial condition, including any documents Mueller planned to present in opposition to this motion.  Ex. 26, 5.  The SEC's requests were issued consistent with Mueller's Consent, which specifically provides that "the parties may take discovery" during the remedies phase of the litigation.  ECF No. 161-2 ¶ 6.  Nevertheless, Mueller has failed to provide a response to the SEC's requests despite repeated inquiries from the SEC.

Even if the Court determines that Mueller's financial condition weighs in favor of a reduced penalty, the Court should still order the requested third-tier penalty of $2,264,959 because the other factors outweigh Mueller's financial condition.  *Gilman*, 2021 WL 4125195, at *9 ("[T]he court could impose a civil penalty even if it determined that Defendants were unable to pay it."); *Myers*, 2018 WL 11353113, at *9 ("[T]he Court finds that the Defendants' inability to pay is significantly outweighed by the other determinative factors in favor of greater civil penalties.").

The record is clear, Mueller has taken no responsibility for his actions and intentionally deceived his victims with conduct that is clearly egregious, caused significant losses, and recurrent.  He should be penalized accordingly with a third-tier penalty equal to at least his personal gross pecuniary gain of $2,264,959.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests the Court grant the SEC's Motion for Final Judgment and Remedies Against Defendant Mueller, enter the Proposed Final Judgment submitted with this motion, and any other relief to which the SEC is entitled.

Dated: September 27, 2024               Respectfully submitted,

_/s/ Charlie L. Divine_____
Charlie Divine, Trial Counsel
Kristen M. Warden, Trial Counsel
David Nasse, Supervisory Trial Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-6673 (Divine)
(202) 551-4661 (Warden)
(202) 551-4426 (Nasse)
divinec@sec.gov
wardenk@sec.gov
nassed@sec.gov

_Counsel for Plaintiff Securities and Exchange Commission_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2024, I filed the foregoing on the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

<u>/s/ Charlie L. Divine</u>