EXHIBIT 22

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
    SECURITIES AND EXCHANGE          .
 4  COMMISSION,                      .
                                     .
 5              PLAINTIFF,           .
         vs.                         . DOCKET NO. 5:21-CV-785-XR
 6                                   .
    ROBERT J. MUELLER, ET AL,        .
 7                                   .
                DEFENDANTS.          .
 8

 9

10         TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                    NOVEMBER 28, 2023
12

13

14  APPEARANCES:
    FOR THE PLAINTIFF:    CHARLIE L. DIVINE, ESQUIRE
15                        DAVID NASSE, ESQUIRE
                          KRISTEN M. WARDEN, ESQUIRE
16                        FERNANDO COMPOAMOR, ESQUIRE
                          US SECURITIES AND EXCHANGE COMMISSION
17                        100 F STREET, NE
                          WASHINGTON DC 20549-5917
18
    FOR THE DEFENDANT:    JASON DAVIS, ESQUIRE
19                        CAROLINE NEWMAN SMALL, ESQUIRE
                          DAVIS & SANTOS PC
20                        719 S. FORES STREET
                          SAN ANTONIO TX 78204
21

22  REPORTED BY:          GIGI SIMCOX, RMR, CRR
                          OFFICIAL COURT REPORTER
23                        UNITED STATES DISTRICT COURT
                          SAN ANTONIO, TEXAS
24

25
```

1 marriages or divorces spent on the money, completely

2 inflammatory and irrelevant, because the government's theory

3 is he shouldn't have had that money.  It should be the same

4 whether he took that money down to the Food Bank and gave it

5 all to the Food Bank.

6 　　　　But that's precisely why, Judge, even you, with your

7 extensive experience there, having to call balls and strikes,

8 if it's sticking in your mind, what's it going to do to a jury

9 here when that's not part of the government's theory,

10 according to them?

11 　　　　THE COURT:  But it is relevant to the scienter, so

12 that's the difference here.  That's the ruling.

13 　　　　Moving on to three.  Advice of counsel.  So — why

14 don't you just stay there.

15 　　　　So help me understand how your client told counsel

16 everything — outside counsel everything they needed to know

17 and that they provided a legal opinion that he relied on.

18 　　　　MR. DAVIS:  Judge, I'd like to first talk about the

19 first point that you raised, which is the full disclosure

20 issue.  And, you know, one of the cases cited by the SEC,

21 the — it's kind of difficult — I think it's *Impastato*.

22 　　　　I'll get the spelling later.

23 　　　　THE COURT:  I-M-P-A-S-T-A-T-O.

24 　　　　MR. DAVIS:  Yes, Your Honor.  I think it was a

25 Louisiana case.  But basically recognized — and I think the

1  *Snyder* case, too, recognized that that's a jury question; that

2  the level of disclosure, whether it was full disclosure or

3  not, should be submitted to the jury.

4          So this is not appropriate for a motion in limine

5  saying you can't get into that.  So that's the threshold

6  issue.  In fact, we cited directly that court's discussion of

7  that, and I think the *Snyder* case just reinforces that.  And

8  that was a large part.

9          THE COURT:  But, I mean, there's got to be enough

10 fact issues to go to a jury.  So tell me where are there fact

11 issues that may go to a jury on this?

12         MR. DAVIS:  Sure, Judge.  I guess we'll put it into

13 context.

14         If you read the SEC's motion, it creates the

15 impression that Robert Mueller went to these lawyers, the

16 securities lawyers, just prior to the PPM and said, "Hey,

17 guys, I'm going to raise some money."  That's not what this

18 was.

19         What you had was over two and a half years of

20 representation –– actually, two years and five months –– by

21 these lawyers prior to that PPM that's the subject of this

22 case, the first PPM.  That's the real subject of this case.

23 There are several, but that's the in-time.

24         So this argument, number one, that there wasn't full

25 disclosure and that the lawyers weren't familiar with the

1  business is belied by the extensive experience and

2  representation that they had these entities and Mr. Mueller,

3  number one.

4          By "extensive," hundreds of thousands of dollars

5  worth of legal bills and hours.  Mr. Concilla described, Your

6  Honor —— I think as he said, "We talked all the time."  We had

7  emails and phone calls all the time, consistent with

8  Mr. Mueller's testimony.

9          So this notion that they weren't fully aware, having

10  set up this structure for the business themself, is just

11  belied by the facts.  So that description, Your Honor ——

12  obviously, we didn't question our own witness, Mr. Mueller,

13  during his deposition, but you will hear testimony, and you

14  see glimpses of it, even through the SEC questions of

15  Mr. Mueller in his deposition about extensive and thorough

16  discussions with his lawyers at all stages two and a half

17  years leading up to the PPM.

18          Now, what they point to is Mr. Concilla's statements

19  during his deposition that he couldn't recall certain things;

20  that he does say there are lots of discussions.  We were

21  talking —— I think he almost said —— every day during the

22  critical time.

23          Mr. Concilla was hospitalized, Your Honor, for a

24  large period of time.  We had to set up his deposition, you

25  know, working around that.  He was ill.  There was a serious

1  illness.  In fact, that's one of the reasons why we've agreed

2  if he has to testify, to do it remotely at his request.

3       He's admitted candidly that he doesn't recall things.

4  He's also admitted candidly that he wouldn't dispute if

5  Mr. Mueller did recall things that he couldn't recall.

6       So — but what we do have — and that's why we cited

7  so many clips — is we have both Mr. Mueller and Mr. Concilla

8  in their testimony — and you'll hear more from Mr. Mueller —

9  talked about the extensive discussions and advice into

10  different areas leading up to the PPMs, which are the

11  representations that are at issue in this case.

12       THE COURT:  There was no, like, warranty letter or

13  letter provided by counsel as to the parameters of the

14  disclosures?  Nothing like that?

15       MR. DAVIS:  Not as to the — you mean as to the scope

16  of representation or as to the disclosure?

17       THE COURT:  No, to the scope of, "this is to affirm

18  that the following disclosures were made."  I mean, the stuff

19  you would normally see a lawyer recap.

20       MR. DAVIS:  You know, I guess look at it from this

21  perspective, Judge.  You have Mr. Mueller going to these guys

22  who are undisputedly veteran.  I mean, the guy has 40 years.

23  In all these offerings, I think the Court may have seen his

24  resume in connection with some of the disclosures as a

25  nonretained expert.

1        So what can Mr. Mueller do as a client but go to

2   these folks and pay them top dollar, pay hundreds of thousands

3   of dollars, and spend —— who knows? —— thousands of billable

4   hours getting advice from them.

5        So if there aren't documents like that other

6   securities lawyers give, it shouldn't be on Mr. Mueller.  Why

7   is that important?  It's important because Mr. Concilla, in

8   his deposition, answered the following questions:  "When you

9   said 'We're done, I approve this,' did you mean that you

10  approved all the disclosures and that this was acceptable and

11  in compliance to give to investors?"

12       "Yes."

13       Over and over and over again.  And in terms of the

14  challenges, Judge, you know, when you look at the case law,

15  the relevance issue is, well, our —— was the advice related to

16  the issues that are at issue in this case?  And that's why we

17  cited so many excerpts, because both Mr. Mueller and

18  Mr. Concilla describe the areas that are of concern in this

19  case.

20       For example, loans and compensation.  "Yes."

21       "Critically, when you blessed the PPMs, did you know

22  that there was no revenue; in other words, that investor money

23  was going to come in at a time when you knew that investor

24  money or that company money was going to be paying these?"

25       "Yes, we knew that."

1          Now, Mr. Concilla said, "I don't recall a specific

2    conversation about investor money being used to pay other

3    investors," but he says, "If I had been asked, yes, I believe

4    money is fungible, as long as there's money from other

5    sources," which there was.

6          You will hear, Judge, that there was money from other

7    sources in these accounts.  There were both loans, and I think

8    one or two of the policies had paid off.  Then Mr. Concilla

9    says there is nothing wrong with that.  Money is fungible.

10         Mr. Mueller certainly will testify, he remembers

11   those conversations in the context of this, and that was

12   precisely why he proceeded and relied upon Mr. Concilla and

13   the law firm.

14         So back to the Court's question, was there

15   disclosure?  You have two and a half years of evidence that

16   will be uncontested of an attorney/client relationship

17   specifically with these companies, the predecessors, going

18   forward, that shows that these lawyers were very familiar with

19   this operation and the structure.  They set it up.

20         You have the testimony from Mr. Mueller and

21   Mr. Concilla talking about the various different topics, and

22   you have Mr. Mueller saying, "Yes, I relied upon them.  Yes, I

23   had these conversations."

24         If you read the SEC's brief, Judge, you think that

25   specific conversations about these different areas that are at

1 issue never happened.  We've given you sworn testimony of

2 Mr. Mueller, even not in response to our questioning — to

3 their questioning — talking specifically that he did get such

4 advice.

5          That is the evidence that is necessary.  If they have

6 a challenge about the extent of that, then that is for the

7 jury to decide.  They can argue to the jury, well, they didn't

8 tell them this.  They didn't tell them that.  But there's

9 certainly enough evidence, Your Honor, to justify that issue

10 being at play in this case.

11          THE COURT:  So — to the government.

12          So defendant says that they have provided some amount

13 of information that should potentially be heard by the jury.

14 I mean, why shouldn't I go on the safe side, allow them to do

15 what they are going to attempt to do?

16          Mueller says whatever he's going to say, the attorney

17 or attorneys — plural — say what they are going to say, then

18 I decide whether or not the reliance on counsel argument can

19 go to the jury.  Perhaps, if you guys are correct, and it's

20 not met, then I don't provide such an instruction, and I tell

21 the jury to disregard all the evidence they previously heard

22 on this point.  Why isn't that the safer route?

23          MR. NASSE:  Yes, Your Honor, I think it's exactly for

24 the point you raised at the outset.  There needs to be some

25 modicum of facts behind some of these assertions of privilege.

1          And you — at our last hearing, Your Honor, you

2    specifically asked the defense counsel to provide you specific

3    examples of where the lawyers were provided — asked a

4    specific question with the appropriate information and what

5    their response was.

6          And here in the motion, you have, I think, ten to

7    twelve pages of citations to the attorneys' depositions.  And

8    not a single one of them, if you look at them closely,

9    indicate that there was a specific question asked about the

10   issues in this case, the information they provided.

11         In fact, to the very issue where Mr. Davis just

12   raised about Ponzi payments, the question they cited, where he

13   says "money is fungible," but the entire quote is, "So

14   wherever this money is coming from or if it's going into an

15   account, it could be used for whatever purpose.  But did we

16   have a specific discussion of what I think you are asking,

17   paying all investors with new investors' money?  We did not."

18         So it's not that we didn't recall or some sort of a

19   vague answer.  It's "We did not."

20         THE COURT:  What did Mr. Mueller say in his

21   affidavit?

22         MR. NASSE:  Mr. Mueller — if you look at their

23   statements, are vague assertions.  We don't dispute that

24   Carlile Patchen provided advice of the drafting of the initial

25   documents.  We're not saying that there are some technical —

1    THE COURT:  That's not going to get them there.

2    MR. NASSE:  Yeah.  That's the — and I think the case

3 law is clear on that.  It's what did they know after the fact,

4 after those funds launched, his — what his conduct was in

5 relation — in light of the representations in the PPMs.

6    His assertions are we had discussion — our vague

7 sort of statements of, we had discussions all the time.  We

8 talked about everything, but the very — the citation that

9 Mr. Davis mentioned about the loans, if you look at that

10 entire transcript, you see me going repeatedly, like, asking

11 Mr. Mueller:  "Do you recall a specific conversation?"

12    "Well, we talked about everything.  We talked about

13 all kinds of — we must have talked about it."

14    Those are his types of responses; whereas the

15 lawyers, when they are deposed, are very definitive and say,

16 "No, we did not," on all the core issues; whether there was a

17 legally enforceable interest in the life policies or the

18 affiliated business.

19    As you pointed out, what does capital acquisition

20 mean?  In fact, their testimony was exactly contrary to that.

21 They expected there to be a legally enforceable interest in

22 the entities that the funds were investing in.  In fact, they

23 said if they had known that there wasn't, they would have

24 advised Mr. Mueller to amend the PPMs.

25    Whether he could use personal — use investor funds

1 for personal expenses.  There is no citation in any of their
2 documents where —— that he provided —— asked that question
3 specifically to Carlile Patchen and they provided any
4 guidance.

5       Whether he could use —— they just cited —— pay
6 returns to other investors with new investor money, whether he
7 could use the company advance to pay those investors.  They
8 have views about what the document said, but at every
9 opportunity, they always said they didn't have those specific
10 conversations with Mr. Mueller.

11       So our view is in light of the fact that there's not
12 a factual basis to introduce the supposed advice of counsel,
13 the prejudice, Your Honor, outweighs the relevancy here.

14       THE COURT:  So Mr. Davis, you are telling me that
15 in —— and I can't pronounce the lawyer's name, and then your
16 client's affidavit, those are the two places that you believe
17 allow you to raise this to the jury.  Is there any other
18 places that you think support?

19       MR. DAVIS:  Well, it's our client's testimony, Judge,
20 from his deposition from the SEC, and it's what we anticipate
21 he will testify to.  I want to slow this down, because there
22 are statements being made —— or if you just look, Your Honor,
23 at what we have filed, there are some examples in there.

24       So, for example:  "Did Carlile Patchen" —— that's the
25 law firm where Mr. Concilla was —— "ever advise you that it

1  was permissible to pay existing investors with new investor

2  investments?"

3          "Answer:  Yes."

4          "Question:  When did that occur?"

5          "Answer:  It occurred continuously throughout the

6  representation, including after there was a privilege waiver

7  date."

8          "Question:  Did you have a conversation where Carlile

9  Patchen advised you it was permissible?"

10          "Answer:  Yes.  We had many conversations."

11          And he was adamant —— Mr. Concilla —— this is

12  Mr. Mueller talking about Mr. Concilla.

13          THE COURT:  You are citing from your client's ——

14          MR. DAVIS:  Deposition answers that are sworn, that

15  are part of our response.  Dennis was adamant about the

16  provision that money was fungible.  That's exactly what

17  Mr. Concilla testified to.

18          Now, Mr. Concilla testified —— just as I said and as

19  counsel said —— we didn't have those conversations.  But when

20  asked by Mr. Hulings in the deposition, he said, "You know,

21  we're talking about eight years ago."  He said, "Yes, it may

22  have.  Mr. Mueller could have a different recollection."

23          But Mr. Concilla says, "I know what I would have

24  said," which is exactly how Mr. Mueller describes it; that

25  money is fungible.  It's not a Ponzi scheme if there are other

1   monies in the account.

2        Here's another example.  Again, sworn testimony from

3   our client.  This was the SEC asking Mr. Mueller.

4        "Question:  Did you ask Carlisle Patchen whether you

5   should disclose that you would pay existing investors with new

6   investor funds?"

7        "Answer" -- not vague, not equivocal -- "Yes.  We

8   talked about it several times."

9        The company advance section and the language therein

10  was their response to these types of discussions.

11       So we cited Mr. Concilla's testimony.  When

12  Mr. Hulings asked Mr. Concilla, "Do you think that the company

13  advance section could be used to pay investors?"

14       "Answer:  Yes.  That could be proper."

15       So is there evidence, Your Honor, that supports this?

16  Yes.  And I could keep going.  For example, Mr. Concilla was

17  asked — it said:

18       "Question:  You don't recall discussions with

19  Mr. Mueller regarding placing 30 percent of investor funds

20  into deeproot Pinball?"

21       Mr. Concilla said:  "I do recall."

22       And they said:  "What did he tell you about that?"

23       He said, "He thought it would allow some

24  diversification of cash flow."

25       This is Mr. Concilla.

1          THE COURT:  But where is that evidence that the

2    lawyer is actually providing him advice?

3          MR. DAVIS:  Because those conversations, Judge, are

4    part of his advice and approval, which is what I'm getting to,

5    the culmination of that, which is, yes, these PPMs, with my

6    knowledge, based upon these discussions, are good to go.  They

7    are compliant with the securities laws, and may be presented

8    to investors.

9          THE COURT:  And there was no written memorialization

10   of any of this?

11         MR. DAVIS:  There's sworn testimony from

12   Mr. Concilla, Judge.

13         So let me give you ——

14         THE COURT:  No.  I'm still wrapping my head around

15   this complex deal being put together by Carlisle Patchen and

16   there is no formal letter blessing this.

17         MR. DAVIS:  Well, that may be a mal —— well, there's

18   a tolling agreement.  That may be a malpractice issue, Judge,

19   but we don't have to guess now, because what Mr. Concilla

20   remembers is, quote, "Did you provide legal advice with

21   respect to the PPMs?"

22         "Yes."

23         THE COURT:  But there's no doubt about that.  The

24   question is what the representations were and did he bless the

25   representations being made.

1          MR. DAVIS:  Right, Judge, but the representations

2    were in the PPM.  Their point is that, well, he did — the way

3    it was actually set up, the way that it was working was

4    inconsistent.

5          What this evidence, the sworn testimony, shows is

6    that Mr. Concilla and his firm were very familiar with the

7    structure and the setup, were very familiar with that.  And so

8    when you have Mr. Mueller, who obviously remembers — he's on

9    trial here.  You have a securities lawyer, a 40-year veteran,

10   who has been through a health crisis and isn't well enough to

11   come to — live here, asked to remember one of many, many

12   clients' conversations eight years ago and says, "Yes,

13   Mr. Mueller, I wouldn't doubt that he would remember this

14   stuff" — basically — "better than me."

15         THE COURT:  So we keep talking about one lawyer.  I

16   thought you guys were going to have more than one lawyer.

17         MR. DAVIS:  There is two.  They're both from the same

18   firm.  Mr. Concilla was the lead lawyer.  There's a

19   Mr. Federico.  Honestly, I think Mr. Concilla was the lead

20   lawyer, and he's probably the one we would call.

21         THE COURT:  No, I'm talking about them.

22         MR. DAVIS:  Oh, them.

23         THE COURT:  Yes.

24         MR. NASSE:  Yes, that's right, Your Honor.  There is

25   another lawyer, Mr. Federico.  Same firm.  He testified in his

1   deposition that he didn't advise Mr. Mueller on either PPM, so
2   that was his testimony.  He did advise him on other funds, but
3   not these two PPMs.
4       *(Off-the-record discussion.)*
5           MR. DAVIS:  I was going to say, Judge — I mean
6   again, we're getting to whether the Court should go down the
7   safe route, and the U.S. versus — or the *SEC versus Snyder*
8   case actually goes directly to what you've said, Judge, which
9   is why isn't it safer to listen to this and then make that
10  decision.
11          In that case, the Fifth Circuit observed that, quote,
12  "The defendant does not have the burden of proving any, quote,
13  'elements' of the defense before the jury can weigh the
14  defendant's theory of reliance."
15          And to deprive — given the testimony, the sworn
16  testimony already from Mr. Concilla and Mr. Mueller, to
17  deprive Mr. Mueller of putting this information before the
18  jury — and at the end of this case, Your Honor, you can
19  decide whether — whatever decisions you want to make in terms
20  of what written instruction, if any, get provided, not only is
21  it the safe route, it's the route that's dictated by the Fifth
22  Circuit and in fairness in this case.
23          When Mr. Concilla stated, "your opinion that you
24  communicated to Mr. Mueller" — this is an example, Judge —
25  "was that the PPMs for the 575 Fund and the GRD Fund

1  adequately disclosed that he would be receiving compensation

2  in some form."

3          He said implicitly, yes.  He said, "I don't" —

4  again, it doesn't speak to it specifically, but implicitly,

5  yes.

6          So, again, we go back to where we started, which was

7  we're going to talk about these expenditures.  Mr. Mueller

8  shouldn't have gotten that money.  Kind of a strange theory.

9  He shouldn't have been compensated.  And here is direct

10  testimony from Mr. Concilla, said, of course, you know, my

11  advice included that area.

12          THE COURT:  What about the alternative argument that,

13  well, you invoke the attorney-client privilege at various

14  times during the deposition of this Concilla?

15          MR. DAVIS:  I'm glad that there is argument.  That

16  the waiver — there was a waiver that was given.  And I think

17  we can all agree that a waiver — you don't have to give up

18  all of your attorney-client relationship in order to meet the

19  burden of the reliance, so there was no assertion of privilege

20  on anything that was covered by this area on the reliance.

21          And so — and if there was an issue — and that's why

22  reading this deposition — Mr. Hulings did the deposition from

23  our side.  If there was an issue, the record is complete with

24  Mr. Hulings taking a break, coming back after conferring with

25  Mr. Mueller, and say, okay, this would be within the scope.

1  You can answer.

2          So some of the examples of what Your Honor is

3  mentioning was actually before that happened, Mr. Mueller

4  reentered and answered some of those questions.  Some he

5  didn't.  So, for example, there wasn't a waiver on post-2019

6  discussions, because that's not relevant to their claims or

7  defenses.  There wasn't a waiver on the SEC investigation.

8  That's not relevant -- I think we can all agree -- to their

9  claims or defenses.

10         So the waiver of attorney-client privilege was even

11 broader than necessary to match these issues on this advice.

12 And if they didn't agree with anything of that; for example --

13 I don't recall, because I wasn't there.  I think Mr. Nasse may

14 have been in those depositions with Mr. Mueller.  There was a

15 discussion -- because I've read the transcript a few times --

16 there was a discussion between Mr. Hulings and Mr. Nasse where

17 they said, well, we disagree with this exertion of privilege.

18 We'll take that up with the Court.

19         That never happened.  So if there was a dispute about

20 the scope of privilege or the -- or that then it could have

21 been taken up, but on a motion in limine to say King's X, even

22 though I've got sworn testimony from Mueller and Concilla and

23 I've got a waiver, you can't put any of that evidence on,

24 Judge, would just not, in our view, be an appropriate result.

25         THE COURT:  What about the accountants?  Are you

```
 1   going to try to argue that accountants gave some kind of
 2   accounting advice that's relevant here?
 3          MR. DAVIS:  Well, we are, depending upon their
 4   theory.  Again, the SEC has kind of molded their theory, and
 5   now it's more limited.  So I don't know if they are going to
 6   get into the fact of how Mr. Mueller received compensation, or
 7   what's noncompensation or loan proceeds.  If they are, then we
 8   need to show that he was advised to book it that way by
 9   accountants.  If they are not, then we don't need to.
10          So if that comes up, Judge, if they say,
11   "Mr. Mueller, why was this booked as a loan or AR?"  Then I
12   think it's undisputed that the accountants provided him that
13   advice to do that, and he testified to it.
14          If they are not going to get into that, then I don't
15   think we need the accountants.
16          THE COURT:  But I thought they testified that they
17   never provided any kind of tax or other advice concerning
18   compliance of security laws.  Is that true or not?
19          MR. DAVIS:  That may be true, but that's not the
20   point on the money coming out.  What they did do is prepare
21   the tax returns.  And what they did do is prepare those tax
22   returns consistent with how Mr. Mueller received these funds.
23   He didn't prepare the tax returns.
24          So the securities laws, we are not going to ask an
25   accountant to talk about securities laws.  But if they're
```

1   getting into, "Hey, why did you take — why was this booked as

2   a loan as opposed to W-2 comp or something else" —

3           THE COURT:  Well, I'm confused.  Why does that all

4   come into this case?

5           MR. DAVIS:  I don't think it should.

6           THE COURT:  What's the government say?

7           MR. NASSE:  Yeah, I don't think that's our position.

8           It was our view that, based on some of their witness

9   designations, Your Honor, that they were going to say, well,

10  the accountant said it was a loan; therefore, it was

11  permissible.  And our claim is that it may have been

12  permissible under the tax code, but it wasn't done necessarily

13  in accordance with the PPM and the disclosures to investors.

14          Introducing that evidence of an accountant is undue

15  privilege that will tell — you know, indicate to the jury

16  that there was some advice maybe that related to securities

17  compliance, because it's a professional, and we just think

18  that's an undue prejudice, given the fact that the actual is

19  relevant.

20          THE COURT:  Respond to that.

21          MR. DAVIS:  Yes.  I don't think we are going to offer

22  testimony of an accountant to say that loans were consistent

23  with securities laws or the PPM.  So that's not — I think

24  we're missing each other there.  We'd like to keep them on

25  board, because if they go forward and say, well, you received

1  your compensation based on the tax laws in a different way,

2  then that's why we would call them.  It sounds like they are

3  not planning on doing that, so maybe we just saved half a day

4  of trial.

5         MR. NASSE:  The only concern with that, Your Honor, I

6  think is if Mr. Mueller gets up and testifies and says, Well,

7  I ran this by my accountant, and they said it was -- you

8  know --

9         THE COURT:  Yes.

10        MR. NASSE:  -- appropriate.

11        THE COURT:  The ruling right now on that one, on

12 reliance of accountant -- that's the motion in limine by the

13 government -- is granted.

14        Now, let's go back to the attorneys.  I'm really

15 wrestling with this.  I'm concerned that if I deny it at this

16 stage -- and again, this is just a motion in limine.  So it's

17 not -- but I think I need to provide you enough guidance as to

18 how we're going to go forward in trial.

19        This is a very close call, and since it's such a

20 close call, I'll allow the lawyers to come up and then

21 Mr. Mueller to come up and say what they have to say, and

22 we'll see whether it's enough to get a jury instruction.  And

23 if it's not, the risk from the defendants' perspective is I'll

24 also instruct the jury to disregard all the evidence that they

25 heard on that point.

1          MR. DAVIS:  And Judge, we'll — we understand the

2    Court's ruling.  We'll take that up at the time.  There is

3    some case law that says, look, even if you don't get the

4    instruction, it can go towards your state of mind and good

5    faith, but we'll take that up at the time, Judge.

6          In terms of the instruction not to consider, I don't

7    think we have to get into that now, but at that time, Judge,

8    we'll reserve our right to show you some authority on that

9    point.

10          THE COURT:  I got it.  Thank you.

11          Number five, undisclosed opinion testimony.  Is there

12    any such?

13          MR. DAVIS:  I'm going to let Ms. Small address that

14    one, Your Honor, with the Court's permission.

15          MS. SMALL:  Good morning, Your Honor.  Caroline Small

16    for the defendant.

17          To your point, there is no undisclosed expert

18    testimony.  We timely disclosed our four nonretained experts

19    on April 6th.  There's been no —

20          THE COURT:  So this motion in limine is only talking

21    about Craig Rushford [sic], I believe, right?

22          MS. SMALL:  He was disclosed, Your Honor, on

23    April 6th.  They took his deposition two months later in June.

24    So he has been disclosed.  There was never any *Daubert*

25    challenge or any pretrial motion on these folks regarding the

1  exclude all of the witnesses pursuant to Federal Rule of

2  Evidence 615, with one exception, which would be our expert

3  Mr. Post, and ask him to be able to watch the testimony.

4          THE COURT:  Experts are excused from the rule.

5          MR. DIVINE:  I believe that's all we have, Your

6  Honor.  Thank you for your patience.

7          MR. DAVIS:  That's it, Judge.  Thank you.

8          THE COURT:  We'll see you-all.

9                      -o0o-

10     I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.  I

12  further certify that the transcript fees and format comply

13  with those prescribed by the Court and the Judicial Conference

14  of the United States.

15

16  Date:  12/04/23          /s/  *Gigi Simcox*
                             United States Court Reporter
17                           262 West Nueve Street
                             San Antonio TX 78207
18                           Telephone:  (210)244-5037

19

20

21

22

23

24

25